1  BONIFACIO B. GARCIA, CITY ATTORNEY (SBN 100761)
   EVA M. PLAZA (SBN 250321)
2  CHAKA C. OKADIGBO (SBN 224547)
   GARCIA CALDERON RUIZ, LLP
3  500 South Grand Ave., Suite 1100
   Los Angeles, California 90071
4  Telephone: (213) 347-0210
   Facsimile: (213) 347-0216
5

6  Attorneys for Defendant
   CITY OF WASCO
7

8              UNITED STATES DISTRICT COURT

9         EASTERN DISTRICT OF CALIFORNIA, FRESNO DIVISION

10

11  ROGER McINTOSH,                    | Case No: 107CV 0180 LJO-WMW

12          Plaintiff,                 | **JOINT STIPULATION REGARDING**
                                        | **FILING OF AMENDMENT  TO CROSS-**
13      vs.                            | **COMPLAINT PURSUANT TO RULE 15(a)**
                                        | **OF THE FEDERAL RULES OF CIVIL**
14  NORTHERN CALIFORNIA UNIVERSAL      | **PROCEDURE**
    ENTERPRISES, *et al.*              |
15                                      |
           Defendants.                 |
16                                      |
17

18              STIPULATION FOR AMENDMENT

19          IT IS HEREBY STIPULATED, pursuant to Rule 15(a) of the Federal Rules of Civil

20  Procedure, by and between Chaka C. Okadigbo of Garcia Calderon Ruiz, LLP, counsel for

21  defendant/cross-complainant City of Wasco, and Jeffrey A. Travis of the Law Offices of Borton

22  Petrini, LLP, counsel for plaintiff Roger McIntosh, that cross-complainant may file, on or before

23  December 11, 2008, a first amended cross-complaint, which cross- complaint is attached hereto.

24  ///

25  ///

26  ///

27  ///

28  ///

4848-1882-6499
                                    -1-

1  DATED:  November 18, 2008

2                                                  GARCIA CALDERON RUIZ, LLP

3

4

5                                                  By: _____

6                                                  CHAKA C. OKADIGBO
                                                   Attorneys for Defendant/Cross-Complainant
7                                                  CITY OF WASCO

8

9

10  DATED: November 18, 2008                       LAW OFFICES OF BORTON PETRINI

11

12

13

14                                                 By: _____/ s /_____

15                                                 JEFFREY A. TRAVIS
                                                   Attorneys for Plaintiff
16                                                 ROGER MCINTOSH

17

18

19

20

21

22

23

24

25

26

27

28

**JOINT STIPULATION REGARDING FILING OF AMENDMENT TO CROSS-COMPLAINT**
**PURSUANT TO RULE 15(a) OF THE FEDERAL RULES OF CIVIL PROCEDURE**

**ATTACHMENT**

Bonifacio B. Garcia, Esq.; SBN 100761
Eva M. Plaza, Esq.; SBN 250321
Chaka C. Okadigbo, Esq.; SBN 224547
GARCIA CALDERÓN RUIZ, LLP
500 S. Grand Avenue, Suite 1100
Los Angeles, California 90071
Telephone: (213) 347-0210
Facsimile:  (213) 347-0216
bgarcia@gcrlegal.com
eplaza@gcrlegal.com
cokadigbo@gcrlegal.com

Attorneys for Defendant
City of Wasco

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA, FRESNO DIVISION

| | |
|---|---|
| ROGER McINTOSH, | CASE NO.:  1:07-CV-01080LJO-GSA |
| Plaintiff, | |
| vs. | **FIRST AMENDED CROSS-COMPLAINT FOR CONTRACTUAL INDEMNITY [California Civil Code § 2772]; JURY TRIAL DEMAND** |
| NORTHERN CALIFORNIA UNIVERSAL ENTERPRISES COMPANY, a California corporation; LOTUS DEVELOPMENTS, LLP; THE CITY OF WASCO, a municipal corporation, and DOES 1 through 50, inclusive, | |
| Defendants. | |
| CITY OF WASCO, | |
| Cross-Complainant, | |
| vs. | |
| NORTHERN CALIFORNIA UNIVERSAL ENTERPRISES COMPANY, a California corporation, | |
| Cross-Defendant. | |

/ / /

/ / /

Defendant/Cross-Complainant City of Wasco (the "City" or "Cross-Complainant") alleges:

1.    This Court has supplemental jurisdiction over the claims asserted herein pursuant to 28 U.S.C. § 1367(a) in that they are related to the claims alleged in the *First Amended Complaint* on file in this action.

2.    The City is and was at all times mentioned herein a municipal corporation formed and organized under the laws of the State of California.

3.    Defendant and Cross-Defendant Northern California Universal Enterprises Company ("Cross-Defendant" or "NCUE") is and was at all times mentioned herein a California Corporation.

4.    Defendants DOE 1 through DOE 50, inclusive, are sued herein under fictitious names. Their true names and capacities are unknown to plaintiff. When their true names and capacities are ascertained, Cross-Complainant will amend this complaint by inserting their true names and capacities herein. Cross-Complainant is informed and believes and thereon alleges that each of the fictitiously named defendants is responsible in some manner for the occurrences herein alleged, and that Cross-Complainant's damages as herein alleged were proximately caused by those defendants. Each reference in this complaint to "cross-defendant," "defendant," "defendants," or a specifically named defendant or cross-defendant refers also to all defendants sued under fictitious names.

5.    On or about April 6, 2004, the City and Wasco Project, LLC entered into a *Purchase and Sale Agreement* ("*Agreement*") with respect to property commonly known as Valley Rose Estates. A true and correct copy of the *Agreement* is attached hereto as Exhibit A. Wasco Project, LLC was to acquire the Valley Rose Estates from the City of Wasco under the *Agreement*. Amongst other provisions, Wasco Project, LLC agreed, under section 6.3 of the *Agreement*, to purchase the property "as is" and without any warranties or representations from the City as to the property, improvements, contract rights or entitlements thereto, or as to the property's condition, state of repair or fitness for use.

6.      Wasco Project, LLC further agreed, under section 8 of the *Agreement*, to indemnify and hold the City harmless from "any and all claims, demands, losses, obligations, costs and expenses (including without limitation attorneys' fees and court costs) which arise out of … the ownership or operation of the Property after Closing."

7.      Wasco Project, LLC was unable to obtain financing to complete its purchase of the Valley Rose Estates under the *Agreement*. Accordingly, on May 18, 2004, Wasco Project, LLC assigned its rights and obligations under the *Agreement* to Cross-Defendant pursuant to an *Assignment of Purchase and Sale Agreement*. A true and correct copy of the *Assignment of Purchase and Sale Agreement* is attached hereto as Exhibit B. Cross-Defendant agreed to purchase the Valley Rose Estates from the City and to assume all obligations, covenants and promises previously made under the *Agreement* by Wasco Project, LLC. The City consented to Wasco Project, LLC's assignment and agreed to release it from all obligations under the *Agreement*.

8.      The parties also entered into an *Amendment to Purchase and Sale Agreement* that finalized the Valley Rose Estates sales transaction. A true and correct copy of the Amendment to Purchase and Sale Agreement is attached hereto as Exhibit C.

9.      The City conveyed the Valley Rose Estates to Cross-Defendant pursuant to the *Assignment of Purchase and Sale Agreement* and the *Amendment to Purchase and Sale Agreement*. Since conveying the Valley Rose Estates to Cross-Defendant, the City has performed all conditions and obligations to be performed on its part under the *Assignment of Purchase and Sale Agreement* and *Amendment to Purchase and Sale Agreement* with Cross-Defendant.

10.     On or about February, 2007, the City entered into a *Subdivision Agreement for Tract 6451* ("*Subdivision Agreement*") with Cross-Defendant relating to Cross-Defendant's development and subdivision of the Valley Rose Estates subdivision. A true and correct copy of the *Subdivision Agreement* is attached hereto as Exhibit D. Under the *Subdivision Agreement*, the City agreed to approve Cross-Defendant's final subdivision map and to accept all streets, alleys, easements and pedestrian ways dedicated or deeded to the City by Cross-Defendant in

1    exchange for Cross-Defendant's performance of specified obligations related to the installation

2    and maintenance of improvements on the Valley Rose Estates subdivision.

3        11.    The *Subdivision Agreement* contains indemnification and attorneys fees

4    provisions. Under the Section 10(a)(1) of the *Subdivision Agreement*, Cross-Defendant agreed to

5    "hold harmless and indemnify the City and its Council, officers and employees, from every

6    liability, claim, suit or demand which may arise or may be made by reason of any act, omission

7    or neglect of [Cross-Defendant], its engineers, employees, agents or contractor." Under Section

8    11 of the *Subdivision Agreement*, the parties agreed that: "If any suit be brought by the City for

9    the recovery of any sum due under this Agreement, for any damages for the breach of this

10   Agreement, or to compel performance of this Agreement, the City shall be entitled to such

11   portion of such reasonable attorney's fees as the Court may determine, in addition to its cost of

12   suit."

13       12.    On or about June 2, 2008, Plaintiff Roger McIntosh filed a *First Amended*

14   *Complaint*, alleging that Cross-Defendant infringed on its copyright by developing the Valley

15   Rose Estates with copyright protected subdivision plans and/or tentative maps that were prepared

16   by Martin-McIntosh exclusively for The Legacy Group, Ltd. in an earlier, but failed, attempt to

17   develop the same property. Plaintiff further alleges that he is now the exclusive owner of the

18   alleged copyright protected plans, having bought out his former business partner, Mr. Martin,

19   and that he did not permit Cross-Defendant to use the subdivision plans prepared by Martin-

20   McIntosh to develop the Rose Valley Estates.

21       13.    Plaintiff has also sued the City under a theory of contributory copyright

22   infringement.

23       14.    The City denies engaging in any acts that constitute contributory copyright

24   infringement.

25       15.    Plaintiff's suit against the City for contributory copyright infringement triggers

26   Cross-Defendant's obligation to indemnify the City pursuant to sections 10(a)(1) and 11 of the

27   *Subdivision Agreement* insofar as the City is being sued as a result of alleged acts, omissions or

28   neglect engaged in by Cross-Defendant, namely failing to obtain Plaintiff's consent to use

1    Plaintiff's copyrighted plans.

2        16.    The same underlying acts or omissions engaged in by Cross-Defendant that are

3    referenced in Paragraph 14 and/or that give rise to Plaintiff's instant suit against Cross-

4    Defendant and the City trigger an obligation by Cross-Defendant to indemnify the City pursuant

5    to section 8 of the *Agreement*, as incorporated into the *Assignment of Purchase and Sale*

6    *Agreement*. Specifically, under section 6.4 of the *Agreement*, Cross-Defendant "acknowledged

7    that the prior subdivision map for the Valley Rose Estates subdivision had expired and that it was

8    Cross-Defendant's "responsibility to obtain a new subdivision map or maps for the [Valley Rose

9    Estates subdivision]."

10       17.    Since entering into the *Assignment of Purchase and Sale Agreement*, Cross-

11   Defendant's alleged development and subdivision of the Valley Rose Estates subdivision has

12   given rise to the instant lawsuit by Plaintiff against the City and, as a result, entitles the City to

13   indemnification pursuant to the *Assignment of Purchase and Sale Agreement* and section 8 of the

14   *Agreement*. The City has incurred, and continues to incur, necessary and reasonable attorneys'

15   fees and other legal costs in prosecuting this action against Cross-Defendant and in defending

16   itself from Plaintiff's *First Amended Complaint*.

