lj

1  James J. Braze, Esq.; SBN 75911
   Jeffrey A. Travis, Esq.; SBN 235507
2  BORTON PETRINI, LLP
   5060 California Avenue, Suite 700
3  Post Office Box 2026
   Bakersfield, CA 93303
4  Telephone (661) 322-3051

5  Attorneys for Plaintiff, Roger McIntosh dba McIntosh
   & Associates

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA, FRESNO DIVISION

| | |
|---|---|
| ROGER McINTOSH,<br><br>   Plaintiff,<br><br>v.<br><br>NORTHERN CALIFORNIA UNIVERSAL ENTERPRISES COMPANY, a California corporation; LOTUS DEVELOPMENTS, LLP; THE CITY OF WASCO, a municipal corporation; DEWALT CM, INC., a California corporation also doing business as DEWALT CORPORATION; and DOES 1 through 10, inclusive<br><br>   Defendants. | Case No. 107CV 01080 LJO-GSA<br><br>DECLARATION OF JEFFREY A. TRAVIS IN SUPPORT OF MOTION TO AMEND PLEADINGS |

I, Jeffrey A. Travis, being duly sworn, state and if so called, will testify as follows:

1. I am an attorney for the plaintiff in the above-named case and have been responsible for preparing, reviewing, instructing and conducting discovery and investigation into the facts surrounding this case.

2. I am duly licensed to practice in the courts of the State of California including the Eastern District of California.

3. An original complaint for copyright infringement was filed against Northern California Universal Enterprises, Lotus Developments, LLP, and Joe Wu, on July 26, 2007.

1  Thereafter, and pursuant to a stipulation between the plaintiff and defendants, a second amended complaint was filed on June 12, 2008, which added the City of Wasco as a defendant and which also included a second cause of action for contributory copyright infringement against all defendants.

4. Subsequent to the addition of the City of Wasco in the first amended complaint, written discovery on the two causes of action has proceeded and which has included depositions of persons most knowledgeable in the City of Wasco, depositions of the persons most knowledgeable for Northern California Universal Enterprises and Lotus Developments, and Joe Wu. In addition to written discovery, a deposition was also taken of Dewalt CM, Inc.

5. On November 24, 2008 at 10:08 a.m., the person most knowledgeable of Dewalt, Jeffrey Gutierrez, was taken and which revealed that Dewalt had obtained and asked for copies of the copyrighted works of Roger McIntosh, including improvement plans and a tentative map. Attached to this Declaration as Exhibit "A" is a true and correct copy of a condensed portion of the transcript taken on November 24, 2008 of the president of Dewalt, Jeffrey Gutierrez, which revealed that Dewalt obtained and copied McIntosh's copyrighted works.

6. Dewalt also admitted that their work was done at the instruction of and pursuant to a contract with Northern, Lotus, and Wu. Furthermore, Dewalt was required to prepare the allegedly infringing works pursuant to conditions imposed by the City of Wasco and wherein Dewalt had to coordinate with the City of Wasco in order to prepare the allegedly infringing work.

7. In response to request to stipulate to the addition of Dewalt as a defendant, the City of Wasco told plaintiff that they would stipulate, but Northern refused to stipulate. This was after a meet and confer conference that was conducted after the deposition of Roger McIntosh on December 18, 2008, and in telephone and email correspondences following that deposition.

8. Pursuant to the meet and confer conferences referred to in the previous paragraph, all parties have recently stipulated to extending all non-expert discovery. A stipulation was filed with this Court on December 26, 2008. However, the parties did not stipulate to extending expert discovery or any pretrial motion filing deadlines.

9. Most all discovery has been completed except for three recent depositions noticed by plaintiff for the end of January and a second round of discovery recently propounded by

1  plaintiff and Northern and which is also due at the end of January.

2      10.    Plaintiff agrees that if the amendment to add Dewalt is ordered by this Court,
3  then plaintiff will send to Dewalt copies of all discoverable documents produced by them and
4  received so far by them.

5      I declare under penalty of perjury, under the laws of the State of California, that the
6  foregoing is true and correct.

7      Executed this 30th day of December, 2008, at Bakersfield, California.

    /s/ Jeffrey A.
    Jeffrey A. Travis, Declarant

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA, FRESNO DIVISION

---

ROGER McINTOSH,                        No. 107CV 01080 LJO-WMW

    Plaintiff,

vs.

NORTHERN CALIFORNIA UNIVERSAL
ENTERPRISES COMPANY, et al.,

    Defendants.

---

DEPOSITION OF JEFFREY GUTIERREZ

Taken at

Borton Petrini
1600 Truxtun Avenue
Bakersfield, California

Monday, November 24, 2008 at 10:08 A.M.


Reported by:

Naomi S. Alvarez, CSR #13007

APPEARANCES:

For the Plaintiff:

    Borton Petrini, LLP
    By MR. JAMES J. BRAZE
      - and -
    By MR. JEFFREY A. TRAVIS
    5060 California Avenue, Suite 700
    Bakersfield, CA 93301
    (661) 322-3051

For the Defendant City of Wasco:

    Garcia, Calderon & Ruiz
    By MR. CHAKA C. OKADIGBO
    500 South Grand Avenue, Suite 1100
    Los Angeles, CA 90071
    (213) 347-0210

Page 2

APPEARANCES (Cont'd)

For the Defendant Northern California Universal Enterprises Company:

    Law Offices of Steven J. Hassing
    By MR. STEVEN J. HASSING
    425 Calabria Court
    Roseville, CA 95747
    (916) 677-1776

Also present:
    MR. ROGER McINTOSH

Page 3

INDEX

| EXAMINATION BY | PAGE |
|---|---|
| MR. BRAZE | 5 |
| MR. TRAVIS | 21 |
| MR. BRAZE | 25 |
| MR. TRAVIS | 27 |
| MR. HASSING | 47 |
| MR. OKADIGBO | 48 |

EXHIBIT INDEX

| PLAINTIFF'S | | FOR ID. |
|---|---|---|
| 1 | Notice of Taking Deposition and Production of Documents | 7 |
| 2 | E-mails | 19 |
| 3 | DeWalt Corporation New Job Request Form | 20 |
| 5 | Tentative Tract No. 6451 | 29 |
| 6 | Final Tract No. 6451 | 29 |
| 4 | CELSOC Contract | 30 |
| 7 | CD from DeWalt Corporation | 50 |

Page 4

          JEFFREY GUTIERREZ,
having been sworn, testified as follows:
          EXAMINATION BY MR. BRAZE
    Q.  Good morning, sir.
       Would you state your full name, please.
    **A.  Jeffrey Gutierrez.**
    Q.  And Mr. Gutierrez, have you ever had your deposition taken before?
    **A.  For this case or --**
    Q.  Ever.
    **A.  Yes.**
    Q.  About how many occasions?
    **A.  I think twice.**
    Q.  As you probably recall from those procedures, a deposition is a procedure authorized under California federal law whereby attorneys place you under oath. The oath is the same oath would you take in a court of law. It carries with it the same force, effect, and dignity as it would in a court of law. I'm going to ask you questions. Hopefully you'll respond to those questions. If you don't understand one of my questions, ask me to rephrase it. If you do answer it, we'll assume you understood the question, okay?
    **A.  Okay.**
    Q.  Please make all your responses audibly because

