Steven J. Hassing
California SBN 152125
LAW OFFICES OF STEVEN J. HASSING
425 Calabria Court
Roseville, CA  95747
Telephone:  (916) 677-1776
Facsimile:   (916) 677-1770

Attorney *for Defendants Northern California Universal Enterprise Company and Lotus Developments, LP*

# UNITED STATES DISTRICT COURT

# EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ROGER MCINTOSH,<br><br>                         Plaintiff(s);<br>v.<br><br>NORTHERN CALIFORNIA UNIVERSAL ENTERPRISES COMPANY, ET AL.,<br><br>                         Defendant(s) | No.  1:07-CV-01080-LJO-GSA<br><br>**DEFENDANT, NORTHERN CALIFORNIA UNIVERSAL ENTERPSISE COMPANY'S AND LOTUS DEVELOPMENTS, L.P.'S POINTS AND AUTHORITIES IN SUPPORT OF SUMMARY JUDGMENT**<br><br>**DATE:  OCTOBER 28, 2009**<br>**TIME:   8:30 A.M.**<br>**PLACE:  COURTROOM 4**<br><br>**JUDGE: Lawrence J. O'Neill** |
| CITY OF WASCO,<br><br>                    Cross-Complainants(s);<br>v.<br><br>NORTHERN CALIFORNIA UNIVERSAL ENTERPRISES COMPANY, ET AL.,<br><br>                    Cross-Defendant(s) | |

# I
# INTRODUCTION

## A.  Case Overview

This is a copyright infringement case in which a surveyor/engineer alleges that a real estate developer infringed his copyright by preparing a tentative subdivision map which incorporated the same "ideas" for street and lot layout as shown on a tentative subdivision map that his company prepared 12 years earlier.  In addition, although neither the developer nor his engineer copied or used them, he alleges infringement of the improvement plans under which the subdivision was constructed.  Plaintiff has also sued the developer's engineer and the City of Wasco.

This summary judgment motion demonstrates, as a matter of law, that there has been no copyright infringement.  The undisputed facts establish that there was no copying of either the subdivision map or the improvement plans.  The only evidence concerning that issue establishes that the developer's engineer independently created its own map from its own survey.  As for the improvement plans, Defendants were relieved by the City of Wasco from drafting or submitting improvement plans.

This is a frivolous action filed and prosecuted in bad faith.  Plaintiff sat by quietly for over three years while the developer spent millions of dollars developing the 68 lot subdivision.  He waited until the developer was actually building homes— until it was too late to change course— before springing his nefarious trap

This lawsuit is classic misuse copyright law.  Worse, it is a sanctionable fraud upon this Court and it would be appalling if Plaintiff's scheme were allowed to succeed.

///

Defendants, Northern California Universal Enterprise Company's and Lotus Developments, L.P.'s Points and Authorities in Support of Summary Judgment

**B.  <u>Parties and Other Relevant Individuals</u>**

The plaintiff is Roger McIntosh, (**"McIntosh"**), a Bakersfield surveyor/engineer. Until 1999 McIntosh was a member of Martin-McIntosh Land Surveyors, (**"MM"**). Eugene Martin, (**"Martin"**), not a party, was the other half of MM and figures prominently later in this brief.

The moving parties are defendants, Lotus Developments, L.P., (**"Lotus"**), a California limited partnership and Northern California Universal Enterprise Company, Inc., (**"Northern"**).  Northern is a general contractor and Lotus's general partner.  The remaining defendants are the City of Wasco, (**"The City"**) and Dennis W. DeWalt, Inc., (**"DeWalt"**), a Bakersfield engineering firm hired by Northern to create an entirely new and different subdivision map incorporating MM's <u>non-copyrightable</u> "ideas" for layout.

Though not a defendant, Joe Wu, (**"Wu"**) is Northern's president and will be referred to throughout this brief.  Another non-party often be referred to is The Legacy Group, L.P., ("**Legacy**").  Legacy was the original developer of the parcel at issue.  Michael Brown, (**"Brown"**), also not a party, was Legacy's general partner and supports this motion by sworn declaration.

**C.  <u>Specialized Terminology</u>**

An understanding of this case requires some familiarity with the following terms used within the Subdivision Map Act;

<u>**"Final Map"**</u> is a subdivision map prepared in accordance with an approved tentative map which allows the sub-divider to legally sell the smaller lots contained therein.

"Improvement" refers to any street work and utilities to be installed on the land to be used for public or private streets including sewer, water, storm drain, curbs, gutters, streets, landscaping and street lights.  (Gov. Code Section 66419(a).

"Improvement plan" means the engineered drawings used to construct public improvements. (Gov. Code Section 66456.2(d).

"Monuments" are durable markers which the engineer or surveyor must set at the time of making a survey for a final map or parcel map so that another engineer may readily retrace the survey. (Gov. Code Section 66495).

"Parcel Map" is a legal mechanism to subdivide real property into smaller parcels.  There is a limit to the number of parcels that can be created by using the parcel map process.  A landowner can only use the parcel map process once.  Future divisions of the same property require a tract map.

"Remainder" is that portion of a unit of land being subdivided which, itself, is not subdivided. (Gov. Code Section 66424.6(a).

"Tentative Map" is a tract map made for the purpose of showing the design of a proposed subdivision and the existing conditions in and around it.  (Gov Code Section 66425.5)

"Vesting Tentative Map" refers to a tentative map that has had conferred upon it a vested right to proceed with development in substantial compliance with the ordinances in effect at the time the application is considered complete.  (Gov. Code Section 66498.1(b).

**D.  <u>Summary of Arguments</u>**

In 1992 MM created Tentative Subdivision Map 5472, (**"Map 5472"**) intended to lead to a final map creating a <u>69 lot</u> subdivision.  In1993, MM prepared the subdivision

improvement plans, (**"The Plans"**) used to construct the water, sewer, storm drain, streets lighting, block walls and landscaping improvements within Tract 5472. Between 1993 and 1994 the subdivision improvements were constructed.  However, MM and Legacy failed to get the final map approved and recorded and in 2001, Map 5472 expired.

In 2004, DeWalt independently surveyed the existing improvements which had been constructed by Legacy and prepared a new and different <u>68 lot</u> map for Northern.  In 2007 McIntosh sued Lotus, Northern and DeWalt contending that DeWalt copied Map 5472 in preparing Map 6451 and that The City "used" or allowed DeWalt, Northern and Lotus to "use" The Plans in order to facilitate the recording of Final Map 6451.  McIntosh sued The City alleging that it "contributed" to the infringement.

