lj:nr

1  James J. Braze, Esq.; SBN 75911
   Jeffrey A. Travis, Esq.; SBN 235507
2  BORTON PETRINI, LLP
   5060 California Avenue, Suite 700
3  Post Office Box 2026
   Bakersfield, CA 93303
4  Telephone (661) 322-3051
   email: jbraze@bortonpetrini.com
5  email: jtravis@bortonpetrini.com

6  Attorneys for Plaintiff, Roger McIntosh dba
   McIntosh & Associates
7

8              UNITED STATES DISTRICT COURT

9      EASTERN DISTRICT OF CALIFORNIA, FRESNO DIVISION

10

11 | ROGER McINTOSH,                         | Case No.  1:07-CV- 01080 LJO-GSA

12 |                      Plaintiff,          | PLAINTIFF'S MEMORANDUM OF
   |                                          | POINTS AND AUTHORITIES IN
13 | v.                                       | SUPPORT OF MOTION FOR PARTIAL
   |                                          | SUMMARY JUDGMENT OF THE
14 | NORTHERN CALIFORNIA UNIVERSAL           | FOLLOWING AFFIRMATIVE
   | ENTERPRISES COMPANY, a California        | DEFENSES:
15 | corporation; LOTUS DEVELOPMENTS,         |
   | LLP; THE CITY OF WASCO, a municipal      | 1. Publication
16 | corporation; DEWALT CM, INC., a California | 2. Implied License
   | corporation also doing business as DEWALT | 3. First Sale Doctrine
17 | CORPORATION; and DOES 1 through 10,      | 4. Abandonment of Copyright
   | inclusive                                | 5. Merger
18 |                                          | 6. Statute of Limitations
   |                      Defendants.         | 7. Laches
19 |                                          | 8. Independent Creation

20

21

22                    **INTRODUCTION**

23        The Valley Rose Estates subdivision in Wasco, California sat dormant from 1993

24  until 2004 with most of its improvements still in place and falling into disrepair.  When Northern

25  California Universal Enterprises Co., through its development group - Lotus Developments,

26  (collectively, "Northern") purchased the Valley Rose Estates subdivision in 2004, it had a choice:

27  It could either redesign the subdivision and rip out the existing improvements at great expense, or,

28  it could use what was there.  However, to "use what was there" meant that Northern and Wasco

1   would need to base the approval of the subdivision on original maps and plans originally created by

2   the plaintiff in 1992. These maps had expired and a final map was never recorded. This posed a

3   problem for Northern since these maps and plans were protected by copyright and when Northern

4   approached Roger McIntosh, the current owner of these documents for approval to use them,

5   Northern was told it would need to pay for them. Northern never did. With the help of the City of

6   Wasco ("Wasco") who had access to these documents, and through the hiring of Dennis W. De Walt,

7   Inc., ("DeWalt") Northern was able to avoid paying McIntosh to complete the subdivision and sell

8   homes.

9          To try and avoid infringement, the defendants present several affirmative defenses.

10  These affirmative defenses are the defenses of publication, implied license, first sale doctrine,

11  abandonment of copyright, merger, statute of limitations, laches, and independent creation.

12  However, and in the context of copying tentative maps for the purpose of continuing development

13  on an existing project, courts have uniformly refused to apply these defenses on almost identical

14  facts.

15         In one of these cases, an infringer asked the Northern District, in effect, what else

16  were they supposed to do since the improvements were already in the ground. The court answered

17  simply that the developer had two choices: it was either free to modify the subdivision or, it was free

18  to develop the property in accordance with the prior map and plans and pay plaintiffs the value of

19  the copyright. As here, the defendants did neither.

20         Taking the allegations of ownership and copyright as true, there are no facts that

21  would support any of the affirmative defenses stated above and the plaintiff respectfully requests this

22  Court grant summary adjudication in favor or plaintiffs on these defenses.

23  ///

24  ///

25  ///

26  ///

27  ///

28  ///

1

## STATEMENT OF FACTS

2

### A.   OVERVIEW OF SUBDIVISION MAP ACT[1]

3          Before a developer can develop a tract of land for a subdivision, it must first present

4    to the respective municipal entity ("municipality") a "tentative map" or, a drawing of the subdivision

5    including the number of lots, streets, boundaries, street names, and other general information that

6    will allow the municipality's planning commission to approve the subdivision with certain

7    enumerated conditions. (Gov. Code, § 66410-66499.58.) The process for developing a subdivision

8    is governed by those sections and is commonly known as California's Subdivision Map Act. *(Id)*

9    ("Map Act") The planning commission reviews the map, with conditions, and then approves the

10   tentative subdivision map so that the developer can develop the subdivision in conformity with the

11   map and conditions. *(Id.)*

12         After final approval by the governing body of the map, the final map is recorded and

13   the developer begins the process of constructing the subdivision and its improvements in accordance

14   with the conditions. *(Id).* (§ 66473.5; §66426.) Supporting each map is a set of improvement plans

15   that are required to conform to the approved design of the subdivision and the tentative map. *(Id.)*

16   Whereas the tentative map shows the general layout of the subdivision, the improvement plans lay

17   out in detail the construction and design of specific elements of the subdivision set forth in the

18   tentative map. (Gov. Code, § 66426; *Wasco Municipal Code*, § 16.32.060, (including street plans,

