EXHIBIT "2"

lj:nr

1  James J. Braze, Esq.; SBN 75911
   Jeffrey A. Travis, Esq.; SBN 235507
2  BORTON PETRINI, LLP
   5060 California Avenue, Suite 700 (93309)
3  Post Office Box 2026
   Bakersfield, CA 93303
4  Telephone (661) 322-3051
   email: jbraze@bortonpetrini.com
5  email: jtravis@bortonpetrini.com

6  Attorneys for Plaintiff, Roger McIntosh dba
   McIntosh & Associates
7

8                 UNITED STATES DISTRICT COURT

9          EASTERN DISTRICT OF CALIFORNIA, FRESNO DIVISION

10

11  ROGER McINTOSH,                          Case No. 1:07-CV-01080 LJO-GSA

12              Plaintiff,

13  v.                                       DECLARATION OF JEFFREY A.
                                             TRAVIS IN SUPPORT OF MOTION FOR
14  NORTHERN CALIFORNIA UNIVERSAL            PARTIAL SUMMARY JUDGMENT
    ENTERPRISES COMPANY, a California
15  corporation; LOTUS DEVELOPMENTS,
    LLP; THE CITY OF WASCO, a municipal      JUDGE: Lawrence J. O'Neill;
16  corporation; DEWALT CM, INC., a California        Gary S. Austin
    corporation also doing business as DEWALT
17  CORPORATION; DENNIS W. DE WALT,
    INC., a California corporation also doing
18  business as DEWALT CORPORATION; and
    DOES 1 through 10, inclusive,
19
                Defendants.
20

21

22          I, Jeffrey A. Travis, state, and if so called, will testify as follows:

23          1.      I am an attorney for the plaintiff in the above-named case and have been

24  responsible for preparing, reviewing, instructing and conducting discovery and investigation into the

25  facts surrounding this case.

26          2.      I am duly licensed to practice in the courts of the State of California including

27  the Eastern District of California.

28

H:\PUBLIC\054493\060971
McIntosh v.
Northern\Pleadings\DCL OF
JAT ISP MSJ TO
PRECLUDE
DEFENSES.wpd

1

DECLARATION IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT

3.  An original complaint for copyright infringement was filed against Northern California Universal Enterprises, Lotus Developments, LLP, and Joe Wu, on July 26, 2007. Thereafter, and pursuant to a stipulation between the plaintiff and defendants, a First Amended Complaint ("FAC") was filed on June 12, 2008, which added the City of Wasco as a defendant and which also included a second cause of action for contributory and vicarious copyright infringement against all defendants. Thereafter, a Second Amended Complaint ("SAC") was allowed pursuant to a motion by plaintiffs to add Dennis W. De Walt, Inc. as an additional party to this case.

4.  On or about April 11, 2008, pursuant to California Public Records Act (Cal. Gov. Code, § 6250, et seq.), I had my office make a serve a request for certain records related to the Valley Rose Subdivision.  In response, we received from the Clerk of the City of Wasco records responsive to that request in electronic form and selected portions of which are attached hereto:

Attached hereto as Exhibit A is a true and correct copy of the copy of the California Records Request Act which I had my office send to the City of Wasco City Clerk on April 11, 2008 and their Response, in which we received documents from the Wasco City Clerk numbered A00002-A02049.

Attached hereto as Exhibit B is a true and correct copy of the 1992 Development Agreement between The Legacy Group and the City of Wasco we received in response to our California Public Records Act request. (Bates Nos. A01048-A01099)

Attached hereto as Exhibit C is a true and correct copy of the resolution approving Tentative Map No. 6451 our office received in response to our California Public Records Act request.  (Bates Nos. A01894-A01912)

5.  I had my office prepare and have served a notice of deposition of the person most knowledgeable, for DeWalt Corporation. That deposition was held on November 24, 2008, with Jeffrey A. Gutierrez designated as the person most knowledgeable. Attached hereto as Exhibit D is a true and correct copy of selected portions of the deposition transcript of Jeffrey A. Gutierrez with selected exhibits including:

A true and correct copy of Exhibit 3 to the deposition, DeWalt's new job request form

H:\PUBLIC\054493\060971
McIntosh v
Northern\Pleadings\DCL OF
JAT ISP MSJ TO
PRECLUDE
DEFENSES.wpd

2

DECLARATION IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT

1   and job proposal, attached to the deposition of Jeffrey A. Gutierrez;

2            A true and correct copy of Exhibit 4 to the deposition, a signed, September, 2004

3   CELSOC contract between DeWalt Corporation and Northern California Universal Enterprises Co.

4   to prepare a tentative map to replace expired Tentative Map No. 5472.

5            6.   On January 29, 2009, I attended the deposition of Larry F. Pennell, the former

6   City Manager for the City of Wasco.  Attached hereto as Exhibit E are true and correct copies of

7   selected portions of the transcript of this deposition.

8            7.   On January 29, 2009, I attended the deposition of Keith Woodcock, the former

9   Planning Director for the City of Wasco.  Attached hereto as Exhibit F are true and correct copies

10   of selected portions of the transcript of this deposition.

11            8.   On January 29, 2009, I attended the deposition of Alan Peake, the former City

12   Attorney for the City of Wasco.  Attached hereto as Exhibit G are true and correct copies of selected

13   portions of the transcript of this deposition.

14            9.   On February 2, 2009, I attended the deposition of Jim DelMarter, the

15   designated expert for the plaintiffs.  Attached hereto as Exhibit H are true and correct copies of

16   selected portions of the transcript of this deposition.

17            10.   On October 28, 2008, I attended the deposition of Jo Wu as the person most

18   knowledgeable for Northern.  Attached hereto as Exhibit I are true and correct copies of selected

19   portions of the transcript of this deposition.

20            11.   On or about September 26, 2008, I caused to be served to defendant, Lotus

21   Developments, LLC ("Lotus") and Northern California Universal Enterprises Co., ("Northern")

22   Request for Production of Documents, Set One.

23            Attached hereto as Exhibits J and K are true and correct copies of Request for

24   Production of Documents, Set One to Lotus and Northern.

25            Attached hereto as Exhibits L and M are true and correct copies of Response to

26   Request for Production of Documents, Set One, from Lotus and Northern and true and correct copies

27   of selected documents responsive to those requests including:

28

H:\PUBLIC\054493\060971
McIntosh v.
Northern\Pleadings\DCL OF
JAT ISP MSJ TO
PRECLUDE
DEFENSES.wpd

3

DECLARATION IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT

1          Attached here to as Exhibits "L1" is a document we received from Northern and Lotus

2    which is a Purchase Agreement of Valley Rose Subdivision between Wasco Project LLC and City

3    of Wasco and its Amendment showing Northern as the Buyer of the Valley Rose Subdivision.

4    (L004-L018)

5          12.    On October 28, 2008, I attended the deposition of Bob Wren, designated by

6    the City of Wasco as the person most knowledgeable for Wasco as to the oversight of public works.

7    Attached hereto as Exhibit N are true and correct copies of selected portions of the transcript of this

8    deposition.

9          13.    On December 18, 2008 I att ended the deposition of Roger McIntosh.

10   Attached hereto as Exhibit "O" is a true and correct copy of the deposition of Roger McIntosh and

11   selected portions of the transcript of that deposition along with Exhibit 3 to that deposition (The

12   CELSOC contract between Martin-McIntosh and Roger Brown of the Legacy Group and, Exhibit

13   16 the Redemption and Dissolution Agreement that dissolved the partnership of Eugene Martin and

14   Roger McIntosh and transferred all California assets of Martin-McIntosh to Roger McIntosh.

15         14.    In response to a first set of Request for Admission I had propounded on the

16   City of Wasco, we received a response from them.  Attached hereto as Exhibit "P" is a true and

17   correct copy of the Defendant, City of Wasco's Responses to Plaintiff Roger McIntosh's Requests

18   for Admission, Set One.

19         15.    In July of 2009, I had my office serve notice of the deposition of Stephen

20   Wong, an expert designed by the City of Wasco to testify as to the lack of substantial similarities

21   between Tentative Map No. 5472 and 6451.  Attached hereto as Exhibit "Q" is a true and correct

22   copy of selected portions of the deposition transcript of Stephen Wong.

23         16.    In June of 2009 I had my office serve a subpoena on Terry Schroepfer, for his

24   deposition, which was taken on July 2, 2009.  Attached hereto as Exhibit "R" is a true and correct

25   copy of the selected portions of the deposition of Terry Schroepfer and selected exhibits from that

26   deposition.

27         17.    I attended the deposition of Stephen Wong on July 2, 2009, counsel for

28

H:\PUBLIC\054493\060971
McIntosh v.
Northern\Pleadings\DCL OF
JAT ISP MSJ TO
PRECLUDE
DEFENSES.wpd

4
DECLARATION IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT

1   Northern, pursuant to Rule 26, had delivered to me a copy of a "Developer's Information Package"

2   it had received from the City of Wasco before purchasing the Valley Rose Subdivision.   This

3   Developer Information Package contained McIntosh's 5472 Map as an attachment. (See,

4   BP0002422) The Developer Information Package also states that it would make available, "all maps

5   and any other information" to interested developers. (See, BP02346)

6            Attached hereto as Exhibit "S" is a true and correct copy of the Developer's

7   Information Package I received from counsel for Northern (Hassing) at the deposition.

8            18.    On June 19, 2009 I attended the deposition of the person most knowledgeable

9   for Dennis W. De Walt, Inc. Jeff Gutierrez was designated as the person most knowledgeable.

10   Attached hereto as Exhibit "T" is a true and correct copy of selected portions of his deposition

11   transcript with selected exhibits including invoices for work performed pursuant to the contract

12   between DeWalt Corporation and Northern California Universal Enterprises Co. to prepare the 6451

13   Tentative Map and attached to the deposition as Exhibit 5.

14           19.    On July 3, 2009 I attended the deposition of Sarah Burgi, former employee

15   of DeWalt Corporation.   Attached hereto as Exhibit "U" are selected portions of the deposition

16   transcript of Sarah Burgi.

17           20.    Our office also received on September 18, 2009, Supplemental Responses to

18   Special Interrogatories, Set One from Defendant, Dennis W. De Walt, Inc. and which showed that

19   they used Tentative Tract Map No. 5472 ("TTM 5472") to assist them in preparing the infringing

20   tentative map.   Attached hereto as Exhibit "V" is a true and correct copy of the Supplemental

21   Responses to Special Interrogatories, Set One, from Defendant, Dennis W. De Walt, Inc. (See,

22   Response to Special Interrogatory No. 2)

23           21.    Our office also received on September 18, 2009, Supplemental Responses to

24   Request for Admissions, Set No. One, from Defendant, Dennis W. De Walt, Inc. wherein it admits

25   and which showed that they saw and used Tentative Tract Map No. 5472 to assist them in preparing

26   the infringing tentative map; that DeWalt never contacted McIntosh prior to preparing Tentative Map

27   No. 6451; and that DeWalt never paid McIntosh for the rights to prepare Tentative Map No. 6451.

28

H:\PUBLIC\054493\050097:
McIntosh v.
Northern\Pleadings\DCL OF
JAT ISP MSJ TO
PRECLUDE
DEFENSES.wpd                                    5
                                DECLARATION IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT

1  Attached hereto as Exhibit "W" is a true and correct copy of the Supplemental Responses to Request

2  for Admissions, Set No. One, received from Defendant, Dennis W. De Walt, Inc. (See, Response

3  Nos. 1,4, 6, and 33-35)

4       I declare under penalty of perjury, under the laws of the State of California, that the

5  foregoing is true and correct.

6       Executed this ⟨29⟩ day of September, 2009, at Bakersfield, California.

7

8                                    _____

9                                    Jeffrey A. Travis, Declarant

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

H:\PUBLIC\054493\060971
McIntosh v
Northern\Pleadings\DCL OF
JAT ISP MSJ TO
PRECLUDE
DEFENSES.wpd

                                    6
DECLARATION IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT

**PROOF OF SERVICE**
**(FRCP No. 5(b)(2)(E))**

## STATE OF CALIFORNIA, COUNTY OF KERN

I, Vanessa J. Claridge, declare:

I am a citizen of the United States. I am employed in the County of Kern, State of California. I am over the age of 18 and not a party to the within action; my business address is 5060 California Avenue, Suite 700, Bakersfield, California 93309.

On **September 29, 2009**, I served the foregoing document described as **DECLARATION OF JEFFREY A. TRAVIS IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT** on the other party(ies) in this action as follows:

| | |
|---|---|
| Steven John Hassing, Esq. <br> Law Offices of Steven J. Hassing <br> 425 Calabria Court <br> Roseville, CA 95747 <br> email address: **stevehassing@yahoo.com** | Attorneys for Attorneys for Defendants, Northern California Universal Enterprises Company and Lotus Developments <br> Tel:    916/677-1776 <br> **Fax:    916/677-1770** |
| Chaka Okadigbo <br> **Garcia Calderon Ruiz, LLP** <br> 500 South Grand Ave Suite 1100 <br> Los Angeles, CA 90071 <br> email address: **cokadigbo@gcrlegal.com** | Attorneys for Defendant, City of Wasco <br><br> Tel: 213/347-0210 <br> **Fax: 213-347-0216** |
| William L. Alexander, Esq. <br> Alexander & Associates <br> 1925 "G" Street <br> Bakersfield, CA 93301 <br> email address: **walexander@alexander-law.com** | Attorneys for Defendant, DeWalt CM, Inc. <br><br> Tel: 661/316-7888 <br> **Fax: 661/316-7890** |

☒     **BY ELECTRONIC SERVICE:** Pursuant to Fed. R. Civ. P. 5(b)(2)(E) and Local Court Rule(s), the foregoing document will be served by the court via CM/ECF.. Pursuant to the CM/ECF docket for this case proceeding the following person(s) are on the Electronic Mail Notice List to receive ECF transmission at the email address(es) indicated below:

☒     **BY OVERNIGHT MAIL:** I caused such envelope with postage fully prepaid to be sent by Golden State Overnight Mail.

Executed on **September 29, 2009**, at Bakersfield, California.

I declare that I am employed in the office of a member of the bar of this court at whose direction the service was made.

