and will not be considered a nuisance for those inconveniences or discomforts arising from agricultural operations, provided such operations are consistent with accepted customs, standards and laws."

4) The subdivider, or general contractor, shall submit a list of all contractors and/or subcontractors performing work on this project to the office of the Finance Director and such contractors and subcontractors shall obtain valid business licenses to do business and/or work in the City of Wasco.

5) The subdivider shall participate in the provision of funding to maintain police services by voting to approve a Special Tax for the Parcels created by this subdivision. The Special Tax shall be the per parcel amount (with appropriate future CPI adjustment) as established at the time of voting by the City Council. The election to provide for the Special Tax shall be completed prior to the transfer of any of the parcels in the subdivision from the subdivider to any person. The property owner shall be responsible for paying the cost of holding the election, payable at the time the election is requested by the owner. The tax shall be due at the time specified in the ordinance imposing the tax.

6) Until all portions of the subdivision have been completed, all vacant and undeveloped land shall be maintained within the boundaries of the subdivision in a weed free and clean manner by the property owner. Should any property not be so maintained, the City shall notify the property owner that the property is to be cleaned within thirty (30) days of receipt of said notice. If the property owner does not comply within the required time frame, the City may then clear the land and bill the property owner for the expenses incurred.

A-PDF Split DEMO : Purchase from www.A-PDF.com to remove the watermark

7) This Tentative Tract shall expire twenty-four (24) months from the date of approval by the City Council, unless an extension is granted by the City Council. Should an extension be requested, the applicant, not less than sixty (60) days prior to the expiration date, shall submit to the City in writing, a request for an extension of time in accordance with the provisions of City Code;

8) The applicant shall provide written documentation form the Division of Oil and Gas that there are no abandoned wells in the proximity of the project site. If there are abandoned wells in the area, the applicant should obtain written approval from the Division of Oil and Gas for the construction of any roadway over or in the proximity of an abandoned well location. Any habitable structures shall be set back per the requirements of the Division of Oil and Gas;

9) The applicant shall obtain a State Water Resources Control Board Permit for Construction prior to the approval of the grading plan;

10) The applicant shall pay all development fees adopted by the City in effect at the time of issuance of any building permits including but not limited to Quimby fees, school fees, plan check fees and recordation fees;

A 01900

11) The applicant shall comply with the latest Uniform Building Code, Uniform Mechanical Code, Uniform Plumbing Code, National Electric Code and all other applicable codes, ordinances, regulations and development standards in effect at the time of issuances of relative permits;

12) If the developer's engineer utilizes computer assisted design drafting for the final map and the subdivision improvement plans, then prior to recordation of the map, the developer's engineer shall ensure a disk with said information, in a format compatible with the City's computers, to the City Engineer;

13) **THE APPROVED SET OF CONDITIONS SHALL BE POSTED AT THE JOB SITE AT ALL TIMES.**

## PLANNING DEPARTMENT

1) Installation of all tract improvements shall be completed within one year from date of filing of the final map unless a time extension is granted by the City Council. The recording of any final map shall be in accordance with the Subdivision Map Act and the Wasco Municipal Code.

2) The Developer shall place the entire subdivision within a Landscape and Lighting Maintenance District, prior to the acceptance of Phase 1 improvements by the City. The developer shall be required to maintain all landscaping, including the replacement of any trees or shrubs that do not survive, within the public right-of-way and landscape easements for a period of six months after final inspection of the landscape improvements. The Developer shall be fully responsible for the formation of the Landscape and Lighting Maintenance District, as directed by the City Engineer. The developer shall be fully responsible for paying the cost of the water for all landscaping and electricity for the street lights until such time as the maintenance district is formed.

3) The subdivider shall submit a copy of Covenants, Conditions and Restrictions (CC&R's) to the Planning Director and City Attorney prior to recordation of the final map or any phase of the final map. If City staff determines that said CC&R's result in any inconsistencies with City Ordinances, the City General Plan, or City development standards, said CC&R's shall be amended to eliminate any such inconsistency. Once the CC&R's are accepted by the City, none of the portions thereof shall be amended, modified or changed without first obtaining the written consent of the City.

4) The City of Wasco, per Section 17.19.01(N) requires site plan review for each residence prior to the issuance of building permits. The following residential design criteria shall be included with each site plan:
   - The applicant shall be required to construct all fencing to the City of Wasco standards. Please see staff for details.

**A 01901**

- Prior to the issuance of each building permit the developer shall submit a site plan to the City Planning Department for review and approval and prior to any foundations being poured. The site plan must reference the floor plan layout and building elevations, including exterior building materials and colors, for each of the single family residences built.
- A color pallet shall be approved by the Planning Department prior to the construction of any house at the time of site plan review.
- Lots deeper than 100 feet shall have a minimum five (5) foot variation in the front yard setback from twenty-five (25) to thirty (30). No more than two houses with the same front yard setback shall be placed on adjacent lots.
- All roofs shall be of a concrete tile, approved shake or twenty five (25) year minimum architectural style composite shingle.
- A minimum of fifteen (15) percent of the houses within the approved subdivision shall have concrete or approved tile roofs.
- All exterior wall elevations of buildings and screen walls shall have architectural treatments enhancing building appearance. Uniform materials and consistent style should be evident within a development in all exterior elevations. Secondary materials should be used to highlight building features and provide visual interest.
- All houses within the subdivision shall provide decorative lighting on both sides of the garage or shall provide lighting under the eave of the garage.
- Residential mechanical equipment shall be placed on the ground and screened from public view.
- The second story of a two story residence shall be offset to the rear of the first floor.
- If fencing is installed in the front yard setback, said fencing shall not exceed three and one half feet (3 ½) in height and shall not be chain link.
- There shall be a minimum of four (4) building footprints and a minimum of four (4) elevations per footprint.
- No two elevations shall be placed side by side within a subdivision.
- All new residential developments shall provide landscaping and automatic irrigation in the front yard area, the landscaping shall consist of sod and two trees (this does not include the tree in the public right of way).
- All trees shall be from a pre-approved list including planting instructions, from the Planning Department.
- All the landscaping and irrigation system shall be done prior to the issuance of a Certificate of Occupancy
- To the extent feasible the subdivision shall include energy conservation techniques in its' development;

5) The developer shall pay all applicable taxes, fees and charges at the rate and amount in effect at the time such taxes, fees and charges become due and payable before recordation of the final map;

**A 01902**

6) The developer shall be required to obtain all necessary permits from agencies having jurisdiction over the property being developed;

7) The subdivider shall dedicate or cause to be dedicated, appropriate easements for existing or proposed City maintained facilities if such facilities are located outside City right-of-way.

8) All easements shall be kept open and clear and free from buildings and structures of any kind pursuant to the City of Wasco Zoning Ordinance. All obstructions, including utility poles and lines, trees, pole signs or similar obstructions, shall be removed from the ultimate right of way at the time of development. Compliance with this requirement is the responsibility of the applicant and may result in significant financial expenditures.

9) The developer shall provide the City of Wasco with "can and will serve" letters from utility companies that will provide services to the proposed subdivision.

10) All public improvements shall conform to the City of Wasco Improvement Standards, and plans shall be submitted to the City Engineer for approval, prior to the Final Map approval.

11) All public improvements shall be installed prior to recordation of the subdivision map or security as deemed sufficient by the City shall be provided in accordance with the Subdivision Map Act and the City of Wasco Subdivision Ordinance;

12) The Subdivider is responsible for the design and installation of street lights. Street light locations shall be shown on the improvement plans and on the key map. Prior to acceptance of street lights for maintenance, the lights shall be tested to the satisfaction of the City/utility company with a power source provided by the contractor. The City of Wasco will own the poles and PG&E will provide the electricity;

13) Street name signs and traffic regulatory signs shall be provided by the Subdivider as required by the City Engineer, Planning Director and Public Works Director. No traffic shall be allowed onto streets until regulatory signs are in place;

14) Access shall be restricted on each final map as required by the City Engineer. Specifically this restriction shall be shown on the final map where lots back onto public streets or a belt park;

15) Developer shall meet all applicable requirements of the San Joaquin Valley Unified Air Pollution Control District including but not limited to the following:
   - **Regulation VIII:** (Fugitive PM10 Prohibitions)
   - **Rule 4103:** (Open Burning)
   - **Rule 4901:** (Wood Burning Fireplaces and Wood Burning Heaters)
   - **Rule 4902:** (Residential Water Heaters)
   - For any additional information please contact the District at (661) 326-6980

A 01903

16) The developer shall provide Cluster Mailbox Units (CBU's), placed for efficient access for all residents and Postal Service personnel. Locations must be approved by the City of Wasco Planning Department and the United States Postal Service.

17) The proposed subdivision is located in the Valley Rose Estates Zone of Benefit, therefore all applicable fees shall be collected prior to the final recordation of the last phase.

18) **The applicant is required to rename Olympic Close to Olympic Ct.**

## WATER/FIRE

1) Water line locations, sizes and materials shall be subject to the approval of the City Engineer

2) Tie-ins to existing water mains shall be constructed as directed by the City Engineer.

3) The City Engineer shall recommend the hydrant type and location. Developer shall seek approval in writing from the County Fire Marshall for hydrant locations.

4) Prior to issuance of a building permit, water mains and fire hydrants to be installed by the developer shall be tested and accepted by the Kern County Fire Department.

## BUILDING

1) No building permit, with the exception of model homes, shall be issued until this subdivision, or any phase thereof, has been recorded pursuant to the requirements of the California State Subdivision Map Act and the Wasco Municipal Code.

2) Prior to the issuance of a building permit an approved final soils report will be required.

3) Private drives shall be constructed of Portland cement-concrete and shall be constructed at a minimum width of twenty (20) feet from the edge of the public roadway pavement to the garage of each house.

4) Prior to permitting occupancy of any lot all required improvements must be completed and accepted by the City of Wasco.

A 01904

**PUBLIC WORKS:**

1) Within in any given phase of development, secondary access easements and improvements shall be provided, as directed by the City Engineer. Access roads shall be twelve (12) feet in width and surfaced with 0.4'' of Class II Aggregate Base.

2) The developer's engineer is to provide to the City of Wasco, verification of substantial compliance of any and all onsite or offsite improvements prior to acceptance by the City of Wasco.

3) Prior to review of any improvement plans, a drainage study, performed by a registered civil engineer, and a grading plan shall be submitted to and approved by the City Engineer. The drainage study shall include the ability of the existing storm water drainage basin facility to accommodate new development. Additionally, the study must demonstrate the ability of any off-site street carrying the development's storm water. Storm drainage protection and disposal of water into and from the Tract shall be by a method approved by the City Engineer;

4) Developer shall be fully responsible for any necessary expansion and/or upgrade of the proposed storm water drainage basin facility.

5) The developer's engineer shall provide a "rough grade certification" prior to the commencement of public improvements and then provide a "final grade certification" prior to the issuance of any building permit.

6) All building pads shall provide a minimum of 1% slope away from the house and to the street from all points on any one lot. The minimum pad height shall be twelve (12) inches above the adjacent curb.

7) Prior to the review of improvement plans by the Engineering Services Division of Public Works, all planning and conceptual improvements shall be obtained, and the developer shall submit the following items:
   - Preliminary Soils Report – including R-Values taken from the proposed road locations, and infiltration tests taken from the proposed basin site.
   - Preliminary Engineer's Estimate
   - Plan check and inspection fees

8) The developer shall maintain the entire project, including adjacent streets in a dust free condition at all times. This condition applies at all times including weekends, evenings and night time hours. During construction operations, cleanup of soil from the public roadways shall be required, if deemed necessary by the City Engineer.

9) All utilities proposed under paving shall be installed prior to paving. Cover over utilities shall be a depth as approved by the City Engineer in the Development Standards.

A 01905

10) Expanded intersections shall be provided as directed by the City Engineer. A traffic study may be required.

11) Sufficient street right-of-way and landscape easements shall be provided as required by City standards to accommodate the required street sections.

12) Temporary turnarounds may be required with each phase of construction, as directed by the City Engineer.

