94

1          I don't have anything else.

2          MR. HASSING:   I'm going to talk to Chaka for just

3     a second, and then we'll come back in and close it up.

4          (Break taken.)

5          (Defendants' Exhibits 9 through 12 were marked

6          for identification by the court reporter.)

7          MR. TRAVIS:   We marked tentative map 5472 as

8     Exhibit 9.   We marked all the improvement plans

9     collectively as Exhibit 10.   We marked tentative map 6451

10    as Exhibit 11.   And we marked the final map 6451 as

11    Exhibit 12.

12          We agreed that Mr. Delmarter would receive a copy

13    of his transcript to review and revise and send back

14    within 30 days after receipt.   But other than that, the

15    stipulations are the same as our other ones.

A-PDF Split DEMO : Purchase from www.A-PDF.com to remove the watermark

16          MR. HASSING:   We're off the record.

17

18          (The deposition concluded at 4:14 p.m.)

19

20

21

22

23

24

25



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.300.1214
Facsimile: 661.322.2242

Suite 170
5001 East Commercenter Drive
Bakersfield, CA 93309
www.esquiresolutions.com

# EXHIBIT "I"

1        UNITED STATES DISTRICT COURT

2    EASTERN DISTRICT OF CALIFORNIA, FRESNO DIVISION

3                _____

4

5   ROGER McINTOSH,                No. 107CV 01080 LJO-WMW

6              Plaintiff,

7   vs.

8   NORTHERN CALIFORNIA UNIVERSAL
    ENTERPRISES COMPANY, et al,
9
             Defendants.
10  _____

11

12            DEPOSITION OF JOE WU
                  Vol. I
13
                 Taken at
14
            Borton Petrini
15       1600 Truxtun Avenue
         Bakersfield, California
16

17   Tuesday, October 28, 2008 at 10:00 A.M.

18

19             Reported by:

20      Naomi S. Chavez, CSR #13007

21

22

23

24                                   KELEHER'S
     **Certified**
25                        Certified Shorthand Reporters
     **Copy**                Bakersfield • Visalia • Fresno

                              800.635.6044

1

1                          APPEARANCES:

2

3

4

5       For the Plaintiff:

6

7            BORTON PETRINI, LLP

8            By MR. JAMES J. BRAZE

9                 - and -

10           By MR. JEFFREY A. TRAVIS

11           1600 Truxtun Avenue

12           Bakersfield, CA   93301

13           (661) 322-3051

14

15

16      For the Defendant City of Wasco:

17

18           Garcia, Calderon & Ruiz

19           By MR. CHAKA C. OKADIGBO

20           500 South Grand Avenue, Suite 1100

21           Los Angeles, CA   90071

22           (213) 347-0210

23

24

25

1                        APPEARANCES (Cont'd)

2

3

4

5     For the Defendant Northern California Universal

6         Enterprises Company:

7

8             Law Offices of Steven J. Hassing

9             By MR. STEVEN J. HASSING

10            425 Calabria Court

11            Roseville, CA  95747

12            (916) 677-1776

13

14

15

16

17

18

19

20

21

22

23

24

25

1                              INDEX

2    EXAMINATION BY                              PAGE

3    MR. BRAZE                                     5

4    MR. TRAVIS                                   68

5

6

7                          EXHIBIT INDEX

8    PLAINTIFF'S                              FOR ID.

9       1        Notice of Taking Deposition       5

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1      A.    I don't remember his name.  He's the City

2   planner.

3      Q.    City planner?

4      A.    Yeah.

5      Q.    Anyone else other than the City planner?

6      A.    No.

7      Q.    Can you describe him?

8      A.    I don't recall his name.  I talked to him

9   several times.

10     Q.    Can you describe him?  Do you know his first

11  name?

12     A.    I don't remember.

13     Q.    How many conversations did you have with the

14  City planner?

15     A.    A few.

16     Q.    A few?  Five to 10?

17     A.    Yes.

18     Q.    So you had five to 10 conversations with the

19  City planner.  What were the general substances?

20     A.    We talked about a map, how to process, how to

21  meet City requirements.

22     Q.    Did you ever find out there had been a prior

23  map?

24     A.    I really have no knowledge about it.

25     Q.    So the question is you never knew that there

1      A.    He said the plan was owned by the other

2    company.    I just said I just want to know what's wrong

3    with the pump station.

4      Q.    Did anyone from Mr. -- did either Mr. McIntosh

5    or anyone from his business tell you how much they

6    wanted for the plans?

7      A.    I'm trying to remember what he tell me.   He

8    tell me that he designed a plan and the previous -- the

9    person who hired him to do it owed him a lot of money.

10   That's what I understand.

11     Q.    Was there ever a number mentions?

12     A.    A few million dollars.

13     Q.    A few million dollars?

14     A.    Yes.

15     Q.    And what did you understand what a few million

16   dollars represented with respect to the plans or

17   drawings?

18     A.    I'm not interested in how much.   All I want to

19   know is the design.   I wanted to fix the problem.

20   That's all I did.

21     Q.    Did you ever make contact with the prior

22   developer who started the development at Valley Rose

23   subdivision?

24     A.    Never.

25     Q.    Did you ever contact anyone other than the

1    might trick you and change it.

2         A.    All right.

3         Q.    Let me try one more time.

4              Do you know the names of any of the people who

5    worked for Northern who worked on the Valley Rose

6    subdivision?

7              MR. HASSING:   Yes or no.

8         A.    No.

9         Q.    (By Mr. Braze)   But you do have documents in

10   your possession that would tell us those names,

11   correct?

12        A.    Yes.

13        Q.    And you believe your superintendent got the

14   landscaping plans and your assistant got the plans with

15   respect to the pump station; is that correct?

16        A.    Yes.

17        Q.    What was wrong with the pump station?

18        A.    I believe it was the sensor or the level of

19   the sensor.   The sensor controlled the water level.

20        Q.    Who fixed that problem?

21        A.    We called an outside consultant to fix it.

22        Q.    Who is that?

23        A.    I don't recall the name right now.

24        Q.    Other than the landscaping plans and the plans

25   for the pump station, what other plans did you obtain

1  Mr. Wu.

2                    EXAMINATION BY MR. TRAVIS

3      Q.   The repairing of the streets, can you explain

4  in more detail what was involved in repairing the

5  streets other than repairing cracks in the concrete?

6      A.   Well, the paving part of the job, the City

7  asked us to just reseal, just cosmetic, reseal the

8  existing asphalt.

9      Q.   And when you reseal that, what's the process

10  for determining how it is that you reseal?  Do you just

11  go out there and get a sealant and put it on?

12     A.   Yes.  Put the seal coat.

13     Q.   Is there any measure of thickness or anything

14  like that?

15     A.   No.

16     Q.   And Mr. Braze had asked you, although I wasn't

17  clear what it meant, when you said about the pump

18  station, the level of the sensor --

19     A.   Yes.

20     Q.   -- what does that mean?

21     A.   The pump station, the way I understand, is

22  they have two stages to control the low level and the

23  high level.  So at the time when the City required us

24  to do the combust test, we have no information.  So

25  what we did is we had tried to know how the design

1    functioned.  Apparently when we do a test, we found out

2    one of the levels was malfunctioning.

3        Q.    And you had a consultant come in and fix that?

4        A.    Yes.

5        Q.    Were they able to fix the problem?

6        A.    Yes.  They switched it and made it work.

7        Q.    Why did you call to get information on the

8    plans for the pump station?

9        A.    Because I don't have any information.  I just

10   wanted to find out, you know, is it related to the pump

11   station?  Normally, you have to find out what it's

12   designed for or how do they connect or those kind of

13   stuff.

14       Q.    And did you give the outside consultant those

15   plans once you received them?

16       A.    No.  I don't have a plan.  We just called -- I

17   remember finally we found on the panel over at the job

18   site, we were tracing the panel, and we find out who

19   was the original company who sold the equipment.

20       Q.    That's right.

21            I think you had mentioned that you had

22   received the landscaping plans from the City but you

23   only asked for the pump station plans but you didn't

24   receive them, correct?

25       A.    I got some from the City.

1      Q.    Some pump station plans from the City?

2      A.    That's right.

3      Q.    Did you look at the pump station plans?

4      A.    Yes, I did.

5      Q.    Was there any indication of where those plans

6  came from?  Were there any names on the plans?

7      A.    I think either it's Roger's name right there

8  on the plan.

9      Q.    Roger?  And by Roger, you mean Roger

10  McIntosh?

11      A.    McIntosh something like that on the plans.

12      Q.    Is that where you got the idea to call Roger?

13      A.    Yes.

14      Q.    If I can ask, why did you call Roger?

15      A.    I wanted him to see if he had any other idea

16  of who built this pump station.

17      Q.    What do you mean by that?

18      A.    Because the pump station, I didn't build it.

19  If anything is wrong, we wanted to find out who built

20  this so we can ask them, we can get more information,

21  who built this.

22      Q.    What more information did you need?

23      A.    At that time it was weakening and we needed to

24  find out what is wrong with this pump station, so I

25  needed to find out who built this.

1      Q.    So you only needed to know who built the pump

2   station?

3      A.    Yeah.  I needed more information.

4      Q.    And those -- so you did receive those plans

5   from the City, correct?

6      A.    That's correct.

7      Q.    And who did you receive those plans from?

8      A.    I sent the people that I mentioned.  At the

9   time, it was maybe -- a year-and-a-half, two years ago.

10  There was somebody working in Wasco at the time and I

11  told them to call the City to see if they had any

12  drawings, so they gave us some plans.

13     Q.    But you don't remember who it was that you

14  received the plans from?

15     A.    I don't remember.

16     Q.    Do you remember if you received them in print

17  form or electronic form?

18     A.    Print.

19     Q.    Did you receive them in the mail?

20     A.    No.  We go to pick it up.

21     Q.    Where did you go?

22     A.    In the city.

23     Q.    Whereabouts in the city?

24     A.    City, I believe in the building department.

25     Q.    In the building department?

1    in improving these subdivisions that you had purchased.

2            Have you ever -- in that instance or any other

3    instance when you've gone to the building department,

4    have you ever asked the City, like the City of

5    Oroville, for plans like improvement plans, to get

6    copies of them?

7       A.   We don't need them because I mentioned to

8    him --

9            MR. HASSING:   That's a yes or no, Joe.

10      A.   No.

11      Q.   (By Mr. Travis)   You had not?

12           When you are -- had you ever gone for getting

13   permission or had you ever asked for plans for housing,

14   for building plans?

15      A.   No.

16      Q.   For any --

17      A.   No.

18      Q.   Because you all do that in-house?

19      A.   Yes.

20      Q.   When you have your architect design your

21   plans, do you have him -- or does he put on his plans

22   anything to designate that he was the one who created

23   them?

24      A.   No.

25      Q.   So when your plans are created, they are --

1   all they have is the information, they don't have your

2   name or his name on them?

3       A.   His name is put there, but it's company

4   property.

5       Q.   It's your company property?

6       A.   Sure.

7       Q.   What makes you think that it's your property?

8       A.   Because I designed it, it passed through my

9   architect to do the plan.

10      Q.   Do you know what type of property, if you

11  know, what type of property that is?

12      A.   Excuse me?

13      Q.   What kind of property is that?

14      A.   What?

15      Q.   You said it's your property.

16      A.   I said I designed it.  That belongs to me.

17  It's my property because I do the plan.

18      Q.   Do you have any understanding of why that plan

19  belongs to you?

