```
 1                          APPEARANCES:

 2

 3

 4

 5        For the Plaintiff:

 6

 7            BORTON PETRINI, LLP

 8            By MR. JAMES J. BRAZE

 9                 - and -

10            By MR. JEFFREY A. TRAVIS

11            1600 Truxtun Avenue

12            Bakersfield, CA  93301

13            (661) 322-3051

14
```

A-PDF Split DEMO : Purchase from www.A-PDF.com to remove the watermark

```
15

16        For the Defendant City of Wasco:

17

18            Garcia, Calderon & Ruiz

19            By MR. CHAKA C. OKADIGBO

20            500 South Grand Avenue, Suite 1100

21            Los Angeles, CA  90071

22            (213) 347-0210

23

24

25
```



APPEARANCES (Cont'd)

For the Defendant Northern California Universal
  Enterprises Company:


    Law Offices of Steven J. Hassing
    By MR. STEVEN J. HASSING
    425 Calabria Court
    Roseville, CA  95747
    (916) 677-1776



Also present:

    MR. ROGER McINTOSH

```
 1                              INDEX
 2    EXAMINATION BY
 3    MR. BRAZE                                      PAGE
 4    MR. TRAVIS                                       5
 5                                                    11
 6
 7                         EXHIBIT INDEX
 8      NONE OFFERED
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

1   have, if they ask to look at it, I will allow them to

2   look at it in-house.  If they want a copy of it, if

3   it's an approved map, they have to send a blueprint

4   service or a bonded company out to pick them up and

5   make copies.  We don't have the ability to make a

6   24-by-36 copy, so I would let them make copies of them,

7   but we couldn't do it for them.

8        Q.   Do you take a log of people who have asked to

9   look at plans --

10       A.   We do not.  We do not.

11       Q.   -- or a log as to people who obtain copies of

12   maps?

13       A.   We do not.

14       Q.   Have you ever been told that there's a

15   government code section that requires that prior to the

16   time that copies are made that the author of them be

17   contacted?

18       A.   I have not.

19       Q.   Would the same be true if they obtain copies

20   of plans from the City?  Would the procedure be the

21   same as to the subdivision of plans?

22       A.   Yes.  I thought we were talking about plans.

23       Q.   Yes.

24            So as far as you know, the City of Wasco

25   places no restriction on people obtaining copies of

1  plans?

2      A.   As far as I know, that's correct.

3      Q.   So if I want a copy, I just send -- ask you

4  and I send a blueprint service down there and they can

5  copy them for me?

6      A.   If it's an approved plan, yes.

7      Q.   What's your relationship as deputy director of

8  public works with respect to how the public has access?

9  Does that follow your responsibility as a deputy

10  director of public works?

11     A.   Yes.   I believe so.

12     Q.   So if I were to ask you if there was any

13  record of Mr. Wu or his engineer coming to the City of

14  Wasco and copying the plans that were prepared by

15  Mr. McIntosh, you would tell me there's no record to

16  indicate one way or another; is that correct?

17     A.   There's no written record, yes, that I would

18  know of.

19                   EXAMINATION BY MR. TRAVIS

20     Q.   When you -- you had testified earlier

21  about you'll do -- as part of the process for improving

22  the improvement plans that you'll do a visual

23  inspection; is that correct?

24     A.   Well --

25     Q.   You mentioned something about a visual

1    A.    I'm not aware, no.

2    Q.    And when that inspection was done, were

3    there -- was that inspection done by comparing it with

4    anything -- was that comparing it with improvement

5    plans?

6    A.    No.   At that time I didn't know there was even

7    improvement plans out there.   We didn't have any, to my

8    knowledge.   It was built 15 years before or 10 years

9    before that and we were doing the visual inspection of

10   things we could see.

11   Q.    Now, do you know if there are improvement

12   plans for Valley Rose Estates now?

13   A.    Yes.   I received a disk, a CD, that had,

14   somebody in the City and I'm not sure when, had scanned

15   all the City drawings they had at the time, and there

16   was some that were called Valley Rose Estates, I think,

17   5472 and they were the improvement plans.

18   Q.    This disk you just received recently?

19   A.    No.   That was, I believe, in late 2005, maybe

20   early 2006.   Somebody told me about it at the City that

21   they have it so I started asking around and I found

22   one.

23   Q.    You don't remember who you received it from?

24   A.    I got it from Rosie Masqueda, M-a-s-q-u-e-d-a.

25   Q.    And she was in which department?

# EXHIBIT "O"

**Certified Copy**

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA

ROGER McINTOSH,

      Plaintiff,

    vs.

NORTHERN CALIFORNIA UNIVERSAL
ENTERPRISES COMPANY, ET AL.,

      Defendants.

~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~

Case No.
107CV-01080-LJO-WMW

**DEPOSITION OF**

**ROGER McINTOSH**

December 18, 2008
9:11 a.m.

5001 East Commercenter
Suite 170
Bakersfield, California

Brian S. Cardoza, CSR No. 8362



ESQUIRE
DEPOSITION SERVICES®

PAULSON
REPORTING & LITIGATION SERVICES, LLC

Toll Free: 800.300.1214
Facsimile: 661.322.2242

Suite 170
5001 East Commercenter Drive
Bakersfield, CA 93309
www.paulsonreporting.com

Roger McIntosh                                          December 18, 2008

2

APPEARANCES OF COUNSEL

1
2
3   FOR THE PLAINTIFF, ROGER McINTOSH:
4        LAW OFFICES OF BORTON PETRINI, LLP
         Attorneys at Law
5        BY:   JEFFREY A. TRAVIS, Esq.
         Attorney at Law
6        5060 California Avenue, Suite 700
         Bakersfield, California 93309
7        (661) 322-3051
         jtravis@bortonpetrini.com
8
    FOR THE DEFENDANTS, NORTHERN CALIFORNIA UNIVERSAL
9   ENTERPRISES COMPANY AND LOTUS DEVELOPMENTS:
10       THE LAW OFFICE OF STEVEN J. HASSING
         Attorney at Law
11       BY:   STEVEN J. HASSING, Esq.
         Attorney at Law
12       425 Calabria Court
         Roseville, California 95747
13       (916) 677-1776
         stevehassing@yahoo.com
14
    FOR THE DEFENDANT, THE CITY OF WASCO:
15
16       GARCIA, CALDERON, RUIZ, LLP
         A Limited Liability Partnership
         BY:   CHAKA OKADIGBO, Esq.
17       Attorney at Law
         500 South Grand Avenue, Suite 1100
18       Los Angeles, California 90071
         (213) 347-0210
19       cokadigbo@gcrlegal.com
         (TELEPHONIC APPEARANCE)
20
21
22
23
24
25



PAULSON
REPORTING & LITIGATION SERVICES, LLC

Toll Free: 800.300.1214
Facsimile: 661.322.2242

Suite 170
5001 East Commercenter Drive
Bakersfield, CA 93309
www.paulsonreporting.com

3

INDEX OF EXAMINATION

WITNESS:  ROGER McINTOSH

EXAMINATION                                              PAGE

By Mr. Hassing                                              6

By Mr. Okadigbo                                          212

WITNESS INSTRUCTED NOT TO ANSWER

|  Page  |  Line  |
| --- | --- |
|  40  |  19  |
|  42  |  3  |
|  235  |  12  |



ESQUIRE
DEPOSITION SERVICES®

PAULSON
REPORTING & LITIGATION SERVICES, LLC

Toll Free: 800.300.1214
Facsimile: 661.322.2242

Suite 170
5001 East Commercenter Drive
Bakersfield, CA 93309
www.paulsonreporting.com

4

1       INDEX TO EXHIBITS

2

3       EXHIBIT NO.                  DESCRIPTION                    PAGE

4       Defendants' 1       A notice of deposition; 5 pages          9

5       Defendants' 2       A Certificate of Registration;
                            2 pages                                 36
6
        Defendants' 3       An Agreement Between Client And
7                           Consultant; 4 pages                     45

8       Defendants' 4       A letter dated 3/18/92; 2 pages         53

9       Defendants' 5       A Draft Guidance Package; 22 pages      65

10      Defendants' 6       A letter dated 5/11/92; 2 pages        143

11      Defendants' 7       A parcel map; 6 pages                  146

12      Defendants' 8       A Certificate of Correction;
                            1 page                                147
13
        Defendants' 9       A Certificate of Correction;
14                          1 page                                148

15      Defendants' 10      A letter dated 6/24/92; 2 pages       149

16      Defendants' 11      An Acquisition Agreement; 18 pages    155

17      Defendants' 12      A letter dated 3/8/93; 4 pages        160

18      Defendants' 13      A Promissory Note; 1 page             168

19      Defendants' 14      A Deed of Trust; 2 pages              171

20      Defendants' 15      An A/R Aged Open Invoice Report;
                            3 pages                               172
21
        Defendants' 16      A redacted Redemption And
22                          Dissolution Agreement; 4 pages        133

23      Defendants' 17      A spreadsheet; 1 page                 133

24      Defendants' 18      A photocopy of a compact disk;
                            1 page                                134
25



ESQUIRE
DEPOSITION SERVICES®

PAULSON
REPORTING & LITIGATION SERVICES, LLC

Toll Free: 800.300.1214
Facsimile: 661.322.2242

Suite 170
5001 East Commercenter Drive
Bakersfield, CA 93309
www.paulsonreporting.com

5

INDEX TO EXHIBITS

EXHIBIT NO.                    DESCRIPTION                PAGE

Defendants' 19      An Ordinance; 8 pages              134

Defendants' 20      A copy of handwritten notes;
                    2 pages                            136

   (Original exhibits included with original transcript.)



E S Q U I R E
DEPOSITION SERVICES®

P A U L S O N
REPORTING & LITIGATION SERVICES, LLC

Toll Free: 800.300.1214
Facsimile: 661.322.2242

Suite 170
5001 East Commercenter Drive
Bakersfield, CA 93309
www.paulsonreporting.com

108

1    the plans attendant thereto, are you aware of any other

2    instance where the City of Wasco handed out or let

3    somebody else have copies of any plan or map prepared by

4    Martin-McIntosh or yourself, and I'm excluding their

5    delivery to you or any of the employees of

6    Martin-McIntosh?

7              A.   No.

8              Q.   All right.  Now, getting back to your last

9    answer, you were told by somebody in the Public Works

10   Department at the City that Mr. Wu was using your plans,

11   right?

12             A.   That's correct.

13             Q.   Who told you that?

14             A.   I don't recall his name, but he works in the

15   Public Works Department.  It's -- it's in the building

16   across the street from City Hall.  And he's the head of

17   the corporation yard.

18             Q.   Do you know what his position is at the

19   Public Works Department?

20             A.   He's the head at the corporation yard.

21             Q.   All right.  I'm sorry.  As head of the

22   corporation yard, do you know what he does, what his

23   duties are, do you have any idea?

24             A.   He maintains all the city improvements, the

25   city streets, the city buildings, and he keeps the records



ESQUIRE
DEPOSITION SERVICES®

PAULSON
REPORTING & LITIGATION SERVICES, LLC

Toll Free: 800.300.1214
Facsimile: 661.322.2242

Suite 170
5001 East Commercenter Drive
Bakersfield, CA 93309
www.paulsonreporting.com

Roger McIntosh                                    December 18, 2008

                                109

1    for the -- the tracts.

2            Q.   Okay.  And about how old is this guy?

3            A.   Forty-five.

4            Q.   Race?

5            A.   Hispanic.

6            Q.   Build?

7            A.   Five foot 10, medium build.

8            MR. TRAVIS:  Style of dress?

9            THE WITNESS:  Huh?  Dressed like a head of a

10   corporation yard.

11           BY MR. HASSING:

12           Q.   When did he give you this information?

13           A.   It was late 2006, I would guess.

14           MR. OKADIGBO:  I'm sorry, when?

15           THE WITNESS:  Late 2006.

16           BY MR. HASSING:

17           Q.   And by late 2006, are you talking about the

18   last two months, the last three months, the last four

19   months, what's your --

20           A.   November.

21           Q.   November or December?

22           A.   As best I could recall.

23           Q.   Okay.  And how did you come to be talking to

24   this gentleman at the time?

25           A.   I had been receiving the minutes of the City





Toll Free: 800.300.1214
Facsimile: 661.322.2242

Suite 170
5001 East Commercenter Drive
Bakersfield, CA 93309
www.paulsonreporting.com

110

1    Council for Wasco for several years and when I found out

2    that there was a final map that was being submitted for

3    recordation on the property, I went to the City of Wasco

4    to inquire about what improvement plans they were using to

5    record the final map.

6             Q.   And who did you talk to at the City of Wasco

7    when you went down there?

8             A.   That was the planning director.

9             Q.   And his name?

10            A.   I think you had him in a deposition not too

11   long ago.  I can't think of what his name is.  I --

12            MR. OKADIGBO:  Bob Wren?

13            BY MR. HASSING:

14            Q.   Bob Wren?

15            MR. TRAVIS:  Dennis McNamara?

16            THE WITNESS:  Dennis.

17            BY MR. HASSING:

18            Q.   Dennis McNamara?

19            A.   Yeah, Dennis McNamara.

20            Q.   All right, you recall now it was Mr. McNamara

21   you talked to?

22            A.   Yes.

23            Q.   And what did you ask Mr. McNamara?

24            A.   I asked him for the records of tract 6451.

25            Q.   Did he give them to you?



ESQUIRE
DEPOSITION SERVICES

PAULSON
REPORTING & LITIGATION SERVICES, LLC

Toll Free: 800.300.1214
Facsimile: 661.322.2242

Suite 170
5001 East Commercenter Drive
Bakersfield, CA 93309
www.paulsonreporting.com

Roger McIntosh                                          December 18, 2008

                                    111

1          A.   Yes, he did.

2          Q.   What did he give you?

3          A.   I believe he gave me a copy of the tentative

4     map and the resolutions.

5          Q.   By the way, don't copy that tentative map or

6     we're going to sue you.

7          A.   Oh, I'm not going to, other than if -- if the

8     court order, or if under discovery, of course.

9          Q.   So, he gave you a copy of the tentative?

10         A.   Yes.

11         Q.   And he gave you also --

12         A.   And a copy of the conditions of approval.

13         Q.   Okay.

14         A.   And just briefed me on what was -- what --

15    what was happening with the recordation of the final map,

16    and informed me that Mr. Wu still had to post the

17    improvement bonds and Mr. Wu was challenging the City's

18    amount on the improvement bonds, since it -- it was his

19    position that all the improvements were in, and there

20    was -- there was some negotiation going on about how --

21    the amount of the bond.

22         Q.   All right.

23         A.   And he referred me over to the Public Works

24    Department across the street for the improvement plans,

25    since he didn't have a copy of them.



**ESQUIRE**
DEPOSITION SERVICES®

**PAULSON**
REPORTING & LITIGATION SERVICES, LLC

Toll Free: 800.300.1214
Facsimile: 661.322.2242

