1  BONIFACIO B. GARCIA (SBN 100761)
   EVA M. PLAZA (SBN 250321)
2  CHAKA C. OKADIGBO (SBN 224547)
   GARCIA CALDERON RUIZ, LLP
3  500 S. Grand Avenue, Suite 1100
   Los Angeles, CA  90071
4  (213) 347-0210; Fax (213) 347-0216

5  Attorneys for Defendant CITY OF WASCO

6

7

8              UNITED STATES DISTRICT COURT

9       EASTERN DISTRICT OF CALIFORNIA, FRESNO DIVISION

10

11 ROGER McINTOSH.                    Case No:  1:07-CV-01080-LJO-GSA

12            Plaintiffs,             **DECLARATION OF CHAKA C.
                                      OKADIGBO IN SUPPORT OF
13       vs.                          DEFENDANT'S SUMMARY JUDGMENT
                                      MOTION**
14 NORTHERN CALIFORNIA
   UNIVERSAL ENTERPRISES, INC. *et al.*  Date:    October 28, 2009
15                                    Time:    8:30 a.m.
            Defendants.              Dept.:   4
16                                    Judge:   Lawrence J. O'Neill

17

18 I, Chaka c. Okadigbo, declare:

19       1.     I am an attorney licensed to practice before this Court and represent the moving

20 parties in this summary judgment motion.

21       2.     I have personal knowledge of each fact set forth herein.

22       3.     Attached hereto as Exhibit "A" is a true and correct copy of Tentative Tract Map

23 No. 6451 and attached as Exhibit "B" is a true and correct copy of Revised Tentative Tract Map

24 No. 5472.  I have examined both maps very carefully and have highlighted in yellow, the items

25 on Map 6451 that are not contained on Map 5472.  I have highlighted in pink, items on Map

26 5472 which are not on Map 6451.

27       4.     Attached hereto as Exhibit "C" is a true and correct copy of the Third Amended

28 Complaint for Copyright Infringement; Demand for Jury Trial.

4811-5579-3412                        -1-
**DECLARATION OF CHAKA C. OKADIGBO IN SUPPORT OF DEFENDANT'S SUMMARY
JUDGMENT MOTION**

1   5.   Attached hereto as Exhibit "D" are true and correct copies of excerpts from the

2   December 18, 2008 deposition of Roger McIntosh, (pp 45-46, 64-67, 73, 81-82, 156, 163-164,

3   178, 204-206).

4   6.   Attached hereto as Exhibit "E" is a true and correct copy of Agreement Between

5   Client and Consultant authenticated by Roger McIntosh during his deposition of December 18,

6   2008.

7   7.   Attached hereto as Exhibit "F" is a true and correct copy of a Draft Guidance

8   Package of Valley Rose Estates dated April 13, 1992.

9   8   Attached hereto as Exhibit "G" are true and correct copies of excerpts from the

10   January 28, 2009 deposition of Roger McIntosh, (pp 265, 270-272, 278-279, 282, 285, 298-300,

11   302-308, 310-311).

12   9.   Attached hereto as Exhibit "H" are true and correct copies of excerpts from the

13   January 29, 2009 deposition of Keith Woodcock, (pp 11, 13-15, 17-18, 22, 26, 30-33).

14   10.   Attached hereto as Exhibit "I" are true and correct copies of excerpts from the

15   October 28, 2008 deposition of Joe Wu, (pp 5, 8-9, 11, 17-18, 29-30, 36-40, 46, 48-49, 52-54,

16   68).

17   11.   Attached hereto as Exhibit "J" are true and correct copies of excerpts from the

18   July 2, 2009 deposition of Terry W. Schroepfer, (pp 14-15).

19   12.   Attached hereto as Exhibit "K" is a true and correct copy of Exhibit 3 of

20   Schroepfer deposition [exhibit B-5] attached thereto.

21   13.   Attached hereto as Exhibit "L" are true and correct copies of excerpts from the

22   January 22, 2009 deposition of Greg Black, (pp 17-18, 32, 33, 37, 48-49, 54, 56, 58, 66-69, 76-

23   77, 81).

24   14.   Attached hereto as Exhibit "M" are true and correct copies of excerpts from the

25   November 24, 2008 deposition of Jeffrey Gutierrez, (pp 16, 18, 35, 47, 48).

26   15.   Attached hereto as Exhibit "N" is a true and correct copy of Exhibit 3 of Gutierrez

27   deposition.

28

**DECLARATION OF CHAKA C. OKADIGBO IN SUPPORT OF DEFENDANT'S SUMMARY
JUDGMENT MOTION**

1    16.    Attached hereto as Exhibit "O" is a true and correct copy of Exhibit 4 of Gutierrez

2    deposition.

3    17.    Attached hereto as Exhibit "P" are true and correct copies of excerpts from the

4    October 28, 2008 deposition of Gerald Frank Helt, (pp 21, 35-36, 39, 41-43, 45).

5    18.    Attached hereto as Exhibit "Q" are true and correct copies of excerpts from the

6    July 3, 2009 deposition of Sarah Burgi, (pp 7-9, 12, 24-25, 30-31).

7    19.    Attached hereto as Exhibit "R" is a true and correct copy of excerpts from the

8    January 29, 2009 deposition of Larry F. Pennell, (p 19).

9    20.    Attached hereto as Exhibit "S" are true and correct copies of excerpts from the

10    October 28, 2008 deposition of Dennis M. McNamara, (pp 8, 15).

11    21.    Attached hereto as Exhibit "T" are true and correct copies of excerpts from the

12    October 28, 2008 deposition of Robert E. Wren, (pp 8, 13).

13    22.    Attached hereto as Exhibit "U" are true and correct copies of excerpts from the

14    February 2, 2009 deposition of James K. Delmarter, (pp 55, 64)

15    23.    Attached hereto as Exhibit "V" is a true and correct copy of the Expert Witness

16    Disclosure of James K. Delmarter by Plaintiff; Exhibit A attached thereto

17    24.    Attached hereto as Exhibit "W" are true and correct copies of excerpts from the

18    July 2, 2009 deposition of Steven Wong, (pp 67-79, 103-120).

19    25.    Attached hereto as Exhibit "X" is a true and correct copy of Defendant City of

20    Wasco's Special Interrogatories to Plaintiff Roger McIntosh, Set No. 1.

21    26    Attached hereto as Exhibit "Y" is a true and correct copy of Responses of Plaintiff

22    Roger McIntosh to Defendant, City of Wasco's Special Interrogatories (Set No. One).

23    27.    Attached hereto as Exhibit "Z" is a true and correct copy of Chapter 13 of the

24    Wasco Municipal Code.

25    28.    Attached hereto as Exhibit "AA" is a true and correct copy of Chapter 16 of the

26    Wasco Municipal Code.

27    / / /

28

4811-5579-3412

-3-

**DECLARATION OF CHAKA C. OKADIGBO IN SUPPORT OF DEFENDANT'S SUMMARY
JUDGMENT MOTION**

1        29.     Attached hereto as Exhibit "BB" is a true and correct copy of the Civil Docket for

2   Case #: 1:07-cv-01080-LJO-GSA.

3        I declare under penalty of perjury under the laws of the State of California that the

4   foregoing is true and correct.

5

6   Dated this **30th** day of September, 2009

7                                                          Chaka C. Okadigbo

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**DECLARATION OF CHAKA C. OKADIGBO IN SUPPORT OF DEFENDANT'S SUMMARY
JUDGMENT MOTION**

# EXHIBIT A      Okadigbo Dec

# EXHIBIT B     Okadigbo Dec

Case 1:07-cv-01080-LJO-GSA   Document 106   Filed 09/28/2009   Page 9 of 15



# EXHIBIT C   **Okadigbo Dec**

lj

1   James J. Braze, Esq.; SBN 75911
    Jeffrey A. Travis, Esq.; SBN 235507
2   BORTON PETRINI, LLP
    5060 California Avenue, Suite 700
3   Post Office Box 2026
    Bakersfield, CA 93303
4   Telephone (661) 322-3051
    jbraze@bortonpetrini.com
5   jtravis@bortonpetrini.com

6   Attorneys for Plaintiff, Roger McIntosh
    dba McIntosh & Associates
7

8                    UNITED STATES DISTRICT COURT

9          EASTERN DISTRICT OF CALIFORNIA, FRESNO DIVISION

10

11  ROGER McINTOSH,

12              Plaintiff,                    Case No. 1:07-CV-01080-LJO-GSA

13  v.                                        THIRD AMENDED COMPLAINT FOR
                                              COPYRIGHT INFRINGEMENT; DEMAND
14  NORTHERN CALIFORNIA UNIVERSAL             FOR JURY TRIAL
    ENTERPRISES COMPANY, a California
15  corporation; LOTUS DEVELOPMENTS,
    LLP; THE CITY OF WASCO, a municipal
16  corporation; DEWALT CM, INC., a
    California corporation also doing business as
17  DEWALT CORPORATION; DENNIS W.
    DE WALT, INC., a California corporation
18  also doing business as DEWALT
    CORPORATION; and DOES 1 through 10,
19  inclusive,

20              Defendants.

21

22

23          For his complaint against Northern California Universal Enterprises Company

24  ("Universal") Lotus Developments, LLP ("Lotus"), the City of Wasco ("Wasco"), DeWalt CM, Inc.,

25  also doing business as DeWalt Corporation, and Dennis W. De Walt, Inc., also doing business as

26  DeWalt Corporation (collectively "DeWalt") (all defendants referred to collectively as,

27  "Defendants"), Roger McIntosh dba McIntosh & Associates ("McIntosh") alleges:

28

H:\PUBLIC\05449\1060931
McIntosh v
Northern\THIRD AMD CP
12-29-08.wpd

## NATURE OF THE ACTION

1.      This is an action to redress the infringement of McIntosh's registered copyrights. Universal, Lotus and Wasco have created a residential subdivision by copying and using McIntosh's copyrighted works and employing a tangible embodiment of the landscape and subdivision design McIntosh conceived and created and that is the subject of Copyright Registration Certificate No. VAU-721-180.

## PARTIES AND OTHER IMPORTANT PERSONS

2.      Plaintiff Roger McIntosh is a civil engineer doing business as McIntosh & Associates and Associates, a sole proprietorship with its principal place of business at 2001 Wheelan Court, Bakersfield, CA 93309.

3.      Defendant Northern California Universal Enterprises Company, a California corporation with an address at 2099 Fortune Drive, San Jose, California 95131, started as a land development company in 1980 and is now a builder in California's Central Valley. On information and belief, Joseph Wu is the founder and head of Northern California Universal Enterprises Company.

4.      Defendant Lotus Developments is a California Limited Partnership with an address at 300 B Street, Turlock, CA 95380. On information and belief, Joseph Wu is also the founder and head of Lotus Developments.

5.      Defendant City of Wasco is a municipal corporation formed and organized under the laws of the State of California with an address at 746 Eighth Street, Wasco, CA 93280.

6.      The true names and capacities of defendants Does 1 through 10 inclusive are unknown to plaintiff, who therefore sues said defendants by such fictitious names. Plaintiff is informed and believes and thereon alleges that each of the defendants herein designated as a Doe is responsible in some manner for the events and happenings herein referred to and caused injuries proximately thereby as hereinafter alleged. Plaintiff is informed and believes and thereon alleges that at all times herein mentioned, each of the defendants was the agent, servant and employee of each of the remaining defendants, and at all times herein mentioned, each was acting within the purpose and scope of said agency and employment. Plaintiff is further informed and believes and

1   thereon alleges that at all times herein mentioned, each of the defendants' employees was the agent,

2   servant and employee of each employee's respective employer, that at all times herein mentioned,

3   each employee was acting within the purpose and scope of said agency and employment, and that

4   each defendant has ratified and approved the acts of its agents and employees.

5          7.      The Legacy Group, referred to throughout, is not a defendant in this action

6   and no longer exists.  The Legacy Group was a land development company originally involved in

7   the development of the property that is the subject of this action.

8                          **JURISDICTION AND VENUE**

9          8.      This court has subject matter jurisdiction over the claims in this action

10  pursuant to 28 U.S.C. section 1331, 28 U.S.C. section 1338(a) through (b) and 28 U.S.C.

11  section 1367.

12         9.      Venue in this judicial district is proper under 28 U.S.C. section 1391(b).

13                          **FACTUAL BACKGROUND**

14                          **McINTOSH & ASSOCIATES**

15         10.     For more than 34 years, Roger McIntosh has been engaged in urban planning,

16  specifically the design of residential subdivisions in community spaces throughout California.  In

17  1980, Mr. McIntosh and Eugene Martin founded Martin-McIntosh Land Surveying.

18         11.     Over the last 27 years, the firm has expanded to offer an array of land-

19  planning services from civil engineering and landscape architecture to construction management

20  throughout Central and Southern California, Arizona and Nevada.

21         12.     On May 3, 1999, Roger McIntosh bought out his partner, Mr. Martin, and

22  Martin-McIntosh became McIntosh & Associates. Pursuant to the buy-out agreement, the rights and

23  all works created up to that point by Martin-McIntosh were assigned to Roger McIntosh.

24         13.     McIntosh & Associates provides all types of civil engineering services,

25  specializing in site planning for private developments, residential developments and public works

26  projects, including infrastructure, subdivision design and oil field facilities.

27         14.     McIntosh & Associates also offers land surveying services, from boundary

28  surveys to geodetic control surveys.

## CONTRACT WITH THE LEGACY GROUP

15.     In or about 1992, McIntosh contracted with the Legacy Group to design and supervise the private development and construction of a subdivision called the Valley Rose Estates Project (the "Subdivision") on a parcel of land owned by the Legacy Group.

16.     Specifically, McIntosh contracted to (1) develop the subdivision's master plans for water, sewer and drainage systems; (2) develop a phase traffic and circulation plan; (3) determine boundaries; (4) develop a tentative tract map for the Subdivision; and (5) develop landscape design unique to the Subdivision.

17.     According to the contract between McIntosh and the Legacy Group, all work product McIntosh created for the Subdivision remained his property and McIntosh retained the right to use the plans without the Legacy Group's consent, including but not limited to McIntosh's designs and technical drawings.

18.     In addition, the Legacy Group agreed that McIntosh's designs and technical drawings were being created exclusively for the Legacy Group and could only be used by the Legacy Group on the Valley Rose Estates project.

19.     The contract between McIntosh and the Legacy Group also established that the agreement between the parties could not be assigned without the written consent of the other party.

20.     The Legacy Group had an agreement with the City of Wasco wherein the City would pay for the Subdivision project with bond anticipation notes. The Legacy Group was to pay McIntosh and the contractor from the money it received from the City of Wasco.

21.     According to the agreement between Wasco and the Legacy Group, the development agreement expired in 2002 because the improvements were not completed.

22.     The tentative map for the Valley Rose Estates subdivision, Tract No. 5472, expired in 2001.

## THE SUBDIVISION PLANS

23.     In accordance with his obligations under the Legacy Group contract, McIntosh designed the overall layout of the Subdivision, as well as the division of the individual

1    plots and common spaces. McIntosh also created landscape designs for the Subdivision. McIntosh's

2    subdivision and landscape designs are depicted in technical drawings ("The Plans") that are the

3    subject of Copyright Registration Certificate No. VAU-721-180, a true and correct copy of which

4    is attached as Exhibit "A."

5         24.    McIntosh is the sole author of the subdivision and landscape designs

6    embodied in the technical drawings.

7         25.    McIntosh is the sole owner of the copyright and the technical drawings. (See

8    Exhibit "A," Copyright Registration Certificate No. VAU-721-180.)

9                       **INITIAL CONSTRUCTION OF THE SUBDIVISION**

10        26.    In 1993, McIntosh submitted the Plans to the City of Wasco in order to obtain

11   a building permit to commence construction on the Subdivision. The City of Wasco subsequently

12   approved the Plans.

13        27.    Construction of the Subdivision commenced after the City of Wasco approved

14   the Plans. Several different contractors worked on the construction of the Subdivision, according

15   to McIntosh's Plans. McIntosh supervised construction of the Subdivision to ensure that the Plans

16   were properly implemented.

17        28.    In 1994, the bottom dropped out of the real estate market and the City of

18   Wasco's bond anticipation notes lost their value. The City was no longer able to pay the Legacy

19   Group for the construction on the Subdivision. Consequently, construction on the Subdivision

20   ceased. The Legacy Group subsequently declared bankruptcy and the City of Wasco purchased the

21   Subdivision at a tax sale.

22                **DEFENDANTS' INFRINGEMENT OF MCINTOSH' PLANS**

23        29.    On information and belief, in or about December 2004, of defendants Lotus

24   and Universal purchased the Subdivision, with all the improvements, from the City of Wasco.

25        30.    In or about late 2005 or early 2006, Mr. Wu of Northern California Universal

26   Enterprises Company and Lotus Developments contacted McIntosh and asked if he could use

27   McIntosh's Plans to finish the Subdivision. McIntosh told Mr. Wu that he could use the plans if he

28   paid for them. Mr. Wu refused to pay the price proposed by McIntosh for use of the Plans.

1    31.    On information and belief, in or about October 2006, without paying McIntosh

2  for his Plans, defendants commenced construction on the Subdivision.

3    32.    In or about November 2006, a Wasco city employee told McIntosh that

4  Mr. Wu was using McIntosh's plans to complete the Subdivision.

5    33.    On information and belief, Defendants' construction of the Subdivision is

6  based on landscape and subdivision designs substantially similar to the subdivision and landscape

7  design conceived and created by McIntosh that is represented in the plans and that is the subject of

8  Copyright Registration Certificate No. VAU-721-180.

9    34.    A point-by-point, feature-by-feature comparison between the subdivision

10  constructed by Defendants and the Plans authored by McIntosh shows that the prominent features

11  of the subdivision are substantially similar to the Plans, such that the overall look and feel of the

12  design representative of the plans is embodied in the subdivision.

13    35.    Specifically, a feature-by-feature comparison between the subdivision and the

14  Plans reveals substantial similarity in, among other things, the streets, curbs and gutters, utilities,

15  walls, fences, entry monuments, street lights, landscaping, and reference lines, annotations, and

16  reference numbering.

17    36.    On information and belief, Defendants, without permission or license,

18  obtained and copied the Plans and are using them or have used them to complete the subdivision.

19  Defendants have not paid McIntosh for use of the Plans.

20                          **FIRST CAUSE OF ACTION**

21      **COPYRIGHT INFRINGEMENT OF TECHNICAL DRAWINGS**

22    37.    McIntosh incorporates by reference and re-alleges paragraphs 1 through 36

23  above.

24    38.    Plaintiff has in all respects complied with the requirements of the copyright

25  laws of the United States with respect to the Plans.

26    39.    The copying of the Plans by defendants constitutes infringement of

27  McIntosh's registered copyright and the technical drawings depicted in the Plans, in violation of the

28  Copyright Act, resulting in harm and injury to McIntosh.

H:\PUBLIC\0544\03\060971
McIntosh v
Northern\THIRD AMD CP
12-29-08.wpd

THIRD AMENDED COMPLAINT FOR COPYRIGHT INFRINGEMENT; DEMAND FOR JURY TRIAL

40.    As a result of the above-described wrongful acts of defendants in creating infringing copies of the Plans, McIntosh's copyright of the Plans has been infringed and he is entitled to recover actual damages and that portion of the profits realized by Defendants from the use and commercial exploitation of the infringing copies attributable to the unlawful use by Defendants of the copyrighted material contained in the plans that is the subject of Copyright Registration Certificate No. VAU-721-180.

## SECOND CAUSE OF ACTION

## CONTRIBUTORY COPYRIGHT INFRINGEMENT OF TECHNICAL DRAWINGS

41.    McIntosh incorporates by reference and re-alleges paragraphs 1 through 40 above.

42.    At all times during the construction of the Valley Rose Estates subdivision, the City of Wasco controlled the development of the Valley Rose Estates subdivision project.

43.    As a result of the construction of the Valley Rose Estates subdivision and the unlawful use of McIntosh's copyrighted plans, Wasco obtained a direct financial benefit.

