# EXHIBIT J    Okadigbo Dec

**Certified Copy**

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA, FRESNO DIVISION

ROGER McINTOSH,

        Plaintiff,

      vs.

NORTHERN CALIFORNIA UNIVERSAL
ENTERPRISES, COMPANY, et al.,

        Defendants.

Case No.
107CV 01080 LJO-WMW

~~~~~~~~~~~~~~~~~~~~~~~~~~~~

**DEPOSITIONS OF**

**TERRY W. SCHROEPFER, PE**

July 2, 2009
10:30 a.m.

5060 California Avenue
Suite 700
Bakersfield, California

Wendy Hahesy, RMR, CSR-4873



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.300.1214
Facsimile: 661.322.2242

Suite 170
5001 East Commercenter Drive
Bakersfield, CA 93309
www.esquiresolutions.com

Terry W. Schroepfer, PE                              July 2, 2009

                                  14
1    bottom?  Is that Bill Black's?

2        A.    That is correct.  It looks like his signature.

3             MR. TRAVIS:  Okay.  Can I get five minutes

4    before I take any final questions here, guys?  Can we go

5    off the record for about five minutes?

6             (Recess taken)

7    BY MR. TRAVIS:

8        Q.    All right.  Mr. Schroepfer, referring back to

9    A 00649 which I believe is the second page.  If you'll

10   notice there's a paragraph that continues from the first

11   page and at the very end it says, the last sentence of

12   that says; "The expiration dates for both tentative maps

13   is May 11, 2001."

14       A.    Okay.

15       Q.    Was there a reason why you put that into this

16   report?

17       A.    I think it was just relevant to indicate what

18   the expiration of the date of the map was because if the

19   map expires the subdivider would either need to have it

20   extended or it would expire and the process would have

21   to start over again.

22       Q.    What do you mean "the process would have to

23   start over again"?

24       A.    A new tentative map would have to be filed and

25   new conditions could be imposed, different conditions



Toll Free: 800.300.1214
Facsimile: 661.322.2242

Suite 170
5001 East Commercenter Drive
Bakersfield, CA 93309
www.esquiresolutions.com

Terry W. Schroepfer, PE                                July 2, 2009

15

1   could be imposed.

2       Q.   Let me see if I understand.   Is it fair to say

3   then that new conditions could be -- what types of new

4   conditions would those be?

5       A.   It would be up to the city and the planning

6   commission and their city staff to determine what those

7   conditions would be.

8       Q.   Okay.   So I mean, the city requires a condition

9   that the entire layout of the subdivision be redone?

10       MR. HASSING:   Objection.   Calls for

11   speculation.

12   BY MR. TRAVIS:

13       Q.   It does but you can answer the question.

14       A.   That's one possibility.

15       Q.   It's up to the city at that point to determine

16   what they want in that subdivision?

17       A.   I think it would be up to the developer to

18   propose something to the city and then the city would

19   review the proposal and assign conditions to it if they

20   wished to do so.

21       Q.   Okay.   In the first page there's a date that

22   says "February 2, 2000."   And counsel to my right

23   pointed out to me the date on the second page in the

24   subsequent pages that are after that show March 2, 2003.

25       MR. HASSING:   March 2, 2000.



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.300.1214
Facsimile: 661.322.2242

Suite 170
5001 East Commercenter Drive
Bakersfield, CA 93309
www.esquiresolutions.com

# EXHIBIT K       Okadigbo Dec

**Certified Copy**

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA, FRESNO DIVISION

ROGER McINTOSH,

       Plaintiff,

    vs.

NORTHERN CALIFORNIA UNIVERSAL
ENTERPRISES, COMPANY, et al.,

      Defendants.

~~~~~~~~~~~~~~~~~~~~~~~~~~~

Case No.
107CV 01080 LJO-WMW

**DEPOSITIONS OF**

**TERRY W. SCHROEPFER, PE**

July 2, 2009
10:30 a.m.

5060 California Avenue
Suite 700
Bakersfield, California

Wendy Hahesy, RMR, CSR-4873



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.300.1214
Facsimile: 661.322.2242

Suite 170
5001 East Commercenter Drive
Bakersfield, CA 93309
www.esquiresolutions.com

# ENGINEER'S REPORT
# AND ASSESSMENT

## CITY OF WASCO
## ASSESSMENT DISTRICT
## NO. 92-2

# VALLEY ROSE
# ASSESSMENT DISTRICT

## MARCH 1995



Exhibit 7/2/09

3 Schrepher

PAULSON

L 101



# TABLE OF CONTENTS

**Engineer's Report**
**City of Wasco**
**Assessment District No. 92-2**
**Valley Rose Assessment District**

**CERTIFICATES OF FILING AND ASSESSMENT** . . . . . . . . . . . . . . . . . . . . . 1

**ENGINEER'S REPORT**
Assessment District Purpose . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3
Introduction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3
Engineer's Report Submittal Statement . . . . . . . . . . . . . . . . . . . . . . . 4

**EXHIBIT "A"**
Description of Work and Acquisitions . . . . . . . . . . . . . . . . . . . . . . . . A-1

**EXHIBIT "B"**
Engineer's Estimate . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . B-1

**EXHIBIT "C"**
Assessment Diagram and Boundary Map . . . . . . . . . . . . . . . . . . . . . . . C-1

**EXHIBIT "D"**
Report Requirements . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . D-1
Proposed Assessment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . D-1
Statement of Total Assessment . . . . . . . . . . . . . . . . . . . . . . . . . . . D-2
Statement of Maximum Annual Parcel Assessment For Recovery
    of Assessment District Administration Costs and Expenses . . . . . . . . . D-3
Bond Declaration . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . D-3
Engineer of Work:  Report Submittal Signature . . . . . . . . . . . . . . . . . . D-4
Assessment Roll . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . D-5

**EXHIBIT "E"**
Land Owner Names and Addresses . . . . . . . . . . . . . . . . . . . . . . . . . E-1

**EXHIBIT "F"**
Summary of Assessment Spread . . . . . . . . . . . . . . . . . . . . . . . . . . F-1

**APPENDIX "A"**
Method of Apportionment

**APPENDIX "B"**
Petition for Acquisition of Improvements AD 92-2

# ENGINEER'S REPORT AND ASSESSMENT

## CITY OF WASCO

### ASSESSMENT DISTRICT
### No. 92-2
### Valley Rose Assessment District

March 1995

## CITY COUNCIL

Mayor - Roy Johnson

### Councilmembers

Melvin McLaughlin
Paul Neufeld
Michael White
Fred West, Jr.

**QUAD Engineering, Inc.**
5500 Ming Avenue, Suite 410
Bakersfield, CA  93309
805/835-8300

## CITY STAFF

Larry Pennell, City Manager
Gordon Drescher, City Attorney
Dru Gibson, City Clerk & Finance Officer

## ASSESSMENT ENGINEER

Terry W. Schroepfer, P.E.
QUAD Engineering, Inc.
Bakersfield, California

## BOND COUNSEL

Richard H. Hargrove, Esq.
Burke, Williams & Sorenson
Fresno, California

## MANAGING UNDERWRITER

1st California Regional Securities
Michael Richardson
San Francisco, California

92909

**L 104**

# CERTIFICATES OF FILING & ASSESSMENT

# ENGINEER'S REPORT

## CITY OF WASCO
### Assessment District No. 92-2
### Valley Rose Assessment District

## CERTIFICATES OF FILING AND ASSESSMENT

I, Dru Gibson, City Clerk of the City of Wasco, do hereby certify that the following "Engineer's Report for the City of Wasco Assessment District No. 92-2 Valley Rose Assessment District", including the Assessment and Assessment Roll in the amounts set forth therein as the "Preliminary Assessment" Column one (1), with the Assessment Diagram attached thereto, was filed with me on the 17th day of January, 1995.

City Clerk,
City of Wasco, California

I have prepared this Engineer's Report and do hereby certify that the amount set forth herein as the "Confirmed Assessment Amount" as set forth in Column two (2), and the individual assessments as shown under the Column entitled "Total Assessment" on Exhibit "D", attached hereto, have been computed by me in accordance with the order of the City Council of the City of Wasco contained in a Resolution of Intention adopted as Resolution of Intention No. 92-1476 on August 18, 1992.

Terry W. Schroepfer, P.E.
Engineer of Work

I, Dru Gibson, City Clerk of the City of Wasco, do hereby certify that the following "Engineer's Report for the City of Wasco Assessment District No. 92-2 Valley Rose Assessment District" and the Confirmed Assessment contained therein in the amounts set forth in Column two (2), was approved by the City Council of the City of Wasco on the 7th day of March, 1995, by Council's adoption of Resolution No. 95-1638.

City Clerk
City of Wasco, California

**L 106**

I, Larry Pennell, as Director of Public Works/Superintendent of Streets of the City of Wasco, do hereby certify that the foregoing Assessment, together with the Assessment Diagram attached thereto, was recorded in my office on the _____ 5ᵗʰ _____ day of _____ March _____, 1995.

_Larry Pennell_

Director of Public Works
Superintendent of Streets
City of Wasco, California

On _____, 1995, a Notice of Assessment was recorded in Book _____ at Page _____, of Official Records and the Assessment Diagram was filed on _____, 1995, in Book _____ of Maps of Assessment and Community Facilities Districts at Page _____ _____, in the Office of the County Recorder of the County of Kern, California.

County Recorder,
County of Kern, California

L 107

# ENGINEER'S REPORT

# ENGINEER'S REPORT

## CITY OF WASCO
### Assessment District No. 92-2
### Valley Rose Assessment District
### Municipal Improvement Act of 1913

Honorable City Council
City of Wasco
State of California

## ASSESSMENT DISTRICT PURPOSE

City of Wasco Assessment District 92-2 (Valley Rose Assessment District) is to be formed by the City Council of the City of Wasco (herein referred to as "City Council") pursuant to the property owner petition on file with the City Clerk, for the purpose of financing construction of public improvements. The assessment district will provide for the retirement of Bond Anticipation Notes issued in August 1992 and used for the interim financing of improvements constructed and acquired through the provisions of an acquisition agreement and its subsequent amendments approved by the City Council.

## INTRODUCTION

On August 18, 1992, in the course of proceedings for Assessment District No. 92-2 that you are conducting under the provisions of the Municipal Improvement Act of 1913, you adopted a Resolution of Intention (Resolution No. 92-1476) for the Assessment District to be designated City of Wasco Assessment District No. 92-2 ("AD 92-2").

Further, on August 18, 1992, you adopted Resolution Authorizing Issuance of Bond Anticipation Notes (Resolution No. 92-1477). Subsequently, a portion of the works of improvement as described under Exhibit "A", and incorporated herein by reference, have been accomplished and acquired through the use of said Bond Anticipation Notes in accordance with the provisions of the Acquisition Agreement approved by Resolution 93-1504 on January 29, 1993, and amended by Resolutions 93-1519 on June 15, 1993, 93-1536 on September 7, 1993, and 94-1594 on June 6, 1994.

## ENGINEER'S REPORT SUBMITTAL STATEMENT

In said Resolution of Intention you appointed QUAD Engineering, Bakersfield, Engineer of Work for AD 92-2 and directed QUAD Engineering to make the necessary Report to you as provided for in Streets and Highways Code Section 10204, which section is a portion of the Act stated above.

In accordance with your direction, I, Terry W. Schroepfer, P.E., am pleased to present this report to you which I have prepared in conformance with said Streets and Highways Code Section 10204. You will note that I have prepared and have included in this report a proposed assessment in the form and style required by said Section 10204.

I have attached said Assessment to this report in such a manner so that if, after complying with the procedures required by law, you should approve this report, you may transmit the Assessment to the Director of Public Works/Superintendent of Streets of the City of Wasco for recording in his office. The Engineer's Report for AD 92-2 consists of seven (7) parts as follows:

1.   Complying with Section 10204 (a) of the Streets and Highways Code:

The improvements to be constructed and acquired through the provisions of the Acquisition Agreement as part of this assessment proceeding are described in "Exhibit A".

2.   Complying with Section 10204 (b) of the Streets and Highways Code:

I report to you that all property already installed, necessary or convenient for the operation of public improvement work that is to be constructed or installed, and rights of way to be acquired in this proceeding are as described on "Exhibit A".

3.   Complying with Section 10204 (c) of the Streets and Highways Code:

I present herewith an estimate of the construction costs of the public improvement work proposed to be constructed or acquired under this proceeding, an estimate of the engineering and inspection costs necessary for said work, and my estimate of the incidental expenses and contingencies necessary and proper in connection with this proceeding. The Engineer's Estimate is attached as "Exhibit B".

4.   Complying with Section 10204 (d) of the Streets and Highways Code:

I attach hereto and mark "Exhibit C" a diagram showing the proposed assessment district and the boundaries and dimensions of the subdivisions of land within the district and the same is entitled "CITY OF WASCO ASSESSMENT DISTRICT NO. 92-2, VALLEY ROSE ASSESSMENT DISTRICT", and I have given a separate number upon said diagram to each lot or subdivision shown thereon and said number is encircled on said diagram.

5.   Complying with Section 10204 (e) of the Streets and Highways Code:

I attach hereto a proposed Assessment, "Exhibit D". I have allocated the total amount of the estimated cost of the public improvement work proposed to be constructed in this proceeding, the total amount of the estimated cost of improvements, lands, easements and rights-of-way to be acquired, my estimate of the contingency expenses, and my estimate of the engineering and incidental expenses of this proceeding to and upon each of the several lots or subdivision of land in the proposed assessment district.

L 110

6.   Complying with Section 10204(f) of the Streets and Highways Code

I have attached hereto a proposed Assessment, "Exhibit D" in which I present a statement of a proposed maximum annual assessment upon each parcel and subdivision of land in Assessment District No. 92-2 for recovery of assessment district administration costs and expenses.

7.   Method of Apportionment

Pursuant to the provisions of law and of Resolution of Intention No. 92-1476, I have so assessed each said lot or subdivision in proportion to my estimate of the benefit to be received by each of said lots or subdivisions from said construction expenses, and I have in said assessment referred to each of said lots or subdivisions by their respective numbers that I assigned to them in preparing the diagram as attached hereto and marked "Exhibit C", under my report respecting Streets and Highways Code Section 10204 (d).

********************

# EXHIBIT A

## Description of Work and Acquisitions

L 112

# ENGINEER'S REPORT

## CITY OF WASCO
### Assessment District No. 92-2
### Valley Rose Assessment District

## DESCRIPTION OF WORK AND ACQUISITIONS

### Project Description

City of Wasco Assessment District 92-2 (Valley Rose Assessment District) proceedings have been undertaken pursuant to the property owner petition on file with the City Council. The petition has been signed by the owner of 100% of the land area proposed to be assessed within Assessment District No. 92-2.

The works of improvement will be completed by said owner and subsequently acquired by the City of Wasco. The City has acquired a portion of said work with proceeds from City approved Bond Anticipation Notes (BAN) in accordance with the Acquisition Agreement approved by City Council on January 28, 1993, by Resolution 93-1504 and amended by Resolutions 93-1519 on June 15, 1993, 93-1536 on September 7, 1993, and 94-1594 on June 6,1994. Bond Anticipation Notes issued in August 1992 and used for the acquisition of completed improvements shall be retired through these assessment proceedings.

### Description of Work

The works of improvement to be acquired with these assessment proceedings shall consist of in-tract improvements, off-site improvements and professional services for the benefit Tentative Tract 5618, Tentative Tract 5472 and adjacent commercial property within the boundary of AD 92-2. The work is generally described as follows:

### 1. In-Tract Subdivision Improvements for Tentative Tract 5472

City of Wasco, Tentative Tract 5472, consisting of sixty-eight (68) single family residential lots and one (1) multi-family residential lot, is located on 22.93 acres of land on Valley Rose Parkway north of State Highway 46. Work to be acquired includes subdivision improvement work conditioned, inspected and accepted by the City of Wasco. This work, shown on City of Wasco approved subdivision improvement plans for Tentative Tract 5472 on file at the City Building Inspector's office and incorporated herein by reference, includes:  full street improvements, including street excavation and grading, aggregate base, asphalt concrete paving, curb, gutter and sidewalk, special paving and street lights; an in-tract sanitary sewer collection system; complete storm drainage improvements including an on-site retention basin; water distribution pipelines and appurtenances; public utilities including electricity, natural gas and telephone (Cost of utility work paid by these proceedings not to exceed ten percent (10%) of

total issue); landscaping and lighting improvements; block walls and ornamental fencing; and approved miscellaneous expenses for surveying, engineering, testing, inspection, construction management and City imposed fees for review, plan checking and construction inspection.

## 2. Tentative Tract 5618

City of Wasco, Tentative Tract 5618, as conditionally approved, consisting of 296 single family residential lots and a neighborhood park, is located on 64.86 acres of land north of State Highway 46 and immediately north of said Tentative Tract 5472. Tentative Tract 5618 is bordered to the west by Scofield Avenue, to the north by Augusta Manor Drive, to the east by Valley Rose Parkway and to the south by Tentative Tract 5472. Work to be acquired by AD 92-2 includes City approved miscellaneous expenses for surveying, design, improvement plan preparation, management expenses and city imposed fees for review, plan checking and construction inspection.

## 3. Commercial Property

Commercial property consists of 11.03 gross acres of land located northwest and northeast of the State Highway 46 and Valley Rose Parkway intersection in the City of Wasco. Work to be acquired, as shown on City of Wasco approved subdivision improvement plans for Tentative Tract 5472 on file at the City Building Inspector's Office and incorporated herein by reference, includes: full street improvements, including street excavation and grading, aggregate base, asphalt concrete paving, special paving, curb, gutter, sidewalk and street lights; sanitary sewer collection system; storm drainage system improvements; water distribution pipelines and appurtenances; public utilities including electricity, natural gas and telephone (Cost of utility work paid by these proceedings not to exceed ten percent (10%) of total issue); landscaping and lighting improvements; and approved miscellaneous expenses for surveying, engineering, testing, inspection, construction management and City imposed fees for review, plan checking and construction inspection.

## 4. Off-site Wastewater Improvements

Off-site wastewater improvements consist of a sewage pump station (convertible to lift station in the future) and an off-site force main system shown on City of Wasco approved construction plans on file in the City Building Inspector's Office and incorporated herein by reference. The pump station, designed for the entire Valley Rose Estates service area, is located at the northeast corner of State Highway 46 and Valley Rose Parkway. Pump station improvements include a triplex submersible pump assembly, wet well, valve vault, standby generator, electrical and control work, piping, fittings, valves, appurtenances, force main crossing of State Highway 46, site work and fencing. The off-site force main system consists of approximately 3,600 feet of 8 inch diameter force main, 170 feet of 12 inch diameter gravity main, two (2) manholes and eight (8) pressure cleanouts. The pump station and force main will be used to convey wastewater from the Valley Rose service area to the City of Wasco Wastewater Treatment Plant. Work for off-site wastewater improvements also acquired by AD 92-2, includes approved miscellaneous expenses for surveying, engineering, testing, inspection, construction management and City imposed fees for review, plan checking and construction inspection.

### 5.  Off-site Water Service

Off-site water service to be acquired consists of an off-site water main and upgrading an existing water well as shown on City of Wasco approved construction plans on file at the City Building Inspector's Office, incorporated herein by reference.   The off-site water main involves approximately 12,000 feet of 12 inch diameter pipe constructed along State Highway 46 from Central Avenue to Valley Rose Parkway and on Leonard Avenue from State Highway 46 to the well site.   The upgraded water well is located on the west side of Leonard Avenue approximately 400 feet north of State Highway 46.  Work on the well encompasses upgrading for potable water use and fire flow requirements, construction of piping, valves, hydropneumatic tank and appurtenant facilities, site work and fencing.  Work also acquired by AD 92-2 for off-site water service includes approved miscellaneous expenses for surveying, engineering, testing, inspection, construction management and City imposed fees for review, plan checking and construction inspection.

### 6.  Off-site Water Storage Tank

The future off-site water storage tank will consist of a 1.2 million gallon water storage tank to be constructed on a 1.09 acre site in Wasco Industrial Park near the intersection of Margolo Street and Annin Avenue.  Improvements will include a welded steel water storage tank, booster pump station, piping, valves, appurtenant facilities, electrical and control work, site improvements and fencing.  Preliminary off-site water storage tank plans have been prepared and are on file with the City Building Inspector's Office incorporated herein by reference. Work to be acquired by AD 92-2 includes preliminary plans for the facility only.   Expenses for construction of the tank in the future will not be paid through these proceedings.

### 7.  Engineering Planning and Miscellaneous Work

This work comprises all miscellaneous services necessary to plan, design and administer the works of improvement.  In general the work includes preparation of master plans for land use, water, sewer, drainage and traffic; required studies; management fees; feasibility studies; appraisals; utility plans; soils investigations; land surveying related to the improvement work; city inspection fees and other miscellaneous items authorized by the city for payment.

### 8.     Miscellaneous Improvement Work

This work includes entrance features and landscaping, street pavement in excess of standard residential street widths, and oversized water and sewer mains.  These works of improvement are constructed within the boundaries of specific properties within the District, but are of general benefit to all properties.

# EXHIBIT  B

## Engineer's Estimate

# EXHIBIT B-1

CITY OF WASCO
ASSESSMENT DISTRICT No. 92-2

ENGINEER'S ESTIMATE

| ITEM DESCRIPTION | ESTIMATED COST | SUBTOTAL |
|---|---|---|
| I. IMPROVEMENT COSTS | | $2,821,091.00 |
| II. BOND ANTICIPATION NOTE (BAN) INCIDENTAL COSTS OF ISSUANCE | | 800,000.00 |
| III. BOND POOL RESERVE FUND REPAYMENT | | 268,000.00 |
| IV. BAN INTEREST THROUGH APRIL 2, 1995 | | 297,500.00 |
| V. BAN INTEREST EARNINGS | | (242,582.21) |
| VI. SUBTOTAL BAN EXPENDITURES | | $3,944,008.79 |
| VII. ASSESSMENT DISTRICT 92-2 INCIDENTAL COSTS | | |
| A. Assessment Engineering (Note 1) | $60,000.00 | |
| B. Disclosure Counsel Fee | OMITTED | |
| C. Bond Counsel Fee | 26,275.00 | |
| D. City Administrative Fee and expenses | 20,888.69 | |
| E. City Inspection Fee (Unpaid Balance) | 8,827.52 | |
| Subtotal Incidental Costs: | | 115,991.21 |
| VIII. COST OF ISSUANCE | | |
| A. Original Issue Discount (2%) | | OMITTED |
| IX. INTEREST | | |
| A. Funded Interest (April 3, 1995 to September 2, 1995) | | OMITTED |
| X. RESERVE FUND | | OMITTED |

| TOTAL TO BE ASSESSED: | $4,060,000.00 |
|---|---|

Note 1: Includes $26,843.37 paid thru 3/7/95)

**L 117**

# EXHIBIT B-1 (A)

### CITY OF WASCO
### ASSESSMENT DISTRICT No. 92-2

### BOND ANTICIPATION NOTE EXPENDITURES

| Item Description | Estimated Cost | Subtotal |
|---|---|---|
| **I.  IMPROVEMENT COSTS** | | |
| A.  ENGINEERING, PLANNING AND MISCELLANEOUS | $309,387.15 | |
| B.  CONSTRUCTION COSTS | | |
| 1. Tract 5472 Improvements | 803,214.46 | |
| 2. Tract 5618 Improvements | 88,309.48 | |
| 3. Commercial Property Improvements | 412,318.62 | |
| 4. Offsite Improvements | 1,187,182.59 | |
| 5. Offsite Water Storage Tank and Appurtenances | 4,550.46 | |
| Subtotal Construction Costs: | 2,495,575.61 | |
| C.  CITY INSPECTION FEES (PAID BY BAN) | 16,128.24 | |
| Subtotal Improvement Costs: | | $2,821,091.00 |
| **II.  BOND ANTICIPATION NOTE (BAN) INCIDENTAL COSTS** | | |
| A. Bond Counsel | 60,000.00 | |
| B. Disclosure Counsel | 30,000.00 | |
| C. Cash Flow Consultant | 60,000.00 | |
| D. City Administration Fee | 50,000.00 | |
| E. Funded Interest | 510,000.00 | |
| F. Issue Discount | 90,000.00 | |
| Subtotal BAN Incidentals: | | 800,000.00 |
| **III.  BOND POOL RESERVE FUND REPAYMENT** | | |
| A. BAN Payment from Reserve Fund (September 2, 1994) | 255,000.00 | |
| B. Interest on BAN payment (September 2, 1994 to April 2, 1995) | 13,000.00 | |
| Subtotal Reserve Fund Payment: | | 268,000.00 |
| **IV.  BAN ACCRUED INTEREST COSTS (After September 2, 1994)** | | |
| A. Accrued Interest (September 3, 1994 to April 2, 1995) | | 297,500.00 |
| **V.  INTEREST EARNINGS** | | |
| A. Improvement Fund Interest Balance (Through Dec. 31, 1994) | (212,582.21) | |
| B. Improvement Fund Interest Earnings (12/31/94 to 4/2/95) | (30,000.00) | |
| Subtotal Interest Earnings: | | (242,582.21) |
| **NET BAN FUNDS EXPENDED (TO AD 92-2):** | | **$3,944,008.79** |
| **BAN FUNDS ENCUMBERED:** | | $6,000,000.00 |
| **UNEXPENDED BAN PROCEEDS (To be called April 2, 1995):** | | $2,055,991.21 |

