BONIFACIO BONNY GARCIA (SBN 100761)
EVA M. PLAZA (SBN 250321)
CHAKA C. OKADIGBO (224547)
GARCIA CALDERON RUIZ, LLP
500 SOUTH GRAND AVENUE, SUITE 1100
LOS ANGELES, CA 90071
(213) 347-0210; Fax (213) 347-0216

Attorneys for Defendant CITY OF WASCO

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA, FRESNO DIVISION

ROGER McINTOSH

         Plaintiff,

   vs.

NORTHERN CALIFORNIA
UNIVERSAL ENTERPRISES
COMPANY, INC., *et al.*,

        Defendants.

Case No: 1:07-CV-01080-LJO-WMV

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANT CITY OF WASCO'S MOTION FOR SUMMARY JUDGMENT OR, IN THE ALTERNATIVE, SUMMARY ADJUDICATION OF FACTS**

4821-5370-5220 v2

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANT CITY OF WASCO'S MOTION FOR
SUMMARY JUDGMENT OR, IN THE ALTERNATIVE, SUMMARY ADJUDICATION OF FACTS

# TABLE OF CONTENTS

I.      INTRODUCTION ............................................................................................ 1

II.     THE PARTIES ................................................................................................ 2

III.    STATEMENT OF FACTS ............................................................................. 4

        A.      Initial Development of the Valley Rose Estates Subdivision .............. 4

        B.      The 480 Acre Parcel is Divided Into Six Separate Parcels .................. 5

        C.      The City and Legacy Enter Into a Written Contract ............................ 5

        D.      Martin-McIntosh Preparation and Submission of Improvement Plans and a
                Tentative Map During the First Developmental Phase of the Subdivision .......... 5

        E.      The City Purchases Parcels 1 and 3 at a Tax Sale and Sells These Properties
                To NCUE and/or Lotus Developments ................................................ 6

        F.      Second Developmental Phase of the Valley Rose Estates Subdivision .............. 6

        G.      McIntosh's Alleged Acquisition of Copyright Interests and the Instant
                Lawsuit ............................................................................................... 10

                1.      Plaintiff's Direct Infringement Allegations Against NCUE, Lotus
                        Developments and DeWalt ....................................................... 10

                2.      Plaintiff's Direct Infringement Claims Against the City ........... 11

                3.      Plaintiff's Contributory Infringement Claims Against the City ............... 11

IV.     STANDARD FOR SUMMARY JUDGMENT ............................................ 12

V.      SUMMARY OF COPYRIGHT LAW AS IT PERTAINS TO PLAINTIFF'S
        DIRECT INFRINGEMENT CLAIMS AGAINST THE CITY ..................... 13

VI.     THE CITY IS NOT LIABLE TO PLAINTIFF FOR DIRECT COPYRIGHT
        INFRINGEMENT BECAUSE PLAINTIFF GRANTED AN IMPLIED LICENSE
        (NONEXCLUSIVE LICENSE) TO THE CITY TO DISTRIBUTE AND/OR
        REPRODUCE THE MARTIN-MCINTOSH TENTATIVE MAPS AND
        IMPROVEMENT PLANS ............................................................................. 15

        A.      The City Was Granted a Nonexclusive License to Reproduce and Distribute
                the Martin-McIntosh Tentative Map (Revised Tentative Map for Tract No.
                5472) and Improvement Plans ........................................................... 15

        B.      Martin-McIntosh's Submission of the Martin-McIntosh Improvement Plans
                to the City Implicitly Licensed the City to Release and Distribute Them .......... 16

        C.      Martin-McIntosh's Authorization that Defendants Could Complete Any
                Improvement Not Completed by the Developer Implicitly Licensed the
                Defendants to Use The Plans ............................................................. 20

i

D.   The City Has An Implied Nonexclusive License to Reproduce and Distribute the Plans By Virtue of Its Payment to Martin-McIntosh of $98,000.00. ...........20

VII.   THE CITY CANNOT BE FOUND LIABLE FOR CONTRIBUTORY COPYRIGHT INFRINGEMENT BECAUSE IT HAD NO KNOWLEDGE OF ANY OF THE ALLEGEDLY INFRINGING ACTIVITIES ENGAGED IN BY THE OTHER DEFENDANTS ..........................................................................................................23

A.   The City is Not Liable for Contributory Copyright Infringement Because It Did Not Know That Defendants NCUE, Lotus Developments and/or DeWalt Were Copying or Using the Martin-McIntosh Improvement Plans and/or Tentative Map in Violation of Plaintiff's Copyright Interests, as Alleged by Plaintiff, and Did Not Intend to Induce or Encourage Defendants' Allegedly Infringing Activities. ...........................................................................................24

B.   The Martin-McIntosh Improvement Plans and Tentative Map Are Capable of Substantial Noncommercial Noninfringing Uses...............................................28

VIII.   THE CITY CANNOT BE FOUND LIABLE FOR VICARIOUS COPYRIGHT INFRINGEMENT BECAUSE IT WAS IN NO POSITION TO SUPERVISE OR CONTROL ANY OF THE ALLEGEDLY INFRINGING ACTIVITIES OF THE OTHER DEFENDANTS..................................................................................................29

A.   Although the City Regulates and Controls the Development of the Subdivision Under the Subdivision Map Act, This Does Not Equate to a Right and Ability to Supervise or Control Defendants Within the Context of Vicarious Copyright Infringement......................................................................31

B.   The City Did Not Have a Practical Ability to Supervise or Control NCUE, Lotus Developments and/or DeWalt's Allegedly Infringing Activities.............33

IX.   THE CITY IS NOT LIABLE FOR CONTRIBUTORY OR VICARIOUS COPYRIGHT INFRINGEMENT BECAUSE THE TENTATIVE MAP FOR TRACT NO. 6451 IS NOT SUBSTANTIALLY SIMILAR TO THE REVISED TENTATIVE MAP FOR TRACT NO. 5472 AND PLAINTIFF CANNOT PROVE THAT DEFENDANTS COPIED THE MARTIN-MCINTOSH IMPROVEMENT PLANS................................................................................................................37

X.   THE CITY INCORPORATES BY REFERENCE ARGUMENTS AND FACTS RAISED BY CO-DEFENDANT NORTHERN CALIFORNIA UNIVERSAL ENTERPRISES COMPANY TO THE EXTENT THAT SUCH ARGUMENTS UNDERCUT PLAINTIFF'S CONTRIBUTORY INFRINGEMENT CLAIM AGAINST THE CITY...............................................................................................41

XI.   CONCLUSION ..........................................................................................................41

1

# TABLE OF AUTHORITIES

2

## CASES

3 Case .......................................................................................................................... Page

4 *Adickes v. S.H. Kress & Co.*
   398 U.S. 144, 157, 90 S. Ct. 1598, 26 L. Ed. 2d 142 (1970) .............................................. 12

5

*Anderson v. Liberty Lobby, Inc.*
6   477 U.S. 242, 248-49, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986) ................................... 12, 13

7 *Anthony v. Snyder*
   116 Cal.App.4th 643 (2004) .......................................................................................... 33

8

*Boyle v. City of Redondo Beach*
9   70 Cal.App. 4th 1109, 1116 (1999) ................................................................................ 17

10 *Bryant v. Adventist Health System/West*
    289 F.3d 1162, 1167 (9th Cir. 2002) .............................................................................. 13

11

*Buck v. Jewell-LaSalle Realty Co.*
12   238 U.S. 191, 198-199 (1931) ....................................................................................... 31

13 *Cavalier v. Random House*
    297 F.3d 815, 822 (9th Cir. 2002) ................................................................................. 40

14

*Cohan v. City of Thousand Oaks*
15   30 Cal.App.4th 547, 555 (1994) .................................................................................... 17

16 *Cooling Systems and Flexibles v. Smart Radiator*
    777 F.2d 485, 491 (9th Cir. 1985) ................................................................................. 38

17

*Del Carmen Guadalupe v. Agosto*
18   299 F.3d 15, 23 (1st Cir. 2002) ..................................................................................... 13

19 *Deutsch v. Arnold*
    98 F.2d 686 (2nd Cir. 1938) .......................................................................................... 30

20

*Effects Associates, Inc. v. Cohen*
21   908 F.2d 555, 558 (9th Cir. 1990) ......................................................................... 15, 21, 22, 23

22 *Estate of Tucker v. Interscope Records*
    515 F.3d 1019, 1030 (9th Cir. 2008) .............................................................................. 13

23

*Foad Consulting Group v. Azzalino*
24   270 F. 3d 821, 828-29 (9th cir. 2001) ............................................................................ 21

25 *Fonovisa, Inc. v. Cherry Auction, Inc.*
    76 F.3d 259 (9th Cir. 1996) ........................................................................................... 36

26

*Fortyune v. American Multi-Cinema, Inc.*
27   364 F.3d 1075, 1080 (9th Cir. 2004) .............................................................................. 12

28

*Fosson v. Palace (Waterland), Ltd.*
78 F.3d 1448, 1454-1455 (9th Cir. 1996)..............................................................21

*Funky Films, Inc. v. Time Warner*
462 F.3d 1072, 1076 (9th Cir. 2006) ............................................................38, 39

*Galen v. County of Los Angeles*
477 F.3d 652, 658 (9th Cir. 2007) ......................................................................13

*Gentry v. City of Murrieta*
36 Cal.App.4th 1359 (4th Dist. 1994) ................................................................18

*Gershwin Publishing Corp. v. Columbia Artists Management, Inc.*
443 F.2d 1159, 1162 (2nd Cir. 1963)......................................................24, 30, 37

*Graham v. James*
144 F.3d 229, 236 (2d Cir. 1998) .......................................................................15

*Hardage v. CBS Broad Inc.*
427 F.3d 1177, 1183 (9th Cir. 2006) ..................................................................13

*Harper & Row, Publishers, Inc. v. Nation Enterprises*
471 U.S. 539, 547 (1985) ...................................................................................38

*I.A.E. Incorporated v. Shaver*
74 F 3d. 768,, 775 (7th Cir. 1996) ...........................................................15, 21, 22

*James River Ins. co. v. Schenk, P.C.*
519 F.3d 917, 925 (9th Cir. 2008) ......................................................................13

*Kregos v. Associated Press*
795 F.Supp 1325 (S.D.N.Y. 1992) ......................................................................40

*Long v. County of Los Angeles*
442 F.3d 1178, 1185 (9th Cir. 2006) ..................................................................12

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*
475 U.S. 574, 586, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986) ...........................13

*Metcalf v. Bochco*
294 F.3d 1069, 1074 (9th Cir. 2002) ..................................................................40

*Metro-Goldwyn-Mayer Studios, Inc. v. Grokster, Ltd.*
545 U.S. 913, 942 (2005) ........................................................................24,25, 28

*Mountain Lion Foundation v. Fish & Game Commission*
16 Cal.4th 105, 134 (1997)................................................................................18

*Nelson-Salabes, Inc. v. Morningside Development, LLC*
284 F.3d 505, 515 (4th Cir. 2002) ......................................................................20

*Nissan Fire & Marine Ins. Co. v. Fritz Companies*
210 F.3d 1099, 1103 (9th Cir. 2000) ..................................................................13

*Perfect 10, Inc. v. Google, Inc.*
    508 F.3d 1146 (9th Cir. 2007) ................................................................... 35

*See v. Durang*
    711 F.2d 141 (9th Cir. 1983) ..................................................................... 39

*Shapiro, Bernstein & Co., Inc. v. H.L. Green Co.*
    316 F.2d 304 (2nd Cir. 1963)........................................................ 30, 31, 36

*Shaw v. Lindheim*
    919 F.2d 1353, 1355 (9th Cir. 1990) ......................................................... 39

*SmithKline Beecham Consumer Healthcare, L.P. v. Watson Pharmaceuticals, Inc.*
    211 F.3d 21, 25 (2nd Cir. 2000) ................................................................ 15

*Sony Corporation v. Universal City Studios, Inc.*
    464 U.S. 417; 442 (1984) ............................................................. 24, 27, 28

*Soremekun v. Thrifty Payless, Inc.*
    509 F.3d 978, 984 (9th Cir. 2007) ............................................................. 13

*Thrifty Oil Co. v. Bank of America Nat'l Trust & Savings Assn.*
    322 F.3d 1039, 1046 (9th Cir. 2002) ......................................................... 12

*Warner Bros. v. American Broadcasting Co.*
    720 F.2d 231, 240 (2nd Cir. 1983).............................................................. 39

*Youngblood v. Board of Supervisors*
    22 Cal.3d 644, 652, f. 2 (1978)................................................................... 33

1

## STATUTES

2

**Statute**........................................................................................................**Page**

3 17 U.S.C. § 101 ..........................................................................14, 15, 16

4 17 U.S.C. § 102 ................................................................................13, 14

5 17 U.S.C. § 204 ......................................................................................16

6 17 U.S.C. § 106 ......................................................................................14

7 CEQA Guidelines § 15002 .....................................................................18

8 CEQA Guidelines § 15072 .....................................................................18

9 CEQA Guidelines § 15603 .....................................................................18

10 CEQA Guidelines § 15604 ....................................................................18

11 California Code of Civil Procedure § 1085 ...........................................33

12 California Code of Civil Procedure § 1094.5 ........................................33

13 California Code of Civil Procedure § 1094.5(b) ...................................33

14 Evidence Code § 602..............................................................................26

15 Evidence Code § 801..............................................................................26

16 Evidence Code § 801(d)(2).....................................................................26

17 Evidence Code § 802..............................................................................26

18 Government Code § 6250 ..................................................................16, 18

19 Government Code § 6252(e) ...................................................................19

20 Government Code § 54950......................................................................17

21 Government Code § 54951......................................................................17

22 Government Code § 54952(a) .................................................................17

23 Government Code § 54953(a) .................................................................16

24 Government Code § 54957.5..............................................................17, 18

25 Government Code § 65451......................................................................32

26 Government Code § 65455......................................................................32

27 Government Code § 66411......................................................................32

28 Government Code § 66419(a) ...................................................................1

Government Code § 66424 .................................................................................................... 4

