Steven J. Hassing
California SBN 152125
LAW OFFICES OF STEVEN J. HASSING
425 Calabria Court
Roseville, CA 95747
Telephone: (916) 677-1776
Facsimile: (916) 677-1770

Attorney *for Defendant, Northern California Universal Enterprise Company and Lotus Developments, L.P.*

# UNITED STATES DISTRICT COURT

# EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ROGER MCINTOSH,<br><br>                    Plaintiff(s);<br>v.<br><br>NORTHERN CALIFORNIA UNIVERSAL ENTERPRISES COMPANY, ET AL.,<br><br>                    Defendant(s).<br><br>and Related Cross-Action | No. 1:07-CV-01080-LJO-GSA<br><br>**NORTHERN'S POINTS AND AUTHORITIES IN OPPOSITION TO McINTOSH'S CROSS-MOTION FOR SUMMARY ADJUDICATION**<br><br>**JUDGE: Lawrence J. O'Neill** |

# TABLE OF CONTENTS

|      |                          | PAGE |
|------|--------------------------|------|
| I    | **INTRODUCTION**         | 1    |
| II   | **ARGUMENT**             | 1    |
|      | The Affirmative Defenses | 3    |
|      | 1. Publication           | 3    |
|      | 2. Implied License       | 7    |
|      | 3. First Sale            | 10   |
|      | 4. Abandonment           | 11   |
|      | 5. Merger                | 11   |
|      | 6. Statue of Limitations | 12   |
|      | 7. Latches               | 12   |
|      | 8. Independent Creation  | 13   |
| III  | **CONCLUSION**           | 15   |

# TABLE OF AUTHORITIES

|  | PAGE |
|---|---|
| *Baker v. Selden*, 101 U.S. 99, 103 (1879) | 12 |
| *Certified Engineering, Inc., v. First Fidelity,* 849 F.Supp. 318 (D.N.J. 1994) | 5, 6, 7 |
| *Danielson v Winchester* 186 F.Supp.2d 1 (2002) | 3, 7 |
| *Del Madera Properties v. Rhoades* 637 F. Supp. 262 (N.D. Cal 1985) | 3, 4, 7 |
| *Effects Associates, Inc. v. Cohen* 908 F. 2d 555, 558. (9th Cir. 1990) | 10 |
| *Feist Publications, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 361 (1991) | 14 |
| *Foad Consulting Group v. Azzalino* 270 F. 3d 821 (2001) | 8, 9 |
| *Herbert Rosenthal Jewelry Corp. v. Kalpakian* 444 F. 2d 738, 740 (9th Cir. 1971) | 10, 12 |
| *I.A.E. Inc. v. Shaver* 74 F. 3d. 768, 772 (7th Cir. 1996) | 10 |
| *Kunycia v. Melville Realty Co., Inc.*755 F. Supp. 566 (S.D.N.Y. 1990) | 3, 4, 6, 7, 14 |
| *Mason v. Montgomery Data, Inc.*, 967 F. 2d 135, 140 (5th Cir. 1992) | 12 |
| *Mazer v. Stein*, 347 U.S. 201, 218 (1954) | 10, 14 |

# I
# INTRODUCTION

Northern and Lotus, (hereinafter referred to as "Northern") hereby submit their Points and Authorities in opposition to McIntosh's Cross-Motion for Summary Adjudication. Because Northern filed a Summary Judgment Motion just prior to McIntosh's filing, and to prevent clouding the record and opposing counsel's files with unnecessary duplicate declarations and exhibits, Northern has asked this Court to judicially notice the declarations and exhibits previously filed in support of its summary judgment motion when referred to in these Points and Authorities and the Separate Statement.

For ease of review, Northern's format follows that employed by McIntosh. All page and line citations, unless otherwise indicated, refer to McIntosh's Memorandum of Points and Authorities.

# II
# ARGUMENT

**REGARDING MCINTOSH'S STATEMENT OF FACTS RELATING TO DEVELOPMENT OF VALLEY ROSE SUBDIVISION (Section "B" of Wasco's Points and Authorities)**

1. At <u>4; 25- 28</u>, McIntosh claims that MM's contract with Legacy provided that MM "retained ownership" over all original papers and documents. However, subsequent to formation of the MM/Legacy contract, MM participated in the formation of the Acquisition Agreement which provided for the sale of those plans to The City under which, The City paid MM over $800,000. The engineering cost exhibit attached to the Acquisition Agreement was prepared by Ronald Staub, MM's project manager. It was

under that later agreement that MM obtained $800,000 from the City for the MM's engineering and plans. Accordingly, there is a factual dispute over whether or not MM actually did retain ownership of the plans.

