lj:st:nr

James J. Braze, Esq.; SBN 75911
Jeffrey A. Travis, Esq.; SBN 235507
BORTON PETRINI, LLP
5060 California Avenue, Suite 700
Post Office Box 2026
Bakersfield, CA 93303
Telephone (661) 322-3051
email: jbraze@bortonpetrini.com
email: jtravis@bortonpetrini.com

Attorneys for Plaintiff, Roger McIntosh dba McIntosh
& Associates

# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA, FRESNO DIVISION

| | |
|---|---|
| ROGER McINTOSH,<br><br>Plaintiff,<br><br>v.<br><br>NORTHERN CALIFORNIA UNIVERSAL ENTERPRISES COMPANY, a California corporation; LOTUS DEVELOPMENTS, LLP; THE CITY OF WASCO, a municipal corporation; DEWALT CM, INC., a California corporation also doing business as DEWALT CORPORATION; DENNIS W. DE WALT, INC., a California corporation also doing business as DEWALT CORPORATION; and DOES 1 through 10, inclusive,<br><br>Defendants. | Case No.  1:07-CV-01080 LJO-GSA<br><br>DECLARATION OF ROGER A. MCINTOSH IN SUPPORT OF OPPOSITION TO WASCO AND NORTHERN'S MOTIONS FOR SUMMARY JUDGMENT<br><br>DATE:  October 28, 2009<br>TIME:   OFF CALENDAR<br>DEPT.:  4<br>JUDGE: Lawrence J. O'Neill |

I, Roger A. McIntosh, state, and if so called, will testify as follows:

1.    I am the plaintiff in this case and am the owner of and doing business as McIntosh & Associates at 2001 Wheelan Court, Bakersfield CA 93309.

2.    I am a licensed civil engineer in the State of California and have held that license for 28 years.  My civil engineering license is 33322.  I am also a licensed land surveyor in the State of California and have held that license for 32 years.  My land surveyor license is 4383.

H:\PUBLIC\054493\060971
McIntosh v.
Northern\Pleadings\MSJ -
Wasco\DCL OF RAM IN
OPP TO MSJ BY DEFS.wpd

1

DCL OF ROGER A. MCINTOSH IN SUPPORT OF OPP TO WASCO AND NORTHERN'S MOTIONS FOR SUMMARY JUDGMENT

3.      I was a partner with Martin-McIntosh when it contracted with Michael Brown, president of the Legacy Group, in 1992 to prepare a survey, engineering studies, create tentative and final maps, improvement plans, and master subdivision plans for the improvements that were to be constructed in the Valley Rose subdivision. I am currently the person most knowledgeable as to any questions relating to Martin-McIntosh and McIntosh & Associates and also about the business practices and customs of Martin-McIntosh and also McIntosh & Associates. I am also the custodian of all business records and documents kept by Martin-McIntosh, including the contract between Legacy Group and Martin-McIntosh.

6.      After we signed the 1992 contract between Martin-McIntosh and Michael Brown who was a principal for the Legacy Group, Martin-McIntosh submitted invoices to Legacy Group who, in turn would submit them to the City of Wasco. Wasco would then pay us directly on behalf of the Legacy Group. At no time did we ever enter into any written agreement with the City of Wasco whereby they would assume the rights to the works Martin-McIntosh prepared for Legacy. Attached hereto as Exhibit "A" are true and correct copies of invoice numbers and correspondences we received from Legacy

7.      Legacy Group defaulted because their development was financed through bond anticipation notes. It is my understanding that the financing for these notes fell through causing Legacy to default on monies paid to Martin-McIntosh in the amount over $300,000. As a result I had my attorney at the time file a mechanic's lien against the Valley Rose property in addition to other causes of action against Legacy and Wasco and other defendants.

8.      At the time, it was my understanding that Wasco owed Martin-McIntosh money because the city manager had said at a council meeting and that was recorded that Martin-McIntosh would be paid for the amounts owed. However, during my lawsuit the City defended itself on the grounds that it was not responsible for the verbal statements of its officers and submitted briefs on this point. Attached hereto as Exhibit "B" is a true and correct copy of the trial brief Wasco submitted to the Court and which my previous attorney gave to me where Wasco argued against owing me any monies.

H:\PUBLIC\054493\060971
McIntosh v.
Northern\Pleadings\MSJ -
Wasco\DCL OF RAM IN
OPP TO MSJ BY DEFS.wpd

2

DECLARATION IN SUPPORT OF MOTION TO AMEND PLEADINGS

1     I declare under penalty of perjury, under the laws of the State of California, that the

2 foregoing is true and correct.

3     Executed this _____ day of October, 2009, at Bakersfield, California.

4

5

6          Roger A. McIntosh, Declarant

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

H:\PUBLIC\054493\060971
McIntosh v.
Northern\Pleadings\MSJ -
Wasco\DCL OF RAM IN
OPP TO MSJ BY DEFS.wpd

3

DECLARATION IN SUPPORT OF MOTION TO AMEND PLEADINGS

**PROOF OF SERVICE**
**(FRCP No. 5(b)(2)(E))**

**STATE OF CALIFORNIA, COUNTY OF KERN**

I, Vanessa J. Claridge, declare:

I am a citizen of the United States. I am employed in the County of Kern, State of California. I am over the age of 18 and not a party to the within action; my business address is 5060 California Avenue, Suite 700, Bakersfield, California 93309.

On **October 21, 2009**, I served the foregoing document described as **DECLARATION OF ROGER A. MCINTOSH IN SUPPORT OF OPPOSITION TO WASCO AND NORTHERN'S MOTIONS FOR SUMMARY JUDGMENT** on the other party(ies) in this action as follows:

| | |
|---|---|
| Steven John Hassing, Esq. | Attorneys for Attorneys for Defendants, |
| Law Offices of Steven J. Hassing | Northern California Universal Enterprises |
| 425 Calabria Court | Company and Lotus Developments |
| Roseville, CA 95747 | Tel:    916/677-1776 |
| email address: **stevehassing@yahoo.com** | **Fax:   916/677-1770** |
| | |
| Chaka Okadigbo | Attorneys for Defendant, City of Wasco |
| **Garcia Calderon Ruiz, LLP** | |
| 500 South Grand Ave Suite 1100 | Tel: 213/347-0210 |
| Los Angeles, CA 90071 | **Fax: 213-347-0216** |
| email address: **cokadigbo@gcrlegal.com** | |
| | |
| William L. Alexander, Esq. | Attorneys for Defendant, DeWalt CM, Inc. |
| Alexander & Associates | |
| 1925 "G" Street | Tel: 661/316-7888 |
| Bakersfield, CA 93301 | **Fax: 661/316-7890** |
| email address: **walexander@alexander-law.com** | |

☒ **BY ELECTRONIC SERVICE:** Pursuant to Fed. R. Civ. P. 5(b)(2)(E) and Local Court Rule(s), the foregoing document will be served by the court via CM/ECF.. Pursuant to the CM/ECF docket for this case proceeding the following person(s) are on the Electronic Mail Notice List to receive ECF transmission at the email address(es) indicated below:

☒ **BY OVERNIGHT MAIL:** I caused such envelope with postage fully prepaid to be sent by Golden State Overnight Mail.

Executed on **October 21, 2009**, at Bakersfield, California.

I declare that I am employed in the office of a member of the bar of this court at whose direction the service was made.

_____Vanessa J. Claridge_____          _____/s/ Vanessa J. Claridge_____

H:\PUBLIC\054493\060971
McIntosh v.
Northern\Pleadings\MSJ -
Wasco\DCL OF RAM IN
OPP TO MSJ BY DEFS.wpd

4

DCL OF ROGER A. MCINTOSH IN SUPPORT OF OPP TO WASCO AND NORTHERN'S MOTIONS FOR SUMMARY JUDGMENT

# EXHIBIT "A"

H

CITY OF WASCO • WASCO, CALIFORNIA 93280

CHECK NUMBER
VENDOR
007050
MMCLAND
DATE 05/04/94

| VOUCHER NO | VOUCHER DATE | INVOICE NO | DESCRIPTION | AMOUNT |
|---|---|---|---|---|
| 4050130 | 09/08/93 | 00220901 | MARTIN MCINTOSH LAND SURV | 6635.14 |

Please Detach Here and Retain Top Portion For Your Records

| TOTAL THIS CHECK | 6635.14 |

**07050**

WARRANT ON THE TREASURY OF THE
CITY OF WASCO
P.O. BOX 159
WASCO, CALIFORNIA 93280

BANK OF AMERICA
WASCO BRANCH 0004
849 SEVENTH ST
P.O. DRAWER C
WASCO, CA 93280

16-66
1220

DATE 05/04/94    AMOUNT    $6635.14

HE EXACT AMOUNT OF
IX THOUSAND SIX HUNDRED THIRTY-FIVE DOLLARS AND 14 CENTS

BY ORDER OF THE CITY COUNCIL

PAY
TO THE
ORDER
OF

MARTIN MCINTOSH LAND SURV
2001 WHEELAN COURT

BAKERSFIELD,   CA 93309

_____ MAYOR

_____ CITY CLERK

_____ TREASURER

⑈"007050"⑈ ⑆1220006 6⑆ 00040⑈8020 1⑈

Brown
oldest

92-22-09
2 5535 —    5997.74
26145    637.40
POSTED

Reed
5/9



**Martin-McIntosh**

LAND SURVEYING·CIVIL ENGINEERING

To avoid a late charge of 1.5% on  the
unpaid balance, please remit payment
within 30 days of date of invoice.

