1

2

3

4

5

6

7                    **IN THE UNITED STATES DISTRICT COURT**

8              **FOR THE EASTERN DISTRICT OF CALIFORNIA**

9

10   ROGER McINTOSH,                          CASE NO. CV F 07-1080 LJO GSA

11              Plaintiff,                    **SUMMARY JUDGMENT/ADJUDICATION**
                                              **DECISION**
12        vs.                                 (Docs. 97, 125, 128.)

13   NORTHERN CALIFORNIA
     UNIVERSAL ENTERPRISES
14   COMPANY, et al,

15              Defendants.
     _____/
16
     AND RELATED CROSS-ACTION.
17
     _____/
18

19                          **INTRODUCTION**

20        Defendants Northern California Universal Enterprises Company ("NCUE"), Lotus

21   Developments, L.P. ("Lotus") and City of Wasco ("Wasco") seek summary judgment that plaintiff Roger

22   McIntosh's ("Mr. McIntosh's") copyright infringement claims arising from preparation of a subdivision

23   tentative map and improvement plans cannot be established and are barred by defenses. Mr. McIntosh

24   seeks summary adjudication that NCUE, Lotus, Wasco and defendant Dennis W. DeWalt, Inc.

25   ("DeWalt")[1] cannot establish affirmative defenses to his copyright infringement claims. This Court

26   _____

27        [1]   NCUE, Lotus, Wasco and DeWalt will be referred to collectively as "defendants." Although DeWalt did
     not file a summary judgment motion to defeat Mr. McIntosh's claims, DeWalt opposes Mr. McIntosh's summary adjudication
28   motion on affirmative defenses.

                                              1

1  considered the parties' summary judgment/adjudication motions on the record[2] without oral argument,

2  pursuant to Local Rule 78-230(h).  For the reasons discussed below, this Court DENIES NCUE, Lotus

3  and Wasco summary judgment on Mr. McIntosh's claims and GRANTS in part Mr. McIntosh summary

4  adjudication on certain affirmative defenses.

5                                    **BACKGROUND**

6                                       **Summary**

7      Mr. McIntosh is a Bakersfield civil engineer and does business as McIntosh & Associates, a sole

8  proprietorship.  For more than 30 years, Mr. McIntosh has performed urban planning and design of

9  California residential subdivisions.

10     NCUE is a general contractor and has developed subdivisions in the Central Valley.  Lotus is a

11  California limited partnership, and NCUE is Lotus' general partner.

12     DeWalt is a Bakersfield civil engineering firm, performs topographical and land surveys and

13  prepares tentative and final maps for subdivisions.[3]

14     This action arises from alleged infringing use of a tentative map and improvement plans to

15  develop 480 acres as a subdivision in Wasco.  Mr. McIntosh alleges that NCUE, Lotus, Wasco and

16  DeWalt "created a residential subdivision by copying and using McIntosh's copyrighted works and

17

18    [2]    This Court carefully reviewed and considered all arguments, points and authorities, declarations, testimony,
19  statements of undisputed facts and responses thereto, objections and other papers filed by the parties.  Omission of reference
     to an argument, document, objection or paper is not to be construed to the effect that this Court did not consider the argument,
20  document, objection or paper.  This Court thoroughly reviewed, considered and applied the evidence it deemed admissible,
     material and appropriate for summary judgment/adjudication.  This Court does not rule on objections in a summary
21  judgment/adjudication context.

22    [3]    Prior to subdivision development, a developer must present to the applicable municipal authority a
23  "tentative map" which comprises a subdivision drawing, including the number of lots, streets, boundaries, street names and
     other general information to permit the municipality's planning commission to approve the subdivision.  *See* Cal. Gov. Code,
24  §§ 66410-66499.58.  A tentative map shows the design of a proposed subdivision and existing conditions in and around it.
     *See* Cal. Gov. Code, § 66425.5.  The planning commission reviews the tentative map and approves it with conditions so that
25  the developer can develop the subdivision in conformity with the tentative map and conditions.  *See* Cal. Gov. Code, §§
     66410-66499.58.  After municipal authority final approval, a final map is recorded and the developer begins construction
26  in accordance with the conditions.  *See* Cal. Gov. Code, §§ 66426, 66473.5.

27          Improvement plans support each map to conform to the approved subdivision design and tentative map.  *See* Cal.
     Gov. Code, §§ 66426, 66473.5.  Improvement plans provide details of construction and design of subdivision elements in
28  the tentative map.  *See* Cal. Gov. Code, § 66426.  Improvements include street work and utilities for public or private streets,
     such as sewer, water storm drain, curbs, gutters, streets, landscaping, and street lights.  *See* Gov. Code, § 66456.2(d).

1   employing a tangible embodiment of the landscape design McIntosh conceived and created."

2   **Mr. McIntosh's Former Partnership**

3   In 1980, Mr. McIntosh and Eugene Martin ("Mr. Martin") formed Martin-McIntosh Land

4   Surveying ("Martin-McIntosh") which performed land planning services in California, including civil

5   engineering, landscape architecture and construction management.  In 1999, Mr. McIntosh bought out

6   Mr. Martin, and Martin-McIntosh became McIntosh & Associates.  Pursuant to the buy out agreement,

7   the rights and works created to that point by Martin-McIntosh were assigned to Mr. McIntosh.

8   **Martin-McIntosh's Preparation Of Tentative Map 5412**

9   In January 1992, Wasco encouraged Legacy Group, L.P. ("Legacy"), a former land development

10  firm, to purchase the 480-acre Valley Rose Estates subdivision ("subdivision") and to develop the

11  subdivision with Wasco financing. In 1992, meaningful steps were initiated to develop a master

12  development plan for the subdivision.

13  Martin-McIntosh created a "draft guidance package" ("guidance package") that provided

14  direction and clarified expectations among Wasco, Legacy and Martin-McIntosh. Martin-McIntosh was

15  to supervise the subdivision development and construction and serve as Legacy's representative for

16  Wasco's review and processing of its master plan.  Wasco notes that the guidance package called for

17  Martin-McIntosh to produce master plans, tentative maps and improvement plans and provide them as

18  part of Wasco's review and approval.  Legacy was to serve as project applicant.

19  By a March 18, 1992 agreement ("MM-Legacy agreement") with Legacy general partner Michael

20  S. Brown ("Mr. Brown"),[4] Martin-McIntosh agreed to prepare for the subdivision a conceptual plan for

21  $15,200, to prepare master plans for water, sewer and drainage, and other utilities for $54,800, and to

22  conduct a subdivision survey for $19,100, for a $89,100 total.  Mr. McIntosh characterizes Martin-

23  McIntosh's roles "as a consultant to perform civil engineering services" for the subdivision.

24  By a May 11, 1992 letter agreement, Martin-McIntosh agreed to prepare for the subdivision

25  Parcel Map No. 9572 for $5,000 and improvement plans and final map for Tract 5472[5] for $57,900.

26  _____

27  [4]   Wasco characterizes Mr. Brown as the point person for Legacy's plans to develop the subdivision.

28  [5]   Tract 5472 is at issue in this action.

3

1    By a June 24, 1992 letter agreement, Martin-McIntosh agreed to prepare a tentative map for Tract

2    5472 ("Tentative Map 5472")for $12,100.

3    On July 21, 1992, Martin-McIntosh recorded Map 9572, which divided the subdivision's 480

4    acres into six parcels, including the 33.51-acre Tract 5472.

5    According to Mr. McIntosh, he designed the overall subdivision layout and division of individual

6    plots and common spaces and created the subdivision's landscape designs.  Mr. McIntosh's subdivision

7    and landscape designs are depicted in technical drawings ("MM improvement plans") that are subject

8    of his February 22, 2007 copyright registration certificate.

9    Mr. McIntosh points out that Martin-McIntosh retained ownership of its work pursuant to the

10   MM-Legacy agreement which provides in pertinent part:

> All original papers, documents, drawings and other work product of consultant [Martin-McIntosh], and copies thereof, produced by consultant pursuant to this agreement shall remain the property of consultant and may be used by consultant without the consent of client [Legacy].  Upon request and payment of the costs involved, client is entitled to copy of all papers, documents and drawing provided client's account is paid current.
>
> . . .
>
> Client agrees not to use or permit any other person to use plans, drawings, or other work product prepared by consultant, which plans, drawings, or other work product are not final and which are not signed, and stamped or sealed by consultant. . . . Client further agrees that final plans, drawings or other work product are for the exclusive use of client and may be used by client only for the project described on the face hereof. Such final plans, drawings or other work product may not be changed nor used on a different project without the written authorization or approval by consultant.[6]

20   The MM-Legacy agreement addressed Legacy's default:

> Client acknowledges that its right to utilize the services and work product provided pursuant to this agreement will continue only so long as client is not in default pursuant to the terms and conditions of this agreement and client has performed all obligations under this agreement.

24   In 1992, the Wasco council approved Tentative Map 5472 for development of 33.51 acres into

---

[6]    Mr. McIntosh's complaint alleges that Legacy agreed that all work product which Mr. McIntosh created for the subdivision remained his property, that Mr. McIntosh retained the right to use the MM improvement plans without Legacy's consent, and that Mr. McIntosh's designs and technical drawings were created exclusively for Legacy and could be used only on the subdivision project.

1   68 residential lots and one 96-unit multi-family lot.[7]

2   **Original Subdivision Improvements**

3   Wasco and Legacy entered in a November 3, 1992 development agreement for the subdivision

4   and which provided that the agreement would continue until 2002, unless the tentative map expired.

5   In 1993, Martin-McIntosh prepared the MM improvement plans (streets, sidewalks, curbs and

6   gutters, storm drains, sewer, water and utilities) for the subdivision.  Also in 1993, Martin-McIntosh

7   submitted the MM improvement plans to Wasco for Legacy to obtain a building permit to construct

8   Tract 5472 improvements.  Wasco approved Tentative Map 5472 and the MM improvement plans, and

9   improvements were constructed in 1993 and 1994.

10   Legacy and Wasco entered into a January 28, 1993 Acquisition Agreement ("Acquisition

11   Agreement") by which Wasco agreed to purchase infrastructure improvements to be constructed on Tract

12   5472.  Legacy was to pay Martin-McIntosh with money received from Wasco.  Wasco claims that it paid

13   no less than $98,000 for the MM improvement plans for Tract 5472.  NCUE, Lotus and Wasco further

14   claim that Wasco paid Martin-McIntosh more than $800,000 for its subdivision services.  Mr. McIntosh

15   explains that Wasco paid Martin-McIntosh on Legacy's behalf from Martin-McIntosh's invoices

16   submitted to Legacy.

17   NCUE and Lotus note that the Acquisition Agreement provided Wasco the right to complete

18   improvements which were not completed by Legacy.

19   In 1994, the real estate market declined, Legacy declared bankruptcy, and subdivision

20   construction ceased.  Although improvements were constructed for Tentative Map 5472, legal lots

21   within Tract 5472 were not created, and Martin-McIntosh ceased work, with Legacy's default, before

22   the final map was approved.  Tentative Map 5472 expired on May 11, 2001, and a final map was not

23   recorded.

24   **Lotus' Subdivision Purchase**

25   The subdivision was dormant for 10 years after Wasco decided to stop funding improvements.

26   On April 26, 2002, Wasco purchased Tract 5472 at a tax sale.  Mr. McIntosh notes that at that time, the

27   _____

28   [7]   As discussed below, Tract 5472 ultimately became Tract 6451 which was divided into 68 single-family lots.

5

subdivision could have been redesigned by a developer.  Wasco points out that substantially all improvements in the subdivision had been constructed in accordance with the MM improvement plans.

