# EXHIBIT A

**Certified Copy**

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA

ROGER McINTOSH,

       Plaintiff,

  vs.

NORTHERN CALIFORNIA UNIVERSAL
ENTERPRISES COMPANY, ET AL.,

       Defendants.

~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~

Case No.
107CV-01080-LJO-WMW

**DEPOSITION OF**

**ROGER McINTOSH**

December 18, 2008
9:11 a.m.

5001 East Commercenter
Suite 170
Bakersfield, California

Brian S. Cardoza, CSR No. 8362



**ESQUIRE**
DEPOSITION SERVICES®

**PAULSON**
REPORTING & LITIGATION SERVICES, LLC

Toll Free: 800.300.1214
Facsimile: 661.322.2242

Suite 170
5001 East Commercenter Drive
Bakersfield, CA 93309
www.paulsonreporting.com

39

1        Q.   And do you know if this registration came out

2    of an office in San Francisco?

3        A.   Yes, it did.

4        Q.   All right.   Now, if you go down from the top

5    a little bit, on the left-hand side you see where the

6    topic says "Title of This Work"?

7        A.   Yes.

8        Q.   All right.   And under that, somebody printed

9    in, "Valley Rose Planned Community".   Do you see that?

10       A.   Yes.

11       Q.   Do you know what was meant by "Valley Rose

12   Planned Community" for purposes of this registration form?

13       A.   It was a large master planned community named

14   Valley Rose in Wasco.

15       Q.   All right.   My understanding, and correct me

16   if I'm wrong, of the Valley Rose planned community was a

17   community comprising 480 acres; is that correct?

18       A.   It was a large acreage.   That sounds about

19   right.

20       Q.   Okay.   And it was adjacent to the golf course

21   out there?

22       A.   Yes.

23       Q.   So, was it your intent, in filing this

24   copyright registration, to copyright all work that you did

25   on that entire 480 acres, or was it your intent to limit



ESQUIRE
DEPOSITION SERVICES®

PAULSON
REPORTING & LITIGATION SERVICES, LLC

Toll Free: 800.300.1214
Facsimile: 661.322.2242

Suite 170
5001 East Commercenter Drive
Bakersfield, CA 93309
www.paulsonreporting.com

40

1     your copyright to the work done in the area of the

2     tentative subdivision 5472?

3            A.   It was my intent to copyright the work done

4     for 5472, and all related work that was necessary to

5     support that tract.

6            Q.   All right.   Over on the right-hand side, it

7     says, "Nature of This Work".   Do you see that?

8            A.   Yes.

9            Q.   And somebody has printed in "Land Planning

10    Drawings and Landscape Design".   Do you see that?

11           A.   Yes, I do.

12           Q.   Did that terminology come from you, or did

13    that terminology come from your lawyer?

14           MR. TRAVIS:   You know, I'm going to object to

15    attorney-client privilege.   Now, we have no problems going

16    through, for example, what he understands about this

17    copyright form.   But as far as any dialogue between him

18    and his attorney, what his attorney told him, I'm going to

19    object here and tell him not to answer any questions along

20    those lines.

21           BY MR. HASSING:   Sure.   Sure.

22           Q.   Mr. McIntosh, these words, "Land Planning

23    Drawings and Landscape Design", was that terminology

24    produced by you for this form?

25           A.   I'm going to take my attorney's advice.



**ESQUIRE**
DEPOSITION SERVICES®

**PAULSON**
REPORTING & LITIGATION SERVICES, LLC

Toll Free: 800.300.1214
Facsimile: 661.322.2242

Suite 170
5001 East Commercenter Drive
Bakersfield, CA 93309
www.paulsonreporting.com

                                55
1    boundary survey, or a topo survey?

2         A.   We usually wait until the contractor signed

3    before we start work.

4         Q.   And with regard to this particular project,

5    even though that's your policy and your general procedure,

6    you don't recall whether or not you actually started the

7    work before this contract was signed?

8         A.   I don't recall.  I'd have to refer to the

9    timesheets.

10        Q.   All right.  Did you have any involvement in

11   drafting this letter that's signed by Mr. Martin?

12        A.   I don't believe I did.

13        Q.   Do you recall seeing it before it went out to

14   Mr. Brown?

15        A.   I don't recall.  I know I've seen it several

16   times since.

17        Q.   Okay.  The other subdivision tract map, in

18   addition to 5472, was 5618, correct?

19        A.   I don't recall the number.

20        Q.   All right.  You did do another subdivision

21   map in that Valley Rose Estates master planned area,

22   correct?

23        A.   That's correct.

24        Q.   All right.  Did you copyright that

25   subdivision tract map?



ESQUIRE
DEPOSITION SERVICES

PAULSON
REPORTING & LITIGATION SERVICES, LLC

Toll Free: 800.300.1214
Facsimile: 661.322.2242

Suite 170
5001 East Commercenter Drive
Bakersfield, CA 93309
www.paulsonreporting.com

56

1          A.   I don't recall.  I don't believe so.

2          Q.   Have the improvements been built in that

3     subdivision?

4          A.   Not that I'm aware of.  But I haven't been

5     out there for six months.

6          Q.   All right.  Was that tentative map approved

7     by the City?

8          A.   I don't recall.

9          Q.   I've asked you this morning if you had ever

10    filed any other copyrights, and you indicated that you

11    haven't, that the only one you filed was the one that's

12    evidenced by this Exhibit Number 2, and I just want to

13    clarify one thing.

14          Paragraph one of your complaint refers to this

15    action being brought "to redress the infringement of

16    McIntosh's registered copyrights", plural, and I just want

17    to confirm with you one more time that, to your

18    understanding, you've only got one copyright, and that's

19    reflected on Exhibit 2; is that correct?

20          A.   I have a copyright on every single plan that

21    is referred to in that copyright certificate.

22          Q.   Oh, okay.  So, what you have is you've got

23    multiple copyrights, right?

24          A.   That's correct.

25          Q.   And you've got one copyright registration?


ESQUIRE
DEPOSITION SERVICES

PAULSON
REPORTING & LITIGATION SERVICES, LLC

Toll Free: 800.300.1214
Facsimile: 661.322.2242

Suite 170
5001 East Commercenter Drive
Bakersfield, CA 93309
www.paulsonreporting.com

105

1    Other than map 5472, do you know of any other instance
2    when the City of Wasco gave a copy of any tentative map
3    drawn by you or Martin-McIntosh to anybody?
4              A.   No.
5              Q.   Okay.  Do you know of any instance when the
6    City of Wasco gave out to anybody a copy of any plan or
7    any map produced by you or Martin-McIntosh?
8              A.   Yes.
9              Q.   Tell me how many times, to your knowledge,
10   that's occurred?
11             A.   Well, it occurred when I requested all the
12   maps and plans from the City of Wasco.
13             Q.   And they gave them to you?
14             A.   Yes.
15             Q.   All right.  I believe I'm asking about their
16   delivery of any plans or maps to anybody other than you or
17   an employee of Martin-McIntosh?
18             A.   I can only assume that the contractor that
19   called had a copy of the plans.
20             Q.   Okay.  Any other instance?
21             A.   I don't know directly, but I was told by the
22   Public Works Department, when I inquired about the
23   improvement plans for 6451, that the City had used the
24   plans for tract 5472.  And whether or not they gave them
25   out to other parties, I would assume that they would have



ESQUIRE
DEPOSITION SERVICES

PAULSON
REPORTING & LITIGATION SERVICES, LLC

Toll Free: 800.300.1214
Facsimile: 661.322.2242

Suite 170
5001 East Commercenter Drive
Bakersfield, CA 93309
www.paulsonreporting.com

122

1    it possible that the plans for 5472 were used for that

2    tract, since it's been sitting there for many, many years,

3    and he said that's probably what happened.