17       WHEREFORE, Cross-Complainant prays for judgment as follows:

18       1.    For all damages, if any, adjudged against Cross-Complainant with respect to

19   Plaintiff's cause of action against Cross-Complainant for contributory copyright infringement;

20       2.    For all Cross-Complainant's attorneys' fees and costs incurred in defending and

21   resolving Plaintiff's claims for contributory copyright infringement; and

22       3.    For such other relief as the court may deem proper.

23   / / /

24   / / /

25   / / /

26   / / /

27   / / /

28   / / /

**JURY TRIAL DEMAND**

Cross-Complainant demands a trial by jury on all issues triable of right by a jury.

Respectfully Submitted,

Dated: November __, 2008          GARCIA, CALDERÓN & RUÍZ, LLP


By: _____
                     Chaka C. Okadigbo
                     Attorneys for Defendants
                     CITY OF WASCO

# EXHIBIT A

EXHIBIT" 3 "

## PURCHASE AND SALE AGREEMENT

## AND JOINT ESCROW INSTRUCTIONS

This Purchase and Sale Agreement and Joint Escrow Instructions ("Agreement"), dated as of April 6th, 2004 is entered into by and between WASCO PROJECT LLC ("Buyer"), and CITY OF WASCO ("Seller").

WHEREAS, Seller is the sole owner in fee of two parcels of real property which contain approximately +/- 97.57 acres which are located in the City of Wasco, and are more particularly described in Exhibit "A" attached hereto and incorporated herein by this reference (the "Property"); and

WHEREAS, the Property is subject to over Four Million Dollars in Assessment Liens; and

WHEREAS, the Property has been partially developed and is currently in a blighted condition; and

WHEREAS, the best use of the Property is for private development; and

WHEREAS, it is for the public benefit that said Property be sold; and

WHEREAS, Buyer desires to purchase from Seller and Seller desires to sell to Buyer the Property on the terms and conditions set forth herein.

Buyer and Seller hereby agree as follows:

1.     Purchase and Sale.  Upon and subject to the terms and conditions set forth in this Agreement, Seller hereby agrees to sell to Buyer and Buyer hereby agrees to buy from Seller the following property (collectively, the "Property"):  that certain real property located in the County of Kern, State of California, more particularly described in Exhibit "A" attached hereto, together with all easements, hereditaments and appurtenances thereto, and all improvements situated thereon; and all other rights and interests in connection with the foregoing.

2.     Purchase Price.  The purchase price for the Property (the "Purchase Price") shall be $ 1,950,000.00

3.     Method of Payment of Purchase Price.  The Purchase Price shall be paid by Buyer to Seller upon the Closing (as that term is defined in Paragraph 4.3, below).  Buyer shall make the following deposits into the Escrow (as defined in Paragraph 4.1, below):

3.1     Deposit.  Buyer shall deposit into the Escrow, at the Opening, the sum of __ # 195,000.00  (10% of the Purchase Price) (the "Deposit").  Escrow Holder (as defined in Paragraph 4.1, below) shall invest the Deposit in an interest-bearing account and the interest earned on such account shall be applied as provided in this Agreement.

3.2     Cash At Closing.  Buyer shall deposit into the Escrow in the form of cash, a certified or bank cashier's check or a confirmed wire transfer of funds, on or before the Closing Deadline, the balance of the Purchase Price remaining after deduction of the Deposit (and interest earned thereon in Escrow).  The amount payable by Buyer pursuant to this Paragraph 3.2 shall be adjusted as necessary to reflect the costs and prorations payable pursuant to Paragraph 4.7, below.

4.      Escrow.

4.1     Opening; Joint Instructions.  Within five (5) days after the execution of this Agreement, Buyer and Seller shall open an escrow (the "Escrow") with Fidelity National Title Company, whose address is 110 New Stine Road, Bakersfield, California ("Escrow Holder"), by delivering to Escrow Holder a fully-executed copy of this Agreement (the "Opening").  The purchase and sale of the Property shall be completed through the Escrow.  This Agreement, together with the provisions of Exhibit "B" attached hereto and incorporated herein by this reference, shall constitute joint escrow instructions to the Escrow Holder in connection with the Escrow.  In the event of any inconsistency between the typed provisions of this Agreement and the provisions of Exhibit "B", the typed provisions of this Agreement shall prevail.

4.2     Additional Instructions.  Buyer and Seller hereby agree to execute such additional instructions not inconsistent with this Agreement as may be reasonably required by the Escrow Holder.

4.3     Closing Deadline.  The Grant Deed (as defined in Paragraph 4.4, below) shall be recorded and the Escrow shall close (the "Closing") as soon as possible after the satisfaction of all of the conditions contained in this Agreement, including but not limited to Section 7.1, but in no event later than June 1st, 2004 (the "Closing Deadline").  Time is specifically of the essence as to the Closing Deadline, and the Closing Deadline shall not be extended except by the mutual written agreement of Buyer and Seller.

4.4     Seller's Closing Documents.  Seller shall deliver to the Escrow Holder, on or before the date two (2) business days prior to the Closing Deadline, the following documents:

(a)     a Grant Deed to the Property duly executed and acknowledged by the Seller in favor of Buyer and in recordable form (the "Grant Deed"); and

(b)     other instruments and documents that may be required by the Escrow Holder to transfer the Property to Buyer.

4.5     Actions at Closing.   At the Closing, the Escrow Holder shall do the following:

(a)     Prorate all matters in accordance with Paragraph 4.7, below, based on the latest available information.

(b)     Cause the Grant Deed to be recorded in the Official Records of the county in which the Property is located.

(c)     Deduct from funds deposited with the Escrow Holder by Buyer in payment of the Purchase Price for the Property for the amount of items chargeable to the account of Seller pursuant to this Agreement;

(d)     The remaining balance of the funds deposited by Buyer into the Escrow in payment of the Purchase Price shall be disbursed for the benefit of the Seller promptly upon the Closing in accordance with separate escrow instructions to be provided to the Escrow.

(e)     Deliver or cause to be delivered to Buyer an original of the owner's policy of title insurance, or commitment therefor, to be issued pursuant to Paragraph 5.2, below, and deliver to Buyer a conformed copy of the Grant Deed.

4.6     Cancellation of Escrow.

(a)     In the event that the Closing does not occur at the time and in the manner provided in this Agreement due to the material failure of Buyer to comply with any of its obligations under this Agreement ("Buyer Default"), Seller shall have the right to cancel the Escrow by written notice to Buyer and the Escrow Holder, and upon such cancellation all costs of cancellation of the Escrow, including without limitation the cost of the preliminary title report furnished to Buyer pursuant to Paragraph 5.1, below (collectively, the "Cancellation Costs"), shall be paid by Buyer.

(b)     In the event that the Closing does not occur at the time and in the manner provided in this Agreement due to the material failure of Seller to comply with any of its obligations under this Agreement ("Seller Default"), Buyer shall have the right to cancel the Escrow by written notice to Seller and the Escrow Holder, and upon such cancellation the Cancellation Costs shall be paid by Seller, and the Escrow Holder shall refund to Buyer the Deposit and all interest earned thereon in Escrow.

(c)     In the event that the Closing does not occur at the time and in the manner provided in this Agreement for any reason other than a Buyer Default or a Seller Default, either Buyer or Seller may, at any time after the Closing Deadline, cancel the Escrow by written notice to the Escrow Holder and to the other; and upon such cancellation, the Cancellation Costs shall be divided equally between Buyer and Seller, and Escrow Holder shall refund to Buyer the Deposit and all interest earned thereon in Escrow.

(d)     Upon any cancellation of the Escrow, all instruments and documents deposited into the Escrow shall be returned to the parties who deposited the same, and any amounts deposited into the Escrow by Buyer pursuant to Paragraph 3, above, shall be returned to Buyer.

4.7     Closing Costs and Prorations.  The costs incidental to the Closing shall be paid as follows:

(a)     Seller shall pay:  (i) the cost of the preliminary title report furnished to Buyer pursuant to Paragraph 5.1, below; (ii) the premium for the CLTA standard coverage owner's policy of title insurance obtained pursuant to Paragraph 5.2, below (provided that if Buyer elects to obtain an ALTA extended coverage policy of title insurance or any endorsements to the policy of title insurance pursuant to Paragraph 5.2, below, Buyer shall pay the additional premium for such policy over the premium for a CLTA policy and the additional premium for any endorsements to the policy of title insurance); (iii) the documentary transfer tax on the Grant Deed; and (iv) the Escrow Holder's fees in connection with the Escrow.

(b)     Buyer shall pay:  (i) the cost of recording the Grant Deed; (ii) one-half (1/2) of the Escrow Holder's fees in connection with the Escrow; and (iii) the additional premium for an ALTA extended coverage policy of title insurance over the premium for a CLTA policy, in the event that Buyer elects to obtain an ALTA policy pursuant to Paragraph 5.2, below, and the additional premium for any endorsements to the policy of title insurance.

(c)     Buyer and Seller shall each pay their own legal fees and other incidental expenses incurred in connection with the transaction contemplated by this Agreement.

(d)     Any other costs or expenses in connection with the transactions contemplated by this Agreement shall be apportioned in the manner customary in the County in which the Property is located.

(e)     As between Buyer and Seller only, Buyer shall be responsible for all real and personal property taxes and assessments for the Property relating to the period commencing on or after the Closing, and the Seller shall be responsible for all real and personal property taxes and assessments for the Property relating to the period prior to the Closing, if any.

5.     Title.

5.1     Preliminary Title Report.  Seller shall furnish Buyer, as soon as available, a preliminary title report for the Property prepared by Fidelity National Title Company (the "Title Company"), together with copies of the documents described in such report (collectively, the "Title Documents").  Buyer shall have ten (10) business days after receipt of the Title Documents (the "Title Approval Period") to approve the same.  If Buyer fails to deliver a written notice disapproving the Title Documents to the Escrow

Company on or before the last day of the Title Approval Period, Buyer shall be conclusively deemed to have approved the Title Documents and the exceptions contained therein. If Buyer timely disapproves the Title Documents, Buyer at its option may (a) cancel the Escrow and this Agreement by written notice to Seller and the Escrow Holder, in which case the Cancellation Costs shall be paid by Seller, or (b) permit Seller to remove the objectionable items from title. If Seller does not remove such items before the Closing Deadline, Buyer at its option may (x) waive its objection and close the transaction or (y) cancel the Escrow and this Agreement by written notice to Seller and the Escrow Holder, in which case the Cancellation Costs shall be paid by Seller.