Page 5

**Page 6**

1 the court reporter can't take down shrugs of the head
2 or shakes of the head. It's important for you to
3 respond audibly in a form that's easily recognizable
4 and avoid such terms as uh-huh or huh-uh because I can
5 testify those often come out the opposite way you
6 intended them.
7     A. Okay.
8     Q. One of the uses of a deposition is it can be
9 read out loud to a jury at the time of trial. So you'd
10 want your responses here today as you'd like to hear
11 them read in court. It will be prepared in a booklet
12 form. You'll have an opportunity to review the booklet
13 and make any changes that you believe are appropriate.
14 If you do, however, make any significant changes, that
15 can be brought to the attention of the trier of fact
16 and it could prove to be embarrassing or reflect
17 negatively on your credibility if those changes are
18 significant.
19     What do you do for a living, sir?
20     A. I'm the president of DeWalt Corporation.
21     Q. And just briefly, I assume the people who
22 report to you are called vice presidents or any vice
23 president.
24     A. We've had vice presidents in the past.
25     Q. Do you have them now?

**Page 7**

1     A. No vice president.
2     Q. What are the titles of people that report to
3 you?
4     A. Engineers, drafts people, surveyors,
5 bookkeepers.
6     Q. With respect to contract negotiations, which,
7 if any, of those groups would get involved?
8     A. The engineers and myself.
9     Q. And in particular, who was involved with the
10 negotiation of a contract, if any, between DeWalt and
11 Northern California Universal Enterprises or Lotus?
12     A. That would be myself and Greg Black.
13     Q. And what was the name of the entity that
14 DeWalt contracted with for this work on the Valley Rose
15 subdivision?
16     A. Northern California Universal I think is what
17 they're called.
18     Q. That is the contracting party?
19     A. Yeah.
20     Q. Now, you've been asked to bring some documents
21 here today, and I believe we've marked a copy of your
22 deposition notice as Exhibit 1 to this deposition. If
23 we haven't, we will.
24     (Plaintiff's Exhibit No. 1 marked.)
25     Q. (By Mr. Braze) Have you had a chance to

**Page 8**

1 review that?
2     A. Yes.
3     Q. Did you bring documents which are responsive
4 to that request?
5     A. Yes.
6     Q. Were you involved at all in locating these
7 documents or did you have someone take care of that for
8 you?
9     A. I had someone do it.
10     Q. What did you have them do?
11     A. I actually had more than one person. I had a
12 secretarial staff locate the files and we sent them to
13 the local blueprint company to duplicate everything
14 that was in the files. I had a separate person, who is
15 a little more technical, retrieve the auto cat files
16 from our computer surveyor and burn them onto a CD as
17 well as locate archive to e-mails between Greg Black
18 and Northern California, and he's put those on a
19 separate CD.
20     Q. Who's Greg Black?
21     A. Greg Black was an engineer at DeWalt
22 Corporation.
23     Q. I heard was. He's no longer employed there?
24     A. Yeah. He's no longer employed with DeWalt
25 Corporation.

**Page 9**

1     Q. At what point did he work for DeWalt?
2     A. I think he came on in 1994 and he left DeWalt
3 Corporation earlier in the year.
4     Q. And what was Mr. --
5     A. Did I say 1994? I meant 2004.
6     Q. I was going to say that's a 14-year play.
7     A. It was 2004. I'm sorry.
8     Q. What was Mr. Black's role with respect to the
9 Valley Rose subdivision?
10     A. He was the project manager as well as the
11 engineer.
12     Q. When did -- to the best of your recollection,
13 when did negotiations with respect to the Valley Rose
14 subdivision commence between DeWalt and Northern
15 California? Let me call them Northern California for
16 sake of the deposition. I'll call them NCUE and that
17 will save us -- when I say NCUE, we'll refer to
18 Northern California Universal Enterprises.
19     A. Okay.
20     Q. When did negotiations begin between DeWalt and
21 NCUE?
22     A. I think the initial contact was with Greg, so
23 I don't know the precise dates. I know from the job
24 number that it was in 2004.
25     Q. Had DeWalt previously done business with NCUE

**Page 10**

1  or any of its affiliates?
2  A. I know we have another project with them. We
3  have two projects, but I don't know which one came
4  first. I'm not sure right now.
5  Q. Is that other project still active?
6  A. No.
7  Q. What was the other project?
8  A. It was a subdivision in Rosamond.
9  Q. Was the subdivision in Rosamond, for lack of a
10 better term, from the ground up or was it also
11 previously partially developed?
12 A. The property was partially developed.
13 Q. And did you have separate contracts for the
14 two jobs or a single contract?
15 A. Separate contracts.
16 Q. And, to your knowledge, was the initial
17 contact made with Mr. Black as opposed to yourself?
18 A. I don't know. At the time, if a call came in
19 and I wasn't available, it would have gone to Greg.
20 Q. What was his position in the company?
21 A. He was the director of the engineering
22 department.
23 Q. And how long have you been associated with
24 DeWalt Corporation?
25 A. Since 1983.

**Page 11**

1  Q. And a brief summary of education after high
2  school.
3  A. I attended Bakersfield College.
4  Q. Did you graduate?
5  A. No.
6  Q. Any other education other than Bakersfield
7  College?
8  A. No.
9  Q. Has DeWalt Corporation ever applied for a
10 copyright?
11 A. Not to my knowledge.
12 Q. How about patent qualifications?
13 A. Not to my knowledge.
14 Q. Applied for any trademarks?
15 A. Not to my knowledge.
16 Q. I'm just noticing your logo on your shirt.
17 A. To be honest with you, I don't know if it's
18 copyrighted or trademarked or anything like that. I
19 don't know.
20 Q. Is there someone in the company who would know
21 that?
22 A. The logo was designed when Dennis DeWalt still
23 owned the company. I bought the company from him. I
24 don't know that he ever did.
25 Q. You may want to you consider that.

**Page 12**

1  Q. Does DeWalt belong to any trade organizations?
2  When I say DeWalt, the corporation.
3  A. We belong to the Home Builders Association.
4  Q. And --
5  A. We belong to CELSA, Civil Engineers and Land
6  Surveyors of California.
7  Q. Do you have any licenses, you personally?
8  A. Yes.
9  Q. What license do you have?
10 A. I'm a licensed land surveyor in California.
11 Q. Through any of the trade publications that you
12 receive from either of these organizations, your
13 licensing bureau with the State, have you ever received
14 any information to the effect that tract maps may be
15 copyrighted?
16 A. Not to my knowledge.
17 Q. And you mentioned that both you and Mr. Black
18 negotiated the contract with NCUE. Who had the primary
19 responsibility with respect to that?
20 A. It would have been -- Mr. Black would have
21 prepared it and I would have just reviewed what he had
22 put on there.
23 Q. So the direct contact with NCUE was through
24 Mr. Black --
25 A. Yes.