Discovery has concluded, the relevant facts have been established and this case is ripe for final determination as a matter of law.  Lotus and Northern seek Summary Judgment because McIntosh will be unable to establish copyright infringement at trial.  The undisputed facts do not support a finding of copying.  Further, those facts clearly establish, as a matter of law, that; (1) Map 6451 is DeWalt's <u>independent creation</u> drafted without copying of any part of The Plans or Map 5472; (2) The City, though it legally could have, did not "use" The Plans in approving Map 6451 and even if they had, that would not constitute copyright infringement against <u>Northern, Lotus or DeWalt</u>; (3) Map 6451 is <u>not substantially similar</u> to Map 5472, and (4) even if the maps had been substantially similar, McIntosh would be further precluded from prevailing under any one of the following doctrines, all of which are established by undisputed facts; <u>merger</u>, <u>license</u>, <u>latches</u>, <u>estoppel</u>, <u>misuse</u> or <u>unclean hands</u>.

///

## II
## FACTS

**A. The City, MM and Legacy Joined Together to Develop 480 Acres in Wasco**

In January of 1992, The City, flush with cash from a $35,000,000 bond issue, encouraged Legacy to purchase and develop the 480 acres, utilizing City financing.  (UMF #1).  MM, Legacy and The City joined together, forming a loose association to develop a Master Development Plan for the 480 acres.  (UMF #2).  On April 13, 1992, MM prepared a "draft guidance package" for the "Valley Rose Estates Master Planned Community".  (UMF #3).  The guidance package was prepared to provide direction and clarify expectations between the The City, MM and Legacy. (UMF #4).  The guidance package required MM to prepare a Master Development Plan in close cooperation with The City.  (UMF #5).

The City, MM and Legacy comprised what MM referred to as the "project team" which was to collaborate and agree upon project objectives (UMF #6).  MM was to serve as planner, engineer and consultant.  (UMF #7).  MM was also to supervise the development and construction of the subdivision.  (UMF #8).  Legacy was to serve as the project applicant.  (UMF #9).  In fact, MM received all its directions related to the performance of the engineering services from The City with The City paying MM's bills. (UMF #10).

**B. Legacy and MM Enter Into a Written Contract**

On March 18, 1992, MM prepared a written contract, (**"The Contract"**).  The Contract addressed the entire 480 acres and provided that MM would prepare a conceptual plan for $15,200, prepare master plans for water, sewer and drainage, and other utilities for $54,800 and conduct a survey of the area for $19,100, a total of $89,100.  (UMF #11).

5

Defendants, Northern California Universal Enterprise Company's and Lotus Developments, L.P.'s Points and Authorities in Support of Summary Judgment

On May 11, 1992, MM and Brown expanded the terms of The Contract to include preparation of Parcel Map No. 9572 for $5,000,[1] preparation of improvement plans and final map for Tract 5472 for $57,900; and other additional work not relevant to the issues here presented.  (UMF #12).

On June 24, 1992, The Contract was again expanded, increasing certain fees and adding $12,100 for preparation of a tentative map for Tract 5472.  (UMF #13). In 1993, MM submitted The Plans to The City so that Legacy could obtain a building permit for construction of the Tract 5472 improvements.  (UMF #14).  The City approved The Plans and the improvements were constructed in 1993 and 1994.  (UMF #15).  Even though the subdivision improvements were constructed in conjunction with Map 5472, legal lots within Parcel 1 or Tract 5472 were not created by MM because MM stopped working on the project before the final map was approved.  (UMF #16 ).

On March 8, 1993, MM issued a memorandum of "cost update" advising of $174,400 in additional costs, none of which directly related to Tract 5472.  (UMF #17).  What had begun as an $89,100 contract, had, within one year, ballooned to $651,000.  Only $70,000 of this extraordinary engineering fee was for the work directly pertaining to Tract 5472.[2]

In 1994, as Legacy was completing the improvements within Tract 5472, The City, for reasons not relevant to this motion, stopped funding the project.  That year, litigation

---

[1]  Parcel Map 9572 subdivided the 480 acres into six separate parcels, Parcel 1 of which was to be further subdivided by Map 5472 into 68 residential lots and 1 ninety-six unit multifamily lot.

[2]  This is not surprising considering that the 33.51 acres in Parcel 1 was 7% of the 480 acres and the $70,000 allocated to Parcel 1 was 10.75% of the $651,000.

instituted by MM against The City and Legacy ensued, moving through the Kern County Superior Court and the Court of Appeal for nine years.

## C.  The 480 Acre Parcel is Divided Into 6 Separate Parcels

On July 21, 1992, MM recorded Parcel Map 9572 which divided the 480 acres into 6 separate parcels of between 27.64 and 154.31 acres.  (UMF #18).  Parcel 1, the parcel at issue in this lawsuit, contains 33.51 acres.  (UMF 19).  Map 5472 sought to further divide Parcel 1 into 69 lots, 68 for single family residential and 1 for ninety six apartments.  (UMF #20).  In 2007, DeWalt's Final Map 6451 divided Parcel 1 into 68 single family lots.  (UMF #21).

## D.  The City and Legacy Enter Into a Written Contract

On January 28, 1993, The City and Legacy, aided by MM, executed an Acquisition Agreement whereby The City agreed to purchase MM's plans and specifications as well as the infrastructure improvements to be constructed in Tract 5472.  (UMF #22).  Ronald Staub, MM's project manager, prepared the engineering cost summary for that agreement which established the amounts MM was to receive from The City.  (UMF #23).

McIntosh admits that The City paid for The Plans as well as the improvements. (UMF #24).  Interestingly, despite the fact that The Contract, as modified, only called for payment of $651,000 to MM, Eugene Martin, McIntosh's partner, during the state court litigation, swore in a declaration filed with the court that The City had paid MM over $800,000 for its services.  (UMF # 25).

## E.  The City Purchases Parcels 1 and 3 at Tax Sale and Sells Them to Lotus

The property sat dormant for the ten years following The City's decision to stop funding the improvements.  On April 26, 2002, The City acquired parcels 1 and 3 via tax

sale.  (UMF #26).  In November, 2003, The City actively began marketing those parcels.
The City circulated a Developer Information Package, one of which reached Northern's real
estate agent, which touted Tract 5472 as having "infrastructure".  (UMF #27).  The package
included a copy of Map 5472 as well as a sewer and water map.  (UMF #28).  The package
noted that there were several plan documents developed in the early 1990's currently on file
with The City which The City would make available to interested parties, an obvious
reference to Map 5472 and The Plans (UMF #29).

　　　　The package also contained an executive summary which noted in two places that,
"infrastructure, including roadways and water lines, were developed on the 34 acre parcel
(Parcel 1) within the City-owned land".  (UMF #30).

　　　　On May 18, 2004, The City and Northern entered into an agreement whereby
Northern would purchased Parcel 1 which contained Tract 5472 (33.51 acres) and Parcel 3,
which contained Tract 5618 (64.06 acres).  (UMF #31).  Lotus was actually the purchaser of
record at close of escrow.  (UMF #32).