19   grading plans, wall plans, landscape plans, and etc.) (See, e.g., *Tentative Map No. 5472 and related*

20   *improvement plans, Exhibits "D" and "E" attached to Declaration of Roger McIntosh.*)

21         As stated above, a final map must be approved by the governing body of the

22   municipality and recorded. *(Gov. Code,* §§ 66410-66499.37; Curtin Jr., Daniel A. and Merritt,

23   Robert E., *California Subdivision Map Act and the Development Process*, Second Edition, § 3.1,

24   (November 2008 Update) ("Map Act Practice"). To be accepted by the municipality, the final map

25   must be certified by a qualified engineer or surveyor who certifies that the final map "substantially

26

27

28   [1]This litigation is centered around the process of preparing a subdivision through California's
     complicated subdivision mapping process. Therefore, this section is a brief overview of this process.

1   conforms" to the tentative map. To "substantially conform" the final map must accurately show data

2   sufficient to identify the intended purpose of the subdivision.   *(Gov. Code,* § 66442(a); 57

3   Op.Atty.Gen. 239, 5-24-74; *Wasco Municipal Code,* 16.20.060, *Request for Judicial Notice,*

4   *Exhibit "A".*)

5         Without an approved final map a developer cannot sell, lease, or finance a parcel;

6   cannot commence construction of any building for sale, lease or financing (except model homes);

7   and cannot allow the occupancy of any such parcel or building. (*Gov. Code,* § 66499.30(a)-(b); *Map*

8   *Act Practice*, supra, § 11.1.)

9         Typically, a developer will obtain approval of a tentative map from the public entity's

10  planning commission.  The life of a tentative map can be extended for ten years or even longer,

11  depending on whether the developer meets certain conditions set forth in Government Code Section

12  66452.6 and also depending on any extension that may be granted by the public entity's municipal

13  code.  Sometimes, prior to approval of a tentative map, a public entity and developer will enter into

14  a development agreement (Gov. Code, § 65864, et seq.).   A development agreement allows a

15  development agreement allows a developer to develop its property in accordance with existing

16  policies, rules and regulations (Gov. Code, § 65864).  The development agreement is this case is

17  attached as Exhibit "B" to the Declaration of Jeffrey A. Travis.

18  **B.    STATEMENT OF FACTS RELATING TO DEVELOPMENT OF VALLEY ROSE**
         **SUBDIVISION**
19

20        The civil engineering firm of Martin-McIntosh entered into a contract with the Legacy

21  Group, a private developer, in 1992 as a consultant to perform civil engineering services for the

22  Valley Rose Estates subdivision in Wasco, Ca. *Sep. Stmnt. of Undisputed Material Facts,*

23  No. 1.("Sep. Stmnt.") These services included preparation of a tentative map and improvement plans

24  for Tract No. 5472. *(Id).*  The contract between them also provided that Martin-McIntosh retained

25  ownership over all "original papers, documents, drawings, and other work product of consultant"

26  and that Legacy Group was "not to use or permit any other person to use the plans, drawings, or other

27  work product" which were to be used "only for the project described on the face hereof." *Sep. Stmnt.*

28  No. 2.

4

1        The City of Wasco Council approved the 5472 Map for development in 1992 and the

2   Legacy Group entered into a development agreement with the City of Wasco to construct the

3   subdivision. *Sep. Stmnt. No. 3, Exhibit "B" attached to Travis Decl.*, 1992 Development Agreement

4   between Legacy Group and Wasco.  The 1992 development agreement provided that the agreement

5   would continue until 2002 unless the tentative map expired. *(Id.)*[2] (clause 4.2) A final map was never

6   recorded.

7        Pursuant to a buyout agreement, the partnership of Martin-McIntosh was dissolved

8   and all of its assets in California were purchased by Roger McIntosh doing business as McIntosh &

9   Associates in 1999. (referred to hereafter collectively as "McIntosh") *Sep. Stmnt. No. 17*  This

10  included the contract and "all assets" between it and the Legacy Group.  *(Id.)*

11       After laying dormant for over ten years and with no further work done on the

12  subdivision, the 5472 Tentative Map expired and the subdivision was left substantially completed

13  but in a blighted condition. *Sep. Stmnt. No. 4, Exhibit 2 attached to the Deposition of Terry*

14  *Schroepfer.* At that time, the Valley Rose subdivision could have been re-designed by the developer.

15  *Sep. Stmnt. No. 30*  However, this was not to be.   In 2003, Wasco marketed the Valley Rose

16  subdivision and the 5472 map and plans to prospective buyers. *Travis Decl., ¶16, Exhibit "S"*

17  *(Developer Information Package).* Shortly thereafter, they obtained a buyer for the subdivision,

18  Northern California Universal Enterprises Company (NCUE) and Lotus Developments, LLC.

19  (collectively, "Northern") and a new development Agreement was then entered between Wasco and

20  Northern. *Travis Decl., ¶4, Exhibit "B"; and ¶7, Exhibit "F", Deposition of Keith Woodcock,*

21  *Exhibit 2.*

22       Instead of expending resources to redesign the subdivision, Northern, with the

23  permission of Wasco, chose to reprocess a new tentative map (the 6451 Tentative Map) to replace

24  expired Tentative Map No. 6451. *(Id.)* Northern then entered into an agreement with an engineering

25  firm, Dennis W. DeWalt Inc. ("DeWalt") in September of 2004 to prepare a new map (Tentative

26

27       [2]The Legacy Group was unable to complete development and the City of Wasco eventually

28  bought the Valley Rose subdivision at a tax sale.