_____
Vanessa J. Claridge

H:\PUBLIC\054493\060971
McIntosh v.
Northern\Pleadings\DCL OF
JAT ISP MSJ TO
PRECLUDE
DEFENSES.wpd

7

# EXHIBIT "A"

LAW OFFICES OF

# BORTON PETRINI, LLP

1800 TRUXTUN AVENUE
POST OFFICE BOX 2026
BAKERSFIELD, CALIFORNIA 93303-2026
(661) 322-3051
FAX: (661) 322-4628
EMAIL: BPCBAK@BPCLAW.COM
WEB SITE: WWW.BORTONPETRINI.COM

F.E. BORTON (1877-1948)
JAMES PETRINI (1897-1978)
HARRY M. CONRON (1907-1971)
RICHARD E. HITCHCOCK (1925-2001)
KENNETH D. PINSENT (1953-1984)

**REGIONAL OFFICES**

FRESNO
TELEPHONE (559) 268-0117
FAX (559) 237-7985

LOS ANGELES
TELEPHONE (213) 624-2869
FAX (213) 489-3930

MODESTO
TELEPHONE (209) 576-1701
FAX (209) 527-9753

ORANGE COUNTY
TELEPHONE (562) 596-2300
FAX (562) 596-2322

SACRAMENTO
TELEPHONE (916) 858-1212
FAX (916) 858-1252

**REGIONAL OFFICES**

SAN BERNARDINO
TELEPHONE (909) 381-0527
FAX (909) 381-0636

SAN DIEGO
TELEPHONE (619) 232-2424
FAX (619) 531-0794

SAN FRANCISCO
TELEPHONE (415) 677-0730
FAX (415) 677-0737

SAN JOSE
TELEPHONE (408) 535-0870
FAX (408) 535-0876

IN REPLY REFER
TO OUR FILE NO.
Bakersfield
054493/060971

April 11, 2008



Ms. Vickie Hight
Wasco City Clerk
City of Wasco
746 8th Street
Wasco, CA 93280

Re:   <u>California Public Records Act Request</u>

Dear Planning Director:

Pursuant to the California Public Records Act (Cal. Gov. Code § 6250, et seq.) and on behalf of Roger McIntosh and McIntosh & Associates, please provide me with copies of the following public records:

1.   All recorded tentative or final maps for Tract No. 6451;

2.   All recorded tentative or final maps for Tract No. 5472;

3.   All writings, referring, to, relating to or concerning the recording of Tract No. 6451;

4.   All writings, referring to, relating to or concerning the recording of Tract No. 5472;

5.   All writings, referring to, relating to or concerning the Valley Rose Estate subdivision and its related maps, specifically, all records and log book entries at the City of Wasco Public Works that reference either Tract No. 6451;

6.   All writings, referring to, relating to or concerning the Valley Rose Estate subdivision and its related maps, specifically, all records and log book entries at the City of Wasco Public Works that reference either Tract No. or 5472;

7.   All writings, referring to, relating to or concerning the Valley Rose Estate subdivision and its related maps, specifically, all records and log book entries at the City of Wasco Public Works that reference Joseph Wu;

COT TO WASCO CPRAR.wpd

# L JRTON PETRINI, LLP

Ms. Vickie Hight
April 11, 2008
Page 2


8.      All writings, referring to, relating to or concerning the Valley Rose Estate subdivision and its related maps, specifically, all records and log book entries at the City of Wasco Public Works that reference Jeffrey Gutierrez;

9.      All writings, referring to, relating to or concerning the Valley Rose Estate subdivision and its related maps, specifically, all log book entries at the City of Wasco Public Works that reference Dewalt or, Dewalt Engineering;

10.     All writings, referring to, relating to or concerning the Valley Rose Estate subdivision and its related maps, specifically, all records and log book entries at the City of Wasco Public Works that reference Greg Black;

11.     All writings, referring to, relating to or concerning the Valley Rose Estate subdivision and its related maps, specifically, all records and log book entries at the City of Wasco Public Works that reference Jess Marimla;

12.     All writings, referring to, relating to or concerning the Valley Rose Estate subdivision and its related maps, specifically, all records and log book entries at the City of Wasco Public Works that reference Chris Oliveras;

13.     All as-built plans for Tract No. 6451;

14.     All as-built plans for Tract No. 5472;

15.     All writings referring to, relating to, or concerning Dewalt Engineering or any of its agents and relating to the Valley Rose Estate subdivision;

16.     All correspondences with Northern California Universal Enterprises, Inc., or any of its agents referring to, and referring to, relating to, or concerning the Valley Rose Estate subdivision;

17.     All correspondences with Lotus Enterprises, Inc., or any of its agents referring to, relating to, or concerning the development of the Valley Rose Estate subdivision;

18.     A copy of the report entitled, "IMPACT FEE ENGINEERING STUDY - City of Wasco VALLEY ROSE ESTATES Zone benefit - VALLEY ROSE ESTATES Infrastructure Improvements," referred to in Section, 13.21.040 of the Wasco Municipal Codes.

For the purpose of this request, the term "writings" includes all documents and things as defined by Government Code section 6252(g), as well as written contracts and correspondence.

A previous, similar but not identical request was sent to the City of Wasco on or about February 13, 2007, by a previous law firm representing Mr. McIntosh (Goodwin Proctor). Although we have made every attempt to tailor this request to exclude these documents in this request, if any documents in the instant request are duplicates of the previous request, these need not be copied.

Copies of these documents should be sent to me at the above address within ten (10) days of receipt of this request. I hereby authorize payment of any fees incurred in copying these

COT TO WASCO CPRAR.wpd

# LORTON PETRINI, LLP

Ms. Vickie Hight
April 11, 2008
Page 3


documents, up to $100.  If costs exceed this amount, please contact me for further authorization. Please contact me if you have any questions.  I await delivery of the requested records within the specified time frame.

Very truly yours,


Jeffrey A. Travis

JAT:vc

**Wasco**
G R O W   W I T H   U S

City Manager's Office (661) 758-7214 Fax (661) 758-5411
746 8th Street, Wasco, CA 93280

2008 MAY -2  A 10 22

April 21, 2008

Jeffrey A Travis
Borton Petrini, LLP
P.O. Box 2026
Bakersfiled, CA 93303

Re: Request for Public Records

We have received your request for records.

This letter is to inform you that The City Clerks office is working on this request and will be in contact with you regarding the amount of records and of the duplication fee.

Should you have any questions or comments, please do not hesitate to give us a call at (661) 758-7215

Best Regards,

Vickie Hight, City Clerk
City of Wasco

CC: Jake Raper, Interim Community Development Director
    Dan Allen, Public Works Director
    Bob Wren Deputy Public Works Director
    Eva Plaza, City Attorney
    Ron Mittag, City Manager

**Service of Process**

On April 22, 2008, I served the within NOTICE OF INSUFFICIENCY OF CLAIM AND
RETURN WITHOUT ACTION on the claimant by placing a true copy thereof enclosed
in a sealed envelope in the outgoing mail addressed as requested by the Claimant.

I declare under penalty of perjury that the foregoing is true and correct. Executed in
Wasco, California on April 18, 2008

_____          4-22-08
Jim Zervis,                         Date
Finance Director
City of Wasco

**Warning:** A claim that is deficient or does not contain sufficient information, as required by law, is not considered timely, and may prevent its consideration by the City of Wasco.


Jim Zervis                    4-22-08
Finance Director              Date
City of Wasco

EXHIBIT "B"

RECORDING REQUESTED BY:

The City of Wasco

WHEN RECORDED, RETURN TO:

City Manager
City of Wasco
Post Office Box 159
Wasco, CA  93280

## DEVELOPMENT AGREEMENT - THE LEGACY GROUP

THIS AGREEMENT is made and entered into this __3rd__ day of
__November__, 1992, by and between the City of Wasco
(hereinafter referred to as the "City") and the Legacy Group, a
California limited partnership (hereinafter referred to as the
"Developer").  The City and the Developer agree as follows:

1.   RECITALS

1.1   CODE AUTHORIZATIONS:  The City of Wasco, a General
Law city, is authorized pursuant to Article 2.5 of Chapter 4 of
Title 7 of the Government Code, Sections 65864 through 65869.5, to
enter into development agreements with persons having legal or
equitable interest in real property for the development of such
property in order to establish certainty in the development
process.  City has adopted Resolution No. 91-1343 which establishes
procedures and requirements for the approval of development
agreements.

1.2   DEVELOPER/PROPERTY:   Developer has a legal or
equitable ownership interest in certain real property located in
the City of Wasco, County of Kern, California, more particularly
described in Exhibit A, attached hereto and incorporated herein,
which real property is the subject matter of this Agreement.  This
real property is also known as "VALLEY ROSE MASTER PLANNED
COMMUNITY."  Said property consists of approximately four hundred
eighty (480) acres of property located within the Valley Rose
Master Plan of the City of Wasco ("Real Property").

1.3   INTEREST OF DEVELOPER:  Developer represents that it
has an equitable or a legal interest in the Real Property.
Developer has provided documentation of its legal or equitable
interest to City and Developer will provide a current preliminary
title report upon request by City to establish the legal interests.

1.4   BENEFITS/BURDENS - INTENT OF PARTIES:   City and
Developer desire to enter into this Agreement in order to facil-
itate the development of the Real Property.  Developer and City
have determined that the development of the Real Property is a
development project (the "Project") for which this Agreement is

A 01048

appropriate; that this Agreement will reduce uncertainty in planning and provide for a more orderly development of the Real Property, insure timely installation of necessary improvements; provide for public services appropriate to the development of the Real Property, insure attainment of the maximum effective utilization of resources within City at the most effective economic cost to its citizens; and otherwise achieve the goals and purposes of Article 2.5 of Chapter 4 of Title 7 of the Government Code.

1.5  CEQA COMPLIANCE:  In consideration of a number of projects, including this one, the City adopted the Master Environmental Assessment 1990.  In conjunction with the City's consideration of this Project and this Agreement, the Final Environmental Impact Report for Annexation 23 and Project Areas I and II was prepared and certified by the City Council on November 20, 1990.  The two documents are hereinafter referred to collectively as the "EIR."  This Agreement is intended in no way to modify that EIR, as amended, and if there is any conflict between the terms of this Agreement, including any of its attachments, and that EIR the terms of that EIR shall be enforced.

1.6  PUBLIC HEARING:  On October 12, 1992, the Planning Commission of the City, after giving notice pursuant to Government Code Sections 65867, 65090 and 65091, held a public hearing on Developer's application for approval of the Agreement.  The City Council, after providing public notice as required by law, similarly held a public hearing on October 20, 1992.

1.7  CITY COUNCIL FINDINGS:  The City Council has found that the Agreement is consistent with the Valley Rose Master Land Use Plan and the City's General Plan, as well as all other applicable plans, policies and regulations of City, including existing development regulations.  The City Council has also found and determined that this Agreement:  is in the best interests of the health, safety, and general welfare of City, its residents, and the public; is entered into pursuant to, and constitutes a present exercise of City's police power; and is entered into pursuant to, and in compliance with, the requirements of Government Code Section 65867, and City's Development Agreement Ordinance.

1.8  CITY ORDINANCE:  On _____November 3,_____, 1992 the City Council of City adopted Ordinance No. 92-381 approving this Agreement with the Developer and authorizing its execution.  The dates and numbers in the preceding sentence shall be completed by the parties when that information is available.

2.  DEFINITIONS

In this Agreement, unless the context otherwise requires:

2.1  AGREEMENT:  Means this Development Agreement.

10/16/92                              2

A 01049

**2.2  AREAS AND SECTIONS:**

Area A - That portion of the Real Property described as Parcel 1 and Parcel 3 of Parcel Map No. 9572 recorded July 21, 1992 in Book 44, Page 57, of Parcel Maps.

Area B - That portion of the Real Property described as Parcel 4 of Parcel Map No. 9572 recorded July 21, 1992 in Book 44, Page 57, of Parcel Maps.

Area C - That portion of the Real Property described as Parcel 6 of Parcel Map No. 9572 recorded July 21, 1992 in Book 44, Page 57, of Parcel Maps.

Area D - That portion of the Real Property described as Parcel 5 of Parcel Map No. 9572 recorded July 21, 1992 in Book 44, Page 57, of Parcel Maps.

Area E - That portion of the Real Property described as Parcel 2 of Parcel Map No. 9572 recorded July 21, 1992 in Book 44, Page 57, of Parcel Maps.

2.3  **CITY:**  means the City of Wasco, California.

2.4  **CITY MANAGER:**  means the person holding the office of the city manager of City.

2.5  **CONDITIONS OF APPROVAL:**  means all conditions attached to the Project approvals.

2.6  **EFFECTIVE DATE:**  means the day and year first written above.

2.7  **EVENT OF DEFAULT:**  means an event of default under this Agreement, as defined in Section 9.1 hereof.

2.8  **EXISTING APPROVALS:**  means those Project Approvals obtained by Developer as of the Effective Date of this Agreement, **and** existing plans, ordinances, rules, regulations, and official policies, including but not necessarily limited to each of the following:

2.8.1  City of Wasco, General Plan, in effect on the Effective Date of this Agreement.

10/16/92                                3

A 01050

2.8.2    Valley Rose Master Land Use Plan dated October 12, 1992, including the attachment to that Plan being the Master Traffic Study and Addendum.

2.8.3    Final Environmental Impact Report for Annexation 23 and Project Areas I and II ("EIR") certified by the City Council on November 20, 1990.

2.8.4    Municipal Code of City as applicable, including Zoning/Subdivision and Grading ordinances.

2.8.5    City of Wasco Tentative Subdivision Map 5472 for Area A, Phase 1.

2.8.6    City of Wasco Tentative Subdivision Map 5618 for Area A, Phase 2.

2.8.7    Master Sewer, Master Water and Master Storm Drainage Plans prepared by Porter Robertson Engineering, for Project Area 1 of Annexation No. 23 and approved May 24, 1991.

2.9    OFF-SITE:    improvements means all of those improvements which are located in either the public right-of-way or on property which, upon the completion of the improvement is either to be offered for dedication to a public agency or is to be acquired by a public agency. All other improvements shall be "On-site" improvements.

2.10    PROJECT:  is the project for development of the Real Property as represented by the Existing and Subsequent Approvals as they may be amended from time to time.

2.11    PROJECT APPROVALS:  means all land use and building approvals, permits and entitlements granted by City, including, without limitation, Subsequent Approvals and Existing Approvals, including those listed in Section 2.8 above.

2.12    DEVELOPER:    means the person, persons or entity having a legal or equitable interest in the Real Property as described in Exhibit A and includes the Developer's successors in interest.

2.13    REAL PROPERTY:  is that real property located in the City of Wasco, County of Kern, California, more particularly described in Exhibit A, attached hereto and incorporated herein, which real property is the subject matter of this Agreement. This real property is also known as "VALLEY ROSE MASTER PLANNED COMMUNITY." Said property consists of approximately four hundred eighty (480) acres of property located within the Master Plan of the City of Wasco ("Real Property").

10/16/92                           4

A 01051

2.14 <u>RULES, REGULATIONS AND OFFICIALLY ADOPTED POLICIES</u>: means the City's rules, regulations, ordinances, general or specific plans, zoning and policies which have been officially adopted by the City Council governing development, design, density and intensity of use, permitted uses, growth management, environmental review, construction and building standards and design criteria (subject however, to the adoption of updated Uniform Codes upon approval of such Uniform Codes by the State of California) applicable to the Real Property and in force at the Effective Date of this Agreement.

2.15 <u>SUBSEQUENT APPROVALS</u>: means those Project Approvals obtained by the Developer after the Effective Date of this Agreement, but prior to its expiration, which are consistent with applicable general and/or specific plans, including but not limited to:

2.15.1   City of Wasco Final Subdivision Map 5472 for Area A, Phase 1.

2.15.2   City of Wasco Final Subdivision Map 5618 for Area A, Phase 2.

2.15.3   Tentative Maps and Final Subdivision Map for Area B, or at least for so much of Area B as is necessary to be placed in a subdivision map under the Valley Rose Master Land Use Plan.

2.15.4   Tentative Maps and Final Subdivision Map for Area C, or at least for so much of Area C as is necessary to be placed in a subdivision map under the Valley Rose Master Land Use Plan.

2.15.5   Tentative Maps and Final Subdivision Map for Area D, or at least for so much of Area D as is necessary to be placed in a subdivision map under the Valley Rose Master Land Use Plan.

2.15.6   Tentative Maps and Final Subdivision Map for Area E, or at least for so much of Area E as is necessary to be placed in a subdivision map under the Valley Rose Master Land Use Plan.

2.15.7   Parcel Map for Areas B, C, D and E if it is deemed necessary under the City of Wasco Municipal Code in effect at the time of the development of Areas B, C, D or E or at least for so much of Areas B, C, D and E as is necessary to be segregated for either Williamson Act purposes or for the development of additional holes for the Golf Course.

A 01052

2.15.8    Site Plans for all of the development other than single family residences (including but not limited to the Garden Homes).

2.15.9    Informal site plans for all of the residential development which is immediately adjacent to any of the existing City of Wasco Golf Course or which is immediately adjacent to any of the additional nine holes of golf which are included within this Project.

2.15.10   Any and all building permits and certificates of occupancy required by the City of Wasco Municipal Code at the time of the initiation of any of the construction.

2.15.11   The Valley Rose Master Water Plan, a draft of which is being prepared by Developer or Developer's Engineer's Martin-McIntosh of Bakersfield, the date of which is _____, which date shall be inserted in this signed Agreement when it becomes available.

2.15.12   The Valley Rose Master Sewer Plan, a draft of which is being prepared by Developer or Developer's Engineer's Martin-McIntosh of Bakersfield.   The date of which is _____, which date shall be inserted in this signed Agreement when it becomes available.

2.15.13   The Valley Rose Master Storm Water Plan, a draft of which is being prepared by Developer or Developer's Engineer's Martin-McIntosh of Bakersfield.   The date of which is _____, which date shall be inserted in this signed Agreement when it becomes available.

2.16 MASTER PLAN:  means the Valley Rose Master Land Use Plan, dated October 12, 1992, including the attachments to that Plan, being the Master Traffic Study and Addendum.

2.17 TENTATIVE MAPS:  means the City of Wasco tentative subdivision maps described in Sections 2.8 and 2.15 of this Agreement.

3.    EXHIBITS

The following documents are referred to in this Agreement, and are incorporated herein as though set forth in full:

| Exhibit Designation | Descriptions |
| --- | --- |
| A | Legal description of the Real Property (Areas A, B, C, D and E) (attached hereto). |

A 01053

B                         Schedule of Performance for the develop-
                          ment of the infrastructure associated
                          with Area A, Phase 1 and Phase 2.