13) Property lines shall be marked with a chiseled line on the top of curb for all lot property lines. The location of all sewer laterals shall be marked on top of curb with the letter "S".

14) All new utilities shall be provided with underground services.

15) Sidewalks and parkways shall be constructed in accordance with the City's subdivision standards.

16) Monument and monument covers shall be set as determined by the City Engineer.

17) Any damaged private or public improvements shall be removed and replaced at the developer's expense in the manner directed by the City Engineer, before final acceptance.

18) Any obstructions including utilities, irrigation lines, etc., shall be removed and/or relocated, as necessary, at the expense of the subdivider.

19) A six (6) foot Public Utilities easement shall be provided on the front of all lots and on the street side of all corner lots as requested by the utility companies and the City of Wasco.

20) No final inspections shall be approved for any lot until all required improvements have been completed by the developer and accepted by the City.

21) Temporary drainage basins may be allowed as approved by the City Engineer. These basins shall be landscaped and fenced accordingly.

22) Sewer, water and storm drain mains shall be stubbed to the tract boundaries to facilitate development of adjacent properties as directed by the City Engineer.

23) All improvements, as designated or approved by the Planning Commission and shown on the marked up map presented to the Commission shall be submitted on a **Revised Tentative Map** following the Commission meeting. This map shall be used for final map checking.

A 01906

TENTATIVE TRACT 6451
LOCATION MAP
Exhibit "A"

HWY 46

SCOFIELD

McCOMBS

LEONARD

A 01907







A 01908



A 01909

Post-it® Fax Note   7671   Date 2/4/-5   # of pages ▶ 1

To Dennis McNamara     From Greg Black

Co./Dept.               Co.

Phone #                 Phone # 323.4600  7/20

Fax # 758.7239          Fax #

# CITY OF WASCO
## NEGATIVE DECLARATION

**TO WHOM IT MAY CONCERN:**

Pursuant to the California Environmental Quality Act of 1970 (CEQA) and State CEQA Guidelines, the City of Wasco Planning Department has conducted an initial study and prepared a Final Environmental Impact Report (SCH#2002051154), of possible environmental impacts of projects such as the following described project:

**APPLICANT:**
Lotus Development
2278 Trade Zone Blvd
San Jose CA 95131

**NAME OF PROJECT:**
Tentative Tract 6451

**LOCATION:**
The project is located approximately one quarter mile northwest of the intersection of Highway 46 and Leonard Avenue

**DESCRIPTION OF PROPOSED PROJECT:**
A sixty eight (68) lot single family home subdivision.

Mitigation Measures included in the proposed project to avoid potentially significant effects (if required):

A.   All applicable mitigation measures as given in the Final Environmental Impact Report (SCH#2002051154) for the City of Wasco shall be included as a part of this project;

Inclusion of Mitigation Measures as a part of the project:  I, as applicant/authorized agent, have reviewed the Mitigation Measures noted above and agree to include said measures as part of this project.

Signed: _____   Date: 2/02/05

DeWalt Corporation

**A 01910**

**FINDINGS:**

It has been found that this project, as described and proposed to be mitigated herein, will not have a significant effect on the environment and that an environmental impact report (EIR) is, therefore, not required. A brief statement of reasons supporting such findings is as follows:

1.      There does not appear to be a substantial body of opinion that considers or will consider the various anticipated environmental effects resulting from the proposed action to be adverse;

2.      The proposal would not appear to conflict with established recreational, educational, religious or scientific uses of the area;

3.      This project shall incorporate all mitigation measures recommended as part of this Mitigated Negative Declaration and the environmental effects have either been eliminated, or reduced to an acceptable level;

4.      When considering the Environmental Impact Report as it pertains to the subject proposal, and the cumulative impacts of the project, there is no substantial body of evidence before this agency that this proposed project will have any potentially adverse effect on wildlife resources, or that habitat upon which wildlife depends;

5.      As addressed in the Final Environmental Impact Report (SCH#2002051154) the City of Wasco has substantial evidence that no significant adverse impacts will occur due to the implications of urban development on the above referenced property;

**PUBLIC INQUIRY:**

Any person may object to dispensing with such EIR or respond to the findings herein. Information relating to the proposed project is on file in the office of the Planning Department at the address shown below. Any person wishing to examine or obtain a copy of that information or this document, or seeking information as to the time and manner to object or respond, may do so by inquiring at said office (located at 746 8th Street, Wasco, CA) during regular business hours on or before January 21, 2005.

A copy of the Initial Study is attached hereto.

Dated this 2nd day of January 2005

Dennis McNamara                                         Wasco Planning Department
Associate Planner                                       P.O. Box 836
                                                        Wasco, CA 93280
                                                        (661) 758-7200

**CORRESPONDENCE:**
City of Wasco Water Department – No Comment
Helt Engineering – Comment Attached
Kern County Fire Department – Comment Attached

A 01912

# EXHIBIT "D"

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA, FRESNO DIVISION

_____

ROGER McINTOSH,

No. 107CV 01080 LJO-WMW

                Plaintiff,

vs.

NORTHERN CALIFORNIA UNIVERSAL
ENTERPRISES COMPANY, et al.,

                Defendants.

_____

DEPOSITION OF JEFFREY GUTIERREZ

Taken at

Borton Petrini
1600 Truxtun Avenue
Bakersfield, California

Monday, November 24, 2008 at 10:08 A.M.

Reported by:

Naomi S. Alvarez, CSR #13007

**Certified
Copy**



KELEHER'S
Certified Shorthand Reporters
Bakersfield • Visalia • Fresno

800.635.6044

1

1                              APPEARANCES:

2

3

4

5      For the Plaintiff:

6

7           Borton Petrini, LLP

8           By MR. JAMES J. BRAZE

9                - and -

10          By MR. JEFFREY A. TRAVIS

11          5060 California Avenue, Suite 700

12          Bakersfield, CA  93301

13          (661) 322-3051

14

15

16     For the Defendant City of Wasco:

17

18          Garcia, Calderon & Ruiz

19          By MR. CHAKA C. OKADIGBO

20          500 South Grand Avenue, Suite 1100

21          Los Angeles, CA  90071

22          (213) 347-0210

23

24

25

APPEARANCES (Cont'd)

For the Defendant Northern California Universal
    Enterprises Company:


        Law Offices of Steven J. Hassing
        By MR. STEVEN J. HASSING
        425 Calabria Court
        Roseville, CA  95747
        (916) 677-1776


    Also present:
            MR. ROGER McINTOSH

```
 1                              INDEX
 2   EXAMINATION BY
                                              PAGE
 3   MR. BRAZE
                                                5
 4   MR. TRAVIS
                                               21
 5   MR. BRAZE
                                               25
 6   MR. TRAVIS
                                               27
 7   MR. HASSING
                                               47
 8   MR. OKADIGBO
                                               48
 9

10

11                         EXHIBIT INDEX

12   PLAINTIFF'S
                                             FOR ID.
13       1        Notice of Taking Deposition and      7

14                Production of Documents

15       2        E-mails
                                               19
16       3        DeWalt Corporation New Job Request   20

17                Form

18       5        Tentative Tract No. 6451
                                               29
19       6        Final Tract No. 6451
                                               29
20       4        CELSOC Contract
                                               30
21       7        CD from DeWalt Corporation
                                               50
22

23

24

25
```

1  set.  And so just from that observation, we surveyed --

2  I'll start from the outside and kind of come in.  We

3  surveyed the section, we surveyed monumentation that

4  was local to the site and adjacent to it.  We surveyed

5  monumentation that was within the site.  We surveyed

6  the curbs and gutters.  We surveyed the actual pads,

7  any visible utilities, street signs.  That's pretty

8  much it.

9      Q.    Then what did you do with that?

10     A.    After the survey, it's processed in our office

11 where a map is generated that shows all those points.

12     Q.    And where did you get the lot numbers for the

13 lots?

14     A.    I don't know.

15     Q.    And who would know that, if you know?

16     A.    It was Greg's project, so either Greg or one

17 of his draftsmen who prepared our tentative map would

18 have numbered the lots.

19     Q.    Was there -- at any time, to your knowledge,

20 did anyone compare your results with map 5472?

21     A.    I believe yes, they did.

22     Q.    Do you know who did that?

23     A.    That was probably Heith James.

24     Q.    And is he still employed by DeWalt?

25     A.    Yes.

1    Q.    And what's his position?

2    A.    He's the survey technician.

3    Q.    And do you know where he got a copy of map

4  5472?

5    A.    I think he got it from Greg.

6    Q.    And did you ever have or overhear any

7  conversations about how map 5472 compared with the map

8  that you developed from your surveys?

9    A.    No.

10    Q.    Did you hear any conversations to the effect

11  that map 5472 was used to fill in any missing

12  information on any map?

13    A.    No.

14    Q.    Other than --

15    A.    I think I need to clarify that.  I'm sorry.

16  At the time that the survey and the map was created I

17  didn't.  I wasn't aware of any.  After my conversations

18  with Joe Wu two weeks ago we pulled it out and looked

19  at it.

20    Q.    You pulled out map 5472?

21    A.    Yeah.  I pulled it out just to see what they

22  looked like.

23    Q.    Did you compare them to each other?

24    A.    Yes.

25    Q.    How would you describe that comparison?

1          Can you open those up and show me what you

2    got?

3        A.    Sure.   This is the CELSOC contract with Joe Wu

4    and that's a copy that you can keep.

5        Q.    This is the contract between and you Northern

6    California Universal Enterprises for work on the Valley

7    Rose subdivision?

8        A.    Yes.

9        Q.    Is this the only contract that was signed

10   other than the proposal that we already exhibited here?

11       A.    Yes.   And it's attached to that.

12       Q.    On the contract it says here Wasco subdivision

13   expired Tract 472.

14          Do you know what that means or why that's put

15   there?

16       A.    I think for identification purposes, what we

17   were talking about.

18       Q.    What do you mean?

19       A.    It's just an identifier so that when we refer

20   to this contract -- so we know the location.

21       Q.    When you say location, you mean -- I don't

22   know what you mean about it.

23          What do you mean by location?

24       A.    We might do other jobs for Joe in other parts

25   of the county or in the city of Bakersfield or

1          Is this identical to what was eventually

2    signed?

3       A.    I don't know.   That was probably submitted.

4    We made a copy of the submittal and put it in the file.

5    We probably got something back that was either marked

6    up -- we can obtain a copy.   It's a record now.   You

7    can get a copy from the County Recorder's.   We can get

8    that for you.

9       Q.    I didn't know if you had an actual copy of it

10   in your file.

11      A.    There's not in this file.

12      Q.    There's a lot of documents in here and I don't

13   want to have her enter in as exhibits that we already

14   have.   Anything that I want to identify and enter as an

15   exhibit we'll just do later on.   We'll waste all of our

16   time doing that.

17             MR. HASSING:   Later on today?

18             MR. TRAVIS:   Off the record.

19             (At 11:08 A.M. the deposition was continued to

20   1:06 P.M., at which time the following proceedings were

21   had:)

22             (Plaintiff's Exhibit No. 4 marked.)

23      Q.    (By Mr. Travis)   Greg, you had went ahead and

24   gotten back to your office and these are the documents

25   that we had discussed earlier.

1          Can you say again what was on this second

2   disk?

3       A.    Sure.  We have a subdirectory on our server,

4   our main drive, that we store all our electronic data

5   on.  Our auto cat files would be on that.  I noticed

6   that there's some other tif files that were probably

7   downloaded off the County's website of other maps that

8   were done in the area, research that we did.  When

9   you're working in auto cat, it's basically a big

10  database and it creates all kinds of other files.

11  They're all stored on there.  Some documents that were

12  prepared, like letters to the City.  I note there's a

13  letter from Greg to Joe.  Word documents are on that

14  disk.

15          MR. TRAVIS:  We'll go ahead and mark it as

16  seven, since you've already told us what was on there.

17          (Plaintiff's Exhibit No. 7 marked.)

18          MR. OKADIGBO:  I have one more question.

19      Q.    (By Mr. Okadigbo)  You mentioned that you

20  talked to Joe Wu at one point about a copy of tentative

21  map 6412 or something like that; is that right?