20      A.   You mean my house plan?

21      Q.   Yes.

22      A.   I designed it so they belong to me.

23      Q.   Has anybody ever called you and asked

24  permission to use your house plans?

25      A.   No.

1     Q.   Ever ask permission to copy the house plans?

2     A.   No.

3     Q.   Has anybody called you and asked permission to

4 use any of your plans you have in your development?

5     A.   No.

6     MR. TRAVIS:  That's it for me, Steve.

7     MR. HASSING:  I have no questions.

8     Yours are reserved?

9     MR. OKADIGBO:  And you're leaving now?

10    A.   Yeah.

11    MR. BRAZE:  And you're coming back for yours.

12 We need to talk about those documents.  We'll reserve

13 our right to -- we'll stipulate that this is a

14 non-finished deposition because Mr. Okadigbo has not

15 had the opportunity to cross-examine and that we also

16 reserve our rights to question Mr. Wu on the documents

17 which he did not produce in response to our request.

18    We can stipulate that the court reporter can

19 prepare a transcript calling it Volume I of the

20 deposition of Joe Wu and that Mr. Wu can review the

21 deposition under penalty of perjury, and counsel for

22 Mr. Wu will maintain the original of the deposition and

23 present it in any hearing where it's required or at the

24 time of trial.

25    If the original is lost or cannot be produced,

1    then a copy can be used with the same force and effect

2    as the original.  And counsel for Mr. Wu will notify us

3    of signature and any corrections that he makes to his

4    testimony.

5            MR. HASSING:  I'll take a copy.

6            MR. OKADIGBO:  Copy.

7            (At 11:51 A.M. the deposition of Joe Wu was

8    adjourned sine die.)

9                          _____

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

# EXHIBIT "J"

1  James J. Braze, Esq.; SBN 75911
   Jeffrey A. Travis, Esq.; SBN 235507
2  BORTON PETRINI, LLP
   1600 Truxtun Avenue
3  Post Office Box 2026
   Bakersfield, CA 93303
4  Telephone (661) 322-3051

5  Attorneys for Plaintiff, Roger McIntosh

6

7

8                    UNITED STATES DISTRICT COURT

9         EASTERN DISTRICT OF CALIFORNIA, FRESNO DIVISION

10

11  ROGER McINTOSH,                    Case No.  107CV 01080 LJO-WMW

12              Plaintiff,             REQUEST FOR PRODUCTION OF
                                       DOCUMENTS, ETC., UNDER FEDERAL
13  v.                                 RULES OF CIVIL PROCEDURE,
                                       RULE 34 (SET NO. ONE)
14  NORTHERN CALIFORNIA UNIVERSAL
    ENTERPRISES COMPANY, et al,
15
                Defendants.
16

17

18  PROPOUNDING PARTY    : Plaintiff Roger McIntosh

19  RESPONDING PARTY     : Defendant, Lotus Developments, LP.

20  SET NO.              : One (1)

21        Plaintiff Roger McIntosh requests defendant, Lotus Developments, LP., ("Lotus")

22  respond within 30 days to the following requests:

23  **REQUEST FOR PRODUCTION NO. 1:**

24        That defendant produce and permit plaintiff to inspect and to copy each of the

25  following documents: all documents that support your denial of Paragraph 30 of the First Amended

26  Complaint.

27  **REQUEST FOR PRODUCTION NO. 2:**

28        That defendant produce and permit plaintiff to inspect and to copy each of the

1  following documents: all documents that support your denial of Paragraph 31 of the First Amended

2  Complaint.

3  **REQUEST FOR PRODUCTION NO. 3**:

4        That defendant produce and permit plaintiff to inspect and to copy each of the

5  following documents: all documents that support your denial of Paragraph 33 of the First Amended

6  Complaint.

7  **REQUEST FOR PRODUCTION NO. 4**:

8        That defendant produce and permit plaintiff to inspect and to copy each of the

9  following documents: all documents that support your denial of Paragraph 34 of the First Amended

10  Complaint.

11  **REQUEST FOR PRODUCTION NO. 5**:

12        That defendant produce and permit plaintiff to inspect and to copy each of the

13  following documents: all documents that support your denial of Paragraph 38 of the First Amended

14  Complaint.

15  **REQUEST FOR PRODUCTION NO. 6**:

16        Produce all documents that support your Second Affirmative Defense that plaintiff's

17  claims are barred by copyright misuse.

18  **REQUEST FOR PRODUCTION NO. 7**:

19        Produce all documents that support your Third Affirmative Defense that plaintiff's

20  claims are barred by the doctrine of laches.

21  **REQUEST FOR PRODUCTION NO. 8**:

22        Produce all documents that support your Fourth Affirmative Defense that plaintiff's

23  claims are barred by the doctrine of unclean hands.

24  **REQUEST FOR PRODUCTION NO. 9**:

25        Produce all documents that support your Fifth Affirmative Defense that plaintiff

26  failed to mitigate its damages.

27  **REQUEST FOR PRODUCTION NO. 10**:

28        Produce all documents that support your Sixth Affirmative Defense that plaintiff's

1  claims are barred by any statute of limitations.

2  **REQUEST FOR PRODUCTION NO. 11**:

3          Produce all documents that support your Seventh Affirmative Defense that plaintiff's

4  claims are barred by the doctrine of fair use.

5  **REQUEST FOR PRODUCTION NO. 12**:

6          Produce all documents that support your Eighth Affirmative Defense that plaintiff's

7  claims are barred by the first sale doctrine.

8  **REQUEST FOR PRODUCTION NO. 13**:

9          Produce all documents that support your Ninth Affirmative Defense that plaintiff's

10  claims are barred by the waiver, license, abandonment, or forfeiture of any rights it may have held

11  under the Copyright Act..

12  **REQUEST FOR PRODUCTION NO. 14**:

13          Produce all documents that support your Tenth Affirmative Defense that plaintiff's

14  claims are barred by the equitable doctrine of estoppel.

15  **REQUEST FOR PRODUCTION NO. 15**:

16          Produce all documents that support your Twelfth Affirmative Defense that plaintiff's

17  claims for an award of statutory damages and attorneys fees are barred because the identified

18  copyright registration of the Plaintiff was not made within three months after the first publication

19  of the allegedly infringing works.

20  **REQUEST FOR PRODUCTION NO. 16**:

21          Produce all documents that support your Thirteenth Affirmative Defense that

22  plaintiff's claims are barred by the doctrine of consent.

23  **REQUEST FOR PRODUCTION NO. 17**:

24          Produce all documents showing engineering costs paid by Lotus to DeWalt for its

25  work on the Valley Rose Estates subdivision.

26  **REQUEST FOR PRODUCTION NO. 18**:

27          Produce all documents showing engineering costs paid by Lotus to develop the Valley

28  Rose Estates subdivision.

**REQUEST FOR PRODUCTION NO. 19**:

Produce all documents, including all electronic copies of said documents, of all plans and maps of the Valley Rose Estates subdivision.

**REQUEST FOR PRODUCTION NO. 20**:

Produce all documents, including all electronic copies of said documents, of all plans and maps of the Valley Rose Estates subdivision received from the City of Wasco.

**REQUEST FOR PRODUCTION NO. 21**:

Produce all documents, including all communication, between Lotus and DeWalt engineering related to the development of the Valley Rose Estates subdivision.

**REQUEST FOR PRODUCTION NO. 22**:

Produce all documents, including all communication, between Lotus and the City of Wasco related to the development of the Valley Rose Estates subdivision.

**REQUEST FOR PRODUCTION NO. 23**:

Produce all as-built plans for Tract No. 6451.

**REQUEST FOR PRODUCTION NO. 24**:

Produce all written requests to the City of Wasco for

**REQUEST FOR PRODUCTION NO. 25**:

Produce all documents, including all written authorization, giving Lotus permission to use maps or plans of the Valley Rose Estates subdivision.

**REQUEST FOR PRODUCTION NO. 26**:

Produce all development agreements between Lotus and the City of Wasco for development of any part of the Valley Rose Estates subdivision.

////

////

////

////

////

////

1      PLEASE TAKE NOTICE that if documents have already been previously produced pursuant

2  to previous discovery or disclosures and are individually stamped, you do not need to produce those

3  documents but may merely reference the stamped numbers in response to your answers to the above

4  requests.

5  DATED:   September *26*, 2008

6                          BORTON PETRINI, LLP

7

8                          By: _____

9                              Jeffrey A. Travis, Attorney for Plaintiff,
                               Roger McIntosh

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

## PROOF OF SERVICE (FRCP Rule No. 5)

2

### STATE OF CALIFORNIA, COUNTY OF KERN

3      I am employed in the County of Kern, State of California.  I am over the age of 18
and not a party to the within action; my business address is 1600 Truxtun Avenue,
4    Bakersfield, California 93301.

5      On **September 26, 2008**, I served the foregoing document described as
**REQUEST FOR PRODUCTION OF DOCUMENTS, ETC., UNDER FEDERAL RULES OF**
6    **CIVIL PROCEDURE, RULE 34 (SET NO. ONE)** on the other parties in this action by placing
a true copy thereof enclosed in sealed envelopes addressed as follows:

7

8    Steven J. Hassing, Esq.                    Chaka Okadigbo
     **Law Offices of Steven J. Hassing**       Garcia Calderon Ruiz, LLP
9    425 Calabria Court                         500 South Grand Avenue, Suite 1100
     Roseville, CA 95747                        Los Angeles, CA 90071
10

11   **BY MAIL:**

12      As follows:  I am "readily familiar" with the firm's practice of collection and
processing correspondence for mailing. Under that practice it would be deposited with U.S.
13   postal service on that same day with postage thereon fully prepaid at **Bakersfield**, California
in the ordinary course of business.  I am aware that on motion of the party served, service is
14   presumed invalid if postal cancellation date or postage meter date is more than one day after
date of deposit for mailing in affidavit.