Suite 170
5001 East Commercenter Drive
Bakersfield, CA 93309
www.paulsonreporting.com

181

1    to obtain any money?

2         A.  Yes.

3         Q.  And is that in the documents too that you

4    brought?

5         A.  Yes, it is.

6         Q.  Okay.  Did you ever collect anything from

7    Brown or The Legacy Group?

8         A.  He sent a check for $300.00.

9         Q.  Really?

10        A.  Yes.

11        Q.  Nothing other than that?

12        A.  No.  Which I never cashed.

13        Q.  Mr. Brown eventually went bankrupt?

14        A.  I believe he did.

15        Q.  Did you file any papers in his bankruptcy,

16   any claims?

17        A.  I -- I believe he went bankrupt before the

18   settlement, or before we were paid, and we did file some

19   documents in the bankruptcy.  They're all in there.

20        Q.  Okay.  Everything's in there then?

21        A.  Yes.

22        Q.  All right.  Did you ever receive any money

23   out of that bankruptcy?

24        A.  No.

25        Q.  Let's talk about your conversation with Joe



Toll Free: 800.300.1214
Facsimile: 661.322.2242

P A U L S O N
REPORTING & LITIGATION SERVICES, LLC

Suite 170
5001 East Commercenter Drive
Bakersfield, CA 93309
www.paulsonreporting.com

182

1    Wu?

2           A.   Okay.

3           Q.   One of the first things we discussed this

4    morning was the fact that you had talked to Mr. Wu, right?

5           A.   Yes.

6           Q.   And you talked to him one time, as I recall?

7           A.   Yes.

8           Q.   All right, tell me how that conversation came

9    to be?

10          A.   He called and wanted to know what it would

11   take to finish out the -- the tract that he was purchasing

12   from the City of Wasco.

13          Q.   Did he tell you what he meant by finishing

14   out the tract?

15          A.   He wanted to -- he had to process a new

16   tentative map and -- and a final map so that he could

17   develop the property.

18          Q.   Okay, was he talking to you about hiring you

19   to be the engineer to process the tentative and the final

20   for him?

21          A.   Yes.

22          Q.   Okay.  So, what did you say to him when he

23   asked you to do that?

24          A.   I said I'd be happy to give him a proposal

25   for it, and, oh, by the way, it -- we're owed quite a bit



ESQUIRE
DEPOSITION SERVICES®

PAULSON
REPORTING & LITIGATION SERVICES, LLC

Toll Free: 800.300.1214
Facsimile: 661.322.2242

Suite 170
5001 East Commercenter Drive
Bakersfield, CA 93309
www.paulsonreporting.com

183

1   of money on it and I would expect that -- to be paid for

2   that -- for the work that we did, and told him it was over

3   $300,000.00.

4          Q.   Okay.  Your proposal was that he pay you the

5   300,000 plus.  Well, now with interest, it was up like

6   around seven or eight at that time, wasn't it?

7          A.   That's correct.

8          Q.   All right.  But you told him 300?

9          A.   It was over 300, yes.

10         Q.   Well, okay.  Did you expect him to pay you

11  300, or 700, or 800, or what was the number you expected

12  him to pay you?

13         A.   He -- we never got that far.  He said he

14  would call me back --

15         Q.   All right.

16         A.   -- and let me know if he wanted a proposal

17  and he never called me back.

18         Q.   Okay.  So, you told him that you were owed

19  over 300,000?

20         A.   Yes.

21         Q.   And you would like to be paid that amount?

22         A.   That's correct.

23         Q.   Plus you wanted to be paid extra for whatever

24  work you were going to do for Joe; is that correct?

25         A.   Yes, revised -- or not revised.  Going back



ESQUIRE
DEPOSITION SERVICES

PAULSON
REPORTING & LITIGATION SERVICES, LLC

Toll Free: 800.300.1214
Facsimile: 661.322.2242

Suite 170
5001 East Commercenter Drive
Bakersfield, CA 93309
www.paulsonreporting.com

195

1    pay over $300,000.00 for a set of plans.  That he was

2    trying to find an easy way to get the project reapproved

3    and -- and finalized.

4           Q.  All right.  And that's based on the

5    conversations that you have explained already in your

6    testimony today?

7           A.  Yes.

8           Q.  You can't think of anything else Joe actually

9    said, or anything else that you said to Joe, that you

10   haven't already testified to?

11          A.  No.

12          Q.  All right.  In paragraph 31 of your

13   Complaint, you state that in October of 2006, "defendants

14   commenced construction on the Subdivision."  And

15   recognizing that your attorney drafted the Complaint and

16   that you didn't, I want to know if in October of 2006 you

17   believed that Joe had commenced construction on the

18   subdivision?

19          A.  Yes.

20          Q.  And what made you believe that?

21          A.  Can I see the final map?

22          Q.  Sure.

23          A.  Well, never mind, I've got it.  Oh, that's

24   not it.  Yeah, 6451.

25          Q.  The final map.



Toll Free: 800.300.1214
Facsimile: 661.322.2242

ESQUIRE
DEPOSITION SERVICES®

PAULSON
REPORTING & LITIGATION SERVICES, LLC

Suite 170
5001 East Commercenter Drive
Bakersfield, CA 93309
www.paulsonreporting.com

196

1        MR. OKADIGBO:  I didn't hear that.

2        MR. HASSING:  I'm just handing him the final map.

3   He wants to look at Joe's final.

4        MR. OKADIGBO:  Okay.

5        THE WITNESS:  Well, the final map was recorded

6   in -- actually, the final map was -- was signed in early

7   2006, and I was aware that -- that this final map was

8   being processed, so I started going by the site, and it

9   may have been because there were houses going up about

10  that time that I knew that he was out constructing.

11       BY MR. HASSING:

12       Q.  Okay, so when paragraph 31 of the Complaint

13  says that, "defendants commenced construction on the

14  Subdivision", what you're referring to is he started

15  building houses out there?

16       A.  I believe that was about the time he started

17  building houses.

18       Q.  Okay.  You're not referring to him installing

19  any infrastructure, sewer, water, that type of thing,

20  you're talking about building houses?

21       A.  That -- that's correct.

22       Q.  All right.  You knew from obtaining agenda of

23  the City Council when this final map was submitted to the

24  City, right?

25       A.  When it was set to go to Council for



E S Q U I R E
DEPOSITION SERVICES™

P A U L S O N
REPORTING & LITIGATION SERVICES, LLC

Toll Free: 800.300.1214
Facsimile: 661.322.2242

Suite 170
5001 East Commercenter Drive
Bakersfield, CA 93309
www.paulsonreporting.com

246

1        MR. TRAVIS:  What about all of our deadlines?

2        MR. OKADIGBO:  I mean, I would like to move it.

3    I mean, the fact is I'm gone Saturday, I do have more

4    questions.  We're saying that Mr. McIntosh has to leave at

5    5:00.

6        MR. TRAVIS:  Well, Chaka, Steve just recommended

7    that we kick everything a month.  I mean, look, if we --

8        MR. HASSING:  Let's go off the record.  Should we

9    go off the record?

10       MR. TRAVIS:  Yeah, we're going to go off the

11   record, Chaka.

12       MR. OKADIGBO:  Yeah.

13       (Discussion had off the record.)

14       MR. HASSING:  What we've agreed to do is continue

15   Mr. McIntosh's deposition to a different day.  We have

16   agreed that we're going to extend our discovery cutoff to

17   February 6th.

18       And we are going to allow the court reporter to

19   maintain the original transcript.  I will call the court

20   reporter two weeks prior to trial and get the original

21   sent to me and bring it to trial.  He will make a copy

22   available for Mr. McIntosh to review by notifying Jeff

23   Travis that it's available.  Mr. McIntosh can then come

24   down here and review it.

25       Is that okay with everybody?



**ESQUIRE**
DEPOSITION SERVICES®

**PAULSON**
REPORTING & LITIGATION SERVICES, LLC

Toll Free: 800.300.1214
Facsimile: 661.322.2242

Suite 170
5001 East Commercenter Drive
Bakersfield, CA 93309
www.paulsonreporting.com

248

1          MR. OKADIGBO:  Yes.

2          MR. TRAVIS:  Okay.

3          MR. HASSING:  And have you sent out a disclosure?

4    Disclosure's tomorrow.  Have you done that?

5          MR. OKADIGBO:  Yeah.  I was planning to send it

6    out tomorrow.

7          MR. HASSING:  Okay, that's good enough.

8          MR. TRAVIS:  Okay, then nobody cares then, so...

9          MR. HASSING:  That's good enough.  All right.

10          MR. OKADIGBO:  I mean, I can, in terms of there

11   will be more time for me to, you know, flush it out,

12   etcetera, but if I have to be in a rush, which I do for

13   now, I will do it.

14          MR. HASSING:  I guess we're doing it.

15          MR. OKADIGBO:  And my preference, in other words,

16   is to kick it over, but if you guys don't feel you want to

17   do that, then I'll --

18          MR. HASSING:  It's up to Jeff, because I can't

19   stip to the --

20          MR. TRAVIS:  Okay, hold on.  How long are you

21   thinking, Chaka?

22          MR. OKADIGBO:  Like a week.

23          MR. TRAVIS:  Fine.

24          MR. HASSING:  All right, so that concludes our

25   business for today?


ESQUIRE
DEPOSITION SERVICES

PAULSON
REPORTING & LITIGATION SERVICES, LLC

Toll Free: 800.300.1214
Facsimile: 661.322.2242

Suite 170
5001 East Commercenter Drive
Bakersfield, CA 93309
www.paulsonreporting.com

250

DECLARATION UNDER PENALTY OF PERJURY

1

2

3        I, ROGER McINTOSH, do hereby declare under

4  penalty of perjury that I have read the foregoing

5  transcript; that I have made any corrections as appear

6  noted, in ink, initialed by me, or attached hereto; that

7  my testimony as contained herein, as corrected, is true

8  and correct.

9        EXECUTED this _2nd_ day of _Feb._ ,

10  20 _09_ , at _Bakersfield_ , _CA._ .

11                    (City)                    (State)

12

13

14

15

16                    ROGER McINTOSH

17

18

19

20

21

22

23

24

25



ESQUIRE
DEPOSITION SERVICES®

PAULSON
REPORTING & LITIGATION SERVICES, LLC

Toll Free: 800.300.1214
Facsimile: 661.322.2242

Suite 170
5001 East Commercenter Drive
Bakersfield, CA 93309
www.paulsonreporting.com

REDACTED

## REDEMPTION AND DISSOLUTION AGREEMENT

THIS AGREEMENT, dated January 1, 1999, is made and entered into by and between the following parties, and shall be retroactive to the above date:

1. Martin-McIntosh, a California General Partnership ("MARTIN-McINTOSH");
2. MARTIN-McINTOSH, L.L.C., an Arizona limited liability company ("Martin-McIntosh, L.L.C. (Arizona)");
3. MARTIN & McINTOSH LLC, a Nevada limited liability company ("Martin & McIntosh, LLC (Nevada)");
4. Wescon, Inc., a Nevada corporation ("Wescon");
5. Western Photogrammetrics, a fictitious business name for MARTIN-McINTOSH;
6. Roger A. McIntosh ("McINTOSH"); and
7. Eugene P. Martin ("MARTIN").

E.T.M.M., a General Partnership ("E.T.M.M."), whose sole remaining partners are MARTIN and McINTOSH, is not a party to this agreement and is not affected by this agreement.

1. **Background and Purpose of Agreement.** MARTIN and McINTOSH are the sole partners of MARTIN-McINTOSH (hereinafter referred to as "the Partnership"). The Partnership provides engineering, land surveying and related professional services through the Partnership and its affiliates, identified as:

1. Martin-McIntosh, L.L.C. (Arizona);
2. Martin & McIntosh, LLC (Nevada);
3. Western Photogrammetrics; and
4. Wescon.

The affiliates are collectively identified as "the Affiliated Companies". The Partnership and its Affiliated Companies, either individually or collectively, conduct business in the States of Arizona, California and Nevada. A separate entity, Western Constructors, Inc. ("Western Constructors"), was the name of a proposed Nevada corporation which was submitted by MARTIN and McINTOSH as an alternative to Wescon. Insofar that the name Wescon, Inc. was authorized and permitted to be used by MARTIN and McINTOSH by the State of Nevada, Western Constructors was never formed and never existed.

The Partnership commenced on July 21, 1980, and currently exists pursuant to a partnership agreement dated September 18, 1980. MARTIN and McINTOSH are equal partners, each owning fifty percent (50%) of the interest in the Partnership profits and losses, including those of the Affiliated Companies. The parties wish to end their business association, and the Partnership has agreed to redeem MARTIN's fifty percent (50%) interest in the Partnership, with



Δπ EXHIBIT 16
Deponent McIntosh
Date 11-18-08 Rptr. BC

BP001342

EX 16

REDACTED

the understanding that McINTOSH will carry on the business of the Partnership as a sole proprietor, to wit, "Roger McIntosh dba Martin-McIntosh", and MARTIN will continue to do business in Reno as Martin & McIntosh, LLC. The parties have also agreed to end their business association in the Affiliated Companies and to divide the assets and ownership interests therein, as well as other assets of the Partnership. For the foregoing reasons, the parties have entered into this Agreement.

The parties hereto acknowledge and agree that it shall be conclusively presumed that the within Redemption and Dissolution Agreement fully complies with all terms and conditions, if any, of the above-referenced partnership agreement with respect to the redemption of a partnership interest, as well as the division of the partnership assets as set forth therein.

2.    Agreement of Redemption.  Subject to the terms and conditions set forth in this Agreement, MARTIN-McINTOSH shall redeem MARTIN's fifty percent (50%) interest in the Partnership. In addition, Martin-McIntosh, L.L.C. (Arizona) shall fully redeem the membership interest of MARTIN in that company and Martin & McIntosh, LLC (Nevada) shall fully redeem the membership interest of McINTOSH in that company, with the assets of each of the respective companies to be distributed as set forth below. Moreover, Wescon will redeem both MARTIN and McINTOSH's fifty percent (50%) interests in Wescon and, thereafter, dissolve and distribute its assets as set forth below. The assets and interests of the Partnership and the Affiliated Companies shall be divided as follows:

a.    Partnership Assets.  MARTIN-McINTOSH shall receive all of MARTIN's right, title and interest to any of the assets of MARTIN-McINTOSH, which includes, but is not limited to, all assets located in the State of California and/or used in the business of MARTIN-McINTOSH, including accounts receivable, wherever located. The assets of MARTIN-McINTOSH, except for the accounts receivable, are more fully identified in the attached Exhibit "1", and include the goodwill of MARTIN-McINTOSH, any client lists, as well as the sole and exclusive right to continue using the names "MARTIN-McINTOSH", and "Western Photogrammetrics" in all States of the United States except, that in Nevada, MARTIN will have the right to continue using the name Martin & McIntosh, without limiting McIntosh's right to use of that same name in Nevada. The accounts receivable for MARTIN-McINTOSH as of December 31, 1998 are identified in the attached Exhibit "2". Notwithstanding the omission of any asset from Exhibit "1" or "2", such omitted asset, if not already specifically listed as an asset of another entity herein, shall be considered a Partnership asset if the above-referenced criteria are satisfied.