44.    As a result of its actions, the City of Wasco knowingly and materially contributed to and induced the infringing conduct of Lotus and Universal.

45.    Defendants also induced infringement through their copying, distribution, and continued recording of the Plans.

46.    As a result of the above-described wrongful acts of defendants in contributing to the infringement and infringing use of the Plans, McIntosh's copyright in the Plans has been infringed and he is entitled to recover actual damages and that portion of the profits realized by Defendants from the use of and commercial exploitation of the infringing copies attributable to the unlawful use by Defendants of the copyrighted material contained in the Plans that is the subject of Copyright Registration Certificate No. VAU-721-180.

## DEMAND/PRAYER FOR RELIEF

WHEREFORE, McIntosh requests that this Court enter a judgment against the defendants that provides for:

Case 1:07-cv-01080-LJO-GSA   Document 107   Filed 09/28/2009   Page 3 of 12

Case 1:07-cv-01080-LJO-GSA   Document 78   Filed 04/23/2009   Page 8 of 12

1    (a)    A declaration that the defendants have willfully infringed McIntosh's

2    exclusive rights in the copyrighted material contained in the Plans that is the subject of Copyright

3    Registration Certificate No. VAU-721-180;

4    (b)    A preliminary and thereafter permanent injunction against defendants and all

5    persons acting in concert or participation with them or persons acting or purporting to act on their

6    behalf, including but not limited to their officers, directors, stockholders, partners, owners, agents,

7    representatives, employees, attorneys, successors and assigns and any and all other persons acting

8    in concert or privity with them, directing defendants to:

9    (i)    Cease and desist from infringing plaintiff's copyright in the Plans;

10    (ii)    Destroy all copies of the plans, including any and all drawings, models,

11    advertisements, catalogues and other materials based on or derived from the Plans; and

12    (iii)    Take all steps necessary to remove any structures or design elements

13    that have been copied from the Plans or built based on the Plans;

14    (c)    The impounding of all copies of the Plans and any other materials derived

15    from the Plans in whole or in part, incorporating any element of the Plans, and all means by which

16    such copies may be reproduced and in order providing for the destruction or other reasonable

17    disposition of materials containing copies of the Plans of the designs embodied in the Plans that have

18    been used in violation of McIntosh's exclusive rights and all means by which such copies may be

19    produced; and in the event that certain such copies are no longer under the control of defendants,

20    provide the name, address and relevant contact information of those believed to be in possession and

21    control of such materials;

22    (d)    The filing with this Court and the service on McIntosh within thirty (30) days

23    following service of the injunction order, a report under oath and in writing, setting forth in detail

24    the manner and form in which defendants have complied with the injunction;

25    (e)    The awarding to plaintiff McIntosh of damages in an amount equal to the

26    actual damages suffered by McIntosh as a result of the infringement and that portion of the profits

27    earned by Defendants from the creation and commercial exploitation of the copied Plans and the

28    infringing building that is attributable to the infringement, and not taken into account in computing

1   McIntosh's actual damages, including an award of the reasonable attorney fees, costs and

2   disbursements incurred by McIntosh in connection with this action;

3           (f)   Alternatively, the awarding to plaintiff McIntosh the maximum statutory

4   damages permitted under the Copyright Act with respect to each infringement, or for such other

5   amount as may be proper pursuant to 17 U.S.C. section 504(c), including an award of reasonable

6   attorney fees, costs, and disbursements incurred by McIntosh in connection with this action; and

7           (g)   The granting to McIntosh of such other and further relief as this Court may

8   deem just and proper.

9   **JURY TRIAL DEMAND**

10   McIntosh demands a trial by jury on all issues triable of right by a jury.

11   DATED:   April 23, 2009        BORTON PETRINI, LLP

12

13

14        By:   /s/ Jeffrey A. Travis
        Jeffrey A. Travis, Attorneys for Plaintiff, Roger

15           McIntosh dba McIntosh & Associates

16

17

18

19

20

21

22

23

24

25

26

27

28

# EXHIBIT A

**PROOF OF SERVICE**
**(FRCP No. 5(b)(2)(E))**

**STATE OF CALIFORNIA, COUNTY OF KERN**

I, Vanessa J. Claridge, declare:

       I am a citizen of the United States. I am employed in the County of Kern, State of California. I am over the age of 18 and not a party to the within action; my business address is 5060 California Avenue, Suite 700, Bakersfield, California 93309.

       On **April 23, 2009**, I served the foregoing document described as **THIRD AMENDED COMPLAINT FOR COPYRIGHT INFRINGEMENT; DEMAND FOR JURY TRIAL** on the other party(ies) in this action as follows:

| | |
|---|---|
| Steven John Hassing, Esq. **Law Offices of Steven J. Hassing** 425 Calabria Court Roseville, CA 95747 email address: stevehassing@yahoo.com | Attorneys for Attorneys for Defendants, Northern California Universal Enterprises Company and Lotus Developments **Tel:** 916/677-1776 **Fax:** 916/677-1770 |
| Chaka Okadigbo **Garcia Calderon Ruiz, LLP** 500 South Grand Ave Suite 1100 Los Angeles, CA 90071 email address: cokadigbo@gcrlegal.com | Attorneys for Defendant, City of Wasco Tel: 213/347-0210 **Fax: 213-347-0216** |
| William L. Alexander, Esq. **Alexander & Associates** 1925 "G" Street Bakersfield, CA 93301 email address: **walexander@alexander-law.com** | Attorneys for Defendant, DeWalt CM, Inc. Tel: 661/316-7888 **Fax: 661/316-7890** |

☒    **BY ELECTRONIC SERVICE:** Pursuant to Fed. R. Civ. P. 5(b)(2)(E) and Local Court Rule(s), the foregoing document will be served by the court via CM/ECF. Pursuant to the CM/ECF docket for this case proceeding the following person(s) are on the Electronic Mail Notice List to receive ECF transmission at the email address(es) indicated below:

☐    **BY MAIL:** As follows: I am "readily familiar" with the firm's practice of collection and processing correspondence for mailing. Under that practice it would be deposited with U.S. postal service on that same day with postage thereon fully prepaid at , California in the ordinary course of business. I am aware that on motion of the party served, service is presumed invalid if postal cancellation date or postage meter date is more than one day after date of deposit for mailing in affidavit.

       Executed on **April 23, 2009**, at Bakersfield, California.

       I declare that I am employed in the office of a member of the bar of this court at whose direction the service was made.

    Vanessa J. Claridge           /s/ Vanessa J. Claridge

# EXHIBIT D

**Okadigbo Dec**

Certified Copy

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA

ROGER McINTOSH,

     Plaintiff,

    vs.

NORTHERN CALIFORNIA UNIVERSAL
ENTERPRISES COMPANY, ET AL.,

     Defendants.

~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~

Case No.
107CV-01080-LJO-WMW

**DEPOSITION OF**

**ROGER McINTOSH**

December 18, 2008
9:11 a.m.

5001 East Commercenter
Suite 170
Bakersfield, California

Brian S. Cardoza, CSR No. 8362



ESQUIRE
DEPOSITION SERVICES®

PAULSON
REPORTING & LITIGATION SERVICES, LLC

Toll Free: 800.300.1214
Facsimile: 661.322.2242

Suite 170
5001 East Commercenter Drive
Bakersfield, CA 93309
www.paulsonreporting.com

Roger McIntosh                                        December 18, 2008

45

1        Q.   Okay, the date that the map was signed?

2        A.   Right.

3        Q.   And what if it was signed on one day and

4    given to the City on the next day, what is your

5    understanding of the publication date?

6        A.   Yeah, I don't have an understanding of the

7    publication date.

8        Q.   Oh, that makes two of us then.

9        A.   It might take two days to get there.  I don't

10   know.

11       Q.   All right.  Okay.  All right.

12       A.   FedEx, overnight, I don't know.

13       Q.   All right, got you.

14       Let's go now to Exhibit Number 3.

15       (Defendants' Exhibit 3 was marked for

16       identification by the court reporter.)

17       THE WITNESS:  Do you want this over here?

18       MR. HASSING:  Back over here in the stack.  And

19   let's put a paperclip on those two sheets, if we could.

20       I'm handing you now what's been marked as Exhibit

21   Number 3.  And for the record, Exhibit Number 3 is a

22   four-page "Agreement Between Client and Consultant", and

23   it bears Bate stamps number 425 through 427, received in

24   the disclosures by your attorney earlier.

25       MR. OKADIGBO:  Just so that it helps my



ESQUIRE
DEPOSITION SERVICES®

PAULSON
REPORTING & LITIGATION SERVICES, LLC

Toll Free: 800.300.1214
Facsimile: 661.322.2242

Suite 170
5001 East Commercenter Drive
Bakersfield, CA 93309
www.paulsonreporting.com

Roger McIntosh                                    December 18, 2008

46

1   understanding, is that the one between Michael Brown and

2   Martin-McIntosh?

3           MR. HASSING:  Yes, sir.

4           MR. OKADIGBO:  Okay.

5           BY MR. HASSING:

6       Q.  Do you recognize this document?

7       A.  Yes.

8       Q.  And take a look at the last page, if you

9   would.  Do you recognize the signature of Eugene Martin?

10      A.  Yes.

11      Q.  And he was a partner in Martin-McIntosh with

12  you?

13      A.  Yes.

14      Q.  Back in 1992?

15      A.  Yes.

16      Q.  You two were the only partners in that

17  company?

18      A.  Yes.

19      Q.  And do you know who prepared this document?

20      A.  Our office -- someone in our office prepared

21  it.  I don't know exactly who.

22      Q.  All right.  Did you have any involvement in

23  the preparation of this document?

24      A.  Yes.

25      Q.  What was your involvement?


ESQUIRE
DEPOSITION SERVICES

PAULSON
REPORTING & LITIGATION SERVICES, LLC

Toll Free: 800.300.1214
Facsimile: 661.322.2242

Suite 170
5001 East Commercenter Drive
Bakersfield, CA 93309
www.paulsonreporting.com

64

1          MR. OKADIGBO:  I'm sorry, it had to be what?

2          MR. HASSING:  It is in the timecards in the

3    records that he brought.

4          MR. OKADIGBO:  Okay.

5          BY MR. HASSING:

6          Q.  Do you know how it was that Mr. Brown became

7    involved in The Legacy Group?

8          A.  I believe that Mr. Kamm and Mr. Christensen

9    had health issues and Mr. Brown stepped in and took over

10   the project.

11         Q.  Who was the main contact person at

12   Martin-McIntosh that dealt with Mr. Brown back in March

13   and April of '92?

14         A.  Mr. Martin.

15         Q.  Did you have any dealings with him yourself

16   during that time period?

17         A.  Yes.  Mr. Martin and -- and the engineers

18   that were working on the project.

19         Q.  When is the last time you talked to

20   Mr. Brown?  More than five years ago?

21         A.  I don't remember.

22         Q.  More than a year ago?

23         A.  Yes.

24         Q.  Have you talked to him about this particular

25   case?  I guess not, if you haven't talked to him in a



**ESQUIRE**
DEPOSITION SERVICES®

**PAULSON**
REPORTING & LITIGATION SERVICES, LLC

Toll Free: 800.300.1214
Facsimile: 661.322.2242

Suite 170
5001 East Commercenter Drive
Bakersfield, CA 93309
www.paulsonreporting.com

Roger McIntosh                                         December 18, 2008

65

1    year, right?

2              A.   No, I have not.

3              Q.   Okay.  Have you talked to any members of The

4    Legacy Group about this case?

5              A.   It would have to be through a seance.

6              Q.   So, the answer's no?

7              A.   The answer's no.

8         MR. OKADIGBO:   No, the answer is no, no.

9         THE WITNESS:   No, no.

10        MR. HASSING:   All right, let's take a look at

11   Exhibit Number 5.

12             (Defendants' Exhibit 5 was marked for

13             identification by the court reporter.)

14        MR. OKADIGBO:   I'm sorry, which one is five?

15        MR. HASSING:   I'm going to get into that.

16        MR. OKADIGBO:   Okay.

17        BY MR. HASSING:   For the record, Number 5 is a

18   multi-page document, maybe 30 pages or so.  It's entitled,

19   "Draft Guidance Package".  It says, "Valley Rose Estates,

20   A Master Planned Community", and it bears the date April

21   13th, 1992.

22             Q.   Do you recognize this document, Mr. McIntosh?

23             A.   Yes.

24             Q.   Was this prepared by Martin-McIntosh?

25             A.   Yes.


ESQUIRE
DEPOSITION SERVICES®

PAULSON
REPORTING & LITIGATION SERVICES, LLC

Toll Free: 800.300.1214
Facsimile: 661.322.2242

Suite 170
5001 East Commercenter Drive
Bakersfield, CA 93309
www.paulsonreporting.com

Roger McIntosh                                    December 18, 2008

                                66

1        Q.   And who was the principal party from

2    Martin-McIntosh that was involved in the preparation of

3    this document?

4        A.   I don't recall.  It probably was whoever the

5    engineer was that was working on the project at the time.

6        Q.   All right.  And who at Martin-McIntosh guided

7    the work of the engineer, was it you, or Mr. Martin, or

8    neither of one of you?

9        A.   Both.

10       Q.   Both of you.  So, is it your recollection

11   that you had an equal involvement in Exhibit 5 with

12   Mr. Martin?

13       A.   No.

14       Q.   Who had the most involvement between you and

15   Mr. Martin?

16       A.   Probably -- probably Mr. Martin.

17       Q.   Do you agree that this was prepared on or

18   around April 13th of 1992?

19       A.   That's what it appears.

20       Q.   You don't have any evidence to suggest it was

21   prepared at a different time, do you?

22       A.   No.

23       Q.   Who at Martin-McIntosh decided what

24   information would be included in this document?

25       A.   Whoever the engineer was that developed it.



ESQUIRE
DEPOSITION SERVICES®

PAULSON
REPORTING & LITIGATION SERVICES, LLC

Toll Free: 800.300.1214
Facsimile: 661.322.2242

Suite 170
5001 East Commercenter Drive
Bakersfield, CA 93309
www.paulsonreporting.com

Roger McIntosh                                    December 18, 2008

67

1        Q.   Do you recall who that is?

2        A.   No, I don't.   It would be in the -- the

3   timecards.

4        Q.   Okay.  So, in the documents that you're

5   providing, you're also providing timecards for all of your

6   employees that worked on this Valley Rose project,

7   correct?

8        A.   Yes.

9        Q.   All right.

10       MR. OKADIGBO:   Does Exhibit 5 have a Bates

11   number?

12       MR. HASSING:   Yes, it does.  It's A00014,

13   received from the City, through A00035.

14       MR. OKADIGBO:   Okay.

15       BY MR. HASSING:

16       Q.   What was the purpose of this document,

17   Exhibit 5?

18       A.   The -- well, it's a -- a guidance package for

19   the development of the master plan known as Valley Rose

20   Estates, and it set forth the project, the planning issues

21   and planning opportunities, the goals and concepts that

22   guided the development of the master planned community.

23       Q.   All right.  Taking a look at the second page,

24   which is Bate stamped A00015, there's a drawing, I guess

25   you'd call it, on that page, and in the bottom right-hand



ESQUIRE
DEPOSITION SERVICES®

PAULSON
REPORTING & LITIGATION SERVICES, LLC

Toll Free: 800.300.1214
Facsimile: 661.322.2242

Suite 170
5001 East Commercenter Drive
Bakersfield, CA 93309
www.paulsonreporting.com

Roger McIntosh                                    December 18, 2008

73

1          A.   To be The Legacy Group's planner, engineer,

2    and consultant.

3          Q.   Did Martin-McIntosh also have

4    responsibilities with regard to construction management?

5          A.   I don't believe so.

6          Q.   Is Ron Staub still employed by you?

7          A.   No.

8          Q.   When's the last time you talked to Mr. Staub?

9          A.   I don't know.  Ten years ago.

10         Q.   You don't know where he is today?

11         A.   No, I don't.

12         Q.   All right.  Was he the lead contact person

13   after April 13th of 1992 between McIntosh and The Legacy

14   Group?

15         A.   I believe he was.

16         Q.   Was he an engineer?

17         A.   Yes.

18         Q.   Did he also serve in the capacity for

19   Martin-McIntosh with regard to construction management

20   services?

21         A.   I don't know.

22         Q.   Did Martin-McIntosh, back in 1992, provide

23   construction management services?

24         A.   I don't know.

25         Q.   You don't remember?



ESQUIRE
DEPOSITION SERVICES·

PAULSON
REPORTING & LITIGATION SERVICES, LLC

Toll Free: 800.300.1214
Facsimile: 661.322.2242

Suite 170
5001 East Commercenter Drive
Bakersfield, CA 93309
www.paulsonreporting.com

Roger McIntosh                                    December 18, 2008

                                    81

1           We then filed a mechanic's lien on the project

2      after 95 percent of the improvements were put in and all

3      of our surveying was done.  So, we filed a mechanic's

4      lien, and a number of people filed mechanic's liens at the

5      same time, and that started a long legal battle with the

6      City of Wasco and Michael Brown.  Mostly with Michael

7      Brown.

8           Q.   All right.

9           A.   That's the short story.

10          Q.   All right.  And so even to summarize that in

11     a shorter form, the City quit making payments and so you

12     quit working on the final map?

13          A.   That's correct.

14          Q.   All right.

15          A.   That -- that the City quit making payments to

16     Michael Brown.

17          Q.   Right.

18          A.   Michael Brown quit making payments to us.

19          Q.   Right.

20          A.   We had no contract with the City of Wasco.

21          Q.   Right.  Now, you indicate that this happened

22     after 95 percent of the improvements had been installed,

23     right?

24          A.   Yes.

25          Q.   All right.  And I understand that's a rough



ESQUIRE
DEPOSITION SERVICES®

PAULSON
REPORTING & LITIGATION SERVICES, LLC

Toll Free: 800.300.1214
Facsimile: 661.322.2242

Suite 170
5001 East Commercenter Drive
Bakersfield, CA 93309
www.paulsonreporting.com

Roger McIntosh

December 18, 2008

82

1    estimate, right?

2         A.    Rough estimate.

3         Q.    To the best of your recollection, what were

4    the improvements, the other roughly five percent, or

5    whatever, that were not installed?

6         A.    Well, they -- the final acceptance of the

7    improvements by the City of Wasco still required a punch

8    list, cleanup, a correction of any deficiency items, which

9    was not done until Mr. Wu bought the project, and to my

10   knowledge, the City has still not accepted those

11   improvements, so the improvements are still not complete.

12        Q.    Okay.    You dealt with a man named Walter

13   Cairns, C-a-i-r-n-s, who was the planning director back in

14   '92 at the City of Wasco; is that correct?

15        MR. TRAVIS:    Are you referring to someone on

16   Exhibit 5, Steve?

17        BY MR. HASSING:    Yeah, I just read his name off

18   of page 24.

19        Q.    Do you remember him?

20        A.    No, I do not.

21        Q.    All right.    I'm taking a look now at A00032,

22   which appears to be a schedule.    Was this schedule

23   prepared by Martin-McIntosh?

24        A.    It appears to be, yes.

25        Q.    I'm looking at the center of the page, under



ESQUIRE
DEPOSITION SERVICES®

PAULSON
REPORTING & LITIGATION SERVICES, LLC

Toll Free: 800.300.1214
Facsimile: 661.322.2242

Suite 170
5001 East Commercenter Drive
Bakersfield, CA 93309
www.paulsonreporting.com

Roger McIntosh                                    December 18, 2008

156

1          A.   Not really.

2          Q.   All right.  I'd like to direct your attention

3    to the very last page of this document.  It says at the

4    top, "Acquisition Of Master Plans", and then it says,

5    "Engineering Costs", "Date:  January 26th, 1993".  Do you

6    see that?

7          A.   Yes, I do.

8          Q.   And it reflects costs through December 15th,

9    1992, right?