**L 118**

QUAD

# EXHIBIT B-2
## CITY OF WASCO
### ASSESSMENT DISTRICT NO. 92-2
### COST ALLOCATION

| Item Description | Estimated Cost | Funds Disbursed | Encumbered Funds | Documentation |
|---|---|---|---|---|
| **A. ENGINEERING, PLANNING AND MISCELLANEOUS** | | | | |
| 1. Land Use Plan | $10,658.67 | $10,658.67 | $10,658.67 | EX B-5, item 6 |
| 2. Design Guidelines | 1,378.57 | 1,378.57 | 1,378.57 | EX B-5, item 7 |
| 3. Water, San Sewer & Drainage Master Plans | 54,147.35 | 54,147.35 | 54,147.35 | EX B-5, items 9, 10, 11 |
| 4. Traffic Master Plan | 16,785.51 | 16,785.51 | 16,785.51 | EX B-5, item 12 |
| 5. Williamson Act Contract Cancellation | 4,281.05 | 4,281.05 | 4,281.05 | EX B-5, item 12 |
| 6. Boundary and Topo Survey | 7,286.15 | 7,286.15 | 7,286.15 | EX B-5, item 13 |
| 7. Engineering and Planning | 79,732.00 | 79,732.00 | 79,732.00 | EX B-5, item 2 |
| 8. Miscellaneous (See Exhibit B-1) | 135,117.85 | 135,117.85 | 135,117.85 | EX B-3, item A-2 |
| Subtotal: | $309,387.15 | $309,387.15 | $309,387.15 | EX B-4, Subtotal of Expenses |
| **B. CONSTRUCTION COSTS** | | | | |
| 1. Tract 5472 | | | | |
| a. Construction (Street, water, sewer, storm, landscaping, walls etc.) | 498,297.00 | 484,848.24 | 546,439.27 | EX B-3, items B-1, 2, 3, 4, 6 & 7 |
| b. Construction Management | 58,184.00 | 52,246.68 | 52,246.68 | EX B-3, item B-9 |
| c. Engineering and Surveying | 98,604.48 | 98,604.48 | 98,604.48 | EX B-5, costs for Tract 5472 |
| d. Construction Staking | 25,592.00 | 26,007.26 | 26,007.26 | EX B-3, item B-8 |
| e. Utilities | 141,508.00 | 141,907.80 | 141,907.80 | EX B-3, item B-5 |
| Subtotal: | $822,185.48 | $803,214.46 | $864,805.49 | |
| 2. Tract 5618 | | | | |
| a. Construction (Street, water, sewer, storm, landscaping, walls etc.) | 1,695,278.00 | | | EX B-3, items C&D-(1,2,3,4,6&7) |
| b. Construction Management | 137,348.00 | 26,059.32 | 26,059.32 | EX B-3, items C-9&D-9(Paid) |
| c. Engineering and Surveying | 62,250.16 | 62,250.16 | 62,250.16 | EX B-5, costs for Tract 5618 |
| d. Construction Staking | 60,674.00 | | | EX B-3, items C8 & D8 |
| e. Utilities | 121,568.00 | | | EX B-3, items C8 & D5 |
| Subtotal: | $2,077,118.16 | $88,309.48 | $88,309.48 | |
| 3. Commercial Property (Rt. 46) | | | | |
| a. Engineering & Surveying | 35,305.20 | 35,305.20 | 35,305.20 | EX B-5, Commercial Property |
| b. Storm Drainage | 112,593.00 | 111,912.06 | 111,912.06 | EX B-3, item E.1 |
| c. Sewer Main (Valley Rose Parkway) | 34,523.50 | 30,049.41 | 34,863.60 | EX B-3, item E.2c (@50%) |
| d. Water Main Rte 46 to Tr. 5472 | 23,250.00 | 23,249.01 | 23,240.01 | EX B-3, item E.3c (@50%) |
| e. Street Improvements | 167,104.00 | 130,212.04 | 134,753.50 | EX B-3, item E.4 (@50%) |
| f. Utilities | 27,257.00 | 27,248.30 | 27,248.30 | EX B-3, item E.5 |
| g. Landscaping | 59,452.00 | 54,342.60 | 60,287.80 | EX B-3, item E.7 |
| Subtotal: | $459,484.70 | $412,318.62 | $427,619.46 | |
| 4. Offsite Improvements | | | | |
| a. Offsite Sanitary Sewer Improvements | | | | |
| 1) Force Main and Pump Station | 285,325.00 | 285,282.11 | 285,282.11 | EX B-3, item E.2a |
| 2) Emergency Generator | 37,435.00 | 37,434.65 | 37,434.65 | EX B-3, item E.2b |
| 3) Sewer Main (Valley Rose Parkway) | 34,523.50 | 30,049.41 | 34,863.60 | EX B-3, item E.2c (@50%) |
| Subtotal: | $357,283.50 | $352,766.17 | $357,580.36 | |
| b. Offsite Water Improvements | | | | |
| 1) Water Main Leonard to Central | 289,542.00 | 280,542.22 | 280,542.22 | EX B-3, item E.3a |
| 2) Upgrade Well | 46,115.00 | 46,115.00 | 48,378.00 | EX B-3, item E.3b |
| 3) Water Main Rte 46 to Tr. 5472 | 23,250.00 | 23,249.01 | 23,249.01 | EX B-3, item E.3c (@50%) |
| Subtotal: | $358,907.00 | $349,906.23 | $352,169.23 | |
| d. Engineering and Surveying (Water and Sewer) | $71,041.56 | $71,041.56 | 71,041.56 | EX B-5, items 4,5,38 & 39 |
| e. Street Improvements | $167,104.00 | $130,212.04 | $134,753.49 | EX B-3, item E.4 (@50%) |
| g. Miscellaneous | | | | |
| 1) Walls | 120,702.00 | 120,701.41 | 120,701.41 | EX B-3, item E.6 |
| 2) Construction Staking | 25,127.00 | 36,119.64 | 36,119.64 | EX B-3, item E.8 |
| 3) Construction Management and Misc. | 122,254.00 | 126,435.54 | 126,435.54 | EX B-3, item E.9 |
| Subtotal: | $268,083.00 | $283,256.59 | $283,256.59 | |
| Subtotal Offsite Improvements: | $1,222,419.06 | $1,187,182.99 | $1,198,801.23 | |
| 5. Storage Tank & Booster Pump Station | 309,405.00 | 4,550.46 | 309,405.00 | EX B-3, items F.1, 2, 3 & 4 |
| Subtotal Storage Tank and Booster Pump Station: | $309,405.00 | $4,550.46 | $309,405.00 | |
| **TOTAL ENGINEERING AND CONSTRUCTION COSTS:** | **$5,199,999.55** | **$2,804,962.76** | **$3,198,327.81** | |

## EXHIBIT B-3
### CITY OF WASCO
### ASSESSMENT DISTRICT NO. 92-2

## ACQUISITION AGREEMENT BUDGET & EXPENDITURES

| ITEM DESCRIPTION | ACQUISITION AGREEMENT BUDGET | REMAINING BALANCE | AMOUNT DISBURSED | OUTSTANDING OBLIGATIONS | AMOUNT ENCUMBERED |
|---|---|---|---|---|---|
| **A. ACQUISITION OF MASTER PLANS** | | | | | |
| 1. Master Studies (From Exhibit B-4) | $496,856.55 | 0.00 | 496,856.55 | | $496,856.55 |
| 2. Engineering/Planning | 79,732.00 | 0.00 | 79,732.00 | | 79,732.00 |
| **SUBTOTAL:** | $576,588.55 | | $576,588.55 | $0.00 | $576,588.55 |
| **B. TRACT NO. 5472** | | | | | |
| 1. Storm Drainage, Street Excavation | 37,080.00 | 0.00 | 37,080.00 | | 37,080.00 |
| 2. Sewer | 77,347.00 | (0.01) | 77,347.01 | | 77,347.01 |
| 3. Water | 53,279.00 | 0.10 | 53,278.90 | | 53,278.90 |
| 4. Street Improvements | | | | | |
| a. Sidewalks and Special Concrete | 48,195.00 | 1.23 | 48,193.77 | 45,224.93 | 93,418.70 |
| b. Agg Base, Curb, Gutter & Paving | 129,365.00 | 9,131.73 | 120,233.28 | 12,060.30 | 132,293.58 |
| c. Street Lights and Street Signs | 23,393.00 | 846.32 | 22,546.68 | 846.00 | 23,392.68 |
| 5. Utilities | 141,508.00 | 0.20 | 141,507.80 | | 141,507.80 |
| 6. Walls | 95,040.00 | 9.59 | 95,030.41 | | 95,030.41 |
| 7. Landscaping | 34,598.00 | 3,459.80 | 31,138.20 | 3,459.80 | 34,598.00 |
| 8. Construction Staking | 25,592.00 | (415.26) | 26,007.26 | | 26,007.26 |
| 9. Construction Management and Misc. | 58,184.00 | 5,937.32 | 52,246.68 | | 52,246.68 |
| **SUBTOTAL:** | $723,581.00 | $18,971.02 | $704,609.99 | $61,591.03 | $766,201.02 |
| **C. TRACT NO. 5618 – PHASE I** | | | | | |
| 1. Storm Drainage, Street Excavation | 90,006.00 | 90,006.00 | | | |
| 2. Sewer | 136,295.00 | 136,295.00 | | | |
| 3. Water | 125,813.00 | 125,813.00 | | | |
| 4. Street Improvements | | | | | |
| a. Sidewalks and Special Concrete | 122,329.00 | 122,329.00 | | | |
| b. Agg Base, Curb, Gutter & Paving | 343,293.00 | 343,293.00 | | | |
| c. Street Lights and Street Signs | 52,161.00 | 52,161.00 | | | |
| 5. Utilities | 75,488.00 | 75,488.00 | | | |
| 6. Walls | 101,951.00 | 101,951.00 | | | |
| 7. Landscaping | 47,809.00 | 47,809.00 | | | |
| 8. Construction Staking | 36,606.00 | 36,606.00 | | | |
| 9. Construction Management and Misc. | 82,812.00 | 65,307.02 | 17,504.98 | | 17,504.98 |
| **SUBTOTAL:** | $1,214,563.00 | $1,197,058.02 | $17,504.98 | $0.00 | $17,504.98 |
| **D. TRACT NO. 5618 – PHASE II** | | | | | |
| 1. Storm Drainage, Street Excavation | 58,648.00 | 58,648.00 | | | |
| 2. Sewer | 88,808.00 | 88,808.00 | | | |
| 3. Water | 83,782.00 | 83,782.00 | | | |
| 4. Street Improvements | | | | | |
| a. Sidewalks and Special Concrete | 81,430.00 | 81,430.00 | | | |
| b. Agg Base, Curb, Gutter & Paving | 228,504.00 | 228,504.00 | | | |
| c. Street Lights and Street Signs | 34,722.00 | 34,722.00 | | | |
| 5. Utilities | 46,080.00 | 46,080.00 | | | |
| 6. Walls | 67,890.00 | 67,890.00 | | | |
| 7. Landscaping | 31,837.00 | 31,837.00 | | | |
| 8. Construction Staking | 24,068.00 | 24,068.00 | | | |
| 9. Construction Management and Misc. | 54,536.00 | 45,981.66 | 8,554.34 | | 8,554.34 |
| **SUBTOTAL:** | $800,305.00 | $791,750.66 | $8,554.34 | $0.00 | $8,554.34 |

## EXHIBIT B-3
### CITY OF WASCO
### ASSESSMENT DISTRICT NO. 92-2

#### ACQUISITION AGREEMENT BUDGET & EXPENDITURES

| ITEM DESCRIPTION | ACQUISITION AGREEMENT BUDGET | REMAINING BALANCE | AMOUNT DISBURSED | OUTSTANDING OBLIGATIONS | AMOUNT ENCUMBERED |
|---|---|---|---|---|---|
| **E. OFFSITE IMPROVEMENTS** | | | | | |
| 1. Storm Drainage | | | | | |
|   a. Storm Drain Pipe | $72,313.00 | 680.94 | 71,632.06 | | 71,632.06 |
|   b. Street Excavation | 40,280.00 | 0.00 | 40,280.00 | | 40,280.00 |
| 2. Sewer | | | | | |
|   a. Force Main & Pump Station | 285,325.00 | 42.89 | 285,282.11 | | 285,282.11 |
|   b. Emergency Generator | 37,435.00 | 0.35 | 37,434.65 | | 37,434.65 |
|   c. Gravity Main (In Valley Rose Parkway) | 69,047.00 | 8,948.18 | 60,098.82 | 9,628.38 | 69,727.20 |
| 3. Water | | | | | |
|   a. Water Main (Leonard to Central) | 289,542.00 | 8,999.78 | 280,542.22 | | 280,542.22 |
|   b. Upgrade Well | 46,115.00 | 0.00 | 46,115.00 | 2,263.00 | 48,378.00 |
|   c. Water Main (Rte 46 to Tr. #5472) | 46,500.00 | 1.99 | 46,498.01 | | 46,498.01 |
| 4. Street Improvements | | | | | |
|   a. Sidewalks and Special Concrete | 56,429.00 | 53,517.72 | 2,911.28 | 5,024.99 | 7,936.27 |
|   b. Curb & Gutter, Paving | 250,150.00 | 20,240.45 | 229,909.55 | 4,057.92 | 233,967.47 |
|   c. Street Lights and Street Signs | 27,629.00 | 25.75 | 27,603.25 | | 27,603.25 |
| 5. Utilities | 27,257.00 | 8.70 | 27,248.30 | | 27,248.30 |
| 6. Walls | 120,702.00 | 0.59 | 120,701.41 | | 120,701.41 |
| 7. Landscaping | 59,452.00 | 5,109.40 | 54,342.60 | 5,945.20 | 60,287.80 |
| 8. Construction Staking | 25,127.00 | (10,992.64) | 36,119.64 | | 36,119.64 |
| 9. Construction Management and Misc. | 122,254.00 | (4,181.54) | 126,435.54 | | 126,435.54 |
| **SUBTOTAL:** | $1,575,557.00 | $82,402.56 | $1,493,154.44 | $26,919.49 | $1,520,073.93 |
| | | | | | |
| **F. WATER STORAGE** | | | | | |
| 1. Storage Tank | 234,290.00 | 229,739.54 | 4,550.46 | 229,739.54 | 234,290.00 |
| 2. Booster Pump Station | 50,000.00 | 50,000.00 | | 50,000.00 | 50,000.00 |
| 3. Construction Staking | 2,372.00 | 2,372.00 | | 2,372.00 | 2,372.00 |
| 4. Construction Mgmt & Misc. | 22,743.00 | 22,743.00 | | 22,743.00 | 22,743.00 |
| **SUBTOTAL:** | $309,405.00 | $304,854.54 | $4,550.46 | $304,854.54 | $309,405.00 |
| | | | | | |
| **TOTALS:** | $5,199,999.55 | $2,395,036.80 | $2,804,962.76 | $393,365.06 | $3,198,327.82 |

# EXHIBIT B-4

## CITY OF WASCO
## ASSESSMENT DISTRICT NO. 92-2

## MISCELLANEOUS BAN EXPENDITURES
## MASTER PLAN ACQUISITION

| DATE | DESCRIPTION | AMOUNT | SUBTOTAL |
|---|---|---|---|
| 04/27/92 | Bruce Beaudoin, MAI (Appraisal Deposit) | $10,800.00 | |
| 05/01/92 | Coleman Christensen (Const. & Mgmt. Fees) | 2,500.00 | |
| 06/01/92 | Coleman Christensen (Const. & Mgmt. Fees) | 2,500.00 | |
| 07/01/92 | Coleman Christensen (Const. & Mgmt. Fees) | 5,000.00 | |
| 07/31/92 | Soils Engineering | 9,147.25 | |
| 08/01/92 | Coleman Christensen (Const. & Mgmt. Fees) | 5,000.00 | |
| 08/10/92 | Kern County Treasurer (Williamson Act Cancel.) | 50,000.00 | |
| 08/19/92 | Howard Berkson (Feasibility for Appraisal) | 15,000.00 | |
| 09/01/92 | Coleman Christensen (Const. & Mgmt. Fees) | 5,000.00 | |
| 09/18/92 | John Eastridge (Utilities Plan) | 385.00 | |
| 09/18/92 | John Eastridge (Utilities Plan) | 1,042.00 | |
| 09/22/92 | City of Wasco (QUAD Engineering) | 436.98 | |
| 09/24/92 | G. T. Farms (Reservoir Grading) | 2,419.50 | |
| 10/01/92 | Coleman Christensen (Const. & Mgmt. Fees) | 5,000.00 | |
| 10/06/92 | City of Wasco (Legal Fees) | 3,662.80 | |
| 10/07/92 | City of Wasco (Williamson Act Cancel.) | 724.65 | |
| 10/14/92 | City of Wasco (QUAD Engineering) | 841.00 | |
| 10/14/92 | City of Wasco (Legal Publication) | 52.65 | |
| 11/01/92 | Coleman Christensen (Const. & Mgmt. Fees) | 5,000.00 | |
| 11/06/92 | City of Wasco (Impact Fees) | 1,290.00 | |
| 11/18/92 | City of Wasco (QUAD Engineering) | 945.50 | |
| 12/02/92 | Coleman Christensen (Const. & Mgmt. Fees) | 5,000.00 | |
| 01/01/93 | Coleman Christensen (Const. & Mgmt. Fees) | 5,000.00 | |
| 01/01/93 | SA Camp Pump Co. (Well Sample & Analysis) | 594.00 | |

SUBTOTAL                                                               137,341.33      $137,341.33

LESS ADJUSTMENT (ACCOUNTING BY CITY OF WASCO)                          (2,223.48)       (2,223.48)

NET MISCELLANEOUS EXPENDITURES                                         135,117.85       135,117.85

TOTAL ENGINEERING EXPENDITURES (FROM EXHIBIT B-5)                      361,738.70       361,738.70

TOTAL FOR ENGINEERING AND MISCELLANEOUS EXPENSES                      $496,856.55      $496,856.55

(NOTE: Information in EXHIBIT B-4 provided by City of Wasco.)

L 122

QUAD

# EXHIBIT B-5

## CITY OF WASCO
## ASSESSMENT DISTRICT NO. 92-2

### ENGINEERING COST SUMMARY

| ITEM NO. | CATEGORY | PERCENT EXPENDED | BUDGET | AMOUNT EXPENDED | BENEFIT ALLOCATIONS | | | |
|---|---|---|---|---|---|---|---|---|
| | | | | | GENERAL | TRACT 5472 | COMMERCIAL PROPERTY | TRACT 5618 |
| 2 | Boundary and Topo Survey | 30% | $24,287.15 | $7,286.15 | $7,286.15 | | | |
| 3 | Rte 46 Survey | 100% | 4,547.17 | 4,547.17 | | | $4,547.17 | |
| 4 | Offsite Sewer Survey | 100% | 6,388.72 | 6,388.72 | 6,388.72 | | | |
| 5 | Offsite Water Survey | 100% | 10,449.15 | 10,449.15 | 10,449.15 | | | |
| 6 | Land Use Plan | 30% | 35,528.89 | 10,658.67 | 10,658.67 | | | |
| 7 | Design Guidelines | 100% | 1,378.57 | 1,378.57 | 1,378.57 | | | |
| 9 | Water Master Plan | 100% | 16,501.50 | 16,501.50 | 16,501.50 | | | |
| 10 | Sewer Master Plan | 100% | 24,678.12 | 24,678.12 | 24,678.12 | | | |
| 11 | Drainage Master Plan | 100% | 12,967.73 | 12,967.73 | 12,967.73 | | | |
| 12 | Traffic Master Plan | 100% | 16,785.51 | 16,785.51 | 16,785.51 | | | |
| 13 | Williamson Act Cancellation | 100% | 4,281.05 | 4,281.05 | 4,281.05 | | | |
| 15 | Tract 5472 Streets and Walls | 100% | 49,188.18 | 49,188.18 | | $49,188.18 | | |
| 16 | Tract 5472 Drainage Plan | 100% | 2,826.88 | 2,826.88 | | 2,826.88 | | |
| 17 | Tract 5472 Grading Plan | 60% | 8,934.22 | 5,360.53 | | 5,360.53 | | |
| 18 | Tract 5472 Sewer Plan | 80% | 12,902.00 | 10,321.60 | | 10,321.60 | | |
| 19 | Tract 5472 Water Plan | 80% | 4,226.06 | 3,380.85 | | 3,380.85 | | |
| 21 | Tract 5472 Landscape Plans | 100% | 23,789.62 | 23,789.62 | | 23,789.62 | | |
| 22 | Tract 5472 Plant Design | 100% | 3,736.82 | 3,736.82 | | 3,736.82 | | |
| 24 | Tract 5618 Street Plans | 100% | 45,755.52 | 45,755.52 | | | | $45,755.52 |
| 25 | Tract 5618 Drainage Plans | 100% | 3,752.48 | 3,752.48 | | | | 3,752.48 |
| 26 | Tract 5618 Grading Plan | 60% | 9,658.08 | 5,794.85 | | | | 5,794.85 |
| 27 | Tract 5618 Sewer Plans | 80% | 2,517.74 | 2,095.19 | | | | 2,095.19 |
| 28 | Tract 5618 Water Plans | 80% | 1,783.78 | 1,427.02 | | | | 1,427.02 |
| 31 | Tract 5618 Landscape Plans | 100% | 3,385.80 | 3,385.80 | | | | 3,385.80 |
| 33 | Tract 5618 Revise Grading | 100% | 39.30 | 39.30 | | | | 39.30 |
| 38 | Offsite Sewer Plans | 100% | 36,401.06 | 36,401.06 | 36,401.06 | | | |
| 39 | Offsite Water Study and Plans | 100% | 17,802.64 | 17,802.64 | 17,802.64 | | | |
| 40 | Offsite Highway Plans | 100% | 30,758.03 | 30,758.03 | | | 30,758.03 | |
| TOTALS: | | | $415,351.77 | $361,738.70 | $165,578.86 | $98,604.48 | $35,305.20 | $62,250.16 |

(NOTE 1: Items 1, 8, 14, 20, 23, 29, 30, 32, 34, 35, 36, and 37 were eliminated because they were not eligible for payment through these proceedings.)
(NOTE 2: Information in this exhibit provided by City and accounts for expenditures with Bond Anticipation Notes.)

92809 AD 92-2

B-5

QUAD

L 123

# EXHIBIT C

## Assessment Boundary Map and Diagram

# EXHIBIT D

## Assessment

L 125

# ENGINEER'S REPORT

## CITY OF WASCO
### Assessment District No. 92-2
### Valley Rose Assessment District

## REPORT REQUIREMENTS

WHEREAS, on August 18, 1992 the City Council of the City of Wasco, Kern County, California, pursuant to the provisions of the Municipal Improvement Act of 1913, adopted its Resolution of Intention No. 92-1476, for the acquisitions, if any, and construction of the public improvements more particularly therein described as City of Wasco Assessment District No. 92-2 (Valley Rose Assessment District); and

WHEREAS, said Resolution of Intention directed the Engineer of Work to make and file a report presenting plans and specifications for the proposed construction, a general description of any works and appliances already installed and any other property necessary or convenient for the operation of the improvements, estimate of costs, maps and descriptions of lands and easements to be acquired and diagram and assessment of and upon the subdivisions of land within the assessment district, to which resolution reference is hereby made for further particulars;

## PROPOSED ASSESSMENT

NOW, THEREFORE, I, Terry W. Schroepfer, P.E., duly appointed Engineer of Work for Assessment District No. 92-2, by virtue of the power vested in me under said Act and the order of the City Council of said City, hereby make the following assessment to cover the portion of the estimated cost of said construction and acquisitions, if any, and the cost and expenses incidental thereto to be paid by the assessment district.

1.   The amount to be paid for said construction and acquisitions, if any, and the expenses incidental thereto, is as follows:

**L 126**

92902 AD 92-2

# STATEMENT OF TOTAL ASSESSMENT

## CITY OF WASCO
Assessment District No. 92-2
Valley Rose Assessment District

| | Description | (1) Preliminary Assessment | (2) Assessment as Confirmed |
|---|---|---|---|
| I. | Improvement Costs | $ 3,227,217.22 | $ 2,821,091.00 |
| II. | Bond Anticipation Note (BAN) Incidental Costs | 800,000.00 | 800,000.00 |
| III. | Bond Pool Reserve Fund Payment | 267,643.75 | 268,000.00 |
| IV. | BAN Funded Interest Costs | 297,500.00 | 297,500.00 |
| V. | Interest Earnings | (227,316.62) | (242,582.21) |
| VI. | Net BAN Funds to Assessment | 4,365,044.35 | 3,944,008.79 |
| VII. | AD 92-2 Incidental Costs | 141,118.15 | 115,991.21 |
| VIII. | AD 92-2 Cost of Issuance | 105,100.00 | -0- |
| IX. | AD 92-2 Funded Interest | 223,337.50 | -0- |
| X. | AD 92-2 Reserve Fund | 420,400.00 | -0- |
| | **TOTAL** | **$ 5,255,000.00** | **$ 4,060,000.00** |

A detailed breakdown of the itemized costs of acquisitions, work and improvements, and expenses incidental thereto is presented in Exhibit "B", attached hereto and incorporated herein by reference.