Government Code § 66425.5 ................................................................................................. 1

Government Code § 66451.3 ............................................................................................... 17

Government Code § 66456.2(d) ............................................................................................ 1

Government Code § 66473 .......................................................................................... 16, 32

Government Code § 66473.1 ............................................................................................... 32

Government Code § 66474 ................................................................................................. 32

Government Code § 66474.1 .............................................................................................. 32

Municipal Code § 16.16.050 through 16.16.110 ........................................................ 8, 16, 32

Municipal Code § 16.16.070 .............................................................................................. 16

Municipal Code § 16.16.080 ....................................................................................... 17, 32

Municipal Code § 16.16.090 .............................................................................................. 17

Public Resources Code § 21064.5 ...................................................................................... 18

Public Resources Code § 21092(a)(b) ................................................................................ 18

Public Resources Code § 21092.2 ...................................................................................... 18

Public Resources Code § 21100 ......................................................................................... 18

Public Resources Code § 21151 ......................................................................................... 18

1  BONIFACIO BONNY GARCIA (SBN 100761)
   EVA M. PLAZA (SBN 250321)
2  CHAKA C. OKADIGBO (224547)
   GARCIA CALDERON RUIZ, LLP
3  500 SOUTH GRAND AVENUE, SUITE 1100
   LOS ANGELES, CA 90071
4  (213) 347-0210; Fax (213) 347-0216

5  Attorneys for Defendant CITY OF WASCO

6

7

8                 UNITED STATES DISTRICT COURT

9         EASTERN DISTRICT OF CALIFORNIA, FRESNO DIVISION

10

11  ROGER McINTOSH                    | Case No: 1:07-CV-01080-LJO-WMV

12            Plaintiff,

13       vs.                          | **MEMORANDUM OF POINTS AND**
                                      | **AUTHORITIES IN SUPPORT OF**
                                      | **DEFENDANT CITY OF WASCO'S**
14  NORTHERN CALIFORNIA               | **MOTION FOR SUMMARY JUDGMENT**
    UNIVERSAL ENTERPRISES             | **OR, IN THE ALTERNATIVE, SUMMARY**
15  COMPANY, INC., et al.,            | **ADJUDICATION OF FACTS**

16            Defendants.

17

18  **I.     INTRODUCTION**

19       It is undisputed that the City of Wasco ("City") paid Plaintiff $800,000 for civil

20  engineering work which his firm performed for the subdivision at issue in this litigation and

21  $98,000 for a set of improvement plans. [1] It is also undisputed that Plaintiff's firm submitted

22  improvement plans and a tentative map[2] for the subdivision, knowing that they would be

23  disseminated to the public for review and comment and treated as public records under

24  California law. Fifteen years after creating these plans and map, however, and after having

---

[1] Improvements refers to any street work and utilities to be installed on land to be used for public or private streets, including sewer, water, storm drain, curbs, gutters, streets, landscaping and street lights. Government Code § 66419(a). "Improvement plan" means the engineered drawings used to construct public improvements. California Government Code § 66456.2(d).

[2] A tentative map is a tract map made for the purpose of showing the design of a proposed subdivision and the existing conditions in and around it. California Government Code § 66425.5

1  received substantial sums from the City for them, Plaintiff now attempts to prevent the City from

2  reproducing and distributing them.  Plaintiff conjures up theories of infringement and

3  contributory infringement hoping to mask his greed and to pick the City's pockets through the

4  court system.  He claims that the City and current developers of the subdivision conspired to

5  develop the subdivision by copying and using without permission the improvement plans and

6  tentative map which his prior firm prepared.   These contentions, however, are demonstrably

7  false and not capable of being proven at trial.  The facts reveal that:

8    (1)  the City paid  Martin-McIntosh approximately $98,000 for his plans and

9         approximately $800,000 for all work Martin-McIntosh performed in

10        connection with the Subdivision in 1994;

11   (2)  the current developers' engineer prepared its own tentative map based on

12        land surveys it conducted and its own observations in the field;

13   (3)  the City did not contribute to any allegedly infringing activity because it

14        was never aware of any claims that the current developers were infringing

15        on Plaintiff's alleged copyright interests;

16   (4)  the City was within its rights to reproduce and distribute the Martin-

17        McIntosh improvement plans, having paid substantial consideration for

18        the plans;

19   (5)  the City was permitted to reproduce and distribute the Martin-McIntosh

20        tentative map under the implied nonexclusive license doctrine, based on

21        Martin-McIntosh's submission of the map to the City for review, comment

22        and public hearings, knowing that the map would be treated as public

23        record under California statutes; and

24   (6)  the improvement plans and tentative map are inherently matters of public

25        concern and public records under California law and, therefore, subject to

26        dissemination.

27        Plaintiff points to "substantial similarities" between the present developers' maps and the

28  Martin-McIntosh map to bolster his claim that NCUE, Lotus Developments or DeWalt

1    unlawfully copied the Martin-McIntosh map.  However, Plaintiff conveniently ignores the fact

2    that a prior developer, constructed the improvements (including driveway approaches, street

3    layouts, curbs and gutters and sidewalks) in the subdivision, which, by consequence, dictated the

4    layout of the subdivision and the configuration of lots within the subdivision.  Thus, any

5    "similarity" between the maps at issue is due to the fact that DeWalt depicted what it observed in

6    the subdivision and sought to configure the lots for maximum gain without tearing out the

7    existing improvements.

8           Since Plaintiff cannot establish the direct infringement claims against NCUE, Lotus

9    Developments and DeWalt upon which his contributory copyright infringement and/or vicarious

10   liability claims against the City are predicated, these contributory infringement and/or vicarious

11   infringement claims necessarily fail for this additional reason.

12          The City has spent untold sums of money defending this frivolous litigation during a time

13   of fiscal crisis in California in which the City can ill afford to loose precious revenue.  Plaintiff's

14   fraudulent conduct must be seen for what it is and terminated at the summary judgment stage.

15   **II.      THE PARTIES**

16          Plaintiff, Roger McIntosh, is a civil engineer doing business as McIntosh & Associates, a

17   sole proprietorship.  (UMF 1.)  Defendant City of Wasco ("City") is a municipal corporation

18   formed and organized under the laws of the State of California. (UMF 2.)   Defendants Northern

19   California Universal Enterprises Company and Lotus Developments, LP are California

20   companies engaged in the business of developing land and, in particular, subdivisions.  (UMF 3.)

21   Defendant Dennis W. DeWalt, Inc. ("DeWalt") is a company that, among other services,

22   performs topographical and land surveys and prepares tentative and final maps for subdivisions

23   of land. (UMF 4.)

24   / / /

25   / / /

26   / / /

27   / / /

28   / / /

III.   **STATEMENT OF FACTS**

   A.   **Initial Development of the Valley Rose Estates Subdivision.**

   During the period 1992 through 1994, the Legacy Group, Ltd. ("Legacy") owned the Valley Rose Estates and made efforts to develop it as a subdivision.[3]  (UMF 5.)  Michael S. Brown ("Brown") was a general partner at Legacy and served as the point person for Legacy's plans to develop the Valley Rose Estates.  (UMF 6.)

   In April 1992, Legacy set out to create a master planned community for the Valley Rose Estates, which at the time consisted of 480 acres.  (UMF 7.)  Martin-McIntosh created a "draft guidance package" that provided direction and clarified expectations between the Legacy, the City and Martin-McIntosh.  (UMF 8.)  The City's acceptance of the package was intended as a commitment to expeditious and efficient processing of the Valley Rose Estates master plan.  The City did not guarantee that it would approve Legacy's project.  (UMF 9.)  Of note, the Package clarifies that Martin-McIntosh was to serve as "the representative of the Legacy Group Limited" with respect to the City's review and processing of its master plan. (p.4).  (UMF 10.)  Ron Staub was mentioned as the point of contact for Martin-McIntosh in connection with the vision to create a master planned community in the Valley Rose Estates.  (UMF 11.)

   The guidance package called for Martin-McIntosh to produce master plans, tentative maps and improvement plans and to share it with the City and the public as part of the City's review and approval process.  (UMF 12.)

   On March 18, 1992, Martin-McIntosh prepared a written contract ("The Contract") which set forth the work it would perform for the entire 480 acres of the Subdivision.  Under The Contract, Martin-McIntosh would prepare a conceptual plan for $15,200, prepare master plans for water, sewer and drainage and other utilities for $54,800 and conduct a survey of the Subdivision for $19,100.  Altogether, Martin-McIntosh's services would cost $89,100.  (UMF 13.)

---

[3] A subdivision is defined by statute as: the division, by any subdivider, of any unit or units of improved or unimproved land, or any portion thereof, shown on the latest equalized county assessment roll as a unit or as contiguous units, for the purpose of sale, lease, or financing, whether immediate or future.  (Government Code § 66424.)

1    The contract was expanded to include preparation of Parcel Map No. 9752 for $5,000,

2    preparation of improvement plans and a final map for Tract No. 5472 for $57,900 and additional

3    work that is not relevant to this case.  (UMF 14.)

4        **B.       The 480 Acre Parcel is Divided Into Six Separate Parcels**

5        On July 21, 1992, Martin-McIntosh recorded Parcel Map 9572, which divided the 480

6    acres into six separate parcels of property ranging from 26.54 to 154.31 acres each.  (UMF 14.)

7    Parcel 1, the parcel at issue in this lawsuit (and which subsequently became Tract No. 5472 and

8    then Tract No. 6451), contains 33.51 acres.  (UMF 16.)  Parcel Map 5472 sought to further

9    subdivide Parcel 1 into 69 lots, 68 for single family residential homes and 1 for 96 apartments.

10   (UMF 17.)  In 2007, the Final Map for Tract No. 6451 divided Parcel 1 into 68 family lots.

11   (UMF 18.)

12       **C.       The City and Legacy Enter Into a Written Contract**

13       On January 28, 1993, the City and Legacy, aided by Martin-McIntosh, executed an

14   Acquisition Agreement whereby the City agreed to purchase Martin-McIntosh's improvement

15   plans and specifications as well as the infrastructure improvements to be constructed on Parcel 1

16   (Tract No. 5472).  (UMF 19.)  Ron Staub, Martin-McIntosh's project manager, prepared the

17   engineering cost summary for this Agreement, which established the amounts Martin-McIntosh

18   would receive from the City.  (UMF 20.)  The City paid at least $98,000 for the Martin-McIntosh

19   improvement plans for Parcel 1, as evidence by an engineer's report prepared by Terry

20   Schroepfer, then of Quad Engineering, for the City.  (UMF 21.)  The City paid Martin-McIntosh

21   over $800,000 for services rendered for the Subdivision.  (UMF 22.)

22       **D.       Martin-McIntosh Preparation  and Submission of Improvement Plans and a
23                 Tentative Map During the First Developmental Phase of the Subdivision**

24       On or about April 21, 1992, Martin-McIntosh prepared a tentative map for the

25   Subdivision ("Revised Tentative Map for Tract No. 5472).  (UMF 23.)  In 1993, Martin-

26   McIntosh prepared improvement plans (streets, sidewalks, curb and gutter, storm drain, sewer,

27   water and utilities) for the Subdivision.  (UMF 24.)

28

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANT CITY OF WASCO'S MOTION FOR
SUMMARY JUDGMENT OR, IN THE ALTERNATIVE, SUMMARY ADJUDICATION OF FACTS**

1    Martin-McIntosh submitted both the improvement plans and Revised Tentative Map for

2  Tract 5472 to the City.  (UMF 25.)  The City approved the Revised Tentative Map for Tract 5472

3  and construction commenced on the Subdivision created.  (UMF 26.)

4    In or after 1994, the Legacy Group declared bankruptcy, and construction on the

5  subdivision ceased.  The City purchased the property with the partially constructed subdivision at

6  a tax sale.  (UMF 27.)

7    All or substantially all improvements in the Valley Rose Estates Subdivision were

8  constructed by 1994 in accordance with the Martin-McIntosh improvement plans.  (UMF 28.)

9  Thus, the streets, sidewalks, curbs, gutters, storm drain, and driveway approaches were

10  constructed during that time period.  (UMF 29.)

11    In 1999, McIntosh purchased Martin's share of Martin-McIntosh and contends that he

12  became the owner of Martin-McIntosh's copyright interests in the Revised Tentative Map for

13  Tract No. 5472 and the Martin-McIntosh improvement plans.  (UMF 30.)

14    The Revised Tentative Map for Tract No. 5472 expired on May 11, 2001.  (UMF 31.)

15    **E.**    **The City Purchases Parcels 1 and 3 at a Tax Sale and Sells These Properties**
         **to NCUE and/or Lotus Developments.**

16

17    Following Legacy's bankruptcy, the Subdivision lay dormant until April 26, 2002 when

18  the City purchased parcels 1 and 3 through a tax sale.  (UMF 32.)