The MM/Legacy contract provided that MM had the right to use the documents however it choose but it did not prohibit Legacy or The City from using the plans for the purpose for which they were created and sold. (Para 9). In fact, paragraph 13 of the contract specifically provides <u>that the plans are to be used for the project noted on the face thereof</u>, i.e., Parcel 1 of Valley Rose. It is undisputed that they were not used any place else. Page 9 of the Acquisition Agreement even gives The City the right to complete any of the improvements not completed by Legacy. Obviously, such completion would entail use of The Plans. Accordingly, there remains a question of fact regarding the scope of The City's right to use the plans.

2.      McIntosh's claim, at <u>6; 7,8,</u> that Wu's office called McIntosh's office requesting the improvement plans is, in addition to being hearsay, not supported by the citation provided (SS #12). Further, there is no such claim in McIntosh's Separate Statement.

The evidence offered in support of McIntosh's SS #12 does not support the contention that Wu asked for the improvement plans. The citations to Wu's deposition are incomplete (page 40 is cited but not produced) and the testimony from pages 39 and 41 indicate that Wu was only talking about the pump station plans. There is no evidence indicating that Wu requested the grading, water, drainage, sewer, street, or other plans. Similarly, Ex "O" to

The Travis Dec does not provide any evidence of Wu asking for "The Plans".

3.  McIntosh's claim, at 6; 10, 11, that Wu admitted being told the plans were owned by another company is also false. The citation refers only to the pump station plans.

4.  At 8; 8, 9, before launching into the substance of his motion, McIntosh sets up a straw-man by indicating that each of the affirmative defenses, "<u>in the specific context of processing a previously submitted map</u> ... have all been uniformly rejected... on **identical facts**". (emphasis added). In truth, each of the cases cited is decided on totally <u>different facts</u> because, unlike in the cases cited, neither DeWalt or Northern attempted to process or use MM's map or a copy of it nor did they use The Plans to complete the subdivision improvements. Further, the cases cited by McIntosh pertain to the map more than they do the improvement plans. Accordingly, the law cited by McIntosh is irrelevant to the facts of this case.

**The Affirmative Defenses**

**1.      Publication**

   a. McIntosh cites *Del Madera, Danielson*, and *Kunycia* in support of his contention that subdivision maps and related documents may be subject to copyright protection. With this, Northern does not argue. However, the facts of this case at bar are so different than the facts of those cases that those three cases simply do not apply.

***Danielson v Winchester* 186 F.Supp.2d 1 (2002).**

   *Danielson* differs from this case because in *Danielson*, the developer's new architect admitted the direct copying of Danielson's "architectural" plans. Danielson's old logos were erased or cut out of the plans and the new architect's inserted. (Id @ 8, 13). That is not the situation in this case. Here, it is undisputed that DeWalt surveyed the

site and independently created a new and different map while The plans themselves were in no way used by DeWalt or Northern. (SS # 47, 48, 51, 52, 54, 55, 56, 57, 58, 59, 60, 68 and 69)[1]

***Del Madera Properties v. Rhodes* 637 F. Supp. 262 (N.D. Cal. 1985)**

*Del Madera* also differs substantially from this case. In *Del Madera*, plaintiff had produced a tentative subdivision map. The property owner lost the land to foreclosure. The new owners then used the Del Madera subdivision map to construct the subdivision improvements.

Our case is totally different in that neither Northern nor DeWalt used MM's subdivision map in anyway whatsoever. Instead, Northern hired DeWalt, to survey the improvements that had been constructed and DeWalt produced a totally different map from its own survey. There was no copying and no use of the MM map. (SS # 52, 54 and 55). Further, Northern did not build improvements using MM's plans. (SS # 60). Legacy had already built all of the improvements. In fact Northern didn't build <u>any</u> improvements--- period.

Cases differ on whether "submitting" plans to The City qualify as "publication". However, when public improvements are actually built pursuant to those plans, they must be deemed published.