February 20, 1993
Invoice No.  25535
Project No. 2022-09

Michael S. Brown
16000 Ventura Blvd.
Suite 1200
Encino, CA  91436

For:    Offsite Sewer

Professional Services: January 23, 1993 through February 20, 1993

----------------------------------------------------------------------------------------

PHASE I – Pump Station & Force Main                           $7,159.36

PHASE II – Oversizing Pump Station                           $   758.38
                                                             -----------

                              TOTAL THIS INVOICE  $7,917.74
                                                             ===========

POSTED

2001 WHEELAN COURT  ·  BAKERSFIELD, CA. 93309  ·  805/834-4814



*Martin-McIntosh*

LAND SURVEYING·CIVIL ENGINEERING

To avoid a late charge of 1.5% on the
unpaid balance, please remit payment
within 30 days of date of invoice.

March 20, 1993
Invoice No. 26145
Project No. 2022-09

Michael S. Brown
16000 Ventura Blvd.
Suite 1200
Encino, CA 91436

For:   Offsite Sewer

Professional Services: February 20, 1993 through March 20, 1993

-----------------------------------------------------------------------------------------------

PHASE I - Pump Station & Force Main                    $10,732.06

PHASE II - Oversizing Pump Station                     $     579.40
                                                           ------------

TOTAL THIS INVOICE  $11,311.46
                                                           ============

POSTED

2001 WHEELAN COURT · BAKERSFIELD, CA. 93309 · 805/834-4814

*92-22 Billing*



A Legacy Group Development



June 17, 1993

Mr. Gene Martin
Martin-McIntosh Engineering
2001 Wheelan Court
Bakersfield, CA 93309

RE:  Valley Rose Estates

Dear Gene:

Enclosed please find check number 1109 in the amount of $79,732.
Said sums represents partial payment on account of Legacy Group.

I want to thank you for your courtesy and professionalism and
friendship.

Very truly yours,

MICHAEL S. BROWN, ESQ.,
Managing Partner

MSB:pf
~Enclosure

16000 Ventura Boulevard–Penthouse Suite 1200, Encino, CA  91436
Tel: 818. 981 3712
Fax: 818. 995 4094

1109

Valley Rose Estates

A Legacy Group Development
16000 Ventura Boulevard—Penthouse, Suite 1200
Encino, CA 91436
Tel: (818) 981-3712

90-3128/1222

6/17        19 93

16000 VENTURA BOULEVARD
ENCINO, CA 91436

PAY
TO THE
ORDER OF   Martin - McIntosh Engineering                    $ 79,732 00/xx

Seventy nine thousand seven hundred thirty two exactly          DOLLARS

Bank of Newport

fees

THIS CHECK IS DELIVERED FOR PAYMENT ON THE ACCOUNTS LISTED

⑈0011091⑈ ⑆122231281⑈ 0405317801

| | | | |
|---|---|---|---|
| 0001109 | 79732.00 | 0025292 | 22.36 |
| | | 0025293 | 10.06 |
| | | 0025294 | 3.30 |
| | | 0025295 | 1188.30 |
| | | 0025296 | 2012.17 |
| | | 0025297 | 892.62 |
| | | 0025298 | 54.35 |
| | | 0025299 | 537.56 |
| | | 0025300 | 226.92 |
| | | 0025301 | 320.15 |
| | | 0025302 | 42.08 |
| | | 0025303 | 914.44 |
| | | 0025304 | 5401.84 |
| | | 0025305 | 416.00 |
| | | 0025306 | 2996.29 |
| | | 0025307 | 1137.60 |
| | | 0025308 | 821.60 |
| | | 0025309 | 1555.49 |
| | | 0025310 | 1332.80 |
| | | 0025311 | 5536.42 |
| | | 0025312 | 761.10 |
| | | 0025313 | 11257.67 |
| | | 0025314 | 1062.00 |
| | | 0025315 | 2661.44 |
| | | 0025316 | 1329.46 |
| | | 0025317 | 1711.30 |
| | | 0025318 | 887.18 |
| | | 0025319 | 517.29 |
| | | 0025320 | 5871.72 |
| | | 0025321 | 513.53 |
| | | 0025322 | 960.32 |
| | | 0025323 | 668.00 |
| | | 0025324 | 3767.60 |
| | | 0025325 | 27.05 |
| | | 0025326 | 1696.32 |
| | | 0025327 | 950.02 |
| | | 0025328 | 16290.60 |
| | | 0025329 | 2470.18 |
| | | 0025508 | 230.40 |
| | | 0025510 | 676.45 |

POSTED

Rec'd
6/21

CITY OF WASCO ● WASCO. CALIFORNIA 93280

CHECK NUMBER 007050
VENDOR MMCLAND
DATE 05/04/94

| VOUCHER NO | VOUCHER DATE | INVOICE NO | DESCRIPTION | AMOUNT |
|---|---|---|---|---|
| 94050130 | 09/08/93 | 0022090! | MARTIN MCINTOSH LAND SURV | 6635.14 |

TOTAL THIS CHECK    6635.14

Please Detach Here and Retain Top Portion For Your Records

07050

WARRANT ON THE TREASURY OF THE
CITY OF WASCO
P.O. BOX 159
WASCO, CALIFORNIA 93280

BANK OF AMERICA
WASCO BRANCH 0004
849 SEVENTH ST.
P.O. DRAWER C
WASCO CA 93280

16-66
1220

DATE 05/04/94    AMOUNT    $6635.14

THE EXACT AMOUNT OF
SIX THOUSAND SIX HUNDRED THIRTY-FIVE DOLLARS AND 14 CENTS

BY ORDER OF THE CITY COUNCIL

PAY
TO THE
ORDER
OF

MARTIN MCINTOSH LAND SURV
2001 WHEELAN COURT

BAKERSFIELD,    CA 93309

_____ MAYOR

_____ CITY CLERK

_____ TREASURER

⑈007050⑈ ⑆122000661⑆ 00040⑈8020 1⑈

92-22-09
2 5535-    5997.74
26145    637.40
POSTED

Reed
5/9

**WASCO PUBLIC**
**FINANCING AUTHORITY**
P. O. BOX 159
WASCO, CA 93280

**Union Bank**
Wasco
1049 Seventh Street
Wasco, CA 93280-1933

1648

16-49/1220

April 21 19 94

PAY ___ Eighteen thousand eight hundred sixty eight and 30/100******** ___ DOLLARS $ __ 18,868.30

TO
THE
ORDER
OF

Martin-McIntosh
2001 Wheelan Court
Bakersfield, CA 93309

⑈"001648⑈" ⑈1220004961:804011365 8⑈"

---

**WASCO PUBLIC**
**FINANCING AUTHORITY**

DETACH AND RETAIN THIS STATEMENT
THE ATTACHED CHECK IS IN PAYMENT OF ITEMS DESCRIBED BELOW.
IF NOT CORRECT PLEASE NOTIFY US PROMPTLY. NO RECEIPT DESIRED.

DELUXE FORM WVC-2 V-2

Brown

| DATE | DESCRIPTION | AMOUNT |
|---|---|---|
| | 22.04 22.10 22.11 22.04 22.09 22.04 22.09 | |
| | Inv. 0029459 29474 29477 29462 0029472 0029461 29471 | |
| | 29460 0029468 0029476 | |
| | 2204 2205 22.10 | |
| | 0029459  2929.96 | |
| | 0029460  1349.53 | |
| | 0029461  1546.95 | |
| | 0029462  835.80 | |
| | 0029468  64.00 | |
| | 0029471  5001.85 | |
| | 0029472  2548.60 | |
| | 0029474  1641.06 | |
| | 0029476  1328.91 | |
| | 0029477  1621.60 | |

V-2

POSTED
for posting purposes only

Recd
4/28/94

# EXHIBIT "B"

1 LAW OFFICES OF N. THOMAS McCARTNEY [BELOW FOR FILING STAMP ONLY]
1920 20th Street
2 Bakersfield, CA 93301-4214
(661) 334-8011 TELEPHONE
3 (661) 334-8016 TELECOPIER

4 N. Thomas McCartney, State Bar No. 066758

5 Attorney for defendant/cross-complainant, City of Wasco

RECEIVED
JAN 2 6 2001
BY:

6

7

8

9 SUPERIOR COURT OF CALIFORNIA, COUNTY OF KERN

10 METROPOLITAN DIVISION

11

12 MARTIN-McINTOSH, a general       )    CASE No.     227661 [JES]
partnership,                       )    Consol. No.  227777
13                                 )
                                   )
14            plaintiff,           )    TRIAL BRIEF OF THE
                                   )    CITY OF WASCO
15 vs.                             )
                                   )
16 MICHAEL S. BROWN, et al.        )
                                   )
17            defendants.          )
_____   )    Date:  January 29, 2001
18                                 )    Time:  9:00 a.m.
AND RELATED CROSS-ACTIONS          )    Dept:  7
19 _____ )

20                         INTRODUCTION

21        The burden of proof rests squarely on Martin-McIntosh and Legacy to prove the

22 essential elements of their claims. In light of the recent request for dismissal by Martin-

23 McIntosh of the cause of action which was based on a third party beneficiary theory, the

24 claims of Martin-McIntosh are distinctly different from the claims of Legacy.