In November 2003, Wasco marketed Tract 5472 and circulated a developer information package ("developer package") which reached NCUE's real estate agent and touted Tract 5472 as having "infrastructure."  The developer package included Tentative Map 5472 and a sewer and water map and noted that there were several plan documents developed in the early 1990s and which Wasco would make available.  The developer package pointed out that "infrastructure, including roadways and water lines, were developed on the 34 acre parcel within the City-owned land."

Wasco and NCUE entered into a May 18, 2004 agreement for NCUE's purchase of the subdivision, including Tract 5472.  Prior to the close of escrow, NCUE assigned its purchase rights to Lotus which purchased the subdivision.  NCUE contemplated to take advantage of existing subdivision improvements to develop it.  Wasco notes that with the subdivision sale, its subdivision ownership interests ceased.

With the May 11, 2001 expiration of the Tentative Map 5472, Wasco required Lotus to submit a new tentative map.

## NCUE's Contact Of Mr. McIntosh

Prior to Lotus' purchase of the subdivision, NCUE president Joseph Wu ("Mr. Wu") spoke with Mr. McIntosh by telephone about Lotus' intended subdivision purchase.[8]  Mr. Wu asked Mr. McIntosh if Mr. McIntosh would prepare a new tentative map.  Mr. McIntosh responded that he would require $300,000 owed by Legacy plus interest.  NCUE and Lotus note that Mr. McIntosh, at the time of his telephone conversation with Mr. Wu, knew that Mr. McIntosh held a copyright interest in Tentative Map 5472 and the MM improvement plans but did not so inform Mr. Wu.  NCUE and Lotus point to Mr. McIntosh's following deposition testimony:

> Q.     . . . Did you know at the time that you had this conversation with Mr. Wu that if instead of hiring you he went with another engineer, who then prepared a tentative map substantially similar to the one you had prepared, that Joe would be infringing on your copyright?

---

[8]     Wasco attributes Mr. Wu to direct Lotus' activities and to have used NCUE and Lotus interchangeably with his dealings with Wasco.

. . .

A.     Well, the improvement plans have a copyright stamp on them, so I assume that everyone knew that there was a copyright infringement.

. . .

Q.     . . . You didn't tell Mr. Wu, though, that if he were to do that, he would be violating copyright laws, did you?

A.     No, I didn't feel it was my duty to tell him, because he was going to – he said he would call me back.

Mr. Wu did not get back to Mr. McIntosh regarding use of Tentative Map 5472 and the MM improvement plans.

### New Tentative Map 6451

Rather than redesign the subdivision, NCUE with Wasco's permission chose to process new Tentative Map 6451 to replace expired Tentative Map 5472.  On July 21, 2004, Mr. Wu hired defendant DeWalt, a Bakersfield engineering firm, for $26,000 to survey existing improvements and prepare and process new Tentative Map 6451.  DeWalt surveyed the streets, curbs, gutters, manhole covers, block walls and visible improvements which had been constructed in Tract 5472.  DeWalt processed the survey information and created Tentative Map 6451 to depict observed site improvements and conditions.  DeWalt submitted Tentative Map 6451 to Wasco on November 10, 2004.  Wasco approved Tentative Map 6451 on March 14, 2005 and Final Map 6451 on February 20, 2007.

Wasco did not require NCUE to submit improvement plans due to Legacy's prior improvement construction.  As such, NCUE and Lotus did not prepare or submit subdivision improvement plans.

Wasco notes that it did not enter with NCUE or Lotus into a joint venture, partnership, co-ownership or other arrangement regarding subdivision ownership or development.  Wasco notes that NCUE and/or Lotus, not Wasco, decided to continue to develop the subdivision.  According to Wasco, its role was limited to "routine municipal functions," including review, comment and approval/disapproval for NCUE/Lotus' tentative and final maps and processing NCUE/Lotus' additional requests to finalize subdivision development.

### Mr. McIntosh's Learning Of Tentative Map 6451

Mr. McIntosh claims that no earlier than late 2006 did he learn that DeWalt contracted with

7

NCUE to prepare new Tentative Map 6451. After he learned of DeWalt's work, Mr. McIntosh requested and received Wasco council agendas to monitor the subdivision's progress. After Mr. McIntosh discovered a final map for new Tract 6451 was being processed, he drove by the subdivision in October 2006 and observed home construction.[9] Mr. McIntosh claims that after seeing the construction, he went to the Wasco building and planning department in late 2006 and confirmed that NCUE had used an identical Tentative Map 5472 and the MM improvement plans to support Tentative Map 6451. Mr. McIntosh concludes that he did not know of infringing activity until November or December 2006.

Mr. McIntosh did not warn Mr. Wu or DeWalt of a potential copyright violation:

> Q. . . . And as he moved forward with obtaining his final, and as he moved forward with constructing homes, you never considered contacting him to advise him that in your opinion he was violating your copyright, correct?
>
> A. Well, I don't feel that that's my – my position to advise him of what the law says.

DeWalt president Jeff Gutierrez ("Mr. Gutierrez") declares: "At no time did Mr. McIntosh ever inform me that my work for Mr. Wu would result in copyright infringement or litigation. In fact, during the entire time [that] DeWalt was working on this project I was never contacted by Mr. McIntosh."

Mr. Wu declares: "The first time I ever heard anything regarding Mr. McIntosh's alleged copyright was when I was served with the summons and complaint in this action. By that time Lotus and Northern had spent over $1,250,000 in hard construction costs on twelve homes then being constructed . . . and $979,403.86 for 68 building permits."

### Denial Of Use Of Tentative Map 5472 And The MM Improvement Plans

NCUE claims that it did not use Tentative Map 5472 to prepare Tentative Map 6451. Greg Black ("Mr. Black") was DeWalt's project manager/lead engineer for Tentative Map 6451 and acknowledges that Wasco emailed him the MM improvement plans. Wasco concedes that it emailed Mr. Black the MM improvement plans on April 13, 2005. However, Mr. Black states in his declaration:

> I did not reproduce anything from, or otherwise make any use of any improvement plans the City of Wasco provided to me in conjunction with our work on Tentative Map 6451. . . . I have no knowledge of any DeWalt employee reproducing anything from Tentative Map 5472 prepared by Martin-McIntosh.

---

[9] Final Map 6451 was recorded in early 2006 and was approved without submission of improvement plans.

DeWalt employees Sara Burgi ("Ms. Burgi") and Josh Woodward ("Mr. Woodward") worked on Tentative Map 6451 and deny or do not recall seeing Tentative Map 5472 or the MM improvement plans prior to this litigation or copying them. Wasco notes that DeWalt employees who performed survey work for Tentative Map 6451 denied copying Tentative Map 5472.

In his deposition, Mr. Gutierrez testified that when DeWalt starts a project like the subdivision, "we go and find out as much as we can about the existing utilities in an area so that we know correctly to attach them." Mr. Gutierrez noted that if Wasco had the MM improvement plans, DeWalt's search would have included them. Mr. Gutierrez declares: "The reason that DeWalt's 68 lot subdivision, at first glance, resembles that portion of Martin-McIntosh's 69 lot subdivision is because all of the roads, curbs and gutters were constructed under the Martin-McIntosh tentative. Since we surveyed 'what was there' it is inevitable that there would be a resemblance to the map under which the improvements were constructed."

Mr. Wu declares that although Wasco provided him landscape and pump station plans for repairs, neither he "nor any other agent of Lotus or Northern obtained any other portions of The Plans prior to the filing of this lawsuit nor did we make copies of any of The Plans." Wasco notes that after Tentative Map 6541 approval, Wasco's dealings with NCUE/Lotus were limited to requiring NCUE/Lotus to perform lift station improvements and repairs and maintenance for subdivision completion and final map recording. Wasco points out that NCUE/Lotus' work in connection with subdivision improvements has been limited to repair and maintenance, including repairing concrete cracks, fixing street lights, repaving streets, and landscaping.

Wasco's Keith Woodcock testified that Wasco did not use the MM improvement plans in conjunction with Tentative Map 6541. Wasco points out that during its review of the Tentative and Final Tract 6451 Maps, it never compared old and new tentative subdivision maps and never used or relied on Tentative Map 5472 to process new and final subdivision maps. Wasco notes that it did not advise, inform or suggest that the other defendants copy, rely on or use Tentative Map 5472 or the MM improvement plans in infringing ways to perform work to finalize subdivision development.

Mr. McIntosh notes that he denied permission to use Tract Map 5472 and the MM improvement plans. Mr. McIntosh declares: "I was never contacted by anyone from the City of Wasco or DeWalt

Corporation requesting permission to use the 5472 Tentative maps or the MM improvement plans. I also never gave any oral or written permission for either of them to use the 5472 Tentative maps or the improvement plans." Mr. McIntosh further declares that NCUE and Lotus "were refused permission" to use the Tentative Map 5472 and the MM improvement plans. Mr. McIntosh declares that neither Wasco, NCUE, Lotus nor DeWalt paid to use Tentative Map 5472 or the MM improvement plans. Mr. McIntosh claims that NCUE and DeWalt had access to Tentative Map 5472 and the MM improvement plans through Wasco.

According to Wasco, Mr. McIntosh is aware of no facts that Mr. Wu, NCUE, Lotus or DeWalt copied the MM improvement plans besides Mr. McIntosh's claim that Tentative Map 6451 looks "substantially similar" to the MM improvement plans. Wasco notes that none of its inspection improvements since Legacy's construction involved a comparison of improvements with the MM improvement plans.

### **Mr. McIntosh's Claims**

Mr. McIntosh registered his copyright on Tentative Map 5472 and the MM improvement plans on February 22, 2007. On July 26, 2007, Mr. McIntosh filed his original complaint to initiate this action. Mr. McIntosh proceeds on this third-amended complaint ("TAC") against NCUE, Lotus, Wasco and DeWalt to allege "Defendants' construction of the Subdivision is based on landscape and subdivision designs substantially similar to the subdivision and landscape design conceived and created by McIntosh that is represented in the plans and that is the subject of Copyright Registration Certificate No. VAU-721-180."

#### *Direct Infringement*

The TAC's first claim alleges that the "copying of the Plans by defendants constitutes infringement of McIntosh's registered copyright and the technical drawings depicted in the Plans, in violation of the Copyright Act." Mr. McIntosh claims Tentative Map 6451 is "substantially similar" to Tentative Map 5472 in that the street names, lot configuration, numbering system and tract boundaries appear identical. As to evidence of copying, Mr. McIntosh points to:

1.      Tentative Map 5472 and Tentative Map 6451's identical number of lots;

2.      Tentative Map 6451 legends' reference to existing centerline monuments and lot corner

1          tags; and

2          3.      A note on Tentative Map 6451 acknowledges construction of improvements per the MM

3                  improvement plans and Tentative Map 5472.

4          As to lot configuration, Mr. McIntosh claims that Martin-McIntosh maximized the subdivision's

5   number of lots after considering Wasco's requirements, including minimum street width, zoning, lot

6   dimensions and setbacks, subdivision size and increased developer profits.

7          Mr. McIntosh's direct infringement claim against Wasco arises from the Wasco's distribution

8   of Tentative Map 5472 and the MM improvement plans to NCUE and/or DeWalt.

9                          *Contributory Infringement*

10         The TAC's second claim alleges that Wasco "knowingly and materially contributed to and

11  induced the infringing conduct" of NCUE and Lotus.  Mr. McIntosh claims that Wasco controlled the

12  subdivision's development, induced infringing activities by copying, distributing and recording Mr.

13  McIntosh's plans, and financially benefitted from alleged infringing activities.

14                              *Requested Relief*

15         The TAC seeks a declaration "that the defendants have willfully infringed McIntosh's exclusive

16  rights in the copyrighted material" and an injunction to "[t]ake all steps necessary to remove any

17  structures or design elements that have been copied from the Plans or built based on the Plans."  The

18  TAC further seeks actual and statutory damages and a "portion of the profits earned by Defendants from

19  the creation and commercial exploitation of the copied Plans."