4           Q.   Okay.

5           A.   He looked for the -- the improvement plans

6    for 5472 and he couldn't find those.

7           Q.   All right.  Okay.  And based on what he told

8    you, then you assumed that the improvement plans

9    associated with 5472, that Martin-McIntosh had prepared,

10   were being circulated between or amongst employees of the

11   City, Mr. Wu, DeWalt, and possibly others; is that

12   correct?

13          A.   Yes, which later proved to be true.

14          Q.   All right, and what proved that to be true?

15          A.   The deposition of Jeff Gutierrez, and the

16   document request that I finally got my plans back from the

17   City of Wasco as they relate to 6451.

18          Q.   All right.  Now, we talked about

19   conversations that you have had with City of Wasco

20   employees, a City of Wasco contractor, and ex-City

21   employees, and other than your attorneys, have you had any

22   other conversations with anybody in 2006 or 2007 about

23   DeWalt or Wu using plans or maps drawn by you?  And I'm

24   going to exclude your wife and your family, --

25          A.   Okay.



ESQUIRE
DEPOSITION SERVICES

PAULSON
REPORTING & LITIGATION SERVICES, LLC

Toll Free: 800.300.1214
Facsimile: 661.322.2242

Suite 170
5001 East Commercenter Drive
Bakersfield, CA 93309
www.paulsonreporting.com

165

1   strike a balance to maximize the amount of return on that

2   land?

3           A.   Yes.

4           Q.   Okay.   How did you come up with the name of

5   the streets?

6           MR. TRAVIS:   I'm going to object that it lacks

7   foundation.   It hasn't been determined that Mr. McIntosh

8   came up with the name of the streets.

9           BY MR. HASSING:   Okay.

10          Q.   Well, let's take a look at these streets.

11  I'm looking at revised 5472 and I see a street here called

12  Pebble Beach Way.  Do you see that?

13          A.   Yes.

14          Q.   Do you know how that name was derived?

15          A.   I believe those were proposed by the

16  developer.

17          Q.   Mike Brown?

18          A.   Possibly, yes.

19          Q.   Yeah.  And Sawgrass Court, the same thing?

20          A.   It looks like this was a golf themed

21  subdivision.  So, Sawgrass, Olympic Clos, Pebble Beach,

22  St. Andrew's, are all names of golf courses.

23          Q.   Right.  And so it's your testimony that each

24  of the names of each of the streets in 5472 was proposed

25  by Mr. Brown?


ESQUIRE
DEPOSITION SERVICES

PAULSON
REPORTING & LITIGATION SERVICES, LLC

Toll Free: 800.300.1214
Facsimile: 661.322.2242

Suite 170
5001 East Commercenter Drive
Bakersfield, CA 93309
www.paulsonreporting.com

166

1          A.   I am guessing they were, but I believe they

2    came from the developer.

3          Q.   Well, isn't the developer Mr. Brown?

4          A.   Yes.

5          Q.   Okay.  All right.  You don't have any

6    information that would cause you to believe that one of

7    your draftsman at Martin-McIntosh came up with those

8    names, do you?

9          A.   I don't have any -- any information.

10         Q.   You've done a lot of tract maps in your life,

11   right?

12         A.   Yes.

13         Q.   How often is it that you, as the engineer or

14   the surveyor, is designated as the one to come up with the

15   names of the streets, as opposed to the developer doing

16   that?

17         A.   I would say 60 percent of the time.

18         Q.   Okay, so you do it often?

19         A.   Yes.

20         Q.   All right.  All right.  So, if

21   Martin-McIntosh would have done it in this case, you'd

22   probably remember that, right?

23         A.   Not necessarily.

24         Q.   All right.  Do you know anybody who would

25   know how those names were derived?



ESQUIRE
DEPOSITION SERVICES

PAULSON
REPORTING & LITIGATION SERVICES, LLC

Toll Free: 800.300.1214
Facsimile: 661.322.2242

Suite 170
5001 East Commercenter Drive
Bakersfield, CA 93309
www.paulsonreporting.com

176

```
 1     $328,000.00, including interest.  Actually, somebody else
 2     added it up on the bottom of the back page also.
 3             A.   Yeah, as of that date, yes.
 4             Q.   All right.
 5             A.   Since then, the interest has compounded
 6     somewhat.
 7             Q.   Sure.
 8             A.   I think it's in the 800 to $900,000.00 range
 9     now.
10             Q.   All right.  Running at 18 percent, right?
11             A.   Yeah.  That's what the contract said.
12             Q.   Good.
13             A.   Not quite as high as credit cards.
14             Q.   All right.  I believe you said you filed a
15     lawsuit against Brown to foreclose a mechanic's lien; is
16     that right?
17             A.   Filed a lawsuit to foreclose a mechanic's
18     lien?
19             Q.   Yeah.
20             A.   Against the property.
21             Q.   Okay.  You filed a lawsuit against the
22     property to foreclose on a mechanic's lien?
23             A.   Yes.
24             Q.   All right.  Mike Brown was a defendant in
25     that lawsuit?
```



**ESQUIRE**
DEPOSITION SERVICES®

**PAULSON**
REPORTING & LITIGATION SERVICES, LLC

Toll Free: 800.300.1214
Facsimile: 661.322.2242

Suite 170
5001 East Commercenter Drive
Bakersfield, CA 93309
www.paulsonreporting.com

178

1   '90s that were invested in other Mello-Roos Districts

2   around the State.  About that time the real estate market

3   started dropping and these Mello-Rooses started going into

4   default.

5         So, the City of Wasco stopped paying Mr. Brown

6   for the improvements because they weren't going to be able

7   to sell bonds to form the district.

8         After we filed our mechanic's lien, we -- we have

9   a judgment for a mechanic's lien for foreclosure, and the

10  City of Wasco, after the fact, passed a resolution to

11  establish the assessment district lien on their behalf and

12  claimed that they had first priority and that we were

13  second priority.  Then they tried to foreclose on their

14  lien.  Before they could foreclose on their lien, the

15  property went to tax sale, because Mr. Brown didn't pay

16  his taxes, and it was sold to the City of Wasco through

17  tax sale, which wiped everyone out.

18             Q.   Okay.  And you weren't aware of that --

19             A.   Okay, what was the question?

20             Q.   You weren't aware that that tax sale was

21  pending then?

22             A.   Absolutely I was.

23             Q.   Oh, you were?  What was the sales price?

24             A.   Whatever the taxes that were due.  It was a

25  hundred thousand dollars.


ESQUIRE
DEPOSITION SERVICES

PAULSON
REPORTING & LITIGATION SERVICES, LLC

Toll Free: 800.300.1214
Facsimile: 661.322.2242

Suite 170
5001 East Commercenter Drive
Bakersfield, CA 93309
www.paulsonreporting.com

179

1        Q.   Oh.   And you didn't want to bid on that?

2        A.   Absolutely I did.

3        Q.   Why didn't you?

4        A.   Because a jurisdiction has first priority to

5   buy property from -- through a tax sale.