5.2     Title Insurance.  At the time of the Closing and as a condition thereto, the Escrow Holder shall deliver to Buyer an original of either a CLTA standard coverage owner's policy of title insurance issued by the Title Company or an unconditional and unqualified commitment by the Title Company to issue such a policy, naming Buyer as insured, in a policy amount equal to the Purchase Price, showing title to the Property to be vested in Buyer, subject only to (a) non-delinquent taxes and assessments (provided that the lien of all current and future assessments for the Wasco Assessment District 1992-2 (Valley Rose Estates) ("Assessment Liens") shall be released concurrently with the Closing), and (b) the exceptions contained in the Title Documents approved or deemed approved by Buyer pursuant to Paragraph 5.1, above. Buyer shall have the right to elect to receive an ALTA owner's extended coverage policy of title insurance with the same liability amount and subject only to the exceptions described in (a) and (b), above in this Paragraph 5.2, in lieu of such CLTA policy, provided that Buyer pays the difference in premium and any costs of required new surveys attributable to such policy and provided further that the procurement of such policy shall not result in an extension of the Closing Deadline. Notwithstanding the foregoing, the Seller shall have no obligation to remove or eliminate any lien or encumbrance affecting title to the Property, including but not limited to the assessment liens.

6.     Buyer's Conditions.  The following shall constitute conditions to the obligations of Buyer under this Agreement:

6.1     Title Insurance.  Receipt by Buyer of a title insurance policy in the manner provided in Paragraph 5.2, above.

6.2     Inspections.  Approval by Buyer, on or before the date ten (10) business days after the Opening (the "Inspection Period"), of all conditions of, and other matters related to, the Property, specifically including the following matters, which shall be deemed approved unless Seller receives written notice of disapproval on or before the last day of the Inspection Period:

(a)     The physical condition of the Property, including without limitation soil conditions, the absence from the Property of asbestos and other hazardous and toxic materials, compliance of the Property with all applicable laws, including any laws relating to hazardous and toxic materials. Seller shall cause the Owners to allow Buyer and/or its agents access to the Property to perform any and all investigations and inspections desired by Buyer, provided that

Buyer shall indemnify and hold Seller and the Owners harmless from and against any and all claims, demands, losses, obligations, costs and expenses (including attorneys' fees and costs) resulting from such entry; and

(b)      All applicable government ordinances, rules and regulations and evidence of Seller's compliance therewith, including without limitation zoning and building regulations, and all licenses, permits and other governmental approvals and/or authorizations relating to the Property, including the suitability of the Property for Buyer's intended use and/or development; and

(c)      All costs and economic feasibility of Buyer's use and/or intended development of the Property.

The foregoing indemnity in Section 6.2(a) by Buyer shall survive the Close of Escrow and the recordation of the Grant Deed, or the earlier termination of this Agreement.

6.3      AS-IS Transaction. Buyer hereby acknowledges and agrees that Seller has made no representations or warranties, express or implied, as to the Property or improvements or contract rights or entitlements relating thereto, or as to the condition, state of repair or fitness for use of the Property or such improvements or appurtenances, and (ii) Buyer shall, following satisfaction of the conditions contained in this Paragraph 6 , accept title to the Property and any improvements thereon or appurtenances thereto "AS IS" and without warranty, express or implied. Buyer acknowledges that Seller has not induced Buyer to execute and deliver this Agreement based upon any representations or warranties of Seller and that Buyer is relying upon Buyer's own independent investigation of the Property in entering into this Agreement and purchasing the Property.

6.4      Subdivision Site. Seller and Buyer acknowledge that the Property is in a blighted condition and is an old subdivision site that has not been completed which contains infrastructure improvements that have been constructed and Buyer accepts the responsibility for taking any and all actions necessary regarding security and maintenance of the improvements. Buyer further acknowledges that the Subdivision Map has not been finalized and that the time for finalizing said Map has expired and it is Buyer's responsibility to obtain a new subdivision map or maps for the Property.

7.      Seller's Condition. The obligations of the Seller under this Agreement shall be conditioned upon the Seller obtaining all appropriate releases of the Assessment Liens from all interested parties thereto, including, without limitation, obtaining any court orders or other instructions with respect to such Assessment Liens or any related public financing that it may determine necessary, in its sole discretion. Failure of Seller to obtain releases of the Assessment Liens or court orders will not be considered an event of default by Seller.

7.1      CONDITIONS PRECEDENT TO CITY CONVEYANCE. Prior to, and as conditions to the City Conveyance, the following conditions shall be completed:

(a)  Prior to April 15th, 2004, the Buyer shall submit to the Seller evidence that the Buyer has obtained sufficient equity capital and firm and binding

commitments for interim and/or permanent financing necessary for the purchase of the Property in accordance with this Agreement. Such evidence of financing shall include copies of all conditional and firm financing commitments and any permanent financing commitments or other documents that indicate Buyer's ability to finance the purchase of the Property. Conditional commitments shall be firm and binding commitments subject only to standard conditions required by the lender. Proof of funding acceptance of each loan commitment by Buyer and proof of payment of all loan commitment fees required to fund the financing commitments and proof of funding of equity capital contributions shall also be required.

(b)    Material Default.   Buyer shall not be in material default of any provision of this Agreement.

(c)    Settlement Agreement and Mutual Release.   The Seller shall enter into a Settlement Agreement and Mutual Release with Michael Richardson and Badger Technology, Inc. and all the terms and conditions of said Agreement shall be satisfied by May 21st, 2004.

(d)    Workout Agreement   The Seller shall enter into a satisfactory agreement with U.S. Bank National Association in its capacity as the Trustee for the Wasco Public Financing Authority 1989 Local Agency Revenue Bonds Series A and the Assessment District No. 1992-2 Assessment District Bonds, Michael Richardson and Badger Technology, Inc. and all the terms and conditions of said agreement shall be satisfied by May 21st, 2004.

8.    Buyer's Indemnity; Release.   Buyer hereby agrees, following the Closing, to indemnify and hold Seller harmless from and against any and all claims, demands, losses, obligations, costs and expenses (including without limitation attorneys' fees and court costs) which arise out of (a) the ownership or operation of the Property after the Closing, or (b) any alleged presence upon the Property of, or any required remediation of, any hazardous or toxic materials. In addition, Buyer hereby waives, releases and forever discharges Seller of and from any and all claims of any kind whatsoever, at law or in equity, known or unknown, which Buyer has ever had, now has, or hereafter can have arising out of any condition of or matter related to the Property, specifically including the alleged presence upon the Property of, or any required remediation of, any hazardous or toxic materials. Buyer hereby agrees to waive the benefits of Section 1542 of the Civil Code of the State of California, which provides as follows:

"A general release does not extend to claims which the creditor does not know or suspect to exist in his favor at the time of executing the release, which if known by him, must have materially affected his settlement with the debtor."

9.    Possession.   Upon the Closing, Seller shall cause possession of the Property to be delivered to Buyer.

10.    <u>Representations and Warranties of Buyer</u>.  Buyer hereby represents and warrants to Seller as follows:

(a)  Buyer has full authority to enter into this Agreement and all documents executed by Buyer which are to be delivered to Seller at the Closing are or at the time of Closing will be duly authorized, executed and delivered by Buyer and do not and at the time of Closing will not violate any provisions of any agreement or judicial order to which Buyer is a party or to which Buyer or the Property is subject.

(b)  The Buyer does not have any material contingent obligations or any material contractual agreements which could materially adversely affect the ability of the Buyer to carry out its obligations in this Agreement.

(c)  There are no material pending or, so far as is known to the Buyer, threatened legal proceedings to which the Buyer is or may be made a party or to which any of its property is or may become subject, which has not been fully disclosed in the material submitted to the Seller which could materially and adversely affect the ability of the Buyer to carry out its obligations in this Agreement.

(d)  Buyer has the full financial where with all to secure financial commitments to be able to purchase the Property on the terms and conditions set forth in this Agreement.

(e)  The Buyer shall maintain the improvements on the Property and shall keep the Property free from any accumulation of debris, weeds, or waste materials.

(f)  The Buyer covenants and agrees for itself, its successors, its assigns and every successor-in-interest to the Property or any part thereof, there shall be no discrimination against or segregation of any person, or group of persons, on account of sex, marital status, race, color, religion, creed, national origin, ancestry or handicap in the sale, lease, sublease, transfer, use, occupancy, tenure or enjoyment of the Property, nor shall the Buyer, itself or any person claiming under or through it, establish or permit any such practice or practices of discrimination or segregation with reference to the selection, location, number, use or occupancy of tenants, lessees, subtenants, sublessees or employees.

11.    <u>Liquidated Damages on Buyer Default</u>.  AS USED IN THIS AGREEMENT, "BUYER DEFAULT" SHALL MEAN THE FAILURE OF BUYER TO COMPLY WITH ANY PROVISION HEREOF AND SHALL INCLUDE ANY FAILURE OF THE CLOSING TO OCCUR (AFTER SATISFACTION OF THE CONDITIONS SET FORTH IN PARAGRAPH 6, ABOVE) AT THE TIME AND IN THE MANNER PROVIDED IN THIS AGREEMENT FOR ANY REASON OTHER THAN THE MATERIAL FAILURE OF SELLER TO COMPLY WITH ANY OF ITS OBLIGATIONS UNDER THIS AGREEMENT. BUYER AND SELLER HEREBY ACKNOWLEDGE AND AGREE THAT, IN THE EVENT OF A BUYER