**Page 13**

1  Q. -- as opposed to yourself?
2  A. Yes.
3  Q. Did you ever talk to Mr. Yu, a principal of
4  NCUE?
5  A. Mr. Wu.
6  Q. Wu.
7  A. I've had conversations with him, yes.
8  Q. Approximately how many conversations have you
9  had with Mr. Wu?
10 A. I'm going to guess. 10 to 15, maybe.
11 Q. And when is the last time you spoke with him?
12 A. Probably two weeks ago.
13 Q. And what was the substance of that
14 conversation?
15 A. He had called to ask me to forward him a copy
16 of a tentative map that we had a copy of.
17 Q. Did that relate to the Valley Rose
18 subdivision?
19 A. Yes.
20 Q. And what map number was that?
21 A. I believe it's 6412.
22 Q. Did he tell you what he wanted with -- excuse
23 me. My tongue is not working this morning.
24    Did he tell you what he wanted with that map?
25 A. Yes. He explained that there was a lawsuit

**Page 14**

1 and that he wanted to look at some of the numbers that
2 were on the map.
3   Q. Was anything further said in that
4 conversation?
5   A. That was mostly the gist of it. He spent a
6 lot of time explaining what the meaning of the -- to
7 his knowledge, what the meaning of the lawsuit was
8 about.
9   Q. What did he say in that regard?
10   A. That the engineer who had prepared the
11 original tentative map had accused him of copying it.
12   Q. And did you have a response for that?
13   A. I kind of talked to him a little bit about
14 what our process was.
15   Q. And what was your process?
16   A. Well, that in preparation for what we did for
17 Mr. Wu, we prepared a survey. We had a survey crew go
18 out to the site and do a complete topographic survey of
19 the existing conditions, and that's what influenced the
20 map design that we came up with.
21   Q. And what did you survey out there, if you
22 know?
23   A. I'll say that I wasn't involved in the actual
24 survey. We had a crew that went out there. I have
25 seen the results of it on paper with points that are

**Page 15**

1 set. And so just from that observation, we surveyed --
2 I'll start from the outside and kind of come in. We
3 surveyed the section, we surveyed monumentation that
4 was local to the site and adjacent to it. We surveyed
5 monumentation that was within the site. We surveyed
6 the curbs and gutters. We surveyed the actual pads,
7 any visible utilities, street signs. That's pretty
8 much it.
9   Q. Then what did you do with that?
10   A. After the survey, it's processed in our office
11 where a map is generated that shows all those points.
12   Q. And where did you get the lot numbers for the
13 lots?
14   A. I don't know.
15   Q. And who would know that, if you know?
16   A. It was Greg's project, so either Greg or one
17 of his draftsmen who prepared our tentative map would
18 have numbered the lots.
19   Q. Was there -- at any time, to your knowledge,
20 did anyone compare your results with map 5472?
21   A. I believe yes, they did.
22   Q. Do you know who did that?
23   A. That was probably Heith James.
24   Q. And is he still employed by DeWalt?
25   A. Yes.

**Page 16**

1   Q. And what's his position?
2   A. He's the survey technician.
3   Q. And do you know where he got a copy of map
4 5472?
5   A. I think he got it from Greg.
6   Q. And did you ever have or overhear any
7 conversations about how map 5472 compared with the map
8 that you developed from your surveys?
9   A. No.
10   Q. Did you hear any conversations to the effect
11 that map 5472 was used to fill in any missing
12 information on any map?
13   A. No.
14   Q. Other than --
15   A. I think I need to clarify that. I'm sorry.
16 At the time that the survey and the map was created I
17 didn't. I wasn't aware of any. After my conversations
18 with Joe Wu two weeks ago we pulled it out and looked
19 at it.
20   Q. You pulled out map 5472?
21   A. Yeah. I pulled it out just to see what they
22 looked like.
23   Q. Did you compare them to each other?
24   A. Yes.
25   Q. How would you describe that comparison?

**Page 17**

1   A. We quickly looked at the boundary and they're
2 very similar but not exact.
3   Q. What's the difference?
4   A. In measurements, five hundredths. Maybe a
5 tenth in some of the lines.
6   Q. The lot numbers are the same?
7   A. The lot numbers are the same.
8   Q. Other than the measurements being off, I guess
9 within any reasonable degree of engineering accuracy,
10 anything else that was different?
11   A. That's all we really looked at. Just quickly
12 pulled it out.
13   Q. Did DeWalt do anything with respect to the
14 improvement plans?
15   A. The City of Wasco, as one of our conditions of
16 approval, required us to prepare improvement plans.
17   Q. And how did you go about that?
18   A. You know, I don't know. That's probably a
19 question for Greg. I wasn't involved in it.
20   Q. Do you know if they obtained copies of the
21 improvement plans that were associated with map 5472?
22   A. I know that we have copies of those.
23   Q. Do you know where you got those?
24   A. I believe we got them from the City of Wasco.
25   Q. Prior to coming here today, did you compare

**Page 18**

1  the improvement plans for map 5472 with the improvement
2  plans that DeWalt developed?
3  A. No.
4  Q. Did you have both of those copies in your
5  office, the ones that are associated with --
6  A. They should both be --
7  Q. Let me finish.
8  A. Sure.
9  Q. Do you have both of those improvement plans in
10 your office, those associated with map 5472 and the map
11 that DeWalt developed?
12 A. Yes.
13 Q. And I think you said you brought them today.
14 A. Yes.
15 Q. You brought both the copies and the
16 improvement plans that you obtained from the City of
17 Wasco and the improvement plans that DeWalt developed?
18 A. Yes. They should be there.
19 Q. Why don't we take some time now and identify
20 some documents. Maybe we can get your box up here on
21 the table.
22     Let's start with the Notice of Taking
23 Deposition here. Number one in our request for
24 production of documents ask for all e-mails and other
25 correspondence between you, meaning DeWalt, and

**Page 19**

1  Northern, Northern California Universal Enterprises.
2  A. All we could find in our archives were Greg's
3  e-mails.
4     MR. TRAVIS: Let's have that as Exhibit 2.
5     MR. BRAZE: Exhibit 2. These are e-mail
6  communications with Greg Black and Northern California
7  Universal Enterprises.
8     (Plaintiff's Exhibit No. 2 marked.)
9  Q. (By Mr. Braze) Number two is all documents
10 prepared by you in connection with your engineering
11 work for Northern.
12 A. That would be everything that's in these files
13 right here.
14    MR. TRAVIS: Let's start out with the
15 contract, the CELSOC, C-E-L-S-O-C, contract, I believe
16 is what it was between and you Northern. Contracts are
17 always a good place to start.
18    MR. BRAZE: Are these copies for us or do you
19 need to take those back?
20 A. No. They're for you. Here you go.
21    MR. TRAVIS: This document here, this is a
22 preliminary document prior to the signing of the actual
23 contract?
24 A. Yeah. That's our proposal letter to Joe. We
25 asked him to sign that stating that he agrees with our

**Page 20**

1  terms.
2     MR. TRAVIS: Let's to the proposal contract as
3  Exhibit 3.
4     (Plaintiff's Exhibit No. 3 marked.)
5  Q. (By Mr. Braze) I noticed your are contracts
6  addressed to Mr. Jesse Miramere.
7     Do you know who that is?
8  A. He's one of Joe's employees.
9     MR. TRAVIS: Was he Joe's engineer at the time
10 of this contract?
11 A. To be honest, I don't know what his official
12 position there is, but he had contact with us.
13    MR. TRAVIS: We can confirm it.
14 A. Okay.
15 Q. (By Mr. Braze) In your proposal, you
16 mentioned the tentative map for Tract 5472 was going to
17 expire.
18    What's your understanding of the impact?
19 A. That Joe could not -- that he didn't have a
20 tentative map to go and file. That he had to start the
21 entire process over again. He had to refile with the
22 City of Wasco.
23 Q. If you were to start from scratch, in other
24 words, just have bear land, nothing, what would it cost
25 to obtain such a tentative map?