　　　　Tentative Map 5472 expired on May 11, 2001, over three years prior to Lotus's
purchase and although the Tract 5472 improvements had been completed, The City required
that Lotus prepare a new tentative map.  (UMF #33).

**F.  McIntosh Sets a Trap for Lotus**

　　　　Prior to Lotus's purchase, Wu and McIntosh spoke by telephone with Wu mentioning
that he was purchasing Parcel 1 and asking McIntosh if he would process a new tentative
map.  McIntosh told Wu that he would prepare a new tentative map but that Wu would have

to pay him the $800,000 "left owing" by Legacy and The City.  (UMF #34).  Instead, on July 21, 2004, Wu hired DeWalt for $26,000.  (UMF #35).

McIntosh admits that at the time of the telephone conversation with Wu he knew he had a copyright interest but kept it to himself.  (UMF #36).  He kept this information from Wu because he "didn't feel it was his duty to tell him".  (UMF #37).  Following the telephone conversation, McIntosh requested that The City send him all future City agendas so he could follow Wu's progress. (UMF #38).

McIntosh believed that if Wu used a different engineer that Wu would be infringing and that McIntosh could sue him. (UMF #39).  McIntosh considered suing Wu as soon as he first learned that he wasn't being hired to prepare the new map.  (UMF #40).  Although McIntosh suspected that his work would be copied he failed to warn DeWalt, Wu or The City that he intended to sue for infringement. (UMF #41).

All the time that DeWalt's tentative and final maps were being processed, McIntosh knew that Northern was spending money. (UMF #42).  Yet, McIntosh stayed quiet; watching and waiting.  In early 2006, when the Final Map was recorded, McIntosh even began driving by the subdivision to see if anything was happening.  (UMF #43).  He didn't warn Wu because "it was not his position to tell Joe what the law says". (UMF #44).

McIntosh quietly registered his copyright on February 22, 2007 and waited another five months before filing the lawsuit on July 26, 2007.  Service of the summons and complaint was the very first notice Defendants had of McIntosh's claim of copyright and was received <u>after</u> Northern and Lotus were well into construction on twelve homes and more than three years <u>after</u> McIntosh formulated his believe that Northern was going to infringe

and that he was going to sue.  (UMF #45).  By the time Wu learned of McIntosh's claims, Northern and Lotus had already spent $1,250,000 in hard construction costs on the twelve homes and $979,403.86 for 68 building permits.  (UMF #46).

**G.  DeWalt Independently Surveyed Parcel 1 and Created Its Own 68 Lot Map**

DeWalt surveyed the streets, curbs, gutters, manhole covers, block walls and all other visible improvements which had been constructed within Tract 5472. (UMF #47).  With that information, DeWalt independently created a new and different tentative map.  (UMF #48). Map 6451, submitted to The City on November 10, 2004, was approved by on March 14, 2005. Final Map 6451 was approved by The City on March 6, 2007.

**III**
**LEGAL ARGUMENT**

McIntosh alleges infringement of <u>both</u> The Plans and Map 5472.  Though there is some crossover, section "B" below will address The Plans while section "C" addresses The Map.

**A.  Summary Judgment**

Federal Rule of Civil Procedure 56(c) provides for summary judgment when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact for trial.  A fact is material if it could affect the outcome of the suit under the governing substantive law.  The burden then shifts to the nonmoving party to establish, beyond the pleadings, that there is a

genuine issue for trial.  *Miller v. Glen Miller Productions, Inc*. 454 F.3d 975, 987 (9th Cir.

2006).

## B.  The Improvement Plans

### 1.  The Improvement Plans Were Not Copied by DeWalt, Lotus or Northern

Proof of copyright infringement requires that the "constituent elements of the work

that are original" were copied.  *Feist Publications, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340,

361 (1991).  DeWalt didn't submit any plans to The City.  Accordingly, DeWalt had no need

to—and did not—copy The Plans.  Since there was no copying there is no infringement.

(UMF #81).

In 1993, MM submitted The Plans for Tract 5472 to The City so that Legacy could

obtain building permits and begin constructing the improvements.  (UMF #49).  Greg Black,

**("Black")**, was the lead engineer/ project manager for DeWalt regarding Map 6451.  (UMF

# 50).  Black acknowledges that The City emailed him a copy of The Plans.  Black testified

that it would be a common practice to obtain any and all available documents in any way

related to the subject site when preparing a new subdivision map.  (UMF #51).  He is clear,

however, that neither he, nor to his knowledge, anyone else at DeWalt ever used The Plans

for any purpose.  (UMF #52).

Sarah Burgi, **("Burgi")**, was another DeWalt employee who worked on Map 6451.

(UMF #53).  Burgi testifies that she had never even saw The Plans or Map 5472 prior to this

litigation. (UMF #54).

Josh Woodard, ("**Woodard**"), the person who Burgi identified as the DeWalt

employee who did a lot of the work on map 6451 does not remember working on it but is

clear that he never, ever copied from another engineer's work while working on maps for DeWalt. (UMF #55).

Wu admits obtaining a copy of the pump station plans and a copy of the landscape plans from The City so that it could make City ordered repairs.  (UMF #56).  But neither Wu, Northern or Lotus obtained any other portions of The Plans, or make any copies of them. (UMF # 57)**.**

Because the improvements <u>had been constructed</u> ten years before Lotus purchased Parcel 1 The City waived the requirement of submitting improvement plans (UMF #58).  Accordingly, Lotus was able to have its final map recorded without preparing or submitting improvement plans. (UMF #59).

Finally, The City did not "use" MM's old improvement plans for <u>any purpose</u> in conjunction with the approval of Lotus's Map.  (UMF #60).  Infringement requires copying.  *Feist Publications, Inc.* @ 361.  Since there is no evidence of *copying* of The Plans by DeWalt, Lotus or Northern there can be no finding of copyright infringement as to those defendants.  Further even if The City had "used" The Plans to facilitate subdivision of Parcel 1, that would not constitute infringement by <u>Lotus, Northern or DeWalt</u>, none of which copied or submitted plans.

## 2.  <u>The City had an Implied License to use The Plans for Parcel 1</u>

As noted above, The City did not "use" the plans in conjunction with Map 6451. (UMF #60).  However, even if The Plans had somehow been used in furtherance of the development of Parcel 1, there would have been no infringement because The City, at the

least, had an implied license to use The Plans for the purpose for which they were delivered to it by MM.[3]

17 U.S.C. section 101 provides that a "nonexclusive license" may be granted without a writing. In fact, the Courts have universally recognized that a nonexclusive license may be implied from <u>conduct</u>. *I.A.E. Incorporated v. Shaver* 74 F 3d. 768, 775 (7th Cir. 1996). Uses of copyright work that stay within the scope of a nonexclusive license are immune from infringement suits. *Graham v. James*, 144 F.3d 229, 236 (2d Cir. 1998). The touchstone for finding an implied license is intent. *Nelson-Salabes, Inc. v. Morningside Development, LLC,* 284 F. 3d 505, 515 (4th Cir. 2002).