1    Map No. 6451) to replace expired Map. No. 5472. *Travis Decl., ¶5, Exhibit "D", Exhibit 4 attached*

2    *to Gutierrez Deposition.*

3              Around the time Northern was developing the tract, Joe Wu, the president of Northern

4    called McIntosh's office and asked what it would cost to finish out the Valley Rose Subdivision

5    including processing the new map. *Sep. Stmnt.* ¶¶10, 12.  McIntosh told Wu that he it would cost

6    over $300,000 plus the cost for processing the map. *Id.* McIntosh never heard back from Wu. (*Id.*)

7    Later, Wu had his office call McIntosh's office requesting McIntosh give them a copy of the

8    improvement plans but McIntosh refused. *Sep. Stmnt. No. 12.* Northern, through Joe Wu, admitted

9    this conversation and also admitted he was denied access to these plans because they were "owned

10   by another company." *Sep. Stmnt. No. 12.*  Wu also admitted that he obtained copies of the

11   copyrighted work from the City of Wasco who gave them to him. *Sep. Stmnt. No. 33.*

12             McIntosh, unaware of the contract between NCUE and Dewalt, discovered that a final

13   map for new Tract No. 6451 was being processed and so drove by the development around October

14   of 2006 and saw houses going up. *Sep. Stmnt. Nos. 26 and 28.* Northern began building its homes

15   in 2006 and completed them sometime in 2007. *Sep. Stmnt. No. 28*  After seeing the homes being

16   built, McIntosh went to Wasco's Building and Planning Department shortly thereafter and confirmed

17   that Northern was using an identical tentative map and his 5472 improvement plans to support the

18   6451 Tentative Map. *Sep. Stmnt. No. 28.*

19             McIntosh filed his claim in February of 2007. *Sep. Stmnt. No. 27.*

20                                              **ARGUMENT**

21   **A.    PARTIAL SUMMARY JUDGMENT STANDARD**

22             If there is no genuine issue of material fact as to any defenses, a court may grant

23   partial summary judgment (summary adjudication) as to particular defenses "on all or part thereof."

24   (FRCP 56(a); *Wang Laboratories, Inc. v. Mitsubishi Electronics, America, Inc.*; 860 F.Supp. 1448,

25   1450 (C.D. Ca 1993).)

26             Courts must grant summary judgment, "if the pleadings, depositions, answers to

27   interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine

28   issue as to any material fact and that the moving party is entitled to judgment as a matter of law."

1 (Fed. Rules Civ. Proc., § 56(c).)  On summary judgment, the court does not weigh evidence, but

2 rather determines "whether a proper jury question was presented." (*Anderson v. Liberty Lobby, Inc.*,

3 477 U.S. 242, 249 (1986).)  To avoid a grant of summary judgment, defendants are required to "go

4 beyond the pleadings and by [their] own affidavits, or by 'depositions, answers to interrogatories,

5 and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'"

6 (*Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986) (quoting Fed. Rules Civ. Proc., 56(e).)

7 <u>Affirmative defenses generally admit the matters in a complaint</u> but nevertheless

8 assert additional facts that would defeat recovery. (*Amelio v. Yazoo Mfg. Co.*, D.C. Ill.1983, 98

9 F.R.D. 691;  5 Wright and Miller, Federal Practice and Procedures 1270 at 292.)  In other words,

10 an affirmative defense raises matters extraneous to the plaintiff's *prima facie* case and so are derived

11 from the common law plea of 'confession and avoidance.' (*Keeler Brass Co. v. Continental Brass*

12 *Co.*, 862 F. 2d 1063, 1066 (4th Cir. 1989).

13 Here, plaintiff asks this Court to review eight affirmative defenses asserted by each

14 of the defendants, which, if the allegations in the complaint are true, suggest some other reason why

15 there is no right of recovery.  These defenses assert:

16 • The copyrighted work was <u>published</u> as that term is defined by the copyright

17 law and is therefore no longer protected by copyright;

18 • McIntosh granted an <u>implied license</u> to one or more of the defendants to use

19 the work giving them the right to develop according to McIntosh's map and

20 plans;

21 • One or more of the defendants purchased the work allowing them to use it

22 without McIntosh's permission under the <u>"first sale"</u> doctrine;

23 • McIntosh <u>abandoned</u> his copyrighted work to the public giving them the right

24 to use it;

25 • The development of the subdivision <u>can only be expressed according to</u>

26 <u>McIntosh's original design</u> and so McIntosh cannot claim a monopoly on the

27 underlying idea expressed in his work under the merger doctrine;

28

1      • McIntosh is prevented from seeking any relief because the <u>statute of</u>
2          <u>limitations</u> has run; and finally

3      • McIntosh <u>waited too long</u> to bring the suit after the alleged infringing activity
4          and therefore, this Court can equitably deny any relief under the doctrine of
5          laches.

6      • Defendants did not need the copyrighted works to create the new tentative
7          map and so the creation was <u>independent</u> of McIntosh's work.