C                         Schedule of City's fees for development
                          currently in effect.

D                         City of Wasco General Plan existing on
                          the Effective Date of this Agreement.

E                         The Master Plan, (as defined in Section
                          2.15 of this Agreement.

F                         City of Wasco Tentative Subdivision Map
                          5472 for Area A, Phase 1.

G                         City of Wasco Tentative Subdivision Map
                          5618 for Area A, Phase 2.

4.   GENERAL PROVISIONS:

     4.1  PROPERTY SUBJECT TO THE AGREEMENT:  This Agreement
applies to and governs the development of the Real Property.

     4.2  DURATION OF AGREEMENT:  The term of this Agreement
shall commence upon the effective date hereof and shall expire on
the same day and same month as the effective date in the year 2007,
unless extended by written mutual agreement of the parties in
writing.  Provided, however, that failure to complete development
of all lots for Area A, meaning that such lots are completed with
all infrastructure necessary therefor (including the commercial
portion of Area A), except construction of on-site residential or
otherwise approved structures, and grant of approval of the
Tentative Map or Maps for either Area B or Area C or Area D or
Area E, by City must have been finalized by the same day and same
month as the date of execution in the year 2002, or this Agreement
will expire on that date in the year 2002.

          4.2.1   Expiration of the Agreement shall not
affect any rights of Developer arising from entitlements for the
Project approved of granted by City prior to, concurrently with, or
subsequent to the approval of this Agreement, except that those
entitlements which would have expired due to the passage of time,
but for this Agreement, shall expire with the termination of this
Agreement.

          4.2.2   If this Agreement should expire after the
completion of the residential portion of Area A but the additional
nine holes of golf shall not yet have been built by Developer then
the parties agree that damages shall be measured as is set forth in
Section 7.3.3 of this Agreement.

10/16/92                           7

A 01054

4.3 <u>PROHIBITION AGAINST ASSIGNMENT AND CHANGE IN OWNERSHIP MANAGEMENT AND CONTROL OF THE DEVELOPER</u>:  No voluntary or involuntary successor in interest or assignee of the Developer or of its constituent members shall acquire any rights or powers under this Agreement except as expressly set forth herein.  The rights and obligations of Developer under this Agreement may not be transferred or assigned without the consent of City, as is more fully set forth in Section 4.3.1., except as is set forth in Section 4.3.2.  Any transfer or assignment shall be subject to the provisions of this Agreement.  During the term of this Agreement, for any transfer or assignment approved by City under the terms of Section 4.3.1 and for any transfer or assignment for which the City's consent is not required under the terms of Section 4.3.2, any assignee or transferee shall observe and perform all of the duties and obligations of Developer contained in this Agreement insofar as such duties may be transferred or assigned to another party and insofar as such duties relate to the development of the Real Property.

4.3.1  The qualifications and entities comprising the Developer are of particular concern to the City.  It is because of these qualifications and identities that the City has entered into this Agreement with the Developer.  Except as expressly provided in Section 4.3.2 and other sections of this Agreement, the Developer shall not assign all or any part of this Agreement without the prior written approval of the City, which approval shall not be unreasonably withheld.  City shall make a determination as to whether it consents to such a change in ownership or assignment within sixty days of the request being made by Property owner, so long as Developer and the prospective transferee or assignee provide the information requested by City upon which to base such a decision within the first fifteen days of the sixty-day time period.  The scope of review by City for City approval is limited to financial capacity and experience to assure ability to meet the requirements of this Agreement.

4.3.2  Prior consent of the City is not necessary for the voluntary assignment or transfer of the benefits of this agreement to any of the following:  a limited partnership of which Developer is a general partner; a subsidiary corporation controlled by Developer.  Nor is the prior consent of City necessary for a transfer or assignment made as a part of the transfer, assignment, sale or lease of finished lots not in conflict with subsection 4.3.1.  For the purpose of this Section, the term, "finished lots" shall mean lots which are in existence by means of a final subdivision map having been filed and are "finished" in that the lots have to each of them the necessary sewer, water, streets, curb, gutters, sidewalks, street lights and storm drainage facilities such that a building permit could be issued and, once a building was constructed thereon, a Certificate of Occupancy could be issued to the property under the terms of the City's Municipal Code as it exists at that time.

10/16/92                              8

A 01055

4.3.3   Developer and any proposed successor in interest shall cooperate with City in providing information necessary for review hereunder.   The Developer shall promptly notify the City of any and all changes in the identity of the parties in control of Developer or the degree thereof, of which it or any of its members have been notified or otherwise have knowledge or information.   This Agreement may be terminated by the City if there is any significant change (voluntary or involuntary) in membership, or control of the Developer (other than such changes occasioned by the death or incapacity of any individual) prior to expiration of this Agreement, other than a change in ownership, assignment or transfer for which the City's prior consent was obtained pursuant to Section 4.3.1, or which is exempt from the consent requirement by virtue of Section 4.3.2.

## 4.4   AMENDMENT OR CANCELLATION OF AGREEMENT:

4.4.1   This Agreement may be amended from time-to-time by the mutual consent of the parties hereto but only in the same manner as its adoption by an ordinance as set forth in Government Code Section 65867, 65867.5 and 65868.   The terms "this Agreement" or "Development Agreement" used herein shall include any such amendment properly approved and executed.

4.4.2   Any amendment to this Agreement which does not relate to the term, permitted uses, provisions for reservation and dedication of land, or conditions, terms, restrictions and requirements relating to subsequent discretionary actions, monetary contributions by Developer or any conditions or covenants relating to the use of the Real Property shall not require notice or public hearing pursuant to Government Code Sections 65867, 65867.5 and 65868.   Notwithstanding anything to the contrary herein, those amendments which modify the overall size/area of the reservation or dedication by ten percent (10%), or less, singularly or cumulatively or those which relate to a change in location or description of reservations or dedications shall also not require notice or hearing.

4.4.3   The parties acknowledge that this Agreement, like all agreements, may be subject to interpretation.   The City Manager (with the advice and consent of the City Attorney's office) may issue written interpretations of this Agreement without the necessity of prior consultation with the City Council.   A copy of any such written interpretation shall be given to both the Developer and the City Council.   If the Developer disagrees with any such interpretation, Developer may appeal that interpretation to the City Council, by means of a notice in writing to the City Council specifying the basis of the Developer's disagreement with the interpretation.   Within thirty days after receipt of the Developer's written appeal of an interpretation, the Council will schedule the matter for a hearing before the Council or, if the Council deems it appropriate, before the Planning Commission, which

A 01056

shall report to the Council.  The Council shall then determine, within thirty days after the completion of the hearing and the submission of any information requested by the Council at the hearing, whether the Council agrees with the interpretation or if it deems it appropriate to modify or withdraw the interpretation of the City Manager.  The Council may, on its own motion, take up an interpretation of the City Manager and may schedule a hearing of such a determination on its own motion.  The decision of the Council as to an interpretation shall be considered a final determination of the issue and, therefore, an exhaustion of administrative remedies.

4.4.4   For purposes of this Agreement, the re-subdivision of the Real Property or the filing of an amended parcel map or amended subdivision map which creates new legal lots (including the creation of new lots within any designated remainder parcel) or which reflects a merger of lots, shall not require an amendment to this Agreement so long as there is no increase in the density per acre permitted hereunder.  Those Subsequent Approvals which are consistent with applicable General and Master Plans shall also not require an amendment to this Agreement.  Such Subsequent Approvals shall be incorporated into this Agreement with new exhibits, and shall be an integral part hereof.

4.4.5  City shall not impose, as a condition to any amendment to this Agreement, any new fee, exaction, dedication or other imposition not otherwise permitted under this Agreement, except to the extent the amendment will directly result in new burdens or impacts requiring additional mitigation or insofar as the amendment results in the discovery of new or additional unmitigated significant environmental impacts.  This provision does not restrict or prohibit imposition of the then current fee or charge applicable at the time of the matter or event which requires such then-current fee or charge to be paid.

4.4.6  This Agreement may be canceled at any time by written mutual consent of the parties.

4.5  NOTICES:  All notices, demands and correspondence required or provided for under this Agreement shall be in writing and delivered in person or dispatched by certified mail, postage prepaid.  Notice required to be given to City shall be addressed as follows:

| | |
|---|---|
| The City of Wasco | Richard H. Hargrove |
| Post Office Box 159 | Attorney at Law |
| Wasco, CA  93280 | 7108 N. Fresno St., 4th Floor |
| Attn:  City Manager | Fresno, CA  93720-2938 |
| [Fax No. (805) 758-5411] | [Fax No. (209) 261-0910] |

Notices required to be given to Developer shall be addressed as follows:

10/16/92                                    10

A 01057

The Legacy Group, L.P.
16000 Ventura Boulevard, Suite 1200
Encino, California 91436

A party may change its address by giving notice in writing to the other party. Thereafter, notices, demands and other pertinent correspondence shall be addressed and transmitted to the new address.

4.6 <u>AMENDMENT OF PROJECT APPROVALS</u>: Upon the written request of Developer for an amendment or modification to the Project Approvals, the City Manager shall notify the appropriate City staff and shall schedule the matter to be considered by the Council. In no case may the total density be increased nor may any changes which singularly or cumulatively, substantively alter this original approval without notice, hearing and approval by the City Council and, insofar as it is required by State law, the City's Planning Commission.

4.7 <u>BINDING EFFECT OF AGREEMENT</u>: The provisions of this Agreement shall constitute covenants or servitudes which shall run with the land comprising the Real Property, and the burdens and benefits hereof shall bind and inure to the benefit of all estates and interests in the Real Property and all successors in interest of the parties hereto.

5. <u>CONFLICTS OF LAW</u>:

5.1 <u>CONFLICT OF CITY AND STATE OR FEDERAL LAWS</u>: In the event that State or federal laws or regulations enacted after the Effective Date of this Agreement prevent or preclude compliance with one or more provisions of this Agreement or require changes in plans, maps or permits approved by City, each party shall provide the other party with written notice of such State or Federal restriction, a copy of such regulation or policy and a statement concerning the conflict with the provisions of this Agreement. The parties shall, within thirty (30) days after the dispatch of such notice, meet and confer in good faith in a reasonable attempt to modify this Agreement to comply with such Federal or State law or regulation.

5.2 <u>COUNCIL HEARING</u>: After the parties have met and conferred pursuant to Section 5.1 hereof, regardless of whether the parties have reached an agreement on the effect of the change in the Federal or State law or regulation upon this Agreement, the matter shall be scheduled for hearing before the Council. Written notice of such hearing shall be given pursuant to Government Code Section 65867 or the then-applicable statute. The Council, at such hearing, shall determine the exact modification or suspension necessitated by such Federal or State law or regulation.

10/16/92                        11

A 01058

Developer, at the hearing, shall have the right to offer oral and written testimony.

5.3 <u>COOPERATION IN SECURING PERMITS</u>:   City shall cooperate with the Developer in the securing of any permits or approvals which may be required as a result of such modification or suspensions made pursuant to Section 5.2 hereof. Such cooperation does not include any financial participation or cost to the City other than financial participation or cost which is fully reimbursed to the City by Developer.

6.   <u>DEVELOPMENT OF SUBJECT PROPERTY</u>:

6.1 <u>PERMITTED USES AND PHASING</u>: The Real Property shall be used and developed only for residential, commercial, recreational, open space and other purposes as more particularly set forth in the Project Approvals and for such other uses that may be mutually agreed upon by the parties hereto in compliance with the applicable provisions of Sections 4.4 and 4.6 hereof relating to the amendment of this Agreement. The Project Approvals require additional development entitlements and permits (the "Further Actions"). Such Further Actions are necessary to accomplish the goals, objectives, policies and plans shown in the Existing Approvals and this Agreement, as they may be modified by Subsequent Approvals. City intends to exercise a reasonable right of review to insure compliance with this Agreement before approval and issuance, as applicable, all in a timely manner to further the accomplishment of the purposes of the Master Plan, the Tentative Subdivision Maps, and the other project approvals.

6.1.1 Developer agrees not to seek approval for any project in excess of that permissible under the General Plan then in existence and the Master Plan in existence as of the Effective Date of this Agreement. City agrees to permit a maximum of 2,342 residential units overall and 52 gross acres of commercial development (of which, no more than 12.3 gross acres is to be highway commercial (H-C), nor more than 29 gross acres is to be general commercial (C-2), with the balance as being neighborhood commercial (N-C)), together with a 9-hole addition to City's golf course and related facilities, related water features and other development (all as shown on the Master Plan) on the Real Property shown in Exhibit "A." City also agrees and covenants to rely upon the Master Plan and EIR, to the maximum extent possible in reviewing and approving the proposed Project on Real Property shown in Exhibit "A." To the extent the acreages set forth herein and those set forth in the Master Plan are inconsistent, the acreages set forth in the Master Plan shall be given effect in interpreting the meaning of the parties.

6.1.2 Subsequent Approvals necessary to develop these uses shall be reviewed for approval by City on a timely basis. Approval is subject to the determination by the City that

10/16/92                          12

A 01059

the applications for such approvals submitted during the term of this Agreement are consistent with applicable General and Master Plans, as well as other applicable plans, policies and regulations of City, and with the prior applicable Subsequent Approvals, if any, which have already been issued.

6.1.3  It is understood and agreed that development shall commence with Area A and that the map approvals therefore by City do not contain schedules regarding infrastructure and performance.  However, a Schedule of Performance for the development of the infrastructure associated with Area A is attached hereto as Exhibit B which is incorporated herein by this reference, and Developer hereby agrees to follow the Schedule of Performance.  Phasing of the balance of the Project is subject to negotiation between City and Developer so long as said phasing is consistent with Existing Project Approvals, including but not limited to the EIR and the Master Plan.   --.

6.1.4   The balance of Area A and any portion of Area B, Area C, Area D or Area E may be developed at any time within the term of this Agreement, however, City reserves the right, as conditions to the approvals of either the subdivision map for any residential development or as conditions to the approvals of Site Plans for any other portion of the balance of Area A or any portion of the other four Areas, to accelerate the time schedule for the development of any items of infrastructure considered necessary to City to require them to be completed as a part of that Area, rather than waiting until the development of one of the other Areas or a phase within another area, if and to the extent that, in City's judgment, these improvements are necessary to provide an adequate level of service to that portion of the area for which development entitlements are being sought.  Any finding by City staff that requires an acceleration shall be subject to appeal and review by the City Council in the same manner as the appeal of a determination made in conjunction with the annual review of the Developer's performance under this Agreement which is set forth in City policy.

6.1.5  Developer has submitted a map to City showing the phasing of development in four phases within Area A.  · The development of the phases within Area A shall not be governed by the terms of that map but by the terms of this Agreement insofar as there is any inconsistency between the terms of that map and the terms of this Agreement.  Any of the Areas may be developed concurrently rather than sequentially without amendment to the Agreement.

6.2  PERMITTED DENSITY OF DEVELOPMENT:  The Real Property shall be developed to no greater density or level of intensity than indicated in the EIR, the Master Plan, the approved maps, plans, permits or other regulatory devices constituting the Project

10/16/92                        13

A 01060

**Approvals.** City agrees to permit the following residential
**densities:**

Area A -    Phase 1 of Area A consists of all of that property
which is the subject of City of Wasco Tentative
Tract Map 5472, which includes 26.85 acres of land
containing no more than 68 lots to be developed as
Low Density Residential (consistent with the
requirements of the City's R-1 Zone), and one
multiple family lot.

Phase 2 of Area A consists of all of that property
which is the subject of City of Wasco Tentative
Tract Map 5618, which includes 64.87 acres of land
containing no more than 121 lots to be developed as
Low Density Residential (consistent with the
requirements of the City's R-1 zone), and no more
than 211 lots to be developed as Medium Density
Residential (consistent with the requirements of
the City's R-2), and one recreational lot of 60,000
square feet.

Shall contain no more High Density Residential lots
than will meet the minimal requirements of the
City's zoning code and such that the combination of
the High Density Residential lots within it and the
High Density Residential lots within Area C do not
exceed 182 lots

The balance of Area A shall be developed in such a
way that it shall contain no more than up to a
maximum of twelve (12 plus or minus 0.4) acres of
highway commercial development of a kind that will
meet the minimal requirements of the City's zoning
ordinance.