22      A.    Yes.

23      Q.    Did you say that he asked you for a copy of

24  that?

25      A.    Yes.

1      Q.    Did you give him a copy of that?

2      A.    Yes.

3            MR. TRAVIS:  When you said 6412 did you mean

4      6412 or 6451?

5      A.    6451.  It was this map.

6            MR. TRAVIS:  And that's also going to go into

7      our stipulation later on, that you're going to receive

8      a copy of your deposition transcript so you'll be able

9      to look at it and make any changes such as

10     typographical errors or otherwise.

11           MR. HASSING:  You're going to get a letter

12     from the court reporter indicating you can come in to

13     her office and review it.  You won't actually get a

14     copy.  Isn't that the way we've been doing it?

15           Off the record.

16           (Discussion off the record.)

17           MR. TRAVIS:  We'll just relieve the court

18     reporter of her duties and then send it to us.

19           Was it 30 days, I think, we had.

20           MR. OKADIGBO:  Copy.

21           MR. HASSING:  Copy.

22           (At 2:03 P.M. the deposition of Jeffrey

23     Gutierrez was concluded.)

24                    _____

25

**COPY**

# DEWALT CORPORATION
# NEW JOB REQUEST FORM

**DATE** _Sept 7 2004_                     **JOB NUMBER** _2004.49_
**SURVEY FILE NEEDED** _Yes_              **PROJECT MANAGER** _GoB_

**CLIENT** _Northern California Universal Enterprise Company (NCUE)_
**STREET ADDRESS** _300 "B" Street_
**CITY, STATE, ZIP** _Turlock, CA  95380_
**ATTN:** _Joe Wu_                         e-mail:
**TELEPHONE:** _(209) 669-0606_   **FAX:** _(209) 669-0778_   **CELL:**
**DESCRIPTION OF JOB:**
_Topographic Survey, Tentative Map, Final Map, Monument & Lot Corner Installation_

**LOCATION:** Section: _4_   Township: _27S_   Range: _14E_   Base & Meridian: _M. D._

**TYPE OF BILLING:**
- ☒ Lump Sum
- ☐ Unit Price  $_____ per _____
- ☐ Time & Materials with Estimated Fee
- ☐ Time & Materials Not To Exceed  $_____
- ☐ Other _____

**PROJECTED FEE INCOME:**   $ _26,000_
(Amount of Contract or Estimated Fees)

**CONTRACT STATUS:**
- ☒ Executed Letter Agreement Dated: _9/2/04_ (Attached).
- ☐ Attached Proposal / Contract Dated _____ sent to Client
  Verbal Authorization Received on _____
- ☐ Awaiting Client Produced Contract / Letter of Authorization.
- ☐ Other: _____

**COMMENTS:** _____
_____
_____
_____
_____

_____     _9/7/04_
**PROJECT MANAGER SIGNATURE**          **DATE**

KFM>PM\LOTUS3-1\NEW JOB.WK4

**PLAINTIFF'S EXHIBIT**
_3_ _(11.24.08)_
PENGAD 800-631-6989
Jeffrey Gutierrez

3-0001

07/21/2004  10:57  t  2348/4          DEWALT                            PAGE  01

EXHIBIT 'A'

# DEWALT
## Corporation

■ ENGINEERING   ■ PLANNING   ■ SURVEYING   ■ LAND DEVELOPMENT   ■ CONSTRUCTION MANAGEMENT

July 21, 2004

04-01P

**NORTHERN CALIFORNIA UNIVERSAL ENTERPRISE CO.**
300 "B" Street
Turlock, CA 95380
FAX:   209.669.0498

Attn:  Mr. Jess Marinia

Re:   **Wasco Subdivision – Expired Tract 5472**
      Proposal for Planning / Engineering / Surveying / Professional Services

Dear Mr. Marinie,

DeWalt Corporation is pleased to provide this proposal for the following Planning, Engineering, and Surveying services for the property on Valley Rose Park Way in the City of Wasco, County of Kern. You will recall that the Tentative Map for Tract 5472 was approved with conditions at one point in time. Many of the conditions of approval with regard to infrastructure improvements to the site in question were completed, yet the Tentative Map was allowed to expire before recordation. Find below the various services that DeWalt Corporation proposes to provide to you for this project and their associated costs:

## TOPOGRAPHIC SURVEY:

Topographic survey will be performed in such a manner as to gather data which will be used for planning or engineering purposes. Please note that prior to the commencement of survey we will require a current (less that 30 days old) preliminary title report.

- Research existing horizontal and vertical monumentation with the Kern County Surveyor.
- Research existing infrastructure improvement plans with the Kern County Resource Management Agency, City of Wasco and any other related utility companies and service districts.
- Perform a boundary survey of the site, corroborating the existence of property corners and defining the site boundary. During the course of the Boundary portion of the survey, we will also devote time to identifying any encroachment of the property lines.
- Perform a topographic survey of the existing pads, street and infrastructure improvements. Pad certification will be desired for proof of flood and grading plan conformance with County of Kern.
- Process and transfer the survey data for entry into electronic drafting software (AutoCAD) for the purposes of preparing the topographic survey plat.
- Dissemination of the Preliminary Title Report and identification of easements, licenses and recorded documents that encumber the property in question.
- Drafting and review of topographic survey plat.
- Validation and Certification of survey by a licensed land surveyor.
- Cost :

$7,500.00

Agreed and Understood:

By: _____
Title:   PRESIDENT       Date: _____

1020 22ND STREET BAKERSFIELD, CA 93301 (805) 321-4600  •  FAX (805) 325-4874

3-0002

07/21/2004  16:57   2234574                          DEWALT                          PAGE  02

## TENTATIVE MAP:

- Meetings with the Owner to discuss development plans / proposed layout / phasing
- Meetings with County Staff to discuss development options, scheduling and fees
- Preparation of Boundary and Easement Map from Record Data and available Title Information
- Prepare and Process Tentative Subdivision Map and Application Package
- Assist in coordination and completion of Tentative Map approval studies and mitigation measures
- Present Tentative Subdivision Map to Governing Bodies for Consideration and Action
- **Cost :**

$5,500.00

Agreed and Understood:

By:
Title:                    president                  Date:

Upon approval of the Tentative Map, DeWalt Corporation and the owner will review and consider the conditions of approval. There may be items in the conditions of approval that will require DeWalt Corporation to engineer and process construction plans for approval by the County of Kern. Costs for these plans are un-determinable at this time and are not a part of this proposal.

## FINAL MAPS:

- Prepare Final Subdivision Map for Recordation
- Process County Improvement Agreements if required
- Prepare legal descriptions as needed
- **Cost :**

$5,500.00

Agreed and Understood:

By:
Title:                    president                  Date:

## SURVEYING SERVICES:

- Surveying for Centerline Monument and lot corner installation
- **Cost :**

$7,500.00

Agreed and Understood:

By:
Title:                    president                  Date:

M:\Proposals\DWC\INCUBICA\Wasco-ttm-FM-eng-survproposal.doc

3_0003

Client Initials / Consultant Initials

This form of agreement is distributed by:

**⚒ CELSOC**
CONSULTING ENGINEERS AND
LAND SURVEYORS OF CALIFORNIA

**AGREEMENT BETWEEN CLIENT AND CONSULTANT**
This form of agreement (Form A) was developed by the Consulting
Engineers and Land Surveyors of California and is intended primarily
for the use of CELSOC members and may not be reproduced without
the permission of the Consulting Engineers and Land Surveyors of
California. © 2003, 2001, 1998, 1994, 1991, 1989, 1987, 1984, 1982,
1979, 1978, 1975, 1973, 1970, 1967.

*Notice: This form of agreement is copyrighted by CELSOC and is only printed by CELSOC on security paper, which has the CELSOC logo background design.*

Project No. __2004-49__

Agreement entered into at __Bakersfield__ on this date of __7 Sept 2004__, by and between:

Client: __Northern California Universal Enterpise__Consultant: __DeWalt Corporation__

Name __Mr. Joe Wu__                            Name __Jeffrey A Gutierrez__

Address __300 'B' Street__                      Address __1930 22nd Street__
        __Turlock, Ca 95380__                            __Bakersfield, Ca 93301__

Phone: __209-669-0606__    Fax __209-669-0498__    Phone __661-323-4600__    Fax __661-323-4674__

email _____              Email __jag@dewaltcorp.com__

                                            License No. __PLS 7595__

### Client and Consultant agree as follows:
A.  Client retains Consultant to perform services for:

   **WASCO SUBDIVISION-EXPIRED TRACT 5472**
   hereinafter called "project."

B.  Consultant agrees to perform the following scope of services:
   **TOPO SURVEY**
   **TENTATIVE MAP**
   **FINAL MAPS**
   **SURVEYING SERVICES**

C.  Client agrees to compensate Consultant for such services as follows:

   **LUMP SUM $26,000.00**

D.  This agreement is subject to the Provisions of Agreement contained in paragraphs 1 through 52, and the provisions of the exhibits attached hereto and made a part hereof. (List exhibits below.)

   **EXHIBIT 'A' SIGNED LETTER OF PROPOSAL**



PLAINTIFF'S
EXHIBIT
4 (11.24.08)
Jeffrey Gutierrez

Form A                            Page 1 of 9

4-0001



## PROVISIONS OF AGREEMENT

Client and Consultant agree that the following provisions shall be part of this agreement:

1. Client and Consultant agree to cooperate with each other in order to fulfill their responsibilities and obligations under this agreement. Both Client and Consultant shall endeavor to maintain good working relationships among members of the project team.

2. This agreement shall be binding upon the heirs, executors, administrators, successors and assigns of Client and Consultant.

3. This agreement shall not be assigned by either Client or Consultant without the prior written consent of the other.

4. This agreement contains the entire agreement between Client and Consultant relating to the project and the provision of services for the project. Any prior agreements, promises, negotiations or representations not expressly set forth in this agreement are of no force or effect. Subsequent modifications to this agreement shall be in writing and signed by both Client and Consultant.

5. Consultant's or Client's waiver of any term, condition or covenant shall not constitute the waiver of any other term, condition or covenant. Consultant's or Client's waiver of any breach of this agreement shall not constitute the waiver of any other breach of the agreement.

6. If any term, condition or covenant of this agreement is held by a court of competent jurisdiction to be invalid, void or unenforceable, the remaining provisions of this agreement shall be valid and binding on Client and Consultant.

7. This agreement shall be governed by and construed in accordance with the laws of the State of California.

8. If the scope of services includes Consultant's assistance in applying for governmental permits or approvals, Consultant's assistance shall not constitute a representation, warranty or guarantee that such permits or approvals will be acted upon favorably by any governmental agency.

9. Upon Consultant's request, Client shall execute and deliver, or cause to be executed and delivered, such additional information, documents or money to pay governmental fees and charges which are necessary for Consultant to perform services pursuant to the terms of this agreement.

10. Client acknowledges all reports, plans, specifications, field data and notes and other documents, including all documents on electronic media, prepared by Consultant are instruments of service, and shall remain the property of Consultant and may be used by Consultant without the consent of Client. Upon request and payment of all costs involved, Client is entitled to a copy of all final plans and specifications for use in connection with the project for which the plans and specifications have been prepared. Client acknowledges that its right to utilize final plans and specifications and the services of Consultant provided pursuant to this agreement will continue only so long as Client is not in default, pursuant to the terms and conditions of this agreement, and Client has performed all its obligations under this agreement.

11. Client agrees not to use or permit any other person to use plans, specifications, drawings, cost estimates, reports or other documents prepared by Consultant which plans, specifications, drawings, cost estimates, reports or other documents are not final and which are not signed and stamped or sealed by Consultant. Client shall be responsible for any such use of non-final plans, specifications, drawings, cost estimates, reports or other documents not signed and stamped or sealed by Consultant. Client hereby waives any claim for liability against Consultant for such use. Client further agrees that final plans, specifications, drawings, cost estimates, reports or other documents are for the exclusive use of Client and may be used by Client only for the project described on page 1 of 9 of this agreement. Such final plans, specifications, drawings, cost estimates, reports or other documents may not be changed or used on a different project without written authorization or approval by Consultant. If signed check-prints are required to be submitted with a stamp or seal, they shall not be considered final for purposes of this paragraph.