15      Executed on **September 26, 2008**, at **Bakersfield**, California.

16      I declare that I am employed in the office of a member of the bar of this court at
whose direction the service was made.
17

18

19      **Gina Pomato**
        Type or Print Name                          Signature
20

21

22

23

24

25

26

27

28

H:\PUBLIC\054493\060971
McIntosh v. Northern\RPD
SET I TO LOTUS
9-24-08.wpd

REQUEST FOR PRODUCTION OF DOCUMENTS

# EXHIBIT "K"

vja

1   James J. Braze, Esq.; SBN 75911
    Jeffrey A. Travis, Esq.; SBN 235507
2   BORTON PETRINI, LLP
    1600 Truxtun Avenue
3   Post Office Box 2026
    Bakersfield, CA 93303
4   Telephone (661) 322-3051

5   Attorneys for Plaintiff, Roger McIntosh

6

7

8                   UNITED STATES DISTRICT COURT

9           EASTERN DISTRICT OF CALIFORNIA, FRESNO DIVISION

10

11  ROGER McINTOSH,                          Case No.  107CV 01080 LJO-WMW

12               Plaintiff,
                                             REQUEST FOR PRODUCTION OF
13  v.                                       DOCUMENTS, ETC., UNDER FEDERAL
                                             RULES OF CIVIL PROCEDURE,
14  NORTHERN CALIFORNIA UNIVERSAL            RULE 34 (SET NO. ONE)
    ENTERPRISES COMPANY, et al,
15
                 Defendants.
16

17  PROPOUNDING PARTY    :  Plaintiff Roger McIntosh

18  RESPONDING PARTY     :  Defendant Northern California Universal Enterprises Company, Inc.

19  SET NO.              :  One (1)

20          Plaintiff Roger McIntosh requests defendant, Northern California Universal

21  Enterprises Company, ("NCUE") respond within 30 days to the following requests:

22  **REQUEST FOR PRODUCTION NO. 1**:

23          That defendant produce and permit plaintiff to inspect and to copy each of the

24  following documents: all documents that support your denial of Paragraph 30 of the First Amended

25  Complaint.

26  **REQUEST FOR PRODUCTION NO. 2**:

27          That defendant produce and permit plaintiff to inspect and to copy each of the

28  following documents: all documents that support your denial of Paragraph 31 of the First Amended

1  Complaint.

2  **REQUEST FOR PRODUCTION NO. 3:**

3        That defendant produce and permit plaintiff to inspect and to copy each of the

4  following documents: all documents that support your denial of Paragraph 33 of the First Amended

5  Complaint.

6  **REQUEST FOR PRODUCTION NO. 4:**

7        That defendant produce and permit plaintiff to inspect and to copy each of the

8  following documents: all documents that support your denial of Paragraph 34 of the First Amended

9  Complaint.

10 **REQUEST FOR PRODUCTION NO. 5:**

11       That defendant produce and permit plaintiff to inspect and to copy each of the

12 following documents: all documents that support your denial of Paragraph 38 of the First Amended

13 Complaint.

14 **REQUEST FOR PRODUCTION NO. 6:**

15       Produce all documents that support your Second Affirmative Defense that plaintiff's

16 claims are barred by copyright misuse.

17 **REQUEST FOR PRODUCTION NO. 7:**

18       Produce all documents that support your Third Affirmative Defense that plaintiff's

19 claims are barred by the doctrine of laches.

20 **REQUEST FOR PRODUCTION NO. 8:**

21       Produce all documents that support your Fourth Affirmative Defense that plaintiff's

22 claims are barred by the doctrine of unclean hands.

23 **REQUEST FOR PRODUCTION NO. 9:**

24       Produce all documents that support your Fifth Affirmative Defense that plaintiff

25 failed to mitigate its damages.

26 **REQUEST FOR PRODUCTION NO. 10:**

27       Produce all documents that support your Sixth Affirmative Defense that plaintiff's

28 claims are barred by any statute of limitations.

**REQUEST FOR PRODUCTION NO. 11:**

Produce all documents that support your Seventh Affirmative Defense that plaintiff's claims are barred by the doctrine of fair use.

**REQUEST FOR PRODUCTION NO. 12:**

Produce all documents that support your Eighth Affirmative Defense that plaintiff's claims are barred by the first sale doctrine.

**REQUEST FOR PRODUCTION NO. 13:**

Produce all documents that support your Ninth Affirmative Defense that plaintiff's claims are barred by the waiver, license, abandonment, or forfeiture of any rights it may have held under the Copyright Act..

**REQUEST FOR PRODUCTION NO. 14:**

Produce all documents that support your Tenth Affirmative Defense that plaintiff's claims are barred by the equitable doctrine of estoppel.

**REQUEST FOR PRODUCTION NO. 15:**

Produce all documents that support your Twelfth Affirmative Defense that plaintiff's claims for an award of statutory damages and attorneys fees are barred because the identified copyright registration of the Plaintiff was not made within three months after the first publication of the allegedly infringing works.

**REQUEST FOR PRODUCTION NO. 16:**

Produce all documents that support your Thirteenth Affirmative Defense that plaintiff's claims are barred by the doctrine of consent.

**REQUEST FOR PRODUCTION NO. 17:**

Produce all documents showing engineering costs paid by NCUE to DeWalt for its work on the Valley Rose Estates subdivision.

**REQUEST FOR PRODUCTION NO. 18:**

Produce all documents showing engineering costs paid by NCUE to develop the Valley Rose Estates subdivision.

1  **REQUEST FOR PRODUCTION NO. 19**:

2         Produce all documents, including all electronic copies of said documents, of all plans

3  and maps of the Valley Rose Estates subdivision.

4  **REQUEST FOR PRODUCTION NO. 20**:

5         Produce all documents, including all electronic copies of said documents, of all plans

6  and maps of the Valley Rose Estates subdivision received from the City of Wasco.

7  **REQUEST FOR PRODUCTION NO. 21**:

8         Produce all documents, including all communication, between NCUE and DeWalt

9  engineering related to the development of the Valley Rose Estates subdivision.

10 **REQUEST FOR PRODUCTION NO. 22**:

11        Produce all documents, including all communication, between NCUE and the City

12 of Wasco related to the development of the Valley Rose Estates subdivision.

13 **REQUEST FOR PRODUCTION NO. 23**:

14        Produce all as-built plans for Tract No. 6451.

15 **REQUEST FOR PRODUCTION NO. 24**:

16        Produce all written requests to the City of Wasco for

17 **REQUEST FOR PRODUCTION NO. 25**:

18        Produce all documents, including all written authorization, giving NCUE permission

19 to use maps or plans of the Valley Rose Estates subdivision.

20 **REQUEST FOR PRODUCTION NO. 26**:

21        Produce all development agreements between NCUE and the City of Wasco for

22 development of any part of the Valley Rose Estates subdivision.

23 ////

24 ////

25 ////

26 /////

27 ////

28 /////

4

REQUEST FOR PRODUCTION OF DOCUMENTS

1    PLEASE TAKE NOTICE that if documents have already been previously produced pursuant

2  to previous discovery or disclosures and are individually stamped, you do not need to produce those

3  documents but may merely reference the stamped numbers in response to your answers to the above

4  requests.

5  DATED:  September _26_, 2008

BORTON PETRINI, LLP

6

7

8                      By: _____

Jeffrey A. Travis, Attorney for Plaintiff,

9                           Roger McIntosh

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

5

REQUEST FOR PRODUCTION OF DOCUMENTS

1

## PROOF OF SERVICE (FRCP Rule No. 5)

2

STATE OF CALIFORNIA, COUNTY OF KERN

3

I am employed in the County of Kern, State of California.  I am over the age of 18
and not a party to the within action; my business address is 1600 Truxtun Avenue,
Bakersfield, California 93301.

4

5

On **September 26, 2008,** I served the foregoing document described as **REQUEST
FOR PRODUCTION OF DOCUMENTS, ETC., UNDER FEDERAL RULES OF
CIVIL PROCEDURE, RULE 34 (SET NO. ONE)**  on the other parties in this action by
placing a true copy thereof enclosed in sealed envelopes addressed as follows:

6

7

8

Steven J. Hassing, Esq.                    Chaka Okadigbo
**Law Offices of Steven J. Hassing**       Garcia Calderon Ruiz, LLP
425 Calabria Court                         500 South Grand Avenue, Suite 1100
Roseville, CA 95747                        Los Angeles, CA 90071

9

10

11

## BY MAIL:

12

As follows:  I am "readily familiar" with the firm's practice of collection and
processing correspondence for mailing.  Under that practice it would be deposited with U.S.
postal service on that same day with postage thereon fully prepaid at **Bakersfield**, California
in the ordinary course of business.  I am aware that on motion of the party served, service is
presumed invalid if postal cancellation date or postage meter date is more than one day after
date of deposit for mailing in affidavit.

13

14

15

Executed on **September 26, 2008,** at **Bakersfield**, California.

16

I declare that I am employed in the office of a member of the bar of this court at
whose direction the service was made.

17

18

19

**Gina Pomato**
Type or Print Name

Signature

20

21

22

23

24

25

26

27

28

# EXHIBIT "L"

Steven J. Hassing
California SBN 152125
LAW OFFICES OF STEVEN J. HASSING
425 Calabria Court
Roseville, CA 95747
Telephone: (916) 677-1776
Facsimile: (916) 677-1770

2009 OCT 27  A 9: 18

Attorney *for Defendants, Northern California
Universal Enterprise Company and Lotus
Developments*

# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

ROGER MCINTOSH,

                                Plaintiff(s);

v.

NORTHERN CALIFORNIA UNIVERSAL
ENTERPRISES COMPANY, ET AL.,

                                Defendant(s).

No. 1:07-CV-01080-LJO-GSA

**DEFENDANT, LOTUS
DEVELOPMENTS, LP'S RESPONSE
TO PLAINTIFF'S REQUEST FOR
PRODUCTION OF DOCUMENTS**

**SET ONE**

PROPOUNDING PARTY:         Plaintiff, ROGER MCINTOSH

RESPONDING PARTY:          Defendant, LOTUS DEVELOPMENTS, LP.

SET NO.                    ONE

        Defendant, Lotus Developments, LP responds to Plaintiff's Request for Production of

Documents, Set One as follows:

///

///

///

1
Defendant, Lotus Development, LP's Response to Plaintiff's Request for Production of Documents
Set One

**REQUEST NO. 1:**

That defendant produce and permit plaintiff to inspect and to copy each of the following documents: all documents that support your denial of Paragraph 30 of the First Amended Complaint.

**RESPONSE**

Responding party objects to the production of the documents identified on the basis that each and every document in the possession or under the control of Lotus has been produced to the requesting party in satisfaction of its disclosure requirements.

**REQUEST NO. 2:**

That defendant produce and permit plaintiff to inspect and to copy each of the following documents:  all documents that support your denial of Paragraph 31 of the First Amended Complaint.

**RESPONSE**

Responding party objects to the production of the documents identified on the basis that each and every document in the possession or under the control of Lotus has been produced to the requesting party in satisfaction of its disclosure requirements.

**REQUEST NO. 3:**

That defendant produce and permit plaintiff to inspect and to copy each of the following documents: all documents that support your denial of Paragraph 33 of the First Amended Complaint.

///

///

///

Defendant, Lotus Development, LP's Response to Plaintiff's Request for Production of Documents
Set One

**RESPONSE**

Responding party objects to the production of the documents identified on the basis that each and every document in the possession or under the control of Lotus has been produced to the requesting party in satisfaction of its disclosure requirements.

**REQUEST NO. 4:**

That defendant produce and permit plaintiff to inspect and to copy each of the following documents: all documents that support your denial of Paragraph 34 of the First Amended Complaint.

**RESPONSE**

Responding party objects to the production of the documents identified on the basis that each and every document in the possession or under the control of Lotus has been produced to the requesting party in satisfaction of its disclosure requirements.

**REQUEST NO. 5:**

That defendant produce and permit plaintiff to inspect and to copy each of the following documents: all documents that support your denial of Paragraph 38 of the First Amended Complaint.

**RESPONSE**

Responding party objects to the production of the documents identified on the basis that each and every document in the possession or under the control of Lotus has been produced to the requesting party in satisfaction of its disclosure requirements.

**REQUEST NO. 6:**

Produce all documents that support your Second Affirmative Defense that plaintiff's claims are barred by copyright misuse.

**RESPONSE**

Responding party objects to the production of the documents identified on the basis that each and every document in the possession or under the control of Lotus has been produced to the requesting party in satisfaction of its disclosure requirements.

**REQUEST NO. 7:**

Produce all documents that support your Third Affirmative Defense that plaintiff's claims are barred by the doctrine of laches.