In event of a breach of the foregoing covenant, such breach shall be conclusively presumed to constitute irreparable injury to the non-breaching party and, therefore, entitling such non-breaching party to injunctive relief.

1.    Accounts Receivable.  All accounts receivable as set forth in the attached Exhibit "2" shall be the property of MARTIN-McINTOSH. Notwithstanding the

BP001343

REDACTED

MARTIN further agrees not to disturb or interfere with the continuing business of the Partnership, its Affiliated Companies, or any of their successors in interest for the prescribed four (4) year period, by way of soliciting, hiring or luring away customers, employees or contractors of those entities. McINTOSH also agrees not to disturb or interfere with the continuing business of Martin & McIntosh, LLC (Nevada), or any of their successors in interest for the prescribed four (4) year period, by way of soliciting, hiring or luring away customers, employees or contractors of those entities.

The parties intend that the covenant contained in the first paragraph of this section shall be construed as a series of separate covenants, one for each State specified. Except for geographic coverage, each separate covenant shall be deemed identical in terms to the covenant contained in that paragraph. If in any judicial proceeding a court refuses to enforce any of these separate covenants, the unenforceable covenant shall be deemed eliminated from these provisions for the purpose of those proceedings, to the extent necessary to permit the remaining separate covenants to be enforced.

In the event of a breach of any of the foregoing covenants, such breach shall be conclusively presumed to constitute irreparable injury to the non-breaching party and, therefore, entitling such non-breaching party to injunctive relief.

13. <u>Trade Secrets and Intellectual Property</u>. MARTIN agrees not to divulge, communicate, use to the detriment of the Partnership, its Affiliated Companies, or any of their successor entities, including, but not limited to, Roger McIntosh dba Martin-McIntosh and Roger McIntosh dba Western Photogrammetrics, or for the benefit of any other person or persons, or misuse in any way any confidential information, trade secret, copyright, trademark, patent or other intellectual property right of the Partnership, its Affiliated Companies or its successors, including but not limited to personnel information, secret processes, know-how, customer lists or other technical data. MARTIN acknowledges and agrees that any such information or data acquired through connections with the Partnership was received in confidence and as a fiduciary of the Partnership and its successors.

Similarly, McINTOSH agrees not to divulge, communicate, use to the detriment of the Martin & McIntosh, LLC (Nevada) or any of its successor entities, or for the benefit of any other person or persons, or misuse in any way any confidential information, trade secret, copyright, trademark, patent or other intellectual property right of Martin & McIntosh, LLC (Nevada), or its successors, including but not limited to personnel information, secret processes, know-how, customer lists or other technical data. McINTOSH acknowledges and agrees that any such information or data acquired through connections with Martin & McIntosh, LLC (Nevada) was received in confidence and as a fiduciary of Martin & McIntosh, LLC (Nevada).

In the event of a breach of the foregoing covenants, such breach shall be conclusively presumed to constitute irreparable injury to the non-breaching party and, therefore, entitling such non-breaching party to injunctive relief.

April 26, 1999 (4:09PM)                    Page 13 of 19

BP001344

REDACTED

Notwithstanding the provisions of Civil Code, Section 1717, a dismissal, with or without prejudice, shall constitute a determination on the merits in favor of the non-dismissing party for purposes of a costs and attorneys' fees award hereunder.

35.    Venue for Litigation.  Any litigation or disputes between the parties hereto involving the business of Martin & McIntosh, LLC (Nevada) shall be litigated solely and exclusively in the State of Nevada in a court of that State, and within the county where Martin & McIntosh, LLC (Nevada) has its principal place of business..

Any other litigation or disputes between the parties hereto, including, but not limited to any disputes arising out of the within Redemption and Dissolution Agreement, shall be solely and exclusively litigated in the Superior or Municipal Court for the State of California in the County of Kern.  California law shall apply in any and all such disputes.

The foregoing is not intended to, nor does it affect the Choice of Law provision pertaining to the applicable law for purposes of interpreting or construing the within agreement.

36.    Incorporation by Reference.  All exhibits referred to in this Agreement and attached hereto are incorporated in this Agreement by that reference as though set forth in full.

IN WITNESS WHEREOF, this Agreement is executed this ___ day of April, 1999.

EUGENE MARTIN                                           ROGER McINTOSH

MARTIN-McINTOSH, a California                            MARTIN-McINTOSH, a California General
General Partnership                                     Partnership

By: Eugene Martin, Partner                               By: Roger McIntosh, Partner

MARTIN-McINTOSH, L.L.C., an                             MARTIN-McINTOSH, L.L.C., an
Arizona Limited Liability Company                       Arizona Limited Liability Company

By: Eugene Martin                                       By: Roger McIntosh
Its: MEMBER                                             Its:

April 26, 1999 (4:09PM)                    Page 18 of 19

This form of agreement is distributed by the:

California Council of Civil Engineers & Land Surveyors

## Agreement Between Client and Consultant

Form A was developed by the California Council of Civil Engineers and Land Surveyors, is intended primarily for the use of Council members, and may not be reproduced without the permission of the California Council of Civil Engineers and Land Surveyors. Copyright 1991, 1989, 1987, 1984, 1982, 1979, 1978, 1975, 1973, 1970 and 1967.

| Client Initials | Consultant Initials |
|---|---|

Project No. __92-22 Billing__

Agreement entered into at _____ Bakersfield, California _____

made this ____18th____ day of ____March____ , 19 92 ____, by and between

**Client:**

Name __Mr. Michael S. Brown__

Address __16255 Ventura Blvd., Suite 1000__

__Encino, CA  91436__

Phone _____

FAX _____

**Consultant:**

Name __Martin-McIntosh__

Address __4130 Ardmore Avenue__

__Bakersfield, California   93309__

Phone __(805) 834-4814__

FAX __(805) 834-0972__

### Client And Consultant Agree As Follows:

Client intends to:

See letter dated March 18, 1992, attached and made a part hereof.

hereinafter called "project."

A.  Consultant agrees to perform the following scope of services:

Design Services, broken down into three (3) phases:

1) Conceptual Plan
2) Develop Master Plans for water, sewer and drainage, etc.
3) Survey

as stated in letter dated March 18, 1992, attached and made a part hereof. Client agrees to compensate consultant for such services as follows:

Phase 1 - $ 15,200.00 , Phase 2 - $54,800.00 , Phase 3 - $19,100.00 plus costs of printing and reproductions to be billed at cost plus 10%, as stated in letter dated March 18, 1992, attached and made a part hereof.

* Martin-McIntosh will proceed with each Phase upon written authorization.

C.  This Agreement is subject to provisions 1 through 48 contained herein, and the terms and conditions contained in initialed exhibits attached herewith and made a part hereof. (List exhibits below.)

## Provisions of Agreement

Client and consultant agree that the following provisions shall be part of their agreement:

1.  This agreement shall be binding upon the heirs, executors, administrators, successors and assigns of client and consultant.

2.  This agreement shall not be assigned by either client or consultant without the prior written consent of the other.

3.  This agreement contains the entire agreement between client and consultant relating to the project and the provision of services to the project. Any prior agreements, promises, negotiations or representations not expressly set forth in this agreement are of no force

or effect. Subsequent modifications to this agreement shall be in writing and signed by both client and consultant.

4.  Consultant's waiver of any term, condition, or covenant, or breach of any term, condition, or covenant, shall not constitute the waiver of any other term, condition, or covenant, or the breach of any other term, condition, or covenant.

5.  If any term, condition, or covenant of this agreement is held by a court of competent jurisdiction to be invalid, void or unenforceable, the remaining provisions of this agreement shall be valid and binding on client and consultant.

Form A 91

Ⓐ π EXHIBIT 3
Deponent McIntosh
Date 1-18-08  Rptr 3C

BP000425

EX 3

6. This agreement shall be governed by and construed in accordance with the laws of the State of California.

7. Consultant shall only act as an advisor in all governmental relations.

8. All original papers, documents, drawings and other work product of consultant, and copies thereof, produced by consultant pursuant to this agreement shall remain the property of consultant and may be used by consultant without the consent of client. Upon request and payment of the costs involved, client is entitled to a copy of all papers, documents and drawings provided client's account is paid current.

9. Client acknowledges that its right to utilize the services and work product provided pursuant to this agreement will continue only so long as client is not in default pursuant to the terms and conditions of this agreement and client has performed all obligations under this agreement. Client further acknowledges that consultant has the unrestricted right to use the services provided pursuant to this agreement as well as all work product provided pursuant to this agreement.

10. Client and consultant agree to cooperate with each other in every way on the project.

11. Upon request, client shall execute and deliver, or cause to be executed and delivered, such additional instruments, documents, governmental fees and charges which are necessary to perform the arms of this agreement.

12. Consultant makes no representations concerning soil conditions unless specifically included in writing in this agreement, and he is not responsible for any liability that may arise out of the making or failure to make soil surveys, or sub-surface soil tests, or general soil testing.

13. Client agrees not to use or permit any other person to use plans, drawings, or other work product prepared by consultant, which ~ians, drawings, or other work product are not final and which are not ~igned, and stamped or sealed by consultant. Client agrees to be ~le and responsible for any such use of nonfinal plans, drawings, ~r other work product not signed and stamped or sealed by consult-ant and waives liability against consultant for their use. Client further agrees that final plans, drawings or other work product are for the exclusive use of client and may be used by client only for the project described on the face hereof. Such final plans, drawings or other work product may not be changed nor used on a different project without the written authorization or approval by consultant. If ~onsultant's work product exists in electronic or computerized format, or is transferred in electronic or computerized format, the stamp, seal and signature shall be original and may not be a computer-generated copy, photocopy, or facsimile transmission of the original.

14. Consultant has a right to complete all services agreed to be ren-dered pursuant to this contract. In the event this agreement is ter-minated before the completion of all services, unless consultant is responsible for such early termination, client agrees to release con-sultant from all liability for services performed. In the event all or any portion of the services or work product prepared by consultant is pre-pared by consultant be suspended, abandoned, or terminated, client shall pay consultant for all fees, charges, and services provided for the project, not to exceed any contract limit specified herein. Client acknowledges if the project services are suspended and restarted, there will be additional charges due to suspension of the services which shall be paid for by client as extra services.

15. If the scope of services to be provided by consultant pursuant to the terms of this agreement include an ALTA survey, client agrees that consultant may sign one of the two ALTA Survey Statements

attached hereto and incorporated herein by reference. In the event that consultant is required to sign a statement or certificate which differs from the ALTA Survey Statements contained in the attach-ment, client hereby agrees to indemnify and hold consultant harm-less from any and all liability arising from or resulting from the sign-ing of any statement which differs from those statements contained in the attachment.



16. If the scope of services to be provided by consultant pursuant to the terms of this agreement include the preparation of grading plans but exclude construction staking services, client acknowl-edges that such staking services normally include coordinating civil engineering services and the preparation of as-built drawings pur-suant to Uniform Building Code Chapter 70 or local grading ordi-nances and client will be required to retain such services from an-other consultant or pay consultant pursuant to this agreement for such services as extra work in accordance with Provision 26.

17. Consultant shall be entitled to immediately, and without notice, suspend the performance of any and all of its obligations pursuant to this agreement if client files a voluntary petition seeking relief under the United States Bankruptcy Code or if there is an involuntary bankruptcy petition filed against client in the United States Bank-ruptcy Court, and that petition is not dismissed within fifteen (15) days of its filing. Any suspension of services made pursuant to the provisions of this paragraph shall continue until such time as this agreement has been fully and properly assumed in accordance with the applicable provisions of the United States Bankruptcy Code and in compliance with the final order or judgment issued by the Bankruptcy Court.

18. This agreement shall not be construed to alter, affect or waive any lien or stop notice right which consultant may have for the performance of services pursuant to this agreement. Client agrees to separately provide to consultant the present name and address of the record owner of the property on which the project is to be located. Client also agrees to separately provide consultant with the name and address of any and all lenders who would loan money on the project and who are entitled to receive a preliminary notice.

19. If payment for consultant's services is to be made on behalf of client by a third-party lender, client agrees that consultant shall not be required to indemnify the third-party lender, in the form of an en-dorsement or otherwise, as a condition of receiving payment for services.

20. If client fails to pay consultant within thirty (30) days after invoices are rendered, client agrees consultant shall have the right to consider such default in payment a material breach of this entire agreement, and, upon written notice, the duties, obligations, and responsibilities of consultant under this agreement are suspended or terminated. In such event, client shall promptly pay consultant for all fees, charges, and services provided by consultant.