10         A.   Yes.

11         Q.   And it indicates that it was prepared by

12   "RJS".  Do you know who "RJS" is?

13         A.   It was probably Ron Staub.

14         Q.   And he worked for Martin-McIntosh, right,

15   during this time period?

16         A.   Yes.  Yes, he did.

17         Q.   He was the point man, for lack of a better

18   word, at Martin-McIntosh with The Legacy Group, right?

19         A.   Yes.

20         Q.   Okay.  And you understand that he prepared

21   this document?

22         A.   That's what it appears.

23         Q.   All right.  Do you recognize this document as

24   one which reflects the cost of the work that

25   Martin-McIntosh did regarding engineering for this

ESQUIRE
DEPOSITION SERVICES

PAULSON
REPORTING & LITIGATION SERVICES, LLC

Toll Free: 800.300.1214
Facsimile: 661.322.2242

Suite 170
5001 East Commercenter Drive
Bakersfield, CA 93309
www.paulsonreporting.com

Roger McIntosh                                          December 18, 2008

163

1      you're working with a certain size piece of land and a

2      developer wants to build houses on it or develop it into

3      lots, a certain amount of that land has to be carved out

4      for streets, right?

5             A.   That's correct.

6             Q.   And you know, based on the municipality's

7      requirements, how wide those streets are going to be, and

8      then you take a look at the setbacks and the zoning and

9      you figure out how many square feet are needed for each

10     lot, and then you try to maximize the number of lots in

11     that tract of land.   Is that about how it's done?

12            A.   Yes.

13            Q.   Okay.  And is that how it was done, to your

14     understanding, in this case?

15            A.   Yes.

16            Q.   All right.  And is it your understanding that

17     based on the municipality ordinances in 1992, and based on

18     the size of the land that you were working with on 5472,

19     that your company was able to develop a map that maximized

20     the number of lots in that parcel of land?

21            A.   To the extent that it was acceptable by the

22     developer, yes.

23            Q.   Okay.  Do you know if you could have got more

24     lots out of that piece of land if designed another way?

25            A.   I think we probably could have gotten more



ESQUIRE
DEPOSITION SERVICES®

PAULSON
REPORTING & LITIGATION SERVICES, LLC

Toll Free: 800.300.1214
Facsimile: 661.322.2242

Suite 170
5001 East Commercenter Drive
Bakersfield, CA 93309
www.paulsonreporting.com

Roger McIntosh                                    December 18, 2008

                                   164

1    out of it.

2           Q.   All right.   How many more lots do you think

3    you could have got?

4           A.   I don't know, without looking at it.

5           Q.   All right.   All right.

6           A.   Maybe one.

7           Q.   Maybe one?

8           A.   Maybe two.

9           Q.   Okay.

10          A.   But -- but there's a balance.   You might get

11   more lots but it might cost you more in streets.

12          Q.   I see.

13          A.   Yeah.   So, you try to come to a balance of

14   cost and -- and density.

15          Q.   Because each lot is worth X number of

16   dollars, right?

17          A.   Right.

18          Q.   And it's going to cost you Y number of

19   dollars to develop those lots?

20          A.   Right.

21          Q.   And the idea is to maximize your profit,

22   right?

23          A.   Right.

24          Q.   Okay.   And you worked with the developer at

25   The Legacy Group, or somebody in your company did, to



Toll Free: 800.300.1214
Facsimile: 661.322.2242

PAULSON
REPORTING & LITIGATION SERVICES, LLC

ESQUIRE
DEPOSITION SERVICES®

Suite 170
5001 East Commercenter Drive
Bakersfield, CA 93309
www.paulsonreporting.com

Roger McIntosh

December 18, 2008

178

1   '90s that were invested in other Mello-Roos Districts

2   around the State.  About that time the real estate market

3   started dropping and these Mello-Rooses started going into

4   default.

5           So, the City of Wasco stopped paying Mr. Brown

6   for the improvements because they weren't going to be able

7   to sell bonds to form the district.

8           After we filed our mechanic's lien, we -- we have

9   a judgment for a mechanic's lien for foreclosure, and the

10  City of Wasco, after the fact, passed a resolution to

11  establish the assessment district lien on their behalf and

12  claimed that they had first priority and that we were

13  second priority.  Then they tried to foreclose on their

14  lien.  Before they could foreclose on their lien, the

15  property went to tax sale, because Mr. Brown didn't pay

16  his taxes, and it was sold to the City of Wasco through

17  tax sale, which wiped everyone out.

18          Q.   Okay.  And you weren't aware of that --

19          A.   Okay, what was the question?

20          Q.   You weren't aware that that tax sale was

21  pending then?

22          A.   Absolutely I was.

23          Q.   Oh, you were?  What was the sales price?

24          A.   Whatever the taxes that were due.  It was a

25  hundred thousand dollars.



**ESQUIRE**
DEPOSITION SERVICES®

**PAULSON**
REPORTING & LITIGATION SERVICES, LLC

Toll Free: 800.300.1214
Facsimile: 661.322.2242

Suite 170
5001 East Commercenter Drive
Bakersfield, CA 93309
www.paulsonreporting.com

Roger McIntosh                                                December 18, 2008

204

1       A.   Yes.   And their numbering system is the same
2    as mine.

3       Q.   Right.   Okay.

4       A.   And their street names are the same as mine.

5       Q.   Okay.

6       A.   And their design is the same as mine.

7       Q.   All right.   Those are facts that you've given
8    me.   Do you know of any other facts that would cause you
9    to believe that they copied your map?

10      A.   I'm sorry, DeWalt copied my map?

11      Q.   Yeah.

12      A.   Or the City of Wasco?

13      Q.   DeWalt.   You're not alleging that the City
14   copied your map, are you?

15      A.   I haven't seen the -- the disk yet.

16      Q.   Well, you're alleging that DeWalt copied your
17   map based on their employment by Joe Wu, right?   Isn't
18   that what we're talking about here?

19      MR. TRAVIS:   Yeah, well maybe what we could do is
20   we could bring out the 6451 map and the 5472, and then he
21   can point out these facts, which I think you're trying to
22   get at, as the basis for copying.

23      MR. HASSING:   All right, let's do that then.
24   Here is the 54 --

25      MR. OKADIGBO:   Good, I can dream of what you guys



ESQUIRE
DEPOSITION SERVICES®

PAULSON
REPORTING & LITIGATION SERVICES, LLC

Toll Free: 800.300.1214
Facsimile: 661.322.2242

Suite 170
5001 East Commercenter Drive
Bakersfield, CA 93309
www.paulsonreporting.com

Roger McIntosh                                    December 18, 2008

205

1    are pointing to?

2              MR. HASSING:  Yeah.

3              THE WITNESS:  Yep.

4              MR. TRAVIS:  Well, we don't care about you,

5    Chaka.

6              MR. HASSING:  That's the 5472.

7              MR. OKADIGBO:  Well, think you care.

8              BY MR. HASSING:  And here is the 6451.

9         Q.   And I guess the question was, what facts do

10   you have that caused you to believe that DeWalt copied

11   your work, and you've indicated that the streets are named

12   the same, the lots are numbered the same, and that there

13   are 68 lots in yours and that there's 68 lots in DeWalt's.

14   Is there anything else?

15        A.   The fact that there's a note on the tentative

16   tract 6451 that refers to tract 5472 tentative map.

17        Q.   Okay.  What note is that, what number?

18        A.   Number one.

19        Q.   And what does it say?

20        A.   It says, "This development contains existing

21   improvements built per Valley Rose planned community

22   expired tentative tract 5472, --"

23        Q.   All right.

24        A.   "-- and associative approved improvement

25   plans."



ESQUIRE
DEPOSITION SERVICES®

PAULSON
REPORTING & LITIGATION SERVICES, LLC

Toll Free: 800.300.1214
Facsimile: 661.322.2242

Suite 170
5001 East Commercenter Drive
Bakersfield, CA 93309
www.paulsonreporting.com

Roger McIntosh                                December 18, 2008

<div align="center">206</div>

1          Q.   Okay.   What else would cause you to believe

2     that DeWalt copied your tentative?

3          A.   In the legend, it calls for existing center

4     line monuments, which were set by -- by us, --

5          Q.   Yes.

6          A.   -- and existing front lot corner tags, which

7     were set by us.

8          Q.   Yes.

9          A.   Okay.

10         Q.   So, those monuments were in the ground,

11    right?

12         A.   Yes.

13         Q.   You set them there?

14         A.   Yes.

15         Q.   DeWalt refers to those monuments, right?

16         A.   Yes.

17         Q.   And that's one of the facts that causes you

18    to believe that they copied your map; is that what you're

19    saying?

20         A.   That, and everything else I've told you.

21         Q.   Right.   Okay.   I just want to be clear on

22    that.   Anything else?

23         A.   Well, let's see here.   The design is

24    substantially similar of the entire tract.   He even has a

25    designated remainder that -- also known as "not a part".



ESQUIRE
DEPOSITION SERVICES®

PAULSON
REPORTING & LITIGATION SERVICES, LLC

Toll Free: 800.300.1214
Facsimile: 661.322.2242

Suite 170
5001 East Commercenter Drive
Bakersfield, CA 93309
www.paulsonreporting.com

# EXHIBIT E    Okadigbo Dec

**Certified Copy**

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA

ROGER McINTOSH,

        Plaintiff,

    vs.

NORTHERN CALIFORNIA UNIVERSAL
ENTERPRISES COMPANY, ET AL.,

        Defendants.

~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~

Case No.
107CV-01080-LJO-WMW

**DEPOSITION OF**

**ROGER McINTOSH**

December 18, 2008
9:11 a.m.

5001 East Commercenter
Suite 170
Bakersfield, California

Brian S. Cardoza, CSR No. 8362



E S Q U I R E
DEPOSITION SERVICES®

P A U L S O N
REPORTING & LITIGATION SERVICES, LLC

Toll Free: 800.300.1214
Facsimile: 661.322.2242

Suite 170
5001 East Commercenter Drive
Bakersfield, CA 93309
www.paulsonreporting.com

This form of agreement
is distributed by the:

California Council
of Civil Engineers
& Land Surveyors

# Agreement Between Client and Consultant

Form A was developed by the California Council of Civil Engineers and Land Surveyors, is intended primarily for the use of Council members, and may not be reproduced without the permission of the California Council of Civil Engineers and Land Surveyors. Copyright 1991, 1989, 1987, 1984, 1982, 1979, 1978, 1975, 1973, 1970 and 1967.

| Client Initials | Consultant Initials |
| --- | --- |

Project No. _92-22 Billing_

Agreement entered into at _____ Bakersfield, California _____

made this _____ 18th _____ day of _____ March _____ , 19 92 _____ , by and between

Client:

Name   Mr. Michael S. Brown

Address   16255 Ventura Blvd., Suite 1000
          Encino, CA 91436

Phone   _____

FAX   _____

Consultant:

Name   Martin-McIntosh

Address   4130 Ardmore Avenue
          Bakersfield, California 93309

Phone   (805) 834-4814

FAX   (805) 834-0972

## Client And Consultant Agree As Follows:

Client intends to:

    See letter dated March 18, 1992, attached and made a part hereof.
hereinafter called "project."

A.   Consultant agrees to perform the following scope of services:

    Design Services, broken down into three (3) phases:

    1) Conceptual Plan
    2) Develop Master Plans for water, sewer and drainage, etc.
    3) Survey

    as stated in letter dated March 18, 1992, attached and made a part hereof.
    Client agrees to compensate consultant for such services as follows:

    Phase 1 - $ 15,200.00 , Phase 2 - $54,800.00 , Phase 3 - $19,100.00
    plus costs of printing and reproductions to be billed at cost plus 10%, as stated
    in letter dated March 18, 1992, attached and made a part hereof.

    * Martin-McIntosh will proceed with each Phase upon written authorization.

C.   This Agreement is subject to provisions 1 through 48 contained herein, and the terms and conditions contained in
    initialed exhibits attached herewith and made a part hereof. (List exhibits below.)

## Provisions of Agreement

    Client and consultant agree that the following provisions shall be part of their agreement:

1.   This agreement shall be binding upon the heirs, executors, administrators, successors and assigns of client and consultant.

2.   This agreement shall not be assigned by either client or consultant without the prior written consent of the other.

3.   This agreement contains the entire agreement between client and consultant relating to the project and the provision of services to the project. Any prior agreements, promises, negotiations or representations not expressly set forth in this agreement are of no force

or effect. Subsequent modifications to this agreement shall be in writing and signed by both client and consultant.

4.   Consultant's waiver of any term, condition, or covenant, or breach of any term, condition, or covenant, shall not constitute a waiver of any other term, condition, or covenant, or the breach of any other term, condition, or covenant.

5.   If any term, condition, or covenant of this agreement is held by a court of competent jurisdiction to be invalid, void or unenforceable, the remaining provisions of this agreement shall be valid and binding on client and consultant.

1/91

Ⓐ π EXHIBIT 3
Deponent McIntosh
Date 3-18-02 Rptr. JC

BP000425

Ex 3

6. This agreement shall be governed by and construed in accordance with the laws of the State of California.

7. Consultant shall only act as an advisor in all governmental relations.

All original papers, documents, drawings and other work product of consultant, and copies thereof, produced by consultant pursuant to this agreement shall remain the property of consultant and may be used by consultant without the consent of client. Upon request and payment of the costs involved, client is entitled to a copy of all papers, documents and drawings provided client's account is paid current.

9. Client acknowledges that its right to utilize the services and work product provided pursuant to this agreement will continue only so long as client is not in default pursuant to the terms and conditions of this agreement and client has performed all obligations under this agreement. Client further acknowledges that consultant has the unrestricted right to use the services provided pursuant to this agreement as well as all work product provided pursuant to this agreement.

10. Client and consultant agree to cooperate with each other in every way on the project.

11. Upon request, client shall execute and deliver, or cause to be executed and delivered, such additional instruments, documents, governmental fees and charges which are necessary to perform the erms of this agreement.

12. Consultant makes no representations concerning soil conditions unless specifically included in writing in this agreement, and he is not responsible for any liability that may arise out of the making or failure to make soil surveys, or sub-surface soil tests, or general soil testing.

13. Client agrees not to use or permit any other person to use plans, drawings, or other work product prepared by consultant, which lans, drawings, or other work product are not final and which are not signed, and stamped or sealed by consultant. Client agrees to be ble and responsible for any such use of nonfinal plans, drawings, other work product not signed and stamped or sealed by consultant and waives liability against consultant for their use. Client further agrees that final plans, drawings or other work product are for the exclusive use of client and may be used by client only for the project described on the face hereof. Such final plans, drawings or other work product may not be changed nor used on a different project without the written authorization or approval by consultant. If onsultant's work product exists in electronic or computerized format, or is transferred in electronic or computerized format, the stamp, seal and signature shall be original and may not be a computer-generated copy, photocopy, or facsimile transmission of the original.

14. Consultant has a right to complete all services agreed to be rendered pursuant to this contract. In the event this agreement is terminated before the completion of all services, unless consultant is responsible for such early termination, client agrees to release consultant from all liability for services performed. In the event all or any portion of the services or work product prepared or partially prepared by consultant be suspended, abandoned, or terminated, client shall pay consultant for all fees, charges, and services provided for the project, not to exceed any contract limit specified herein. Client acknowledges if the project services are suspended and restarted, there will be additional charges due to suspension of the services which shall be paid for by client as extra services.

15. If the scope of services to be provided by consultant pursuant to the terms of this agreement include an ALTA survey, client agrees that consultant may sign one of the two ALTA Survey Statements

attached hereto and incorporated herein by reference. In the event that consultant is required to sign a statement or certificate which differs from the ALTA Survey Statements contained in the attachment, client hereby agrees to indemnify and hold consultant harmless from any and all liability arising from or resulting from the signing of any statement which differs from those statements contained in the attachment.



16. If the scope of services to be provided by consultant pursuant to the terms of this agreement include the preparation of grading plans but exclude construction staking services, client acknowledges that such staking services normally include coordinating civil engineering services and the preparation of as-built drawings pursuant to Uniform Building Code Chapter 70 or local grading ordinances and client will be required to retain such services from another consultant or pay consultant pursuant to this agreement for such services as extra work in accordance with Provision 26.

17. Consultant shall be entitled to immediately, and without notice, suspend the performance of any and all of its obligations pursuant to this agreement if client files a voluntary petition seeking relief under the United States Bankruptcy Code or if there is an involuntary bankruptcy petition filed against client in the United States Bankruptcy Court, and that petition is not dismissed within fifteen (15) days of its filing. Any suspension of services made pursuant to the provisions of this paragraph shall continue until such time as this agreement has been fully and properly assumed in accordance with the applicable provisions of the United States Bankruptcy Code and in compliance with the final order or judgment issued by the Bankruptcy Court.

18. This agreement shall not be construed to alter, affect or waive any lien or stop notice right which consultant may have for the performance of services pursuant to this agreement. Client agrees to separately provide to consultant the present name and address of the record owner of the property on which the project is to be located. Client also agrees to separately provide consultant with the name and address of any and all lenders who would loan money on the project and who are entitled to receive a preliminary notice.

19. If payment for consultant's services is to be made on behalf of client by a third-party lender, client agrees that consultant shall not be required to indemnify the third-party lender, in the form of an endorsement or otherwise, as a condition of receiving payment for services.

20. If client fails to pay consultant within thirty (30) days after invoices are rendered, client agrees consultant shall have the right to consider such default in payment a material breach of this entire agreement, and, upon written notice, the duties, obligations, and responsibilities of consultant under this agreement are suspended or terminated. In such event, client shall promptly pay consultant for all fees, charges, and services provided by consultant.

21. All fees and other charges will be billed monthly and shall be due at the time of billing unless otherwise specified in this agreement.

22. Client agrees that the periodic billings from consultant to client are correct, conclusive, and binding on client unless client, within ten (10) days from the date of receipt of such billing, notifies consultant in writing of alleged inaccuracies, discrepancies, or errors in billing.

23. Client agrees to pay a monthly late payment charge, which will be the lesser of, one and one-half percent (1 1/2%) per month or a monthly charge not to exceed the maximum legal rate, which will be applied to any unpaid balance commencing thirty (30) days after the date of the original billing.

F    '91

BP000406

24. If consultant, pursuant to this agreement, produces plans, specifications, or other documents and/or performs field services, and such plans, specifications, and other documents and/or field services are required by one or more governmental agency, and one or more such governmental agency changes its ordinances, policies, procedures or requirements after the date of this agreement, any additional office or field services thereby required shall be paid for by client as extra services.

25. In the event consultant's fee schedule changes due to any increase of costs such as the granting of wage increases and/or other employee benefits to field or office employees due to the terms of any labor agreement, or rise in the cost of living, during the lifetime of this agreement, a percentage increase shall be applied to all remaining compensation.

26. Client agrees that if client requests services not specified pursuant to the scope of services description within this agreement, client agrees to pay for all such additional services as extra work.

27. In the event that any staking is destroyed, damaged or disturbed by an act of God or parties other than consultant, the cost of restaking shall be paid for by client as extra services.

28. Client acknowledges that the design services performed pursuant to this agreement are based upon field and other conditions existing at the time these services were performed. Client further acknowledges that field and other conditions may change by the time project construction occurs and clarification, adjustments, modifications and other changes may be necessary to reflect changed field or other conditions. If the scope of services pursuant to this agreement does not include construction staking services by consultant for this project, or if subsequent to this agreement client retains other persons or entities to provide such staking services, client acknowledges that such staking services will be performed by others and that client will defend, indemnify, and hold consultant harmless from any and all claims arising from or resulting from the performance of such staking services by other persons or entities except claims caused by the sole negligence or willful misconduct of consultant; and from any and all claims arising from or resulting from clarifications, adjustments, modifications or other changes which may be necessary to reflect changed field or other conditions except claims caused by the sole negligence or willful misconduct of consultant.

29. Client shall pay the costs of checking and inspection fees, zoning and annexation application fees, assessment fees, soils engineering fees, soils testing fees, aerial topography fees, and all other fees, permits, bond premiums, title company charges, blueprints and reproductions, and all other charges not specifically covered by the terms of this agreement.