2.  Pursuant to the provisions of law and said Resolution of Intention, I do hereby assess and apportion the total amount of the cost and expenses of construction and acquisitions, if any, upon the several lots, pieces or parcels or portions of lots or subdivisions of land liable therefor and benefitted thereby, and hereinafter numbered to correspond with the numbers upon the attached diagram, upon each, severally and respectively, in proportion to the benefits to be received by such subdivisions, respectively from the construction and acquisitions, if any, and more particularly set forth in the Assessment Roll, attached hereto as Exhibit "D" and by reference made a part hereof. The numbers on the Assessment Roll correspond with the numbers assigned to each respective parcel and shown on the Assessment Diagram. Each subdivision of land assessed is described within the Assessment Roll by reference to its parcel number as shown on the Assessor's Maps of the County of Kern or by reference to maps and deeds of record excepting those portions thereof in existing public roads or proposed to be acquired in those proceedings.

Said assessment is made upon the several property owners. The property owner list with names of each property owner of each lot or parcel shown on the Assessment Diagram

Said assessment is made upon the several property owners. The property owner list with names of each property owner of each lot or parcel shown on the Assessment Diagram in Exhibit "C" herein, corresponds to the latest equalized roll of the Kern County Assessor.

For a more particular description of the manner in which the Estimated Total Improvement and Acquisition Cost and Incidental Expenses have been assessed upon the several subdivisions of land in Assessment District No. 92-2, reference is made to the Method of Apportionment, attached hereto as Appendix "A" and incorporated herein by reference.

3.  As required by the Municipal Improvement Act of 1913, the assessment diagram entitled "ASSESSMENT DIAGRAM, CITY OF WASCO, ASSESSMENT DISTRICT NO. 92-2, VALLEY ROSE ASSESSMENT DISTRICT, COUNTY OF KERN, STATE OF CALIFORNIA", consisting of three (3) sheets, is on file in the office of the City Clerk.

Also, said diagram shows the assessment district, the boundaries and dimensions of the respective subdivisions of land within said assessment district, as the same which existed at the time of the passage of said Resolution of Intention, and as requested in the petition for said construction and acquisitions, if any, each of which subdivisions having been given a separate number upon said diagram. A reduced scale diagram is attached hereto in Exhibit "C" and incorporated herein by reference. For a more particular description of the Assessment District No. 92-2 exterior boundaries, reference is made to the Assessment District No. 92-2 Boundary Map on file in the office of the City Clerk. Included in Exhibit "C" and incorporated herein by reference, is a reduced copy of the boundary map.

## STATEMENT OF MAXIMUM ANNUAL PARCEL ASSESSMENT FOR RECOVERY OF ASSESSMENT DISTRICT ADMINISTRATION COSTS AND EXPENSES

Pursuant to Subdivision (f) of Section 10204 of the Streets and Highways Code, I present the following statement of a proposed maximum annual assessment upon each parcel and subdivision of land in Assessment District No. 92-2, in the amount of twenty-five and no hundredths dollars ($25.00) plus an annual maximum five percent (5%) adjustment for inflation.

Said annual assessment shall be levied by the City Council to cover all administrative costs of Assessment District No. 92-2 incurred by the City, and not otherwise reimbursed, which result from the administration and collection of assessments or from the administration or registration of any associated bonds and reserve or other related funds. The City Council shall determine, by resolution, the amount of the annual assessment for this purpose, which shall not exceed the maximum assessment stated above and shall not exceed a reasonable estimate of costs actually incurred. The above stated maximum annual assessment amount shall be separate from and in addition to any fee charged to property owners in Assessment District No. 92-2 by the City of Wasco, pursuant to Sections 8682 and 8682.1 of the Streets and Highways Code.

**L 128**

## BOND DECLARATION

NOTICE IS HEREBY GIVEN, that serial and or term bonds to represent the unpaid assessments and to bear interest at the rate not to exceed twelve percent (12%) per annum may be issued in the manner provided by the Improvement Bond Act of 1915 (being Division 10 of the Streets and Highways Code) (herein the "1915 Act") the last installment of such bonds shall mature not to exceed thirty-nine (39) years from the second day of September, next succeeding twelve (12) months from their date and shall be subject to a call premium equal to five percent (5%) of the principal. Prior to issuance, the City Council may provide for a redemption of the redemption premium to an amount equal to not less than three percent (3%) for the first five (5) years of the term of the bonds or to any amount, including zero, after the first five (5) years of the term of the bonds, or both.

The provisions of Part 11.1 of the 1915 Act, providing an alternative procedure for the advance payment of assessments and the calling of bonds, shall apply and the principal amount of the bonds maturing in each year shall be other than an amount equal to an even annual proportion of the aggregate principal of the bonds.

The total amount assessed pursuant to the Assessment District No. 92-2 proceedings includes an incidental expense to cover the estimated cost of preparing, printing, registering, servicing and collecting the improvement bonds proposed to be issued to represent the unpaid assessments.

Submitted for preliminary approval on the 17th day of January, 1995 and submitted for final approval on the 7th day of March, 1995.

Terry W. Schroepfer, P.E.
Engineer of Work
City of Wasco
Assessment District No. 92-2

REGISTERED PROFESSIONAL ENGINEER
TERRY W. SCHROEPFER
NO. 26398
EXP. 3-31-96
CIVIL
STATE OF CALIFORNIA

L 129

# EXHIBIT D

### CITY OF WASCO
### Assessment District No. 92-2

## ASSESSMENT ROLL

| Assmt. Diagram No. | Assessor's Parcel No. | Land Owner | Preliminary Assessment | Confirmed Assessment |
|---|---|---|---|---|
| 1 | 070-050-46-00-6 | Legacy Group | $3,433,805.02 | $2,708,520.48 |
| 2 | 070-050-48-00-0 | Legacy Group | 1,821,194.98 | 1,351,479.52 |
| | | | $5,255,000.00 | $4,060,000.00 |

L 130

# EXHIBIT E

## Land Owner Names and Addresses

# EXHIBIT E

### CITY OF WASCO
Assessment District No. 92-2

## LAND OWNER NAMES AND ADDRESSES

| Assmt. Diagram No. | Assessor's Parcel No. | Land Owner | Address | City | State | Zip |
|---|---|---|---|---|---|---|
| 1 | 070−050−46−00−6 | Legacy Group | 16000 Ventura Blvd. #1200 − Encino, CA 91436 | | | |
| 2 | 070−050−48−00−0 | Legacy Group | 16000 Ventura Blvd. #1200 − Encino, CA 91436 | | | |

QUAD

# EXHIBIT F

## Summary of Assessment Spread

# EXHIBIT F

## CITY OF WASCO ASSESSMENT DISTRICT NO. 92-2
### VALLEY ROSE ASSESSMENT DISTRICT

### SUMMARY OF ASSESSMENT SPREAD

| ASMT DIAG. NO. | ASSESSOR'S PARCEL NUMBER | TOTAL EDU | ENGR. AND PLANNING | ON-SITE BENEFIT | | COML. | OFF-SITE BENEFIT | | CITY INSPECTION FEE | TOTAL IMPROVEMENT COSTS | BAN INCIDENTAL AND INTEREST COSTS | BAN NET; FUNDS TO ASSESSMENT | AD 92-2 INCIDENTAL INTEREST & RESERVE FUND COSTS | AD 92-2 TOTAL ASSESSMENT |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | | | | TENT. TR. 5472 | TENT. TR. 5618 | | OFF-SITE IMPROVEMENTS | WATER TANK | | | | | | |
| 1 | 070-050-46-00-6 | 203.11 | $134,040.71 | $803,214.46 | $90.00 | $412,318.62 | $514,341.96 | $1,971.47 | $16,128.24 | $1,881,015.46 | $749,124.59 | $2,631,140.05 | $77,380.44 | $2,708,520.48 |
| 2 | 070-050-48-00-0 | 265.70 | 175,346.44 | 0.00 | 88,309.48 | 0.00 | 672,840.63 | 2,578.99 | 0.00 | 939,075.54 | 373,793.20 | 1,312,868.74 | 38,610.77 | 1,351,479.52 |
| TOTALS | | 468.81 | $309,387.15 | $809,214.46 | $88,309.48 | $412,318.62 | $1,187,182.59 | $4,550.46 | $16,128.24 | $2,821,091.00 | $1,122,917.79 | $3,944,008.79 | $115,991.21 | $4,060,000.00 |

L 134

# EXHIBIT L    Okadigbo Dec

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA, FRESNO DIVISION

———————

ROGER McINTOSH,                    No. 1:07-CV-01808-LJO-GSA

        Plaintiff,

vs.

NORTHERN CALIFORNIA UNIVERSAL
ENTERPRISES COMPANY, et. al.,

        Defendants.

_____

DEPOSITION OF GREG BLACK

Taken at

Borton, Petrini, LLP
5060 California Avenue, Seventh Floor
Bakersfield, California

Wednesday, January 22, 2009 at 9:05 A.M.

Reported by:

Karen A. Marousek, CSR #10022

1

1    A.    All of the physical improvements to the site

2    had previously been constructed, so all the roads were

3    in place, all of the perimeter block wall was in place,

4    I believe even to the point that landscaping had

5    previously been installed.  So I'm not sure who

6    prepared those plans.  I don't believe it was part of

7    our contract at DeWalt Corporation to prepare any

8    improvement plans.

9    Q.    So you didn't prepare the improvement plans,

10   your only job was to process the tentative map?

11   A.    And I believe it also included preparing the

12   final map for recordation.

13   Q.    And I'm sorry, and the final map for

14   recordation?

15   A.    Yes.

16   Q.    But you're not sure who actually created the

17   plans for this particular tract?

18   A.    Right.

19   Q.    Had you ever seen the plans for this

20   particular tract?

21   A.    I had seen an old copy of some of the plans,

22   but I don't -- I don't know if I had seen all of the

23   improvement plans or just a couple of the plans.  I

24   don't specifically recall.

25   Q.    Do you remember ever asking for those plans?

1       A.    No.

2       Q.    It has been a while.  If I gave you some -- I

3   will find them here somewhere.

4             When we were at -- when we took Jeff

5   Gutierrez's deposition -- scratch that.

6             At Dewalt's deposition, Jeff Gutierrez was the

7   person most knowledgeable.  He provided to us a compact

8   disk with a number of different e-mails that were on

9   it.  And I know it's been a while, these -- the stack

10  of e-mails I'm going to give you are dated 2005, and

11  see if you can -- take your time and look through those

12  and see if you remember if those are e-mails that were

13  sent by you or to you or if they refresh your memory?

14      A.    This first e-mail looks like it was from

15  Dennis McNamara, who is in the planning department at

16  the City of Wasco, to me.  And there are some images

17  attached that look like some of the improvement plans

18  for that Tract 5472.

19      Q.    And that Tract 5472 is the tract number that

20  you were referring to earlier, but that you didn't

21  recall?

22      A.    Again, I don't specifically recall.  I assume

23  that that is the previous tract number.

24      Q.    Fair enough.

25            MR. HASSING:  What was the date on the e-mail

 1    or discussion that led to him sending me that

 2    information.

 3       Q.    Uh-huh.  Typically, what would you need

 4    improvement plans -- let me go back.

 5            Is it your -- is it your understanding that

 6    this was a tract where improvements had already been

 7    put into the ground, I think you had said that earlier;

 8    is that right?

 9       A.    That's correct.

10       Q.    All right.  And so according to the proposal

11    that we looked at earlier, your job was to simply

12    prepare and process the tentative and later the final

13    map; is that right?

14       A.    I believe so, yes.

15       Q.    So in a situation like that, why would you

16    need improvement plans to prepare and process a

17    tentative map?

18            MR. HASSING:  Objection.

19       Q.    (By Mr. Travis)  If you understand that

20    question.

21            MR. HASSING:  Objection, the question assumes

22    that he would need those plans.  Object to the form of

23    the question.

24       Q.    (By Mr. Travis)  You can go ahead and answer.

25            MR. OKADIGBO:  Yeah, to add to that, he didn't

1    say that he needed the plans.

2         Q.    (By Mr. Travis)   It's a hypothetical, you can

3    answer it.

4              MR. HASSING:   Objection, incomplete

5    hypothetical.

6              MR. TRAVIS:   You're welcome.

7              THE WITNESS:   Could you repeat it, please?

8         Q.    (By Mr. Travis)   Sure.   In a situation like in

9    64 -- in preparing and processing the tentative and

10   final map where the improvements are already in the

11   ground and all you need to do is prepare and process

12   that map, why would you need improvement plans, if you

13   would need them at all?   Can you think of a situation

14   where you would need them?

15        A.    I can't think of a situation where I would

16   need them.   Typically, on a project like this, as an

17   engineer, I like to get my hands on, you know, as much

18   information as there may be out there available to look

19   at.   Whether it's absolutely essential to the

20   completion of the project or, you know, just some

21   cursory information that may not have any direct

22   bearing on the project, still like to get all that

23   information, you know, just to use in case -- you know,

24   there might be something on some of that information

25   that may impact what you're going to do on the project.

1    project that we've been talking about?

2        A.    Not that I recall.

3        Q.    I have another -- and what I just gave you

4    looks to be a letter to Jeremy Bowman, letterhead with

5    DeWalt Corporation dated September 2nd, 2005, and it

6    looks to have your name in type print and then your

7    signature.  Is that your signature on that letter?

8        A.    Yes.

9        Q.    Okay.  And do you remember -- do you remember

10   this letter or what this letter was concerning?

11       A.    I don't specifically remember preparing it,

12   however, it appears that this letter would have been a

13   transmittal accompanying the final map for Tract 6451.

14   And it appears in this case that it is a second check

15   or later version.

16       Q.    In the second sentence of that letter it says,

17   "The revisions incorporate your comments provided on

18   the marked-up plans, which are also included with this

19   letter."

20            Do you know what marked-up plans you were

21   referring to?

22       A.    I believe those marked-up plans would have

23   referred to the previous version of the final map which

24   would have been submitted for check.

25       Q.    So in this -- so if I understand what you're

1    A.    Right.

2    Q.    Ordinarily when you take on the obligation of

3  processing a tentative and final map on a residential

4  subdivision, you're also charged with the

5  responsibility of preparing the improvement plans, are

6  you not?

7    A.    Ordinarily, yes.

8    Q.    99.999 percent of the time, would you say?

9    A.    I would say 90 percent or better.

10    Q.    90 percent or better.  Okay.

11        Do you recall when you first realized that in

12  this project DeWalt was not going to be preparing the

13  improvement plans?

14    A.    Was at the very beginning of the project.

15    Q.    And tell me how you became aware of that for

16  the first time.

17    A.    I think in the proposal it actually reflects

18  that the improvements, I believe -- if I'm recalling

19  correctly, I think it reflects the improvements are in

20  place.

21    Q.    All right.  I'm going to give you Exhibit 2,

22  and direct your attention to the first page, the second

23  bullet point, if you can read that.  Is that what

24  you're referring to?

25    A.    That certainly indicates it.  And also in the

1    first paragraph of the letter, the second sentence

2    says, "You will recall that the tentative map for Tract

3    5472 was approved with conditions at the time.  Many of

4    the conditions of approval with regard to

5    infrastructure improvements to the site in question

6    were completed."

7        Q.   All right.  Now, in reading that paragraph,

8    did you come to the understanding that all of the

9    improvements -- all of the improvements were in place

10   or some of the improvements were in place?

11       A.   My understanding was all of the improvements

12   were in place.

13       Q.   All right.  And that understanding, then, came

14   from more than just this document, did it?

15       A.   Yes.

16       Q.   Do you know what that understanding was based

17   on?  Was it a conversation with somebody?

18       A.   I think it was a conversation with someone,

19   perhaps a site visit early -- early in the project.

20       Q.   Do you recall who that conversation was with?

21       A.   No.  It may have been with Jeff Gutierrez, may

22   have been with Mr. Wu.  Again, I don't specifically

23   recall.

24       Q.   All right.  I see the second bullet point

25   under Topographic Survey indicates that you were to

1    Q.   Do you recall any reason why you would have

2  needed those improvement plans?

3    A.   Again, just as part of the initial information

4  gathering for the project.

5    Q.   All right.  Do you recall ever looking at

6  those improvement plans?

7    A.   I recall looking at them, not studying them

8  in-depth or looking into any of the specific, you know,

9  data on them.

10    Q.   Did you ever make any use of those improvement

11  plans?

12    A.   Not that I recall.

13    Q.   All right.  Now, you had to prepare a cost

14  estimate, right?

15    A.   Uh-huh.

16    Q.   And how did you prepare that cost estimate?

17    A.   We would look -- typically, take, like, the

18  tentative map and estimate quantities off of that.  You

19  can determine, like, linear footage of curb and gutter,

20  square foot area of paving, linear footage of block

21  wall, get those quantities.  And then we had, I'll call

22  it a database of information of historical construction

23  costs that we would then obtain a unit cost for each of

24  those items and then just, you know, carry out the math

25  associated with calculating that total.

1      A.    Thinking back, I believe it's all surface

2    drain in here.  Again, it's been quite a while.  I

3    don't specifically remember.

4      Q.    All right.  But you didn't -- you didn't study

5    or use the improvement plans that the city provided by

6    e-mail in order to calculate the cost, estimated cost

7    of improvements for purposes of determining the size of

8    the maintenance bond?

9      A.    No.

10     Q.    All right.  Now, in determining the cost of

11   improvements, is that something that you, yourself,

12   did, or did you delegate any part of that to anybody

13   else?

14     A.    I could have delegated part of that to someone

15   else, a designer individual perhaps could have

16   calculated those quantities from the map.  And a

17   technician could have, you know, built the spreadsheet

18   with all of that information in it.

19     Q.    You don't know if you did it or you delegated

20   it?

21     A.    Yeah, I don't remember.  Sometimes --

22   typically, sometimes I did, and other times, depending

23   on availability of other staff to do it, you know, they

24   may have done it.

25     Q.    Okay.  Did you have any conversations with

 1    A.    Not that I specifically recall.

 2    Q.    All right.  Do you recall whether the lot

 3  numbering as it existed on 5472 was in any way tied to

 4  the improvements that were already in place?

 5    A.    I'm sorry, could you ask that again?

 6    Q.    Yeah.  Mr. Travis asked you some questions

 7  about the lot numbering at the subdivision, and I think

 8  in answering those questions we determined that the lot

 9  numbering for 6451 is identical to the lot numbering of

10  5472.  And I'm wondering if there was any reason why

11  those lot numbers are the same as those lot numbers

12  relate to the improvements that are already on-site.

13  Do you know of any -- any reason in that regard?

14    A.    No specific reason that I can think of.  I

15  could only -- could only think that, you know, a

16  possible alternative would be just, you know, following

17  the typical convention of numbering lots.  Just so

18  happened that they started and followed the same

19  pattern as the previous map.

20    Q.    Did anybody ever ask you to copy the 5472

21  tentative map?

22    A.    No, not that I recall.

23    Q.    Do you know of any copying that was done at

24  DeWalt of the 5472 map?

25    A.    Not that I recall.

1  designers -- other than to express to them what their

2  work was supposed to be, in other words, "Go and" --

3  "Go and do what it is that you do." Did you give any

4  specific direction to them on how to perform their

5  jobs, or was it just understood that, you know, it was

6  within -- it was within the nature of things that they

7  do, and so they should just do it and come back to you

8  and have you sign off on it?

9     A.    It was certainly within the nature of their

10  normal activities that they would do, their normal job

11  requirements. The only thing that would have made this

12  unique would have been the improvements that have been

13  constructed in making sure that the designer

14  understood, "Okay. This is the perimeter block wall

15  that's already in place. There's a driveway cut here

16  and here and here. And so layout the lots making sure

17  that it accommodates the existing physical features

18  that are already there on site."

19     Q.    In your interactions with the City of Wasco

20  for the purpose of processing the tentative map that

21  DeWalt prepared for 6451, do you -- did you -- did the

22  city tell you to submit improvement plans? Did they

23  specifically direct you and/or DeWalt to submit

24  improvement plans?

25     A.    No.

1    Q.    Do you remember any conversations with people

2    from the City of Wasco generally about improvement

3    plans?

4    A.    I don't remember any specific conversations.

5    Again, I'll refer back to these e-mails in Exhibit No.

6    5.  Obviously, I had some conversations with at least

7    Dennis McNamara about existing plans.

8    Q.    Okay.  But besides -- besides Dennis McNamara

9    providing copies of these plans per this e-mail and --

10   sorry.  Yeah, besides that, did you have -- do you

11   recall -- did the City of Wasco tell you -- let me

12   scratch that.

13        Besides this e-mail series where McNamara gave

14   you improvement plans, do you recall any other

15   interactions with the City of Wasco persons concerning

16   improvement plans for the Valley Rose Estates

17   subdivision?

18   A.    No specific conversations, except for maybe in

19   the process of preparing that cost estimate that we had

20   mentioned earlier.

21   Q.    Did anyone from the City of Wasco suggest to

22   you that you should use the improvement plans for the

23   Valley Rose Estates subdivision to perform any work

24   that you were doing for Northern California Universal

25   Enterprises Company?

1       A.    No.

2       Q.    Did anyone from the City of Wasco suggest to

3   you that you should use the tentative map for Tract No.

4   5472 or any other maps, tentative maps, prior to the

5   one that DeWalt created, which is 6451, did anyone from

6   the City of Wasco suggest that you should use any of

7   those prior tentative maps to create or prepare the

8   tentative map for Tract No. 6451 that DeWalt submitted

9   for Northern California Universal Enterprises Company?

10      A.    No.

11      Q.    Did anyone from the City of Wasco suggest to

12  you that you should use the tentative map for Tract No.

13  5472 and/or any other tentative maps created prior to

14  the one that DeWalt created -- prior to the tentative

15  map for Tract No. 6451 to prepare a final map for Tract

16  No. 6451?

17      A.    No.

18      Q.    Let me rephrase it.

19            Did anyone from the City of Wasco suggest to

20  you that you should use the tentative map for Tract No.

21  5472 to prepare the final map for Tract No. 6451?

22      A.    No.

23      Q.    To your knowledge, did the City of Wasco

24  suggest to anyone else at DeWalt that they should use

25  prior tentative maps to prepare the tentative map for

 1  Tract No. 6451?

 2     A.    Not to my knowledge.

 3     Q.    And is that also true of -- well, let me ask

 4  the exact question.

 5         Did anyone else -- did anyone from the City of

 6  Wasco, to your knowledge, suggest to anyone else at

 7  DeWalt that they should use the tentative -- the prior

 8  tentative maps for the Valley Rose Estates subdivision

 9  to prepare the final map for Tract No. 6451?

10     A.    Again, not to my knowledge.

11     Q.    Okay.  And just to clarify, when I refer to

12  prior tentative maps, I am referring to any and all --

13  any and all tentative maps created for the Valley Rose

14  Estates subdivision prior to Tentative Tract Map No.

15  6451.

16         To your knowledge, did anyone at DeWalt use

17  copies of tentative map for Tract No. 5472 to perform

18  the surveying work that DeWalt did for Tract No. 6451?

19     A.    Not to my knowledge.

20     Q.    To your knowledge, did anyone at DeWalt use

21  copies of the tentative map for Tract No. 5472 to

22  prepare the final map for Tract No. 6451?

23     A.    Not to my knowledge.

24     Q.    Do you have any understanding as to how the

25  street names for Tract Map -- I'm sorry.  How the

1     A.    No.

2           MR. TRAVIS:   Okay.

3           MR. HASSING:   Just a few.

4              FURTHER EXAMINATION BY MR. HASSING

5     Q.    Dewalt never prepared any improvement plans

6    for the subdivision, correct?

7     A.    Correct.

8     Q.    Do you know if DeWalt ever gave Joe or

9    Northern a set of improvement plans?

10    A.    Could you be more specific?

11    Q.    Do you know if DeWalt ever provided a set of

12   improvement plans that you received from Mr. McNamara

13   to Joe or Northern?

14    A.    I don't specifically remember doing that, but

15   it may have, may have happened.

16    Q.    Are you aware of the fact that a number of the

17   lots in the subdivision have slightly different

18   dimensions in 6451 than they did in 5472?

19    A.    I'm not specifically aware of it, because I

20   have never taken the maps side by side and compared

21   them, but that certainly doesn't surprise me to hear

22   that.

23    Q.    Were the -- were the lots -- at the time you

24   began your survey, were the lots, individual lots

25   staked in any manner?

1      A.   Not -- not that I specifically recall.

2      Q.   Given the fact that all of the improvements

3   were in place and given the fact that the developer

4   wanted to maximize the lots, can you think of any other

5   way to have drawn the plan other than the way DeWalt

6   drew it?

7      A.   Short of demolishing some of the existing

8   improvements?

9      Q.   Yes, sir.

10     A.   No.

11     Q.   And when I said "plan," I meant map.  You

12  understood that, right?

13     A.   Yes.   Tentative map.

14     Q.   Yes.   Now, I understand from your testimony

15  that there was a time when you came into the office and

16  met with Mr. Travis?

17     A.   Yes.

18     Q.   How did that come about?   What caused that

19  meeting?

20     A.   Mr. Travis, I think, had contacted me and

21  wanted to get together and talk, again, just about what

22  was DeWalt Corporation's involvement in the project,

23  what was my role and activities with DeWalt

24  Corporation.

25     Q.   That's the reason Mr. Travis gave you in the

1     A.   No.

2          MR. HASSING:  All right.  I have no further

3  questions.