19    **F.**    **Second Developmental Phase of the Valley Rose Estates Subdivision**

20    On or about May 18, 2004, the City sold the Valley Rose Estates Subdivision to Northern

21  California Universal Enterprises Company ("NCUE"), a California corporation owned and

22  operated by Joe Wu.  (UMF 33.)  Mr. Wu also directs the activities of Lotus Developments, LP

23  and, in his dealings with the City to develop the Subdivision, has used NCUE and Lotus

24  Developments interchangeably.  (UMF 34.)

25    NCUE bought the Valley Rose Estates, knowing that improvements had already been

26  constructed in the Subdivision and intending to take advantage of the existing improvements to

27  develop the property.  (UMF 35.)  Indeed, Mr. Wu is experienced in purchasing and completing

28

1  subdivisions in which improvements have already been constructed but the development of the

2  subdivision remains incomplete.  (UMF 36.)

3       The purchase agreement between the City and NCUE did not require NCUE to complete

4  the development of the Valley Rose Estates as a subdivision.  (UMF 37.)

5       Following the sale of the Subdivision, the City's ownership interests in the Subdivision

6  ceased.  (UMF 38.)  The City and NCUE have not entered into any joint venture, partnership, co-

7  ownership or other such arrangement with respect to owning or developing the Subdivision.

8  (UMF 39.)  Similarly, the City has not entered into any such arrangement with Lotus

9  Developments.  (UMF 40.)

10       The decision to continue developing the Subdivision was made by NCUE and/or Lotus

11  Developments, not the City.  The City's role was merely to perform <u>routine municipal functions</u>

12  -- (1) review, comment on and approve or disprove NCUE and/or Lotus Development's tentative

13  and final maps based on whether they complied with the Subdivision Map Act and/or the City's

14  Municipal Code and (2) process any additional requests from NCUE/Lotus Developments

15  associated with finalizing the development of the Subdivision.  (UMF 41.)

16       Beyond the tentative map approval stage, the City's dealings with NCUE and Lotus

17  Developments has consisted of requiring these entities to perform lift station improvements and

18  repair and maintenance in connection with NCUE and/or Lotus Developments' sustained

19  interests in completing the Subdivision and recording a final map.  (UMF 42.)

20       The City informed NCUE and/or Lotus Developments that the Revised Tentative Map for

21  Tract No. 5472 had expired and, thus, NCUE and/or Lotus Developments were required to

22  submit a new tentative and final map to proceed with its plans to develop the Subdivision. (UMF

23  43.)  Consequently, NCUE and/or Lotus Developments retained DeWalt to prepare and submit a

24  new tentative map (Tentative Map for Tract No. 6451) and a final map (Final Map for Tract No.

25  6451) for the Valley Rose Estates.  (UMF 44.)

26       The City provided a copy of the Martin-McIntosh improvement plans to Greg Black, the

27  person at DeWalt who supervised other employees responsible for conducting the land surveys

28  and for preparing the Tentative Map for Tract No. 6451 and the Final Map for Tract No. 6451.

1   (UMF 45.) Plaintiff contends that the City also provided a copy of the Revised Tentative Map

2   for Tract No. 5472 to DeWalt, based on the deposition testimony of Jeffrey Gutierrez, DeWalt's

3   President. (UMF 46.)

4        DeWalt prepared the Tentative Map for Tract No. 6451 and the Final Map for Tract No.

5   6451 and submitted these maps to the City. (UMF 47.) DeWalt conducted its own land survey,

6   which provided the basis for the information depicted in its tentative and final maps. (UMF 48.)

7   Plaintiff's expert, James K. Delmarter, concedes that DeWalt conducted its own land surveys.

8   (UMF 49.)

9        The employees at DeWalt responsible for performing the surveying work for the

10   Tentative Map for Tract No. 6451 and the Final Map for Tract No. 6451 testified during

11   depositions that they did not copy the Revised Tentative Map for Tract No. 5472. (UMF 50.)

12        At no point in time did any persons from the City advise, inform or suggest to DeWalt,

13   NCUE or Lotus Developments that they copy, rely upon or use the Martin-McIntosh

14   improvement plans or tentative map in infringing ways to perform any of the work required to

15   finalize the development of the Subdivision. (UMF 51.)

16        Upon submitting the Tentative Map for Tract No. 6451, the Subdivision became

17   identified as Tract No. 6451 and ceased being identified as Tract No. 5472. (UMF 52.)

18        The City approved the Tentative Map for Tract No. 6451 on March 14, 2005 and the

19   Final Map for Tract No. 6451 on February 20, 2007. (UMF 53.)

20        During its review of the tentative and final maps for Tract No. 6451, the City never

21   compared the old and new tentative maps for the Subdivision and never used or relied upon the

22   old tentative map for any purpose when processing the new tentative and final maps for the

23   Subdivision. (UMF 54.) Similarly, the City did not consult the Martin-McIntosh improvement

24   plans because improvement plans are not considered during the tentative map review and

25   approval process. (UMF 55.) Indeed, Municipal Code §§ 16.16.050 through 16.16.110 and

26   16.20.010 through 16.20.140 reveal that improvement plans are neither required nor considered

27   during the City's tentative or final map review process. (UMF 56.)

28   ///

1    The City did not require NCUE to submit improvement plans because the improvements

2  for the Subdivision had already been constructed.  (UMF 57.)

3    Neither NCUE nor Lotus Developments prepared or submitted any improvement plans

4  for the Valley Rose Estates.  (UMF 58.)  Similarly, neither NCUE nor Lotus Developments

5  prepared any "as-built" plans in connection with developing the Valley Rose Estates as a

6  subdivision.  (UMF 59.)

7    Neither NCUE nor Lotus Developments relied upon, used, or copy the Martin-McIntosh

8  improvement plans to perform any work required to complete the Subdivision.  (UMF 60.)

9    Plaintiff is aware of no facts suggesting that Joseph Wu and/or NCUE and/or Lotus

10  Developments and/or DeWalt copied the Martin-McIntosh improvement plans, besides

11  Plaintiff's allegation that the Tentative Map for Tract No. 6451 looks "substantially similar" to

12  the Martin-McIntosh improvement plans.  (UMF 61.)

13    On or about February, 2007, the City and Lotus Developments entered into a Subdivision

14  Agreement.  (UMF 62.)  The purpose of the Subdivision Agreement was to ensure that NCUE

15  and/or Lotus Developments completed all necessary repairs and maintenance of the

16  improvements in the Subdivision in exchange for the City's approval of the Final Map for Tract

17  No. 6451.  (UMF 63.)  Although the Subdivision Agreement references the construction of

18  improvements, such work had already been performed, as Plaintiff acknowledges.  (UMF 64.)

19    The Agreement referenced the construction of improvements only because the City

20  initially insisted that NCUE or Lotus Developments post a bond for the improvements.  The

21  Agreement, therefore, listed the improvements that were to be bonded.  (UMF 65.)  However, the

22  City later dropped this requirement, after concluding that it was unnecessary because the

23  improvements had already been constructed and inspected during the Legacy era and that they

24  conformed to the improvement plans.  (UMF 66.)  No City inspection of the improvements since

25  the Legacy era has involved comparing the improvements with the Martin-McIntosh

26  improvement plans.  (UMF 67.)

27    On or about November 6, 2007 and April 23, 2009, the City sent Mr. Wu a list of punch

28  list items summarizing all required repairs and maintenance that NCUE and/or Lotus

1  Developments needed to complete in the Valley Rose Estates to complete the recording of the

2  Final Map for Tract No. 6451.  (UMF 68.)

3       The only work that NCUE and/or Lotus Developments have performed in connection

4  with the improvements in the Valley Rose Estates has been repair and maintenance work, such as

5  repairing cracks in concrete, fixing street lights, repaving streets and performing landscaping

6  work.  (UMF 69.)

7      **G.**    **McIntosh's Alleged Acquisition of Copyright Interests and the Instant**
   **Lawsuit.**
8

9      On or about July, 2007, Plaintiff filed the instant lawsuit against NCUE and Lotus

10  Developments.  (UMF 70.)  Plaintiff subsequently amended his complaint three times to add the

11  City and DeWalt as additional defendants. (UMF 71.)

12       *1.*    *Plaintiff's Direct Infringement Allegations Against NCUE, Lotus*
    *Developments and DeWalt.*
13

14      Plaintiff alleges that Defendants have infringed upon his copyright interests by copying

15  and/or using the Martin-McIntosh improvement plans and the Revised Tentative Map for Tract

16  No. 5472 as part of their efforts to complete the development of the Subdivision.  (UMF 72.)

17  Specifically, Plaintiff contends that NCUE's tentative map (Tentative Map for Tract No. 6451)

18  and the Martin-McIntosh tentative map (Revised Tentative Map for Tract No. 5472) look

19  "substantially similar."  (UMF 73.)  Plaintiff also contends that improvement plans are required

20  to complete the Subdivision and, thus, Defendants must have used or relied upon the Martin-

21  McIntosh improvement plans since they did not prepare their own improvement plans.  (UMF

22  74.)

23      Plaintiff maintains that the Tentative Map for Tract No. 6451 is "substantially similar" to

24  the Revised Tentative Map for Tract No. 5472 in that the street names, lot configuration,

25  numbering system and tract boundaries appear to be identical.  (UMF 75.)  As additional

26  evidence of copying, Plaintiff also alleges that (1) both maps contain the same number of lots;

27  (2) the legends in the Tentative Map for Tract No. 6451 reference existing centerline monuments

28  and lot corner tags, and (3) a note on the map acknowledges the construction of improvements

4821-5370-5220 v2           10

1    per the Martin-McIntosh improvement plans and tentative map (Revised Tentative Map for Tract

2    No. 5472).  (UMF 76.)  The lot corner tags and monuments, however, are physical objects

3    observable in the Subdivision, facts which Plaintiff acknowledges.  (UMF 77.)  Plaintiff also

4    admits that Legacy, not Martin-McIntosh, generated the street names for the Subdivision.  (UMF

5    78.)

6        As for lot configuration, Plaintiff claimed that Martin-McIntosh maximized the number

7    of lots in the Subdivision after considering the City requirements, such as minimum street

8    widths, zoning, lot dimensions and setbacks, the size of the Subdivision, and the developer's

9    interests in increasing profits.  (UMF 79.)  Based on the construction of the improvements and on

10   NCUE's desire to leave the existing improvements in place and to maximize profits by creating

11   as many lots as possible within the Subdivision, however, DeWalt was left with no choice but to

12   configure the lots, design the Subdivision similarly to Martin-McIntosh's design and create

13   approximately the same number of lots.  (UMF 80.)

14            **2.    *Plaintiff's Direct Infringement Claims Against the City.***

15       Plaintiff's direct infringement cause of action against the City is premised on the City's

16   distribution of the Martin-McIntosh tentative map and improvement plans to NCUE and/or its

17   agents (DeWalt).  (UMF 81.)  The City concedes that Dennis McNamara provided the

18   improvement plans to Greg Black, then NCUE's Director of Engineering, via electronic mail on

19   April 13, 2005.  (UMF 82.)  It is unclear whether the City provided the Revised Tentative Map

20   for Tract No. 5472 to DeWalt.  However, Jeffrey Gutierrez, DeWalt's President contends that he

21   received this map from the City.  (UMF 83.)

22       For statutory reasons (e.g. California Public Records Act, CEQA, Brown Act), the City

23   treats tentative maps and improvement plans as public records. (UMF 84.)

24            **3.    *Plaintiff's Contributory Infringement Claims Against the City.***

25       Plaintiff's contributory copyright infringement claim against the City, alleges that the

26   City: (1) controlled the development of the Valley Rose Estates as a subdivision; (2) financially

27   benefited from the allegedly infringing activities described in the Plaintiff's Second Amended

28

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANT CITY OF WASCO'S MOTION FOR
SUMMARY JUDGMENT OR, IN THE ALTERNATIVE, SUMMARY ADJUDICATION OF FACTS**

1  Complaint; and (3) induced the infringing activities described in Plaintiff's Second Amended

2  Complaint by copying, distributing and recording Plaintiff's "plans." (UMF 85.)

3      When asked, during his deposition, about the bases for his contention that the City

4  "controlled" the development of the Subdivision, Plaintiff alluded to the facts that the City

5  entered into a development agreement with Legacy, funded the construction of the improvements

6  during the Legacy era, inspected the improvements, bought the Subdivision at a tax sale and then

7  sold it to NCUE, "obtained the benefit" of the improvement plans, and collected impact fees

8  from the Subdivision. (UMF 86.) With the exception of collecting impact fees, all of the events

9  upon which Plaintiff relies for his claims of control occurred before the City sold the Subdivision

10  to NCUE. UMF 86.) In the case of "obtaining the benefit" of the improvement plans, it is

11  unclear what Plaintiff means other than the fact that Legacy built the Subdivision using the

12  improvement plans and that subsequent owners of the property, including the City, were spared

13  the expenses of constructing and/or installing improvements.

14      What is clear, nevertheless, is that Plaintiff and Joe Wu discussed the issue of Plaintiff

15  preparing a new set of maps for Parcel 1 (Tract No. 5472, now Tract No. 6451). Plaintiff states

16  that he told Mr. Wu that he expected Mr. Wu to pay him for work Martin-McIntosh performed

17  for Legacy and for which Martin-McIntosh was not paid, 15 years ago! (UMF 87.)

18  **IV.  STANDARD FOR SUMMARY JUDGMENT**

19      Summary judgment is appropriate when genuine issue of material fact exists, and the

20  moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); *Adickes v. S.H.*

21  *Kress & Co.,* 398 U.S. 144, 157, 90 S. Ct. 1598, 26 L. Ed. 2d 142 (1970); *Fortyune v. American*

22  *Multi-Cinema, Inc.,* 364 F.3d 1075, 1080 (9th Cir. 2004). A fact is "material" if it might affect

23  the outcome of the suit under the governing law. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S.