***Kunycia v. Melville Realty Co., Inc.* 755 F. Supp. 566 (S.D.N.Y. 1990)**

In Kunycia, Plaintiff asserted that the "format" of his drawings of particular retail stores was protected by copyright. Format refers to the method of expressing the basic

---

[1] SS refers to Northern's separate statement of undisputed material facts filed in support of its Summary Judgment Motion of which Northern has requested this Court take Judicial Notice.

design of the store, including layout. The Court held that examination of the subject of the drawing and subsequent creation of a <u>new drawing based on the observation</u>, is not copyright infringement. (Id @ 576). That is exactly what DeWalt did in creating new Map 6451.

     **b.** McIntosh argues that The Plans were not dedicated to the public and therefore there was no publication. However, under the Acquisition Agreement, the plans were <u>sold</u> to The City. (SS # 22, 24 and 25). MM participated in and acquiesced to the terms of the Agreement. (SS # 23). Those improvements are <u>public</u> <u>improvements</u> undeniably meant to be owned by The City. Accordingly, the plans under which they were build and which were paid for by The City are owned by The City and therefore, at least for all purposes related to The City's use concerning the subdivision---published. The City has to be able to use those plans for any purpose related to the improvements which were constructed thereunder. To argue otherwise is nonsense.

     For example, suppose that a developer wanted to develop an adjacent parcel and had to connect to the Parcel 1 improvements. Would The City be infringing on a copyright if it were to copy the MM improvement plans and distribute them to the new developer so that he could design his infrastructure to be compatible with the existing improvements? Of course not. Similarly, neither The City nor Northern infringed when The City provided Northern with the pump station plans so that it could make City required repairs.

     Additional authority supporting publication is found in *Certified Engineering, Inc., v. First Fidelity,* 849 F.Supp. 318 (D.N.J. 1994). There, Plaintiff entered into a

contract to provide engineering plans and related services to the owner of a 91 acre parcel of land for the purpose of obtaining subdivision approval. Prior to Plaintiff receiving full payment for the engineering, the land owner filed bankruptcy, the land went into foreclosure. The lender then acquired title at the foreclosure sale.

The new owners then actually used Plaintiffs plans to install most of the public improvements. In our case at bar, all of those public improvements were already constructed by the time Northern purchased the land.

In *Certified*, Plaintiff sought an injunction, to prevent the new owner from completing the final road work. The issue before the Court was whether or not the Certified's plans were "published" as that term is used for purposes of copyright litigation.

Like McIntosh, Plaintiff cited *Kunycia* in support of his argument that providing the plans to the City was a "limited publication". However, as noted by the Court in *Certified*, there is a difference between architectural plans, which were at issue in *Kunycia,* and the improvement plans which were at issue in *Certified* (and our McIntosh case). The scope and intricacies involved in plans for the development of the entire subdivision are far greater than architectural drawings for a particular building. The process involves a period of time during which the public is invited to comment and the plans are made available for inspection and copying. Furthermore, noted the Court, the nature of an architectural plan differs from that of a subdivision plan, since the latter is strictly site-specific, whereas the former can easily be "pirated" and used as the basis of myriad copied structures. (Id @324)

Despite the fact that the new owner actually used Plaintiff's plans, the Court determined, for purposes of denying Plaintiff's request for injunction, that there was a general publication. Since the facts of this case at bar more closely resemble those of *Certified* than of *Kunycia* or even *Danielson*, and since the Court in *Certified* found general publication, Northern's publication defense should not be summarily dismissed.

This Court must consider the fact that here the improvements were actually constructed by Legacy pursuant to the MM contract. The improvements became the property of The City of Wasco when The City obtained title to the land at the tax sale. By definition, the improvements were "public improvements".

## 2. Implied License

**a.** McIntosh totally misses the thrust of Northern's Implied License defense. First, the defense is asserted only as to The Plans, (not Map 5472). Second, because Northern's license defense is not based upon MM having simply submitted those plans to The City, and since Northern did not construct the subdivision by use of The Plans, McIntosh's citations to *Danielson* and *Del Madera* are wasted effort.

The license results from MM, Legacy and The City having joined together in January of 1992 to form an association to develop Valley Rose Estates together. (SS # 2). While the original MM contract was with Legacy--- The City, Legacy and MM all participated in the subsequent Acquisition Agreement which provided for payment to MM for its plans and specifications. (SS #22, 24 and 25). Ronald Staub, MM's project manager, came up with the engineering estimates attached to the agreement itself. (SS #23). Further, the City paid MM over $800,000 for MM's services, including preparing

the plans and specifications which were specifically defined in the Agreement as part of the "improvements" purchased by The City. (SS #25).