25 Legacy's claims are based on the Development Agreement and Acquisition Agreement

26 entered into by an ordinance passed by the Wasco City Council and a related theory of

27 estoppel. The contract cause of action of Martin-McIntosh is based on an alleged oral

28 agreement entered into by the city manager of Wasco. Its other cause of action is based on a

1   statutory theory. Martin-McIntosh has no estoppel theory plead and no longer has any stake

2   in the 1:3 ratio issues. Accordingly, although there is some overlap in the applicable law,

3   the cases of Martin-McIntosh and Legacy bear separate analysis.

4                     THE MARTIN-McINTOSH COMPLAINT

5                         I

6   AS A MATTER OF LAW MARTIN-MCINTOSH CANNOT MEET ITS BURDEN OF PROVING THAT THERE WAS A LEGALLY VIABLE CONTRACT WITH WASCO.

7        1.   *A Contract which an Officer of a Municipality has*

8            *No Authority to make Can Never Bind the Municipality.*

9   Contracts which the officers of a the municipality have no authority to make are void

10  and the city is not bound by such contracts. [*City of Pasadena v. Estrin* (1931) 212 Cal. 231,

11  298 P. 14; *Dynamic Ind. Co. v. City of Long Beach* (1958) 159 Cal.App.2d 294, 323 P.2d

12  768; *Shea-Kaiser-Lockheed-Healy* (1977) 73 Cal.App.3d 679, 695, 140 Cal.Rptr. 884, 893]

13        2.   *The Authority of a City Official to Act Must Be*

14            *Specifically and Expressly Conferred.*

As articulated long ago:

15

16  "Powers of a municipality are to be exercised through its legally constituted agents, and the authority of such officer, board, or department to exercise any of the corporate power with which a municipality has been clothed must be

17  distinctly conferred upon that officer, board, or department, or its acts create no obligation against the municipality.' " [*Rooney v. Snow* 131 Cal. 51, 53, 63 P.

18  155, 156 quoting Von Schmidt v. Widber, 105 Cal. 151, 38 Pac. 682 (emphasis added)]

19

20      3.   *Contracts Beyond The Scope of Authority of a Municipal Official Can Never Be Validated by the*

21        *Application of Principles of Estoppel.*

Moreover, the acts of municipal officers without authority are void and cannot ever be

22 validated by the application of principles of estoppel. [*Raisch v. City and County of San*

23

24 *Francisco*, 80 Cal. 1, 22 P. 22; *Wheeler v. City of Santa Ana*, 81 Cal.App.2d 811, 185 P.2d

373.] The cases are uniform that estoppel simply cannot lie to validate a contract or action

25

26 beyond the scope of the municipal official or agency involved. In assessing a claim very

similar to that made here by Martin-McIntosh the California Supreme Court articulated the

27 applicable rule of law:

28

1    "Plaintiff contends that even if the State Personnel Board was without authority
     to make a contract limiting the geographical area of plaintiff's service, the state
2    is nevertheless estopped by the Board's representations. To invoke estoppel in
     cases like the present would have the effect of granting to the state's agents the
3    power to bind the state merely by representing that they have the power to do
     so. It is accordingly held that the authority of a public officer cannot be
4    expanded by estoppel. County of San Diego v. California Water etc. Co., 30
     Cal.2d 817, 825-830, 186 P.2d 124, 175 A.L.R. 747; Wheeler v. City of Santa
5    Ana, 81 Cal.App.2d 811, 817, 185 P.2d 373; Branham v. Mayor etc. of City of
     San Jose, 24 Cal. 585, 604; Raisch v. City and County of San Francisco, 80
6    Cal. 1, 6, 22 P. 22; Gardella v. County of Amador, 164 Cal. 555, 564, 129 P.
     933; Foxen v. City of Santa Barbara, 166 Cal. 77, 81-83, 134 P. 1142; Von
7    Schmidt v. Widber, 105 Cal. 151, 157, 38 P. 682; Sacramento and San Joaquin
     Drainage Dist. v. Riley, 194 Cal. 624, 638, 229 P. 957; see also 10 Cal.Jur. s
8    28, p. 652; 7 A.L.R. 1248, 1249; cf. Lukens v. Nye, 156 Cal. 498, 505-506, 405
     P. 593, 36 L.R.A., N.S., 244; City of Arcata v. Green, 156 Cal. 759, 764-765,
9    106 P. 86." [*Boren v. State Personnel Bd.* 37 Cal.2d 634, 643 , 234 P.2d 981,
     986 (emphasis added)]

10

11   Although there are cases which allow estoppel against a public entity under certain

12   circumstances, there is no case which departs from the above noted rule of law. Whatever its

13   application in other contexts, estoppel simply will not lie to increase the authority of a city

14   official. Here the city manager did not have the authority to contract.

15        4.   *Theories of Ostensible or Implied Authority Cannot Be Invoked*
               *to Confer Authority to Act When There Otherwise Is No*
16             *Authority.*

17        There is no theory of ostensible or implied authority that applies to government

18   employees. Instead persons dealing with a city are chargeable with knowledge of the actual

19   authority of the officers and agents of a city:

20        "One dealing with a municipal corporation is chargeable with knowledge of the
          limitations of power of its agents and officers. Wallace v. San Jose 29 Cal.
21        180." [*Contra Costa Const. Co. v. Daly City* 48 Cal.App. 622, 625, 192 P. 178,
          180]

22        5.   *Nature of City Manager's Authority.*

23        It is abundantly clear that the city manager is the City's administrator working under

24   the City Council. While several specific duties and powers are conferred upon the city

25   manager, the power to enter into contracts is not one of them. See Exh. 112 a copy of which

26   is attached hereto.

27        6.   Under The Subdivision Map Act a Specific Ordinance is
               Required to Confer Upon a City Official the Authority to Enter
28             Into Subdivision Contracts.

1    *Government Code* §66462  reads in pertinent part:

2    "(d) The legislative body may provide, by ordinance, that the agreement
     entered into pursuant to this section may be entered into by a designated
3    official, in accordance with standards adopted by the local agency. The
     designated official's action may be appealed to the legislative body for
4    conformance with this chapter and any applicable local subdivision ordinance.
     Any ordinance adopted pursuant to this subdivision shall provide that the
5    legislative body shall periodically review this delegation of authority to the
     designated official." (emphasis added.)
6
7        7.    *Even If the City Manager Had the Authority Conferred on Him*
               *by the City Council the Agreements alleged in the Pleadings*
               *would be Unenforceable.*
8
9         When a specific method of contracting is required a contract made outside of that

10   mode is void. [*Miller v. McKinnon* (1942) 20 Cal. 2d 83, 88, 124 P.2d 34.] No estoppel to

11   deny the validity of a contract made in accordance with the mandated procedures can be

12   invoked against the public entity; and ordinarily no recovery in quasi contract can be had for

13   work performed under it. Moreover, generally the mode of contract for a public entity is the

14   measure of the power to contract. A contract made in disregard of the prescribed mode is

15   unenforceable. [*Miller v. McKinnon*, supra, 20 Cal. 2d 83, 88, 124 P.2d 34.]

16        A direct contract between a municipality and a contractor to pay for construction work

17   is subject to the requirement that such contracts only be let by competitive bidding. [Public

18   *Contracts Code* §§ 20160, 20161, 20162] Compliance with the terms of a statute requiring

19   the letting of certain contracts by a public agency, such as a municipal corporation or a

20   county, by competitive bidding and the advertising for bids is mandatory with respect to

21   those contracts coming within the terms of the statute; a contract made without compliance

22   with the statute is void and unenforceable as being in excess of the agency's power. *Miller v.*

23   *McKinnon*, supra, 87-88. Furthermore, persons dealing with the public agency are presumed

24   to know the law with respect to the requirement of competitive bidding and act at their peril.

25   [*Miller v. McKinnon*, supra, 89.] Neither the doctrine of estoppel nor any other equitable

26   principle may be invoked against a governmental body where it would operate to defeat the

27   effective operation of the competitive bidding statutes, which were adopted to protect the

28   public. [*Paterson v. Board of Trustees* (1958) 157 Cal. App. 3d 811, 819, 321 P.2d 825.]

1    Thus, a court may not, by the application of the doctrine of estoppel, abrogate a bidding
2    statute and make a new contract between the parties where in effect the court would create
3    and enforce an illegal contract. For example, a subsequent promise by a public entity to pay
4    more than the contract price which was not awarded in compliance with competitive bidding
5    requirements may not be enforced, even though the elements of estoppel may be otherwise
6    present, since to permit enforcement of the promise would completely disregard the salutary
7    provisions of the bidding statutes and would afford a method by which the public entity and
8    persons dealing with it could evade the law. [*Paterson v. Board of Trustees*, supra, 820.]