20                              **DISCUSSION**

21                  **Summary Judgment/Adjudication Standards**

22         NCUE, Lotus and Wasco seek summary judgment on Mr. McIntosh's copyright infringement

23  claims.  Mr. McIntosh seeks summary adjudication on eight of defendants' affirmative defenses.

24         F.R.Civ.P. 56(b) permits a "party against whom relief is sought" to seek "summary judgment on

25  all or part of the claim."  "A district court may dispose of a particular claim or defense by summary

26  judgment when one of the parties is entitled to judgment as a matter of law on that claim or defense."

27  *Beal Bank, SSB v. Pittorino*, 177 F.3d 65, 68 (1st Cir. 1999).

28         Summary judgment is appropriate when there exists no genuine issue as to any material fact and

the moving party is entitled to judgment as a matter of law. F.R.Civ.P. 56(c); *Matsushita Elec. Indus. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 1356 (1986); *T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987). The purpose of summary judgment is to "pierce the pleadings and assess the proof in order to see whether there is a genuine need for trial." *Matsushita Elec.,* 475 U.S. at 586, n. 11, 106 S.Ct. 1348; *International Union of Bricklayers v. Martin Jaska, Inc.*, 752 F.2d 1401, 1405 (9th Cir. 1985).

On summary judgment, a court must decide whether there is a "genuine issue as to any material fact," not weigh the evidence or determine the truth of contested matters. F.R.Civ.P. 56(c); *Covey v. Hollydale Mobilehome Estates*, 116 F.3d 830, 834 (9th Cir. 1997); *see Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157, 90 S.Ct. 1598 (1970); *Poller v. Columbia Broadcast System*, 368 U.S. 464, 467, 82 S.Ct. 486 (1962); *Loehr v. Ventura County Community College Dist.*, 743 F.2d 1310, 1313 (9th Cir. 1984). The evidence of the party opposing summary judgment is to be believed and all reasonable inferences that may be drawn from the facts before the court must be drawn in favor of the opposing party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S.Ct. 2505 (1986); *Matsushita*, 475 U.S. at 587, 106 S.Ct. 1348. The inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 251-252, 106 S.Ct. 2505.

To carry its burden of production on summary judgment, a moving party "must either produce evidence negating an essential element of the nonmoving party's claim or defense or show that the nonmoving party does not have enough evidence of an essential element to carry its ultimate burden of persuasion at trial." *Nissan Fire & Marine Ins. Co. v. Fritz Companies, Inc.*, 210 F.3d 1099, 1102 (9th Cir. 2000); *see High Tech Gays v. Defense Indus. Sec. Clearance Office*, 895 F.2d 563, 574 (9th Cir. 1990). "[T]o carry its ultimate burden of persuasion on the motion, the moving party must persuade the court that there is no genuine issue of material fact." *Nissan Fire*, 210 F.3d at 1102; *see High Tech Gays*, 895 F.2d at 574. "As to materiality, the substantive law will identify which facts are material. Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson*, 477 U.S. at 248, 106 S.Ct. 2505.

"If a moving party fails to carry its initial burden of production, the nonmoving party has no

obligation to produce anything, even if the nonmoving party would have the ultimate burden of persuasion at trial." *Nissan Fire*, 210 F.3d at 1102-1103; *see Adickes*, 398 U.S. at 160, 90 S.Ct. 1598. "If, however, a moving party carries its burden of production, the nonmoving party must produce evidence to support its claim or defense." *Nissan Fire*, 210 F.3d at 1103; *see High Tech Gays*, 895 F.2d at 574. "If the nonmoving party fails to produce enough evidence to create a genuine issue of material fact, the moving party wins the motion for summary judgment." *Nissan Fire*, 210 F.3d at 1103; *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548 (1986) ("Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make the showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.")

"But if the nonmoving party produces enough evidence to create a genuine issue of material fact, the nonmoving party defeats the motion." *Nissan Fire*, 210 F.3d at 1103; *see Celotex*, 477 U.S. at 322, 106 S.Ct. 2548. "The amount of evidence necessary to raise a genuine issue of material fact is enough 'to require a jury or judge to resolve the parties' differing versions of the truth at trial.'" *Aydin Corp. v. Loral Corp.*, 718 F.2d 897, 902 (quoting *First Nat'l Bank v. Cities Service Co.*, 391 U.S. 253, 288-289, 88 S.Ct. 1575, 1592 (1968)). "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient." *Anderson*, 477 U.S. at 252, 106 S.Ct. 2505.

Under F.R.Civ.P. 56(d)(1), a summary judgment/adjudication motion, interlocutory in character, may be rendered on the issue of liability alone. "In cases that involve . . . multiple causes of action, summary judgment may be proper as to some causes of action but not as to others, or as to some issues but not as to others, or as to some parties, but not as to others." *Barker v. Norman*, 651 F.2d 1107, 1123 (5th Cir. 1981); *see also Robi v. Five Platters, Inc.*, 918 F.2d 1439 (9th Cir. 1990); *Cheng v. Commissioner Internal Revenue Service*, 878 F.2d 306, 309 (9th Cir. 1989). A court "may grant summary adjudication as to specific issues if it will narrow the issues for trial." *First Nat'l Ins. Co. v. F.D.I.C.*, 977 F.Supp. 1051, 1055 (S.D. Cal. 1977).

As discussed below, NCUE, Lotus and Wasco fail to demonstrate the absence of factual issues and that they are entitled to judgment as a matter of law. Mr. McIntosh demonstrates that he is entitled to summary adjudication on defendants' affirmative defenses, except independent creation.

**General Copyright Principles**

"Copyright protection subsists . . . in original works of authorship fixed in any tangible medium of expression . . . from which they can be perceived, reproduced, or otherwise communicated." 17 U.S.C. § 102(a). "Works of authorship include . . . architectural works." 17 U.S.C. § 102(a)(8). "An 'architectural work' is the design of a building as embodied in any tangible medium of expression, including a building, architectural plans, or drawings. The work includes the overall form as well as the arrangement and composition of spaces and elements in the design, but does not include individual standard features." 17 U.S.C. § 101.

Defendants agree that Tentative Map 5472 and the MM improvement plans are subject to copyright protection. *See Del Madera Properties v. Rhodes and Gardner, Inc.*, 637 F.Supp. 262, 263-264 (N.D. Cal. 1985). Defendants dispute that Mr. McIntosh's copyright interests in them were infringed.

**Direct Copying Of The MM Improvement Plans**

Defendants argue that they are not subject to copyright infringement arising from the MM improvement plans because DeWalt need not and did not submit improvement plans. NCUE and Lotus claim an absence of evidence of their copying the MM improvement plans. Wasco argues that it is not subject to contributory or vicarious copyright infringement in the absence of evidence of copying the MM improvement plans.

A copyright infringement plaintiff must demonstrate "copying of constituent elements of the work that are original." *Feist Pubs., Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 361, 111 S.Ct. 1282 (1991). "The test of infringement is whether the work is recognized by an ordinary observer as having been taken from the copyrighted source." *Bradbury v. Columbia Broadcasting System, Inc.*, 287 F.2d 478, 485 (9th Cir.), *cert. dismissed*, 368 U.S. 801, 82 S.Ct. 19 (1961). To avoid summary judgment, a copyright infringement plaintiff need only demonstrate a triable issue of fact whether a defendant copied "anything that was 'original' to" the plaintiff's work. *Funky Films, Inc. v. Time Warner Entertainment Co.*, 462 F.3d 1072, 1076 (9th Cir. 2006).

Defendants point to the absence of evidence of direct copying in that the four DeWalt employees involved in Tentative and Final Maps 6451 deny or do not recall copying. Defendants rely on DeWalt's

14

lead engineer/project manager Mr. Black who declares that his practice is to "obtain any and all documents in any way related to a parcel of land on which I am working" but denies reproducing or using "any improvement plans" provided by Wasco.

Defendants concede that Wasco provided NCUE copies of pump station and landscape plans but note that NCUE did not copy them and reference to the plans for maintenance is not copyright infringement. The parties acknowledge an absence of evidence of direct copying to support copyright infringement. However, the analysis does not end there.

### Substantial Similarity Of Tentative Map 5472 And Tentative And Final Map 6541

Claiming an absence of evidence of direct copying, defendants hold Mr. McIntosh to establish substantial similarity between Tentative Map 5472 and Tentative and Final Maps 6451.

"Absent evidence of direct copying, 'proof of infringement involves fact-based showings that the defendant had 'access' to the plaintiff's work and that the two works are 'substantially similar.'" *Funky Films*, 462 F.2d at 1076 (internal quotes omitted). "[T]here must be substantial similarity between infringing work and the work copyrighted; and that similarity must have been caused by the defendant's having copied the copyright holder's creation." *Roth Greeting Cards v. United Card Co.*, 429 F.2d 1106, 1110 (9th Cir. 1970).

Substantial similarity "is inextricably linked to the issue of access." *Three Boys Music Corp. v. Bolton*, 212 F.3d 477, 485 (9th Cir. 2000), *cert. denied*, 531 U.S. 1126, 121 S.Ct. 881 (2001). "Copying may be established by proof of access and substantial similarity." *Transgo, Inc. v. Ajac Transmission Parts Corp.*, 768 F.2d 1001, 1018 (9th Cir. 1985), *cert. denied*, 474 U.S. 1059, 106 S.Ct. 802 (1986). "In what is known as the 'inverse ratio rule,' we 'require a lower standard of proof of substantial similarity when a high degree of access is shown.'" *Three Boys Music*, 212 F.3d at 485 (quoting *Smith v. Jackson*, 84 F.3d 1213, 1218 (9th Cir. 1996)).

"When the issue is whether two works are substantially similar, summary judgment is appropriate if no reasonable juror could find substantial similarity of ideas and expression." *Kauf v. Walt Disney Pictures & Television*, 16 F.3d 1042, 1045 (9th Cir. 1994). Although "summary judgment is not highly favored on the substantial similarity issue in copyright cases," *Berkic v. Crinchton*, 761 F.2d 1289, 1292 (9th Cir.), *cert. denied*, 474 U.S. 826, 106 S.Ct. 85 (1985), substantial similarity "may

1    often be decided as a matter of law." *Sid & Marty Krofft Television Prods., Inc. v. McDonald's Corp.*,

2    562 F.2d 1157, 1164 (9th Cir. 1977).

3         The substantial similarity test contains extrinsic and intrinsic components. *Funky Films*, 462

4    F.3d at 1077.  At summary judgment, a court applies only the extrinsic test in that intrinsic test, which

5    examines an ordinary person's subjective impressions of the similarities between two works, is the jury's

6    exclusive province. *Funky Films*, 462 F.3d at 1077.[10]  Extrinsic analysis is objective and depends on

7    "specific criteria which can be listed and analyzed," not "the responses of the trier of fact." *Funky Films*,

8    462 F.3d at 1077 (quoting *Kouf*, 16 F.3d at 1045).  A court may determine non-infringement as a matter

9    of law on summary judgment if "no reasonable jury, properly instructed, could find that the two works

10   are substantially similar." *Warner Bros. v. American Broadcasting Co.*, 720 F.2d 231, 240 (2nd Cir.

11   1983).

12        A court "must take care to inquire only whether 'the *protectible elements, standing alone,* are

13   substantially similar." *Williams v. Crichton*, 84 F.3d 581, 588 (2nd Cir. 1996) (emphasis in original).

14   "[W]hen applying the extrinsic test, a court must filter out and disregard the non-protectible elements

15   in making its substantial similarity determination." *Cavalier*, 297 F.3d at 823.