6        Q.   All right.   And they wanted it?

7        A.   And they wanted it.

8        Q.   Okay.

9        A.   Yeah, remember about the --

10       MR. OKADIGBO:   And how much money did you say?

11       MR. HASSING:   He said a hundred thousand.

12       THE WITNESS:   A little over a hundred thousand.

13       MR. OKADIGBO:   Okay.

14       THE WITNESS:   There were -- there were two

15  parcels that were going to tax sale.   So, the City of

16  Wasco contacted the Tax Collector of the County of Kern

17  and State code allows them to have first right at

18  purchasing the property and they bought the property.

19       BY MR. HASSING:

20       Q.   At the amount of the delinquent taxes?

21       A.   Yeah.

22       Q.   So, in other words, ordinarily a tax sale,

23  it's a bidding process?

24       A.   That's correct.

25       Q.   And if the City bid a hundred, you could bid



ESQUIRE
DEPOSITION SERVICES

PAULSON
REPORTING & LITIGATION SERVICES, LLC

Toll Free: 800.300.1214
Facsimile: 661.322.2242

Suite 170
5001 East Commercenter Drive
Bakersfield, CA 93309
www.paulsonreporting.com

220

1           A.   It's my understanding that if it is agreed to

2    by me to allow that to go to the public, that it can be

3    used for public review.  Contractually it is my work

4    product, and I prepared it for the benefit of my client,

5    in accordance with the contract that I entered into with

6    my client.

7           Q.   So, in terms of 5472, would you say that you

8    agreed or you consented to have these tentative maps be

9    reviewed under CEQA and to make them available to the

10   public as part of that process?

11          MR. TRAVIS:  I'm going to object as it's

12   ambiguous as to when you're talking about, or the

13   timeframe.

14          MR. OKADIGBO:  I'm talking about at the time that

15   he submitted the tentative map to the City for approval.

16          THE WITNESS:  Which -- which maps are we talking

17   about?

18          BY MR. OKADIGBO:

19          Q.   5472, the tentative maps.

20          A.   Okay, that's one map.

21          Q.   Okay.

22          A.   Okay, at the time I submitted the tentative

23   tract 5472, I agreed to process it through the -- the

24   City's public review process.

25          Q.   And when you say you agreed, what do you mean



ESQUIRE
DEPOSITION SERVICES

PAULSON
REPORTING & LITIGATION SERVICES, LLC

Toll Free: 800.300.1214
Facsimile: 661.322.2242

Suite 170
5001 East Commercenter Drive
Bakersfield, CA 93309
www.paulsonreporting.com

                                    267

1    Every improvement plan has a distance or a dimension on

2    it.  It's consistent or substantially similar to the

3    tentative map and the final map, because they have to be.

4    They have to match.  Otherwise a whole new set of

5    improvement plans would have had to have been done by

6    somebody, by a civil engineer.

7              Q.  Okay.  Have you ever used someone else's

8    improvement plans without their permission to create a

9    tentative map?

10             A.  No.

11             Q.  Have you ever used someone else's improvement

12   plans without their permission to create a final map?

13             A.  No.

14             Q.  Have you ever used someone else's improvement

15   plans to perform surveying work?

16             A.  Yes.

17             Q.  Without their permission?

18             A.  If they are approved and accepted by the

19   city, then they would be -- they could be used without the

20   engineer's permission.  Or if the engineer passes away or

21   is no longer around or available, then there's a provision

22   in the Subdivision Map Act that allows for that to occur.

23             Q.  So, if I understand your testimony, you're

24   stating that on the occasion that you did use someone's

25   improvement plans without their permission, the



Toll Free: 800.300.1214
Facsimile: 661.322.2242

Suite 170
5001 East Commercenter Drive
Bakersfield, CA 93309
www.esquiresolutions.com

271

1          MR. TRAVIS:   If you understand it, you can answer

2      it.

3          THE WITNESS:   Well, the City of Wasco controlled

4      the subdivision -- the construction of the subdivision and

5      the development of the subdivision through the Development

6      Agreement that they had with the Legacy Group.  They also

7      controlled the construction through the purchasing of the

8      property through a tax sale.  And they also controlled it

9      through the disposition of the property to Northern

10     California.  So, I would say that they controlled the

11     construction of the -- and the -- the development of the

12     subdivision.

13          BY MR. OKADIGBO:

14          Q.   Okay.  Would you say that there's anything

15     else that the City of Wasco has done, after selling the

16     property to Northern California Universal Enterprises,

17     that constitutes controlling the development of the

18     subdivision?

19          A.   They -- the City of Wasco reprocessed a

20     tentative tract 6451 and allowed the final map to record

21     so that the developer could build homes and -- and sell

22     the individual lots.  The City of Wasco signs off on the

23     tentative map process, they sign off on the final map, so

24     they have complete control of that whole subdivision

25     process, including the construction of the improvements.



ESQUIRE
An Alexander Gallo Company

Toll Free: 800.300.1214
Facsimile: 661.322.2242

Suite 170
5001 East Commercenter Drive
Bakersfield, CA 93309
www.esquiresolutions.com

# EXHIBIT B

**Certified Copy**

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA

ROGER McINTOSH,

        Plaintiff,

   vs.

NORTHERN CALIFORNIA UNIVERSAL
ENTERPRISES COMPANY, ET AL.,

        Defendants.

Case No.
107CV-01080-
LJO-WMW

**DEPOSITION OF**

**KEITH WOODCOCK**

January 29, 2009
1:40 p.m.

Suite 170, 5001 East Commercenter
Bakersfield, California

Brian S. Cardoza, CSR No. 8362



Toll Free: 800.300.1214
Facsimile: 661.322.2242

Suite 170
5001 East Commercenter Drive
Bakersfield, CA 93309
www.esquiresolutions.com

Keith Woodcock                                    January 29, 2009

33

1          A.   Yes.

2          Q.   And there's a list of items listed there?

3          A.   Yes.

4          Q.   Since it's your testimony that improvements

5     were already put in, can you describe what improvements,

6     if any, were actually required from Northern?

7          A.   Yeah, as I previously stated, that this

8     document is -- is a -- a -- a boilerplate and it spells

9     out -- like it doesn't -- it's not particular to the -- to

10    the map in question, because that -- that -- like (a), it

11    says, "Subdivider shall grade, pave, construct and improve

12    all of the Streets, Alleys, Easements and Pedestrian Ways

13    dedicated to the City."   It doesn't go and name those

14    streets, it's generic -- it's meant to be generic in

15    nature on that.   "Shall install a Water Distribution

16    System".

17          So, -- so, these -- these "Improvements to Be

18    Constructed" are those that the City believes are -- are

19    important to support that subdivision, and -- and in this

20    case, that -- that looking at -- to that paragraph seven,

21    that's where the comparison would be, that -- that you'd

22    look at and say, okay, what's -- what's the value of the

23    streets, etcetera, and since that they were already in,

24    that -- that no -- no need was -- there was not a need

25    for -- for bonding.