DEFAULT, SELLER WILL SUFFER DAMAGES IN AN AMOUNT WHICH WILL, DUE TO THE SPECIAL NATURE OF THE TRANSACTION CONTEMPLATED BY THIS AGREEMENT AND THE SPECIAL NATURE OF THE NEGOTIATIONS WHICH PRECEDED THIS AGREEMENT, BE IMPRACTICAL OR EXTREMELY DIFFICULT TO ASCERTAIN.  IN ADDITION, BUYER WISHES TO HAVE A LIMITATION PLACED UPON THE POTENTIAL LIABILITY OF BUYER TO SELLER IN THE EVENT OF A BUYER DEFAULT, AND WISHES TO INDUCE SELLER TO WAIVE OTHER REMEDIES WHICH SELLER MAY HAVE IN THE EVENT OF A BUYER DEFAULT. BUYER AND SELLER, AFTER DUE NEGOTIATION, HEREBY ACKNOWLEDGE AND AGREE THAT THE AMOUNT OF THE DEPOSIT, TOGETHER WITH INTEREST EARNED THEREON IN ESCROW, REPRESENTS A REASONABLE ESTIMATE OF THE DAMAGES WHICH SELLER WILL SUSTAIN IN THE EVENT OF SUCH BUYER DEFAULT. BUYER AND SELLER HEREBY AGREE THAT SELLER MAY, IN THE EVENT OF A BUYER DEFAULT, TERMINATE THIS AGREEMENT AND THE ESCROW BY WRITTEN NOTICE TO BUYER AND RETAIN THE DEPOSIT, TOGETHER WITH INTEREST EARNED THEREON IN ESCROW, AS LIQUIDATED DAMAGES. SUCH RETENTION OF THE DEPOSIT AND INTEREST EARNED THEREON IN ESCROW BY SELLER IS INTENDED TO CONSTITUTE LIQUIDATED DAMAGES TO SELLER PURSUANT TO SECTIONS 1671, 1676 AND 1677 OF THE CALIFORNIA CIVIL CODE, AND SHALL NOT BE DEEMED TO CONSTITUTE A FORFEITURE OR PENALTY WITHIN THE MEANING OF SECTION 3275 OR SECTION 3369 OF THE CALIFORNIA CIVIL CODE, OR ANY SIMILAR PROVISIONS.  FOLLOWING THE TERMINATION OF THIS AGREEMENT, CANCELLATION OF THE ESCROW AND RETENTION OF THE DEPOSIT AND INTEREST EARNED THEREON IN ESCROW AS LIQUIDATED DAMAGES PURSUANT TO THIS SECTION 10, ALL OF THE RIGHTS AND OBLIGATIONS OF BUYER AND SELLER UNDER THIS AGREEMENT SHALL BE TERMINATED. RETENTION OF THE DEPOSIT AND INTEREST EARNED THEREON IN ESCROW AND TERMINATION OF THIS AGREEMENT AND THE ESCROW AS PROVIDED HEREIN SHALL BE SELLER'S SOLE AND EXCLUSIVE REMEDY IN THE EVENT OF BUYER DEFAULT, AND SELLER EXPRESSLY WAIVES ITS RIGHT TO SPECIFIC ENFORCEMENT OF THIS AGREEMENT IN SUCH EVENT.

BUYER AND SELLER ACKNOWLEDGE THAT THEY HAVE READ AND UNDERSTAND THE PROVISIONS OF THIS SECTION 9 AND BY THEIR INITIALS IMMEDIATELY BELOW AGREE TO BE BOUND BY ITS TERMS.

"Seller":

City of Wasco

"Buyer":

12.   Seller Default.  If there is a material default by Seller under this Agreement (which remains uncured ten (10) days after notice from Buyer to Seller), then Buyer may, at its sole remedy hereunder, terminate this Agreement upon written notice to Seller and Escrow Holder, in which case the Deposit shall be paid to Buyer and each party shall be released from all obligations hereunder, provided, however, Buyer shall be entitled to receive reimbursement from Seller for its actual "out-of-pocket" costs and expenses incurred in connection with its investigation of the Property, in no event to exceed $10,000.00. The foregoing remedies are the

only remedies of Buyer hereunder in the event of Seller's default under this Agreement, and Buyer shall not be entitled to, and hereby waives all right to seek any other damages, specific performance, or any other remedies that otherwise may be available at law or in equity to it. Under no circumstances shall Buyer have the right to file a lis pendens against the Property.

13.    Notices.  All notices, approvals, disapprovals or elections required or permitted to be given under this Agreement shall be in writing and shall be delivered personally, or mailed, certified or registered mail, return receipt requested, or sent by Federal Express or other professional courier, to the parties at the following addresses:

If to Buyer:    WASCO PROJECT LLC
                P.O. BOX 12263
                MILL CREEK, WA 98082
Attention:      MEL RADFORD
Telephone:      425 - 239 - 6626
Fax:            425 - 337 - 7320
Email:          MEL.RADFORD@ATT.NET

If to Seller:   City of Wasco
                P.O. Box 190
                Wasco, CA 93280
Attention: Deu Gibson City Clerk
Telephone:      (661) 758-7200
Fax:            (661) 758-5411
Email: DRGIBSAN@CI.WASCO.CA.US

And a copy to:

                Wall, Wall & Peake
                1601 "F" Street
                P.O. Box 2507
                Bakersfield, CA 93303
                Attention:    Alan J. Peake, Esq.
                Telephone:    (661) 327-8461
                Fax:          (661) 327-8568
                Email: ajpesq@pacbell.net

Personally delivered and courier-delivered notices shall be deemed given upon actual personal delivery or tender of delivery to the intended recipient. Mailed notices shall be deemed given upon the date of actual delivery or tender of delivery as evidenced by the return receipt.

14.    Attorneys' Fees.  In the event of any action between Buyer and Seller for enforcement or interpretation of any of the terms or conditions of this Agreement, the prevailing party in such action shall be entitled to recover its reasonable costs and expenses, including without limitation court costs and attorneys' fees actually incurred, as awarded by a court of competent jurisdiction.

WG2-LA:LYL\70662279.1                         -10-

15.   Brokers. Except for RADFORD & ASSOCIATES INC., A WASHINGTON CORP. ("Broker"), who shall be paid THREE HUNDRED THOUSAND   ($ 300,000.00)   by Buyer when the Property is transferred, each party represents and warrants to the other that no broker or real estate agent has been engaged by it in connection with this Agreement or the subject transaction. Buyer shall be solely responsible for any commission due to Broker. Buyer and Seller each hereby indemnify and hold the other harmless from and against all costs, expenses or liabilities (including without limitation attorneys' fees and court costs, whether or not taxable and whether or not any action is prosecuted to judgment) incurred by the indemnified party in connection with any claim or demand by any person or entity for any broker's, finder's or other commission or fee in connection with the indemnifying party's entry into this Agreement and the transactions contemplated hereby.

16.   Effect and Duration Covenants, Conditions and Obligations which are for Seller's Benefit.   The covenants established in this Agreement and the Grant Deed shall, without regard to technical classification and designation, be binding for the benefit and in favor of the Seller, its successors, and assigns, as to those covenants which are for its benefit. The covenants, contain in this Agreement and the Grant Deed (Attachment No. 3) shall remain in perpetuity.

The Seller is deemed the beneficiary of the terms and provisions of this Agreement and of the covenants running with the land, for and in its own rights and for the purposes of protecting the interests of the community and other parties, public or private, in whose favor and for whose benefit this Agreement and the covenants running with the land have been provided. The Agreement and the covenants shall run in favor of the Seller without regard to whether the Seller has been, remains or is an owner of any land or interest therein in the Property. The Seller shall have the right, if the Agreement or covenants are breached, to exercise its rights and remedies, and to maintain any actions or suits at law or in equity or other proper proceedings to enforce the curing of such breaches to which it or any other beneficiaries of this Agreement and covenants may be entitled.

17.   Continuation and Survival of Representations, Warranties and Covenants.   All representations, and covenants by the respective parties contained herein or made in writing pursuant to this Agreement are intended to and shall remain true and correct as of the Close of Escrow, shall be deemed to be material, and shall survive the execution and delivery of this Agreement, the delivery of the Grant Deed and transfer of title.

18.   Conflict of Interest.   No member, official or employee of the Seller shall have any personal interest, direct or indirect, in this Agreement nor shall any such member, official or employee participate in any decision relating to the Agreement which affects his or her personal interests or the interests of any corporation, partnership or association in which he or she is directly or indirectly interested.

19.   Non-Liability of Seller Officials and Employees.   No member, official, employee, consultant, Attorney, or independent contractor of the Seller shall be personally liable to the Buyer, or any successor-in-interest, in the event of any default or breach by the Seller or for any amount which may become due to the Buyer, or to its successor, or on any obligations under the terms of this Agreement.

20.  INVALIDITY OF TERMS.  It is hereby declared to be the intention of the parties that the sections, paragraphs, sentences, clauses and phrases of this Agreement are severable, and if any phrase, clause, sentence, paragraph or section of this Agreement shall be declared unconstitutional, invalid or unenforceable by a judgment or decree of a court of competent jurisdiction, such unconstitutionality, invalidity or unenforceability shall not affect any of the remaining clauses, sentences, paragraphs and sections of this Agreement.

21.  TIME FOR ACCEPTANCE OF AGREEMENT BY SELLER.  This Agreement, when executed by the Buyer and delivered to the Seller must be authorized, executed and delivered by the Seller within thirty (30) days after the date of signature by the Buyer or this Agreement may be terminated by the Buyer on written notice to the Seller.  The date of this Agreement shall be the date when the Agreement shall have been signed by the Seller.

/ / /

/ / /

/ / /

/ / /

22.   Miscellaneous.   This Agreement, together with the documents described and referred to herein, contains all of the agreements of Buyer and Seller with regard to the transactions contemplated hereby, and supersedes all prior agreements, understandings and negotiations, whether written or oral. This Agreement shall not be modified or amended except by an instrument in writing duly executed by both Buyer and Seller. This Agreement may be executed in counterparts either by original signature or facsimile thereof, each of which shall be deemed to be an original, and all counterparts shall together constitute the Agreement. The provisions of this Agreement shall be binding upon and shall inure to the benefit of the successors in interest and assigns of Buyer and Seller; provided, however, that Buyer shall have no right to assign its rights or obligations hereunder without the express prior written consent of Seller. This Agreement shall be governed by and construed in accordance with the laws of the State of California. The paragraph headings and captions in this Agreement are for convenience only and shall not limit or define the contents of this Agreement. This Agreement shall survive the Closing, and shall not merge into the Grant Deed upon recordation. Time is of the essence of this Agreement. As used in this Agreement, "business day" shall mean any day except Saturday, Sunday or a day on which banking institutions in California are required or allowed to close for business.

IN WITNESS WHEREOF, Seller and Buyer have caused this Agreement to be duly executed as of the date first above written.

"Buyer"

WASCO   PROJECT   LLC

By: _____ (MEL RADFORD)
   _____ (JAMES COUSNARD)

Its: _____ MANAGING   MEMBERS

"Seller"

CITY OF WASCO

By: _____
   Danny Espitia

Its:   Mayor

ATTEST:

_____
City Clerk

EXHIBIT B

## ASSIGNMENT OF PURCHASE AND SALE AGREEMENT

This Assignment of Purchase and Sale Agreement (the "Agreement") is entered into as of May 18th, 2004 by and between the City of Wasco, a municipal corporation ("City"), Wasco Project, LLC. ("Assignor") and Northern California Universal Enterprises, a California Limited Partnership ("Assignee") with reference to the following facts:

A.   The City and Assignor have entered into that certain Purchase and Sale Agreement dated April 6th, 2004 ("Purchase Agreement") with respect to property commonly known as Valley Rose Estates as more specifically described in the Purchase Agreement ("Property").

B.   Assignor is not able to obtain financing to complete the purchase of the Property as required under the Purchase Agreement and Assignor is currently in default under the Purchase Agreement.

C.   Assignor desires to assign all of its rights and obligations under the Purchase Agreement to avoid liability for being in default under the Purchase Agreement.