**Page 21**

1  A. It would be in the 20- to $30,000 range
2  probably, depending on what all services you were going
3  to give to somebody, because many times there's studies
4  that are involved. I have clients that will procure
5  those studies by themselves and I have clients that
6  will rely on us to do that.
7     MR. TRAVIS: Does that assume that the
8  improvements are already in the ground?
9  A. No.
10       EXAMINATION BY MR. TRAVIS
11 Q. When you say the 25- to $30,000, that's only
12 for surveying services?
13 A. That would be for the surveying services and
14 preparation of the tentative map. You take the survey,
15 you have to process all the data, prepare all the
16 tentative map. And typically those will go through the
17 iterations with the owner to make sure that they're
18 meeting whatever criteria he has.
19 Q. So the 20- to $30,000 is limited to the
20 surveying and process for approving the tentative map?
21 It doesn't include the costs that would be for actually
22 putting improvements in the ground, for city fees, for
23 getting the approval of the improvement plans and
24 accepting the improvement plans, all that is separate
25 from the 20- to $30,000?

**Page 22**

1  A. Yes. Those are costs that the owner would
2  pay.
3  Q. So I'm assuming that in this particular case
4  the improvements were already in the ground so you
5  didn't have to deal with an engineering firm in
6  cooperation with getting the tentative map prepared.
7     Are there other circumstances where the
8  improvements are currently being developed or being
9  approved where you come into the project before all
10 that occurs where you have to work in -- work in
11 cooperation with the engineer?
12    MR. HASSING: Object to the question as vague
13 and ambiguous.
14 A. I'm not sure what you mean.
15 Q. (By Mr. Travis) In this particular case the
16 improvements were already in the ground?
17 A. Correct.
18 Q. Have you ever come across development projects
19 where the improvements weren't already in the ground
20 and you started that project from the beginning?
21 A. Yes. Most of our projects are probably
22 started that way.
23 Q. And in that particular case, do you do any
24 work other than preparing the tentative map or
25 processing the tentative map?

**Page 23**

1  A. Again, it depends on the client's needs and
2  how experienced they are as a developer. Many times
3  the developer will already have a relationship let's
4  say with a soils engineer or somebody that does air
5  quality studies for them or air traffic studies for
6  them, some of those typical studies that a City or a
7  government entity will require as they're considering a
8  project like this. Sometimes they'll rely on us.
9  They'll say we want you to procure all those studies
10 for us because you know the local people.
11    So many times a contract would be a lump sum
12 for some things that we know are going to cost and time
13 and materials for other things that we can't put an
14 actual cost on.
15 Q. And the improvement plans, I'm assuming you
16 had seen the improvement plans that Roger had done for
17 this subdivision.
18 A. I have seen copies.
19 Q. Had you ever done improvement plans on any of
20 the projects that you had worked on?
21 A. You mean have we ever done any improvement
22 plans with the City of Wasco?
23 Q. Correct?
24 A. Yes.
25 Q. Can you explain what that process is like? I

**Page 24**

1  know that's a little bit too general. What's the first
2  step when you're doing improvement plans? What do you
3  need to do in order to get those things on paper?
4  A. Probably the first step is to find out
5  whatever the improvement that you're doing, find the
6  entity that is going to govern the improvement.
7  Typically they'll have some kind of record of what
8  existing facilities you'll use. So the sewer, you'll
9  find out who the district or City that manages the area
10 is and find out the closest space you can tie into the
11 sewer. You try to find out the most logical,
12 economical, efficient way to service your site to that
13 point.
14 Q. So you just started out with one, potentially
15 many, different improvements that you would need to put
16 into the ground.
17    Generally any subdivision like Wasco, to
18 create improvements, what would generally be the cost
19 for creating improvement plans like that?
20 A. $10,000, $15,000, something like that.
21 Q. For putting in -- for creating the sewer
22 plans, the construction plans, the wall plans, the
23 Valley Rose parkway?
24 A. Right. You may have to put together a little
25 water plan. Typically we have to put together some

**Page 25**

1  kind of a utility plan that PG&E or Southern California
2  Edison will use. There's a few plans we have to put
3  together.
4  Q. And speaking of improvement plans, did you
5  bring those with you today?
6  A. It should be in here.
7     MR. BRAZE: Is your file organized in any way
8  in response to the request?
9  A. No. We just sent the file over to be copied.
10 Q. (By Mr. Travis) Right before we get to the
11 improvement plans I think we probably want to put those
12 in order where the Exhibit 4 would be the contract.
13 Did we get that?
14 A. I haven't found it yet, the actual sales
15 document. I'm going to go through this.
16 Q. As you're rummaging through that, if you
17 happen to run across the improvement plans, you might
18 want to set that aside.
19 A. Yeah. I'm looking for that sales contract.
20    Well, I don't see it in that file. This is
21 where it should be.
22    FURTHER EXAMINATION BY MR. BRAZE
23 Q. In the material you brought with you today,
24 you don't see the contract with NCUE?
25 A. No. I don't see that or the improvement

**Page 26**

1  plans. I'm going to take a look through here.
2     Q. I take it at some point you did see the
3  improvement plans for both map 5472 and the map that
4  you prepared. Is that correct?
5     A. Yes. I think what happened is the girl
6  assigned to do this grabbed the two files that were in
7  the file cabinet. We have a flat file that probably
8  has the improvement plans and some other things in it,
9  and I don't think she got the things out of the flat
10 file. I'll probably need to get those things for you.
11    Q. What else is in the flat file other than the
12 improvement plans?
13    A. Anything that we produced.
14    Q. You mentioned one telephone conversation with
15 Mr. Wu about this lawsuit.
16       Did you have any other conversations with him
17 about the lawsuit?
18    A. Just the one when he called and asked for the
19 map.
20    Q. Do you know Roger McIntosh?
21    A. I do.
22    Q. Do you know his business?
23    A. Yes.
24    Q. Would you describe them as competitors?
25    A. Yes.

**Page 27**

1     Q. At any time during your work on the Valley
2  Rose subdivision, did you or anyone in your employ call
3  Mr. McIntosh?
4     A. I didn't. And I'm not aware that Greg did
5  either.
6     Q. Did Mr. Wu relate to you any conversations
7  that he had with Mr. McIntosh --
8     A. No.
9     Q. -- regarding this subdivision?
10    A. No.
11    Q. Did Mr. Wu or anyone that worked for him tell
12 you that they had contacted Mr. McIntosh about
13 obtaining copies of his map and improvement plans?
14    A. No.
15       MR. BRAZE: Let's go off the record a minute.
16       (A recess was taken.)
17       MR. TRAVIS: Back on the record.
18       What we're going to do is identify the
19 documents that you have produced. What I'm going to do
20 is go through the notice of deposition. The first
21 request was all e-mail and other correspondences.
22       FURTHER EXAMINATION BY MR. TRAVIS
23    Q. And that was in Exhibit 2 with the CD you gave
24 us, correct?
25    A. Yes.