MM had always anticipated and intended that The City would become the ultimate owner of the subdivision improvements— and therefore, by necessity and implication, The Plans. On January 28, 1993, The City and Legacy entered into an Acquisition Agreement whereby The City agreed to purchase <u>The Plans</u>, specifications and infrastructure improvements to be constructed in Tracts 5472 and 5618. (UMF #22). The agreement even gave The City the right to complete any improvements which were not completed by the developer. (UMF #61). Obviously, such completion would be accomplished by use of The Plans.

Section 6 of the agreement provided that it would inure to the benefit of the parties' heirs, executors, administrators, <u>successors, and assigns</u>. (UMF #62). The City became the successor to Legacy in 2002 when it obtained title to Parcel 1 and the improvements via tax deed. In 2004, when The City sold to Lotus, Lotus became the successor, owning Parcel 1

---

[3] It is more likely that The City actually owned The Plans at the time of its sale to Lotus and that Lotus became the owner at the time of sale.

Defendants, Northern California Universal Enterprise Company's and Lotus Developments, L.P.'s Points and Authorities in Support of Summary Judgment

and all improvements located thereon and, at least by implication, The Plans.  Under the terms of the Acquisition Agreement, both Lotus and The City could have used The Plans for Parcel 1 without having infringed any McIntosh copyright.

There was never any intent on the part of MM that The City be precluded from making use of The Plans in the same manner it would use plans for any other of The City's infrastructure.  Moreover, Eugene Martin himself admitted that all of the directions to MM for the performance of the engineering services for the subdivision came from The City which paid all the bills.  (UMF #63).

Oddly, McIntosh accuses The City of "using" The Plans for the exact purpose for which they were intended; to facilitate the subdivision of Parcel 1.  The City is not accused of using The Plans on some unrelated parcel in an attempt to deprive Plaintiff of new revenue it would have otherwise earned.  Striped bare of all pretense, McIntosh is complaining that the City interfered with his plan to extort unreasonable and unearned compensation from Lotus through his misuse of copyright law.

That The City had an implied license is made even more clear by a review of The Contract.  While Paragraph 8 of The Contract provides that all original papers, documents, drawings and other MM work product and copies thereof may be used by consultant— MM— without the consent of client, nowhere does it prohibit The City from using The Plans for the specific purpose for which they were intended.  (UMF #64).  In fact Paragraph 13 of The Contract specifically spells that out, providing, that the final plans, drawings or other work product may be used **for the project** described on the face hereof. (UMF #65).

Nowhere in The Contract does MM claim a copyright.  While paragraph 13 restricts Legacy from using or permitting others to use plans or drawings that are "not final", i.e., not signed or stamped by MM, The Contract does not prohibit Legacy from using The Plans—or permitting others, i.e., The City, from "using" final, signed, stamped infrastructure plans for the purpose for which they were prepared. Certainly, such use is implicit.

It is difficult to imagine how a contract provision providing that plans are to be used "for the project described on the face hereof" can be read or interpreted to prohibit their use on or in connection with that very project.  If so, that portion of paragraph 13 of MM's contract would serve no purpose.[4]

Improvement plans are kept by the public works department and the city engineer. (UMF #66).  As engineers, surly MM knew and intended that The City, having a full set of plans on file, would use them in conjunction with Parcel 1 as necessary for the public good. Use by The City of The Plans which it paid for was anticipated, intended and, licensed by MM.  Does McIntosh seriously believe that The City would have allowed the improvements to be built if MM had told The City that the plans could not be used by The City following construction?  Of course not.

In *Foad Consulting Group v. Azzalino* 270 F. 3d 821 (9th Cir. 2001) a shopping center developer hired Foad to create a concept development plan for a shopping center.  Foad prepared a preliminary plot plan showing the location of proposed buildings, parking lots and landscape areas, created final engineering drawings and obtained city approval.

---

[4] MM's March 18, 1992 letter to Brown, incorporated into The Contract by reference makes clear that the project is the Valley Rose subdivision- Wasco, CA, MM's project #92-22.  (UMF #11)/

Defendants, Northern California Universal Enterprise Company's and Lotus Developments, L.P.'s Points and Authorities in Support of Summary Judgment

The developer then sold its rights to another developer who hired a different engineer to perform further engineering services.  The new engineer obtained copies of Foad's work from the city.  It then prepared final site plans by <u>tracing</u> much of Foad's plan.  Foad sued for copyright infringement and the trial court granted summary judgment against him.  On appeal, the Court concluded that Foad had granted the developer an implied license to build the project by using Foad's plot plan without his permission.

The Court noted that the central purpose of the contract was the production of a set of engineering documents for the commercial center.  Under the contract, Foad agreed to create multiple maps, drawings, and plans for the project and to "process" these documents with the city.  For this service, the developer agreed to pay Foad a $175,000 fee.

The Court stated that given the amount of money the developer paid to for Foad's services and because part of the agreement was for Foad to help the developer with its application to the city, it would be surprising if the parties had intended for the developer to seek Foad's permission before using the plans to build the project.  Further, noted the Court, had that been the parties' intention, <u>one would expect to see the requirement spelled out explicitly in the agreement.</u>  It didn't.  Accordingly, the Court found an implied license to use the plot plan to build the project. (Id @ 828, 829).

As in *Foad*, the central purpose of the MM-Brown contract was the production of engineering documents for a specific project, a 69 lot subdivision within Parcel 1.  While in *Foad*, a new engineer came in and used Foad's plans, Defendants in this case at bar did not us MM's plans.  (UMF #81).  But under *Foad*, Defendants could have used The Plans had The City required it.

Noting that the developer paid Foad $175,000 for his work, The Court stated that "it would be surprising if the parties had intended for the developer to seek Foad's permission before using the plans to build the project". (id at 828). It would be truly surprising if, at the time it delivered The Plans to The City, MM intended to retain the right to prohibit The City from using them in the subdivision of Parcel 1. As the Ninth Circuit noted in *Foad*, "had that been the parties' intention, one would expect to see the requirement spelled out explicitly in the agreement". (id at 829). It wasn't. And remember, MM was paid over $800,000 by The City for engineering on the 480 acres, including its work on Parcel 1. (UMF #25).

In *I.A.E., Incorporated v. Shaver 74 F 3d 768 (7th Cir. 1996)* a construction company contracted to design and construct an air cargo/hanger building. It hired an architect to prepare the schematic design. The architect submitted his copyrighted design work to the construction company and the airport.