8      As will be shown below, each of these defenses, in the specific context of processing

9 a previously submitted map to a governmental agency, have all been uniformly rejected by courts

10 in California and across this country on identical facts.  Summary adjudication for each should

11 therefore be granted.

12      **1.    <u>The Copyrighted Work Was Not Published Because the Work Was</u>**

13 **<u>Required to Be Submitted to the City of Wasco</u>**.

14      Tentative Maps can be protected by copyright.  (17 U.SC. 102(a)(5); *Del Madera*

15 *Properties v. Rhodes and Gardner, Inc.*, 637 F.Supp. 262, 263 (N.D. Cal. 1985); ("*Del Madera I*")

16 *John G. Danielson, Inc. v. Winchester-Conant Properties, Inc.*, 186 F.Supp.2d 1, 18 (D. Mass.

17 2002)); More than that, "[e]ffort expended to create the Tentative Map and supporting documents

18 is effort expended to create the tangible works of authorship.  As such this effort is within the scope

19 of copyright protection." (*Del Madera Properties v. Rhodes and Gardner, Inc.*, 820 F.2d 973, 976-

20 977 (9th Cir. 1987), rev'd on other grounds.) ("*Del Madera II*") Therefore, not just the map but also

21 its corresponding improvement plans are also protected.

22      Federal statutes provide that if a work has been published and dedicated to the public,

23 it is not protected by copyright. 17 USC 101. Yet, federal courts around this country, including here

24 in California, have all held that the submission of a tentative map and improvemet plans to a city for

25 processing is <u>not</u> a "publication" under this federal statute. (*Del Madera Properties v. Rhodes and*

26 *Gardner*, 637 F.Supp. 262, 264 (N.D. Ca. 1985) *Paul v. Pederson* (1st Dist. 1959) 174 Cal. App.2d

27 744, 750. *John G. Danielson, Inc. v. Winchester-Conant Properties, Inc.*, 186 F.Supp.2d 1, 18

28 (D. Mass. 2002) *Kunycia v. Melville Realty* Co., 755 F.Supp. 566, 574 (S.D.N.Y. 1990) *Intown*

1 | *Enters., Inc. v. Barnes*, 721 F.Supp. 1263, 1266 (N.D. Ga. 1989).)

2 "Publication" therefore, does not mean the same thing as may be used in common
3 parlance. Specifically, tentative map and improvement plans submitted at the request of a city, , in
4 this case the City of Wasco, does not equate to a publication under 17 U.S.C. §101. The Court in
5 *Paul v. Pederson* stated, "the forced filing of the plans in the building department of a municipality
6 constitutes only a limited publication of the [copyright]…which gives no person the right to use a
7 copy thereof." (*Paul v. Pederson, supra*, at 751).[3]  This longstanding rule was affirmed in
8 *Del Madera* which held that a tentative map "is not a self-executing ordinance" and is not
9 "transformed into law" sufficient to constitute a publication. (*Del Madera* at 264.)

10 Under the Subdivision Map Act and the Wasco Municipal Code, the Legacy Group
11 was required to submit a tentative map and improvement plans in order to gain acceptance by the
12 City to sell lots and homes. (Gov.  Code, § 66410-66499.58 and §66499.30(a)-(b); *Map Act*
13 *Practice, supra*, § 11.1.; and *Wasco Municipal Code*, §16.20.060. Further, in order to sell lots, a
14 <u>final</u> map must also be approved. (*Id.*)

15 When the original 5472 Map was first submitted to Wasco by plaintiff, it was done
16 so because of a requirement by the Subdivision Map Act of the California Government Code and
17 per Wasco's municipal guidelines. *Sep. Stmnt. No. 3*.  The facts here are identical to those in
18 *Del Madera, Danielson*, and the other cases cited *supra* in this section in that plaintiff was required
19 to submit the map and plans in order to obtain approval by the City of Wasco.

20 As a matter of law, there was no publication.

21 **2.    <u>There Was No Implied License Because Plaintiff Never Intended for the</u>**
22 **<u>Work to Be Distributed to Defendants</u>**.

23 A copyright owner has the exclusive rights to reproduce the work, prepare derivative
24 works, and distribute copies. (17 U.S.C. §106; *Danielson, supra*, at 9-10.) The Copyright Act also
25 invalidates a purported transfer of ownership unless it is in writing. (17 U.S.C. 204(a).) The narrow

26
27
28 [3]Limited publication is a phrase no longer used in copyright law but was previously used to
denote a work that does not fall under the publication statute.

1  exception to this is that of a nonexclusive, implied license. (*Effects Assoc. Inc. v. Cohen*, 908 F.2d

2  555, 558-559 (9th Cir. 1990).)

3          If a copyright owner never intends for the alleged licensee to copy and distribute its

4  work, there is no implied license. (*Effects Assoc. Inc. v. Cohen*, 908 F.2d 555, 558-559 (9th Cir.

5  1990); 3 Melville B. Nimmer & David B. Nimmer, *Nimmer on Copyright*, §10.03[A][7}(2001);

6  *John G. Danielson, Inc. v. Winchester-Conant Properties, Inc.*, 186 F.Supp.2d 1, 18 (D. Mass.

7  2002).)