Area B -    Shall contain no more Low Density Residential lots
than will meet the minimal requirements of the
City's zoning code and such that the combination of
the Low Density Residential lots within it and the
Low Density Residential lots within Areas C, D and
E do not exceed 1,071 lots.

Shall contain no more Medium Density Residential
lots than will meet the minimal requirements of the
City's zoning code and such that the combination of
the Medium Density Residential lots within it and
the Medium Density Residential lots within Areas C,
D and E do not exceed 569 lots.

Shall contain no more than five (5.0, plus or minus
0.2), net acres of neighborhood commercial (NC),

10/16/92                    14

A 01061

acreage of a kind that will meet the minimal requirements of the City's zoning ordinance.

Shall contain so much of the additional nine holes of golf as are shown on the Master Plan. All of the additional nine holes of golf shall be of the same quality and level of development as in the existing golf course owned by City which is adjacent to Area A and Area C, plus various commercial uses as identified in the Master Plan and the EIR.

Shall contain no more Low Density, Large Residential lots (consistent with City's R-1-10 zone), than will meet the minimal requirements of the City's zoning code and such that the combination of Low Density, Large Residential lots within it and the Low Density, Large Residential lots within Areas C and D do not exceed 120 lots. It is the present intent of the parties hereto that all such Low Density, Large Residential lots shall have frontage along the additional nine holes of golf.

Area C -    Shall contain so much of the additional nine holes of golf as are shown on the Master Plan. All of the additional nine holes of golf shall be of the same quality and level of development as in the existing golf course owned by City which is adjacent to Area A and Area C, plus various commercial uses as identified in the Master Plan and the EIR.

Shall contain no more Low Density, Large Residential lots (consistent with City's R-1-10 zone), than will meet the minimal requirements of the City's zoning code and such that the combination of Low Density, Large Residential lots within it and the Low Density, Large Residential lots within Areas C and D do not exceed 120 lots. It is the present intent of the parties hereto that all such Low Density, Large Residential lots shall have frontage along the additional nine holes of golf.

Shall contain no more Low Density Residential lots than will meet the minimal requirements of the City's zoning code and such that the combination of the Low Density Residential lots within it and the Low Density Residential lots within Areas B, D and E do not exceed 1,071 lots.

A 01062

Shall contain no more High Density Residential lots than will meet the minimal requirements of the City's zoning code and such that the combination of the High Density Residential lots within it and the High Density Residential lots within Area A do not exceed 182 lots.

Area D - Shall contain so much of the additional nine holes of golf as are shown on the Master Plan. All of the additional nine holes of golf shall be of the same quality and level of development as in the existing golf course owned by City which is adjacent to Area A and Area C, plus various commercial uses as identified in the Master Plan and the EIR.

Shall contain no more Low Density, Large Residential lots (consistent with City's R-1-10 zone), than will meet the minimal requirements of the City's zoning code and such that the combination of Low Density, Large Residential lots within it and the Low Density, Large Residential lots within Areas B and C do not exceed 120 lots. It is the present intent of the parties hereto that all such Low Density, Large Residential lots shall have frontage along the additional nine holes of golf.

Shall contain a Central Park area containing at least thirteen acres of land and developed as a park and/or other public facilities including as a possible storm drainage detention basin.

Shall contain no more than eight (8.0, plus or minus 0.2) net acres of neighborhood commercial (NC), acreage of a kind that will meet the minimal requirements of the City's zoning ordinance.

Shall contain no more Low Density Residential lots than will meet the minimal requirements of the City's zoning code and such that the combination of the Low Density Residential lots within it and the Low Density Residential lots within Areas B, C and E do not exceed 1,071 lots.

Shall contain no more Medium Density Residential lots than will meet the minimal requirements of the City's zoning code and such that the combination of the Medium Density Residential lots within it and the Medium Density Residential lots within Areas B, C and E do not exceed 569 lots.

10/16/92                               16

A 01063

> Area E -. Shall contain up to twenty-nine (29 plus or minus
> 0.2 acres) of General Commercial (C-2).

To the extent the acreages set forth herein and those set forth in
the Master Plan are inconsistent, the acreages set forth in the
Master Plan shall be given effect in interpreting the meaning of
the parties.  However, in no event shall the total number of
residential dwelling units exceed 2,342, nor the total acreage to
be developed as commercial property exceed 52 acres nor the total
density exceed 16 residential units per acre.  Interim approvals
and construction may temporarily exceed this limit.  It is the
intent of the parties hereto that the maximum of 2,342 residential
units overall and 52 acres of commercial development and total
density of not more than 16 residential units per acre shall be
given force and effect to the exclusion of any other numbers or
verbal provisions contained in this Agreement.

6.3  <u>MAXIMUM HEIGHT AND SIZE OF STRUCTURES</u>:  The maximum
height and size of structures to be constructed upon the Real
Property shall be governed by the Master Plan, the approved map,
site plans, permits or other regulatory devices constituting the
Project approvals.  In no event shall (a) any single family
detached housing unit exceed thirty (30) feet in height, nor (b)
any multi-family or commercial unit exceed a height of seventy (70)
feet, provided that any height in excess of thirty-five (35) feet
on a multi-family or commercial unit shall be subject to approval
of the City through the site plan review process.

6.4  <u>RESERVATIONS OR DEDICATIONS OF LAND FOR PUBLIC
PURPOSES</u>:  Portions of the Real Property are to be reserved or
dedicated as shown on the Master Plan.  Such reservations and
dedications are to be imposed in accordance with the ordinances and
standards in effect upon the Effective Date of this Agreement.
City may require further reservations or dedications of land as a
condition to development of the Project during the term of the
Agreement.  City specifically intends to require the reservation of
no more than 2.0 acres of land for the purpose of developing a fire
station.  The reservations or dedications shown in the Master Plan
and any additional reservations or dedication required by City will
be imposed as conditions in connection with subsequent approvals
such as the vesting tentative map and Preliminary and Final
Development plans.

6.5  <u>RULES, REGULATIONS, OFFICIAL POLICIES</u>:  City Rules,
Regulations and Official Policies shall be those in effect upon the
Effective Date of this Agreement, except as otherwise permitted
herein and to future amended Uniform Codes for Building Officials
in effect at the time of issuance of a building permit.

6.5.1  <u>APPLICATIONS OF SUBSEQUENTLY ENACTED CITY
RULES, REGULATIONS AND OFFICIALLY ADOPTED POLICIES</u>:  The parties
agree that subsequently-enacted Rules, Regulations or Official

A 01064

Policies, whether enacted by action of City or by initiative, referendum or otherwise, which limit or restrict the rate, timing or sequencing of development of the Project ("growth control limitations") shall be conclusively presumed to prevent or impede development of the Project or impair the rights of Developer under this Agreement and shall not apply to the Project. City agrees to use its best efforts to prevent any such growth control limitations from invalidating or prevailing over all or any part of this Agreement, and City agrees to cooperate with Developer in a reasonable manner in order to keep this Agreement in full force and effect notwithstanding any such growth control limitations. Provided, however, that this Section 6.5.1 shall not preclude the application to the Project of such subsequently-enacted Rules, Regulations or Official Policies as are specifically mandated and required by changes in State or Federal laws or regulations adopted after the Effective Date of this Agreement as provided in Government Code Section 65869.5. Provided further that nothing herein shall serve to limit or restrict the effectiveness of orders or regulations from other governmental agencies that would affect the rate, timing or sequence of development because of lack of infrastructure to accommodate such development.

6.5.2   FEES AND DEDICATIONS:  Developer shall make only those contributions and dedications and pay only those fees expressly prescribed in Exhibit "C" to this Agreement (which are the fees in force and applicable to the Project as of the Effective Date of this Agreement) subject to Article 8, below, and the following:

(a)  Processing Fees:  City may charge processing fees for land use approvals, building permits and other similar permits and entitlements which fees are in force and effect on a city-wide basis at the time application is submitted for those permits, except as provided to the contrary in this Agreement. Developer shall pay the fee in effect at the time of the submission of the application, and such fees or charges shall not be increased after submission of the application unless justified by an increase in the estimated reasonable cost to City for performing the work for which the particular fee or charge is paid, and limited to an amount which will compensate City for the estimated reasonable cost and increases incurred.

(b)  Additional Fees:  City may impose additional fees, dedications or exactions ("Additional Fees") which meet one of the following definitions:  (1) they are directly imposed by another governmental agency; or (2) they are uniformly imposed on all comparable development projects within City and are required solely to provide capital infrastructure facilities or improvements needed for health and safety reasons as a direct result of the Project and are otherwise consistent with Government Code Section 66000 et seq., and the General Plan and the Master Plan.

10/16/92                        18

A 01065

(c) _Increases_:   Any Additional Fees authorized under this Agreement may be increased from time to time as otherwise permitted by law to account for inflations or updated construction cost estimates, provided that such increases are uniformly applicable to all comparable residential development projects within City and are imposed in a manner which is consistent with State and Federal law, including but not limited to Government Code Section 66000 et seq. if the fee is subject to that State law.

(d) _Taxes and Assessments_:   City shall not subject the Real Property, or any part thereof, to any special taxes, liens or assessments over the protests of a majority of the owners of the Real Property.   Developer has specifically consented to the imposition of an assessment district on the Real Property within Phases 1 and 2 of Area A for the purpose of funding certain offsite improvements to public infrastructure which is necessary in order for City to provide municipal services to Phases 1 and 2 of Area A.   It is anticipated that future phases of the Project may also be funded, in part, by means of assessment district financing. It is also anticipated that a maintenance district will be imposed on the Project or the Project or a part of it is annexed to an existing City maintenance District, with Developer's consent. Insofar as Developer consents to the formation of the assessment district and/or the formation of or the annexation to a maintenance district, nothing contained in this paragraph is intended to change the applicability of the law of assessment or the law of maintenance districts.

6.5.3   _COVENANTS, CONDITIONS & RESTRICTIONS_: Developer and City acknowledge that it will be necessary for certain matters to be handled by means of Covenants, Conditions & Restrictions (CC&R) to be recorded against the Real Property, and possibly a different set of CC&Rs to be recorded against different portions of the Real Property. They also acknowledge that, insofar as the CC&Rs are designed to require an association of property owners to be responsible for common area maintenance, disclose limitations not readily apparent to a prospective purchaser (particularly in regard to municipal services), or limit the use of all or a portion of the property to a particular age group, the CC&Rs are a legitimate area of concern for City.   They therefore agree as follows:

(a) _Review and Approval by City Attorney_:   The parties acknowledge that the City has an interest in the content of the CC&Rs.   Therefore the parties agree that any CC&Rs to be recorded against any portion of the Real Property by Developer or any amendment to such CC&Rs must be approved by the City Attorney or by City's Special Counsel for that purpose, before they are recorded. The consent of the City Attorney or the Special Counsel, to the content of such CC&Rs will not be unreasonably withheld.   Such review is for the purpose of determining:

10/16/92                          19

(i) If there are any conflicts in the CC&Rs with this Agreement or applicable City Rules, Regulations and Official Policies not otherwise agreed to by the parties hereto,

(ii) The CC&Rs are designed to require an association of property owners to be responsible for common area maintenance,

(iii) The CC&Rs adequately disclose limitations not readily apparent to a prospective purchaser, with regard to infrastructure and what are commonly presumed to be municipal services, or

(iv) the CC&Rs limit the use of at least eighty percent (80%) of the residential units allowed on the Property to senior citizen's housing, but Area A shall be 100% senior citizens housing.

The cost of the City Attorney's review (or, if deemed appropriate by City, the review by Special Counsel to the City) of any such proposed CC&Rs or any amendment to such CC&Rs shall be reimbursed to City by the Developer or the Home Owner's Association, whichever one initiated the request for an amendment.

(b) <u>Third Party Beneficiary</u>: Insofar as it does not impair the enforceability of any such CC&Rs, all such CC&Rs shall, at the option of City, be written so as to allow (but not to require) enforcement of those provisions of the CC&Rs which relate to the areas set forth in the preceding paragraph, but particularly, with regard to the assessment of the cost of maintenance, repair or improvement of the works, systems or facility otherwise to be maintained by said homeowners' association. The City Council of the City shall, by resolution, adopt a preliminary determination of failure to keep these terms and set a hearing on the Council's intent to finally determine whether such failure has occurred. The hearing shall be held not less than thirty (30) days after passage of the resolution. Within ten (10) days after the adoption of said resolution of preliminary determination, the City Clerk shall mail, postage prepaid, notice of the adoption of the resolution of preliminary determination, setting forth the date of the hearing and an estimate of the costs of correcting the deficiency. If, at the close of the public hearing, the City Council determines that the failure to follow the terms of the CC&Rs did in fact occur and has not yet been remedied, the City may proceed to correct the failure and collect the cost either by virtue of the collection provisions of the CC&Rs or pursuant to Section 10204 of the Streets and Highways Code of the State of California as authorized or as may be authorized by proceedings on the Real Property under the Municipal Improvement Act of 1913, Subsection (d) of Section 6.5.2 of this Agreement notwithstanding.

10/16/92                    20

A 01067

(c) <u>Maintenance District</u>: Developer consents to either the formation of a new maintenance district or the annexation of the Project to an existing City maintenance district (either alternative is hereafter referred to as a "Maintenance District"), which shall cover all areas which are subject to CC&Rs for the purpose of maintaining common area improvements (insofar as those areas may legally be covered by a Maintenance District) and may include, but shall not necessarily be limited to, each of the following: all or part of the park lands (including the pocket parks, central park and the park strips running along and between the halves of boulevards) all or part of the storm water retention and detention facilities and all or part of the street lights within the Project. The imposition of a Maintenance District on each portion of the property which is subject to a particular subdivision map shall be a condition to the approval of a tentative subdivision map and, for that portion of the property which is not subject to a subdivision map, then the imposition of a Maintenance District shall be a condition to the approval of a Site Plan. The imposition of a Maintenance District is hereby made a condition of the approval of a final map as to Area A, Phases 1 and 2. City agrees that insofar as the property owner's association is effectively serving to maintain these areas, City will not impose any assessment on any of the property through the Maintenance District. The Maintenance District referred to in this Agreement is intended to be a Landscape and Lighting Maintenance District under Section 22500 et seq. of the Street and Highways Code.

## 6.6 ENVIRONMENTAL COMPLIANCE:

6.6.1 <u>EIR PROCESSING COMPLETED</u>: Developer hereby acknowledges that the Project shall be subject to the mitigation measures set forth in the EIR. It is understood and agreed that the costs of any off-site improvements (including, without limitation, land acquisition costs, severance damages, and construction costs) are to be borne by Developer, except as otherwise expressly provided in this Agreement or as otherwise stated in the EIR, and subject to such reimbursements to Developer as may hereafter be agreed to by City.

6.6.2 <u>SUBSEQUENT ENVIRONMENTAL REVIEW</u>: In exercising its legislative discretion to enter into this Development Agreement and to commit City to the completion of the Project, City has reviewed and considered the potential adverse environmental impacts related to all aspects of the contemplated Project, including, without limitation, the potential demands the Project will make on local and regional streets, highways, parks and recreation areas, water capacity and water lines, sewer capacity and sewer lines, flood and storm drain systems, and energy conservation, and the effect on school capacity, traffic, pedestrian safety, noise and air quality impacts. City has further reviewed and considered a variety of assumptions, the projected future regional and cumulative environmental demands that will

A 01068

compete with the Project for available capacities and cumulatively add to potential adverse impacts. In so doing, City has considered, among other things, the possibilities that:

(a) Federal, local, regional and state plans, if any, for provision of new infrastructure systems or expansion of existing infrastructure system may be delayed, modified, or

(b) The types, intensities, and amount of future regional development may exceed or otherwise be different from that currently being planned by City and other local agencies; and

(c) Regional and Development generated demands on infrastructure and utility improvements to be constructed as a part of the Project may exceed in either the short run, or the long run, the allocated capacities for such demands.

After assessing these and other potential adverse environmental impacts associated with the development of the Property, City has imposed the mitigation measures set forth in the EIR, through the EIR and the subdivision review process, and this Agreement to the fullest extent City considers feasible and necessary. City has determined that phased completion of the Project in the manner contemplated will itself provide the mitigation measure needed to contribute to alleviate short run and long run potential adverse environmental impacts, and that the public benefits of the Project override any potential adverse environmental impacts which may arise during the development period. Subsequent or supplemental environmental impacts report shall not be required by City except as may be required by California Public Resources Code Section 21166.