2. In accepting and utilizing any drawings, reports and data on any form of electronic media generated and furnished by Consultant, Client covenants and agrees that all such electronic files are instruments of service of Consultant, who shall be deemed the author, and shall retain all common law, statutory law and other rights, including copyrights.

Client agrees not to reuse these electronic files, in whole or in part, for any purpose or project other than the project that is the subject of this agreement. Client agrees not to transfer these electronic files to others without the prior written consent of Consultant. Client further agrees to waive all claims against Consultant resulting in any way from any unauthorized changes or reuse of the electronic files for any other project by anyone other than Consultant.

Client and Consultant agree that any electronic files furnished by either party shall conform to the CADD specifications listed in Exhibit _____. Any changes to the CADD specifications by either Client or Consultant are subject to review and acceptance by the other party. Additional services by Consultant made necessary by changes to the CADD or other software specifications shall be compensated for as additional services.

Electronic files furnished by either party shall be subject to an acceptance period of fifteen (15) days during which the receiving party agrees to perform appropriate acceptance tests. The party furnishing the electronic file shall correct any discrepancies or errors detected and reported within the acceptance period. After the acceptance period the electronic files shall be deemed to be accepted and neither party shall have any obligation to correct errors or maintain electronic files.

Client is aware that differences may exist between the electronic files delivered and the printed hard copy construction documents. In the event of a conflict between the signed construction documents prepared by Consultant and electronic files, the signed and stamped or sealed hard copy construction documents shall govern.

In addition, Client agrees, to the fullest extent permitted by law, to indemnify and hold harmless Consultant, its officers, directors, employees, agents and subconsultants against all damages, liabilities or costs, including reasonable attorneys' fees and defense costs, arising from any changes made by anyone other than Consultant or from any reuse of the electronic files without the prior written consent of Consultant.

Under no circumstances shall delivery of electronic files for use by Client be deemed a sale by Consultant, and Consultant makes no warranties, either express or implied, of merchantability and fitness for any particular purpose. In no event shall Consultant be liable for indirect or consequential damages as a result of Client's use or reuse of the electronic files.

13. Consultant makes no representations concerning soils or geological conditions unless specifically included in writing in this agreement, or by amendments to this agreement, and shall not be responsible for any liability that may arise out of the making of or failure to make soils or geological surveys, subsurface soils or geological tests, or general soils or geological testing.

14. Client acknowledges Consultant has the right to complete all services agreed to be rendered pursuant to this agreement. In the event this agreement is terminated before the completion of all services, unless Consultant is responsible for such early termination, Client agrees to release Consultant from all liability for services performed. In the event all or any portion of the services by Consultant are suspended, abandoned, or otherwise terminated, Client shall pay Consultant all fees and charges for services provided prior to termination, not to exceed the contract limits specified herein, if any. Client acknowledges if the project services are suspended and restarted, there will be additional charges due to suspension of the services which shall be paid for by Client as extra services pursuant to paragraph 29. Client acknowledges if project services are terminated for the convenience of Client, Consultant is entitled to reasonable termination costs and expenses, to be paid by Client as extra services pursuant to paragraph 29.

If the scope of services to be provided by Consultant pursuant to the terms of this agreement includes an ALTA survey, Client agrees that Consultant may sign one of the ALTA survey statements attached to this agreement and incorporated herein by reference. In the event Consultant is required to sign a statement or certificate which

Form A                                      Page 3 of 9

4-0003

differs from the ALTA survey statements contained in the attachment to this agreement, Client hereby agrees to indemnify and hold Consultant harmless from any and all liability arising from or resulting from the signing of any statement which differs from those statements contained in the attachment to this agreement.

16. If the scope of services to be provided by Consultant pursuant to the terms of this agreement includes the preparation of grading plans but excludes construction staking services, Client acknowledges that such staking services normally include coordinating civil engineering services and the preparation of record drawings based upon information provided by others, and Client will be required to retain such services from another consultant or pay Consultant pursuant to this agreement for such services as extra services in accordance with paragraph 29.

17. Unless the scope of services to be provided by Consultant expressly includes Consultant's assistance in determinations regarding the application of prevailing wages, Client and Consultant acknowledge that it is Client's exclusive responsibility to determine whether the project, which is the subject of this agreement, is a "public work" as defined in California Labor Code Section 1720, or whether prevailing wage rates are to be paid to certain workers in connection with the project, or determine the rate of prevailing wages to be paid certain workers. Consultant will develop its schedule of labor rates in reliance on the determinations of Client. In the event of a dispute regarding whether the project is a "public work", whether prevailing wages are to be paid, or the amount of prevailing wages to be paid to individual workers, Client agrees to pay Consultant for any and all additional costs and expenses (including additional wages, penalties & interest) incurred by Consultant and further agrees to the maximum extent permitted by law to defend, indemnify and hold harmless Consultant, its officers, directors, employees, agents and subconsultants from all damages, liabilities or costs, including reasonable attorneys' fees and costs, arising from or related to the Client's determinations regarding the application of or payment of prevailing wages.

18. If the scope of services contained in this agreement does not include construction-phase services for this project, Client acknowledges such construction-phase services will be provided by Client or by others and Client assumes all responsibility for interpretation of the contract documents and for construction observation and supervision and waives any claim against Consultant that may in any way be connected thereto. In addition, Client agrees to indemnify and hold Consultant harmless from any loss, claim, or cost, including reasonable attorneys' fees and costs of defense, arising or resulting from the performance of such services by other persons or entities and from any and all claims arising from the modification, clarification, interpretation, adjustments or changes made to the contract documents to reflect changed field or other conditions, except for claims arising from the sole negligence or willful misconduct of Consultant.

19. If the scope of work of Consultant includes the rendition of professional services for a project which is a common interest development subject to the provisions of Civil Code section 1375, Client agrees to reimburse Consultant for all costs associated with Consultant's participation in the pre-litigation process described in Civil Code section 1375. Further, Client agrees to pay Consultant's fees for time incurred participating in the pre-litigation process. These fees and costs shall be paid as extra services in accordance with paragraph 29. Such extra services shall be paid at Consultant's normal hourly rates in effect at the time Consultant participates in the pre-litigation process. For purposes of this paragraph, a "common interest development" shall be a common interest development as defined in Civil Code section 1375.

Client agrees, to the maximum extent permitted by law, to defend, indemnify and hold harmless Consultant, its officers, directors, employees, agents and subconsultants from all damages, liabilities or costs, including reasonable attorneys' fees and costs, arising from or related to Consultant's participation in the pre-litigation process pursuant to Civil Code section 1375.

Client agrees that if Client receives a Notice of Commencement of Legal Proceedings pursuant to Civil Code section 1375, Client will notify Consultant within 10 days of Client's receipt of the Notice of Commencement of Legal Proceedings, provided the Notice of Commencement of Legal Proceedings either identifies Consultant as a potentially responsible party or the face of the Notice contains information which identifies Consultant's potential responsibility. If Client does not timely notify Consultant, then Client agrees, to the maximum extent permitted by law, to defend, indemnify and hold harmless Consultant, its officers, directors, employees, agents

and subconsultants from all damages, liabilities or costs, including reasonable attorneys' fees and costs, arising from or related to Client's failure to timely notify Consultant.

20. Consultant shall be entitled to immediately, and without notice, suspend the performance of any and all of its obligations pursuant to this agreement if Client files a voluntary petition seeking relief under the United States Bankruptcy Code or if there is an involuntary bankruptcy petition filed against Client in the United States Bankruptcy Court, and that petition is not dismissed within fifteen (15) days of its filing. Any suspension of services made pursuant to the provisions of this paragraph shall continue until such time as this agreement has been fully and properly assumed in accordance with the applicable provisions of the United States Bankruptcy Code and in compliance with the final order or judgment issued by the Bankruptcy Court. If the suspension of performance of Consultant's obligation pursuant to this agreement continues for a period in excess of ninety (90) days, Consultant shall have the right to terminate all services pursuant to this agreement.

21. This agreement shall not be construed to alter, affect or waive any design professional's lien, mechanic's lien or stop notice right which Consultant may have for the performance of services pursuant to this agreement. Client agrees to provide to Consultant the present name and address of the record owner of the property upon which the project is to be located. Client also agrees to provide Consultant with the name and address of any and all lenders who may loan money on the project and who are entitled to receive a preliminary notice.

22. If payment for Consultant's services is to be made on behalf of Client by a third-party lender, Client agrees that Consultant shall not be required to indemnify the third-party lender, in the form of an endorsement or otherwise, as a condition to receiving payment for services.

23. The Consultant shall not be required to execute any documents subsequent to the signing of this Agreement that in any way might, in the judgment of the Consultant, increase the Consultant's contractual or legal obligations or risk, or adversely affect the availability or cost of its professional or general liability insurance. Nor shall Consultant be required to sign any documents, requested by any party, including Client, that would result in the Consultant's having to certify, guarantee, warrant or state the existence of conditions whose existence the Consultant cannot ascertain. The Client also agrees not to make resolution of any dispute with the Consultant or payment of any money due to the Consultant, in any way contingent upon the Consultant's signing any such certification, guarantee, warranty or statement.

24. All fees and other charges due Consultant will be billed monthly and shall be due at the time of billing unless specified otherwise in this agreement. If Client fails to pay Consultant within thirty (30) days after invoices are rendered, Consultant shall have the right in its sole discretion to consider such default in payment a material breach of this entire agreement, and, upon written notice, Consultant's duties, obligations and responsibilities under this agreement may be suspended or terminated. In such event, Client shall promptly pay Consultant for all outstanding fees and charges due Consultant at the time of suspension or termination. If Consultant elects to suspend or terminate Consultant's services pursuant to this provision, Consultant is entitled to reasonable suspension or termination costs or expenses.

25. Client agrees that all billings from Consultant to Client are correct and binding on Client unless Client, within ten (10) days from the date of receipt of such billing, notifies Consultant in writing of alleged inaccuracies, discrepancies, or errors in billing.

26. Client agrees to pay a monthly late payment charge, which will be the lesser of one and one-half percent (1-1/2%) per month or a monthly charge not to exceed the maximum legal rate, which will be applied to any unpaid balance commencing thirty (30) days after the date of the billing.

27. If Consultant, pursuant to this agreement, produces plans, specifications, or other documents and/or performs field services, and such plans, specifications, or other documents and/or field services are required by any governmental agency, and such governmental agency changes its ordinances, codes, policies, procedures or requirements after the date of this agreement, any additional office or field services thereby required shall be paid for by Client as extra services in accordance with paragraph 29.

Form A

4-0005



28. In the event Consultant's fee schedule changes due to any increase of costs such as the granting of wage increases and/or other employee benefits to field or office employees due to the terms of any labor agreement, or increase in the cost of living, during the lifetime of this agreement, a percentage increase shall be applied to all remaining fees and charges to reflect the increased costs.

29. Client agrees that if Client requests services not specified in the scope of services described in this agreement, Client will pay for all such additional services as extra services, in accordance with Consultant's billing rates utilized for this agreement.

30. In the event that any staking or record monuments are destroyed, damaged or disturbed by an act of God or parties other than Consultant, the cost of restaking shall be paid for by Client as extra services in accordance with paragraph 29.

31. Client acknowledges that the design services performed pursuant to this agreement are based upon field and other conditions existing at the time these services were performed. Client further acknowledges that field and other conditions may change by the time project construction occurs and clarification, adjustments, modifications and other changes may be necessary to reflect changed field or other conditions. Such clarifications, adjustments, modifications and other changes shall be paid for by Client as extra services in accordance with paragraph 29.

32. Client shall pay the costs of all checking and inspection fees, zoning and annexation application fees, assessment fees, soils or geotechnical engineering fees, soils or geotechnical testing fees, aerial topography fees, and all other fees, permits, bond premiums, applicable taxes on professional services, title company charges, blueprints and reproductions, and all other similar charges not specifically covered by the terms of this agreement.