**RESPONSE**

Responding party objects to the production of the documents identified on the basis that each and every document in the possession or under the control of Lotus has been produced to the requesting party in satisfaction of its disclosure requirements.

**REQUEST NO. 8:**

Produce all documents that support your Fourth Affirmative Defense that plaintiff's claims are barred by the doctrine of unclean hands.

**RESPONSE**

Responding party objects to the production of the documents identified on the basis that each and every document in the possession or under the control of Lotus has been produced to the requesting party in satisfaction of its disclosure requirements.

**REQUEST NO. 9:**

Produce all documents that support your Fifth Affirmative Defense that plaintiff failed to mitigate its damages.

///

///

**RESPONSE**

Responding party objects to the production of the documents identified on the basis that each and every document in the possession or under the control of Lotus has been produced to the requesting party in satisfaction of its disclosure requirements.

**REQUEST NO. 10:**

Produce all documents that support your Sixth Affirmative Defense that plaintiff's claims are barred by any statute of limitations.

**RESPONSE**

Responding party objects to the production of the documents identified on the basis that each and every document in the possession or under the control of Lotus has been produced to the requesting party in satisfaction of its disclosure requirements.

**REQUEST NO. 11:**

Produce all documents that support your Seventh Affirmative Defense that plaintiff's claims are barred by the doctrine of fair use.

**RESPONSE**

Responding party objects to the production of the documents identified on the basis that each and every document in the possession or under the control of Lotus has been produced to the requesting party in satisfaction of its disclosure requirements.

**REQUEST NO. 12:**

Produce all documents that support your Eighth Affirmative Defense that plaintiff's claims are barred by the first sale doctrine.

///

///

**RESPONSE**

Responding party objects to the production of the documents identified on the basis that each and every document in the possession or under the control of Lotus has been produced to the requesting party in satisfaction of its disclosure requirements.

**REQUEST NO. 13:**

Produce all documents that support your Ninth Affirmative Defense that plaintiff's claims are barred by the waiver, license, abandonment, or forfeiture of any rights it may have held under the Copyright Act..

**RESPONSE**

Responding party objects to the production of the documents identified on the basis that each and every document in the possession or under the control of Lotus has been produced to the requesting party in satisfaction of its disclosure requirements.

**REQUEST NO. 14:**

Produce all documents that support your Tenth Affirmative Defense that plaintiff's claims are barred by the equitable doctrine of estoppel.

**RESPONSE**

Responding party objects to the production of the documents identified on the basis that each and every document in the possession or under the control of Lotus has been produced to the requesting party in satisfaction of its disclosure requirements.

**REQUEST NO. 15:**

Produce all documents that support your Twelfth Affirmative Defense that plaintiff's claims for an award of statutory damages and attorneys fees are barred because the identified

copyright registration of the Plaintiff was not made within three months after the first publication of the allegedly infringing works.

## RESPONSE

Responding party objects to the production of the documents identified on the basis that each and every document in the possession or under the control of Lotus has been produced to the requesting party in satisfaction of its disclosure requirements.

## REQUEST NO. 16:

Produce all documents that support your Thirteenth Affirmative Defense that plaintiff's claims are barred by the doctrine of consent.

## RESPONSE

Responding party objects to the production of the documents identified on the basis that each and every document in the possession or under the control of Lotus has been produced to the requesting party in satisfaction of its disclosure requirements.

## REQUEST NO. 17:

Produce all documents showing engineering costs paid by Lotus to DeWalt for its work on the Valley Rose Estates subdivision.

## RESPONSE

Objection, irrelevant, will not lead to discovery of admissible evidence.  Objection, seeks to invade responding party's private proprietary financial information for the sole sake of harassment.

## REQUEST NO. 18:

Produce all documents showing engineering costs paid by Lotus to develop the Valley Rose Estates subdivision.

**RESPONSE**

Objection, irrelevant, will not lead to discovery of admissible evidence. Objection, seeks to invade responding party's private proprietary financial information for the sole sake of harassment.

**REQUEST NO. 19:**

Produce all documents, including all electronic copies of said documents, of all plans and maps of the Valley Rose Estates subdivision.

**RESPONSE**

Responding party will produce the documents requested.

**REQUEST NO. 20:**

Produce all documents, including all electronic copies of said documents, of all plans and maps of the Valley Rose Estates subdivision received from the City of Wasco.

**RESPONSE**

Responding party will produce the documents requested.

**REQUEST NO. 21:**

Produce all documents, including all communication, between Lotus and DeWalt engineering related to the development of the Valley Rose Estates subdivision.

**RESPONSE**

Responding party will produce the documents requested.

**REQUEST NO. 22:**

Produce all documents, including all communication, between Lotus and the City of Wasco related to the development of the Valley Rose Estates subdivision.

///

**RESPONSE**

Responding party will produce the documents requested.

**REQUEST NO. 23:**

Produce all as-built plans for Tract No. 6451.

**RESPONSE**

Responding party will produce the documents requested.

**REQUEST NO. 24:**

Produce all written requests to the City of Wasco for

**RESPONSE**

Objection, vague and ambiguous; unintelligible.

**REQUEST NO. 25:**

Produce all documents, including all written authorization, giving Lotus permission to use maps or plans of the Valley Rose Estates subdivision.

**RESPONSE**

Responding party objects to the production of the documents identified on the basis that each and every document in the possession or under the control of Lotus has been produced to the requesting party in satisfaction of its disclosure requirements.

**REQUEST NO. 26:**

Produce all development agreements between Lotus and the City of Wasco for development of any part of the Valley Rose Estates subdivision.

///

///

///

**RESPONSE**

Responding party objects to the production of the documents identified on the basis that each and every document in the possession or under the control of Lotus has been produced to the requesting party in satisfaction of its disclosure requirements.

Dated this 21st day of October, 2008

Steven J Hassing, Attorney
for defendants

**PROOF OF SERVICE**

Case No. 1:07-CV-01080-LJO-GSA

I, the undersigned, declare:

I am employed in the County of Placer, State of California. I am over the age of eighteen years and not a party to the within action; my business address is 425 Calabria Court, Roseville, CA 95747. I am readily familiar with the business practice for collection and processing of correspondence for mailing with the United States Postal Service. On October 23, 2008 I served the foregoing described as:

**LOTUS DEVELOPMENT'S RESPONSE TO PLAINTIFF'S REQUEST FOR PRODUCTION OF DOCUMENTS**

on the parties in this action.

__xx__  placing an original or true copy thereof enclosed in a sealed envelope with postage fully prepaid, placed for collection and mailing in Roseville, California, on said date, following ordinary business practice, and addressed as follows:

James J. Braze
Jeffrey A. Travis
Borton Petrini, LLP
1600 Truxtun Avenue
Post Office Box 2026
Bakersfield, CA 93303

Chaka Okadigbo
Garcia Calderon Ruiz, LLP
500 South Grand Avenue, Ste. 1100
Los Angeles, CA 90071

____  Emailed to:   James Braze @jbraze@bortonpetrini.com and
Chaka Okadigbo @cokadigbo@gcrlegal.com

____  Overnight service via UPS to:

I declare under penalty of perjury that the foregoing is true and correct, and that this declaration was executed on October 23, 2008.

Kimberley A. Hassing

PROOF OF SERVICE - 1

## VERIFICATION

I, the undersigned, declare:

I am president of Northern California Universal Enterprise Company, the general partnership of Lotus Developments, LP which is a party to the action herein and I have read the foregoing responses to Plaintiff, Roger McIntosh's Requests for Production of Documents – set one above and know the contents thereof.  The same are true of my own knowledge, except as to those matters therein stated on information and belief, and as to those matters, I believe them to be true.

I declare under penalty of perjury under the laws of the State of California and of the United States of America that the foregoing is true and correct.

Date: _____        _____

Joe Wu,
Lotus Developments, LP

# EXHIBIT "L" 1

EXHIBIT "__3__"

### PURCHASE AND SALE AGREEMENT

### AND JOINT ESCROW INSTRUCTIONS

This Purchase and Sale Agreement and Joint Escrow Instructions ("Agreement"), dated as of April 6th, 2004 is entered into by and between WASCO PROJECT LLC ("Buyer"), and CITY OF WASCO ("Seller").

WHEREAS, Seller is the sole owner in fee of two parcels of real property which contain approximately +/- 97.57 acres which are located in the City of Wasco, and are more particularly described in Exhibit "A" attached hereto and incorporated herein by this reference (the "Property"); and

WHEREAS, the Property is subject to over Four Million Dollars in Assessment Liens; and

WHEREAS, the Property has been partially developed and is currently in a blighted condition; and

WHEREAS, the best use of the Property is for private development; and

WHEREAS, it is for the public benefit that said Property be sold; and

WHEREAS, Buyer desires to purchase from Seller and Seller desires to sell to Buyer the Property on the terms and conditions set forth herein.

Buyer and Seller hereby agree as follows:

1.     Purchase and Sale.  Upon and subject to the terms and conditions set forth in this Agreement, Seller hereby agrees to sell to Buyer and Buyer hereby agrees to buy from Seller the following property (collectively, the "Property"): that certain real property located in the County of Kern, State of California, more particularly described in Exhibit "A" attached hereto, together with all easements, hereditaments and appurtenances thereto, and all improvements situated thereon; and all other rights and interests in connection with the foregoing.

2.     Purchase Price.  The purchase price for the Property (the "Purchase Price") shall be $ 1,950,000.00

3.     Method of Payment of Purchase Price.  The Purchase Price shall be paid by Buyer to Seller upon the Closing (as that term is defined in Paragraph 4.3, below).  Buyer shall make the following deposits into the Escrow (as defined in Paragraph 4.1, below):

BP000202

L 004

3.1    Deposit.  Buyer shall deposit into the Escrow, at the Opening, the sum of $195,000.00   (10% of the Purchase Price) (the "Deposit").  Escrow Holder (as defined in Paragraph 4.1, below) shall invest the Deposit in an interest-bearing account and the interest earned on such account shall be applied as provided in this Agreement.

3.2    Cash At Closing.  Buyer shall deposit into the Escrow in the form of cash, a certified or bank cashier's check or a confirmed wire transfer of funds, on or before the Closing Deadline, the balance of the Purchase Price remaining after deduction of the Deposit (and interest earned thereon in Escrow).  The amount payable by Buyer pursuant to this Paragraph 3.2 shall be adjusted as necessary to reflect the costs and prorations payable pursuant to Paragraph 4.7, below.

4.    Escrow.

4.1    Opening; Joint Instructions.  Within five (5) days after the execution of this Agreement, Buyer and Seller shall open an escrow (the "Escrow") with Fidelity National Title Company, whose address is 110 New Stine Road, Bakersfield, California ("Escrow Holder"), by delivering to Escrow Holder a fully-executed copy of this Agreement (the "Opening").  The purchase and sale of the Property shall be completed through the Escrow.  This Agreement, together with the provisions of Exhibit "B" attached hereto and incorporated herein by this reference, shall constitute joint escrow instructions to the Escrow Holder in connection with the Escrow.  In the event of any inconsistency between the typed provisions of this Agreement and the provisions of Exhibit "B", the typed provisions of this Agreement shall prevail.

4.2    Additional Instructions.  Buyer and Seller hereby agree to execute such additional instructions not inconsistent with this Agreement as may be reasonably required by the Escrow Holder.