21. All fees and other charges will be billed monthly and shall be due at the time of billing unless otherwise specified in this agree-ment.

22. Client agrees that the periodic billings from consultant to client are correct, conclusive, and binding on client unless client, within ten (10) days from the date of receipt of such billing, notifies consultant in writing of alleged inaccuracies, discrepancies, or errors in billing.

23. Client agrees to pay a monthly late payment charge, which will be the lesser of, one and one-half percent (1 1/2%) per month or a monthly charge not to exceed the maximum legal rate, which will be applied to any unpaid balance commencing thirty (30) days after the date of the original billing.

r    91

BP000426

24. If consultant, pursuant to this agreement, produces plans, specifications, or other documents and/or performs field services, and such plans, specifications, and other documents and/or field services are required by one or more governmental agency, and one or more such governmental agency changes its ordinances, policies, procedures or requirements after the date of this agreement, any additional office or field services thereby required shall be paid for by client as extra services.

25. In the event consultant's fee schedule changes due to any increase of costs such as the granting of wage increases and/or other employee benefits to field or office employees due to the terms of any labor agreement, or rise in the cost of living, during the lifetime of this agreement, a percentage increase shall be applied to all remaining compensation.

26. Client agrees that if client requests services not specified pursuant to the scope of services description within this agreement, client agrees to pay for all such additional services as extra work.

27. In the event that any staking is destroyed, damaged or disturbed by an act of God or parties other than consultant, the cost of restaking shall be paid for by client as extra services.

28. Client acknowledges that the design services performed pursuant to this agreement are based upon field and other conditions existing at the time these services were performed. Client further acknowledges that field and other conditions may change by the time project construction occurs and clarification, adjustments, modifications and other changes may be necessary to reflect changed field or other conditions. If the scope of services pursuant to this agreement does not include construction staking services by consultant for this project, or if subsequent to this agreement client retains other persons or entities to provide such staking services, client acknowledges that such staking services will be performed by others and that client will defend, indemnify, and hold consultant harmless from any and all claims arising from or resulting from the performance of such staking services by other persons or entities except claims caused by the sole negligence or willful misconduct of consultant; and from any and all claims arising from or resulting from clarifications, adjustments, modifications or other changes which may be necessary to reflect changed field or other conditions except claims caused by the sole negligence or willful misconduct of consultant.

29. Client shall pay the costs of checking and inspection fees, zoning and annexation application fees, assessment fees, soils engineering fees, soils testing fees, aerial topography fees, and all other fees, permits, bond premiums, title company charges, blueprints and reproductions, and all other charges not specifically covered by the terms of this agreement.

30. Client acknowledges and agrees that if consultant provides surveying services, which services require the filing of a Record of Survey in accordance with Business and Professions Code Section 8762, that all of the costs of preparation, examination and filing for the Record of Survey will be paid by client as extra work in accordance with Provision 26.

31. Consultant is not responsible for delay caused by activities or factors beyond consultant's reasonable control, including but not limited to, delays by reason of strikes, lockouts, work slowdowns or stoppages, accidents, acts of God, failure of client to furnish timely information or approve or disapprove of consultant's services or work product promptly, faulty performance by client or other contractors or governmental agencies. When such delays beyond consultant's reasonable control occur, client agrees consultant is not responsible in damages nor shall consultant be deemed to be in default of this agreement.

Consultant shall not be liable for damages resulting from the ac-

tions or inactions of governmental agencies including, but not limited to, permit processing, environmental impact reports, dedications, general plans and amendments thereto, zoning matters, annexations or consolidations, use or conditional use permits, project or plan approvals, and building permits. The client agrees that it is the responsibility of the client to maintain in good standing all government approvals and permits and to apply for any extensions thereof.

33. In the event that client institutes a suit against consultant, either directly by complaint or by way of cross-complaint, including a cross-complaint for indemnity, for alleged negligence, error, omission, or other failure to perform, and if client fails to obtain a judgment in client's favor, the lawsuit is dismissed, or if judgment is rendered for consultant, client agrees to pay consultant all costs of defense, including attorneys' fees, expert witness fees, court costs, and any and all other expenses of defense. Client agrees such payments shall be made immediately following dismissal of the case or upon entry of judgment.

34. If any action at law or equity, including an action for declaratory relief, is brought to enforce or interpret the provisions of this agreement, the prevailing party shall be entitled to reasonable attorneys' fees, which fees may be set by the court in the same action or in a separate action brought for that purpose, in addition to any other relief to which he may be entitled.

35. Client agrees that in the event client institutes litigation to enforce or interpret the provisions of this agreement, such litigation is to be brought and adjudicated in the appropriate court in the county in which consultant's principal place of business is located, and client waives the right to bring, try or remove such litigation to any other county or judicial district.

36. Consultant makes no representation concerning the estimated quantities and probable costs made in connection with maps, plans, specifications, reports or drawings other than that all such costs are estimates only and actual costs will vary. It is the responsibility of client to verify costs.

37. Client acknowledges that consultant is not responsible for the performance of work by third parties including, but not limited to, the construction contractor and its subcontractors.

38. Consultant makes no warranty, either expressed or implied, as to his findings, recommendations, plans, specifications, or professional advice except that the services or work product were performed pursuant to generally accepted standards of practice in effect at the time of performance.

39. Estimates of land areas provided under this agreement are not to be considered precise unless consultant specifically agrees to provide the precise determination of such areas.

40. In the event the client agrees to, permits, authorizes, constructs or permits construction of changes in the plans, specifications, and documents or does not follow recommendations or reports prepared by consultant pursuant to this agreement, which changes are not consented to in writing by consultant, client acknowledges that the changes and their effects are not the responsibility of consultant and client agrees to release consultant from all liability arising from the use of such changes and further agrees to defend, indemnify and hold harmless consultant, its officers, directors, principals, agents and employees from and against all claims, demands, damages or costs arising from the changes and their effects.

41. Client acknowledges that the design services performed pursuant to this agreement are based upon field and other conditions existing at the time of preparation of consultant's services. Client



BP000438

further acknowledges that field and other conditions may change by the time project construction occurs and clarification, adjustments, modifications, discrepancies or other changes may be necessary to reflect changed field or other conditions. If the scope of services pursuant to this agreement does not include on-site construction review, construction management, supervision of construction of engineering structures, or other construction supervision for this project, or if subsequent to this agreement client retains other persons or entities to provide such services, client acknowledges that such services will be performed by others and client will defend, indemnify and hold consultant harmless from any and all claims arising from or resulting from the performance of such services by other persons or entities except claims caused by the sole negligence or willful misconduct of consultant; and from any and all claims arising from or resulting from clarifications, adjustments, modifications, discrepancies or other changes necessary to reflect changed field or other conditions, except claims caused by the sole negligence or willful misconduct of consultant.

42. Client agrees that in accordance with generally accepted construction practices, construction contractor will be required to assume sole and complete responsibility for job site conditions during the course of construction of the project, including safety of all persons and property; that this requirement shall be made to apply continuously and not be limited to normal working hours, and client further agrees to defend, indemnify and hold consultant harmless from any and all liability, real or alleged, in connection with the performance of services on this project, excepting liability arising from the sole negligence of consultant.

43. In the event client discovers or becomes aware of changed field or other conditions which necessitate clarification, adjustments, modifications or other changes during the construction phase of the project, client agrees to notify consultant and engage consultant to prepare the necessary clarifications, adjustments, modifications or other changes to consultant's services or work product before construction activities commence or further activity proceeds. Further, client agrees to have a provision in its construction contracts for the project which requires the contractor to notify client of any changed field or other conditions so that client may in turn notify consultant pursuant to the provisions of this paragraph.

44. Client agrees to limit the liability of consultant, its principals and employees, to client and to all contractors and subcontractors on the project, for any claim or action arising in tort or contract, to the sum of $50,000 or consultant's fee, whichever is greater. However, if consultant's fee exceeds $250,000, liability to client and to all contractors and subcontractors shall not exceed $250,000.

45. Client agrees to purchase and maintain, during the course of construction, builder's risk "all risk" insurance which will name consultant as an additional insured as their interest may appear.

46. Consultant hereby states and client hereby acknowledges that consultant has no professional liability insurance for claims arising out of the performance of or failure to perform professional services, including, but not limited to the preparation of reports, designs, drawings and specifications, related to the investigation, detection, abatement, replacement, use or specification, or removal of products, materials or processes containing asbestos, asbestos cement pipe, and/or hazardous waste materials. Accordingly, the client hereby agrees to bring no claim for negligence, breach of contract, indemnity or otherwise against the consultant, its principals, employees, and agents if such claim, in any way, would involve the consultant's services for the investigation, detection, abatement, replacement, use or specification, or removal of products, materials or processes containing asbestos, asbestos cement pipe, and/or hazardous waste materials. Client further agrees to defend, indemnify and hold harmless consultant, its officers, directors, principals, employees and agents from any asbestos and/or hazardous waste material related claims that may be brought by third parties as a result of the services provided by the consultant pursuant to this agreement except claims caused by the sole negligence or willful misconduct of the consultant.

47. Client acknowledges that consultant's scope of services for this project do not include any services related in any way to asbestos and/or hazardous waste. Should consultant or any other party encounter such materials on the job site, or should it in any other way become known that such materials are present or may be present on the job site or any adjacent or nearby areas which may affect consultant's services, consultant may, at its option, terminate work on the project until such time as client retains a specialist contractor to abate and/or remove the asbestos and/or hazardous waste materials and warrant that the job site is free from any hazard which may result from the existence of such materials.

48. (a) Notwithstanding any other provision of this Agreement and except for the provisions of (b) and (c), if a dispute arises regarding consultant's fees pursuant to this contract, and if the fee dispute cannot be settled by discussions between client and consultant, both client and consultant agree to attempt to settle the fee dispute by mediation through the American Arbitration Association for other mediation service) before recourse to arbitration.

If mediation does not resolve the fee dispute, such dispute shall be settled by binding arbitration in accordance with the Construction Industry Arbitration Rules of the American Arbitration Association, and judgment upon the award rendered by the Arbitrator(s) may be entered in any court having jurisdiction thereof.

(b) Subdivision (a) does not preclude or limit consultant's right to elect to file an action for collection of fees if the amount in dispute is within the jurisdiction of the small claims court.

(c) Subdivision (a) does not preclude or limit consultant's right to elect to perfect or enforce applicable mechanics lien remedies.

IN WITNESS WHEREOF, the parties hereby execute this agreement dated _____ upon the terms and conditions stated above.

Client   MICHAEL S. Brown
_____
Print or Type

By _____
Signature

Name/Title _____

Date Signed   3/25/92

Project Number   92-22

Consultant   Martin-McIntosh — Eugene P. Martin
_____
Print or Type

By _____
Signature

Name/Title   Eugene P. Martin — Partner

Date Signed   3/26/92

Project Number   92-22

Client should mail completed contract to the address shown for consultant.

Form A 91

EP000427

A/R Aged Open Invoice Report
MARTIN-MCINTOSH

From  00BROWN  To 00BROWN