30. Client acknowledges and agrees that if consultant provides surveying services, which services require the filing of a Record of Survey in accordance with Business and Professions Code Section 8762, that all of the costs of preparation, examination and filing for the Record of Survey will be paid by client as extra work in accordance with Provision 26.

31. Consultant is not responsible for delay caused by activities or factors beyond consultant's reasonable control, including but not limited to, delays by reason of strikes, lockouts, work slowdowns or stoppages, accidents, acts of God, failure of client to furnish timely information or approve or disapprove of consultant's services or work product promptly, faulty performance by client or other contractors or governmental agencies. When such delays beyond consultant's reasonable control occur, client agrees consultant is not responsible in damages nor shall consultant be deemed to be in default of this agreement.

32. Consultant shall not be liable for damages resulting from the ac-



tions or inactions of governmental agencies including, but not limited to, permit processing, environmental impact reports, dedications, general plans and amendments thereto, zoning matters, annexations or consolidations, use or conditional use permits, project or plan approvals, and building permits. The client agrees that it is the responsibility of the client to maintain in good standing all government approvals and permits and to apply for any extensions thereof.

33. In the event that client institutes a suit against consultant, either directly by complaint or by way of cross-complaint, including a cross-complaint for indemnity, for alleged negligence, error, omission, or other failure to perform, and if client fails to obtain a judgment in client's favor, the lawsuit is dismissed, or if judgment is rendered for consultant, client agrees to pay consultant all costs of defense, including attorneys' fees, expert witness fees, court costs, and any and all other expenses of defense. Client agrees such payments shall be made immediately following dismissal of the case or upon entry of judgment.

34. If any action at law or equity, including an action for declaratory relief, is brought to enforce or interpret the provisions of this agreement, the prevailing party shall be entitled to reasonable attorneys' fees, which fees may be set by the court in the same action or in a separate action brought for that purpose, in addition to any other relief to which he may be entitled.

35. Client agrees that in the event client institutes litigation to enforce or interpret the provisions of this agreement, such litigation is to be brought and adjudicated in the appropriate court in the county in which consultant's principal place of business is located, and client waives the right to bring, try or remove such litigation to any other county or judicial district.

36. Consultant makes no representation concerning the estimated quantities and probable costs made in connection with maps, plans, specifications, reports or drawings other than that all such costs are estimates only and actual costs will vary. It is the responsibility of client to verify costs.

37. Client acknowledges that consultant is not responsible for the performance of work by third parties including, but not limited to, the construction contractor and its subcontractors.

38. Consultant makes no warranty, either expressed or implied, as to his findings, recommendations, plans, specifications, or professional advice except that the services or work product were performed pursuant to generally accepted standards of practice in effect at the time of performance.

39. Estimates of land areas provided under this agreement are not to be considered precise unless consultant specifically agrees to provide the precise determination of such areas.

40. In the event the client agrees to, permits, authorizes, constructs or permits construction of changes in the plans, specifications, and documents or does not follow recommendations or reports prepared by consultant pursuant to this agreement, which changes are not consented to in writing by consultant, client acknowledges that the changes and their effects are not the responsibility of consultant and client agrees to release consultant from all liability arising from the use of such changes and further agrees to defend, indemnify and hold harmless consultant, its officers, directors, principals, agents and employees from and against all claims, demands, damages or costs arising from the changes and their effects.

41. Client acknowledges that the design services performed pursuant to this agreement are based upon field and other conditions existing at the time of preparation of consultant's services. Client

BP000428

further acknowledges that field and other conditions may change by the time project construction occurs and clarification, modifications, discrepancies or other changes may be necessary to reflect changed field or other conditions. If the scope of services pursuant to this agreement does not include on-site construction review, construction management, supervision of construction of engineering structures, or other construction supervision for this project, or if subsequent to this agreement client retains other persons or entities to provide such services, client acknowledges that such services will be performed by others and client will defend, indemnify and hold consultant harmless from any and all claims arising from or resulting from the performance of such services by other persons or entities except claims caused by the sole negligence or willful misconduct of consultant; and from any and all claims arising from or resulting from clarifications, adjustments, modifications, discrepancies or other changes necessary to reflect changed field or other conditions, except claims caused by the sole negligence or willful misconduct of consultant.

42. Client agrees that in accordance with generally accepted construction practices, construction contractor will be required to assume sole and complete responsibility for job site conditions during the course of construction of the project, including safety of all persons and property; that this requirement shall be made to apply continuously and not be limited to normal working hours, and client further agrees to defend, indemnify and hold consultant harmless from any and all liability, real or alleged, in connection with the performance of services on this project, excepting liability arising from the sole negligence of consultant.

43. In the event client discovers or becomes aware of changed field or other conditions which necessitate clarification, adjustments, modifications or other changes during the construction phase of the project, client agrees to notify consultant and engage consultant to prepare the necessary clarifications, adjustments, modifications or other changes to consultant's services or work product before construction activities commence or further activity proceeds. Further, client agrees to have a provision in its construction contracts for the project which requires the contractor to notify client of any changed field or other conditions so that client may in turn notify consultant pursuant to the provisions of this paragraph.

44. Client agrees to limit the liability of consultant, its principals and employees, to client and to all contractors and subcontractors on the project, for any claim or action arising in tort or contract, to the sum of $50,000 or consultant's fee, whichever is greater. However, if consultant's fee exceeds $250,000, liability to client and to all contractors and subcontractors shall not exceed $250,000.

45. Client agrees to purchase and maintain, during the course of construction, builder's risk "all risk" insurance which will name consultant as an additional insured as their interest may appear.

46. Consultant hereby states and client hereby acknowledges that consultant has no professional liability insurance for claims arising out of the performance of or failure to perform professional services, including, but not limited to the preparation of reports, designs, drawings and specifications, related to the investigation, detection, abatement, replacement, use or specification, or removal of products, materials or processes containing asbestos, asbestos cement pipe, and/or hazardous waste materials. Accordingly, the client hereby agrees to bring no claim for negligence, breach of contract, indemnity or otherwise against the consultant, its principals, employees, and agents if such claim, in any way, would involve the consultant's services for the investigation, detection, abatement, replacement, use or specification, or removal of products, materials or processes containing asbestos, asbestos cement pipe, and/or hazardous waste materials. Client further agrees to defend, indemnify and hold harmless consultant, its officers, directors, principals, employees and agents from any and all asbestos and/or hazardous waste material related claims that may be brought by third parties as a result of the services provided by the consultant pursuant to this agreement except claims caused by the sole negligence or willful misconduct of the consultant.

47. Client acknowledges that consultant's scope of services for this project do not include any services related in any way to asbestos and/or hazardous waste. Should consultant or any other party encounter such materials on the job site, or should it in any other way become known that such materials are present or may be present on the job site or any adjacent or nearby areas which may affect consultant's services, consultant may, at its option, terminate work on the project until such time as client retains a specialist contractor to abate and/or remove the asbestos and/or hazardous waste materials and warrant that the job site is free from any hazard which may result from the existence of such materials.

48. (a) Notwithstanding any other provision of this Agreement and except for the provisions of (b) and (c), if a dispute arises regarding consultant's fees pursuant to this contract, and if the fee dispute cannot be settled by discussions between client and consultant both client and consultant agree to attempt to settle the fee dispute by mediation through the American Arbitration Association [or other mediation service] before recourse to arbitration.

If mediation does not resolve the fee dispute, such dispute shall be settled by binding arbitration in accordance with the Construction Industry Arbitration Rules of the American Arbitration Association, and judgment upon the award rendered by the Arbitrator(s) may be entered in any court having jurisdiction thereof.

(b) Subdivision (a) does not preclude or limit consultant's right to file an action for collection of fees if the amount in dispute is within the jurisdiction of the small claims court.

(c) Subdivision (a) does not preclude or limit consultant's right to elect to perfect or enforce applicable mechanics lien remedies.

IN WITNESS WHEREOF, the parties hereby execute this agreement dated _____ upon the terms and conditions stated above.

Client  MICHAEL E. BROWN
       _____
           Print or Type

By _____
           Signature

Name/Title _____

Date Signed  8/28/92

Project Number  92-22

Consultant  Martin-McIntosh - Eugene P. Martin
           _____
               Print or Type

By _____
           Signature

Name/Title  Eugene P. Martin - Partner

Date Signed  3/24/92

Project Number  92-22

Client should mail completed contract to the address shown for consultant.

FORM A 91

EP000427

# EXHIBIT F

**Okadigbo Dec**

**Certified Copy**

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA

ROGER McINTOSH,

       Plaintiff,

  vs.

NORTHERN CALIFORNIA UNIVERSAL
ENTERPRISES COMPANY, ET AL.,

       Defendants.

~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~

Case No.
107CV-01080-LJO-WMW

**DEPOSITION OF**

**ROGER McINTOSH**

December 18, 2008
9:11 a.m.

5001 East Commercenter
Suite 170
Bakersfield, California

Brian S. Cardoza, CSR No. 8362



ESQUIRE
DEPOSITION SERVICES®

PAULSON
REPORTING & LITIGATION SERVICES, LLC

Toll Free: 800.300.1214
Facsimile: 661.322.2242

Suite 170
5001 East Commercenter Drive
Bakersfield, CA 93309
www.paulsonreporting.com

# DRAFT
# GUIDANCE PACKAGE

● ● ●

# *Valley Rose Estates*

## A MASTER PLANNED COMMUNITY
### W A S C O ,         C A L I F O R N I A

## APRIL 13, 1992

A 00014



EXHIBIT 5
Deponent McIntosh
Date 12-8-08 Rptr.
WWW.DEPOBOOK.COM



*Valley Rose Estates*
LAND USE PLAN

A MASTER PLANNED COMMUNITY
WASCO, CALIFORNIA

LOCATION

FAIRWAY

PARKWAY

LEGEND

AMPHITHEATRE

VALLEY ROSE GOLF COURSE

The
LEGACY GROUP, LTD.

A 00015

# TABLE OF CONTENTS

| | | |
|---|---|---|
| 1.0 | Introduction | page......1 |
| 2.0 | Purpose | page......2 |
| 3.0 | Acknowledgement | page......2 |
| 4.0 | Proposed Boundaries for the Valley Rose Master Development Plan | page......3 |
| 5.0 | Process | page......4 |
| 6.0 | Products | page......5 |
| 7.0 | Issues and Planning Opportunities | page......8 |
| 8.0 | Goals and Concepts | page.....12 |
| | Appendix | page.....15 |

A 00016

# VALLEY ROSE MASTER DEVELOPMENT PLAN
# CITY OF WASCO

### DRAFT GUIDANCE PACKAGE

### April 13, 1992

## 1.0   INTRODUCTION

The Legacy Group Limited, a California based limited partnership, together with Martin-McIntosh and with City of Wasco assistance, will be preparing a program for the development of Section 4, Township 27 South, Range 24 East, M.D.B.M. (except existing Golf Course in Southeast 1/4) located on the west side of the City's downtown area. This program will focus in detail upon a 480 acre area bordered by State Route 46 on the south, Leonard Avenue on the east, McCombs Road on the north, and Schofield Avenue on the west. Specifically, the Valley Rose Master Development Plan will involve the preparation and processing of the following products to help the City implement its General Plan adopted in 1988:

A.   A "Master Development Plan" for The Legacy Group Limited property that will be consistent with Wasco General Plan and applicable ordinances.

B.   A "Development Agreement" with a 15-year time frame prepared pursuant to Article 2.5 of the California Government Code.

C.   A set of "Design Guidelines" that would be applied to all properties within the Valley Rose Master Development Plan Community.

D.   The following maps and Williamson Act cancellations in the Southwest 1/4 of Section 4

1.   Tract No. 5472 revisions, Improvement Plan and Final Map
2.   Williamson Act Cancellations (if necessary)
3.   Tentative Parcel Map No. 9576
4.   Tract No. 5618 Tentative Map, Improvement Plans and Final Map

A 00017

Once adopted, the Valley Rose Master Development Plan will allow for the approval of additional Tentative and Final Maps and Improvement Plans for the remaining Valley Rose property. The Master Development Plan will serve as the definitive guide for all development in this planning area, and the Development Agreement will govern the terms and conditions of these projects over the anticipated 15-year time frame of the project. The Design Guidelines will outline the project theme and provide mechanisms for implementing this theme. The initial mapping of the Southwest 1/4 of Section 4 will set the tone for development of the plan area and bring the Master Plan to fruition.

## 2.0   PURPOSE

This Guidance package is intended to function as a device to clarify project direction and expectations between the City of Wasco, Martin-McIntosh, and The Legacy Group Limited.

This package serves primarily as a tool for guiding the future development of the 480 acres controlled by The Legacy Group Limited as defined in the Figure 4.1 on page 3.

This package identifies the:

A.  Process:  The process to be followed by the City of Wasco,The Legacy Group Limited and Martin-McIntosh with respect to the proposed development of the Valley Rose Master Development Plan;

B.  Products: The actual work products to be produced as part of the Valley Rose Master Development Plan.

C.  Issues:  The issues, opportunities, and constraints that will influence and affect the Valley Rose Master Development Plan;

D.  Goals:  The principles and goals of the project in view of the City's role, and its General Plan and ordinances as they affect the Valley Rose Master Development Plan.

## 3.0   ACKNOWLEDGEMENT

Agreement by the City to adhere to the processing guidelines of the Guidance Package does not necessarily mean that the project will receive approval. Instead, the City's acceptance of this package as a device to define processing direction, demonstrates the City's commitment to expeditious and efficient processing of the Valley Rose Master Development Plan.

2

A 00018

The City, through its adoption of Title 16: Subdivision Ordinance, allows the City to approve, conditionally approve, or deny exceptions to the regulations and requirements of this title, under §16.36.020 B. This section states that exceptions may be allowed "When a subdivider proposes to develop property using modern site planning techniques in a manner which does not conform or literally comply to the design standards or regulations set forth in this title but would serve to facilitate the ultimate development of the land in manner that will be commensurate with contemporary living patterns and technical progress."

## 4.0   PROPOSED BOUNDARIES FOR THE VALLEY ROSE MASTER DEVELOPMENT PLAN

The boundaries of the project site are depicted in the Figure below:



**Figure 4.1**

A majority of the land within the project site is designated as LMR (Low-Medium Residential Density) in the Wasco General Plan. The proposed Master Development Plan and supporting documents will provide insight into potentially acceptable uses and detailed ways which the uses may develop. As a tool for implementing and focusing on the City's General Plan, the proposed Master Development Plan will establish more detailed policies and coherent development regulations tailored to this site and its unique circumstances.

The Master Development Plan will benefit the City and its developing urban area by laying ground work for the future development of this site consistent

A 00019

with the City's General Plan.  Furthermore, the Wasco environmental documentation addresses the full range of environmental concerns and mitigation measures pertaining to the Valley Rose Master Development Plan in particular.

The preparation of the Master Development Plan will be done in close cooperation with the City of Wasco and will be governed by a Development Agreement prepared pursuant to state law.  The Valley Rose Master Development Plan will seek to refine and translate emerging public policy to apply to the Valley Rose Master Plan area.

## 5.0   PROCESS

The following identifies several key elements required for expeditious and efficient processing of the project.

### 5.1   Agent/Representative

The Legacy Group Limited, will serve as the applicant for the Valley Rose Master Development Plan project.  Martin-McIntosh, of Bakersfield, CA, in its role as planner, engineer and consultant, will serve as the representative for The Legacy Group Limited.

### 5.2   Contact

All products, information, and comments will be distributed to City staff through a single City contact, the Planning Director, ensuring an efficient and complete flow of products and information. Martin-McIntosh, Ron Staub; Project Manager, in conjunction with The Legacy Group Limited, Chris Christensen; representative, will act a the principal developer contacts.

### 5.3   Agendas

The project team -- Martin-McIntosh, The Legacy Group Limited, and the City of Wasco-- have a strong commitment to conducting productive and timely meetings.  To guide meetings and facilitate discussion, agendas will be developed prior to the meetings by Martin-McIntosh, in coordination with the project team.

4

A 00020

5.4   **Schedule**

The applicant's intent is to expedite the Valley Rose Master Development Plan project adoption within an approximate 7-month time frame. A work schedule has been developed to define the necessary flow of events, which is shown in Exhibit A.

5.5   **Distribution**

The City Planning Department will ensure that all necessary products are distributed to team members and interested City staff. Martin-McIntosh will provide a master copy, and specified number of copies of all necessary documents and plans for the City to use for distribution.

5.6   **Review**

It is intended that the City Planning Department will act as the lead review agency for the Valley Rose Master Development Plan and related products. Following the City's review period, the Valley Rose Master Development Plan will be distributed to responsible agencies and made available to individuals who have expressed an interest, or may have comments on the proposed plan.

5.7   **Approval**

The Valley Rose Master Development Plan will be heard by the City of Wasco Planning Commission and their recommendation forwarded to the City Council who will, approve, conditionally approve, or deny the Valley Rose Master Development Plan and related products. City staff will coordinate this process.

**6.0   PRODUCTS**

Based upon the current understanding of the project, the anticipated products shall be governed by the following:

6.1   **Documents**

The Legacy Group Limited, in conjunction with Martin-McIntosh, will produce final documents: Valley Rose Master Development Plan, Valley Rose Development Agreement, Design Guidelines that will be applied throughout the Valley Rose, Williamson Act cancellation documents, Parcel Map No.9572, Tract No. 5472 revisions, Improvement Plans and Final Map, Tract No. 5618 Tentative Map, Improvement Plans and Final Map.

A 00021

6.2   **Quality**

Any document text will be of desk top publishing quality consistent with the City's desktop publishing capabilities (i.e., Microsoft Word for Windows 2.0). This will ensure that all documents will have a quality and professional appearance, and that future amendments or changes to the text can be facilitated by City staff.

6.3   **Format**

Documents will be formatted to 8 1/2" x 11" (portrait or landscape style). Exhibits of the planning area will be at a scale appropriate to show relevant information. Some graphic exhibits may need to be 11" x 17" to adequately portray necessary information. Print will be black on white paper. Documents will be spiral bound with card stock hard covers. All covers will be coordinated so that the documents appear related. Document format will be flexible to accommodate any changes desired by the City. All plans and maps will be in a format consistent with City of Wasco and/or State of California Standards.

6.4   **Content**

Each document will be prepared in accordance with State of California guidelines. The Valley Rose Master Development Plan and Development Agreement will serve as the City's definitive guides to all land use and development for the Valley Rose projects. The general content of each product is anticipated to include, but will not be limited to the following:

   Master Development Plan

   -Introduction
   -Relationship to General Plan, Zoning Ordinance,
     and other City regulations
   -Land Use Plan, Project Description
   -Circulation/transportation
   -Public facilities/services
   -Infrastructure
   -Parks and Open Space
   -Phasing Plan

   Development Agreement

   -Future project processing principles
   -Term to fit lifetime of project

6

A 00022

**Design Guidelines**

-How to use the guidelines
-Streetscape and Project Theme
-Architectural and site design
-Landscape design
-Pedestrian/Bike/Golf Cart circulation
-Walls and Fencing
-Signage and lighting

**Tract No. 5472**

-Revisions to fit boundary survey and zoning boundaries
-Street and Drainage Plans
-Sewer and Water Plans
-Grading Plans
-Landscape Plan
-Final Map

**Parcel Map 9572**

-Tentative Parcel Map
-Parcel Map

**Williamson Act Cancellations**

-Legal Description
-Exhibit Map
-Cancellation Document

**Tract No 5618**

-Tentative Tract Map
-Street and Drainage Plan
-Sewer and Water Plans
-Grading Plan
-Landscape Plan
-Final Map

7

A 00023

**6.5    Document Revisions**

6.5.1   Five (5) copies of the Valley Rose Master Development Plan will be submitted to the City for review. The Master Plan will be subject to one revision cycle, based upon comments received by various City agencies (distributed via City staff). Following the incorporation of the City's comments into the plan. A Final Master Plan will be forwarded to the Planning Commission as stated in Section 5.7 of this Guidance Package.