4          MR. OKADIGBO:  I've got just a few.

5          FURTHER EXAMINATION BY MR. OKADIGBO

6     Q.   I've probably beat this to death, but I just

7  want to make sure, because that's what I do.

8          You've testified already about the nature of

9  DeWalt's or your interaction with the City of Wasco in

10  terms of submitting the tentative and the final maps

11  through the city's process of review and approval of

12  the tentative and final maps.  So in that process --

13  let me rephrase that.

14          The city's process of reviewing and approving

15  the final, the tentative map, did that process ever

16  involve instructions from the city to DeWalt about

17  using the Tentative Map 5472?

18     A.   No.

19     Q.   Did that process ever involve instructions to

20  use the improvement plans for 5472?

21     A.   No.

22          MR. OKADIGBO:  No further questions.

23          MR. TRAVIS:  I'm done.  I know that we had

24  used another reporter, we had a stipulation, but I

25  think we just need to redo it because we have Greg

# EXHIBIT M    Okadigbo Dec

1                UNITED STATES DISTRICT COURT

2        EASTERN DISTRICT OF CALIFORNIA, FRESNO DIVISION

3                      _____

4

5   ROGER McINTOSH,              No. 107CV 01080 LJO-WMW

6                Plaintiff,

7   vs.

8   NORTHERN CALIFORNIA UNIVERSAL
    ENTERPRISES COMPANY, et al.,
9
                 Defendants.
10  _____

11

12          DEPOSITION OF JEFFREY GUTIERREZ

13                   Taken at

14               Borton Petrini
                1600 Truxtun Avenue
15            Bakersfield, California

16     Monday, November 24, 2008 at 10:08 A.M.

17

18                 Reported by:

19        Naomi S. Alvarez, CSR #13007

20

21

22

23

24

25

                                              1

```
 1        Q.    And what's his position?

 2        A.    He's the survey technician.

 3        Q.    And do you know where he got a copy of map

 4   5472?

 5        A.    I think he got it from Greg.

 6        Q.    And did you ever have or overhear any

 7   conversations about how map 5472 compared with the map

 8   that you developed from your surveys?

 9        A.    No.

10        Q.    Did you hear any conversations to the effect

11   that map 5472 was used to fill in any missing

12   information on any map?

13        A.    No.

14        Q.    Other than --

15        A.    I think I need to clarify that.  I'm sorry.

16   At the time that the survey and the map was created I

17   didn't.  I wasn't aware of any.  After my conversations

18   with Joe Wu two weeks ago we pulled it out and looked

19   at it.

20        Q.    You pulled out map 5472?

21        A.    Yeah.  I pulled it out just to see what they

22   looked like.

23        Q.    Did you compare them to each other?

24        A.    Yes.

25        Q.    How would you describe that comparison?
```

1    the improvement plans for map 5472 with the improvement

2    plans that DeWalt developed?

3        A.    No.

4        Q.    Did you have both of those copies in your

5    office, the ones that are associated with --

6        A.    They should both be --

7        Q.    Let me finish.

8        A.    Sure.

9        Q.    Do you have both of those improvement plans in

10   your office, those associated with map 5472 and the map

11   that DeWalt developed?

12       A.    Yes.

13       Q.    And I think you said you brought them today.

14       A.    Yes.

15       Q.    You brought both the copies and the

16   improvement plans that you obtained from the City of

17   Wasco and the improvement plans that DeWalt developed?

18       A.    Yes.   They should be there.

19       Q.    Why don't we take some time now and identify

20   some documents.   Maybe we can get your box up here on

21   the table.

22             Let's start with the Notice of Taking

23   Deposition here.   Number one in our request for

24   production of documents ask for all e-mails and other

25   correspondence between you, meaning DeWalt, and

1      A.    Different people, but mostly Greg Black and

2   people from Northern California or the City of Wasco or

3   in some cases title companies, other people that might

4   have gotten involved in the project that Greg had to

5   e-mail.

6      Q.    And as part of those correspondences were

7   attachments -- what were some of those attachments?

8      A.    In some cases title documents, old plans, the

9   tentative map, just various things associated with the

10   project.

11      Q.    Which included as attachments the improvement

12   plans?

13      A.    Yes.

14      Q.    And which improvement plans were those?

15      A.    I glanced at the subdirectory during the break

16   and I saw grading plans, some street improvement plans,

17   a tentative map in there.

18      Q.    And those were the original improvement plans

19   for the Valley Rose Estate subdivision?

20      A.    They came from the City of Wasco, so I assume

21   that's what they had on file.

22      Q.    Also attached as Exhibit Number 5, you had

23   identified tentative Tract Map 6451.  We should

24   probably use the exhibit that's already been marked.

25   Do we have that?  Here we go.

1    A.   I'm not positive, but I think it's Roger.

2    Q.   Roger McIntosh?

3    A.   Yeah.

4    Q.   So you had to rely for these monuments --

5    okay.  Well, scratch that.

6         That's Roger's license number, to the best of

7    your knowledge?

8    A.   I think it is.

9    Q.   And the associative improvement plans, looking

10   again at the notes -- I'm trying to find it to see if

11   they're on this one.  Excuse me.

12        It's probably on Exhibit 6 somewhere, but I

13   know they are here.  On Exhibit 5 in the note section

14   it talks about the approved -- an associative approved

15   improvement plan.

16        Is that referring to Roger's plans as well?

17   A.   Yes.

18        MR. TRAVIS:   Now that's it.

19             EXAMINATION BY MR. HASSING

20   Q.   To your knowledge, did your office ever

21   prepare any improvement plans for this subdivision?

22   A.   Yeah.  No, we did not.  No, we did not.

23   Q.   Do you know why you didn't?

24   A.   Greg probably knows better than I do.

25   Q.   What is your understanding of why?

1     A.    I would assume it was because the improvements

2     were all installed.

3            MR. HASSING:   I have no further questions.

4                  EXAMINATION BY MR. OKADIGBO

5     Q.    In terms of how the lot numbers would have

6     been chosen, you didn't have any role in choosing the

7     numbers listed on either tentative map or final map

8     6451, did you?

9     A.    Not me personally, no.

10    Q.    So you can only guess as to what that process

11    would have involved since you didn't do it; is that

12    right?

13    A.    Yes.

14    Q.    What specifically did Northern California --

15    NCUE hire DeWalt to do for them in relation to the

16    Valley Rose Estate subdivision?

17    A.    They hired us to do topographic survey of the

18    site.  They hired us to prepare a tentative map and

19    they hired us to prepare the final map and to get the

20    final map approved.

21    Q.    How much did you charge NCUE for that?

22    A.    Can I refer to one of these?

23    Q.    I think it's in Exhibit 4.

24    A.    Yeah.  In Exhibit 4, a proposal letter is here

25    and it's broken down.  $7,500 for the topographic

# EXHIBIT N

**Okadigbo Dec**

1                UNITED STATES DISTRICT COURT

2         EASTERN DISTRICT OF CALIFORNIA, FRESNO DIVISION

3                       _____

4

5     ROGER McINTOSH,                    No. 107CV 01080 LJO-WMW

6                      Plaintiff,

7     vs.

8     NORTHERN CALIFORNIA UNIVERSAL
      ENTERPRISES COMPANY, et al.,
9
                      Defendants.
10    _____

11

12              DEPOSITION OF JEFFREY GUTIERREZ

13                      Taken at

14                   Borton Petrini
                  1600 Truxtun Avenue
15                Bakersfield, California

16       Monday, November 24, 2008 at 10:08 A.M.

17

18                   Reported by:

19             Naomi S. Alvarez, CSR #13007

20

21

22

23

24

25

1

**COPY**

# DEWALT CORPORATION
## NEW JOB REQUEST FORM

DATE _Sept 7 2004_  JOB NUMBER _2004 49_
SURVEY FILE NEEDED _Yes_  PROJECT MANAGER _GoB_

CLIENT _Northern California Universal Enterprise Company   (NCUE)_
STREET ADDRESS _300 "B" Street_
CITY, STATE, ZIP _Turlock, CA   95380_
ATTN: _Joe Wu_   e-mail:
TELEPHONE: _(209) 669-0606_   FAX: (209) 669-0498   CELL:
DESCRIPTION OF JOB:
_Topographic Survey, Tentative Map, Final Map, Monument & Lot Corner Installation_

LOCATION: Section: _4_   Township: _27S_   Range: _24E_   Base & Meridian: _M. D._

TYPE OF BILLING:   ☒   Lump Sum
  ☐   Unit Price   $ _____ per _____
  ☐   Time & Materials with Estimated Fee
  ☐   Time & Materials Not To Exceed   $ _____
  ☐   Other _____

PROJECTED FEE INCOME:   $ _26,000_
(Amount of Contract or Estimated Fees)

CONTRACT STATUS:
  ☒   Executed Letter Agreement Dated: _9/2/04_  (Attached).
  ☐   Attached Proposal / Contract Dated _____ sent to Client
      Verbal Authorization Received on _____
  ☐   Awaiting Client Produced Contract / Letter of Authorization.
  ☐   Other: _____

COMMENTS: _____

_(signature)_ _9/7/04_
PROJECT MANAGER SIGNATURE   DATE

KPM>M/LDT/JSF-1\NEW JOB.WK4

PLAINTIFF'S EXHIBIT
3
(11-24-04)
Jeffrey Gutierrez

3-0001

07/21/2004  10:57    2346/4              DEWALT                    PAGE  01

EXHIBIT 'A'

# DEWALT
## Corporation

* ENGINEERING   * PLANNING   * SURVEYING   * LAND DEVELOPMENT   * CONSTRUCTION MANAGEMENT

July 21, 2004

04-01P

**NORTHERN CALIFORNIA UNIVERSAL ENTERPRISE CO.**
300 "E" Street
Turlock, CA 95380
FAX:   209.669.0496

Attn.:  Mr. Jess Marinta

Re:    Wasco Subdivision – Expired Tract 5472
       Proposal for Planning / Engineering / Surveying / Professional Services

Dear Mr. Marinta,

DeWalt Corporation is pleased to provide this proposal for the following Planning, Engineering, and Surveying services for the property on Valley Rose Park Way in the City of Wasco, County of Kern. You will recall that the Tentative Map for Tract 5472 was approved with conditions at one point in time. Many of the conditions of approval with regard to infrastructure improvements to the site in question were completed, yet the Tentative Map was allowed to expire before recordation. Find below the various services that DeWalt Corporation proposes to provide to you for this project and their associated costs:

## TOPOGRAPHIC SURVEY:

Topographic survey will be performed in such a manner as to gather data which will be used for planning or engineering purposes. Please note that prior to the commencement of survey we will require a current (less that 30 days old) preliminary title report.

*   Research existing horizontal and vertical monumentation with the Kern County Surveyor.
*   Research existing infrastructure improvement plans with the Kern County Resource Management Agency, City of Wasco and any other related utility companies and service districts.
*   Perform a boundary survey of the site, corroborating the existence of property corners and defining the site boundary. During the course of the boundary portion of the survey, we will also devote time to identifying any encroachment of the property lines.
*   Perform a topographic survey of the existing pads, street and infrastructure improvements. Pad certification will be desired for proof of flood and grading plan conformance with County of Kern.
*   Process and transfer the survey data for entry into electronic drafting software (AutoCAD) for the purposes of preparing the topographic survey plat.
*   Dissemination of the Preliminary Title Report and identification of easements, licenses and recorded documents that encumber the property in question.
*   Drafting and review of topographic survey plat.
*   Validation and Certification of survey by a licensed land surveyor.
*   Cost :

$7,600.00

Agreed and Understood:

By: _[signature]_ _9/3/04_
Title:  PRESIDENT                    Date:

1130 2540 STREET BAKERSFIELD, CA 92301 (805) 221-4600   •   FAX (805) 808-4474

SEP. 2. 2004  3:39PM        NO. 209    P. 1/2

Expired Tract 5472, Wasco, CA
Proposal for Planning, Engineering and Surveying
Page 2 of 3

## TENTATIVE MAP:

- Meetings with the Owner to discuss development plans / proposed layout / phasing
- Meetings with County Staff to discuss development options, scheduling and fees
- Preparation of Boundary and Easement Map from Record Data and available Title Information
- Prepare and Process Tentative Subdivision Map and Application Package
- Assist in coordination and completion of Tentative Map approval studies and mitigation measures
- Present Tentative Subdivision Map to Governing Bodies for Consideration and Action
- **Cost :**                                                                        **$5,500.00**

Agreed and Understood:

By:
Title:                  president              Date:

Upon approval of the Tentative Map, DeWalt Corporation and the owner will review and consider the conditions of approval. There may be items in the conditions of approval that will require DeWalt Corporation to engineer and process construction plans for approval by the County of Kern. Costs for these plans are un-determinable at this time and are not a part of this proposal.

## FINAL MAPS:

- Prepare Final Subdivision Map for Recordation
- Process County Improvement Agreements if required
- Prepare legal descriptions as needed
- **Cost :**                                                                        **$5,500.00**

Agreed and Understood:

By:
Title:                  president              Date:

## SURVEYING SERVICES:

- Surveying for Centerline Monument and lot corner installation
- **Cost:**                                                                          **$7,500.00**

Agreed and Understood:

By:
Title:                  president              Date:

M:\Proposals\DWC\WCUBC\Wasco-ttn-FM-eng-survproposal.doc

3-0003

# EXHIBIT O   Okadigbo Dec

1              UNITED STATES DISTRICT COURT

2        EASTERN DISTRICT OF CALIFORNIA, FRESNO DIVISION

3                    _____

4

5    ROGER McINTOSH,                 No. 107CV 01080 LJO-WMW

6                   Plaintiff,

7    vs.

8    NORTHERN CALIFORNIA UNIVERSAL
     ENTERPRISES COMPANY, et al.,
9
                    Defendants.
10   _____

11

12          DEPOSITION OF JEFFREY GUTIERREZ

13                 Taken at

14              Borton Petrini
               1600 Truxtun Avenue
15             Bakersfield, California

16     Monday, November 24, 2008 at 10:08 A.M.

17

18              Reported by:

19         Naomi S. Alvarez, CSR #13007

20

21

22

23

24

25

                                                          1





This form of agreement is distributed by:

**CELSOC**

CONSULTING ENGINEERS AND
LAND SURVEYORS OF CALIFORNIA

**AGREEMENT BETWEEN CLIENT AND CONSULTANT**
This form of agreement (Form A) was developed by the Consulting
Engineers and Land Surveyors of California and is intended primarily
for the use of CELSOC members and may not be reproduced without
the permission of the Consulting Engineers and Land Surveyors of
California. © 2003, 2001, 1998, 1994, 1991, 1989, 1987, 1984, 1982,
1979, 1978, 1975, 1973, 1970, 1967.

*Notice: This form of agreement is copyrighted by CELSOC and is only printed by CELSOC on security paper, which has the
CELSOC logo background design.*

Project No. 2004-49

Agreement entered into at __Bakersfield__ on this date of __7 Sept 2004__, by and between:

Client: __Northern California Universal Enterpise__ Consultant: __DeWalt Corporation__

Name __Mr. Joe Wu__                          Name __Jeffrey A Gutierrez__

Address __300 'B' Street__                   Address __1930 22nd Street__
        __Turlock, Ca 95380__                        __Bakersfield, Ca 93301__

Phone: __209-669-0606__   Fax __209-669-0498__   Phone __661-323-4600__   Fax __661-323-4674__

Email _____   Email __jag@dewaltcorp.com__

                                          License No. __PLS 7595__

*Client and Consultant agree as follows:*

A. Client retains Consultant to perform services for:

   WASCO SUBDIVISION-EXPIRED TRACT 5472
   hereinafter called "project."

B. Consultant agrees to perform the following scope of services:

   TOPO SURVEY
   TENTATIVE MAP
   FINAL MAPS
   SURVEYING SERVICES

C. Client agrees to compensate Consultant for such services as follows:

   LUMP SUM $26,000.00

D. This agreement is subject to the Provisions of Agreement contained in paragraphs 1 through 52, and the
provisions of the exhibits attached hereto and made a part hereof. (List exhibits below.)

   EXHIBIT 'A' SIGNED LETTER OF PROPOSAL

PLAINTIFF'S
EXHIBIT
4
(11.24.08)
Jeffray Gutierrez

Form A                     Page 1 of 9

4-0001



## PROVISIONS OF AGREEMENT

Client and Consultant agree that the following provisions shall be part of this agreement:

1. Client and Consultant agree to cooperate with each other in order to fulfill their responsibilities and obligations under this agreement. Both Client and Consultant shall endeavor to maintain good working relationships among members of the project team.

2. This agreement shall be binding upon the heirs, executors, administrators, successors and assigns of Client and Consultant.

3. This agreement shall not be assigned by either Client or Consultant without the prior written consent of the other.

4. This agreement contains the entire agreement between Client and Consultant relating to the project and the provision of services for the project. Any prior agreements, promises, negotiations or representations not expressly set forth in this agreement are of no force or effect. Subsequent modifications to this agreement shall be in writing and signed by both Client and Consultant.

5. Consultant's or Client's waiver of any term, condition or covenant shall not constitute the waiver of any other term, condition or covenant. Consultant's or Client's waiver of any breach of this agreement shall not constitute the waiver of any other breach of the agreement.

6. If any term, condition or covenant of this agreement is held by a court of competent jurisdiction to be invalid, void or unenforceable, the remaining provisions of this agreement shall be valid and binding on Client and Consultant.

7. This agreement shall be governed by and construed in accordance with the laws of the State of California.

8. If the scope of services includes Consultant's assistance in applying for governmental permits or approvals, Consultant's assistance shall not constitute a representation, warranty or guarantee that such permits or approvals will be acted upon favorably by any governmental agency.

9. Upon Consultant's request, Client shall execute and deliver, or cause to be executed and delivered, such additional information, documents or money to pay governmental fees and charges which are necessary for Consultant to perform services pursuant to the terms of this agreement.

10. Client acknowledges all reports, plans, specifications, field data and notes and other documents, including all documents on electronic media, prepared by Consultant are instruments of service, and shall remain the property of Consultant and may be used by Consultant without the consent of Client. Upon request and payment of all costs involved, Client is entitled to a copy of all final plans and specifications for use in connection with the project for which the plans and specifications have been prepared. Client acknowledges that its right to utilize final plans and specifications and the services of Consultant provided pursuant to this agreement will continue only so long as Client is not in default, pursuant to the terms and conditions of this agreement, and Client has performed all its obligations under this agreement.

11. Client agrees not to use or permit any other person to use plans, specifications, drawings, cost estimates, reports or other documents prepared by Consultant which plans, specifications, drawings, cost estimates, reports or other documents are not final and which are not signed and stamped or sealed by Consultant. Client shall be responsible for any such use of non-final plans, specifications, drawings, cost estimates, reports or other documents not signed and stamped or sealed by Consultant. Client hereby waives any claim for liability against Consultant for such use. Client further agrees that final plans, specifications, drawings, cost estimates, reports or other documents are for the exclusive use of Client and may be used by Client only for the project described on page 1 of 9 of this agreement. Such final plans, specifications, drawings, cost estimates, reports or other documents may not be changed or used on a different project without written authorization or approval by Consultant. If signed check-prints are required to be submitted with a stamp or seal, they shall not be considered final for purposes of this paragraph.

Form A                                        Page 2 of 9

4-0002

2. In accepting and utilizing any drawings, reports and data on any form of electronic media generated and furnished by Consultant, Client covenants and agrees that all such electronic files are instruments of service of Consultant, who shall be deemed the author, and shall retain all common law, statutory law and other rights, including copyrights.

Client agrees not to reuse these electronic files, in whole or in part, for any purpose or project other than the project that is the subject of this agreement. Client agrees not to transfer these electronic files to others without the prior written consent of Consultant. Client further agrees to waive all claims against Consultant resulting in any way from any unauthorized changes or reuse of the electronic files for any other project by anyone other than Consultant.

Client and Consultant agree that any electronic files furnished by either party shall conform to the CADD specifications listed in Exhibit _____. Any changes to the CADD specifications by either Client or Consultant are subject to review and acceptance by the other party. Additional services by Consultant made necessary by changes to the CADD or other software specifications shall be compensated for as additional services.

Electronic files furnished by either party shall be subject to an acceptance period of fifteen (15) days during which the receiving party agrees to perform appropriate acceptance tests. The party furnishing the electronic file shall correct any discrepancies or errors detected and reported within the acceptance period. After the acceptance period the electronic files shall be deemed to be accepted and neither party shall have any obligation to correct errors or maintain electronic files.

Client is aware that differences may exist between the electronic files delivered and the printed hard copy construction documents. In the event of a conflict between the signed construction documents prepared by Consultant and electronic files, the signed and stamped or sealed hard copy construction documents shall govern.

In addition, Client agrees, to the fullest extent permitted by law, to indemnify and hold harmless Consultant, its officers, directors, employees, agents and subconsultants against all damages, liabilities or costs, including reasonable attorneys' fees and defense costs, arising from any changes made by anyone other than Consultant or from any reuse of the electronic files without the prior written consent of Consultant.

Under no circumstances shall delivery of electronic files for use by Client be deemed a sale by Consultant, and Consultant makes no warranties, either express or implied, of merchantability and fitness for any particular purpose. In no event shall Consultant be liable for indirect or consequential damages as a result of Client's use or reuse of the electronic files.

13. Consultant makes no representations concerning soils or geological conditions unless specifically included in writing in this agreement, or by amendments to this agreement, and shall not be responsible for any liability that may arise out of the making of or failure to make soils or geological surveys, subsurface soils or geological tests, or general soils or geological testing.

14. Client acknowledges Consultant has the right to complete all services agreed to be rendered pursuant to this agreement. In the event this agreement is terminated before the completion of all services, unless Consultant is responsible for such early termination, Client agrees to release Consultant from all liability for services performed. In the event all or any portion of the services by Consultant are suspended, abandoned, or otherwise terminated, Client shall pay Consultant all fees and charges for services provided prior to termination, not to exceed the contract limits specified herein, if any. Client acknowledges if the project services are suspended and restarted, there will be additional charges due to suspension of the services which shall be paid for by Client as extra services pursuant to paragraph 29. Client acknowledges if project services are terminated for the convenience of Client, Consultant is entitled to reasonable termination costs and expenses, to be paid by Client as extra services pursuant to paragraph 29.

If the scope of services to be provided by Consultant pursuant to the terms of this agreement includes an ALTA survey, Client agrees that Consultant may sign one of the ALTA survey statements attached to this agreement and incorporated herein by reference. In the event Consultant is required to sign a statement or certificate which

4-0003

| Client Initials | Consultant Initials |
|---|---|
| | |

differs from the ALTA survey statements contained in the attachment to this agreement, Client hereby agrees to indemnify and hold Consultant harmless from any and all liability arising from or resulting from the signing of any statement which differs from those statements contained in the attachment to this agreement.

16. If the scope of services to be provided by Consultant pursuant to the terms of this agreement includes the preparation of grading plans but excludes construction staking services, Client acknowledges that such staking services normally include coordinating civil engineering services and the preparation of record drawings based upon information provided by others, and Client will be required to retain such services from another consultant or pay Consultant pursuant to this agreement for such services as extra services in accordance with paragraph 29.

17. Unless the scope of services to be provided by Consultant expressly includes Consultant's assistance in determinations regarding the application of prevailing wages, Client and Consultant acknowledge that it is Client's exclusive responsibility to determine whether the project, which is the subject of this agreement, is a "public work" as defined in California Labor Code Section 1720, or whether prevailing wage rates are to be paid to certain workers in connection with the project, or determine the rate of prevailing wages to be paid certain workers. Consultant will develop its schedule of labor rates in reliance on the determinations of Client. In the event of a dispute regarding whether the project is a "public work", whether prevailing wages are to be paid, or the amount of prevailing wages to be paid to individual workers, Client agrees to pay Consultant for any and all additional costs and expenses (including additional wages, penalties & interest) incurred by Consultant and further agrees to the maximum extent permitted by law to defend, indemnify and hold harmless Consultant, its officers, directors, employees, agents and subconsultants from all damages, liabilities or costs, including reasonable attorneys' fees and costs, arising from or related to the Client's determinations regarding the application of or payment of prevailing wages.

18. If the scope of services contained in this agreement does not include construction-phase services for this project, Client acknowledges such construction-phase services will be provided by Client or by others and Client assumes all responsibility for interpretation of the contract documents and for construction observation and supervision and waives any claim against Consultant that may in any way be connected thereto. In addition, Client agrees to indemnify and hold Consultant harmless from any loss, claim, or cost, including reasonable attorneys' fees and costs of defense, arising or resulting from the performance of such services by other persons or entities and from any and all claims arising from the modification, clarification, interpretation, adjustments or changes made to the contract documents to reflect changed field or other conditions, except for claims arising from the sole negligence or willful misconduct of Consultant.

19. If the scope of work of Consultant includes the rendition of professional services for a project which is a common interest development subject to the provisions of Civil Code section 1375, Client agrees to reimburse Consultant for all costs associated with Consultant's participation in the pre-litigation process described in Civil Code section 1375. Further, Client agrees to pay Consultant's fees for time incurred participating in the pre-litigation process. These fees and costs shall be paid as extra services in accordance with paragraph 29. Such extra services shall be paid at Consultant's normal hourly rates in effect at the time Consultant participates in the pre-litigation process. For purposes of this paragraph, a "common interest development" shall be a common interest development as defined in Civil Code section 1375.