24  242, 248-49, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986); *Thrifty Oil Co. v. Bank of America Nat'l*

25  *Trust & Savings Assn,* 322 F.3d 1039, 1046 (9th Cir. 2002). A dispute is "genuine" as to a

26  material fact if there is sufficient evidence for a reasonable jury to return a verdict for the non-

27  moving party. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d

28  202 (1986); *Long v. County of Los Angeles,* 442 F.3d 1178, 1185 (9th Cir. 2006).

1   Where the moving party will have the burden of proof on an issue at trial, the movant

2   must affirmatively demonstrate that no reasonable trier of fact could find other than for the

3   movant. *Soremekun v. Thrifty Payless, Inc.,* 509 F.3d 978, 984 (9th cir. 2007).  Where the

4   nonmoving party will have the burden of proof on an issue at trial, the movant may prevail by

5   presenting evidence that negates an essential element of the non-moving party's claim or by

6   merely pointing out that there is an absence of evidence to support an essential element of the

7   non-moving party's claim.  *See James River Ins. Co. v. Schenk, P.C.,* 519 F.3d 917, 925 (9th Cir.

8   2008).   If the moving party meets its initial burden, the burden then shifts to the opposing party

9   to establish that a genuine issue as to any material fact actually exists.  *See Matsushita Elec.*

10  *Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986).

11  The opposing party cannot "'rest upon the mere allegations or denials of [its] pleading' but must

12  instead produce evidence that 'sets forth specific facts showing that there is a genuine issue for

13  trial. *Estate of Tucker v. Interscope Records,* 515 F.3d 1019, 1030 (9th Cir. 2008).

14      A genuine issue of material fact does not spring into being simply because a litigant

15  claims that one exists or promises to produce admissible evidence at trial.  *Del Carmen*

16  *Guadalupe v. Agosto,* 299 F.3d 15, 23 (1st Cir. 2002); *see also Galen v. County of Los Angeles,*

17  477 F.3d 652, 658 (9th Cir. 2007); *Bryant v. Adventist Health System/West,* 289 F.3d 1162, 1167

18  (9th Cir. 2002).  Further, a "motion for summary judgment may not be defeated …by evidence

19  that is 'merely colorable' or 'is not significantly probative. *Anderson v. Liberty Lobby, Inc.,* 477

20  U.S. 242, 249-50, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986); *Hardage v. CBS Broad Inc.,* 427

21  F.3d 1177, 1183 (9th Cir. 2006).  If the nonmoving party fails to produce evidence sufficient to

22  create a genuine issue of material fact, the moving party is entitled to summary judgment. See

23  *Nissan Fire & Marine Ins. Co. v. Fritz Companies,* 210 F.3d 1099, 1103 (9th Cir. 2000).

24  **V.**   **SUMMARY OF COPYRIGHT LAW AS IT PERTAINS TO PLAINTIFF'S**
       **DIRECT INFRINGEMENT CLAIMS AGAINST THE CITY.**
25

26      Copyright protects the original expression of an author, and copyright protection extends

27  to original works of authorship that are fixed in any tangible medium of expression.  17 U.S.C. §

28  102.  Maps and engineering schematics are protected as pictorial and graphic works under

1    federal copyright law.  17 U.S.C. §§ 101, 102.  "The term ['pictorial, graphic, and sculptural

2    works'] is intended to comprise not only 'works of art' in the traditional sense but also works of

3    graphic art and illustration, art reproductions, plans and drawings, photographs and reproductions

4    of them, maps, charts, globes, and other cartographic works, works of these kinds intended for

5    use in advertising and commerce, and work of 'applied art.'"  House Report No. 94-1476.

6         Copyright law gives the owner of a copyright the exclusive right to do the following:

7              (1)   to reproduce the copyrighted work in copies or phonorecords;

8              (2)   to prepare derivative works based upon the copyrighted work;

9              (3)   distribute copies or phonorecords of the copyrighted work to the public by

10                   sale or other transfer of ownership, or by rental, lease, or lending;

11             (4)   in the case of literary, musical, dramatic, and choreographic works,

12                   pantomimes, and motion pictures and other audiovisual works, to perform

13                   the copyrighted work publicly;

14             (5)   in the case of literary, musical, dramatic, and choreographic works,

15                   pantomimes, and pictorial, graphic, or sculptural works, including the

16                   individual images of a motion picture or other audiovisual work, to display

17                   the copyrighted work publicly; and

18             (6)   in the case of sound recordings, to perform the copyrighted work publicly

19                   by means of a digital audio transmission.  17 U.S.C. § 106.

20        Plaintiff's direct infringement claim against the City concerns the copyright rights of

21   reproduction and distribution.  Plaintiff contends that the City reproduced the Martin-McIntosh

22   improvement plans and tentative map and distributed them to the other Defendants in violation

23   of his copyright interests.  Assuming, however, that Plaintiff owns the copyright interests in the

24   Martin-McIntosh improvement plans and tentative map, the City was permitted to reproduce and

25   distribute these documents under the doctrines of implied license and/or implied consent.

26   Therefore, the City is not liable for direct copyright infringement, as discussed below in greater

27   detail.

28

VI.   **THE CITY IS NOT LIABLE TO PLAINTIFF FOR DIRECT COPYRIGHT INFRINGEMENT BECAUSE PLAINTIFF GRANTED AN IMPLIED LICENSE (NONEXCLUSIVE LICENSE) TO THE CITY TO DISTRIBUTE AND/OR REPRODUCE THE MARTIN-MCINTOSH TENTATIVE MAPS AND IMPROVEMENT PLANS.**

A.   **The City Was Granted a Nonexclusive License to Reproduce and Distribute the Martin-McIntosh Tentative Map (Revised Tentative Map for Tract No. 5472) and Improvement Plans.**

Martin-McIntosh provided the City an implied nonexclusive license to reproduce and distribute the Revised Tentative Map for Tract No. 5472 and the Martin-McIntosh improvement plans. Uses of copyright work that stay within the scope of a nonexclusive license are immune from infringement suits. *Graham v. James*, 144 F.3d 229, 236 (2d Cir. 1998). A "nonexclusive license" may be granted without a writing. 17 U.S.C. § 101. In fact, the Courts have universally recognized that a nonexclusive license may be implied from conduct. *I.A.E. Incorporated v. Shaver*, 74 F 3d. 768, 775 (7th Cir. 1996); *see also Effects Associates, Inc. v. Cohen*, 908 F.2d 555, 558 (9th Cir. 1990) (stating that "a nonexclusive license may be granted orally, or may even be implied from conduct." (citing that 3 M. Nimmer & D. Nimmer, Nimmer on Copyright § 10.03[a], at 10-36 (1989))  An example of such conduct that may create a license is where the party who creates the work turns a copy of the work over to the defendant intending that the defendant use it.  *See, e.g. SmithKline Beecham Consumer Healthcare, L.P. v. Watson Pharmaceuticals, Inc.*, 211 F.3d 21, 25 (2nd Cir. 2000).

In this instance, the City was granted a nonexclusive license to reproduce and/or distribute the Revised Tentative Map for Tract No. 5472 and Martin-McIntosh improvement plans based on the conduct of Martin-McIntosh for several reasons.  First, by submitting a tentative map to a municipality that is bound by multiple statutes to release maps as public records, Martin-McIntosh implicitly licensed the City to release and distribute the Revised Tentative Map for Tract No. 5472.  Second, The Contract authorized the City and subsequent developers of the Subdivision to complete any improvements not completed by Legacy.  Thus, Martin-McIntosh implicitly licensed Defendants to use the improvement plans.   Third, the City has an implied nonexclusive license to reproduce and distribute the improvement plans since it paid Martin-McIntosh $98,000.00 for the plans.

1    **B.**    **Martin-McIntosh's Submission of the Martin-McIntosh Improvement Plans**
2    **to the City Implicitly Licensed the City to Release and Distribute Them.**

3        Because several California statutes and a City ordinance require that the City reproduce

4 and distribute documents that are part of a subdivision approval process, Martin-McIntosh's

5 submission of the Revised Tentative Map for Tract No. 5472 gave the City an implied

6 nonexclusive license to reproduce and distribute the map to the public.   These statutes, and the

7 ordinance, are: (a) the California Subdivision Map Act, Cal. Gov. Code §§ 66473 et seq.; (b)

8 City of Wasco Municipal Code, Title 16, Chapter 16.16; (c) the Ralph M. Brown Act ("Brown

9 Act"), California Government Code § 54953(a), et. seq.; (d) The California Environmental

10 Quality Act ("CEQA"), Cal. Pub. Resources Code § 21000, *et. seq.*; and (e) the California Public

11 Records Act ("CPRA") (California Government Code § 6250 et seq.).   In the face of these

12 statutes and ordinances requiring the City to make tentative maps available to the public, Martin-

13 McIntosh submitted the Revised Tentative Map for Tract No. 5472 to the City, knowing that the

14 City would treat the map as a public record.   By its conduct, therefore, Martin-McIntosh

15 consented to the treatment of its map as a public record and, thus, provided the City an implied

16 nonexclusive license to reproduce and distribute the map.  As such, pursuant to 17 U.S.C. §§ 101

17 and 204, the City is not liable to Plaintiff for direct copyright infringement.

18        From the very beginning of the subdivision approval process that Martin-McIntosh

19 initiated, the California Subdivision Map Act and City of Wasco Municipal Code, Title 16,

20 required the tentative Map's disclosure.   After Martin-McIntosh submitted to the City, as

21 required by City of Wasco Municipal Code § 16.16.050, multiple full size copies and one eight

22 and one-half inch reduced copy of the tentative map, the City was then specifically required by

23 statute to provide copies of the tentative map to a variety of public officials, public agencies, and

24 utilities.   City of Wasco Municipal Code § 16.16.070.   Specifically, the City was required to

25 provide copies to the City Engineer, the City Building Department/Water Department

26 Superintendent, the Kern County Fire Department, the City Public Works Department, the

27 Southern California Gas Company, the Pacific Gas and Electric Company, the Pacific Bell

28 Telephone Company, the Warner Cable Television Company, school districts, other public

1   agencies, and other utilities that would be affected by the subdivision. City of Wasco Municipal

2   Code § 16.16.080.

3          The submission process not only required the distribution of the tentative map to public

4   officials; it also required the distribution of the map to the public itself under the Brown Act.

5   The Brown Act generally requires legislative bodies, to hold their meetings and deliberate in

6   public.   California, Government Code § 54953(a); *Boyle* v. *City of Redondo Beach*, 70

7   Cal.App.4th 1109, 1116 (1999).   Following the initial submission, the City Planning Director

8   was required to prepare a report and recommendations, which is to include any comments

9   received on the tentative map from the public agencies and utilities that received copies.   City of

10  Wasco Municipal Code § 16.16.080.   After the Planning Director prepared the report and

11  recommendations, the City had to hold a public hearing.   California Subdivision Map Act, Cal.

12  Gov. Code § 66451.3 (requiring that a public hearing be held for all proposed divisions of land

13  which require a final map); the Ralph M. Brown Act ("Brown Act"), Cal. Gov. Code § 54953(a);

14  City of Wasco Municipal Code § 16.16.090.[4]   This public hearing requires, under the Brown Act,

15  that the City make the tentative map available to the public.   Cal. Gov. Code § 54957.5.

16         A specific examination of the Brown Act's requirements reveals that the public hearing

17  Martin-McIntosh's submission of the tentative map triggered also unavoidably caused the City to

18  make the Revised Tentative Map for Tract No. 5472 available to the public.   The purpose of the

19  Brown Act is to facilitate public participation in local government decisions and to curb misuse

20  of the democratic process by secret legislation by public bodies.   California Government Code §

21  54950; *Cohan* v. *City of Thousand Oaks*, 30 Cal.App.4th 547, 555 (1994).   As part of this

22  process, writings which are distributed to the members of the legislative body are disclosable

23  public records.   California Government Code § 54957.5.   The City's Planning Commission is

24  considered a legislative body under the Brown Act. *See* California. Government Code §§ 54951

25  (defining local agency as including cities), 54952(a) (defining legislative body as including

26  commissions of a local agency).   Therefore, the Brown Act requires City Planning Commission

27  

28  ---

[4] A public hearing is also encouraged under the CEQA.  CEQA Guidelines, § 15202(a), (g).  But see CEQA Guidelines, § 15074.1(a) (to avoid re-circulating a proposed negative declaration, a public agency must hold a public hearing before substituting equivalent of more effective mitigation measures).

1   meetings to be conducted in public.  To facilitate public participation in the City's tentative map

2   comment and review process, the Brown Act requires that the City make available to the public

3   copies of the tentative map.  California Government Code § 54957.5.

4        Beyond the Brown Act, the City was also required under the CEQA to provide the

5   tentative map to the public as part of its environmental compliance review process.  Under

6   CEQA, public agencies must refrain from approving projects with significant environmental

7   effects if "there are feasible alternatives or mitigation measures" that can substantially lessen or

8   avoid those effects.  *Mountain Lion Foundation v. Fish & Game Commission*, 16 Cal.4th 105,

9   134 (1997).  Public agencies contemplating the approval of a project must identify the

10  environmental impacts, if any, of the project and prepare an initial study, a negative declaration

11  or an Environmental Impact Report ("EIR") unless the project meets certain CEQA specified

12  exemptions or if the public agency determines that approval of the project will have no possible

13  significant effect on the environment.  *Gentry v. City of Murrieta*, 36 Cal.App. 4th 1359 (4th Dist.