Regarding implied license under the facts of this case, *Foad Consulting Group v. Azzalino* 270 F. 3d 821 (2001), a Ninth Circuit case, is instructive.

In *Foad,* a shopping center developer hired Foad to create a concept development plan for a shopping center. Foad prepared a preliminary plot plan showing the location of proposed buildings, parking lots and landscape areas, created final engineering drawings and obtained city approval.

The developer then sold its rights to another developer who hired a different engineer to perform further engineering services. The new engineer obtained copies of Foad's work from the city. It then prepared final site plans by **tracing** much of Foad's plan. Foad sued for copyright infringement and the trial court granted summary judgment against him. On appeal, the Court concluded that Foad had granted the developer an implied license to build the project by using Foad's plot plan without his permission.

The Court noted that the central purpose of the contract was the production of a set of engineering documents for the commercial center. Under the contract, Foad agreed to create multiple maps, drawings, and plans for the project and to process these documents with the city. For this service, the developer agreed to pay Foad a $175,000 fee.

The Court stated that given the amount of money the developer paid to for Foad's services and because part of the agreement was for Foad to help the developer with its

application to the city, it would be surprising if the parties had intended for the developer to seek Foad's permission before using the plans to build the project. Further, noted the Court, had that been the parties' intention, <u>one would expect to see the requirement spelled out explicitly in the agreement.</u> Accordingly, the Court found an implied license to use the plot plan to build the project. (Id @ 828, 829).

As in *Foad*, the central purpose of the MM-Legacy contract was the production of engineering documents for a specific project, a 69 lot subdivision within Parcel 1. While in *Foad*, a new engineer came in and even used Foad's plans, Defendants in this case at bar did not us MM's plans. (UMF #81). But it should be noted that under *Foad*, Defendants could have used The Plans had The City required it.

Noting that the developer paid Foad $175,000 for his work, The Court stated that "it would be surprising if the parties had intended for the developer to seek Foad's permission before using the plans to build the project". (id at 828). It would be truly surprising if, at the time it delivered The Plans to The City, MM intended to retain the right to prohibit The City from using them for purposes related to Parcel 1. As the Ninth Circuit noted in *Foad*, "had that been the parties' intention, one would expect to see the requirement spelled out explicitly in the agreement". (id at 829). It wasn't. Similarly, there is no prohibition of The City using MM"s plans for the purposes related to the subdivision of Parcel 1. And remember, MM was paid over $800,000 by The City for engineering on the 480 acres, including its work on Parcel 1. (UMF #25).

    **b.** McIntosh is wrong when he argues that The Plans were only to be used by Legacy and that The City was never given authorization to use the plans for any purpose.

(10; 3- 15). MM intended that The Plans be used to construct the subdivision. (Ex "F" to Brown Dec.). The Plans were used for that intended purpose. The Plans were never used by DeWalt or Northern. (SS #51, 52, 54, 55, 57, 58 and 59). But even if they had been, The City had license to use those plans for purposes of "that" subdivision. *I.A.E. Inc. v. Shaver* 74 F. 3d. 768, 772 (7th Cir. 1996) and *Effects Associates, Inc. v. Cohen* 908 F. 2d 555, 558. (9th Cir. 1990).

    **c.** Even if The City had wrongly used The Plans in approving Northern's Map 6451 that use by The City would not constitute infringement by Northern, Lotus or DeWalt. The City was not the agent of those other Defendants. Those three entities did not "use" or copy The Plans. Without copying, there can be no infringement. *Herbert Rosenthal Jewelry Corp. v. Kalpakian* 444 F. 2d 738, 740 (9th Cir. 1971) and *Mazer v. Stein*, 347 U.S. 201, 218 (1954).

    **d.** McIntosh again misrepresents Wu's and McIntosh's deposition testimony at (10; 16, 17 and 11; 11- 17) by arguing that Wu "admitted" that he was told that he could not use McIntosh's work. The depositions clearly establish that the reference was only to the pump station and Wu's declaration makes it clear that he did not copy the pump station plans. They were given to him by The City so that he could make City ordered repairs. Wu's "use" of the pump station plans is akin to reading a copyrighted book.

**3.**    **First Sale**

MM sold The Plans to The City for over $800,000. (SS # 25). In addition, McIntosh testified that he never planned on using those plans (or Map 5472) on any other project. (SS # 67).