9         The fact that a public district or body has received the benefit of labor and materials
10   furnished under a contract which is void by reason of the failure of the district or body to
11   comply with applicable competitive bidding statutes does not entitle a contractor who has
12   furnished the labor and materials to recover their reasonable value in an action in quantum
13   meruit. [*Reams v. Cooley* (1915) 171 Cal. 150, 151-157, 152 P. 293.] Although this may
14   work a hardship on the contractor, the contractor is bound no less than the public entity to be
15   sure that the competitive bidding requirements are complied with. Where the contractor
16   neglects this or chooses to take the hazard, the contractor is considered to be a mere
17   volunteer and suffers only what he or she ought to have anticipated. [[Reams v. Cooley,
18   supra 171 Cal. 150, 157, 152 P. 293.]

19        Moreover, not only may the contractor not recover the reasonable value of labor and
20   materials furnished to a public entity under a void contract, but a right of action exists to
21   recover any funds paid to the contractor for labor and materials furnished the entity in
22   contravention of a statute requiring competitive bidding. Such an action may be prosecuted
23   by the public entity or by a taxpayer since the taxpayer would otherwise be helpless to
24   compel observance of the law if the public agency could have the work done and pay the
25   charges therefor in violation of the competitive bidding requirement. [*Miller v. McKinnon*,
26   supra, 89.]

27        Development Agreements and Acquisition Agreements outside of public works
28   projects are also controlled by State law and can only be entered into by the legislative body,

1   not an administrative head or any other government official. *Government Code* § 65867.5

2   provides in part that "[a] development agreement is a legislative act which shall be approved

3   by ordinance and is subject to referendum." *Government Code* § 65866 provides that only

4   the governing body through ordinance can amend such an agreement. *Government Code* §§

5   66485 and 66486 also provide that acquisition agreements are to be entered into by local

6   ordinance. [See also *Lawrence v. City of Concord* (1956) 156 Cal.App.2d 531, 320 P.2d

7   215] Indeed it is the universal law of this state that only the legislative bodies of

8   municipalities i.e. city councils may enter into any form of acquisition agreement. [See for

9   example *Streets and Highways Code* § 10102]

10
                                    II
11      WASCO WAS NEVER UNDER ANY MANDATORY DUTY TO OBTAIN A BOND TO
        PROTECT MARTIN-MCINTOSH AS ITS WORK PROGRESSED.

12      In California, a public entity is not liable for any claim against it except as provided by

13  statute or required by the state or federal Constitution. [*Government Code, § 815; Cochran v.*

14  *Herzog Engraving Co.* (1984) 155 Cal.App.3d 405, 409, 205 Cal. Rptr. 1; *Lundeen Coatings*

15  *Corp. v. Department of Water & Power* (1991) 232 Cal.App.3d 816, 832, 283 Cal. Rptr. 551.

16  *Government Code* § 815.6 is a statute which provides for such liability under certain

17  circumstances. It reads:

18      "Where a public entity is under a mandatory duty imposed by an enactment that
        is designed to protect against the risk of a particular kind of injury, the public
19      entity is liable for an injury of that kind proximately caused by its failure to
        discharge the duty unless the public entity establishes that it exercised
20      reasonable diligence to discharge the duty."

21  *Government Code* § 815.6 contains a three-pronged test for determining whether liability

22  may be imposed on a public entity: (1) an enactment must impose a mandatory, not

23  discretionary, duty ...; (2) the enactment must intend to protect against the kind of risk of

24  injury suffered by the party asserting section 815.6 as a basis for liability ...; and (3) breach of

25  the mandatory duty must be a proximate cause of the injury suffered. [*Becerra v. County of*

26  *Santa Cruz* (1998) 68 Cal.App.4th 1450, 1458, 81 Cal.Rptr.2d 165.] All three elements must

27  be met before a government entity can be liable under § 815.6

28      In order to analyze whether liability is possible under §815.6 the underlying enactment

1  is of course the critical subject of inquiry. Moreover, a plaintiff asserting liability under

2  *Government Code* § 815.6 for liability based on statute must specifically allege the

3  applicable statute or regulation. [*Washington v. County of Contra Costa* (1995) 38

4  Cal.App.4th 890, 45 Cal.Rptr.2d 646.] Here Martin-McIntosh only specifically alleges and

5  a portion of the Wasco Subdivision Ordinance enacted in 1993. The duty upon which

6  Martin-McIntosh relies is contained in §16.32.240 of the Wasco Subdivision Ordinance. It

7  reads:

8  "A subdivision map which requires a final or parcel map shall not be approved
and subsequently recorded until improvements required as a condition of
9  approval of the tentative map have been completed or an agreement to
complete the improvements has been entered into pursuant to section 66462 of
10  the Map Act. Such agreement to complete the improvements shall be
guaranteed by security in amount, type, form and content as set forth in this
11  chapter."

12  An agreement entered into pursuant to *Government Code §66462* is again one dealing with a

13  project whose improvements are not finished at the time that approval of the final map is

14  sought. Such agreements are generally referred to as "subdivision agreements." *Government*

15  *Code* §66462 reads in pertinent part:

16  "(a) If, at the time of approval of the final map by the legislative body, any
public improvements required by the local agency pursuant to this division or
17  local ordinance have not been completed and accepted in accordance with
standards established by the local agency by ordinance applicable at the time of
18  the approval or conditional approval of the tentative map, the legislative body,
as a condition precedent to the approval of the final map, shall require the
19  subdivider to enter into one of the following agreements specified by the local
agency:
20  (1) An agreement with the local agency upon mutually agreeable terms to
thereafter complete the improvements at the subdivider's expense.
21  (2) An agreement with the local agency to thereafter do either of the following:
(A) Initiate and consummate proceedings under an appropriate special
22  assessment act or the Mello-Roos Community Facilities Act of 1982, Chapter
2.5 (commencing with Section 53311) of Part 1 of Division 2 of Title 5 for the
23  financing and completion of all of the improvements.
(B) If the improvements are not completed under a special assessment act or
24  the Mello-Roos Community Facilities Act of 1982, Chapter 2.5 (commencing
with Section 53311) of Part 1 of Division 2 of Title 5, to complete the
25  improvements at the subdivider's expense.
(b) The standards may be adopted by reference, without posting or publishing
26  them, if they have been printed in book or booklet form and three copies of the
books or booklets have been filed for use and examination by the public in the
27  office of the clerk of the legislative body.
(c) The local agency entering into any agreement pursuant to this section shall
28  require that performance of the agreement be guaranteed by the security

1    specified in Chapter 5 (commencing with Section 66499)..." (emphasis added)

2 The duty that Wasco is under is a duty that only arises as a condition precedent to the

3 recordation of the final map. This duty is in sharp contrast to duties in public works

4 contracts that arise before any construction is to commence.

5    This distinction is crucial to the matter before this Court and undermines the seventh

6 cause of action in its entirety. *Walt Rankin & Associates, Inc. v. City of Murrieta* 84

7 Cal.App.4th 605, 101 Cal.Rptr.2d 48, relied on by Martin-McIntosh illustrates the difference

8 in the enactments. In *Rankin* the duties involved were part of the statutory responsibilities

9 imposed on municipalities in public works contracts. *Civil Code* § 3247 requires a payment

10 bond as a condition of being awarded a contract by a public entity. It provides in relevant

11 part as follows:

12    "(a) Every original contractor to whom is awarded a contract by a public entity,
      except as provided in subdivision (d) of Section 7103 of the Public Contract
13    Code, involving an expenditure in excess of twenty-five thousand dollars
      ($25,000) for any public work shall, before entering upon the performance of
14    the work, file a payment bond with and approved by the officer or public entity
      by whom the contract was awarded...." (emphasis added)
15

16 In contrast to *Civil Code § 3247* the Wasco ordinance requires security, not at the outset of

17 the agreement i.e not as a condition of letting the contract, but as a condition for the approval

18 of the final subdivision map if at the time all of the improvements are not completed. Said

19 differently, the requirement to post a bond under the Wasco ordinance does not precede the

20 onset of construction, as do the bond requirements in public works, but only arises when a

21 request is made to have the final subdivision map recorded. Under the Wasco subdivision

22 ordinance the right to commence construction arises upon the recordation of the tentative

23 map. This right is further confirmed in § 16.18.030 of the Wasco Subdivision Ordinance, a

24 copy of which is attached. It reads in pertinent part:

25    "(a) Approval or conditional approval of a vesting tentative map or vesting
      tentative parcel map shall confer a right to proceed with residential
26    development in substantial compliance with the ordinances, policies and
      standards described in Section 66474.2 of the Government Code..."

27    The differences between the Wasco ordinance and the mandatory bonding

28 requirements reflect differences in public works contracts and private works of improvement.