16        Defendants concede that Wasco provided DeWalt's Mr. Black Tentative Map 5472 by an April

17   13, 2005 email but challenge substantial similarity in that DeWalt submitted Tentative Map 6451 to

18   Wasco on November 10, 2004.

19        Defendants contend that substantial similarity refers to expression of an artist's concept, not the

20   underlying idea and that mere identity of ideas expressed by two works is insufficient substantial

21   similarity.  *See* 17 U.S.C. § 102(b) ("In no case does copyright protection for an original work of

22   authorship extend to any idea . . . regardless of the form in which it is described, explained, illustrated,

23   or embodied in such work.") "Copyright law only protects expression of ideas, not the ideas

24   themselves." *Cavalier*, 297 F.3d at 823.  Facts and ideas are not subject to copyright: "The copyright

25   is limited to those aspects of the work-termed 'expression' – that display the stamp of the author's

26   _____

27        [10]      "The 'intrinsic test' is a subjective comparison that focuses on 'whether the ordinary, reasonable audience'
     would find the works substantially similar in the 'total concept and feel of the works.'" *Cavalier v. Random House, Inc.*, 297
28   F.3d 815, 822 (9th Cir. 2002) (quoting *Kouf*, 16 F.3d at 1045).

originality." *Harper & Row Publishers, Inc. v. Nation Enterprises*, 471 U.S. 539, 547, 105 S.Ct. 2218 (1985). "An author can claim to 'own' only an original manner of expressing ideas or an original arrangement of facts." *Cooling Systems and Flexibles v. Stuart Radiator*, 777 F.2d 485, 491 (9th Cir. 1985), *overruled on other grounds, Fogerty v. Fantasy, Inc.*, 510 U.S. 517, 114 S.Ct. 1023, 127 L.Ed.2d 455 (1994).

According to defendants, placement of 68 lots of particular size with streets "is a non-copyrightable idea." Defendants argue that the "only similarity" between Tentative Map 5472 and Tentative and Final Maps 6451 are non-copyrightable ideas of 68 lots of particular size, lot numbering, street layout, and street naming.

To address substantial similarity, Mr. McIntosh points to near unfettered access to Tentative Map 5472 and the MM improvement plans. Mr. McIntosh relies on deposition testimony of Wasco Deputy Director of Public Works Robert Wren that Wasco places no restriction on obtaining copies of subdivision plans. In addition to the number of lots and tract numbering system, Mr. McIntosh points to substantial similarity of Tentative Maps 5472 and 6451, including centerline monuments, front lot corner tags and Tentative Map 6451's notes referring to Tentative Map 5472.

The evidence reveals that defendants had access to Tentative Map 5472 and the MM improvements plans to lower Mr. McIntosh's substantial similarity burden. Defendants neither articulate nor delineate particular differences between Tentative Map 5472 and Tentative and Final Maps 6451. Defendants put this Court to the task to compare the maps and find the differences without meaningful guidance. Wasco notes that if this Court compares the maps, the Court will "find over 100 differences" and "will be overwhelmed by the differences." NCUE and Lotus invite this Court to "focus . . . on the innumerable differences between the two maps" by which "this Court will find over 250 differences." Defendants point this Court to 29 pages of the deposition of Steven Wong, whom defendants do not identify but whom presumably is a defense expert. Defendants appear to ask this Court to comb the deposition transcript for differences.

This Court is not obliged to scour the evidence to support defendants' summary judgment motions. Defendants have failed to satisfy their burden to distill the evidence and present it. Defendants' "go fish" approach is unacceptable. Defendants' inartful papers fail to demonstrate an

absence of a genuine issue of material fact.  This Court construes defendants' failure to articulate and delineate differences as their concession that Tentative Map 5472 and Tentative and Final Maps 6451 are substantially similar, or at a minimum, that factual issues arise as to their similarity.  Moreover, the insignificant differences noted by Mr. McIntosh raise factual issues as to substantial similarity to prohibit summary judgment for defendants, especially given Tentative and Final Maps 6451's need to conform to the prior MM improvement plans.  *See Baxter v. MCA, Inc.*, 812 F.2d 421, 425 (9th Cir. 1987) ("Even if a copied portion be relatively small in proportion to the entire work, if qualitatively important, the finder of fact may properly find substantial similarity.")

### Implied Nonexclusive License[11]

Defendants argue that even if the MM improvement plans had been used, Martin-McIntosh had provided Wasco an implied nonexclusive license to reproduce and distribute Tentative Map 5472 and the MM improvement plans[12] to avoid defendants' liability for copyright infringement.  Mr. McIntosh seeks summary adjudication on defendants implied nonexclusive license defense in that he never intended his work to be distributed to or by defendants.

A copyright owner "has exclusive rights" "to reproduce the copyrighted work in copies," "to prepare derivative works based upon the copyrighted work, " and "to distribute copies . . . of the copyrighted work to the public by sale or other transfer of ownership . . ."  17 U.S.C. § 106(1)-(3).  "A transfer of copyright ownership, other than by operation of law, is not valid unless an instrument of conveyance, or a note or memorandum of the transfer, is in writing and signed by the owner of the rights conveyed or such owner's duly authorized agent."  17 U.S.C. § 204(a).  A "narrow exception to the writing requirement" is an implied nonexclusive license to use the copyrighted work.  *Effects Assocs., Inc. v. Cohen*, 908 F.2d 555, 558-559 (9th Cir. 1990), *cert. denied*, 498 U.S. 1103, 111 S.Ct. 1003 (1991).

---

[11]     Mr. McIntosh seeks summary adjudication on eight of defendants' affirmative defenses (implied license, independent creation, merger, publication, first sale doctrine, abandonment, statute of limitations and laches).  This Court will address the affirmative defenses immediately below and later address Mr. McIntosh's claims against Wasco for contributory and vicarious copyright infringement.

[12]     The parties are unclear whether the implied nonexclusive license defense applies to both Tentative Map 5472 and the MM improvement plans.  NCUE and Lotus note that the defense "is asserted only as to the Plans, (not Map 5472)."  Wasco appears to take a different position.

1    Nonexclusive licenses may be granted orally or may be implied from conduct. *Graham v. James*,

2    144 F.3d 229, 235 (2nd Cir. 1998). "A copyright owner who grants a nonexclusive license to use his

3    copyright material waives his right to sue the licensee for copyright infringement." *Graham*, 144 F.3d

4    at 236. However, "courts have found implied licenses only in 'narrow' circumstances where one party

5    'created a work at [the other's] request and handed it over, intending that [the other] copy and distribute

6    it.'" *Smithkline Beecham v. Watson Pharmaceuticals*, 211 F.3d 21, 25 (2nd Cir. 2000) (quoting *Effects*

7    *Assocs., Inc. v. Cohen*, 908 F.2d 555, 558 (9th Cir. 1990)).

8    An "implied nonexclusive license" for use of an otherwise copyright protected work is created

9    "when (1) a person (the licensee) requests the creation of a work, (2) the creator (the licensor) makes that

10   particular work and delivers it to the licensee who requested it, and (3) the licensor intends that the

11   licensee copy and distribute his work." *I.A.E., Inc. v. Shaver,* 74 F.3d 768, 776 (7th Cir. 1996) (citing

12   *Effects Assocs.*, 908 F.2d at 558-559).

13   In the case at hand, Legacy, not defendants, requested Tentative Map 5472 and the MM

14   improvement plans, which were the subject of contracts between Legacy and Martin-McIntosh. Martin-

15   McIntosh created Tentative Map 5472 and the MM improvement plans and submitted them to Legacy.

16   Wasco appears to attempt to step into Legacy's shoes to transpose itself as the licensee. Although

17   Legacy submitted Tentative Map 5472 and the MM improvement plans for Wasco approval, such

18   approval does not render Wasco a licensee for implied nonexclusive license purposes despite whether

19   payment of Martin-McIntosh fees flowed from Wasco funds.

20   Defendants conveniently ignore the first two prongs of the implied nonexclusive license test and

21   focus on Martin-McIntosh's intent as to copying and distribution of Tentative Map 5472 and the MM

22   improvement plans.

23   Courts have interpreted the third "copy and distribute" prong "to mean that the creator of the

24   protected work must intend that its copyrighted drawings be used on the project for which they were

25   created, independent of the creator's involvement." *Nelson-Salabes v. Morningside Development*, 284

26   F.3d 505, 515 (4th Cir. 2002). The "determinative question" is the creator's intent assessed in the

27   "totality of circumstances" surrounding the creator's conduct. *See Nelson-Salabes*, 284 F.3d at 515.

28   Factors to determine existence of an implied nonexclusive license include "(1) whether the

parties are engaged in a short-term discrete transaction as opposed to an ongoing relationship; (2) whether the creator utilized written contracts . . . providing that copyrighted materials could only be used with the creator's future involvement or express permission; and (3) whether the creator's conduct during the creation or delivery of the copyrighted material indicated that use of the material without the creator's involvement or consent was permissible." *Nelson-Salabes*, 284 F.3d at 516.

Defendants overlook these factors and address others discussed below.

### *Public Submission Of Tentative Map 5472*

Wasco argues that Martin-McIntosh "implicitly licensed" Wasco to release and distribute Tentative Map 5472 in that California statutes and Wasco ordinances obligated Wasco to release Tentative Map 5472 as a public record as part of subdivision approval. Wasco points to requirements of the California Subdivision Map Act, Cal. Gov. Code, §§ 66473, et seq., the Wasco Municipal Code, Title 16, Chapter 16.16, the Ralph M. Brown Act ("Brown Act"), California Government Code, §§ 54953, et seq., the California Environmental Quality Act ("CEQA"), Cal. Pub. Resources Code, § 21000, et seq., and the California Public Records Act ("CPRA"), California Gov. Code, §§ 6250, et seq. Wasco contends that in light of these statutes and ordinances, Martin-McIntosh consented to treatment of Tentative Map 5472 as a public record to provide Wasco a nonexclusive license to reproduce and distribute Tentative Map 5472.

Wasco notes that its municipal code required Wasco to provide the Tentative Map 5472 to many public officials, agencies and utilities. Wasco points out that after initial submission of Tentative Map 5472, Wasco's planning director prepared a report and recommendations which were subject to a public hearing. Wasco concludes that the "public hearing requires, under the Brown Act, that Wasco make the tentative map [and copies of it] available to the public. Cal Gov. Code § 54957.5." Wasco further notes that CEQA required public disclosure of Tentative Map 5472 as part of the "environmental compliance review process." Wasco attributes the CPRA to require public access to Tentative Map 5472 "because it constituted a public record." Wasco argues that Tentative Map 5472 remained in the public domain after its expiration to enable "subsequent purchasers of the parcel to understand what had previously been built on the property."

Mr. McIntosh contends that Martin-McIntosh's submission for Wasco's approval "does not mean

that it is creating an implied license" in that Wasco adopted not Tentative Map 5472 but rather "the conditions that required construction in conformity with the plans." Mr. McIntosh continues that neither Martin-McIntosh's action or inaction demonstrate "willingness" to permit use of Tentative Map 5472 or the MM improvement plans without Mr. McIntosh's permission.

There is no question that Tentative Map 5472 and the MM improvement plans were subject to public disclosure and review. Defendants fail to satisfy that such public disclosure and review constitutes Martin-McIntosh's intent that Wasco copy and distribute Martin-McIntosh's work in that, pursuant to defendants' way of thinking, any protected work subject to public disclosure would lose its protected status. Wasco's approval of Tentative Map 5472 did not transform Tentative Map 5472 and the MM improvement plans into a matter of statute or ordinance. Although Martin-McIntosh may have intended Tentative Map 5472 and the MM improvement plans to be disclosed in the subdivision approval process, there is no evidence that Martin-McIntosh intended Tentative Map 5472 and the MM improvement plans to be dispersed to NCUE, Lotus or DeWalt or any other civil engineering firm years after Wasco's approval of Tentative Map 5472. Mr. McIntosh declares that he never gave permission for further use of Tentative Map 5472 and the MM improvement plans to demonstrate his intent to withhold an implied nonexclusive license.