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.300.1214
Facsimile: 661.322.2242

Suite 170
5001 East Commercenter Drive
Bakersfield, CA 93309
www.esquiresolutions.com

# EXHIBIT C

1   BONIFACIO B. GARCIA (SBN 100761)
    CHAKA C. OKADIGBO (SBN 224547)
2   GARCIA CALDERON RUIZ, LLP
    520 S. Grand Avenue, Suite 695
3   Los Angeles, CA 90071
    (213) 347-0210; Fax (213) 347-0216
4
    Attorneys for Defendant CITY OF WASCO
5

6

7
                        UNITED STATES DISTRICT COURT
8
              EASTERN DISTRICT OF CALIFORNIA, FRESNO DIVISION
9

10
    ROGER McINTOSH,                          Case No: 1:07-CV-01080-LJO-GSA
11
              Plaintiffs,                     **DECLARATION OF ROBERT EDWARD
12                                           WREN IN SUPPORT OF DEFENDANT
         vs.                                 CITY OF WASCO'S MOTIONS IN LIMINE**
13
    NORTHERN CALIFORNIA                       Date:
14  UNIVERSAL ENTERPRISES, INC. et al,       Time:
                                             Dept.:   4
15            Defendants.                     Judge:  Lawrence J. O'Neill

16

17

18  I, Robert Edward Wren, declare as follows:

19       1.      I have firsthand personal knowledge of the facts set forth below, except as to

20  those matters attested to on information and belief, and, if called as a witness, could and would

21  competently testify thereto under oath.

22       2.      I am currently employed by the City of Wasco ("City") and have worked

23  for the City since January 2005. Since October, 2007, I have served as the Deputy Director of

24  City's Public Works Department. Before October 2007, I served as City Projects Manager and

25  Superintendent of Streets and City Projects from Jan 3, 2005 through October, 2007. In all of

26  these capacities, I have overseen City construction projects, including the construction of roads,

27  improvements and reconstruction projects. I have also liaised with the Contract City Engineer

28

                                            -1-

01/29/2010  13:11    6617591728              WASCO PUB WKS                    PAGE  02/02

1    on civil engineering issues relating to City construction projects.  Regarding the Valley Rose

2    Estates, I have overseen the public works inspections of the Valley Rose Estates Subdivision.

3           3.     The City's Public Works Department maintains all records of improvement plans

4    related to any developments with the city limits.

5           4.     Attached hereto are full size copies of the improvement plans for tract 5472 on

6    file with the City.

7           I declare under penalty of perjury, under the laws of the State of California, that the

8    foregoing is true and correct.

9           Executed this 29th day of January, 2010, at Wasco, California.

10

11

12                                            Robert  Wren

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

-2-

**DECLARATION OF ROBERT EDWARD WREN**

# EXHIBIT D

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA, FRESNO DIVISION

———————

ROGER McINTOSH,                    No. 1:07-CV-01808-LJO-GSA

        Plaintiff,

vs.

NORTHERN CALIFORNIA UNIVERSAL
ENTERPRISES COMPANY, et. al.,

        Defendants.

———————————————

DEPOSITION OF GREG BLACK

Taken at

Borton, Petrini, LLP
5060 California Avenue, Seventh Floor
Bakersfield, California

Wednesday, January 22, 2009 at 9:05 A.M.


Reported by:

Karen A. Marousek, CSR #10022


1

1        A.    All of the physical improvements to the site

2    had previously been constructed, so all the roads were

3    in place, all of the perimeter block wall was in place,

4    I believe even to the point that landscaping had

5    previously been installed.  So I'm not sure who

6    prepared those plans.  I don't believe it was part of

7    our contract at DeWalt Corporation to prepare any

8    improvement plans.

9        Q.    So you didn't prepare the improvement plans,

10   your only job was to process the tentative map?

11       A.    And I believe it also included preparing the

12   final map for recordation.

13       Q.    And I'm sorry, and the final map for

14   recordation?

15       A.    Yes.

16       Q.    But you're not sure who actually created the

17   plans for this particular tract?

18       A.    Right.

19       Q.    Had you ever seen the plans for this

20   particular tract?

21       A.    I had seen an old copy of some of the plans,

22   but I don't -- I don't know if I had seen all of the

23   improvement plans or just a couple of the plans.  I

24   don't specifically recall.

25       Q.    Do you remember ever asking for those plans?

1    say that he needed the plans.

2         Q.   (By Mr. Travis)  It's a hypothetical, you can

3    answer it.

4              MR. HASSING:  Objection, incomplete

5    hypothetical.

6              MR. TRAVIS:  You're welcome.

7              THE WITNESS:  Could you repeat it, please?

8         Q.   (By Mr. Travis)  Sure.  In a situation like in

9    64 -- in preparing and processing the tentative and

10   final map where the improvements are already in the

11   ground and all you need to do is prepare and process

12   that map, why would you need improvement plans, if you

13   would need them at all?  Can you think of a situation

14   where you would need them?

15        A.   I can't think of a situation where I would

16   need them.  Typically, on a project like this, as an

17   engineer, I like to get my hands on, you know, as much

18   information as there may be out there available to look

19   at.  Whether it's absolutely essential to the

20   completion of the project or, you know, just some

21   cursory information that may not have any direct

22   bearing on the project, still like to get all that

23   information, you know, just to use in case -- you know,

24   there might be something on some of that information

25   that may impact what you're going to do on the project.

1        Q.    Do you recall any reason why you would have

2    needed those improvement plans?

3        A.    Again, just as part of the initial information

4    gathering for the project.

5        Q.    All right.  Do you recall ever looking at

6    those improvement plans?

7        A.    I recall looking at them, not studying them

8    in-depth or looking into any of the specific, you know,

9    data on them.

10       Q.    Did you ever make any use of those improvement

11   plans?

12       A.    Not that I recall.

13       Q.    All right.  Now, you had to prepare a cost

14   estimate, right?

15       A.    Uh-huh.

16       Q.    And how did you prepare that cost estimate?

17       A.    We would look -- typically, take, like, the

18   tentative map and estimate quantities off of that.  You

19   can determine, like, linear footage of curb and gutter,

20   square foot area of paving, linear footage of block

21   wall, get those quantities.  And then we had, I'll call

22   it a database of information of historical construction

23   costs that we would then obtain a unit cost for each of

24   those items and then just, you know, carry out the math

25   associated with calculating that total.

1   Mr. Wu about the number of lots he wanted to gain out
2   of this subdivision?

3       A.    Not -- not that I specifically recall having.

4       Q.    Do you have to any idea how DeWalt came up
5   with the exact same number of lots as McIntosh came up
6   with?

7       A.    The physical constraints of the improvements
8   that were already in place were pretty limiting.   The
9   streets were already there.   The perimeter walls were
10  already there.  The curb, gutter and sidewalk were in.
11  Driveway cuts were in.  And that kind of locked us in
12  to where each lot would be.

13      Q.    Well, you could have, instead of coming up
14  with 68 lots, you could have maintained that same
15  street configuration and come up with 34 lots just by
16  making them twice as big as they are, couldn't you?

17      A.    You could have, may not have been very
18  practical.

19      Q.    Why wouldn't it have been practical?

20      A.    Because typically, the goal is to maximize the
21  number of lots within the constraints of the city's
22  zoning ordinances and requirements.

23      Q.    Do you ever recall having any conversations
24  with Mr. Wu where he expressed to you that that was his
25  desire?

1   designers -- other than to express to them what their
2   work was supposed to be, in other words, "Go and" --
3   "Go and do what it is that you do." Did you give any
4   specific direction to them on how to perform their
5   jobs, or was it just understood that, you know, it was
6   within -- it was within the nature of things that they
7   do, and so they should just do it and come back to you
8   and have you sign off on it?

9        A.   It was certainly within the nature of their
10  normal activities that they would do, their normal job
11  requirements. The only thing that would have made this
12  unique would have been the improvements that have been
13  constructed in making sure that the designer
14  understood, "Okay. This is the perimeter block wall
15  that's already in place. There's a driveway cut here
16  and here and here. And so layout the lots making sure
17  that it accommodates the existing physical features
18  that are already there on site."