D.   Assignee desires to purchase the Property and is willing to accept assignment of Assignor's rights and obligations under the Purchase Agreement so long as certain amendments to the Purchase Agreement are made.

E.   Assignor has entered into other agreements in which the City is a party, which Assignor will not be able to meet the terms and conditions of and which will also need to be assigned to Assignor.

NOW THEREFORE, in consideration of the foregoing, of the mutual promises of the parties hereto and for other good and valuable consideration the receipt and sufficiency of which are hereby acknowledged, the parties mutually agree as follows:

1.   <u>Assignment by Assignor.</u>  The Assignor hereby assigns and delegates to the Assignee, and the Assignee hereby accepts from the Assignor, all of the Assignor's rights, title and interest in and any and all obligations under the Purchase Agreement.

2.   <u>Acceptance of Assignment.</u>  The Assignee hereby accepts the above assignment and hereby assumes, agrees and undertakes to perform all of the obligations, covenants and promises of the Assignors pursuant to the Purchase Agreement.  Any reference to the Assignor, in the Purchase Agreement shall be deemed a reference to the Assignee.  The Assignee shall reimburse the Assignor for any amount paid by the Assignor under any of the agreements, contracts and proposals described above.

3.   <u>Release of Assignor.</u>  The City hereby consents to the assignment by Assignor to Assignee and to the release of the Assignor from all obligations imposed under the Purchase Agreement.

4.      Effective Date.  The assignment set forth above shall be effective as of the date of this Agreement.

5.      Additional Assignments.  As additional consideration of the execution of this Agreement, the parties will execute the Assignment of the Supplemental Golf Course Bonds Agreement attached hereto as Exhibit "1" and the assignment of the Workout Agreement attached hereto as Exhibit "2".

6.      Amendment to Purchase Agreement.  The City and Assignee agree to amend the Purchase Agreement as set forth in Exhibit "3".

7.      Cooperation.  The Parties acknowledge that it may be necessary to execute additional documents or take additional actions other than those specifically referred to herein in order to complete the assignment contemplated by this Agreement.  Therefore, each party hereto agrees to cooperate with each other by executing such other documents or taking such other action as may be reasonably necessary to complete the transactions contemplated by this Agreement in accordance with the intent of the parties as evidenced in this Agreement.

8.      Amendment.  This Agreement may be amended only by a written instrument executed by the parties hereto or their successors in interest.

9.      Integration.  This Agreement constitutes the entire agreement between the parties hereto pertaining to the subject matter hereof and all prior and contemporaneous agreements, representations, negotiations and understandings of the parties hereto, oral or written are hereby superseded and merged herein.

10.     Representations and Warranties.  Each of the parties hereto represents and warrants to each other party hereto that the execution and delivery of this Agreement and the performance of their obligations hereunder have been duly authorized and that this Agreement is a valid and legal agreement binding on him, her or it and enforceable in accordance with its terms.  Each of the parties hereto each also represents and warrants to each other party hereto that he, she or it has not assigned any rights or claims against any of the other parties hereto to any third party.

11.     Interpretation:  The provisions of this Agreement shall be construed and interpreted neutrally, as if drafted by all parties, and shall not be construed or interpreted as against any party hereto.

12.     Counterparts:  The Agreement may be executed in counterparts, each of which, when executed and delivered, shall be deemed to be an original, but such counterparts together constitute one and the same document.

13.     Facsimile.  Except for documents that must be recorded on real property title records, facsimile copies of signed documents shall be deemed originals for all purposes.

14.     Governing Law.  California law shall apply for purposes of enforcement and interpretation of this Agreement.

15.     Time is of the Essence.  Time is of the essence with regard to each covenant, condition and provision of this Agreement.

16.     Attorneys' Fees.  In any proceeding brought by any party to this Agreement regarding the terms, conditions, obligations, and/or covenants of this Agreement, the prevailing party shall be entitled to recover its reasonable attorney's fees and costs of litigation in addition to any other relief awarded in such proceeding.


IN WITNESS WHEREOF, the parties have executed this Agreement as of the date first written above.

**ASSIGNOR**

Wasco Project, LLC

By:_____
Name:_____
Its:_____

By:_____
Name:_____
Its:_____


**ASSIGNEE**

Northern California Universal Enterprises

By:_____
Name:_____
Its:_____

**CITY**

City of Wasco

By:_____
Name: DANNY ESPITIA
Its:_____MAYOR

C:\files\wasco\agreements\vreassignmentpurchase.agr

14.   Governing Law.  California law shall apply for purposes of enforcement and interpretation of this Agreement.

15.   Time is of the Essence.  Time is of the essence with regard to each covenant, condition and provision of this Agreement.

16.   Attorneys' Fees.  In any proceeding brought by any party to this Agreement regarding the terms, conditions, obligations, and/or covenants of this Agreement, the prevailing party shall be entitled to recover its reasonable attorney's fees and costs of litigation in addition to any other relief awarded in such proceeding.

IN WITNESS WHEREOF, the parties have executed this Agreement as of the date first written above.

**ASSIGNOR**

Wasco Project, LLC

By:_____
Name:_____
Its:_____

By:_____
Name:_____
Its:_____

**ASSIGNEE**

Northern California Universal Enterprises

By:_____
Name:_____
Its:_____

**CITY**

City of Wasco

By:_____
Name:_____
Its:_____

C:files\wasco\agreements\vreassignmentpurchase.agr

EXHIBIT C

## AMENDMENT TO PURCHASE AND SALE AGREEMENT

This Amendment Agreement ("Agreement") is entered into as of May 18th, 2004 by and between the City of Wasco, a municipal corporation ("City") and Northern California Universal Enterprises, a California limited partnership ("Northern") with reference to the following facts:

A.    The City and Wasco Project, LLC. entered into that certain Purchase and Sale Agreement ("Purchase Agreement") dated as of April 6th, 2004.

B.    The Purchase Agreement was assigned to Northern on the condition that certain amendments were made to the Purchase Agreement.

C.    Section 22 of the Purchase Agreement provides that it can be modified in writing.

NOW THEREFORE, based upon the foregoing, the parties agree that Sections 2, 3.1, 4.3, 7.1(a) (c) and (d), 13 and 15, shall be modified as follows:

2.    "Purchase Price. The purchase price for the Property (the "Purchase Price") shall be $1,605,000.00."

"3.1    Deposit. Buyer shall deposit into the Escrow, at the Opening, the sum of $160,500.00 (10% of the Purchase Price) (the "Deposit). Escrow Holder (as defined in Paragraph 4.1 below) shall invest the Deposit in an interest-bearing account and the interest earned on such account shall be applied as provided in this Agreement." As part of the consideration for this Agreement, the Deposit shall be non-refundable and retained by Seller if Buyer does not purchase the Property by the Closing Deadline.

"4.3    Closing Deadline. The Grant Deed (as defined in Paragraph 4.4, below) shall be recorded and the Escrow shall close (the "Closing") as soon as possible after the satisfaction of all of the conditions contained in this Agreement, including but not limited to Section 7.1, but in no event later than November 1st, 2004 (the "Closing Deadline"). Time is specifically of the essence as to the Closing Deadline, and the Closing Deadline shall not be extended except by the mutual written agreement of Buyer and Seller."

"7.1(a)    Financing. Prior to June 1st, 2004, the Buyer shall submit to the Seller evidence that the Buyer has obtained sufficient equity capital and firm and binding commitments for interim and/or permanent financing necessary for the purchase of the Property in accordance with this Agreement. Such evidence of financing shall include copies of all conditional and firm financing commitments and any permanent financing commitments or other documents that indicate Buyer's ability to finance the purchase of the Property. Conditional commitments shall be firm and binding commitments subject only to standard conditions required by the lender. Proof of funding acceptance of each loan commitment by Buyer and proof of payment of all loan commitment fees required to fund the financing commitments and proof of funding of equity capital contributions shall also be required."

"7.1(c)    Settlement Agreement and Mutual Release. The Seller shall enter into a Settlement Agreement and Mutual Release with Michael Richardson and Badger Technology, Inc. and all the terms and conditions of said Agreement shall be in full force and effect for the duration of this Agreement"

"7.1(d)    Workout Agreement The Seller shall enter into a satisfactory agreement with U.S. Bank National Association in its capacity as the Trustee for the Wasco Public Financing Authority 1989 Local Agency Revenue Bonds Series A and the Assessment District No. 1992-2 Assessment District Bonds, Michael Richardson and Badger Technology, Inc. and all

the terms and conditions of said agreement shall be in full force and effect for the duration of this Agreement."

13.        "....

If to Buyer:_____Northern California Universal Enterprises

_____2278 Trade Zone Blvd.

_____San Jose, CA  95131

Attention:_____Mr. Joe Wu___

Telephone:  (408) 946-7856    "

"15.        Brokers. Except for Darrell Sousa of Sperry Van Ness Commercial Real Estate, ("Broker"), who shall be paid One Hundred Thousand Dollars ($100,000) by Buyer when the Property is transferred, each party represents and warrants to the other that no broker or real estate agent has been engaged by it in connection with this Agreement or the subject transaction.  Buyer shall be solely responsible for any commission due to Broker.  Buyer and Seller each hereby indemnify and hold the other harmless from and against all costs, expenses or liabilities (including without limitation attorneys' fees and court costs, whether or not taxable and whether or not any action is prosecuted to judgment) incurred by the indemnified party in connection with any claim or demand by any person or entity for any broker's, finder's or other commission or fee in connection with the indemnifying party's entry into this Agreement and the transactions contemplated hereby."

All other terms and provisions of the Purchase Agreement, which are not expressly modified by this amendment shall remain in full force and effect.

NORTHERN CALIFORNIA
UNIVERSAL ENTERPRISES

By:_____Attached_____
_____

APPROVED AND RECOMMENDED

By: _Larry F. Pennell_
    Larry Pennell, City Manager

APPROVED AS TO FORM

By:_____
    Alan J. Peake, City Attorney

CITY OF WASCO

By:_____
    Danny Espitia, Mayor

c:\files\wasco\agreements\vrepurchase0521clean.amd

## AMENDMENT TO PURCHASE AND SALE AGREEMENT

This Amendment Agreement ("Agreement") is entered into as of May 18th, 2004 by and between the City of Wasco, a municipal corporation ("City") and Northern California Universal Enterprise, a California limited partnership ("Northern") with reference to the following facts:

   A.   The City and Wasco Project, LLC, entered into that certain Purchase and Sale Agreement ("Purchase Agreement") dated as of April 8th, 2004.

   B.   The Purchase Agreement was assigned to Northern on the condition that certain amendments were made to the Purchase Agreement.

   C.   Section 22 of the Purchase Agreement provides that it can be modified in writing.

NOW THEREFORE, based upon the foregoing, the parties agree that Sections 2, 3.1, 4.3, 7.1(a) (c) and (d), 13 and 15, shall be modified as follows:

2.     "Purchase Price. The purchase price for the Property (the "Purchase Price") shall be $1,605,000.00."