**Page 28**

1     Q. Two, all documents prepared by you in
2  connection with your engineering work with Northern. I
3  guess that is the bulk.
4     A. Yes. That would probably be the bulk of this,
5  although there's research and title documents and
6  engineer estimates all intermixed.
7     Q. I'm going to have to look at these. Many of
8  these we probably don't need.
9        By the way, did you do a bond estimate for
10 this?
11    A. I believe it's in there.
12    Q. This Tract No. 6451, this is the tentative map
13 or the final?
14    A. Looks like the final map.
15    Q. Where is the tentative map? Would the
16 tentative map folder be in here? Is there any rhyme or
17 reason?
18    A. This is all the surveyor's data. This is
19 their file. And that's the engineering, that's Greg's
20 file over there. So the tentative file is probably a
21 little deeper in there because it was done a little
22 later -- earlier.
23    Q. You know your files. Can you find tentative
24 Tract 6451 for me? What's our exhibit number at?
25 Four.

**Page 29**

1        In anticipation of him finding tentative
2  Tract 6451 we'll go ahead and enter in final tract map
3  6451 as Exhibit 5.
4        MR. OKADIGBO: Is Exhibit 4 the contract that
5  he was searching for?
6        MR. TRAVIS: I see. So final tract map is
7  going to be Exhibit Number 6.
8     A. Can I interject?
9     Q. (By Mr. Travis) Sure.
10    A. That was probably part of a submittal so it's
11 not the approved map.
12    Q. It's not the signed approved map?
13    A. Just so you know.
14    Q. That's fine. That's the signed --
15    A. This is the tentative map.
16       MR. TRAVIS: This will be number 5.
17       (Plaintiff's Exhibit No. 5 marked.)
18       MR. TRAVIS: 6 will be the final tract map
19 6451.
20       (Plaintiff's Exhibit No. 6 marked.)
21    Q. (By Mr. Travis) I'm trying to find the
22 signed -- or a copy of the signed final tract map
23 number 6451.
24    A. I don't think that's in this file.
25    Q. This 6451 final map is not signed.

**Page 30**

1  Is this identical to what was eventually
2  signed?
3      A. I don't know. That was probably submitted.
4  We made a copy of the submittal and put it in the file.
5  We probably got something back that was either marked
6  up -- we can obtain a copy. It's a record now. You
7  can get a copy from the County Recorder's. We can get
8  that for you.
9      Q. I didn't know if you had an actual copy of it
10 in your file.
11     A. There's not in this file.
12     Q. There's a lot of documents in here and I don't
13 want to have her enter in as exhibits that we already
14 have. Anything that I want to identify and enter as an
15 exhibit we'll just do later on. We'll waste all of our
16 time doing that.
17         MR. HASSING: Later on today?
18         MR. TRAVIS: Off the record.
19         (At 11:08 A.M. the deposition was continued to
20 1:06 P.M., at which time the following proceedings were
21 had:)
22         (Plaintiff's Exhibit No. 4 marked.)
23     Q. (By Mr. Travis) Greg, you had went ahead and
24 gotten back to your office and these are the documents
25 that we had discussed earlier.

**Page 31**

1  Can you open those up and show me what you
2  got?
3      A. Sure. This is the CELSOC contract with Joe Wu
4  and that's a copy that you can keep.
5      Q. This is the contract between and you Northern
6  California Universal Enterprises for work on the Valley
7  Rose subdivision?
8      A. Yes.
9      Q. Is this the only contract that was signed
10 other than the proposal that we already exhibited here?
11     A. Yes. And it's attached to that.
12     Q. On the contract it says here Wasco subdivision
13 expired Tract 472.
14        Do you know what that means or why that's put
15 there?
16     A. I think for identification purposes, what we
17 were talking about.
18     Q. What do you mean?
19     A. It's just an identifier so that when we refer
20 to this contract -- so we know the location.
21     Q. When you say location, you mean -- I don't
22 know what you mean about it.
23        What do you mean by location?
24     A. We might do other jobs for Joe in other parts
25 of the county or in the city of Bakersfield or

**Page 32**

1  something. His Wasco subdivision, which was this
2  expired tract.
3      Q. And so 5472 represents the location where the
4  project was going to be performed?
5      A. Yeah. That was a way for us to cite it.
6      Q. So are you saying that 5472 is in the
7  identical location as where Tract 6451 is?
8      A. Yes.
9      Q. Are you familiar with -- I'm sure you are --
10 the PLSS, the Public Land Survey System --
11     A. Yes.
12     Q. -- and all of its markers?
13        And from your understanding, are the
14 boundaries in everything that's in Tract 6451 the same
15 as in Tract 5472?
16     A. They're not exactly the same but they're very
17 similar.
18     Q. They're within a small margin of --
19        MR. HASSING: I object that small margin is
20 vague and ambiguous.
21     Q. (By Mr. Travis) So there's going to be some
22 measurements that are going to be very close. There
23 might be some degrees that are slight --
24     A. Yes.
25        MR. HASSING: Again, I'm going to object as

**Page 33**

1  slight as very vague and ambiguous.
2      Q. (By Mr. Travis) Looks like you brought a roll
3  of maps.
4      A. Yeah. These were the copies that were in our
5  flat file, so I brought those too.
6      Q. Can you show me what those are?
7      A. Sure.
8      Q. When you say copies, you mean copies of what?
9      A. What was -- I made prints so that the original
10 stayed at my office and these are copies of what was in
11 that file, and they are work product that we produced,
12 our tentative map and our final map.
13     Q. So all you brought back with you are
14 the tentative -- copies of the tentative and final maps
15 for Tract No. 6451?
16     A. Yes.
17     Q. When we left you had mentioned that you had
18 copies of the plans that you had prepared for this
19 tract.
20     A. What I discovered was that in the flat file
21 there were no copies of those. Those are on one of the
22 disks that you got and the e-mail correspondence that
23 Greg had with the City of Wasco, all of those are
24 electronic are pdf files, some electronic format, the
25 improvement plans are all electronic. I couldn't find

**Page 34**

1  any prints.
2  Q. Did you go through that disk?
3  A. I little bit.
4  Q. Did you see the plans on that disk?
5  A. Yes.
6  Q. Do you remember what folder it was under?
7  A. The disk that has it is a reproduction of
8  Greg's subdirectory where he put all the e-mails of
9  this project and put them under a specific
10 subdirectory.
11 Q. Do you know which program is used to gain
12 access to those particular files?
13 A. In our office it's Outlook.
14 Q. It's Outlook.
15 A. Yeah.
16 Q. So you're saying that there are Outlook files
17 on this disk?
18 A. Yes.
19    MR. TRAVIS: Off the record.
20    (A recess was taken.)
21 Q. (By Mr. Travis) So attached as Exhibit 2 is
22 the correspondences and in the correspondences are
23 attachments that are plans; is that correct?
24 A. Yes.
25 Q. And who are those correspondences to and from?