A second architect was hired to perform the balance of the design work. The first architect demanded a fee for "assignment of his copyright". The contractor and the airport countered that they had only used the drawings to build the airport's air cargo building as the first architect had intended. The Court noted that the architect's argument that the Airport could use the drawings only as pieces of paper (wall hangings? Placemats?) is untenable. (id at 772)

The same could be said of McIntosh's contentions. After having been paid $800,000 by The City and knowing that The City would have to maintain the improvements, it would be extremely surprising if this Court were to even consider an argument that MM did not intend that The City use The Plans for the subdivision.

It is not like The Plans were used on <u>some other project</u> or that MM intended to use The Plans on another project or in any other way had their "economic expectations" thwarted by the City's normal and expected use of the plans. (UMF #67).

In *Effects Associates, Inc v. Cohen* 908 F. 2d 555 (9th Cir. 1990)*,* a special effects company was hired to create scenes for a Cohen movie. Cohen was less than excited about the special effects, paid Effects Associates only half of the agreed upon amount but used the special effects in his movie. The Ninth Circuit, agreeing with the trial court, found that Effects had granted an implied license. It had created the work at the request of Cohen and had handed it over to Cohen intending that Cohen copy and distribute it. While delivery of a copy "does not of itself convey any rights in the copyrighted work," it is one factor that may be relied upon in determining that an implied license has been granted. (Id @ fn 6). Similarly, MM handed The Plans over to The City <u>intending</u> that The City use the plans in creation of the subdivision.

## C. <u>The Map</u>

### 1. <u>Map 6451 Was The Independent Creation of DeWalt</u>

DeWalt surveyed all of the parcels in which Tract 6451 is located. It then surveyed the existing improvements within Tract 6451, including the existing streets, curbs and gutters, building pads, any visible utilities, block walls and previously set street monuments. (UMF #68). DeWalt processed the survey information whereby a map was generated which shows all the observed site improvements and conditions. (UMF #69). Accordingly, Map 6451, prepared by DeWalt, is an independent creation representing what was surveyed.

The subdivision streets, curbs, gutters, manhole covers, monuments, block walls, water and sewer stub outs that DeWalt surveyed are visible and in the public domain. McIntosh, by claiming copyright, cannot prevent DeWalt from surveying visible improvements and monuments and incorporating the data into an independently created subdivision map.  Map 6451 and Map 5472 are, except for the idea of lots and streets laid out in a particular fashion, significantly different.  But if the expressions had turned out to be identical, though created through the independent efforts of both engineers, there would be no infringement.  That is because copyright infringement requires that the work be copied. *Feist Publications, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 361 (1991).  Absent copying there can be no infringement.  *Herbert Rosenthal Jewelry Corp. v. Kalpakian* 446 F.2d 738, 740 (9th Cir. 1971) (citing *Mazer v. Stein*, 347 U.S. 201, 218 (1954)).

In *Kunycia v. Melville Realty Co., Inc.*755 F. Supp. 566 (S.D.N.Y. 1990) the Court held that the defendant "could, of course, have prepared its own Kay-Bee drawings based upon examinations of existing stores, landlord specifications, and shop drawings.  Even if, by chance, the resulting drawings had resembled plaintiff's, there would have been no copyright infringement because the drawings were prepared independently". (Id @ 576)

As noted in at 217 and 218 of *Mazer,* when two men independently make identical maps of the same territory each may obtain the exclusive right to make copies of his own particular map without infringing the other's copyright.  Likewise, a copyrighted directory is not infringed by a similar directory which is the product of independent work.  Copyright protects originality, rather than invention -- conferring only "the sole right of multiplying copies.  Absent copying, there can be no infringement of copyright.  (Id at 218).

2. **Maps 5472 and 6451 Are Not Substantially Similar**

Copyright infringement requires copying.  Absent evidence of direct copying, proof of infringement involves a showing that the defendant had access to Plaintiff's work and that the two works are substantially similar.  *Funky Films, Inc. v. Time Warner* 462 F.3d 1072, 1076. (9th Cir. 2006).

Here, there is no evidence of direct copying.  All four DeWalt employees who had anything to do with Map 6451 have testified that there was no copying.  Since McIntosh can provide no evidence of direct copying he must establish access by DeWalt to MM's work and substantial similarity in order to prevail.  As to The Plans, Defendants don't need to address substantial similarity because DeWalt didn't prepare any.  It is conceded that DeWalt obtained an electronic copy of Map 5472 on April 13, 2005 but, as shown below, the maps are not substantially similar.  Further, it's unclear how DeWalt could have copied from the April 13, 2005 email when it submitted Map 5472 to The City November 10, 2004, five months prior.

It is also conceded that Northern obtained copies of the pump station and landscape plans from The City. However, Northern did not copy them.  (UMF #56).  Anyway, a reference to those plans to perform maintenance required by The City does not constitute copyright infringement.

Substantial similarity refers only to the expression of the artist's concept, not the underlying idea itself; mere identity of ideas expressed by two works is not substantial similarity giving rise to an infringement action.  17 U.S.C. Sec. 102(b).  Ideas cannot be copyrighted.  *Harper & Row, Publishers, Inc. v. Nation Enterprises*, 471 U.S. 539, 547

(1985).  An artist can claim to own only an original manner of expressing ideas, not the ideas themselves.  *Cooling Systems and Flexibles v. Stuart Radiator*, 777 F.2d 485, 491 (9th Cir.1985).  The placement of 68 lots consisting of a particular size, with streets running through them is a non copyrightable idea, cannot be the subject of a copyright monopoly and must not be used to satisfy the substantial similarity requirement.

Substantial similarity "may often be decided as a matter of law."  (Funky @ 1076).  In fact, summary judgment has frequently been affirmed in favor of copyright defendants on the issue of substantial similarity.  *Shaw v. Lindheim,* 919 F.2d 1353, 1355 (9th Cir.1990).

Courts have noted in copyright infringement cases that determining whether substantial similarity exists between competing works is often resolved as a matter of law, particularly when the similarity between the works is insubstantial.  *See v. Durang,* 711 F.2d 141 (9th Cir.1983).

Summary judgment may be appropriate when, as in this case, the similarity between the competing works concerns only non-copyrightable elements of the Plaintiff's work or when no reasonable jury could find that the two works are substantially similar.  *Warner Bros. v. American Broadcasting Co.* 720 F.2d 231, 240 (2nd Cir. 1983).  In this case at bar, the only similarity between Map 5472 and Map 6451 is the non-copyrightable idea for lot and street layout, the numbering of the lots and the naming of most of the streets.

The substantial similarity test contains an extrinsic and intrinsic component.  At summary judgment, courts apply only the extrinsic test because the intrinsic test, which examines an ordinary person's subjective impressions of the similarities between two works, is exclusively the province of the jury.  *Shaw v. Lindheim* 919 F.2d 1353, 1360-61 (9th Cir

1990).  A plaintiff who cannot satisfy the extrinsic test necessarily loses on summary judgment, because a jury may not find substantial similarity without evidence on both the extrinsic and intrinsic tests.  *(Funky Films* at 1077).