8          Here, McIntosh entered into a contract with Legacy Group in which he would create

9  works for them and retain all rights to those works. *Sep. Stmnt. Nos. 1-2.* Further, the contract

10  between plaintiff and the Legacy Group specifically stated that the works were only to be used by

11  the Legacy Group and in connection with the specific project identified by that contract. *Sep. Stmnt.*

12  *Nos. 2,(provisions 12-13).* The Work prepared by plaintiff was only for Legacy Group's use and

13  could not be used on any other project "without the written authorization (Agreement between

14  Martin-McIntosh and Michael Brown) or approval" of McIntosh. *Id.* At no time were Northern,

15  Wasco, or DeWalt given authorization by plaintiff to use his work. *Sep. Stmnt. Nos. 7-12.* In fact,

16  Northern's president, Joe Wu, admitted that he was told by McIntosh that he could not use

17  McIntosh's work. *Sep. Stmnt. No. 12.*

18          The *Danielson* case is particularly instructive here. In *Danielson*, the Court, relying

19  on the Ninth Circuit holding in *Effects*, held that plans submitted to a planning board did <u>not</u> grant

20  an implied license to the town. In deciding this, they relied on three primary facts.

21          First, the original contract for services was between the copyright holder and an

22  original developer, not the town; Second, the copyright holder retained control over the rights to the

23  work under the contract; and finally, the town of the later developer never retained the plans directly

24  from the copyright holder but indirectly through the foreclosure of the properties. (*Danielson, supra,*

25  at 18-23, following identical facts in *Johnson v. Jones*, 149 F.3d 494, 500 (6th Cir. 1998).)

26          The *Danielson* Court followed the rationale of the Northern District of California in

27  *Del Madera I* holding that just because a copyright holder submits its work to a city for approval

28  does not mean that it is creating an implied license. (*Id.*, at 21.) As the Court explained, it was <u>not</u>

1   the map that was adopted by the city but the conditions that required construction in conformity with

2   the plans.  (*Id.*)

3           Like *Danielson* and *Johnson*, the original contract between McIntosh and Legacy

4   Group was a standard form contract from the California Council of Civil Engineers and Land

5   Surveyors.  (See, "CELSOC" contract between Martin-McIntosh and Richard Brown attached as

6   Exhibit "A" to McIntosh Decl.)  Other than this contract, there is no writing that gave Wasco or

7   anyone else the rights to the copyrighted works. In fact, Wasco's own municipal code provides that

8   electronic versions of the map and plans are for government use and not available to the general

9   public. *Request for Judicial Notice, Exhibit "B", Wasco Mun. Code §16.32.050.*

10          Neither Wasco or DeWalt ever discussed their use of the works with McIntosh while

11  preparing Tentative Map No. 6451. *Sep. Stmnt. Nos. 8 and 11.* The only party to contact McIntosh

12  was Northern asking to use the plans. Northern later admitted in its deposition that Northern's office

13  was told they could not use them because they were owned by another company. *Sep. Stmnt. Nos. 9*

14  *and 12.*  To paraphrase *Danielson*, "at no point did [McIntosh's] conduct (or lack of conduct)

15  demonstrate a willingness to allow use of the drawings without [McIntosh's] permission.  In fact,

16  the only parties with whom [McIntosh] was in privity, [Legacy Group] was expressly forbidden to

17  do so."*Danielson*, at 20; *McIntosh Decl., Exhibit A, par. 13.*

18          Based on the undisputed facts and law, summary adjudication should be granted in

19  favor of plaintiff on the affirmative defense of implied license.

20          **3.      There Can Be No First Sale Defense When the Copyrighted Work Was**

21  **Never Sold.**

22          A person who has assumed ownership of a particular work "is entitled, without the

23  authority of the copyright owner, to sell or otherwise dispose of the possession of that copy[.]" (17

24  U.S.C. 109.)  This has come to be known as the "first sale" doctrine.  This statute "restates and

25  confirms the principle that, where the copyright owner has transferred ownership of a particular copy

26  ... of a work, the person to whom the copy ... is transferred is entitled to dispose of it by sale ... or

27  any other means." (*Microsoft Corp. v. Harmony Computers & Electronics, Inc.*, 846 F.Supp. 208,

28  212 (E.D.N.Y. 1994).)

1    Yet, and in civil actions for copyright infringement, it is the defendant who has the

2    burden of proving that the copyrighted work was lawfully acquired. (*Id.*, cited in *American Int'l*

3    *Pictures, Inc. v. Foreman*, 576 F.2d 661, 663 n. 1 (5th Cir.1978).) Further, the first sale doctrine

4    does not apply unless the owner <u>voluntarily releases his work</u>. (*Parfums Givenchy, Inc. v. Drug*

5    *Emporium, Inc.,* Cal.App.9 (Cal.) 1994, 38 F.3d 477, 32 U.S.P.Q.2d 1512).)

6    As the facts have been detailed in Part A.2, *supra*, the only allowed use of the

7    copyrighted work was for the Legacy Group to use the copyrighted work to use the map and plans

8    pursuant to a written contract in 1992. All other uses were expressly prohibited as were all uses by

9    anyone other than the Legacy Group. Even after the work was transferred to McIntosh pursuant to

10   a buyout agreement, no party ever paid McIntosh for the work. *Sep. Stmnt. Nos. 18-21.* The

11   undisputed facts are that when Legacy contracted for the work from Martin-McIntosh, they agreed

12   that Martin-McIntosh would retain the rights to the work and that if

13   Defendants' cannot meet their burden in showing that plaintiff ever sold them the

14   copyrighted work. Summary adjudication in favor of plaintiffs on this defense should be granted.