6.6.3   CUMULATIVE IMPACTS:   To the extent that development other than contemplated by this Agreement (new development) is proposed within the jurisdictional limits of City, City agrees to require that the applicable environmental review process consider the full impacts of the entire buildout of Areas A, B, C, D and E. Such impacts shall include, but not be limited to, traffic, air pollution, sanitary sewer capacity, water supply and quality, schools and parkland/park facilities. City further agrees to fully assess the impacts of any new development upon existing or anticipated infrastructure improvements, including those shown in the EIR as being required for this Project, and to impose as mitigation measures a pro rata share of such infrastructure improvements upon the new development, even if to do so would reduce the share to be paid by this Project. To the extent that new development is proposed outside the City, City agrees to notify all potential approving agencies, owners, and developers of the existence of this Project, the Master Plan and the EIR, and to suggest, in writing, that any such new development fully consider the entire buildout (Areas A, B, C, D and E) of this Project in the approval, environmental review and mitigation processes.

10/16/92                         22

A 01069

6.6.4   <u>DUTY TO HOLD HARMLESS, INDEMNIFY, DEFEND</u>:
The Developer shall indemnify, hold harmless and defend the City
and each of its officers, officials and employees from any and all
liability, loss, debts, costs, and damages (whether in mandamus,
breach of the California Environmental Quality Act or breach of any
other related law. whether sounding in contract, tort or strict
liability including but not limited to attorney's fees, court
costs, damage and damages for breach of contract or even statutory
penalties) incurred by the City and from any and all claims,
demands, actions and proceedings in law or equity (whether or not
well-founded) brought by another public agency or any other person,
not a party to this Agreement, arising directly or indirectly out
of the City's agreement to require no additional studies,
investigations, reports or mitigation measures to comply with the
Environmental Quality Act, other than those set forth in this
Agreement and in the EIR.  The preceding sentence shall not apply
to any liability, loss, debts, costs or damages caused solely by
the negligence or willful misconduct of the City.  This duty of
Developer is separate and apart from and in addition to any similar
obligation of Developer arising under any other part, Section or
SubSection of this Agreement.

6.7   <u>COOPERATION-IMPLEMENTATION</u>:

6.7.1   <u>PROCESSING</u>:  If necessary or required, upon
satisfactory completion by Developer of all required preliminary
actions and payments of appropriate processing fees, if any:

a.   City shall promptly commence and diligently
proceed to complete all steps required or necessary for the
implementation of this Agreement and the development by Developer
of the Real Property in accordance with the Project Approvals,
including but not limited to:

(i) the scheduling, convening and concluding of
all required public hearings in an expeditious manner consistent
with applicable laws and regulations in force as of the date of the
application; and

(ii) processing and issuing a decision as to
whether City approves, conditionally approves or disapproves, in an
expeditious manner, all maps, plans, annexation requests, land use
permits, building plans and specifications and other plans relating
to the development of the Real Property filed by Developer which
are complete and meet the statutory requirements, including but not
limited to all zoning, preliminary and final development plans,
tentative maps, parcel maps, final maps, re-subdivisions,
amendments to maps, subdivision improvement agreements, lot line
adjustments, encroachments, grading and building permits,
associated zoning actions and related matters as necessary for the
completion of the development of all lots and parcels comprising

10/16/92                        23

A 01070

the Project, that are in conformance with the General Plan, including reliance upon the Environmental Impact Report, to the maximum extent possible in reviewing and approving all such applications relating to the Real Property Described in Exhibit "A."

     b.   Developer shall, in a timely manner, provide City with all documents, applications, plans and other information necessary for City to carry out its obligations hereunder and shall cause Developer's planners, engineers, and all other consultants to submit in a timely manner all required materials and documents therefor.

     c.   It is the express intent of the parties to cooperate and diligently work to implement any zoning, final development plan and/or other land use, grading or building permits or approvals which are necessary or desirable in connection with the development of the Project in substantial conformance with the Project Approvals (as they may be amended from time to time pursuant to the terms of this Agreement).

     d.   If mutually agreed, and if paid for by Developer, City will engage outside consultants of City's choice (with the advice of the Developer), if deemed necessary by City in order to comply with this Section.

     6.7.2   COOPERATION IN THE EVENT OF A LEGAL CHALLENGE:   In the event of any legal or equitable action or other proceeding instituted by a third party, other governmental entity or official challenging the validity of any provision of this Agreement, the parties hereby agree to cooperate in defending said action or proceeding. The Developer shall indemnify, hold harmless and defend the City and each of its officers, officials and employees from any and all liability, loss, debts, costs, and damages (whether in mandamus, or sounding in contract, tort or strict liability including but not limited to attorney's fees, court costs, damage and damages for breach of contract or even statutory penalties) incurred by the City and from any and all claims, demands, actions and proceedings in law or equity (whether or not well-founded) brought by another public agency or any other person, not a party to this Agreement, arising directly or indirectly out of the City's entry into this Agreement. The preceding sentence shall not apply to any liability, loss, debts, costs or damages caused solely by the negligence or willful misconduct of the City. This duty of Developer is separate and apart from and in addition to any similar obligation of Developer arising under any other part, Section or Sub-Section of this Agreement.

     6.8   ANNUAL REVIEW:   Each year during the term of this Agreement beginning in 1994, the City Manager shall, conduct a review meeting in September, to review the extent of good faith

10/16/92                              24

A 01071

compliance by Developer with the terms of this Agreement.  Such
periodic review shall be limited in scope to compliance with the
terms of this Agreement pursuant to Government Code Section 65865.1
and pursuant to the provisions of City's ordinance on the subject.

(a)   At such review meeting, Developer shall be
required to demonstrate good faith compliance with the terms of
this Agreement pursuant to Government Code Section 65865.1 and the
applicable City ordinance.

(b)  In the manner prescribed in Section 4.7 hereof,
City shall deposit in the mail to Developer a copy of all public
staff   reports,   documents   and   related   exhibits   concerning
Developer's performance hereunder at least ten (10) days prior to
any such periodic review.

(c)  In the event City fails to either (1) hold the
annual review meeting or (2) notify Developer in writing (following
the scheduled date of the review meeting) of City's determination
as to compliance or noncompliance with the terms of this Agreement
and such failure remains uncured as of December 31 of the same
year,   such   failure   shall   be   deemed   an   approval   by   City   of
Developer's good faith compliance with the terms of this Agreement.


7.    DEVELOPMENT PROGRAM:

7.1  PUBLIC IMPROVEMENT FACILITIES AND SERVICES:  Deve-
loper and its successors in interest agree to provide the public
improvements,   facilities   and   services   required   by   the   Project
Approvals for the Project in accordance with the terms and condi-
tions of this Agreement.

7.2  PROJECT PHASING/TIMING:  Except   as   otherwise
provided in this Agreement, construction and development activity
on   the   Real   Property   covered   by   this   Agreement   initiated   by
Developer shall be phased in accordance with the time frames and
conditions set forth in this Agreement (for Area A, the Schedule of
Performance attached to this Agreement as Exhibit B), the Project
Approvals (including but not limited to the EIR, the Master Plan
and the Tentative Subdivision Maps).  Scheduling, dates or times of
performance by either party hereto may be subject to revision from
time to time as mutually agreed in writing, but termination as set
forth herein shall be modified only by amendment to this Agreement.
Such   revisions   are   deemed   to   be   within   the   framework   of   this
Agreement as presently drafted and executed and do not constitute
amendments requiring new notice or hearing.

For the term of this Agreement, for each residential lot in the
Project   which   Developer   sells,   Developer   may   offer,   as   an
inducement to prospective purchaser, two preferred player passes,
per residential unit in the City's golf course consistent with the

A 01072

limitations set forth in this Agreement.  The parties shall use
their best efforts to negotiate a mutually agreeable program.  If
the parties wish to pursue this alternative, they should do so by
means of a separate agreement with the City.

7.3.1 <u>TRIGGERING EVENT</u>:  Developer's obligation to
build the additional nine holes of golf, and dedicate those nine
holes to the City, required under this Agreement shall be triggered
by the earlier of the following to occur:

(a) The issuance of the building permit for the one
thousandth (1,000th) residential unit in the Project; or

(b) The City's golf course, in any consecutive
twelve month time period, selling at least eighty-five thousand
(85,000) rounds of golf, with at least twenty percent (20%) of
those rounds of golf being sold to residents or guests of homes
within this Project.  Notwithstanding the foregoing, Developer
shall not be required to construct this facility before the
issuance of certificates of occupancy to the 400th residential unit
in this Project.

7.3.2 <u>SCHEDULE OF PERFORMANCE IN DEVELOPMENT OF GOLF
COURSE ADDITION</u>:  Upon commencement of the sale of lots in this
Project, City shall notify the Developer at regular intervals (but
not less than annually) of the total number of rounds of golf and
the percentages of rounds played by residents or guests of homes
within this Project.  The Developer shall, thereby, obtain current
data in order to plan for the future golf course construction.
Once a triggering event described in Section 7.3.1 has occurred,
City shall notify Developer in writing in a manner consistent with
the terms of this Agreement.  Developer shall, within thirty (30)
days of issuance of the notice by City, give City notice in writing
of Developer's intention to construct the addition to the golf
course, and shall actually begin planning and design of said golf
course addition within thirty (30) days thereafter.  Developer
shall proceed expeditiously with the design work and shall actually
begin construction within sixty (60) days after final approval of
all plans and specifications, and shall complete the construction
within twelve months after it is initiated.  The nine (9) holes of
the golf course which will be constructed as a part of Areas B, C,
and D shall be completed and placed into service as a unit.
Developer shall not place into service fewer than the full nine
holes at once.  Developer shall, upon completion of the
construction of the addition to the golf course, maintain it for a
period of at least six months after completion, in order to allow
the grass to grow to an acceptable level and shall then offer it
for dedication to the City.  Developer shall, under no
circumstances, open the extension or any part thereof for private
or public play unless the City fails or refuses to accept the
dedication and mutually agrees with the Developer to the private
operation of said extension.  In any event no part of the nine hole

10/16/92                          26

A 01073

facility shall be open to the public nor shall fees for its use be payable unless and until the entire nine (9) hole segment has commenced operation.

7.3.3 <u>DAMAGES IN THE EVENT OF DEFAULT</u>: Any remedies created by virtue of this clause shall be in addition to and without prejudice to the remedies for an event of default set forth elsewhere in this Agreement.  If Developer should default in its obligation to construct the addition to the golf course, in any material way, or should this Agreement terminate pursuant to the provisions of Section 4.2.2, after the completion of the residential portion of Area A but before the completion of the additional nine holes of golf, the parties hereto agree that the damages to City would be extremely hard to calculate.  However they agree that Developer shall, in such event:

(a)   transfer to City ownership of the land which would have contained those nine holes of golf, if Developer currently owns that land, or, the cash value of acquiring that land, if the Developer does not then own the land and

(b)   pay to the City the then-current cost of developing that land into the nine holes, (based upon the annual National Golf Foundation estimate of the per-hole cost of the development of a golf course, subject to proof by one party to the other the such figure is inappropriately low or inappropriately high for this circumstance,) plus

(c)   any sum over and above that amount in hitherto waived Park Acquisition and Development Fees.

7.4   <u>FINANCING</u>:  City agrees, without attempting to commit its legislative description, to use its last efforts, in good faith, to pursue tax exempt financing for those nine holes of golf.

8.   <u>UTILITIES/INFRASTRUCTURE/FEES/REIMBURSEMENT</u>:

8.1   <u>INFRASTRUCTURE - TRAFFIC CIRCULATION</u>:  As a condition of the development of the Project, Developer is required to make certain improvements to the surface street network of City and to dedicate those improvements either to City or, if necessary, to the Department of Transportation of the State of California (CalTrans).  The timing of each of these improvements which are required as a part of the development of Phases 1 and 2 of Area A, shall be governed by the Schedule of Performance (Exhibit B).  The timing of the balance of the improvements shall be set forth in the conditions to the approval of tentative subdivision maps or, for those associated with parts of the Project for which no tentative subdivision maps are required, then in site plan reviews, all of which shall be performed in a manner consistent with this

Agreement, the Master Plan, including but not limited to the Traffic Study dated May 7, 1992.

8.1.1 PHASING: Developer and City agree that the traffic improvements will be constructed as outlined in the Project Approvals, including the EIR, except that all traffic improvements along Highway 46, shall be subject to the revisions, modifications and requirements set by CalTrans. The phasing of the traffic circulation mitigation measures required for Area A, Phases 1 and 2, are as follows:

(a) Internal Collector Streets: The Master Plan indicates that there are to be two landscaped collector streets (Valley Rose Parkway and Augusta Manor Drive) running through the development.

(i) That portion of Valley Rose Parkway which runs from the planned intersection of Valley Rose Parkway and Saint Andrews Crescent to the intersection of Valley Rose Parkway and Highway 46, shall be developed from its intersection with Highway 46 to its intersection with Saint Andrews Crescent, which is the northerly most street with which intersects it on the Subdivision Maps in the first two phases of Area A, prior to its planned eventual intersection with Augusta Manor Drive.

(ii) That portion of Augusta Manor Drive which runs from the planned intersection of Edinburgh Way and Augusta Manor Drive, west to Scofield Avenue shall be developed from its intersection with Scofield Avenue to its intersection with Edinburgh Way which is the easterly most street which intersects it on the Subdivision Maps prior to its planned eventually intersection with Valley Rose Parkway.

(b) Scofield Avenue: That portion of Scofield Avenue which runs from the planned intersection of Augusta Manor Drive to the existing intersection of Scofield Avenue and Highway 46, at the time set forth in the Schedule of Performance (Exhibit B), shall be improved as follows:

(i) From the center line of the existing right of way of Scofield Avenue, to the east, to this project, the street shall be widened to at least forty-three (43) feet of Asphalt Concrete (AC), paving, with an adjoining curb and two (2) foot wide gutter. From the planned intersection of Augusta Manor Drive to the southern end of the planned residential portion of the development of Area A, there shall be a five (5) foot sidewalk plus as on-half (0.5) foot curb installed such that the distance from the center line of the existing right of way of Scofield Avenue to the eastern edge of the sidewalk shall be a distance of fifty and one half (50.5) feet, more or less. From the existing intersection of Scofield Avenue and Highway 46 to the southern end of the planned residential portion of the development of Area A (in other words,

10/16/92                                28

A 01075

to the northern end of the planned commercial portion of the development of Area A), no curb, gutter or sidewalk is required as part of Area A, Phase 1 or 2.

(ii) From the center line of the current right of way of Scofield Avenue, to the west, the street shall be paved to a distance of at least twelve (12) feet so that it matches the grade and quality of the improved easterly portion from the northerly edge of the intersection of Augusta Manor Drive and Scofield Avenue to the intersection of Scofield Avenue and Highway 46.

(c) Highway 46:  Highway 46 is a California State Highway and, as such, is under the jurisdiction of the California Department of Transportation (CalTrans), which is not bound by any of the terms of this Agreement or any of the findings or determinations of the City with regard to CEQA compliance.

(i) City is currently of the opinion that not all of these improvements required by CalTrans are necessary, at least as for the development of Area A, Phases 1 and 2.  Therefore, City is requiring only that Highway 46 be improved as a condition of the first two phases of Area A's development by (a) the widening of Highway 46 from the westerly edge of the City's golf course to Valley Rose Parkway, but it shall gradually taper as it goes east along the golf course frontage, and shall taper to the west along the frontage of Area E, (b) the frontage along Area A shall be improved fully, (c) the addition of the turn lanes ("turn pockets"), on Highway 46 at and approaching its intersection with Valley Rose Parkway, and (d) the addition of a turn pocket to the east of Scofield and Highway 46, on Highway 46, at the intersection of Highway 46 and Scofield Avenue.

(ii) Conditions in Site Plan approvals and Tentative Subdivision approvals shall dictate when the additional traffic mitigation measures along Highway 46 shall be required.

8.1.2  COMMERCIAL AREA:  It is currently the intent of Developer that the commercial areas shall not be constructed until after the completion of the residential units and the golf holes to be located in Areas B, C and D.  The parties agree to allow the City the flexibility to require the improvements to Highway 46 and Scofield Avenue when the adjacent commercial property develops, should one or more parcels of that commercial property develop earlier than is set forth above.