33. Client acknowledges and agrees that if Consultant provides surveying services, which services require the filing of a Record of Survey in accordance with Business and Professions Code section 8762, or a Corner Record pursuant to Business and Professions Code section 8773, all of the costs of preparation, examination and filing for the Record of Survey or Corner Record will be paid by Client as extra services in accordance with paragraph 29.

34. Consultant is not responsible for delay caused by activities or factors beyond Consultant's reasonable control, including but not limited to, delays by reason of strikes, lockouts, work slowdowns or stoppages, accidents, acts of God, failure of Client to furnish timely information or approve or disapprove of Consultant's services or instruments of service promptly, faulty performance by Client or other contractors or governmental agencies. When such delays beyond Consultant's reasonable control occur, Client agrees Consultant shall not be responsible for damages nor shall Consultant be deemed to be in default of this agreement. Further, when such delays occur, Client agrees that, to the extent such delays cause Consultant to perform extra services, such services shall be paid for by Client as extra services in accordance with paragraph 29.

35. Notwithstanding any other provision of this Agreement, and to the fullest extent permitted by law, neither the Client nor the Consultant, their respective officers, directors, partners, employees, contractors or subconsultants shall be liable to the other or shall make any claim for any incidental, indirect or consequential damages arising out of or connected in any way to the Project or to this Agreement. This mutual waiver of consequential damages shall include, but is not limited to, loss of use, loss of profit, loss of business, loss of income, loss of reputation or any other incidental, indirect or consequential damage that either party may have incurred from any cause or action.

36. Consultant shall not be liable for damages resulting from the actions or inactions of governmental agencies including, but not limited to, permit processing, environmental impact reports, dedications, general plans and amendments thereto, zoning matters, annexations or consolidations, use or conditional use permits, project or plan approvals, and building permits. Client agrees that it is the responsibility of Client to maintain in good standing all governmental approvals or permits and to timely apply for any necessary extensions thereof.

37. If the scope of services requires Consultant to estimate quantities, such estimates are made on the basis of Consultant's experience and qualifications and represent Consultant's best judgment as a professional generally familiar with the industry. However, such estimates are only estimates and shall not constitute representations,

warranties or guarantees of the quantities of the subject of the estimate. If the scope of services requires Consultant to provide its opinion of probable construction costs, such opinion is to be made on the basis of Consultant's experience and qualifications and represents Consultant's best judgment as to the probable construction costs. However, since Consultant has no control over costs or the price of labor, equipment or materials, or over the contractor's method of pricing, such opinions of probable construction costs do not constitute representations, warranties or guarantees of the accuracy of such opinions, as compared to bid or actual costs.

38. Estimates of land areas provided under this agreement are not intended to be, nor should they be considered to be, precise. The estimate will be performed pursuant to generally accepted standards of professional practice in effect at the time of performance.

39. Client acknowledges that Consultant is not responsible for the performance of work by third parties including, but not limited to, the construction contractor and its subcontractors.

40. Consultant makes no warranty, either express or implied, as to its findings, recommendations, plans, specifications, or professional advice except that the services were performed pursuant to generally accepted standards of professional practice in effect at the time of performance.

41. In the event (1) Client agrees to, authorizes, or permits changes in the plans, specifications or documents prepared by Consultant, which changes are not consented to in writing by Consultant, or (2) Client agrees to, authorizes or permits construction of unauthorized changes in the plans, specifications or documents prepared by Consultant, which changes are not consented to in writing by Consultant, or (3) Client does not follow recommendations prepared by Consultant pursuant to this agreement, which changed recommendations are not consented to in writing by Consultant: Client acknowledges that the unauthorized changes and their effects are not the responsibility of Consultant and Client agrees to release Consultant from all liability arising from the use of such changes, and further agrees to defend, indemnify and hold harmless Consultant, its officers, directors, agents, employees and subconsultants from and against all claims, demands, damages or costs, including attorneys' fees, arising from the unauthorized changes.

42. Client agrees that in accordance with generally accepted construction practices, the construction contractor and construction subcontractors will be required to assume sole and complete responsibility for job site conditions during the course of construction of the project, including safety of all persons and property, and that this requirement shall apply continuously and not be limited to normal working hours. Neither the professional activities of Consultant nor the presence of Consultant or his or her employees or subconsultants at a construction site shall relieve the contractor and its subcontractors of their obligations, duties and responsibilities including, but not limited to, construction means, methods, sequence, techniques or procedures necessary for performing, superintending or coordinating all portions of the work of construction in accordance with the contract documents and applicable health or safety requirements of any regulatory agency or of state law.

43. Client agrees to require its contractor and subcontractors to review the plans, specifications and documents prepared by Consultant prior to the commencement of construction-phase work. If the contractor and/or subcontractors determine there are deficiencies, conflicts, errors, omissions, code violations, improper uses of materials, or other deficiencies in the plans, specifications and documents prepared by Consultant, contractors and subcontractors shall notify Client so those deficiencies may be corrected by Consultant prior to the commencement of construction-phase work.

44. If during the construction phase of the project Client discovers or becomes aware of changed field or other conditions which necessitate clarifications, modifications or other changes to the plans, specifications, estimates or other documents prepared by Consultant, Client agrees to notify Consultant and retain Consultant to prepare the necessary changes or modifications before construction activities proceed. Further, Client agrees to require a provision in its construction contracts for the project which requires the contractor to promptly notify Client of any changed field or other conditions so that Client may in turn notify Consultant pursuant to the provisions of this paragraph. Any extra work performed by Consultant pursuant to this paragraph shall be paid for as extra services pursuant to paragraph 29.

4-0007

45. Client agrees to purchase and maintain, or cause Contractor to purchase and maintain, during the course of construction, builder's risk "all risk" insurance which will name Consultant as an additional named insured as its interest may appear.

46. Client acknowledges that Consultant's scope of services for this project does not include any services related in any way to asbestos and/or hazardous or toxic materials. Should Consultant or any other party encounter such materials on the job site, or should it in any other way become known that such materials are present or may be present on the job site or any adjacent or nearby areas which may affect Consultant's services, Consultant may, at its option, suspend or terminate work on the project until such time as Client retains a qualified contractor to abate and/or remove the asbestos and/or hazardous or toxic materials and warrant that the job site is free from any hazard which may result from the existence of such materials.

47. Client hereby agrees to bring no cause of action on any basis whatsoever against Consultant, its officers and directors, principals, employees, agents and subconsultants if such claim or cause of action in any way would involve Consultant's services for the investigation, detection, abatement, replacement, use or specification, or removal of products, materials or processes containing asbestos, asbestos cement pipe, and/or any hazardous or toxic materials. Client further agrees to defend, indemnify and hold harmless Consultant, its officers, directors, principals, employees and subconsultants from any asbestos and/or hazardous or toxic material related claims that may be brought by third parties as a result of the services provided by Consultant pursuant to this agreement, except claims caused by the sole negligence or willful misconduct of Consultant.

48. Client agrees to defend, indemnify and hold harmless Consultant, its officers, directors, principals, employees and subconsultants from and against all claims, losses, damages and cost caused by, arising out of, or relating to, the presence of any fungus, mildew, mold or resulting allergens, provided that such claim, loss, damage or cost is not due to the sole negligence or willful misconduct of Consultant.

49. In the event of any litigation arising from or related to the services provided under this agreement, the prevailing party will be entitled to recovery of all reasonable costs incurred, including staff time, court costs, attorneys' fees, experts' fees and other related expenses.

50. Client agrees that in the event Consultant institutes litigation to enforce or interpret the provisions of this agreement, such litigation is to be brought and adjudicated in the appropriate court in the county in which Consultant's place of business is located, and Client waives the right to bring, try or remove such litigation to any other county or judicial district.

51. (a) Except as provided in subdivisions (b) and (c), in an effort to resolve any conflicts that arise during the design or construction of the project or following completion of the project, Client and Consultant agree that all disputes between them arising out of or relating to this agreement shall be submitted to nonbinding mediation, unless the parties mutually agree otherwise.

    Client and Consultant further agree to include a similar mediation provision in all agreements with independent contractors and consultants retained for the project and to require all independent contractors and consultants also to include a similar mediation provision in all agreements with subcontractors, subconsultants, suppliers or fabricators so retained, thereby providing for mediation as the primary method for dispute resolution between the parties to those agreements.

    (b) Subdivision (a) shall not preclude or limit Consultant's right to file an action for collection of fees if the amount in dispute is within the jurisdiction of the small claims court.

    (c) Subdivision (a) shall not preclude or limit Consultant's right to record, perfect or enforce applicable mechanic's lien or stop notice remedies.

52. Client agrees to limit the liability of Consultant, its principals, employees and subconsultants, to Client and to all contractors and subcontractors on the project, for any claim or action arising in tort, contract, or strict liability, to the sum of $50,000 or Consultant's fee, whichever is greater. Client and Consultant acknowledge that this provision was expressly negotiated and agreed upon.

Form A                                    Page 8 of 9

A-0008

| Client Initials | Consultant Initials |
|---|---|

IN WITNESS WHEREOF, the parties hereby execute this agreement upon the terms and conditions stated above.

Client **Northern California Universal Enterprise** Consultant **DeWalt Corporation**

By _____    By _____

Name _____    Name **Jeffrey A Gutierrez**

Title _____    Title **President**

Date Signed _____    Date Signed **9-8-04**

**Client should mail completed contract to the address shown for Consultant.**

Form A                          Page 9 of 9

4-0009

07/21/2004  18:57   6613234674                  DEWALT                              PAGE  01

EXHIBIT 'A'

# DEWALT
*Corporation*

• ENGINEERING   • PLANNING   • SURVEYING   • LAND DEVELOPMENT   • CONSTRUCTION MANAGEMENT

July 21, 2004

04-01P

**NORTHERN CALIFORNIA UNIVERSAL ENTERPRISE CO.**
300 "B" Street
Turlock, CA 95380
FAX:   209.669.0498

Attn.:   Mr. Jess Marimla

Re:   **Wasco Subdivision – Expired Tract 5472**
**Proposal for Planning / Engineering / Surveying / Professional Services**

Dear Mr. Marimla,

DeWalt Corporation is pleased to provide this proposal for the following Planning, Engineering, and Surveying services for the property on Valley Rose Park Way in the City of Wasco, County of Kern. You will recall that the Tentative Map for Tract 5472 was approved with conditions at one point in time. Many of the conditions of approval with regard to infrastructure improvements to the site in question were completed, yet the Tentative Map was allowed to expire before recordation. Find below the various services that DeWalt Corporation proposes to provide to you for this project and their associated costs:

## TOPOGRAPHIC SURVEY:

Topographic survey will be performed in such a manner as to gather data which will be used for planning or engineering purposes. Please note that prior to the commencement of survey we will require a current (less that 30 days old) preliminary title report.

- Research existing horizontal and vertical monumentation with the Kern County Surveyor.
- Research existing infrastructure improvement plans with the Kern County Resource Management Agency, City of Wasco and any other related utility companies and service districts.
- Perform a boundary survey of the site, corroborating the existence of property corners and defining the site boundary. During the course of the boundary portion of the survey, we will also devote time to identifying any encroachment of the property lines.
- Perform a topographic survey of the existing pads, street and infrastructure improvements. Pad certification will be desired for proof of flood and grading plan conformance with County of Kern.
- Process and transfer the survey data for entry into electronic drafting software (AutoCAD) for the purposes of preparing the topographic survey plat.
- Dissemination of the Preliminary Title Report and identification of easements, licenses and recorded documents that encumber the property in question.
- Drafting and review of topographic survey plat.
- Validation and Certification of survey by a licensed land surveyor.
- **Cost :**

$7,500.00

Agreed and Understood:

By: _____
Title:   PRESIDENT                      Date: _____

1229 22ND STREET BAKERSFIELD, CA 93301 (805) 323-4600   •   FAX (805) 323-4674

07/23/2004  10:57   5513234574                    DEWALT                              PAGE  02

Expired Tract 5472, Wasco, CA
Proposal for Planning, Engineering and Surveying
Page 2 of 3

## TENTATIVE MAP:

- Meetings with the Owner to discuss development plans / proposed layout / phasing
- Meetings with County Staff to discuss development options, scheduling and fees
- Preparation of Boundary and Easement Map from Record Data and available Title Information
- Prepare and Process Tentative Subdivision Map and Application Package
- Assist in coordination and completion of Tentative Map approval studies and mitigation measures
- Present Tentative Subdivision Map to Governing Bodies for Consideration and Action
- **Cost :**

$5,500.00

Agreed and Understood:

By:
Title:                      President                  Date:

Upon approval of the Tentative Map, DeWalt Corporation and the owner will review and consider the conditions of approval. There may be items in the conditions of approval that will require DeWalt Corporation to engineer and process construction plans for approval by the County of Kern. Costs for these plans are un-determinable at this time and are not a part of this proposal.