4.3    Closing Deadline.  The Grant Deed (as defined in Paragraph 4.4, below) shall be recorded and the Escrow shall close (the "Closing") as soon as possible after the satisfaction of all of the conditions contained in this Agreement, including but not limited to Section 7.1, but in no event later than June 1st, 2004 (the "Closing Deadline").  Time is specifically of the essence as to the Closing Deadline, and the Closing Deadline shall not be extended except by the mutual written agreement of Buyer and Seller.

4.4    Seller's Closing Documents.  Seller shall deliver to the Escrow Holder, on or before the date two (2) business days prior to the Closing Deadline, the following documents:

(a)    a Grant Deed to the Property duly executed and acknowledged by the Seller in favor of Buyer and in recordable form (the "Grant Deed"); and

(b)    other instruments and documents that may be required by the Escrow Holder to transfer the Property to Buyer.

BP000203

4.5    Actions at Closing.    At the Closing, the Escrow Holder shall do the following:

(a)    Prorate all matters in accordance with Paragraph 4.7, below, based on the latest available information.

(b)    Cause the Grant Deed to be recorded in the Official Records of the county in which the Property is located.

(c)    Deduct from funds deposited with the Escrow Holder by Buyer in payment of the Purchase Price for the Property for the amount of items chargeable to the account of Seller pursuant to this Agreement;

(d)    The remaining balance of the funds deposited by Buyer into the Escrow in payment of the Purchase Price shall be disbursed for the benefit of the Seller promptly upon the Closing in accordance with separate escrow instructions to be provided to the Escrow.

(e)    Deliver or cause to be delivered to Buyer an original of the owner's policy of title insurance, or commitment therefor, to be issued pursuant to Paragraph 5.2, below, and deliver to Buyer a conformed copy of the Grant Deed.

4.6    Cancellation of Escrow.

(a)    In the event that the Closing does not occur at the time and in the manner provided in this Agreement due to the material failure of Buyer to comply with any of its obligations under this Agreement ("Buyer Default"), Seller shall have the right to cancel the Escrow by written notice to Buyer and the Escrow Holder, and upon such cancellation all costs of cancellation of the Escrow, including without limitation the cost of the preliminary title report furnished to Buyer pursuant to Paragraph 5.1, below (collectively, the "Cancellation Costs"), shall be paid by Buyer.

(b)    In the event that the Closing does not occur at the time and in the manner provided in this Agreement due to the material failure of Seller to comply with any of its obligations under this Agreement ("Seller Default"), Buyer shall have the right to cancel the Escrow by written notice to Seller and the Escrow Holder, and upon such cancellation the Cancellation Costs shall be paid by Seller, and the Escrow Holder shall refund to Buyer the Deposit and all interest earned thereon in Escrow.

(c)    In the event that the Closing does not occur at the time and in the manner provided in this Agreement for any reason other than a Buyer Default or a Seller Default, either Buyer or Seller may, at any time after the Closing Deadline, cancel the Escrow by written notice to the Escrow Holder and to the other, and upon such cancellation, the Cancellation Costs shall be divided equally between Buyer and Seller, and Escrow Holder shall refund to Buyer the Deposit and all interest earned thereon in Escrow.

WO2LAILYIA70562879.1

BP000204

(d)    Upon any cancellation of the Escrow, all instruments and documents deposited into the Escrow shall be returned to the parties who deposited the same, and any amounts deposited into the Escrow by Buyer pursuant to Paragraph 3, above, shall be returned to Buyer.

4.7    Closing Costs and Prorations.  The costs incidental to the Closing shall be paid as follows:

(a)    Seller shall pay:    (i) the cost of the preliminary title report furnished to Buyer pursuant to Paragraph 5.1, below; (ii) the premium for the CLTA standard coverage owner's policy of title insurance obtained pursuant to Paragraph 5.2, below (provided that if Buyer elects to obtain an ALTA extended coverage policy of title insurance or any endorsements to the policy of title insurance pursuant to Paragraph 5.2, below, Buyer shall pay the additional premium for such policy over the premium for a CLTA policy and the additional premium for any endorsements to the policy of title insurance); (iii) the documentary transfer tax on the Grant Deed; and (iv) the Escrow Holder's fees in connection with the Escrow.

(b)    Buyer shall pay:    (i) the cost of recording the Grant Deed; (ii) one-half (1/2) of the Escrow Holder's fees in connection with the Escrow; and (iii) the additional premium for an ALTA extended coverage policy of title insurance over the premium for a CLTA policy, in the event that Buyer elects to obtain an ALTA policy pursuant to Paragraph 5.2, below, and the additional premium for any endorsements to the policy of title insurance.

(c)    Buyer and Seller shall each pay their own legal fees and other incidental expenses incurred in connection with the transaction contemplated by this Agreement.

(d)    Any other costs or expenses in connection with the transactions contemplated by this Agreement shall be apportioned in the manner customary in the County in which the Property is located.

(e)    As between Buyer and Seller only, Buyer shall be responsible for all real and personal property taxes and assessments for the Property relating to the period commencing on or after the Closing, and the Seller shall be responsible for all real and personal property taxes and assessments for the Property relating to the period prior to the Closing, if any.

5.    Title.

5.1    Preliminary Title Report.  Seller shall furnish Buyer, as soon as available, a preliminary title report for the Property prepared by Fidelity National Title Company (the "Title Company"), together with copies of the documents described in such report (collectively, the "Title Documents").  Buyer shall have ten (10) business days after receipt of the Title Documents (the "Title Approval Period") to approve the same.  If Buyer fails to deliver a written notice disapproving the Title Documents to the Escrow

Company on or before the last day of the Title Approval Period, Buyer shall be conclusively deemed to have approved the Title Documents and the exceptions contained therein. If Buyer timely disapproves the Title Documents, Buyer at its option may (a) cancel the Escrow and this Agreement by written notice to Seller and the Escrow Holder, in which case the Cancellation Costs shall be paid by Seller, or (b) permit Seller to remove the objectionable items from title. If Seller does not remove such items before the Closing Deadline, Buyer at its option may (x) waive its objection and close the transaction or (y) cancel the Escrow and this Agreement by written notice to Seller and the Escrow Holder, in which case the Cancellation Costs shall be paid by Seller.

      5.2   Title Insurance. At the time of the Closing and as a condition thereto, the Escrow Holder shall deliver to Buyer an original of either a CLTA standard coverage owner's policy of title insurance issued by the Title Company or an unconditional and unqualified commitment by the Title Company to issue such a policy, naming Buyer as insured, in a policy amount equal to the Purchase Price, showing title to the Property to be vested in Buyer, subject only to (a) non-delinquent taxes and assessments (provided that the lien of all current and future assessments for the Wasco Assessment District 1992-2 (Valley Rose Estates) ("Assessment Liens") shall be released concurrently with the Closing), and (b) the exceptions contained in the Title Documents approved or deemed approved by Buyer pursuant to Paragraph 5.1, above. Buyer shall have the right to elect to receive an ALTA owner's extended coverage policy of title insurance with the same liability amount and subject only to the exceptions described in (a) and (b), above in this Paragraph 5.2, in lieu of such CLTA policy, provided that Buyer pays the difference in premium and any costs of required new surveys attributable to such policy and provided further that the procurement of such policy shall not result in an extension of the Closing Deadline. Notwithstanding the foregoing, the Seller shall have no obligation to remove or eliminate any lien or encumbrance affecting title to the Property, including but not limited to the assessment liens.

6.    Buyer's Conditions. The following shall constitute conditions to the obligations of Buyer under this Agreement:

      6.1   Title Insurance. Receipt by Buyer of a title insurance policy in the manner provided in Paragraph 5.2, above.

      6.2   Inspections. Approval by Buyer, on or before the date ten (10) business days after the Opening (the "Inspection Period"), of all conditions of, and other matters related to, the Property, specifically including the following matters, which shall be deemed approved unless Seller receives written notice of disapproval on or before the last day of the Inspection Period:

          (a)   The physical condition of the Property, including without limitation soil conditions, the absence from the Property of asbestos and other hazardous and toxic materials, compliance of the Property with all applicable laws, including any laws relating to hazardous and toxic materials. Seller shall cause the Owners to allow Buyer and/or its agents access to the Property to perform any and all investigations and inspections desired by Buyer, provided that

BP000206

Buyer shall indemnify and hold Seller and the Owners harmless from and against any and all claims, demands, losses, obligations, costs and expenses (including attorneys' fees and costs) resulting from such entry; and

(b)     All applicable government ordinances, rules and regulations and evidence of Seller's compliance therewith, including without limitation zoning and building regulations, and all licenses, permits and other governmental approvals and/or authorizations relating to the Property, including the suitability of the Property for Buyer's intended use and/or development; and

(c)     All costs and economic feasibility of Buyer's use and/or intended development of the Property.

The foregoing indemnity in Section 6.2(a) by Buyer shall survive the Close of Escrow and the recordation of the Grant Deed, or the earlier termination of this Agreement.

6.3     AS-IS Transaction.  Buyer hereby acknowledges and agrees that Seller has made no representations or warranties, express or implied, as to the Property or improvements or contract rights or entitlements relating thereto, or as to the condition, state of repair or fitness for use of the Property or such improvements or appurtenances, and (ii) Buyer shall, following satisfaction of the conditions contained in this Paragraph 6 , accept title to the Property and any improvements thereon or appurtenances thereto "AS IS" and without warranty, express or implied.  Buyer acknowledges that Seller has not induced Buyer to execute and deliver this Agreement based upon any representations or warranties of Seller and that Buyer is relying upon Buyer's own independent investigation of the Property in entering into this Agreement and purchasing the Property.

6.4     Subdivision Site.  Seller and Buyer acknowledge that the Property is in a blighted condition and is an old subdivision site that has not been completed which contains infrastructure improvements that have been constructed and Buyer accepts the responsibility for taking any and all actions necessary regarding security and maintenance of the improvements.  Buyer further acknowledges that the Subdivision Map has not been finalized and that the time for finalizing said Map has expired and it is Buyer's responsibility to obtain a new subdivision map or maps for the Property.

7.     Seller's Condition.  The obligations of the Seller under this Agreement shall be conditioned upon the Seller obtaining all appropriate releases of the Assessment Liens from all interested parties thereto, including, without limitation, obtaining any court orders or other instructions with respect to such Assessment Liens or any related public financing that it may determine necessary, in its sole discretion. Failure of Seller to obtain releases of the Assessment Liens or court orders will not be considered an event of default by Seller.

7.1     CONDITIONS PRECEDENT TO CITY CONVEYANCE.  Prior to, and as conditions to the City Conveyance, the following conditions shall be completed:

(a)  Prior to April 15th, 2004, the Buyer shall submit to the Seller evidence that the Buyer has obtained sufficient equity capital and firm and binding

BP000207

commitments for interim and/or permanent financing necessary for the purchase of the Property in accordance with this Agreement. Such evidence of financing shall include copies of all conditional and firm financing commitments and any permanent financing commitments or other documents that indicate Buyer's ability to finance the purchase of the Property. Conditional commitments shall be firm and binding commitments subject only to standard conditions required by the lender. Proof of funding acceptance of such loan commitment by Buyer and proof of payment of all loan commitment fees required to fund the financing commitments and proof of funding of equity capital contributions shall also be required.

(b)   Material Default.   Buyer shall not be in material default of any provision of this Agreement.