| ustomer Code | Name/Phone | Job Nmbr | Invoice Number | Last Pat Type Chck # | Invoice Date | Balance/ Balance | Current | 30 Days | 60 Days | 90+ Days | Retentn |
|---|---|---|---|---|---|---|---|---|---|---|---|
| ROWN | Michael S. Brown | | | | 05/11/94 | | | | | | |
| | (818) 981-3712 92-022-02 Master planning | | | | | | | | | | |
| | | | 0026422 | P 0001155 | 04/24/93 | 4229.05 | | | | | |
| | | | 0026731 | p | 05/22/93 | 1458.44 | | | | 4229.05 | |
| | | | 0027058 | p | 06/19/93 | 1081.86 | | | | 1458.44 | |
| | | | 0027343 | p | 07/24/93 | 1444.28 | | | | 1081.86 | |
| | | | 0027680 | p | 08/21/93 | 119.59 | | | | 1444.28 | |
| | | | 0027968 | p | 09/18/93 | 472.19 | | | | 119.59 | |
| | | | 0028241 | p | 10/23/93 | 162.95 | | | | 472.19 | |
| | | | 0029696 | p | 04/23/94 | 4029.77 | | | | 162.95 | |
| | | | 0030727 | p | 08/20/94 | 58.08 | 58.08 | | | 4029.77 | |
| | | Job Site Total: | | | | 13056.21 *Brown's* | 58.08 | | | 12998.13 | |
| | 92-022-04 Tract #5472 | | | | | | | | | | |
| | | | 0025516 | P 0001596 | 02/20/93 | 522.00 | | | | | |
| | | | 0026124 | p | 03/20/93 | 17838.60 | | | | 522.00 | |
| | | | 0026426 | p | 04/24/93 | 18594.39 | | | | 17838.60 | |
| | | | 0026734 | p | 05/22/93 | 5968.00 | | | | 18594.39 | |
| | | | 0027059 | p | 06/19/93 | 2454.67 | | | | 5968.00 | |
| | | | 0027347 | p | 07/24/93 | 1546.38 | | | | 2454.67 | |
| | | | 0027353 | P 0001596 | 07/24/93 | 148.10 | | | | 1546.38 | |
| | | | 0027681 | p | 08/21/93 | 188.35 | | | | 148.10 | |
| | | | 0027971 | p | 09/18/93 | 4045.00 | | | | 188.35 | |
| | | | 0028243 | p | 10/23/93 | 506.04 | | | | 4045.00 | |
| | | | 0028938 | p | 01/22/94 | 4295.49 | | | | 506.04 | |
| | | | 0029697 | p | 04/23/94 | 30.00 | | | | 4295.49 | |
| | | | 0029698 | p | 04/23/94 | 618.90 | | | | 30.00 | |
| | | | 0029699 | p | 04/23/94 | 140.99 | | | | 618.90 | |
| | | | 0029700 | p | 04/23/94 | 1353.73 | | | | 140.99 | |
| | | | 0029701 | p | 04/23/94 | 245.75 | | | | 1353.73 | |
| | | | 0029702 | p | 04/23/94 | 1374.45 | | | | 245.75 | |
| | | | 0030728 | p | 08/20/94 | 1147.55 —*Brown's* | 1147.55 | | | 1374.45 | |
| | | | 0030729 | p | 08/20/94 | 1275.96 | 1275.96 | | | | |
| | | | 0030730 | p | 08/20/94 | 1277.36 | 1277.36 | | | | |
| | | | 0030731 | p | 08/20/94 | 1350.69 | 1350.69 | | | | |
| | | | 0030732 | p | 08/20/94 | 2679.09 | 2679.09 | | | | |
| | | Job Site Total: | | | | 67601.57 | 7730.65 | | | 59870.92 | |
| | 92-022-05 Tract 5618 | | | | | | | | | | |
| | | | 0026134 | P 0001596 | 03/20/93 | 19964.71 | | | | | |
| | | | 0026436 | p | 04/24/93 | 46833.63 | | | | 19964.71 | |
| | | | 0026763 | p | 05/22/93 | 24576.31 | | | | 46833.63 | |
| | | | 0027066 | p | 06/19/93 | 12265.51 | | | | 24576.31 | |
| | | | | | | | | | | 12265.51 | |



π EXHIBIT 15
Deponent McIntosh
Date 4-8-08  Rptr S.C.
WWW.DEPOBOOK.COM

#15

EP000431

sting Date: 10/12/94
wr. No: 001
Invoice Date
rteu By Number and Job Site

A/R Aged Open Invoice Report
MARTIN-MCINTOSH

From 00BROWN  To 00BROWN

Page: 2   JLR
Run Date: 10/12/94
Run Time: 10:18 ac

| stoner Code | Name/Phone | Job Nmbr | Invoice Number | Last Pat Type Chck # | Invoice Date | Balance/ Balance | Current | 30 Days | 60 Days | 90+ Days | Retentn |
|---|---|---|---|---|---|---|---|---|---|---|---|
| XWN | Michael S. Brown (818) 981-3712 | | | 05/11/94 | | | | | | | |
| | | | 0027075 | p | 06/19/93 | 3647.36 | | | | | |
| | | | 0027355 | p | 07/24/93 | 9173.87 | | | | 3647.36 | |
| | | | 0027684 | p. | 08/21/93 | 591.00 | | | | 9173.87 | |
| | | | 0027685 | p | 08/21/93 | 591.00 | | | | 591.00 | |
| | | | 0027686 | p | 08/21/93 | 6941.60 | | | | 591.00 | |
| | | | 0027977 | p | 09/18/93 | 463.60 | | | | 6941.60 | |
| | | | 0028247 | p | 10/23/93 | 300.00 | | | | 463.60 | |
| | | | 0029703 | p | 04/23/94 | 64.00 | | | | 300.00 | |
| | | | 0030733 | p | 08/20/94 | 239.20 | | 239.20 | | 64.00 | |
| | | | 0030734 | p | 08/20/94 | 138.46 | | 138.46 | | | |

Job Site Total:   125797.45  *Browns*  377.66   125419.79

92-022-06 Parcel Map #3572
| | | | 0025534 | p | 02/20/93 | 216.00 | | | | | |
| | | | 0026144 | p | 03/20/93 | 21.60 | | | | 216.00 | |

{ Browns

Job Site Total:   237.60   237.60

92-022-09 Offsite sewer
| | | | 0026145 | p | 03/20/93 | 10674.06 | | | | | |
| | | | 0026450 | p | 04/24/93 | 9634.48 | | | | 10674.06 | |
| | | | 0026777 | p | 05/22/93 | 10305.29 | | | | 9634.48 | |
| | | | 0027076 | p | 06/19/93 | 4580.73 | | | | 10305.29 | |
| | | | 0027077 | p | 06/19/93 | 113.16 | | | | 4580.73 | |
| | | | 0027364 | p | 07/24/93 | 2786.91 | | | | 113.16 | |
| | | | 0027366 | p | 07/24/93 | 2065.62 | | | | 2786.91 | |
| | | | 0027687 | p | 08/21/93 | 424.70 | | | | 2065.62 | |
| | | | 0027688 | p | 08/21/93 | 67.94 | | | | 424.70 | |
| | | | 0029704 | p | 04/23/94 | 2223.06 | | | | 67.94 | |
| | | | 0030736 | p | 08/20/94 | 306.78 | | 306.78 | | 2223.06 | |

*Browns*

Job Site Total:   43182.65   306.78   42875.87

92-022-10 Offsite water
| | | | 0026147 | p 0001596 | 03/20/93 | 448.53 | | | | | |
| | | | 0026453 | p | 04/24/93 | 8301.86 | | | | 448.53 | |
| | | | 0026743 | p | 05/22/93 | 7434.91 | | | | 8301.86 | |
| | | | 0027078 | p | 06/19/93 | 5473.99 | | | | 7434.91 | |
| | | | 0027079 | p | 06/19/93 | 262.00 | | | | 5473.99 | |
| | | | 0027368 | p | 07/24/93 | 3892.82 | | | | 262.00 | |
| | | | 0027369 | p | 07/24/93 | 118.49 | | | | 3892.82 | |
| | | | 0027689 | p | 08/21/93 | 137.51 | | | | 118.49 | |

} Browns

137.51

EP000432

sting Date: 10/12/94
ap—— No: 001
—e   Invoice Date
     By Number and Job Site

A/R Aged Open Invoice Report
MARTIN-MCINTOSH

From 00BROWN   To 00BROWN

Page: 2   JLH
Run Date: 10/12/94
Run Time: 10:19 am

| .stomer Code | Name/Phone | Job Nmbr | Invoice Number | Type | Last Pmt Chck # | Invoice Date | Balance/ Balance | Current | 30 Days | 60 Days | 90+ Days | Retentn |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| ZWN | Michael S. Brown | | | | | 05/11/94 | | | | | | |
| | (818) 981-3712 | | 0027698 | p | | 08/21/93 | 10.25 | | | | 10.25 | |
| | | | 0027691 | p | | 08/21/93 | 1353.00 | | | | 1353.00 | |
| | | | 0029705 | p | | 04/23/94 | 192.00 | | | | 192.00 | |
| | | | 0029706 | p | | 04/23/94 | 209.18 | | | | 209.18 | |
| | | | 0029707 | p | | 04/23/94 | 17.71 | | | | 17.71 | |
| | | | 0030737 | p | | 08/20/94 | 454.00 | | 454.00 | | | |
| | | | 0030738 | p | | 08/20/94 | 1389.11 | | 1389.11 | | | |
| | | | 0030739 | p | | 08/20/94 | 407.51 | | 407.51 | | | |
| | | | 0030740 | p | | 08/20/94 | 64.00 | | 64.00 | | | |

Job Site Total:   30247.75   2314.62   27933.13

92-022-11 Offsite highway (Caltrans)
0027090   P 0001596  06/19/93   4463.63   4463.63
0027370   p   07/24/93   1485.20   1485.20
0027692   p   08/21/93   1464.10   1464.10

Job Site Total:   7412.93 *Brown's*   7412.93

92-022-12 Color Rendering
0026454   p   04/24/93   3314.13   3314.13 *Brown's*

92-022-16 Lot Study Plan
0029488   p   03/19/94   256.78   256.78
0029706   p   04/23/94   1517.20   1517.20

$ 292,624.19

35,000.
1,113.11
$36,113.11

36,113.11
328,737.30

35,695.35  Total Int.

$ 364,432.65  *

Bro-Lund to pay $15,468.27
M. Brown to pay $313,269.03
$328,737.30

BP000433

# EXHIBIT "P"

1  **RESPONSE TO REQUEST FOR ADMISSION NO. 1:**

2        The City is unable to admit or deny this request on the ground that the reference to "City

3  of Wasco" is unclear, vague and ambiguous in that it does not specify whether an employee of

4  the City is intended by the reference, whether the reference relates to persons with authority to

5  bind the City to acts and/or omissions, or whether the City Council is intended.  Furthermore, the

6  City cannot admit or deny the instant request on the ground that the term "Valley Rose Estate

7  Subdivision" is a capitalized term which Plaintiff has failed to define and, as such, renders the

8  request vague and ambiguous.  For these reasons, the City denies the request.

9        In any event, the City admits that the staff report attached as Exhibit 1 to Plaintiff's

10  request for admissions is a staff report prepared by the City of Wasco Planning Department.

11  **REQUEST FOR ADMISSION NO. 2:**

12        Admit that the staff report attached to this request as Exhibit "2" is a staff report prepared

13  by the City of Wasco for Tract No. 6451 of the Valley Rose Estate Subdivision.  (Previously

14  produced as Bates Nos. BP000809 to BP000823).

15  **RESPONSE TO REQUEST FOR ADMISSION NO. 2:**

16        The City is unable to admit or deny this request on the ground that the reference to "City

17  of Wasco" is unclear, vague and ambiguous in that it does not specify whether an employee of

18  the City is intended by the reference, whether the reference relates to persons with authority to

19  bind the City to acts and/or omissions, or whether the City Council is intended.  Furthermore, the

20  City cannot admit or deny the instant request on the ground that the term "Valley Rose Estate

21  Subdivision" is a capitalized term which Plaintiff has failed to define and, as such, renders the

22  request vague and ambiguous.  For these reasons, the City denies the request.

23        In any event, the City admits that the staff report attached as Exhibit 2 to Plaintiff's

24  request for admissions is a staff report prepared by the City of Wasco Planning Department.

25  **REQUEST FOR ADMISSION NO. 3:**

26        Admit that Tentative Map No. 5472 attached to this request as Exhibit "3" is a copy of a

27  Tentative Map prepared by Martin-McIntosh for the Valley Rose Estate Subdivision.

28  (Previously produced as BP000434)

1  **RESPONSE TO REQUEST FOR ADMISSION NO. 3:**

2        The City cannot admit or deny this request as drafted on the ground that the document is

3  entitled "'Revised' Tentative Tract Map No. 5472" and not "Tentative Map No. 5472."

4  Furthermore, the City cannot admit or deny the instant request on the ground that the term

5  "Valley Rose Estate Subdivision" is a capitalized term which Plaintiff has failed to define and, as

6  such, renders the request vague and ambiguous. Furthermore, by invoking the word "prepared,"

7  the request requires that the City confirm or deny the intentions of the drafter of the document, a

8  fact to which the City cannot attest. For these reasons, the City denies the request.

9        In any event, the City admits that the document attached as Exhibit 4 to Plaintiff's

10  requests for admission states that it was prepared by Martin-McIntosh.

11  **REQUEST FOR ADMISSION NO. 4:**

12        Admit that Vesting Tentative Map No. 6451 attached to this request as Exhibit "4' is a

13  copy of a Vesting Tentative Map prepared for the Valley Rose Estate Subdivision. (Previously

14  produced as BP000155 and A01918).

15  **RESPONSE TO REQUEST FOR ADMISSION NO. 4:**

16        The City cannot admit or deny this request as drafted on the ground that the document

17  attached as Exhibit 4 is entitled "Vesting Tentative Tract Map No. 6451' and not "Vesting

18  Tentative Map No. 6451." Additionally, the City cannot admit or deny the instant request for

19  admission on the grounds that "Vesting Tentative Map" and "Valley Rose Estate Subdivision"

20  are capitalized terms which Plaintiff has failed to define and, as such, render Plaintiff's request

21  vague and ambiguous. Furthermore, by invoking the word "prepared," the request requires that

22  the City confirm or deny the intentions of the drafter of the document, a fact to which the City

23  cannot attest. For these reasons, the City denies the request.

24        In any event, the City admits that the document attached as Exhibit 4 to McIntosh's

25  request for admission is entitled "Vesting Tentative Tract Map No. 6451."

26  / / /

27  / / /

28  / / /

1    **REQUEST FOR ADMISSION NO. 5:**

2           Admit that the copy of Vesting Tentative Map No. 6451 attached to this request as

3    Exhibit "5" contains hand-written annotations made by the City of Wasco.  (Previously produced

4    as BP000101)

5    **RESPONSE TO REQUEST FOR ADMISSION NO. 5:**

6           The City is unable to admit or deny the request as drafted on the ground that the reference

7    to "City of Wasco" is unclear, vague and ambiguous in that it does not specify whether an

8    employee of the City is intended by the reference, whether the reference relates to persons with

9    authority to bind the City to acts and/or omissions, or whether the City Council is intended.

10   Additionally, the City cannot admit or deny the instant request for admission on the grounds that

11   the term "Vesting Tentative Tract Map No. 6451" is a capitalized term which Plaintiff has failed

12   to define and, as such, renders Plaintiff's request vague and ambiguous.  For these reasons, the

13   City denies the request.

14          In any event, the City admits that hand written notations were made by a City of Wasco

15   employee on a document entitled "Vesting Tentative Tract Map No. 6451."

16   **REQUEST FOR ADMISSION NO. 6:**

17          Admit that the copy of Tentative Map No. 6451 attached to this request as Exhibit "6" is

18   a copy of a Tentative Map prepared for the Valley Rose Estate subdivision.  (BP001314).

19   **RESPONSE TO REQUEST FOR ADMISSION NO. 6:**

20          The City cannot admit or deny the request as drafted on the ground that the document

21   attached as Exhibit 6 to Plaintiff's request for admissions is entitled "Tentative Tract Map No.

22   6451" and not "Tentative Map No. 6451."  Additionally, the City cannot admit or deny the

23   request on the ground that "Tentative Map" and Valley Rose Estate Subdivision" are capitalized

24   terms which Plaintiff has failed to define and, as such, render Plaintiff's request vague and

25   ambiguous.  Furthermore, by invoking the word "prepared," the request requires that the City

26   confirm or deny the intentions of the drafter of the document, a fact to which the City cannot

27   attest.  For these reasons, the City denies the request.

28   / / /

1    In any event, the City admits that the document attached as Exhibit 6 to Plaintiff's

2  requests for admission is entitled "Tentative Tract Map No. 6451."

3  **REQUEST FOR ADMISSION NO. 7:**

4    Admit that Final Map No. 6541 attached to this request as Exhibit "7" is a copy of a Final

5  Map prepared for the Valley Rose Estate Subdivision. (Previously produced as BP00047-

6  BP00949)

7  **RESPONSE TO REQUEST FOR ADMISSION NO. 7:**

8    The City cannot admit or deny the request as drafted on the ground that no where in the

9  document attached as Exhibit 7 to Plaintiff's request for admissions does the document use the

10  term "Final Map." Similarly, the City cannot admit or deny the request on the ground that "Final

11  Map" and "Valley Rose Estate Subdivision" are capitalized terms which Plaintiff has failed to

12  define and, as such, render Plaintiff's request vague and ambiguous. Furthermore, the City

13  cannot admit or deny the request on the ground that, by invoking the word "prepared," the

14  request requires that the City confirm or deny the intentions of the drafter of the document, a fact

15  to which the City cannot attest. For these reasons, the City denies the request.

16    In any event, the City responds that the document attached as Exhibit 7 to Plaintiff's

17  request for admissions appears to be a copy of a final map for Tract No. 6451.

18  **REQUEST FOR ADMISSION NO. 8:**

19    Admit that Martin-McIntosh prepared the Improvement Plans for expired Tentative Map

20  No .5472 of the Valley Rose Estate subdivision.

21  **RESPONSE TO REQUEST FOR ADMISSIONS NO. 8:**