6.5.2   Three (3) copies of each map or plan set will be submitted to the City for review. The map or plans will be subject to one revision cycle, based upon comments received by various City agencies (distributed via City staff).Following the incorporation of the City's comments into the plan, Tentative and Final Maps will be forwarded to the Planning Commission as stated in Section 5.7 of this Guidance Package.

**7.0    ISSUES AND PLANNING OPPORTUNITIES**

**7.1    Product Review**

7.1.1   Issues

A. Due to the project's nature, the Valley Rose Master Development Plan and related products require City review for content and quality. This review can be time consuming and difficult to schedule.

B. Delays in product review can also occur due to the level of input and number of reviewers involved.

C. Many of the Valley Rose Development Plan products will require simultaneous review.

7.1.2   Solutions

A. Planning Director, Walter Cairns, will coordinate the review of all products.

B. City review and comment time periods shall be limited to two (2) weeks.

C. The City will have one review period: This review period will enable the City to make substantive comments on the

8

A 00024

Master Development Plan and related products. Martin-McIntosh will be responsible to make changes relating to the City's comments.

D. The City will appropriate necessary manpower for timely review of the Valley Rose Master Development Plan products.

## 7.2. Schedule

### 7.2.1 Issues

A 7-month time schedule will require an aggressive commitment to product preparation, timely reviews, meetings, and fulfilling target dates. Potential problems may arise if all team members do not maintain this commitment.

### 7.2.2 Solutions

A. Consultants shall work with the City to establish a timeline for meetings, products, and reviews early in the project process. This timeline shall serve as a master schedule, and shall be somewhat flexible. However, this master schedule shall provide the guidance and direction to achieving project approval.

B. The final project completion date for all project components is October, 1992. The attached schedule (Exhibit A) is intended to be the guide to project completion.

C. Commitment to target deadlines and meeting the review period time schedules discussed in Section 7.1.2 is essential.

D. Team members shall identify conflicts and work toward resolutions in order to maintain the schedule.

## 7.3 Purpose of Products

### 7.3.1 Issues

Identifying and agreeing to the purpose of the products and their content is critical. Defining the purpose will also clarify the products' relationships to one another. Achieving agreement on the products'

9

A 00025

content may be difficult if a common understanding of the process is not defined.

### 7.3.2  Solutions

A. The purpose and goals of the Valley Rose Master Development Plan in Section 8.0 of this Guidance Package, will serve as the team's collaboratively approved objectives for the project.

B. The Valley Rose Master Development Plan and Development Agreement are to serve as a regulatory documents which will implement the General Plan and clearly define the City's and developer's desires for the Valley Rose Master Plan area.

C. The Design Guidelines are intended to identify a "character" and indicate a consistent philosophy for this "new" area of the City, consistent with the goals for the City's future.

D. The improvement plans and maps for the Southwest 1/4 of Section 4 will be the tools for constructing the first Valley Rose Communities.

### 7.5    Consensus Revisions

#### 7.5.1  Issues

The process involves many different individuals expressing a broad range of ideas and opinions. Therefore, it is likely that reaching a consensus of these opinions may be difficult at times. Failure to reach this consensus can cause project processing delays and may jeopardize project completion.

#### 7.5.2  Solutions

A. In order to ensure full consideration, written City staff comments shall be passed through a designated City reviewer so that a consensus can be facilitated. Upon City consensus, comments will be forwarded to Martin-McIntosh.

B. In order to ensure full consideration, written public comments shall be passed through a designated City reviewer. Written comments will be forwarded to Martin-McIntosh.

A 00026

C. In the event that a project proponent expresses a concern over certain comments received, Martin-McIntosh will mediate a consensus.

D. Martin-McIntosh will revise the product based upon City input. Two revisions will take place; one for substantive comments and one for technical comments.

E. It should be emphasized that effective consensus is not necessarily unanimity. However, agreement regarding the significant issues is necessary to make project continuance worthwhile.

## 7.6   Meetings

### 7.6.1   Issues

The Master Development Plan and related products are intended to represent the desires of both the City and the developers. Scheduling meetings for a team of players may often lead to delays in the project, as meetings are delayed to a time when schedules can be accommodated.

### 7.6.2   Solutions

A. It is essential that all team members participate in and attend most or all meetings. It is important to make the most out of these meetings; resolve issues and merge with some concrete decisions and input. Agendas will be prepared by Martin-McIntosh to guide meetings, and agenda input will be collected by Martin-McIntosh. Prior to each meeting, Martin-McIntosh, with the City, will draft a master agenda to be distributed prior to each meeting.

B. Martin-McIntosh and the City staff shall coordinate to establish an advanced meeting schedule, when possible.

11

A 00027

**8.0   GOALS AND CONCEPTS**

   8.1   **Project Goals**

   To create a residential mixed use environment that will enhance and promote increased usage of the recently developed Valley Rose Golf Course. The project design should optimize the golf course and its open space qualities as a residential amenity. The design ideas for the project listed below have evolved from Martin-McIntosh and The Legacy Group Limited brainstorming sessions and design meetings.

   **Guiding Design Features**

   -Utilize windows and focals to Golf Course
   -Increase Golf Course play and frontage by adding 9 holes
   -Provide gated communities to enhance security
   -Provide retirement, executive and multi-family neighborhoods
   -Provide parkway/belt park features connecting neighborhoods to commercial centers, Golf Course and public amenities (ie. community center, amphitheater and parks)
   -Eliminate "strip commercial" by providing windows into the Hwy 46 commercial center from inside the project.
   -Encourage pedestrian, golf cart and bicycle access
   -Encourage the use of art in public places
   -Develop unique indentifying entry features into project and neighborhoods
   -Provide multi-use plaza areas for community events, exhibits, farmers markets, etc.
   -Provide a grassy, terraced amphitheater for community concerts and events. This facility would also serve as a storm water detention basin.
   -Provide an Inn and Restaurant adjacent to the Golf Course at the project entry along Hwy 46.
   -Provide one community utilizing a formal street configuration with appropriate architectural theme (ie. Victorian).

   8.2   **Preminary Concepts and Features**

   1. Create fluid streetscaping by introducing on-site pedestrian linkages that connect a series of nodes or plazas and open spaces.

12

A 00028

2. Create pedestrian areas with a strong streetscape involving furniture, trees, light fixtures and textured paving of a character that will be unique to the Valley Rose Community.

3. Create a central public plaza that will be a gathering place and intersection for pedestrian circulation paths. The plaza will have its own character and potential uses include a restaurant,amphitheater and/or facilities oriented to residents and the community of Wasco..

4. The project enterance may be identified by a multi-level Inn that will be a focal point for passing motorists on Hwy 46 and will provide visitors an opportunity to look out over the Valley Rose Golf Course and the surrounding scenery. Seating areas and entertainment space may be integrated into the Inn common areas.

5. Design water features that may be used as focal points and gateways, creating items of strong visual interest. These features can be used along the trail system to provide variation of scenery.

6. Plant dramatic trees to line the main streets. These trees will compliment the architecture and define the residential neighborhoods.

7. Locate artwork in important nodes of cultural and aesthetic interest, making these nodes and plazas a community stage and gallery for an Art in Public Places Program. This program will help the City and citizens identify with this new addition to Wasco.

8. Give pedestrians many choices via an interconnecting web of paths and plazas that create an urban pattern within the project.

9. Design spaces to allow incorporation of signs and banners to advertise cultural events taking place in the Valley Rose community.

10. Provide significant landscaping to be integrated into the spaces rather than forming a uniform buffer. Pedestrians should walk beneath the tree canopy rather than only view it from a distant sidewalk.

13

A 00029

11. Setbacks and rooflines of buildings should vary to create interest and promote a stimulating visual image.

12. Assure that this pedestrian-oriented project encourages a growing connection between the Valley Rose community and the existing downtown. This connection should be encouraged through linkages to a parkway system.

13. The Valley Rose project architecture <u>must</u> make a positive statement about thecommunity. It should be warm, inviting and interesting.

14. Examples of non-residential uses:

| | |
|---|---|
| Deli | Craft Store |
| Sidewalk Cafe | Clothing |
| Restaurant | Art/Sculpture Galleries |
| Inn & Conference Facility | Travel Agency |
| Community Services | Tailor |
| Neighborhood Grocery | Medical Office |
| Drug Store | |

15. Examples of residential support uses:

| | |
|---|---|
| Dry Cleaners | Recreation Center |
| Post Office | Tennis Courts |
| Health Club | Pool |
| Gymnasium | Bank |

14

A 00030

# Valley Rose Master Plan
## 1992 Design Schedule

| WBS | Name | Duration | % | Sched ST | Sched FN |
|---|---|---|---|---|---|
| 1 | GUIDANCE PKG & CONCEPTUAL PLAN | 28.08ed | 0% | 3/24/92 | 4/21/92 |
| 1.1 | Finalize Concept Plan & Guidance Pkg | 8d | 0% | 3/24/92 | 4/6/92 |
| 1.2 | Meet & Present to Staff | 0.25d | 0% | 4/6/92 | 4/6/92 |
| 1.3 | Staff Review | 3d | 0% | 4/6/92 | 4/8/92 |
| 1.4 | Martin-McIntosh Revision | 4.5d | 0% | 4/6/92 | 4/10/92 |
| 1.5 | Advertise Hearing | 0.25d | 0% | 4/3/92 | 4/3/92 |
| 1.6 | Planning Commission | 0.25d | 0% | 4/13/92 | 4/13/92 |
| 1.7 | City Council | 0.25d | 0% | 4/21/92 | 4/21/92 |
| | | | | | |
| 2 | SURVEYING | 22.33ed | 0% | 3/25/92 | 4/16/92 |
| 2.1 | Boundary Survey | 7d | 0% | 3/25/92 | 4/2/92 |
| 2.2 | Topographic Survey | 10d | 0% | 4/2/92 | 4/16/92 |
| | | | | | |
| 3 | PH 1 DVLPMNT SUBPROJECT (27 ACRES) | 97.04ed | 0% | 4/14/92 | 7/20/92 |
| | | | | | |
| 4 | TENTATIVE PARCEL MAP | 57.09ed | 0% | 4/6/92 | 6/2/92 |
| 4.1 | Design Parcel Map | 4.5d | 0% | 4/6/92 | 4/10/92 |
| 4.2 | Draft Parcel Map | 3.25d | 0% | 4/10/92 | 4/15/92 |
| 4.3 | Check Parcel Map | 2d | 0% | 4/15/92 | 4/17/92 |
| 4.4 | Revise Parcel Map | 2d | 0% | 4/17/92 | 4/21/92 |

Qtr 2, 1992 — Mar, Apr, May, Jun, Jul

By: Martin-McIntosh
Date: 4/8/92
M-Mc Job# 92-22

Summary Bar  Schedule Timeframe  Actual Progress  Target Timeframe  Milestone

Page 1

WBS (left margin): 4.5, 4.6, 4.7, 4.8, 4.9, 4.10, 5, 5.1, 5.2, 5.3, 5.4, 5.5, 5.6, 5.7, 5.8, 6, 6.1, 6.2, 6.3

By: Mart
Date: 4/
M-Mc J

A 00032

## Valley Rose Master Plan
### 1992 Design Schedule

| WBS | Name | Duration | % | Sched ST | Sched FN |
|---|---|---|---|---|---|
| 6.4 | Final Design | 7d | 0% | | 4/15/92 |
| 6.5 | Draft | 7.25d | 0% | 4/15/92 | 4/24/92 |
| 6.6 | Office Review | 5d | 0% | 4/24/92 | 5/1/92 |
| 6.7 | Revisions | 1d | 0% | 5/1/92 | 5/4/92 |
| 6.8 | Prepare Applications | 6.5d | 0% | 4/2/92 | 4/10/92 |
| 6.9 | Obtain Signatures/Fees | 1d | 0% | 5/4/92 | 5/4/92 |
| 6.10 | Incremental Traffic Study | 15d | 0% | 4/6/92 | 4/27/92 |
| 6.11 | Submittal to City 5618 | 0.25d | 0% | 4/27/92 | 4/27/92 |
| 6.12 | City Staff/Resp. Agency Review 5618 | 30d | 0% | 4/27/92 | 6/8/92 |
| 6.13 | M-Mo / Client Review Conditions | 7d | 0% | 6/8/92 | 6/17/92 |
| 6.14 | Advertise Hearing | 1d | 0% | 6/8/92 | 6/9/92 |
| 6.15 | Planning Commission | 0.25d | 0% | 6/30/92 | 6/30/92 |
| 6.16 | City Council | 0.25d | 0% | 7/8/92 | 7/8/92 |
| | | | | | |
| 7 | MASTER PLANNING | 93.28d | 0% | 4/6/92 | 7/8/92 |
| 7.1 | Land Use Master Plan | 6d | 0% | 4/15/92 | 4/22/92 |
| 7.2 | Design Guidelines | 8d | 0% | 4/15/92 | 4/27/92 |
| 7.3 | Development Agreement | 8d | 0% | 4/15/92 | 4/27/92 |
| 7.4 | Water Master Plan | 3d | 0% | 4/22/92 | 4/27/92 |
| 7.5 | Sewer Master Plan | 3d | 0% | 4/22/92 | 4/27/92 |
| 7.6 | Drainage Master Plan | 3d | 0% | 4/22/92 | 4/27/92 |
| 7.7 | Traffic Master Plan | 15d | 0% | 4/6/92 | 4/27/92 |

By: Martin-McIntosh
Date: 4/8/92
M-Mo Job# 92-22

Summary Bar · Actual Progress · Schedule Timeframe · Target Timeframe · Milestone

Page 3

A 00033

# Valley Rose Master Plan
## 1992 Design Schedule

| WBS | Name | Duration | % | Sched ST | Sched FN |
|---|---|---|---|---|---|
| 7.8 | Submittal to City M-Plan | 0.25d | 0% | 4/27/92 | 4/27/92 |
| 7.9 | City Staff/Resp Agency Review M-Plan | 30d | 0% | 4/27/92 | 6/8/92 |
| 7.10 | M-Mo Review/Revise | 9.5d | 0% | 6/8/92 | 6/22/92 |
| 7.11 | Advertise Hearing | 1d | 0% | 6/8/92 | 6/9/92 |
| 7.12 | Planning Commision | 0.25d | 0% | 6/30/92 | 8/30/92 |
| 7.13 | City Council | 0.25d | 0% | 7/8/92 | 7/8/92 |
| | | | | | |
| 8 | VALLEY ROSE IMPRVMNTS TR. 5618 | 98ed | 0% | 7/8/92 | 10/14/92 |
| | | | | | |
| 8.1 | STREETS | 80.04ed | 0% | 7/8/92 | 10/7/92 |
| 8.1.1 | Design Street Grades | 20d | 0% | 7/9/92 | 8/6/92 |
| 8.1.2 | Draft Street Grades | 25d | 0% | 7/16/92 | 8/20/92 |
| 8.1.3 | Wesco Street Review | 20d | 0% | 8/27/92 | 9/24/92 |
| 8.1.4 | Final Street Revisions | 9d | 0% | 9/24/92 | 10/7/92 |
| | | | | | |
| 8.2 | GRADING | 81ed | 0% | 7/8/92 | 10/7/92 |
| 8.2.1 | Design Grading Plans | 20d | 0% | 7/8/92 | 8/5/92 |
| 8.2.2 | Draft Grading Plans | 30d | 0% | 7/15/92 | 8/26/92 |
| 8.2.3 | Wesco GP Review | 20d | 0% | 8/26/92 | 9/23/92 |
| 8.2.4 | Pull Grading Permit | 10d | 0% | 9/23/92 | 10/7/92 |
| | | | | | |
| 8.3 | STORM DRAINAGE | 77ed | 0% | 7/8/92 | 9/23/92 |

By: Martin-McIntosh
Date: 4/8/92
M-Mo Job# 92-22

Summary Bar   Schedule Timeframe   Actual Progress   Target Timeframe   Milestone

Page 4

A 00034

# Valley Rose Master Plan
## 1992 Design Schedule

| WBS | Name | Duration | % | Sched BT | Sched FN |
|-----|------|----------|---|----------|----------|
| 8.3.1 | Design SD System | 10d | 0% | 7/8/92 | 7/22/92 |
| 8.3.2 | Draft SD System | 15d | 0% | 7/22/92 | 8/12/92 |
| 8.3.3 | Wasco SD Review | 20d | 0% | 8/12/92 | 9/9/92 |
| 8.3.4 | Final SD Revisions | 10d | 0% | 9/9/92 | 9/23/92 |
| | | | | | |
| 8.4 | SEWERS | 84d | 0% | 7/8/92 | 9/30/92 |
| 8.4.1 | Design Sewer Piping | 20d | 0% | 7/8/92 | 8/5/92 |
| 8.4.2 | Draft Sewer Piping | 25d | 0% | 7/15/92 | 8/19/92 |
| 8.4.3 | Wasco Sewer Review | 20d | 0% | 8/19/92 | 9/16/92 |
| 8.4.4 | Final Sewer Revisions | 10d | 0% | 9/16/92 | 9/30/92 |
| | | | | | |
| 8.5 | WATER | 91d | 0% | 7/8/92 | 10/7/92 |
| 8.5.1 | Design Water Piping | 20d | 0% | 7/8/92 | 8/5/92 |
| 8.5.2 | Draft Water Piping | 25d | 0% | 7/22/92 | 8/26/92 |
| 8.5.3 | Wasco Water Review | 20d | 0% | 8/26/92 | 9/23/92 |
| 8.5.4 | Final Water Revisions | 10d | 0% | 9/23/92 | 10/7/92 |
| | | | | | |
| 8.6 | FINAL MAP | 84d | 0% | 7/22/92 | 10/14/92 |
| 8.6.1 | Prep Legals & Certificates | 15d | 0% | 7/22/92 | 8/12/92 |
| 8.6.2 | Draft Final Map | 25d | 0% | 7/29/92 | 9/2/92 |
| 8.6.3 | Wasco Map Review | 20d | 0% | 9/2/92 | 9/30/92 |
| 8.6.4 | Final Revisions to Map | 10d | 0% | 9/30/92 | 10/14/92 |

Timeline headers: Qtr 2, 1992 (Mar, Apr, May, Jun); Qtr 3, 1992 (Jul, Aug, Sep, Oct); Qtr 4, 19 (Nov)

Legend:
- Summary Bar
- Schedule Timeframe
- Actual Progress
- Target Timeframe
- Milestone

By: Martin-McIntosh
Date: 4/8/92
M-Ms Job # 92-22

Page 5

A 00035

# EXHIBIT G      Okadigbo Dec

**Certified Copy**

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA

ROGER McINTOSH,

       Plaintiff,

    vs.