Client agrees, to the maximum extent permitted by law, to defend, indemnify and hold harmless Consultant, its officers, directors, employees, agents and subconsultants from all damages, liabilities or costs, including reasonable attorneys' fees and costs, arising from or related to Consultant's participation in the pre-litigation process pursuant to Civil Code section 1375.

Client agrees that if Client receives a Notice of Commencement of Legal Proceedings pursuant to Civil Code section 1375, Client will notify Consultant within 10 days of Client's receipt of the Notice of Commencement of Legal Proceedings, provided the Notice of Commencement of Legal Proceedings either identifies Consultant as a potentially responsible party or the face of the Notice contains information which identifies Consultant's potential responsibility. If Client does not timely notify Consultant, then Client agrees, to the maximum extent permitted by law, to defend, indemnify and hold harmless Consultant, its officers, directors, employees, agents

4-0004

and subconsultants from all damages, liabilities or costs, including reasonable attorneys' fees and costs, arising from or related to Client's failure to timely notify Consultant.

20. Consultant shall be entitled to immediately, and without notice, suspend the performance of any and all of its obligations pursuant to this agreement if Client files a voluntary petition seeking relief under the United States Bankruptcy Code or if there is an involuntary bankruptcy petition filed against Client in the United States Bankruptcy Court, and that petition is not dismissed within fifteen (15) days of its filing. Any suspension of services made pursuant to the provisions of this paragraph shall continue until such time as this agreement has been fully and properly assumed in accordance with the applicable provisions of the United States Bankruptcy Code and in compliance with the final order or judgment issued by the Bankruptcy Court. If the suspension of performance of Consultant's obligation pursuant to this agreement continues for a period in excess of ninety (90) days, Consultant shall have the right to terminate all services pursuant to this agreement.

21. This agreement shall not be construed to alter, affect or waive any design professional's lien, mechanic's lien or stop notice right which Consultant may have for the performance of services pursuant to this agreement. Client agrees to provide to Consultant the present name and address of the record owner of the property upon which the project is to be located. Client also agrees to provide Consultant with the name and address of any and all lenders who may loan money on the project and who are entitled to receive a preliminary notice.

22. If payment for Consultant's services is to be made on behalf of Client by a third-party lender, Client agrees that Consultant shall not be required to indemnify the third-party lender, in the form of an endorsement or otherwise, as a condition to receiving payment for services.

23. The Consultant shall not be required to execute any documents subsequent to the signing of this Agreement that in any way might, in the judgment of the Consultant, increase the Consultant's contractual or legal obligations or risk, or adversely affect the availability or cost of its professional or general liability insurance. Nor shall Consultant be required to sign any documents, requested by any party, including Client, that would result in the Consultant's having to certify, guarantee, warrant or state the existence of conditions whose existence the Consultant cannot ascertain. The Client also agrees not to make resolution of any dispute with the Consultant or payment of any money due to the Consultant, in any way contingent upon the Consultant's signing any such certification, guarantee, warranty or statement.

24. All fees and other charges due Consultant will be billed monthly and shall be due at the time of billing unless specified otherwise in this agreement. If Client fails to pay Consultant within thirty (30) days after invoices are rendered, Consultant shall have the right in its sole discretion to consider such default in payment a material breach of this entire agreement, and, upon written notice, Consultant's duties, obligations and responsibilities under this agreement may be suspended or terminated. In such event, Client shall promptly pay Consultant for all outstanding fees and charges due Consultant at the time of suspension or termination. If Consultant elects to suspend or terminate Consultant's services pursuant to this provision, Consultant is entitled to reasonable suspension or termination costs or expenses.

25. Client agrees that all billings from Consultant to Client are correct and binding on Client unless Client, within ten (10) days from the date of receipt of such billing, notifies Consultant in writing of alleged inaccuracies, discrepancies, or errors in billing.

26. Client agrees to pay a monthly late payment charge, which will be the lesser of one and one-half percent (1-1/2%) per month or a monthly charge not to exceed the maximum legal rate, which will be applied to any unpaid balance commencing thirty (30) days after the date of the billing.

27. If Consultant, pursuant to this agreement, produces plans, specifications, or other documents and/or performs field services, and such plans, specifications, or other documents and/or field services are required by any governmental agency, and such governmental agency changes its ordinances, codes, policies, procedures or requirements after the date of this agreement, any additional office or field services thereby required shall be paid for by Client as extra services in accordance with paragraph 29.

4-0005



28. In the event Consultant's fee schedule changes due to any increase of costs such as the granting of wage increases and/or other employee benefits to field or office employees due to the terms of any labor agreement, or increase in the cost of living, during the lifetime of this agreement, a percentage increase shall be applied to all remaining fees and charges to reflect the increased costs.

29. Client agrees that if Client requests services not specified in the scope of services described in this agreement, Client will pay for all such additional services as extra services, in accordance with Consultant's billing rates utilized for this agreement.

30. In the event that any staking or record monuments are destroyed, damaged or disturbed by an act of God or parties other than Consultant, the cost of restaking shall be paid for by Client as extra services in accordance with paragraph 29.

31. Client acknowledges that the design services performed pursuant to this agreement are based upon field and other conditions existing at the time these services were performed. Client further acknowledges that field and other conditions may change by the time project construction occurs and clarification, adjustments, modifications and other changes may be necessary to reflect changed field or other conditions. Such clarifications, adjustments, modifications and other changes shall be paid for by Client as extra services in accordance with paragraph 29.

32. Client shall pay the costs of all checking and inspection fees, zoning and annexation application fees, assessment fees, soils or geotechnical engineering fees, soils or geotechnical testing fees, aerial topography fees, and all other fees, permits, bond premiums, applicable taxes on professional services, title company charges, blueprints and reproductions, and all other similar charges not specifically covered by the terms of this agreement.

33. Client acknowledges and agrees that if Consultant provides surveying services, which services require the filing of a Record of Survey in accordance with Business and Professions Code section 8762, or a Corner Record pursuant to Business and Professions Code section 8773, all of the costs of preparation, examination and filing for the Record of Survey or Corner Record will be paid by Client as extra services in accordance with paragraph 29.

34. Consultant is not responsible for delay caused by activities or factors beyond Consultant's reasonable control, including but not limited to, delays by reason of strikes, lockouts, work slowdowns or stoppages, accidents, acts of God, failure of Client to furnish timely information or approve or disapprove of Consultant's services or instruments of service promptly, faulty performance by Client or other contractors or governmental agencies. When such delays beyond Consultant's reasonable control occur, Client agrees Consultant shall not be responsible for damages nor shall Consultant be deemed to be in default of this agreement. Further, when such delays occur, Client agrees that, to the extent such delays cause Consultant to perform extra services, such services shall be paid for by Client as extra services in accordance with paragraph 29.

35. Notwithstanding any other provision of this Agreement, and to the fullest extent permitted by law, neither the Client nor the Consultant, their respective officers, directors, partners, employees, contractors or subconsultants shall be liable to the other or shall make any claim for any incidental, indirect or consequential damages arising out of or connected in any way to the Project or to this Agreement. This mutual waiver of consequential damages shall include, but is not limited to, loss of use, loss of profit, loss of business, loss of income, loss of reputation or any other incidental, indirect or consequential damage that either party may have incurred from any cause or action.

36. Consultant shall not be liable for damages resulting from the actions or inactions of governmental agencies including, but not limited to, permit processing, environmental impact reports, dedications, general plans and amendments thereto, zoning matters, annexations or consolidations, use or conditional use permits, project or plan approvals, and building permits. Client agrees that it is the responsibility of Client to maintain in good standing all governmental approvals or permits and to timely apply for any necessary extensions thereof.

37. If the scope of services requires Consultant to estimate quantities, such estimates are made on the basis of Consultant's experience and qualifications and represent Consultant's best judgment as a professional generally familiar with the industry. However, such estimates are only estimates and shall not constitute representations,

Form A                                                    Page 6 of 9

warranties or guarantees of the quantities of the subject of the estimate. If the scope of services requires Consultant to provide its opinion of probable construction costs, such opinion is to be made on the basis of Consultant's experience and qualifications and represents Consultant's best judgment as to the probable construction costs. However, since Consultant has no control over costs or the price of labor, equipment or materials, or over the contractor's method of pricing, such opinions of probable construction costs do not constitute representations, warranties or guarantees of the accuracy of such opinions, as compared to bid or actual costs.

38. Estimates of land areas provided under this agreement are not intended to be, nor should they be considered to be, precise. The estimate will be performed pursuant to generally accepted standards of professional practice in effect at the time of performance.

39. Client acknowledges that Consultant is not responsible for the performance of work by third parties including, but not limited to, the construction contractor and its subcontractors.

40. Consultant makes no warranty, either express or implied, as to its findings, recommendations, plans, specifications, or professional advice except that the services were performed pursuant to generally accepted standards of professional practice in effect at the time of performance.

41. In the event (1) Client agrees to, authorizes, or permits changes in the plans, specifications or documents prepared by Consultant, which changes are not consented to in writing by Consultant, or (2) Client agrees to, authorizes or permits construction of unauthorized changes in the plans, specifications or documents prepared by Consultant, which changes are not consented to in writing by Consultant, or (3) Client does not follow recommendations prepared by Consultant pursuant to this agreement, which changed recommendations are not consented to in writing by Consultant: Client acknowledges that the unauthorized changes and their effects are not the responsibility of Consultant and Client agrees to release Consultant from all liability arising from the use of such changes, and further agrees to defend, indemnify and hold harmless Consultant, its officers, directors, agents, employees and subconsultants from and against all claims, demands, damages or costs, including attorneys' fees, arising from the unauthorized changes.

42. Client agrees that in accordance with generally accepted construction practices, the construction contractor and construction subcontractors will be required to assume sole and complete responsibility for job site conditions during the course of construction of the project, including safety of all persons and property, and that this requirement shall apply continuously and not be limited to normal working hours. Neither the professional activities of Consultant nor the presence of Consultant or his or her employees or subconsultants at a construction site shall relieve the contractor and its subcontractors of their obligations, duties and responsibilities including, but not limited to, construction means, methods, sequence, techniques or procedures necessary for performing, superintending or coordinating all portions of the work of construction in accordance with the contract documents and applicable health or safety requirements of any regulatory agency or of state law.

43. Client agrees to require its contractor and subcontractors to review the plans, specifications and documents prepared by Consultant prior to the commencement of construction-phase work. If the contractor and/or subcontractors determine there are deficiencies, conflicts, errors, omissions, code violations, improper uses of materials, or other deficiencies in the plans, specifications and documents prepared by Consultant, contractors and subcontractors shall notify Client so those deficiencies may be corrected by Consultant prior to the commencement of construction-phase work.

44. If during the construction phase of the project Client discovers or becomes aware of changed field or other conditions which necessitate clarifications, modifications or other changes to the plans, specifications, estimates or other documents prepared by Consultant, Client agrees to notify Consultant and retain Consultant to prepare the necessary changes or modifications before construction activities proceed. Further, Client agrees to require a provision in its construction contracts for the project which requires the contractor to promptly notify Client of any changed field or other conditions so that Client may in turn notify Consultant pursuant to the provisions of this paragraph. Any extra work performed by Consultant pursuant to this paragraph shall be paid for as extra services pursuant to paragraph 29.

4-0007

45. Client agrees to purchase and maintain, or cause Contractor to purchase and maintain, during the course of construction, builder's risk "all risk" insurance which will name Consultant as an additional named insured as its interest may appear.

46. Client acknowledges that Consultant's scope of services for this project does not include any services related in any way to asbestos and/or hazardous or toxic materials. Should Consultant or any other party encounter such materials on the job site, or should it in any other way become known that such materials are present or may be present on the job site or any adjacent or nearby areas which may affect Consultant's services, Consultant may, at its option, suspend or terminate work on the project until such time as Client retains a qualified contractor to abate and/or remove the asbestos and/or hazardous or toxic materials and warrant that the job site is free from any hazard which may result from the existence of such materials.

47. Client hereby agrees to bring no cause of action on any basis whatsoever against Consultant, its officers and directors, principals, employees, agents and subconsultants if such claim or cause of action in any way would involve Consultant's services for the investigation, detection, abatement, replacement, use or specification, or removal of products, materials or processes containing asbestos, asbestos cement pipe, and/or any hazardous or toxic materials. Client further agrees to defend, indemnify and hold harmless Consultant, its officers, directors, principals, employees and subconsultants from any asbestos and/or hazardous or toxic material related claims that may be brought by third parties as a result of the services provided by Consultant pursuant to this agreement, except claims caused by the sole negligence or willful misconduct of Consultant.

48. Client agrees to defend, indemnify and hold harmless Consultant, its officers, directors, principals, employees and subconsultants from and against all claims, losses, damages and cost caused by, arising out of, or relating to, the presence of any fungus, mildew, mold or resulting allergens, provided that such claim, loss, damage or cost is not due to the sole negligence or willful misconduct of Consultant.

49. In the event of any litigation arising from or related to the services provided under this agreement, the prevailing party will be entitled to recovery of all reasonable costs incurred, including staff time, court costs, attorneys' fees, experts' fees and other related expenses.

50. Client agrees that in the event Consultant institutes litigation to enforce or interpret the provisions of this agreement, such litigation is to be brought and adjudicated in the appropriate court in the county in which Consultant's place of business is located, and Client waives the right to bring, try or remove such litigation to any other county or judicial district.

51. (a) Except as provided in subdivisions (b) and (c), in an effort to resolve any conflicts that arise during the design or construction of the project or following completion of the project, Client and Consultant agree that all disputes between them arising out of or relating to this agreement shall be submitted to nonbinding mediation, unless the parties mutually agree otherwise.

Client and Consultant further agree to include a similar mediation provision in all agreements with independent contractors and consultants retained for the project and to require all independent contractors and consultants also to include a similar mediation provision in all agreements with subcontractors, subconsultants, suppliers or fabricators so retained, thereby providing for mediation as the primary method for dispute resolution between the parties to those agreements.

(b) Subdivision (a) shall not preclude or limit Consultant's right to file an action for collection of fees if the amount in dispute is within the jurisdiction of the small claims court.

(c) Subdivision (a) shall not preclude or limit Consultant's right to record, perfect or enforce applicable mechanic's lien or stop notice remedies.

52. Client agrees to limit the liability of Consultant, its principals, employees and subconsultants, to Client and to all contractors and subcontractors on the project, for any claim or action arising in tort, contract, or strict liability, to the sum of $50,000 or Consultant's fee, whichever is greater. Client and Consultant acknowledge that this provision was expressly negotiated and agreed upon.

Form A                                    Page 8 of 9

| Client Initials | Consultant Initials |
|---|---|

IN WITNESS WHEREOF, the parties hereby execute this agreement upon the terms and conditions stated above.

Client __Northern California Universal Enterprise__  Consultant __DeWalt Corporation__

By _____     By _____

Name _____     Name __Jeffrey A Gutierrez__

Title _____     Title __President__

Date Signed _____     Date Signed __9-8-04__

Client should mail completed contract to the address shown for Consultant.

Form A                          Page 9 of 9

4-0009

07/21/2004  16:57  6613294674                    DEWALT                          PAGE  01

EXHIBIT 'A'

## DEWALT
### Corporation
* ENGINEERING   * PLANNING   * SURVEYING   * LAND DEVELOPMENT   * CONSTRUCTION MANAGEMENT

July 21, 2004

04-01P

**NORTHERN CALIFORNIA UNIVERSAL ENTERPRISE CO.**
300 "E" Street
Turlock, CA. 95380
FAX:   209.659.0498

Attn.:  Mr. Jess Marimla

Re:   **Wasco Subdivision – Expired Tract 5472**
      **Proposal for Planning / Engineering / Surveying / Professional Services**

Dear Mr. Marimla,

DeWalt Corporation is pleased to provide this proposal for the following Planning, Engineering, and Surveying services for the property on Valley Rose Park Way in the City of Wasco, County of Kern. You will recall that the Tentative Map for Tract 5472 was approved with conditions at one point in time. Many of the conditions of approval with regard to infrastructure improvements to the site in question were completed, yet the Tentative Map was allowed to expire before recordation.  Find below the various services that DeWalt Corporation proposes to provide to you for this project and their associated costs:

### TOPOGRAPHIC SURVEY:

Topographic survey will be performed in such a manner as to gather data which will be used for planning or engineering purposes. Please note that prior to the commencement of survey we will require a current (less that 30 days old) preliminary title report.

* Research existing horizontal and vertical monumentation with the Kern County Surveyor.
* Research existing infrastructure improvement plans with the Kern County Resource Management Agency, City of Wasco and any other related utility companies and service districts.
* Perform a boundary survey of the site, corroborating the existence of property corners and defining the site boundary. During the course of the boundary portion of the survey, we will also devote time to identifying any encroachment of the property lines.
* Perform a topographic survey of the existing pads, street and infrastructure improvements. Pad certification will be desired for proof of flood and grading plan conformance with County of Kern.
* Process and transfer the survey data for entry into electronic drafting software (AutoCAD) for the purposes of preparing the topographic survey plat.
* Dissemination of the Preliminary Title Report and identification of easements, licenses and recorded documents that encumber the property in question.
* Drafting and review of topographic survey plat.
* Validation and Certification of survey by a licensed land surveyor.
* **Cost :**

                                                        $7,500.00

**Agreed and Understood:**

By:
Title:          PRESIDENT                      Date:

1809 22ND STREET BAKERSFIELD, CA 93301 (805) 328-4000   •   FAX (805) 328-4474

2/1 .P   209 .ON                                          MA93:3 4002 .2 .P3S

4-0010

Expired Tract 5472, Wasco, CA
Proposal for Planning, Engineering and Surveying
Page 2 of 3

## TENTATIVE MAP:

- Meetings with the Owner to discuss development plans / proposed layout / phasing
- Meetings with County Staff to discuss development options, scheduling and fees
- Preparation of Boundary and Easement Map from Record Data and available Title Information
- Prepare and Process Tentative Subdivision Map and Application Package
- Assist in coordination and completion of Tentative Map approval studies and mitigation measures
- Present Tentative Subdivision Map to Governing Bodies for Consideration and Action
- **Cost :**                                                              $5,500.00

Agreed and Understood:

By:
Title:                                        president                Date:

Upon approval of the Tentative Map, DeWalt Corporation and the owner will review and consider the conditions of approval. There may be items in the conditions of approval that will require DeWalt Corporation to engineer and process construction plans for approval by the County of Kern. Costs for these plans are un-determinable at this time and are not a part of this proposal.

## FINAL MAPS:

- Prepare Final Subdivision Map for Recordation
- Process County Improvement Agreements if required
- Prepare legal descriptions as needed
- **Cost :**                                                              $5,500.00

Agreed and Understood:

By:
Title:                                        president                Date:

## SURVEYING SERVICES:

- Surveying for Centerline Monument and lot corner installation
- **Cost:**                                                              $7,500.00

Agreed and Understood:

By:
Title:                                        president                Date:

M:\Proposals\DWC\NCUB\DWasco-ttm-FM-eng-survproposal.doc

SEP. 8. 2004  3:11PM    N. CALF. UNIVERSAL                    NO. 537    P. 3

*recd 9/20/04*

# CONSULTANT AGREEMENT

Project:                        PRINCETON DEVELOPMENTS
General Contractor:    Northern California Universal Enterprise Co.
Location of Job:                WASCO, CA (TRACT 5472)
Date of Contract:                    9/7/2004

This agreement is made by and between __Princeton Developments, LP__, as the property owner, hereinafter called Owner, and __DeWalt Corporation__ as the Consultant, hereinafter called Consultant.

Consultant agrees with all of the terms and conditions in this agreement and finish labor, material and equipment required to perform the work for job stated below in a workermanlike manner. The cost breakdown and specifications are based on the proposal submitted by consultant on July 21, 2004 and are listed as below. Actual payment will be based upon percent complete.

1/ Cost Breakdown:

| DESCRIPTION | SUB TOTAL | |
|---|---|---|
| ALTA / TOPOGRAPHIC SURVEY | $ | 7,500.00 |
| TENTATIVE MAP | $ | 5,500.00 |
| FINAL MAPS | $ | 5,500.00 |
| SURVEYING SERVICES | $ | 7,500.00 |
| GRAND TOTAL: | $ | 26,000.00 |

2/ For additional work outside of the contract, Change Order Form must be submitted and approved by Joe Wu prior to performing such additional work.

3/ Payment Terms:    Progress payment on 30 days Net.

4/ Retention 10% will be hold until final inspection approval by County of Kern and all final checklist items completed.

Accepted the terms and conditions stated as above by:

DeWalt Corporation
Consultant
by: _____
Title
Lic #: PRESIDENT
Federal Tax ID # : 81-0572077
Date: 9-08-04

Princeton Developments, LP
President of General Partner
by: _____
Joe Wu, President
Lic # :
FTID#:    51-0506351
Date:

Note: Subcontractor must finish to the General Contractor the Certificate of Insurance evidencing laws that the Subcontractor has in force, valid insurance covering full liability under worker's compensation laws of the State California, and also the current general liability policy of comprehensive body injury and property damage insurance.

4-0012

# EXHIBIT P

**Okadigbo Dec**

1              UNITED STATES DISTRICT COURT

2        EASTERN DISTRICT OF CALIFORNIA, FRESNO DIVISION

3                    _____

4

5     ROGER McINTOSH,                No. 107CV 01080 LJO-WMW

6                    Plaintiff,

7     vs.

8     NORTHERN CALIFORNIA UNIVERSAL
      ENTERPRISES COMPANY, et al,
9
                     Defendants.
10    _____

11

12          DEPOSITION OF GERALD FRANK HELT

13                    Taken at

14              Borton Petrini
                1600 Truxtun Avenue
15           Bakersfield, California

16     Tuesday, October 28, 2008 at 1:42 P.M.

17

18                Reported by:

19        Naomi S. Chavez, CSR #13007

20

21

22

23

24

25

                                                    1

1    designated the person most knowledgeable with respect

2    to the cost for engineering, developing, and improving

3    the Valley Rose Estate subdivision.

4            And what was your function in that regard?

5        A.    I'm familiar with the engineer's cost

6    submitted to us.

7        Q.    And what engineer was that?

8        A.    The engineer of record.

9        Q.    Who is that?

10       A.    Greg Black.

11       Q.    Why would Mr. Black have submitted his

12   engineering cost to you?

13       A.    During the subdivision map approval process,

14   he was requested to calculate a bond amount for

15   recordation of the final map.

16       Q.    And do you have any recollection as to the

17   amount of engineering costs submitted to you by

18   Mr. Black or calculation of his bond?

19       A.    No, I don't.

20       Q.    And are there documents that reflect that?

21       A.    There are documents that reflect that.

22            MR. BRAZE:  Have you brought those with you

23   today, Counsel?

24            MR. OKADIGBO:  I haven't brought any documents

25   today other than -- when I say we, I, in the collective

1    examples.

2        Q.    Have you ever received copy of the improvement

3    plans for the Valley Rose subdivision?

4        A.    We received a copy via disk.

5        Q.    You have received a copy.

6              Do you still have that disk?

7        A.    Yes, we do.

8        Q.    Have you ever given a copy of that disk or the

9    contents of that disk to anybody else?

10       A.    No.

11       Q.    Has anybody else ever asked for it?

12       A.    No.

13       Q.    And just on the -- you said you don't know

14   about the fees about the engineering costs that started

15   our previous discussion because you don't have those

16   documents.

17             Can you give us an estimate?  Was it more than

18   $100,000?

19       A.    Specifically for engineering fees, I couldn't

20   respond.  There was several different improvement plans

21   addressed; water, sewer, roads.  There were tabulations

22   for each of those.  I can tell you I recall from

23   looking at the information that the engineer of record,

24   Greg Black, when he was documenting an amount of

25   improvements for bonding purposes to record the final

 1    map, he used the cost unit prices from other projects

 2    they had.  I'm not aware that they used any of the

 3    original Valley Rose improvement plans themselves.  I

 4    don't have any documents that show that.

 5        Q.   Going back now a little bit, it looks like

 6    we're not going to get an answer to that question

 7    because you don't know and we don't have the documents,

 8    but going back to the reviewing, a little unclear the

 9    way you explained it as far as reviewing.

10             Is there any review done of the subdivision --

11    when it needs to get through its final approval, is

12    there any review at all done at any stage in insuring

13    that the improvement plans, as originally submitted,

14    comply with the subdivision before the City, I guess,

15    gives a final approval to go ahead and build?

16        A.   This is normally done by public works.

17        Q.   Done by public works.

18             Do you know personally if there's a process in

19    the City of Wasco?

20        A.   No.  I know the policy.  I'm not aware of a

21    documented written procedure.

22        Q.   What is your understanding of that policy?

23        A.   That the Public Works Department conducts

24    discussions during the construction phase, and that

25    during the inspections they require a construction via

1      Q.    It's also your understanding that Northern
2   hired Dewalt to do a final map?
3      A.    That's what I understand.
4      Q.    It's also your understanding that years ago
5   Mr. McIntosh, as an engineer, drew some plans that were
6   used in creating that subdivision, correct?
7      A.    I understand that in the early '90s there were
8   improvement plans drawn by McIntosh that were used to
9   construct the improvements on that subdivision, and the
10  improvements were constructed and completed at that
11  time.
12     Q.    They were completed, to your knowledge?
13     A.    That's correct.
14     Q.    And now when the Dewalt tentative map came to
15  you for your review, did you in any way compare that
16  map to the McIntosh map?
17     A.    No.
18     Q.    You didn't see a need to do that?
19     A.    I didn't consider doing that.
20     Q.    Next question, when Dewalt submitted a final
21  map for your review, did you compare that final map to
22  the McIntosh final map?
23     A.    No.
24     Q.    Again, did you consider doing that?
25     A.    That was never --

1      Q.     Yes, sir.  The map.

2      A.     I'm not aware if any of the previous maps.

3      Q.     And my last question -- maybe not my last

4   question -- did you see the need to compare Dewalt's

5   submitted final map, any of their submitted final maps

6   to any of the McIntosh maps?