14  1995); Public Resources Code §§ 21100, 21151; CEQA Guidelines, §§15002, 15603, 15604.

15  Each of these possibilities entails public participation and requires the public agency to make

16  available to the public documents which relate to the assessment of environmental impacts.  *See*

17  Public Resources Code §§ 21092(a),(b) (public review process associated with notice of intent to

18  adopt a negative declaration); CEQA Guidelines §15072 (public review process associated with

19  notice of intent to adopt a negative declaration); Public Resources Code § 21064.5 (public

20  review of proposed mitigated negative declarations); Public Resources Code § 21092.2

21  (requiring provision of notice of preparation of environmental impact report to members of the

22  public upon request), § 21092 (notice to public of completion of draft EIR and requirement that

23  notice including all supporting documents mentioned in the draft EIR).

24       Moreover, the City the California Public Records Act ("CPRA") (California Government

25  Code § 6250, *et. seq.*) required the City to provide public access to the tentative map, because it

26  constituted a public record.   The CPRA requires local agencies, including cities, to provide the

27  public access to "public records."  California Government Code §§ 6250 (stating that access to

28  information concerning the conduct of the people's business is a fundamental right for California

1   citizens), 6252(a) (defining local agencies as including cities), 6253 (providing that public

2   records are open to inspection by the public during office hours), and 6253.1 (requiring public

3   agencies to assist the public in locating public records responsive to a request for public records).

4   Under the CPRA, such records include "any writing containing information relating to the

5   conduct of the people's business prepared, owned, used, or retained by any state or local agency

6   regardless of physical form or characteristics." California Government Code § 6252(e). In this

7   instance, the Martin-McIntosh tentative map would be considered a public record because it was

8   retained by the City and relates to the City's engagement in the tentative map review process, a

9   matter of public concern. Plaintiff himself conceded during his deposition that he has asked for

10  and received copies of tentative maps prepared by other entities because he considers them

11  public records (McIntosh Deposition, at 227:18-21.)

12       Although Plaintiff might argue that the City was prevented from further distributing the

13  Revised Tentative Map for Tract No. 5472 after the map was approved or after it expired, this

14  contention lacks merit. Collectively, the statutes and City ordinance requiring the City to

15  conduct public hearings and to provide documents associated with the map approval process to

16  the public enabled the public to participate fully in public hearings that were required by state

17  law; it enabled the public to compare the development of the Subdivision with the tentative map;

18  it enabled subsequent purchasers of the parcel to understand what had previously been built on

19  the property; and it enabled the public to monitor the City's governance to ensure that the City

20  complied with the law in approving the tentative maps. These purposes survive beyond the

21  initial tentative map review and approval process. For example, a member of the public

22  attending the public hearing relating to the review and/or approval of the DeWalt maps

23  (Tentative Map for Tract No. 6541 and Final Map for Tract No. 6451) might wish to refer to

24  other documents concerning the City's past actions concerning the Subdivision or which reflect

25  the developmental history of the Subdivision. The public's right to receive a copy of the Martin-

26  McIntosh tentative map for these purposes is not diminished by the facts that the map has already

27  been reviewed and approved by the City or that the map has expired.

28  ///

1    In sum, when Martin-McIntosh submitted its tentative map to the City, it intended that

2    the map enter the public domain and become a public record.  Because the touchstone for finding

3    an implied license is intent, Martin-McIntosh provided the City an implied license to copy and

4    distribute its tentative map to the extent necessary to comply with the state laws and City

5    ordinances governing tentative maps, public records, and public hearings.  *Nelson-Salabes, Inc.*

6    *v. Morningside Development, LLC*, 284 F. 3d 505, 515 (4th Cir. 2002).

7       **C.**     **Martin-McIntosh's Authorization that Defendants Could Complete Any**
        **Improvement Not Completed by the Developer Implicitly Licensed the**
8       **Defendants to Use The Plans.**

9       In the Acquisition Agreement, which the City and Legacy entered into on January 28,

10   1993, the City specifically obtained the right to complete any improvements which were not

11   completed by the developer. (Zervis Decl. ¶ 4; Exhibit A attached thereto).  Obviously, such

12   completion would be accomplished by use of the Martin-McIntosh improvement plans.  The

13   Acquisition Agreement did not limit this right to the City.  To the contrary, under Section 6 of

14   the Agreement, the right clearly inures to the benefit of the parties' heirs, executors,

15   administrators, successors, and assigns. (Zervis Decl. ¶ 4; Exhibit A attached thereto; McIntosh

16   Deposition, at 45:20-47:10).  Accordingly, because the City and NCUE and/Lotus Developments

17   are successors to Legacy, under the terms of the Acquisition Agreement, both Lotus

18   Developments and the City were permitted to use the Martin-McIntosh improvement plans for

19   the Subdivision without infringing on Martin-McIntosh's copyright interests.

20      **D.**    **The City Has An Implied Nonexclusive License to Reproduce and Distribute**
        **the Plans By Virtue of Its Payment to Martin-McIntosh of $98,000.00.**
21

22      Given the vast sum of money the City paid to Martin-McIntosh for the improvement

23   plans, Plaintiff is hard pressed to claim that the City paid merely for the privilege of storing them

24   under lock and key.  Martin-McIntosh knew that the City intended to purchase the improvement

25   plans because these intentions were expressed in the Acquisition Agreement.  Rob Staub, a

26   representative of Martin-McIntosh, reviewed the Agreement and consented to the sale of the

27   improvement plans to the City by placing his initials on the portion of the Agreement addressing

28   the sale of the improvement plans, for which the City paid $98,000.00 directly to Martin-

1   McIntosh.[5]  However, under Plaintiff's theory of the case, Martin-McIntosh received $98,000.00

2   of cold, hard cash for the improvement plans and $800,000 for all engineering work done in the

3   Subdivision, yet retained the right to prohibit the City from using them to complete the

4   Subdivision.

5        The Ninth Circuit faced this same outlandish theory in *Effects Associates* and concluded

6   it baseless. There, the Court found that because defendant film producer had paid $56,000 to the

7   plaintiff for special effects footage, the plaintiff necessarily granted an implied nonexclusive

8   license to the defendant to incorporate its special effects into defendant's film.  *Effects*

9   *Associates* at 558-59.  The Court reasoned that it could not find that defendant paid the plaintiff

10  substantial sums of money for nothing.  Courts, when addressing this issue, have repeatedly held

11  the same. *Foad Consulting Group v. Azzalino* 270 F. 3d 821, 828-29 (9th Cir. 2001) (holding, as

12  there was no specific agreement to the contrary, the commissioner did not need the creator's

13  permission to use the plans for which he paid); *I.A.E., Incorporated v. Shaver*, 74 F. 3d 768, 772

14  (7th Cir. 1996) (holding that airport not required to pay an architect a fee for assignment of

15  copyright for second architect to use preliminary plans that airport had previously

16  commissioned); see also *Fosson v. Palace (Waterland), Ltd.*, 78 F.3d 1448, 1454-1455 (9th Cir.

17  1996) (holding music producer granted implied nonexclusive license to have composition

18  included in a film where the producer had handed over his composition to the defendant with the

19  intent that it be included and distributed with the film).

20       Like the defendants in *Effects Associates*, the City paid Martin-McIntosh a substantial

21  sum (approximately $98,000.00) to acquire its improvement plans.  Notably, Martin-McIntosh

22  cannot point to any express agreement where the City foreswore use of engineering plans for

23  which it had paid $98,000.00.  Had it been the parties' intent that Martin-McIntosh receive

24  approximately $98,000.00 of the City's funds yet retain the right to require that City seek its

25  permission before using the plans for anything other than a wall hanging or placemat, "one

26  would expect to see the requirement spelled out explicitly in the agreement." *Foad* at 829; *see*

27

---

28  [5] The price paid by the City is established by an Engineer's Report and Assessment done by Terry Schroepfer in March, 1995. *See* Wren Decl. ¶ 8; Exhibit B attached thereto.  Martin-McIntosh billing statements also reflect that Martin-McIntosh received substantial sums from the City for the improvement plans.

1   *also I.A.E.* at 74 F.3d 768, 772 (7th Cir. 1996) (stating that the argument that the purchaser of

2   plans "can use the drawings only as pieces of paper (wallhangings? placemats?) [sic] is

3   untenable.").

4       In fact, under The Contract which retained Martin-McIntosh to prepare improvement

5   plans, there was never any signal of intent that the City would be precluded from making use of

6   the improvement plans in the same manner it would use plans for any other of the City's

7   infrastructure. (Okadigbo Decl. ¶6 and Exhibit E attached thereto).  Nowhere in the agreement

8   does Martin-McIntosh claim a copyright.  While paragraph 13 of The Contract restricts Legacy

9   from using or permitting others to use plans or drawings that are "not final", i.e., not signed or

10   stamped by Martin-McIntosh, the Contract does not prohibit Legacy from using the

11   improvement plans—or permitting others, i.e., the City, from "using" final, signed, stamped

12   infrastructure plans for the purpose for which they were prepared. Certainly, such use is implicit.

13   (Okadigbo Decl. ¶6 and Exhibit E attached thereto)  In fact, the improvement plans are kept by

14   the public works department and the city engineer, yet under Martin-McIntosh's view, these

15   plans were never to be touched—a view that strains credulity.

16       Moreover, Paragraph 13 of The Contract specifically provides that the final plans,

17   drawings or other work product may be **used for the project** described on the face hereof.

18   (Okadigbo Decl. ¶ 6; Exhibit E attached thereto; McIntosh Deposition, at 45:20-47:10.)  Under

19   Plaintiff's theory of the case, this clause would, contrary to its plain language, be read so as to

20   prohibit use of the improvement plans in connection with the very project for which they were

21   designed.  If so, that portion of paragraph 13 of Martin-McIntosh's contract would serve no

22   purpose.[6]

23       On the basis of all of these arguments, it is clear that "[a] balancing of equities [does not]

24   favor plaintiff, who has paid almost [$98,000] for [improvement plans] that [are] worthless to the

25   [City] should [P]laintiff prevail." *Effects Associates*, 908 F.2d at 559.  To the extent that Plaintiff

26   might contend that Martin-McIntosh did not receive all monies owed to it for preparing the

27

28   [6] Martin-McIntosh's March 18, 1992 letter to Brown, incorporated into The Contract by reference makes clear that the project is the Valley Rose subdivision- Wasco, CA, Martin-McIntosh's project #92-22. (NCUE UMF #11).

1    improvement plans, *Effects Associates* establishes that this concern is immaterial to the finding

2    of an implied nonexclusive license.  The Ninth Circuit stated explicitly that payment in full is not

3    a condition precedent to implying a license.  *Id.*  Consequently, Martin-McIntosh granted to the

4    City an implied nonexclusive license to reproduce and distribute the plans consistent with the

5    rights of ownership.

6    **VII.   THE CITY CANNOT BE FOUND LIABLE FOR CONTRIBUTORY**
     **COPYRIGHT INFRINGEMENT BECAUSE IT HAD NO KNOWLEDGE OF**
7    **ANY OF THE ALLEGEDLY INFRINGING ACTIVITIES ENGAGED IN BY THE**
     **OTHER DEFENDANTS.**
8

9         Plaintiff's contributory copyright infringement claim rests on allegations that the City

10   distributed the Martin-McIntosh improvement plans and tentative map to Defendants NCUE,

11   Lotus Developments and/or DeWalt; (2) the City controlled the development of the Subdivision

12   through it powers to approve or disprove Defendants' tentative and final maps and/or through its

13   powers to issue building permits and the like to Defendants; (3) the City knew that Defendants

14   were using the Martin-McIntosh improvement plans and tentative map to complete the

15   development of the Subdivision and, therefore, was aware that Defendants were infringing on

16   Plaintiff's alleged copyright interests; and (4) the City encouraged Defendants to infringe upon

17   Plaintiff's alleged copyright interests to develop the Subdivision and, thereby, enhance the City's

18   opportunity to collect revenue from individual lots in the Subdivision.  These allegations,

19   however, cannot be substantiated.

20        Plaintiff's contributory infringement claim, however, is devoid of merit, for several

21   reasons – (1) the City never knew that the other Defendants were copying or using the Martin-

22   McIntosh improvement plans and tentative map in violation of Plaintiff's alleged copyright

23   interest; (2) distributing the Martin-McIntosh improvement plans and tentative map cannot be

24   considered acts that encouraged infringement because Martin-McIntosh granted the City a

25   nonexclusive implied license to distribute these plans and map as public records; and (3) the

26   improvement plans and tentative map are capable of substantial, non-commercial and non-

27   infringing uses.

28   / / /

1   The theory of contributory copyright infringement has been articulated as follows: "[o]ne

2   who, with knowledge of the infringing activity, induces, causes or materially contributes to the

3   infringing conduct of another, may be held liable as a contributory infringer." *Gershwin*

4   *Publishing Corp. v. Columbia Artists Management, Inc.*, 443 F.2d 1159, 1162 (2nd Cir. 1963).

5   Contributory liability is predicated on either of two theories, proof that the defendant actively

6   encouraged (or induced) infringement through specific acts or proof that the defendant

7   distributed a product that is not capable of "substantial" or commercially significant non-

8   infringing uses. *Metro-Goldwyn-Mayer Studios, Inc. v. Grokster, Ltd.*, 545 U.S. 913, 942 (2005)

9   (Ginsburg, J., concurring) (quoting *Sony Corporation v. Universal City Studios, Inc.*, 464 U.S.