1  "Public work" means any work of improvement contracted for by a public entity. [*Civil*

2  *Code § 3100*] Wasco did not enter into any contract for a work of improvement. Instead it

3  entered into a statutorily created form of a development agreement and a statutorily created

4  form of an acquisition agreement for completed improvements. The remedies available to

5  private works claimants, including mechanics' liens [*Civil Code* §§3109 et seq.] and stop

6  notices for private works of improvement [*Civil Code* §§3156 et seq.], do not apply to any

7  public work [*Civil Code* §§3109, 3156]. More importantly, the remedies provided in public

8  work projects do not apply in private works. The remedies consist of the stop notice right

9  and the specific bond requirement of *Civil Code* § 3247. Neither remedy was available here.

10  What right does exist in this type of project, which is a private project, is mechanic's lien

11  protection. A subcontractor does not have both mechanic's liens rights and the statutory bond

12  rights.

13      "Because the right to file a mechanic's lien does not inure against public property, the
         Public Works Act was enacted to afford a statutory remedy to materialmen and
14      laborers who supply work, labor or materials upon a public works job. California Elec.
         Supply Co. v. United Pac. Life Ins. Co. (App. 1 Dist. 1964) 38 Cal.Rptr. 479, 227
15      Cal.App.2d 138."

16  *Rankin* reaffirms the rule as it describes the bond as "being ...a substitute for the mechanics

17  lien remedy. [*Rankin* at page 626]

18      Martin-McIntosh has obtained a judgment foreclosing its mechanic's lien. In short,

19  this is not a public works development. Martin-McIntosh cannot be allowed to sue for an

20  alleged failure to obtain a bond after having foreclosed its mechanic's lien.

21      Application of the three prong test vividly illustrates that Wasco can have no liability

22  on the seventh cause of action.

23      Was there a duty on Wasco to obtain a bond? No. Since Wasco never allowed

24  recordation of the final parcel map it was not under a duty to enter into an agreement that

25  required a bond.

26      Was the enactment relied on intended to protect against the kind of risk of injury

27  suffered by the party asserting section 815.6 as a basis for liability? No. The purpose of the

28  statute is to make sure that the project is completed. The injury alleged here is nonpayment

1  for construction services rendered <u>before</u> recordation of the final map. If Wasco had allowed
2  recordation of the final parcel map and <u>thereafter</u> Martin-McIntosh rendered services for
3  which it was not paid by the contractor and for which the contractor secured no bond, the
4  result might be different.

5      Was the breach of the mandatory duty a proximate cause of the injury suffered?  No.
6  Martin-McIntosh performed no services after recordation of the final map. It was not
7  harmed by the recordation of a final map without a bond to pay for future services.[1]

8                          III
   THE CITY IS IMMUNE FROM ANY LIABILITY BASED ON ANY TYPE OF
9  MISREPRESENTATION.

10  *Government Code* Section 818.8 provides:

11     "A public entity is not liable for an injury caused by misrepresentation by an
        employee of the public entity, whether or not such misrepresentation be
12     negligent or intentional."

13  This immunity is absolute. [*Masters v. San Bernardino County Employees Retirement Assn.*
14  32 Cal. App.4th 30, 37 Cal. Rptr.2d 860]  The eighth, ninth and tenth causes of action are
15  clearly violative of this rule and cannot be maintained.

16      Whether a governmental tort immunity applies does not depend on the form of the
17  pleading, or relief sought. Instead, the nature of the right sued upon controls. [*Arthur L.*
18  *Sachs, Inc. v. City of Oceanside* (1984) 151 Cal.App.3d 315, 322, 198 Cal. Rptr. 483]  In
19  order to avoid the immunity of *Government Code* § 818.8, a plaintiff must point to a
20  "contractual promise." [*Janis v. California State Lottery Com.* (1998) 68 Cal.App.4th 824,
21  830-831, 80 Cal. Rptr.2d 549]  There must be some express contractual relationship between
22  the plaintiff and the public entity to avoid the immunity statute. Here there is no viable
23  contractual relationship. The fifth cause of action is, in essence, a claim based on a theory of
24  misrepresentation. It runs afoul of this rule of immunity. If all that would be necessary to
25  defeat the immunity statute is to phrase the representation as a contractual promise, the

26

27     [1]    As stated in Rankin, supra "proximate cause...is always in the first instance, a question
28  of law. Id. at page 626

1   immunity statute would be eviscerated. This is not the law.   For example, a similar

2   argument was made and rejected in *Los Angeles Equestrian Center, Inc. v. City of Los*

3   *Angeles* (1993) 17 Cal.App.4th 432, 21 Cal. Rptr.2d 313.  In that case plaintiff sued the city

4   on several theories which were based on a letter and other conduct of city officials.  These

5   theories included breach of implied in fact contract, breach of fiduciary duty, promissory

6   estoppel, quasi-contractual recovery and similar theories.  In rejecting each of the theories the

7   court noted the general rule cited in so many decisions:

8         "As a general rule, a public entity cannot be sued on an implied-in-law or
9         quasi-contract theory, because such a theory is based on quantum meruit or
          restitution considerations which are outweighed by the need to protect and limit
          a public entity's contractual obligations."  [*Los Angeles Equestrian Center, Inc.*
10        *v. City of Los Angeles*, supra at page 449]

11                          THE LEGACY COMPLAINT

12        Unlike Martin-McIntosh, Legacy did enter into two legally viable agreements with

13   Wasco. However it seeks relief which is not cognizable under either contract or its estoppel

14   theory. Legacy did not sue for specific performance to compel the City Council of Wasco to

15   resume funding the project with the balance of the assessment proceeds. Instead it sued

16   simply to obtain a judgment for damages against the general fund of Wasco.

17                                   I
                      WASCO'S LIABILITY WAS EXPRESSLY LIMITED
18                      BY CONTRACT TO PROTECT THE PUBLIC.

19        As is always the case with developments under the Subdivision Map Act, the parties

20   here agreed that there would be no general fund liability. More specifically Section 4 of the

21   Acquisition Agreement provides in part as follows:

22        "The City's obligation to acquire improvements is not backed by the full faith
          and credit of the City of Wasco but is limited solely to funds available to the
23        City of Wasco in the District, if any, as a result of the proceedings for
          formation of the District, confirmation of assessments and receipt of proceeds
24        from the issuance of bonds."

25        The Development Agreement is concerned with the infrastructure requirements

26   needed for the provision of municipal services to the project. The Development Agreement

27   expressly provides that the City is not obligated to fund the improvements. The

28   Development Agreement specifically provides that insofar as it is feasible, these

1  improvements shall be funded by means of assessment district financing. If the City, after
2  signing the Development Agreement, reached the conclusion that assessment district bond
3  rates were too high to warrant the sale of bonds or that the property did not meet the
4  minimum requirement for the creation of an assessment district, then the City has no further
5  obligation. Legacy, under the Development Agreement, would still be required to construct
6  the improvements to the City's standards and dedicate them to the City, as a condition to
7  being allowed to proceed with the overall development. The Development Agreement and
8  Acquisition Agreement make clear that Legacy could not depend upon continued funding
9  and that it should be prepared at all times to complete the project with its own funds. The
10  bottom line is that the developer, Legacy, was obligated to build the improvements. As
11  stated in Section 2 of the Acquisition Agreement:

> "The Subdivider, at Subdivider's own cost and expense, shall
> cause to be constructed the improvements..."

The third cause of action seeks damages against Wasco for alleged breaches of the
Development Agreement and Acquisition Agreement. This cause of action therefore seeks to
impose general fund liability of Wasco. Such liability is not only inconsistent with the
Marks-Roos Act and the Subdivision Map Act but also flatly inconsistent with the terms of
the agreements between Legacy and Wasco. If Legacy believed that funding should have
continued under the agreements its remedy was to bring equitable relief seeking an injunction
or other equitable relief compelling Wasco to continue to fund the project.

## II
### WASCO WAS ENTITLED TO STOP ALL USE OF ASSESSMENT MONEY TO FUND THE PROJECT BECAUSE THE LIEN TO VALUE RATIO WAS NOT MAINTAINED.