### *Acquisition Agreement Authorization*

Defendants point to the January 28, 1993 Acquisition Agreement between Wasco and Legacy to note that Wasco obtained the right to complete improvements uncompleted by Legacy. Defendants note that "such completion would be accomplished by use of the MM improvement plans." Defendants repeatedly claim without supporting evidence that Wasco "agreed to purchase" the MM improvement plans which were "sold" to Wasco. Defendants point to the Acquisition Agreement's "assignment and successors in interest" clause to claim that defendants were permitted to use the Martin-McIntosh improvements.

The assignment and successors in interest clause provides: "None of the obligations or benefits of this Agreement shall be assignable by the Subdivider [Legacy] without the prior written consent of the City of Wasco. However, this Agreement shall be binding upon and inure to the benefit of the parties' heirs, executors, administrators, successors and assigns." The clause prohibits assignment of

benefits without Wasco's written consent.  There is no evidence that Wasco gave such consent.  More importantly, Martin-McIntosh was not a party to the Acquisition Agreement.  As such, defendants could inure to no benefit derived from Martin-McIntosh, in particular Tentative Map 5472 and the MM improvement plans.  Defendants' claims that Wasco succeeded Legacy and in turn Lotus succeeded Wasco are unsupported factually and legally to grant Wacso an implied nonexclusive license to provide Tentative Map 5472 and the MM improvement plans to a subsequent purchaser of Tract 5472.  Moreover, the Acquisition Agreement addresses acquisition of the constructed improvements, not Tentative Map 5472 and the MM improvement plans, which were not Wasco's to assign, sell or otherwise disperse.

No evidence supports defendants' claim that Wasco purchased the MM improvement plans under the Acquisition Agreement.  Defendants point to no definitive language to such effect.  Martin-McIntosh's ancillary efforts in connection with the Acquisition Agreement do not substantiate an agreement to sell the MM improvement plans to Wasco.  Wasco's payments to Martin-McIntosh on behalf or account of Legacy do not constitute purchase of Tentative Map 5472 and the MM improvement plans in light of the financing arrangements between Legacy and Wasco.  The evidence reveals Martin-McIntosh adeptness with written agreements and suggests Martin-McIntosh would have entered into a written agreement with Wasco if it intended to sell the MM improvement plans to Wasco.  There is lack of evidence of an "association" among Martin-McIntosh, Legacy and Wasco to support an implied license to use Tentative Map 5472 and the MM improvement plans to the degree suggested by NCUE and Lotus.

Mr. McIntosh notes that Wasco is limited to written, not implied, agreements.  Mr. McIntosh cites to California Government Code section 40602, which provides in part:

> The mayor shall sign:
>
> . . .
>
> (b) All written contracts and conveyances made or entered into by the city.
>
> (c) All instruments requiring the city seal.
>
> The legislative body may provide by ordinance that the instruments described in (a), (b) and (c) be signed by an officer other than the mayor.

A California city "may be held liable on a contract only if the contract is in writing, approved by the city council, and signed by the mayor or by another city officer designated by the city council in an ordinance." *Authority for California Cities Excess Liability v. City of Los Altos*, 136 Cal.App.4th 1207, 1212, 39 Cal.Rptr.3d 571 (2006).  The absence of a written contract between Martin-McIntosh and Wasco reinforces the absence of an implied nonexclusive license.

***MM-Legacy Agreement***

Defendants argue that Wasco's nearly $98,000 payments to Martin-McIntosh supports an implied nonexclusive license for defendants' use of Tentative Map 5472 and the MM improvement plans. Wasco argues that the March 18, 1992 MM-Legacy agreement between did not "signal . . . intent that the City would be precluded from making use of the improvement plans in the same manner it would use plans for any other of the City's infrastructure."

Mr. McIntosh responds that the MM-Legacy agreement limited use of Tentative Map 5472 and the MM improvement plans to Legacy "in connection with the specific project identified by that contract" and "only so long as [Legacy] was not in default."  Mr. McIntosh contends that neither the MM-Legacy agreement nor another writing authorized defendants to use Martin-McIntosh's work.

The MM-Legacy agreement preserved Martin-McIntosh' work as its property: "All original papers, documents, drawings and other work product of consultant, and copies thereof, produced by consultant pursuant to this agreement shall remain the property of consultant . . ."  The MM-Legacy agreement limits the scope of use of Martin-McIntosh's work:

> Client agrees not to use or permit any other person to use plans, drawings, or other work product prepared by consultant, which plans, drawings, or other work product are not final and which are not signed, and stamped or sealed by consultant. . . . Client further agrees that final plans, drawings or other work product are for the exclusive use of client and may be used by client only for the project described on the face hereof.  Such final plans, drawings or other work product may not be changed nor used on a different project without the written authorization or approval by consultant.

Defendants claim that the MM-Legacy agreement does not prohibit Mr. Brown/Legacy from "using the improvement plans – or permitting others."  (Underlining in original.)  Defendants appear to argue that the MM improvement plans were final to lift the use by others prohibition.  Defendants appear to further claim that the MM improvement plans could be used in connection with subsequent subdivision development in that the subdivision is the project described in the MM-Legacy agreement.

23

The MM-Legacy agreement evidences Martin-McIntosh's intent to maintain its work as its property and to limit the use of its work by Mr. Brown/Legacy.  Logic dictates that the scope of the "project" contemplated by the MM-Legacy agreement was limited to Legacy's development and died when Legacy ceased work and defaulted on its obligations to Martin-McIntosh.  NCUE/Lotus revived a project 10 years later and made changes to it.  The MM-Legacy agreement limits the scope of "project" to that contemplated at the time, not a project arising at an undetermined future date.  The MM-Legacy agreement was not an open ended, unlimited license to use Martin-McIntosh's works, as defendants claim.  Moreover, despite Wasco's payments to Martin-McIntosh for Legacy, those payments arose from Legacy's obligations to Martin-McIntosh.  There is no evidence of a direct agreement between Wasco and Martin-McIntosh in that Martin-McIntosh's agreements were with Mr. Brown/Legacy.  Claims that Wasco paid Martin-McIntosh are unavailing, despite the amounts which Martin-McIntosh earned.  Martin-McIntosh's receipt of payment for its subdivision work do not establish an implied nonexclusive license to use Tentative Map 5472 and the MM improvement plans a decade after the payments.  Defendants point to no pertinent facts or legal authority that payments to Martin-McIntosh evidence an implied nonexclusive license.

Defendants fail to establish an implied nonexclusive license to defeat Mr. McIntosh's copyright infringement claims.  Mr. McIntosh establishes he is entitled to summary adjudication on the issue of implied nonexclusive license which is not a viable defense for defendants.

### Independent Creation

NCUE, Lotus and DeWalt argue that Tentative and Final Maps 6451 were DeWalt's "independent creation" in that DeWalt surveyed Tract 6451 (former Tract 5472) and processed the survey information to generate Tentative and Final Maps 6451 with observed improvements and conditions.  DeWalt notes it "simply compared the results of Map 6451 to Map 5472 to determine whether there were any major external boundary differences."  (Underlining in original.)  NCUE and Lotus conclude that "if the expressions had turned out to be identical, though created through independent efforts of both engineers, there would be no infringement" absent copying.

"Once a plaintiff has demonstrated that a defendant had access to the copyrighted work and that the defendant's work is substantially similar to the copyrighted work, the burden shifts to the defendant

24

to prove that the defendant's work was not a copy, but was independently created." *Transgo*, 768 F.2d at 1018.

The copying element of a copyright infringement claim "is demonstrated by showing (1) circumstantial (or other) evidence of defendants' access to the protected works, and (2) substantial similarity between the copyrighted and accused works." *Lanard Toys Ltd. v. Novelty Inc.*, 511 F.Supp.2d 1020, 1031 (C.D. Cal. 2007) (citing *Kouf*, 16 F.3d at 1043, n. 2).

Copyright infringement plaintiffs generally rely on indirect evidence of copying:

> Because, however, the act of copying is rarely witnessed, copying is ordinarily established indirectly. The plaintiff demonstrates that the defendant had access to the copyrighted items, and that the defendant's product is substantially similar to plaintiffs' work. Once this is done, the burden shifts to the defendant to prove his work was not copied, but independently created.

*Kamar Intern., Inc. v. Russ Berrie and Co.*, 657 F.2d 1059, 1062 (9th Cir. 1981).

"Proof of access requires only 'an opportunity to view or to copy plaintiff's work.' . . . And 'evidence that a third party with whom both the plaintiff and defendant were dealing had possession of plaintiff's work is sufficient to establish access by the defendant." *Kamar*, 657 F.2d at 1062.

The evidence is unsettled whether DeWalt independently created Tentative and Final Maps 6451. The evidence is undisputed that NCUE, Lotus and DeWalt had an opportunity to view Tentative Map 5472 in that Wasco used Tentative Map 5472 to market the subdivision to potential developers. There is no dispute that Wasco emailed DeWalt's Mr. Black the MM improvement plans on April 13, 2005. Wasco maintained Tentative Map 5472 and the MM improvement plans and according to Wasco's deputy director of public works, did not withhold them from the public. Factual issues arise as to access via Wasco to prevent defendants to establish independent creation of Tentative and Final Maps 6451.

Nonetheless, defendants raise meaningful points to support DeWalt's independent creation of Tentative and Final Maps 6451. DeWalt surveyed Tract 5472 with its existing improvements and incorporated them into its work. The evidence is fuzzy as to what DeWalt did after its survey to generate Tentative and Final 6451 Maps. There is insufficient evidence to conclude that DeWalt's handling of Tentative Map 5472 and the MM improvement plans constitutes copying to raise factual issues to prevent granting summary adjudication for Mr. McIntosh on the independent creation issue. The jury will need to determine whether Tentative and Final Maps 6451 are the product of copying or

1    independent creation.[13]

2                    **Idea-Expression Merger Doctrine**

3        Defendants contend that Mr. McIntosh's copyright infringement claims are barred by the idea-

4    expression merger doctrine.  Mr. McIntosh argues that the merger doctrine is inapplicable because

5    defendants could have redesigned the subdivision and he seeks "to enforce a copyright as to an original

6    design embodied in his tentative map, not the location of the subdivision."

7        Copyright "protection is given only to the expression of the idea – not the idea itself." *Mazer*

8    *v. Stein*, 347 U.S. 201, 217, 74 S.Ct. 460 (1954).  "Ideas, like facts, are not entitled to copyright." *CDN,*

9    *Inc. v. Kapes*, 197 F.3d 1256, 1261 (9th Cir. 1999).  "Where an idea and the expression 'merge,' or are

10   'inseparable,' the expression is not given copyright protection."  *Johnson Controls, Inc. v. Phoenix*

11   *Control Systems, Inc.*, 886 F.2d 1173, 1175 (9th Cir. 1971).  "When there is essentially only one way to

12   express an idea, the idea and its expression are inseparable and copyright is no bar to copying that

13   expression." *Concrete Machinery Co., Inc. v. Classic Lawn Ornaments, Inc.*, 843 F.2d 600, 606 (2nd Cir.

14   1988).

15       "Under the merger doctrine, courts will not protect a copyrighted work from infringement if the

16   idea underlying the copyrighted work can be expressed in only one way, lest there be a monopoly on the

17   underlying idea. . . . In such an instance, it is said that the work's idea and expression 'merge.'" *ETS-*

18   *Hokin v. Skyy Spirits, Inc.*, 225 F.3d 1068, 1082 (9th Cir. 2000).