19        Q.   In your interactions with the City of Wasco
20  for the purpose of processing the tentative map that
21  DeWalt prepared for 6451, do you -- did you -- did the
22  city tell you to submit improvement plans? Did they
23  specifically direct you and/or DeWalt to submit
24  improvement plans?

25        A.   No.

# EXHIBIT E

1            UNITED STATES DISTRICT COURT

2       EASTERN DISTRICT OF CALIFORNIA, FRESNO DIVISION

3                 _____

4

5   ROGER McINTOSH,            No. 107CV 01080 LJO-WMW

6               Plaintiff,

7   vs.

8   NORTHERN CALIFORNIA UNIVERSAL
    ENTERPRISES COMPANY, et al,
9
              Defendants.
10   _____

11

12        DEPOSITION OF GERALD FRANK HELT

13               Taken at

14            Borton Petrini
         1600 Truxtun Avenue
15         Bakersfield, California

16     Tuesday, October 28, 2008 at 1:42 P.M.

17

18            Reported by:

19        Naomi S. Chavez, CSR #13007

20

21

22

23

24

25

                                      1

1    Q.   It's also your understanding that Northern

2  hired Dewalt to do a final map?

3    A.   That's what I understand.

4    Q.   It's also your understanding that years ago

5  Mr. McIntosh, as an engineer, drew some plans that were

6  used in creating that subdivision, correct?

7    A.   I understand that in the early '90s there were

8  improvement plans drawn by McIntosh that were used to

9  construct the improvements on that subdivision, and the

10  improvements were constructed and completed at that

11  time.

12    Q.   They were completed, to your knowledge?

13    A.   That's correct.

14    Q.   And now when the Dewalt tentative map came to

15  you for your review, did you in any way compare that

16  map to the McIntosh map?

17    A.   No.

18    Q.   You didn't see a need to do that?

19    A.   I didn't consider doing that.

20    Q.   Next question, when Dewalt submitted a final

21  map for your review, did you compare that final map to

22  the McIntosh final map?

23    A.   No.

24    Q.   Again, did you consider doing that?

25    A.   That was never --

1       Q.    Yes, sir.   The map.

2       A.    I'm not aware if any of the previous maps.

3       Q.    And my last question -- maybe not my last

4   question -- did you see the need to compare Dewalt's

5   submitted final map, any of their submitted final maps

6   to any of the McIntosh maps?

7       A.    There was no consideration for that.

8       Q.    Why didn't you consider that to be something

9   that should be done?

10      A.    Because when the tentative map was submitted

11  to the City, when the Planning Department sent us a

12  memorandum for conditions on that map, they had noted

13  that all the improvements were done and that the City

14  had been maintaining them and that they were going

15  forward to record a final map with improvements in

16  place.

17          MR. HASSING:   Thank you, sir.

18          MR. TRAVIS:   I'll follow up with that.

19              FURTHER EXAMINATION BY MR. TRAVIS

20      Q.    At what point did they tell you this?  Do you

21  remember when they said the improvements were done?

22      A.    It was when they first notified our office to

23  do a review of the submitted tentative map, and that

24  would have been sometime in 2004.

25      Q.    And we're talking specifically about

# EXHIBIT F

**Certified Copy**

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA

ROGER McINTOSH,

      Plaintiff,

    vs.

NORTHERN CALIFORNIA UNIVERSAL
ENTERPRISES COMPANY, ET AL.,

      Defendants.

Case No.
107CV-01080-LJO-WMW

~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~

**DEPOSITION OF**

**JAMES K. DELMARTER**

February 2, 2009
1:32 p.m.

5001 East Commercenter
Suite 170
Bakersfield, California

Brian S. Cardoza, CSR No. 8362



ESQUIRE

Toll Free: 800.300.1214
Facsimile: 661.322.2242

Suite 170
5001 East Commercenter Drive
Bakersfield, CA 93309
www.esquiresolutions.com

21

1    Q.   Anybody else there?

2    A.   No.

3    Q.   And where did that meeting take place?

4    A.   In my office.

5    Q.   How long did that meeting last?

6    A.   An hour, hour and a half.

7    Q.   All right.  Now, between the first time that

8    you talked to Mr. McIntosh about this case and December

9    11th, did you ever have any other conversations with

10   Mr. McIntosh about this case?

11   A.   No.

12   Q.   And December 11th was the first day you met

13   Mr. Travis?

14   A.   I think so, yes.

15   Q.   All right.  And had you talked to him on the

16   phone before you met him?

17   A.   I think he may have called me to set up the

18   meeting.

19   Q.   All right.  During that telephone call to set

20   up the meeting, what did Mr. Travis say to you, besides

21   the date, time and place of the meeting?

22   A.   Well, essentially the same particulars that

23   Mr. McIntosh and I discussed with regard to serving as an

24   expert witness.

25   Q.   All right.  Mr. Travis asked you if you'd be



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.300.1214
Facsimile: 661.322.2242

Suite 170
5001 East Commercenter Drive
Bakersfield, CA 93309
www.esquiresolutions.com

22

1    willing to serve as an expert?

2              A.   Yes.

3              Q.   And did he tell you anything about the case?

4              A.   No.

5              Q.   All right.  Did he tell you in that phone

6    conversation the type of opinions he was looking to

7    develop for trial?

8              A.   No.

9              Q.   Okay.  That came later?

10             A.   Yes.

11             Q.   All right.  So, as I understand it, between

12   the first time you talked to Mr. McIntosh and your

13   December 11th meeting, you didn't have any other

14   conversations with McIntosh but you had one with

15   Mr. Travis; is that correct?

16             A.   Yes.

17             Q.   Okay.  So then we come to December 11th where

18   you meet with the two of them?

19             A.   Yes.

20             Q.   Tell me what happened at that meeting?

21             A.   Well, they brought a lot of exhibits and so

22   forth and explained to me what -- what they were looking

23   for with regard to my testimony and what they were looking

24   for with regard to an opinion.

25             Q.   Well, let's stop right there for a second.



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.300.1214
Facsimile: 661.322.2242

Suite 170
5001 East Commercenter Drive
Bakersfield, CA 93309
www.esquiresolutions.com

34

1          A.    No.

2          Q.    Have you, before this lawsuit, ever been

3     exposed to a legal term of art which is "substantially

4     similar", those two words together, "substantially

5     similar"?

6          A.    No.

7          Q.    Prior to this case, did you have any

8     understanding of the effect or the importance of the term

9     "substantially similar" as it applies to copyright

10    infringement?

11         A.    No.

12         Q.    Have you done any research with regard to the

13    term "substantially similar"?

14         A.    No.

15         Q.    Have you been told the meaning of the term

16    "substantially similar"?

17         A.    No.

18         Q.    Have you discussed the term "substantially

19    similar" with Mr. Travis?