"3.1     Deposit. Buyer shall deposit into the Escrow, at the Opening, the sum of $160,500.00 (10% of the Purchase Price) (the "Deposit). Escrow Holder (as defined in Paragraph 4.1 below) shall invest the Deposit in an interest-bearing account and the interest earned on such account shall be applied as provided in this Agreement."

"4.3     Closing Deadline. The Grant Deed (as defined in Paragraph 4.4, below) shall be recorded and the Escrow shall close (the "Closing") as soon as possible after the satisfaction of all of the conditions contained in this Agreement, including but not limited to Section 7.1, but in no event later than November 1, 2004 (the "Closing Deadline"). Time is specifically of the essence as to the Closing Deadline, and the Closing Deadline shall not be extended except by the mutual written agreement of Buyer and Seller."

"7.1(a)   Financing. Prior to June 1st, 2004, the Buyer shall submit to the Seller evidence that the Buyer has obtained sufficient equity capital and firm and binding commitments for interim and/or permanent financing necessary for the purchase of the Property in accordance with this Agreement. Such evidence of financing shall include copies of all conditional and firm financing commitments and any permanent financing commitments or other documents that indicate Buyer's ability to finance the purchase of the Property. Conditional commitments shall be firm and binding commitments subject only to standard conditions required by the lender. Proof of funding acceptance of each loan commitment by Buyer and proof of payment of all loan commitment fees required to fund the financing commitments and proof of funding of equity capital contributions shall also be required."

"7.1(c)   Settlement Agreement and Mutual Release. The Seller shall enter into a Settlement Agreement and Mutual Release with Michael Richardson and Badger Technology, Inc. and all the terms and conditions of said Agreement shall be in full force and effect for the duration of this Agreement."

"7.1(d)   Workout Agreement. The Seller shall enter into a satisfactory agreement with U.S. Bank National Association in its capacity as the Trustee for the Wasco Public Financing Authority 1992 Local Agency Revenue Bonds Series A and the Assessment District No.

*3d*

05/17/2004  16:19   3278568                          WA                              PAGE  03/03
04/04/1999  21:06   2095933010                       SPERRY VAN NESS                 PAGE  04

04/04/1999  03:26   2095933010                SPERRY VAN NESS              PAGE  03

1992-2 Assessment District Bonds, Michael Richardson and Badger Technology, Inc. and all the terms and conditions of said agreement shall be in full force and effect for the duration of this Agreement."

13.      "....

If to Buyer:   Northern California Universal Enterprises

2278 Trade Zone Blvd.

San Jose, CA  95131

Attention:   Mr. Joe Wu

Telephone: (408) 946-7866 "

"16.     Brokers. Except for Darrell Souse of Sperry Van Ness Commercial Real Estate, ("Broker"), who shall be paid One Hundred Thousand Dollars ($100,000) by Buyer when the Property is transferred, each party represents and warrants to the other that no broker or real estate agent has been engaged by it in connection with this Agreement or the subject transaction.  Buyer shall be solely responsible for any commission due to Broker.  Buyer and Seller each hereby indemnify and hold the other harmless from and against all costs, expenses or liabilities (including without limitation attorneys' fees and court costs, whether or not taxable and whether or not any action is prosecuted to judgment) incurred by the indemnified party in connection with any claim or demand by any person or entity for any broker's, finder's or other commission or fee in connection with the indemnifying party's entry into this Agreement and the transactions contemplated hereby."

All other terms and provisions of the Purchase Agreement, which are not expressly modified by this amendment shall remain in full force and effect.

NORTHERN CALIFORNIA
UNIVERSAL ENTERPRISES              5-24-04

By:

APPROVED AND RECOMMENDED

By:
    Larry Pennell, City Manager

APPROVED AS TO FORM                    CITY OF WASCO

By:                                    By:
    Alan J. Peake, City Attorney           Danny Espitia, Mayor

## AMENDMENT TO PURCHASE AND SALE AGREEMENT

This Amendment Agreement ("Agreement") is entered into as of May 18th, 2004 by and between the City of Wasco, a municipal corporation ("City") and Northern California Universal Enterprises, a California ~~limited partnership~~ ("Northern") with reference to the following facts:

    A.    The City and Wasco Project, LLC. entered into that certain Purchase and Sale Agreement ("Purchase Agreement") dated as of April 6th, 2004.

    B.    The Purchase Agreement was assigned to Northern on the condition that certain amendments were made to the Purchase Agreement.

    C.    Section 22 of the Purchase Agreement provides that it can be modified in writing.

NOW THEREFORE, based upon the foregoing, the parties agree that Sections 2, 3.1, 4.3, 7.1(a) (c) and (d), 13 and 15, shall be modified as follows:

2.    "Purchase Price. The purchase price for the Property (the "Purchase Price") shall be $1,605,000.00."

"3.1    Deposit. Buyer shall deposit into the Escrow, at the Opening, the sum of $160,500.00 (10% of the Purchase Price) (the "Deposit). Escrow Holder (as defined in Paragraph 4.1 below) shall invest the Deposit in an interest-bearing account and the interest earned on such account shall be applied as provided in this Agreement." As part of the consideration for this Agreement, the Deposit shall be non-refundable and retained by Seller if Buyer does not purchase the Property by the closing deadline.

"4.3    Closing Deadline. The Grant Deed (as defined in Paragraph 4.4, below) shall be recorded and the Escrow shall close (the "Closing") as soon as possible after the satisfaction of all of the conditions contained in this Agreement, including but not limited to Section 7.1, but in no event later than November 1st, 2004 (the "Closing Deadline"). Time is specifically of the essence as to the Closing Deadline, and the Closing Deadline shall not be extended except by the mutual written agreement of Buyer and Seller."

"7.1(a)    Financing. Prior to June 1st, 2004, the Buyer shall submit to the Seller evidence that the Buyer has obtained sufficient equity capital and firm and binding commitments for interim and/or permanent financing necessary for the purchase of the Property in accordance with this Agreement. Such evidence of financing shall include copies of all conditional and firm financing commitments and any permanent financing commitments or other documents that indicate Buyer's ability to finance the purchase of the Property. Conditional commitments shall be firm and binding commitments subject only to standard conditions required by the lender. Proof of funding acceptance of each loan commitment by Buyer and proof of payment of all loan commitment fees required to fund the financing commitments and proof of funding of equity capital contributions shall also be required."

"7.1(c)    Settlement Agreement and Mutual Release. The Seller shall enter into a Settlement Agreement and Mutual Release with Michael Richardson and Badger Technology, Inc. and all the terms and conditions of said Agreement shall be in full force and effect for the duration of this Agreement"

"7.1(d)    Workout Agreement The Seller shall enter into a satisfactory agreement with U.S. Bank National Association in its capacity as the Trustee for the Wasco Public Financing Authority 1989 Local Agency Revenue Bonds Series A and the Assessment District No. 1992-2 Assessment District Bonds, Michael Richardson and Badger Technology, Inc. and all

the terms and conditions of said agreement shall be in full force and effect for the duration of this Agreement."

13.         "....

If to Buyer: ___ Northern California Universal Enterprises

_____ 2278 Trade Zone Blvd.

_____ San Jose, CA  95131

Attention: ___ Mr. Joe Wu

Telephone: (408) 946-7856 "

"15.        Brokers. Except for Darrell Sousa of Sperry Van Ness Commercial Real Estate, ("Broker"), who shall be paid One Hundred Thousand Dollars ($100,000) by Buyer when the Property is transferred, each party represents and warrants to the other that no broker or real estate agent has been engaged by it in connection with this Agreement or the subject transaction. Buyer shall be solely responsible for any commission due to Broker. Buyer and Seller each hereby indemnify and hold the other harmless from and against all costs, expenses or liabilities (including without limitation attorneys' fees and court costs, whether or not taxable and whether or not any action is prosecuted to judgment) incurred by the indemnified party in connection with any claim or demand by any person or entity for any broker's, finder's or other commission or fee in connection with the indemnifying party's entry into this Agreement and the transactions contemplated hereby."

All other terms and provisions of the Purchase Agreement, which are not expressly modified by this amendment shall remain in full force and effect.

NORTHERN CALIFORNIA
UNIVERSAL ENTERPRISES

By:_____

APPROVED AND RECOMMENDED

By:_____
     Larry Pennell, City Manager

APPROVED AS TO FORM                    CITY OF WASCO

By:_____          By:_____
     Alan J. Peake, City Attorney          Danny Espitia, Mayor

c:\files\wasco\agreements\vrepurchase0521clean.amd

EXHIBIT D

AGREEMENT NO. 2007 - ____

SUBDIVISION AGREEMENT
FOR
TRACT 6451

THIS AGREEMENT, entered into this 20ᵗʰ day of February, 2007 by and between the CITY OF WASCO, a Municipal Corporation, herein referred to as the "City"; and NORTHERN CALIFORNIA UNIVERSAL herein referred to as the "Subdivider".

## WITNESSETH:

WHEREAS, the Subdivider is developing and subdividing land in the City of Wasco, under the provisions of the Subdivision Map Act (Government Code Sections 66410 et. seq., referred to as the "Map Act") and under the provisions of the Subdivision Ordinance of the City of Wasco (Wasco Municipal Code), referred to as the "Ordinance", and

WHEREAS, the tentative map Tract 6451 has been approved by the Planning Commission of the City (Advisory Agency), subject to certain approved exceptions and conditions; and

WHEREAS, the Subdivider has submitted the final map to the City Council of the City for approval in accordance with the Map Act and the Ordinance, said final map shall be referred to as the "Final Subdivision Map of Tract 6451, or "Subdivision"; and

WHEREAS, the Subdivider has complied with all provisions of the Map Act and the Ordinance applicable to the Subdivision, excepting only that the Subdivider has not completed the improvement work therefor and has not set or placed all of the permanent monuments required for the Subdivision, but desires to enter into an agreement with the City to complete the required improvement work within the time and in the manner provided herein; and

WHEREAS, the City Council of the City is willing to approve the Final Subdivision Map, and to accept on behalf of the City all of the streets, alleys, easements and pedestrian ways dedicated thereon or deeded to the City in connection therewith, under the terms and conditions hereinafter more particularly set forth;

NOW, THEREFORE, for and in consideration of the mutual covenants and conditions herein contained, IT IS EXPRESSLY AGREED AND UNDERSTOOD as follows:

I.

Concurrently upon the execution of this Agreement and upon posting by the Subdivider of the Improvement Security as mentioned herein, the City, by and through its City Council, does hereby agree to approve the Final Subdivision Map of Tract 6451, and to accept all streets, alleys, easements, and pedestrian ways dedicated thereon or deeded by the Subdivider to the City in connection therewith. Improvement Security shall be as hereinafter provided for, to be approved by the City Council of the City and shall be in the amounts fixed by said City Council.