**Page 35**

1  A. Different people, but mostly Greg Black and
2  people from Northern California or the City of Wasco or
3  in some cases title companies, other people that might
4  have gotten involved in the project that Greg had to
5  e-mail.
6  Q. And as part of those correspondences were
7  attachments -- what were some of those attachments?
8  A. In some cases title documents, old plans, the
9  tentative map, just various things associated with the
10 project.
11 Q. Which included as attachments the improvement
12 plans?
13 A. Yes.
14 Q. And which improvement plans were those?
15 A. I glanced at the subdirectory during the break
16 and I saw grading plans, some street improvement plans,
17 a tentative map in there.
18 Q. And those were the original improvement plans
19 for the Valley Rose Estate subdivision?
20 A. They came from the City of Wasco, so I assume
21 that's what they had on file.
22 Q. Also attached as Exhibit Number 5, you had
23 identified tentative Tract Map 6451. We should
24 probably use the exhibit that's already been marked.
25 Do we have that? Here we go.

**Page 36**

1  Exhibit 5 is the tentative map. On the notes
2  section comment number two -- excuse me, comment number
3  one it refers to -- you know, I'm looking at it upside
4  down. Read the number one.
5  A. Sure. This development contains existing
6  improvements built for Valley Rose planned community,
7  expired tentative Tract 5472, an associative approved
8  improvement plans.
9  Q. Do you know which approved improvement plans
10 it was referring to?
11 A. I suspect the improvement plans for
12 Tract 5472.
13 Q. The ones that Roger McIntosh had prepared?
14 A. Yes.
15 Q. Are you familiar with -- I'm assuming you
16 are -- legends on tentative maps?
17 A. Yes.
18 Q. For example, legends on this map -- the
19 particular legend that I'm looking at here is the
20 legend with the box with a little circle and it refers
21 to existing centerline monuments.
22    Where are those on the tentative map?
23 A. You can see one at the end of this cul-de-sac
24 here.
25    MR. HASSING: Can you name that cul-de-sac?

**Page 37**

1  A. Sure. It's Saw Grass Court at the
2  intersection of Pebble Beach Way and Saw Grass Court.
3  At the end of the cul-de-sac that's Pebble Beach Way.
4  At the intersection of St. Andrews Crescent and Pebble
5  Beach Way.
6  Q. For the sake of redundancy, it looks like --
7  in cumulative testimony here, it looks like there are a
8  number of those centerline monument markers at various
9  places along each of the streets that are in this
10 tentative map.
11    Do you know how it's determined how those
12 markers are placed there?
13 A. What this map represents is what we've
14 surveyed prior to the preparation of this map. So when
15 we prepare one of these, it's done so that the
16 governing agency can review it and understand what the
17 conditions are out here. If we found a monument at the
18 end of the cul-de-sac or intersection of that street,
19 we would have surveyed that street and described it in
20 the survey and got plotted on a map that got prepared
21 for the City of Wasco.
22 Q. Do you have those documents that you had
23 earlier, the stack? I'm going to go get those.
24    Now, I'm looking at --
25    MR. OKADIGBO: Is that exhibit --

```
 1       MR. TRAVIS: Let me use the exhibit.
 2    Q.  (By Mr. Travis) This is Exhibit Number 6.
 3  We've already identified this as final tract map,
 4  Number 6.
 5       On this particular legend for the final tract
 6  map, what is that circle with the dot? It's underneath
 7  the legend. It's a black line circled with a black dot
 8  in the middle.
 9       Is that the same reference marker as the one
10  in the tentative tract map?
11    A.  Appears to be.
12    Q.  I'm looking at it upside down.
13       So that's a yes?
14    A.  Here we noted the existing monuments with a
15  square.
16       MR. HASSING: Here on what?
17       MR. OKADIGBO: On Exhibit 5.
18    A.  On Exhibit 5 we noted them with a square, but
19  on Exhibit --
20    Q.  (By Mr. Travis) Six?
21    A.  -- 6 we denoted it with a circle.
22    Q.  That's a matter of custom and discretion of
23  who prepared the map?
24    A.  Yes.
25    Q.  But it refers to the same points on the
                                                Page 38
```

```
 1  particular map?
 2    A.  Yes.
 3    Q.  In the annotation to this legend it says --
 4  I'm reading it upside down again -- annotation on final
 5  tract map, Exhibit No. 6, the legend reference that we
 6  were just looking at, it says -- I don't know the
 7  abbreviations for that.
 8    A.  Fd stands for found. Six inch concrete
 9  monument with brass tags marked LS4713. Not of record.
10  Accepted for position.
11    Q.  What does that mean, not of record? Accepted
12  for position?
13    A.  When we're preparing a final map for a city or
14  county or agency that's going to review it, you make
15  reference to another map, possibly that had been
16  recorded previously and accepted that had the same
17  monumentation on it.
18       I think that statement, not of record, what
19  we're referring to is that there's these monuments that
20  were set in here that we couldn't find any recorded map
21  for, how they were set.
22    Q.  But it says -- so what was the map not of
23  record that was accepted for position?
24    A.  We never found a map of record to state where
25  these were supposed to be.
                                                Page 39
```

```
 1    Q.  Did you find a map not of record?
 2    A.  Well, the tentative map is not of record.
 3       MR. HASSING: Which tentative map?
 4    A.  Tentative map -- I don't know the number --
 5       MR. HASSING: McIntosh's?
 6    A.  Yeah.
 7    Q.  (By Mr. Travis) And this is my first foray,
 8  as you could probably tell, into zoning and land law
 9  and how to create subdivisions so it's been an
10  interesting experience.
11       When you prepared -- or you had Greg prepare
12  this particular map, and I'm referring now to either
13  the Exhibit 5 or 6, how was it that you went ahead and
14  determined what the lot numbers were going to be?
15    A.  You know, I honestly don't know how they were
16  chosen. Although, I think I should state that -- right
17  now I'm the most knowledgeable person of this tract at
18  DeWalt Corporation and prior to that it was Greg and he
19  had draftsmen, and I don't know how he chose the
20  numbering.
21    Q.  If it was the fact that the original
22  improvement plans had the numbering scheme this
23  particular way, would you have to set it up in the
24  exact same way?
25    A.  I don't think we would have to, but if we
                                                Page 40
```

```
 1  were -- if there was some convenience in us using the
 2  same numbering system -- for instance, you know if we
 3  were counting up whether or not the improvement plans
 4  showed laterals for sewers for each lot, it might be
 5  convenient if were you talking about the same lot.
 6  Honestly, I don't even why they chose this convention.
 7    Q.  That's fair. Could you have, as the civil
 8  engineer in preparing this map, changed any of the lot
 9  sizes if you wanted to?
10    A.  First, I'm not a civil engineer.
11    Q.  My mistake.
12    A.  I'm not stating that I am.
13       MR. OKADIGBO: To that extent, calls for
14  speculation.
15    Q.  (By Mr. Travis) In a deposition -- you don't
16  have an attorney here. There has been an objection
17  which can be made at trial which the judge can rule on.
18  However, you can still answer the question. Those
19  objections can be dealt with at a later time.
20    A.  Okay. Yeah, I think we could have, but I
21  don't think it would have been the most effective way
22  for us to represent our client because I think it would
23  have ended up costing him some money in probably
24  removing or tearing up or destroying existing
25  improvements.
                                                Page 41
```