Extrinsic analysis is objective in nature.  It depends not on the responses of the trier of fact, but on specific criteria which can be listed and analyzed.  The extrinsic test focuses on articulable similarities.  In applying the extrinsic test, the Court compares, not the basic plot ideas for stories, but the actual concrete elements that make up the total sequence of events and the relationships between the major characters.  (*Funky Films* at 1077)

Protectable expression includes the specific details of an author's rendering of ideas. *Metcalf v. Bochco,* 294 F.3d 1069, 1074 (9th Cir.2002).  We "must take care to inquire only whether 'the protectable elements, standing alone, are substantially similar.'"  In so doing, we "filter out and disregard the non-protectable elements in making the substantial similarity determination."  *Cavalier v. Random House,* 297 F.3d 815, 822 (9th Cir.2002).

In this case at bar, in applying the extrinsic test, the Court will ignore non-copyrightable elements and focus only on the innumerable differences between the two maps.  In so doing, this Court must conclude that there was no copying.

The facts of *Kregos v. Associated Press* 795 F.Supp.  1325 (S.D.N.Y. 1992) are helpful in analyzing the issue of substantial similarity between Map 5472 and Map 6451. Kregos created a form or chart of statistics on baseball pitchers.  He sent a copy of his form to the Associated Press.  Soon, the AP began running its own chart of pitching statistics. Kregos contended that charts were substantially similar.

The Court found three differences between Kregos' chart and the AP's.  The AP chart included two categories not appearing in Kregos' and a set of three statistics in Kregos' chart not appearing in the AP's.  (Id at 1333).

The Kregos Court, noting that in copyright infringement cases determining substantial similarity is often a question of law, held that the AP's addition of two categories not present in the Kregos chart, together with the alteration of a set of three statistics results in a finding that no reasonable person could conclude that the two charts were substantially similar.  (Id at 1333, 1334).

After comparing Map 5472 with Map 6451, this Court will find over 250 differences and must conclude, as a matter of law, that there is no substantial similarity between the two. The differences between the two are staggering.  For example, pages 67 through 79 and pages 103 through 120 of the transcript of Steven Wong's deposition are filled with differences between the two maps.  (UMF #70).  If the Court will compare the two maps as Exhibits "A" and "B" to the declaration of Steven J Hassing, it will be overwhelmed by the differences.  For ease of review Defendants have highlighted items on Map 6451 (Exh. "A") which are not on Map 5472, (Exh. "B") in yellow.  Defendants have also highlighted in pink, items on Map 5472 which are not found on Map 6451.  Of particular interest is the fact that Map 5472 contemplates 69 lots containing a total of 164 units, (68 single family homes and 96 apartments), while Map 6451 contains only 68 lots to accommodate a total of 68 homes).

### 3.  <u>The Doctrine of Merger Would Prevent Plaintiff From Prevailing</u>

The merger doctrine would apply in this case and preclude an infringement finding if DeWalt's Map had been substantially similar to Map 5472.  Copyright registration confers

no right at all to the conception reflected in the registered subject matter.  (*Harper* at 547)

Protection is given only to the expression of the idea— not the idea itself.  (*Cooling Systems* at 491).  In other words, McIntosh cannot, by claiming copyright, prevent Lotus from developing Parcel 1 using the same idea for lot layout, lot numbering and street location as expressed by MM on Map 5472.  A copyright confers only the sole right of multiplying copies.  *Herbert Rosenthal Jewelry Corp. v. Kalpakian* 446 F.2d 738, 740 (9th Cir. 1971) (*Citing Mazer v. Stein*, 347 U.S. 201, 218).  Copyright law does not authorize the ownership of ideas.  *(Harper* at 547).

The Protection that a map receives extends only to its original expression, and neither the facts nor the idea embodied in the maps is protected.  *Mason v. Montgomery Data, Inc.*, 967 F.2d 135, 140 (5th Cir. 1992).  The facts and ideas are free for the taking.  Objective "facts" and ideas are not copyrightable.  *Satava v. Lowry* 323 F.3d 805, 810 (9th Cir. 2003).

The "idea" of a 68 lot subdivision with streets running through it in the same manner as in MM''s "idea" was employed by DeWalt because all of the improvements were in and that was the only way of drawing a map to take advantage of those expensive improvements. (UMF 71)

When the "idea" and its "expression" are inseparable, copying the expression will not be barred, since the expression in such circumstances would confer a monopoly of the idea upon the copyright owner free of the conditions and limitations imposed by the patent law. *Baker v. Selden*, 101 U.S. 99, 103 (1879) (Cited by *Herbert Rosenthal Jewelry Corp v. Kalpakian* 446 F.2d 738 (9th Cir. 1971).

It is unlikely that Congress intended to protect McIntosh's $800,000 demand to do a $26,000 job based on a monopoly of the subdivision design idea. Especially after having already been paid $800,000 by The City.

Even when the idea and its expression are not completely inseparable, there may still be only a limited number of ways of expressing the idea. In such a case, the burden of proof is heavy on the plaintiff who may have to show "near identity" between the works at issue. (*Concrete Machinery Co., Inc.* at 606). This showing is necessary because, as idea and expression merge fewer and fewer aspects of a work embody a unique and creative expression of the idea; a copyright holder must then prove substantial similarity to those few aspects of the work that are expression not required by the idea. (*Concrete Machinery Co., Inc.* 607). McIntosh can't show "near identity". In fact, it takes 31 pages of deposition testimony to provide only a partial account of the differences between the maps.

*In Kern River Gas Transmission Co. v. Coastal Corp*, 899 F.2d 1458 (5th Cir. 1990), the Court found that the idea of a location for a gas pipeline and the expression of that idea embodied in a map are inseparable and not subject to protection. It held that the idea of a proposed location of a pipeline is not copyrightable (id at 1464). The Court noted that the lines Plaintiff created (on its map) are the only effective way to express the idea of the pipeline's location. (id at 1464). Similarly, the idea of a subdivision containing 68 lots arranged in a manner to take advantage of existing improvements can only be expressed by a map incorporating the same lot and street layout idea as shown on Map 5472.

In *Ets-Hokin v. Skyy Spirits, Inc*. 323 F.2d 763 (9th Cir. 2003) a photographer took a picture of a Skyy Vodka bottle which allegedly infringed a prior photograph by another

photographer.  The Court found that although the photographs were similar, their similarity was inevitable, given the shared concept, or idea, of photographing the Skyy bottle.  (id at 766).