15   **4.    <u>There Can Be No Abandonment When the Copyright Holder Never</u>**

16   **<u>Intends to Surrender His Right to the Work</u>.**

17   Abandonment of a copyrighted work only occurs when there is a showing that the

18   copyright holder intends to surrender his rights in the work and there is an overt act by the plaintiff

19   evidencing that act. (CLH, Copyrights, § 17.19) 4 Melville B. Nimmer & David B. Nimmer,

20   *Nimmer on Copyright*, §13.06 (2001);  *Micro Star v. Formgen, Inc.*, 154 F.3d 1107, 1114 (9th

21   Cir.1998); *Pacific & Southern Co., Inc. v. Duncan*, 572 F. Supp. 1186 (N.D. Ga. 1983), aff'd, 744

22   F.2d 1490 (11th Cir. 1984).) This defense is similar to that of implied license except that it is more

23   restrictive since it requires an "overt" act by plaintiff demonstrating abandonment.

24   Defendant's only support for this defense is that McIntosh intended for the

25   copyrighted works to be submitted to the City of Wasco for approval. Yet, and similar to implied

26   license, courts have uniformly held that the act of submitting a work for approval by a municipality

27   is not an overt act of abandonment. (*John G. Danielson, Inc. v. Winchester-Conant Properties, Inc.*

28   186 F.Supp.2d 1, 24 (D. Mass. 2002); *Del Madera Properties v. Rhodes and Gardner* 637 F.Supp.

1 | 262, 264 (N.D. Ca. 1985); *Paul v. Pederson* (1ˢᵗ Dist. 1959) 174 Cal.App.2d 744, 751.)

2 |     Here, and for reasons already stated above, plaintiff never made such an overt act.

3 | *Sep. Stmnt. Nos 5-12*, making summary adjudication appropriate.

4 |     **5.**    **The Valley Rose Subdivision Could Have Been Redesigned to**

5 | **Accommodate a New Subdivision Design Making the Merger Defense Inapplicable**.

6 |     The merger doctrine "will not protect a copyrighted work from infringement if the

7 | idea underlying the copyrighted work can be expressed in only one way, lest there be a monopoly

8 | on the underlying idea." (*Ets-Hokin v. Skyy Spirits, Inc.*, 225 F.3d 1068, 1082 (9th Cir.2000); *CDN,*

9 | *Inc. v. Kapes*, 197 F.3d 1256, 1261 (9th Cir.1999).)

10 |     In the context of subdivision maps, the fact that a governmental entity adopts a

11 | particular design scheme for a property does not cause that scheme to merge with the unprotected

12 | idea of developing the property. (*John G. Danielson, Inc. v. Winchester-Conant Properties, Inc.* 186

13 | F.Supp.2d 1, 24 (D. Mass. 2002); *Del Madera Properties v. Rhodes and Gardner* 637 F.Supp. 262,

14 | 264 (N.D. Ca. 1985).)

15 |     The fact that defendants could have redesigned the subdivision has been admitted by

16 | every party. *Sep. Stmnt. No.24.* This includes plaintiff and his expert, numerous Wasco employees

17 | and Wasco's expert, Stephen Wong. *Id.* In fact, the only impediment to redesigning the subdivision

18 | was that it would be impractical because of the money involved in doing so. *See, Id., Defendant's*

19 | *Expert, Deposition of Stephen Wong*, 50:9-25;51; 52:1-20; 54:8-25; 55; 56:1-5. The fact that the

20 | Valley Rose Subdivision already had most of the improvements in the ground is not what prevented

21 | the defendants from redesigning the subdivision, money did.

22 |     The City of Wasco's former managers admitted they really wanted Northern to

23 | redesign the subdivision into something more "upscale." See, *Sep. Stmnt. No. 24, Depositions of*

24 | *Larry Peake, Larry Pennell, and Keith Woodcock.* As Wasco's expert aptly stated, the design

25 | possibilities of the Valley Rose subdivision were "almost infinite." *Wong Dep.*, 52:1-20. But, and

26 | as he went on to testify, it would be impractical because, "tearing out improvements and actually

27 | having to reinstall them costs money." *Wong Dep.*, 54:21-25; 55:1. This was something the

28 | defendants avoided by using McIntosh's previous map and plans.

1    In *Del Madera I*, the defendants complained they had no choice but to develop the

2    subdivision according to the previous map because the conditions for approval were already made

3    by the city and they had already developed the property in accordance with the Tentative Map. See,

4    *Del Madera I*, at 265, and *Del Madera II* at 975. The Court rejected these complaints and responded

5    that their choices were simple, they could have either submitted modifications to the map or, they

6    could have paid the plaintiff and developed according to the map. *Del Madera I*, at 265. Like the

7    defendants in *Del Madera*, the defendants here did neither, and court concluded in *Del Madera*,

8    defendants needed to either pay McIntosh or not use the infringing works. .

9    Therefore, summary adjudication should be granted in favor of plaintiff on this

10    defense.

11    **6.    There Can Be No Defense of Statute of Limitations When the Alleged**

12    **Infringement Did Not Begin until Fewer than Three Years Before the Suit Was Brought**.