8.1.3  FUNDING:  City and Developer have agreed that, insofar as it is feasible, these improvements shall be funded by means of assessment district financing.  However, in the event that this is either not sufficient or not financially advantageous to both parties, City agrees to diligently pursue any and all potential additional and extraordinary sources of governmental

10/16/92                          29

A 01076

funding which may be available to assist in funding the costs of construction of Highway 46 improvements including, but not limited to, Federal Highway Funds and State Highway Funds. Nothing herein contained shall, however, be interpreted to require the City to use governmental funds which it has historically and traditionally received (including but not limited to Gas Tax funds, TDA funds, etc.) to apply to this project. Developer and City agree to cooperate in order to meet all requirements for availability, applicability and use of such funds and to maximize their use. To the extent such funds are available, City and Developer agree to use their best efforts to obtain and use them to make the required improvements. Once all such funds have been expended, the balance of such cost shall be borne by Developer. Failure to receive such funds or accomplish the purposes of this subsection does not affect, modify or defer any other provision of this Agreement. Notwithstanding any provision of this Agreement to the contrary, Developer will:

(a) pay to City the traffic signalization fees as set forth in Exhibit C. So much of these fees as are necessary, City shall use to provide the traffic signals along Highway 46 and the streets constructed as part of the Project, which feed into Highway 46.

(b) post a bond which is adequate to guarantee the payment of the Developer's share of the cost of median improvements required by CalTrans along Highway 46, as well as the cost of any improvements required by City along Scofield Avenue, along Leonard Avenue or along McCombs Road.

(c) post a performance bond or provide other adequate security to City as required by any future discretionary approvals.

## 8.2 SANITARY SEWER:

8.2.1 CAPACITY AND CONSTRUCTION: City owns and operates a wastewater disposal system which collects and processes one and one-half million (1.5 MGD) gallons per day of waste water within City. It has a current design capacity of one million nine hundred fifty thousand (1.95 MGD) gallons per day.

8.2.2 SHORT TERM SOLUTION: As a condition of the issuance of a certificate of occupancy in Area A, Developer will be required to complete the following improvements:

(a) Install a sewer pump station (On-site Pump Station) on the Property. In a mutually agreeable location, near the intersection of Highway 46 and Valley Rose Parkway and an eight-inch (8") diameter force main from the pump station approximately four thousand nine hundred (4,900) feet, along a

10/16/92                           30

A 01077

route mutually agreed upon by the City and the Developer, to the City's existing Wastewater Treatment Plant. The City will acquire any right of way necessary for the purpose, the cost of which shall be reimbursed to the City by the Developer. The right-of-way shall also be sufficient for the Long Term Solution described below. The pump station and force main shall have a capacity sufficient to service one thousand one hundred fifty (1150) equivalent R-1 units and the commercial property along Highway 46, and be designed in such a way that the wet well may be modified to serve as the wet well for a lift pump station as a part of the Long Term Solution, to carry all of the sewage from the entire project at build out.

(b)   The Developer will be required to install Sanitary Sewer Facilities as described in Exhibit B.

8.2.3  LONG TERM SOLUTION:  As a condition of the approval to a Subsequent Approval, Developer will be required to complete the following improvements:

(a)   Conversion of the On-site Pump Station described above to a Lift Station (On-site Lift Station) and installation of a minimum of a twenty-one inch (21") diameter gravity sewer main from the On-site Lift Station approximately four thousand nine hundred (4,900) feet, along a route mutually agreed upon by the City and the Developer, to the City's existing Wastewater Treatment Plant. The City shall acquire any additional right-of-way necessary to construct the "Long Term Solution" at no cost to the Developer.

(b)   Construction of a lift station (Off-site Lift Station) near the City's existing Wastewater Treatment Plant to lift the sewage from the twenty-one inch gravity sewer main described above to the Treatment Plant. After the On-site Pump station is converted to a lift station and the eight inch force main is no longer required to transport sewage, the development may be allowed to use the force main as a reclaimed water line if reclaimed water becomes available in the future.

8.2.4    TRIGGERING EVENT:  The conversion of the On-site Pump Station to the On-site Lift Station and the installation of the twenty-one inch gravity main and the Off-site Lift Station shall be required at the City's discretion. The City's present intent is to require this construction when the force main described above as part of the Short Term Solution has reached ninety percent (90%) of its capacity.  It is presently estimated that this will occur at or near the connection of the one thousand one hundredth (1,100th), residential connection or residential equivalent.  Nothing herein contained shall be interpreted in such a way so as to require City to issue a Certificate of Occupancy to a property which is not connected to a means of transporting all of the sewage produced by that property in normal use to the City's waste water treatment plant.

10/16/92                          31

A 01078

**8.2.5   CAPACITY:**   The City agrees that,

(a)   So long as the Developer pays the City's Treatment Plant Charge, the City is obligated to provide sufficient capacity within its Wastewater Treatment Plant to service the entire project.   This capacity shall be sufficient to serve at least two thousand three hundred forty-two (2,342) residential units and at least fifty-two (52) gross acres of commercial development and related uses.   If at any time the City determines that there is not sufficient capacity within the Wastewater Treatment Plant to service both the existing users and the undeveloped portion of this Project, the City shall expeditiously proceed to construct whatever additional capacity to the Wastewater Treatment Plant the City deems necessary to serve the expected demand without delaying the Developer from continuing to develop the undeveloped portion of this Project.   A failure by the City to proceed in such a manner shall be presumed to be an effort by the City to block continued development of this Project and shall, therefore, constitute a breach of this Agreement by the City.

(b)   The parties also agree that, so long as the Developer pays Trunk Line Charges and so long as the Developer agrees to construct, upon direction by the City, then the City is obligated to acquire, at a mutually agreed upon cost, the facilities described as the Long Term Solution in Section 8.2.3. from Developer.   The Developer will expeditiously proceed with this work when the Triggering Event described in Section 8.2.4 occurs so that the Developer is not delayed in continuing to develop the undeveloped portion of this Project.   A failure by the City to acquire these facilities shall be presumed to be an effort by the City to block continued development of this Project and shall, therefore, constitute a breach of this Agreement by the City.

**8.2.6   FEES:**   City agrees that it will neither charge nor collect fees from Developer or any successor in interest including purchasers of any residential unit from Developer for wastewater fees or hookup fees except as is set forth in this Section.   For all development the Developer shall be assessed and shall pay both a Trunk Line Charge and a Treatment Plant Charge in the amounts set forth in Exhibit C which is attached hereto and incorporated by this reference (these fees shall be subject to increases based upon the requirements set forth in Section 66000 et seq. of the Government Code).   These Fees shall be assessed upon issuance of each building permit and the amount shall be that which is in effect in the City at the time of the issuance of the building permit.

**8.2.7   REIMBURSEMENT:**   The City and the Developer agree that the sewer facilities to be constructed by the Developer as a condition of development of the Project are of no greater capacity than needed to service the Project.   The City and the Developer agree that the Developer is not entitled to any

A 01079

reimbursement for the oversizing of said sewer facilities since oversizing is not currently required. If oversizing of any or all of these facilities is required by the City prior to the start of construction of these sewer facilities, the City will provide an agreement to the Developer as a means of compensation to the Developer for the cost of oversizing these sewer facilities. The parties agree that the amount of reimbursement due the Developer from the City shall be based on the incremental cost of oversizing the facility and not on the value of the benefit conferred. If oversizing is required by the City after the start of construction of these facilities, the City shall pay all costs associated with the oversizing, including any costs for any redesign of the facilities and all costs for any modifications to any facilities already constructed or installed.

8.3 **WATER**: City operates a domestic water system which consists of a number of domestic wells which are tied together through a water distribution system. Developer is obligated to connect the Project site to the City's domestic water delivery system at some time in the future. Construction of the water main connecting this Project to the balance of the City's system by extending a 12" water main from the water delivery system built as part of the Project to the City's existing water main in Central Avenue, will be required as a condition of approval in a subsequent phase of this Project but is not being required as a condition to the approval of Area A, Phase 1 or phase 2.

8.3.1 <u>SHORT TERM SOLUTION</u>: As a condition to the issuance of a Certificate of Occupancy for any of the Projects, the Developer is required to provide two sources of water and some storage capacity, in order to meet the minimum City standards for fire flow. Developer may accomplish this in any one of the following ways:

(a) Drill a new well which produces a minimum of eight hundred gallons per minute, <u>and</u> pay the City to purchase adequate capacity in the domestic water well currently owned by the City which is located on the golf course property and tie that well to the water storage and delivery system in the Project (Developer shall, if it wishes to use a portion of the capacity of City's existing well at the golf course, pay to City the sum of one hundred thousand $100,000, for a share of that well's capacity) <u>and</u> construct a three hundred thousand (300,000) gallon water storage facility; <u>or</u>

(b) Provide an alternative which is acceptable to the City Manager and the City's consulting engineer which provides, in their opinion, adequate water at an adequate rate of flow to meet the legal standards for fire flow as well as providing domestic water to the first phase of the project.

A 01080

### 8.3.2   LONG TERM SOLUTION:

(a) Developer shall construct to City requirements, storage facilities which are adequate to provide one million two hundred thousand (1.2 million) gallons of water storage as a condition to build out.   However, the parties agree that the completion of neither phase 1 nor phase 2 of Area A will necessitate so large a storage facility.

(b) Developer shall construct to City standards new water wells for domestic use on-site in the Project.   Any wells drilled to meet these requirements shall be dedicated to the City and, upon acceptance by City of said wells, it shall be City's sole determination and discretion as to where the water produced by any such wells shall be used.   However, Developer shall have the right to a credit for capacity in City water production representing a volume equal to the capacity in water produced from these wells which is not used by property within this Project.   Developer shall not be required to construct these wells concurrently.

(c) The parties acknowledge that the Master Plan documents assume that a well will produce 1,500 gallons per minute. If a well is drilled and produces less than that volume of water at that rate, then Developer may be required by City to drill one or more additional wells in order to provide an adequate supply of water to this project.   Developer shall receive no capacity credit for the capacity made available to Developer from the City's existing water well on the golf course, unless he pays the City for that capacity.

8.3.3   TRIGGERING EVENT:   With the exception of the improvements described in Section 8.3.1 as being necessary as part of the development of Area A, Phases 1 and 2, neither the construction of water mains or pumps nor the construction of water wells shall be required unless and until so many building permits have been issued in the Project that, in the opinion of the City Engineer, based upon the standards set forth in the City's Rules, Regulations and Officially Adopted Policies and the Master Plan, the supply of water will not be sufficient to provide adequate domestic and fire flow to any more residences without the contemplated construction of water wells, mains, pumps and/or water storage facilities having been completed.   Under no circumstances will City be requested or required to issue a building permit for a structure which did not have available water adequate to meet minimum fire flows.

8.3.4   WATER DEVELOPMENT AND CONNECTION FEES:   City agrees that it will neither charge nor collect water development fees from Developer or any successor in interest including purchasers of any residential unit from Developer (except for those fees described above regarding the connection to the City's golf course well).   City will not charge Developer water connection fees

10/16/92                                    34

generally charged to like development so long as Developer performs
the work necessary for each connection, subject to reasonable
inspection by City.  Developer shall install water meters in each
new building constructed in the Project.  City shall take up and
consider an ordinance to establish water fees based on a metered
rate as well as a flat rate before any certificate of occupancy is
issued to any of the buildings in this Project.  In no way will the
City's consideration of such an ordinance cause a delay in the
process of the issuance of a Certificate of Occupancy beyond the
time in which the Developer would normally have received a
Certificate of Occupancy. City will establish a procedure by which
the water meters installed in this Project are read at least
quarterly, and that information shall be made available to the
Developer by City in a format which, in the opinion of the City,
preserves the privacy of the individual property owner.

   8.3.5  SUBSEQUENT EVALUATIONS OF WATER DEMAND:  City
and Developer agree that water usage varies depending on the
intensity of the land use and that the Developer is required to
construct facilities to supply water to the Project.  In order to
be responsive to the demands of the Project and to provide
facilities which efficiently supply water to the Project, City and
Developer agree to perform a re-evaluation of said water demand and
the facilities required to supply said demand.  Subsequent
evaluations of water demand will be undertaken by the Developer
with the approval of City, and shall be based on the actual water
demand of the project or an intermediated phase of not less than
three hundred residential (300) units.  Valid usage data is defined
as that information upon which the City bases its monthly charges
to each lot and/or unit collected for a minimum of twelve
consecutive months.  Said consumption information is described and
shall be provided pursuant to section 8.3.4.  In no way shall the
consumption data be used to reduce the size of any of the plumbing
fixtures either to be placed in the ground or in future buildings
in the Project, but may be used only to reconsider the requirements
as to the necessity and timing for the construction of new wells
and/or water storage facilities.  City and Developer agree that,
should subsequent evaluations demonstrate the need for supply
facilities other than those specified above and by the Master Plan
documents, that the subsequent evaluation shall govern and not
require an amendment or modification of this Agreement.

   8.4  STORM DRAINAGE:  The Master Plan contemplates and
City and Developer agree that Developer shall construct all
necessary drainage systems which will contain, discharge and
dispose of all storm water drainage.  The storm drainage system,
including but not limited to all necessary and appurtenant ease-
ments, shall be dedicated to the City and shall be included in a
City established maintenance district for the annual cost of
maintenance and operation.  Such storm drainage facilities are in
lieu of the storm drainage fee of City and shall be constructed to
current City standards applicable to development in the City as of

10/16/92                          35

A 01082

the Effective Date of this Agreement.  For the purposes of the provisions of this Agreement which concern storm drainage, the following definitions shall apply:

(a) "Detention" - A facility which is designed to hold water only for a limited period of time.

(b) "Retention" - A facility which is designed to hold water until the water either evaporates or percolates into the ground or is otherwise eliminated from the facility.

(c) "Temporary" facility - A facility which is designed to act as a retention basin only for a few months or a few years, but will, at some later time, either be demolished or used for another purpose (such as a Detention facility but not as a Retention facility).

8.4.1 LONG TERM SOLUTION: Ultimately, at build out of the entire Project, there will be certain detention basins constructed on the Property by Developer, with pump outlets which will be used to store storm water only after a storm and which shall then be pumped or drained out and the water transported to a retention facility.  These detention basins may be dual use facilities and shall be designed with low flow areas of sufficient size and capacity to handle "nuisance flows" and minor storm events.  There are three alternative solutions to the final location of this storm water.  Those solutions are set forth below.  The choice of alternates will be made by City, with the advice of the Developer.

(a) Developer will construct a retention facility which is not on the Property but at a mutually agreeable location off of the Property. The retention facility, along with the right of way between the Project site and this facility, along with the mechanisms and appurtenances necessary to transport storm water to it will be a site of at least ten acres which shall be acquired and developed by the Developer and dedicated to the City, as a condition to one of the later phases of the Project.  City will acquire any right of way which is necessary for this purpose, and, if in the City's determination it becomes necessary, will aid in the acquisition of the site for the retention basin as well.  A condition of the City's participation in the acquisition of either right of way or the site is that the cost incurred by the City shall be fully reimbursed to City by Developer. or

(b) The Developer will construct a permanent retention facility on the Property, which will be constructed to City standards and dedicated to the City, along with the right of way between the detention facilities on the Property and this facility, along with the mechanisms and appurtenances necessary to transport storm water to it. or

10/16/92                          36

A 01083

(c) If Developer can develop a plan which would provide for the cleaning of this storm water to a level acceptable to the City, then the storm water could be pumped or drained to either the existing golf course lakes or the golf course lakes constructed as part of this Project on the nine holes of golf constructed by Developer.  City would then have to assure the Developer that adequate capacity in the golf course lakes would be available at all times to accept this storm water flow from the detention basins on the Project.

8.4.2  SHORT TERM SOLUTION:  Prior to the build out of the Project, City will allow the Developer to construct as a part of each phase, a temporary retention basin.  That temporary retention basin will then, as part of a later phase, either be filled in and built upon or may become a detention basin.  The timing of the construction of these facilities and the filling in of the temporary retention basins which are not planned to be permanent basins at build out of the Project, will be set forth in the conditions of approval in the discretionary planning entitle-ments of future phases of development.

8.4.3  STANDARDS OF CONSTRUCTION:  All facilities for either the detention or retention of storm waters shall be built to City standards.  These standards include but are not limited to the requirement that these facilities be fenced off so long as they are used as either retention or detention basins.

(a) All temporary retention basins will be constructed to the standard for permanent retention basins, or Developer will be required to post adequate security with City in an amount sufficient for City to improve said basins to meet the City's standards for permanent retention basins.  An easement for drainage purposes will be offered for dedication to the City, which City shall abandon or reconvey to Developer when the retention basin is no longer required for drainage purposes.