## FINAL MAPS:

- Prepare Final Subdivision Map for Recordation
- Process County Improvement Agreements if required
- Prepare legal descriptions as needed
- **Cost :**

$5,500.00

Agreed and Understood:

By:
Title:                      President                  Date:

## SURVEYING SERVICES:

- Surveying for Centerline Monument and lot corner installation
- **Cost:**

$7,500.00

Agreed and Understood:

By:
Title:                      President                  Date:

M:\Proposals\DWCANCUEO\Wasco-ttm-FM-eng-surv\proposal.doc

4-0011

SEP. 8. 2004  3:11PM    N. CALF. UNIVERSAL                          NO. 537    P. 3

*recd 9/20/04*

# CONSULTANT AGREEMENT

Project: _____ PRINCETON DEVELOPMENTS

General Contractor: _____ Northern California Universal Enterprise Co.

Location of Job: _____ WASCO, CA (TRACT 5472)

Date of Contract: _____ 9/7/2004

This agreement is made by and between  Princeton Developments, LP, as the property owner, hereinafter called Owner, and  DeWalt Corporation  as the Consultant, hereinafter called Consultant.

Consultant agrees with all of the terms and conditions in this agreement and finish labor, material and equipment required to perform the work for job stated below in a workmanlike manner. The cost breakdown and specifications are based on the proposal submitted by consultant on July 21, 2004 and are listed as below. Actual payment will be based upon percent complete.

1/ Cost Breakdown:

| DESCRIPTION | SUB TOTAL |
|---|---|
| ALTA / TOPOGRAPHIC SURVEY | $ 7,500.00 |
| TENTATIVE MAP | $ 5,500.00 |
| FINAL MAPS | $ 5,500.00 |
| SURVEYING SERVICES | $ 7,500.00 |
| GRAND TOTAL: | $ 26,000.00 |

2/ For additional work outside of the contract, Change Order Form must be submitted and approved by Joe Wu prior to performing such additional work.

3/ Payment Terms:    Progress payment on 30 days Net.

4/ Retention 10% will be hold until final inspection approval by County of Kern and all final checklist items completed.

Accepted the terms and conditions stated as above by:

DeWalt Corporation                          Princeton Developments, LP

Consultant                                  President of General Partner

by: _____            by: _____

Title                                       Joe Wu, President

Lic # :  PRESIDENT                          Lic # :

Federal Tax ID # : 81-0572077               FTID#:   51-0506351

Date:  9-03-04                              Date:

Note: Subcontractor must finish to the General Contractor the Certificate of Insurance evidencing laws that the Subcontractor has in force, valid insurance covering full liability under worker's compensation laws of the State California, and also the current general liability policy of comprehensive body injury and property damage insurance.

# EXHIBIT "E"

*(o0991*

**Certified Copy**

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA

ROGER McINTOSH,

       Plaintiff,

    vs.

NORTHERN CALIFORNIA UNIVERSAL
ENTERPRISES COMPANY, ET AL.,

       Defendants.

~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~

Case No.
107CV-01080-
LJO-WMW

**DEPOSITION OF**

**LARRY F. PENNELL**

January 29, 2009
11:43 a.m.

Suite 170, 5001 East Commercenter
Bakersfield, California

Brian S. Cardoza, CSR No. 8362



**ESQUIRE**
an Alexander Gallo Company

Toll Free: 800.300.1214
Facsimile: 661.322.2242

Suite 170
5001 East Commercenter Drive
Bakersfield, CA 93309
www.esquiresolutions.com

2

1                   APPEARANCES OF COUNSEL

2

3   FOR THE PLAINTIFF, ROGER McINTOSH:

4         LAW OFFICES OF BORTON PETRINI, LLP
      Attorneys at Law

5         BY:  JEFFREY A. TRAVIS, Esq.
      Attorney at Law

6         5060 California Avenue, Suite 700
      Bakersfield, California 93309

7         (661) 322-3051
      jtravis@bortonpetrini.com

8

9   FOR THE DEFENDANTS, NORTHERN CALIFORNIA UNIVERSAL
ENTERPRISES COMPANY AND LOTUS DEVELOPMENTS:

10        THE LAW OFFICE OF STEVEN J. HASSING
      Attorney at Law

11        BY:  STEVEN J. HASSING, Esq.
      Attorney at Law

12        425 Calabria Court
      Roseville, California 95747

13        (916) 677-1776
      stevehassing@yahoo.com

14

15  FOR THE DEFENDANT, THE CITY OF WASCO:
      GARCIA, CALDERON, RUIZ, LLP

16        A Limited Liability Partnership
      BY:  CHAKA OKADIGBO, Esq.

17        Attorney at Law
      500 South Grand Avenue, Suite 1100

18        Los Angeles, California 90071
      (213) 347-0210

19        cokadigbo@gcrlegal.com

20

21

22

23

24

25



Toll Free: 800.300.1214
Facsimile: 661.322.2242

Suite 170
5001 East Commercenter Drive
Bakersfield, CA 93309
www.esquiresolutions.com

ESQUIRE
an Alexander Gallo Company

3

INDEX OF EXAMINATION

WITNESS:  LARRY F. PENNELL

EXAMINATION                                          PAGE

By Mr. Hassing                                         5

By Mr. Travis                                         12

By Mr. Hassing                                        22

By Mr. Okadigbo                                       27



Toll Free: 800.300.1214
Facsimile: 661.322.2242

Suite 170
5001 East Commercenter Drive
Bakersfield, CA 93309
www.esquiresolutions.com

4

INDEX TO EXHIBITS

1

2

3  EXHIBIT NO.                DESCRIPTION                    PAGE

4

5  Defendants' 1        A Subpoena In A Civil Case, with

                        attached documents; 22 pages         24

6

7

8       (Original exhibit included with original transcript.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25



Toll Free: 800.300.1214
Facsimile: 661.322.2242

Suite 170
5001 East Commercenter Drive
Bakersfield, CA 93309
www.esquiresolutions.com

1   apparent, along with the, I think, driveway cuts even in

2   the -- in the curb and gutter.

3       Q.   And do you have any understanding of whether

4   lots had already been determined by the planning

5   department or the City of Wasco, you know, when those

6   improvements were originally put in?

7       A.   I -- I believe that's the case.  I wasn't an

8   employee of the City when that occurred.  But knowing how

9   a tentative map process works, I would assume so.

10      Q.   Okay.  And have you ever seen a tentative map

11  number 5472?

12      A.   No.

13      Q.   Okay.  You had only seen tentative map 6451?

14      A.   Is that Valley Rose Estates?

15      Q.   That's correct.

16      A.   Yeah, I don't normally -- I don't typically

17  see tentative maps.  It's not my job to review the

18  tentative map.

19      Q.   That's fair enough, yeah.  I honestly don't

20  know what the city manager's job is, so I'm probably

21  making a lot --

22      A.   I'm still guessing at that too after 30

23  years.

24      Q.   -- probably making a lot of assumptions.

25      Okay, well let's go back to Mr. Peake had



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.300.1214
Facsimile: 661.322.2242

Suite 170
5001 East Commercenter Drive
Bakersfield, CA 93309
www.esquiresolutions.com

21

1   mentioned that they would like something upscale.  Do you

2   know what would have had to have happened if you wanted

3   something more upscale?  Let me say what he said.  He said

4   that you would have to rip out the existing improvements,

5   and does that sound right to you?

6        A.  Well, I'm not a developer, I'm just a simple

7   city manager, but I would have built homes along the

8   fairway if -- to maximize the -- the potential of the golf

9   course as an asset in the community.  I think the

10  developer could have maximized his profits by taking

11  better advantage of the location of the golf course.

12       I don't know if -- if he would build one home for

13  every two meter boxes, you know, abandoning in place one

14  of the services.  I -- I don't know, because I'm not a

15  developer.  But I know I would have probably done it a

16  little bit differently.  But I -- again, I'm a city

17  manager, not a developer.

18       Q.  So, do you know why it wasn't redesigned, or

19  the more upscale neighborhood, or maximizing the fairway,

20  why those designs were never put in place?

21       A.  I have no idea.

22       Q.  Are you familiar with litigation involving

23  Mr. McIntosh and the City of Wasco regarding a mechanic's

24  lien?

25       A.  Yes, I am.



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.300.1214
Facsimile: 661.322.2242

Suite 170
5001 East Commercenter Drive
Bakersfield, CA 93309
www.esquiresolutions.com

22

1       Q.   And did the City have a chance to review the

2   Complaint when it was filed and all of the related

3   exhibits?

4       A.   I'm sure the City did.

5       Q.   Now, when did you start as city manager of

6   Wasco?

7       A.   I started in August of 1994.

8       Q.   Okay, so right about when you started is when

9   that lawsuit was filed, or thereabouts?

10      A.   I don't recall specifically.

11      Q.   As I recall, that lawsuit went on until early

12  2000s.  Does that sound about right?

13      A.   That -- okay, yeah, because I don't remember

14  that specifically being on my front burner in 1994.  The

15  imminent default was on my front burner, of the golf

16  course, not of Valley Rose Estates.

17      Q.   Okay.  So, you and Mr. McIntosh go way back?

18           You know, I think that is it for me.  I have no

19  more questions.

20                       ---oOo---

21                      EXAMINATION

22      BY MR. HASSING:

23      Q.   Getting back to the lawsuit that was filed

24  around 1994 by Mr. McIntosh, did you as the city manager

25  have any responsibility for dealing in any manner with



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.300.1214
Facsimile: 661.322.2242

Suite 170
5001 East Commercenter Drive
Bakersfield, CA 93309
www.esquiresolutions.com

# EXHIBIT "F"

60091

**Certified Copy**

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA

ROGER McINTOSH,

        Plaintiff,

     vs.

NORTHERN CALIFORNIA UNIVERSAL
ENTERPRISES COMPANY, ET AL.,

        Defendants.

~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~

Case No.
107CV-01080-
LJO-WMW

**DEPOSITION OF**

**KEITH WOODCOCK**

January 29, 2009
1:40 p.m.

Suite 170, 5001 East Commercenter
Bakersfield, California

Brian S. Cardoza, CSR No. 8362



ESQUIRE

Toll Free: 800.300.1214
Facsimile: 661.322.2242

Suite 170
5001 East Commercenter Drive
Bakersfield, CA 93309
www.esquiresolutions.com

2

APPEARANCES OF COUNSEL

FOR THE PLAINTIFF, ROGER McINTOSH:
    LAW OFFICES OF BORTON PETRINI, LLP
    Attorneys at Law
    BY:   JEFFREY A. TRAVIS, Esq.
    Attorney at Law
    5060 California Avenue, Suite 700
    Bakersfield, California 93309
    (661) 322-3051
    jtravis@bortonpetrini.com

FOR THE DEFENDANTS, NORTHERN CALIFORNIA UNIVERSAL
ENTERPRISES COMPANY AND LOTUS DEVELOPMENTS:
    THE LAW OFFICE OF STEVEN J. HASSING
    Attorney at Law
    BY:   STEVEN J. HASSING, Esq.
    Attorney at Law
    425 Calabria Court
    Roseville, California 95747
    (916) 677-1776
    stevehassing@yahoo.com

FOR THE DEFENDANT, THE CITY OF WASCO:
    GARCIA, CALDERON, RUIZ, LLP
    A Limited Liability Partnership
    BY:   CHAKA OKADIGBO, Esq.
    Attorney at Law
    500 South Grand Avenue, Suite 1100
    Los Angeles, California 90071
    (213) 347-0210
    cokadigbo@gcrlegal.com



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.300.1214
Facsimile: 661.322.2242

Suite 170
5001 East Commercenter Drive
Bakersfield, CA 93309
www.esquiresolutions.com

3

INDEX OF EXAMINATION

WITNESS:   KEITH WOODCOCK

EXAMINATION                                        PAGE

By Mr. Hassing                                        5

By Mr. Travis                                        16

By Mr. Okadigbo                                      30

By Mr. Hassing                                       35



Toll Free: 800.300.1214
Facsimile: 661.322.2242

Suite 170
5001 East Commercenter Drive
Bakersfield, CA 93309
www.esquiresolutions.com

4

INDEX TO EXHIBITS

EXHIBIT NO.                  DESCRIPTION                PAGE

Defendants' 1        A Bonding Estimate; 2 pages          30

Defendants' 2        A Subdivision Agreement For

                     Tract 6451; 10 pages                 36


     (Original exhibits included with original transcript.)