(c)   Settlement Agreement and Mutual Release.   The Seller shall enter into a Settlement Agreement and Mutual Release with Michael Richardson and Badger Technology, Inc. and all the terms and conditions of said Agreement shall be satisfied by May 21st, 2004,

(d)   Workout Agreement.   The Seller shall enter into a satisfactory agreement with U.S. Bank National Association in its capacity as the Trustee for the Wasco Public Financing Authority 1989 Local Agency Revenue Bonds Series A and the Assessment District No. 1992-2 Assessment District Bonds, Michael Richardson and Badger Technology, Inc. and all the terms and conditions of said agreement shall be satisfied by May 21st, 2004.

8.   Buyer's Indemnity; Release.   Buyer hereby agrees, following the Closing, to indemnify and hold Seller harmless from and against any and all claims, demands, losses, obligations, costs and expenses (including without limitation attorneys' fees and court costs) which arise out of (a) the ownership or operation of the Property after the Closing, or (b) any alleged presence upon the Property of, or any required remediation of, any hazardous or toxic materials. In addition, Buyer hereby waives, releases and forever discharges Seller of and from any and all claims of any kind whatsoever, at law or in equity, known or unknown, which Buyer has ever had, now has, or hereafter can have arising out of any condition of or matter related to the Property, specifically including the alleged presence upon the Property of, or any required remediation of, any hazardous or toxic materials. Buyer hereby agrees to waive the benefits of Section 1542 of the Civil Code of the State of California, which provides as follows:

"A general release does not extend to claims which the creditor does not know or suspect to exist in his favor at the time of executing the release, which if known by him, must have materially affected his settlement with the debtor."

9.   Possession.   Upon the Closing, Seller shall cause possession of the Property to be delivered to Buyer.

10.     Representations and Warranties of Buyer.  Buyer hereby represents and warrants to Seller as follows:

(a)  Buyer has full authority to enter into this Agreement and all documents executed by Buyer which are to be delivered to Seller at the Closing are or at the time of Closing will be duly authorized, executed and delivered by Buyer and do not and at the time of Closing will not violate any provisions of any agreement or judicial order to which Buyer is a party or to which Buyer or the Property is subject.

(b)  The Buyer does not have any material contingent obligations or any material contractual agreements which could materially adversely affect the ability of the Buyer to carry out its obligations in this Agreement.

(c)     There are no material pending or, so far as is known to the Buyer, threatened legal proceedings to which the Buyer is or may be made a party or to which any of its property is or may become subject, which has not been fully disclosed in the material submitted to the Seller which could materially and adversely affect the ability of the Buyer to carry out its obligations in this Agreement.

(d)     Buyer has the full financial where with all to secure financial commitments to be able to purchase the Property on the terms and conditions set forth in this Agreement.

(e)     The Buyer shall maintain the improvements on the Property and shall keep the Property free from any accumulation of debris, weeds, or waste materials.

(f)     The Buyer covenants and agrees for itself, its successors, its assigns and every successor-in-interest to the Property or any part thereof, there shall be no discrimination against or segregation of any person, or group of persons, on account of sex, marital status, race, color, religion, creed, national origin, ancestry or handicap in the sale, lease, sublease, transfer, use, occupancy, tenure or enjoyment of the Property, nor shall the Buyer, itself or any person claiming under or through it, establish or permit any such practice or practices of discrimination or segregation with reference to the selection, location, number, use or occupancy of tenants, lessees, subtenants, sublessees or employees.

11.    Liquidated Damages on Buyer Default.  AS USED IN THIS AGREEMENT, "BUYER DEFAULT" SHALL MEAN THE FAILURE OF BUYER TO COMPLY WITH ANY PROVISION HEREOF AND SHALL INCLUDE ANY FAILURE OF THE CLOSING TO OCCUR (AFTER SATISFACTION OF THE CONDITIONS SET FORTH IN PARAGRAPH 6, ABOVE) AT THE TIME AND IN THE MANNER PROVIDED IN THIS AGREEMENT FOR ANY REASON OTHER THAN THE MATERIAL FAILURE OF SELLER TO COMPLY WITH ANY OF ITS OBLIGATIONS UNDER THIS AGREEMENT.  BUYER AND SELLER HEREBY ACKNOWLEDGE AND AGREE THAT, IN THE EVENT OF A BUYER

BP000209

L 011

DEFAULT, SELLER WILL SUFFER DAMAGES IN AN AMOUNT WHICH WILL, DUE TO THE SPECIAL NATURE OF THE TRANSACTION CONTEMPLATED BY THIS AGREEMENT AND THE SPECIAL NATURE OF THE NEGOTIATIONS WHICH PRECEDED THIS AGREEMENT, BE IMPRACTICAL OR EXTREMELY DIFFICULT TO ASCERTAIN. IN ADDITION, BUYER WISHES TO HAVE A LIMITATION PLACED UPON THE POTENTIAL LIABILITY OF BUYER TO SELLER IN THE EVENT OF A BUYER DEFAULT, AND WISHES TO INDUCE SELLER TO WAIVE OTHER REMEDIES WHICH SELLER MAY HAVE IN THE EVENT OF A BUYER DEFAULT. BUYER AND SELLER, AFTER DUE NEGOTIATION, HEREBY ACKNOWLEDGE AND AGREE THAT THE AMOUNT OF THE DEPOSIT, TOGETHER WITH INTEREST EARNED THEREON IN ESCROW, REPRESENTS A REASONABLE ESTIMATE OF THE DAMAGES WHICH SELLER WILL SUSTAIN IN THE EVENT OF SUCH BUYER DEFAULT. BUYER AND SELLER HEREBY AGREE THAT SELLER MAY, IN THE EVENT OF A BUYER DEFAULT, TERMINATE THIS AGREEMENT AND THE ESCROW BY WRITTEN NOTICE TO BUYER AND RETAIN THE DEPOSIT, TOGETHER WITH INTEREST EARNED THEREON IN ESCROW, AS LIQUIDATED DAMAGES. SUCH RETENTION OF THE DEPOSIT AND INTEREST EARNED THEREON IN ESCROW BY SELLER IS INTENDED TO CONSTITUTE LIQUIDATED DAMAGES TO SELLER PURSUANT TO SECTIONS 1671, 1676 AND 1677 OF THE CALIFORNIA CIVIL CODE, AND SHALL NOT BE DEEMED TO CONSTITUTE A FORFEITURE OR PENALTY WITHIN THE MEANING OF SECTION 3275 OR SECTION 3369 OF THE CALIFORNIA CIVIL CODE, OR ANY SIMILAR PROVISIONS. FOLLOWING THE TERMINATION OF THIS AGREEMENT, CANCELLATION OF THE ESCROW AND RETENTION OF THE DEPOSIT AND INTEREST EARNED THEREON IN ESCROW AS LIQUIDATED DAMAGES PURSUANT TO THIS SECTION 10, ALL OF THE RIGHTS AND OBLIGATIONS OF BUYER AND SELLER UNDER THIS AGREEMENT SHALL BE TERMINATED. RETENTION OF THE DEPOSIT AND INTEREST EARNED THEREON IN ESCROW AND TERMINATION OF THIS AGREEMENT AND THE ESCROW AS PROVIDED HEREIN SHALL BE SELLER'S SOLE AND EXCLUSIVE REMEDY IN THE EVENT OF BUYER DEFAULT, AND SELLER EXPRESSLY WAIVES ITS RIGHT TO SPECIFIC ENFORCEMENT OF THIS AGREEMENT IN SUCH EVENT.

BUYER AND SELLER ACKNOWLEDGE THAT THEY HAVE READ AND UNDERSTAND THE PROVISIONS OF THIS SECTION 9 AND BY THEIR INITIALS IMMEDIATELY BELOW AGREE TO BE BOUND BY ITS TERMS.

"Seller":

City of Wasco

"Buyer":

12.   Seller Default.  If there is a material default by Seller under this Agreement (which remains uncured ten (10) days after notice from Buyer to Seller), then Buyer may, at its sole remedy hereunder, terminate this Agreement upon written notice to Seller and Escrow Holder, in which case the Deposit shall be paid to Buyer and each party shall be released from all obligations hereunder, provided, however, Buyer shall be entitled to receive reimbursement from Seller for its actual "out-of-pocket" costs and expenses incurred in connection with its investigation of the Property, in no event to exceed $10,000.00. The foregoing remedies are the

BP000210

only remedies of Buyer hereunder in the event of Seller's default under this Agreement, and Buyer shall not be entitled to, and hereby waives all right to seek any other damages, specific performance, or any other remedies that otherwise may be available at law or in equity to it. Under no circumstances shall Buyer have the right to file a lis pendens against the Property.

13.    Notices.  All notices, approvals, disapprovals or elections required or permitted to be given under this Agreement shall be in writing and shall be delivered personally, or mailed, certified or registered mail, return receipt requested, or sent by Federal Express or other professional courier, to the parties at the following addresses:

If to Buyer:   WASCO PROJECT LLC
               PO. BOX 17263
               MILL CREEK, WA 98082
Attention:     MEL RADFORD
Telephone:     425 - 239 - 6626
Fax:           425 - 857 - 7826
Email:         MEL.RADFORD@ATT.NET

If to Seller:  City of Wasco
               P.O. Box 190
               Wasco, CA 93280
               Attention: Dau Gibson City Clerk
               Telephone:   (661) 758-7200
               Fax:         (661) 758-5411
               Email: DRGIBSON@CI.WASCO.CA.US

And a copy to:

               Wall, Wall & Peake
               1601 "F" Street
               P.O. Box 2307
               Bakersfield, CA 93303
               Attention:   Alan J. Peake, Esq.
               Telephone:   (661) 327-8461
               Fax:         (661) 327-8568
               Email: ajpesq@pacbell.net

Personally delivered and courier-delivered notices shall be deemed given upon actual personal delivery or tender of delivery to the intended recipient. Mailed notices shall be deemed given upon the date of actual delivery or tender of delivery as evidenced by the return receipt.

14.    Attorneys' Fees.  In the event of any action between Buyer and Seller for enforcement or interpretation of any of the terms or conditions of this Agreement, the prevailing party in such action shall be entitled to recover its reasonable costs and expenses, including without limitation court costs and attorneys' fees actually incurred, as awarded by a court of competent jurisdiction.

BP000211

W02-LA:LYL76\62179.1                    -19-

L 013

15.     Brokers.  Except for  RADFORD & ASSOCIATES  INC., A WASHINGTON
CORP. ("Broker"), who shall be paid THREE HUNDRED THOUSAND   ($ 300,000.00)   by   Buyer
when the Property is transferred, each party represents and warrants to the other that no broker or
real estate agent has been engaged by it in connection with this Agreement or the subject
transaction.  Buyer shall be solely responsible for any commission due to Broker.  Buyer and
Seller each hereby indemnify and hold the other harmless from and against all costs, expenses or
liabilities (including without limitation attorneys' fees and court costs, whether or not taxable and
whether or not any action is prosecuted to judgment) incurred by the indemnified party in
connection with any claim or demand by any person or entity for any broker's, finder's or other
commission or fee in connection with the indemnifying party's entry into this Agreement and the
transactions contemplated hereby.

16.     Effect and Duration Covenants, Conditions and Obligations which are for Seller's
Benefit.   The covenants established in this Agreement and the Grant Deed shall, without regard
to technical classification and designation, be binding for the benefit and in favor of the Seller,
its successors, and assigns, as to those covenants which are for its benefit.  The covenants,
contain in this Agreement and the Grant Deed (Attachment No. 3) shall remain in perpetuity.