22    The City cannot admit or deny the request as drafted on the ground that the term

23  "Improvement Plans" is a capitalized term which Plaintiff has failed to define and, as such,

24  renders Plaintiff's request vague and ambiguous. As such, the City denies the request.

25  Furthermore, by invoking the word "prepared," the request requires that the City confirm or deny

26  the intentions of the drafter of the document, a fact to which the City cannot attest. For these

27  reasons, the City denies the request.

28  / / /

1    In any event, the City admits that improvement plans for Tract No. 5472 were submitted

2    to the City.

3    **REQUEST FOR ADMISSION NO. 9:**

4    Admit that Martin-McIntosh prepared the Improvement Plans for Tentative Map No.

5    6451 of the Valley Rose Estate subdivision.

6    **RESPONSE TO REQUEST FOR ADMISSION NO. 9:**

7    Deny.

8    **REQUEST FOR ADMISSION NO. 10:**

9    Admit that the, "Associative Approved Improvement Plans" referenced in the "Notes"

10   section of Tentative Map No. 6451 (BP001314) refers to the Improvement Plans prepared by

11   Martin-McIntosh for the Valley Rose Estate subdivision.

12   **RESPONSE TO REQUEST FOR ADMISSION NO. 10:**

13   The City cannot admit or deny this request on the ground that, by invoking the term

14   "prepared," the request requires that the City confirm or deny the intentions of the drafter of the

15   document, a fact to which the City cannot attest.  Additionally, the City cannot admit or deny this

16   request on the ground that "Improvement Plans" is a capitalized term which Plaintiff has failed

17   to define and, therefore, renders the request vague and ambiguous.  For these reasons, the City

18   denies the request.

19   In any event, the City admits that the document states "This document contains existing

20   improvements built per "Valley Rose Planned Community" Expired Tentative Tract 5472, and

21   Associative Approved Improvement Plans."

22   **REQUEST FOR ADMISSION NO. 11:**

23   Admit that the numbered lots in the Wall Improvement Plans in Exhibit "8" attached

24   hereto and labeled as Bates Nos. BP000452 to BP000456 refers to the lots referenced on

25   Tentative Map No. 6451.

26   **RESPONSE TO REQUEST FOR ADMISSION NO. 11:**

27   Deny.

28   ///

1  **REQUEST FOR ADMISSION NO. 12:**

2      Admit that the City of Wasco gave a copy of Tentative Map No. 5472 to by [sic] DeWalt

3  CM, Inc., also known as DeWalt Corporation, ("DeWalt").

4  **RESPONSE TO REQUEST FOR ADMISSION NO. 12:**

5      The City cannot admit or deny the instant request on the ground that the reference to

6  "Tentative Map No. 5472" is unclear, vague and ambiguous in that a capitalized term is being

7  used without definition and no specific document identified by Bates numbering or any other

8  manner is identified in the request. Furthermore, the request is unclear as to what the City is

9  being asked to admit insofar it uses a vague and ambiguous term ("to by DeWalt CM, Inc.")

10  Furthermore, the City cannot admit or deny the request for admission to the extent that it requires

11  confirmation of other aliases assumed by the DeWalt Corporation.

12      In any event, the City lacks sufficient knowledge to admit or deny this request, after

13  having conducted a reasonable inquiry into the matter. As such, the City denies the request.

14  **REQUEST FOR ADMISSION NO. 13:**

15      Admit that the City of Wasco gave a copy of Tentative Map No. 5472 to Northern

16  California Universal Enterprises. ("Northern")

17  **RESPONSE TO REQUEST FOR ADMISSION NO. 13:**

18      Deny.

19  **REQUEST FOR ADMISSION NO. 14:**

20      Admit that the City of Wasco gave a copy of Tentative Map No. 5472 to Lotus

21  Developments, LLC. ("Lotus")

22  **RESPONSE TO REQUEST FOR ADMISSION NO. 14:**

23      Deny.

24  **REQUEST FOR ADMISSION NO. 15:**

25      Admit that the City of Wasco gave a copy of Tentative Map No. 5472 to Joe Wu.

26  ("Wu").

27  / / /

28  / / /

1   **RESPONSE TO REQUEST FOR ADMISSION NO. 15:**

2       Deny.

3   **REQUEST FOR ADMISSION NO. 16:**

4       Admit that the City of Wasco gave a copy of the Improvement Plans prepared by Martin-

5   McIntosh to DeWalt.

6   **RESPONSE TO REQUEST FOR ADMISSION NO. 16:**

7       The City cannot admit or deny the instant request on the ground that the reference to

8   "Improvement Plans" is unclear, vague and ambiguous in that a capitalized term is being used

9   without definition and no specific documents identified by Bates numbering or any other manner

10   are identified in the request.  Furthermore, the City is unable to admit or deny the request as

11   drafted on the ground that the reference to "City of Wasco" is unclear, vague and ambiguous in

12   that it does not specify whether an employee of the City is intended by the reference, whether the

13   reference relates to persons with authority to bind the City to acts and/or omissions, or whether

14   the City Council is intended.

15       In any event, the City admits that a City employee appears to have provided Greg Black a

16   copy of improvement plans related to Tract No. 5472.

17   **REQUEST FOR ADMISSION NO. 17:**

18       Admit that the City of Wasco gave a copy of the Improvement Plans prepared by Martin-

19   McIntosh to Northern.

20   **RESPONSE TO REQUEST FOR ADMISSION NO. 17:**

21       Deny.

22   **REQUEST FOR ADMISSION NO. 18:**

23       Admit that the City of Wasco gave a copy of the Improvement Plans prepared by Martin-

24   McIntosh to Wu.

25   **RESPONSE TO REQUEST FOR ADMISSION NO. 18:**

26       Deny.

27   / / /

28   / / /

1 **REQUEST FOR ADMISSION NO. 19:**

2      Admit that the City of Wasco gave a copy of the Improvement Plans prepared by Martin-

3 McIntosh to Lotus.

4 **RESPONSE TO REQUEST FOR ADMISSION NO. 19:**

5     Deny.

6 **REQUEST FOR ADMISSION NO. 20:**

7      Admit that without prior approval by the City of Wasco of the Improvement Plans

8 prepared by Martin-McIntosh for the Valley Rose Estate Subdivision, the City of Wasco would

9 not have approved Tentative Map No. 6451.

10 **RESPONSE TO REQUEST FOR ADMISSION NO. 20:**

11     Deny.

12 **REQUEST FOR ADMISSION NO. 21:**

13      Admit that the City of Wasco knew that the references contained in Tentative Map No.

14 6451, specifically, the lot numbers and boundaries, needed to be the same or similar to those in

15 prior Tentative Tract Map No. 5472.

16 **RESPONSE TO REQUEST FOR ADMISSION NO. 21:**

17     Deny.

18 **REQUEST FOR ADMISSION NO. 22:**

19      Admit that the "plans" referred to in Exhibit "2", (item "10" in BP00814) refers to the

20 Improvement Plans originally prepared by Martin-McIntosh for Tract No. 5472.

21 **RESPONSE TO REQUEST FOR ADMISSION NO. 22:**

22     Deny.

23 **REQUEST FOR ADMISSION NO. 23:**

24      Admit that the City of Wasco has not formally accepted the improvements for Tract No.

25 6451.

26 **RESPONSE TO REQUEST FOR ADMISSION NO. 23:**

27     Admit.

28 / / /

1  **REQUEST FOR ADMISSION NO. 24:**

2       Admit that the City of Wasco could not have approved a tentative map for Tract No.

3  6451 with lot numbers different than those referenced to in Tentative Map No. 5472 without

4  modified improvement plans.

5  **RESPONSE TO REQUEST FOR ADMISSION NO. 24:**

6       Deny.

7  **REQUEST FOR ADMISSION NO. 25:**

8       Admit that the City of Wasco is now able to collect impact fees based on the number of

9  dwelling units on the Valley Rose Estates Subdivision to reimburse the city's enterprise funds'

10  capital accounts for the costs incurred by the city in constructing the public Valley Rose Estates

11  infrastructure project.

12  **RESPONSE TO REQUEST FOR ADMISSION NO. 25:**

13       The City admits that it is able to collect impact fees for reasons set forth in a 2004

14  ordinance adopting chapter 13.19 of the Wasco Municipal Code. The City otherwise denies the

15  request.

16  **REQUEST FOR ADMISSION NO. 26:**

17       Admit that the City of Wasco is now able to collect impact fees to pay for the engineering

18  work done on the Valley Rose Estates subdivision.

19  **RESPONSE TO REQUEST FOR ADMISSION NO. 26:**

20       The City admits that it is able to collect impact fees for reasons set forth in a 2004

21  ordinance adopting chapter 13.19 of the Wasco Municipal Code. The City otherwise denies the

22  request.

23  **REQUEST FOR ADMISSION NO. 27:**

24       Admit that the City of Wasco had the ability to either approve or disapprove of Tentative

25  Map No. 6451.

26  **RESPONSE TO REQUEST FOR ADMISSION NO. 27:**

27       The City cannot admit or deny this request on the ground that the terms "approve or

28  disapprove" are unclear, vague and ambiguous. Additionally, the City cannot admit or deny this

1    request on the ground that the reference to "Tentative Map No. 6451" is unclear, vague and

2    ambiguous in that no particular document identified by Bates numbering or any other manner is

3    specified.  For these reasons, the City denies the request.

4    **REQUEST FOR ADMISSION NO. 28:**

5           Admit that the City of Wasco had the ability to either approve or disapprove of Final Map

6    No. 6451.

7    **RESPONSE TO REQUEST FOR ADMISSION NO. 28:**

8           The City cannot admit or deny this request on the ground that the terms "approve or

9    disapprove" are unclear, vague and ambiguous.  Additionally, the City cannot admit or deny this

10   request on the ground that the reference to "Final Map No. 6451" is unclear, vague and

11   ambiguous in that no particular document identified by Bates numbering or any other manner is

12   specified.  For these reasons, the City denies the request.

13   **REQUEST FOR ADMISSION NO. 29:**

14          Admit that Tentative Map No. 5472 and Tentative Map No. 6451 are substantially

15   similar.

16   **RESPONSE TO REQUEST FOR ADMISSION NO. 29:**

17          Deny.

18   **REQUEST FOR ADMISSION NO. 30:**

19          Admit that Tentative Map No. 5472 and Final Map No. 6451 are substantially similar.

20   **RESPONSE TO REQUEST FOR ADMISSION NO. 30:**

21          Deny.

22   **REQUEST FOR ADMISSION NO. 31:**

23          Admit that Tentative Map No. 5472 and Vesting Tentative Map No. 6451 are

24   substantially similar.

25   **RESPONSE TO REQUEST FOR ADMISSION NO. 31:**

26          Deny.

27   / / /

28   / / /

1   **REQUEST FOR ADMISSION NO. 32:**

2          Admit that without prior approval by the City of Wasco of the Improvement Plans

3   prepared by Martin-McIntosh for the Valley Rose Estate subdivision, the City of Wasco would

4   not have approved final Map No. 6451.

5   **RESPONSE TO REQUEST FOR ADMISSION NO. 32:**

6          Deny.

7   **REQUEST FOR ADMISSION NO. 33:**

8          Admit that Lotus submitted a final map and improvement plans in order to get your

9   approval of a subdivision agreement between you and Lotus.

10   **RESPONSE TO REQUEST FOR ADMISSION NO. 33:**

11          Deny.

12   **REQUEST FOR ADMISSION NO. 34:**

13          Admit that Lotus submitted a final map and improvement plans in order to get your

14   approval of a subdivision agreement between you and Northern.

15   **RESPONSE TO REQUEST FOR ADMISSION NO. 34:**

16          Deny.

17   **REQUEST FOR ADMISSION NO. 35:**

18          Admit that without a final map and improvement plans, you would not have signed the

19   subdivision agreement between you and Northern.

20   **RESPONSE TO REQUEST FOR ADMISSION NO. 35:**

21          Deny.

22   **REQUEST FOR ADMISSION NO. 36:**

23          Admit that the City of Wasco sold the Valley Rose Estates golf course to Northern.

24   **RESPONSE TO REQUEST FOR ADMISSION NO. 36:**

25          The City admits that the Valley Rose Estates golf course was sold to Northern California

26   Universal Enterprises Co., Inc. through a trustee sale.  The City otherwise denies the request.

27   **REQUEST FOR ADMISSION NO. NO. 37:**

28          Admit that the City of Wasco sold the Valley Rose Estates golf course to Lotus.

1    **RESPONSE TO REQUEST FOR ADMISSION NO. 37:**

2        Deny.

3    **REQUEST FOR ADMISSION NO. 38:**

4        Admit that the City of Wasco sold the Valley Rose Estates golf course to Wu.

5    **RESPONSE TO REQUEST FOR ADMISSIONS NO. 38:**

6        Deny.

7

8    DATED: February 4, 2009                    GARCIA CALDERON RUIZ, LLP

9

10

11                                        By:_____

12                                            CHAKA C. OKADIGBO
                                            Attorneys for Defendant
13                                          CITY OF WASCO

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

02/04/2009  14:48    6617587239                CITY OF WASCO                        PAGE  02/02

Fax:                                   Feb  4 2009 02:09pm  P002/002

1                              **VERIFICATION**

2         I have read the foregoing **DEFENDANT CITY OF WASCO'S RESPONSES TO**

3  **PLAINTIFF ROGER McINTOSH'S REQUESTS FOR ADMISSION, SET ONE**

4  propounded by Roger McIntosh and know its contents.

5         I am the Assistant City Manager for the City of Wasco, a party to this action, and am

6  authorized to make this verification for and on its behalf, and I make this verification for that

7  reason.  I am informed and believe and on that ground allege that the matters stated in the

8  foregoing document are true.

9         I declare under penalty of perjury under the laws of the State of California that the

10  foregoing is true and correct.

11         Executed this 4th day of February, 2009, at Wasco, California.

12

13                              By: _____

14                                        JIM ZERVIS

15

16

17

18

19

20

21

22

23

24

25

26

27

28

4833-5220-4291                        -14-

**CITY OF WASCO'S RESPONSES TO PLAINTIFF ROGER McINTOSH'S REQUESTS FOR ADMISSION**

1

**PROOF OF SERVICE**

2

    I declare that I am over the age of eighteen (18) and not a party to this action.  My business address is 500 South Grand Avenue, Suite 1100, Los Angeles, California 90071.

3

On **February 4, 2009**, I served the following documents: **DEFENDANT CITY OF WASCO'S**
4  **RESPONSES TO PLAINTIFF ROGER MCINTOSH'S REQUESTS FOR ADMISSION, SET ONE** on the interested parties in this action by placing a true and correct copy of such
5  document, enclosed in a sealed envelope, addressed as follows:

6

7  Steven J. Hassing                           Jeffrey A. Travis
    Law Offices of Steven J. Hassing         Borton Petrini, LLP
8  425 Calabria Court                      5060 California Avenue, Suite 700
    Roseville, CA 95747                   Bakersfield, CA 93303

9

10  **( X )**     **BY MAIL:**  I am readily familiar with the business' practice for collection and processing of correspondence for mailing with the United States Postal Service.  I
11          know that the correspondence was deposited with the United States Postal Service on the same day this declaration was executed in the ordinary course of business.
12          I know that the envelope was sealed and, with postage thereon fully prepaid, placed for collection and mailing on this date in the United States mail at Los
13          Angeles, California.

14  **( )**     **BY OVERNIGHT COURIER:**  I caused the above-referenced document(s) to be deposited in a box or other facility regularly maintained by the overnight
15          courier, or I delivered the above-referenced document(s) to an overnight courier service, for delivery to the above addressee(s).