NORTHERN CALIFORNIA UNIVERSAL
ENTERPRISES COMPANY, ET AL.,

       Defendants.

~~~~~~~~~~~~~~~~~~~~~~~~~~~~

Case No.
107CV-01080-LJO-WMW

**DEPOSITION OF**

**ROGER McINTOSH**

**VOLUME 2**

Wednesday, January 28, 2009
11:38 a.m.

5001 East Commercenter
Suite 170
Bakersfield, California

Brian S. Cardoza, CSR No. 8362



ESQUIRE
DEPOSITION SOLUTIONS
an Alexander Gallo Company

Toll Free: 800.300.1214
Facsimile: 661.322.2242

Suite 170
5001 East Commercenter Drive
Bakersfield, CA 93309
www.esquiresolutions.com

Roger McIntosh - Volume II

January 28, 2009

265

1   in, among other things, the streets, curbs and gutters,

2   utilities, walls, fences, entry monuments, street lights,

3   landscaping, and reference lines, annotations, and

4   reference numbering."

5          Are you contending that Northern California

6   Universal Enterprises constructed the streets, curbs and

7   gutters, utilities, and all the other work mentioned in

8   paragraph 35?

9          A.   I'm contending that they finished the

10  subdivision based on the improvement plans.  Many of the

11  improvements were already constructed, and they purchased

12  those improvements but still had to finish out the

13  improvements in order to record the final map.

14         Q.   Well, paragraph 35 says that there's a

15  similarity between the plans and each of these specific

16  things listed, the streets, the curbs, the gutters.  I'm

17  assuming that you're saying in paragraph 35 that NCUE put

18  in the streets, curbs and gutters, utilities, walls,

19  fences, entry monuments, street lights, landscaping,

20  reference lines, annotations, and reference numbering.  Is

21  my assumption incorrect?

22         A.   Yes.

23         Q.   Why?

24         A.   The similarities include the tentative map,

25  6451, and the final map, 6451, in that the exact numbering



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.300.1214
Facsimile: 661.322.2242

Suite 170
5001 East Commercenter Drive
Bakersfield, CA 93309
www.esquiresolutions.com

Roger McIntosh - Volume II                     January 28, 2009

270

1          A.   Yes.

2          Q.   I'll direct your attention to paragraph 42 of

3    the First Amended Complaint.   Paragraph 42 says, "At all

4    times during the construction of the Valley Rose Estates

5    subdivision, the City of Wasco controlled the development

6    of the Valley Rose Estates subdivision project."   Can you

7    tell me your understanding of what "controlled the

8    development" means?

9          A.   The City of Wasco had -- had processed the

10   tentative tract 5472 and had an agreement with the Legacy

11   Group to provide funding for the construction of the

12   improvements.   The City of Wasco also, in addition to

13   providing funding, oversaw and inspected the improvements

14   as they were constructed as part of their Subdivision Map

15   Act process.

16         Q.   Okay.   So far you've only described what the

17   City of Wasco did during the Legacy era.   In terms of

18   understanding "controlled the development", are you also

19   contending that anything that Wasco did after the Legacy

20   era constitutes controlling the development of the Valley

21   Rose Estates subdivision?

22         MR. TRAVIS:   I'll object, that's rather vague.

23   There's a lot that happened.   That's 10 years, 15 years.

24         MR. OKADIGBO:   Okay.   All right, let me ask this

25   more simply.



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.300.1214
Facsimile: 661.322.2242

Suite 170
5001 East Commercenter Drive
Bakersfield, CA 93309
www.esquiresolutions.com

Roger McIntosh - Volume II

January 28, 2009

271

1          MR. TRAVIS:   If you understand it, you can answer

2     it.

3          THE WITNESS:   Well, the City of Wasco controlled

4     the subdivision -- the construction of the subdivision and

5     the development of the subdivision through the Development

6     Agreement that they had with the Legacy Group.   They also

7     controlled the construction through the purchasing of the

8     property through a tax sale.   And they also controlled it

9     through the disposition of the property to Northern

10    California.   So, I would say that they controlled the

11    construction of the -- and the -- the development of the

12    subdivision.

13          BY MR. OKADIGBO:

14          Q.   Okay.   Would you say that there's anything

15    else that the City of Wasco has done, after selling the

16    property to Northern California Universal Enterprises,

17    that constitutes controlling the development of the

18    subdivision?

19          A.   They -- the City of Wasco reprocessed a

20    tentative tract 6451 and allowed the final map to record

21    so that the developer could build homes and -- and sell

22    the individual lots.   The City of Wasco signs off on the

23    tentative map process, they sign off on the final map, so

24    they have complete control of that whole subdivision

25    process, including the construction of the improvements.



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.300.1214
Facsimile: 661.322.2242

Suite 170
5001 East Commercenter Drive
Bakersfield, CA 93309
www.esquiresolutions.com

Roger McIntosh - Volume II

January 28, 2009

272

1      Q.   Okay.   Can I direct your attention to

2   paragraph 43 of the Complaint.   It states, "As a result of

3   the construction of the Valley Rose Estates subdivision

4   and the unlawful use of McIntosh's copyrighted plans,

5   Wasco obtained a direct financial benefit."

6          So far my understanding of what you believe a

7   direct financial benefit is is impact fees.   Can you give

8   me an understanding of what you believe a direct financial

9   benefit is?

10         A.   Sure.   The City of Wasco, in addition to the

11   impact fee ordinance that they adopted to be reimbursed

12   for the engineering of the subdivision, also used the sale

13   of the subdivision so that Northern California could

14   obtain a higher appraisal and obtain a loan so that

15   Northern California could also purchase the Valley Rose

16   golf course from the City of Wasco, which they were trying

17   to sell.

18         So, the City of Wasco sold two projects, the golf

19   course and the subdivision, to try to recoup some of the

20   expenses that they had put into the improvements for tract

21   5472.

22         Can I add to that?

23         Q.   Sure.

24         A.   I believe they also sold another piece of

25   property, and the tract number escapes me at this time,



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.300.1214
Facsimile: 661.322.2242

Suite 170
5001 East Commercenter Drive
Bakersfield, CA 93309
www.esquiresolutions.com

Roger McIntosh - Volume II

January 28, 2009

278

1  for a legal conclusion.

2         You can answer it if you understand it.

3         THE WITNESS:  I don't understand it.

4         BY MR. OKADIGBO:

5         Q.  One of the things that you claimed in the

6  last deposition that you believe showed that your

7  improvement plans were used is that you said the numbering

8  of the lots by DeWalt was the same as the numbering of the

9  lots in your tentative map, or Martin-McIntosh's tentative

10  map for Tract Number 5472.  What I'm asking you is, do you

11  think that the choice to number the lots in the particular

12  way that Martin-McIntosh did, do you think that that is

13  protected by the copyright laws?

14         A.  The numbering system is mandated by city

15  policy or city ordinance.  If any engineer wants to

16  renumber a tract differently than the first tract, and it

17  falls within the ordinance or policy of the city, then

18  that's acceptable.  In this case, that wasn't done.  It

19  was copied exactly the same way.

20         Q.  That doesn't answer the question, but I'll

21  move on.

22         MR. TRAVIS:  Chaka, I was going to object to it

23  again anyway, so...

24         BY MR. OKADIGBO:

25         Q.  Do you have any idea whether the construction



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.300.1214
Facsimile: 661.322.2242

Suite 170
5001 East Commercenter Drive
Bakersfield, CA 93309
www.esquiresolutions.com

Roger McIntosh - Volume II                    January 28, 2009

279

1  of the improvements for the Valley Rose Estates

2  subdivision conforms to the specifications in your

3  improvement plans?  When I say "your", I mean

4  Martin-McIntosh's improvement plans.

5           A.   Yes.

6           Q.   Yes, they do, or you have an idea?

7           A.   Both.

8           Q.   Okay.  Okay.

9           MR. HASSING:  Can I follow up, just one question?

10          MR. OKADIGBO:  Sure.

11                    ---oOo---

12                  EXAMINATION

13          BY MR. HASSING:

14          Q.   What do you base that answer on?

15          A.   The fact they were constructed in accordance

16  with my plans, and from a physical observation of the

17  improvements, the walls are the same, the planting

18  material is the same, the landscaping's the same, the curb

19  and gutter design's the same, the lots are the same, the

20  numbering system's the same, the utilities are the same,

21  the street lights are the same.  They all meet the

22  requirements of my improvement plans.

23          Q.   How do you know the sewer's the same?

24          A.   Because we did an as-built and copyrighted

25  the as-builts when it was built.



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.300.1214
Facsimile: 661.322.2242

Suite 170
5001 East Commercenter Drive
Bakersfield, CA 93309
www.esquiresolutions.com

Roger McIntosh - Volume II

January 28, 2009

282

1   Number 5472 and the improvement plans for the Valley Rose

2   Estates subdivision that Martin-McIntosh prepared?

3        A.   That was my direction, and it's my

4   understanding, yes.

5        Q.   Okay.   Okay, I'm trying to get an

6   understanding of the range of activities that you believe

7   the City has engaged in that is the reason for you suing

8   the City.   So far I understand that you're claiming that

9   the City provided copies of your tentative map for Tract

10  Number 5472 and the improvement plans to DeWalt, or

11  Northern California Universal Enterprises, or Mr. Wu, or

12  Lotus Developments.

13        I also understand, as we've gone through now,

14  your claim about the City of Wasco controlling the

15  development of the Valley Rose Estates subdivision.

16        Is there anything else that you are claiming the

17  City of Wasco did that is the reason for you suing the

18  City of Wasco?

19        A.   They collected the impact fees, specifically

20  to pay for engineering.   And I filed a claim with the City

21  when they adopted that ordinance, you probably have a copy

22  of it, and the claim was rejected.

23        Q.   Okay.   So, to understand what you're saying,

24  you're saying that what you stated in the claim is also

25  the range of things you're claiming the City did, --



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.300.1214
Facsimile: 661.322.2242

Suite 170
5001 East Commercenter Drive
Bakersfield, CA 93309
www.esquiresolutions.com

Roger McIntosh - Volume II

January 28, 2009

285

1        A.   No.

2        Q.   Okay.

3        A.   The way I understood the question was that

4    instead of asking me if that contributed to contributory

5    infringement, you asked if that was the claim that I

6    was -- that was in my claim.  That was -- that was

7    everything in my claim.

8        Q.   Okay.

9        A.   So, are you looking for what is contributory

10   infringement?

11        MR. TRAVIS:   Roger, just let him ask the

12   question.

13        MR. OKADIGBO:   Yeah.

14        THE WITNESS:   Ask the same question.

15        BY MR. OKADIGBO:   Yeah, no problem.  I was trying

16   to simplify as much as possible.

17        Q.   I'm trying to get a picture of the entire set

18   of things that you believe the City has done that equals

19   infringement and/or contributory infringement.  So far I

20   understand that you are saying that the City distributed

21   copies of the Martin-McIntosh improvement plans and the

22   tentative map for 5472 to Northern California Universal

23   Enterprises, or Joe Wu, or DeWalt Corporation.  So, I

24   understand that's one piece of the puzzle.

25        The other is your testimony about controlling the



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.300.1214
Facsimile: 661.322.2242

Suite 170
5001 East Commercenter Drive
Bakersfield, CA 93309
www.esquiresolutions.com

Roger McIntosh - Volume II

January 28, 2009

298

1     BY MR. OKADIGBO:   -- by not going through each

2  and every request.

3         Q.   So, the question I'm going to ask you is, as

4  far as you know, you have produced all documents

5  responsive to each request for production of documents

6  that the City has propounded?

7         A.   Yes.

8         Q.   Okay.

9         MR. HASSING:   That was a pretty good shortcut.

10        BY MR. OKADIGBO:   Yeah.

11        Q.   Are you contending that Northern California

12  Universal Enterprises Company submitted as-built plans to

13  the City for Tract Number 6451?

14        A.   I don't know if they did or not.

15        Q.   Is it your understanding that impact fees are

16  profits?

17        MR. TRAVIS:   I'm going to object, that calls for

18  a legal conclusion.

19        To the best of your understanding, you can answer

20  it.

21        THE WITNESS:   No.   That would be a legal, because

22  it wouldn't meet the nexus test.

23        MR. OKADIGBO:   Okay.

24        Do you have questions?

25        MR. HASSING:   Yeah, I just have just a few, and



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.300.1214
Facsimile: 661.322.2242

Suite 170
5001 East Commercenter Drive
Bakersfield, CA 93309
www.esquiresolutions.com

Roger McIntosh - Volume II

January 28, 2009

299

1    just to clarify a couple of things.

2                    ---oOo---

3                    EXAMINATION

4         BY MR. HASSING:

5         Q.   Do you know of any facts that would support a

6    contention that Northern copied any improvement plans that

7    were drafted by Martin-McIntosh?

8         A.   I don't know.

9         Q.   You don't know if you know of any facts?

10        A.   I don't know of any facts.

11        Q.   All right.

12        Could you read that question back?

13        (Record read as follows:

14             "Question:   Do you know of any facts that

15        would support a contention that Northern copied

16        any improvement plans that were drafted by

17        Martin-McIntosh?")

18        BY MR. HASSING:

19        Q.   And your answer is no?

20        A.   The answer is, I don't know.

21        MR. HASSING:   Read the question back again,

22    please.

23        (Record read as follows:

24             "Question:   Do you know of any facts that

25        would support a contention that Northern copied



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.300.1214
Facsimile: 661.322.2242

Suite 170
5001 East Commercenter Drive
Bakersfield, CA 93309
www.esquiresolutions.com

Roger McIntosh - Volume II

January 28, 2009

300

1    any improvement plans that were drafted by

2    Martin-McIntosh?")

3    BY MR. HASSING:

4    Q.  Do you know of any facts that would support

5  that contention?

6    A.  No.

7    Q.  Do you know of any facts that would support a

8  contention that Joe Wu copied any improvement plans

9  drafted by Martin-McIntosh?

10   A.  He personally?

11   Q.  Yes, sir.

12   A.  No.

13   Q.  Do you know of any facts that would support a

14  contention that any agent of Northern California Universal

15  copied any improvement plans drafted by Martin-McIntosh?

16   A.  Only the -- the fact that Northern

17  California's contractor called me and had questions about

18  my plans, --

19   Q.  All right.

20   A.  -- and I don't know where he got them from.

21   Q.  Okay, and which contractor was that?

22   A.  He was working on the lift station.

23   Q.  All right.  Do you know of any facts that

24  would support a contention that DeWalt Engineering copied

25  any improvement plans prepared by Martin-McIntosh?



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.300.1214
Facsimile: 661.322.2242

Suite 170
5001 East Commercenter Drive
Bakersfield, CA 93309
www.esquiresolutions.com

Roger McIntosh - Volume II

January 28, 2009

302

1    that distinction to me. Do you recall that?

2         A.  No.

3         Q.  All right. Do you understand that there is a

4    distinction between a tentative map and improvement plans?

5         A.  Yes, I do.

6         Q.  All right. And what I'm asking you about

7    right now are the improvement plans. Do you understand

8    that?

9         A.  Okay, I do now.

10        Q.  All right. And by improvement plans, I'm

11   talking about the plans for the streets, the sewer, the

12   water, the landscaping, those kind of things, which are

13   separate and apart from the tentative subdivision map

14   5472, all right?

15        A.  Okay.

16        Q.  Given that, do you know of any facts that

17   would support a contention that DeWalt copied improvement

18   plans prepared by Martin-McIntosh?

19        A.  I didn't sit in on all of the deposition, but

20   it's my understanding that they relied on those plans.

21        Q.  Sir, again, you're talking about reliance and

22   I'm talking about copying, and I'm specifically talking

23   about copying.

24        A.  Physically copying?

25        Q.  I don't know how else you'd copy it if it



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.300.1214
Facsimile: 661.322.2242

Suite 170
5001 East Commercenter Drive
Bakersfield, CA 93309
www.esquiresolutions.com

Roger McIntosh - Volume II

January 28, 2009

303

1   wasn't physically.

2        A.   Okay.   No, I don't.

3        Q.   All right.   Getting back to this

4   subcontractor that you talked to about the plans for the

5   pump station, did the contractor tell you anything that

6   caused you to believe that Joe Wu, Northern, or Lotus

7   copied the improvement plans for the pump station?

8        A.   He indicated to me that he had been hired by

9   the developer to get the lift station up and running.

10       Q.   Okay.   And based on that conversation, did

11  you come to the conclusion that any of my clients had

12  copied the improvement plans for the pump station?

13       A.   I -- I -- yes, I came to that conclusion.

14       Q.   All right.   And was that conclusion based on

15  anything other than what you have just explained to us?

16       A.   No.

17       Q.   All right.   Did you ever learn of any other

18  facts, other than what you've testified to, that cause you

19  to believe that any of my clients copied the plans to the

20  pump station?

21       A.   You're only talking about the pump station

22  now?

23       Q.   Yes, sir.

24       A.   No.

25       Q.   All right.   Now, separate and apart from the



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.300.1214
Facsimile: 661.322.2242

Suite 170
5001 East Commercenter Drive
Bakersfield, CA 93309
www.esquiresolutions.com

Roger McIntosh - Volume II

January 28, 2009

304

1    plans for the pump station, do you know of any facts that

2    have caused you to believe that my client, or any of my

3    clients in this case, have copied any plans, any

4    improvement plans, prepared by Martin-McIntosh?

5           A.   Physically copy them?

6           Q.   Yes, sir.

7           A.   No.

8           Q.   Do you know of any facts that would support a

9    contention that any of my clients copied tentative

10   subdivision map 5472?  And my clients are Northern

11   California Universal Enterprises, Lotus Developments.

12          A.   No.

13          Q.   And Northern operates through agents, which

14   would include Joe Wu and Jess Marimala.  Do you know of

15   any facts that would support a contention that Jess

16   Marimala or Joe Wu copied tentative subdivision map 5472?

17          A.   No.

18          MR. TRAVIS:  And to be clear, Steve, we're

19   talking about physically copying, right?

20          MR. HASSING:  Well, --

21          MR. TRAVIS:  Like taking it and putting it into a

22   photocopy machine?  I just want to be clear.

23          BY MR. HASSING:

24          Q.   That's what I'm talking about, and I want to

25   ask Mr. McIntosh if you know of any other way to copy a



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.300.1214
Facsimile: 661.322.2242

Suite 170
5001 East Commercenter Drive
Bakersfield, CA 93309
www.esquiresolutions.com

Roger McIntosh - Volume II

January 28, 2009

305

1    plan or a map other than by physically copying it?  Am I

2    missing something?  Is there another way?

3              A.    You can scan it.

4              Q.    Okay.  All right.

5              A.    Put it into electronic format.

6              Q.    Okay.

7              A.    Use it in that format.

8              MR. OKADIGBO:  May I interject for a second?

9              THE WITNESS:  You can ask other people to do it

10   for you.  You can ask the City of Wasco to do it for you,

11   for your benefit and your behalf.  You can hire an

12   engineer to have them do it, giving them direction to do

13   it.  I have -- so, yeah, there's a number of different

14   ways.

15             MR. HASSING:  All right, let's cover those.

16             You got something?

17             MR. OKADIGBO:  Yeah, I was just going to say that

18   there could be copying in the photocopying sense, there

19   could be copying in the duplicating, you know, like

20   someone looks at the map and then draws the same thing

21   since, so maybe that's what they're getting at, I don't

22   know.

23             BY MR. HASSING:  All right.

24             Q.    Well, let me ask this question then.  Do you

25   know of any facts that would support a contention that



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.300.1214
Facsimile: 661.322.2242

Suite 170
5001 East Commercenter Drive
Bakersfield, CA 93309
www.esquiresolutions.com

Roger McIntosh - Volume II

January 28, 2009

306

1  Northern, Lotus, Joe Wu, Jess Marimala, scanned or in any

2  other way electronically copied any improvement plans or

3  the tentative map 5472?  And when I say improvement plans,

4  I mean drawn by Martin-McIntosh.

5          THE WITNESS:  Did we ever get the sales brochure?

6          MR. TRAVIS:  Just what you know, Roger.

7          THE WITNESS:  Okay.

8          Electronically or physically?

9          BY MR. HASSING:

10          Q.  Or scanning.

11          A.  Does that include looking at a document and

12  copying it to something else?

13          Q.  Yes, sir.

14          A.  Yes.

15          Q.  And I'm talking about Joe, Jess, Northern,

16  and Lotus.

17          A.  Oh, no.

18          Q.  And the answer is no, right?

19          A.  That's correct.

20          Q.  All right.  Let's then talk about DeWalt.  Do

21  you have any facts that would support a contention that

22  DeWalt electronically copied any improvement plans drafted

23  by Martin-McIntosh?

24          A.  Improvement plans only?

25          Q.  Improvement plans only.



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.300.1214
Facsimile: 661.322.2242

Suite 170
5001 East Commercenter Drive
Bakersfield, CA 93309
www.esquiresolutions.com

Roger McIntosh - Volume II

January 28, 2009

307

1   A.   I don't know.

2   Q.   Well, do you know of any facts?  That's a yes

3   or no, sir.

4   A.   No.

5   Q.   How about with regard to scanning, do you

6   know of any facts that would support a contention that

7   DeWalt scanned any improvement plans drafted by

8   Martin-McIntosh?

9   A.   No.

10   Q.   Do you know of any facts that would support a

11   contention that DeWalt Engineering copied any improvement

12   plans prepared by Martin-McIntosh by looking at the

13   Martin-McIntosh improvements and then drawing out similar

14   improvements?

15   A.   Yes.

16   Q.   Okay, and what are those facts?

17   A.   The tentative map.

18   Q.   And what about the tentative map causes you

19   to believe that DeWalt copied improvement plans?

20   A.   It's substantially similar, and they had to

21   match the improvement plans in order to be able to use the

22   improvement plans for the benefit of the subdivision, of

23   the final map.

24   Q.   Okay.  Do you know of any other facts that

25   would support that contention?



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.300.1214
Facsimile: 661.322.2242

Suite 170
5001 East Commercenter Drive
Bakersfield, CA 93309
www.esquiresolutions.com

Roger McIntosh - Volume II

January 28, 2009

308

1      A.   No.

2      Q.   Do you have knowledge of any facts that would

3  support a contention that any of my clients asked or

4  encouraged anybody else, other than DeWalt, to copy

5  Martin-McIntosh improvement plans, and I mean copy in any

6  form whatsoever?

7      A.   The -- the conversation that -- yes.

8      Q.   Okay, and what are those facts?

9      A.   The conversation I had with the city employee

10  where I requested to review the improvement plans for

11  tract 6451 and he couldn't find them and he realized that

12  your client had used my improvement plans for 5472.

13     Q.   And when you say "used" your plans, are you

14  saying that that employee gave you information about the

15  copying of the improvement plans, as opposed to the using

16  of the improvement plans?

17     A.   No.

18     Q.   Before you authorized an attorney to file

19  this lawsuit, did you perform any calculations to

20  determine whether or not Martin-McIntosh had ever been

21  paid in full for the work they did in preparing the

22  tentative map 5472?

23     A.   Yes.

24     Q.   And what calculations did you perform?

25     A.   They were given to you at my last deposition.



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.300.1214
Facsimile: 661.322.2242

Suite 170
5001 East Commercenter Drive
Bakersfield, CA 93309
www.esquiresolutions.com

Roger McIntosh - Volume II

January 28, 2009

310

1    had been paid for preparing the improvement plans for 5472

2    prior to this lawsuit being filed?

3          A.   Yes.

4          Q.   And again, what was done in that regard?

5          A.   The same thing as on the tentative map.

6          Q.   And did you determine then that neither the

7    work in preparing the tentative map, nor the work in

8    preparing the improvement plans, had been fully paid for?

9          A.   I believe it's in the summary.

10         Q.   Is that what you concluded?

11         A.   Yes.

12         Q.   You indicated on prior questioning today that

13   Martin-McIntosh prepared a revised 5472 tentative map,

14   correct?

15         A.   Correct.

16         Q.   And you also indicated that prior to

17   preparing the revised 5472, that Martin-McIntosh had

18   prepared an original 5472, correct?

19         A.   I'm assuming that, since the revised one was

20   a revised map.

21         Q.   And was your answer based strictly on that

22   assumption?

23         A.   Yes.

24         Q.   Mr. Wu, according to you, contacted you at

25   some point and asked if he could use your plans to obtain



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.300.1214
Facsimile: 661.322.2242

Suite 170
5001 East Commercenter Drive
Bakersfield, CA 93309
www.esquiresolutions.com

Roger McIntosh - Volume II

January 28, 2009

311

1     a final map; is that correct?

2          A.   He contacted me to ask if I would reprocess

3     his tentative map, or a tentative map, and -- and -- and

4     prepare a final map, because he was purchasing the

5     property from the City of Wasco.

6          Q.   And you told him that you would do it if he

7     would pay you what was left owing for work done on that

8     subdivision?

9          A.   That's correct.

10         Q.   But as I recall, you didn't give him a dollar

11    figure; is that correct?

12         A.   I gave him a ballpark figure.

13         Q.   And what was the ballpark figure?

14         A.   I don't recall.

15         Q.   Was it more than 300,000 or less than

16    300,000?

17         A.   I believe with interest, it was more around

18    800,000.

19         Q.   Okay.  All right.  Did you know at the time

20    you gave him that figure that you had a copyright interest

21    in the improvement plans and the tentative map?

22         A.   Yes.

23         Q.   Did you know at that time that if he went

24    forward and had somebody else prepare a tentative map

25    substantially similar to yours that he would be infringing



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.300.1214
Facsimile: 661.322.2242

Suite 170
5001 East Commercenter Drive
Bakersfield, CA 93309
www.esquiresolutions.com

# EXHIBIT H   Okadigbo Dec

Certified Copy

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA

ROGER McINTOSH,

Plaintiff,

vs.

NORTHERN CALIFORNIA UNIVERSAL
ENTERPRISES COMPANY, ET AL.,

Defendants.

~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~

Case No.
107CV-01080-
LJO-WMW

**DEPOSITION OF**

**KEITH WOODCOCK**

January 29, 2009
1:40 p.m.

Suite 170, 5001 East Commercenter
Bakersfield, California

Brian S. Cardoza, CSR No. 8362



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.300.1214
Facsimile: 661.322.2242

Suite 170
5001 East Commercenter Drive
Bakersfield, CA 93309
www.esquiresolutions.com

Keith Woodcock                                    January 29, 2009

11

1   agreement for map 6451, correct?  I don't mean you have

2   memorized it, but you were a --

3          A.   Right, I'm familiar -- right, that's correct.

4          Q.   Okay.  You're familiar with it?

5          A.   Yes.

6          Q.   And you worked with it?

7          A.   Yes.

8          Q.   Okay.  The subdivision agreement for 6451,

9   was that an agreement that had to be drafted by the city

10  attorney, or was there a form that you used, or somebody

11  within your department used, to create that document and

12  then have it reviewed by the city attorney?

13         A.   We had what I would call like a boilerplate

14  that -- that we would use as far as the format of -- of

15  the structure of that agreement.  As we filled in the

16  various pieces, like from public works, engineering, my

17  statements of whether it conformed or not, etcetera,

18  were -- were in that, and then -- then we would submit

19  that to the city attorney and he would review on that.

20         Q.   Okay.  In preparing that subdivision

21  agreement, did you include a requirement for a maintenance

22  bond?

23         A.   That -- I don't recall specifically a bond,

24  but I do recall that -- that all improvements needed to be

25  warranted for -- for 24 months.



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.300.1214
Facsimile: 661.322.2242

Suite 170
5001 East Commercenter Drive
Bakersfield, CA 93309
www.esquiresolutions.com

Keith Woodcock                                    January 29, 2009

13

1          Q.    Okay.   And do you recall what process you

2     undertook to determine what those improvements were?

3          A.    The -- I -- I -- I need to defer to the

4     public works and then the -- and the city engineer on --

5     on how they costed items out.   But as far as -- as

6     inspection for improvements, that it was that each -- each

7     aspect of the improvement that would be within the public

8     right-of-way.   Value of streets, of fire hydrants, sewer

9     lines, water lines, etcetera, would each have a cost that

10    would come up with a -- with a total, and then -- and then

11    typically that -- that the developer would have to -- to

12    bond for a certain percent of that.

13         Q.    Okay.   Is it also customary, in approving a

14    final tentative subdivision map, that the developer bond

15    the amount, or a percentage of the amount, of the

16    infrastructure improvements?

17         A.    Yes.

18         Q.    And with regard to 6451, was there a

19    requirement that Northern bond the subdivision

20    infrastructure improvements?

21         A.    No.

22         Q.    Well, why is that?

23         A.    That the infrastructure had already been

24    completed, and at the time of the prior -- I forget the

25    number that -- that -- that you referred to -- the prior



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.300.1214
Facsimile: 661.322.2242

Suite 170
5001 East Commercenter Drive
Bakersfield, CA 93309
www.esquiresolutions.com

Keith Woodcock                                    January 29, 2009

14

1    tentative map and the infrastructure was -- was in place,

2    and so that when this -- the newer tentative map came up,

3    that since that the improvements were already in and had

4    been inspected and conformed to the -- the improvement

5    plans, that no bonding was required because that they were

6    already in.

7           Q.   All right.  So, what I hear you telling me

8    then, if I understand you correctly, is that Northern was

9    not required to bond the infrastructure improvements

10   because it was not required to build any infrastructure

11   improvements; is that correct?

12          A.   That's correct.

13          Q.   In the subdivision agreement, though, I think

14   I remember some language in there that indicated that as

15   part of that agreement, that Northern would construct

16   improvements.  Do you recall anything like that in the

17   subdivision agreement?

18          A.   Yes.

19          Q.   Well, why would that have been in there if

20   those improvements were already in place and the City

21   wasn't requiring Northern to build any?

22          A.   I -- I don't recall all the specifics, but

23   that I think the City wanted a list of what to place in

24   the record of what improvements needed to be warranted for

25   the 24-month period, and -- and that because later on in



Toll Free: 800.300.1214
Facsimile: 661.322.2242

Suite 170
5001 East Commercenter Drive
Bakersfield, CA 93309
www.esquiresolutions.com

ESQUIRE
an Alexander Gallo Company

Keith Woodcock                                                    January 29, 2009

15

1    that subdivision agreement, for costing out those figures,

2    that -- that no -- no value was -- was placed as far as

3    what needed to be bonded.

4             Q.   Okay.  So, in the subdivision agreement

5    there's someplace in there where you list certain values?

6             A.   Yes.

7             Q.   And you're telling me then that in that

8    subdivision agreement, in the place where you would have

9    had a number for the improvements, there was no number

10   inserted in that agreement?

11            A.   That's correct.

12            Q.   And that's because those improvements were

13   already completed?

14            A.   That's correct.

15            Q.   Did you, or anybody working under you, ever

16   actually use the old improvement plans for any purpose in

17   conjunction with 6451?

18            A.   Not within planning, no.

19            Q.   Okay.

20            I think that's all I have, Jeff.  Do you have any

21   questions or should we send him home?

22            MR. TRAVIS:  No, I have a few.  Just a few, not

23   too many.

24   ///

25   ///



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.300.1214
Facsimile: 661.322.2242

Suite 170
5001 East Commercenter Drive
Bakersfield, CA 93309
www.esquiresolutions.com

Keith Woodcock                                    January 29, 2009

17

1          A.   Right.   Right.

2          Q.   -- and unless your attorney instructs you not

3     to answer, then you can go ahead and answer if you

4     understand that question?

5          A.   Correct.   Right.

6          Q.   Okay.   So, did you understand that question?

7          A.   If you could repeat it, please.

8          Q.   Yeah, you bet.   I had heard you were talking

9     about the tentative map 6451, --

10         A.   Yes.

11         Q.   -- and you said, and I quoted you here, that

12    it was "based on improvement plans"?

13         A.   Yes.

14         Q.   When you said, "based on improvement plans",

15    what were you referring to tentative map 6451?

16         A.   When that the improvements were -- were in

17    place for the earlier tentative map, that there -- it's my

18    understanding that there were stub outs provided to where

19    the various lots would be located, and so that without

20    tearing up the roads and -- and redoing the sewer, that

21    those stub outs dictated where the building sites would

22    be.

23         Q.   And explain what stub outs are for the

24    layperson here?

25         A.   That you have a -- a -- a -- your -- your



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.300.1214
Facsimile: 661.322.2242

Suite 170
5001 East Commercenter Drive
Bakersfield, CA 93309
www.esquiresolutions.com

Keith Woodcock                                    January 29, 2009

18

1    main line, and this would be -- the stub out is where a

2    residential lot would connect to that main line.

3            Q.  So, when you said it was dictated, -- maybe

4    you could read back when he mentioned something about

5    dictating.

6            (Record read as follows:

7                "Answer:  When that the improvements were --

8                were in place for the earlier tentative map, that

9                there -- it's my understanding that there were

10               stub outs provided to where the various lots

11               would be located, and so that without tearing up

12               the roads and -- and redoing the sewer, that

13               those stub outs dictated where the building sites

14               would be.")

15           BY MR. TRAVIS:   Okay.

16           Q.   In previous depositions we had talked to

17   Dennis McNamara, we had talked to DeWalt Engineering, Greg

18   Black, and we had looked at tentative map number 6451.

19   And on that tentative map there's a note section.  Are you

20   familiar with the note section?

21           A.   There -- there are various notes that are

22   placed on a map.  Which one are you -- do you refer to?

23           Q.   Well, on that note section it mentioned

24   "associative improvement plans".

25           A.   Yes.



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.300.1214
Facsimile: 661.322.2242

Suite 170
5001 East Commercenter Drive
Bakersfield, CA 93309
www.esquiresolutions.com

Keith Woodcock                                          January 29, 2009

                                22

1          A.   That's correct.

2          Q.   Well, first of all, why would there be a

3    bonding estimate in this particular case if it was not

4    needed?

5          A.   As -- as I recall, that this -- this document

6    that -- that -- of the bonding estimate, was submitted to

7    Northern California.  That Northern California stated back

8    that they did not need to -- they -- they were questioning

9    the need for -- for bonding because the improvements had

10   already been in place.  That, to my recollection, caused

11   both the city engineer and public works to review the

12   files and determine that -- that no bonding then was

13   necessary because the improvements had been constructed in

14   accordance with the -- with the -- in -- in accordance

15   with the -- with the improvement plans of the -- of the

16   prior tentative map, and, therefore, for this new

17   tentative map, did not require the bonding for -- for

18   those improvements.

19         Q.   And can you read, what is the total bonding

20   estimate that in this case was -- and I can't --

21         A.   It says, "Total Bonding Cost $1,924,633".

22         Q.   I see.  So, because the improvements were

23   already in place, that was a cost that Northern California

24   didn't need to provide to the City of Wasco; is that

25   right?



Toll Free: 800.300.1214
Facsimile: 661.322.2242

Suite 170
5001 East Commercenter Drive
Bakersfield, CA 93309
www.esquiresolutions.com

26

1        Q.    Okay.    And to your understanding, the

2    improvements as they were currently in, would not have

3    supported that design?

4        A.    That's correct.

5        Q.    And you are an engineer, correct?

6        A.    No, I'm not.

7        Q.    You're not?

8        A.    No.

9        Q.    What is your background?

10        A.    City and regional planning.    I have a

11    Master's in city and regional planning from Fresno State,

12    and approximately 25 years of -- of planning experience.

13        Q.    And, you know, throughout those 25 years as a

14    planner, --

15        A.    Yes.

16        Q.    -- it was possible that you could have

17    redesigned the subdivision to the configuration with the

18    more upscale housing?

19        A.    We don't do the -- you know, don't do the

20    development for the developer, but it -- it -- it's the

21    developer that would need to -- to submit the plans as to

22    his concept.

23        Q.    You're essentially beholding to the developer

24    to do the design?

25        A.    And then we review and comment on that.



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.300.1214
Facsimile: 661.322.2242

Suite 170
5001 East Commercenter Drive
Bakersfield, CA 93309
www.esquiresolutions.com

30

1   where -- where the improvements were to -- to attack the

2   problem.

3          BY MR. TRAVIS:

4          Q.   Well, let me ask this.  Would there be any

5   other documents that would inform anyone of what is under

6   the ground?

7          A.   Not to my knowledge.

8          MR. HASSING:  If you think you could get by

9   without that estimate, I'd like to mark it as an exhibit.

10         MR. TRAVIS:  Yeah.

11         MR. HASSING:  Okay?

12         MR. TRAVIS:  Yeah, go ahead.

13         MR. HASSING:  Let's mark this as Exhibit Number

14   1.

15         (Defendants' Exhibit 1 was marked for

16         identification by the court reporter.)

17         MR. HASSING:  I have no further questions.

18   How about you?

19         MR. OKADIGBO:  Yeah, I'm going to follow up.

20                   ---oOo---

21                   EXAMINATION

22         BY MR. OKADIGBO:

23         Q.   Mr. Hassing was asking you earlier about the

24   subdivision agreement for tract 6451?

25         A.   Yes.



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.300.1214
Facsimile: 661.322.2242

Suite 170
5001 East Commercenter Drive
Bakersfield, CA 93309
www.esquiresolutions.com

Keith Woodcock                                    January 29, 2009

31

1        Q.   I have a copy of that agreement, and I just

2   want to go through it so that we have a connection between

3   you looking at the agreement and the testimony that you've

4   already given Mr. Hassing.  I'd like to direct your

5   attention to paragraph seven, which says, "Improvement

6   Security".

7        A.   Yes.

8        Q.   If I'm correct in understanding your prior

9   testimony, you said that improvements were in and that

10  ordinarily, if improvements were not in, if the developer

11  still had to construct them, then essentially the items

12  listed in 7(b) of this agreement would have to be done; is

13  that correct?

14       A.   That's correct.

15       Q.   Okay, and in this case, can you describe what

16  paragraph seven, entitled "Improvement Security", relates

17  to and --

18       A.   Okay.

19       Q.   -- how it relates to what was actually done?

20       A.   I've got to put on -- I've got to put on my

21  stronger glasses.

22       Q.   Okay.  And could you first describe what

23  paragraph seven refers to and what it's bearing on this

24  particular case, 6451?

25       A.   Okay.  Well, paragraph seven refers to



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.300.1214
Facsimile: 661.322.2242

Suite 170
5001 East Commercenter Drive
Bakersfield, CA 93309
www.esquiresolutions.com

32

1    "Improvement Security", and that the -- the -- there are

2    -- there are two paragraphs.  Paragraph (a) says that --

3    that you need security prior -- "shall be filed with the

4    City prior to certification of the final map by the City

5    Engineer."  It talks about the -- the -- the bond, a

6    deposit, or irrevocable instrument of credit to secure

7    the -- the improvement.  And that -- that -- it says

8    that -- that the -- the use of the bond is for work that

9    it would be occurring within the public rights-of-way.

10           And paragraph (b) lists one, two, three, four,

11   five, six -- six items, ranging from "Site Preparation" to

12   "Utilities", and that the city engineer then is to provide

13   a cost of -- the city engineer's cost estimate for -- for

14   each of those items, plus a contingency, to come up with a

15   total that -- that would -- that would need to be bonded

16   for.

17           And -- and in this case, that -- that there --

18   there is no value placed in that because that -- that --

19   based on, to my recollection, the discussions that since

20   the improvements were already in, that -- that the --

21   there was no -- there was no need to provide instrument

22   security because those -- those were already in place.

23           Q.   Okay.  Now, I'm going to direct your

24   attention to paragraph one, which is entitled,

25   "Improvements to Be Constructed".



Toll Free: 800.300.1214
Facsimile: 661.322.2242

Suite 170
5001 East Commercenter Drive
Bakersfield, CA 93309
www.esquiresolutions.com

Keith Woodcock                                    January 29, 2009

33

1      A.   Yes.

2      Q.   And there's a list of items listed there?

3      A.   Yes.

4      Q.   Since it's your testimony that improvements

5   were already put in, can you describe what improvements,

6   if any, were actually required from Northern?

7      A.   Yeah, as I previously stated, that this

8   document is -- is a -- a -- a boilerplate and it spells

9   out -- like it doesn't -- it's not particular to the -- to

10  the map in question, because that -- that -- like (a), it

11  says, "Subdivider shall grade, pave, construct and improve

12  all of the Streets, Alleys, Easements and Pedestrian Ways

13  dedicated to the City."  It doesn't go and name those

14  streets, it's generic -- it's meant to be generic in

15  nature on that.  "Shall install a Water Distribution

16  System".

17      So, -- so, these -- these "Improvements to Be

18  Constructed" are those that the City believes are -- are

19  important to support that subdivision, and -- and in this

20  case, that -- that looking at -- to that paragraph seven,

21  that's where the comparison would be, that -- that you'd

22  look at and say, okay, what's -- what's the value of the

23  streets, etcetera, and since that they were already in,

24  that -- that no -- no need was -- there was not a need

25  for -- for bonding.



Toll Free: 800.300.1214
Facsimile: 661.322.2242

Suite 170
5001 East Commercenter Drive
Bakersfield, CA 93309
www.esquiresolutions.com

# EXHIBIT I

**Okadigbo Dec**

1           UNITED STATES DISTRICT COURT

2      EASTERN DISTRICT OF CALIFORNIA, FRESNO DIVISION

3                     _____

4

5   ROGER McINTOSH,              No. 107CV 01080 LJO-WMW

6                   Plaintiff,

7   vs.

8   NORTHERN CALIFORNIA UNIVERSAL
    ENTERPRISES COMPANY, et al,
9
                    Defendants.
10  _____

11

12             DEPOSITION OF JOE WU
                     Vol. I
13
                    Taken at
14
                 Borton Petrini
15             1600 Truxtun Avenue
               Bakersfield, California
16

17      Tuesday, October 28, 2008 at 10:00 A.M.

18

19               Reported by:

20        Naomi S. Chavez, CSR #13007

21

22

23

24

25

                                                    1