7      A.     There was no consideration for that.

8      Q.     Why didn't you consider that to be something

9   that should be done?

10     A.     Because when the tentative map was submitted

11  to the City, when the Planning Department sent us a

12  memorandum for conditions on that map, they had noted

13  that all the improvements were done and that the City

14  had been maintaining them and that they were going

15  forward to record a final map with improvements in

16  place.

17          MR. HASSING:  Thank you, sir.

18          MR. TRAVIS:  I'll follow up with that.

19          FURTHER EXAMINATION BY MR. TRAVIS

20     Q.     At what point did they tell you this?  Do you

21  remember when they said the improvements were done?

22     A.     It was when they first notified our office to

23  do a review of the submitted tentative map, and that

24  would have been sometime in 2004.

25     Q.     And we're talking specifically about

1   Tentative Map 6451, if you recall.

2       A.   The current one.

3       Q.   The current one?

4       A.   Correct.

5       Q.   So to your knowledge, nothing needed to be

6   done at that point to improve the Valley Rose Estate

7   subdivision; is that correct?

8       A.   That's what we were told.

9       Q.   That's what you were told by who?

10      A.   The Planning Department.

11      Q.   The Planning Department.

12          Do you remember names specifically or --

13      A.   I hate to say this, but it's in my file.

14          MR. BRAZE:  I had a feeling.

15          MR. TRAVIS:  I was waiting for that one.

16          MR. HASSING:  You instigator, you.

17      A.   I could guess, but I know there's about three

18  possible people.

19      Q.   (By Mr. Travis)  Just name each one we'll work

20  it out later.

21      A.   It could have been the planning director at

22  the time.  It could have been Dennis McNamara or it

23  could have been a person by the Keith Woodcock.

24          MR. BRAZE:  And this is a memo that was issued

25  at that time?

```
 1      A.    The third fellow I forgot.

 2            MR. TRAVIS:  Off the record.

 3            (Discussion off the record.)

 4            MR. BRAZE:  Back on the record.

 5      Q.    (By Mr. Travis)  We were talking before

 6   about -- the last thing we discussed, I believe, was

 7   about the improvements that was told by the planning

 8   department -- no.  Where was I?

 9            MR. BRAZE:  You received a memo from the

10   planning department saying they were incomplete.

11            MR. TRAVIS:  That's right.

12      Q.    (By Mr. Travis)  Do you know anything about

13   whether there's such things as improvement agreements?

14      A.    Yes.

15      Q.    Do you know if an approvement agreement was

16   required by the City of Wasco in this case?

17      A.    Yes.

18      Q.    Do you know -- why would you have an

19   improvement agreement?  What would be the reason for

20   it?

21            MR. HASSING:  You mean in this case?

22            MR. TRAVIS:  In this particular case.

23      A.    There was a maintenance bond that was going to

24   secure the improvements for a period of time after the

25   map recorded.
```

1    improvements that needed to happen in the future?

2            MR. HASSING:   Objection.   Vague and ambiguous.

3            Do you understand the question?

4    A.    Yes, I do.

5            And that's my understanding.   However, it

6    would be helpful if I told you that during the process

7    of preparing that subdivision agreement, there was a

8    decision by the City manager not to require any bonds.

9    Therefore, the improvement agreement had zero value for

10   all improvements.

11           FURTHER EXAMINATION BY MR. HASSING

12   Q.    If you know, why did the City manager not

13   require any bonds?

14   A.    The information that was told to us by

15   planning was that all the improvements were complete.

16   Q.    And there was no need to maintain them?

17   A.    That's what we were told.

18           MR. HASSING:   No further questions.

19           MR. TRAVIS:   No further questions.

20            FURTHER EXAMINATION BY MR. BRAZE

21   Q.    Are you registered?

22   A.    That's correct.

23   Q.    What year did you become registered?

24   A.    1978.   I have a lot of dates rolling around

25   there.

# EXHIBIT Q

Okadigbo Dec

1

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA, FRESNO DIVISION

ROGER McINTOSH,

        Plaintiff,

    vs.                  Case No.

                       107CV 01080 LJO-WMW

NORTHERN CALIFORNIA UNIVERSAL

ENTERPRISES, COMPANY, et al.,



        Defendants.

~~~~~~~~~~~~~~~~~~~~~~~~~~~~~


DEPOSITION OF

SARAH BURGI


July 3, 2009

10:00 a.m.


5060 California Avenue

Suite 700

Bakersfield, California


Wendy Hahesy, RMR, CSR-4873



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.875.5071
Facsimile: 661.322.2242

Suite 170
5001 East Commercenter Drive
Bakersfield, CA 93309
www.esquiresolutions.com

Sarah Burgi                                                July 3, 2009

7

1    Q.   Okay.   Thanks for coming.  Miss Burgi, let me

2    make sure I get your name spelled correctly, S-a-r-a-h?

3    A.   Mmm-hmm.

4    Q.   Burgi, B-u-r-g-i?

5    A.   Yes.

6    Q.   Okay.  And what is your current address?

7    A.   3124 Bank Street, B-a-n-k, Bakersfield,

8    California 93304.

9    Q.   Okay.  And where are you currently working

10   right now, Miss Burgi?

11   A.   Cannon & Associates, C-a-n-n-o-n.

12   Q.   That's right.  And, again, what are you doing

13   there?

14   A.   Survey tech and duty scanning.

15   Q.   So when you say survey technician you mean

16   you're doing land surveys?

17   A.   I do land surveys, I do the mapping, I do the

18   research.

19   Q.   And so you also operate the -- I guess we had

20   had a conversation earlier and you were describing that

21   you did 3-D imaging and so you operate the machinery

22   that does all that?

23   A.   I operate the machinery and process the data.

24   Q.   Right.  You worked for DeWalt Corporation in

25   2004?



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.875.5071
Facsimile: 661.322.2242

Suite 170
5001 East Commercenter Drive
Bakersfield, CA 93309
www.esquiresolutions.com

8

1        A.    Correct.

2        Q.    And you were involved in the creation of

3    Tentative Map 6451; is that correct?

4        A.    Yes.

5        Q.    And I am going to pull out -- I'm going to pull

6    out somewhere -- well, let's go here first.  We had some

7    questions yesterday as we were speaking with the expert

8    for the City of Wasco regarding this tentative map.

9    Does this tentative map look familiar?

10       A.    Yes.

11            MS. COOPER:   Which tentative map is it?

12   BY MR. TRAVIS:

13       Q.    We're looking at Vesting Tentative Track Map

14   6451.

15            MR. HASSING:   It's Exhibit 5 from yesterday's

16   depo.

17   BY MR. TRAVIS:

18       Q.    This is Exhibit 5 from the deposition of

19   Stephen Wong.  And I'm standing up so I can -- it's a

20   big map.  And in the bottom right-hand corner it looks

21   like there's some sort of an identifier table.

22       A.    Yes.

23       Q.    Okay.  And there's some, looks like SAB, do you

24   know what SAB stands for?

25       A.    Those are my initials.



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.875.5071
Facsimile: 661.322.2242

Suite 170
5001 East Commercenter Drive
Bakersfield, CA 93309
www.esquiresolutions.com

Sarah Burgi

July 3, 2009

9

1    Q.   Those are your initials?

2    A.   Yes.

3    Q.   And in there it says "drawn by"?

4    A.   Mmm-hmm.

5    Q.   So is it fair to say this whole map was drawn

6    by you?

7    A.   No.  I assisted Josh Woodard in drawing this

8    map.  I believe it was his first tentative map he had

9    ever done so I helped him with the bulk of it.

10   Q.   And Josh Woodard, what was his position there?

11   A.   He was an EIT, I believe he had his degree but

12   not his license.

13   Q.   And as I understand it, as you told me earlier

14   EIT is engineer in training, correct?

15   A.   Yes.

16   Q.   And Josh Woodard to your understanding does he

17   still work for DeWalt Corporation?

18   A.   No.  He left long before I did and he went up

19   north.  I believe up by Eureka or Yreka.

20   Q.   And so is it your testimony that you oversaw

21   his work in preparation for drafting this particular

22   map?

23   A.   Yes.

24   Q.   And we had some questions yesterday because we

25   had seen that there were what appeared to be two maps,



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.875.5071
Facsimile: 661.322.2242

Suite 170
5001 East Commercenter Drive
Bakersfield, CA 93309
www.esquiresolutions.com

July 3, 2009

                                12

1        A.    I don't remember that at all.  No, not really.

2        Q.    What about prior improvement plans?

3        A.    I knew that there were improvements put on

4    there and by assumption there were improvement plans.

5        Q.    Okay.  Did you ever have to review any of those

6    improvement plans during the preparation of this map?

7        A.    No.

8        Q.    Do you know whether Josh Woodard ever reviewed

9    any improvement plans during the preparation of this

10   map?

11       A.    I don't recall him mentioning anything of

12   improvement plans.

13       Q.    Okay.  Do you recall a conversation we had last

14   week?

15       A.    Mmm-hmm.

16       Q.    And in that conversation do you remember us

17   discussing Josh Woodard?

18       A.    Mmm-hmm.

19            MR. HASSING:  You might want to admonish her on

20   the uh-huhs and the uh-uhs.

21            THE WITNESS:  I'll correct that one.

22            MR. HASSING:  For the record we have to get

23   yeses and noes.

24            THE WITNESS:  I understand.

25   BY MR. TRAVIS:



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.875.5071
Facsimile: 661.322.2242

Suite 170
5001 East Commercenter Drive
Bakersfield, CA 93309
www.esquiresolutions.com

Sarah Burgi

July 3, 2009

24

1     A.    Okay.

2     Q.    Did you get the feeling in talking to

3     Mr. Travis that he was trying to get you to say that

4     DeWalt in some way used the McIntosh improvement plans?

5     A.    Yes.

6     Q.    And why do you say "Yes"?

7     A.    He's a lawyer.  I mean, just asking questions

8     of why things were put in certain places, why lot lines

9     were drawn in certain places, whether or not we had seen

10    the improvement plans.  And I explained to him that lot

11    lines have to be put depending on where the improvements

12    are and he asked if we had improvement plans.

13    Q.    Okay.  And what did you tell him when he asked

14    you if you had any improvement plans?

15    A.    Not to my knowledge.

16    Q.    Okay.  While you worked for DeWalt and were

17    working on this tentative for Northern I take it that

18    you never saw any improvement plans that were prepared

19    by Mr. McIntosh; is that correct?

20    A.    Yes.

21    Q.    And do you have any knowledge as to whether

22    anybody at DeWalt ever saw any improvement plans that

23    were prepared by McIntosh?

24    A.    No, I have not, no.

25    Q.    All right.  During the time you worked for



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.875.5071
Facsimile: 661.322.2242

Suite 170
5001 East Commercenter Drive
Bakersfield, CA 93309
www.esquiresolutions.com

Sarah Burgi                                                July 3, 2009

25

1    DeWalt did you ever or do you recall ever seeing any

2    tentative map prepared by McIntosh?

3        A.    No.

4        Q.    During the time you worked for DeWalt do you

5    ever recall gaining any information that would cause you

6    to believe that anybody at DeWalt ever saw McIntosh's

7    tentative map?

8        A.    Pertaining, to clarify what you're saying

9    pertaining to this map?

10       Q.    Correct.

11       A.    No.

12       Q.    All right.  You said that Josh Woodard worked

13   on the map?

14       A.    Yes.

15       Q.    You worked on the tentative map?

16       A.    Yes.

17       Q.    Was there anybody else at DeWalt that you know

18   of that actually physically worked on the tentative map?

19       A.    I would have to ask Heath James as to whether

20   or not he drew the surface, the contra lines.  I can't

21   recall if that was him or I.

22       Q.    Okay.  How about Greg Black, was he the overall

23   supervisor of the tentative map that DeWalt worked on?

24       A.    Yes.

25       Q.    Did he do any, to your knowledge any physical



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.875.5071
Facsimile: 661.322.2242

Suite 170
5001 East Commercenter Drive
Bakersfield, CA 93309
www.esquiresolutions.com

Sarah Burgi
July 3, 2009

30

1     Q.   Okay.  And did your duties change once again
2  when you had this senior title tacked onto your second
3  title?
4     A.   No.
5     Q.   Okay.  Earlier you were talking with Steve and
6  he asked if during your previous conversations with
7  Mr. Travis if he had ever asked you, I believe you said
8  whether or not you had copied a McIntosh map?
9     A.   Yes.
10    Q.   What was your understanding of the meaning of
11 the term "copy"?
12    A.   To replicate what was on a previous map without
13 a survey done would be a copy.
14    Q.   Use somebody else's work passed off as your
15 own?
16    A.   Yes.
17    Q.   None of that ever occurred?
18    A.   No.
19         MR. TRAVIS:  I'm done.
20         MR. HASSING:  I just have one.
21              FURTHER EXAMINATION
22 BY MR. HASSING:
23    Q.   Following up on counsel's question about
24 copying, to your knowledge was anything at all copied
25 off of the McIntosh tentative onto the DeWalt tentative?



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.875.5071
Facsimile: 661.322.2242

Suite 170
5001 East Commercenter Drive
Bakersfield, CA 93309
www.esquiresolutions.com

Sarah Burgi                                           July 3, 2009

                              31
1        A.    No.

2              MR. HASSING:   I have no further questions.

3    We're off the record.

4              (Discussion off the record)

5              MS. COOPER:   I apologize for bringing us back

6    on the record, however, I just completely forgot this.

7                     FURTHER EXAMINATION

8    BY MS. COOPER:

9        Q.    You testified earlier when you were talking

10   with Steve about the four or five emails that are in

11   your inbox.

12       A.    Yes.

13       Q.    And they're currently still in your inbox?

14       A.    Yes.

15       Q.    When you have an opportunity print those out

16   and send those to counsel.

17       A.    Yes.

18       Q.    Can I ask you to do that?

19       A.    Yes.   Where would you like me to send them to?

20       Q.    That's a good question.

21             MR. TRAVIS:   Well, You have their cards,

22   correct?

23             THE WITNESS:   I have one card.

24             MR. TRAVIS:   Why don't you just send them to

25   everybody.



**ESQUIRE**
an Alexander Gallo Company

Toll Free: 800.875.5071
Facsimile: 661.322.2242

Suite 170
5001 East Commercenter Drive
Bakersfield, CA 93309
www.esquiresolutions.com

# EXHIBIT R   Okadigbo Dec

<div align="right">**Certified Copy**</div>

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA

ROGER McINTOSH,

        Plaintiff,

    vs.

NORTHERN CALIFORNIA UNIVERSAL
ENTERPRISES COMPANY, ET AL.,

        Defendants.

~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~

Case No.
107CV-01080-
LJO-WMW

**DEPOSITION OF**

**LARRY F. PENNELL**

January 29, 2009
11:43 a.m.

Suite 170, 5001 East Commercenter
Bakersfield, California

Brian S. Cardoza, CSR No. 8362



**ESQUIRE**

Toll Free: 800.300.1214
Facsimile: 661.322.2242

Suite 170
5001 East Commercenter Drive
Bakersfield, CA 93309
www.esquiresolutions.com

Larry F. Pennell

January 29, 2009

19

1    A.  Yes.

2    Q.  And is that true?

3    A.  Yes.

4    Q.  Okay.

5    A.  Alan's testimony?  Are you asking me if

6    Alan's testimony is true?

7    Q.  I'm asking you if you understand that those

8    discussions took place?

9    A.  Yes.

10   Q.  Okay.  And the lot sizes that were originally

11   done in 1992 by the previous developer, are those the same

12   lots that exist today?

13   MR. OKADIGBO:  Well, objection, insofar as this

14   testimony of when the lot sizes were done, and in 1992,

15   and there's no fact established as to that.

16   BY MR. TRAVIS:  Okay, well we can go through that

17   in detail, if we need to.

18   Q.  But you understand that because you had

19   previously testified that improvements were already put in

20   place before Mr. Wu purchased the property?

21   A.  That's correct.

22   Q.  Okay.  And correct me if I'm wrong, but you

23   had said that lots were already outlined and in place in

24   that subdivision; isn't that right?

25   A.  I testified that the water meter boxes were



ESQUIRE

an Alexander Gallo Company

Toll Free: 800.300.1214
Facsimile: 661.322.2242

Suite 170
5001 East Commercenter Drive
Bakersfield, CA 93309
www.esquiresolutions.com

# EXHIBIT S

Okadigbo Dec

1              UNITED STATES DISTRICT COURT

2       EASTERN DISTRICT OF CALIFORNIA, FRESNO DIVISION

3                     _____

4

5    ROGER McINTOSH,              No. 107CV 01080 LJO-WMW

6                  Plaintiff,

7    vs.

8    NORTHERN CALIFORNIA UNIVERSAL
     ENTERPRISES COMPANY, et al,
9
                   Defendants.
10   _____

11

12        DEPOSITION OF DENNIS MICHAEL McNAMARA

13                   Taken at

14                 Borton Petrini
                 1600 Truxtun Avenue
15              Bakersfield, California

16      Tuesday, October 28, 2008 at 3:37 P.M.

17

18                 Reported by:

19           Naomi S. Chavez, CSR #13007

20

21

22

23

24

25

                                              1

1  back up.

2        What was your involvement with approval?

3     A.   For Tentative Tract 6451, as the project

4  planner, I received the application to prepare the

5  appropriate environmental document, write it out for

6  comment for the California Environmental Quality Act,

7  scheduled a public hearing, presented the case before

8  the planning commission, the planning commission

9  approved the tentative map.

10    Q.   Did you compare the tentative map of

11  Tract 6451 to the prior map on the tract?

12    A.   No, sir.

13    Q.   And why not?

14    A.   The previous map had expired, so it was not a

15  document for me to review.  I took the existing map,

16  the proposed map, Tract 6551, into the CEQA analysis on

17  that map.

18    Q.   Now, you mentioned the improvements on the

19  prior map had already been installed.

20    A.   There were improvements out there, yes.

21    Q.   Was that indicated on the new tract or map or

22  was that something you just knew?

23    A.   That was something that I knew.

24    Q.   And how did you know that the prior

25  improvements had been installed?

```
 1   file.  I don't know those conditions.

 2        Q.   Do you know in general what conditions may or

 3   may not apply?

 4        A.   Yeah.  Now there's a new requirement to enter

 5   into a police tax, a fire tax.  You have to have

 6   improvement plans.  You have to comply with the City of

 7   Wasco's ordinance and any other section of the

 8   municipal code.

 9        Q.   Are you finished?

10        A.   Yes.

11        Q.   So if there were no improvement plans, what

12   would happen to a tentative map?  Would it be accepted?

13        A.   A tentative map, yes.  To approve a tentative

14   map you don't need improvement plans for a tentative

15   map to be approved.  You can have a condition of

16   approval on the tentative saying that prior to

17   acceptance by the City or -- infrastructure improvement

18   plans have to be signed and stamped or something like

19   that.  I'm not sure what exactly --

20        Q.   I understand.  We're talking in general.

21             So it could be under any circumstances, to the

22   best of your knowledge in dealing with this, that once

23   it makes it to final map, there has to be some

24   condition that improvement plans -- if they have it

25   they will be set in place; is that correct?
```

# EXHIBIT T

**Okadigbo Dec**

```
 1              UNITED STATES DISTRICT COURT

 2        EASTERN DISTRICT OF CALIFORNIA, FRESNO DIVISION

 3                       _____

 4

 5    ROGER McINTOSH,              No. 107CV 01080 LJO-WMW

 6                    Plaintiff,

 7    vs.