10  417, 442 (1984)).

11          **A.   The City is Not Liable for Contributory Copyright Infringement Because It**
12              **Did Not Know That Defendants NCUE, Lotus Developments and/or DeWalt**
                **Were Copying or Using the Martin-McIntosh Improvement Plans and/or**
13              **Tentative Map in Violation of Plaintiff's Copyright Interests, as Alleged by**
                **Plaintiff, and Did Not Intend to Induce or Encourage Defendants' Allegedly**
14              **Infringing Activities.**

15  Under the first theory of contributory liability, a party is liable for contributory copyright

16  infringement if it distributes a copyrighted work "with the object of promoting its use to infringe

17  copyright, as shown by clear expression or other affirmative steps taken to foster infringement."

18  *Id.* at 936-937. In instances, where the copyrighted work that was distributed is capable of

19  substantial lawful (i.e. non-infringing uses), "mere knowledge of infringing potential or of actual

20  infringing uses would not be enough ... to subject a distributor to liability.  Nor would ordinary

21  acts incident to product distribution, such as offering customers technical support or product

22  updates, support liability in themselves.  The inducement rule, instead, premises liability on

23  purposeful, culpable expression and conduct." *Grokster, supra*, 545 U.S. at 937.

24  In this instance, the City provided the Subdivision improvement plans it paid for to

25  DeWalt.  However, at not point in the City's dealings with NCUE, Lotus Developments or

26  DeWalt did the City know that these Defendants harbored any designs to use, copy, or otherwise

27  infringe upon any Plaintiff's alleged copyright interests in the Martin-McIntosh tentative map or

28

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANT CITY OF WASCO'S MOTION FOR**
**SUMMARY JUDGMENT OR, IN THE ALTERNATIVE, SUMMARY ADJUDICATION OF FACTS**

1   improvement plans. The parties never discussed the process DeWalt would use to create the

2   Tentative Map for Tract No. 6451 and the Final Map for Tract No. 6451.

3          To the contrary, the City's dealings with NCUE, Lotus Developments and DeWalt

4   consisted solely of *processing* and reviewing the tentative and final maps which they prepared

5   for the Subdivision. In carrying out these municipal functions, the City neither compared the

6   Martin-McIntosh tentative map with NCUE's tentative map, nor the Martin-McIntosh

7   improvement plans with the Martin-McIntosh tentative map. Thus, it was in no position to know

8   whether DeWalt's tentative and final maps were infringing copies of the Martin-McIntosh

9   improvement plans and/or tentative map. The City first became aware of Plaintiff's claims of

10  infringement only after Plaintiff threatened to sue the City for copyright infringement and/or

11  contributory infringement. (Zervis Decl. ¶ 12.)

12         Based on the above-described facts, the City is not liable for contributory infringement

13  because, at the time it provided the Martin-McIntosh improvement plans and tentative map to

14  DeWalt, it neither knew nor had reason to know of any intentions DeWalt may have had to copy,

15  use or rely upon the plans and map and, therefore, to infringe on Plaintiff's alleged copyright

16  interests. Furthermore, since the City did not discuss the use of Martin-McIntosh improvement

17  plans with NCUE , Lotus Developments or DeWalt, it clearly did not encourage or induce

18  infringement. Plaintiff cannot establish the "purposeful, culpable expression and conduct"

19  needed to conclude that the City engaged in contributory copyright infringement. *Grokster*,

20  *supra*, 545 U.S. at 937. Therefore, the Court should grant the City's motion for summary

21  adjudication on the issue of contributory infringement.

22         Plaintiff will undoubtedly attempt to meet his burden to establish knowledge of infringing

23  activity by referencing an alleged conversation that he had with a City employee from the City's

24  Public Works Department in November or December, 2006. (Wren Decl. ¶ 7; Exhibit A

25  attached thereto; Okadigbo Decl. ¶ ¶25, 26; Exhibits X and Y attached thereto)  Plaintiff claims

26  that the City employee advised him that his improvement plans were being used to complete the

27  Subdivision. However, this "evidence" is rank speculation and inadmissible hearsay.

28  / / /

1     Plaintiff cannot recall the name of the City employee who alleged imparted this

2  information to him, despite being presented, during discovery, with a list of names of all City

3  employees who worked in the Public Works Department from December 1, 2005 through

4  December 31, 2007.  Therefore, this alleged conversation with an unnamed City employee is

5  inadmissible on lack of personal knowledge and hearsay grounds.  Evidence Code §§ 602, 801

6  and 802.

7     Plaintiff lacks personal knowledge to testify about the City employee's alleged

8  observations because Plaintiff did not directly observe or witness the alleged use of his

9  improvement plans.  Evidence Code § 602.  Moreover, since Plaintiff cannot identify the City

10  employee with whom he conversed, the parties are not in a position to fathom the bases upon

11  which this phantom City employee relies for his claim that any of the Defendants unlawfully

12  used the Martin-McIntosh improvement plans.  For this reason, the issue of lack of personal

13  knowledge extends to the phantom City employee.

14     Plaintiff's evidence of the alleged conversation he had with the City employee is also

15  inadmissible hearsay under Evidence Code §§ 801 and 802 because Plaintiff is purporting to

16  introduce an out of court statement to establish the truth of the matter being asserted – that the

17  Martin-McIntosh improvement plans were used to complete the Subdivision.  Although Plaintiff

18  might contend that the alleged statement by the City employee constitutes an admission by party

19  opponent under Evidence Code § 801(d)(2), this would be inaccurate.  Plaintiff has no means of

20  establishing the nature of the position that the alleged City employee held within the City.

21     Although Plaintiff maintains that the employee was the "head of the corporation yard,"

22  no such title exists at the City.  As such, Plaintiff cannot prove that the employee was of

23  sufficient authority within the City for his statements to deemed binding upon the City as an

24  admission.  Indeed, the person with whom Plaintiff claims to have discussed the use of Martin-

25  McIntosh improvement plans might not be a City employee.  Certainly, the fact that there is no

26  "head of corporation yard" position within the City bolsters this conclusion.

27     In the end, Plaintiff has produced no evidence that somebody observed NCUE, Lotus

28  Developments or DeWalt using or copying the Martin-McIntosh improvement plans or that these

1   Defendants submitted any improvement plans to the City, much less the Martin-McIntosh

2   improvement plans.   To the contrary, the City and the other Defendants have produced evidence

3   that improvement plans were not required and that neither NCUE nor Lotus Developments

4   submitted any improvement plans.  The absence of any evidence that the City knew of any

5   infringing activities alone compels an award of summary judgment in the City's favor, as *Sony*

6   *Corporation v. Universal City Studios, Inc.*, 464 U.S. 417 (1984), clarifies.

7       In *Sony Corporation*, the U.S. Supreme Court addressed a contributory infringement

8   claim that was premised on the distribution of videocassette recorders.  Copyright holders sued

9   Sony as the manufacturer, contending that Sony was contributorily liable for the infringement

10   that occurred when VCR owners taped copyrighted programs because it supplied the VCRs and

11   had constructive knowledge that infringement would occur.  There was no evidence that Sony

12   intended to encourage taping in violation of copyright or that it had taken active steps to increase

13   profits through unlawful taping. *Id*. at 438.  Additionally, Sony did know that some of the VCR

14   users would use the product to commit infringement.  But because the Court found that the

15   product could be used for "commercially significant noninfringing uses," it held that Sony could

16   not be liable merely for distributing the product. *Id*. at 442.  Thus, the facts that Sony continued

17   to manufacture the VCRs and distribute them was held not to be sufficient to give rise to liability

18   for contributory infringement.

19       The *Sony* result applies with equal force to the instant facts.  Indeed the City is in a

20   stronger position for avoiding liability for contributory infringement than the VCR manufacturer

21   was in the *Sony* case.  Unlike, the facts of *Sony*, the City did not know that any of the Defendants

22   planned to use the Martin-McIntosh improvement plans or tentative map for infringing purposes

23   (i.e. copying them or using them, whereas Sony specifically knew that some of its consumers

24   were using its VCRs for infringing purposes and yet still escaped liability.

25       Just as the *Sony* ruling found the manufacturing and distribution of the VCRs to be

26   insufficient to create liability for contributory infringement, here too the Court must conclude

27   that the City is not vicariously liable merely for processing the DeWalt tentative and final maps

28   or for distributing the Martin-McIntosh improvement plans.  The City was under an obligation to

1  process the DeWalt tentative and final maps pursuant to state law and the City's ordinance and,

2  therefore, is at least on par with Sony, which manufactured the product capable of infringing

3  uses (the VCRs).  Also, like the VCR manufacturer in *Sony*, the City never intended to

4  encourage infringement when it distributed the Martin-McIntosh improvement plans and

5  tentative map to DeWalt.

6      If, in *Sony*, the Supreme Court found the VCR manufacturer not to be liable for

7  distributing VCRs <u>even when it was aware of their potentially infringing uses</u>, this Court cannot

8  conclude as a matter of law that the City could be liable for contributory infringement merely for

9  reviewing and processing NCUE and/or DeWalt's tentative and final maps or for providing them

10  to DeWalt.

11      Collectively, Plaintiff's evidence, if it can be called that, fails to establish that the City

12  either knew, or was in a position to know, that the other Defendants were infringing upon

13  Plaintiff's alleged copyright interests.  For these reasons, the City the Court must conclude that

14  the City is not liable for contributory infringement.

15      **B.    The Martin-McIntosh Improvement Plans and Tentative Map Are Capable**

16  **of Substantial Noncommercial Noninfringing Uses**

17      Any possible claim by Plaintiff that the City is liable for contributory infringement under

18  the second theory of contributory liability espoused in *Grokster* fails.   Specifically, Plaintiff

19  cannot prove that the Martin-McIntosh improvement plans and tentative map are capable only of

20  infringing uses.

21      The Martin-McIntosh improvement plans and tentative map concern the development of

22  a subdivision that created new public streets, affects schools and other local government entities,

23  and requires the provision of public utilities.  They are inherently matters of public concern.  The

24  improvement plans and tentative map enables the public, including NCUE and/or Lotus

25  Developments to understand what had previously been built in the Subdivision they owned.  If

26  for example, NCUE wished to fix problems associated with the Subdivision's underground

27  sewer, the improvement plans would enable it to detect and fix such problems.  Using the

28  improvement in this manner is consistent with the purposes for which the plans were created and

1   required, namely to enable the general public and property owners to understand the layout and

2   structure of the Subdivision.  Plaintiff cannot credibly contend that using the improvement plans

3   for these foreseeable purposes, and consistent with the reasons for which they were created,

4   constitutes copyright infringement.

5        It makes no sense to conclude that every member of the public, including property

6   owners within the Subdivision, must contact Plaintiff each time they want a copy of the

7   improvement plans and pay whatever fee Plaintiff deems acceptable to receive copies of the

8   plans.  Similarly, Plaintiff cannot credibly contend that Martin-McIntosh intended for the

9   improvement plans and tentative map to be used only up until the point of completing the

10  Subdivision during its first stage of development, but not for additional purposes beyond the map

11  approval stage, such as fixing underground utility problems or as part of any future assessment of

12  environmental issues concerning the property.

13       Furthermore, in the case of the improvement plans, the City purchased them from Martin-

14  McIntosh was granted an implied nonexclusive license to reproduce and distribute them.  Thus,

15  simply providing them to DeWalt is not an act of contributory infringement without a showing

16  that the City knew about any of NCUE, Lotus Developments or DeWalt's allegedly infringing

17  activities.

18       Since the Martin-McIntosh improvement plans and tentative map are capable of

19  substantial, non-commercial and non-infringing uses, the City did not encourage, induce or

20  materially encourage infringement merely by disseminating them to DeWalt.

21  **VIII.  THE CITY CANNOT BE FOUND LIABLE FOR VICARIOUS COPYRIGHT
        INFRINGEMENT BECAUSE IT WAS IN NO POSITION TO SUPERVISE OR
22      CONTROL ANY OF THE ALLEGEDLY INFRINGING ACTIVITIES OF THE
        OTHER DEFENDANTS.**
23

24       Plaintiff has not stated a cause of action for vicarious infringement, which is a separate

25  and distinct claim from contributory copyright infringement.  The City submits, therefore, that

26  the Court should reject any plea by Plaintiff to advance a vicarious liability cause of action.

27  However, even if the Court allows Plaintiff to advance a vicarious infringement cause of action,

28  Plaintiff cannot prevail on this theory as a matter of law.

1    Vicarious infringement typically allows for the imposition of liability when the defendant

2    directly profits from infringement and has a <u>right and ability</u> to supervise the direct infringer,

3    even if the defendant lacks personal knowledge of the infringement. *Gershwin, supra,* 545 U.S.

4    at 931.

5    Plaintiff has contended thus far that (1) the City had the ability to control or supervise the

6    allegedly infringing activities in that it retained the authority to approve or disprove the tentative

7    and final maps and (2) the City provided the Martin-McIntosh tentative map and improvement

8    plans to the other Defendants. As discussed earlier, however, the City lawfully distributed these

9    plans and map to Defendants and, therefore, did not contribute to any of their allegedly

10   infringing activities. With respect to approving the DeWalt tentative and final maps, Plaintiff's

11   contention is flawed in that it seeks to impose vicarious liability on the City for performing

12   routine municipal functions that are required by city ordinances and state law and which it

13   cannot refuse to perform. Existing case law does not support the imposition of vicarious liability

14   on this basis. The City never exercised a right and ability to supervise any of the allegedly

15   infringing Defendants and, therefore, cannot be liable for vicarious infringement.