(A)  *The Doctrine Of Estoppel May Not Be Invoked
Against a Governmental Body Where It Would
Operate To Frustrate Public Policy Adopted To
Protect The Public.*

The lien to value ratio was not maintained. Thus there was no obligation to continue
to use assessment funds to finance the project. Legacy contends instead that Wasco should
be estopped to assert the lien to value ratio. It is clear, however, that neither the doctrine of
estoppel nor any other equitable principle may be invoked against a governmental body

1    where it would operate to defeat the effective operation of a policy adopted to protect the
2    public. [Miller v. McKinnon (1942) 20 Cal.2d 83, 124 P.2d 820 34, 140 A.L.R. 570, and
3    cases cited therein; *Pan American Petroleum & Transport Co. v. United States*, 273 U.S.
4    456, 505, 506, 47 S.Ct. 416, 71 L.Ed. 734; *American Surety Co. of New York v. United*
5    *States*, 10 Cir., 112 F.2d 903, 906.]  The ratio requirement is designed to protect the pubic in
6    that it is designed to limit the assessment obligations to amount related to the actual value of
7    the improvements. The ratio is also designed to ensure that the assessment spending will be
8    adequately secured. In this case the assessment funding derived from a separate bond
9    issuance, the Wasco Public Finance Authority Local Revenue Bonds, Series A. The
10   indenture for this issuance also contains a 1:3 ratio. Thus by requiring the ratio in the
11   Acquisition Agreement the parties thereto were complying with the legal requirements of the
12   Series A issuance and thus protecting the bondholders thereof. Moreover the assessment
13   financing is part of the overall development program which is designed to protect the public.
14   The primary purpose and goals of the Subdivision Map Act are to encourage orderly
15   community development by providing for local regulation and control of the design and
16   improvement of subdivisions; to ensure that areas within the subdivision that are dedicated
17   for public purposes will be properly improved by the subdivider so that they will not become
18   an undue burden on the community; and, to protect the public and individual transferees from
19   fraud and exploitation. [*Government Code* § 66441.] Toward that end, the Subdivision Map
20   Act allows a city or county to require the financing, construction or dedication of
21   improvements as a condition precedent to approval of a final map.

22        The Legislature encourages development agreements between local agencies and
23   developers concerning the financing of public facilities. [*Government Code* §§ 65864 et
24   seq.] This statutory scheme makes clear that the regulation of development contracts and
25   related contracts pertaining to financing methods implementing such programs are matters of
26   policy designed to protect the public. *Government Code* § 65864 specifically provides in part
27   as follows:

28        "The Legislature finds and declares that:

1       (a) The lack of certainty in the approval of development projects can result in a
waste of resources, escalate the cost of housing and other development to the
2       consumer, and discourage investment in and commitment to comprehensive
planning which would make maximum efficient utilization of resources at the
3       least economic cost to the public."

4   The Development Agreement likewise contains a recital which confirms that this contract

5   affects and protects the public interests:

6       "City and Developer desire to enter into this agreement in order to facilitate
the development of the real property. The Developer and City have
7       determined that the development of the real property is a development
project (the "Project") for which this agreement is appropriate; that this
8       agreement will reduce uncertainty in planning and provide for a more
orderly development of the real property, insure timely installation of
9       necessary improvements; provide for public services appropriate to the
development of the real property, insure attainment of the maximum
10      effective utilization of resources within City at the most effective economic
costs to its citizens; and otherwise achieve the goals and purposes of Article
11      2.5 of Chapter 4 of Title 7 of the Government Code".

12  Application of any estoppel theory here would clearly undermine several distinct policies

13  designed to protect the public. Accordingly, no theory of estoppel is valid in this matter.

14      (B)   *Estoppel Can Not Be Invoked To Undermine A Public
Contract Made In Accordance With A Legislatively
15      Prescribed Mode.*

16      The Development Agreement and the Acquisition Agreement were entered into as

17  part of an overall statutory scheme regulating the means by which such agreements may be

18  executed by public entities. Under the Subdivision Map Act (*Government Code* §§ 66410, et

19  seq), cities and counties have long been authorized by statute to require construction of and

20  to otherwise regulate and control the design and improvement of divisions and subdivisions

21  within their boundaries. *Government Code* §§ 66411, 66411.1). Under the statute, cities and

22  counties are <u>required</u> to adopt an ordinance regulating and controlling subdivisions for which

23  the Subdivision Map Act requires a tentative and final or parcel map. [*Government Code* §

24  66441]

25      *Government Code* Section 65865.2 sets forth the mandatory and discretionary

26  contents of development agreements. Required components of the agreement include the

27  duration of the agreement, the permitted uses of the property, the density or intensity of use,

28  the maximum height and size of the proposed buildings and provisions for reservation or

1    dedication of land for public purposes. This code section also specifically provides that the

2    agreement may include "terms and conditions relating to applicant financing of related public

3    improvements." *Government Code* § 65867.5 provides in part that "[a] development

4    agreement is a legislative act which shall be approved by ordinance and is subject to

5    referendum." *Government Code* § 65866 provides:

6        "A development agreement may be amended, or canceled in whole or in
         part, by mutual consent of the parties to the agreement or their successors in
7        interest. Notice of intention to amend or cancel any portion of the
         agreement shall be given in the manner provided by Section 65867. An
8        amendment to an agreement shall be subject to the provisions of Section
         65867.5."

9

10   In this case the parties to the Development Agreement entered into a subsequent Acquisition

     Agreement. The process of entering into the Acquisition Agreement complied with
11
     *Government Code* § 65867.5  *Government Code* §§ 66485 and 66486 also provide that
12
     acquisition agreements are to be entered into by local ordinance.
13

14           Under these circumstances estoppel will not lie to prevent enforcement of the terms

15   of such contracts. When a specific method of contracting is required a contract made outside

     of that mode is void. [*Miller v. McKinnon* supra 20 Cal. 2d 83, 88, 124 P.2d 34.]  No
16
     estoppel to deny the validity of a contract made in accordance with the mandated procedures
17
     can be invoked against the public entity; and ordinarily no recovery in quasi contract can be
18
     had for work performed under it. Moreover, generally the mode of contract for a public entity
19
     is the measure of the power to contract. A contract made in disregard of the prescribed mode
20
     is unenforceable. [*Miller v. McKinnon*,  supra, 20 Cal. 2d 83, 88, 124 P.2d 34.]
21

22                                         III
                 THE SEVENTH CAUSE OF ACTION DOES NOT STATE FACTS
23           SUFFICIENT TO CONSTITUTE AN INDEPENDENT CAUSE OF ACTION.

24           The seventh cause of action is based on the allegation that "Wasco concealed the

25   true fact that they (sic) intended to assert the 'three to one' ratio..."  Even assuming that

     Wasco could be estopped from invoking the ratio requirements, imposition of liability on the
26
     city's general fund does not ensue from such an estoppel. Instead, all that results from such
27
     an estoppel would be an obligation on the part of Wasco to continue to use assessment funds
28

1  to pay for the development. Legacy has sued to compel Wasco to make the payments itself.

2  The estoppel theory ignores the limitations of liability contained in the Acquisition

3  Agreement and the Development Agreement. As argued above, the doctrine of estoppel is

4  not available to Legacy here. Therefore, this cause of action based on an estoppel theory is

5  not legally viable.

6              AFFIRMATIVE DEFENSES AND RELATED MATTERS

7          The purpose of this brief is not to discuss every potential legal and factual issue that

8  could arise in this proceeding. In addition to the foregoing Wasco contends that (1) the third

9  cause of action of Martin-McIntosh violates the statute of frauds, (2) that all causes of action

10  asserted against violate the parol evidence rule, (3) that all causes of action are subject to

11  several statutory affirmative defenses including *Government Code* §§ 911.2, *945.4, 810.8,*

12  *66499.37* and *Civil Code* § 3264. It is believed that most, if not all of these issues, also are

13  matters based on indisputable facts and therefore present themselves primarily as issues for

14  the Court. However, in the absence of the evidence or further stipulation among counsel the

15  Court may not be able to make the necessary rulings on these issues now.

16

17                                  Respectfully submitted,

18

19  Dated: January 25, 2001

20                                  LAW OFFICES OF N. THOMAS MCCARTNEY

21                                  _____
                                    N. THOMAS MCCARTNEY, ESQ.
22                                  Attorney for defendant/cross-complainant,
                                    City of Wasco

23

24

25

26

27

28

# Title 2

## ADMINISTRATION AND PERSONNEL

Chapters:

| 2.04 | City Manager |
|------|--------------|
| 2.08 | City Council |
| 2.12 | Fire Chief |
| 2.16 | Public Recreation Department |
| 2.20 | Planning Commission |
| 2.24 | Redevelopment Agency |
| 2.28 | Bonds of City Officials |
| 2.32 | Emergency Organization |
| 2.36 | Peace Officer Standards and Training |
| 2.40 | Personnel Rules |
| 2.44 | Lost or Abandoned Property |
| 2.48 | Eligibility for Employment |
| 2.52 | Claims Against the City |
| 2.56 | Citation Issuance Authority |

## Chapter 2.04

## CITY MANAGER*

Sections:

| 2.04.010 | Office created--Appointment. |
|----------|------------------------------|
| 2.04.020 | Residence requirements. |
| 2.04.030 | Eligibility. |
| 2.04.040 | Bond required. |
| 2.04.050 | Acting city manager. |
| 2.04.060 | Compensation. |
| 2.04.080 | Officers' duty to assist. |
| 2.04.090 | Relations with council. |
| 2.04.100 | Participation with commissions. |
| 2.04.110 | Powers and duties--Generally. |
| 2.04.120 | Powers and duties--Employees. |
| 2.04.130 | Powers and duties--Appointment and removal. |
| 2.04.140 | Powers and duties--Administrative reorganization. |
| 2.04.150 | Powers and duties--Financial report to council. |

---

* For statutory provisions on the city manager form of government, see Gov. Code §§34851--34859.