19       In *Mason v. Montgomery Data, Inc.*, 967 F.2d 135, 138 (5th Cir. 1992), the Fifth Circuit Court

20   of Appeals explained the merger doctrine:

21            The Copyright Act extends copyright protection to "original works of authorship
         fixed in any tangible medium of expression." 17 U.S.C.A. § 102(a) (West Supp.1992).
22       The scope of that protection, however, is not unlimited. "In no case does copyright
         protection for an original work of authorship extend to any idea, ... regardless of the form
23       in which it is described, explained, illustrated, or embodied in such work." *Id.* § 102(b)
         (emphasis added). Thus, while a copyright bars others from copying an author's original
24       expression of an idea, it does not bar them from using the idea itself. "Others are free to
         utilize the 'idea' so long as they do not plagiarize its 'expression.' " *Herbert Rosenthal*
25       *Jewelry Corp. v. Kalpakian*, 446 F.2d 738, 741 (9th Cir.1971). In some cases, however,
         it is so difficult to distinguish between an idea and its expression that the two are said to

26

27       [13]    The ruling on independent creation is not inconsistent with the substantial similarity ruling in that for
     summary judgment purposes, this Court construes substantial similarity in Mr. McIntosh's favor in the absence of defendants'
28   establishment of the absence of factual issues as to substantial similarity.

                                          26

merge. Thus, when there is essentially only one way to express an idea, "copying the 'expression' will not be barred, since protecting the 'expression' in such circumstances would confer a monopoly of the 'idea' upon the copyright owner free of the conditions and limitations imposed by the patent law." *Id.* at 742. By denying protection to an expression that is merged with its underlying idea, we "prevent an author from monopolizing an idea merely by copyrighting a few expressions of it." *Toro Co. v. R & R Products Co.*, 787 F.2d 1208, 1212 (8th Cir.1986).

The focus to determine whether the merger doctrine applies is "whether the idea is capable of various modes of expression." *Apple Computer, Inc. v. Franklin Computer Corp.*, 714 F.2d 1240, 1253 (3rd Cir.1983), *cert. dismissed*, 464 U.S. 1033, 104 S.Ct. 690 (1984)). In *Mason*, 967 F.2d at 138-139, the Fifth Circuit explained how courts are to address whether idea and expression are merged:

> Thus, the court must first identify the idea that the work expresses, and then attempt to distinguish that idea from the author's expression of it. If the court concludes that the idea and its expression are inseparable, then the merger doctrine applies and the expression will not be protected. Conversely, if the court can distinguish the idea from its expression, then the expression will be protected because the fact that one author has copyrighted one expression of that idea will not prevent other authors from creating and copyrighting their own expressions of the same idea. In all cases, "[t]he guiding consideration in drawing the line is the preservation of the balance between competition and protection reflected in the patent and copyright laws." *Herbert Rosenthal Jewelry*, 446 F.2d at 742.

NCUE and Lotus note that DeWalt employed Martin-McIntosh's "idea" of a 68 lot subdivision with street arrangement "because all of the improvements were in and that was the only way of drawing a map to take advantage of those expensive improvements." NCUE and Lotus claim that "the <u>idea</u> of a subdivision containing 68 lots arranged in a manner to take advantage of existing improvements can only be expressed by a map incorporating the same lot and street layout idea as shown on Map 5472." NCUE and Lotus admit that NCUE wanted to use the Legacy constructed improvements.

Wasco echoes such sentiments and notes that the "only effective way to express the idea" of a 68-lot subdivision was "to take advantage of the existing improvements."

DeWalt points to NCUE's "right to develop the property in the manner that they [sic] saw fit" and to use existing improvements.

To avoid the merger doctrine, Mr. McIntosh points out that NCUE and Lotus chose to take economic advantage of the existing improvements pursuant to Martin-McIntosh's work rather than redesign Tract 5472. Mr. McIntosh notes that NCUE, Lotus and DeWalt could have submitted modifications to Tentative Map 5472 or paid Mr. McIntosh and developed according to Tentative Map

5472.

The idea at issue here is a means to subdivide and arrange Parcel 5472. Tentative Map 5472 expressed a 68-residential lot subdivision. Defendants fail to demonstrate that there was only one way to express a Parcel 5472 map or a subdivision of Parcel 5472, especially considering that more or less lots was an option to Martin-McIntosh's 68-lot design with an additional lot for a multi-family unit. NCUE and Lotus' election to use the existing improvements does not transform Tentative Map 5472 into a merger of idea and expression. Tentative Map 5472 is an expression of Martin-McIntosh's idea. However, the idea of a Parcel 5472 map or Parcel 5472 subdivision could be expressed in numerous ways. Defendants chose to utilize Martin-McIntosh's expression of Martin-McIntosh's idea and fail to establish application of merger, whereas Mr. McIntosh has defeated its application and is entitled to summary judgment on the issue of merger.

### Publication

Mr. McIntosh argues that required submission of Tentative Map 5472 and the MM improvement plans for Wasco's approval did not constitute publication to deprive copyright protection.

Wasco contends that Mr. McIntosh "no longer retains any copyright interests" in Tentative Map 5472 and the MM improvement plans based on their submission to Wasco "for approval and comment pursuant to a review and approval process that requires making the map and plans available to the general public."

NCUE, Lotus and DeWalt argue that a factual dispute arises whether Martin-McIntosh sold or transferred copyrighted works to Wasco and rely on DeWalt's survey to produce a different map.

"A general publication occurs when a work is made available to members of the public regardless of who they are or what they will do with it." *Academy of Motion Picture Arts and Sciences v. Creative House Promotions, Inc.*, 944 F.2d 1446, 1451-52 (9th Cir.1991) (*citing Burke v. National Broadcasting Co., Inc.*, 598 F.2d 688 (1st Cir.), cert. denied, 444 U.S. 869, 100 S.Ct. 144, 62 L.Ed.2d 93 (1979)). 17 U.S.C. § 101 defines "publication" as "distribution of copies . . . of a work to the public by sale or other transfer of ownership, or by rental, lease, or lending. The offering to distribute copies . . . to a group of persons for purposes of further distribution, public performance, or public display, constitutes publication. A public performance or display of a work does not of itself constitute publication."

28

1    To support his contention, Mr. McIntosh cites to *Danielson v. Winchester-Conant Properties,*

2  *Inc.*, 186 F.Supp.2d 1, 18 (D. Mass. 2002) ("an architect's submission of plans to those involved in the

3  development and execution of the plans does not constitute publication that divests the architect of rights

4  under the Copyright Act"); *Kunycia v. Melville Realty Co., Inc.*, 755 F.Supp. 566, 574 (S.D.N.Y. 1990)

5  ("Distribution of plaintiff's architectural drawings to contractors, landlords and building authorities does

6  not constitute a publication requiring copyright notice. . . . The distribution was restricted to those

7  persons without whose participation the plans could not be given practical effect."); *Intown Enterprises,*

8  *Inc. v. Barnes*, 721 F.Supp. 1263, 1266 (N.D. Ga. 1989) ("The weight of authority holds that neither the

9  filing of architectural plans with permitting authorities nor distributing such plans to subcontractors for

10  bidding purposes constitutes publication under the Copyright Act."); *Del Madera Properties v. Rhodes*

11  *and Gardner, Inc.*, 637 F.Supp. 262, 264 (N.D. Cal. 1985) ("There is no basis for a holding that the

12  Tentative Map is an administrative ruling, legislative enactment, or similar official document."); *Smith*

13  *v. Paul*, 174 Cal.App.2d 744, 751, 345 P.2d 546 (1959) ("the forced filing of the plans in the building

14  department of a municipality constitutes only a limited publication of the common-law copyright, a

15  limited publication which gives no person the right to use a copy thereof").

16    As noted above, Martin-McIntosh was required to submit Tentative Map 5472 and the MM

17  improvement plans to Wasco for its review and approval.  Such limited disclosure to comply with

18  California subdivision law and Wasco ordinances does not constitute publication to the "general public"

19  to deprive Mr. McIntosh of copyright protection.[14]  Mere public display of Tentative Map 5472 and the

20  MM improvement plans does not constitute publication.  *See* 17 U.S.C. § 101.  Wasco improperly

21  attempts to transform the limited disclosure of Tentative Map 5472 and the MM improvement plans to

22  broad disclosure to the general public, of which nearly all members would be disinterested in Tentative

23

---

24    [14]    In *Danielson*, 186 F.Supp.2d at 17-18, a fellow district court pointed out:

25       While it is true that a subdivision plan takes account of the particular features of the land
         upon which it is to be built, thus perhaps making it harder to use lock, stock and barrel
26       elsewhere, there is no reason to suggest that subdivision plans are not also desirable
         targets of pirating. . . . If anything, there is more to be reaped from pirating a subdivision
27       plan than there is to be gained by pirating a single house or building plan, as the profits
         from designing a single subdivision may be much greater than the profits from designing
28       a single house.

1   Map 5472 and the MM improvement plans.

2        The MM-Legacy agreement illustrates Martin-McIntosh's efforts to limit use and disclosure of

3   Tentative Map 5472 and the MM improvement plans and contrary to DeWalt's claim, raises no factual

4   issues as to the scope of disclosure.  Taken to its extreme, Wasco's notion is that any copyrighted

5   material submitted to a public agency is a general publication to entitle the public agency to unlimited

6   dissemination of the material.  Wasco fails to substantiate its claim that Martin-McIntosh lost ability to

7   prohibit access to Tentative Map 5472 and the MM improvement plans "once they were submitted" to

8   Wasco.  Such notion is illogical and legally unsupported.  Defense arguments as to DeWalt's survey and

9   map preparation address the independent creation defense, not publication.  Mr. McIntosh establishes

10  that he is entitled to summary adjudication on the publication issue.

11                                        **First Sale Doctrine**

12       Mr. McIntosh contends that the first sale doctrine does not bar his copyright infringement claims.

13       A registered copyright owner "has 'exclusive rights' to *authorize or distribute* copies of the

14  copyrighted work to the public." *Parfums Givenchy, Inc. v. Drug Emporium, Inc.*, 38 F.3d 477, 480 (9th

15  Cir. 1994) (italics in original; citing 17 U.S.C. § 106(3)).  Under the "first sale" doctrine, "a sale of a

16  'lawfully made' copy terminates the copyright holder's authority to interfere with subsequent sales or

17  distribution."  *Parfums Givenchy*, 38 F.3d at 480.

18       17 U.S.C. § 109(a) codifies the first sale doctrine in that "the owner of a particular copy . . .

19  lawfully made under this title . . . is entitled, without the authority of the copyright owner, to sell or

20  otherwise dispose of the possession of that copy . . ."  "This statute 'restates and confirms the principle

21  that, where the copyright owner has transferred ownership of a particular copy . . . of a work, the person

22  to whom the copy . . . is transferred is entitled to dispose of it by sale . . . or any other means." *Microsoft

23  Corp. v. Harmony Computers & Electronics, Inc.*, 846 F.Supp. 208, 212 (E.D.N.Y. 1994).  17 U.S.C.

24  § 109(a) provides a defense for "lawful purchasers of copies of copyrighted materials, so long as the

25  copies were 'lawfully made under this title.'" *Parfums Givenchy*, 38 F.3d at 480.

26       A defendant bears the "burden of proving that a particular copy was lawfully made or acquired."

27  *American Intern. Pictures, Inc. v. Foreman*, 576 F.2d 661, 663, n. 1 (5th Cir. 1978).  "In civil actions for

28  copyright infringement, the defendant has the burden of proving that the particular pieces of the

1   copyrighted work that he sold were lawfully made or acquired." *Microsoft Corp.*, 846 F.Supp. at 212.

2          Mr. McIntosh correctly notes that Martin-McIntosh, pursuant to the MM-Legacy, permitted only

3   Mr. Brown/Legacy to use Tentative Map 5472 and the MM improvement plans.  By the MM-Legacy

4   agreement, Martin-McIntosh retained rights to Tentative Map 5472 and the MM improvement plans.