20         A.    Only to the effect that I'm familiar with the

21    words "substantial conformance", which we use a lot in our

22    business with various cities and counties.  When you turn

23    in a map, that your final map is in -- substantially

24    conforms to the tentative, --

25         Q.    Right.



Toll Free: 800.300.1214
Facsimile: 661.322.2242

ESQUIRE
an Alexander Gallo Company

Suite 170
5001 East Commercenter Drive
Bakersfield, CA 93309
www.esquiresolutions.com

35

1        A.   -- and that's the word I use, and I assume
2    that the words "substantially similar" was essentially the
3    same thing.  And I think we discussed that.
4        Q.   You and Mr. Travis did?
5        A.   Yeah.
6        Q.   When was that?
7        A.   Oh, probably during the time that -- he also
8    had this e-mail that Roger McIntosh sent me.  Mr. Travis
9    has some wording on here where he sent me the template,
10   which is where I mentioned it for this report, and I think
11   at that time we talked about it.
12       Q.   Can I see that e-mail?  Now, this e-mail,
13   it's from Roger McIntosh to Jeff Travis, dated Friday,
14   December 12th, 2008.  And then there's a second header
15   from Jeff Travis to Delmarter at your e-mail address,
16   correct?
17       A.   It appears that Jeff sent me the first part,
18   and he copied Roger, and then Roger added the second part
19   to it and then forwarded that to me.
20       Q.   Okay.  All right.  And in Jeff Travis' e-mail
21   to you, he sends you a template for your report.  He also
22   sends you some staff reports.  What staff reports was it
23   that he sent you?
24       A.   The -- the two tract -- the planning
25   commission staff reports for the two tracts.



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.300.1214
Facsimile: 661.322.2242

Suite 170
5001 East Commercenter Drive
Bakersfield, CA 93309
www.esquiresolutions.com

38

1    substantially similar in that the Lot configuration,

2    numbering, street names and Tract boundary appear to be

3    identical with minor differences due to the separate

4    surveys.  Tentative Tract Number 6451 reflects existing

5    improvements constructed as a result of the plans prepared

6    for Tract Number 5472 hereinabove referenced."

7         I considered that to be one opinion.  What did

8    you mean by that?

9         A.   That's what I meant.

10        Q.   One opinion?

11        A.   Yes.

12        Q.   I next read, "It is my opinion that Tract

13   Number 6451 could not have been recorded had the

14   improvements prepared from plans for Tract Number 5472 not

15   been constructed."

16        I interpreted that as a second opinion.

17        A.   Okay.

18        Q.   How did you intend it?

19        A.   As a second opinion.

20        Q.   Okay.  Other than these two opinions, have

21   you formulated any other opinions that you expect to

22   testify to at trial?

23        A.   Well, I could have gone into the second

24   opinion a lot more detail, in the fact that in order to

25   record a final map, improvements either have to be



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.300.1214
Facsimile: 661.322.2242

Suite 170
5001 East Commercenter Drive
Bakersfield, CA 93309
www.esquiresolutions.com

55

1        A.   Yes.

2        Q.   And in comparing those two maps you noticed

3    enough differences that you were led to believe that they

4    were prepared off of two separate surveys; is that

5    correct?

6        A.   Yes.

7        Q.   Have you ever talked to anybody at DeWalt

8    Engineering about either of these maps?

9        A.   No.

10       Q.   Have you had any dealings with Jeff Gutierrez

11   at DeWalt Engineering?

12       A.   No.

13       Q.   Do you know Jeff?

14       A.   Yes.

15       Q.   Have you ever had any problems with him?

16       A.   No.

17       Q.   Have you ever had any problems with DeWalt

18   Engineering?

19       A.   Yes.

20       Q.   What kind of problems?

21       A.   In their previous capacity years and years

22   ago, they -- we had something similar to this type of a

23   situation, in which they had done some work for a client

24   and the client came to me and asked me to do some work for

25   them, and I called DeWalt and I told him what I was going



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.300.1214
Facsimile: 661.322.2242

Suite 170
5001 East Commercenter Drive
Bakersfield, CA 93309
www.esquiresolutions.com

65

1  bearing of 89°16'09" southeast, 1317.97.  The bearing on

2  the final map shows south 89°16'05" seconds southeast,

3  1317.97.  In that case, the distances are the same, the

4  bearings are different by four seconds.

5          Q.   And what you're doing is you're comparing

6  the --

7          A.   Right.

8          Q.   -- 6451 tentative with the 6451 final?

9          A.   Exactly.  The east line shows a bearing of

10  north 01°05'50" northeast, 1268.50.  The final -- that's

11  the final map.  The tentative says north 01°05'50" east,

12  1268.49.  Again, a hundredth of a foot difference.

13          Q.   Another little difference?

14          A.   A little difference, right.

15          Q.   And does anything you've just testified to

16  here in the last five minutes, these minor differences

17  between the tentative and the final, in any way cause you

18  to believe that DeWalt copied the 5472 tentative?  Does it

19  cause you to believe that?

20          MR. TRAVIS:   I'm going to object to that question

21  as vague as to "copied".  In what sense?

22          BY MR. HASSING:   All right.

23          Q.   Do you understand the question?

24          A.   I think he copied the boundaries and the --

25  the -- the lot configuration, the street configuration.



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.300.1214
Facsimile: 661.322.2242

Suite 170
5001 East Commercenter Drive
Bakersfield, CA 93309
www.esquiresolutions.com

66

1    They're identical, except for these very minor

2    differences.

3              Q.    All right.

4              A.    Why there's a minor difference, I don't know.

5              Q.    Did you find or learn of any facts during

6    your review of the documents that were provided to you

7    that would explain why the streets of the two tentatives

8    were in the same location?

9              A.    Yes.

10             Q.    And what was that?

11             A.    The fact that the improvements were already

12   in, --

13             Q.    All right.

14             A.    -- and they were based on the improvement

15   plans that were prepared by McIntosh.   They would have to

16   tear out all the improvements in order to change the

17   street alignments and the lot configurations.   The lot

18   corners were already set by McIntosh.   The boundaries were

19   already set by McIntosh.

20             Q.    How do you know the corners were already set?

21             A.    He told me.

22             Q.    Okay.   And how were they set?

23             A.    By survey methods.

24             Q.    Okay.   Well, specifically with regard to this

25   particular subdivision, --



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.300.1214
Facsimile: 661.322.2242

Suite 170
5001 East Commercenter Drive
Bakersfield, CA 93309
www.esquiresolutions.com



67

1           A.   I don't know the nature of the monuments.

2   All I was told was that the monument corners -- the lot

3   corners and monument boundaries were set.

4           Q.   Okay.  Lot corners were set with monuments,

5   right?  Is that what you're saying?

6           A.   No, I said lot corners were set.

7           Q.   Okay.  The boundaries were set with

8   monuments?

9           A.   Of some sort, yes.

10          Q.   And the lot corners were set?

11          A.   Yes.

12          Q.   I don't understand what you mean by the lot

13  corners were set.  What does that mean?

14          A.   Well, first of all, when you do a

15  subdivision, you have to set monuments at the boundaries.

16  This final map does not indicate the final -- the

17  monuments are there.  There's no monuments on this map.

18  This map would not have been allowed to be recorded in any

19  jurisdiction that would -- that had surveyors that knew

20  what was going on with respect to checking the map.

21  There's no monuments shown there, there, there, there.

22  None of the five -- none of the boundary monuments are

23  shown.

24          ·I was told they were set by -- by McIntosh.  I

25  don't know the -- the nature of them.  I don't know if



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.300.1214
Facsimile: 661.322.2242

Suite 170
5001 East Commercenter Drive
Bakersfield, CA 93309
www.esquiresolutions.com

69

1          Q.   Yeah.

2          A.   And those lot corners are established by

3     taking the dimensions off the final map and surveying and

4     proportioning the distances in here.

5          Q.   Right.  But if I were to go out there, how

6     could I find a lot corner?

7          A.   You would have to have the final map, and

8     there would be a physical monument set there.