II.

For and in consideration of the approval of the Final Subdivision Map referred to in Paragraph I hereof, and for and in consideration of the acceptance of the streets, alleys, easements and pedestrian ways dedicated thereon or deeded to the City in connection therewith, the Subdivider hereby agrees as follows:

1

In accordance with the requirements of the City Council, the Subdivider shall construct, at its sole cost and expense, those improvements. shown on the plans, profiles and specifications, all as approved by the City Engineer, and all of which are incorporated in the Agreement by reference as a part hereof, and which are generally designated as follows: Curbs, gutters, sidewalks, grading, paving, drainage facilities, landscaping, parking, sanitary sewers, water distribution system, street name signs, underground street lighting and utility systems, subject only to those times agreed upon between Developer and the City which are reimbursable to Developer. The reimbursable costs are listed in this document.

1.    IMPROVEMENTS TO BE CONSTRUCTED:

(a)    Subdivider shall grade, pave, construct and improve all of the Streets, Alleys, Easements and Pedestrian Ways dedicated to the City or deeded by the Subdivider to the City in connection therewith, pursuant to and in accordance with those provisions of the Wasco Municipal Code applicable thereto and, more particularly pursuant to and in accordance with the Plans and Profiles, and by this reference incorporated herein.

(b)    Subdivider shall install a Water Distribution System, including the construction and installation of all pipelines, appurtenances, and services to each lot, pursuant to and in accordance with those provisions of the Wasco Municipal Code applicable thereto, and more particularly pursuant to and in accordance with the Plans, and by reference incorporated herein.

(c)    Subdivider shall install a Sanitary Sewer System, including the construction and installation of all pipelines, manholes, appurtenances, and services to each lot, pursuant to and in accordance with those provisions of the Wasco Municipal Code applicable thereto, and more particularly pursuant to and in accordance with the Plans and Profiles, and by reference incorporated herein.

(d)    Subdivider shall site grade, compact and improve building sites, so as to drain properly within the Subdivision, pursuant to and in accordance with the Plans and Specifications, and by reference incorporated herein.

(e)    Subdivider shall provide for all necessary Storm Drainage Facilities, including the construction and installation of pipelines, sumps, and appurtenances, pursuant to and in accordance with the Wasco Municipal Code applicable thereto, and more particularly pursuant to and in accordance with the Plans and Profiles, and by reference incorporated herein.

(f)    Subdivider shall construct all public utilities as required by the Wasco Municipal Code. Services from the public utilities, consisting of telephone, gas, electric, water, sewer and cable t.v. service, shall be provided for each lot within this subdivision. This shall also include a Street Lighting System.

Subdivider shall furnish the City with written statements from the Electric Company, Gas Company, Telephone Company, and Cable T.V. Company, specifying that financial arrangements and terms for the installation of all electrical, gas, telephone and cable t.v. services have been made for the subdivision. The terms thereof shall guarantee the installation of said services to each lot as required at no cost to the City and shall be subject to the approval of the City Engineer.

(g)    Subdivider shall provide for the setting or placement of all permanent monuments required for the Subdivision by the Wasco Municipal Code. Said permanent monuments shall be placed or set in accordance with said Municipal Code and shall be located in such positions and shall be of the character and type specified therein.

2

(h)     Subdivider shall, remove, relocate or replace all obstructions, or otherwise make all necessary arrangements to have said obstructions relocated, at his own expense. Said obstructions and their removal and/or relocation, shall be shown on all applicable plans and profiles, and shall not hinder any construction.

(i)     All changes, relocations, or modifications required for the development of the proposed subdivision to existing city utilities, streets and facilities whether within the boundaries of the subdivision or offsite; and all changes, relocations and modifications to other public utilities including, but not limited to electric, gas, water or telephone lines, caused by the development of the subdivision shall be paid for by the Subdivider. If Subdivider damages any public or private utility, said utility is to be repaired or replaced at Subdivider's expense.

## 2.   MANNER OF CONSTRUCTION:

The improvements designated above shall be installed and constructed in accordance with all of the following:

(a)     Wasco Municipal Code.

(b)     Kern County Standards

(c)     The California Subdivision Map Act.

(d)     Approved plans, specifications and profiles.

(e)     Standard City specifications and grades.

(f)     State of California Business and Transportation Agency Standard Specifications (Current Edition).

(g)     Good engineering practices and workmanlike manner.

## 3.   TIME FOR COMPLETION:

All of said improvements shall be completed in full in accordance with the terms of this Agreement and to the satisfaction of the City Engineer within twelve (12) months from the date of approval of this Agreement, to wit: on or before the February 20, 2008, or any extension of said completion date granted by the City Council. Any work which affects any existing City maintained road or traffic thereon shall be completed within thirty (30) working days from start of work.

## 4.   INSPECTION AND APPROVAL OF WORK:

(a)     All improvement work shall be subject to inspection by the City Engineer or his designee and shall be completed to his satisfaction.

(b)     When all of the required improvement work has been satisfactorily completed, upon written application of the Subdivider, the City Engineer or his designee, and the Developer and his Engineer or designee shall inspect and approve the same within a reasonable time and shall forward his recommendation to City Council showing the date of inspection and approval.

(c)     If the City Council approves the recommendation, it shall make its order accepting or approving the work of improvement.

(d)     Such order of acceptance or approval made by the City Council shall be deemed operative from the time of approval of the work of improvement by the City Engineer or his designee, from the time of his approval of the work of improvement as shown in his said certificate.

(e)     Except as otherwise provided, the Subdivider and surety shall be deemed released from liability for damage or injury to such work so accepted by said Council, and from the maintenance thereof, from and after the time said order is operative. However, the foregoing provision shall not relieve the Subdivider or its surety from any damage or injury to such work of improvement or any maintenance required therefor arising from any other work undertaken by the Subdivider or its surety, or as may necessarily be done by the City in the performance of any part of the required improvement work as a result of any default in the performance of this Agreement by the Subdivider or its surety or arising from any willful act or negligent act or omission of the Subdivider or its surety or their contractors, agents or employees, or arising from defective work or labor done or defective materials furnished in the performance of the Agreement.

(f)     At the time of making of the order of acceptance or approval of such work, as the case may be, said Council shall affect a reduction of the improvement security in accordance with other provisions of this Agreement.

(g)     The provisions of (e) notwithstanding, the Subdivider shall not be released from liability arising from damage or injury to such work of improvements that may have been accepted by the City that has been caused by the construction of new homes and related accessories in the subdivision. A close-out inspection shall be called for by the Subdivider/Developer prior to the release of the final building permit. All damage or injury shall be corrected prior to the issuance of a certificate of occupancy for the final building.

5.   **CHANGES AND ALTERATIONS:**

(a)     The Subdivider shall make no change or alteration in such work except with written approval by the City Engineer.

(b)     The Subdivider shall carry out such changes or alterations in such work as may be ordered by the City Engineer in the exercise of its reasonable discretion, as follows:

   (i)     As required by the Map Act;
   (ii)    As consistent with City ordinance, applicable at the time of approval of the tentative map; or
   (iii)   As made necessary by conditions of the soil, topography, drainage, flood hazard, or fire hazard not foreseen at the time of approval of the tentative map.

(c)     In any case, all changes or alterations in such work shall be otherwise performed and fully and timely completed in accordance with all other provisions of this Agreement.

(d)     Within sixty (60) days following City's acceptance of subdivision improvements, Subdivider shall provide City Engineer with original set of improvement plans and electronic drawings (AutoCAD) containing the appropriate posted "Record Drawings" changes. Changes shall be clearly noted as changes on said plans.

4

6.    <u>GUARANTEE AGAINST DEFECTS:</u>

The Subdivider hereby guarantees all features of the work of improvement for a period of 24 months following the acceptance of the work against defective work or labor done, or defective material furnished, in the performance of this Agreement; and Subdivider agrees to correct, repair or replace promptly when demanded by the City all such defective work or labor done, or defective materials furnished, as may be discovered within such one 24 month period and reported to the City Council.

Provided further that the Subdivider shall repair or replace all features of the work of improvement as directed by the City Engineer that are damaged by construction, including but not limited to dwellings and related accessory features, that occurs after the expiration of the 24 month warrantee. The issuance of the final certificate of occupancy for a dwelling shall be withheld until the damage is corrected.

7.    <u>IMPROVEMENT SECURITY:</u>

(a)    As provided for in the Wasco Municipal Code, the Agreement shall be secured by good and sufficient security, which shall be filed with the City prior to certification of the final map by the City Engineer. Such improvement security shall consist of either (1) a faithful performance bond or bonds by one or more duly authorized corporate sureties; or (2) a deposit, either with the City or a responsible escrow agent or trust company, selected by the City, of cash or negotiable bonds of the kind approved for securing deposits of public moneys, or (3) an irrevocable instrument of credit form one or more responsible financial institutions regulated by State or Federal government and pledging that the funds are on deposit and guaranteed for payment on demand by the City. The forms of all documents relating to such security shall be subject to approval by the City Attorney. The corporate surety bond shall conform substantially with the form set forth in Section 66499.1 of the Map Act. The estimated cost of the various features of the work of improvement shall be used, if applicable, as the basis for the reduction of bonds in connection with the final completion of any feature of the work (or any unit thereof). Costs referred to herein are as set forth on the Costs Estimate for the Subdivision, as submitted for approval to, and on file in the office of, the City Engineer.

(b)    The estimated cost of the various features of the work of improvement, to be used as the basis for determination of the amount of such security and for reduction of security in accordance with other provisions of this Agreement, is as follows:

Site Preparation and Grading. . . . . . . . . . . . . . . . . . . . . . $
Sewer Improvements . . . . . . . . . . . . . . . . . . . . . . . . . . . $
Water Improvements . . . . . . . . . . . . . . . . . . . . . . . . . . . $
Storm Drain Improvements . . . . . . . . . . . . . . . . . . . . $
Street Improvements . . . . . . . . . . . . . . . . . . . . . . . . . . $
Utilities . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . $
SUBTOTAL . . . . . . . . . . . . . . . . . . . . . . . . . $

10% Contingency . . . . . . . . . . . . . . . . . . . . . . . . $
TOTAL    . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . $

(c)     Said improvement security shall be in the amount of 100% of the total estimated cost of the improvement, conditioned upon the faithful performance of the Agreement, as follows:

    (1)     The faithful performance and full and timely completion of the work according to this Agreement; and

    (2)     The guarantee and maintenance of the work of improvement for a period of 24 months following the completion and approval thereof, against defective work or labor done, or defective materials furnished, in the performance of this Agreement; and

(d)     Said improvement security shall also be in an additional amount of 50% of the total estimated cost of the improvement, securing payment to the contractor, his subcontractors and to persons renting equipment or furnishing labor or materials to them for the improvement; and if such portion of the improvement security is:

    (1)     A cash deposit, suit may be maintained against the holder of such deposit; or

    (2)     A surety bond, suit may be maintained against the surety, or an instrument of credit, suit may be maintained against the financial institution of obligating itself as trustee on such instrument.