**Page 42**

1  Q. Can you explain why that would be the case?
2  A. You know, just as a for instance, the curb and
3  gutter was installed out here and the drive approaches
4  were already in place. So for any -- if I would have
5  made lots three and four one large lot, there might
6  have been two drive approaches that might have to be
7  destroyed, removed, and replaced to be put in a
8  position where it could be used better. I guess that
9  goes for the sewer laterals and the electrical and the
10 water.
11 Q. So to be efficient in preparing this
12 particular map, you would not have wanted to change,
13 say, the dimensions of the lot number or the -- I'm
14 sorry. What are the little circle dots called again?
15 A. Those are survey monuments.
16 Q. You would not have wanted to change that?
17     MR. HASSING: It assumes that those lots were
18 not changed. I'm going to object to the question.
19     MR. TRAVIS: I'm not understanding your
20 objection.
21     MR. HASSING: Well, the form of your question
22 imposes an assumption that the size of the lots were
23 not changed, and they were changed. That's my
24 objection.
25     MR. TRAVIS: That's fine. I'll deal with that

**Page 43**

1  objection later.
2  Q. (By Mr. Travis) You had said before, and
3  correct me if I'm wrong, that it was efficient and it
4  was in the best interest of your client to, for
5  example, keep the lot numberings the same.
6  A. I think I said that I wasn't exactly sure why
7  we came up with the numbering convention, but that it
8  could have been convenient. And the lots, while
9  probably not exactly the same dimensions, are similar
10 because of the existing improvements. We surveyed all
11 the existing improvements, everything that was above
12 ground and visible, so that we could give him the most
13 efficient use of what was out on the site.
14 Q. Let's move on, then, to the legend itself. I
15 mean, it sounds like you've been in business for quite
16 a number of years and you've done quite a few of these.
17     The annotations and the marking, and I'm
18 looking now at Exhibit 6, the final Tract Map 6451, the
19 annotations and the markings, how do you determine what
20 types of annotations are put on there, what is
21 necessary and what's not necessary?
22 A. There are some common standards that I think a
23 lot of draftsmen, a lot of engineers and surveyors use
24 in our cities and counties locally. I don't think that
25 anybody like the City of Wasco requires you to use

**Page 44**

1  specific markings for each one of those. As long as
2  you're consistent on your map and -- they review these
3  before they approve them, then it's pretty much left up
4  to the surveyor or engineer.
5      In this particular case, I'm guessing that the
6  draftsman who was preparing this map took a shell cad
7  drawing from a previous final map and used it to begin
8  preparing this one and it had some icons on it and he
9  just used those.
10 Q. At some point, if you -- if you're unfamiliar
11 with the process go ahead and say I don't know if you
12 don't know.
13     At some point the City of Wasco or an engineer
14 is going to come out and review this map. What is your
15 understanding of that process and what they're looking
16 at, if you know?
17     MR. OKADIGBO: Objection. Calls for
18 speculation.
19 Q. (By Mr. Travis) If you know.
20 A. What I know of the process is that they try to
21 verify that it's in compliance with the subdivision
22 tract map, that the legal description of the property
23 has been held to. They check things like closures on
24 all the lots to make sure that the dimensions that we
25 show do indeed form a closed entity.

**Page 45**

1  Q. When you're saying boundaries -- I'm looking
2  at final map 645, Exhibit 6 -- which boundaries are you
3  referring to?
4  A. There would be two boundaries, I think, they
5  would be very concerned with, the first being the
6  exterior of the entire piece of land. The second would
7  be the individual lots.
8  Q. So you said for there to be compliance, that
9  the boundaries would need to -- what would they compare
10 the -- what would they be comparing these boundaries
11 with on the final map?
12 A. The exterior.
13 Q. So make sure they're in compliance?
14 A. To the legal description of the property.
15 Q. And what about the interior?
16 A. They would be comparing each individual lot.
17 They wouldn't be comparing it to anything other than
18 itself. They just wanted to know that it closed, that
19 from this starting point you could use these bearings
20 and distances to go around it, and when you got back to
21 here you'd be on the same point.
22 Q. Because in my understanding, a lot of this is
23 because I need to get clear on how this process works.
24     They do at some point, don't they, have to
25 check on the first page of the final map that there's a

**Page 46**

1  City engineer statement where it says on the City
2  engineer that it's substantially the same as it
3  appeared on the tentative map. And in that case, what
4  tentative map would that be?
5  A. That would be the tentative map for Exhibit 6,
6  the tentative map for 6451.
7  Q. Do you know who it was that reviewed final map
8  6451?
9  A. I don't know.
10 Q. It's okay.
11    MR. TRAVIS: That's it.
12    MR. HASSING: That's it?
13    MR. TRAVIS: That's all the questions I have.
14 Actually, before -- off the record.
15    (A recess was taken.)
16 Q. (By Mr. Travis) Looking again at final map
17 6451, the second page, it refers up here at the very
18 top where it says legend -- it says marked LS 7573.
19    Do you know what that is?
20 A. The LS number?
21 Q. Correct.
22 A. Yes. That's my license land surveyor number.
23 Q. So your license land surveyor number is 7573?
24 A. Yes.
25 Q. Who is land surveyor number 4713?

**Page 47**

1  A. I'm not positive, but I think it's Roger.
2  Q. Roger McIntosh?
3  A. Yeah.
4  Q. So you had to rely for these monuments --
5  okay. Well, scratch that.
6     That's Roger's license number, to the best of
7  your knowledge?
8  A. I think it is.
9  Q. And the associative improvement plans, looking
10 again at the notes -- I'm trying to find it to see if
11 they're on this one. Excuse me.
12    It's probably on Exhibit 6 somewhere, but I
13 know they are here. On Exhibit 5 in the note section
14 it talks about the approved -- an associative approved
15 improvement plan.
16    Is that referring to Roger's plans as well?
17 A. Yes.
18    MR. TRAVIS: Now that's it.
19    EXAMINATION BY MR. HASSING
20 Q. To your knowledge, did your office ever
21 prepare any improvement plans for this subdivision?
22 A. Yeah. No, we did not. No, we did not.
23 Q. Do you know why you didn't?
24 A. Greg probably knows better than I do.
25 Q. What is your understanding of why?