Likewise, a similarity of lot and street layout was inevitable after DeWalt surveyed what had been built in Tract 5472.  The *Ets-Hokin* Court noted that when applying the limiting doctrines, subtracting the unoriginal elements, what was left was only a "thin" copyright, which protects against only virtually identical copying.  (id at 766).  See *Apple,* 35 F.3d 1435, 1442 (9th Cir. 1994).  As observed, in *Apple*, "when the range of protectable expression is narrow, the appropriate standard for illicit copying is virtual identity."  (id at 1439).  When one subtracts the unoriginal elements from Map 5472, i.e., the lot numbers, street names and overall "idea", McIntosh's copyright is extremely thin.

The Skyy photographs were found not to be virtually identical.  Indeed, they were found to differ in as many ways <u>as possible</u> within the constraints of the commercial product shot.  The lighting differs; the angles differ; the shadows and highlighting differ, as do the reflections and background.  The only constant is the bottle itself.  The photographs are therefore not infringing.  (*Ets-Hokin* at 766). Of course, the long list of differences between the two maps, as a matter of law, prevents a finding of virtual identity.

Merger is said generally to be found in works with a utilitarian function.  *Kay Berry, Inc. v. Taylor Gifts, Inc*. 421 F.3d 199, 209 (3rd Cir. 2005).  Of course, a subdivision map is more a utilitarian object than a work of art.  Subdivision maps are created for the sole purpose of dividing larger tracts of land into smaller ones to comply with legal requirements which precondition the developer's ability to sell the smaller lots.  It would be unusual,

indeed, to find a subdivision map hanging in an art gallery.  Accordingly, a subdivision map is utilitarian and likely to be the subject of a merger of idea and expression.  Where the idea and the expression have merged there can be no infringement.  *Concrete Machinery Co., Inc. v. Classic Lawn Ornaments, Inc.* 843 F.2d 600, 606 (1st Cir. 1988)

**D.  Latches, Estoppel, Misuse and Unclean Hands**

    **1.  Latches**

Latches is an equitable time limitation on a party's right to bring suit.  Latches is a viable defense to a copyright infringement suit.  Haas v. Leo Feist, Inc. 234 F. 105, 108 (S.D.N.Y. 1916; also see *Los Angeles News Service v. Tullo* 973 F2d. 791, 799 (9th Cir. 1992).  To obtain a judgment on this affirmative defense, a defendant must prove "both an unreasonable delay by the plaintiff and prejudice to itself.  *Kling v. Hallmark Cards*, 225 F.3d 1030, 1036 (9th Cir. 2000).  Each element is easily established in this summary judgment motion and since Plaintiff will be unable to refute the overwhelming evidence here provided, summary judgment is warranted.

When applying the equitable doctrine of latches in order to bar a claim, the period of delay is measured from when the claimant had actual notice of the claim or would have reasonably been expected to inquire about it.  *(Kling* at 1036).  The law is well settled, that where the question of latches is in issue, the plaintiff is chargeable with such knowledge as he might have obtained upon inquiry, provided the facts already known by him were such as to put upon a man of ordinary intelligence the duty of inquiry.  *Johnston v. Standard Mining Co.*, 148 U.S. 360, 370 (1893).

McIntosh admits that he was put on notice of a probable infringement claim in early 2004. He didn't warn anyone of his intended infringement suit before filing it on July 21, 2007. (UMF # 72). DeWalt submitted Tentative Map 6451 to The City on November 10, 2004, (UMF #73), but McIntosh decided to sue even before that. His decision was made when DeWalt started processing Map 6451. (UMF #74). McIntosh kept his true intention secret from Wu, DeWalt and The City. (UMF #75). His actions were both inexcusable and prejudicial and he is barred from recovering damages by his failure to act in a timely manner which delay severely prejudiced Northern and Lotus.

Here, there was much more than mere delay in asserting a claim. McIntosh intentionally stood by for more than three years keeping watch from afar as Lotus and Northern spent over **$3,855,000**. Between the time McIntosh decided to sue and the time he did sue, Northern and Lotus spent $1,605,000 in purchasing the land, $979,403.86 on building permits, $26,000 on DeWalt, and over $1,250,000 in hard construction costs. (UMF #76). Had McIntosh put Wu on notice of his "copyright" and his intention to sue for infringement during that 2004 telephone conversation instead of keeping it secret, Wu would perhaps have had an opportunity to address the issue prior to the purchase. Perhaps he could have somehow re-designed the subdivision. Perhaps he would have simply walked away. But McIntosh intentionally waited over three years—until Northern was actually building the first twelve homes—to raise, for the very first time, copyright infringement.

As Learned Hand explained over 80 years ago, "it must be obvious to everyone familiar with equitable principles that it is inequitable for the owner of a copyright, with full notice of an intended infringement, to stand inactive while the proposed infringer spends

large sums of money in its exploration, and to intervene only when his speculation has proved a success.  Delay under such circumstances allows the owner to speculate without risk with other's money; he cannot possibly lose, and may win".  *Haas v. Leo Feist, Inc*. 234 F. 105, 108 (S.D.N.Y. 1916).

    2. **Estoppel**

      Principles of equitable estoppel apply to copyright actions.  (See *Hampton v. Paramount Pictures Corp.*, 279 F.2d 100, 104 (9th Cir. 1960); *Cherry River Music Co. v. Simitar Entertainment, Inc*., 38 F.Supp.2d 310, 318 (S.D.N.Y. 1999).

      Four elements must be present to establish the defense of estoppel: (1) The party to be estopped must know the facts; (2) he must intend that his conduct shall be acted on or must so act that the party asserting the estoppel has a right to believe it is so intended; (3) the latter must be ignorant of the true facts; and (4) he must rely on the former's conduct to his injury. *Hampton v.  Paramount Pictures Corp.*, 279 F.2d 100, 104 (9th Cir. 1960) 79 F.2d 100 (9th Cir. 1960), 16486, Hampton v. Paramount Pictures Corp.

      Here, all of the elements of estoppel have been met; (1) McIntosh believed that he had a copyright and that Northern was going to infringe, (2) By keeping quiet about his belief in his copyright, that Defendant's actions would constitute infringement and of his intent to sue if Northern hired another engineer to prepare a new map, Defendants had every right to believe that their conduct was innocent and condoned by McIntosh, (3) Defendants were ignorant of the fact that McIntosh secretly claimed a copyright and intended to sue if Northern hired a different engineer, and (4) Defendants would not have proceeded as they did had they been advised of McIntosh's true intentions and beliefs.  (UMF #77).

### 3.  McIntosh has Misused Copyright Law and Comes to This Court With Unclean Hands

The doctrine of misuse is a form of unclean hand.  The defense prevents the copyright owner from asserting infringement.  *Supermarket of Homes, Inc. v. San Fernando Valley Board of Realtors* 786 F2d 1400, 1408 (9th Cir. 1986).  For a copyright owner to use an infringement suit to obtain property protection that copyright law clearly does not confer, hoping to force a settlement or even achieve an outright victory over an opponent that may lack the legal sophistication to resist effectively, is an abuse of process.  *Assessment Technologies of WI, LLC v Wiredata, Inc.* 350 F.3d 640, 647 (7th Cir. 2003).