13    There is a three-year federal statute of limitations from when a copyright claim

14    accrues to when a copyright holder can file their claim. (17 U.S.C. 507(b).) The claim only begins

15    accruing when one has actual knowledge of infringement. (*Roley v. New World Pictures*, 19 F.3d

16    479, 481 (9th Cir.1994); *Kling v. Hallmark Cards, Inc.*, 225 F.3d 1030, 1038 (9th Cir.2000).)

17    Northern California Entered into a contract to prepare the tentative map in September

18    of 2004. Therefore, any knowledge of any infringement could not have been earlier than this date.

19    *Sep. Stmnt. No. 25*. Further, DeWalt's principal admitted that the preparation of the new tentative

20    map did not begin until after September of 2004 and the invoices show that the earliest work was

21    done in September of 2004. (*Id.* ¶ 17, Exhibit "T", DeWalt Invoices attached to Deposition of Jeff

22    Gutierrez, June 19, 2009 as Exhibit 5.) Even if McIntosh had knowledge of this contract at that time,

23    (which there's no way he could have) the limitations period would have not have run until October

24    of 2007. The claim in this case was filed in February of 2007, and well within the limitations period

25    provided by federal statute. Furthermore, McIntosh was not even aware of the infringement until

26    later in 2006 as shown in section A.7, infra. *Sep. Stmnt. No. 28*.

27    Plaintiff therefore requests this Court grant summary adjudication against defendant

28    on defendants' statute of limitations defense.

1    **7.    Since McIntosh Brought His Claim Within Several Months after**

2    **Learning of the Infringement of His Work, Laches Is Inapplicable.**

3    Laches is an equitable time limitation on a party's right to bring suit. *(Kling v.*

4    *Hallmark Cards, Inc.*, 225 F.3d 1030, 1036 (9th Cir.2000); *New Era Publ'ns Int'l v. Henry Holt &*

5    *Co.*, 873 F.2d 576, 585 (2d Cir.1989). To obtain a judgment on this affirmative defense, a defendant

6    must prove both an 1) unreasonable delay by the plaintiff and 2) prejudice to itself." *(Couveau v.*

7    *American Airlines,* 218 F.3d 1078, 1083 (9th Cir.2000).)

8    At his deposition, McIntosh testified that he was unaware of any infringing activity

9    until late 2006 when he received notice from the City of Wasco that a final map had been prepared

10   for the subdivision. *Sep. Stmnt. No. 29.* The notice did not say what type of final map was prepared

11   so he drove by the Valley Rose subdivision sometime around November of 2006 and saw homes

12   being erected and that the subdivision  had not been altered or redesigned. *Id.* From these

13   observations he concluded the defendants were probably using his map and plans or else the

14   developer would have had to redesign the subdivision. *(Id.)* He then went to the City of Wasco's

15   planning department and spoke with a person at the counter who told him that there were no

16   improvement plans for Tract No. 6451 because they were using the improvement plans for Tract

17   No. 5472. (McIntosh's plans) *Sep. Stmnt. No. 29.*

18   McIntosh brought his suit several months later in February of 2007. *Sep. Stmnt.*

19   *No. 30.*

20   There was also no prejudice to defendants since Wasco had already approved the

21   subdivision by Northern and DeWalt had already prepared the map. *Sep. Stmnt. Nos. 30-32.* Further,

22   the homes were already built or in the process of being built with most of the homes completed in

23   2007. *Sep. Stmnt. No, 32..* (Kern County records showing Northern's certification that homes were

24   completed in 2007).  Since the process for starting the homes had already begun and were completed

25   shortly after McIntosh filing the complaint, there was no prejudice to defendants since the work in

26   completing the subdivision was mostly done before McIntosh was aware of the infringement in late

27   2006.

28   McIntosh acted quickly to file a complaint within several months of discovering the

1  infringement. The infringement began in September of 2004 without his knowledge and continued

2  until 2007 when the homes were completed. Therefore, plaintiff requests this court grant judgment

3  in favor of plaintiff on this defense.

4      **8.    Defendants Can Present No Evidence Which Would Rebut Their Burden**

5  **to Show That the 6451 Map Was Independently Created.**

6      To prove copying under the Copyright Act, a plaintiff must offer either direct or

7  indirect evidence. As most every court explains when analyzing possible copyright infringement,

8  direct evidence is rarely if ever found. Therefore, courts will almost always apply a test for indirect

9  infringements. (*Lanard Toys Limited v. Novelty, Inc.,* 511 F.Supp.2d 1020, (C.D. Ca 2007); See

10  Also, *Kamar Int'l. v. Russ Berrie and Co.,* (9th Cir. 1982) 657 F.2d 1059, 1962. Indirect

11  infringement is shown by demonstrating that the defendant 1) had access to the copyrighted work

12  and that the defendant's work is 2) "substantially similar" to the plaintiff's work. (*Id.*)

13      Proof of access requires only an, "opportunity to view or to copy plaintiff's work."

14  (*Kamar International Inc. v. Russ Berrie & Co,* 657 F.2d 1059, 1062 (9th Cir. 1981), citing, *Sid &*

15  *Marty Krofft Television v. McDonald's Corp.,* 562 F.2d 1157, 1162 (9th Cir. 1977).) (underline

16  added) Assuming that plaintiff has proven access and substantial similarity, the burden would then

17  shift to the defendant to prove the work was not copied but independently created. *(Transgo, Inc. v.*

18  *Ajac Transmission Parts Corp.,* 768 F.2d 1001, 1018-1019 (9th Cir. 1985).)