(b)  If a temporary retention basin is to become a permanent detention or retention basin, then the facility will be built to City standards for a permanent facility.  Adequate security will be posted with the City for the City to acquire and construct a permanent retention basin if that should become necessary.

(c)  All such security will be refunded to the Developer if and when the temporary retention basin is filled in and is no longer required for drainage purposes.

8.5  POLICE AND FIRE PROTECTION:  Since the preparation and submission of the Master Plan, it has become apparent to City that for City to provide adequate fire protection service to the Project at completion, an additional fire sub-station will be needed which is located on the Real Property.  It shall not exceed

A 01084

two (2.0) acres, and shall be located so as to have adequate
vehicular access to the major collector streets within the Project.
The timing for the dedication of this land shall be a function of
the conditions placed on tentative subdivision maps for the
development of the project.

8.6   SCHOOL FEES:   Based upon the mitigation measures
identified in the EIR, Developer shall negotiate an agreement with
all of the school districts which have jurisdiction over the real
property described in Exhibit A.   Property owner is required as a
condition precedent to the issuance by City of a building permit
for Area A, Phases 1 and 2, and shall be required as a condition in
each tentative subdivision map of each phase in the future, as to
all of these school districts, to produce either:   (a) a signed
agreement between Developer the district with respect to school
facilities; or (b) a letter signed by the district that an agree-
ment has been reached.   In the event that this second alternative
is used, as to that district (or those districts), a condition of
the tentative map for that phase (and a condition for Area A,
Phases 1 and 2) is that a final, signed agreement between the
Developer and the district be presented to the City in order for a
building permit to be issued by City.

8.7   MISCELLANEOUS FEES:   Any development fees not
already specified in this Agreement, including Exhibit C to this
Agreement, and which are assessed or charged on a "per residential
lot" basis shall not be levied or collected unless and until a
building permit is issued for that lot.

8.7.1   Fees for traffic signalization, median
improvements and interchange improvement are hereby agreed to, set
and established as set forth in Exhibit C which is incorporated
herein by this reference.

8.7.2   Insofar as City has the legal authority to
assess and collect Park Acquisition and Improvement Fees, such fees
will initially be waived based on the Developer's covenant
contained herein to construct the nine holes of golf and construct
other recreational facilities and dedicate them to the City.   If
Developer should fail to construct these recreational facilities or
fail to dedicate them to the City, then, subject to the provisions
of Subsection 7.3.3, Developer shall be required to pay Park
Acquisition and Improvement Fees in the same amount as are
chargeable under the City's Rules, Regulations and Official
Policies in effect at the time of the issuance of the building
permit will be charged

8.7.3   All fees identified in this Section 8.7 are
subject to annual increases by City based upon the projected actual
cost of providing the facilities to which the fees are related,
following the requirements set forth in Section 66000 et seq. of
the Government Code.

A 01085

9.   DEFAULT, REMEDIES AND TERMINATION:

9.1   EVENTS OF DEFAULT DEFINED:   The following shall be "events of default" under this Agreement, and the terms "Events of Default" and "Default" shall mean, whenever they are used in this Agreement, with respect to the Project, any one or more of the following events:

9.1.1   FAILURE BY THE DEVELOPER:   to observe and perform any covenant, condition or agreement on its part to be observed or performed under this Agreement or conditions of approval for any vesting tentative map or tentative map for the Project, including but not limited to the maps in subsections 2.8.5 and 2.8.5 hereof, for a period of thirty (30) days after written notice specifying such failure and requesting that it be remedied has been given to the Developer by the City; provided, however, if the failure stated in the notice can be corrected, but not within such thirty (30) day period, the City shall not unreasonably withhold its consent to an extension of such time if corrective action is instituted by the Developer within the thirty (30) day period and diligently pursued until the failure is corrected.   The City staff may, but is not required, under such circumstances, to extend the time period for completion of the corrective action to a total time not to exceed ninety (90) days, without the necessity of amending this Agreement.   Any extension of time beyond the ninety (90) day time period would require the consent of the City Council after a noticed public hearing.

9.1.2   BANKRUPTCY OR EXECUTION OF ATTACHMENT:   The filing by Developer or any assignee or successor in interest, of a voluntary or involuntary petition in bankruptcy, or failure by the Developer promptly to lift any execution or attachment on any part of the Project, or adjudication of the Developer as a bankrupt, or assignment by the Developer for the benefit of creditors, or the entry by the Developer into an agreement of composition with creditors, or the approval by a court of competent jurisdiction of a petition applicable to the Developer in any proceedings instituted under the provisions of the Federal Bankruptcy Act, as amended, or under any similar acts which may hereafter be enacted.

9.1.3   FAILURE BY THE CITY:   to observe and perform any covenant, condition or agreement on its part to be observed or performed under this Agreement or conditions of approval for any vesting tentative map or tentative map for the Project, including but not limited to the maps in subsections 2.8.7 and 2.8.8 hereof, for a period of thirty (30) days after written notice specifying such failure and requesting that it be remedied has been given to the City by the Developer; provided, however, if the failure stated in the notice can be corrected, but not within such thirty (30) day period, the Developer shall not unreasonably withhold its consent to an extension of such time if corrective action is instituted by

A 01086

the City within the thirty (30) day period and diligently pursued until the failure is corrected.

9.2  **GENERAL PROVISIONS**:   In the event of default or breach of this Agreement, other than as determined in Section 6.8 hereof, or of its terms or conditions, the party alleging such default or breach shall give the breaching party not less than thirty (30) days Notice of Default in writing, unless the parties extend such time by mutual consent in writing.  The time of notice shall be measured from the date of certified mailing.  The Notice of Default shall specify the nature of the alleged default, and, where appropriate, the manner and period of time in which said default may be satisfactorily cured.   Developer shall be given ninety (90) days from the date of notice in which to cure the specified default.  If the nature of the alleged default is such that it cannot reasonably be cured within such ninety (90) day period, the commencement of the cure within such time period and the diligent prosecution to completion of the cure shall be deemed a cure within such period.  During any period of during, the party charged shall not be considered in default for the purposes of termination or institution of legal proceedings.  If the default is cured, then no default shall exist and the noticing party shall take no further action.

9.2.1  **OPTION TO INSTITUTE LEGAL PROCEEDINGS OR TO TERMINATE**:  After proper notice and the expiration of said cure period, the noticing party to this Agreement, at its option, may institute legal proceedings or give notice of intent to terminate this Agreement pursuant to Government Code Section 65868.  Following notice of intent to terminate, the matter shall then be scheduled for consideration and review by the City Council, within thirty (30) days, in the manner set forth in Government Code Sections 65865, 65867 and 65868, as amended.

9.2.2  **NOTICE OF TERMINATION**:  Following consideration of the evidence presented before the City Council, either party alleging a default by the other party may, at its option, give written notice of termination of this Agreement to the other party by certified mail.  Written Notice of Termination of this Agreement shall be effective immediately upon certified mailing to the defaulting party.

9.2.3  **WAIVER**:  Failure to give or delay in giving notice of default pursuant to this section shall not constitute a waiver of any default.  Except as otherwise expressly provided in this Agreement, any failure or delay by the other party in asserting any of its rights or remedies as to any default shall not operate as a waiver of any default or of such rights or remedies or deprive such party of its right to institute and maintain any actions or proceedings which it may deem necessary to protect, assert or enforce any such rights or remedies.

10/16/92                            40

A 01087

**9.3   ENFORCED DELAY, EXTENSION OF TIME OF PERFORMANCE:**
In addition to specific provisions of this Agreement, performance
by either party hereunder shall not be deemed to be in default,
where delays or defaults are due to war, insurrection, strikes,
walkouts, riots, floods, earthquakes, fires, casualties, acts of
God, governmental restrictions imposed or mandated by other
governmental entities, enactment of conflicting state or federal
laws   or   regulations,   new   or   supplementary   environmental
regulations, litigation, or similar bases for excused performance,
except that the maximum term of this agreement shall not be
extended thereby without amendment to this Agreement.

**9.4   INSTITUTION OF LEGAL ACTION:**   In addition to any
other rights or remedies, either party may institute legal action
to cure, correct or remedy any default, to enforce any covenants or
agreements herein or to enjoin any threatened or attempted
violation thereof; to recover damages for any default; or to obtain
any remedies consistent with the purpose of this Agreement. Except
with respect to rights and remedies expressly declared to be
exclusive in this Agreement, the rights and remedies of the parties
are cumulative, and the exercise by either party of one or more of
such rights or remedies shall not preclude the exercise by it, at
the same or different times, of any other rights or remedies for
the same default or any other default by the other party.

## 10.   MISCELLANEOUS PROVISIONS:

**10.1 RULES  OF  CONSTRUCTION  &  APPLICABLE  LAWS:**   The
singular includes the plural; the masculine gender includes the
feminine; "shall" and "will" are mandatory, and "may" is permis-
sive.  This Agreement shall be construed and enforced in accordance
with the laws of the State of California.  It is further understood
that  the  Developer  is  responsible  for  compliance  with  all
applicable laws including, but not limited to the Labor Code,
Public Contract Code and Government Code of the State of Califor-
nia.   City makes no representation as to the applicability or
applicability of any laws regarding contracts, and especially
public improvements, thereunder.  Developer will not hold or seek
to hold City liable for any failure by Developer to comply with any
such laws without regard to whether City knew, could have known, or
should have known as to the necessity of such compliance.

**10.2 SEVERABILITY:**   The parties hereto agree that the
provisions are severable.  If any provision of this Agreement is
held invalid, the remainder of this Agreement shall be effective
and shall remain in full force and effect unless amended or
modified by mutual consent of the parties.

**10.3 ENTIRE AGREEMENT, WAIVERS, AMENDMENT -- SUPERSEDING:**
This Agreement constitutes the entire understanding and agreement
of the parties.   This Agreement integrates all of the terms and
conditions mentioned herein or incidental hereto, and supersedes

10/16/92                            41

A 01088

all negotiation or previous agreements between the parties with respect to all or any part of the subject matter hereof.  To the extent those are conflicts or inconsistencies between this Agreement and any prior agreement, map approval, permit or conditions of approval, the provisions of this Agreement shall prevail.  All waivers of the provisions of this Agreement must be in writing and signed by the appropriate authorities of City or of Developer.  All amendments which are authorized in the manner provided by law must be in writing, signed by the appropriate authorities of City and Developer, in a form suitable for recording in the Office of the Recorder, County of Kern.  Any such amendments shall be promptly recorded.  Upon the completion of performance of this Agreement or its earlier revocation and termination, a statement evidencing said completion or revocation signed by the appropriate agents of Developer and City shall be recorded in the Official Records of Kern County, California.

   10.4 ADMINISTRATIVE COSTS:   Developer agrees to pay reasonable fees to offset administrative costs incurred by City in preparing and administering this Agreement, including but not limited to legal fees, engineering fees and fees to the City's consultants.

   10.5 PROJECT IS A PRIVATE UNDERTAKING:  It is specifically understood and agreed to by and between the parties hereto that:  (1) the Project is a private development; (2) City has no interest or responsibilities for or duty to third parties concerning any improvements until such time and only until such time that City accepts the same pursuant to the provisions of this Agreement or in connection with various subdivision map approvals; (3) Developer shall have full power over and exclusive control of Developer under this Agreement; and (4) the contractual relationship between City and Developer is such that Property Owner is an independent contractor and not an agent of City.  None of the terms or provisions of this Agreement shall be deemed to create a partnership between or among the parties in the business of Developer, the affairs of City, or otherwise, nor shall it cause them to be considered joint venturers or members of any joint enterprise.  This Agreement is not intended nor shall it be construed to create any third party beneficiary rights in any person who is not a party, unless expressly otherwise provided.

   10.6 CONFLICTS OF INTEREST:   No member, official or employee of the City shall have any personal interest, direct or indirect, in this Agreement nor shall any such member, official or employee participate in any decision relating to the Agreement which affects his or her personal interest or the interests of any corporation, partnership, or association in which he or she is directly or indirectly interested.  The Developer warrants that it has not paid or given, and will not pay or give, any third party any money or other consideration for obtaining the Agreement.

A 01089

10.7 <u>DUE DILIGENCE</u>: City and Developer each acknowledge and agree that time is expressly made of the essence of this Agreement and each covenant, condition, promise or agreement to be performed hereunder. Each party will exercise reasonable and due diligence in performing any and all things required by them to be performed under the terms of this Agreement. Approvals required of the City or the Developer shall not be unreasonably withheld.

10.8 <u>INDEMNITY</u>:   The Developer shall indemnify, hold harmless and defend the City and each of its officers, officials and employees from any and all liability, loss, debts, costs, and damages (whether in contract, tort or strict liability, including but not limited to personal injury, death at any time, property damage and damages for breach of contract or warranty) incurred by the City, the Developer or any other person, and from any and all claims, demands, actions and proceedings in law or equity (whether or not well-founded) brought by the Developer or any other person, arising directly or indirectly out of any act, omission or contract of the Developer or any of its contractors, subcontractors, materialmen or employees in connection with construction of any of the facilities, work or improvements. The preceding sentence shall not apply to any liability, loss, debts, costs or damages caused solely by the negligence or willful misconduct of the City.  This section shall apply in regard to any enforcement action, whether public or private, and whether brought by a public enforcement agency or by private civil litigation, against City with regard to the content of this section. If legal action by City, or Developer commences because of breach of this Agreement or to enforce or interpret a provision of this Agreement, the prevailing party is entitled to reasonable attorneys' fees and court costs.

10.9 <u>FINDINGS OF SUPPORT & INCORPORATION OF RECITALS</u>: City hereby finds and determines that execution of this Agreement is in the best interest of the public health, safety and general welfare and that the provisions of this Agreement are consistent with the General Plan and the Master Plan.  The recitals are specifically incorporated into this Agreement.

10.10 <u>CAPTIONS AND HEADINGS</u>: The captions and headings contained within this Agreement are merely intended to be directory and informational and are not intended to be a material part of the content of this Agreement.  Such captions and headings are not intended to be or considered to be material in the interpretation of this agreement.

\* \* \* \* \* \*

A 01090

## EXHIBIT "A"

**Project Legal Description**

Parcels 1 through 6, inclusive, of Parcel Map No. 9572 in the City of Wasco, County of Kern, State of California, as per map recorded July 21, 1992 in Book 44, Page 57 of Parcel Maps in the office of the County recorder of Kern County.

Excepting therefrom all interest conveyed to Tenneco Oil Company, a Delaware Corporation in assignment and conveyance thereof recorded November 18, 1988, in the office of the Kern County Recorder, in Book 6183 of Official Records, at page 1167, which interests can be briefly summarized as all oil gas and other liquid and gaseous hydrocarbons, and in addition thereto carbon dioxide, hydrogen, helium, nitrogen, methane, sulfur (in each case in either liquid or gaseous form) and any other liquid or gaseous substances, inert or otherwise, or any of them, and any minerals or other substances produced in association therewith ("hydrocarbons") in, on or under the premises, together with all rights, privileges, duties and responsibilities in any way related thereto. Grantee acknowledges that this reservation is fully set forth in the conveyance and not subject to this summary which is for convenience only. Said assignment and conveyance was clarified by first amendment thereof recorded January 17, 1989 in the Kern County Recorder's office, in Book 6200 of Official Records, at Page 1908.