Toll Free: 800.300.1214
Facsimile: 661.322.2242

Suite 170
5001 East Commercenter Drive
Bakersfield, CA 93309
www.esquiresolutions.com

10

1       Q.   Okay.   Do you know who the planning director

2   was at the time the tentative map was approved?

3       A.   It was a -- a King Patrick Leonard.

4       Q.   Okay.   Do you know where he works now?

5       A.   No, I don't.

6       Q.   Okay.   All right.   Do you know where he

7   lives?

8       A.   I think he lives in Lompoc.

9       Q.   All right.   What was your function, if any,

10  with regard to requiring bonding for the 6451 final map?

11      A.   The -- the bonding is really the

12  responsibility of public works and engineering, but I was

13  involved in making sure that the subdivision agreement

14  reflected the -- the requirements of -- of both public

15  works and engineers related to the bonding and -- and what

16  engineering or public work inspection fees would be

17  required.

18      Q.   Okay.   And you mentioned subdivision

19  agreements.

20      A.   Yes.

21      Q.   Was the subdivision agreement something that

22  came under your purview as the planning director?

23      A.   Yes, and working that out with the -- with

24  the city attorney.

25      Q.   Okay.   You're familiar with the subdivision



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.300.1214
Facsimile: 661.322.2242

Suite 170
5001 East Commercenter Drive
Bakersfield, CA 93309
www.esquiresolutions.com

11

1   agreement for map 6451, correct?  I don't mean you have

2   memorized it, but you were a --

3          A.   Right, I'm familiar -- right, that's correct.

4          Q.   Okay.  You're familiar with it?

5          A.   Yes.

6          Q.   And you worked with it?

7          A.   Yes.

8          Q.   Okay.  The subdivision agreement for 6451,

9   was that an agreement that had to be drafted by the city

10  attorney, or was there a form that you used, or somebody

11  within your department used, to create that document and

12  then have it reviewed by the city attorney?

13         A.   We had what I would call like a boilerplate

14  that -- that we would use as far as the format of -- of

15  the structure of that agreement.  As we filled in the

16  various pieces, like from public works, engineering, my

17  statements of whether it conformed or not, etcetera,

18  were -- were in that, and then -- then we would submit

19  that to the city attorney and he would review on that.

20         Q.   Okay.  In preparing that subdivision

21  agreement, did you include a requirement for a maintenance

22  bond?

23         A.   That -- I don't recall specifically a bond,

24  but I do recall that -- that all improvements needed to be

25  warranted for -- for 24 months.



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.300.1214
Facsimile: 661.322.2242

Suite 170
5001 East Commercenter Drive
Bakersfield, CA 93309
www.esquiresolutions.com

25

1   if I am either.

2        Q.   We had spoken earlier today with Mr. Pennell

3   and Mr. Peake, and they had both talked about that there

4   was some discussion that the City of Wasco would have

5   liked to have seen a different layout of the subdivision

6   with, you know, a little higher end, I think was their

7   term that they used, homes that were on there, and they

8   had said that would have required them to rip out the

9   improvements to put in something more upscale.

10       If you understand why they would say that, what

11  is your understanding of why they would need to rip out

12  the improvements?

13       A.   The layout of Valley Rose Estates puts the

14  golf course in one corner of the section, whereas the

15  residential was kind of wrapped around that.  That the

16  desire was to open up the golf course and have sort of

17  fingers of golf course play, with houses around those

18  fingers, and therefore not having it in -- in just one

19  square, and that way, by having sort of houses on the

20  greens, it would allow for potential upscale housing to be

21  provided out there than -- than having the -- the golf

22  course divorced from -- from the residences.

23       Q.   Do you know why that upscale housing was not

24  put in?

25       A.   No, I don't.



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.300.1214
Facsimile: 661.322.2242

Suite 170
5001 East Commercenter Drive
Bakersfield, CA 93309
www.esquiresolutions.com

26

1    Q.   Okay.   And to your understanding, the

2    improvements as they were currently in, would not have

3    supported that design?

4    A.   That's correct.

5    Q.   And you are an engineer, correct?

6    A.   No, I'm not.

7    Q.   You're not?

8    A.   No.

9    Q.   What is your background?

10   A.   City and regional planning.   I have a

11   Master's in city and regional planning from Fresno State,

12   and approximately 25 years of -- of planning experience.

13   Q.   And, you know, throughout those 25 years as a

14   planner, --

15   A.   Yes.

16   Q.   -- it was possible that you could have

17   redesigned the subdivision to the configuration with the

18   more upscale housing?

19   A.   We don't do the -- you know, don't do the

20   development for the developer, but it -- it -- it's the

21   developer that would need to -- to submit the plans as to

22   his concept.

23   Q.   You're essentially beholding to the developer

24   to do the design?

25   A.   And then we review and comment on that.



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.300.1214
Facsimile: 661.322.2242

Suite 170
5001 East Commercenter Drive
Bakersfield, CA 93309
www.esquiresolutions.com

# EXHIBIT "G"

**Copy of Transcript**

# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF CALIFORNIA

ROGER McINTOSH,

        Plaintiff,

   vs.

NORTHERN CALIFORNIA UNIVERSAL
ENTERPRISES COMPANY, ET AL.,

        Defendants.

Case No.
107CV-01080-
LJO-WMW

---

### DEPOSITION OF

### ALAN J. PEAKE, ESQ.

January 29, 2009
10:59 a.m.

Suite 170, 5001 East Commercenter
Bakersfield, California

Brian S. Cardoza, CSR No. 8362



## ESQUIRE

Telephone: 661.322.2202
Facsimile: 661.322.2242

5001 E.Commercenter Drive
Suite 170
Bakersfield, CA 93309

2

1                    APPEARANCES OF COUNSEL

2

3    FOR THE PLAINTIFF, ROGER McINTOSH:

4         LAW OFFICES OF BORTON PETRINI, LLP
          Attorneys at Law

5         BY:   JEFFREY A. TRAVIS, Esq.
          Attorney at Law

6         5060 California Avenue, Suite 700
          Bakersfield, California 93309

7         (661) 322-3051
          jtravis@bortonpetrini.com

8

     FOR THE DEFENDANTS, NORTHERN CALIFORNIA UNIVERSAL

9    ENTERPRISES COMPANY AND LOTUS DEVELOPMENTS:

10        THE LAW OFFICE OF STEVEN J. HASSING
          Attorney at Law

11        BY:   STEVEN J. HASSING, Esq.
          Attorney at Law

12        425 Calabria Court
          Roseville, California 95747

13        (916) 677-1776
          stevehassing@yahoo.com

14

     FOR THE DEFENDANT, THE CITY OF WASCO:

15        GARCIA, CALDERON, RUIZ, LLP

16        A Limited Liability Partnership
          BY:   CHAKA OKADIGBO, Esq.

17        Attorney at Law
          500 South Grand Avenue, Suite 1100

18        Los Angeles, California 90071
          (213) 347-0210

19        cokadigbo@gcrlegal.com

20

21

22

23

24

25



Toll Free: 800.300.1214
Facsimile: 661.322.2242

Suite 170
5001 East Commercenter Drive
Bakersfield, CA 93309
www.esquiresolutions.com

Alan J. Peake, Esq.                                            January 29, 2009

3

INDEX OF EXAMINATION


WITNESS:  ALAN J. PEAKE, Esq.

EXAMINATION                                                    PAGE

By Mr. Hassing                                                   5

By Mr. Travis                                                   18

By Mr. Hassing                                                  26









WITNESS INSTRUCTED NOT TO ANSWER

              Page        Line

               16          20



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.300.1214
Facsimile: 661.322.2242

Suite 170
5001 East Commercenter Drive
Bakersfield, CA 93309
www.esquiresolutions.com

4

1          INDEX TO EXHIBITS

2

3    EXHIBIT NO.              DESCRIPTION              PAGE

4

5    Defendants' 1        A Purchase and Sale Agreement

                          and Joint Escrow Instructions;

6                         13 pages                          6

7    Defendants' 2        An Assignment of Purchase and

                          Sale Agreement; 4 pages          11

8

9

      (Original exhibits included with original transcript.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.300.1214
Facsimile: 661.322.2242

Suite 170
5001 East Commercenter Drive
Bakersfield, CA 93309
www.esquiresolutions.com

8

1          Q.   At any time during your involvement with this

2     Purchase and Sale Agreement, were you aware of the fact

3     that anybody claimed a copyright interest in the

4     improvement plans that were used to construct the

5     infrastructure in that subdivision?

6          A.   No.

7          Q.   In the negotiations that you were involved in

8     that led to the drafting and execution of this Purchase

9     and Sale Agreement, which is Exhibit Number 1, do you

10    recall that the fact that the improvements had already

11    been constructed within that subdivision were touted as a

12    selling point to the prospective buyer?

13         A.   Can you maybe rephrase that?

14         Q.   Sure.  Do you recall, during the negotiations

15    that led to this contract being signed, that the

16    prospective purchaser, Wasco Project, LLC, was told that

17    the improvements for that particular subdivision that was

18    being sold had already been constructed on the property?

19         A.   Well, let me -- we weren't necessarily -- we

20    weren't selling a subdivision.  Matter of fact, that did

21    come up in conversations with both Darrell Souza, who's

22    representing Joe Wu.  I don't know if they came in --

23    in -- in discussions with or negotiations with Mel

24    Radford, who was representing the -- the party that

25    executed this Wasco Project, LLC.



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.300.1214
Facsimile: 661.322.2242

Suite 170
5001 East Commercenter Drive
Bakersfield, CA 93309
www.esquiresolutions.com

9

1      And we -- and the reason I remember that part is

2  the map had never been finalized and we were taking the

3  position that you didn't have a final map, that there was

4  going to have to be a new map on the property, and

5  actually what the City kind of desired on their end was a

6  different map.  The -- the -- the old map that was never

7  finalized was kind of a cookie cutter type of subdivision

8  next to the golf course and the City was hoping, not

9  demanding but hoping, that somebody would do a map that

10  may incorporate more of the golf course, you know, do more

11  upscale homes, that type of thing.

12      So, I know we put in this agreement that that

13  map -- being very upfront, that that map was not a valid

14  map.

15      Q.  Right.  Getting more to the improvements that

16  were in place, the streets, the curbs, the sewer, the

17  water, that type of thing, was the prospective purchaser,

18  Wasco Project, LLC, advised that those improvements had

19  been constructed on that parcel of land?

20      A.  I don't know if they were -- I don't remember

21  ever discussing that with them or being in a meeting that

22  that was discussed, but certainly -- certainly it's open

23  and notorious as to the streets, curb, and gutter, if you

24  just went out there on the property, that that was there.

25      Q.  Okay.



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.300.1214
Facsimile: 661.322.2242

Suite 170
5001 East Commercenter Drive
Bakersfield, CA 93309
www.esquiresolutions.com

Alan J. Peake, Esq.                                    January 29, 2009

10

1          A.   But my understanding from the individuals who

2    were at the City of Wasco during this time period, I don't

3    believe any of them were the individuals that were there

4    during this original map.  So, I guess I'm -- what I'm

5    going to say is, I don't believe we knew exactly what was

6    or was not in the ground, so to speak.  Anything that was

7    open and visible, certainly we had an idea of what was

8    there, but --

9          Q.   All right.

10         A.   -- any -- anything else below ground.

11         Q.   All right.  You indicated that the City was

12   hopeful that the new purchaser would prepare a different

13   map with a more upscale product and taking more into

14   consideration the golf course, right?