        The Seller is deemed the beneficiary of the terms and provisions of this Agreement
and of the covenants running with the land, for and in its own rights and for the purposes of
protecting the interests of the community and other parties, public or private, in whose favor and
for whose benefit this Agreement and the covenants running with the land have been provided.
The Agreement and the covenants shall run in favor of the Seller without regard to whether the
Seller has been, remains or is an owner of any land or interest therein in the Property.  The Seller
shall have the right, if the Agreement or covenants are breached, to exercise its rights and
remedies, and to maintain any actions or suits at law or in equity or other proper proceedings to
enforce the curing of such breaches to which it or any other beneficiaries of this Agreement and
covenants may be entitled.

17.     Continuation and Survival of Representations, Warranties and Covenants.   All
representations, and covenants by the respective parties contained herein or made in writing
pursuant to this Agreement are intended to and shall remain true and correct as of the Close of
Escrow, shall be deemed to be material, and shall survive the execution and delivery of this
Agreement, the delivery of the Grant Deed and transfer of title.

18.     Conflict of Interest.  No member, official or employee of the Seller shall have any
personal interest, direct or indirect, in this Agreement nor shall any such member, official or
employee participate in any decision relating to the Agreement which affects his or her personal
interests or the interests of any corporation, partnership or association in which he or she is
directly or indirectly interested.

19.     Non-Liability of Seller Officials and Employees.  No member, official, employee,
consultant, Attorney, or independent contractor of the Seller shall be personally liable to the
Buyer, or any successor-in-interest, in the event of any default or breach by the Seller or for any
amount which may become due to the Buyer, or to its successor, or on any obligations under the
terms of this Agreement.

BP000212

L 014

20.  INVALIDITY OF TERMS.  It is hereby declared to be the intention of the parties that the sections, paragraphs, sentences, clauses and phrases of this Agreement are severable, and if any phrase, clause, sentence, paragraph or section of this Agreement shall be declared unconstitutional, invalid or unenforceable by a judgment or decree of a court of competent jurisdiction, such unconstitutionality, invalidity or unenforceability shall not affect any of the remaining clauses, sentences, paragraphs and sections of this Agreement.

21.  TIME FOR ACCEPTANCE OF AGREEMENT BY SELLER.  This Agreement, when executed by the Buyer and delivered to the Seller must be authorized, executed and delivered by the Seller within thirty (30) days after the date of signature by the Buyer or this Agreement may be terminated by the Buyer on written notice to the Seller.  The date of this Agreement shall be the date when the Agreement shall have been signed by the Seller.

/ / /

/ / /

/ / /

/ / /

BP000213

L 015

W02-LA:LYI3\70662279.1             -12-

22.   **Miscellaneous.**   This Agreement, together with the documents described and referred to herein, contains all of the agreements of Buyer and Seller with regard to the transactions contemplated hereby, and supersedes all prior agreements, understandings and negotiations, whether written or oral. This Agreement shall not be modified or amended except by an instrument in writing duly executed by both Buyer and Seller. This Agreement may be executed in counterparts either by original signature or facsimile thereof, each of which shall be deemed to be an original, and all counterparts shall together constitute the Agreement. The provisions of this Agreement shall be binding upon and shall inure to the benefit of the successors in interest and assigns of Buyer and Seller, provided, however, that Buyer shall have no right to assign its rights or obligations hereunder without the express prior written consent of Seller. This Agreement shall be governed by and construed in accordance with the laws of the State of California. The paragraph headings and captions in this Agreement are for convenience only and shall not limit or define the contents of this Agreement. This Agreement shall survive the Closing, and shall not merge into the Grant Deed upon recordation. Time is of the essence of this Agreement. As used in this Agreement, "business day" shall mean any day except Saturday, Sunday or a day on which banking institutions in California are required or allowed to close for business.

   IN WITNESS WHEREOF, Seller and Buyer have caused this Agreement to be duly executed as of the date first above written.

"Buyer"

WASCO PROJECT LLC

By: _____ (MEL RADFORD)
                       (JAMES COUSINARD)

Its: _____ MANAGING MEMBERS

"Seller"

CITY OF WASCO

By: _____
       Danny Espitia
Its:   Mayor

ATTEST:

_____
City Clerk

BP000214

L 016

W02-LA:LYD/0682279.J                    -13-

09/19/1999  01:22   2095933910                                    SPERRY VAN NESS                          PAGE  83
09/29/2004  16:16   3270558                                           WA                                   PAGE  82

## AMENDMENT TO PURCHASE AND SALE AGREEMENT

This Amendment Agreement ("Agreement") is entered into as of May 18th, 2004 by and between the City of Wasco, a municipal corporation ("City") and Northern California Universal Enterprises, a California limited partnership ("Northern") with reference to the following facts:

A.   The City and Wasco Project, LLC. entered into that certain Purchase and Sale Agreement ("Purchase Agreement") dated as of April 6th, 2004.

B.   The Purchase Agreement was assigned to Northern on the condition that certain amendments were made to the Purchase Agreement.

C.   Section 22 of the Purchase Agreement provides that it can be modified in writing.

NOW THEREFORE, based upon the foregoing, the parties agree that Sections 2, 3.1, 4.3, 7.1(a) (c) and (d), 13 and 16, shall be modified as follows:

2.      "Purchase Price. The purchase price for the Property (the "Purchase Price") shall be $1,605,000.00."

"3.1      Deposit. Buyer shall deposit into the Escrow, at the Opening, the sum of $160,500.00 (10% of the Purchase Price) (the "Deposit"). Escrow Holder (as defined in Paragraph 4.1 below) shall invest the Deposit in an interest-bearing account and the interest earned on such account shall be applied as provided in this Agreement." As part of the consideration for this Agreement, the Deposit shall be non-refundable and retained by Seller if Buyer does not purchase the Property by the Closing Deadline.

"4.3      Closing Deadline. The Grant Deed (as defined in Paragraph 4.4, below) shall be recorded and the Escrow shall close (the "Closing") as soon as possible after the satisfaction of all of the conditions contained in this Agreement, including but not limited to Section 7.1, but in no event later than  November 1st, 2004 (the "Closing Deadline"). Time is specifically of the essence as to the Closing Deadline, and the Closing Deadline shall not be extended except by the mutual written agreement of Buyer and Seller."

"7.1(a)    Financing. Prior to June 1st, 2004, the Buyer shall submit to the Seller evidence that the Buyer has obtained sufficient equity capital and firm and binding commitments for interim and/or permanent financing necessary for the purchase of the Property in accordance with this Agreement. Such evidence of financing shall include copies of all conditional and firm financing commitments and any permanent financing commitments or other documents that indicate Buyer's ability to finance the purchase of the Property. Conditional commitments shall be firm and binding commitments subject only to standard conditions required by the lender. Proof of funding acceptance of each loan commitment by Buyer and proof of payment of all loan commitment fees required to fund the financing commitments and proof of funding of equity capital contributions shall also be required."

"7.1(c)    Settlement Agreement and Mutual Release. The Seller shall enter into a Settlement Agreement and Mutual Release with Michael Richardson and Badger Technology, Inc. and all the terms and conditions of said Agreement shall be in full force and effect for the duration of this Agreement"

"7.1(d)    Workout Agreement. The Seller shall enter into a satisfactory agreement with U.S. Bank National Association in its capacity as the Trustee for the Wasco Public Financing Authority 1989 Local Agency Revenue Bonds Series A and the Assessment District No. 1992-2 Assessment District Bonds, Michael Richardson and Badger Technology, Inc. and all

BP000215

L 017

the terms and conditions of said agreement shall be in full force and effect for the duration of this Agreement."

13.       "....

          If to Buyer:   Northern California Universal Enterprises

                    2278 Trade Zone Blvd.

                    San Jose, CA  95131

          Attention:    Mr. Joe Wu

          Telephone:  (408) 946-7858  ."

"15.      Brokers. Except for Darrell Sousa of Sperry Van Ness Commercial Real Estate, ("Broker"), who shall be paid One Hundred Thousand Dollars ($100,000) by Buyer when the Property is transferred, each party represents and warrants to the other that no broker or real estate agent has been engaged by it in connection with this Agreement or the subject transaction. Buyer shall be solely responsible for any commission due to Broker. Buyer and Seller each hereby indemnify and hold the other harmless from and against all costs, expenses or liabilities (including without limitation attorneys' fees and court costs, whether or not taxable and whether or not any action is prosecuted to judgment) incurred by the indemnified party in connection with any claim or demand by any person or entity for any broker's, finder's or other commission or fee in connection with the indemnifying party's entry into this Agreement and the transactions contemplated hereby."

All other terms and provisions of the Purchase Agreement, which are not expressly modified by this amendment shall remain in full force and effect.

NORTHERN CALIFORNIA
UNIVERSAL ENTERPRISES

By:  _attached_____


APPROVED AND RECOMMENDED

By:  _____
     Larry Pennell, City Manager


APPROVED AS TO FORM                          CITY OF WASCO

By:  _____                 By:  _____
     Allen J. Peake, City Attorney                Danny Espitia, Mayor

c:files\wasco\agreements\wecpurchase-0521 clean.amd

# EXHIBIT "M"

1

Steven J. Hassing
California SBN 152125
LAW OFFICES OF STEVEN J. HASSING
425 Calabria Court
Roseville, CA  95747
Telephone:  (916) 677-1776
Facsimile:  (916) 677-1770

2

3

4

5

Attorney *for Defendants, Northern California*
*Universal Enterprise Company and Lotus*
*Developments*

6

7

8

9

10

# UNITED STATES DISTRICT COURT

11

## EASTERN DISTRICT OF CALIFORNIA

12

13

14

ROGER MCINTOSH,

No.  1:07-CV-01080-LJO-GSA

15

v.                                    Plaintiff(s);

16

NORTHERN CALIFORNIA UNIVERSAL
ENTERPRISES COMPANY, ET AL.,

**DEFENDANT, NORTHERN
CALIFORNIA UNIVERSAL
ENTERPRISE COMPANY'S
RESPONSE TO PLAINTIFF'S
REQUEST FOR PRODUCTION OF
DOCUMENTS**

17

18

Defendant(s).

**SET ONE**

19

20

21

PROPOUNDING PARTY:

Plaintiff, ROGER MCINTOSH

22

RESPONDING PARTY:

Defendant, NORTHERN CALIFORNIA
UNIVERSAL ENTERPRISE COMPANY

23

24

SET NO.

ONE

25

26

Defendant, Northern California Universal Enterprise Company responds to Plaintiff's

27

Request for Production of Documents, Set One as follows:

///

28

///

**REQUEST NO. 1:**

That defendant produce and permit plaintiff to inspect and to copy each of the following documents: all documents that support your denial of Paragraph 30 of the First Amended Complaint.

**RESPONSE**

Responding party objects to the production of the documents identified on the basis that each and every document in the possession or under the control of NCUEC has been produced to the requesting party in satisfaction of its disclosure requirements.

**REQUEST NO. 2:**

That defendant produce and permit plaintiff to inspect and to copy each of the following documents: all documents that support your denial of Paragraph 31 of the First Amended Complaint.

**RESPONSE**

Responding party objects to the production of the documents identified on the basis that each and every document in the possession or under the control of NCUEC has been produced to the requesting party in satisfaction of its disclosure requirements.