16  **( )**     **BY HAND-DELIVERY:**  I caused the above-referenced document(s) to be hand-delivered to the addressee(s)

17

18  **( )**    (State)     I declare under penalty of perjury under the laws of the State of California that the above is true and correct.

19  **( X )**   (Federal)   I declare that I am employed in the office of a member of the bar of this court at whose direction the service was made.

20

21     Executed **February 4, 2009**, Los Angeles, California.

22

23

24                         **Carolyn Dominguez**

25

26

27

28

# EXHIBIT "Q"

**Certified Copy**

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA, FRESNO DIVISION

ROGER McINTOSH,

       Plaintiff,

vs.

NORTHERN CALIFORNIA UNIVERSAL
ENTERPRISES, COMPANY, et al.,

       Defendants.

~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~

Case No.
107CV 01080 LJO-WMW

**30(b) AND 34 DEPOSITIONS OF**

**STEPHEN WONG, C.E.**

July 2, 2009
1:30 p.m.

5060 California Avenue
Suite 700
Bakersfield, California

Wendy Hahesy, RMR, CSR-4873



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.300.1214
Facsimile: 661.322.2242

Suite 170
5001 East Commercenter Drive
Bakersfield, CA 93309
www.esquiresolutions.com

1

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA, FRESNO DIVISION

ROGER McINTOSH,

          Plaintiff,

     vs.

                         Case No.

                         107CV 01080 LJO-WMW

NORTHERN CALIFORNIA UNIVERSAL

ENTERPRISES, COMPANY, et al.,

          Defendants.

~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~

30(b) AND 34 DEPOSITIONS OF

STEPHEN WONG, C.E.

July 2, 2009

1:30 p.m.

5060 California Avenue

Suite 700

Bakersfield, California

Wendy Hahesy, RMR, CSR-4873



Toll Free: 800.300.1214
Facsimile: 661.322.2242

Suite 170
5001 East Commercenter Drive
Bakersfield, CA 93309
www.esquiresolutions.com

2

APPEARANCES OF COUNSEL

1

2

3  For the Plaintiff:
4      LAW OFFICES OF BORTON & PETRINI, LLP
       BY:  JEFFREY A. TRAVIS, ESQ.
5      5060 California Avenue, Suite 700
       Bakersfield, California 93301
6      661.322.3051
7  For the Defendants DeWalt CM, Inc. and Dennis W. DeWalt,
   Inc.:
8

       ALEXANDER & ASSOCIATES, PLC
9      BY:  TENIELLE E. COOPER, ESQ.
       1925 "G" Street
10     Bakersfield, California 93301
       661.316.7888
11

   For the Defendants Lotus Developments and Northern
12  California Universal Enterprises Company:
13     LAW OFFICES OF STEVEN J. HASSING
       BY:  STEVEN J. HASSING, ESQ.
14     425 Calabria Court
       Roseville, California 95747
15     916.677.1776
16  For the Defendant City of Wasco:
17     GARCIA CALDERON RUIZ
       BY:  CHAKA C. OKADIGBO, ESQ.
18     500 South Grand Avenue, Suite 1100
       Los Angeles, California 90071
19     213.347.0210
20

21

22

23

24  ALSO PRESENT:
25     ROGER McINTOSH





Toll Free: 800.300.1214
Facsimile: 661.322.2242

Suite 170
5001 East Commercenter Drive
Bakersfield, CA 93309
www.esquiresolutions.com

3

INDEX OF EXAMINATION

WITNESS:   STEPHEN WONG, C.E.

EXAMINATION                                          PAGE

By Mr. Travis                                      5, 121

By Mr. Hassing                                        103

By Mr. Okadigbo                                       115



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.300.1214
Facsimile: 661.322.2242

Suite 170
5001 East Commercenter Drive
Bakersfield, CA 93309
www.esquiresolutions.com

4

INDEX OF EXHIBITS

| Exhibit | Description | Page |
|---|---|---|
| 1 | Plaintiff's Rules 30(b) and 34 Depositions and Production of Documents of Stephen Wong | 5 |
| 2 | City of Wasco Department of Public Works Street Improvement and Storm Drain Plans for Construction, Valley Rose Planned Community Tract No. 5472 | 37 |
| 3 | Parcel Map No. 9573 | 51 |
| 4 | Expert Witness Disclosure of Stephen Wong | 57 |
| 5 | Vesting Tentative Tract No. 6451 | 61 |
| 6 | Tract No. 6451 | 68 |
| 7 | Tentative Tract Map No. 6451 | 103 |
| 8 | Tentative Tract Map No. 5472 | 121 |
| 9 | Revised Tentative Parcel Map No. 9572 | 122 |
| 10 | Depositions of James K. Delmarter, Keith Woodcock, Greg Black, Jeffrey Gutierrez, Gerald Frank Helt, Dennis Michael McNamara, Robert Edward Wren, and Robert McIntosh | 122 |
| 11 | Correspondence file | 122 |
| 12 | Wasco Municipal Code | 122 |



ESQUIRE

an Alexander Gallo Company

Toll Free: 800.300.1214
Facsimile: 661.322.2242

Suite 170
5001 East Commercenter Drive
Bakersfield, CA 93309
www.esquiresolutions.com

50

1     Q.   Okay.  After the parcel was created did you

2  find there to be any prior limitations that you're

3  referring to for this rectangle as to the development of

4  that particular piece of property?

5     A.   Yes.  To my recollection I think Valley Rose

6  Parkway was the master plan access and it went right

7  through Parcel 1 so that alignment was preestablished

8  and you had to work around it.

9     Q.   Okay.  So apart from the Valley Rose Parkway

10  provided the developer worked that into the subdivision

11  layout and design it was open to whatever development

12  that they wanted and the city eventually agreed upon,

13  correct?

14     A.   Within the zoning, that's correct.

15     Q.   Within the zoning.  We're assuming it's like a

16  residential zoning and we'll only be talking

17  specifically about that.  So prior to that time as a

18  civil engineer in your experience on the particular lot

19  that encompasses Tract 5472 could a subdivision have

20  been designed with apartment buildings provided the

21  zoning was there?

22     A.   If the zoning and master plan allowed the

23  development of apartments, yes.

24     Q.   Could a lot layout that encompassed different

25  streets but yet still allowed access to Valley Rose



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.300.1214
Facsimile: 661.322.2242

Suite 170
5001 East Commercenter Drive
Bakersfield, CA 93309
www.esquiresolutions.com

51

1    Parkway could that have been designed?

2         MR. OKADIGBO:  Objection.  Vague and ambiguous

3    as to "different streets."

4    BY MR. TRAVIS:

5         Q.   Other than the ones that are found in 6451 or

6    Tract 5472?

7         A.   You know, it's getting convoluted, and if we go

8    to the map that created Lot 1, Parcel 1 which is Parcel

9    Map 9572, Parcel 1 of 9572 is the development that we're

10   talking about.

11        MR. TRAVIS:  Okay.  Before you begin, let's --

12   you know, we've already got, we've got Exhibit 2 here.

13   We're going to have to go ahead and mark this as

14   Parcel Map No. 5472, Exhibit 3.

15        (Parcel Map No. 9573 marked Exhibit No. 3)

16   BY MR. TRAVIS:

17        Q.   And you're looking at what looks like Page 59.

18   Go ahead.

19        A.   First of all, it's Page 3 of 6 of that parcel

20   map.

21        Q.   I see a little page 559.

22        A.   I don't know what that referred to.

23        Q.   Nor do I.

24        A.   Sorry.  But that created Parcel 1.

25        Q.   Okay.



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.300.1214
Facsimile: 661.322.2242

Suite 170
5001 East Commercenter Drive
Bakersfield, CA 93309
www.esquiresolutions.com

52

1        A.    And as you can see there's a dotted line for

2    right-of-way of Valley Parkway going right through the

3    middle of it.

4        Q.    All right.

5        A.    On either side you could develop those

6    properties given that Valley Parkway infringement in any

7    manner you so choose.  That is you could have put one

8    cul-de-sac or none access off of Valley Parkway if they

9    would have allowed you to do that.

10       Q.    Okay.  In what time frame are you talking?  Are

11   you talking about --

12       A.    In the initial planning stages.

13       Q.    In the initial planning stages.

14       A.    If you were given a piece of raw land the

15   boundaries and the infringement of Valley Parkway what

16   could you do with it?  You could do any number of

17   things, depending upon the topography of the

18   arrangement, the number of the zoning, the number of

19   lots that you want out of it.  I mean, it could be

20   differences or the installation is almost infinite.

21       Q.    It's almost infinite.  Would one of those

22   possibilities also include from your experience the

23   money available to the developer?

24            MR. HASSING:  Objection.  Vague.

25       A.    Sorry, I don't understand that.



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.300.1214
Facsimile: 661.322.2242

Suite 170
5001 East Commercenter Drive
Bakersfield, CA 93309
www.esquiresolutions.com

1    wanted larger lots or anything to that effect.

2         And the developer then works his numbers to

3    determine whether or not it's economically feasible for

4    him to do that or not or he needs more lots rather than

5    large lots depending upon the marketing, so there's a

6    lots of things that come into play and you work back and

7    forth with the developer.

8         Q.   Which leads me to your next sentence here in

9    your opinion which is "Given these criteria, the

10   engineer creating the tentative map would have very

11   little choice as to the configuration of the lots within

12   this map."   I guess my question then is what do you mean

13   by "given these criteria"?

14        A.   What I just mentioned previously.   The exterior

15   boundaries.   The fact that Valley Rose Parkway, for

16   example, was established.   The fact that these streets

17   were already installed and monumented.   And the fact

18   that had zoning restrictions as to the size and width

19   and depth of lot.   Given that, the engineer had very

20   little choice as to how he could lay out the project.

21        Q.   Well, couldn't a developer tear out all the

22   existing improvements and start anew?

23        A.   It doesn't make practical sense.

24        Q.   Why not?

25        A.   Tearing out improvements and actually having to



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.300.1214
Facsimile: 661.322.2242

Suite 170
5001 East Commercenter Drive
Bakersfield, CA 93309
www.esquiresolutions.com

55

1  reinstall them costs money.

2      Q.   But if they could tear those out and if money

3  wasn't an object or if money wasn't a determining

4  factor, as you said before there are any number of

5  possibilities for layout subdivision and design for this

6  particular parcel; is that correct?

7      A.   It's just not reasonable and practical to tear

8  out something that's already existing that you'd only

9  have to go back and reinstall, it just doesn't make

10  reasonable sense.

11         As an engineer we try to be practical about how

12  we lay things out.  And if what was done was reasonable

13  and efficient we'd recommend that he utilize them.

14      Q.   That's fine.  But I'm not talking right now

15  about reasonable and efficient.  I'm talking about

16  possibilities and I'm asking you whether or not if money

17  isn't an issue it is possible to tear out the

18  subdivision, tear out the existing improvements and

19  create any number of different scenarios for a

20  subdivision layout for this particular parcel; is that

21  correct?

22      A.   Yes, it's possible.

23      Q.   So when you say the engineer creating the

24  tentative map would have very little choice as to the

25  configuration of the lots within this map you're then



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.300.1214
Facsimile: 661.322.2242

Suite 170
5001 East Commercenter Drive
Bakersfield, CA 93309
www.esquiresolutions.com

56

1    limiting that to a developer who doesn't want to and

2    practically go out and spend money tearing out the

3    subdivisions and creating a new subdivision layout; is

4    that correct?

5        A.   Yes.

6        Q.   In the last sentence of that paragraph it says

7    "This in my opinion explains the similarities between

8    the Legacy Group tentative map prepared by

9    Martin-McIntosh and the tentative map prepared by DeWalt

10   for

11   No Cal."   I'm assuming Northern California Universal

12   Enterprises; is that correct?

13       A.   Yes, sir.

14       Q.   We've had a debate about how exactly we want to

15   say that, too.

16       A.   I think above in the first paragraph I showed

17   that definition.

18       Q.   I understand.   What explains the similarities?

19   I'm trying to figure out what the object of this is in

20   your opinion.   "This in my opinion explains the

21   similarities, what is "this"?

22       A.   The fact that the layouts look the same.   I

23   mean, if you compare 5472 and 6451 at a glance you'd say

24   that they looked the same because the streets were

25   already in because the boundaries of Lot 1 which is all



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.300.1214
Facsimile: 661.322.2242

Suite 170
5001 East Commercenter Drive
Bakersfield, CA 93309
www.esquiresolutions.com

127

1      MR. HASSING:  He's going to keep them.  Do you
2   need them back?

3      THE WITNESS:  Yes.  Sometime.

4      MR. HASSING:  What's going to happen here is
5   the court reporter is going to take those exhibits and
6   she has to incorporate them into the transcript as
7   exhibits to the transcript.  As soon as she's got it
8   done she's going to notify your lawyer, right, or are
9   you going to notify him and he can come and review his
10   transcript?

11      THE WITNESS:  State the stipulation.

12      MR. HASSING:  Let's notify the lawyer and get a
13   copy to the lawyer then he can just review it at the
14   lawyer's office.

15      THE WITNESS:  No, I'm not.

16      MR. HASSING:  Oh, no, you're in San Diego.

17      THE WITNESS:  I'm not going to review it at his
18   office.

19      MR. OKADIGBO:  He didn't put all the documents,
20   the exhibits for --

21      THE WITNESS:  He did as one.

22      MR. OKADIGBO:  One group.  He marked it.

23      THE WITNESS:  Are you making copies of all
24   those exhibits?

25      MR. TRAVIS:  She's going to make copies of all



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.300.1214
Facsimile: 661.322.2242

Suite 170
5001 East Commercenter Drive
Bakersfield, CA 93309
www.esquiresolutions.com

128

1   the exhibits and then per our stipulation we're going to

2   relieve you of your duties under the code.  You're going

3   to go ahead and make a copy of all of the exhibits,

4   attach them to the deposition.  And you're going to send

5   the original to -- you're going to send the original to

6   Mr. Okadigbo.  We will have access to those on-line,

7   correct.  And then you will have Mr. Wong sign the

8   errata sheet.  In lieu of sending the whole thing here,

9   you can just have him review it and sign the errata

10  sheet and send those to us.

11          THE WITNESS:  I'd like the originals to my --

12  exhibits returned to me after she makes copies.

13          MR. TRAVIS:  You can do that, correct?  Go off

14  the record.

15                        * * * * *

16

17

18

19

20

21

22

23

24

25



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.300.1214
Facsimile: 661.322.2242

Suite 170
5001 East Commercenter Drive
Bakersfield, CA 93309
www.esquiresolutions.com

# EXHIBIT "R"

**Certified Copy**

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA, FRESNO DIVISION

ROGER McINTOSH,

      Plaintiff,

    vs.

NORTHERN CALIFORNIA UNIVERSAL
ENTERPRISES, COMPANY, et al.,

      Defendants.