```
 1                          JOE WU,
 2    having been sworn, testified as follows:
 3                    EXAMINATION BY MR. BRAZE
 4          (Prior to the commencement of the deposition,
 5            Plaintiff's Exhibit No. 1 was marked.)
 6       Q.   Could you state your full name, please.
 7       A.   ·J-o-e W-u, Joe Wu.
 8       Q.   Joe?
 9       A.   J-o-e.
10       Q.   And what is your residence address, Mr. Wu?
11       A.   Excuse me, my address?
12       Q.   Yeah.
13       A.   Company address is 2099 Fortune Drive,
14    San José, 95131.
15       Q.   And your date of birth?
16       A.   October 30, 1948.
17       Q.   Happy birthday if we don't see you before
18    October 30th.
19       A.   Thank you.
20       Q.   What do you do for a living, Mr. Wu?
21       A.   I'm a contractor.  Build houses and sell
22    houses.  Contractor.
23       Q.   And I say this not to be insulting, just to
24    make sure we have a clear record, do you feel
25    comfortable having your deposition in English as
```

1      A.   I believe in early 1980.

2      Q.   Now, the defendant in this case is Northern

3  California Universal Enterprises Company --

4      A.   Yes.

5      Q.   -- correct?

6      A.   Yes.   Incorporation.

7      Q.   Is that incorporated?

8      A.   Yes.

9      Q.   When was that incorporated?

10     A.   1987, I believe that time.

11     Q.   And between 1978 and 1987, how did you do

12  business?   Under what name?

13     A.   Still the same company, just sole

14  proprietorship.

15     Q.   Who were the share holders of Northern

16  California Universal Enterprises?

17     A.   Only me and my wife.

18     Q.   Can we shorten the name by calling it NCUE?

19     A.   NCUEC, yes.

20         MR. HASSING:   You can also call it Northern to

21  be easier.

22         MR. BRAZE:   All right.

23     Q.   (By Mr. Braze)   If I call it Northern, would

24  that be fine?   Would you know what I mean?

25     A.   Yes.

1    Q.    Does Northern have any employees other than

2  you and your wife?

3    A.    Yes.   We have a lot of employees.

4    Q.    Do you have employees that are licensed

5  contractors?

6    A.    No.

7    Q.    Who is the holder of your contractor's

8  license?

9    A.    My name, Joe.   Me.

10    Q.    Have you ever transferred the license to your

11  corporation?

12    A.    Yes, I do transfer it, yes.   The company is

13  still the same, just --

14    Q.    Right.

15    A.    -- change from sole proprietorship to

16  corporation.

17    Q.    The only question is have you transferred your

18  contractor's license from you, as an individual, to

19  Northern --

20    A.    Yes.

21    Q.    -- as a corporation?

22    A.    Yes.   That's correct.   We did.

23    Q.    Do you know when you did that?

24    A.    1987, around that time.

25    Q.    Now, since 1987, has Northern been involved in

1    Q.    Now, were those three subdivisions -- did you

2    start it from the ground up basically or did you come

3    in in the middle of --

4    A.    Mostly it comes from the middle.  It's the

5    previous developer that -- failure to complete it and

6    we took over the project and continued working on the

7    project.

8    Q.    So that's true as to all three of those

9    subdivisions?  Yes?

10    A.    These two are bigger.

11    Q.    The what?

12    A.    The Laura Dawn and Chateau are apartments.

13    Q.    Oh, they're apartments.

14         Have you ever had your deposition taken

15    before?

16    A.    Yes.

17    Q.    About on how many occasions?

18    A.    A few.  A few depositions.

19    Q.    I know what I mean by a few.

20         More than three?

21    A.    Yes.

22    Q.    More than five?

23    A.    Yes.

24    Q.    More than 10?

25    A.    No.