 8    NORTHERN CALIFORNIA UNIVERSAL
      ENTERPRISES COMPANY, et al,
 9
                       Defendants.
10    _____

11

12          DEPOSITION OF ROBERT EDWARD WREN

13                    Taken at

14                Borton Petrini
                1600 Truxtun Avenue
15             Bakersfield, California

16       Tuesday, October 28, 2008 at 3:03 P.M.

17

18                  Reported by:

19          Naomi S. Chavez, CSR #13007

20

21

22

23

24

25

                                              1
```

1      A.    They have not, to my knowledge -- not to my

2    knowledge.  They have not been approved by me or

3    anybody in the City since 2005.  They have never been

4    accepted.

5      Q.    So the public works portion of the Rose Valley

6    Ranch have not been accepted?

7            MR. TRAVIS:  Valley Rose.

8            MR. BRAZE:  Excuse me.  I took two cases, Rose

9    Valley and Valley Rose.

10     Q.    (By Mr. Braze)  So the improvements of Valley

11   Rose have not been accepted?

12     A.    That's correct.

13     Q.    And that includes the streets and sewers?

14     A.    That's correct.

15     Q.    Watermains?

16     A.    They have been inspected, but they've never

17   gone to Council to accept the improvements, to my

18   knowledge.  And again, that's from 2005 on.

19     Q.    What is required for acceptance?

20     A.    The developer needs to contact the City.  We

21   meet out there with the engineer of record, the

22   developer, and do a site check to make sure that the

23   improvements are in place and that the corners have

24   been set.  If we find everything is done and correct,

25   we accept -- we take it to City Council for acceptance.

1      A.    I'm not aware, no.

2      Q.    And when that inspection was done, were

3  there -- was that inspection done by comparing it with

4  anything -- was that comparing it with improvement

5  plans?

6      A.    No.   At that time I didn't know there was even

7  improvement plans out there.   We didn't have any, to my

8  knowledge.   It was built 15 years before or 10 years

9  before that and we were doing the visual inspection of

10  things we could see.

11      Q.    Now, do you know if there are improvement

12  plans for Valley Rose Estates now?

13      A.    Yes.   I received a disk, a CD, that had,

14  somebody in the City and I'm not sure when, had scanned

15  all the City drawings they had at the time, and there

16  was some that were called Valley Rose Estates, I think,

17  5472 and they were the improvement plans.

18      Q.    This disk you just received recently?

19      A.    No.   That was, I believe, in late 2005, maybe

20  early 2006.   Somebody told me about it at the City that

21  they have it so I started asking around and I found

22  one.

23      Q.    You don't remember who you received it from?

24      A.    I got it from Rosie Masqueda, M-a-s-q-u-e-d-a.

25      Q.    And she was in which department?

# EXHIBIT U     Okadigbo Dec

**Certified Copy**

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA

ROGER McINTOSH,

      Plaintiff,

  vs.

NORTHERN CALIFORNIA UNIVERSAL
ENTERPRISES COMPANY, ET AL.,

      Defendants.

~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~

Case No.
107CV-01080-LJO-WMW

**DEPOSITION OF**

**JAMES K. DELMARTER**

February 2, 2009
1:32 p.m.

5001 East Commercenter
Suite 170
Bakersfield, California

Brian S. Cardoza, CSR No. 8362



**ESQUIRE**

Toll Free: 800.300.1214
Facsimile: 661.322.2242

Suite 170
5001 East Commercenter Drive
Bakersfield, CA 93309
www.esquiresolutions.com

James K. Delmarter                                    February 2, 2009

                                  55

1        A.   Yes.

2        Q.   And in comparing those two maps you noticed

3   enough differences that you were led to believe that they

4   were prepared off of two separate surveys; is that

5   correct?

6        A.   Yes.

7        Q.   Have you ever talked to anybody at DeWalt

8   Engineering about either of these maps?

9        A.   No.

10       Q.   Have you had any dealings with Jeff Gutierrez

11  at DeWalt Engineering?

12       A.   No.

13       Q.   Do you know Jeff?

14       A.   Yes.

15       Q.   Have you ever had any problems with him?

16       A.   No.

17       Q.   Have you ever had any problems with DeWalt

18  Engineering?

19       A.   Yes.

20       Q.   What kind of problems?

21       A.   In their previous capacity years and years

22  ago, they -- we had something similar to this type of a

23  situation, in which they had done some work for a client

24  and the client came to me and asked me to do some work for

25  them, and I called DeWalt and I told him what I was going



Toll Free: 800.300.1214
Facsimile: 661.322.2242

Suite 170
5001 East Commercenter Drive
Bakersfield, CA 93309
www.esquiresolutions.com

James K. Delmarter                          February 2, 2009

64

1    different surveys, did you also then come to the

2    conclusion that DeWalt didn't just copy the old tentative?

3         A.   Well, obviously the final map in here

4    indicates that Jeff Gutierrez states he's a licensed land

5    surveyor and this survey represents -- this map represents

6    a survey made under his supervision during September 2004.

7         Q.   So, have you seen anything in any of the

8    documents you've reviewed that would cause you to question

9    whether or not DeWalt went out and did their own survey?

10        A.   No.

11        Q.   You believe they did go out and do their own

12   survey, right?

13        A.   Yes.   Yes.

14        Q.   And you believe that tentative 6451 and final

15   6451 was based on that separate survey done by DeWalt,

16   right?

17        A.   Well, something's different, because the

18   tentative and the final map do not have the same

19   information on it.

20        Q.   In what regard?

21        A.   Again, the distances are not the same as

22   what's on the final map.

23        Q.   Which distances?

24        A.   Well, let's -- specifically, if you want to

25   look at it, the north line of the tentative map shows a



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.300.1214
Facsimile: 661.322.2242

Suite 170
5001 East Commercenter Drive
Bakersfield, CA 93309
www.esquiresolutions.com

# EXHIBIT V      Okadigbo Dec

**Certified Copy**

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA

ROGER McINTOSH,

      Plaintiff,

    vs.

NORTHERN CALIFORNIA UNIVERSAL
ENTERPRISES COMPANY, ET AL.,

      Defendants.

~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~

Case No.
107CV-01080-LJO-WMW

**DEPOSITION OF**

**JAMES K. DELMARTER**

February 2, 2009
1:32 p.m.

5001 East Commercenter
Suite 170
Bakersfield, California

Brian S. Cardoza, CSR No. 8362



ESQUIRE

Toll Free: 800.300.1214
Facsimile: 661.322.2242

Suite 170
5001 East Commercenter Drive
Bakersfield, CA 93309
www.esquiresolutions.com

nr

1   James J. Braze, Esq.; SBN 75911
    Jeffrey A. Travis, Esq.; SBN 235507
2   BORTON PETRINI, LLP
    5060 California Avenue, Suite 700
3   Post Office Box 2026
    Bakersfield, CA 93303
4   Telephone (661) 322-3051

5   Attorneys for Plaintiff, Roger McIntosh

6

7

8                       UNITED STATES DISTRICT COURT

9          EASTERN DISTRICT OF CALIFORNIA, FRESNO DIVISION

10

11  ROGER McINTOSH,                    Case No.  107CV 01080 LJO-WMW

12              Plaintiff,             EXPERT WITNESS DISCLOSURE OF
                                       JAMES K. DELMARTER BY
13  v.                                 PLAINTIFF, ROGER McINTOSH

14  NORTHERN CALIFORNIA UNIVERSAL
    ENTERPRISES COMPANY, et al,
15
                Defendants.
16

17

18  TO ALL PARTIES AND TO THEIR ATTORNEYS OF RECORD:

19          COMES NOW plaintiff, Roger McIntosh (hereinafter "Plaintiff"), pursuant to Federal

20  Rules of Civil Procedure, Rule 26, as agreed to by the parties and as required by the Court, submits

21  the following expert to be called at the time of trial:

22                          **RETAINED EXPERT**

23          Mr. James K. Delmarter, is qualified through education and experience to testify as

24  an expert in this matter as set forth in Rule 26 Expert Disclosure and Report of Mr. Delmarter.

25  Mr. Delmarter is presently prepared to provide meaningful testimony in support of any and all

26  opinions which he intends to offer at the trial in this matter.

27          The Rule 26 Expert Disclosure and Report of Mr. Delmarter is attached hereto and

28  incorporated herein by reference as Exhibit "A."

H:\PUBLIC\054493\060971
McIntosh v. Northern\EXPT
DISCL. DELMARTER.wpd

EXHIBIT A
Deponent Delmarter
Dated 2 09 Rptr. B.C.
WWW.DEPBOOK.COM

1

EXPERT WITNESS DISCLOSURE OF PLAINTIFF, ROGER McINTOSH

1    The aforementioned expert has reviewed the file and other relevant materials, and is

2    prepared to submit to meaningful deposition on the opinions to which he intends to testify at trial.

3    The aforementioned expert reserves the right to review additional materials, documents and

4    depositions that are brought to his attention and to modify, alter or supplement his testimony based

5    on those additional and/or supplemental material, documents or testimony. Plaintiff further reserves

6    the right to call as an expert witness any and all other experts who may have been designated and/or

7    identified by any other party in this matter.

8    Further, Plaintiff reserves its constitutional, statutory and common rights to later name

9    other experts before trial and to call to testify at trial experts not presently named whose testimony

10   is needed to aid in the prosecution of this matter and/or to refute and/or rebut the contentions and

11   testimony of opposition experts and/or witnesses.

12   DATED:   December 16, 2008

13                     BORTON PETRINI, LLP

14

15

16   By: _____
     Jeffry A. Travis, Attorney for Plaintiff,
     Roger McIntosh

17

18

19

20

21

22

23

24

25

26

27

28

2

EXPERT WITNESS DISCLOSURE OF PLAINTIFF, ROGER McINTOSH

# Exhibit A

Compensation:                    $150.00 per hour for document review and research.
                                 $250.00 per hour for deposition testimony and trial
                                 $1.00 per mile for travel.
                                 Out-of-pocket expense for out-of-town meals and lodging.


Materials Reviewed:

In forming my opinions, I have reviewed the following documents:

1.   Tentative Tract No. 5472 and Conditions of Approval
2.   Tentative Tract No. 6451 and Conditions of Approval
3.   Final Map Tract No. 6451
4.   Parcel Map No. 9572
5.   Contracts and Agreements
6.   Street, Sewer, Water-Storm Drain, and Wall Plans
7.   Master Drainage Plan
8.   Master Sewer Plan
9.   Master Water Plan
10.  Master Land Use Plan, including Traffic Study.

Based on my review of the documents provided to date, I am prepared to render the
following opinions with respect to the above referenced case. To the extent that additional
materials are brought to my attention, I respectfully reserve the right to supplement and/or amend
the following opinions.

The revised Tentative Map for Tract No. 5472, dated April 21, 1992, and the
Tentative Map for Tract No. 6451, dated November 8, 2004, are substantially similar
in that the Lot configuration, numbering, street names and Tract boundary appear to
be identical with minor differences due to the separate surveys. Tentative Tract
No. 6451 reflects existing improvements constructed as a result of the plans
prepared for Tract No. 5472 hereinabove referenced.

It is my opinion that Tract No. 6451 could not have been recorded had the
improvements, prepared from the plans for Tract No. 5472, not been constructed.


Prepared and Submitted by:                        December 17, 2008


_James K. Delmarter_____

James K. Delmarter
R.C.E. 17564   Expires: 6-30-2009

**PROOF OF SERVICE**
**(FRCP No. 5(b)(2)(E))**

**STATE OF CALIFORNIA, COUNTY OF KERN**

I, Gina Pomato, declare:

I am a citizen of the United States. I am employed in the County of Kern, State of California. I am over the age of 18 and not a party to the within action; my business address is 5060 California Avenue, Suite 700, Bakersfield, California 93309.

On December 1 9, 2008, I served the foregoing document described as **EXPERT WITNESS DISCLOSURE OF JAMES K. DELMARTER BY PLAINTIFF, ROGER McINTOSH** on the other party(ies) in this action as follows:

| | |
|---|---|
| Steven John Hassing, Esq. | Attorneys for Attorneys for Defendants, |
| **Law Offices of Steven J. Hassing** | Northern California Universal Enterprises |
| 425 Calabria Court | Company and Lotus Developments |
| Roseville, CA 95747 | Tel:   916/677-1776 |
| | **Fax:   916/677-1770** |
| email address: **stevehassing@yahoo.com** | |

| | |
|---|---|
| Chaka Okadigbo | Attorneys for Defendant, City of Wasco |
| **Garcia Calderon Ruiz, LLP** | |
| 500 South Grand Ave Suite 1100 | Tel: 213/347-0210 |
| Los Angeles, CA 90071 | **Fax: 213-347-0216** |
| email address: **cokadigbo@gcrlegal.com** | |

**BY ELECTRONIC SERVICE:** Pursuant to Fed. R. Civ. P. 5(b)(2)(E) and Local Court Rule(s), the foregoing document will be served by the court via CM/ECF.. Pursuant to the CM/ECF docket for this case proceeding the following person(s) are on the Electronic Mail Notice List to receive ECF transmission at the email address(es) indicated below:

**BY MAIL:** As follows: I am "readily familiar" with the firm's practice of collection and processing correspondence for mailing. Under that practice it would be deposited with U.S. postal service on that same day with postage thereon fully prepaid at , California in the ordinary course of business. I am aware that on motion of the party served, service is presumed invalid if postal cancellation date or postage meter date is more than one day after date of deposit for mailing in affidavit.

Executed on **December 19, 2008**, at Bakersfield, California.

I declare that I am employed in the office of a member of the bar of this court at whose direction the service was made.

_____                 _____
Gina Pomato                                              /s/ Gina Pomato

## Rule 26 Expert Disclosure by James K. Delmarter

Case Title:          Roger McIntosh v. Northern California Universal
Enterprises Company.  (Civil Docket #1:07-cv-01080).

Venue:              United States District Court
Eastern District of California
Fresno Division

Subject Matter:      Copyright Infringement.

Qualifications:      Bachelor of Science in Civil Engineering  - University of
California-Berkeley 1964 with Honors.

California Registered Civil Engineer - 1967.

1964 - 1974    Engineer of Predecessor Partnerships.

1974 - Present -  Partner of Current Delmarter & Deifel and
its Predecessor Partnerships.

Professional Affiliations:

Fellow and Life Member of American Society of Civil
Engineers.

Past President and Director of Kern County Chapter of
American Council of Engineering Companies of California.

Experience:        45 Years of Civil Engineering (42 years as Registered
Engineer) specializing in Land Development and Surveying.

Processed approximately 195 Final Map Subdivisions, over one-
thousand Parcel Maps, Lot Line Adjustments and Parcel Map
Waivers, and numerous Commercial and Industrial Projects in the
County of Kern communities of Rosamond and Lamont, and the cities
of Bakersfield, Arvin, Shafter, McFarland, Delano, Tehachapi and
Wasco.

Publications:       None

Trial Listing:       None

Deposition Listing:   None

# EXHIBIT W

**Okadigbo Dec**

**Certified Copy**

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA, FRESNO DIVISION

ROGER McINTOSH,

       Plaintiff,

   vs.

NORTHERN CALIFORNIA UNIVERSAL
ENTERPRISES, COMPANY, et al.,

      Defendants.

~~~~~~~~~~~~~~~~~~~~~~~~~~~~

Case No.
107CV 01080 LJO-WMW

## 30(b) AND 34 DEPOSITIONS OF

## STEPHEN WONG, C.E.

July 2, 2009
1:30 p.m.

5060 California Avenue
Suite 700
Bakersfield, California

Wendy Hahesy, RMR, CSR-4873



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.300.1214
Facsimile: 661.322.2242

Suite 170
5001 East Commercenter Drive
Bakersfield, CA 93309
www.esquiresolutions.com

Stephen Wong, C.E.

July 2, 2009

67

1   differences that are more substantial in my mind and we

2   can go, you know, through the maps themselves and I can

3   show you the differences.

4       Q.   You're going to be testifying that the two maps

5   are substantially different, correct?

6       A.   Yes.

7       Q.   All right.  I want to know what leads you to

8   believe that in your opinion that these two maps are

9   substantially different?

10      A.   Okay.

11      Q.   All right.  And I want to know specifically

12  what are the differences that make them -- well, let's

13  just go into it.

14          MR. HASSING:  Would you like a larger map to

15  look at?

16          THE WITNESS:  If you have one.

17          MR. HASSING:  Right here.

18          MR. TRAVIS:  Well, those are the improvement

19  plans.

20          MR. HASSING:  Okay.  You got good eyes?

21  BY MR. TRAVIS:

22      Q.   Let's go through the things, the differences

23  that you've listed in your opinion then we'll go through

24  any others that you feel are significant.  Before we do

25  that, however, I want to list as exhibit -- what are we



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.300.1214
Facsimile: 661.322.2242

Suite 170
5001 East Commercenter Drive
Bakersfield, CA 93309
www.esquiresolutions.com

Stephen Wong, C.E.                                    July 2, 2009

68

1    at, 6?

2              (Tract No. 6451 marked Exhibit No. 6)

3    BY MR. TRAVIS:

4        Q.   We'll also bring back and resurrect Exhibit 5

5    so that we can review these two maps.  Let's first go

6    through what you've listed as -- I'm assuming this is a

7    significant difference which is the legal description of.

8    the property; is that correct?

9        A.   Yes.

10       Q.   Okay.  What significant difference is that?

11       A.   Well, the legal description is different.

12       Q.   Okay.

13       A.   It represents the same property but is

14   described differently.  The legal description on

15   Tentative Tract 5472 reads "A portion of the southeast

16   quarter section of southwest quarter of Section No. 4,

17   township 27 south, range 24 east of Mount Diablo Base

18   and Meridian, City of Wasco.  The legal description on

19   the Vesting Tentative Map 6451 reads "A division of

20   Parcel 1 of Parcel Map 9572 filed in Book 44 of Parcel

21   Maps at Pages 57 through 62", and it goes on from there.

22   So you can see at the outset one is a simple Parcel 1 of

23   this parcel map the other is a portion of the quarter

24   section.

25       Q.   But as you stated before you started reading



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.300.1214
Facsimile: 661.322.2242

Suite 170
5001 East Commercenter Drive
Bakersfield, CA 93309
www.esquiresolutions.com

Stephen Wong, C.E.

July 2, 2009

69

1    they're describing the same property; isn't that right?

2        A.   Yes, they are.

3        Q.   So isn't it a matter of schematics in the way

4    that it's being described?

5            MR. OKADIGBO:   Objection.

6            MR. HASSING:   Argumentative.

7        A.   Looking for differences they are describing the

8    property in a different manner.  I mean, if you were to

9    copy, if you would, from an original map why wouldn't

10   you copy then the legal description?   It's a

11   representation in a difference manner.

12   BY MR. TRAVIS:

13       Q.   Well, I'm asking you something more specific

14   than just differences.   I'm asking you exactly what you

15   put here which is we noted several significant

16   differences.

17       A.   Okay.   In my mind that's significant.

18       Q.   Let me just get it clear for the record.   So

19   it's significant to you that even though they're

20   describing the same property it's described in a

21   different way?

22       A.   Yes.

23       Q.   That was the first significant difference that

24   you listed on your opinion.   The second part of that you

25   said another what I take as a significant difference,



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.300.1214
Facsimile: 661.322.2242

Suite 170
5001 East Commercenter Drive
Bakersfield, CA 93309
www.esquiresolutions.com

Stephen Wong, C.E.

July 2, 2009

70

1   correct me if I'm wrong, is that Map 6451 show the

2   underground utilities which were in place when the

3   property was surveyed whereas Map 5472 does not show any

4   improvements.  And can you point out on these maps what

5   it is you're referring to?

6        A.   Well, 5472 shows streets with no utilities

7   shown.  6451, however, shows a sewer line with sewer

8   manhole locations, a water line, so those are the

9   utilities that we are talking about.

10       Q.   Okay.  So that's another what you consider to

11  be a significant difference, correct?

12       A.   Yes.

13       Q.   Okay.  Any other significant differences that

14  are not here in your opinion?

15       A.   The Rule 26 opinion was not intended to be an

16  exhaustive but more of an example of the conditions that

17  represented differences that I mentioned.  And if you

18  want me to do so I will mention everything that I

19  considered in my review.  And one other very significant

20  one is the fact that the original tentative map of 5472

21  was a standard tentative map as defined in the

22  Subdivision Map Act.  6451, however, is a vesting

23  tentative map, it is defined completely different.  It

24  is intended for a completely different purpose than a

25  standard tentative map.



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.300.1214
Facsimile: 661.322.2242

Suite 170
5001 East Commercenter Drive
Bakersfield, CA 93309
www.esquiresolutions.com

Stephen Wong, C.E.                                    July 2, 2009

71

1      Q.   I have a question:  Did you review all the
2   tentative maps in this case?
3      A.   I was comparing Tentative Map 5472 and
4   Tentative Map 6451.
5      Q.   Okay.  As far as Exhibit 5, Vesting Tentative
6   Tract No. 6451 this is the only tentative map of any
7   kind that you reviewed when conducting your opinion; is
8   that correct?
9           MR. OKADIGBO:  Vague as to only of what?
10  BY MR. TRAVIS:
11     Q.   Vesting Tentative Tract No. 6451 did you review
12  anything other than Vesting Tentative Tract Map No. 6451
13  when forming your opinion?
14          MR. OKADIGBO:  Vague and ambiguous in the sense
15  are you asking him whether he possibly other 6451
16  tentative maps, whether this vesting is the only
17  tentative map for 6451 that he looked at?
18  BY MR. TRAVIS:
19     Q.   Do you understand the question, Mr. Wong?
20     A.   I'm sorry, I don't.
21     Q.   Did you review any tentative map for 6451 that
22  was not vesting?
23     A.   No.
24     Q.   Okay.
25          MS. COOPER:  Sorry, I need to ask to take a



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.300.1214
Facsimile: 661.322.2242

Suite 170
5001 East Commercenter Drive
Bakersfield, CA 93309
www.esquiresolutions.com

Stephen Wong, C.E.                                        July 2, 2009

72

1    break.   I didn't realize we were going to take this

2    long.   If I could have two minutes, I'd appreciate it.

3              MR. TRAVIS:   Go ahead.

4              (Recess taken)

5    BY MR. TRAVIS:

6         Q.   We were going through significant differences

7    between the Vesting Tentative Tract Map No, 6451 and

8    Revised Tentative Tract Map No. 5472.   You'd given

9    another difference between that 5472 map was a standard

10   tract map whereas 6451 was a vesting tentative tract

11   map.   Why was that a significant difference?

12        A.   The Subdivision Map Act defines these

13   differently.   The vesting tentative map is intended for

14   another specific purpose of vesting rights to the

15   development that are not always vested when you file a

16   standard tentative map.

17        Q.   Do you know whether or not Wasco accepted this

18   tentative map as a vesting tentative tract map?

19        A.   No.

20        Q.   Do you have an understanding that Wasco doesn't

21   typically allow vesting tentative tract maps?

22        A.   No.

23        Q.   What is another significant difference?

24        A.   There is a legend in the upper right-hand

25   corner of Tentative Map 6451 which identifies existing



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.300.1214
Facsimile: 661.322.2242

Suite 170
5001 East Commercenter Drive
Bakersfield, CA 93309
www.esquiresolutions.com

Stephen Wong, C.E.                                    July 2, 2009

73

1   improvements, some of which I already indicated but also

2   identifies existing monumentation.  We had identified

3   monuments of the streets that were existing on I believe

4   another exhibit that we had looked at.  There are also

5   monuments that were of the front of, I believe I counted

6   12 or 13 lots.

7       Q.   So if I can summarize, if I'm wrong let me

8   know, another significant difference is the legend in

9   addition to the monument markers which appear on the

10  6451 map and in that I'm referring to Exhibit 5 which do

11  not appear on the 5472 map; is that correct?

12      A.   Yes.

13      Q.   Okay.  Any other significant differences?

14      A.   The boundary survey is different, for example,

15  the northerly boundary of 6451 reads as follows "A south

16  89 degrees, 16 minutes, nine seconds east, 1317.97 feet.

17  The 5472 shows it as north 89 degrees, 16 minutes,

18  five seconds west, and 1317.71 feet.  So that reflects

19  the fact that survey was just different based on what

20  they found out in the field.

21      Q.   Well, based on your experience can you ever

22  have two surveys that are similar, that are identical?

23      A.   Sure.

24      Q.   Is it possible in your experience to go out

25  conduct one survey from one team, have another separate



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.300.1214
Facsimile: 661.322.2242

Suite 170
5001 East Commercenter Drive
Bakersfield, CA 93309
www.esquiresolutions.com

Stephen Wong, C.E.                                      July 2, 2009

74

1    team come out and perform another survey on the same

2    property and have identical surveys?

3         A.   If they're looking at the same monuments, yes,

4    you can.  With today's equipment you can get down fairly

5    accurately.  Whereas previously you had to pull a chain

6    and if you've ever done that the accuracy is not quite

7    the same.

8         Q.   You said "fairly accurate" that's not

9    identical.

10        A.   Well, you said is it possible and I said, yes,

11   it is possible.

12        Q.   Have you ever seen that happen?

13        A.   I've never had to redo a survey.  I never had

14   the opportunity to have to compare it.

15        Q.   So you don't know?

16        A.   Again, you ask is it possible, yes, it is

17   possible.

18        Q.   So it's possible but practically you've never

19   actually seen it happen?

20        A.   I've never had to do it, no.

21        Q.   Okay.  But then, again, as you testified

22   earlier how many actual surveys, again, was it that you

23   physically performed?

24             MR. OKADIGBO:  Objection.  Asked and answered.

25        A.   I've been out with a field crew but I've never



**ESQUIRE**
an Alexander Gallo Company

Toll Free: 800.300.1214
Facsimile: 661.322.2242

Suite 170
5001 East Commercenter Drive
Bakersfield, CA 93309
www.esquiresolutions.com

Stephen Wong, C.E.

July 2, 2009

75

1   led the field crew, I've always had a party chief do the

2   actual field work.

3   BY MR. TRAVIS:

4       Q.   But I'm actually asking you how many number of

5   times you've actually been out there whether as a party,

6   in any way as a party to a field survey in any capacity?

7       A.   Probably in my career, maybe 20 times,

8   something to that effect.

9       Q.   None of those times have you ever had to redo a

10  survey that had already been done previously?

11      A.   I'm not sure I know exactly what you mean by

12  "redo a survey."  When you go out there you find the

13  same monuments that were found previously and you shoot

14  between those monuments.  You don't know what type of

15  equipment they used.  You don't know how long ago that

16  was done and so forth, so there may be different

17  parameters.

18          But is it possible to have -- utilizing the

19  same type of equipment in the same time frame and

20  shooting the same monuments to come up with the same

21  information, yes, it is possible.

22      Q.   Probable?

23      A.   Likely, yes.

24      Q.   Let me ask you about any more significant

25  differences that you've seen on comparing these two



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.300.1214
Facsimile: 661.322.2242

Suite 170
5001 East Commercenter Drive
Bakersfield, CA 93309
www.esquiresolutions.com

Stephen Wong, C.E.                                July 2, 2009

76

1   maps.

2       A.    Well, 6451 gives reference to improvements that

3   were existing in their notes section.   Note No. 1 reads

4   "This development contains existing improvements built

5   for Valley Rose Planned Community expired Tentative Map

6   5472, and associative approved improvement plans."   So

7   they already recognize that the improvements were done

8   by or previous to the preparation of this document

9   whereas obviously 5472 did not.

10      Q.    Did you ever discover who created these

11  improvement plans or were they ever created?

12      A.    The improvement plans --

13          MR. HASSING:   Objection.   Compound.

14  BY MR. TRAVIS:

15      Q.    Well, let ask it doubly.   Did you ever

16  discovery any improvement plans for Tentative Tract Map

17  No. 6451?

18      A.    The Tentative Map 6451 clearly states that the

19  improvements were existing so no improvement plans would

20  be associated with the completion of the filing of 6451.

21  It references improvement plans prepared by or for 5472

22  and, yes, we did have a copy of the improvement plans

23  for 5472.

24      Q.    You did have a copy of those improvement plans

25  and did you see who created those improvement plans?



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.300.1214
Facsimile: 661.322.2242

Suite 170
5001 East Commercenter Drive
Bakersfield, CA 93309
www.esquiresolutions.com

Stephen Wong, C.E.                                    July 2, 2009

77

1     A.    Yes.

2     Q.    Who did that?

3     A.    Martin-McIntosh.

4     Q.    Okay.  And are those the same improvement plans

5     that references the streets that we referred to earlier

6     in this deposition?

7     A.    What do you mean by streets references?

8     Q.    Well, we were looking earlier at improvement

9     plans which we had put down here as Exhibit 2.  And you

10    had testified earlier, correct me if I'm wrong, that

11    those improvement plans had street names that were

12    referred to; is that correct?

13    A.    The improvement plans do have street names on

14    them, yes.

15    Q.    Are those same street names that are Tentative

16    Map 5461?

17    A.    They appear to be.  I didn't actually compare

18    them one for one but I could do that.

19    Q.    Okay.  I could refer you for your ease to the

20    very last page if that helps you.

21    A.    We're speaking of the grading plan?

22    Q.    That's correct.

23    A.    Yes.

24    Q.    Do all those street names appear to be

25    identical?



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.300.1214
Facsimile: 661.322.2242

Suite 170
5001 East Commercenter Drive
Bakersfield, CA 93309
www.esquiresolutions.com

Stephen Wong, C.E.                                    July 2, 2009

78
1        A.    They do appear to be identical except for the
2    apostrophe in Andrew's.
3        Q.    Okay.  So there an apostrophe difference in one
4    of the street names, correct?
5        A.    Yes.
6        Q.    What about the lot configuration, and I'm
7    referring to on that specifically the way that the lots
8    are sequentially numbered, do those appear to be the
9    same?
10       A.    Yes.
11       Q.    Okay.  What about the subdivision layout and
12   design, does that appear to be the same?
13       A.    I don't know what you mean by "design."  The
14   subdivision layout appears to be the same, yes.
15       Q.    Okay.  The subdivision layout appears to be the
16   same.  What about the lot shapes and sizes, do those
17   appear to be the same?
18       A.    We're comparing what now, the grading plan?
19       Q.    In the last page of the grading plan that you
20   were just looking at it shows on the improvement plans
21   it shows the lot numbering and lot configurations, the
22   layout of each of the lots themselves, do those appear
23   to be the same as that in Tentative Map No. 6451?
24       A.    Yes.  But your last question referred to size
25   and the sizes are not shown on the grading plan.