16   The landmark case of *Shapiro, Bernstein & Co., Inc. v. H.L. Green Co.,* 316 F.2d 304

17   (2nd Cir. 1963) developed the concept of vicarious copyright liability.

18   In *Shapiro,* the Second Circuit faced a copyright infringement suit against the owner of a

19   department store chain in which a concessionaire sold counterfeit recordings. The court

20   developed a means of enforcing copyrights against a defendant whose economic interests mesh

21   with a direct infringer's even though the defendant did not employ the direct infringer.

22   The *Shapiro* court looked at two lines of precedent it perceived as being most relevant to

23   the issue of vicarious infringement. In one line of cases, the landlord-tenant cases, the courts

24   found a landlord not to be vicariously liable for the infringing acts of its tenant, if the landlord

25   exercised no control over the leased premises, had no knowledge of the tenant's infringing acts,

26   and in no way contributes to the infringement. *See e.g. Deutsch v. Arnold,* 98 F.2d 686 (2nd Cir.

27   1938). In the other line of cases, the "dance hall cases," the owner or manager of an

28   entertainment venue was found liable for infringing performances when the owner or manager

1    (1) could control the premises and (2) obtained a direct financial benefit from the audience, who

2    paid to enjoy the infringing performance. *See e.g. Buck v. Jewell-LaSalle Realty Co.*, 238 U.S.

3    191, 198-199 (1931).

4            From these two lines of cases, the *Shapiro* court concluded that the relationship between

5    the store owner and the concessionaire resembled the dance-hall model more than the landlord-

6    tenant model. *Shapiro* imposed liability based on a conclusion that the store owner had the

7    power to control the concessionaire – it had an existing licensing agreement with the

8    concessionaire which provided that the concessionaire's employees were to "abide by, observe

9    and obey all rules and regulations promulgated from time to time by H.L. Green Company, Inc. .

10   . ." The store owner also had the authority, in its "unreviewable discretion," to discharge any

11   concessionaire employee believed to be conducting himself improperly. *Shapiro, supra*, 316

12   F.2d at 307.

13           In the case at bar, the City's relationships to NCUE, Lotus Developments and DeWalt are

14   akin to the landlord-tenant set of cases in which the courts did not impose vicarious liability and,

15   therefore, unlike *Shapiro* and the dance hall cases. The City did not have the right and ability to

16   supervise these Defendants both from a legal and practical standpoint.

        **A.**      **Although the City Regulates and Controls the Development of the**
                 **Subdivision Under the Subdivision Map Act, This Does Not Equate to a**
                 **Right and Ability to Supervise or Control Defendants Within the Context of**
                 **Vicarious Copyright Infringement.**

20           Besides providing the Martin-McIntosh improvement plans and tentative map to the other

21   Defendants, the City's only dealings with the other Defendants consisted of processing the

22   DeWalt tentative and final maps as required under California law and existing City ordinances.

23   Plaintiff seeks to hold the City liable for carrying out ordinary municipal functions which the

24   City cannot legally refuse to perform and for which the City could be sued if it unreasonably

25   withholds its approval. Plaintiff's position is untenable and finds no support either in case law or

26   statute. As a matter of law, the City's dealings with NCUE, Lotus Developments, and DeWalt

27   cannot be construed as investing in the City the right and ability to supervise or control the other

28

1  Defendants' allegedly infringing activities.  A brief review of the subdivision map approval

2  process shows why.

3      The California Subdivision Map Act vests in cities the power to regulate and control the

4  design and improvement of subdivisions within its boundaries.  California Government Code

5  § 66411.  Each city is required to adopt an ordinance regulating and controlling subdivisions for

6  which the Map Act requires a tentative and final map.  California Government Code § 66411.

7  Thus, as a preliminary matter, the City's decision on whether or not to approve a tentative and

8  final map is circumscribed by its own ordinance.

9      The Subdivision Map Act further defines and constrains the City's powers over the

10  tentative and final map review process in the following ways:

11      1.      In determining whether to approve or disapprove a tentative subdivision

12              map, the City can apply only those ordinances, policies and standards

13              which were in effect at the time the application was determined to be

14              complete (California Government Code § 66473);

15      2.      the City is required to make findings to support its decision to approve or

16              disprove a tentative or final map (California Government Code § 65455;

17              Municipal Code § 16.16.110);

18      3.      Cites must deny approval of a tentative map if they make any of the

19              specified findings listed in California Government Code § 66474; [7]  and

20      4.      the City is required to approve a final map if it substantially complies with

21              the tentative map.  (California Government Code § 66474.1; Municipal

22              Code § 16.20.080).  The approval of the final map is, thus, a ministerial

23

---

24  [7] (1) the map is not consistent with applicable general and specific plans as specified in Government Code § 65451;
25  (2) the design or improvement of the proposed subdivision is not consistent with applicable general and specific
    plans; (3) the site is not physically suitable for the proposed type of development; (4) the site is not physically
26  suitable for the proposed density of development; (5) the design of the subdivision or the proposed improvements
    are likely to cause substantial environmental damage or substantially and avoidably injure fish or wildlife or their
27  habitat; (6) the design of the subdivision or the type of improvements is likely to cause serious health problems; (7)
    the design of the subdivision or they type of improvements will conflict with easements, acquired by the public at
28  large, for access through or use of, property within the proposed subdivision.  Government Code § 66474; or (8) the
    design of the subdivision does not provide for, to the extent feasible, future passive or natural heating and cooling
    opportunities. Government Code § 66473.1.

4821-5370-5220 v2                              32

1    act if it substantially complies with a tentative map. *Anthony v. Snyder*,

2    116 Cal.App.4[th] 643 (2004).

3    Applicants for tentative and/or final maps may challenge the City's denial of a tentative

4    map by filing a petition for a writ of administrative mandamus under California Code of Civil

5    Procedure § 1094.5 on grounds that the city abused its discretion, which is defined as not

6    proceeding in a manner required by law, making decisions that are not supported by the findings,

7    or making findings that are not supported by the evidence. Code of Civil Procedure § 1094.5(b).

8    *Youngblood v. Board of Supervisors*, 22 Cal.3d 644, 652, fn. 2 (1978). The approval or denial of

9    a final map may be challenged through an ordinary writ of mandate under Code of Civil

10   Procedure § 1085. *Youngblood*, 22 Cal.3d at 654.

11   On the instant facts, had the City refused to approve NCUE's tentative or final maps

12   (Tentative Map for Tract No. 6451 and Final Map for Tract No. 6451) based on speculative

13   infringement concerns, NCUE might well have filed a writ of mandamus or a writ of

14   administrative mandamus, claiming that the City rejected its map based on criteria that were not

15   listed in its ordinances or policies. In the case of the Final Map for Tract No 6451, NCUE could

16   have contended that this map conformed to the Tentative Map for Tract No. 6451, that the City

17   was ministerially required to approve it, and, that by failing to approve it, the City abused its

18   discretion.

19   The subdivision map review process described above establishes that the City must

20   follow certain protocols and does not have an unrestrained power to deny the approval of maps.

21   Here, the City concluded that the Tentative Map for Tract No. 6451 and the Final Map for Tract

22   No. 6451 satisfied the Subdivision Map Act and existing City ordinances, rules and regulations

23   and, on this basis, approved the maps. The City cannot possibly be held vicariously liable

24   merely for following established subdivision map review procedures.

25   **B.    The City Did Not Have a Practical Ability to Supervise or Control NCUE,**

26   **Lotus Developments and/or DeWalt's Allegedly Infringing Activities.**

27   The conclusion that the City did not have the right and ability to supervise or control the

28   other Defendants is underscored by the facts that (1) the City had no knowledge of NCUE, Lotus

1  Developments or DeWalt's allegedly infringing activities and, therefore, could not have been in

2  a position to supervise or control these activities and (2) City staff was in no position to detect

3  any infringement even if they had compared the copyrighted works at issue with the Tentative

4  Map for Tract No. 6451 and the Final Map for Tract No. 6451.

5        Specifically, the infringing activities of which Plaintiff complains – the copying and/or

6  use of the Martin-McIntosh improvement plans and tentative map – are activities which the City

7  can detect only if it is informed as such.  The City cannot determine whether NCUE, Lotus

8  Developments and/or DeWalt infringed on Plaintiff's copyright interests simply by looking at the

9  DeWalt tentative and final maps.  The City was never aware of any designs NCUE, Lotus

10  Developments and/or DeWalt may have had to copy or infringe upon the Martin-McIntosh

11  improvement plans and tentative map.  Furthermore, the persons at DeWalt responsible for

12  preparing NCUE and/or Lotus Developments' tentative and final maps testified during

13  deposition that that they did not copy, use or rely upon the Martin-McIntosh improvement plans

14  or tentative map to perform their work.  Thus, the City did not have the ability to control or

15  supervise any of the allegedly infringing Defendants.

16        Consequently, for the City to have been in a position to stop any allegedly infringing

17  activities, it would have had to pull out the Martin-McIntosh improvement plans and tentative

18  map and compare them to the DeWalt tentative and final maps even though (1) it had no reason

19  to know about any allegedly infringing activities, having received no notice to that effect, and (2)

20  the City's tentative and final map review process does not ordinarily involve making these

21  comparisons.  Had City staff compared the allegedly copyrighted works at issue with the DeWalt

22  tentative and final maps, they would then have had to determine whether the maps are

23  "substantially similar and, therefore, whether any illicit copying occurred.  The fact that the

24  parties have produced experts who are diametrically opposed on the issue of substantial

25  similarity underscores the difficulty City staff would have had in making such a determination.

26  Indeed, the City was in no position to control any of the allegedly infringing activities unlike the

27  defendants in other cases in which the courts have imposed vicarious liability.

28  / / /

1      Plaintiff's implication that City staff engage in this process places an undue and
2   unreasonable burden on the City to police Plaintiff's copyright interests.  Plaintiff had access to
3   the Tentative Map for Tract No. 6451 and the Final Map for Tract No. 6451 the moment DeWalt
4   submitted them to the City for review and approval because they are public records.  Plaintiff
5   knew that the City treated these maps as public records because he requested and received copies
6.  of these maps from the City prior to filing this lawsuit.  Plaintiff could also have received the
7   Tentative Map for Tract No. 6451 by attending the public hearing pertaining to the approval of
8   the map.  Furthermore, Plaintiff was undoubtedly more familiar with the Martin-McIntosh
9   tentative map (Revised Tentative Map for Tract No. 5472) than was City staff.  For all of these
10  reasons, he was in a better position than the City to protect his copyright interests.  Requiring the
11  City to compare maps and make "substantial similarity" determinations would choke the
12  subdivision map review process.  It would also subject the City to potential lawsuits premised on
13  an abuse of discretion under California Code of Civil Procedure §§ 1085 and 1094.5.

14      The City's inability to control the allegedly infringing conduct of the other Defendants
15  resembles the situation of the defendant in *Perfect 10, Inc. v. Google, Inc.*, 508 F.3d 1146 (9th
16  Cir. 2007), which was found not to be liable for vicarious infringement.  In *Perfect 10*, a
17  copyright owner sued Google for vicarious infringement, seeking to enjoin Google from
18  facilitating access (or linking) to third-party websites that displayed plaintiff's copyrighted
19  photographs.  The Ninth Circuit concluded that Google did not exercise the requisite control over
20  these third parties because the plaintiff had not shown that Google had contracts with third-party
21  websites empowering it to stop them from reproducing, displaying and distributing the plaintiff's
22  photographs.  508 F.3d at 1173-1174.  *Perfect 10* also held that Google lacked the practical
23  ability to police the third party website's infringing conduct because Google lacked software
24  capable of analyzing images and comparing them to determine whether a certain image infringes
25  on someone's copyright.  *Id.* at 1174.

26      Like *Perfect 10*, here, the City was not in a position to control the allegedly infringing
27  activities of NCUE, Lotus Developments or DeWalt in that it lacked the practical ability to
28  determine whether the Martin-McIntosh improvement plans and tentative map are substantially

1   similar to the DeWalt subdivision maps.  In addition, having not been informed of any infringing

2   activity, there was noting the City could have done to prevent infringement.  Therefore,

3   Plaintiff's insistence that the City somehow police its copyright interests in the absence of any

4   indicia of infringement is absurd.

5          The facts of this case are not analogous to those of other cases, such as *Shapiro*, in which

6   courts have found a defendant vicariously liable for copyright infringement.  For example, this

7   case is distinguishable from *Shapiro* in that the City's dealings with NCUE, Lotus Developments

8   and DeWalt are not comparable to the situation in *Shapiro* where the department store's contract

9   with a concessionaire afforded it the right to control the concessionaire's activities, including by

10  terminating concessionaire employees.  The City did not demand that Defendants complete the

11  Subdivision and it did not advise them how to do so, besides advising them of what was required

12  to satisfy City ordinances and the Subdivision Map Act.  Furthermore, the City was not in a

13  position to detect any of the allegedly infringing activities because it was not informed of NCUE,

14  Lotus Developments and/or DeWalt's allegedly infringing activities and these activities could

15  not be detected simply by comparing the DeWalt maps with the Martin-McIntosh tentative map

16  and improvement plans.