(Wasco 2/97)

## Sections: (Continued)

2.04.210   Powers and duties—Investigations and complaints.
2.04.220   Powers and duties—Enforcement.
2.04.230   Powers and duties—Additionally.
2.04.240   Removal—Procedure.
2.04.250   Removal—Hearing.
2.04.260   Removal—Suspension pending hearing.
2.04.270   Removal—Council action.
2.04.280   Removal—Limitation when.
2.04.290   Additional terms of officer employment authorized.

**2.04.010   Office created—Appointment.**   The office of the city manager, also to be known as the city administrator, as may be designated by the city council, is created and established.   The city manager, or city administrator, shall be appointed by the city council wholly on the basis of his administrative and executive ability and qualifications, and shall hold office for and during the pleasure of the city council.   (Ord. 265 §1, 1980: Ord. 196 §1, 1974).

**2.04.020   Residence requirements.**   Residence in the city at the time of appointment of a city manager shall not be required as a condition of the appointment, but within one hundred eight days after reporting for work the city manager must become a resident of the city unless the city council approves his residence outside the city.   (Ord. 196 §2, 1974).

**2.04.030   Eligibility.**   No member of the city council shall be eligible for appointment as city manager until one year has elapsed after such council member shall have ceased to be a member of the city council.   (Ord. 196 §3, 1974).

**2.04.040   Bond required.**   The city manager and acting city manager shall furnish a corporate surety bond to be approved by the city council in such sum as may be determined by the city council, and shall be conditioned upon the faithful performance of the duties imposed upon the city manager and acting city manager, as prescribed in this chapter. Any premium for such bond shall be a proper charge against the city.   (Ord. 196 §4, 1974).

**2.04.050   Acting city manager.**   The assistant city manager shall serve as manager pro tempore during any temporary absence or disability of the city manager.   In the event there is no assistant city manager, the city manager, by filing a written notice with the city clerk, shall designate a qualified city employee to exercise the powers and perform the duties of city manager during his temporary absence or disability.   In the event the city manager's

7

absence or disability extends over a two-month period, the
city council may, after the two-month period, appoint an
acting city manager.   (Ord. 196 §5, 1974).

2.04.060  Compensation.   A.   The city manager shall
receive such compensation as the city council shall from
time to time determine.
    B.   In addition, the city manager shall be reimbursed
for all actual and necessary expenses incurred by him in the
performance of his duties.   (Ord. 265 §2, 1980:  Ord. 196
§6(part), 1974).

2.04.080  Officers' duty to assist.   It shall be the
duty of all subordinate officers and the elected officers.
and city attorney to assist the manager in administering
the affairs of the city efficiently, economically and
harmoniously.   (Ord. 196 §8.2, 1974).

2.04.090  Relations with council.   The city council
and its members shall deal with the administrative services
of the city only through the city manager, except for the
purpose of inquiry, and neither the city council nor any
member thereof shall give orders or instructions to any
subordinates of the city manager.   The city manager shall
take his orders and instructions from the city council only
when sitting in a duly convened meeting of the city council,
and no individual councilman shall give any orders or instruc-
tions to the city manager.   (Ord. 196 §8.1, 1974).

2.04.100  Participation with commissions.   The city
manager may attend any and all meetings of the planning
commission, and any other commissions, boards or committees
created by the city council, upon direction of the city
council.   At such meetings which the city manager attends,
he shall be heard by such commissions, boards or committees
as to all matters upon which he wishes to address the
members thereof, and he shall inform said members as to
the status of any matter being considered by the city coun-
cil.   He shall cooperate to the fullest extent with the
members of all commissions, boards or committees appointed
by the city council.   (Ord. 265 §4, 1980:  Ord. 196 §8.2,
1974).

8

**2.04.110  Powers and duties—Generally.** The city manager shall be the administrative head of the government of the city under the direction and control of the city council, except as otherwise provided in this ordinance. He shall be responsible for the efficient administration of all the affairs of the city which are under his control. In addition to his general powers as administrative head, and not as a limitation thereon, it shall be his duty and he shall have the powers set forth in 2.04.120 through 2.04.230.  (Ord. 196 §7(part), 1974).

**2.04.120  Powers and duties—Employees.** It shall be the duty of the city manager, and he shall have the authority to control, order and give directions to all heads of departments and to subordinate officers and employees of the city under his jurisdiction through their department heads.  (Ord. 196 §7.2, 1974).

**2.04.130  Powers and duties—Appointment and removal.** It shall be the duty of the city manager to, and he shall appoint, remove, promote and demote any and all officers and employees of the city, excepting elected officers, department heads and the city attorney.  (Ord. 265 §3, 1980; Ord. 196 §7.3, 1974).

**2.04.140  Powers and duties—Administrative reorganization.** It shall be the duty and responsibility of the city manager to conduct studies and effect such administrative reorganization of offices, positions or units under his direction as may be indicated in the interest of efficient, effective and economical conduct of the city's business.  (Ord. 196 §7.4, 1974).

**2.04.150  Powers and duties—Financial report to council.** It shall be the duty of the city manager to keep the city council at all times fully advised as to the financial condition and needs of the city.  (Ord. 196 §7.7, 1974).

**2.04.160  Powers and duties—Budget and salary plan.** It shall be the duty of the city manager to prepare and submit the proposed annual budget and the proposed annual salary plan to the city council for its approval.  (Ord. 196 §7.8, 1974).

**2.04.170  Powers and duties—Expenditure control.** It shall be the duty of the city manager to see that no expenditures are submitted or recommended to the city council except on approval of the city manager or his authorized

9

022/029

10/19/2009 10:49 FAX  6613280380

representative.  The city manager or his authorized represen-
tative shall be responsible for the purchase of all supplies
for all the departments or divisions of the city.   (Ord.
196 §7.9, 1974).

**2.04.180  Powers and duties--Ordinance recommendation.**
It shall be the duty of the city manager and he shall recom-
mend to the city council for adoption such measures and ord-
inances as he deems necessary.   (Ord. 196 §7.5, 1974).

**2.04.190  Powers and duties--Council meeting attendance.**
It shall be the duty of the city manager to attend all
meetings of the city council, unless at his request he is
excused therefrom by the mayor individually or the city
council, except when his removal is under consideration.
(Ord. 196 §7.6, 1974).

**2.04.200  Powers and duties--Supervision of public
property.**  It shall be the duty of the city manager and he
shall exercise general supervision over all public buildings,
public parks, and all other public property which are under
the control and jurisdiction of the city council.  (Ord. 196
§7.11, 1974).

**2.04.210  Powers and duties--Investigations and
complaints.**  It shall be the duty of the city manager to make
investigations into the affairs of the city and any department
or division thereof, and any contract or the proper perform-
ance of any obligations of the city.  Further, it shall be
the duty of the city manager to investigate all complaints
in relation to matters concerning the administration of the
city government and in regard to the service maintained by
public utilities in the city.   (Ord. 196 §7.10, 1974).

**2.04.220  Powers and duties--Enforcement.**  It shall be
the duty of the city manager to enforce all laws and ordi-
nances of the city and to see that all franchises, contracts,
permits and privileges granted by the city council are faith-
fully observed.   (Ord. 196 §7.1, 1974).

**2.04.230  Powers and duties--Additionally.**  It shall be
the duty of the city manager to perform such other duties and
exercise such other powers as may be delegated to him from
time to time by ordinance or resolution or other official
action of the city council.   (Ord. 196 §7.12, 1974).

**2.04.240  Removal--Procedure.**  The removal of the city
manager shall be effected only by a majority vote of the
whole city council, as then constituted, convened in a regular
council meeting, subject, however, to the provisions of
Sections 2.04.250 through 2.04.260.  In case of his intended

10

removal by the city council, the city manager shall be fur-
nished with a written notice stating the council's intention
to remove him, at least thirty days before the effective date
of his removal.   If the city manager so requests, the city
council shall provide, in writing, reasons for the intended
removal, which shall be provided the city manager within
seven days after the receipt of such request from the city
manager, and at least fifteen days prior to the effective
date of such removal.   (Ord. 196 §9.1, 1974).

**2.04.250   Removal--Hearing.**   Within seven days after
the delivery to the city manager of notice of intention to
remove, he may, by written notification to the city clerk,
request a hearing before the city council.   Thereafter, the
city council shall fix a time for the hearing, which shall
be held at its usual meeting place, but before the expiration
of the thirty-day period, at which the city manager shall
appear and be heard, with or without counsel.    (Ord. 196
§9.2, 1974).

**2.04.260   Removal--Suspension pending hearing.**   After
furnishing the city manager with written notice of intended
removal, the city council may suspend him from duty, but
his compensation shall continue until his removal by action
of the council passed subsequent to the hearing provided for
in Section 2.04.250.    (Ord. 196 §9.3, 1974).

**2.04.270   Removal--Council action.**   In removing the city
manager, the city council shall use its uncontrolled dis-
cretion, and its action shall be final and shall not depend
upon any particular showing or degree of proof at the hearing.
The purpose of the hearing is to allow the city manager to
present to the city council his grounds of opposition to
his removal prior to its action.   (Ord. 196 §9.4, 1974).