5   There is no credible evidence that Martin-McIntosh sold Tentative Map 5472 and the Martin-McIntosh

6   plans to defendants.  There is no credible evidence, despite Wasco's claims, that Martin-McIntosh

7   "intended" that Wasco acquire the MM improvement plans "as part of the Acquisition Agreement."

8   Wasco did not acquire Tentative Map 5472 and the MM improvement plans through Legacy.  Mr.

9   McIntosh establishes that the first sale doctrine does not bar his copyright infringement claims.

10                                 **Abandonment**

11         Mr. McIntosh contends that submission of Tentative Map 5472 and the MM improvement plans

12  for Wasco's approval does not constitute abandonment of copyright protection.

13         Copyright abandonment "must be manifested by some overt act indicative of a purpose to

14  surrender the rights and allow the public to copy." *Hampton v. Paramount Pictures Corp.*, 279 F.2d

15  100, 104, *cert. denied*, 364 U.S. 882, 81 S.Ct. 170 (1960); *see Micro Star v. Formgen, Inc.*, 154 F.3d

16  1107, 1114 (1998) (abandonment "must be manifested by some overt act indicating an intention to

17  abandon that right").

18         There is no evidence that Mr. McIntosh made an overt act to abandon copyright protection for

19  Tentative Map 5472 and the MM improvement plans and to allow the public to copy them.  In fact, the

20  evidence is to the contrary in that Mr. McIntosh denied Mr. Wu permission to use them.  Wasco offers

21  cockamamie notions that Martin-McIntosh's submission of the MM improvement plans to Wasco as part

22  of the approval process and "in exchange for payment constitutes an overt act of abandonment."  Mr.

23  McIntosh establishes that the abandonment doctrine does not bar his copyright infringement claims.

24                                 **Limitations Period**

25         Mr. McIntosh contends that his copyright infringement claims are not subject to the three-year

26  limitations period of 17 U.S.C. § 507(b) ("No civil action shall be maintained under the provisions of

27  this title unless it is commenced within three years after the claim accrued.")

28         A copyright infringement claim "accrues when one has knowledge of a violation or is chargeable

                                        31

1   with such knowledge." *Roley v. New World Pictures*, 19 F3d 479, 481 (9th Cir. 1994); *see Kling v.*

2   *Hallmark Cards, Inc.*, 225 F.3d 1030, 1038 (9th Cir. 2000).

3        Mr. McIntosh argues that his copyright infringement claims accrued no earlier than DeWalt's

4   engagement to prepare Tentative Map 6541 in summer 2004.  As such, his February 22, 2007 filing of

5   this action is within the three-year limitations period.

6        There is no evidence that Mr. McIntosh's copyright infringement claims accrued more than three

7   years prior to his filing this action.  NCUE, Lotus and DeWalt concede the absence of facts to support

8   a limitations defense.  Mr. McIntosh establishes that he is entitled to summary adjudication on the

9   limitations period issue.

10                                  **Laches**

11        NCUE and Lotus contend that laches bars Mr. McIntosh's copyright infringement claims.  Mr.

12   McIntosh argues that laches is an unviable defense.

13        "Laches is an equitable time limitation on a party's right to bring suit" and applies in copyright

14   infringement cases. *Kling*, 225 F.3d at 1036.  To establish a judgment on the laches affirmative defense,

15   "a defendant must prove 'both an unreasonable delay by plaintiff and prejudice to itself.'" *Kling*, 225

16   F.3d at 1036 (quoting *Couveau v. American Airlines*, 218 F.3d 1078, 1083 (9th Cir. 2000)).

17        Delay is measured "from the time the plaintiff knew or should have known about the potential

18   claim at issue." *Kling*, 225 F.3d at 1036.  "An 'indispensable element of lack of diligence is knowledge,

19   or reason to know, of the legal right, assertion of which is "delayed."'" *Portland Audubon Society v.*

20   *Lujan*, 884 F.2d 1233, 1241 (9th Cir. 1989) (quoting *City of Davis v. Coleman*, 521 F.2d 661, 667 (9th

21   Cir. 1975)).  "There must, of course, have been knowledge on the part of the plaintiff of the existence

22   of the rights, for there can be no laches in failing to assert rights of which a party is wholly ignorant, and

23   whose existence he had no reason to apprehend." *Halstead v. Grinnan*, 152 U.S. 412, 417, 14 S.Ct. 641

24   (1984).  The "period of delay is measured from when the claimant had actual notice of the claim or

25   would have reasonably been expected to inquire about the subject matter." *Advanced Cardiovascular*

26   *Sys., Inc. v. SciMed Life Sys., Inc.*, 988 F.2d 1157, 1161 (Fed.Cir. 1993).

27        In applying the laches doctrine, "courts have exclusively focused on plaintiffs' prior knowledge

28   of actual or impending copyright infringements." *Kling*, 225 F.3d at 1038.  "The duty to bring an action

1    for copyright infringement does not arise . . . until the plaintiff knows of the infringement." *Kepner-*

2    *Tregoe, Inc. v. Executive Dev., Inc.*, 79 F.Supp.2d 474, 486 (D. N.J. 1999).

3        In his declaration, Mr. McIntosh states: "I was not aware until late 2006 at the earliest that

4    DeWalt or Northern had contracted with each other to prepare a new tentative map."  Mr. McIntosh

5    claims that he was alerted first of infringing activity in late 2006 when he received from Wasco a notice

6    that a final subdivision map had been prepared.  Mr. McIntosh notes that since the notice did not indicate

7    the type of final map which was prepared, he drove by the subdivision in fall 2006 and observed home

8    construction and that the subdivision had not been redesigned or altered.  Mr. McIntosh surmised that

9    NCUE, Lotus and DeWalt were probably using Tentative Map 5472 and the MM improvement plans

10   in the absence of subdivision redesign.  Mr. McIntosh characterizes his actions as diligent in filing this

11   action within "several months of discovering the infringement."

12       NCUE and Lotus claim that "McIntosh admits that he was put on notice of a probable

13   infringement claim in early 2004."  NCUE and Lotus provide **no** supporting evidence for such notion.

14   NCUE and Lotus claim that Mr. McIntosh had decided to sue before the November 10, 2004 submission

15   of Tentative Map 6451 to Wasco and had decided to sue when DeWalt started processing Tentative Map

16   6451.  NCUE and Lotus provide **no** supporting evidence for such notion.

17       NCUE and Lotus appear to misrepresent, and at a minimum, misconstrue Mr. McIntosh's

18   deposition testimony to the effect that he had designs to sue in 2004.  NCUE and Lotus rely on Mr.

19   McIntosh's following testimony:

20       Q.   When you found out that Joe [Mr. Wu] was not going to hire you to process the
             new tentative map, and in fact that he had hired DeWalt to do that work, did you
21           consider suing Joe for copyright infringement at that time?

22       A.   Yes

23   Such testimony demonstrates no knowledge of potential infringement from use of Tentative Map 5472

24   or the MM improvement plans.  The testimony reveals only Mr. McIntosh's knowledge that he was not

25   hired and DeWalt was hired.  The fact that Mr. Wu hired DeWalt reveals nothing as to potential

26   infringement.  There is no evidence that when DeWalt was hired, Mr. McIntosh knew that NCUE, Lotus

27   or DeWalt would develop Parcel 5472 with substantial similarity to Tentative Map 5472.  Mr. McIntosh

28   had no knowledge to pursue claims until he learned no earlier than late 2006 of potential infringement

33

based on his physical observation of the subdivision.  Mr. McIntosh correctly notes that his collection of Wasco council agendas does not equate to knowledge of potential infringement based on the agendas' limited information.  Defendants point to no authority that Mr. McIntosh was obligated to investigate infringement in the offing.  *See William A. Graham Co. v. Haughey*, 568 F.3d 425, 439 (3rd Cir. 2009).  Mr. McIntosh has presented sufficient evidence to prevail on the unreasonable delay prong of the laches doctrine.

As to prejudice to defendants, Mr. McIntosh notes that homes had been completed shortly after Mr. McIntosh filed this action on February 22, 2007.  Mr. McIntosh concludes "there was no prejudice to defendants since the work in completing the subdivision was mostly done before McIntosh was aware of the infringement in late 2006."

NCUE and Lotus claim prejudice based on the amount they have spent to develop the subdivision.  NCUE and Lotus accuse Mr. McIntosh of lying in wait during which NCUE built 12 homes.

There is no prejudice to NCUE and Lotus to support a laches defense.  Prejudice to NCUE and Lotus is a result of their own doing.  Prior to Lotus' purchase of the subdivision, Mr. Wu knew that Mr. McIntosh would not permit use of Tentative Map 5472 and the MM improvement plans unless Mr. McIntosh was compensated.  The evidence suggests that Mr. Wu was not interested in Mr. McIntosh's terms and hired DeWalt.  Mr. Wu chose not to deal with Mr. McIntosh.  The subsequent results fall on NCUE and Lotus, not Mr. McIntosh, who establishes that he is entitled to summary adjudication on the laches doctrine.

## Equitable Estoppel

NCUE and Lotus appear to claim that Mr. McIntosh is equitably estopped to pursue his claims.

The estoppel defense elements are "(1) The party to be estopped must know the facts; (2) he must intend that his conduct shall be acted on or must so act that the party asserting the estoppel has a right to believe it is so intended; (3) the latter must be ignorant of the true facts; and (4) he must rely on the former's conduct to his injury."  *Hampton v. Paramount Pictures Corp.*, 279 F.2d 100, 1004 (9th Cir. 1960) (addressing estoppel in a copyright case).

NCUE and Lotus attempt to support an estoppel defense with unsupported and previously

rejected notions that Mr. McIntosh "believed" that NCUE "was going to infringe" and kept "quiet." As with the laches defense, NCUE and Lotus lack evidence to support an estoppel defense. As explained above, despite lacking Mr. McIntosh's permission, NCUE and Lotus proceeded to develop Parcel 5472 at risk of infringing on Mr. McIntosh's copyrighted work. NCUE and Lotus fail to substantiate an estoppel defense.

### Copyright Misuse – Unclean Hands

NCUE and Lotus appear to contend that Mr. McIntosh's copyright misuse supports an unclean hands defense.

"[M]isuse is a defense to copyright infringement." *Practice Management Info. v. American Med. Ass'n*, 121 F.3d 516, 520 (9th Cir.), *cert. denied*, 522 U.S. 933, 118 S.Ct. 339 (1997). The copyright misuse defense "prevents copyright holders from leveraging their limited monopoly to allow them control of areas outside the monopoly." *Assessment Technologies of Wi, LLC v. Wiredata, Inc.*, 350 F.3d 640, 647 (7th Cir. 2003). The copyright misuse defense "forbids the use of the copyright to secure an exclusive right or limited monopoly not granted by the Copyright Office." *Lasercomb America, Inc. v. Reynolds*, 911 F.2d 970, 977 (4th Cir. 1990).

"The defense of unclean hands by virtue of copyright misuse prevents the copyright owner from asserting infringement and asking for damages when the infringement occurred by his dereliction of duty." *Supermarket of Homes, Inc. v. San Fernando Valley Bd. of Realtors*, 786 F.2d 1400, 1408 (9th Cir. 1986) (citing *Tempo Music, Inc. v. Myers*, 407 F.2d 503, 507 (4th Cir.1969) (infringer requested list of copyrighted songs from owner which owner neglected to supply). "Plaintiff's action will be dismissed under the theory of unclean hands if defendant establishes that plaintiff's evidence was false and that plaintiff was involved in a scheme to defraud the public." *Supermarket of Homes*, 786 F.2d at 1408.