9          Q.   That's what I'm thinking.

10         A.   It would either be a -- a -- a two-by-two

11    stake with a brass tag on top of it, which is the way we

12    used to do it years ago, or it may be an iron pipe -- it

13    may be a rebar with a plastic cap on it, it may be an iron

14    pipe with a wood plug in it with a tag on it, but

15    physically it would be marked.

16         And nowadays most of us mark the concrete curbs

17    out in front and put a tag on the curb, because typically

18    the front lot corner's going to get knocked out with

19    landscaping and things of that nature.

20         Q.   So, Mr. McIntosh told you that

21    Martin-McIntosh set boundary monuments in the subdivision?

22         A.   Yes.

23         Q.   And he also told you that they set some sort

24    of monument to designate each particular lot?

25         A.   Yes.



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.300.1214
Facsimile: 661.322.2242

Suite 170
5001 East Commercenter Drive
Bakersfield, CA 93309
www.esquiresolutions.com

73

1  exactly at 130 feet.

2      Q.  Are you prepared to offer an opinion at trial

3  that DeWalt copied the McIntosh tentative?

4      A.  Yes.

5      MR. TRAVIS:  And the same objections.

6      THE WITNESS:  Well, let me qualify that.  He

7  copied the street and lot alignments, and the lot

8  numbering and the street names.  Obviously the

9  improvements were already in when -- when DeWalt did it,

10  so obviously he had to have gone out and done some

11  surveying to determine the extent of the improvements that

12  were in.  But as far as the boundary of the map, it's my

13  opinion that these two maps are the same, from a tentative

14  and a final.

15      BY MR. HASSING:

16      Q.  Okay.  And so when I asked you if you had an

17  opinion whether or not DeWalt copied McIntosh's tentative,

18  you said yes, and what you mean by that, and correct me if

19  I'm wrong when I get through, but what you meant by that

20  was, the boundaries are, within minuscule differences,

21  identical, the streets are all in the same place, the

22  streets are all named the same, and the lots are all

23  numbered the same, and therefore, the two maps are, as you

24  say, nearly identical.  Would that be an accurate

25  statement?



Toll Free: 800.300.1214
Facsimile: 661.322.2242

Suite 170
5001 East Commercenter Drive
Bakersfield, CA 93309
www.esquiresolutions.com

74

1        A.   That's accurate to the effect that one street

2   name was changed by the fact that the City, I think,

3   wanted to change the -- the -- this one street was called

4   Olympic Close and now they called it Olympic Court.

5        Q.   Right.

6        A.   But that's the -- essentially from a -- I

7   haven't looked and -- and compared each and every lot

8   line, each and every bearings and distance, and so forth,

9   but from a standpoint of looking at the final map and the

10  two tentatives, I would say they are essentially the same.

11       Q.   All right.  I know I asked this question, I

12  don't remember if I got an answer, and if I did, I don't

13  remember what the answer was, so I'm going to ask you

14  again.  Your opinion number one has reference to "separate

15  surveys", and how do you know that there were separate

16  surveys?

17       A.   Well, obviously McIntosh had to do a survey

18  in order to prepare their tentative map.  Their tentative

19  map was prepared in 1992.  The final map for 6451

20  indicates his survey was done in 2004.  Therefore, there's

21  two separate surveys.

22       Q.   All right.  You did answer that question, I

23  apologize.

24       Separate and apart from what you have testified

25  to here today, do you have any other opinions that you



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.300.1214
Facsimile: 661.322.2242

Suite 170
5001 East Commercenter Drive
Bakersfield, CA 93309
www.esquiresolutions.com



75

1    intend to express at trial?

2         A.   No.

3         Q.   Did you bring with you all correspondence

4    between you and Borton Petrini?

5         A.   Yes.

6         Q.   Can I look at that?

7         A.   Well, that's -- here's the --

8         MR. HASSING:   Let's go off the record while he

9    searches.

10        (Pause in the proceedings.)

11        MR. HASSING:   Okay, I'm going to assemble these

12   four documents into one, which will be Exhibit Number 4.

13   We'll have that copied at the next break.

14             (Defendants' Exhibit 4 was marked for

15             identification by the court reporter.)

16        BY MR. HASSING:

17        Q.   I'd like to see the engagement letter or the

18   retainer agreement regarding your participation in this

19   case.

20        A.   And what's that sticky on there?  I don't

21   know if that's -- if it belongs on there or not.

22        Q.   It just says "File Copy".  I'm going to write

23   on that.

24        A.   Oh, okay.

25        MR. HASSING:   This will be Exhibit Number 5.



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.300.1214
Facsimile: 661.322.2242

Suite 170
5001 East Commercenter Drive
Bakersfield, CA 93309
www.esquiresolutions.com

# EXHIBIT G

# Certificate of Registration



This Certificate issued under the seal of the Copyright Office in accordance with title 17, United States Code, attests that registration has been made for the work identified below. The information on this certificate has been made a part of the Copyright Office records.

*Marybeth Peters*

Register of Copyrights, United States of America



**Form VA**
For a Work of the Visual Arts

**VAu 721 – 180**

EFFECTIVE DATE OF REGISTRATION

**FEB 2 2 2007**
Month    Day    Year

---

DO NOT WRITE ABOVE THIS LINE. IF YOU NEED MORE SPACE, USE A SEPARATE CONTINUATION SHEET.

**Title of This Work ▼**

Valley Rose Planned Community

**NATURE OF THIS WORK ▼** See Instructions

Land Planning Drawings and Landscape Design

**Previous or Alternative Titles ▼**

**Publication as a Contribution** If this work was published as a contribution to a periodical, serial, or collection, give information about the collective work in which the contribution appeared. Title of Collective Work ▼

If published in a periodical or serial give: Volume ▼     Number ▼     Issue Date ▼     On Pages ▼

---

**NAME OF AUTHOR ▼**

Martin-McIntosh

**DATES OF BIRTH AND DEATH**
Year Born ▼     Year Died ▼

Was this contribution to the work a "work made for hire"?
☒ Yes
☐ No

Author's Nationality or Domicile
Name of Country
OR { Citizen of __United States__
     Domiciled in __California__

Was This Author's Contribution to the Work
Anonymous?     ☐ Yes  ☒ No
Pseudonymous?  ☐ Yes  ☒ No
If the answer to either of these questions is "Yes," see detailed instructions.

**NOTE**
Under the law, the "author" of a "work made for hire" is generally the employer, not the employee (see instructions). For any part of this work that was "made for hire" check "Yes" in the space provided, give the employer (or other person for whom the work was prepared) as "Author" of that part, and leave the space for dates of birth and death blank.

Nature of Authorship Check appropriate box(es). See Instructions
☐ 3-Dimensional sculpture     ☐ Map            ☒ Technical drawing
☐ 2-Dimensional artwork       ☐ Photograph     ☐ Text
☐ Reproduction of work of art ☐ Jewelry design ☐ Architectural work

**Name of Author ▼**

N/A

**Dates of Birth and Death**
Year Born ▼     Year Died ▼

Was this contribution to the work a "work made for hire"?
☐ Yes
☐ No

Author's Nationality or Domicile
Name of Country
OR { Citizen of _____
     Domiciled in _____

Was This Author's Contribution to the Work
Anonymous?     ☐ Yes  ☐ No
Pseudonymous?  ☐ Yes  ☐ No
If the answer to either of these questions is "Yes," see detailed instructions.