## 8.   REDUCTION AND RELEASE OF SECURITY:

(a)     Improvement security may be reduced or released on order of the City Engineer in accordance with this Section.

(b)     Improvement security given for the faithful performance of the Agreement shall be reduced at the time and in the manner provided herein, subject to retention of security for defects as hereinafter provided.

(c)     Whenever improvement security is reduced on account of approval of units of the work such shall be subject to retention of security for defects and security against damage as hereinafter provided.

(d)     In any case, however, the City in the exercise of its reasonable discretion shall retain ten percent (10%) of the improvement security for faithful performance to secure the maintenance and guarantee of such improvement work for a period of 24 months following the operative date of the order of said Council for the acceptance or approval thereof, as the case may be, and (in the case of acceptance or approval of a unit of the improvement work as its progresses) to secure the maintenance and guarantee of the work of improvement so accepted or approved against damage thereto by any other work undertaken by the Subdivider or its surety. The amounts of improvement security so retained shall be finally released one (1) year following the operative date of the order of the city Council for the acceptance or approval thereof, as the case may be, provided that no defective work or labor done or defective materials furnished in the performance of the work has been discovered within such 24 month period and reported in writing to the said Council, and further provided (in the case of acceptance of a unit or units of the improvement work as it progresses) that no damage has been done to the required improvement work so accepted by any other work, undertaken by the Subdivider or its surety.

(e)     Improvement security for payment to the contractor, or any of his subcontractors of any person renting equipment or furnishing labor or materials to them for the work of improvement may, six (6) months after the completion of the work of improvement and

the making of the order for its acceptance or approval, as the case may be, be reduced to an amount not less than the total of all claims on which an action has been filed and notice thereof given in writing to the City, and if no such action is filed, such improvement security may be released in full.

9.    **COMPLETION BY SURETY OR CITY:**

(a)    If the City Council, in the exercise of its reasonable discretion, shall determine:

(1)    That the Subdivider has failed to properly and fully complete all of the work of improvement in accordance with this Agreement, and within the time (or any extension of time) provided herein; and

(2)    That the Subdivider has failed or neglected to begin work, or any feature of the work, within a time which will reasonably allow its completion within the time (or any extension of time) provided in this Agreement; or

(3)    That the Subdivider has created an unsafe or hazardous condition which requires immediate correction.

(4)    That the Subdivider has abandoned any of the work; or

(5)    That the Subdivider has failed to keep the work under direct control of a superintendent, manager, engineer or other competent agent.

(6)    That the Subdivider (if he shall be an individual) has been declared incompetent or placed under the care of a guardian or conservator, or has disappeared; or

(7)    That the Subdivider has filed a petition in bankruptcy or has been declared bankrupt then the City Council may determine to, and the City may give the Subdivider and its Surety fourteen (14) days' written notice to proceed with the work, without prejudice to any other remedy the City may have in law or equity.

(b)    If the Surety shall proceed with the work, the Surety shall be subject to all of the provisions of this Agreement as in the case of the Subdivider.

(c)    If the Subdivider or its Surety shall fail or neglect to proceed with the work diligently and in good faith in accordance with this Agreement after such notice has been given, the City may thereafter, at its sole option and without prejudice to any other remedy, provide the necessary supervision, equipment, materials and labor as it may determine necessary to undertake and complete the work of improvement or any part thereof in the manner required by this Agreement, by independent contract or by City forces, all for the account and at the expense of the Subdivider, and the Subdivider and its Surety shall be liable to the City and shall pay the City on demand, any expenses incurred by the City in the course thereof.

10.    **INDEMNIFICATION PROVISIONS:**

(a)    The Subdivider shall, and it does hereby agree to hold harmless and indemnify the City and its Council, officers and employees, from every liability, claim, suit or demand which may arise or may be made by reason of:

(1)    Any act, omission or neglect of the Subdivider, its engineers, employees, agents or contractor; or

7

(2)    Any injury to any person, death of any person, or damage to any property, sustained by any person, firm or corporation while in or upon the parcel of land herein mentioned and for which the Subdivider is legally liable (excepting negligence of the City, or its officers or employees); or

(3)    Any injury to or death of the Subdivider or any officer or employee of the Subdivider, or any damage to the property of any such person, firm or corporation, and for which the Subdivider is legally liable (excepting any negligence of the City or its officers or employees); or

(4)    Any damage to or taking of any property arising from said plans, specifications or profiles, or arising from the work of construction or the conduct thereof.

(b)    The Subdivider at its own cost, expense and risk shall defend all legal proceedings which may be brought against the City, its Council, officers and employees, on any liability suit, claim or demand which it has agreed indemnify them against herein, and shall satisfy any resulting judgment that may be rendered against any of them.

(c)    It is mutually agreed that the Subdivider's surety under the improvement security for faithful performance shall not be deemed liable for performance of any of the foregoing provisions of this section, unless said surety shall undertake the completion of any improvement or the conduct of work required to be done under this Agreement, and then only to the extent of any act, omission or neglect of the Surety, its engineers, employees, agents or contractors in the course of the completion of such improvements or the conduct of such work by said Surety.

## 11.   ATTORNEY'S FEES ON SUIT:

If any suit be brought by the City for the recovery of any sum due under this Agreement, for any damages for the breach of this Agreement, or to compel performance of this Agreement, the City shall be entitled to such portion of such reasonable attorney's fees as the Court may determine, in addition to its cost of suit.

## 12.   INSURANCE REQUIREMENTS:

(a)    The Subdivider shall at all times during the course of any of the improvement work, secure and maintain, and shall cause its contractors to secure and maintain, in the manner required by law, workers' compensation insurance as required by the California Labor Code and amendments thereto, and shall furnish to the City satisfactory evidence thereof.

(b)    The Subdivider shall maintain, and pay premiums on, a policy of comprehensive liability insurance in the amounts given below, in form and with insurance companies satisfactory to the City, containing an endorsement including the City, its Council, officers and employees as additional named insured.

(c)    The limits of said policy shall be in amounts not less than Bodily Injury, $500,000 per person and $1,000,000 per accident; and Property Damage $500,000 per accident and $1,000,000 aggregate amount.

(d)    Prior to undertaking any work of construction, the Subdivider shall file with the City Clerk, a true copy of said policy of insurance, with the endorsement thereon aforementioned, certified by the carrier.

(e)    The Subdivider shall continue to so maintain said policy and pay the premiums thereon for a period of one (1) year from and after the acceptance or approval, as the case may be, of the entirety of the improvement work.

(f)    In case the estimated cost of the required work of improvement is found to be less than $10,000. the City Council may approve limits of insurance coverage in lesser amounts than those specified in (c) above.

13.    FEES:
The Subdivider shall pay all fees and charges scheduled pursuant to the Wasco Municipal Code as may be amended from time to time. Quimby fees of $1,100 per residence shall be due and payable prior to the issuance of a building permit.

14.    VALLEY ROSE ESTATES ZONE OF BENEFIT:
The Subdivider shall pay all fees and charges scheduled pursuant to Valley Rose Estates Zone of Benefit. These fees shall be collected at the time a building permit is issued. This fee shall be in the amount of $2,626.29 per building permit

15.    FINAL MAP FEE:
Pursuant to the Wasco Municipal Code, the Subdivider shall pay a Public Works Final Map fee which includes all charges for checking and recording the Final Map performed by the City. The Subdivider agrees that it has, or will forthwith deposit, with the Finance Officer of the City, the amount of $3,100.00 (Three thousand one hundred dollars).

16.    PUBLIC WORKS INSPECTION FEE:
Pursuant to the Wasco Municipal Code, the Subdivider shall pay a Public Works Inspection fee which includes all charges for inspection by the City of the Subdivision. The Subdivider agrees that it has, or will forthwith deposit, with the Finance Officer of the City, the amount of $2,434.77 (Two thousand four hundred and thirty four dollars and seventy seven cents.)

16.    LANDSCAPE LIGHTING AND MAINTENANCE DISTRICT:
Prior to any lot being sold to an individual buyer, the owner(s) shall agree to annex the entire subdivision into a Landscape Lighting and Maintenance District. If a previously formed district is unavailable: than the owner (s) shall form a separate Landscape, Lighting and Maintenance District.

17.    ENGINEERING FEE:
Pursuant to the Wasco Municipal Code, the Subdivider shall pay an Engineering Fee which includes all charges for Improvement Plan Check performed by the City. These fees have already been paid by the subdivider.

IN WITNESS WHEREOF, the parties to this Agreement have executed the same on the day and year first mentioned herein.

RECOMMENDED FOR APPROVAL

By _____
Gerald Helt    , City Engineer

CITY OF WASCO

By _____
Larry Pennell, City Manager

APPROVED AS TO FORM

By _____
City Attorney

ATTEST BY:

By _____
Vickie Hight   City Clerk

"SUBDIVIDER"

By _____ 2/26/07

C:\files\wasco\agreements\subdivision.agr

10

## PROOF OF SERVICE

I declare that I am over the age of eighteen (18) and not a party to this action.   My business address is 500 South Grand Avenue, Suite 1100, Los Angeles, California 90071.

On **November 18, 2008,** I served the following document: **JOINT STIPULATION REGARDING FILING OF AMENDMENT TO CROSS-COMPLAINT PURSUANT TO RULE 15(a) OF THE FEDERAL RULES OF CIVIL PROCEDURE** on the interested parties in this action by placing a true and correct copy of such document, addressed as follows:

| | |
|---|---|
| Steven Hassing<br>Law Office of Steven J. Hassing<br>425 Calabria Court<br>Roseville, CA  95747 | Jeffrey A. Travis<br>Borton, Petrini, LLP<br>1600 Truxtun Avenue<br>Bakersfield, CA  93301 |

( **X** )  **BY MAIL**:  I am readily familiar with the business' practice for collection and processing of correspondence for mailing with the United States Postal Service.  I know that the correspondence was deposited with the United States Postal Service on the same day this declaration was executed in the ordinary course of business.  I know that the envelope was sealed and, with postage thereon fully prepaid, placed for collection and mailing on this date in the United States mail at Los Angeles, California.

( )  **BY OVERNIGHT COURIER:**  I caused the above-referenced document(s) to be deposited in a box or other facility regularly maintained by the overnight courier, or I delivered the above-referenced document(s) to an overnight courier service, for delivery to the above addressee(s).

( )  **BY PERSONAL SERVICE:**  I caused the above-referenced document(s) to be personally served to the addressee(s).

( )  (State)  I declare under penalty of perjury under the laws of the State of California that the above is true and correct.

( **X** )  (Federal)  I declare that I am employed in the office of a member of the bar of this court at whose direction the service was made.

Executed **November 18, 2008**, Los Angeles, California.

**Carolyn Dominguez**