**Page 48**

1  A. I would assume it was because the improvements
2  were all installed.
3     MR. HASSING: I have no further questions.
4     EXAMINATION BY MR. OKADIGBO
5  Q. In terms of how the lot numbers would have
6  been chosen, you didn't have any role in choosing the
7  numbers listed on either tentative map or final map
8  6451, did you?
9  A. Not me personally, no.
10 Q. So you can only guess as to what that process
11 would have involved since you didn't do it; is that
12 right?
13 A. Yes.
14 Q. What specifically did Northern California --
15 NCUE hire DeWalt to do for them in relation to the
16 Valley Rose Estate subdivision?
17 A. They hired us to do topographic survey of the
18 site. They hired us to prepare a tentative map and
19 they hired us to prepare the final map and to get the
20 final map approved.
21 Q. How much did you charge NCUE for that?
22 A. Can I refer to one of these?
23 Q. I think it's in Exhibit 4.
24 A. Yeah. In Exhibit 4, a proposal letter is here
25 and it's broken down. $7,500 for the topographic

**Page 49**

1  survey. There was six, $5,500 for the tentative map,
2  and $5,500 for the final map, and $7,500 for installing
3  lot corners and any monuments that we might have had to
4  set as a result of filing the final map.
5  Q. Again, it's your testimony that Greg Black
6  would know more about the actual work that DeWalt did
7  for NCUE than you know?
8  A. Yes. When we got the request for the
9  deposition, you asked for the person most knowledgeable
10 at DeWalt Corporation and it so happens that's me at
11 this point. When Greg worked there, it would have been
12 him because he was the project manager.
13 Q. And I assume that also means in terms of the
14 legends, whether monuments were on the map or not and
15 all those sort of variables, those would be things that
16 he would be more likely to know the answers to than
17 you; is that correct?
18 A. Greg had more contact with the draftsman who
19 prepared this than I do.
20    MR. OKADIGBO: I have nothing further.
21    MR. HASSING: I note that Exhibit Number 2 is
22 the e-mail disk. We've also got a second disk but
23 that's not been identified as an exhibit. Is it going
24 to be?
25    MR. TRAVIS: No. I looked on that disk.

**Page 50**

1  Can you say again what was on this second
2  disk?
3  A. Sure. We have a subdirectory on our server,
4  our main drive, that we store all our electronic data
5  on. Our auto cat files would be on that. I noticed
6  that there's some other tif files that were probably
7  downloaded off the County's website of other maps that
8  were done in the area, research that we did. When
9  you're working in auto cat, it's basically a big
10 database and it creates all kinds of other files.
11 They're all stored on there. Some documents that were
12 prepared, like letters to the City. I note there's a
13 letter from Greg to Joe. Word documents are on that
14 disk.
15     MR. TRAVIS: We'll go ahead and mark it as
16 seven, since you've already told us what was on there.
17     (Plaintiff's Exhibit No. 7 marked.)
18     MR. OKADIGBO: I have one more question.
19 Q. (By Mr. Okadigbo) You mentioned that you
20 talked to Joe Wu at one point about a copy of tentative
21 map 6412 or something like that; is that right?
22 A. Yes.
23 Q. Did you say that he asked you for a copy of
24 that?
25 A. Yes.

**Page 51**

1  Q. Did you give him a copy of that?
2  A. Yes.
3     MR. TRAVIS: When you said 6412 did you mean
4  6412 or 6451?
5  A. 6451. It was this map.
6     MR. TRAVIS: And that's also going to go into
7  our stipulation later on, that you're going to receive
8  a copy of your deposition transcript so you'll be able
9  to look at it and make any changes such as
10 typographical errors or otherwise.
11    MR. HASSING: You're going to get a letter
12 from the court reporter indicating you can come in to
13 her office and review it. You won't actually get a
14 copy. Isn't that the way we've been doing it?
15    Off the record.
16    (Discussion off the record.)
17    MR. TRAVIS: We'll just relieve the court
18 reporter of her duties and then send it to us.
19    Was it 30 days, I think, we had.
20    MR. OKADIGBO: Copy.
21    MR. HASSING: Copy.
22    (At 2:03 P.M. the deposition of Jeffrey
23 Gutierrez was concluded.)
24    _____
25

**Page 52**

1  STATE OF CALIFORNIA )
                       ) ss.
2  COUNTY OF KERN      )
3
4      I, Jeffrey Gutierrez, do hereby certify:
5      That I have read the foregoing deposition;
6      That I have made such changes in form and/or
7  substance to the within deposition as might be
8  necessary to render the same true and correct;
9      That having made such changes thereon, I
10 hereby subscribe my name to the deposition.
11     I declare, under penalty of perjury, that the
12 foregoing is true and correct.
13     Executed this      day of        , 2008,
14 at             , California.
15
16
17
18
19            Jeffrey Gutierrez
20
21
22
23
24
25

**Page 53**

1  STATE OF CALIFORNIA )
                       ) ss.
2  COUNTY OF KERN      )
3      I, Naomi S. Álvarez, a Certified Shorthand
4  Reporter in the State of California, holding
5  Certificate No. 13007, do hereby certify that Jeffrey
6  Gutierrez, the witness named in the foregoing
7  deposition, was by me duly sworn; that said deposition
8  was taken Monday, November 24, 2008, at the time and
9  place set forth on the first page hereof.
10     That upon the taking of the deposition, the
11 words of all parties present were written down by me in
12 stenotypy and thereafter transcribed by computer under
13 my supervision; that the foregoing is a true and
14 correct transcript of the testimony given by the
15 witness.
16     I further certify that I am neither counsel
17 for, nor in any way related to any party to said
18 action, nor in any way interested in the result or
19 outcome thereof.
20     Dated the 9th day of December, 2008, at
21 Bakersfield, California.
22
23
24
                Naomi S. Álvarez, CSR #13007
25

# PROOF OF SERVICE
## (FRCP No. 5(b)(2)(E))

**STATE OF CALIFORNIA, COUNTY OF KERN**

I, Gina Pomato, declare:

I am a citizen of the United States. I am employed in the County of Kern, State of California. I am over the age of 18 and not a party to the within action; my business address is 5060 California Avenue, Suite 700, Bakersfield, California 93309.

On **December 30, 2008**, I served the foregoing document described as **DECLARATION IN SUPPORT OF MOTION TO AMEND PLEADINGS** on the other party(ies) in this action as follows:

| | |
|---|---|
| Steven John Hassing, Esq.<br>Law Offices of Steven J. Hassing<br>425 Calabria Court<br>Roseville, CA 95747<br><br>email address: **stevehassing@yahoo.com** | Attorneys for Attorneys for Defendants,<br>Northern California Universal Enterprises<br>Company and Lotus Developments<br>Tel:   916/677-1776<br>**Fax:   916/677-1770** |
| Chaka Okadigbo<br>**Garcia Calderon Ruiz, LLP**<br>500 South Grand Ave Suite 1100<br>Los Angeles, CA 90071<br><br>email address: **cokadigbo@gcrlegal.com** | Attorneys for Defendant, City of Wasco<br><br>Tel: 213/347-0210<br>**Fax: 213-347-0216** |

☒  **BY ELECTRONIC SERVICE:** Pursuant to Fed. R. Civ. P. 5(b)(2)(E) and Local Court Rule(s), the foregoing document will be served by the court via CM/ECF.. Pursuant to the CM/ECF docket for this case proceeding the following person(s) are on the Electronic Mail Notice List to receive ECF transmission at the email address(es) indicated below:

☐  **BY MAIL:** As follows: I am "readily familiar" with the firm's practice of collection and processing correspondence for mailing. Under that practice it would be deposited with U.S. postal service on that same day with postage thereon fully prepaid at , California in the ordinary course of business. I am aware that on motion of the party served, service is presumed invalid if postal cancellation date or postage meter date is more than one day after date of deposit for mailing in affidavit.

Executed on **December 30, 2008**, at Bakersfield, California.

I declare that I am employed in the office of a member of the bar of this court at whose direction the service was made.

_____Gina Pomato_____                              _____/s/ Gina Pomato_____