Copyright misuse is a defense to copyright infringement.  *Practice Management Information Corp. v. American Medical Association* 121 F.3d 516, 520 (9th Cir. 2001).  Copyright misuse is an "unclean hands defense" which "forbids the use of the copyright to secure an exclusive right or limited monopoly not granted by the Copyright Office and which is contrary to public policy to grant.  *Alcatel USA, Inc. v. DGI Techs, Inc.* 166 F.3d 772, 792 (5th Cir. 1999).

In *Hall v Wright*, a 1957 patent case, the court noted that if one does not come into court with clean hands he will be denied relief regardless of the merits of his claim.  (at 240 F.2d 787, 794- 795).  The unclean hands doctrine protects judicial integrity and promotes justice because allowing a plaintiff with unclean hands to prevail creates doubts as to the justice provided by the judicial system.  Thus, precluding recovery to the unclean plaintiff protects the court's, rather than the opposing party's interests.  *Fiberboard Paper Products Corp. v. East Bay Union of Machinists* (1964) 227 CA2d 675, 728.

Many of the facts that give rise to Defendants' defenses of latches and estoppel also support their claim of misuse and unclean hands. Northern contracted to purchase Parcel 1 and the improvements on May 18, 2004. McIntosh's telephone conversation with Wu was prior to the purchase. McIntosh, believing that he could obtain more from an infringement suit than from preparing a new map worth $26,000, he was careful not to mention the copyright. The fact that McIntosh demanded $800,000 for the same service that DeWalt was willing to perform for $26,000 and for which MM was paid between $10,000 and $12,100, shows that McIntosh was not dealing fairly with Wu. Knowing that he intended to sue for copyright infringement, McIntosh had an obligation to inform Wu of the copyright instead of quietly watching him invest millions of dollars over a three year period.

When McIntosh says he "didn't feel it was his duty to tell him" and "it was not his position to tell Joe what the law says", McIntosh is wrong, morally and legally. McIntosh knew the kind of money Defendants were spending. McIntosh monitored Defendants' progress by ordering all of The City agendas. He even spent his time driving by the site, watching for Defendants to start construction. After Defendants had invested over 6.5 million dollars in reliance on his silence, McIntosh sprung his trap. McIntosh intended all along that once Wu was so heavily invested that he couldn't turn back McIntosh would sue for infringement. McIntosh's conduct was unfair, dishonest and outrageous.

Also unfair is McIntosh's contention that The City and Moving Parties should pay what McIntosh seemingly believes is still owing from 1994. MM started off with an $89,100 contract which ballooned to over $651,000. MM was paid over $800,000 by The City. Why McIntosh thought he could extort $800,000 from Wu for a $26,000 job remains a mystery.

Regarding his ancient claim against Legacy and The City, McIntosh would like to ignore the fact that in addition to the $800,000 that MM received from The City, that on September 8, 1993, MM received a promissory note from Legacy for $250,000. (UMF #78). A month later, Legacy secured the note with a deed of trust. (UMF #79). On January 26, 2001, MM and Legacy entered into a Settlement Agreement and Mutual Release wherein they each settled completely released any and all claims in consideration of Brown and Legacy promising to pay MM 15% of any amount Brown or Legacy received from The City. MM then obtained a stipulated judgment in the amount of $341,487.01 plus interest at 18% from December 19, 1994. (UMF #80).

Obviously, there is no viable cause of action under which McIntosh may assert a claim against The City or Moving Parties for the old Legacy/City debt, if any there really was. As a last resort, McIntosh now attempts to twist and contort copyright law into a sword, misusing what was intended as a shield. Copyright law does not sanction a monopoly on the "idea" or sanction charging $800,000 for a $26,000 job by asserting an unfair and illegal monopoly.

## IV
## CONCLUSION

Defendants are entitled to summary judgment because, as a matter of law, Plaintiff cannot prevail. Infringement requires copying and it is undisputed that, with the exception of The City emailing copies of The Plans to DeWalt and The City providing copies of landscape and pump station plans to Northern so that it could make repairs required by The City, there was no copying of the plans. The "copying" referred to above was not by moving parties or DeWalt, their engineer. Further, the undisputed evidence confirms that The City

did not "use" The Plans in approving Map 6451.  Even if it had of, that would not constitute infringement.  Moreover, The City surely had license to make normal use of The Plans which were admittedly created in order to develop the subdivision.

With regard to the maps, 6451 and 5472 they are, as a matter of law, not substantially similar.  A cursory look at Exhibits "A" and "B" to Hassing's declaration confirms that fact. The undisputed evidence is that Map 6451 was DeWalt's independent creation from DeWalt's survey of the site.

Aside from the foregoing, Plaintiff is precluded from prevailing under the doctrine of merger.  There was obviously only one way to depict the improvements which had already been constructed.

Finally, Plaintiff is precluded from obtaining any recovery by latches, estoppel and unclean hands of the most egregious nature.  He made the decision to sue when DeWalt began processing the map.  DeWalt first submitted the map to The City on November 10, 2004.  Between then and July 21, 2007, Defendants spent millions of dollars while Plaintiff sat by quietly, biding his time, until it was too late for Defendants to change course.  In this case, Plaintiff outfoxed himself.  The law does not reward such conduct.


Dated this 22nd day of September, 2009              _____ /s/ Steven J. Hassing, Esq. _____
                                                    Steven J Hassing, Attorney for defendants

## CERTIFICATE OF SERVICE

1.   On September 28, 2009, I served the following document:

- **DEFENDANT, NORTHERN CALIFORNIA UNIVERSAL ENTERPRISE COMPANY'S AND LOTUS DEVELOPMENTS, L.P.'S POINTS AND AUTHORITIES IN SUPPORT OF SUMMARY JUDGMENT**

2.   The above-named document was served by the following means to the persons as listed below:

_XX_   Overnight service via UPS and addressed to:

James Braze
Jeffrey Travis
Borton, Petrini, LLP
1600 Truxtun Avenue
Bakersfield, CA  93301

Chaka Okadigbo
Garcia Calderon Ruiz, LLP
500 South Grand Avenue, Ste. 1100
Los Angeles, CA  90071

William L. Alexander
Alexander & Associates
1925 G Street
Bakersfield, CA  93301

By fax transmission. I faxed the document to the persons at the fax number listed below. No error was reported by the fax machine that I used. A copy of the record of the fax transmission is attached.

I declare under penalty of perjury that the foregoing is true and correct.
Dated this 28th Day of September, 2009.

/s/ Kimberley A. Hassing
Kimberley A. Hassing

Defendants, Northern California Universal Enterprise Company's and Lotus Developments, L.P.'s Points and Authorities in Support of Summary Judgment