19      Every defendant has admitted they had an opportunity to view the copyrighted work

20  during the infringing period. Wasco used a copy of the 5472 Tentative map to market the Valley

21  Rose subdivision to potential developers and attached it to a "Developer Information Package"; *Sep.*

22  *Stmnt. No. 34;* Wasco also admitted that it freely gives out works of this type if asked; *Sep. Stmnt.*

23  *No. 36;* Wasco gave the 5472 improvement plans to DeWalt early in 2005 in emails from Dennis

24  McNamara to Greg Black of DeWalt with copies of the 5472 map and improvement plans attached;

25  *Sep. Stmnt. No.35;* DeWalt's principal, Jeff Gutierrez, admitted his office compared the 5472 Map

26  with the 6451 Map while preparing the new 6451 map. *Sep. Stmnt. 37;* DeWalt's employee at the

27  time, Sarah Burgi, admitted that while overseeing Josh Woodard, who she claims actually drew the

28  map under her supervision, he had asked to see the improvement plans while preparing the 6451

1   Map.  *Sep. Stmnt. No.37*;[4] Northern admitted it had asked for and received copies of the

2   improvement plans from the City of Wasco. *Sep. Stmnt. No.33*; and finally, DeWalt admitted that

3   it used Tentative Map No. 5472 to assist it in preparing Tentative Map No. 6451. *Sep. Stmnt. Nos. 35*

4   *and 37.*

5         Defendant's had the opportunity to view the infringing work and even used the 5472

6   map and plan to assist them in preparing the 6451 map and complete the subdivision.  Opportunity

7   is all that is needed to prove access and therefore, there is no material fact that defendants can

8   present that will rebut their previous admissions that they had access to the copyrighted work while

9   processing the 6451 map.

10                            **CONCLUSION**

11         For the reasons set forth in this motion, memorandum, and supporting documents,

12   plaintiff respectfully requests this Court grant summary adjudication as to each of the seven

13   affirmative defenses asserted by the several defendants.

14   DATED:  September 29 , 2009

15                            Respectfully submitted,

16                            BORTON PETRINI, LLP

17

18                  By:_____

19                      Jeffrey A. Travis, Attorney for Plaintiff,
                        Roger McIntosh dba McIntosh & Associates

20

21

22

23

24

25

26

27   _____

28       [4]Josh Woodard was deposed on September 11, 2009, but claims he does not remember
     anything about his preparation of the 6451 Map.

1

**PROOF OF SERVICE**
**(FRCP No. 5(b)(2)(E))**

2

3
    **STATE OF CALIFORNIA, COUNTY OF KERN**

    I, Vanessa J. Claridge, declare:

4
       I am a citizen of the United States. I am employed in the County of Kern, State of California. I am over the age of 18 and not a party to the within action; my business address
5
is 5060 California Avenue, Suite 700, Bakersfield, California 93309.

6
       On **September 29, 2009**, I served the foregoing document described as **MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION**
7
**FOR SUMMARY JUDGMENT 1. Publication; 2. Implied License; 3. First Sale Doctrine; 4. Abandonment of Copyright; 5. Merger; 6. Statute of Limitations;**
8
**7. Laches; 8. Independent Creation** on the other party(ies) in this action as follows:

9
Steven John Hassing, Esq.               Attorneys for Attorneys for Defendants,
 Law Offices of Steven J. Hassing       Northern California Universal Enterprises
10
425 Calabria Court                  Company and Lotus Developments
Roseville, CA 95747               Tel:   916/677-1776
11
                                        **Fax:  916/677-1770**
email address: **stevehassing@yahoo.com**
12
Chaka Okadigbo                      Attorneys for Defendant, City of Wasco
13
**Garcia Calderon Ruiz, LLP**
500 South Grand Ave Suite 1100       Tel: 213/347-0210
14
Los Angeles, CA 90071             **Fax: 213-347-0216**
email address: **cokadigbo@gcrlegal.com**
15
William L. Alexander, Esq.          Attorneys for Defendant, DeWalt CM, Inc.
16
Alexander & Associates
1925 "G" Street                    Tel: 661/316-7888
17
Bakersfield, CA 93301             **Fax: 661/316-7890**
email address: **walexander@alexander-law.com**
18
X     **BY ELECTRONIC SERVICE:** Pursuant to Fed. R. Civ. P. 5(b)(2)(E) and Local Court
19
        Rule(s), the foregoing document will be served by the court via CM/ECF.. Pursuant to the CM/ECF docket for this case proceeding the following person(s) are on the Electronic Mail
20
        Notice List to receive ECF transmission at the email address(es) indicated below:

21
X     **BY OVERNIGHT MAIL:** I caused such envelope with postage fully prepaid to be sent by Golden State Overnight Mail.
22
       Executed on **September 29, 2009**, at Bakersfield, California.
23
       I declare that I am employed in the office of a member of the bar of this court at
24
whose direction the service was made.

25
      _Vanessa J. Claridge_
26
                                                    Signature
27

28