Excepting and reserving all other minerals of whatever kind or character, all herein collectively called "minerals", not conveyed to Tenneco Oil Company whether such minerals are now known to exist or hereafter discovered (it being intended that the word "minerals" as used herein shall be defined in the broadest sense of the word but shall include, sand gravel, or aggregates) which are in, under or may be produced from the premises; all salt water brines and geothermal resources, in, under or may be produced from said real property; the exclusive right, by whatever methods now or hereafter known, as grantor or its successors or assigns may deem advisable, to prospect for, investigate for, explore for, drill for, produce, extract, remove and reduce to possession and ownership, all such minerals, salt water brines, and geothermal resources, which are in, under, or may be produced from the premises; · the exclusive right to drill into and through the premises to explore for and thereafter produce and extract minerals, salt water, brines and geothermal resources which may be produced from adjacent property; the right to lay, construct, erect, and place upon and in the premises, and use, maintain and operate thereon and thereafter remove, all machinery, fixtures, equipment, pipelines,

A 01091

telephone lines, electric power lines, roads, and other structures and
facilities as grantor or its successors or assigns may deem advisable, for
the exercise and enjoyment of the right to treat, process, (but not refine),
store upon and remove from the premises such minerals, salt water,
brines and geothermal resources; the exclusive right to produce and
extract such minerals by such method or methods as grantor or its
successors or assigns may deem advisable; the right at all times, without
charge, to investigate for, explore for drill for, produce, remove and
reduce possession and ownership, those quantities of fresh water from
aquifers underlying said real property deemed necessary by grantor or its
successors or assigns to use in prospecting, exploring, drilling, producing,
extracting, and removing, or other operations in connection with the full
enjoyment and exercise of the rights upon said real property as grantor or
its successors or assigns deems necessary, incidental to, or convenient,
whether alone or conjointly with neighboring lands, in exploring for,
producing and extracting the minerals, salt water, brines and geothermal
resources and of ingress and egress to and from, over and across said
real property for all purposes deemed advisable by grantor or its
successors or assigns in the exercise of the rights excepted and reserved
herein provided however, that the grantor, or its successors and assigns,
upon being provided proof thereof, shall compensate grantee or its
successors and assign (a) for any and all damage to improvements and
growing crops upon said real property which is caused by the exercise of
the rights excepted and reserved herein, and (b) the reasonable value of
the lands used for actual development and extraction of such mineral
rights, as reserved in deed recorded March 30, 1990 in Book 6364, Page
1801 of Official Records.

A 01092

**Area Legal Descriptions**

**Area A–**      The portion of the Real Property described as Parcel 1 and
Parcel 3 of Parcel Map No. 9572 recorded July 21, 1992 in Book 44,
Page 57, of Parcel Maps.

**Area B –**      The portion of the Real Property described as Parcel 4 of
Parcel Map No. 9572 recorded July 21, 1992 in Book 44, Page 57, of
Parcel Maps.

**Area C –**      The portion of the Real Property described as Parcel 6 of
Parcel Map No. 9572 recorded July 21, 1992 in Book 44, Page 57, of
Parcel Maps.

**Area D –**      The portion of the Real Property described as Parcel 5 of
Parcel Map No. 9572 recorded July 21, 1992 in Book 44, Page 57, of
Parcel Maps.

**Area E –**      The portion of the Real Property described as Parcel 2 of
Parcel Map No. 9572 recorded July 21, 1992 in Book 44, Page 57, of
Parcel Maps.

A 01093

EXHIBIT "B"
To Development Agreement - Legacy Group
Schedule of Performance - Area A

TRAFFIC CIRCULATION IMPROVEMENTS

1.   That portion of Valley Rose Parkway from the planned
intersection of Valley Rose Parkway and Augusta Manor Drive
south to Highway 46, shall be constructed from its
intersection with Highway 46 to the northerly line of Tract
5472, prior to the issuance of a Certificate of Occupancy
for any building in Tract 5472 or Tract 5618, and shall be
extended northerly from the north line of said Tract 5472 to
Saint Andrews Crescent prior to the issuance of a
Certificate of Occupancy for any building in Tract 5618.

2.   Augusta Manor Drive shall be constructed from Scofield
Avenue easterly to Edinburgh Way prior to issuance of a
Certificate of Occupancy for any building in Tract 5618.

3.   A second west bound traffic lane shall be added to the
north side of Highway 46, between the westerly edge of the
City's golf course to a point sufficiently westerly of the
Valley Rose Parkway intersection to provide transitions
acceptable to CalTrans and Highway 46 shall further be
improved by the addition of separate left turn lanes at
Valley Rose Parkway, prior to issuance of any Certificate of
Occupancy's within Tract 5472 or Tract 5618.

4.   Scofield Avenue along the frontage of Tract 5618 and
extending to Highway 46 shall be reconstructed from a line
twelve (12') foot westerly of and parallel to the centerline
of the existing right-of-way and to a line fifty-five (55')
feet east and parallel there to of said right-of-way
centerline in accordance with City Arterial Street Standard,
except that the sidewalk and curb & gutter will not be
required southerly of the south line of said Tract 5618
prior to the issuance of any Certificate of Occupancy for
any building within Tract 5618.

5.   The addition of landscaping, lighting, curb & gutter,
and sidewalk along the frontage of the development on
Highway 46 between the westerly golf course property line
and Scofield Avenue shall be installed as a condition to
issuance of Certificate of Occupancy for development of the
commercial property with Parcel 1 of Parcel Map 9572
fronting along Highway 46 within said limits.

6.   Traffic signals shall be installed at the intersection
of Valley Rose Parkway and Highway 46, when traffic counts
at the intersection meet the minimum volume required to
satisfy the standard set forth in the California Department
of Transportation (Cal Trans) Traffic Manual for p.m. peak
hour rural signal warrants.

A 01094

## SANITARY SEWER IMPROVEMENTS

At lease one wet well in the sewer pump station and the entire length of one force main will be required as part of Area A, Tract No. 5472 and Tract No. 5618. The Sewer Pump Station and Force Main Alternate set forth at Page 3, Section 6.0 of the Valley Rose Master Sewer Plan dated _____, 1992 shall be used. The design capacity for the force main and the initial capacity for the sewer pump station are set forth in said Master Sewer Plan and its appendices.

## ALL OTHER AREAS

As is set forth in the appropriate section of the body of the Development Agreement - The Legacy Group.

H:707011TK.E1A

9/30/92                                    2

A 01095

## EXHIBIT "C"
### (Development Cost)

1. **Traffic Signal Cost Share**

   (a)  Route 46/Valley Rose Parkway      - 100%

   (b)  Route 46/"J" Street               - To be
                                            determined

   (c)  Route 43/Kimberlina               - To be
                                            determined

   (d)  Route 46/Leonard Avenue           - To be
                                            determined

   (e)  Route 46/Central Avenue           - To be
                                            determined

2. **Current Sewer Facilities Charges**

   Treatment Plant charges collected prior to building
   permit issuance.

   (a)  Single Family Residential and Multiple   $1,220.00
        Family Units                              per unit

   (b)  Mobilehomes in mobilehome parks            870.00
        and apartments                            per unit

   (c)  Motels                                     435.00
                                                  per unit

   (d)  Commercial and Industrial                    3.00
                                                  per GPD of
                                                  effluent

3. **Current Water Facilities**

   (a) Water Development Reimbursement
       for usage by others of well
       capacity developed by subdivider      $208.00/gpm
       and not required by his               of well excess
       subdivisions.                         capacity to be
                                             paid by others.
                                             Reimbursement to be based
                                             on   actual   cost   of
                                             facilities   varified   by
                                             the   City   Engineer   from
                                             paid invoices.

4. **Refuse Container Charge**

   Charge shall be City's cost for said container at the
   time of Final or Parcel map recordation.  The current
   charge is $87.00 for a 90 gallon container.

# 'REVISED'
## TENTATIVE TRACT MAP No. 5472



A 01097

# TENTATIVE TRACT MAP No. 5618



A 01098

IN WITNESS WHEREOF, this Agreement has been executed by the parties on the day and year first above written, as authorized by Ordinance No. 92-381 __ of the City Council.

City:

Developer:

The City of Wasco, a municipal corporation

the Legacy Group, L.P. a California Limited Partnership

Mayor of the City of Wasco
City of Wasco

General Partner and
Its Duly Authorized Agent

Attest:

By: D. Gibson
City Clerk

APPROVED AS TO FORM

FOR Richard K. Hargrove
Special Counsel

710300TK.A1L

10/16/92

44

A 01099

EXHIBIT "C"



the city of
**Wasco**
ROSE CAPITAL OF THE NATION

764 "E" Street  P.O. Box 836  Wasco, California 93280
Fax (661) 758-7239

March 15, 2005

Lotus Development
2278 Trade Zone Blvd.,
San Jose, CA 95131

RE:  Tentative tract Map 6451

Dear Sirs:

Please be advised that at 7:00 P.M. on March 14, 2005 the City of Wasco
Planning Commission reviewed the above-mentioned requests for  Tentative Tract Map
6451, which was initiated by you. The Planning Commission approved the request. There
is a fourteen (14) day appeal period (starting from the date of receipt of this letter). Any
appeals must be made in writing within that time frame and be submitted to the City
Clerk.

If you have any questions please call 758-7210, thank you.

Sincerely,

Dennis McNamara
Associate Planner

Enclosure: Resolution

*— The City with a rosy future —*

| Engineering | Building | Planning & Zoning | Police Services | Public Works | City Administration | City Clerk Personnel | Animal Control | Dial-a Ride | Finance | Utilities |
|---|---|---|---|---|---|---|---|---|---|---|
| 758-7208 | 758-7250 | 758-7210 | 758-7266 | 758-7270 | 758-7280 | 758-7215 | 758-7240 | 758-7222 | 758-7235 | 758-7230 |

A 01894

RESOLUTION NO.    05–10
A RESOLUTION OF THE PLANNING COMMISSION OF THE CITY OF
WASCO IN THE MATTER OF THE APPLICATION OF LOTUS
DEVELOPMENT FOR TENTATIVE TRACT 6451

WHEREAS, Lotus Development, filed an application requesting approval of a sixty eight (68) lot single family subdivision on the parcel hereinafter described; and

WHEREAS, Pursuant to the California Government Code, Title 7, Section 65000, et seq., the City Council of the City of Wasco has adopted a General Plan and an official Zoning Ordinance of the City of Wasco; and

WHEREAS, the Planning Commission, through its clerk, did set, Monday March 14, 2005, at the hour of 7:00 p.m. in the Council Chambers of City Hall, 746 8th Street, Wasco California as the time and place of a public hearing before the Planning Commission on said application and accompanying proposed environmental document, and notice of public hearing was given in the manner provided in Title 17 of the Wasco Municipal Code; and

WHEREAS, the parcel of said real property is described as follows:
APN 487-050-46

WHEREAS, said application has been made in the form and manner prescribed by the Zoning Ordinance and is on file with the Secretary of this Commission, designated below, and reference is hereby made thereto for further particulars; and

WHEREAS, said notice of public hearing has been duly and timely conducted, during which the proposal was explained by a representative of the Planning Department and all persons desiring were duly heard; and

WHEREAS, for the above described project, and Initial Study was conducted and it was determined that the proposed project would not have a significant effect on the environment, therefore, a Mitigated Negative Declaration, was prepared for this project in accordance with CEQA; and

WHEREAS, before making any findings on said environmental document or any consideration of the proposal on its merits, this Commission called for objections or comments on said environmental document; and

WHEREAS, the proposed is deemed to be reasonable and in the interest of the general health, safety, aesthetics and welfare of the community, as conditioned; and

A 01895

During said hearing, this Commission duly considered the adequacy and scope of said environmental and therefore reviewed and considered the information therein contained with respect of the merits of the matters under consideration; and

This Commission has considered the recommendation of the Planning Department and all the testimony presented during said public hearing, after which the public hearing was concluded.

**NOW, THEREFORE, BE IT RESOLVED BY THE PLANNING COMMISSION OF THE CITY OF WASCO AS FOLLOWS:**

**A. FINDINGS:**

1. The applicable provisions of the California Environmental Quality Act, and the Subdivision Map Act have been duly observed in conjunction with said hearing in the consideration of this matter and of all the previous proceedings related hereto. Per CEQA Guidelines, a Mitigated Negative Declaration was circulated for the required thirty day comment period, after which time staff determined there were no objections to the proposed Mitigated Negative Declaration.

2. The project is in an urbanized zone so therefore the effect upon the environment of such project and the activities and improvements which may be carried out thereunder will not be substantial and will not interfere with the maintenance of a high quality environment now or in the future.

3. The project has adequate water, sanitary sewer and storm drain infrastructure and will not cause an undue burden on infrastructure.

4. The proposed project complies with all the provisions set forth in the City of Wasco General Pan and Zoning Ordinance.

**B. DECISION:**

Based on the findings of fact and determinations, it was moved by Commissioner Santillan and seconded by Commissioner Voth to approve the project request as submitted subject to the found in the staff report and map.

**A 01896**

Dated: March 14, 2005

_Danny Brown, Chairman_

I, RACHEL RODRIGUEZ, Planning Secretary of the City of Wasco hereby certify the foregoing Resolution was approved, adopted, and passed by the body on the 14th day of March, 2005 by the following vote:

AYES: Commissioners Brown, Arredondo, Santillan, Steward, Voth
NOES: none
ABSENT: Commissioners Hunt, Mitchell
ABSTAIN: NONE

_Rachel Rodriguez, Planning Secretary_

A 01897

## CITY OF WASCO PLANNING DEPARTMENT
## STAFF REPORT
## TENTATIVE TRACT 6451

**FILE:**  Tentative Tract 6451

**APPLICANT:**  Lotus Development
2278 Trade Zone Blvd.
San Jose CA 95131

**PROPOSAL:**  68 lot single family lot subdivision.

**LOCATION:**  The project is located approximately one quarter mile northwest of
the intersection of Highway 46 and Leonard Avenue

**CEQA:**  Mitigated Negative Declaration

**GENERAL PLAN:**
The City of Wasco General Plan shows the site to be designated as **Low Density
Residential** and the surrounding areas are designated as follows:

| | |
|---|---|
| North: | Low Density Residential and Estate Residential |
| East: | Parks and Open Space |
| South: | Community Retail and Neighborhood Commercial |
| West: | Low Density Residential |

**ZONING:**
The City of Wasco Zoning Ordinance shows the site to be Zoned Designations,
**R-1-6(Low Density Residential 6,000 sq.ft. lots)** and the surrounding land as follows:

| | |
|---|---|
| North: | R-1-8 (Low Density Residential 8,000 square foot lot) and Estate Residential |
| West: | R-1-8 (Low Density Residential 8,000 square foot lot) |
| East: | O-S (Recreation Open Space) |
| South: | N-C (Neighborhood Commercial) |

**APN#:**  487-050-46

**EXHIBITS:**

| | |
|---|---|
| Exhibit "A" | Regional Location Map |
| Exhibit "B" | Land Use – General Plan |
| Exhibit "C" | Land Use – Zoning |
| Exhibit "D" | Tentative Tract #6451 |

**A 01898**

**ANALYSIS –Tentative Tract 6451 (Exhibit "D"):**

Tentative Tract 6451 is a sixty eight (68) lot detached single family subdivision. The project was previously mapped as Tentative Tract 5472, which was never recorded and therefore expired. However, upon approval of Tract 5472, the previous developer commenced to put in improvements which were never formally accepted by the City of Wasco. These improvements include: streets, sidewalks, curb and gutter, storm drain, sewer, water and dry utilities.

**ALL DEVELOPMENT SHALL BE REQUIRED TO COMPLY WITH THE STANDARDS SET FORTH IN THE GENERAL PLAN, ZONING ORDINANCE AND SUBDIVISION ORDINANCE IN ADDITION TO ANY CONDITIONS REQUIRED BY EFFECTED AGENCIES.**

**STAFF RECOMMENDATION:**

Staff recommends approval of Tentative Tract 6451 with the following conditions:

**GENERAL**

1) The applicant(s), at their sole cost and expense, shall defend, indemnify and hold harmless the City of Wasco, its agents, legislative body, officers or employees in any legal or administrative action, claim or proceeding concerning approval of Tentative Tract 6451: or, at its election and in the alternative, shall relinquish such approval. The applicant(s) shall assume the defense of the City in any such legal or administrative action, claim or proceeding with legal counsel paid for in the entirety by the applicant(s), but subject to the City's reasonable approvals. The applicant shall also reimburse the City, its agents, its legislative body, officers or employees for any judgments, amounts paid in the settlements court costs and attorneys' fees which the City, its agents, legislative body, officers or employees may be required to pay at court as a result of such action, claim or proceeding. The City may, at its sole discretion, participate at its own expense in the defense of any such action, claim or proceeding, but such participation shall not relieve the applicant(s) of their obligations under this condition.

2) A copy of a current Preliminary Title Report shall be submitted to the Planning Department by the applicant prior to submittal of any improvement plans or final map;

3) The following disclosure shall be given as part of the transfer of ownership: "If your real property is near property used for agricultural or golf course operations, you may be subject to inconveniences or discomforts arising from such operations on any 24 hour basis. Said discomforts may include, but not be limited to equipment noises, loud voices, stray golf balls, odors from manure or other chemicals, and dust or smoke. The City of Wasco has determined that the use of real property for agricultural operations is a high priority and favored use to the City and the County

**A 01899**