15         A.   That's correct.

16         Q.   Can you explain to me how that could be done

17   with the streets, curbs, gutters already in place?

18         A.   Oh, I -- it was felt that you -- you might

19   have to rip out some of the infrastructure that's already

20   in and -- and -- and do a -- you know, do something over

21   it.

22         Q.   All right.

23         A.   That's why, again, it wasn't a demand, it was

24   just something that we tossed on the table and said, gee,

25   we'd like to see that, or something more incorporated into



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.300.1214
Facsimile: 661.322.2242

Suite 170
5001 East Commercenter Drive
Bakersfield, CA 93309
www.esquiresolutions.com

11

1    the golf course.

2         Q.   All right.  About a month later, May 18th,

3    2004, there was a document drafted and executed that is

4    entitled, "Assignment of Purchase and Sale Agreement".

5         I'm going to mark that Exhibit Number 2 to this

6    deposition, and ask if you prepared that document?

7         A.   Yes, I believe I did.

8         (Defendants' Exhibit 2 was marked for.

9         identification by the court reporter.)

10   BY MR. HASSING:

11        Q.   All right.  And did you have any involvement

12   in the negotiation of the eventual purchase of the

13   subdivision by Northern California Universal?

14        A.   Yes.

15        Q.   And can you explain to me the extent of your

16   participation in that regard?

17        A.   I believe I was at several meetings with

18   Darrell Souza, who was the representative for Mr. Wu.  I

19   believe we had some contact with Mr. Wu.  I know we went

20   up and visited one of his project sites at one point in

21   time, just to see the kind of -- the, you know, house he

22   was building, that type of thing.

23        As I remember, Mr. Wu, although understanding

24   English, it wasn't his primary language, so he was never

25   really at the table during direct negotiations, it was



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.300.1214
Facsimile: 661.322.2242

Suite 170
5001 East Commercenter Drive
Bakersfield, CA 93309
www.esquiresolutions.com

18

1    through that --

2         MR. OKADIGBO:  Well, do you have any more

3    questions to ask?

4         MR. HASSING:  I have no further questions.

5         MR. OKADIGBO:  Okay, well let me talk to Mr.

6    Peake for a second.

7         MR. HASSING:  All right.

8         THE WITNESS:  Well, why don't we -- why don't we

9    finish up and then we'll --

10        MR. TRAVIS:  Yeah, let's finish up, you can talk

11   --

12        MR. OKADIGBO:  Okay.

13        MR. TRAVIS:  -- and then we can -- before we go

14   to you and after I'm finished, then we'll take a few

15   minutes, you can talk, you can come back.

16        MR. OKADIGBO:  Okay.

17                    ---oOo---

18                    EXAMINATION

19        BY MR. TRAVIS:

20        Q.  Mr. Peake, are you familiar with a lawsuit

21   filed by Mr. McIntosh against the City of Wasco in the

22   nineties, and I'm not talking about this litigation?

23        A.  A -- a lawsuit having to do with a mechanic's

24   lien.

25        Q.  That's correct.



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.300.1214
Facsimile: 661.322.2242

Suite 170
5001 East Commercenter Drive
Bakersfield, CA 93309
www.esquiresolutions.com

Carol M. Pesenson, Esq.                                          January 29, 2009

19

1          A.   Yes.

2          Q.   And what was your understanding of that

3     lawsuit?

4          A.   We came in at the very tail end.  It was

5     handled originally by an attorney Michael Hargrove.

6          Q.   And was he still the attorney when you -- I'm

7     sorry, were you finished?

8          A.   We -- we came on board and then -- and took

9     over the litigation and it was dismissed soon after.

10    We -- we really didn't have anything -- I mean, as far as

11    handling the litigation, there wasn't really much to

12    handle.  The -- the property -- the mechanic's lien and

13    everything was dismissed.  That property -- that complaint

14    was dismissed soon after we came on board.

15         Q.   Okay, so when you came on board, there was

16    still a lawsuit but it was kind of in the later stages?

17         A.   Correct.

18         Q.   Okay.  And were you ever able to go ahead and

19    look at the complaint that was originally filed by

20    Mr. McIntosh in that case?

21         A.   I don't believe I did, but I'm not sure.

22         Q.   Okay.  I mean, if I gave it to you maybe to

23    refresh your memory.  So, if you could just look at that

24    and see if that refreshes your memory as to the complaint,

25    whether you had looked at it, or instructed anyone else to



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.300.1214
Facsimile: 661.322.2242

Suite 170
5001 East Commercenter Drive
Bakersfield, CA 93309
www.esquiresolutions.com

# EXHIBIT "H"

60971

**Certified Copy**

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA

ROGER McINTOSH,

        Plaintiff,

    vs.

NORTHERN CALIFORNIA UNIVERSAL
ENTERPRISES COMPANY, ET AL.,

        Defendants.

~~~~~~~~~~~~~~~~~~~~~~~~~~~~

Case No.
107CV-01080-LJO-WMW

**DEPOSITION OF**

**JAMES K. DELMARTER**

February 2, 2009
1:32 p.m.

5001 East Commercenter
Suite 170
Bakersfield, California

Brian S. Cardoza, CSR No. 8362



# ESQUIRE

Toll Free: 800.300.1214
Facsimile: 661.322.2242

Suite 170
5001 East Commercenter Drive
Bakersfield, CA 93309
www.esquiresolutions.com

1

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA

ROGER McINTOSH,

        Plaintiff,

   vs.                 Case No.
                           107CV-01080-LJO-WMW

NORTHERN CALIFORNIA UNIVERSAL
ENTERPRISES COMPANY, ET AL.,

        Defendants.
~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~

DEPOSITION OF

JAMES K. DELMARTER

February 2, 2009
1:32 p.m.

5001 East Commercenter
Suite 170
Bakersfield, California

Brian S. Cardoza, CSR No. 8362



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.300.1214
Facsimile: 661.322.2242

Suite 170
5001 East Commercenter Drive
Bakersfield, CA 93309
www.esquiresolutions.com

2

APPEARANCES OF COUNSEL

1

2

3  FOR THE PLAINTIFF, ROGER McINTOSH:
4       LAW OFFICES OF BORTON PETRINI, LLP
        Attorneys at Law
5       BY:  JEFFREY A. TRAVIS, Esq.
        Attorney at Law
6       5060 California Avenue, Suite 700
        Bakersfield, California 93309
7       (661) 322-3051
        jtravis@bortonpetrini.com
8

   FOR THE DEFENDANTS, NORTHERN CALIFORNIA UNIVERSAL
9  ENTERPRISES COMPANY AND LOTUS DEVELOPMENTS:
10      THE LAW OFFICE OF STEVEN J. HASSING
        Attorney at Law
11      BY:  STEVEN J. HASSING, Esq.
        Attorney at Law
12      425 Calabria Court
        Roseville, California 95747
13      (916) 677-1776
        stevehassing@yahoo.com
14

   FOR THE DEFENDANT, THE CITY OF WASCO:
15
        GARCIA, CALDERON, RUIZ, LLP
16      A Limited Liability Partnership
        BY:  CHAKA OKADIGBO, Esq.
17      Attorney at Law
        500 South Grand Avenue, Suite 1100
18      Los Angeles, California 90071
        (213) 347-0210
19      cokadigbo@gcrlegal.com
20

21

22

23

24

25



Toll Free: 800.300.1214
Facsimile: 661.322.2242

Suite 170
5001 East Commercenter Drive
Bakersfield, CA 93309
www.esquiresolutions.com

James K. Delmarter                                    February 25, 2009

3

INDEX OF EXAMINATION

WITNESS:   JAMES K. DELMARTER

EXAMINATION                                          PAGE

By Mr. Hassing                                          5

By Mr. Okadigbo                                        84

By Mr. Travis                                         88



Toll Free: 800.300.1214
Facsimile: 661.322.2242

Suite 170
5001 East Commercenter Drive
Bakersfield, CA 93309
www.esquiresolutions.com

4

INDEX TO EXHIBITS

| EXHIBIT NO. | DESCRIPTION | PAGE |
|---|---|---|
| Defendants' 1 | A notice of deposition; 3 pages | 23 |
| Defendants' 2 | An Expert Witness Disclosure; 6 pages | 26 |
| Defendants' 3 | Correspondence between Martin-McIntosh and Michael Brown; 10 pages | 42 |
| Defendants' 4 | Correspondence between The Law Offices of Borton Petrini, LLP and James K. Delmarter; 5 pages | 75 |
| Defendants' 5 | A Contract To Perform Services; 2 pages | 76 |
| Defendants' 6 | A Letter of Transmittal dated 12/16/08; 4 pages | 77 |
| Defendants' 7 | A Staff Report for Tentative Tract 5472; 2 pages | 78 |
| Defendants' 8 | A Staff Report for Tentative Tract 6451; 15 pages | 78 |
| Defendants' 9 | Tentative Tract Map No. 5472; 1 page | 94 |
| Defendants' 10 | Improvement Plans for Tract No. 5472; 59 pages | 94 |
| Defendants' 11 | Tentative Tract Map No. 6451; 1 page | 94 |
| Defendants' 12 | Final Tract Map No. 6451; 3 pages | 94 |

(Original Exhibits included, except D-9, D-10, D-11, and D-12, which were copied and retained by the witness.)



Toll Free: 800.300.1214
Facsimile: 661.322.2242

Suite 170
5001 East Commercenter Drive
Bakersfield, CA 93309
www.esquiresolutions.com

65

1    bearing of 89°16'09" southeast, 1317.97.  The bearing on

2    the final map shows south 89°16'05" seconds southeast,

3    1317.97.  In that case, the distances are the same, the

4    bearings are different by four seconds.

5          Q.  And what you're doing is you're comparing

6    the --

7          A.  Right.

8          Q.  -- 6451 tentative with the 6451 final?

9          A.  Exactly.  The east line shows a bearing of

10   north 01°05'50" northeast, 1268.50.  The final -- that's

11   the final map.  The tentative says north 01°05'50" east,

12   1268.49.  Again, a hundredth of a foot difference.

13         Q.  Another little difference?

14         A.  A little difference, right.

15         Q.  And does anything you've just testified to

16   here in the last five minutes, these minor differences

17   between the tentative and the final, in any way cause you

18   to believe that DeWalt copied the 5472 tentative?  Does it

19   cause you to believe that?

20         MR. TRAVIS:  I'm going to object to that question

21   as vague as to "copied".  In what sense?

22         BY MR. HASSING:  All right.

23         Q.  Do you understand the question?

24         A.  I think he copied the boundaries and the --

25   the -- the lot configuration, the street configuration.



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.300.1214
Facsimile: 661.322.2242

Suite 170
5001 East Commercenter Drive
Bakersfield, CA 93309
www.esquiresolutions.com

66

1    They're identical, except for these very minor

2    differences.

3            Q.   All right.

4            A.   Why there's a minor difference, I don't know.

5            Q.   Did you find or learn of any facts during

6    your review of the documents that were provided to you

7    that would explain why the streets of the two tentatives

8    were in the same location?

9            A.   Yes.

10           Q.   And what was that?

11           A.   The fact that the improvements were already

12   in, --

13           Q.   All right.

14           A.   -- and they were based on the improvement

15   plans that were prepared by McIntosh.  They would have to

16   tear out all the improvements in order to change the

17   street alignments and the lot configurations.  The lot

18   corners were already set by McIntosh.  The boundaries were

19   already set by McIntosh.

20           Q.   How do you know the corners were already set?

21           A.   He told me.

22           Q.   Okay.  And how were they set?

23           A.   By survey methods.

24           Q.   Okay.  Well, specifically with regard to this

25   particular subdivision, --



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.300.1214
Facsimile: 661.322.2242

Suite 170
5001 East Commercenter Drive
Bakersfield, CA 93309
www.esquiresolutions.com