**REQUEST NO. 3:**

That defendant produce and permit plaintiff to inspect and to copy each of the following documents: all documents that support your denial of Paragraph 33 of the First Amended Complaint.

///

///

///

2

Defendant, Northern California Universal Enterprise Company's Response to Plaintiff's Request for Production of Documents

**RESPONSE**

Responding party objects to the production of the documents identified on the basis that each and every document in the possession or under the control of NCUEC has been produced to the requesting party in satisfaction of its disclosure requirements.

**REQUEST NO. 4:**

That defendant produce and permit plaintiff to inspect and to copy each of the following documents: all documents that support your denial of Paragraph 34 of the First Amended Complaint.

**RESPONSE**

Responding party objects to the production of the documents identified on the basis that each and every document in the possession or under the control of NCUEC has been produced to the requesting party in satisfaction of its disclosure requirements.

**REQUEST NO. 5:**

That defendant produce and permit plaintiff to inspect and to copy each of the following documents: all documents that support your denial of Paragraph 38 of the First Amended Complaint.

**RESPONSE**

Responding party objects to the production of the documents identified on the basis that each and every document in the possession or under the control of NCUEC has been produced to the requesting party in satisfaction of its disclosure requirements.

**REQUEST NO. 6:**

Produce all documents that support your Second Affirmative Defense that plaintiff's claims are barred by copyright misuse.

Defendant, Northern California Universal Enterprise Company's Response to Plaintiff's Request for Production of Documents

1  **RESPONSE**

2       Responding party objects to the production of the documents identified on the basis

3  that each and every document in the possession or under the control of NCUEC has been

4  produced to the requesting party in satisfaction of its disclosure requirements.

5

6  **REQUEST NO. 7:**

7       Produce all documents that support your Third Affirmative Defense that plaintiff's claims

8  are barred by the doctrine of laches.

9

10 **RESPONSE**

11      Responding party objects to the production of the documents identified on the basis

12 that each and every document in the possession or under the control of NCUEC has been

13 produced to the requesting party in satisfaction of its disclosure requirements.

14

15 **REQUEST NO. 8:**

16      Produce all documents that support your Fourth Affirmative Defense that plaintiff's

17 claims are barred by the doctrine of unclean hands.

18 **RESPONSE**

19      Responding party objects to the production of the documents identified on the basis

20 that each and every document in the possession or under the control of NCUEC has been

21 produced to the requesting party in satisfaction of its disclosure requirements.

22

23 **REQUEST NO. 9:**

24      Produce all documents that support your Fifth Affirmative Defense that plaintiff failed to

25 mitigate its damages.

26

27 ///

28 ///

Defendant, Northern California Universal Enterprise Company's Response to Plaintiff's Request for Production of Documents

**RESPONSE**

Responding party objects to the production of the documents identified on the basis that each and every document in the possession or under the control of NCUEC has been produced to the requesting party in satisfaction of its disclosure requirements.

**REQUEST NO. 10:**

Produce all documents that support your Sixth Affirmative Defense that plaintiff's claims are barred by any statute of limitations.

**RESPONSE**

Responding party objects to the production of the documents identified on the basis that each and every document in the possession or under the control of NCUEC has been produced to the requesting party in satisfaction of its disclosure requirements.

**REQUEST NO. 11:**

Produce all documents that support your Seventh Affirmative Defense that plaintiff's claims are barred by the doctrine of fair use.

**RESPONSE**

Responding party objects to the production of the documents identified on the basis that each and every document in the possession or under the control of NCUEC has been produced to the requesting party in satisfaction of its disclosure requirements.

**REQUEST NO. 12:**

Produce all documents that support your Eighth Affirmative Defense that plaintiff's claims are barred by the first sale doctrine.

///

///

**RESPONSE**

Responding party objects to the production of the documents identified on the basis that each and every document in the possession or under the control of NCUEC has been produced to the requesting party in satisfaction of its disclosure requirements.

**REQUEST NO. 13:**

Produce all documents that support your Ninth Affirmative Defense that plaintiff's claims are barred by the waiver, license, abandonment, or forfeiture of any rights it may have held under the Copyright Act..

**RESPONSE**

Responding party objects to the production of the documents identified on the basis that each and every document in the possession or under the control of NCUEC has been produced to the requesting party in satisfaction of its disclosure requirements.

**REQUEST NO. 14:**

Produce all documents that support your Tenth Affirmative Defense that plaintiff's claims are barred by the equitable doctrine of estoppel.

**RESPONSE**

Responding party objects to the production of the documents identified on the basis that each and every document in the possession or under the control of NCUEC has been produced to the requesting party in satisfaction of its disclosure requirements.

**REQUEST NO. 15:**

Produce all documents that support your Twelfth Affirmative Defense that plaintiff's claims for an award of statutory damages and attorneys fees are barred because the identified

1   copyright registration of the Plaintiff was not made within three months after the first publication
2   of the allegedly infringing works.
3
**RESPONSE**
4
5       Responding party objects to the production of the documents identified on the basis
6   that each and every document in the possession or under the control of NCUEC has been
7   produced to the requesting party in satisfaction of its disclosure requirements.
8
**REQUEST NO. 16:**
9
10      Produce all documents that support your Thirteenth Affirmative Defense that plaintiff's
11  claims are barred by the doctrine of consent.
12
**RESPONSE**
13
14      Responding party objects to the production of the documents identified on the basis
15  that each and every document in the possession or under the control of NCUEC has been
16  produced to the requesting party in satisfaction of its disclosure requirements.
17
**REQUEST NO. 17:**
18
19      Produce all documents showing engineering costs paid by NCUEC to DeWalt for its
20  work on the Valley Rose Estates subdivision.
21
**RESPONSE**
22
23      Objection, irrelevant, will not lead to discovery of admissible evidence.  Objection,
24  seeks to invade responding party's private proprietary financial information for the sole sake
25  of harassment.
26
**REQUEST NO. 18:**
27
28      Produce all documents showing engineering costs paid by NCUEC to develop the Valley
    Rose Estates subdivision.

**RESPONSE**

Objection, irrelevant, will not lead to discovery of admissible evidence. Objection, seeks to invade responding party's private proprietary financial information for the sole sake of harassment.

**REQUEST NO. 19:**

Produce all documents, including all electronic copies of said documents, of all plans and maps of the Valley Rose Estates subdivision.

**RESPONSE**

Responding party will produce the documents requested.

**REQUEST NO. 20:**

Produce all documents, including all electronic copies of said documents, of all plans and maps of the Valley Rose Estates subdivision received from the City of Wasco.

**RESPONSE**

Responding party will produce the documents requested.

**REQUEST NO. 21:**

Produce all documents, including all communication, between NCUEC and DeWalt engineering related to the development of the Valley Rose Estates subdivision.

**RESPONSE**

Responding party will produce the documents requested.

**REQUEST NO. 22:**

Produce all documents, including all communication, between NCUEC and the City of Wasco related to the development of the Valley Rose Estates subdivision.

///

8

Defendant, Northern California Universal Enterprise Company's Response to Plaintiff's Request for Production of Documents

1   **RESPONSE**

2       Responding party will produce the documents requested.

3

4   **REQUEST NO. 23:**

5       Produce all as-built plans for Tract No. 6451.

6   **RESPONSE**

7       Responding party will produce the documents requested.

8

9   **REQUEST NO. 24:**

10      Produce all written requests to the City of Wasco for

11  **RESPONSE**

12      Objection, vague and ambiguous; unintelligible.

13

14  **REQUEST NO. 25:**

15      Produce all documents, including all written authorization, giving NCUEC permission to

16  use maps or plans of the Valley Rose Estates subdivision.

17  **RESPONSE**

18      Responding party objects to the production of the documents identified on the basis

19

20  that each and every document in the possession or under the control of NCUEC has been

21  produced to the requesting party in satisfaction of its disclosure requirements.

22  **REQUEST NO. 26:**

23      Produce all development agreements between NCUEC and the City of Wasco for

24  development of any part of the Valley Rose Estates subdivision.

25

26  ///

27  ///

28  ///

Defendant, Northern California Universal Enterprise Company's Response to Plaintiff's Request for Production of Documents

**RESPONSE**

     Responding party objects to the production of the documents identified on the basis that each and every document in the possession or under the control of NCUEC has been produced to the requesting party in satisfaction of its disclosure requirements.

Dated this 21st day of October, 2008

                             Steven J Hassing, Attorney
                             for defendants

## PROOF OF SERVICE

### Case No. 1:07-CV-01080-LJO-GSA

I, the undersigned, declare:

I am employed in the County of Placer, State of California.  I am over the age of eighteen years and not a party to the within action; my business address is 425 Calabria Court, Roseville, CA 95747.  I am readily familiar with the business practice for collection and processing of correspondence for mailing with the United States Postal Service.  On October 23, 2008 I served the foregoing described as:

**NORTHERN CALIFORNIA UNIVERSAL ENTERPRISE COMPANY'S RESPONSE TO PLAINTIFF'S REQUEST FOR PRODUCTION OF DOCUMENTS**

on the parties in this action.

<u>xx</u>   placing an original or true copy thereof enclosed in a sealed envelope with postage fully prepaid, placed for collection and mailing in Roseville, California, on said date, following ordinary business practice, and addressed as follows:

James J. Braze
Jeffrey A. Travis
Borton Petrini, LLP
1600 Truxtun Avenue
Post Office Box 2026
Bakersfield, CA 93303

Chaka Okadigbo
Garcia Calderon Ruiz, LLP
500 South Grand Avenue, Ste. 1100
Los Angeles, CA 90071

_____   Emailed to:   James Braze @jbraze@bortonpetrini.com and
Chaka Okadigbo @cokadigbo@gcrlegal.com

___   Overnight service via UPS to:

I declare under penalty of perjury that the foregoing is true and correct, and that this declaration was executed on October 23, 2008.

Kimberley A. Hassing

PROOF OF SERVICE - 1

# VERIFICATION

I, the undersigned, declare:

I am president of the Defendant's corporation which is a party to the action herein and I have read the foregoing responses to Plaintiff, Roger McIntosh's Requests for Production of Documents – set one above and know the contents thereof. The same are true of my own knowledge, except as to those matters therein stated on information and belief, and as to those matters, I believe them to be true.

I declare under penalty of perjury under the laws of the State of California and of the United States of America that the foregoing is true and correct.

Date:

_____
Joe Wu, President of Northern
California Universal Enterprise Company, Inc.

# EXHIBIT "N"

1    UNITED STATES DISTRICT COURT

2    EASTERN DISTRICT OF CALIFORNIA, FRESNO DIVISION

3    ————

4

5    ROGER McINTOSH,                    No. 107CV 01080 LJO-WMW

6              Plaintiff,

7    vs.

8    NORTHERN CALIFORNIA UNIVERSAL
     ENTERPRISES COMPANY, et al,
9
               Defendants.
10   ——————————————————————————

11

12            DEPOSITION OF ROBERT EDWARD WREN

13                    Taken at

14                 Borton Petrini
                 1600 Truxtun Avenue
15              Bakersfield, California

16      Tuesday, October 28, 2008 at 3:03 P.M.

17

18                 Reported by:

19            Naomi S. Chavez, CSR #13007

20

21

22

23

24   **Certified**       KELEHER'S
                      Certified Shorthand Reporters
25   **Copy**          Bakersfield • Visalia • Fresno

                          800.635.6044

                                                              1