~~~~~~~~~~~~~~~~~~~~~~~~~~~~

Case No.
107CV 01080 LJO-WMW

## DEPOSITIONS OF

## TERRY W. SCHROEPFER, PE

July 2, 2009
10:30 a.m.

5060 California Avenue
Suite 700
Bakersfield, California

Wendy Hahesy, RMR, CSR-4873



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.300.1214
Facsimile: 661.322.2242

Suite 170
5001 East Commercenter Drive
Bakersfield, CA 93309
www.esquiresolutions.com

1

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA, FRESNO DIVISION

ROGER McINTOSH,

          Plaintiff,

          vs.

NORTHERN CALIFORNIA UNIVERSAL

ENTERPRISES, COMPANY, et al.,

          Defendants.

~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~

Case No.

107CV 01080 LJO-WMW

DEPOSITION OF

TERRY W. SCHROEPFER, PE

July 2, 2009

10:30 a.m.

5060 California Avenue

Suite 700

Bakersfield, California

Wendy Hahesy, RMR, CSR-4873



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.300.1214
Facsimile: 661.322.2242

Suite 170
5001 East Commercenter Drive
Bakersfield, CA 93309
www.esquiresolutions.com

2

APPEARANCES OF COUNSEL

For the Plaintiff:
    LAW OFFICES OF BORTON & PETRINI, LLP
    BY:  JEFFREY A. TRAVIS, ESQ.
    5060 California Avenue, Suite 700
    Bakersfield, California 93301
    661.322.3051
For the Defendants DeWalt CM, Inc. and Dennis W. DeWalt,
Inc.:

    ALEXANDER & ASSOCIATES, PLC
    BY:  TENIELLE E. COOPER, ESQ.
    1925 "G" Street
    Bakersfield, California 93301
    661.316.7888

For the Defendants Lotus Developments and Northern
California Universal Enterprises Company:
    LAW OFFICES OF STEVEN J. HASSING
    BY:  STEVEN J. HASSING, ESQ.
    425 Calabria Court
    Roseville, California 95747
    916.677.1776
For the Defendant City of Wasco:
    GARCIA CALDERON RUIZ
    BY:  CHAKA C. OKADIGBO, ESQ.
    500 South Grand Avenue, Suite 1100
    Los Angeles, California 90071
    213.347.0210



ALSO PRESENT:
    ROGER McINTOSH



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.300.1214
Facsimile: 661.322.2242

Suite 170
5001 East Commercenter Drive
Bakersfield, CA 93309
www.esquiresolutions.com

3

INDEX OF EXAMINATION

1

2

3    WITNESS:   TERRY W. SCHROEPFER, PE

4    EXAMINATION                                          PAGE

5    By Mr. Travis                                      5, 75

6    By Mr. Hassing                                        16

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.300.1214
Facsimile: 661.322.2242

Suite 170
5001 East Commercenter Drive
Bakersfield, CA 93309
www.esquiresolutions.com

4

INDEX OF EXHIBITS

Exhibit                    Description                        Page

   1        Deposition Notice of Terry Schroepfer              5

   2        Letter dated 2/2/00                                5

   3        Engineer's Report and Assessment                  16



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.300.1214
Facsimile: 661.322.2242

Suite 170
5001 East Commercenter Drive
Bakersfield, CA 93309
www.esquiresolutions.com





February 2, 2000



Mr. Keith Marshall
U. S. Bank Trust
550 S. Hope Street, Suite 500
Los Angeles, CA 90071

**RE:   Wasco, Valley Rose Estates**

Dear Mr. Marshall:

On March 18, 2000, you authorized Quad Knopf to research the status of Valley Rose Estates development, in Wasco, California.  Quad Knopf civil engineer, Bill Black, met with city staff, reviewed public records, and consulted with the bond counsel and the contractor. The  meeting with city staff included Larry Pennell, City Manager, Bud Kopp, Planning Director, Kerrie Cobb, Associate Planner, John Wooner, Finance Director and Eddie Johnson, Water Department Superintendent.  Mr. Black also visited the project site to review the current condition of the development improvements.  Based on our research, we have the following to report:

**1.  Legal Lots**

Referenced Enclosures

       Parcel Map 9572                                                              Exhibit A

       Tentative Tract 5472                                                         Exhibit B

       Tentative Tract 5618                                                         Exhibit C

       Valley Rose Master Planned Community Master Land Use Plan               Exhibit D

Parcel Map 9572.  There are two recorded  lots within the Assessment District 92-2 boundary. They are Parcels 1 and 3 of Parcel Map 9572 and consist of 33.51 acres and 65.32 acres respectively.  Enclosed for your use is a copy of Parcel Map 9572, as recorded, in the County Recorders Office, labeled Exhibit A.

Tentative Tracts 5472 and 5618.  Tentative Tract 5472 is an approved tentative map which subdivides Parcel 1 of PM 9572.  Tentative Tract 5618 is an approved tentative map which

A 00648

U. S. Bank Trust
March 2, 2000
Page 2

subdivides Parcel 3 of PM 9572.  Tentative Tracts 5472 and 5618 were the subdivisions proposed within Assessment District 92-2.  Please refer to Exhibits B and C for conditions of approval.  Tentative Tract 5472 consists of 68 low density residential lots (R-1), one (1) 7.09-acre high density residential lot (R-3) and a remaining portion (11.03-acre) designated as Highway Commercial (H.C.).  Tentative Tract 5618 consists of 94 low density residential lots (R-1) and 202 medium density residential lots (R-2).  According to City Staff, these zoning designations are current.  The expiration dates for both tentative maps is May 11, 2001, as extended by the Planning Commission on May 11, 1998 (Exhibit B and C).

**2.  Improvements**

Referenced Enclosures

| | |
|---|---|
| Engineer's Report,  Valley Rose Assessment District (AD/92-2) | Exhibit E |
| Resolutions 95-1634 and 1638 (Relating to the Engineer's Report for Assessment District 92-1) | Exhibit F |
| Ordinance No. 92-381 (For Development Agreement with Legacy Group), Proof of Publication and the Development Agreement | Exhibit G |
| Draft Addendums 1 and 2 to the Development Agreement | Exhibit H |
| Resolutions 93-1504, 93-1519, 93-1536 and 94-1594 relating to the Acquisition Agreement and Amendments | Exhibit I |

Required Improvements

The development of the Valley Rose Estates property is subject to a development agreement between the City of Wasco and the Legacy Group (or its successors), approved by City Council in Ordinance 92-381 (Exhibit G), and to the conditions of approval for the approved tentative maps (Exhibits B and C).  Note that the development agreement can expire in 2002 in accordance with paragraph 4.2, Exhibit G.

Construction of the in-tract improvements for Tract 5472 is substantially complete, but lacks final inspection and acceptance for maintenance by the city.  The off-site work is also substantially complete,  including the domestic water well upgrade at Valley Rose Golf Course, the sewage pump station, the 3,600 foot long 8-inch force main to the wastewater treatment plant, and the 12,000 foot long 12-inch water main from Central Avenue along Highway 46 to the project area.

A 00649

U. S. Bank Trust
March 2, 2000
Page 3

The development agreement also required "short term" and "long term" improvements to the water system. The first and second addendums to the development agreement addressed changes in the requirements for water system improvements. (Exhibit H). At this time, the city could not confirm that these addendums were ever approved by City Council. The actual requirements for short term water supply to serve Tentative Tracts 5472 and 5618 is unclear, needs additional research and may require a legal interpretation. Additional off-site water supply improvements may be required, including construction of a 1.2 million gallon water storage reservoir.

## 3. City Acceptance of Improvements

Referenced Enclosures

Photographs (19) taken on February 29, 2000.                                    Exhibit J

According to city staff, the off-site improvements as described above, were inspected during construction by city staff, and are believed to installed in accordance with city standards. The water well is exercised and bacteria tested on a regular basis and it meets Health Department standards for a municipal well. The 12-inch water distribution main has been holding pressure since its construction. The sewage pump station and appurtenances are all believed by city staff to be in good condition, although it has not been operated regularly.

In-tract improvements for Tract 5472 were inspected during construction by city staff, and are believed to installed in accordance with city standards. However, due to the elapsed time and vandalism, significant degradation of improvements has occurred. Pavement is showing signs of deterioration. All the street lamp globes are missing. According to the city, the globes were stolen or broken. Paved areas are overgrown with weeds. Some of the utility boxes are missing. A summary of work required to bring this area up to City standards is provided in the next section.

## 4. Summary of Work Required for Approval

For approval of Tract 5472 in-tract improvements, the following items were identified by city staff as needing to be accomplished:

a. Repair and paint wrought iron fencing and gates.
b. Repaint block walls
c. Replace all light globes
d. Replace all street signs
e. Replace all "coach" lights located in the walk through
f. Remove debris and weed growth, patch, crack fill and seal pavement

A 00650

U. S. Bank Trust
March 2, 2000
Page 4

g.  Replace missing or broken meter boxes.
h.  Repair and or replace missing or broken telephone pedestals
i.  Replace missing or damaged plant material in the landscape areas.
j.  Repair or replace irrigation equipment and controllers.
k.  General cleanup and other work as directed by the City.
l.  The developer should confirm with utility companies the status of utility improvements such as gas, electric, telephone and cable.
m.  Final inspection and acceptance for maintenance by the City Council

As a matter of information, the fire hydrants are all accounted for.  The one hydrant that is missing was removed by City staff because it had been knocked over.  It is in storage at the corporation yard.

<u>Other</u>

In order to receive full approval for sale of lots, final maps for Tracts 5472 and 5618 will need to be approved by City Council along with subdivision improvement agreements.  The subdivision improvement agreement for Tract 5472 should be minimal since work required is minor.  The subdivision improvement agreement for Tract 5618 should be the standard agreement with bonds, as none of the in-tract improvements have been completed.  The City does not have original improvement plans for Tract 5618 and will require them as part of the approval process.  Following Council approval, the maps will need to be recorded.

There may be other issues of a legal nature, related to litigation and foreclosure, that we are not qualified to address.  We recommend these be referred to an attorney.

This report was prepared based on available information and oral statements made by City staff. The information presented herein is believed to be accurate, however, you should confirm the information with the City.  Approved conditions of development can only be obtained from the City.  Any prospective buyer of the property should independently verify the information provided.  Also, be aware, that the condition of improvements and the information provided herein may change over time. The information provided is for your exclusive use.

If there are other items you want to have addressed or if you have questions, please call me or Bill Black.

Very truly yours,

Quad Knopf Inc.

— ORIGINAL SIGNED —
Terry W. Schroepfer, P. E.

enclosures: (Exhibits A through J)
L:\Engineering\2000\00041\00041 Valley Rose - US Bank 1 Ltr.wpd

**A 00651**

**QUAD - KNOPF, INC.**
5500 Ming Avenue, Suite 410
Bakersfield, California 93309

**LETTER OF TRANSMITTAL**

(805) 835-8300    FAX (805) 835-8311

TO _CITY OF WASCO_

| | |
|---|---|
| DATE 9/7/00 | JOB NO. 00041 |
| ATTENTION Rachel | |
| RE: Valley Rose Estates | |

> WE ARE SENDING YOU    ☐ Attached    ☐ Under separate cover via _____ the following items:

☐ Shop drawings    ☐ Prints    ☐ Plans    ☐ Samples    ☐ Specifications
☐ Copy of letter    ☐ Change order

| COPIES | DATE | NO. | DESCRIPTION |
|---|---|---|---|
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |

THESE ARE TRANSMITTED as checked below:

☐ For approval    ☐ Approved as submitted    ☐ Resubmit _____ copies for approval
☒ For your use    ☐ Approved as noted    ☐ Submit _____ copies for distribution
☐ As requested    ☐ Returned for corrections    ☐ Return _____ corrected prints
☐ For review and comment    ☐
☐ FOR BIDS DUE _____ 19 _____    ☐ PRINTS RETURNED AFTER LOAN TO US

REMARKS _Rachel —_
_It was nice talking with you today._
_Attached is a copy of the letter we sent to_
_US Bank regarding Valley Rose Estates. I thought we_
_had sent a courtesy copy to Larry some time_
_ago with all exhibits. If you need the exhibits_
_please call me._
_Thanks!_

A 00652

COPY TO _____

SIGNED: _Bill Flacto_

*If enclosures are not as noted, kindly notify us at once.*