```
 1        A.    Was it Campus Vista.

 2        Q.    What was it?

 3        A.    The name is Campus.

 4        Q.    Campus?

 5        A.    Yeah.  Campus Vista.

 6        Q.    And the second word?

 7        A.    V-i-s-t-a.

 8        Q.    Campus Vista?

 9        A.    Yes.

10        Q.    And who did you take the Chowchilla --

11        A.    I believe from City of Chowchilla.

12        Q.    You took it over from the City?

13        A.    Yeah.

14        Q.    And then in Merced you had Campus Vista.

15              Who did you take that over from?

16        A.    I believe it come from a developer -- from a

17   bank.  I'm sorry.

18        Q.    Do you know which bank that was?

19        A.    I don't remember the bank.

20        Q.    And then any others in Merced or Modesto?

21        A.    Yeah.  We have a project in Modesto, but I

22   don't recall the project name.  Similar bank

23   foreclosure project.

24        Q.    And correct me if I'm wrong, it sounds like

25   the nature of your business is to take over
```

1   subdivisions that are partially completed where the

2   developer has failed to finish them and you complete

3   them.  Is that correct?

4      A.   Yes.

5      Q.   Is that the nature of your business?

6      A.   Yes.

7      MR. TRAVIS:  It's a good market for you today.

8      A.   I clean up.

9      Q.   (By Mr. Braze)  It probably would be easier to

10   ask you these things by interrogatories as opposed to

11   deposition.

12      Do you know the name of the developer you took

13   over in Laura Dawn in Sacramento?

14      A.   That's foreclosure type too.

15      Q.   From a bank?

16      A.   Yeah.

17      Q.   And the Deer Creek in Oroville, is that also

18   in foreclosure?

19      A.   From the City of Oroville.  The bank

20   foreclosure.

21      Q.   How many subdivisions did you take over from

22   cities and municipalities as opposed to taking over

23   from a bank or a developer?

24      A.   Are you asking me how many?

25      Q.   Yeah.

1            Do you have documents relating to that?

2      A.    I'm not quite understanding.

3      Q.    Have you ever seen an organization chart

4  before?

5      A.    Organization chart?  Are you talking about the

6  personnel?

7      Q.    Uh-huh.

8      A.    We don't make an organization chart.

9      Q.    Who is the president of Northern?

10     A.    Me, Joe.

11     Q.    Who is the vice president?

12     A.    I have no vice president.

13     Q.    No vice president?

14     A.    I cover everything.

15     Q.    Who is the secretary or secretary/treasurer?

16     A.    That's my wife, Gloria.

17     Q.    Is she the secretary and secretary/treasurer?

18     A.    Yes.

19     Q.    When is the last time the corporation had a

20  meeting of the board of directors?

21     A.    We started in 1987 the corporation and we meet

22  every six months.

23     Q.    Do you have any directors of the corporation?

24     A.    Directors of the corporation?

25     Q.    Do you have anyone that sits on the board of

1   directors other than you and your wife?

2       A.   No.

3       Q.   And who is the -- I'll call it the chief

4   operations officer.

5            Who is the guy that's in charge of daily

6   operations?

7       A.   That's Joe, me.

8       Q.   Do you have an assistant?

9       A.   No.

10      Q.   Do you have an accounting department?

11      A.   Yes.

12      Q.   Who is the head of your accounting department?

13      A.   My wife.

14      Q.   She takes care of both accounts receivable and

15  accounts payable?

16      A.   Yes.

17      Q.   Do you have any employees other than you and

18  your wife?

19      A.   Yes.

20      Q.   And what types of employees are those?

21      A.   We have an in-house accountant and also have

22  construction crew.

23      Q.   Do you have construction superintendents?

24      A.   Yes.

25      Q.   And do you have construction foremen?

```
 1   engineer in Bakersfield -- excuse me.  Not just in
 2   Bakersfield.  Any other engineers that you hired --
 3       A.   Soil.
 4       Q.   Let me finish my question, otherwise the court
 5   reporter's eyes are going to cross.  If you wait, it
 6   makes her happy and it makes a clear record.
 7            So you hired a soil engineer, correct?
 8       A.   Yes.
 9       Q.   You hired a civil engineer, which was Dewalt.
10            You hired a soil engineer which was who?
11       A.   See's, S-e-e, apostrophe, s Consulting.
12       Q.   Any other consultants that you hired in the
13   area to work on the Valley Rose subdivision?
14       A.   That's all I know.
15       Q.   Did you hire any architects?
16       A.   No.
17       Q.   What did Dewalt engineering do you for you?
18       A.   Basically a civil engineer to process the map.
19       Q.   They were going to process the map?
20       A.   Yes.
21       Q.   And what did you understand that to mean?
22       A.   The map is going to be processed, a tentative
23   map, so we can build houses.
24       Q.   Do you know if Dewalt prepared drawings?
25       A.   Yes.
```

1      Q.    What kind of drawings did Dewalt prepare?

2      A.    Tentative map and a final map.

3      Q.    And did you have those maps approved by

4   anybody?

5      A.    Yes.  We finally got approved by the City

6   Planning Commission and the final by City Council.

7      Q.    Did you ever look at any of the maps or

8   drawings on file at the City of Wasco?

9      A.    No.

10     Q.    Do you know if Dewalt did?

11     A.    Say it again.

12     Q.    Do you know if Dewalt --

13     A.    Yeah.

14     Q.    -- looked at any of the maps or drawings on

15  file with the City of Wasco with respect to the Valley

16  Rose subdivision?

17     A.    No.

18     Q.    You don't know or you don't believe they did?

19     A.    I don't believe they did, because we told them

20  we wanted to have a new map.

21     Q.    Why did you want a new map?

22     A.    Because the City required it.

23     Q.    Who did you talk to at the City or did someone

24  on your behalf talk to the City?

25     A.    I don't recall who I talked to.  I understand

1    it's a broker or the City told me the map is expired so

2    we had to start over again to do the process.

3        Q.   Did someone represent you with respect to the

4    City of Wasco?

5        A.   Not really.

6        Q.   Did you have a lawyer who dealt with the City

7    of Wasco?

8        A.   If I have to -- we don't use any lawyer in

9    Wasco.   We don't need it.

10       Q.   So the answer is no?

11       A.   No.

12       Q.   Did you have any engineering firm deal with

13   the City of Wasco on your behalf?

14       A.   Dewalt Engineering.

15       Q.   Dewalt?

16       A.   Yes.

17       Q.   You were told that the City wanted a new map.

18   Who told you that?

19       A.   The area's broker told me that, the City

20   Planning Department told me that.

21       Q.   So you don't know if it was your broker who

22   told you that or the Planning Department?

23       A.   Yeah.   Either one.

24       Q.   Do you know the names of the people that you

25   dealt with at the City of Wasco?

1      A.    I don't remember his name.  He's the City

2   planner.

3      Q.    City planner?

4      A.    Yeah.

5      Q.    Anyone else other than the City planner?

6      A.    No.

7      Q.    Can you describe him?

8      A.    I don't recall his name.  I talked to him

9   several times.

10      Q.    Can you describe him?  Do you know his first

11   name?

12      A.    I don't remember.

13      Q.    How many conversations did you have with the

14   City planner?

15      A.    A few.

16      Q.    A few?  Five to 10?

17      A.    Yes.

18      Q.    So you had five to 10 conversations with the

19   City planner.  What were the general substances?

20      A.    We talked about a map, how to process, how to

21   meet City requirements.

22      Q.    Did you ever find out there had been a prior

23   map?

24      A.    I really have no knowledge about it.

25      Q.    So the question is you never knew that there

1   was a prior map with respect to the Valley Rose

2   subdivision?

3        A.    Yes.

4        Q.    Yes, you knew?

5        A.    I didn't know that.

6        Q.    And you didn't know there were any drawings on

7   file with respect to the Valley Rose subdivision?

8        A.    No.

9        Q.    Did you ever ask the City planner if there

10  were any prior maps or drawings on file?

11       A.    I never came across this because we needed to

12  do a new map.  It was required before I purchased, so

13  no.

14       Q.    Did you ever ask Mr. McIntosh for permission

15  to use his drawings?

16       A.    No.

17       Q.    Do you have a recollection of him telling you

18  how much he wanted for those drawings?

19       A.    Like I mentioned just a few minutes ago, I one

20  time talked to him about a pump station and I asked to

21  see if he had any design or drawing.  Actually, I never

22  talked to him.  I talked to, I believe, his assistant,

23  his engineer.  And he told me that he cannot give to us

24  or something like that.

25       Q.    Did he explain why?

```
 1   you --
 2       A.   The same thing.   Wasco, we didn't need it.
 3       Q.   Let me ask my question first.
 4            Did you obtain improvement plans for the
 5   Valley Rose subdivision?
 6       A.   No.
 7       Q.   Why not?
 8       A.   Because I didn't need it.
 9       Q.   Why didn't you need it?
10       A.   Because they were already completed before I
11   took over.
12       Q.   All the off-site improvements had been
13   completed?
14       A.   Yes.
15       Q.   How about the map?
16       A.   The map, yes.
17       Q.   Why did you need to make a map if all the
18   off-site improvements had been completed?
19       A.   Because the City required it.
20       Q.   I thought you said even though all the
21   off-site improvements were completed you needed to make
22   a map.
23       A.   Sure.
24       Q.   And how did you go about that?
25       A.   That's a City requirement.
```

1    Q.    And as you sit here today, you have no idea

2  how Mr. Black went about preparing the map?

3    A.    That's correct.

4    Q.    When you say the improvements were completed

5  at the Valley Rose subdivision, what improvements were

6  completed when you took over?

7    A.    Underground was done.

8    Q.    That being the soil --

9    A.    Underground means sewer, water, storm drain.

10  Then utilities in, telephone is in, gas is in, then

11  start ground paving, sidewalk, curb and gutter,

12  streetlight is completed.

13    Q.    So what did you have to do to satisfy the

14  City?

15    A.    What I did is that this project -- the way I

16  understand, it was sitting there for a long, long

17  period of time.  So the City was making me go over

18  there to -- any concrete crack, I have to fix the

19  concrete, the curb and gutter, fix all the concrete

20  cracks, fix the streetlights.  We repaired the

21  streetlight.

22    Q.    Anything else the City made you do?

23    A.    Repaving the street.

24    Q.    Is that the only requirements the City had of

25  you?

1       A.    Yeah.   Also, they did want me to do any
2   landscaping in Valley Rose parkway.   They wanted me to
3   maintain it.   I said okay.   Cut the grass, fix the
4   irrigation line, any broken line.   Any trees dead, they
5   want me to replace it.
6       Q.    Have you ever seen the prior map for this
7   subdivision?
8       A.    I may have some map, but it's incomplete
9   because there was -- I remember we got a -- a broker
10  gave us some landscaping plan.
11      Q.    They gave you a landscaping plan?
12      A.    Yeah.   The tree was dead.
13      Q.    I'm talking about the tract map.
14      A.    No, I don't have it.
15      Q.    Did you ever compare the tract map that you
16  came up with versus the tract map that was on file
17  before you took over?
18      A.    No.
19      Q.    And that would be Tract Map 6451 versus 5472.
20            Did you ever compare those two?
21      A.    I don't compare, but I do remember the
22  surveyor.   We found the boundary.   You know, in order
23  to build a home, we need to check all the boundaries
24  and all the corners.   We found a lot of discrepancies.
25      Q.    Discrepancies in what way?

1    responsible.

2         Q.   And you never compared the old map?

3         A.   Never.  Because I don't have old map.

4         Q.   What instructions did you give to Dewalt with

5    respect to the preparation of the new map?

6         A.   The instruction was we need to prepare a new

7    tentative map, and from a new tentative map to new

8    final map.

9         Q.   I'm sorry.  What did you tell him to do?

10        A.   New tentative map.

11        Q.   That you needed them to prepare a new

12   tentative map?

13        A.   Yes.

14        Q.   Did you give them any other instructions other

15   than that?

16        A.   No.

17        Q.   Did you have any discussions with Dewalt about

18   the old maps?

19        A.   No.

20        Q.   When did the Oroville project take place?

21        A.   Oroville project back to -- I believe it was

22   2002 or 2003.

23             MR. HASSING:   Are we talking about the

24   purchase of the Oroville project?

25             MR. BRAZE:   Yes.

1      Q.    (By Mr. Braze)   That's when you purchased it?

2      A.    Around that time.

3      Q.    Is it finished yet?

4      A.    Yeah.   It's similar to the Wasco situation.

5    Underground improvement is done.

6          MR. BRAZE:   This is probably a good time to

7    take a break.

8          (A recess was taken.)

9          MR. OKADIGBO:   I had discussed with Mr. Wu's

10   counsel the City asking Mr. Wu further questions, not

11   necessarily -- I mean, obviously in connection with

12   these proceedings where they've agreed to allow us to

13   question Mr. Wu further.   So it's not necessary that he

14   stay here for City purposes today.

15         MR. HASSING:   And we've agreed that we would

16   do that in Fresno.

17         (A recess was taken.)

18         MR. BRAZE:   Back on the record.

19     Q.    (By Mr. Braze)   And when you took over the

20   Valley Rose subdivision, when you bought it, what

21   needed to be done?   Other than building homes, what

22   needed to be done?

23     A.    I don't do a lot of --

24     Q.    Excuse me?

25     A.    -- ready to build homes.

1    Q.    You didn't have to do anything?

2          MR. HASSING:   That's been asked and answered.

3    He told you what he had to do, fix the cracks, fix

4    street lights, prepare the streets, do the landscaping,

5    fix the irrigation line.  He went all through that.

6    A.    Just minor repairs.

7    Q.    (By Mr. Braze)  You mentioned that you got the

8    landscaping plans from your broker.

9    A.    I believe from the City.

10   Q.    You got the landscaping plans from the City?

11   A.    Yes.

12   Q.    How did you do that?

13   A.    I believe my superintendent called the City to

14   ask them for plans because some plants was dead and

15   plants were dying.

16   Q.    In other words, you had to know what trees to

17   plant where and what the spacing was?

18   A.    No.  We just want to find out because the tree

19   was dead already.

20   Q.    Had you to know what kind of tree it was?

21   A.    Yeah.  We had to find out what kind of tree or

22   anything.  We told the City we don't want to do

23   anything.  We just cut across.

24   Q.    Your superintendent went to the City of Wasco

25   and they gave him the landscaping plans?

```
 1  Mr. Wu.

 2            EXAMINATION BY MR. TRAVIS

 3       Q.   The repairing of the streets, can you explain

 4  in more detail what was involved in repairing the

 5  streets other than repairing cracks in the concrete?

 6       A.   Well, the paving part of the job, the City

 7  asked us to just reseal, just cosmetic, reseal the

 8  existing asphalt.

 9       Q.   And when you reseal that, what's the process

10  for determining how it is that you reseal?  Do you just

11  go out there and get a sealant and put it on?

12       A.   Yes.  Put the seal coat.

13       Q.   Is there any measure of thickness or anything

14  like that?

15       A.   No.

16       Q.   And Mr. Braze had asked you, although I wasn't

17  clear what it meant, when you said about the pump

18  station, the level of the sensor --

19       A.   Yes.

20       Q.   -- what does that mean?

21       A.   The pump station, the way I understand, is

22  they have two stages to control the low level and the

23  high level.  So at the time when the City required us

24  to do the combust test, we have no information.  So

25  what we did is we had tried to know how the design
```