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.300.1214
Facsimile: 661.322.2242

Suite 170
5001 East Commercenter Drive
Bakersfield, CA 93309
www.esquiresolutions.com

79

1    Q.    Okay.

2    A.    The sizes are not shown on 5472.

3    Q.    That's fine.  That's fair.  Thank you.  Good

4    point.

5    A.    That's a significant difference as well.

6    Q.    It is a significant difference because that's

7    not found on Tract No. 5472?

8    A.    That's correct.

9    Q.    It says that you'd reviewed the Wasco Municipal

10   Code, correct?

11   A.    Portions of it.

12   Q.    Portions of it.  I wouldn't expect you to go

13   through the whole thing.  I think you had mentioned the

14   subdivision map, are you familiar with that?

15   A.    Yes.

16   Q.    Do you know if having the legends identical,

17   monuments identical -- let me ask it one-by-one.  Do you

18   know if having the identical legends is a requirement

19   forgetting approval of a tentative map?

20   A.    I'm not understanding what you mean by --

21   Q.    Well, do you know what the conditions are for

22   having a tentative map approved by the City of Wasco?

23         MR. OKADIGBO:  Objection.  Vague and ambiguous

24   as to conditions.

25   A.    I believe what you're asking is do I know



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.300.1214
Facsimile: 661.322.2242

Suite 170
5001 East Commercenter Drive
Bakersfield, CA 93309
www.esquiresolutions.com

Stephen Wong, C.E.

July 2, 2009

103

1      Yes, the words "vesting" indicated to me that

2  it was designed for a specific different purpose

3  altogether, but nevertheless they still differ in that

4  same information that we were talking about.

5      Q.   But it does appear that the City of Wasco

6  didn't require any more or less information for either

7  of these two maps; isn't that correct?

8          MR. HASSING:   Objection.   Calls for

9  speculation.

10  BY MR. TRAVIS:

11      Q.   Looking just at these two maps it appears

12  except for what you pointed out was vesting, it appears

13  that there was no any other requirements other than what

14  is on these two particular maps; isn't that true?

15      A.   Yes.

16          (Tentative Tract Map No. 6451 marked Exhibit

17  No. 7)

18          MR. TRAVIS:   I'm done.

19          MR. HASSING:   I just have a few questions.

20                       EXAMINATION

21  BY MR. HASSING:

22      Q.   Did you notice any difference between 5472 and

23  6541 with respect to the way the designated remainder

24  was handled?

25      A.   6451.



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.300.1214
Facsimile: 661.322.2242

Suite 170
5001 East Commercenter Drive
Bakersfield, CA 93309
www.esquiresolutions.com

Stephen Wong, C.E.                                    July 2, 2009

104

1    Q.   Yes, 6451 and 5472.

2         MR. TRAVIS:   Now really we're going to have to

3    be precise about which map we're looking at because have

4    three.

5         A.   You want to compare it with Exhibit 5?

6    BY MR. HASSING:

7         Q.   Let's first take a look at Exhibit 5 and

8    compare it to the 5472 map.

9         A.   Yes, there are differences.   The designated

10   remainder nomenclature was identified on threes separate

11   lots on the 6451 map which is Exhibit 5 and not

12   indicated at all on the 5472 map.

13        Q.   All right.   And how about with regard to

14   Exhibit 7?

15        A.   With respect to those designated remainders

16   Exhibit 7 is identical to Exhibit 5.

17        Q.   All right.   And I notice from your written

18   opinion that you used the term "significant

19   differences."   In that first paragraph on the last page

20   you say that after comparing the Revised Tentative Tract

21   Map 5472, Vesting Tentative Tract No. 6451 we also noted

22   several significant differences.   And you gave some

23   examples of the significant differences and Mr. Travis

24   asked you about additional significant differences.   And

25   I want to ask you about just differences because when



Toll Free: 800.300.1214
Facsimile: 661.322.2242

Suite 170
5001 East Commercenter Drive
Bakersfield, CA 93309
www.esquiresolutions.com

Stephen Wong, C.E.                                    July 2, 2009

105

1    you get to trial your interpretation of "significant

2    differences" might conflict with the judge's definition

3    or with the law.  Did you find any other differences

4    between 5472 and Tentative 6451 other than those that

5    you talked about here today?

6         A.    Yes.

7         Q.    Can you tell me what they are?  And it's

8    important because if you don't talk about it now you're

9    not going to be able to talk about it at trial and

10   that's the whole focus of our defense.

11        A.    The difficult I have is because it's an

12   exhaustive amount of differences that I don't know that

13   I can expound on every single one, I may miss some.

14        Q.    Why do you say it's an exhaustive list of

15   differences?

16        A.    Well, we have discussed just a few of the

17   differences.  There's bearings differences, there's lot

18   dimension differences, there's more information on 6451

19   than on 5472.

20        Q.    Let's start this way then.  Why don't you pick

21   a lot, you have 68 lots, right, pick a lot and compare

22   the differences that are shown on 6451 with 5472 and

23   then tell me if that's representative of the other 67

24   lots?

25        A.    Okay.  Let's pick one in the corner here,



**ESQUIRE**
an Alexander Gallo Company

Toll Free: 800.300.1214
Facsimile: 661.322.2242

Suite 170
5001 East Commercenter Drive
Bakersfield, CA 93309
www.esquiresolutions.com

Stephen Wong, C.E.

July 2, 2009

106

1   Lot No. 46.   The northerly boundary on 5472 indicates

2   that to be 84.34 feet with no bearing indicated on

3   there, that boundary line.   On 6451 it shows it as 84.38

4   feet with a bearing of north 74 degrees, 76 minutes, and

5   54 seconds west.

6         MR. TRAVIS:   What lot number is this?

7         THE WITNESS:   46.

8   BY MR. HASSING:

9     Q.   Okay.   What other differences do you see, if

10  any, between the two maps with regard to Lot 46?

11    A.   The easterly boundary of lot 46 on 5472 is

12  100.83.   On 6451 it's 100.82.   The southerly boundary on

13  5472 is not indicated at all.   The southerly boundary on

14  6451 is shown as north 88 degrees, 53 minutes, 16

15  seconds west, 37.71 feet.   It would be the southwest

16  property line, property line between Lots 46 and 47.

17  Again, with 5472 does not have a bearing on it.   It has

18  a dimension of 113.28 feet.   On 6451 it has a bearing of

19  north 33 degrees, 19 minutes, and 18 seconds west with a

20  distance of 113.33 feet.

21         And then the very last dimension along the

22  street, 5472 does not have any dimension on that nor

23  does it have any curve data relative to the curve of the

24  street.   6451 has a dimension of 35.74 feet and it

25  references in the curve table as C-5 being a radius of


ESQUIRE
an Alexander Gallo Company

Toll Free: 800.300.1214
Facsimile: 661.322.2242

Suite 170
5001 East Commercenter Drive
Bakersfield, CA 93309
www.esquiresolutions.com

Stephen Wong, C.E.                                    July 2, 2009

107

1    50 feet from the center of the cul-de-sac.

2        Q.    Do you see any additional differences between

3    the two maps with regard to Lot 46?

4        A.    The last difference is the area.   On Map 5472

5    the area is not shown.   On 6451 it shows an area of

6    8,202 square feet.

7        Q.    Now you've indicated to my calculations here

8    five differences between the two maps with regard to

9    Lot 46.   Are those differences exhibited regularly with

10   respect to the other 67 lots?

11        MR. TRAVIS:   Objection.   Vague.   Compound.

12   Ambiguous.

13        A.    I don't know whether or not they're exactly the

14   same but, yes, those differences, and there are relative

15   to the boundaries as well as the areas are shown in

16   practically every single lot on the project.

17             There are also some indications adjacent to

18   Lot 46 where on 5472 it does not show any improvements.

19   On 6451 it shows an existing fence on the east boundary

20   line and an existing block wall on the south boundary

21   line, an existing street improvements adjacent to the

22   front of the lot.

23        MR. HASSING:   Right.   Madam Court Reporter,

24   would you read back the first three sentences in that

25   answer?



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.300.1214
Facsimile: 661.322.2242

Suite 170
5001 East Commercenter Drive
Bakersfield, CA 93309
www.esquiresolutions.com

Stephen Wong, C.E.                                  July 2, 2009

108

1          (Last question read)

2     BY MR. HASSING:

3        Q.    Those first three or four sentences she read

4     you didn't indicate which map you were referring to when

5     you said those differences were standard, were you

6     referring to 6451 or 5472?

7        A.    When I'm speaking of differences I'm speaking

8     in the comparison of 5472 and 6451 in specifically

9     Exhibit No. 7 which is the one I was referring to at the

10    time that I looked at this.

11       Q.    All right.  And is the 6451 Exhibit 7 that has

12    the additional information that you were referring to?

13       A.    Yes.

14       Q.    All right.  When you started testifying about

15    the difference between the two maps with respect to

16    Lot 46 you used the term "bearing", what did you mean by

17    "bearing"?

18       A.    In surveying terminology we identify an angle

19    by a bearing relative to north, north being zero and

20    relative to that we say these are northwest or northeast

21    with the difference being from true north.

22       Q.    Are there any bearings shown on 5472?

23       A.    Yes.

24       Q.    And where are they shown?

25       A.    Along the perimeter of the project.



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.300.1214
Facsimile: 661.322.2242

Suite 170
5001 East Commercenter Drive
Bakersfield, CA 93309
www.esquiresolutions.com

Stephen Wong, C.E.                                    July 2, 2009

109

1      Q.    Okay.  Are there any bearings on a 5472 with

2    regard to the individual lots?

3      A.    Only where they add join the parameter.

4      Q.    All right.  With respect to 6541 are the

5    bearings shown with respect to all four sides of each

6    lot?

7      A.    Some lots have more than four sides so relative

8    to every boundary of each lot there is a bearing that is

9    indicated, yes.

10     Q.    All right.  You also mentioned a curve table,

11   is there a curve table on 5472?

12     A.    No.

13     Q.    Is there a curve table on 6541?

14     A.    6451.

15     Q.    6451.

16     A.    Yes.

17     Q.    All right.  Are there any other differences

18   between 5472 and 6541 that you haven't testified about?

19     A.    You got a block in your mind, it's 6451.  Yes,

20   I mean, even the boundary is shown differently.

21     Q.    How?

22     A.    Bearings are different distances.

23     Q.    Each boundary contains that difference?

24     A.    I have not compared every boundary so I can't

25   say that every one different.



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.300.1214
Facsimile: 661.322.2242

Suite 170
5001 East Commercenter Drive
Bakersfield, CA 93309
www.esquiresolutions.com

110

1    Q.    Which one are you looking at now that you see a

2    difference on?

3    A.    I'm looking at -- well, I was looking at the

4    westerly boundary of the designated remainder which is

5    adjacent to and perpendicular with Lot No. 16.

6    Q.    Can you take a look at the other boundaries and

7    see if, in fact, they show differences?

8    A.    Do you want me to expound on the differences

9    when I come to them?

10   Q.    Yes, sir, I would like that.

11   A.    Yes, there are differences.  I can't tell with

12   respect to the most southerly boundary of Lots 13

13   through 18 because they show different locations for the

14   total.  I need to add them up in order to compare them.

15   But on the most westerly boundary of the project

16   adjacent to Lots 9 through 13 there is a bearing on 5472

17   of south one degree, five minutes, and 49 seconds west.

18   On 6451 that bearing is north one degree, four minutes,

19   20 seconds east.  And the distance on that same line on

20   5472 is 512.90, on 6451 it's 512.92.

21   Q.    Right.  What I'd like you to do on the rest of

22   the boundaries is just tell me if you see differences,

23   you don't have to tell me what they are.

24   A.    On the most northerly boundary there is a

25   difference between the two maps.  The most southerly



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.300.1214
Facsimile: 661.322.2242

Suite 170
5001 East Commercenter Drive
Bakersfield, CA 93309
www.esquiresolutions.com

Stephen Wong, C.E.                                    July 2, 2009

111

1    boundary which is along the State Route 46 appears to

2    identify a different line on these two maps.

3         Q.    What do you mean by that?

4         A.    Well, on 5472 the most southerly boundary

5    depicted on this map is the center line of that which is

6    a total of 89 feet from the property line of the

7    remainder lot in that area.   On 6451 the southerly

8    boundary that's depicted is not the center line of State

9    Route 46 but rather a line that is 49 feet from that

10   designated remainder lot so the difference of about

11   50 feet.

12        Q.    Okay.

13        A.    I don't know exactly which is right.  I don't

14   know.

15        Q.    I don't really care.

16        A.    But there is a difference.

17        Q.    What about that little configuration at the

18   bottom left-hand corner of the map of 5472, is there one

19   like that on 6451?

20        A.    That's just a key map or a vicinity map.

21        Q.    Is there one like that on 6451?

22        A.    No.

23        Q.    Do you see any other differences?

24        A.    Yes, there are improvements not just the

25   streets and the utilities that we discussed previously,



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.300.1214
Facsimile: 661.322.2242

Suite 170
5001 East Commercenter Drive
Bakersfield, CA 93309
www.esquiresolutions.com

112

1    but the fence lines that I mentioned adjacent to Lot 46

2    there are also existing block wall fences adjacent to

3    other lots.   There are monuments that are adjacent to

4    the entrance at Valley Rose Parkway and State Route 46.

5    There are location of existing power poles or service

6    lines or guy wires, again, based on the topographic data

7    found by the survey in the most southeasterly corner of

8    6451 that is not shown on 5472.

9        Q.   All right.   Are there additional differences?

10       A.   Yes.   6451 goes much further than the

11   boundaries with their survey to locate the corner of a

12   quarter section that was shown on the parcel map.

13       Q.   5472 doesn't do that?

14       A.   And 5472 does not.

15       Q.   You can probably guess what my next question

16   is, right?

17       A.   6451 also indicates references to a parcel map

18   of 5472 which is adjacent to this subdivision by parcel

19   numbers.   Parcel 6, for example, being next to Lots 30

20   through 37.   Parcel 3 of 9572 being adjacent to Lots 1

21   through 8.

22            MR. OKADIGBO:   You meant 5472.

23            THE WITNESS:   No, 9572.

24            MR. OKADIGBO:   Sorry.

25       A.   And Parcel 3 of 9572 being adjacent to Lots 8



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.300.1214
Facsimile: 661.322.2242

Suite 170
5001 East Commercenter Drive
Bakersfield, CA 93309
www.esquiresolutions.com

Stephen Wong, C.E.                                    July 2, 2009

113
1    through 13.  And Parcel 2 of that Parcel Map 9572 being

2    southerly of Lots 13 through 15 all of which are not

3    referenced or shown on 5472.

4    BY MR. HASSING:

5        Q.    Anything else?

6        A.    5472 does not indicate a benchmark or a basis

7    of bearings which is something that normally is

8    referenced by the surveys.  6451 does specifically call

9    out a benchmark because it shows topographic data or

10   elevations.  It also calls out a basis of bearings

11   because it shows the boundaries in meets and bounds

12   descriptions.

13       Q.    Are you saying that 5472 doesn't show

14   topography?

15       A.    That's correct, it does not.

16       Q.    6541 does?  What is it, 6541?  I wrote down the

17   wrong number that's why I'm saying it wrong every time.

18   6451.

19       A.    6451 does show topography.

20       Q.    All right.

21       A.    We discussed that earlier.

22       Q.    Yes.

23       A.    That's why I didn't mention it separately.

24       Q.    Based on your analysis of the differences

25   between the two maps can you give an opinion as to


ESQUIRE
an Alexander Gallo Company

Toll Free: 800.300.1214
Facsimile: 661.322.2242

Suite 170
5001 East Commercenter Drive
Bakersfield, CA 93309
www.esquiresolutions.com

Stephen Wong, C.E.

July 2, 2009

114

1  whether or not you believe that 6451 was in any way a

2  copy of 5472?

3      A.    While there are similarities and I think we

4  tried to explain the commonalty of it based upon

5  existing improvements and the boundaries that were

6  established for this development, there are more

7  significant differences between the two maps.  As we've

8  just pointed out it would indicate that it could not be

9  a copy because a lot of the information that's shown on

10  6451 is not shown on 5472.

11      Q.    All right.  And what we're going to do is we

12  are going to ask you to continue to look at these two

13  maps and make a list of any further differences you see,

14  provide that list to your lawyer who will provide it to

15  Mr. Travis, and at that point Mr. Travis might have you

16  come back and ask you some more questions but we'd like

17  you to take an exhaustive look at both maps to see if

18  you can find any more differences; is that right?

19          MR. OKADIGBO:  Yes.

20      A.    Are you speaking of every single lot?

21  BY MR. HASSING:

22      Q.    Well, you've already testified with regard to

23  Lot 46, and you've indicated that your testimony with

24  regard to Lot 46 can BE extrapolated to the other

25  67 lots, correct?



**ESQUIRE**
an Alexander Gallo Company

Toll Free: 800.300.1214
Facsimile: 661.322.2242

Suite 170
5001 East Commercenter Drive
Bakersfield, CA 93309
www.esquiresolutions.com

Stephen Wong, C.E.

July 2, 2009

115

1    A.    68 lots.

2    Q.    You've already looked at 46, so those

3  differences between the two maps with regard to Lot 46

4  can then be extrapolated to the other 67 lots; is that

5  correct?

6    A.    Not exactly but substantially so.

7    Q.    But substantially so.  I don't think we're

8  going to ask you to make a list of every difference with

9  respect to every single lot but with regards to other

10  differences that you might see we'd like you to make a

11  list and get it to your lawyer who will get it to

12  Mr. Travis.

13        And I'd also for the record like to point out

14  that any time I was referring to 6541 I meant 6451

15  because I had it written down wrong.  I don't have any

16  further questions.

17                    EXAMINATION

18  BY MR. OKADIGBO:

19    Q.    Not to beat a dead horse but I'm going to refer

20  you to Lots 13 in both Tentative Tract Map No. 5472 and

21  Tract Map No. 6451, and I would like you to describe, if

22  anything, what differences you see in Lot 13 between the

23  two maps?

24    A.    Much like we did on Lot 46?

25    Q.    Correct.



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.300.1214
Facsimile: 661.322.2242

Suite 170
5001 East Commercenter Drive
Bakersfield, CA 93309
www.esquiresolutions.com

Stephen Wong, C.E.                                July 2, 2009

116

1      A.    And, again, we're using Exhibit No. 7?

2      Q.    Right.   Exhibit 7 is the Tentative Tract Map

3   No. 6451.

4      A.    Okay.   The north westerly boundary of Lot 13,

5   that is the boundary between Lots 12 and 13 is shown as

6   115.67 on 5472 without a bearing shown.   On Lot 13 on

7   the 6451 map it is shown as north 52 degrees, 27

8   minutes, 48 seconds east, 135.43.   Wow.   That is a

9   significant difference, we're talking about 20 feet.

10  Okay.   I didn't catch that.   Sorry.

11     Q.    It's okay.

12     A.    Along the street on Lot 5472 there is no

13  dimension.   It does give a radius for the curvature of

14  the street.   On 6451 it has a dimension of 36.45.   On

15  the property boundary between Lots 13 and 14 on 5472 it

16  has a distance of 129.04 with no bearing.   And on 6451

17  we have a bearing of north 30 degrees, 31 minutes, seven

18  seconds east, 110.38 feet.   That's a difference of

19  19 feet.

20          Okay.   On the most southerly boundary of

21  Lot 13, and it is map 5472 has a dimension of 45.34 feet

22  with a bearing of 89 degrees, 14 minutes, and 42 seconds

23  west.   6451 has a dimension of 79.15 feet with the same

24  bearing.

25          And lastly, along the westerly boundary of


ESQUIRE
an Alexander Gallo Company

Toll Free: 800.300.1214
Facsimile: 661.322.2242

Suite 170
5001 East Commercenter Drive
Bakersfield, CA 93309
www.esquiresolutions.com

Stephen Wong, C.E.                                        July 2, 2009

117

1    Lot 13, 5472 has a dimension of 69.86 feet with a

2    bearing of south one degree, five minutes, 49 seconds

3    west.  On 6451 we have a dimension of 35.54 feet and the

4    bearing of north one degree, four minutes, and 20

5    seconds east.  The area of Lot 13 on 5472 is not shown.

6    On 6451 the area is 8,529 square feet.

7        Q.   Okay.  You just talked about Lot 13, can you do

8    the same for Lot 14 and after Lot 14 we'll leave it at

9    that for examples, but can you go through the

10   differences between Lot 14 on Tentative Tract Map No.

11   6451 and Tentative Tract Map No. 5472?

12       A.   If you wish.  If you insist.

13       Q.   I wish.

14       A.   We just identified the difference with respect

15   to the most westerly boundary that is the lot, lot line

16   between Lots 13 and 14 so I wouldn't go through that

17   again.

18       Q.   That's fine.

19       A.   Along the street or the most northerly boundary

20   5472 does not have a dimension.  On 6451 it has a

21   dimension of 49.51 feet.  Along the most easterly

22   boundary line 5472 shows a distance of 84.96 feet with

23   no bearing.  And 6451 shows a bearing of north 00

24   degrees, six minutes, 19 seconds east, 83.31 feet.  And

25   on the most southerly boundary of Lot 14, 5472 shows a



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.300.1214
Facsimile: 661.322.2242

Suite 170
5001 East Commercenter Drive
Bakersfield, CA 93309
www.esquiresolutions.com

Stephen Wong, C.E.

July 2, 2009

118

1    distance of 111.17 feet.  On 6451 the distance is 103.07

2    feet.  The bearings are the same.  The area for Lot 14

3    is not shown an 5472.  On 6451 it's shown as 6,798

4    square feet.

5        There is also a note on 6451 that is not shown

6    on 5472 relative to an existing improvement of a block

7    wall that adjoins both sides of an easement that is

8    partially within Lot 14.

9        Q.   Okay.  Can I direct your attention to the outer

10   boundary of Lot 40, do you see where it says "16-foot

11   wide existing golf course access road"?

12       A.   Yes.

13       Q.   Can you tell me whether you see that same

14   designation in -- first of all, it says "16-feet wide

15   golf course golf cart access road" and this is on

16   Tentative Tract Map No. 6451 which is Exhibit 7.  Can

17   you tell me whether you see that same sort of

18   designation in the Revised Tentative Tract Map No. 5472?

19       A.   Yes.  5472 shows it as a 10 feet rather than a

20   16-foot wide path and does not identify its intended

21   purpose.  It pictorially shows it to be split between

22   Lots 39 and 40 and I believe that to be the same except

23   for the width on 6451.

24       Q.   Based on all the differences that you've

25   testified to today between Tentative Tract Map No. 6451,



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.300.1214
Facsimile: 661.322.2242

Suite 170
5001 East Commercenter Drive
Bakersfield, CA 93309
www.esquiresolutions.com

Stephen Wong, C.E.                                    July 2, 2009

119

1   Exhibit 7 and Revised Tentative Tracts Map No. 5472,

2   based on those differences would you say that Exhibit 7

3   is a copy of Tentative Tract Map No. 5472?

4       A.   No, it is not a copy of that map, no.

5       Q.   Mr. Travis asked you whether you were only

6   going to testify to the issue of substantial similarity,

7   do you recall that question?

8       A.   I recall a question of that sort, yes.  I'm not

9   sure it was only relative to that issue.

10      Q.   Is it fair to say that you're going to testify

11  on the subject matters that you set forth in your

12  opinion?

13      A.   Yes.

14      Q.   And the bases, therefore?

15      A.   Yes.

16      Q.   Is it also fair to say that whatever in your

17  experience, in your own experience in engineering

18  generally helps you come to the conclusions that you

19  have formulated that you will also talk about those

20  things?

21      A.   Yes.

22      Q.   Based on your review of Tentative Tract Map

23  No. 6451 which is Exhibit 7 and Revised Tentative Tract

24  Map No. 5472 would you state that the two maps are

25  substantially similar?



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.300.1214
Facsimile: 661.322.2242

Suite 170
5001 East Commercenter Drive
Bakersfield, CA 93309
www.esquiresolutions.com

Stephen Wong, C.E.                                            July 2, 2009

120

1          A.    While they have certain elements in common I

2     would not state that they are substantially similar.

3          Q.    Earlier Mr. Travis was asking you or there was

4     discussion about the differences between Tentative Tract

5     Map No. 6451 which is Exhibit 7 and the Vesting

6     Tentative Tract Map No. 6451.

7          A.    Which is Exhibit 5.

8          Q.    If the Vesting Tract Map No. 6451 was submitted

9     to the city and the city rejected it because it didn't

10    want that label "vesting," is there any reason why the

11    engineer submitting Tentative Tract Map No. 6451 would

12    subtract the level of detail that he has in Vesting

13    Tentative Tract Map No. 6451?

14          MR. TRAVIS:   Objection.   Incomplete

15    hypothetical.   Unintelligible.   Compound and vague.

16          MR. HASSING:   You can answer.

17          A.    As I understand your question you're comparing

18    Exhibit 5 with Exhibit 7?

19    BY MR. OKADIGBO:

20          Q.    Correct.

21          A.    And asked if whether or not there were any, why

22    would the engineer change Exhibit 5 just to remove the

23    designation of vesting if that was requested by the

24    city.   And there would be really no reason to change it

25    because the vesting tentative map or Exhibit 5 had



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.300.1214
Facsimile: 661.322.2242

Suite 170
5001 East Commercenter Drive
Bakersfield, CA 93309
www.esquiresolutions.com