17         Similarly, this case is distinguishable from *Fonovisa, Inc. v. Cherry Auction, Inc.*, 76

18  F.3d 259 (9th Cir. 1996), in which the Ninth Circuit concluded that defendant swap meet

19  operators had the right to stop vendors from selling counterfeit recordings on its premises.  The

20  *Fonovisa* ruling was motivated by the fact that the swap meet operator had the contractual right

21  to terminate vendors for whatever reason and, therefore, the ability to control the vendors'

22  activities.  Additionally, the swap meet operator promoted the swap meet and controlled the

23  access of customers to the area.  By comparison, the City's interactions with the other

24  Defendants have been limited to processing their subdivision maps.  Again, the process could not

25  have enabled, and did not enable, the City to know about any about any of their allegedly

26  infringing activities.  Moreover, the City has not entered into a contractual relationship with the

27  other Defendants that affords it the right to control their allegedly infringing activities, unlike the

28  situation in *Fonovisa*.

1    In *Gershwin Publishing Co. v. Columbia Artists Management, Inc.*, the defendant CAMI

2   acted as manager for concert artists and created, organized and maintained local non-profit

3   organizations which sponsored concerts where CAMI and non-CAMI artists performed. The

4   artists did not obtain permission to perform copyrighted musical compositions before the

5   concerts. The court found that CAMI was liable for the infringing performances as a vicarious

6   and contributory infringer. Although CAMI had no formal power to control the content of the

7   performances, the court found that it had been an active participant in organizing and supervising

8   the local organizations that sponsored the concerts.  CAMI representatives worked with the local

9   organizations to prepare a budget, select artists and plan publicity. Concert programs

10  prominently displayed CAMI's name on the cover. CAMI-managed artists paid CAMI a

11  commission for services rendered in connection with each concert and non-CAMI artists paid a

12  "differential". CAMI admitted that it knew the performers had not obtained copyright

13  permission.

14    Based on these facts the court concluded that the infringing parties depended upon CAMI

15  for direction in the activities, that CAMI was in a position to police the infringing conduct and

16  that it derived substantial financial benefit from the acts of the primary infringers.  443 F.2d at

17  1163. These set of facts differ from the facts here in that the City merely processed and

18  approved NCUE tentative and final maps and, therefore, did not actively participate in the

19  allegedly infringing activities engaged in by the other Defendants.

20  **IX.    THE CITY IS NOT LIABLE FOR CONTRIBUTORY OR VICARIOUS**
**COPYRIGHT INFRINGEMENT BECAUSE THE TENTATIVE MAP FOR**
21  **TRACT NO. 6451 IS NOT SUBSTANTIALLY SIMILAR TO THE REVISED**
**TENTATIVE MAP FOR TRACT NO. 5472 AND PLAINTIFF CANNOT PROVE**
22  **THAT DEFENDANTS COPIED THE MARTIN-MCINTOSH IMPROVEMENT**
**PLANS.**
23

24    To establish that NCUE, Lotus Developments or DeWalt infringed upon Plaintiff's

25  alleged copyright interests, Plaintiff must prove that they copied the Martin-McIntosh

26  improvement plans and/or the Revised Tentative Map for Tract No. 5472.  Absent evidence of

27  direct copying, a plaintiff may prove infringement by showing that the defendant had access to

28

1   Plaintiff's work and that the defendant's work is substantially similar to the plaintiff's work.

2   *Funky Films, Inc. v. Time Warner* 462 F.3d 1072, 1076. (9th Cir. 2006).

3   On the instant facts, Plaintiff has no evidence of direct copying. All four DeWalt

4   employees involved in the preparation of the Tentative Map for Tract No. 6451 and the Final

5   Map for Tract No. 6451 have testified that there was no copying. Since Plaintiff can provide no

6   evidence of direct copying, he must establish access by DeWalt to Martin-McIntosh's work and

7   substantial similarity in order to prevail.

8   With respect to improvement plans, DeWalt did not prepare any improvement plans,

9   thus NCUE, Lotus Developments and DeWalt could not have copied the Martin-McIntosh

10   improvement plans.

11   As for the Revised Tentative Map for Tract No. 5472, the City concedes that it provided

12   DeWalt an electronic copy of the map on April 13, 2005. Nevertheless, as shown below, the

13   maps are not substantially similar. Moreover, DeWalt could not possibly have copied from the

14   April 13, 2005 email when it submitted the Tentative Map for Tract No. 6451 to the City on

15   November 10, 2004, five months prior to receiving a copy of the Revised Tentative Map for

16   Tract No. 5472.

17   The City concedes that it provided NCUE with copies of the pump station and landscape

18   plans. However, NCUE did not copy them. In any event, referring to the plans to perform

19   maintenance required by the City does not constitute copyright infringement.

20   Substantial similarity refers only to the expression of an artist's concept, not the

21   underlying idea itself; mere identity of ideas expressed by two works is not substantial similarity

22   giving rise to an infringement action. 17 U.S.C. Sec. 102(b). Ideas cannot be copyrighted.

23   *Harper & Row, Publishers, Inc. v. Nation Enterprises*, 471 U.S. 539, 547 (1985). An artist can

24   claim to own only an original manner of expressing ideas, not the ideas themselves. *Cooling*

25   *Systems and Flexibles v. Stuart Radiator*, 777 F.2d 485, 491 (9th Cir.1985). The placement of

26   68 lots consisting of a particular size, with streets running through them is a non-copyrightable

27   idea, cannot be the subject of a copyright monopoly and cannot be factored into the substantial

28   similarity analysis.

1    Substantial similarity "may often be decided as a matter of law." *Funky, supra*, 462 F.3d

2    at 1076. In fact, summary judgment has frequently been affirmed in favor of copyright

3    defendants on the issue of substantial similarity. *Shaw v. Lindheim,* 919 F.2d 1353, 1355 (9th

4    Cir.1990).

5    Courts have noted that determining whether substantial similarity exists between

6    competing works is often resolved as a matter of law, particularly when the similarity between

7    the works is insubstantial. *See v. Durang,* 711 F.2d 141 (9th Cir.1983).

8    Summary judgment is appropriate when, as in this case, the similarity between the

9    competing works concerns only non-copyrightable elements of the Plaintiff's work or when no

10   reasonable jury could find that the two works are substantially similar. *Warner Bros. v.*

11   *American Broadcasting Co.* 720 F.2d 231, 240 (2nd Cir. 1983). Here, the only similarity between

12   the Revised Tentative Map for Tract No. 5472 and the tentative and final maps for Tract No.

13   6451 (the Tentative Map for Tract No. 6451 and the Final Map for Tract No. 6451) are the non-

14   copyrightable ideas for lot and street layout, the numbering of the lots and the naming of most of

15   the streets.

16   The substantial similarity test contains an extrinsic and intrinsic component. At the

17   summary judgment stage, courts apply only the extrinsic test because the intrinsic test, which

18   examines an ordinary person's subjective impressions of the similarities between two works, is

19   exclusively the province of the jury. *Shaw v. Lindheim*, 919 F.2d 1353, 1360-61 (9th Cir 1990).

20   A plaintiff who cannot satisfy the extrinsic test necessarily loses on summary judgment, because

21   a jury may not find substantial similarity without evidence on both the extrinsic and intrinsic

22   tests. *Funky Films, supra,* 462 F.3d at 1077.

23   Extrinsic analysis is objective in nature. It depends not on the responses of the trier of

24   fact, but on specific criteria which can be listed and analyzed. The extrinsic test focuses on

25   articulable similarities. In applying the extrinsic test, the Court compares, not the basic plot

26   ideas for stories, but the actual concrete elements that make up the total sequence of events and

27   the relationships between the major characters. *Funky Films,* 462 F.3d at 1077.

28   / / /

1    Protectable expression includes the specific details of an author's rendering of ideas.

2  *Metcalf v. Bochco,* 294 F.3d 1069, 1074 (9th Cir.2002). We "must take care to inquire only

3  whether 'the protectable elements, standing alone, are substantially similar.'" In so doing, we

4  "filter out and disregard the non-protectable elements in making the substantial similarity

5  determination." *Cavalier v. Random House,* 297 F.3d 815, 822 (9th Cir.2002).

6    In applying the extrinsic test to the maps at issue here, the Court must ignore non-

7  copyrightable elements and focus only on the innumerable differences between the two maps. In

8  so doing, this Court must conclude that no copying occurred.

9    The facts of *Kregos v. Associated Press* 795 F.Supp. 1325 (S.D.N.Y. 1992) are helpful in

10  analyzing the issue of substantial similarity between the maps at issue in this litigation. Kregos

11  created a form or chart of statistics on baseball pitchers. He sent a copy of his form to the

12  Associated Press. Soon, the AP began running its own chart of pitching statistics. Kregos

13  contended that charts were substantially similar.

14    The Court found three differences between Kregos' chart and the AP's. The AP chart

15  included two categories that did not appear in Kregos' and a set of three statistics in Kregos'

16  chart that did not appear in the AP's. *Id.* at 1333.

17    The *Kregos* court first noted that determining the issue of substantial similarity in

18  copyright infringement cases is often a question of law. It then concluded that no reasonable

19  person could conclude that the two charts were substantially similar because AP added two

20  categories not present in the Kregos chart and altered three sets of statistics. *Kregos, supra,* 795

21  F.Supp. at 1333, 1334.

22    After comparing the Revised Tentative Map for Tract No. 5472 with the Tentative Map

23  for Tract No. 6451 and the Final Map for Tract no. 6451, this Court will find over 100

24  differences and must conclude, as a matter of law, that there is no substantial similarity between

25  the two sets of maps. The differences between the two sets of maps are staggering.

26    For example, pages 67 through 79 and pages 103 through 120 of the transcript of Steven

27  Wong's deposition are filled with differences between the two maps. The Revised Tentative

28  Map for Tract No. 5472 is substantially different from the Tentative Map for Tract No. 6451.

1   (UMF 88.)  If the Court compares the two maps as Exhibits "A" and "B" to the Declaration of

2   Chaka C. Okadigbo, it will be overwhelmed by the differences.  For ease of review, the City has

3   highlighted items on the Tentative Map for Tract No. 6451 (Exh. "A") that do not appear on the

4   Revised Tentative Map on for Tract No. 5472 (Exh. "B") in yellow.  The City has also

5   highlighted in pink, items on the Revised Tentative Map for Tract No. 5472 which do not appear

6   on the Tentative Map for Tract No. 6451.  Of particular interest is the fact that the Revised

7   Tentative Map for Tract No. 5472 contemplates 69 lots containing a total of 164 units, (68 single

8   family homes and 96 apartments), while the Tentative Map for Tract No. 6451 contains only 68

9   lots to accommodate a total of 68 homes).

10         After the Court concludes that the two sets of maps are not substantially similar, it must

11   also find, as a matter of law, that Defendants NCUE, Lotus Developments and DeWalt did not

12   copy the Revised Tentative Map for Tract No. 6451.  Consequently, it must conclude that the

13   City could not possibly have committed contributory or vicarious infringement.

14   **X.     THE CITY INCORPORATES BY REFERENCE ARGUMENTS AND FACTS**
         **RAISED BY CO-DEFENDANT NORTHERN CALIFORNIA UNIVERSAL**
15       **ENTERPRISES COMPANY TO THE EXTENT THAT SUCH ARGUMENTS**
         **UNDERCUT PLAINTIFF'S CONTRIBUTORY INFRINGEMENT CLAIM**
16       **AGAINST THE CITY.**

17         The City hereby adopts, incorporates and restates Defendant NCUE's Motion for

18   Summary Judgment as well as the accompanying Memorandum of Points and Authorities and

19   Statement of Undisputed Material Facts filed on September 28, 2009, to the extent that the facts

20   and arguments bear directly on the issue of whether or not NCUE and Lotus Developments

21   committed direct infringement.  Plaintiff must establish and prove the direct infringement of

22   Defendants NCUE, Lotus Developments and/or DeWalt in order to prove his contributory

23   infringement case against the City.

24   **XI.    CONCLUSION**

25         Still reeling from the alleged fact that Martin-McIntosh did not receive all monies owed

26   to it in 1994 by Legacy, Plaintiff's motive in this lawsuit is clearly to recover these monies under

27   the guise of copyright.  This motive is revealed by Plaintiff's candid admission that, when Mr.

28   Wu, the President of NCUE, allegedly inquired if Plaintiff was willing to draft new tentative and

1    final maps for NCUE, Plaintiff told Mr. Wu that he expected NCUE to pay these outstanding

2    monies before any agreement on the costs of drafting new tentative and final maps could be

3    reached. In the final analysis, however, Plaintiff cannot recoup these monies from the City either

4    on his direct or contributory infringement theories because the entitlement to these monies is

5    divorced from the issue of copyright.

6            The City is not liable merely for performing municipal duties required of it by state law

7    and its own ordinance, namely to review, process and approve tentative and final maps that meet

8    California Subdivision Map Act, CEQA and City conditions and requirements. Similarly,

9    Plaintiff cannot base his direct or contributory infringement claims on the City's distribution of

10   tentative maps and improvement plans because (1) these documents are public records and

11   Plaintiff understood this to be so when he knowingly submitted them to the City; (2) the City

12   purchased the improvement plans for substantial consideration and, therefore, was granted an

13   implied nonexclusive license to reproduce and distribute them to the public; and (3) the City was

14   never aware of any allegedly infringing activities being committed by Defendants NCUE, Lotus

15   Developments and/or DeWalt. Accordingly, the Court should grant the City's motion for

16   summary judgment against Plaintiff, or, in the alternative, summary adjudication on each of

17   Plaintiff's individual causes of action.

18   DATED: September 30, 2009                    GARCIA CALDERON RUIZ, LLP

19

20

21   By: _____
                 CHAKA C. OKADIGBO
22               Attorneys for Defendant
                 CITY OF WASCO
23

24

25

26

27

28

4821-5370-5220 v2                                 42