**2.04.280   Removal--Limitation when.**   Notwithstanding
the provisions of Sections 2.04.240 through 2.04.270,
the city manager shall not be removed from office, other
than for misconduct in office, during or within a period of
ninety days next succeeding any general municipal election
held in the city at which election a member of the city
council is elected or when a new city councilman is appointed.
The purpose of this provision is to allow any newly elected
or appointed member of the city council or a reorganized
city council to observe the actions and ability of the city
manager in the performance of the powers and duties of his
office.   After the expiration of said ninety-day period,
the provisions of Sections 2.04.240 through 2.04.270 as to
the removal of the city manager shall apply and be effective.
(Ord. 196 §9.5, 1974).

11

**2.04.290 Additional terms of officer employment authorized.** Nothing in this chapter shall be construed as a limitation on the power or authority of the city council to enter into any supplemental agreement with the city manager delineating additional terms and conditions of employment not inconsistent with any provisions of this chapter. (Ord. 196 §10, 1974).

## Chapter 2.08

### CITY COUNCIL*

Sections:

| | |
|---|---|
| 2.08.010 | Meetings--Time. |
| 2.08.020 | Meetings--Place. |
| 2.08.030 | Salary. |

**2.08.010 Meetings--Time.** The city council of the city shall hold regular meetings on the first and third Tuesday of each month, at the hour of seven p.m. (Ord. 346 §1, 1989: Ord. 274 §1, 1980: Ord. 90 §1, 1960; Ord. 12 §1, 1946).

**2.08.020 Meetings--Place.** The address for the City Hall of the city is designated as 746 8th Street, in the city of Wasco, county of Kern, state of California, and all meetings of the city council shall be held therein unless otherwise designated by the city council by motion or resolution adopted prior thereto at a regular or special meeting, or as designated in the call for special meeting as provided by statute. (Ord. 308 §1, 1984: Ord. 146 §1, 1969; Ord. 12 §2, 1946).

**2.08.030 Salary.** Each member of the city council of the city shall receive a salary in the amount of seventy-five dollars per month, commencing at such time as one or more members of the council begins a new term of office. (Ord. 192 §1, 1974).

---

* For statutory provisions on city council meetings, see Gov. Code §36805 et seq. and §54950 et seq.; for statutory provisions on the salaries of city councilmen, see Gov. Code §36514 et seq.

6.   Detailed landscape plans;

7.   Detailed environmental information sufficient to permit assessment of all environmental effects of the project including cumulative and long-term effects.

D.   All vesting tentative maps regardless of the number of lots shall be considered by the city planning commission pursuant to Section 16.12.010 of the code.

E.   All vesting tentative parcel maps shall be referred to the planning commission for consideration pursuant to the provisions of Section 16.16.100 of the code. The decision of the planning commission concerning a tentative parcel map shall be final unless the decision is appealed to the city council pursuant to the provisions of Section 16.40.020 of the code.

F.   Notwithstanding the provisions of Section 16.16.120 of the code, the time for filing a final map for a vesting tentative map shall not be extended except for subdivisions of one hundred or more units where an extension is necessary to accomplish an approved phasing program. Failure to file a final map within the time period established by Section 16.20.010 of the code shall terminate all proceedings and no final map or parcel map for all or any part of the property included within the vesting tentative map shall be filed without first processing a new map pursuant to this title.

G.   The time for filing a parcel map for vesting tentative parcel map shall not be extended. Failure to file a parcel map within the time period established by Section 16.24.040 of the code shall terminate all proceedings and no final map or parcel map for all or any part of the property included within the vesting tentative map shall be filed without first processing a new map pursuant to this title.

H.   A vesting tentative map or vesting tentative parcel map shall not be approved or conditionally approved unless the planning commission finds on the basis of the studies and reports submitted by the subdivider that all public facilities necessary to serve the subdivision or mitigate any impacts created by the subdivision will be available for the entire time that the vesting tentative map or vesting tentative parcel map is valid plus any time during which the rights conferred by Section 17.26.030 of the code exist.   (Ord. 322 §2, 1987).

16.18.030   Rights conferred.   A.   Approval or conditional approval of a vesting tentative map or vesting parcel map shall confer a right to proceed with residential development in substantial compliance with the ordinances, policies and standards described in Section 66474.2 of the Government Code. However, if Section 66474.2 is repealed, the approval shall confer a vested right to proceed with development in substantial compliance with the ordinances, policies and standards in effect at the time the vesting tentative map or vesting tentative parcel map was approved or conditionally approved. Any disputes whether a development substantially complies with the approved

224-10b     (Wasco 1/88)

or conditionally approved map, or with the ordinances, policies or standards described in this subsection, shall be resolved by the city council.

B.    Notwithstanding subsection A, a permit or entitlement for development may be conditionally approved or denied if at the time of the issuance of the permit approval or entitlement it is determined by the issuing authority or the city council on appeal:

1.    A failure to condition or deny the permit or entitlement would place the residents of the subdivision or of the immediate community or both in a condition dangerous to their health or safety or both; or

2.    The condition or denial is required in order to comply with state or federal law.

C.    The rights conferred by a vesting tentative map or vesting tentative parcel map shall expire if:

1.    A final map or parcel map is not approved prior to the expiration of the vesting tentative parcel map;

2.    The applicant has requested and the city has approved a change in the type, density, bulk, or design of the development unless an amendment to the vesting tentative map or vesting tentative parcel map has been approved.

D.    Upon the filing of a final map or parcel map for a vesting tentative map or vesting tentative parcel map, the rights conferred by subsection A shall continue for one year. Where several final maps or parcel maps are recorded on various phases of a project covered by a single vesting tentative map or vesting tentative parcel map, this period shall begin for each phase when the final map or parcel map for that phase is recorded.

E.    The time period set forth in subsection D shall be automatically extended by any time used for processing a complete application for a grading permit if such processing exceeds thirty days from the date a complete application is accepted.

F.    A subdivider may apply to the city council for a one-year extension of the rights conferred by subsection D at any time before the time period set forth in subsection D expires. An extension may be granted only if the council finds that the map still complies with the requirements of this title.   The city council may approve, conditionally approve, or deny an extension in its sole discretion.

G.    If the subdivider submits a complete application for a building permit during the periods of time set forth in subsections D through F, the rights referred to therein shall continue until the expiration of that building permit or any extension of that permit.

H.    Upon the expiration of the time limits specified in subsections A, D, E, F or G all rights conferred by this section shall cease and the project shall be considered as the same as any subdivision which was not processed pursuant to this chapter.

I.  Notwithstanding subsection A, the amount of any fees which are required to be paid either as a condition of the map approval or by operation of any law shall be determined by application of the law or policy in effect at the time the fee is paid.  The amounts of the fees are not vested upon approval of the vesting tentative map or tentative parcel map.  (Ord. 322 §3, 1987).

## PROOF OF SERVICE

### STATE OF CALIFORNIA, COUNTY OF KERN

I am employed in the county of Kern, State of California. I am over the age of 18 and not a party to the within action; my business address is: 1920 20th Street, Bakersfield, California, 93301-4214.

On _January 25, 2001_, I served the foregoing document described as:

### TRIAL BRIEF OF THE CITY OF WASCO

on the interested parties in this action by placing ___ the original _✓_ a true copy thereof enclosed in sealed envelopes addressed as follows:

### [See Attached Mailing List]

_✓_ **By Mail**

_✓_ **As follows:** I am "readily familiar" with the firm's practice of collection and processing correspondence for mailing. Under that practice it would be deposited with U.S. postal service on that same day with postage thereon fully prepaid at Bakersfield, California in the ordinary course of business. I am aware that on motion of the party served, service is presumed invalid if postal cancellation date or postage meter date is more than one day after date of deposit for mailing in affidavit.

Executed on _January 25, 2001_, at Bakersfield, California.

___ By UPS Next Day Air: I deposited such envelope in a box regularly maintained by the UPS carrier, in an envelope or package designated by UPS with delivery fees provided for on ___ _____, 2001.

_✓_ By Facsimile: I sent a true copy of the above document via facsimile transmission to the offices of the parties as set forth below on this date before 5:00p.m.

___ By Personal Service I delivered the aforementioned document by hand to the individuals designated below as having been served by personal delivery.

Executed on _____, 2001, at Bakersfield, California.

_✓_ (State) I declare under penalty of perjury under the laws of the State of California that the above is true and correct.

___ (Federal) I declare that I am employed in the office of a member of the bar of this court at whose direction the service was made.

_RoseMary Myers_

## MAILING LIST

*Martin-McIntosh vs. Michael S. Brown, et al.*
*K.C.S.C. Case No. 227661 [JES]*
(c/w 227777)


David B. Potter, Esq.                                    Facsimile - (661) 328-0380
Arrache, Clark & Potter
4800 Easton Drive, Suite 114
Bakersfield, CA  93309-9424
(Attorneys for plaintiff, Martin-McIntosh)

Robert V. Scapa                                          Facsimile - (818) 995-4094
California Lawyers Court, LLP
16601 Ventura Boulevard, Suite 204
Encino, CA  91436
(Attorneys for cross-complainants, The Legacy Group and Michael S. Brown)