NCUE and Lotus accuse Mr. McIntosh of copyright misuse and unclean hands because Mr. McIntosh informed Mr. Wu prior to Lotus' subdivision purchase that Mr. McIntosh would require $300,000 owed by Legacy plus interest for $800,000 total to prepare a new tentative map. NCUE and Lotus claim that Mr. McIntosh should have informed Mr. Wu "of the copyright instead of quietly watching him invest millions of dollars." NCUE and Lotus further accuse Mr. McIntosh of delaying to sue until Mr. Wu "was so heavily invested that he couldn't turn back."

35

1    There is no evidence of Mr. McIntosh's copyright misuse.  There was no evidence of fraud or

2    misconduct.  Mr. McIntosh does not attempt to leverage control beyond his copyright.  There is no

3    evidence that Mr. McIntosh lured NCUE or Lotus to "spend millions."  NCUE and Lotus proceeded with

4    knowledge that Mr. McIntosh required compensation to prepare a new tentative map.  NCUE and Lotus

5    rejected Mr. McIntosh's terms, and there is no evidence that they attempted to negotiate with him.  The

6    evidence reveals that NCUE and Lotus proceeded with subdivision development at risk that a jury may

7    find substantial similarity between Tentative Map 5472 and Tentative and Final Maps 6451.  The

8    copyright misuse/unclean hands defense is unviable.

9    **Wasco's Contributory Copyright Infringement**

10   Wasco challenges Mr. McIntosh's contributory copyright infringement claim against it.  "One

11   infringes contributorily by intentionally inducing or encouraging direct infringement."  *Metro-Goldwyn-*

12   *Mayer Studios, Inc. v. Grokster, Ltd.*, 545 U.S. 913, 930, 125 S.Ct. 2764 (2005).  "[O]ne who, with

13   knowledge of the infringing activity, induces, causes or materially contributes to the infringing conduct

14   of another, may be held liable as a 'contributory' infringer."  *Gershwin Pub. Corp. v. Columbia Artists*

15   *Management, Inc.*, 443 F.2d 1159, 1162 (2nd N.Y. 1971).  Contributory copyright infringement liability

16   "may be predicated on actively encouraging (or inducing) infringement through specific acts . . . or on

17   distributing a product [which] distributees use to infringe copyrights, if the product is not capable of

18   'substantial' or 'commercially significant' noninfringing uses."  *Grokster*, 545 U.S. at 942, 125 S.Ct.

19   2764 (Ginsburg, J. concurring) (citing *Sony Corp. v. Universal City Studios, Inc.*, 464 U.S. 417, 442,

20   104 S.Ct. 774 (1984)).

21   Mr. McIntosh's contributory copyright infringement claim against Wasco rests on:

22   1.    Wasco's distribution of Tentative Map 5472 and the MM improvement plans to NCUE,

23         Lotus and DeWalt; and

24   2.    Preparation of infringing Tentative and Final 6451 Maps which Wasco approved to

25         enable NCUE to sell homes from which Wasco could collect fees and taxes.

26   As discussed below, Wasco challenges these points.

27   ***Wasco's Knowledge And Intent***

28   "[C]ontribution to infringement must be intentional for liability to arise."  *Perfect 10, Inc. v.*

36

*Amazon.com, Inc.*, 487 F.3d 701, 727 (9th Cir. 2007).  A defendant "is liable for the resulting acts of infringement by third parties" when defendant distributes a copyrighted work "with the object of promoting its use to infringe copyright, as shown by clear expression or other affirmative steps taken to foster infringement."  *Grokster*, 545 U.S. at  936-937, 125 S.Ct. 2764.  An "actor may be contributorily liable for intentionally encouraging direct infringement if the actor knowingly takes steps that are substantially certain to result in such direct infringement."  *Perfect 10*, 487 F.3d at 727.

The Ninth Circuit interprets "the knowledge requirement for contributory copyright infringement to include both those with *actual knowledge* and those who *have reason to know* of direct infringement." *Ellison v. Robertson*, 357 F.3d 1072, 1076 (9th Cir. 2004) (italics in original).

Contributory liability is analyzed in light of "rules of fault-based liability derived from common law." *Grokster*, 545 U.S. at 934-935, 125 S.Ct. 2764.  Common law principles "establish that intent may be imputed."  *Perfect 10*, 487 F.3d at 727.  "Tort law ordinarily imputes to an actor the intention to cause the natural and probable consequences of his conduct."  *DeVoto v. Pac. Fid. Life Ins. Co.*, 618 F.2d 1340, 1347 (9th Cir. 1980).

Wasco claims an absence of knowledge that NCUE, Lotus or DeWalt "harbored designs to use, copy, or otherwise infringe upon Plaintiff's alleged copyright interests" in Tentative Map 5472 or the MM improvement plans.  Wasco characterizes its "dealings" with NCUE, Lotus and DeWalt as limited to "processing and reviewing the tentative and final maps which they prepared for the Subdivision." Wasco claims that it did not encourage or induce infringement of the MM improvement plans in that Wasco did not discuss the MM improvement plans with NCUE, Lotus or DeWalt and improvement plans were not required for the revived subdivision work of NCUE and Lotus, who did not submit improvement plans.

Mr. McIntosh attributes Wasco to apply an improper standard that Wasco did not know "of an existing copyright, or how defendants would infringe, or even that they intended to infringe" in that the proper standard is that Wasco knew of "infringing activity."  Mr. McIntosh characterizes the "infringing activity" as "the act of DeWalt preparing a substantially similar map to McIntosh's."  Mr. McIntosh argues that Wasco knew that a map similar to Tentative Map 5472 needed to be created or that a new map need to be submitted to require "a lengthy, new approval process, and a potential redesign of the

subdivision."  To support contributory infringement, Mr. McIntosh points to:

> 1. Wasco's approval of Tentative Map 5472 in 1992 and Tentative and Final Maps 6451 in 2004;
>
> 2. The MM improvement plans' conformance to Tentative Map 5472;
>
> 3. Wasco's use of the developer package to tout in place improvements and tentative map approval;
>
> 4. Tentative and Final Maps 6451's need to conform to the MM improvement plans;
>
> 5. Absence of improvement plans created by DeWalt;
>
> 6. Wasco's emailing the MM improvement plans to Mr. Black, DeWalt's project manager/lead engineer for Tentative Map 6541;
>
> 7. DeWalt's conformance of Tentative and Final Maps 6451 to Tentative Map 5472 and the MM improvement plans; and
>
> 8. Wasco's approval of Tentative and Final Maps 6451

At a minimum, Mr. McIntosh raises genuine factual questions as to Wasco's contributory infringement.  There is no dispute that Wasco's developer package included Tentative Map 5472.  The developer package evidence raises factual issues whether Wasco distributed a copyrighted work to promote infringing use.  The evidence derives inferences that Wasco desired to ease subdivision completion by providing Tentative Map 5472.  Wasco's actions raise a question of its imputed knowledge by its providing easy access to Tentative Map 5472 and the MM improvement plans.  Wasco concedes that on April 13, 2005, it emailed the MM improvement plans to Mr. Black, DeWalt's project manager/lead engineer for Tentative Map 6541.  The evidence infers Wasco's wink and a nod approach to subsequent use of Tentative Map 5472 and the MM improvement plans.  Mr. McIntosh raises a disputed issue whether Wasco distributed Tentative Map 5472 and the MM improvement plans to ensure that a "new map could conform to the old map and improvement plans" to ease Wasco approval and in turn subdivision completion.  Although Mr. McIntosh may not prevail on his contributory infringement claim, he raises sufficient factual questions as to Wasco's imputed knowledge and reason to know of direct infringement to escape summary judgment.

/ / /

***Substantial Or Commercially Significant Noninfringing Uses***

Wasco challenges Mr. McIntosh to prove that Tentative Map 5472 and the MM improvement plans "are capable only of infringing uses" in that they "are inherently matters of public concern" and "enable the general public and property owners to understand the layout and structure of the Subdivision."

Wasco fails to support its conclusory claim that Tentative Map 5472 and the MM improvement plans are capable of substantial or commercially significant noninfringing uses. Wasco confuses potential public use of Tentative Map 5472 and the MM improvement plans with their dissemination at issue here. Public observation of Tentative Map 5472 and the MM improvement plans does not address their use in the copyright context. The fact that Tentative Map 5472 and the MM improvement plans touch a public setting does not render them capable of substantial or commercially significant noninfringing uses.

### **Wasco' Vicarious Copyright Infringement**

To attempt to avoid vicarious copyright infringement, Wasco argues that it "lawfully distributed" Tentative Map 5472 and the MM improvement plans and performed "routine municipal functions" in connection with approval of tentative and final maps.

Vicarious copyright liability "allows imposition of liability when the defendant profits directly from the infringement and has a right and ability to supervise the direct infringer, even if the defendant initially lacks knowledge of the infringement." *Grokster*, 545 U.S. at 931, 125 S.Ct. 2764; *see, e.g., Shapiro, Bernstein & Co. v. H.L. Green Co.*, 316 F.2d 304, 308 (2nd 1963); *Dreamland Ball Room, Inc. v. Shapiro, Bernstein & Co.*, 36 F.2d 354, 355 (7th Cir. 1929). "A defendant is vicariously liable for copyright infringement if he enjoys a direct financial benefit from *another's* infringing activity and 'has the right and ability to supervise' the infringing activity." *Ellison*, 357 F.3d at 1076 (quoting *A & M Records v. Napster, Inc.*, 239 F.3d 1004, 1013 (9th Cir. 2001)).

Wasco claims an inability to supervise or control NCUE, Lotus or DeWalt's infringing activities in that the "subdivision map review process . . . establishes that the City must follow certain protocols and does not have an unrestrained power to deny approval of maps." Wasco further claims inability to have detected NCUE, Lotus or DeWalt's infringement based on observation of DeWalt's Tentative and

1   Final Maps 6451.  Wasco argues that it should not be placed in a position to "police" copyright interests.

2        Wasco again makes a conclusory claim without legal or factual support.  Wasco attempts to

3   distract the issue by focusing on its "municipal" functions, not its dissemination of Tentative Map 5472

4   and the MM improvement plans.  At a minimum, Wasco's approval of Tentative and Final Maps 6541

5   under the circumstances of reviving the dormant subdivision raises factual issues as to Wasco's ability

6   to supervise and control infringing activity, especially given Wasco's desire to complete the subdivision.

7   Despite Wasco's claims that its actions were limited to municipal functions, Wasco actively sought to

8   revive the subdivision to raise a factual question over its supervision and control of alleged infringing

9   activity.

10       As to financial benefit, Mr. McIntosh points to proceeds to Wasco from the subdivision sale and

11  collection of fees with home construction.  Wasco faced the task to complete the subdivision which had

12  remained dormant for 10 years.  The evidence suggests that Wasco enticed potential buyers and

13  developers with Tentative Map 5472 and the allure of completed improvements.  There is no dispute that

14  Wasco financially benefitted from subdivision completion compared to leaving the subdivision

15  incomplete.  Again, Mr. McIntosh may not prevail on his vicarious infringement claim but raises factual

16  issues to avoid summary judgment.

17                                    **CONCLUSION AND ORDER**

18  _____ For the reasons discussed above, this Court:

19       1.    DENIES NCUE, Lotus and Wasco summary judgment on all of Mr. McIntosh's

20              copyright infringement claims;

21       2.    GRANTS Mr. McIntosh summary adjudication on issues of implied nonexclusive

22              license, merger, publication, first sale doctrine, abandonment, limitations period and

23              laches;

24       3.    DENIES Mr. McIntosh summary adjudication on the independent creation issue; and

25       4.    CONFIRMS the March 17, 2010 pretrial conference and March 1, 2010 trial.

26       IT IS SO ORDERED.

27  **Dated:    October 30, 2009**              **/s/ Lawrence J. O'Neill**
                                          UNITED STATES DISTRICT JUDGE
28