Nature of Authorship Check appropriate box(es). See Instructions
☐ 3-Dimensional sculpture     ☐ Map            ☒ Technical drawing
☐ 2-Dimensional artwork       ☐ Photograph     ☐ Text
☐ Reproduction of work of art ☐ Jewelry design ☐ Architectural work

---

**Year in Which Creation of This Work Was Completed**
1992
This information must be given in all cases.
Year

**Date and Nation of First Publication of This Particular Work**
Complete this information ONLY if this work has been published.
Month N/A     Day _____     Year _____
Nation _____

**COPYRIGHT CLAIMANT(S)** Name and address must be given even if the claimant is the same as the author given in space 2. ▼

Roger McIntosh d/b/a McIntosh & Associates, a sole proprietorship
2001 Wheelan Court, Bakersfield, CA 93309

**APPLICATION RECEIVED**
FEB 2 2 2007
**ONE DEPOSIT RECEIVED**
FEB 2 2 2007
**TWO DEPOSITS RECEIVED**

**Transfer** If the claimant(s) named here in space 4 is (are) different from the author(s) named in space 2, give a brief statement of how the claimant(s) obtained ownership of the copyright. ▼

The Work was assigned from Martin-McIntosh to McIntosh & Associates on May 3, 1999 via a buyout agreement.

**FUNDS RECEIVED**    BP000001

MORE ON BACK ▶ • Complete all applicable spaces (numbers 5-9) on the reverse side of this page.
• See detailed instructions.     • Sign the form at line 8.

DO NOT WRITE HERE
Page 1 of ____ pages

EXAMINED BY

CHECKED BY

CORRESPONDENCE
☐ Yes

FORM VA

FOR
COPYRIGHT
OFFICE
USE
ONLY

**DO NOT WRITE ABOVE THIS LINE. IF YOU NEED MORE SPACE, USE A SEPARATE CONTINUATION SHEET.**

**PREVIOUS REGISTRATION** Has registration for this work, or for an earlier version of this work, already been made in the Copyright Office?
☐ Yes  ☑ No   If your answer is "Yes," why is another registration being sought? (Check appropriate box.) ▼
a. ☐ This is the first published edition of a work previously registered in unpublished form.
b. ☐ This is the first application submitted by this author as copyright claimant.
c. ☐ This is a changed version of the work, as shown by space 6 on this application.
If your answer is "Yes," give: **Previous Registration Number ▼**          **Year of Registration ▼**

**DERIVATIVE WORK OR COMPILATION** Complete both space 6a and 6b for a derivative work; complete only 6b for a compilation.
a. **Preexisting Material** Identify any preexisting work or works that this work is based on or incorporates. ▼

b. **Material Added to This Work** Give a brief, general statement of the material that has been added to this work and in which copyright is claimed. ▼

**DEPOSIT ACCOUNT** If the registration fee is to be charged to a Deposit Account established in the Copyright Office, give name and number of Account.
**Name ▼**          **Account Number ▼**

**CORRESPONDENCE** Give name and address to which correspondence about this application should be sent. Name/Address/Apt/City/State/Zip ▼

Kevin V. Lam
Goodwin Procter LLP
101 California St., Suite 1850, San Francisco, CA 94111

Area code and daytime telephone number   ( 415 ) 733-6052          Fax number   ( 415 ) 677-9041
Email   klam@goodwinprocter.com

**CERTIFICATION*** I, the undersigned, hereby certify that I am the

check only one ▶
☐ author
☐ other copyright claimant
☐ owner of exclusive right(s)
☑ authorized agent of   Roger McIntosh d/b/a McIntosh & Associates
   Name of author or other copyright claimant, or owner of exclusive right(s) ▲

of the work identified in this application and that the statements made by me in this application are correct to the best of my knowledge.

Typed or printed name and date ▼ If this application gives a date of publication in space 3, do not sign and submit it before that date.
Kevin V. Lam, Esq.          Date   February 21, 2007

Handwritten signature (X) ▼
X

BP000002

Certificate
will be
mailed in
window
envelope
to this
address:

Name ▼
Kevin V. Lam

Number/Street/Apt ▼
101 California St., Suite 1850

City/State/Zip ▼
San Francisco, CA 94111

• Complete all necessary spaces
• Sign your application in space 8

SEND ALL 3 ELEMENTS
IN THE SAME PACKAGE:
1. Application form
2. Nonrefundable filing fee in check or money order payable to Register of Copyrights
3. Deposit material

MAIL TO:
Library of Congress
Copyright Office
101 Independence Avenue SE
Washington, DC 20559-6000

*17 USC §506(e): Any person who knowingly makes a false representation of a material fact in the application for copyright registration provided for by section 409, or in any written statement filed in connection with the application, shall be fined not more than $2,500.

Form VA—Full   Rev: 07/2006   Print: 07/2006—50,000   Printed on recycled paper          U.S. Government Printing Office: 2006-xxx-xxx/xx,xxx

# EXHIBIT H

1  James J. Braze, Esq.; SBN 75911
2  Jeffrey A. Travis, Esq.; SBN 235507
   BORTON PETRINI, LLP
3  5060 California Avenue, Suite 700
   Post Office Box 2026
4  Bakersfield, CA 93303
   Telephone (661) 322-3051

5  Attorneys for Plaintiff, Roger McIntosh

6

7

8                UNITED STATES DISTRICT COURT

9        EASTERN DISTRICT OF CALIFORNIA, FRESNO DIVISION

10

11 ROGER McINTOSH,                         Case No.  107CV 01080 LJO-WMW

12              Plaintiff,                  EXPERT WITNESS DISCLOSURE OF
                                           JAMES K. DELMARTER BY
13 v.                                      PLAINTIFF, ROGER McINTOSH

14 NORTHERN CALIFORNIA UNIVERSAL
   ENTERPRISES COMPANY, et al,
15
                Defendants.
16

17

18 TO ALL PARTIES AND TO THEIR ATTORNEYS OF RECORD:

19        COMES NOW plaintiff, Roger McIntosh (hereinafter "Plaintiff"), pursuant to Federal

20 Rules of Civil Procedure, Rule 26, as agreed to by the parties and as required by the Court, submits

21 the following expert to be called at the time of trial:

22                         **RETAINED EXPERT**

23        Mr. James K. Delmarter, is qualified through education and experience to testify as

24 an expert in this matter as set forth in Rule 26 Expert Disclosure and Report of Mr. Delmarter.

25 Mr. Delmarter is presently prepared to provide meaningful testimony in support of any and all

26 opinions which he intends to offer at the trial in this matter.

27        The Rule 26 Expert Disclosure and Report of Mr. Delmarter is attached hereto and

28 incorporated  herein by reference as Exhibit "A."

1     The aforementioned expert has reviewed the file and other relevant materials, and is

2  prepared to submit to meaningful deposition on the opinions to which he intends to testify at trial.

3  The aforementioned expert reserves the right to review additional materials, documents and

4  depositions that are brought to his attention and to modify, alter or supplement his testimony based

5  on those additional and/or supplemental material, documents or testimony. Plaintiff further reserves

6  the right to call as an expert witness any and all other experts who may have been designated and/or

7  identified by any other party in this matter.

8     Further, Plaintiff reserves its constitutional, statutory and common rights to later name

9  other experts before trial and to call to testify at trial experts not presently named whose testimony

10  is needed to aid in the prosecution of this matter and/or to refute and/or rebut the contentions and

11  testimony of opposition experts and/or witnesses.

12  DATED:   December 15, 2008

13               BORTON PETRINI, LLP

14

15

16           By: _____
               Jeffrey A. Travis, Attorney for Plaintiff,
               Roger McIntosh

17

18

19

20

21

22

23

24

25

26

27

28

2