1

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

HON. LAWRENCE J. O'NEILL


ROGER McINTOSH,                      )
                                     )   1:07-cv-1080 LJO
          Plaintiff,                 )
                                     )   JURY TRIAL, DAY 1
     vs.                             )
                                     )
NORTHERN CALIFORNIA                  )
UNIVERSAL ENTERPRISES                )
COMPANY, a California                )
corporation, et al.,                 )
                                     )
          Defendants.                )
_____  )

Fresno, California                   Monday, March 1, 2010


REPORTER'S TRANSCRIPT OF PROCEEDINGS


Vol. 1, pgs. 1 to 233, inclusive


REPORTED BY:  PEGGY J. CRAWFORD, RDR, CRR, Official Reporter

APPEARANCES OF COUNSEL:

For the Plaintiff:          LAW OFFICES OF BORTON PETRINI, LLP
                            5060 California Avenue
                            Suite 700
                            Bakersfield, CA  93309
                            BY:  **JAMES J. BRAZE**
                                 **JEFFREY A. TRAVIS**


For the Defendants:

(Northern/Lotus)            LAW OFFICES OF STEVEN J. HASSING
                            425 Calabria Court
                            Roseville, CA  95747
                            BY:  **STEVEN J. HASSING**

(DeWalt)                    ALEXANDER & ASSOCIATES, PLC
                            1925 G Street
                            Bakersfield, CA  93301
                            BY:   **WILLIAM L. ALEXANDER**

(City of Wasco)             GCR, LLP
                            520 South Grand Avenue
                            Suite 695
                            Los Angeles, CA  90071
                            BY:   **CHAKA C. OKADIGBO**
                                  **SUSAN GRAHAM BARNES**

3

<u>INDEX</u>

**PLAINTIFF'S WITNESSES**:

**ROGER MCINTOSH**                                    161
DIRECT EXAMINATION BY MR. BRAZE                       161
VOIR DIRE EXAMINATION BY MR. HASSING                  189
VOIR DIRE EXAMINATION BY MR. OKADIGBO                 199
FURTHER DIRECT EXAMINATION BY MR. BRAZE               205
CROSS-EXAMINATION BY MR. HASSING                      213


\* \* \* \* \*

**EXHIBITS**

**PLAINTIFF'S**                                  Received

P 110                                                172
P 108, Page 436                                      179

4

1   Monday, March 1, 2010                    Fresno, California

2   8:30 a.m.

3           (The following proceedings were had outside the

4           presence of the jury, to wit:)

5           THE COURT:  Thank you, everybody.  Please be seated.

6   All right.  Let's call the case of McIntosh versus Northern

7   California, et al., Action Number 07-CV-1080.

8           Could I have your appearances, please, for the

9   record.

10          MR. BRAZE:  Good morning, your Honor.  Jim Braze,

11  Borton Petrini, on behalf of the plaintiff, Roger McIntosh,

12  who is seated to my left.

13          MR. TRAVIS:  And Jeff Travis also on behalf of the

14  plaintiff.

15          MR. HASSING:  Steve Hassing, representing Northern

16  California and Lotus Developments.

17          MR. ALEXANDER:  Good morning, your Honor.  William

18  Alexander on behalf of Dennis W. DeWalt, Inc., and Mr. Jeff

19  Gutierrez is present out of the courtroom.

20          MS. BARNES:  Good morning, your Honor.  I'm Susan

21  Barnes, and I represent the City of Wasco.

22          And Mr. Okadigbo will be here in a moment.  We are

23  hauling a lot of boxes, and it's slowed him down a little bit,

24  but we are ready to proceed.

25          THE COURT:  Okay.

1      MR. BRAZE:  Also present is my law clerk, Tom

2  Kapstrom, and I assume it's okay if I sits here?

3      THE COURT:  Yes, that's not a problem.

4      Just a few things.  Ordinarily, in a civil case, as

5  you know, we have three and three challenges, one each side.

6  Does anybody wish to be heard on that issue?

7      On the defense side, are you planning on just simply

8  using them joint and several or what are you going to do?

9      MS. BARNES:  Your Honor, I think that what we would

10  like to do is joint and several, if Mr. Hassing agrees.

11      MR. HASSING:  I would agree, your Honor.

12      THE COURT:  Okay, that's fine.  The City of Wasco

13  submitted its amended trial brief, and on page 7, commencing

14  at line 7, it indicated that I had ruled in a certain way.

15  And I looked at my -- the order, and my order is not as

16  limiting as you think it is.

17      MS. BARNES:  Ah.

18      THE COURT:  In the trial brief, as I said, from lines

19  7 to 20 on page 7, it discusses that prior order, and my

20  initial question was whether or not our prior order had gone

21  as far as you indicate that would -- that apparently led you

22  or left you to believe that you could not use a prior

23  inconsistent and impeaching statement just because that

24  statement was obtained during a prior litigation.

25      That wasn't my order.

6

1          MS. BARNES:  Oh.

2          THE COURT:  The short answer is it's not that

3    limiting.  The in limine order precludes evidence that the

4    plaintiffs's old firm pursued and settled a breach of contract

5    claim against Wasco.  It faults Wasco's grounds to oppose

6    McIntosh's in limine motion and it says, quote:

7               "Wasco fails to demonstrate how the prior litigation

8               supports impeachment.  Wasco does not identify the

9               evidence it intends to use for impeachment, and

10              presumably such evidence is Mr. McIntosh's settlement

11              demands or agreement to settle."

12         But the ruling on this, they were limited to the

13   prior litigation and its settlement.

14         The trial brief that you filed raises different

15   issues.  I agree with you that the evidence discussed in the

16   trial brief could be used for impeachment if it does impeach,

17   so I want to make sure you understand, it is not as limiting

18   as you apparently believed it was.

19         MR. OKADIGBO:  Thank you, your Honor.

20         MS. BARNES:  Thank you, your Honor.

21         THE COURT:  On DeWalt's -- it is actually DeWalt, and

22   it says Defendants' Joint Objection to Plaintiff's Map

23   Overlays Exhibit.

24         And it indicates that there is a motion to preclude

25   the map and acetate overlays exhibits on the grounds that the

1    defense counsel never saw this 13-page exhibit in advance of

2    the February 10, 2010, or before that date, and still had not

3    seen, as of the date of this motion, when it was filed on

4    February 16, the actual exhibit.

5         And it indicates that plaintiffs' counsel refuses to

6    disclose who will testify with regard to the exhibit, other

7    than to say that plaintiff himself will provide impermissible

8    expert opinion utilizing the exhibit.

9         It further indicates that plaintiffs' counsel stated

10   that the exhibit he showed to defense counsel that day, in

11   other words, the 13 pages of map drawings, was not the actual

12   exhibit he would use at trial, but rather, the quote, "real

13   exhibit would be page after page of clear acetate overlays,

14   with various colors, to be used by laying one page over

15   another, to depict various elements of maps or stages of

16   mapping."

17        The request here in this motion is that plaintiffs'

18   expert, James DelMarter, D-e-l-M-a-r-t-e-r, should not be

19   permitted to utilize the overlays exhibit at trial because he

20   has provided no opinion testimony regarding or utilizing that

21   exhibit.

22        What's the status of this?  Are we still exactly

23   where this motion says we are?

24        MR. TRAVIS:  Your Honor, no.  We withdrew that

25   exhibit.  It was removed from both ours and the -- the

1    plaintiff's exhibit book.

2         THE COURT:  It is no longer a problem?

3         MR. TRAVIS:  No.

4         THE COURT:  It is a moot issue.

5         MR. OKADIGBO:  Your Honor, I'm sorry.  I have further

6    comment.

7         THE COURT:  Your appearance?

8         MR. OKADIGBO:  My name is Chaka Okadigbo.  I

9    represent the City of Wasco.

10        On a similar topic, we have an expert, Stephen Wong,

11   who is going to give testimony.  And he would like to use or

12   have a "layering," is what he calls it, of various exhibits.

13   It is a layering of the 6451 tentative map.

14        And what he proposes to do is to isolate different

15   segments of the 6451 map.  It is not any new information, it

16   is just isolating each part, so we wanted to bring that to

17   your attention.

18        THE COURT:  Well, has any of this been shown to any

19   other counsel?

20        MR. OKADIGBO:  No.

21        THE COURT:  Don't you think that, in fairness,

22   counsel should see it before --

23        MR. OKADIGBO:  Yes, I do.  I have discussed it -- I

24   have discussed the idea with counsel, but I have not shown it

25   to them yet.

1        THE COURT:  When do you propose to do that?  We are

2  running out of time to give them much notice to --

3        MR. OKADIGBO:  As soon as possible.  I have it.  I

4  can give it to them sometime later today.  Our expert will be

5  giving testimony next week.

6        THE COURT:  What about their expert?  When is your

7  expert coming to testify?

8        MR. BRAZE:  Tomorrow.

9        THE COURT:  Well, I would suggest this, then.  Show

10  it to the plaintiff's counsel today --

11        MR. OKADIGBO:  Okay.

12        THE COURT:  -- and see if they have a problem with

13  it.  They may or may not.  I don't know.  They probably don't

14  either if they haven't seen it.

15        MR. OKADIGBO:  Okay.

16        THE COURT:  And let me know if it becomes an issue.

17        MR. OKADIGBO:  Thank you, your Honor.

18        THE COURT:  All right.  In looking at Defendant

19  DeWalt's trial brief, on page 8, commencing at the top, line

20  2, starting and moving forward, where it says:

21        "Defendants intend to offer evidence from McIntosh's

22            financial records, establishing when McIntosh told Wu

23            that he was still owed $800,000.  At that time, he

24            only was owed $67,000 for work performed on the

25            15-acre tract, 5472.  The balance of the other

1          $800,000 was for other work."

2          Is anybody still planning on bringing this type of

3     testimony in?

4          MR. HASSING:  Your Honor, Steve Hassing for Northern.

5     I plan to offer that testimony, your Honor.  I think that

6     testimony goes to the willful allegation that the plaintiff is

7     making.  I think it also goes to establish damages as far as

8     the amount that was actually charged for the tentative map and

9     was actually charged for the improvement plans, that all goes

10    to damages.

11         If there is testimony from Mr. McIntosh that in his

12    discussions with Mr. Wu, Mr. Wu is just not willing to

13    negotiate or talk, I think, then, the $800,000 figure that was

14    given to Mr. Wu, when in fact, it was only $67,000 left owing

15    on the subdivision, would be relevant also, your Honor.

16         THE COURT:  To prove what?  In other words, how much

17    time are we planning on spending on something that doesn't

18    seem to truly go to the heart of this case?

19         MR. HASSING:  I didn't anticipate spending a lot of

20    time on it, your Honor, and it would depend on Mr. McIntosh's

21    testimony as to whether we get into that in much detail.

22         THE COURT:  So, in other words, your position is if

23    Mr. McIntosh testifies that he is owed $800,000 and it's owed

24    to him by your client, you are interested; otherwise, you are

25    not?

1          MR. HASSING:  If he testifies that he was trying to

2     negotiate a deal with my client, I think that the $800,000

3     figure he threw out is relevant at that point to -- because we

4     would be casting my client in a bad light, I think.  And I

5     think I would be able to bring in this $800,000 figure that he

6     was trying to get out of my client for doing 10 to $20,000

7     worth of work to counteract that.

8          THE COURT:  Well, I guess let's go to the front end

9     of this.  What are you planning on doing?  Are you planning on

10    bringing in that type of evidence or not?

11         MR. BRAZE:  No, your Honor.  This is one of the major

12    evidentiary issues in this case.  It is our position that

13    Mr. McIntosh is entitled to recover the value of his work.

14    Whether he received one dollar or a million dollars is

15    irrelevant.

16         THE COURT:  That's how I view it too.

17         MR. BRAZE:  What they are trying to do is

18    Mr. McIntosh had a conversation with Mr. Wu, and in that

19    conversation, since deposition, he says, "I'm owed in excess

20    of $300,000."

21         It is our position that testimony is irrelevant

22    because that's not the value of his work, which he is entitled

23    to recover.

24         THE COURT:  Well, let's assume that he thinks he was

25    owed 3,000 or 3 million.  What difference does it make what he

1    thinks that he was owed by somebody other than what he is

2    entitled to in damages if he gets to -- gets past liability in

3    this case?

4         MR. HASSING:  It doesn't make any difference as to

5    what he thinks he was owed.

6         My point was going more to his conversations with

7    Mr. Wu.  He was telling Mr. Wu, "I won't do anything for you

8    unless you pay me $800,000."  Actually, it's 300,000 plus the

9    interest makes it 800,000.  And at some points in his

10   deposition, he threw out the $800,000 figure and some the 300.

11        But in his negotiations with Mr. Wu, he is telling

12   Mr. Wu, "Look, I will -- I would be happy to do a tentative

13   map for you.  I would be happy to do a final map for you.

14   Before we start talking about what that's going to cost, I'm

15   owed $800,000, and I want you to pay it."  Mr. Wu didn't have

16   any further interest in discussing the matter with

17   Mr. McIntosh at that time.

18        THE COURT:  So what is all the relevance of that?  In

19   other words, so what?  They didn't agree on -- they didn't

20   make a deal on --

21        MR. HASSING:  Well, it would be relevant if they

22   tried to make the case that my client was unreasonable and not

23   wanting to negotiate.

24        THE COURT:  Is that your position?

25        MR. BRAZE:  No.  Our position is we are entitled at

1.2 million, which we think is the value of the work.

THE COURT:  If you open up the door of accusing his
client of negotiating in bad faith, that sort of thing, then
we revisit this.  Otherwise, it doesn't come in.

MR. BRAZE:  I think there is one conversation.  There
was really no negotiations, and we are not claiming any bad
faith on his part, other than his infringement on the
copyright portion.

THE COURT:  Different issue.

MR. BRAZE:  Different issue.

MR. HASSING:  If I might just finish this up, your
Honor.  There will be testimony as to what Mr. McIntosh
charged for certain portions of his work for the tentative
map, the final map, the improvement plans for 5472.  That
testimony goes to his damages.

THE COURT:  Charged, or was paid?

MR. HASSING:  Charged.  Charged.

THE COURT:  You are talking about an issue of credit
or are you talking about an issue of worth?

MR. HASSING:  I'm talking about an issue of worth.
What he charged Mr. Brown of Legacy Group was what that work
was worth.

We need to get evidence in as to what was charged for
these various portions of the work because some of it applied
to 5472, which is a 30-acre parcel.  Some of it applied to a

1   480-acre parcel, of which we are a part.

2           So he has a million 149 worth of charges.

3           We need to take a look and see what he charged for

4   the Tentative Map 5472.  What did he charge for the Final Map

5   5472?  What did he charge for the improvement plans for 5472?

6           THE COURT:  Do you agree or disagree that that is

7   some direct or circumstantial evidence as to the value?

8           MR. BRAZE:  Mr. McIntosh will testify that he

9   incurred charges of approximately 1.1 or $1.2 million for this

10  tract, including the offsite improvement plans which are

11  necessary to get the maps approved.

12          I think the problem is plaintiffs -- excuse me,

13  defendants, I believe, are focusing on the tract map, and it's

14  our position that the improvement plans that went along with

15  it and the studies are necessary for that tract.  And I think

16  that's where the problem arises.  They want to break it down

17  into little pieces and say only this map is what he can charge

18  for, but we believe that the total effort expended for Tract

19  5472 is $1.2 million.

20          THE COURT:  So it sounds to me, although you have a

21  disagreement as to how you figure it out, you are not

22  disagreeing that what he says is relevant.

23          MR. BRAZE:  True.  They are just claiming that it

24  wasn't 1.2 million because some of the charges related to

25  something else, and we disagree with that.

1          THE COURT:  Well, that's fine.

2          In looking at the plaintiff's trial brief, I do have

3     just a few questions.  Is there any issue here as to whether

4     or not there was a total assignment from the company that

5     Mr. McIntosh was dealing with early and then ultimately his

6     company later?  Is that an issue?

7          MR. HASSING:  Yes, it is an issue, your Honor.

8          THE COURT:  You don't think there was a complete

9     assignment?

10          MR. HASSING:  I think there is an issue as to whether

11     or not there was.  I think there is a legitimate issue, your

12     Honor.  There is a --

13          THE COURT:  What's the issue?

14          MR. HASSING:  Well, the issue is whether or not, at

15     the time the redemption and dissolution agreement was entered

16     into, the intellectual property, the copyright interests that

17     we are arguing about here, was actually considered by the

18     parties and was actually included within the assets that were

19     sold.

20          THE COURT:  Do you have specific evidence to

21     legitimately question that?

22          MR. HASSING:  I believe I do, your Honor.

23          THE COURT:  Does anybody disagree with his statement

24     that there is an issue?  I'm not suggesting what you think the

25     result of that disagreement will be, but rather, do you have a

1   disagreement with what he has said as to the existence of the

2   issue?

3          MR. TRAVIS:  Well, yes, your Honor, we do.  We have

4   seen all the defendants' exhibits.  We have done this for two

5   years.  We have seen nothing that would in any way contest the

6   redemption and dissolution agreement.  It says "all assets."

7          THE COURT:  I don't think he is saying that it

8   doesn't exist.  I think he is saying that there is an issue as

9   to the breadth of it.  That's what I'm hearing him say.

10          MR. TRAVIS:  I misunderstood.  As to the breadth of

11   what?

12          THE COURT:  In other words, I think your statement is

13   that you've not seen any evidence at all to indicate that the

14   agreement does not exist.  But I think what he is saying is

15   not that, but rather, he is saying we are disagreeing on the

16   breadth of that agreement, what it actually encompasses and

17   doesn't.

18          MR. TRAVIS:  I mean the agreement says what it says.

19   It says, "all assets in California."

20          MR. HASSING:  Your Honor, the agreement does say what

21   it says, and I think there is a lot of room within that

22   agreement for dispute as to whether or not this intellectual

23   property was transferred.

24          Mr. McIntosh, I believe, will admit that at the time

25   they entered into this agreement back in 1999, that neither he

1    nor Mr. Martin actually considered the intellectual property

2    rights.

3            THE COURT:  Does it make a difference?  In other

4    words, if it's encompassed by language that really does say

5    "all assets," whether they talked about it or even thought

6    about it, if it's there.

7            MR. HASSING:  It doesn't just say "all assets."  It

8    says "all assets," and if I remember correctly, there is a

9    clause after "all assets" that refers you back to another part

10   of the agreement.  And that part of the agreement talks about

11   "assets located in California or used within the business,"

12   and there is a very detailed, maybe, I don't know, 200-page

13   attachment that details each and every one of these assets.

14   There is also a clause that allows for omitted assets.

15          THE COURT:  Is your representation that you are going

16   to attempt to indicate that it is not inclusive by

17   cross-examination of the plaintiff?

18          MR. HASSING:  Yes, your Honor.

19          THE COURT:  Okay.  Then the plaintiff needs to be in

20   a position, when the question is asked in front of the jury,

21   "Where is it that it's inclusive," that he be in a position to

22   know so that we don't sit there in front of the jury, very

23   uncomfortably, and also wasting a lot of time as he flips

24   through 200 pages.  Fair enough?

25          MR. TRAVIS:  Fair enough, your Honor.

1        THE COURT:  Okay.  On page 3 of the plaintiff's

2   brief, it -- at around line 22, it says:

3           "Plaintiff will object to a condensed summary of these

4            expenses insofar as Mr. Wu, the person who created

5            these summaries, goes outside of the personal

6            knowledge as a general contractor to extrapolate

7            estimated property values and sale prices."

8        Question:  Is it the plaintiffs' position that

9   Mr. Wu, you are going to be able to establish expertise with

10  regard to him on the issue of estimated property values and

11  sales prices?

12       MR. BRAZE:  Well, what plaintiff [sic] presented to

13  us was a -- five boxes of expenses associated with the

14  construction of his tract.

15       He then has a one-page piece of paper where he tries

16  to summarize his profits from the tract.  But he has to make

17  certain assumptions in order to do that.  And we believe those

18  assumptions are not the subject of lay opinion.  He has

19  assigned values to lots.  He has assigned certain values.  We

20  have an expert witness --

21       THE COURT:  You are talking about Mr. Wu?

22       MR. BRAZE:  Talking about Mr. Wu.  He is not an

23  expert.  He hasn't been designated as an expert.  And we have

24  no problem with him saying what his expenses are, but to

25  prepare this summary paper, it has a lot of expert opinion in

1  it.

2        THE COURT:  So your issue is he doesn't have the

3  expertise; therefore, there is not a foundation for the

4  opinion.

5        MR. BRAZE:  Exactly.

6        MR. HASSING:  Mr. Wu doesn't have to give an opinion

7  with regard to the value of his lots and the values of his

8  houses.

9        What he will do, your Honor, is he will testify as to

10  what his houses have sold for over different periods of time.

11  He will tell the jury what the houses that are left unsold at

12  this time are listed for.

13        THE COURT:  What's the relevance of that?  If you are

14  talking about value, you can list anything for anything.  That

15  doesn't tell you what the value of the property is.

16        MR. HASSING:  For instance, your Honor, if he has a

17  house that he has had listed for $200,000, and if he has had

18  that house listed, trying to sell it for a period of three

19  months and he hasn't had one offer on it, I think the jury can

20  assume from that that the house is not worth more than

21  $200,000.  That's all we are saying.

22        THE COURT:  Well, wait a minute.  You are asking them

23  basically to assume that it's worth up to 200,000.

24        MR. HASSING:  No, no.  In fact, the lower the value,

25  the better for us, really.

1    So what I'm saying is if it's listed for 200,000,

2  they can assume it's worth anywhere from zero to 200,000, but

3  if it hasn't sold, then they shouldn't assume that it's worth

4  more than 200,000.  If they want to assume that, I guess they

5  can, but they shouldn't assume it is worth more than 200,000.

6    THE COURT:  I disagree with the statement if they

7  want to assume it's worth more than 200,000, they can.  It has

8  to be based on something other than speculation.

9    MR. HASSING:  I understand, your Honor.  What our

10  testimony would be trying to accomplish is to limit the value

11  of these houses that have not sold.  So Mr. Wu would be

12  presenting evidence --

13    THE COURT:  Why isn't that not circumstantial

14  evidence, as he is arguing it?  That if you list a house for

15  $200,000 and it hasn't sold for several months, it is not

16  worth more than the asking price, that's for sure.

17    MR. BRAZE:  Well, I think that's part of the issue.

18  The other part of the issue is he has a 69 -- 68-lot

19  subdivision.  He makes assumptions that he is not going to

20  build houses on them, he is going to sell the land.  He has

21  allocated costs from the purchase of the land on the lots on a

22  formula that he has come up with.

23    It is totally expert opinion that he makes this piece

24  of paper, this summary he is talking about.  There is more

25  into it than that.  We believe he has made certain improper

1   assumptions regarding the costs claimed.

2          THE COURT:  Well, isn't that music to your ears for

3   cross-examination purposes?

4          MR. BRAZE:  Not with Mr. Wu.  But the question is we

5   have an expert that will say, "Look, we believe Mr. Wu

6   improperly performed these functions, mathematical functions."

7   And that he believes the profit is the $3.6 million.

8          THE COURT:  Be aware that it is an issue they are

9   going to be objecting on foundational grounds.  Do the best to

10  lay the foundation and see what happens.

11         MR. BRAZE:  I think the only issue we had so far was

12  we did not object to the foundation as to his supporting cost

13  data, but we objected to the foundation of his summary sheet.

14  So it is one exhibit.

15         THE COURT:  I understand.  Let's see.  Is there still

16  an issue on Mr. Merati's deposition?

17         MR. TRAVIS:  Your Honor, we have coordinated with

18  counsel, and tomorrow, Wednesday night, Mr. Merati will be

19  deposed.

20         THE COURT:  I'm not going to get involved in it.

21         MS. BARNES:  Excuse me, your Honor.  There is one

22  issue relating to Mr. Merati's testimony.  We were notified, I

23  think it was on Thursday, by the plaintiff, that they intend

24  to call Mr. Merati in the plaintiffs' case-in-chief.

25         Mr. Merati, as we understood it, was a rebuttal

1    witness, and he has never had a -- they have never done an

2    expert opinion disclosure.  He is being offered so that the

3    defense can learn something about what his opinions are.

4            THE COURT:  How are you going to do that?

5            MR. BRAZE:  Well, Mr. Merati could not form any

6    opinions until he had plaintiff's damage information.  In

7    other words, he stands there as an economist prepared to

8    evaluate what the plaintiffs [sic] gave us, but we didn't get

9    the damage information on Mr. Wu's deposition until January

10   7th, something like that.  So we fed that to him immediately.

11           No one has asked for his deposition until just last

12   week.  So we are prepared to offer him for deposition.

13           THE COURT:  Well, how do you get around the federal

14   rules so quickly here and the Scheduling Conference Order?

15           You know, I understand that this is done all the time

16   in state court.  I was a superior court judge a number of

17   years ago, and I remember these issues happening all the time.

18           But they don't happen in federal court because the

19   Scheduling Conference Order here means something.  And even

20   when counsel stipulate to things, when you do it without the

21   Court's involvement, you do it at your own peril.

22           MR. BRAZE:  I understand, your Honor.  But we had

23   nothing to give to Mr. Merati for his review until the

24   defendant, Northern, gave us the documents and the damages

25   they were claiming or what they were claiming happened as a

1  result.

2          THE COURT:  That's what motions are for.  That's what

3  motions are for, when counsel, on any side of litigation in

4  federal court, start violating the Scheduling Conference

5  Order, and that's what you are saying occurred, you don't just

6  ignore it, and you don't on either side of this.  And it

7  sounds like everybody participated in this, this stipulating

8  and simply ignoring the conference order.

9          MS. BARNES:  If the Court please --

10          THE COURT:  It's not my problem.

11          MS. BARNES:  If the Court please, the City of Wasco

12  did not agree with respect to this deposition.  And we

13  notified them as quickly as we could by e-mail that we had

14  understood that this was a rebuttal witness.

15          And for the first time, on Thursday, we got a

16  schedule saying they are calling him during their case.  And

17  we have, again --

18          THE COURT:  Well, they are not.  They are not going

19  to do that.  As I said, all of the things that make you think

20  it is a possibility don't exist as far as I'm concerned,

21  because all of this is outside the Scheduling Conference

22  Order.  It is outside the Federal Rules of Civil Procedure.

23  We follow the rules in Federal Court.  Sometimes 473

24  encompasses the entire case in state court, but it doesn't

25  here.

1         Anything else?

2         MR. BRAZE:  Well, we could call Mr. Merati after

3   Mr. Wu testifies to rebut his opinions.

4         THE COURT:  If it does, you are entitled to do that.

5         MR. BRAZE:  Thank you, your Honor.

6         MR. HASSING:  But, your Honor, we have established

7   that we are going to have an opportunity to depose him

8   Wednesday night.  That's not changed, right?

9         MR. BRAZE:  No.

10        THE COURT:  Not my issue.

11        MR. HASSING:  I know.

12        THE COURT:  All right.  Are there any other issues we

13  need to take up before we call the jury panel?

14        MR. ALEXANDER:  Your Honor, if you don't mind,

15  William Alexander.  Just a couple housekeeping.

16        Does the Court like us to stay out of the well area?

17        THE COURT:  I am not one of those that gets too

18  excited about that.  There is enough pressure on counsel and

19  parties during the trial for you not to have to worry a lot

20  about what my dislikes and likes are.

21        All I want to make sure you do, and it is not because

22  I'm the judge and I can tell you to do it, I don't have that

23  view of what a judge should be doing, but I do have practical

24  issues, and that is, I need you to be near a microphone when

25  you are speaking.

1          You can turn this podium around if it helps.  You can

2     put it at an angle.  I don't care about that.  But I do care

3     that the court reporter can hear everything, because we

4     have -- it is my obligation to have an accurate, clear, clean

5     record.  So your being in the well is not an issue for me.

6          Approaching a witness, you don't have to genuflect

7     and ask me every time you do it, but please remember, we all

8     know what happens physically when you get closer to people, we

9     don't usually yell at people when we are two feet from them,

10    but we do need you to speak out loudly if you are up at a

11    witness showing them a document, that if your back is to the

12    jury and you lower your voice like we ordinarily normally do

13    when we get closer to somebody we are talking to, that may be

14    a problem.

15         So that's why I don't want you to spend an awful lot

16    of time up here with a witness, next to them.  I don't mind if

17    you approach witnesses and show them documents without

18    permission.

19         MR. ALEXANDER:  Couple more questions.  Use of the

20    podium is up to the attorneys?

21         THE COURT:  It's up to you.

22         MR. ALEXANDER:  Also, with regard to the pretrial

23    orders, I know there was designation of deposition transcript

24    testimony and counter-designations.  I just want to make sure

25    the Court wasn't intending to limit the parties to the use of

1   deposition testimony for the purpose of impeachment.

2           THE COURT:  No, I'm not.  And with regard to that, I

3   simply wait for an objection and then rule on it.

4           MR. ALEXANDER:  And, finally, your Honor, it is kind

5   of a strange case, and since we are using big maps, the

6   monitors are wonderful, but they don't display the maps very

7   well.  Any problem with the use of the maps as an exhibit

8   themselves?

9           THE COURT:  No.

10          MR. ALEXANDER:  Thank you, your Honor.

11          MR. HASSING:  Your Honor, what about with regard to

12  opening statement, the possibility of using some of these

13  exhibits, these blowups that we know are going to come into

14  evidence?

15          THE COURT:  If everybody agrees, I have no problem

16  with it.  I just don't want there to be used something that is

17  not in evidence yet that somebody is going to have an

18  objection to in the middle of the opening statement.  It is

19  not fair to the jury, it is not fair to counsel either,

20  because it throws everyone off track.

21          So if you are planning on showing something in your

22  opening statement that possibly is going to draw an objection,

23  that you anticipate that and show that to the counsel now.

24          MS. BARNES:  Excuse me.  Just a few housekeeping

25  issues for the City.  First of all, one of the witnesses who

1   is associated with the City, but no longer employed by the

2   City, has a problem with the date of the subpoena.  He takes

3   his wife every Wednesday to the hospital for medical

4   treatment, and Mr. Pennell is scheduled on Wednesday.

5        We notified plaintiffs about this, we haven't heard

6   back, but I wonder if the Court would be willing, with

7   counsel's agreement, to continue his subpoena over to Thursday

8   because of this personal issue that requires him to

9   accommodate his wife.

10        THE COURT:  What does that do on the plaintiff's

11   side?

12        MR. TRAVIS:  We have no objection, your Honor.

13        THE COURT:  So long as the person, the witness

14   understands that he is under subpoena, even though we are

15   adjusting the date for him.  It doesn't mean he can say, "I'm

16   really not subpoenaed."  He is.

17        MS. BARNES:  No.  We will make certain he understands

18   that, and we thank you.

19        The next issue is I would like to present to the

20   Court our paralegal clerk/trial assistant, who is Ms. Rosa

21   Urias (phonetic), and she is here, sitting in the back of the

22   courtroom.

23        I wonder if the Court would have a problem with her

24   approaching counsel table occasionally to assist us with

25   exhibits and that sort of thing.

1          THE COURT:  Not a problem.

2          MS. BARNES:  The other thing is we do have a new set

3     of the City's exhibits -- these are not joint exhibits -- that

4     we are here to distribute to everyone this morning because we

5     had a problem with our copy service and we had to redo them

6     over the weekend.  We now have a set that is properly marked

7     and will be easy for everyone to understand.  And at some

8     point, probably at the recess, we would like to distribute

9     those.

10         THE COURT:  There are not documents in there that are

11    surprising to counsel?

12         MR. OKADIGBO:  Chaka Okadigbo for the City.  There is

13    no new documents.  All the documents in there were the

14    documents that we originally submitted, just in a better

15    organized fashion.

16         THE COURT:  So these are documents that have been

17    produced in discovery?

18         MR. OKADIGBO:  Yes.

19         THE COURT:  All of them?

20         MR. OKADIGBO:  Yes.

21         THE COURT:  Anything else?

22         Now, what is your best time estimate as you sit there

23    now?  Because that's one of the statements I make to the jury.

24         MR. BRAZE:  Well, your Honor, I think we had

25    originally estimated a two-week trial.  I understand it is not

1   bifurcated now.  I think certainly the plaintiffs would be

2   finished by Thursday, maybe even Wednesday.

3          THE COURT:  Okay.  And then on the defense side,

4   what's your best estimate?

5          MR. HASSING:  Your Honor, we pretty much agree that

6   we will be finished by no later than Tuesday.  Probably

7   earlier.

8          THE COURT:  You understand Friday is not a Court

9   date?

10         MR. HASSING:  I did not understand that.  It should

11  have been taken up at the time of scheduling.  I'm not blaming

12  you.

13         The reason for that is because we have -- ordinarily

14  on Fridays, we have criminal calendar.  This week, what we

15  have done is we have limited criminal calendar.  We are going

16  to start just a little not too late, but a little later on

17  Thursday morning because I'm going to take care of a bunch of

18  criminal matters before you come on Thursday morning, full day

19  then with Thursday on this trial, and on Friday, we have a

20  program called "Open Doors to the Courts."

21         Let me just ask this.  Anyway, what does that do to

22  you?

23         MR. HASSING:  Doesn't do anything, your Honor.  All I

24  would say is if we are -- if the courtroom is going to be dark

25  to us on Friday, that we will be finished by Wednesday,

1   probably earlier.  We will probably finish on Tuesday sometime

2   or Monday anyway.

3          MR. OKADIGBO:  Sorry.  I would say -- I would

4   estimate probably Wednesday/Thursday, just to be on the safe

5   side.

6          THE COURT:  I understand.

7          Any other issues?

8          MR. OKADIGBO:  No.

9          THE COURT:  Now, I'm going to ask jurors lots of

10  questions in the voir dire, and then I generally will give

11  counsel a few minutes each.

12         Please don't ask bumper sticker type questions.

13  Those really are not important and just tend to attempt to

14  schmooze the jury, and we don't do that.

15         So if you have any followup questions or you find a

16  problem juror and you start asking questions that follow up to

17  their answers, those types of things, we will let you do that,

18  but keep time at a limited amount of expenditure, and we will

19  then move forward and pick the jury.

20         My suggestion is, as you know, we need at least six

21  to decide the case, and my thought is eight.  Does anybody

22  have a problem with that?

23         MR. ALEXANDER:  I had one question, your Honor, thank

24  you.  We were informed last week the Court likes eight.  Does

25  the Court actually use all eight or are two undesignated

1  alternates?

2         THE COURT:  There is no alternate in civil cases.  In

3  other words, if we have eight, we select eight and there are

4  still eight there; they all deliberate and they are all eight

5  jurors.

6         MR. ALEXANDER:  Likewise, if they drop off, we live

7  with the six or seven that we have remaining?

8         THE COURT:  Yes.

9         MS. BARNES:  There is one other issue this

10  conversation reminded me of and that is order of proof before

11  the jury on the defense side.  I think counsel felt that we

12  could work it out, but we wanted to be able to have a

13  different order of proof for the opening statements.

14         THE COURT:  I don't care.  If you have worked it out,

15  do whatever you want to do.

16         MS. BARNES:  Thank you.

17         THE COURT:  Anything else?

18         All right.  Then we will call for the jury now and as

19  soon as the jury panel comes, we will move forward and select

20  the jury.  We will be in recess until the jury panel arrives.

21         (The potential jurors entered the courtroom.)

22         (Jurors are identified by number only.  Any reference

23         to personal identifiers regarding jurors has been

24         redacted.  Actual personal information requires a

25         motion and Court order.)

1          THE COURT:  Thank you, everyone.  Please be seated.

2     Let us call the case of McIntosh versus Northern Enterprises

3     Company, Lotus Developments, City of Wasco, and DeWalt, Action

4     Number 07-CV-1080.

5          Counsel, could you state your appearances for the

6     record, please.

7          MR. BRAZE:  Good morning, your Honor.  Ladies and

8     gentlemen, my name is Jim Braze.  I'm with the law firm of

9     Borton Petrini out of Bakersfield.  This is my client, Roger

10    McIntosh, my associate, Jeff Travis, and my law clerk, Tom

11    Kapstrom.

12         MR. HASSING:  My name is Steve Hassing.  I represent

13    Northern California Universal Enterprise Company and Lotus

14    Developments.  My client, Mr. Joe Wu, is the owner of both

15    companies.

16         MR. ALEXANDER:  Good morning, ladies and gentlemen.

17    My name is Bill Alexander.  I represent Dennis DeWalt, Inc.,

18    which is owned by Jeff Gutierrez, who is seated right here to

19    my right.

20         MS. BARNES:  Good morning, prospective jurors.  I am

21    Susan Barnes.  And with my is Mr. Chaka Okadigbo.  And we are

22    the lawyers who are going to try together the case for

23    Defendant City of Wasco.

24         And we would like to introduce our client in the form

25    of our City Manager, who is Mr. Jim Zervis.

1          THE COURT:  Good morning.  I know that you know you

2     have been sent to this courtroom for the purpose of picking a

3     jury in this case.  In just a few minutes, we are going to

4     bring a certain number of you forward into the area of the

5     jury box.  And once we do that, we are going to start asking

6     questions.  Let's do that first, and then I will give you

7     further instructions as soon as we do that.

8          Fill the box, please.

9          THE CLERK:  Starting with number 7, Juror 007.

10         THE COURT:  Ma'am, come forward all the way into this

11    area, back row, and all the way in.  Thanks.

12         THE CLERK:  Juror 006, Juror 005, Juror 004, Juror

13    003, Juror 002, Juror 001.

14         Number 14, Juror 014.

15         THE COURT:  Come forward into in area, second row,

16    and all the way in.

17         THE CLERK:  Juror 013, Juror 012, Juror 011, Juror

18    010, Juror 009, Juror 008.

19         Number 15, Juror 015.

20         THE COURT:  Juror 015, if you would come all the way

21    into this first chair, right in the courtroom.  Thanks.

22         THE CLERK:  Juror 016, Juror 017, Juror 018, Juror

23    019, Juror 020, Juror 021.

24         THE COURT:  Let me make my first comments to those of

25    you who have not been called forward yet.  Because you have

1    not been called forward does certainly not mean that you won't

2    be called forward.

3          We know that we have a right to have you here under

4    the law.  But we also know that we do not have a right to

5    waste your time, and it is not our intent to waste your time.

6          We want to know who this jury is going to be, and

7    then we want to move forward with the trial.  We want those of

8    you who are not going to serve on this jury to be able to move

9    forward in your lives.  We are very aware that you had other

10   things to do, that you are not here because you have nothing

11   to do.  And we want you to get back to doing the things that

12   you are entitled to do if you are not going to sit as a juror

13   in this case.

14         We want to be efficient in selecting the jury, but we

15   can't do that without your help, and here's how.

16         In just a few moments, I'm going to start asking

17   questions of the people who have brought -- been brought

18   forward into the area of the jury box.  And you will note that

19   the questions I ask, unless they are followup questions, but

20   the questions I ask initially, are going to be requiring and

21   requesting "yes" and "no" answers.

22         If the answer is "yes" to a question I ask, then

23   anyone seated in the area of the jury box will simply raise

24   his or her hand.  That will indicate to me that their answer

25   is yes.

1          If their answer is "no," then they will have to do

2   nothing, they just sit and wait for the next question.

3          Here's where you come in.  If you will listen to the

4   questions that I ask and make a mental or a written note of

5   any question that I ask to which, if you had been seated in

6   the area of the jury pox, you would have raised your hand, in

7   other words, your answer would have been "yes," that will make

8   things much more efficient when you are called forward,

9   because as soon as you are called forward, I will ask you if

10  you heard the questions I asked.

11         And assuming you say yes, and I'm hoping you will, I

12  will ask, "Were there any questions I asked to which you would

13  have raised your hand," in other words, you would have

14  answered yes.  If you tell me "Yes," or "There were a couple,"

15  I will ask you what they were.

16         If, at that point, you tell me, "I can't remember, I

17  just know I would have raised my hand," I have no choice but

18  to ask all those same questions again.  And that's why the

19  inefficiency comes in, to say nothing of the lack of

20  popularity that you will be encountering.

21         So that's what I ask you to do.  Any issues,

22  questions or concerns about that procedure?

23         All right.  Ladies and gentlemen, the first thing I'm

24  going to do is I'm going to ask counsel to reintroduce

25  themselves, but this time with a specific purpose.  And that

1   is I would like you to take a look at them as they introduce

2   themselves, because I will tell you what my followup question

3   is going to be:  Do you recognize any of those people by name

4   or by face?

5            Sometimes people will recognize somebody by name and

6   not by face or vice versa.  That's normal, and we want to know

7   if you have any knowledge of any of the people who are going

8   to be trying the case or parties that are involved in the case

9   that you let us know that.

10           So we will start again.

11           MR. BRAZE:  Thank you, your Honor.  As I indicated,

12  my name is Jim Braze, B-r-a-z-e.

13           MR. TRAVIS:  Jeff Travis.

14           THE COURT:  Thanks.

15           MR. HASSING:  My name is Steve Hassing,

16  H-a-s-s-i-n-g.

17           MR. ALEXANDER:  Bill Alexander.

18           MS. BARNES:  I am Susan Barnes, and I forgot to tell

19  before that Mr. Okadigbo and I are with the law firm of GCR,

20  which, until recently, was known as Garcia Calderon.

21           MR. OKADIGBO:  Chaka Okadigbo.

22           THE COURT:  I want to make sure you see him.  That is

23  my question.  Because on your seeing them, hearing them, do

24  you recognize anyone?  Please raise your hand if the answer to

25  that is yes.

1          Juror 013, who do you know?

2          JUROR:  I know Bill Alexander.

3          THE COURT:  How do you know him, generally?

4          JUROR:  40 years probably.  Back from high school.

5          THE COURT:  Okay.  Are you social friends?

6          JUROR:  I haven't seen him for quite a while.  We

7    probably had a lot more hair the last time I saw him.

8          THE COURT:  You talking about him or you?

9          JUROR:  Both of us.

10         THE COURT:  Are you talking 20 years or are you

11   talking --

12         JUROR:  Maybe five or ten years.

13         THE COURT:  Okay.

14         JUROR:  Probably saw him on the golf course.

15         THE COURT:  Now, the issue is the same, but the real

16   issue is this.  Based on your knowledge of him, whatever

17   association you had with him before, do you believe that that

18   friendship, or whatever it was, whatever the relationship was,

19   would in any way affect your ability to be completely fair and

20   impartial to any party in this case, knowing that he is

21   representing one of those parties?

22         JUROR:  No, I don't think so.

23         THE COURT:  Wouldn't make any difference?

24         JUROR:  No.

25         THE COURT:  So nothing in the past has occurred that

1    was so good or so bad that it would affect your view of this

2    case, his client or him; is that a fair statement?

3          JUROR:  Yes.  Should have no effect.

4          THE COURT:  Anyone else?  All right.

5          What I'm going to do now is I'm going to read you a

6    very brief statement.  And all this statement is, is it tells

7    you what this case is very generally about.  And it is not

8    evidence.  I'm not giving you evidence in reading you the

9    short statement.  I simply want to tell you what the case is

10   about.  This is a statement that counsel have agreed that I

11   can read to you, and it will be followed up by the question of

12   whether or not there is anything about the subject matter of

13   this case that would affect your ability to be fair and

14   impartial.  That's the whole purpose of my reading this.

15         This case is about copyrights.  The plaintiff, Robert

16   McIntosh, claims to own a copyright in a tract map and

17   improvement plans for a tract that we will call "5472."

18         The plaintiff claims that his copyright has been

19   infringed and the defendants and each of them deny the

20   plaintiff's claims.

21         Just based on that short statement of subject matter

22   of what the case is very generally about, is there anyone who

23   believes that for any reason, that you shouldn't sit on this

24   case?  Anyone?  Anyone at all?

25         Yes, Juror 005?  Why?

1          JUROR:  My English is limited, so I don't know I

2    going to be able to follow everything.

3          THE COURT:  You are jumping ahead just a little bit

4    of what question I'm going to ask in just a moment, but let me

5    ask you a question now that you have brought it up.  Have you

6    understood everything I have said so far or not?  No?  You

7    raised your hand and kind of went back and forth.  Is that a

8    "no" or something else?

9          JUROR:  I don't know.  I might.

10         THE COURT:  Is English not your primary language?

11         JUROR:  No.

12         THE COURT:  Does any counsel wish to inquire?

13         MR. ALEXANDER:  No, your Honor.

14         MR. HASSING:  No, your Honor.

15         MS. BARNES:  No, your Honor.

16         THE COURT:  All right.  Well, I appreciate that,

17   Juror 005.  Obviously, we need people to be able to understand

18   what is going on, and I appreciate your bringing this to our

19   attention.  It is not our intent -- and I hope you are in no

20   way embarrassed by bringing that to our attention.  But my

21   fear is that we need you to understand what's going on here

22   from the witnesses.  And if we put you in a position where you

23   don't, and then you go back into the jury room to deliberate

24   at the end of the case, it's not fair to put you in a position

25   of having to have someone else tell you what they believe the

1  evidence is going to be.  That's the whole purpose of

2  deliberations.

3          So I'm going to excuse you from this case.  All

4  right?  You can leave.

5          Fill seat number 5, please.

6          THE CLERK:  Juror 022.

7          THE COURT:  All right.  Juror 022, I know we haven't

8  asked a lot of questions, but on the ones we have, did you

9  hear them?

10          JUROR:  Yes.

11          THE COURT:  Would you have raised your hand had you

12  been seated where you are seated now?

13          JUROR:  No.

14          THE COURT:  Thanks.

15          Let's see, Juror 010?

16          JUROR:  Yes.

17          THE COURT:  Did you have an issue?

18          JUROR:  My English is not well, so I don't think I

19  able to doing this.

20          THE COURT:  Okay.  English is not your first

21  language?

22          JUROR:  No.

23          THE COURT:  Does anybody wish to inquire?

24          MR. HASSING:  No, your Honor.

25          MR. ALEXANDER:  No, thank you, your Honor.

1          THE COURT:  Juror 010, I appreciate, again, the same

2     thing I said to Juror 005, I say to you, and I thank you for

3     bringing it to our attention and we will excuse you.  You can

4     go.  Thanks.

5          Fill seat 10.

6          THE CLERK:  Juror 023.

7          THE COURT:  Juror 023, have you heard the questions?

8          JUROR:  Yes.

9          THE COURT:  Would you have raised your hand so far?

10         JUROR:  No.

11         THE COURT:  Anybody else's hand?  Did I miss anybody?

12         All right.  In this case, we are going to give you an

13    estimate of how long we think it will take.  Our estimates are

14    pretty good.  They are not off very often.  We believe that,

15    first of all, this Friday you will not have court in this

16    courtroom in this case.  We have other matters that we are

17    obligated to take, a different calendar.  It is a criminal

18    calendar.  And so Friday, you will not be in session in this

19    case if you are a juror.

20         But even in light of that day that you won't be here,

21    we believe that you will have the case and be done with the

22    case no later than next Thursday, this week and then up until

23    Thursday of next week.

24         Now, there is something in the law called "legal

25    hardship" in jury service.  And it does not mean

1   inconvenience.  If that's what it meant, I could clear this

2   courtroom in about three minutes, and I know that.

3        And I will tell you that I also know that it is

4   inconvenient to you.  It really is.  Jury duty disrupts

5   people's lives in what they are doing at home, what they are

6   doing at work or school or someplace else.

7        And this may come as a surprise to some of you, but

8   judges are not exempt from jury duty.  And about a year and a

9   half ago, I remember flipping through the mail and seeing the

10  welcoming remarks from the Fresno Superior Court, which is

11  where I sat for a number of years as a superior court judge

12  before I came over here, so I was very familiar with the form

13  and the notice.

14       And I will admit that when, as I opened it up and I

15  started looking at it, my first impression was, oh, no.

16  Because I could see, frankly, in my mine's eye, my desk in my

17  chambers stacking up to the ceiling with work while I was

18  away.  And I caught myself and realized I can't be

19  hypocritical when that notice comes to me and expect jurors in

20  my courtroom to serve.  And so I did go over and I did serve,

21  and when I came back, my desk was piled up to the ceiling,

22  like I knew it would be, and I dug through it and got through

23  it just like we all do.

24       And I tell you that because the jury system provided

25  by the United States Constitution only works because people

1   like you are willing to be inconvenienced and allow it to

2   work.  That's the only way it works.

3           And one thing I am sure about and can guarantee you,

4   100 percent certain, that if any one of you or any member of

5   your family or any close friend of yours ever needs a jury,

6   the system will be here for them or you, and I will tell you

7   that if that occurs, the people who are parties to the

8   litigation will truly not understand it when somebody tries to

9   get out of jury duty unjustifiably.

10          Because at that instant, that case, no matter what

11  side of the case you or they are on, it will be the most

12  important thing in your life at that time.  Being in a lawsuit

13  is a big deal.  It is not a small thing in life.  And you will

14  be depending on the system to work to be present, to be here

15  for you as required and provided for by law.

16          So I ask you to think about that as I ask you the

17  question about hardship.  When I do in just a moment ask you

18  about that question, understand that there are legal

19  parameters, legal factors that I must consider.  Because if

20  you tell me you have a hardship, I have to delve into it, I

21  have to find out what the hardship is, and then I have to make

22  a legal determination whether or not it really is a hardship.

23          And it makes no difference whether a judge is nice or

24  not nice.  It makes a difference on whether or not the judge

25  follows the law, and I do.

1          So I ask you to, if you are inclined to try to get

2     off jury duty unjustifiably, don't.  It's not a good thing for

3     the system, it's not a good thing for you.  And I have to, if

4     I even suspect that, I have to delve into it very deeply, and

5     it becomes oftentimes unpleasant.

6          So now based on the time length of this trial that we

7     truly believe is accurate, is there anyone who believes that

8     they cannot or should not, from a legal standpoint, hardship

9     standpoint, sit as a juror in this case?  If so, raise your

10    hand and we will take it up now.

11         All right, is it Juror 007?  Tell me what it is.

12         JUROR:  My husband and I own a fencing company, and

13    he does not have a license right now, so I'm the one that

14    transports us back and forth to job sites.  And we have three

15    children, and the youngest is five, so she goes to Head Start

16    in afternoon.  So I deal with that too, and we work out of our

17    home office.  So it is pretty much --

18         THE COURT:  I think I see where you are going, and

19    the question is this -- and I will try not to get too

20    personal, but I have to get this personal -- if you were to

21    sit as a juror on this case for the time indicated that we

22    believe the case will take to try to verdict, and you are not

23    available to do the things that you are talking about in your

24    business, will you and your husband be able to meet the

25    necessitates of life, paying your bills, for food, shelter and

1    clothing?  And the answer is either "yes" or it is "no."

2             JUROR:  Would I be able to if I missed work for the

3    time allotted?

4             THE COURT:  Yes.

5             JUROR:  No, I wouldn't.

6             THE COURT:  Does any counsel have any inquiry?

7             (No counsel wished to inquire.)

8             THE COURT:  I will excuse you from the case for

9    financial hardship.  Any time anybody tells me that they

10   cannot pay their bills, that ends the inquiry as a matter of

11   law.  All right?

12            Fill seat number 7, please.

13            THE CLERK:  Juror 024.

14            THE COURT:  Juror 024, did you hear my questions so

15   far?

16            JUROR:  Yes.

17            THE COURT:  Would you have raised your hand so far?

18            JUROR:  No.

19            THE COURT:  Now, I think is it Juror 009, you raised

20   your hand?

21            JUROR:  Yes.  I started a job at the hospital a few

22   weeks ago.  I'm still on probation and I get paid hourly, so

23   I'm just -- based on that work.

24            THE COURT:  Let's parse it a little bit here.  On the

25   issue of whether or not you are on probation, I can assure you

1    that you will not be affected, your probationary status will

2    not be affected because of your jury duty.  Because there is a

3    criminal statute, frankly, that if you were, that would be

4    implemented and the administrator of the hospital would be in

5    this courtroom answering questions from me, and they know

6    that.

7                On the other issue, on the monetary issue, that's the

8    same inquiry that I had asked the previous juror.  I don't

9    know what your personal financial situation is, and I don't

10   want to probe, but I do need to ask that question.  If you

11   were not to work and assuming you were not -- do you know

12   whether or not you would be paid?

13               JUROR:  No, because I'm part-time.

14               THE COURT:  So you would not be paid.

15               JUROR:  I don't think so.

16               THE COURT:  Let's assume, because you are probably

17   right if you are paid on an hourly basis, let's assume you are

18   not going to be paid.  If you were to serve anyway, would you

19   be able to meet the financial necessitates of life?

20               JUROR:  Yeah, I would.

21               THE COURT:  You would?

22               JUROR:  Uh-huh.

23               THE COURT:  Okay.  Do you have any other issues?

24               JUROR:  Huh-uh.

25               THE COURT:  I appreciate your candor.  But if you

1    even suspect that there is a problem on your sitting as a

2    juror with regard to work, all you need to do is tell me, and

3    I will be on the phone to the administrator of the hospital.

4            JUROR:  Okay.

5            THE COURT:  Yes, Juror 017?

6            JUROR:  Financial.  I wouldn't be able to pay my

7    bills.  I do billing and I get paid hourly also.

8            THE COURT:  Your position is --

9            JUROR:  Medical billing.

10           THE COURT:  I don't mean that.  I meant your

11   position, as far as this issue is concerned, is that you

12   cannot pay your bills if you sit as a juror in this case.

13           JUROR:  Yeah.

14           THE COURT:  Any questions from counsel?

15           MR. HASSING:  No, your Honor.

16           MR. BRAZE:  Nothing.

17           THE COURT:  Thank you.  Then you are excused from the

18   case and we will ask that seat 17 be filled.

19           THE CLERK:  Juror 025.

20           THE COURT:  Juror 025, did you hear my questions?

21   Have you heard my questions so far?

22           JUROR:  Yes.

23           THE COURT:  Would you have raised your hand so far?

24           JUROR:  No.

25           THE COURT:  Have I missed any other hands?

48

1          Yes, Juror 018?

2          JUROR:  Yes.  I'm caretaker for my grandkids, and I

3   have one that has seizures all the time.  I'm the only one

4   that can be there when the school calls, and sometimes I have

5   to come all the way to Fresno with her.  Her mother works 45

6   minutes to an hour away, so sometimes we have to wait for her

7   two and a half hours at the hospital for my granddaughter.  So

8   I'm the only one that has a license who can take care of my

9   grandchildren.  They all in different schools there in Winton,

10  California.

11         THE COURT:  In other words, what you are saying is if

12  you were not there --

13         JUROR:  My daughter wouldn't be there for hour and a

14  half.  I can't meet her at the hospital.  There would be no

15  one to meet her at the hospital.

16         THE COURT:  How often does this happen?

17         JUROR:  Every three months or so.

18         THE COURT:  Every three months?

19         THE WITNESS:  Yeah, it just depends, you know.  If

20  she get excited or something, then she have seizures.  When

21  she gets frustrated or upset or something.  They got her on

22  pills for it, but I just have to go and I wouldn't be able to

23  get these phone calls if I'm sitting here in the jury room.

24         THE COURT:  And your position is there is no one else

25  who can handle the situation that you are talking about?

1          JUROR:  No.  I'm the one that takes care of them.  My

2     daughter works in Modesto.  She works about 45 minutes to an

3     hour away.  I'm the one that meets her at the hospital and

4     have to come to Fresno, I'm the one.  If she has to stay in

5     the hospital, I'm the one that has to stay.

6          THE COURT:  If she did not have you to take care of

7     the children, is it your position she has no one else?

8          JUROR:  No.  All my family is in Arizona, different

9     states.  My daughter is in Las Vegas, the other daughter.

10         THE COURT:  Does counsel have questions?

11         MR. BRAZE:  No, your Honor.

12         MR. HASSING:  No, your Honor.

13         MS. BARNES:  No, your Honor.

14         THE COURT:  All right, Juror 018, we will allow you

15    on a family hardship, you are excused.

16         JUROR:  Thank you.

17         THE COURT:  Fill seat 18.

18         THE CLERK:  Juror 026.

19         THE COURT:  Good morning.  Did you hear my questions

20    so far?

21         JUROR:  Yes, your Honor.

22         THE COURT:  Would you have raised your hand so far?

23         JUROR:  No, your Honor.

24         THE COURT:  Mr. Hidalgo?

25         JUROR:  I think I would have a financial hardship.  I

1 have a DUI, and I'm going to classes and my work is generously

2 working with me, so I'm on a plan with them.  And I already

3 got written up for my attendance for my class, so that's why I

4 got on the plan, and if it prolongs any more, I'm afraid they

5 are going to fire me.

6           THE COURT:  How does the jury duty fit in there?

7           JUROR:  Because I have my classes every week.

8           THE COURT:  During the day?

9           JUROR:  Yes, sir.

10           THE COURT:  How long does that go on?

11           JUROR:  I have another -- all the way to October.

12           THE COURT:  Okay.  I -- you have a class every week

13 from now until October?

14           JUROR:  Yeah, I have 18 months.  It is my second DUI.

15           THE COURT:  Okay.  I can't excuse you, but I can

16 defer you.  In other words, if you want to be deferred until

17 November, we can do that.  Is that what you are asking for?

18           JUROR:  Yes.

19           THE COURT:  Return to the Jury Commissioner's Office

20 now and get a new date in November.  Then you can come back

21 and serve.

22           JUROR:  Okay.

23           THE COURT:  Fill seat number 21.

24           THE CLERK:  Juror 027.

25           THE COURT:  Good morning.  Did you hear my questions

1  so far?

2          JUROR:  Yes, your Honor.

3          THE COURT:  Would you have raised your hand so far?

4          JUROR:  No, your Honor.

5          THE COURT:  Juror 014?

6          JUROR:  Yes.  I'm an hourly worker and I'm not

7  compensated for jury duty.

8          THE COURT:  The followup question is if you were to

9  serve on this jury, not work, not get paid, would you still be

10 able to meet the necessitates of life?

11         JUROR:  No, your Honor.

12         THE COURT:  Okay.  Any questions of counsel?

13         MR. BRAZE:  None, your Honor.

14         MR. HASSING:  None, your Honor.

15         MR. ALEXANDER:  No, thank you, your Honor.

16         THE COURT:  You are excused for financial hardship.

17         Can we fill seat 14.

18         THE CLERK:  Juror 028.

19         THE COURT:  Juror 028, have you heard the questions

20 so far?

21         JUROR:  Yes.

22         THE COURT:  Would you have responded by raising your

23 hand so far?

24         JUROR:  Yes.

25         THE COURT:  Tell me why.

1          JUROR:  Number 3, financial.

2          THE COURT:  Tell me just a little bit about what you

3     are referring to.

4          JUROR:  Well, I'm the only one working in my family

5     right now.  My wife, she can't even find a job right now.  We

6     are in the construction industry, and you know you know what's

7     happening in that right now.  We haven't even been getting 40

8     hours week.  We depleted our savings account.

9          THE COURT:  You don't have to go into that.  I need

10    to know then if you were not to work during the pendency of

11    this case and you sat as a juror, are you saying you could not

12    meet the necessitates of life in your bills?

13         JUROR:  Yes, sir, your Honor.

14         THE COURT:  Does anybody wish to inquire?

15         You are excused.

16         Fill seat 14.

17         THE CLERK:  Juror 029.

18         THE COURT:  Juror 029, have you heard my questions?

19         JUROR:  Yes.

20         THE COURT:  Would you have responded by raising your

21    hand so far?

22         JUROR:  No.

23         THE COURT:  Have I missed any hands on the questions

24    I have asked so far?

25         Yes, sir, Juror 025.

1          JUROR:  Yeah.  I can't understand.  I thought I was

2    going to be able, but I don't understand the English good.

3          THE COURT:  Okay.  Is English not your primary

4    language?

5          JUROR:  No, no.  I'm from Mexico.

6          THE COURT:  Have you understood things that I have

7    said so far that you did not understand?

8          JUROR:  Yes.  There is a lot of words that --

9          THE COURT:  Okay.

10          JUROR:  I didn't have too much school.

11          THE COURT:  That's all right.  Any questions by

12   counsel?

13          MR. BRAZE:  No, your Honor.

14          MR. ALEXANDER:  No, your Honor.

15          MS. BARNES:  No, thank you.

16          THE COURT:  Sir, you are excused.  Thank you for

17   bringing that to our attention.

18          Fill seat 17.

19          THE CLERK:  Juror 030.

20          THE COURT:  Juror 030, have you heard the questions?

21          JUROR:  Yes.

22          THE COURT:  Would you have raised your hand so far?

23          JUROR:  No.

24          THE COURT:  Any other hands?

25          Yes, Juror 024.

1       JUROR:  The more I think about it, I'm going to have

2  a financial hardship.  I work hourly as well.

3       THE COURT:  Are you representing that if you were to

4  serve on this case and you did not get paid because you didn't

5  work, that you could not meet the necessitates of life?

6       JUROR:  Yes.

7       THE COURT:  Not necessarily what you want to spend

8  on, but the necessitates.

9       JUROR:  Yes.

10       THE COURT:  Any questions by counsel?

11       MR. HASSING:  No, your Honor.

12       MS. BARNES:  No, your Honor.

13       MR. BRAZE:  No, your Honor.

14       THE COURT:  You are excused.

15       Fill seat 7.

16       THE CLERK:  Juror 031.

17       THE COURT:  Okay, Juror 031, have you heard the

18  questions?

19       JUROR:  Yes, sir, I have.

20       THE COURT:  Would you have raised your hand so far?

21       JUROR:  No, sir.

22       THE COURT:  Any other hands that I missed?

23       All right.  Are any of you currently involved in a

24  lawsuit?  Suing someone or being sued?  Anyone?

25       Yes, sir, Juror 015?

1          JUROR:  I have a trucking business and we are being

2     sued right now over an accident.

3          THE COURT:  All right.  And are you represented?

4          JUROR:  Yes.

5          THE COURT:  Is there anything about the lawsuit up to

6     right now that you believe would affect your ability to be

7     fair and impartial in this case?

8          JUROR:  I'm fine, not a problem.

9          THE COURT:  Anyone else?  I'm expanding the question

10    now to include spouses, close family members involved in a

11    lawsuit now, to the best of your knowledge.

12         Now I'm expanding my question to include in the last

13    five years.

14         Yes, sir, Juror 022?

15         JUROR:  I was just sued by my ex-wife.

16         THE COURT:  That was a domestic issue?

17         JUROR:  Yes.

18         THE COURT:  Dissolution issue?

19         JUROR:  Yes.

20         THE COURT:  Based on anything that occurred in that,

21    is there anything that you believe would affect your ability

22    to be fair here?

23         JUROR:  No.

24         THE COURT:  Anyone else?  Anyone?

25         Yes?

1          JUROR:  It won't affect it, but I was in a rear end

2     accident like four years ago and I sued, but it won't affect

3     it.

4          THE COURT:  Did you actually sue somebody as a

5     result?

6          JUROR:  No, they sued me.

7          THE COURT:  Did it settle or did it go to trial?

8          JUROR:  It settled before trial.

9          THE COURT:  Is there anything about what happened

10    there, did it offend you to the point of where it would affect

11    your ability to be fair here?

12         JUROR:  No.

13         THE COURT:  Anyone else?  Last five years.

14         Has anybody ever, I'm talking about you, been

15    involved in anything having to do with copyright?  Anyone?

16    Expanding that to your family members or close friends, to the

17    best of your knowledge, copyright issues, legal issues?

18         Is anybody by trade or by education involved with

19    copyright matters?  Anyone?  Now, I'm including again spouses

20    or close family members.

21         Do any of you have any legal background by education

22    or by experience, profession, lawyers, paralegals, legal

23    secretaries, those types of positions?

24         Yes, Juror 012.

25         JUROR:  I work for Superior Court, County of Kern,

1  and I actually have my degree in criminal justice.

2          THE COURT:  What do you do in Kern County Superior

3  Court?

4          JUROR:  I work in the probation department.

5          THE COURT:  Are you ever involved in copyright

6  matters in your business, in your work?

7          JUROR:  No.

8          THE COURT:  I know Probation generally does not have

9  jury issues, but are you ever involved in jury cases?

10          JUROR:  No.

11          THE COURT:  Anyone else?  All right.

12          Has anyone had any employment with a city, county or

13  government agency now, in other words, you are employed now by

14  one of those agencies?

15          And we know you are because of the superior court.

16          Juror 008?

17          JUROR:  Yes, I work for the County of Kern,

18  Bakersfield, California.

19          THE COURT:  Do you know each other?

20          JUROR:  No.

21          THE COURT:  What do you do there?

22          JUROR:  I run a work release program for the Kern

23  County Sheriff's Department.

24          THE COURT:  You recognize that there is a city that

25  is a party in this lawsuit.

1          JUROR:  Yes.

2          THE COURT:  Would that in any way, the fact that you

3     work for the governmental entity, not the same one that's a

4     party here, but you work for one, do you think that that would

5     in any way affect your objectivity?

6          JUROR:  No.

7          THE COURT:  Anyone else?

8          Now, I expand it to your spouses, if you have

9     spouses.  Anybody work for a governmental entity?

10         Yes, Juror 030.

11         JUROR:  My wife works as a speech therapist for

12    Tulare County School District.

13         THE COURT:  Anyone else?

14         Has anyone in the last five years had a dispute with

15    a city, county or agency of local, state or federal

16    government, where there was a complaint or a legal issue?  You

17    felt you were owed money or they had done you wrong or the

18    other way around, where they felt you had done something

19    wrong, where there was the threat of litigation or actual

20    litigation?  Anyone?  Expanding again to include your spouses

21    or close family members.  Anyone?

22         Has anyone ever worked for the County of -- excuse

23    me, the City of Wasco?  Anyone?  Including family members or

24    close friends, anyone?

25         Yes, sir, Juror 013?

1      JUROR:  My wife is a teacher's aide at a Wasco

2  school.

3      THE COURT:  So she works for the Wasco School

4  District?

5      JUROR:  Yes.

6      THE COURT:  Would that in any way affect your ability

7  to be fair here?

8      JUROR:  No.

9      THE COURT:  Would you assure me if you sit as a juror

10  now you won't go home and ask her; you have no problem in not

11  asking her.

12      JUROR:  No.

13      THE COURT:  Okay.  Anyone else?  Do any of you know

14  any of the rest of you other than, of course, perhaps meeting

15  this morning on jury duty?

16      Yes, Juror 026?

17      JUROR:  I know Juror 015.  I used to serve him at

18  Apple Annie's Restaurant quite a few times throughout the

19  week, but it won't affect anything.

20      THE COURT:  Let's assume you both sit on the same

21  jury.  Would that in any way compromise your independence?

22      JUROR:  No.

23      THE COURT:  Juror 015?

24      JUROR:  No.

25      THE COURT:  Anyone else?  I didn't used to ask that

1   question, but a number of years ago, I had a juror actually

2   Juror Number 3 -- I remember where he was sitting -- and he

3   asked if it made any difference that Juror Number 11, who did

4   not share his same last name, was his wife.

5          And, you know, the issue legally is it doesn't.

6   Spouses can sit on the same jury, there is no legal

7   preclusion.  The issue is whether or not, because that other

8   person sits on the jury, whether or not they can be

9   independent in voice, in thinking, in discussion.

10         And by the time we were through with that discussion,

11  I should have just sent them down to the divorce court.

12         But in any event, that's why I ask that question.

13         Does anyone have any background by education, by

14  experience, by profession, in the area of planning, zoning or

15  construction approval processes?

16         Yes, sir, Juror 022, tell me about it.

17         JUROR:  We have telecommunications.

18         THE COURT:  I'm sorry?

19         JUROR:  We are setting up a wireless communications

20  program in my business, and we are in the process right now of

21  getting approved through the federal government for the rights

22  to build the project.

23         THE COURT:  What type of business are you in?

24         JUROR:  Wireless communications.  Well, I have

25  several different businesses, but one of them is wireless

1    communications.

2           THE COURT:  So you are going through that process

3    just because you are trying to get a license to do this; is

4    that what's going on?

5           JUROR:  To be approved through a grant through the

6    federal government.  We have passed through the state and now

7    we are in process of being approved through the federal

8    government.

9           THE COURT:  Is there anything about the process that

10   has affected you or offended you, frankly, that would affect

11   your ability to be fair in this case?

12          JUROR:  I don't know that much about the case right

13   now, but so far, no.

14          THE COURT:  Okay.  Anyone else?  Now, again, I expand

15   my question dealing with this sort of issue, the planning,

16   development of projects, to include spouses or close family

17   members?

18          Yes, Juror 001?

19          JUROR:  It wouldn't affect me, but my husband did

20   work for KB Home for a number of years.

21          THE COURT:  Let's talk about that for just a second.

22   What did he do for -- is it a home development company?

23          JUROR:  They built homes here.

24          THE COURT:  What did he do?

25          JUROR:  He was in charge of closing escrows.  He was

1   a real estate agent.

2          THE COURT:  Did he get involved, do you know, in the

3   planning and construction issues?

4          JUROR:  I know he would walk through and he was

5   interested in construction, but that's about all I know.

6          THE COURT:  Did he walk through with inspectors?

7          JUROR:  Yes.

8          THE COURT:  Have you basically told me everything you

9   know about what he was doing?

10         JUROR:  Yes.

11         THE COURT:  Will you assure me that you will not talk

12  to him about this case if you were to sit as a juror?

13         JUROR:  Sure, yes.

14         THE COURT:  Let's talk about that for just a second.

15  The law requires jurors not to discuss the case with anyone

16  while you are sitting as jurors.

17         And "anyone" includes spouses.  And this is so

18  important that the law almost never, almost never involves

19  itself with a husband-wife relationship, but this is an

20  exception.  It is that important.  You can't even talk to your

21  spouse about the case.

22         The most you can do is tell somebody who needs to

23  know that you are on a jury and tell them where you are in

24  case somebody needs to get in touch with you in case of an

25  emergency.

1          But you can't then go into any details, you can't

2   tell them it is a civil case or criminal case.  You can't tell

3   them anything about the case.

4          Does anybody believe that they cannot follow that law

5   for any reason?

6          Yes?

7          JUROR 002:  Yeah.  I share everything with my

8   husband.  I don't know if I could not say anything.

9          THE COURT:  Well, let me ask you this.  Can you defer

10  talking to him?  In other words, when you are off the jury,

11  you can talk to him all you want for as long as you want about

12  this case if it interests you that much, but not while you are

13  sitting as a juror.  You can't talk to him about it.  Now,

14  what?

15         JUROR:  I don't know if I could not say nothing.

16         THE COURT:  Well, it is so serious a breach of a

17  Court order that it could cause us to have to start the case

18  again.

19         JUROR:  I wouldn't want that.

20         THE COURT:  You stand in a long line.  So where are

21  we with you on that issue?

22         JUROR:  I just don't know if I could not share

23  anything.  I mean it is not like I would set out to do it, but

24  I kind of -- I don't want to use the word I'm a

25  "blabbermouth," but I am going to say that.  I don't mean to

1  be.

2          THE COURT:  Does any counsel wish to inquire?

3          MR. BRAZE:  No, your Honor.

4          MR. HASSING:  No, your Honor.

5          MR. ALEXANDER:  No, thank you, your Honor.

6          MS. BARNES:  No, thank you, your Honor.

7          THE COURT:  I'm going to put it bluntly, and I don't

8  mean it to be insulting, but we can't take a chance on you.  I

9  think you are being candid and I think you are being frank and

10 honest, I don't question that, but we just can't have your

11 husband give me a call in the middle of the night saying,

12 "Guess what I heard?"

13         So we are going to excuse you from this case and you

14 can go about and go chat with your husband.

15         JUROR:  Do I go downstairs and put my name in?

16         THE COURT:  No.

17         JUROR:  Thank you.

18         Fill seat number 2.

19         THE CLERK:  Juror 032.

20         THE COURT:  Juror 032, have you heard the questions?

21         JUROR:  Yes, I have.

22         THE COURT:  Would you have raised your hand?

23         JUROR:  Yes.  My husband is right in the middle of a

24 lawsuit.  I'm right now supposed to be down at San Joaquin

25 Rehab to get my father-in-law out.

1              THE COURT:  Let's talk about the first issue first.

2      What type of business is your husband in?

3              JUROR:  Farming.  We farm on the West Side.

4              THE COURT:  Is that case venued in --

5              JUROR:  We are in depositions right now.

6              THE COURT:  Is it in the federal court or state

7      court?

8              JUROR:  I'm assuming federal.

9              THE COURT:  Are you related to --

10             JUROR:  Harry ████, no.

11             THE COURT:  Do you believe that the fact that you are

12     involved in a lawsuit, that that would affect your ability to

13     be fair?

14             JUROR:  Yes.

15             THE COURT:  Why?

16             JUROR:  I cannot be partial.

17             THE COURT:  Because?

18             JUROR:  I have too many things going on right now.

19     My father-in-law is 95.  We do have a caregiver, but he is

20     from Greece, cannot hear.  He gets confused.  I have to get

21     him out of rehab today, get him home, and I basically have to

22     be there, plus I have three kids in different schools.  I

23     cannot focus on other people's issues right now.

24             THE COURT:  Okay.  I can't excuse you for what you

25     are telling me, but I can defer you.

1          JUROR:  That would be even better.

2          THE COURT:  Why don't you go back to the Jury

3  Commissioner's office and pick a new date in about six months.

4  See if things would be better.

5          JUROR:  That would be fine, thank you.

6          THE COURT:  Fill seat 2.

7          THE CLERK:  Juror 033.

8          THE COURT:  Sir, have you heard the questions?

9          JUROR:  Yes.

10          THE COURT:  Would you have raised your hand so far?

11          JUROR:  No.

12          THE COURT:  Have I missed hands so far?

13          Is anybody involved with the City of Wasco by

14  business, residence, in any way, where you are actually

15  involved with the City of Wasco?  Anyone?

16          Okay.  Is anyone familiar with how the process of

17  land surveying occurs?  I don't mean just very, very

18  generally.  I mean more specifically.  Anyone?

19          Yes, sir?

20          JUROR 022:  It's part of our business.  We also do

21  underground construction.  We -- everything we do is surveyed.

22          THE COURT:  Well, when you say everything you do is

23  surveyed, are you doing the surveying?

24          JUROR:  We deal with the surveyors.

25          THE COURT:  Do you deal directly with them?

1        JUROR:  Yes.

2        THE COURT:  I will tell you part of this will be

3   about surveying.  Do you believe that you could decide this

4   case only based on the evidence that comes from this chair,

5   from witnesses, and not from other things that may or may not

6   be so?

7        JUROR:  I will be fair.

8        THE COURT:  I'm sorry?

9        JUROR:  I will be fair.

10        THE COURT:  But will you assure me that you will

11   decide the case based on the evidence that comes in through

12   the courtroom, not from any other source?

13        JUROR:  Yes.

14        THE COURT:  Anyone else?

15        Does anyone have any education or experience in the

16   area of civil engineering?  Anyone?  Okay.

17        Has anyone been involved in the area in any way, in

18   the area of trade secrets or patents or copyrights?  In any

19   way?

20        Has anyone been, in the last five years, a witness in

21   a case, whether it be by deposition or by actually coming into

22   court and testifying?

23        Yes.

24        JUROR 033:  I don't know if this would have to do

25   with it.  We had to file bankruptcy recently.

1          THE COURT:  All right.  And you haven't testified in

2     that case, have you?

3          JUROR:  No, no, it was closed.

4          THE COURT:  Anyone else?  Okay.

5          Is there anyone who does not believe in the jury

6     system?  In other words, you think that things -- people can

7     come to court if they want, but it should not be decided by

8     juries?  Anyone?

9          Yes, sir?

10         JUROR 008:  I do.

11         THE COURT:  You think that the jury system should not

12    exist?

13         JUROR:  Right.

14         THE COURT:  You understand that the jury system is

15    established not because an individual judge or a party or a

16    lawyer thinks it is a good idea, but rather, it is established

17    by the United States Constitution?

18         JUROR:  Right.

19         THE COURT:  And that is the law.  The fact that you

20    think that it should be decided, any case should be decided by

21    someone other than a jury, does that mean that you cannot be a

22    juror or that just simply means you have a disagreement with

23    the law?

24         JUROR:  Just a disagreement.

25         THE COURT:  Okay.  So are you all right then with

1    following the law that the law provides for the jury?   In

2    other words, you are a juror, that's why you are here.   Do you

3    have any concerns that you can't sit as a fair juror?

4           JUROR:  No.

5           THE COURT:  Anyone else?

6           Juror 008 raises an interesting issue.   And that is

7    from time to time, we do have people who say, "I just don't

8    agree with this particular law or that law," and there is not

9    a problem with that.   The First Amendment of the United States

10   Constitution allows you to disagree with the law and voice it.

11          And I will admit to you from time to time, law comes

12   my way in certain cases, and I look, and I am thinking, I

13   don't agree with this decision of the Court of the Appeal or

14   the Circuit Court or the U.S. Supreme Court.   Or I don't agree

15   that this law Congress passed should have been passed.

16          And I'm entitled to that, but it does not in any way

17   allow me to then not follow it.   I have taken an oath to

18   follow the law, no matter what that law is.   If that's what

19   the law is, I have to follow it, just like you.   Just like

20   those of you who are going to sit as jurors.

21          Is there anyone who believes that if he or she

22   disagrees with the law that you will be unwilling or unable to

23   follow it?  Anyone?

24          Okay.   Now, in this case, there are business entities

25   or in one case, the City, that is a party, and I will tell you

1   that as a matter of law, you must treat business entities or

2   public entities, like a city, in the same manner as you would

3   any individual party, no differently.

4          Is there anyone who believes that they would have a

5   difficult time following that law?  Anyone?

6          Has anyone actually sat on a jury in the past?  I

7   don't mean on jury duty.  I mean actually sat in a courtroom

8   on a jury.  Could you raise your hands if you have?

9          Okay.  For the six of you who have, thanks.  Did

10  anyone sit on a jury that was not able to reach a verdict?  No

11  hands.

12         Did anyone sit on a jury where, at the end of the

13  day, when you were done with your jury duty, you considered

14  that to be a bad experience, for whatever reason?  Doesn't

15  make any difference right now, but you figured it was a bad

16  experience.  Anyone?  All right.

17         Did any of the six of you who raised your hand who

18  sat on juries, sit on a criminal case, in other words,

19  somebody was charged with a crime?  So half of you, three of

20  you.

21         I will tell you that criminal cases and civil cases

22  are wholly different, totally different.  One of the

23  differences is the standard of proof.  In a criminal case, it

24  is beyond a reasonable doubt standard.  In a civil case, like

25  this is, it is preponderance of the evidence, which means

1    probably, in other words, more than -- a little more than 50

2    percent.  That's the burden.

3            If those of you who sat as jurors on criminal cases,

4    if you remember any of the jury instructions, the law that the

5    judge gave you, and you believe that that law contradicts the

6    law as I give it to you, is there anyone who believes they

7    would have a difficult time, if not impossible time, not

8    following the law as I give it to you.  That's what you are

9    required to do.  Anyone?

10           Okay.  Whether I have touched on this or not, if you

11   are sitting there thinking, "I really shouldn't sit as a juror

12   in this case, for whatever reason you are thinking that, if

13   you are thinking that, could you raise your hand and we need

14   to talk about it.  Anyone?

15           On each of your laps, I believe you have a

16   questionnaire.  And if you don't, you can borrow it from

17   somebody next to you when it comes your turn.

18           I'm going to ask each of you to answer the questions,

19   and it won't take as long as you might think.  You don't need

20   to read the questions out loud.  We will know what the

21   questions are based on your answers.  I do ask you to speak

22   out loud so we can all hear you.

23           If a question does not pertain to you, such as what

24   do your adult children do for a living, and you don't have

25   adult children, just go on to the next question that does

1    pertain to you.

2    BY THE COURT:

3    Q.   Juror 001, we are going to start with you.

4    A.   Juror 001, (spelling redacted.)  Los Banos, California.

5    High school diploma.  I am a shift supervisor at Starbucks and

6    my husband is unemployed.

7              THE COURT:  Thank you.

8    BY THE COURT:

9    Q.   Juror 033?

10   A.   My name is Juror 033, (spelling redacted.)  I'm from

11   Laton, California.  High school diploma.  I am operations

12   director of a restaurant chain throughout California.

13             And my spouse does not work.  I have two sons and a

14   daughter.  The daughter lives in Colorado.  My two sons, one

15   is unemployed and the other works for Laguna Irrigation

16   District.

17   Q.   Does your daughter in Colorado work outside the home?

18   A.   She works with the school district there in Silt,

19   Colorado.

20             THE COURT:  Thank you.

21   BY THE COURT:

22   Q.   Juror 003?

23   A.   Juror 003.  I'm from Sonora, California.  I have a high

24   school diploma and some technical school.  I work for AT&T.  I

25   work on digital electronics.  And my children are not adults.

1           THE COURT:  Okay.

2    BY THE COURT:

3    Q.   Juror 004?

4    A.   Yes.  Juror 004, (spelling redacted.)  I live in Clovis,

5    California.  I have a college degree in intercultural child

6    development.  I do not work outside the home.  I home-school

7    two of our three boys.  My husband is a consultant for a

8    medical computer company based out of Chicago.

9           THE COURT:  Thank you.

10   BY THE COURT:

11   Q.   Juror 022, and could you speak out?  You have a very low

12   voice, light voice, and could you speak out a little bit

13   louder so we can make sure everybody hears you?

14   A.   My name is Juror 022.  I live in Valley Springs,

15   California.  I went to college, but didn't graduate.  My

16   wife -- I am a general contractor.  My wife works as assistant

17   to the Dean of Rudolf Steiner College in Sacramento.

18   Q.   Anything else?

19   A.   That's it.

20   Q.   Adult children?

21   A.   No.

22          THE COURT:  Thanks.

23   BY THE COURT:

24   Q.   Juror 006?

25   A.   Juror 006, (spelling redacted.)  I live in Fresno.

1    Education, graduated from high school, three years of college.

2    I'm a customer service rep for a linen company here in Fresno,

3    and my wife is a office manager for a products supplier.  No

4    children.

5              THE COURT:  Thank you.

6    BY THE COURT:

7    Q.   Juror 031?

8    A.   Juror 031, (spelling redacted.)  I live in Merced,

9    California.  I'm a college graduate, and my occupation was a

10   nurse.  I'm currently retired.  My adult son is a federal

11   officer at the Atwater Penitentiary.

12             THE COURT:  All right.  Thank you.

13   BY THE COURT:

14   Q.   Juror 008?

15   A.   Juror 008.  I live in Bakersfield, California.  Went to

16   high school and junior college, didn't finish college.  My

17   wife is a teacher at a preschool in Bakersfield.

18             My oldest son, he runs Vista Paints in Burbank,

19   California.  And my middle son, he is a student at Bakersfield

20   College.  And my daughter is 18.  She is a student at UCLA,

21   who hopes to be a judge.

22             THE COURT:  Send her over.  We need the help right

23   now.

24   BY THE COURT:

25   Q.   Juror 009?

1    A.   My name is Juror 009, and (spelling redacted.)  I live in

2    Visalia, California.  And I have my Bachelor's in social work,

3    but I'm currently a secretary at a hospital.

4            THE COURT:  Okay.

5            Yes?

6            JUROR 022:  I do have children in college and I

7    didn't consider them adults.

8            THE COURT:  When they get out of college, you will

9    have the same problem.  Are they working other than being

10   college students?

11           JUROR:  They both have part-time jobs.

12           THE COURT:  What type?

13           JUROR:  One works for Wal-Mart and one works for a

14   day care.

15           THE COURT:  Thank you for telling us.

16   BY THE COURT:

17   Q.   Yes, sir?

18   A.   Juror 023, (spelling redacted.)  Fresno, California.  High

19   school diploma.  Bachelor's of Arts in Psychology and a Master

20   of Arts in Clinical Psychology.  Currently, I'm an in-home

21   tutor and a substitute teacher, and that's it.

22           THE COURT:  Thanks.

23   BY THE COURT:

24   Q.   Juror 011?

25   A.   I'm Juror 011, (spelling redacted.)

1    Q.   Speak up just a little bit.

2    A.   I'm from Fresno, California.   I have a high school

3    diploma, currently in college.   And right now, I just paint

4    cars.

5              THE COURT:   Okay.

6    BY THE COURT:

7    Q.   Juror 012?

8    A.   Juror 012, (spelling redacted.)   Bakersfield.   I have a

9    Bachelor's in Criminal Justice, with a minor in Psychology.

10   I'm a Court Service Specialist at Superior Court, County of

11   Kern.   My husband is a physical therapist, and I do not have

12   any adult children.

13             THE COURT:   Thank you.

14   BY THE COURT:

15   Q.   Juror 013?

16   A.   Juror 013, (spelling redacted.)   I live in Shafter,

17   California.   Got three years of college.   I'm an insurance

18   agent.   My wife is a teacher's aide.   I have two daughters.

19   One is a hair stylist and the other is a student.

20             THE COURT:   Thanks.

21   BY THE COURT:

22   Q.   Juror 029?

23   A.   My name is Juror 029 and I -- it is (spelling redacted.)

24   And I live in Clovis, California.   I have an Associate degree,

25   and I'm a retiree from the federal government, and my husband

1   is deceased.  I have an adult child who works for Grundfos

2   Pumps.

3   Q.  What did you do for the federal government before you

4   retired?

5   A.  I was an administrative specialist for the Commander of

6   the Coast Guard Pacific area in Alameda.  I was there for 17

7   years.

8   Q.  What type of business was your husband in?

9   A.  Aircraft engine overhaul.  He worked for a company in

10  Alameda, in Oakland, actually.  And he dealt with foreign

11  military governments, taking contracts for aircraft engine

12  overhaul.

13          THE COURT:  Thank you.

14  BY THE COURT:

15  Q.  Juror 015?

16  A.  Juror 015, (spelling redacted.)  Tulare.  High school.  My

17  wife and I own a trucking company.  Three adult children.  My

18  oldest son, he works in the company.  My daughter works for

19  her husband in the insurance business, and my youngest

20  daughter works for us in the trucking company also.

21          THE COURT:  Okay.  Thank you.

22  BY THE COURT:

23  Q.  Juror 016?

24  A.  Juror 016, (spelling redacted.)  I live in Fresno.

25  Completed three years of college.  I am currently retired.  My

husband is a food scientist.  I have two adult children.  One

is -- owns a distributorship for hips and joint -- he is a

"joint rep," is what he calls himself.  And I have a daughter

who has four children she home-schools.

Q.  What are you retired from?

A.  I was in sales, insurance sales.

        THE COURT:  Thank you.

BY THE COURT:

Q.  Juror 030?

A.  Juror 030, (spelling redacted.)  I'm from Visalia.  I have

a Bachelor of Science in Industrial Technology.  I work for a

garden supply wholesaler, and my wife is a speech therapist.

        THE COURT: Thank you.

BY THE COURT:

Q.  Juror 026?

A.  Juror 026, (spelling redacted.)  I live in Tulare, and I

am currently working on two majors.  I'm double-majoring in

Sociology and Communicative Disorders, and I am a server at

Red Lobster and a certified trainer full-time.

        THE COURT:  Thanks.

BY THE COURT:

Q.  Juror 019?

A.  Juror 019, (spelling redacted.)  I live in Midpines.  I'm

a retired registered nurse.  I'm retired.  My husband is

retired.  I have four children.  One is a career Marine, and I

1  have one is a mechanic and one is a code enforcer in Reno, and

2  my daughter don't work.

3  Q.  What is your husband retired from?

4  A.  He was retired Air Force.

5         THE COURT:  Okay.  Thank you.

6  BY THE COURT:

7  Q.  Juror 020?

8  A.  My name is Juror 020, (spelling redacted.)  I live in

9  Fresno, California.  I have a high school diploma.  Currently

10 unemployed, with no children.

11        THE COURT:  Okay.  Thank you.

12 BY THE COURT:

13 Q.  Juror 027, you are a physician?

14 A.  I am.

15 Q.  Doctor, give us your information?

16 A.  Juror 027, (spelling redacted.)  I live in Fresno.  I have

17 a B.S. in Biology and M.D.  I'm a pediatrician.  My husband

18 works for Kerman Unified as an adaptive educational

19 instructor.

20        THE COURT:  Has anybody thought of something they

21 believe they should have told me but left it out?  Anyone?

22        Does anyone need a break?  I will just tell you that

23 I can sit up here for days, and I don't want to put anybody in

24 a position where you are embarrassed to ask for a break.  If

25 there is anybody who needs a break, let me know and we will

1    take a quick break.  Anyone?

2          Okay.

3          MR. BRAZE:  I was hoping for a break, but --

4          THE COURT:  Do you need a break?

5          MR. BRAZE:  I would like to take a break.

6          THE COURT:  Let's take ten, no more than 15 minutes

7    break, and I ask those of you who are seated here, get

8    familiar with that chair.

9          And there is no secret about it, this is now I know

10   who you are, and so we need you to be in the same chair.  And

11   everybody else, we just need you in the same courtroom.

12         So, please understand, we are not done.  And so we

13   need you back.  And just keep in mind, the one thing that you

14   have in common is this case.  And it's the one thing you can't

15   talk about with one another.  So please don't talk about this

16   case, any aspect of it, and we will take -- we will shoot for

17   ten, but no more than 15 minutes.  Please then be in the same

18   seats.

19         (Recess)

20         THE COURT:  Back on the record.  Counsel are present.

21   We have all the 21 jurors in the box, and we are ready for any

22   questions that counsel have.

23         MR. BRAZE:  Good morning, ladies and gentlemen.  As I

24   told you before, my name is Jim Braze, and I'm with the law

25   firm of Borton Petrini out of Bakersfield.

1          And you heard what the Judge had to say about this

2     case and what to expect as far as time.   This phase of the

3     trial is referred to as "voir dire." It is a French word.   I

4     don't know any French, so I was told it means "to tell the

5     truth" and "to speak the truth," and that's what we are asking

6     to you do here.   Just as the witness would tell the truth from

7     the witness stand, we want you to tell us the truth.

8          This phase of the trial is trying to determine

9     whether any of you have a bias or a prejudice.   A prejudice

10    means to prejudge that before this case even begins, you

11    basically made up your mind as to one party or the other

12    winning this case.   That's prejudice.

13         And we certainly, if you had that kind of prejudice,

14    we want to know about it.

15         The other is called "bias."   Bias means you haven't

16    made up your mind, but you are leaning one way or the other.

17    In other words, one party or the other has an advantage.   Or

18    if you were thinking of a horse race, one horse is ahead of

19    the other before we even start anything.   Now, you haven't

20    heard any evidence and yours was to make a decision based on

21    the evidence only.

22         So if you have a bias leaning one way or the other,

23    that, of course, is something we don't want.   We have all

24    spent a lot of time, effort and money to get here, and we will

25    spend more time, effort and money to get through this trial.

1          So, please, if you have a bias or prejudice, please

2     tell us about it, because the last thing we want is for you to

3     come to us when the trial is over and say, "Gee, I wish I

4     would have told you about that."

5          So while we are talking about bias, let's go to Juror

6     013.  You somehow knew I would ask you a question.  Now, you

7     know Mr. Alexander and how do you know Mr. Alexander?  How do

8     you know him?

9          JUROR:  It is a long-term friend.  Goes back probably

10    out of high school.  I think we probably used to golf some.

11         MR. BRAZE:  Where did you go to high school?

12         JUROR:  Shafter High.

13         MR. BRAZE:  Well, do you want Mr. Alexander to do

14    well?

15         JUROR:  What's that again?

16         MR. BRAZE:  Do you want Mr. Alexander to do well?

17         JUROR:  Yeah, I always want him to do well.

18         MR. BRAZE:  So that is a bias; would you say that?

19         JUROR:  It might be a little bit.

20         MR. BRAZE:  How little of a bias is it?

21         JUROR:  Very little.  I don't think very much at all.

22         MR. BRAZE:  Well, if I got up and argued certain

23    facts to you, and Mr. Alexander got up and offered -- argued

24    the same set of facts a little differently, which one of us

25    would you tend to believe?

1   　　　　JUROR:  Truthfully, maybe Billy, just a little bit,

2   possibly.

3   　　　　MR. BRAZE:  Well, if you were my client that is

4   sitting where he is, would you want a juror like you on the

5   jury?

6   　　　　JUROR:  I think I would be a good juror.

7   　　　　MR. BRAZE:  That's not my question.  Would McIntosh

8   want to have a juror like you on the jury considering that you

9   are going to believe Billy a little bit more than me.

10  　　　　JUROR:  If that's the case, probably not.

11  　　　　MR. BRAZE:  Would it be better, you think, for you to

12  serve on another jury where you didn't know people

13  individually?

14  　　　　JUROR:  Yes, probably.

15  　　　　THE COURT:  Counsel, do you wish to voir dire?

16  　　　　MR. HASSING:  No.

17  　　　　MS. BARNES:  No, thank you.

18  　　　　THE COURT:  All right.  I think that based on that

19  one statement and answer, we need to -- it is not a matter of

20  accusing you of anything, it is a matter of making sure.  We

21  would rather err on the side of total objectivity, and that's

22  what we are going to do.

23  　　　　Juror 013, could you call the 800 number after

24  5:00 p.m., on Friday, for further instructions.

25  　　　　JUROR:  Okay.

1            THE COURT:  Thanks.  Can we fill seat 13, please.

2            THE CLERK:  Juror 034.

3            THE COURT:  Ma'am, have you heard the questions I

4    have asked so far?

5            JUROR:  Yes.

6            THE COURT:  Would you have raised your hand so far?

7            JUROR:  No.

8    BY THE COURT:

9    Q.  Give us your personal information, please.

10   A.  My name is Juror 034, (spelling redacted.)  Mojave,

11   California, is where I reside.  High school diploma.  I am a

12   lead cashier at a Fast Trip gas station.  My spouse is an

13   unemployed homemaker.  No adult children.

14           THE COURT:  Thank you.

15           Go right ahead, please, Mr. Braze.

16           MR. BRAZE:  I noticed, and I guess I'm surprised, at

17   how far some of you have come to be here today.  Mojave, two

18   from Bakersfield and one from Los Banos.

19           Let's start with Juror 001.  How long did it take you

20   to get here from Los Banos?

21           JUROR:  Hour and a half.

22           MR. BRAZE:  Now -- I will guarantee you that the

23   Judge wants to start on time, and so I don't know what's going

24   on in your household in the morning, but do you see any

25   problem being here on time every morning?

1          JUROR:  No.  I'm always here early from work.

2          MR. BRAZE:  How about any of the rest of you from

3    Bakersfield to Mojave?

4          JUROR 008:  Right now, it's financially kind of rough

5    on me right now, but I would love to try to be here every time

6    when I need to be, but money right now is an issue for me

7    right now.

8          THE COURT:  You mean because of travel?

9          JUROR:  For travel, yes.

10         THE COURT:  You will be reimbursed for that.  But

11   that shouldn't have anything to do with being on time, should

12   it?

13         JUROR:  No.

14         MR. BRAZE:  Anyone else have any travel problems that

15   prevent you from being here on time?

16         Now, Juror 015, I think you said that you had a

17   lawsuit pending; is that right?

18         JUROR:  Yes, sir.

19         MR. BRAZE:  What's the status of it?

20         JUROR:  We are in depositions right now.

21         MR. BRAZE:  Have you had your deposition taken?

22         JUROR:  No.

23         MR. BRAZE:  Have you attended any of the depositions?

24         JUROR:  No.  Two of the other employees have, but I

25   haven't.  My son and another fellow in the office, dispatcher.

1          MR. BRAZE:  You are going to hear some testimony read

2    from depositions in this case.  Is your experience with

3    depositions going to influence your ability when evaluating

4    that deposition testimony?

5          JUROR:  I don't think it would be a problem.

6          MR. BRAZE:  I have to try to pronounce your name

7    because it is unusual, Juror 027.

8          JUROR:  Very good.

9          MR. BRAZE:  You are a doctor?

10          JUROR:  I am.

11          MR. BRAZE:  Did you go to college in Fresno?

12          JUROR:  I went to college in the Bay Area, St. Mary's

13    College.

14          MR. BRAZE:  You didn't go to Fresno State?

15          JUROR:  I didn't.

16          MR. BRAZE:  I wanted to make sure you didn't go to

17    school with my son.

18          THE COURT:  As beautiful as that campus is, I'm

19    surprised you left the campus.

20          JUROR:  It was hard to leave it.

21          MR. BRAZE:  Juror 012, you work in the Kern County

22    Superior Court?  You have probably heard of our law firm.  I

23    think you probably -- I don't know if you have dealt with me

24    directly or my clerk.  Is there anything about our experience

25    together that causes you to have a bias or prejudice?

1          JUROR:  No.  But I think is -- are you related to

2    Gail Braze?

3          MR. BRAZE:  She is my wife.

4          JUROR:  I deal with her.

5          MR. BRAZE:  I got to ask you this.  Anything about

6    your dealings with my wife that would cause you to be biased

7    or prejudiced against my client in this case, Mr. McIntosh?

8          JUROR:  No.

9          THE COURT:  Because you deal with his wife, it is the

10   same type of question he was asking before of another juror;

11   would you be inclined to go one way or the other because of

12   that relationship?

13         JUROR:  No.

14         THE COURT:  Okay.

15         MR. BRAZE:  So are you the one that hands out the

16   pink slips?

17         JUROR:  Yes.

18         MR. BRAZE:  When they reject a pleading, they call it

19   a "pink slip."

20         Anything about your experience in Kern County

21   Superior Court that would affect your ability to be a fair and

22   impartial juror in this case?

23         JUROR:  No.

24         MR. BRAZE:  And all the attorneys are going to tell

25   you, we are looking for fair and impartial jurors.  That's the

1   main question.

2           Now, Juror 033.

3           JUROR:  Yes.

4           MR. BRAZE:  You say that you are involved with a

5   restaurant chain.

6           JUROR:  Yes.

7           MR. BRAZE:  What chain is that?

8           JUROR:  Country Waffles.

9           MR. BRAZE:  As the judge indicated to you, this case

10  involves federal copyright law, probably not something many of

11  you are familiar with because not many lawyers are familiar

12  with it, actually.  And it falls in the area of intellectual

13  property, patents, trademarks, copyrights.

14          The Judge talked to you about the law, but this is

15  probably an area where you may hear the law for the first time

16  in this case.

17          And you already have committed to following the law,

18  even if you disagree with it; is that a fair statement?

19          JUROR:  Yes.

20          MR. BRAZE:  Do any of you feel different about that?

21  Going to hear it for the first time, probably today, if the

22  Judge preinstructs, or at the end of the case, if he doesn't.

23  But you haven't heard the law about copyrights.

24          Can we get a commitment from each of you that you are

25  going to follow that law, no matter what, even if you disagree

1   with it?  Anybody have a problem with that?

2          As a result that we are dealing with federal

3   copyright law, we are in federal court, which is different

4   than the place across the street, state court.

5          And who had prior jury duty?

6          Juror 003.

7          JUROR:  Yes, sir.

8          MR. BRAZE:  That was a state court jury?

9          JUROR:  No, sir.  Our local, county.

10         MR. BRAZE:  That's a state court jury.

11         JUROR:  Yes.

12         MR. BRAZE:  We have federal courts and state courts.

13  Was that a civil or criminal?

14         JUROR:  Criminal.

15         MR. BRAZE:  Juror 022?

16         JUROR:  Yes.

17         MR. BRAZE:  You recall in that case, you had 12

18  jurors, and you had to reach a verdict by nine out of 12; do

19  you recall that?

20         JUROR:  Yes.

21         MR. BRAZE:  In this case, there is only going to be

22  eight jurors, but you are going to have to reach a unanimous

23  period.  And that's one of the main differences between state

24  Court and federal Court, fewer jurors and unanimous verdict,

25  as opposed to a nine out of 12.

1          Anybody have a problem with that situation of having

2    to go into a jury room where you have to all reach unanimous

3    agreement?

4          Now, Juror 008, I think you are the person who said

5    you didn't believe in the jury system; is that correct?

6          JUROR:  Yes.

7          MR. BRAZE:  Maybe you can tell me.  I didn't quite

8    understand what it was about.

9          JUROR:  I just believe that the judge should be the

10   one to make a decision on what goes on in the court.

11         MR. BRAZE:  I mean is it because you think it is an

12   inconvenience on people or do you think that jurors tend to

13   reach the wrong decisions?

14         JUROR:  Yes.

15         MR. BRAZE:  It is the latter; you think that juries

16   tend to get it wrong?

17         JUROR:  Yes.

18         MR. BRAZE:  Do you have any personal experience with

19   that?

20         JUROR:  No.

21         MR. BRAZE:  So because you come into the system

22   saying, "I don't believe in the jury system because I think

23   juries get it wrong," how do you feel about having seven other

24   people who all have to unanimously agree on a verdict?

25         JUROR:  I don't have a problem with it.

1          MR. BRAZE:  As the Court indicated to you, the

2     standard of proof here is preponderance of the evidence.  We

3     are the plaintiffs.  We have the burden of proof to recognize

4     that.  We sit closer to you than the defendants.  We speak

5     first in voir dire, opening statement, closing arguments, and

6     we get a rebuttal argument.  That's because we have the burden

7     of proof.  So we get those advantages, if you want to call

8     them an advantage.

9          However, you know in law, there is only three burden

10    of proofs.  That's the criminal burden of proof, beyond a

11    reasonable doubt.  And preponderance of the evidence is the

12    lowest burden of proof, and that's what the Judge told you 50

13    percent.  And you may have seen the scales of justice.  And if

14    the scales of justice tip ever so slightly in favor of

15    plaintiff, you have to return a verdict in favor of the

16    plaintiff.  Anybody have a problem with that?

17         You are a very quiet group.  So please don't be

18    bashful.  I don't bite.  And so tell us if you have problems

19    or if you have concerns.

20         Now, we had just our first example of this, but when

21    we took the break, hopefully, none of us lawyers talked to

22    you, and we are not allowed to talk to you outside of this

23    courtroom.  And so if we see you in the hallway, we may smile,

24    but we are not trying to be rude.  We can't talk to you.

25         And in this case, the law is going to be read to you

1   by the Judge.  The facts and evidence is going to come to you

2   from the witness stand up there and the documents and the

3   attorneys, all they do is argue the facts and the law and ask

4   questions.

5         And most likely, the judge is going to tell you that

6   nothing we say is to be considered by you as evidence.

7   Nothing that any of the attorneys in this courtroom say is to

8   be considered by you as evidence.

9         You should not ignore it, but view it that what we

10  say is an attempt to help you understand the facts and the

11  law.  Anybody have a problem with that, you have to disregard

12  what the attorneys say as evidence?

13        Anyone been to the City of Wasco?

14        JUROR:  I have driven through it?

15        MR. BRAZE:  Fast?

16        JUROR:  Not that fast.

17        MR. BRAZE:  Does anybody know where it's at?

18        JUROR:  46 and 43.

19        MR. BRAZE:  For those of you don't know, it is north

20  and west of Bakersfield.  I assume you all know where

21  Bakersfield is.  You have driven through that probably.

22        JUROR:  Yeah, that one fast.

23        JUROR 006:  I play golf at Valley Rose.

24        MR. BRAZE:  That's an interesting comment, because

25  this lawsuit, I don't know if the Judge told you about, is

1   about the Valley Rose Estates, which happens to be the

2   subdivision right next to the golf course.

3           How often do you play golf at Valley Rose?

4           JUROR:  Once every ten years.

5           MR. BRAZE:  You must have seen a lot of change.  When

6   was the last time you played there?

7           JUROR:  About ten years.

8           MR. BRAZE:  Anything about your experience playing

9   golf at Valley Rose Golf Course that causes you to have any

10  bias or prejudice in this case?

11          JUROR:  No.

12          THE COURT:  Just a couple more questions, please.

13          MR. BRAZE:  Okay, your Honor.

14          How many of you feel that jury verdicts are too high?

15  Great, I love it.  Not a hand.  Nobody feels that jury

16  verdicts are too high?

17          Is there anyone who says that I couldn't award over a

18  certain sum of money?  At the conclusion of this case, we are

19  going to ask you for a large amount of money.  Anyone have any

20  problem with that?

21          You are smiling.

22          JUROR 034:  You are going to ask me personally?

23          MR. BRAZE:  Yes, I am.  I won't ask you to pay it.

24  Okay.

25          Anyone here who couldn't award a large amount of

1   money if the facts and law support it?  Thank you.  You have

2   been very quiet, but we look forward to talking to you again.

3          THE COURT:  Okay, Counsel.

4          MR. HASSING:  Good morning again, ladies and

5   gentlemen.  One more time, my name is Steve Hassing, and I

6   represent two of the four defendants in this case.  I

7   represent a corporation called Northern California Universal

8   Enterprise Company.  That corporation is a general contractor

9   that builds homes in the Central Valley of California.

10          I also represent Lotus Developments, a Limited

11  Partnership, and that company is a real estate developer that

12  develops subdivisions on which homes are built.

13          I would like to ask you first of all, does anybody

14  here feel that they have any kind of a bias against a

15  corporation as opposed to an individual?  In this case, we

16  have an individual, Mr. McIntosh, who has sued my client's

17  corporation.  Does anybody feel that an individual has more

18  rights under the law than a corporation does?

19          Is there anybody who feels they can't be fair in

20  listening and evaluating the evidence as it applies to a

21  corporate defendant, just as they would if it applies to an

22  individual?  No hands?

23          Same with the limited partnership.  Is there anybody

24  here that would think that just because one of my clients is a

25  partnership, that they shouldn't be accorded the same fair

1    treatment as an individual?

2           Has anybody here ever had a problem after buying a

3    home, ever had a problem with a real estate company builder of

4    homes that sold you a home and you felt that you had some

5    defects?  Anybody?

6           Has anybody here ever bought a new home in a

7    subdivision?  A lot of hands go up.  Those of you that have

8    bought homes in new subdivisions, do any of you recall having

9    any problems at all with those homes?  I see some hands go up

10   again.

11          Do any of you think that the home builder didn't

12   respond fairly to your complaints?  You do?  What kind of a

13   problem did you have.

14          JUROR 029:  My cabinets were falling apart and they

15   said after a year, that it wasn't any of their responsibility,

16   although they had, during the year, had to come out and do

17   repairs.

18          MR. HASSING:  It sounds like you had a pretty big

19   problem with your seller.  Because of that problem you had

20   with your seller, are you going to hold that against my client

21   that builds houses?

22          JUROR:  Probably not.

23          MR. HASSING:  You say "probably not."  That concerns

24   me a little bit.

25          JUROR:  Well, I don't really know.

1          MR. HASSING:  You know, this case is not about

2     construction defects in any way at all.  There is no

3     allegation here that any of the homes built by my client are

4     defective.  That's not what this case is about.  But what I'm

5     trying to check for, just like Mr. Braze did, is bias against

6     my client.

7          Do you feel that because of the experience you had

8     with your home, that you might have some sort of a carryover

9     bias towards my client?

10          JUROR:  I might possibly, because it was such a long

11     process of buying this house, and I saw a lot of things.  And

12     a lot of us moved into this brand new neighborhood, and we all

13     bought from the builder and we all had various problems.

14          MR. HASSING:  And the seller just didn't take care of

15     them.

16          JUROR:  The seller was the builder.

17          MR. HASSING:  They didn't take care of the problem?

18          JUROR:  They glossed over, but then I sort of forgot

19     about it.

20          THE COURT:  You understand in this case, you can't

21     take your own circumstances and situation and even it out in

22     this courtroom?

23          JUROR:  I know.

24          THE COURT:  That isn't the way it works.

25          JUROR:  Right.

1          THE COURT:  You agree that that would not be fair?

2          JUROR:  That would not be fair, you are right.

3          THE COURT:  Do you believe that you can set aside

4    your situation that you had with a builder, wholly different

5    from the builder in this case, and decide this case only based

6    on the evidence?  That's the test.

7          JUROR:  I hope so.

8          THE COURT:  Do you have reservation?

9          JUROR:  Slightly, I guess.

10         THE COURT:  Does any other counsel wish to ask her

11   questions with regard to this issue?

12         MR. ALEXANDER:  Yes, your Honor.

13         Juror 029, just briefly, similar to what Mr. Braze

14   had asked you, if you were faced with some arguments by

15   Mr. Braze or something on behalf of his client versus a

16   builder, and you had to choose between one or the other, was

17   that bad experience something that might influence you in

18   making a determination as to who is truthful or not?

19         JUROR:  Hmm.  I would probably try to be fair.  I

20   would be fair.

21         THE COURT:  I don't think anybody is questioning

22   whether or not you would try.  I think that everybody believes

23   you would.  But the issue is that, based on whatever

24   experiences you have had, based on what you are telling us,

25   whether or not you would be able to.  In other words, whether

1   or not you have already had such a bitter taste in your mouth

2   about your experience that it would carry over into this

3   courtroom, and I think you have indicated that you are

4   concerned it would.  Am I right?

5              JUROR:  Probably, a little bit.

6              THE COURT:  Anything else, Counsel?  Anyone?

7              MR. ALEXANDER:  No, thank you, your Honor.

8              MS. BARNES:  No, thank you.

9              THE COURT:  Okay.  Juror 029, I appreciate your

10  candor, but we have to make sure.   We can't be in the middle

11  of a case and have you raise your hand and say, "You know what

12  I said, it's come true and I can't be fair."  At that point,

13  it's too late.

14             Out of an abundance of caution, we will ask you to

15  call the 800 number, after 5:00 p.m., on Friday.

16             Fill seat 14, please.

17             THE CLERK:  Juror 035.

18  BY THE COURT:

19  Q.  Juror 035, have you heard the questions I have asked so

20  far?

21  A.  Yes.

22  Q.  Would you have raised your hand so far?

23  A.  Yes.

24  Q.  Go ahead and tell me, please.

25  A.  I have a medical hardship.

1   Q.  Let's talk about the medical issue first.  What is your

2   medical problem?

3   A.  Recurring respiratory papilloma.  I have a problem

4   talking.  I have a papilloma on my vocal cord, so difficult

5   talking at that time.

6   Q.  I'm not familiar with that medical condition.

7   A.  It is recurring, and I'm going to UCSF Thursday.

8   Basically have surgery every five, six months.

9   Q.  Did you say -- when did you have that?

10  A.  Next Thursday, the 11th.

11        THE COURT:  I'm not sure that we are going to be done

12  with this case, but you know, you could still be deliberating

13  if you were on the jury that day.

14        Would you like us to defer you to -- for a time out,

15  where maybe you could find out what's going on medically and

16  be in a better position to answer?

17        JUROR:  I suppose that's probably the best.

18        THE COURT:  Would you like that?

19        JUROR:  Yeah, it's a recurring thing, so it could

20  happen next time too, but that's fine for now.

21        THE COURT:  I think we are going to have to do that

22  because of the medical appointment that we don't want you to

23  have to reschedule.

24        JUROR:  All right.

25        THE COURT:  Why don't you go back to the Jury

1    Commissioner's Office now and pick out a date in five or six

2    months and let's see how you are doing then.  Okay?

3            If you have a medical condition still at that time --

4            JUROR:  It's recurring, so it comes and goes.

5            THE COURT:  How often does it do that?

6            JUROR:  I had surgery three times last year.

7            THE COURT:  If you are still in the throes of this,

8    get a letter from your physician if you would, if your

9    physician will give it to you, and send it in.  Okay?

10           Fill seat 14, please.

11           JUROR:  Still reschedule?

12           THE COURT:  Yes, five or six months out, and see how

13   we are doing.  As you approach that date, you still have a

14   medical issue, get a statement from your physician, if you

15   can.

16           JUROR:  All right.

17           THE CLERK:  Juror 036.

18   BY THE COURT:

19   Q.   Juror 036, have you heard the questions I have asked?

20           THE COURT:  Would you have responded by raising your

21   hand.

22           THE WITNESS:  Yes.

23   BY THE COURT:

24   Q.   Tell me what question or questions, please.

25   A.   The legal hardship.

1    Q.  Tell me what it is, if you would.

2    A.  My wife and I have three young children, of which I take

3    care of, and my wife works full-time out of town.  And I take

4    my two older children to and from school, and I watch my

5    youngest during the whole day until my wife gets off work.

6    And we don't have anybody to watch the children.  So if I'm

7    here, then my wife has to take off of work.

8    Q.  Let's assume that if you were to serve as a juror, you

9    have to have your wife take off or be home to take care of

10   what you usually do, or if you have to hire someone to do it.

11   If either of those scenarios occurred, would you still be able

12   to meet the necessitates of life, pay your bills?

13   A.  No.

14           THE COURT:  Okay.  Anybody, any question by counsel?

15           MR. ALEXANDER:  No, thank you.

16           MS. BARNES:  No, thank you.

17           THE COURT:  Fill seat 14, please.  You are done.

18   Thanks.

19           THE CLERK:  Juror 037.

20   BY THE COURT:

21   Q.  Juror 037, good morning.  Did you hear my questions?

22   A.  Yes.

23   Q.  Would you have raised your hand if you were seated where

24   you are seated now?

25   A.  No, your Honor.

1  Q.  Could you give us your personal information, please.

2  A.  It's Juror 037, It's actually ██████, (spelling

3  redacted.)

4  Q.  Just so I'm clear on --

5  A.  ██████ is my maiden name.  Oakdale, California.  High

6  school diploma, college, and working at a restaurant, and my

7  spouse works at a country club.

8  Q.  All right.  Have you declared a major?

9  A.  Liberal studies.

10         THE COURT:  Okay.  Go ahead, please, Counsel.

11         MR. HASSING:  Yes, your Honor, thank you.

12         Juror 022, I notice that you also raised your hand

13  when you asked about potential bias against a home seller

14  because you had a problem that wasn't resolved to your

15  satisfaction; is that correct?

16         THE WITNESS:  No.

17         MR. HASSING:  That was not correct?

18         JUROR:  I had problems, but they were resolved.

19         MR. HASSING:  They were resolved.  Do you think the

20  fact you had those problems would tend to cause you to be

21  biased against my client that does build homes?

22         JUROR:  I realize when you build a house, it is not

23  going to be perfect.

24         MR. HASSING:  And Juror 004, did you raise your hand

25  to that question also?

1          JUROR:  I raised my hand that we have had two homes

2     built.

3          MR. HASSING:  On either of those occasions, did you

4     have any kind of problem with the builder?

5          JUROR:  We didn't.

6          MR. HASSING:  You did not?

7          JUROR:  Our second home was by the same builder and

8     it was just fine.

9          MR. HASSING:  I would like to ask you, Juror 001,

10    your husband worked for KB Homes for sometime.

11         JUROR:  Yes.

12         MR. HASSING:  Did he work for any builders prior to

13    that?

14         JUROR:  Anderson Homes, in Los Banos.

15         MR. HASSING:  How long did he work for Anderson?

16         JUROR:  Two years.

17         MR. HASSING:  Did you learn of any facts from your

18    husband because of his employment that would cause you to be

19    biased against a home builder?

20         JUROR:  No.

21         MR. HASSING:  Juror 012, just a couple of questions.

22    I understand that you know Mr. Braze's wife?

23         JUROR:  Yes.

24         MR. HASSING:  You see her at the courthouse from time

25    to time?

104

1          JUROR:  Very often.

2          MR. HASSING:  About how often do you see her?

3          JUROR:  I would say a couple times a week.

4          MR. HASSING:  Does she file papers with you or

5   something?

6          JUROR:  Yes.

7          MR. HASSING:  Does she file papers with other clerks?

8   Does she have a special relationship with you where she comes

9   to you?

10          JUROR:  She can file it with any clerk, but a lot of

11   her paperwork does come to my desk.

12          MR. HASSING:  Does she ask for you when she comes in

13   the clerk's office so she can deal with you?

14          JUROR:  No.

15          MR. HASSING:  That's kind of the luck of the draw?

16          JUROR:  Yes.

17          MR. HASSING:  Do you have a friendly relationship

18   with her?

19          JUROR:  No.  I mean I have had to deal with her when

20   it has to do with the paperwork she has filing with me.  I

21   mean I have spoken to her personally or over the phone or her

22   assistants, but to be honest with you, I don't know if she

23   would know who I am.

24          MR. HASSING:  Okay.  But you know who she is?

25          JUROR:  But I know who she is.

1          MR. HASSING:  Do you like Mrs. Braze?

2          JUROR:  Yes, I do.

3          MR. HASSING:  Do you think the fact that you have

4     this relationship with Ms. Braze would cause you at all to

5     like to see Mr. Braze do well in this case?

6          JUROR:  No, no.

7          MR. HASSING:  You don't think that would have any

8     effect at all?

9          JUROR:  No.

10          MR. HASSING:  You can be fair to my client, even

11     though Mr. Braze wants my client to pay money, no problem?

12          JUROR:  I don't have a problem.

13          MR. HASSING:  One last question I want to ask all of

14     you -- Mr. Braze touched on it -- is we need a unanimous

15     verdict in this case in order to find against my clients.  And

16     do any of you believe that you would have a problem, if you

17     were the lone holdout, so to say, believing that the facts did

18     not tend to establish a copyright infringement on behalf of my

19     client, and seven other jurors were pushing for a verdict

20     against my client, do any of you think that you would have

21     trouble standing up to the other seven and advocating for what

22     you believe the evidence shows?  Anybody at all?

23          Thank you very much.

24          THE COURT:  All right.

25          MR. ALEXANDER:  Good morning, ladies and gentlemen.

1   Just because Juror 013 called me Billy doesn't mean you can do

2   that.

3          Anyway, ladies and gentlemen, does anybody -- and the

4   Judge had asked you some questions and limited it on time.

5   Has anybody in their lifetime ever been involved in a lawsuit,

6   other than those who have already shared with us their

7   experiences, either sued somebody or been sued?

8          And has anybody on the jury ever had a good or a bad

9   experience with any sort of surveyor or an engineer of any

10  type in their lifetime?  Okay.  Does anybody on the jury know

11  of anybody who has had either a good or bad experience with

12  any surveyor or civil engineer?

13         Yes, Juror 022?

14         JUROR:  Well, like I said earlier, I do underground,

15  and we --

16         THE REPORTER:  I'm sorry, sir.  I can't hear you.

17         JUROR:  We go in and do undergrounds and we do vaults

18  and stuff underground and we have to have them surveyed and

19  set and everything, and we get paperwork and stuff on that,

20  and they come back later and say we didn't set it correctly

21  and it costs us a lot of money.  I have had a few of those

22  happen.

23         MR. ALEXANDER:  That's where a surveyor would come in

24  and suggest to you you didn't put them in a right place?

25         JUROR:  Right.

1          MR. ALEXANDER:  Anything in that experience that

2   would lead you to feel you couldn't be fair to my client who

3   happens to be a surveyor?

4          JUROR:  I will be fair.

5          MR. ALEXANDER:  You may notice that several attorneys

6   are sitting at one table and several at another.  Does the

7   fact that several attorneys might be sitting there together,

8   and maybe even visiting or talking, lead you to conclude that

9   we are all on the same side?

10          Do you understand that each of us is a different

11   attorney representing a different client?  And is there

12   anything about our relationship, whether it be friendly, or

13   even our relationship with Mr. Braze or Mr. Travis, if we are

14   friendly with them, that will lead you to conclude that one

15   side is right or one side is wrong in this case?

16          Does anybody here have the feeling that serving on a

17   jury is just a waste of time?  Okay.

18          Juror 012, I'm going to ask you a similar question to

19   what Mr. Braze asked you earlier because you know Gail Braze,

20   Mr. Braze's wife.

21          If Mr. Braze were to make a statement to the effect

22   that something was correct and one of the other attorneys made

23   a statement on the other side of the fence, would your

24   relationship with her lead you to conclude that Mr. Braze must

25   be naturally right?

1          JUROR:  No.

2          MR. ALEXANDER:  Okay.  Juror 006, I know you played

3     golf out at Wasco Valley Rose.  Do you know anything about the

4     property that was located just to the west?

5          JUROR:  No.

6          MR. ALEXANDER:  Never heard anything about it?

7          JUROR:  No.

8          MR. ALEXANDER:  Never heard about a squabble going

9     on?

10         JUROR:  No.

11         MR. ALEXANDER:  And I notice that there were -- and I

12    may be mistaken, but I think it was Juror 004, Juror 022 and

13    Juror 003; is that correct?  All served on a jury before.  And

14    I had on my notes it was all criminal juries; is that right?

15         JUROR 022:  Well, he asked if it was criminal and I

16    raised my hand that it was, but I have been on a couple

17    juries, so I have done both.

18         MR. ALEXANDER:  On the civil side, without telling me

19    what the result was, did you reach a verdict?

20         JUROR:  Yes.

21         THE COURT:  On the criminal cases that Juror 003 and

22    Juror 004 served on, do you recall that the burden of proof in

23    that case was a different burden than in this case?  And do

24    you recall that the number of jurors that you needed and that

25    that was unanimous?  And regardless of what the outcome was,

109

1    were you able to reach a verdict in those cases?

2              JUROR:  Yes.

3              MR. ALEXANDER:  Did either one of you serve as the

4    foreperson?

5              JUROR:  No.

6              MR. ALEXANDER:  I noticed there were a couple people

7    up front.  Juror 016, you served on a civil jury?

8              JUROR:  It was criminal.

9              MR. ALEXANDER:  Likewise, was a verdict reached?

10             JUROR:  Uh-huh.

11             MR. ALEXANDER:  Did you serve as the foreperson?

12             JUROR:  I did not.

13             MR. ALEXANDER:  I also had a note that maybe Juror

14   026 and Juror 030 also served?

15             JUROR:  No.

16             MR. ALEXANDER:  Juror 015?

17             JUROR:  Civil.

18             MR. ALEXANDER:  Foreperson or no?

19             JUROR:  No.

20             MR. ALEXANDER:  Was a verdict reached?

21             JUROR:  Yes.

22             JUROR 022:  I was a foreperson.

23             MR. ALEXANDER:  You were a foreperson, Juror 022?

24             Juror 019, was it a civil case or criminal?

25             JUROR:  Criminal.

1          MR. ALEXANDER:  Were you a foreperson?

2          JUROR:  No.

3          MR. ALEXANDER:  Was a verdict reached?

4          JUROR:  Yes.

5          MR. ALEXANDER:  Thank you.  Again, my client is

6    Dennis D. DeWalt.  You heard that corporations and persons are

7    the same, and my client is Jeff DeWalt [sic], who owns that

8    company.  Do you have any reason to think that you would lean

9    one way or the other because my client chooses to do business

10   under a corporation, whereas Mr. McIntosh does not?

11         Has anyone ever had a complaint that a governmental

12   entity did not treat them fairly over their lifetime?

13         Thank you very much.  That's all I have right now.

14         MS. BARNES:  Hello again, prospective members.  I'm

15   Susan Barnes and I represent the City of Wasco.

16         One of the advantages of going last, and also most of

17   the disadvantages, is most of the questions have been asked,

18   so I'm not going to be talking with each one of you.  There

19   are just a couple of areas I want to cover, and I might pick

20   on you to make a point that generally applies to everyone.

21         So let me ask first, Juror 023, you are a substitute

22   teacher?

23         JUROR:  Yes.

24         MS. BARNES:  I would assume then, sir, that you would

25   be interested in learning new facts as a teacher?

1          JUROR:  Correct.

2          MS. BARNES:  So in this case, I think all of you are

3    going to be having an opportunity to learn some new and, quite

4    frankly, complicated facts.

5          And as you sit here today, can each of you tell me

6    that that might be interesting and I'm going to listen

7    carefully?  Everyone can agree that they need to listen to

8    this evidence and, even if it's kind of obscure, we got to try

9    to hear and understand what the facts are from the people who

10   are sitting up there on the witness stand or in documents that

11   you may be entitled to see because they are exhibits, what we

12   call "admitted in evidence."

13         And can everybody feel that they can have that be

14   their focus?  And the reason I raise that is Mr. Braze did the

15   scale of justice thing.  And, quite frankly, all of us lawyers

16   love to talk, as you have already observed, and sometimes we

17   try to jump on the one side or the other of the scale of

18   justice and hope to have you consider what we say and maybe

19   obscure the evidence a little bit.

20         And understand that we all -- we wouldn't be here in

21   the courtroom if we didn't like to talk and communicate with

22   people.  And, quite frankly, we love learning new facts, and

23   maybe we think that we are -- it is more fascinating than

24   anything you might think is fascinating.

25         But can you all be a little patient with us?  We will

1  try to get through the trial as quickly as possible and

2  explain it all, but understand it is those witnesses and those

3  documents you are going to look at that are going to be the

4  basis of your decision.  You can listen to the arguments of

5  counsel.  And the Court, of course, will instruct you on the

6  law, but, essentially, this is what's important, the evidence

7  you will hear.  Can you all agree with that and understand

8  that concept?

9        I have to apologize to you because, Juror 022, I

10  couldn't hear a lot of what you said.  I'm coming off a cold

11  and I'm blaming that for a problem with my hearing this

12  morning.

13        So I wanted to go back with you and ask you a couple

14  of things that you may have said.  And if you didn't, I

15  apologize.  But you are in the wireless industry as a

16  contractor?

17        JUROR:  That's part of our business.  We have several

18  businesses.

19        MS. BARNES:  Is that with the part of the industry

20  that's called gas providers, the fiber optic cable that

21  connects one cellular tower to another or do you build the

22  towers?

23        JUROR:  We build towers.

24        MS. BARNES:  Build the vaults?

25        JUROR:  Build the whole tower and provide telephone

1    and electricity to them.  We also do subdivisions for

2    somebody's gas, electric, cable TV and streetlights.  We do

3    paving, we have trucking.  We do various things.

4              MS. BARNES:  Here's where I'm going with that.

5    Ordinarily, those kinds of things that you do do involve a

6    permitting process or an application process to usually your

7    local jurisdiction?

8              JUROR:  Correct.

9              MS. BARNES:  Has there been anything about that

10   experience, have you been the person to apply directly or work

11   directly with the local jurisdiction?

12             JUROR:  Yes.

13             MS. BARNES:  Okay.  You do that, you and your company

14   do that in California or elsewhere?

15             JUROR:  Mostly California, some in Nevada.

16             MS. BARNES:  Okay.  And would the City of Wasco be

17   one of the jurisdictions you have dealt with in the past?

18             JUROR:  Not yet.

19             MS. BARNES:  Not yet, but you are hoping to?

20             JUROR:  Some day.

21             MS. BARNES:  Has there been anything about that

22   experience, which I would understand is a fairly routine

23   experience for your company --

24             JUROR:  Yes.

25             MS. BARNES:  Dealing at some level with the local

1    jurisdiction?

2             JUROR:  Yes.

3             MS. BARNES:  -- that would cause you to feel you love

4    them or hate them, but you couldn't be fair as a juror and

5    listen to all the evidence you are going to hear this week and

6    maybe next?

7             JUROR:  I can be fair.  I mean of course you run into

8    some problems, but I deal with developers also.

9             MS. BARNES:  That's life, isn't it?

10            JUROR:  It's a business.

11            MS. BARNES:  In fact, we are not here thinking that

12   we have been so fortunate that we have a bunch of people who

13   have lived in a bubble and haven't had life experiences.  All

14   we are asking is can you be interested and attentive enough to

15   listen to the evidence and so forth.  I have done that, we

16   won't do it again.

17            And also if you have got a life experience that might

18   otherwise cause you not to favor one of these parties or

19   another, just say.  "This is my life experience, I have to put

20   it aside and decide this case based on what happens when what

21   I see and hear in this courtroom."

22            You can do that, Juror 022?

23            JUROR:  Yes.

24            MS. BARNES:  Okay.  Now, have all of you been to the

25   City of Wasco?  Rose capital of the country, I think of the

1  | nation, is their slogan?

2  |      Wasco is a little 19,000, approximately, population

3  | city.  They have 66 employees.  It is a small town, small

4  | city.  Is there anything about where Wasco is or who they are

5  | or who they advertise themselves to be, which is the rose

6  | capital of the nation, that would cause any of you to think,

7  | "I don't want to be involved in this case because maybe I

8  | can't be fair to them"?

9  |      Juror 023, I want to go back to you for a second.  As

10 | a teacher, what are your favorite topics?

11 |      JUROR:  I enjoy physical education.  It seems to be

12 | the easiest subject to substitute.  But I have a general

13 | interest in just about all of the classes that I have taken.

14 |      MS. BARNES:  Your background is psychology?

15 |      JUROR:  Correct.

16 |      MS. BARNES:  I suppose you enjoy those interactions

17 | with children.  What age group, particularly, if there is an

18 | age group, do you teach when you go into schools and teach as

19 | a substitute teacher?

20 |      JUROR:  There is no specific age.  I do K through 12.

21 | I have spent a lot of time doing the middle school ages,

22 | seventh and eighth grade.  But as far as a preference, I don't

23 | necessarily have a preference.

24 |      MS. BARNES:  Okay.  You are the pediatrician, are you

25 | not, Juror 027?

1              JUROR:  Yes.

2              MS. BARNES:  Are you currently in private practice?

3              JUROR:  I work for UCFMG (phonetic) and UC program

4    here in Fresno.

5              MS. BARNES:  Is there anything about that experience

6    that would cause you to feel, "Oh, this is a case I

7    shouldn't" -- this is pretty far afield from what you do with

8    your life, copyright and a trial?

9              JUROR:  Yes.

10             MS. BARNES:  But would you be comfortable sitting

11   here and discussing with all of the jurors what your view of

12   the evidence is once that jury room door is closed and the

13   case is turned over to all of you?

14             JUROR:  Sure.

15             MS. BARNES:  Is there anybody who doesn't feel they

16   would be willing to speak up if they had a belief about the

17   case based on the evidence and the Court's instructions as to

18   the law?  Everybody would be comfortable being a juror in this

19   case?

20             If I talk too fast, will you raise your hand and slow

21   me down?

22             THE COURT:  The court reporter will take care of

23   that.

24             MS. BARNES:  I know.  Anyway, thank you very much,

25   jurors.

1            THE COURT:  Counsel, pass for cause?

2            MR. BRAZE:  Pass for cause.

3            MR. HASSING:  Pass for cause.

4            MR. ALEXANDER:  Yes, your Honor.

5            MS. BARNES:  Yes, your Honor.

6            THE COURT:  Pass the strike sheet, please.

7            Ladies and gentlemen, let me explain what's going on

8    now from a procedural standpoint.  The law does not allow us

9    to do anything more until we do the process that's in -- that

10   we are handling right now.

11           If I didn't explain this to you, we would sit here in

12   silence and we would wonder what we are doing.  The law

13   provides -- and when I say the law, I'm talking about law as

14   it is written by Congress -- provides that each side of the

15   case has a certain number of what we call "peremptory

16   challenges."

17           That means that they can thank and excuse a potential

18   juror without giving any reason at all.  They just thank and

19   excuse you.

20           If that occurs, or when it occurs, because it's

21   obviously going to occur to some of you, just don't have your

22   brain go wild and think of all these reasons why they could

23   possibly have thought you weren't the juror they wanted.  It's

24   not worth that effort.  There could be a thousand reasons,

25   most of which are not obvious to you and you would never

1 │ figure out.  So it is not worth the effort, believe me.

2 │       If that occurs or when it occurs, what you need to do

3 │ is just simply go about your business, home, school, work,

4 │ whatever you are doing, and call the 800 number after 5:00

5 │ p.m., on Friday.

6 │       And in just a few minutes, we will know who the jury

7 │ is.  And when we do, we will swear the jury in, and then we

8 │ will have further instructions for you and we will then

9 │ proceed with evidence.

10 │       But in the meantime, we have to sit here and wait for

11 │ this process to play out because that's what the law tells us

12 │ to do.

13 │       Any questions at all?  Okay.  This will only take a

14 │ few minutes.  It is important, though, that you not take a

15 │ break because it is very normal for people to figure, as they

16 │ look at the chart and they see your name, they need sometimes

17 │ to refresh and look at your face to match it up, and that

18 │ triggers answers and responses you have given.

19 │       So this will only take a few minutes, and then we

20 │ will know who the jury is and then we can proceed.

21 │       (The strike sheet was passed.)

22 │       THE COURT:  As I call your name, you are free to go.

23 │ And remember the 1-800 number, after 5:00, on Friday.

24 │       We would like to thank and excuse Juror Number 005,

25 │ Juror 022, Number 19, Juror 019.

1          Number 1, Juror 001.  Number 20, Juror 020.  Number

2     11, Juror 011.  Number 12, Juror 012.

3          And I'm going to designate Juror 033 as Juror Number

4     1, and I would ask you to move over one seat, if you would.

5          Juror 003, if you could move over to seat number 2.

6          Juror 004, number 3.

7          Juror 006, number 4.

8          Juror 031, number five.  Actually, Juror 031, you can

9     sit there for just a second.

10          Could I ask the three of you to move down one seat in

11     the second row just one seat over, please.

12          And Juror 031, I would ask you to come down and have

13     a seat in what we consider to be seat number 5.

14          Juror 008, you are exactly where you are, seat 6.

15          Juror 009, number 7.

16          Juror 023, number 8.

17          Now, Counsel, I ask you, is there any reason we

18     should not now swear in this jury?

19          MR. HASSING:  No, your Honor.

20          MR. ALEXANDER:  No, your Honor.

21          MS. BARNES:  No, your Honor.

22          THE COURT:  Before we do, of the eight that I have

23     just acknowledged, is there anyone who can think of any

24     reason, before we swear you in, why you should not sit as a

25     juror in this case, at all?  Any reason at all?  Anyone?

1          Then I would ask you, the eight of you, to please

2     stand, raise your right hand, and be sworn as the jury.

3          (The jury was sworn and duly impaneled.)

4          THE COURT:  Thank you.  For everyone else, you can

5     figure out we have a jury in the case.  Some of you may say,

6     "Wait a minute, there are only eight.  What happened to the

7     12?"  Twelve is only in criminal cases, not in civil cases.

8          And so I thank all of the rest of you, you and

9     everyone who was not called forward, thank you for being

10    willing to be here today.  And I would ask you to call the 800

11    number after 5:00 p.m., on Friday, for any further

12    instructions they might have.

13         Thank you.

14         (The prospective jurors left the courtroom.)

15         THE COURT:  Ladies and gentlemen, it is noon.  We are

16    going to do just a few things with you before we release you

17    for lunch.

18         We are first going to show you -- Mr. Gary Green is

19    one of the lawyers in chambers with me, and he is going to be

20    coming out here in just a moment.  And first thing he will do

21    is take you back to the jury room to show you where it is.  If

22    the wall behind you were to be glass, you could look through

23    it and see the jury room.  There are restrooms back there for

24    you.  There is seating.  There is a microwave, refrigerator, a

25    couch, plus the seating around the table, so I hope you will

1    find it to be comfortable for you.

2           You will not come into the courtroom anymore directly

3    by yourselves.  You will come in as a unit.

4           Mia, you are going to show them?

5           Mia is also a lawyer in chambers and she is going to

6    show you.  I said Gary, but I think he is on a conference

7    call.

8           In any event, she will show you, and then she will

9    also show you how to get into the jury room, not just after

10   the noon hour, but in the morning, in the mornings.

11          And so you go directly in there and then when all

12   eight of you are there and it is time, we bring you out as a

13   jury now through this door, so you don't come through that

14   door anymore.

15          We will also be giving you notebooks.  If you want to

16   take notes, take notes.  You can use those notes during your

17   deliberations to key your own memory, if you wish, and they

18   are for your own memory use.  If you don't want to take notes,

19   don't.  It is totally up to you.  It is totally your decision.

20          For those of you who do take notes, be assured they

21   are for your own personal use.  They will be destroyed without

22   anyone having read those notes.  You will be the only one who

23   writes them.  You will be the only one who reads them.  And at

24   the end, as I said, they will be destroyed without anyone else

25   having read those notes.

122

1          Another thing we are going to do is we will give you

2   jury badges.  I would ask you to wear those jury badges so

3   that we can see them, so that other people can see them.

4          Sometimes a juror will hook it onto a belt loop.  And

5   it is clear you have something down there, it is just not

6   clear what.  We want people to know you are jurors, and we ask

7   you to wear those badges not only in the courtroom, not only

8   in the courthouse, but as you are leaving for a safe distance

9   and coming into the courthouse for a safe distance, because

10  people who are in this courthouse generally have courthouse

11  business.  We don't want them talking about this case or any

12  other case in your presence.

13         Now, if you suspect somebody is talking about a case,

14  then simply move away from them if you can.  You have that

15  responsibility.

16         However, if you are in, for instance, an elevator,

17  and you can't move away, you now have an obligation to say,

18  "Excuse me, I'm on a jury.  Could you just wait until I get

19  off the elevator?"  And they will accommodate you.  They are

20  not trying to influence you, they are just talking about

21  what's on their mind, and that's a normal thing.  People do

22  that all the time.

23         So also, you go to lunch with one another, you can go

24  by yourself, you can take a walk.  You can do whatever you

25  want to do, but remember you can't talk about this case, even

1  with one another, because the only time you can talk about the

2  case is when it is finally at the end, submitted to you after

3  the law has been read to you, after the evidence has been all

4  in, and then when all eight of you are in the jury room.

5  That's the only place, it is the only time you can discuss the

6  case.

7          Please don't do anything having to do with the case.

8  Get on line, look a word up in the dictionary or on line, talk

9  to somebody who doesn't have a clue that you are on jury duty.

10  That is doing things that you are not permitted to do.

11  Everything that you need to decide this case on has to come

12  from this courtroom, this courtroom, no place else.

13          So please don't do anything having to do with the

14  case during breaks, noon hour, in the evenings, period.

15          Any questions?

16          Okay.  What we are going to do -- it is going to take

17  you a few minutes -- one of them is going to do it, it will

18  take a few minutes to do the things I indicated we would be

19  doing in the jury room with you, and that shouldn't take more

20  than about five or six minutes.  That would be ten after

21  12:00.  We will take an hour and 15 minutes from now, which

22  would be 1:20.

23          I would ask you to be in the jury room, ready to go,

24  at 1:20, and at that time, we will bring you back out, and I

25  will give you some preliminary jury instructions.  That's all.

1   They are preliminary in nature.  It won't take me that long to

2   read them to you, but the law does require that I do read them

3   to you.

4          You will have a copy of these instructions in the

5   jury room if you wish them.  All you have to do is ask for

6   them and as soon as I'm done, we will move into the opening

7   statements of counsel.

8          You need to understand, finally, that opening

9   statements of counsel, is the lawyers' opportunity to tell you

10  what they believe the evidence will show, but that is not

11  evidence.  What they tell you is not evidence.  It is their

12  opportunity to tell you what they think the evidence is going

13  to show.

14         You might say, "Well, I don't understand exactly.  If

15  it is not evidence, if we can't decide the case based on what

16  they are telling us in their opening statements, why bother?"

17         There is a good reason.  Unlike television cases,

18  where in courtroom scenes, they have certain orders of

19  witnesses and they are always in perfect order on television,

20  that's not real life.  We accommodate people's schedules all

21  the time.  And so what might be the third witness on a

22  television show is the first witness here or the sixth witness

23  here.

24         And this is the law's answer to giving you a global

25  view of what the case is going to be so that you don't get

1   confused, we hope, during the case as to, "Well, wait a

2   minute.  That person said that, but where are pieces one and

3   two?"  This is the opportunity to take care of that problem.

4           Any questions at all?

5           Okay.  This is Mr. Green, and he is going to take you

6   into the jury room and accomplish the things we just

7   indicated.

8           (The jury left the courtroom.)

9           THE COURT:  Let the record reflect the jury has left.

10  Any issues?

11          MR. OKADIGBO:  Yes, your Honor.  Chaka Okadigbo.  We

12  forgot to bring an issue up earlier, and that is that

13  plaintiff's counsel indicates that they are intending to talk

14  about 1.2 million or so in damages that the plaintiff

15  suffered, so to speak.

16          It goes to our Motion in Limine 2, which the Court

17  ruled on.  And the issue there was that we were asking the

18  Court to instruct the plaintiff to limit his evidence of

19  damages to Tract 5472 maps and plans, and that only those

20  damages were relevant.

21          Counsel earlier this morning was talking about how

22  they intended to show 1.2 million in damages and how some of

23  the work Mr. McIntosh did somehow related to Tract 5472.

24          But your instruction was clear that the amount in

25  actual damages is the amount a willing buyer would pay for

1  Tract 5472 maps and plans.  And so we would ask that if they

2  want to talk about 1.2 million in damages, that the

3  understanding be that that is what their representation of

4  what 5472 maps and plans specifically cost.  Because if it's

5  not that, it's irrelevant.

6        THE COURT:  Well, the response, the Court's response

7  to that is all counsel are obligated to know what the rulings

8  on the motions in limine were and, of course, to follow them.

9        If counsel for the plaintiff wishes to say that this

10  case, the damages are worth 10 billion and defense wants to

11  say it is worth 1 cent, you do that at your own risk, whoever

12  you are.

13        Because the law is the law and the orders are the

14  orders, and there are ramifications when opening statements

15  make promises, on either side of the case, that cannot be

16  kept, because that's fair game in closing arguments.

17        We will be in recess, 1:20.

18        (The lunch recess was taken.)

19

20

21

22

23

24

25

AFTERNOON SESSION

1:20 p.m.

THE COURT:  Back on the record.  Counsel are present.
Are we ready for the jury?

MS. BARNES:  Your Honor, one matter.  I think we have
to distribute our revised exhibits, which were redone over the
weekend.  I told you about it, and I wanted to make sure
everybody has a copy.

THE COURT:  You can go ahead and do that.  I will
bring the jury in and start instructing.

MR. ALEXANDER:  Mr. Braze and Mr. Travis aren't here
yet, your Honor.

THE COURT:  We don't wait.  Sorry.

Ready for the jury.

(The following proceedings were had in the presence
of the jury, to wit:)

(Mr. Travis entered the courtroom.)

THE COURT:  The jury has joined us.  Any issues,
ladies and gentlemen?

Good.  All right.  As I indicated to you, the first
thing we are going to do is I'm going to read you some of the
jury instructions, and they are preliminary in nature.  And
then at the end of the case, after all the evidence is in, I
will read you the rest of the jury instructions.  And as I had
told you before lunch, these instructions will be available to

1    you.  All you have to do is ask for them, and we will give you

2    copies of them.

3         These instructions are preliminary instructions to

4    help you understand the principles that apply to civil trials

5    and to help you understand the evidence as you listen to it.

6    You must not infer from these instructions or from anything I

7    may say or do as indicating that I have an opinion regarding

8    the evidence or what your verdict should be.

9         It's your duty to find the facts from all the

10   evidence in the case.  To those facts you will apply the law

11   as I give it to you, and you must follow that law, whether or

12   not you agree with it.

13        You must not be influenced by any personal likes or

14   dislikes or opinions, prejudices or sympathies.  That means

15   that you must decide the case solely on the evidence before

16   you.  And, as you understand, that's part of your oath.

17        In following these instructions, you must follow all

18   of them and not single out some and ignore others because they

19   are all important.  I have already indicated to you who

20   represents which party and what this case generally is about.

21        Keep an open mind throughout the trial and do not

22   decide what the verdict should be until you and your fellow

23   jurors have completed your deliberations at the end of the

24   case.

25        Because you must decide the case only on the evidence

1   received in the case and on my instructions as to the law that

2   applies, you must not be exposed to any other information

3   about this case or to the issues involving this case during

4   the course of your jury duty.  Thus, until the end of the case

5   or until I tell you otherwise, do not communicate with anyone

6   in any way and do not let anyone else communicate with you in

7   any way about the merits of the case or anything having to do

8   with the case at all.

9           This includes discussing the case in person or in

10  writing or by phone or electronic means, e-mail, text

11  messaging or any Internet chat room, blog, web site or any

12  other features.  This applies to communicating with your

13  fellow jurors until I give you the case for deliberation and

14  applies to communicating with everyone else, including your

15  family members, your employer and the people involved in the

16  trial, although you may notify your family and your employer

17  that you have been seated as a juror in the case.

18          If you are asked or approached in any way about your

19  jury service or anything about this case, you must respond

20  that you have been ordered not to discuss the matter and

21  report the contact to me.

22          Because you will receive all the evidence and legal

23  instructions you properly may consider to return a verdict, do

24  not read or watch or listen to any news or media accounts or

25  commentary about the case or anything to did with it.

1      We never know when the press is going to be

2  interested in the case and, frankly, we don't care.  That's

3  not our function, that's not our issue.  And sometimes they

4  are interested in the case and you wonder why, and sometimes

5  they are not interested in the case, and you wonder why not.

6  All it is is wondering.

7      They are not our issue.  And so if they were to get

8  interested in the case -- and that's the only reason I bring

9  this up -- don't pay any attention to that.

10     Do not do any research consulting dictionaries,

11 consulting the Internet or consulting other reference

12 materials.  Do not make any investigation or in any other way

13 try to learn about the case on your own.

14     The law requires these instructions to ensure that

15 parties have a fair trial based on the same evidence that each

16 party has an opportunity to address.

17     A jury who violates these restrictions jeopardizes

18 the fairness of the proceedings and a mistrial could result

19 that would require the entire trial process to start over.

20     If any one of you is exposed to any outside

21 information, please notify me immediately.  From time to time

22 during the trial, it may become necessary for me to talk with

23 attorneys outside of your hearing, either by having a

24 conference at the bench over here at the sidebar, when you are

25 present in the courtroom, or by calling a recess as far as you

1    are concerned.

2           If we call the recess while you are waiting, we are

3    working.  The purpose of these conferences is not to keep

4    relevant information from you, but, rather, to decide how

5    certain evidence is to be treated under the rules of evidence

6    and to avoid confusion and error.

7           In a jury trial, you are the judges of the facts, and

8    I am the judge of the law, and we have separate functions in

9    that regard.  And that's one of the reasons, if there are

10   legal issues, that's why you are not included in the process

11   in the courtroom when we are talking about the legal issues,

12   because they are not yours to decide.

13          And it really isn't trying to hide things from you.

14   It's simply trying to follow the law as the law is written.

15          We will do what we can to keep the number and length

16   of those conferences to a minimum.  Do not consider my

17   granting or denying a request for a conference as any

18   indication of my opinion of the case or what your verdict

19   should be.

20          Each side may make an opening statement.  An opening

21   statement is not evidence.  It is simply an outline to help

22   you understand what the party expects the evidence to show.  A

23   party is not required to make an opening statement and we will

24   find out in a few minutes whether counsel are going to make

25   opening statements.

1          Then the plaintiff presents evidence because he goes

2     first because he has the burden of proof, and counsel for the

3     defendants may cross-examine or ask questions of those

4     witnesses.

5          Then the defense may present evidence and counsel for

6     plaintiff may cross-examine those witnesses.

7          After all the evidence has been presented, I will

8     instruct you on the rest of the law, as I indicated to you,

9     and then counsel have the opportunity, if they wish, to make

10    closing arguments.

11         After that, it's your turn.  You go to the jury room

12    and deliberate.

13         During your deliberations, you will have to make your

14    decisions based on what you recall of the evidence.  You will

15    not have a transcript of the trial, so I urge you to pay close

16    attention to the testimony as it comes in.

17         If at any time you cannot hear or see the testimony

18    or evidence, questions or arguments, let me know so that I can

19    correct that problem.

20         I have already indicated to you whether or not you

21    wish to take notes, it's totally up to you.

22         Evidence has a definition.  The evidence you are to

23    consider in deciding what the facts are consists of the sworn

24    testimony of any witness, the exhibits which are actually

25    received into evidence, and any facts to which the lawyers

1    have agreed.

2         If lawyers agree in this case, I will make it very

3    clear that they have agreed.  You won't have to guess whether

4    or not there was an agreement.  In reaching your verdict, you

5    may not consider things that are not evidence.  You may

6    consider only the testimony and exhibits received into

7    evidence.

8         The things that are not evidence and that you may not

9    consider in deciding what the facts are include arguments and

10   statements by lawyers.  The lawyers themselves, remember, are

11   not witnesses.  What they will say in their opening statements

12   or in their closing arguments and at any other time is

13   intended to help you interpret the evidence, but it is not

14   itself evidence.

15        If the facts as you remember them differ from the way

16   the lawyers have stated them, your memory controls.  Questions

17   and objections by lawyers are not evidence.  Attorneys have a

18   duty to their clients to object when they believe a question

19   is improper under the rules of evidence.

20        You should not be influenced by the objection or by

21   the Court's ruling on that objection.

22        Testimony that's been excluded or stricken or that

23   you have been instructed to disregard is not evidence and must

24   not be considered by you.

25        Sometimes testimony and exhibits are received only

1  for a limited purpose, so I will tell you if that occurs and I

2  will tell you what that limited purpose is, and then you can

3  only accept that evidence based on that limited reason.

4         Anything you may have seen or heard when the Court is

5  not in session is not evidence.  You must decide the case

6  solely on the evidence during the trial.

7         If I instruct you that an item of evidence has been

8  admitted for that limited purpose, you must consider it only

9  for that limited purpose.

10         Evidence can be direct or it can be circumstantial.

11  Direct evidence is direct proof of a fact, such as testimony

12  by a witness about what that witness personally saw or heard

13  or did.

14         Circumstantial evidence is proof of one or more facts

15  from which you could find another fact.  You should consider

16  both kinds of evidence.  The law makes no distinction between

17  the weight to be given either direct or circumstantial

18  evidence.  So it is for you to decide how much weight to give

19  any evidence.

20         When a party has the burden of proof on any claim or

21  affirmative defense by a preponderance of the evidence, it

22  means you must be persuaded by the defendant that the claim or

23  the affirmative defense is more probably true than not true.

24  You should base your decision on all the evidence regardless

25  of which party presented it.

1      There are rules of evidence that control what can and
2  cannot be received into evidence.  When a lawyer asks a
3  question or offers an exhibit into evidence and a lawyer on
4  the other side thinks that it is not proper or permitted by
5  the rules of evidence, that lawyer may object.

6      If I overrule the objection, the question may be
7  answered or the exhibit received.

8      If I sustain the objection, the question cannot be
9  answered and the exhibit cannot be received.  Whenever I
10  sustain an objection to a question, you must ignore that
11  question then and must not guess what the answer might have
12  been.

13      Sometimes I may order that evidence be stricken from
14  the record and that you disregard it or ignore it.  And
15  usually the way that happens is a question is asked and the
16  witness gives a quick answer; in other words, not allowing
17  time for there to be an objection, but then there is an
18  objection and I sustain the objection, saying, that's correct,
19  it is not a proper question or it is not -- doesn't comport
20  with the rules of evidence.

21      That's why I would strike the answer even if you have
22  heard it.  And if I strike the answer, that means you can't
23  use that answer for any purpose at all.

24      In deciding the facts of this case, you may decide
25  which testimony to believe and which testimony not to believe.

1    You may believe everything a witness says or part of it or

2    none of it.  Proof of a fact does not necessarily depend on

3    the number of witnesses who testify about it.

4          In considering the testimony of any witness, you may

5    take into account the opportunity and the ability of the

6    witness to see or hear or know the things testified to.  Also,

7    the witness' memory.  Also the witness' manner while

8    testifying and the witness' interest in the outcome of the

9    case and any bias or prejudice.  Whether other evidence

10   contradicted the witness' testimony, the reasonableness of the

11   witness' testimony in light of all the evidence, and any other

12   factors that bear on believability.

13         The weight of the evidence as to a fact does not

14   necessarily depend on the number of witnesses who testify

15   about that fact.

16         Now we are going to stop with the instructions and we

17   are going to start with the opening statements of counsel.

18         Do you have any questions?

19         All right.  Counsel?

20         MR. BRAZE:  Thank you, your Honor.

21         As you can see, there is a lot of paper in this

22   courtroom --

23         THE COURT:  Let me, before you start, are you going

24   to be using the monitors during your opening statement?

25         MR. BRAZE:  I don't believe so.  We may.

1          THE COURT:  You may?

2          MR. BRAZE:  Do you want to turn it on?

3          THE COURT:  That will be fine.  This will only take a

4    second.  We are going to turn the monitors on in the jury box

5    there for you.

6          MR. BRAZE:  While we are doing that, your Honor, I

7    would like to make a motion to exclude witnesses.

8          THE COURT:  Any objection?

9          MR. HASSING:  No, your Honor.

10          MR. ALEXANDER:  No objection.

11          MS. BARNES:  No objection, your Honor.

12          THE COURT:  Granted.

13          MR. BRAZE:  As I was saying, we have a lot of paper.

14    And as the Judge indicated, this is known as the opening

15    statement.  This is going to tell you where we believe the

16    evidence will take you.

17          And let me try this fancy machine here for the first

18    time.

19          MR. ALEXANDER:  The other way.

20          MR. BRAZE:  There is nothing on it.

21          MR. ALEXANDER:  Oh.

22          MR. BRAZE:  I was going to write on it.  We have to

23    figure out which end is up on the monitor.

24          Let me take you to where we think we are going to end

25    up in this case by talking to you about damages.  At the

1  conclusion of this case, we are going to ask for damages

2  against Joe Wu, the developer; that's Northern.  Against

3  DeWalt, and against the City of Wasco.

4          And so how much will that be?  We believe that we can

5  show that Joe Wu will make a profit from Rose Valley

6  Subdivision on the order of $3.6 million.  And that would be

7  the infringer's profits we would be asking you to award at

8  that time.

9          We also believe that the value of Mr. McIntosh's work

10  was $1.2 million, and we will be asking for that recovery.

11          The City of Wasco is supposed to receive $529,000 in

12  impact fees as a result of this subdivision.  And, of course,

13  their tax base is increased and they will receive increased

14  taxes from that.

15          And so you are going to hear terms like "vicarious

16  infringement," "contributory infringement," and we don't need

17  to talk about those right now, but with respect to some of

18  these defendants, we just want the recovery of the value of

19  Mr. McIntosh's work.  And with respect to some of them, such

20  as Northern, we would want the 3.6, plus the 1.2.  3.6,

21  representing infringer's profits, and 1.2 representing the

22  value of the work.

23          As to Wasco, we would ask for the 529, and depending

24  whether they are contributorily or vicariously infringing,

25  also the 1.2.  And it isn't double recovery situation.  The

1    Judge will take care of all of that post trial.

2          How do we get there?  This story started a long time

3    ago, probably about almost 20 years ago.  In the early 1990's,

4    an organization called The Legacy Group wanted to develop this

5    subdivision in Wasco.  And they approached the then firm of

6    Martin-McIntosh -- Mr. McIntosh was the "McIntosh" in

7    Martin-McIntosh -- and asked them to develop tentative maps

8    and improvement plans for the development of the subdivision.

9          And what you see here on the table are the maps and

10   improvement plans, and there are also some studies that had to

11   be done before the tentative maps could be made.  And we will

12   show you all of those and Mr. McIntosh will tell you how much

13   effort it took to do all that work.  And he will tell you, he

14   will testify that the amount of his work was about $1.2

15   million to get that to that phase.

16         Well, the work was done and the problem, of course,

17   was that Legacy ran out of money.  So the property is not

18   developed.  They got the roads and the streets and

19   improvements, the sewers, the water, the gutters, everything

20   in, but couldn't build houses.  Didn't have a final map, and

21   you can't build houses until you have a final map, so the

22   project expired, it sat dormant.

23         Well, over the years, property prices started to come

24   up again, and Wasco realized that it was going to be

25   profitable for them to have this subdivision developed.  So

1    they basically put out a bid to developers and said, "Look at

2    this.  We have this piece of land with a subdivision.  The

3    improvements are already in, already waiting for you.  Why

4    don't you come on in and develop it?"

5            And so the City of Wasco and Mr. Wu ultimately

6    entered into a contract where they sold Mr. Wu, it was about a

7    hundred acres, which contained the Rose Valley Subdivision,

8    which, I believe, is 35 acres, we will figure that out later,

9    and Mr. Wu paid to the City of Wasco the sum of $1.6 million

10   for that subdivision.

11           We took Mr. Wu's deposition.  And, most likely, he

12   will say the same thing when he is on the witness stand today

13   because he already told us under penalty of perjury what his

14   testimony would be.  His testimony was that he was going to

15   clean up, make a lot of money.

16           And so he went to Mr. McIntosh and asked him whether

17   he could use his maps and plans.  And, unfortunately,

18   Mr. McIntosh told him it would cost a lot of money for that.

19   And so Mr. Wu went somewhere else, and where he went was to

20   DeWalt Engineering.

21           Now, prior to that, Mr. McIntosh had copyrighted the

22   maps and plans and had a certificate of copyright.

23           MR. ALEXANDER:  Excuse me, Mr. Braze, can you tell us

24   what we are looking at?

25           MR. BRAZE:  I'm sorry, it's the tentative map of

141

1   5472.

2           MR. ALEXANDER:  The exhibit number?

3           MR. BRAZE:  What's the exhibit number?  This is a

4   blowup of the exhibit.

5           MR. ALEXANDER:  I didn't want to bother you.

6           MS. BARNES:  I wonder if you could turn it around

7   briefly so we could look at it.  No, the other side.

8           MR. BRAZE:  J 25.

9           MS. BARNES:  Thank you.

10          MR. BRAZE:  Let me back up a little bit to some of

11  this.  The minutia you are going to hear is Martin-McIntosh

12  became Mr. McIntosh doing business as a sole proprietor.

13  There was an assignment of the assets of Martin-McIntosh to

14  Mr. McIntosh.

15          And when he found out that DeWalt Engineering was

16  using his plans and maps, he had the maps and plans

17  copyrighted.  The copyright basically is your copyright

18  attaches when you complete the work.  You don't have to

19  register it right away.  It doesn't matter when you register

20  it.  The only difference has to do with some technicalities,

21  not the subject of this trial.  But he copyrighted those plans

22  and maps after he found out that City of Wasco and DeWalt were

23  using them.

24          Tentative 6451.  That's J --

25          MR. ALEXANDER:  134.

1         MR. BRAZE:  -- 134.  The numbers with the J's means

2    we have all agreed that they will be exhibits.

3         So DeWalt came up with Tentative Map Number 6451.

4    This Tract 5472 had expired.  Under the Subdivision Map Act,

5    if you don't get the tract map in the final form before a

6    certain date, it expires.  So they had to do a new tract map.

7         Now, so Mr. Wu went to DeWalt and said, "We want you

8    to do this work for us and we have a copy of the contract."

9         Now, DeWalt's theory is they went out to the Valley

10   Rose Subdivision and surveyed what was on the ground because

11   the streets were in, sewer and water was in.  Lots were in,

12   boundaries were in.  And they contend that that's an

13   independent creation, and that is a defense to a copyright.

14        However, it is our position, and you will have to

15   decide it, but they copy, they copy, they copied what was on

16   the ground.  They -- what was put on the ground came from our

17   tract map and improvement plans.  So by copying it, they were

18   basically committing the act of infringement in order to make

19   the new tentative tract map.

20        But I think you are going to see it isn't even that

21   subtle.  We are going to show that there was direct copying of

22   the tentative map and improvement plans in order to make that

23   tentative tract map and the final tract map.  That we don't

24   think that there is going to be much of a dispute about that.

25   This is --

1          MR. TRAVIS:  J 126, 127.

2          MR. BRAZE:  The final tract map for Tract 6451.

3          And so, in essence, there is the story.

4          But the big kicker is that no one bothered to prepare

5    improvement plans for Tract 6451 because they are directly

6    using the improvement plans that Mr. McIntosh prepared for

7    5472.

8          So that, in a nutshell, is what this story is about.

9    They copied the tract map.  They copied the final map.  They

10   copied the final map from the improvement plans, they copied

11   the tract maps.  They are using his improvement plans without

12   authorization, in violation of the Subdivision Map Act.

13         And each tract is supposed to have its own

14   improvement plans.  Tract 6451 does not.  It's using the

15   improvement plans from 5472.

16         It's so bad that the City has not yet accepted the

17   improvements, but they are allowing people to live in the

18   houses.  Not supposed to allow people to move in houses until

19   you know who maintains the streets.  But they haven't accepted

20   the improvement plans, because why?  They accept the

21   improvement plans, they become public domain and they are

22   committing copyright infringement again because they didn't

23   bother to get improvement plans drawn for 6451.

24         That's basically our case in a nutshell.  There is

25   more detail that you will hear about as we go along.

1              I thank you for your time.  And we will talk to you

2     in the end at the close of the evidence.

3              MR. HASSING:  Good afternoon, ladies and gentlemen.

4     Again, I represent Northern California Universal Enterprises

5     Company and Lotus Developments, both companies owned by Joe

6     Wu.

7              I want to tell you a little bit about Joe Wu.  He is

8     the gentleman sitting over here in the blue jacket and the

9     white shirt.  He is 61 years old.  He was born in Taiwan.  He

10    came here when he was 20 years old.  He was a college graduate

11    when he came here.  And upon arriving, he obtained his

12    Master's in Engineering at a university in Tennessee.  He is

13    married.  Has one son in medical school.  His wife works with

14    him in the development business.

15             Mr. Wu has been a residential developer in the

16    Central Valley of California for close to 30 years, 25, 30

17    years.  He builds subdivisions up and down the valley.

18             And in 19 -- excuse me, in 2004, a real estate agent

19    came to Mr. Wu and said there is a piece of land in Wasco that

20    would accommodate 68 houses.  It's got the streets in, the

21    sewer, the water, the power, sidewalks, curbs, gutters, street

22    signs.  Street lights, everything is in, and it's just been

23    sitting there for about ten years.

24             Mr. Wu was told that the City of Wasco owned the

25    property and that they had obtained it at a tax foreclosure

1   sale.

2          So Mr. Wu was interested.  He came out and he looked

3   at the land.  He saw that the streets were in.  He found out

4   that there were 68 curbs cut, 68 driveways, 68 sewer pop-ups,

5   stub-ups, 68 water meters.  So he entered into an agreement to

6   buy the property from the City.

7          Before buying the property, the City told Mr. Wu,

8   "Look, there was a tentative map on this property, and that's

9   why all the improvements are here.  But that tentative map

10  expired sometime ago and you are going to have to have a new

11  tentative map drawn."

12         There is tentative maps and final maps.  A developer

13  does a tentative map first, shows the City the outline of the

14  lots and the boundaries and has to show what's on the

15  property.  And that goes through a hearing process.  And if

16  certain requirements are satisfied, then that tentative map is

17  approved and then you move on to the final map stage, the

18  final map having a little bit more detail.  And once that's

19  approved, you can start selling houses on those individual

20  lots.  It creates individual legal lots out of a larger

21  parcel.

22         So Mr. Wu was told, "You are going to have to get a

23  new tentative map.  The old one expired.  Plus you have all

24  the improvements in the ground and they have to be shown on

25  the new tentative map."

1      So he did the logical thing.  He found out who had

2  drawn the tentative map the first time.  He found out it was

3  Mr. McIntosh.  So he contacted Mr. McIntosh.

4      And you are -- I hope you pay particular attention to

5  this, because Mr. Braze just told you that Mr. Wu asked to use

6  McIntosh's plans.  And you are going to find out from

7  Mr. McIntosh on the witness stand that Mr. Wu didn't do that.

8  What Mr. Wu did is he called Mr. McIntosh and said, "What

9  would it take to do a tentative map and a final map for this

10  project?"

11      Mr. McIntosh said, "Well, you know I'm owed a lot of

12  money from the old developer.  And I would be happy to do the

13  new tentative map for you and I would be happy to do a final

14  map for you, but I want you to pay me the money owed by the

15  old developer."  And it was a lot of money.

16      Mr. McIntosh never gave Mr. Wu a price for doing a

17  tentative map or a final map and the conversation ended.  It

18  was about a five-minute conversation.

19      The other thing that we heard this morning or this

20  afternoon was that Mr. McIntosh told Mr. Wu that "My plans and

21  my map are copyrighted."

22      Now, Mr. McIntosh will get on the witness stand and

23  he will tell you under oath he didn't mention the word

24  "copyright."  He didn't tell Mr. Wu, "I have got a copyright

25  on this map."  He didn't tell him, "I've got a copyright on

1    the plans."  In fact, they didn't even talk about the

2    improvement plans.

3           Mr. Wu will tell you that he bought the property

4    because the improvements were already in.  They were in the

5    ground.  He didn't need improvement plans.  He wasn't going to

6    draw any improvement plans.  He wasn't going to pay anybody to

7    draw improvement plans.  He just needed a tentative map and a

8    final map.

9           Well, when he didn't get a price from Mr. McIntosh,

10   he contacted DeWalt Engineering, and he told DeWalt

11   Engineering that there was a piece of land he was buying, told

12   them all about it, said he needed a tentative map and a final

13   map.  They entered into a contract for 26 or $27,000.

14          Mr. Wu would just as soon have entered into that

15   contract with Mr. McIntosh.  But you will see that contract

16   and you will see that there is no provision in that contract

17   for the preparation of any improvement plans.

18          And you will hear from the City witnesses, who will

19   tell you that they didn't require improvement plans because

20   the improvements were already in.  Why would you require

21   improvement plans?

22          What DeWalt did, they went out and resurveyed

23   everything that was out there because they had to show on

24   their tentative map where all of these improvements were, they

25   had to show everything on the property.  I'm not going to get

1   into too much what DeWalt did because DeWalt's attorney will

2   tell you about that.

3         But Mr. McIntosh, when he didn't get a call back from

4   Mr. Wu, he became suspicious that Mr. Wu was going to hire

5   another engineer.  So he started getting the City's agenda

6   mail to him so he could follow the progress of the

7   subdivision.  This was in 2004.

8         As the process moved forward, Mr. Wu spent money on

9   engineering.  He paid just under a million dollars for

10  building permits.  He paid about a million and a quarter for

11  construction costs.  He also paid a million-six for the land

12  because that came after his conversation with Mr. McIntosh.

13  He built -- well, he has built now 30 houses, but at the time,

14  he probably had ten or 12 houses built.

15        And the first thing he ever heard about a copyright

16  or infringement of a copyright was when he got served with a

17  lawsuit in this case.  He didn't know anything about a

18  copyright.  Had never been accused of infringing on a

19  copyright.  He got sued about two years ago.

20        The evidence will be very clear that neither Mr. Wu

21  nor anybody in his company copied anything.  They are not

22  engineers.  They are builders.  They bought a piece of land.

23  They hired an engineer to get a map approved.  He got it

24  approved.  They built houses.  Mr. Wu built houses.  Didn't

25  copy anything, and there will be no question about that.

149

1        As far as profit goes, I'm sure you all know what's

2   happened in the market.  This project started in 2004, when

3   things were selling like hot cakes.  Mr. Wu will tell you that

4   he has built 30 homes.  He has only been able to sell 19 of

5   them.  He has got 11 of them sitting there that he can't sell.

6   He is not going to build any more homes.

7        He will show you the figures that it cost him, the

8   expenses that it cost him to build those houses, and he will

9   show you that he lost money.  He has lost money on that

10  subdivision.  All right?

11       I think what I will do now is I'm going to turn over

12  to the other attorneys and let them tell you about their

13  clients.  Thank you very much.

14       THE COURT:  All right.  Counsel?

15       MR. OKADIGBO:  Hello.  Once again, my name is Chaka.

16  I represent the City of Wasco.  Susan Barnes, behind me, also

17  represents the City of Wasco.

18       It's interesting that the plaintiffs started talking

19  about damages before they talked about the evidence of copying

20  and infringement.  You can't get to damages, however, unless

21  you have a finding as to whether or not the City or any other

22  defendants actually copied or committed infringement.

23       The key thing to understand in this case is that

24  there were two phases of development.  In the first phase, as

25  Mr. Braze and Mr. Hassing discussed, improvements were put in,

1   into the ground in the subdivision.

2          It's important to understand the extent of that work.

3   Improvements are streets, curbs, sidewalks, gutters, water

4   meter boxes, utility conduits, driveway approaches.  All of

5   these things were in the ground during the first phase of

6   developing this subdivision.  That had nothing to do with the

7   current defendant, DeWalt, and the current defendant,

8   Northern, or Mr. Wu.  These things were already in the ground.

9          Improvement plans relates to those things that were

10   already in the ground.  That's an important fact to

11   understand.

12          The prior developer ran out of funds, and the City

13   subsequently purchased the subdivision.  The City then began

14   to advertise the subdivision to potential developers.  The

15   City wanted to sell the subdivision.  The City developed a

16   marketing brochure.  The marketing brochure simply described

17   what was on the property and communicated information that any

18   prospective purchaser of the land would want to know.  That

19   the improvements were in.  It had other information relating

20   to the City of Wasco and its populous and what type of

21   community it is and that sort of thing.

22          There is language in the brochure that indicates that

23   the City hoped that the potential purchaser would develop the

24   property, that the design of the property would change.  But

25   at that time, the City was not insisting that a purchaser of

1   the property do any particular thing one way or the other in

2   terms of designing the subdivision.

3        Put differently, the City's goal at that time was

4   simply to sell the property.  You will hear testimony from

5   several City witnesses that the City's hopes was actually that

6   a purchaser would build more upscale homes on that

7   subdivision, but the City was not going to require any

8   particular design or development.  It just wanted to sell the

9   property, but it did discuss these things with Mr. Wu at that

10  time.

11       The City sold the property to Mr. Wu as is.  The

12  contract documents between the City and Mr. Wu state that

13  Mr. Wu was buying the property as is, and not based on any

14  representation by the City as to what he could or could not

15  do --

16       I'm sorry, let me recap.

17       The contract documents state that he was buying the

18  property as is and that it was up to him or his company to get

19  new subdivision maps.

20       After the City sold the property, the City's role was

21  simply to process the tentative maps and improvement plans as

22  required by law.

23       The City does not have a choice to refuse processing

24  any plan or application for development.  The process is the

25  City sold the property, and after that, the City stayed out of

152

1   the defendants' particular designs on the property.  They

2   could either develop it or not.  The City was not going to

3   tell them one way or other.

4           The evidence will also show that the City did not get

5   into the business of how to design the subdivision.  It simply

6   received applications for developments and processed them

7   accordingly, telling them what would or would not satisfy its

8   municipal code, and pretty much, leaving it at that.

9           The City sold the property for $1.6 million.  None of

10  the monies -- the City didn't retain any of the money.  The

11  money actually went to paying off debts that the City had

12  during the prior phase of constructing the subdivision.  The

13  City paid for the improvements in the subdivision and the

14  monies went towards paying off those debts.

15          The next thing is the City, after selling the

16  subdivision, the City gets sued for assisting or contributing

17  to alleged copyright infringement.

18          The truth is that the improvements in the subdivision

19  were constructed.  The City told Northern that they did not

20  need improvement plans and the reason is because the

21  improvements were already in the ground.  You don't need the

22  plans if the improvements are in there.  And in the City's

23  municipal code, it even has a provision that says the

24  improvement plans are to be submitted only if necessary.  In

25  this case, it was not necessary.  No plans were submitted

1    and, therefore, no infringement with relation to the plans.

2            The City didn't get involved in telling Northern how

3    to design the subdivision.  And on top of that, the maps at

4    issue are not similar.  Once you take into consideration the

5    prior construction of the improvements and you compare the

6    maps, it will be evident that any similarities between them

7    are due to the construction of the improvements that were

8    already in the ground.

9            You will notice many differences between the two

10   maps.  And there will be testimony towards that that will show

11   that DeWalt's did their own independent survey.  Mr. Alexander

12   will speak more to that.

13           Mr. Braze talked about the City not accepting

14   improvement plans.  The facts will show the City did actually

15   accept the improvement plans.  What the City has not done is

16   accept the improvements.  There is two big differences.

17           Ultimately, however, it is a fact, or we will prove

18   that the improvements were constructed during the first phase.

19   There was nothing else to be done with the improvements.  The

20   plans, therefore, were not necessary.  So even if we get into

21   issues of did the law require acceptance of the improvements

22   and was that a violation of the law, that issue will not

23   relate to copyright infringement.  Thank you.

24           THE COURT:  Counsel?

25           MR. ALEXANDER:  Good afternoon, ladies and gentlemen.

154

1   Again, my name is Bill Alexander.  I represent Jeff Gutierrez.

2   I know I misspoke earlier and I said Jeff DeWalt of DeWalt

3   Engineering.

4           The plaintiff, of course, is Mr. McIntosh, seated

5   here with his attorneys.  The City of Wasco is seated here, as

6   well, with their counsel, and Mr. Wu's company are present

7   through Mr. Wu and his attorney as well, Mr. Hassing.

8           The evidence is going to show you that back in 1992

9   to 1994 time period, is when Mr. McIntosh's former company,

10  Martin-McIntosh, performed all this work.  Nearly 20 years

11  ago.

12          The evidence is going to show that DeWalt was simply

13  a surveyor and that this was a surveying job, and that DeWalt

14  had no interest in the project whatsoever, no interest in the

15  profits, no interest in any sort of additional money.  All it

16  was hired to do was to go out and perform a complete survey.

17          At the time Mr. McIntosh performed his work for

18  Martin-McIntosh, this was a raw piece of land.  The evidence

19  will show you that the tract involved is 33 and a half acres,

20  plus or minus, but that the work on which Mr. McIntosh

21  performed his services, the property, was 480 acres large.  So

22  this was a small fraction of a larger parcel.

23          The evidence is going to show you that at the time

24  Mr. McIntosh did the work on this raw land, it was a

25  completely different set of circumstances than when DeWalt

1    became involved.

2        Because at that time DeWalt became involved, all of

3    these improvements -- and these are the things you see when

4    you drive into a neighborhood -- were all there.  So it was

5    not a raw piece of land.  It was a completed development.

6        In fact, in addition to what you heard before -- and

7    I may repeat a couple and if I do, forgive me -- there were

8    planters installed.  Median islands, and those are the things

9    in the middle of roadways.  There were block walls installed.

10   Cart paths, because it was adjacent to a golf course.  There

11   were the drive approaches, 68 of them.

12       And you will learn later on, when the evidence comes

13   out, the reason the lots were the way they were is because the

14   drive approaches were side by side, as in any neighborhood,

15   and, therefore, the lots had to be divided between the drive

16   approaches.  That will be explained more by Mr. Gutierrez when

17   he testifies.

18       Utility boxes were installed.  These are the things

19   you will see on street corners or in the neighborhood where

20   the power units were stored.  Sidewalks were installed.

21   Streets were completed.  The sewers were in.  The water lines

22   were in.  All the electrical was installed.  This was a

23   completed development at the time DeWalt was hired.

24       Now, in July of 2004 is when DeWalt was contacted,

25   and in response to the contact from Mr. Wu or his company,

156

1   prepared a proposal.  And here is what they agreed to do and

2   the contract will say this specifically.  DeWalt agreed to do

3   a topographic, which is, essentially, a view of the land

4   survey, as well as a boundary survey.  That portion of the job

5   was estimated to be $7500.

6           They were hired to do a tentative map for $5500.  A

7   final map, also for $5500, and a lot corner survey for $7500,

8   for a total of roughly $26,000.

9           The evidence is going to show that DeWalt did exactly

10   that.  They completely performed their work.  They performed

11   their work independent of anything that Mr. McIntosh did.

12           There is a contract that we will show you during the

13   trial which has all of that information in it and, rather

14   clear, and you will have an easy time understanding it.

15           It is important for you to know that the evidence is

16   going to show you that in order to do a topographic survey,

17   you have to send the surveyors to the field.  You can't simply

18   look at maps or take a picture and do the survey.  You

19   actually have to send people to the field.

20           And in this case, the survey staff, Director Paul

21   Chavez and the survey tech, Don Osborne (phonetic), were the

22   people that went to the field.  You will see J 129, keep that

23   in mind, J 129, that's going to show you all of the survey

24   shots that were taken.

25           And what that means is that when you are out

157

1    conducting a survey -- and they will explain it way better

2    than I could ever do it -- you have to go to different points

3    on the property and take a shot.  And what it is, it is a

4    computer reading that goes into a hand-held instrument that

5    stores the data, and it is later used to be put into a

6    computer program to tell you where everything is.

7             So unlike when Mr. McIntosh did the project, when it

8    was raw land and there was nothing there to obstruct a survey,

9    DeWalt had to perform a survey with all the improvements

10   completed, in place.  Therefore, the survey did things that

11   Mr. McIntosh didn't have to do, such as shooting a corner curb

12   and gutter, shooting block walls, shooting streets, measuring

13   the ups and downs of the development.  It required a lot more

14   work.

15            And in fact, the evidence is going to show that not

16   only did DeWalt get paid only the 26 or $27,000, but DeWalt

17   actually lost money on the job because Jeff Gutierrez

18   underestimated the amount of time it would take, because this

19   was a fixed bid project.

20            Now, the evidence is going to show that it took

21   roughly 85 man-hours of time on the survey crew to perform the

22   survey, which was done through GPS.  That GPS equipment,

23   again, is a hand-held, and it transmits data into a program

24   called AutoCAD.  AutoCAD is a software program which allows

25   this surveying in the field to be transferred to a computer so

1   maps can be designed and prepared.

2          Now, as you will see and the evidence will show,

3   there were approximately 420 survey points that were located

4   and another 40 boundary monuments that were either searched or

5   located.

6          After all this information was gathered, it was put

7   into the computers and maps were drawn.  And in October of

8   2004, all of this data resulted in the preparation of a map

9   that had all of the survey heights, location, boundaries,

10  streets, gutters, all of these things were located, and it was

11  developed into a map.

12         And the people who prepared that map were Greg Black

13  and Brandon Thompson and Sara Burgi, and you will hear from

14  this trial from both Sara Burgi and Greg Black.  The tentative

15  map was then submitted to the City of Wasco for review.

16         Originally a vesting tentative was wanted.  And that

17  gives the developer more rights than a tentative, but after

18  the City of Wasco responded and said that "Your map is

19  inadequate, there are some errors.  You need to do these

20  things to make it happen."  The developer changed and went to

21  a typical tentative map.

22         In December of 2004, the City believed that the

23  tentative map still needed work to be done, sent it back.  And

24  after that point in time, Mr. Wu said, "Drop the vesting

25  tentative and go with a regular tentative."

1          In June of 2005, the evidence will show that Robert

2     Balow and Joe Stormont, who was supervised by Greg Black,

3     finally drafted the final map.  And the final map is largely a

4     map that has updates to the tentative map, and there is also

5     creation of a final map title page.  And in March of 2007, the

6     Final Map 6451 was in fact filed with the Kern County

7     Recorder's Office at that time.

8          Now, one thing also that DeWalt did was it went out

9     to each of the 68 residential lots, and it went out to all of

10    them and they installed new corner markers for their property

11    lines.  So that way, if you are buying a lot, you can now see

12    something on the ground that tells you exactly where your

13    property line is.

14         Now, that may seem like it is somewhat easy to do,

15    but remember, this is a completely developed subdivision.  So

16    in order to install a corner marker where there is a curb and

17    gutter, DeWalt had to go out and drill a hole in the ground,

18    insert epoxy into the hole and then put their little brass or

19    metal corner marker on top of it and nail it into the epoxy.

20    So DeWalt also did that in relation to the subdivision.

21         You will also learn that each one of those corner

22    markers has a designation, which is LS 7595, which is

23    essentially, Jeff Gutierrez's licensed surveyor number.

24         Now, the evidence is going to show that Jeff's

25    company, DeWalt, did everything they contracted to do.  They

160

1    in fact did more work than they wanted to do because they lost

2    money.

3              Tentative Tract Number 5472, which was

4    Mr. McIntosh's, did not require the time or effort required of

5    this because of those improvements.

6              The evidence will be undisputed that DeWalt never

7    copied Tract 5472, DeWalt never copied the improvement plans

8    whatsoever.  That evidence will be undisputed.

9              In this case, let me conclude by stating that the

10   evidence is going to show that McIntosh cannot prove that

11   DeWalt did anything wrong or DeWalt did not independently

12   create its Map 6451.  They can't.

13             The evidence is going to be that DeWalt independently

14   created it, did all of its own work, and that nothing in Map

15   Number 5472 created by Mr. McIntosh reduced the amount of

16   DeWalt's work, lessened the amount of DeWalt's work, increased

17   DeWalt's income on the job.  It did nothing.  That's what the

18   evidence is going to show.

19             Ultimately, you are going to be instructed by his

20   Honor as to what the law says.  But if even, even if McIntosh

21   were able to establish that the maps were substantially

22   similar, this is a decision for you to make, even if they are,

23   the evidence will prove that because DeWalt independently

24   created Map 6451, Mr. McIntosh is entitled to nothing.

25             And that's what we would expect you to do, is to

1    bring back a verdict in favor of DeWalt and to conclude that

2    even if -- that -- excuse me, that 6451 is not substantially

3    similar, but even if it is, because it was independently

4    created, McIntosh is entitled to nothing.

5              Thank you very much.

6              THE COURT:  All right.  We are ready for the first

7    witness, please.

8              MR. BRAZE:  Yes, your Honor.  We would call Roger

9    McIntosh.

10             THE COURT:  All right.

11                          **ROGER MCINTOSH**,

12   called as a witness on behalf of the Plaintiff, having been

13   first duly sworn, testified as follows:

14             THE COURT:  Please take the witness stand right here,

15   and, once you do, please tell us who you are.

16             THE WITNESS:  My name is Roger McIntosh.

17                          DIRECT EXAMINATION

18   BY MR. BRAZE:

19   Q.  Good afternoon, Mr. McIntosh.  You are the plaintiff in

20   this case, are you not?

21   A.  Yes, I am.

22   Q.  And can you give us a brief summary of your educational

23   background after high school?

24   A.  I have an Associate's degree in Construction Technology

25   from Iowa State University.

1   Q.   And have you become registered in the State of California?

2   A.   I'm a Registered Civil Engineer in the State of California

3   and Arizona and a Licensed Surveyor in both states as well.

4   Q.   And when did you become licensed in the State of

5   California?

6   A.   Licensed Surveyor in 1976, and a registered engineer in

7   1981.

8   Q.   And in the 1980's were you working with an individual by

9   the name of Martin?

10  A.   Yes.

11  Q.   Did you form a firm, a company or partnership?

12  A.   We formed a partnership of Martin-McIntosh in June of

13  1980.

14  Q.   For what period of time was that business then in

15  operation under that name?

16  A.   We operated as a partnership until 1999, and I took it

17  over as a sole proprietor and maintained the name until I

18  changed it to McIntosh & Associates.

19  Q.   Is one of the things that Martin-McIntosh did is develop

20  tracts, subdivisions, that type of thing?

21  A.   We performed engineering and surveying for residential

22  subdivisions and other projects.

23  Q.   Okay.

24       MR. TRAVIS:  J 18.  I'm sorry.

25       TRIAL ASSISTANT:  J 128.

163

1          MR. TRAVIS:  That's it.  The enlargement is 131.

2          MR. BRAZE:  J 128.

3          MR. ALEXANDER:  Thank you.

4          MR. BRAZE:  Do we have an easel around?

5          THE CLERK:  It's in the back.

6          THE COURT:  I think we do.  We will get it.

7          MR. BRAZE:  Maybe I can borrow this chair for a

8    moment.

9          THE COURT:  Sure.

10   BY MR. BRAZE:

11   Q.  I want to talk to you for a moment about the work that

12   goes into coming up with one of these tentative maps.  And

13   counsel was correct in that when you started out, this was

14   just bare land, right?

15   A.  That's correct.  It was a vacant piece of property.

16   Q.  And so what do you have to do to get to this tentative

17   map?

18   A.  To get to that tentative map, we were under contract with

19   The Legacy Group to perform general plan amendments, zone

20   changes, master studies, to develop a much larger piece of

21   property, but all of that work had to go into the larger piece

22   of property before we could get to the first tentative tract.

23   Q.  And are these papers here, which I believe we have

24   identified as P 108, and all the drawings and maps that are

25   contained in P 108, are those documents that you had to

MCINTOSH

164

1   prepare in order to get to the tentative map?

2   A.   I haven't seen what's in those tubes.

3   Q.   Let me put the exhibits in front of you.

4        Well, let's come back.  We will look for P 108 and

5   see if we can find it.

6        Let me show you what's been marked as J 24, and

7   again, "J" indicates it is a Joint Exhibit.

8        MR. ALEXANDER:  24 or 124?

9        MR. BRAZE:  24.

10       MR. ALEXANDER:  Thank you.

11  BY MR. BRAZE:

12  Q.   Is that your contract with Legacy Group to develop the

13  Valley Rose Subdivision?

14  A.   This is -- this is our contract with Michael Brown, who

15  was acting as The Legacy Group, yes.

16  Q.   And when did you enter into that contract?

17  A.   That was entered into on March 26, 1992.

18  Q.   Let me show you what's been marked as P 108.  It's

19  Plaintiff's Exhibit 108.  Are all those the drawings and

20  improvement plans that you prepared in order to prepare the

21  tract map, the tentative map?

22  A.   These are documents that we prepared leading up to the

23  preparation of that tentative map, yes.

24  Q.   And are those the documents, along with the tentative map

25  that you -- tentative tract map, that you also copyrighted?

1    A.   These are the documents that have been copyrighted, yes.

2               MR. BRAZE:  I would move to admit Exhibit P 108, your

3    Honor.

4               MR. HASSING:  Your Honor, I object, and I move to

5    strike based on lack of foundation.

6               THE COURT:  You move -- that request is denied.

7               What is your legal objection on his moving Exhibit P

8    108 into evidence?

9               MR. HASSING:  My legal objection is it lacks

10   foundation.

11              THE COURT:  As I understand it, the foundation is

12   that he prepared these maps.  What is the foundation that you

13   are focusing in on?

14              MR. HASSING:  I'm focusing in on the fact that

15   Mr. McIntosh did not send any of this information off to the

16   Copyright Office.  It was done through an attorney in San

17   Francisco.  And he testified at his deposition that he doesn't

18   know what was copyrighted.  Page 42 of his deposition.  So he

19   doesn't have the foundation to testify as to what was

20   copyrighted.

21              THE COURT:  Well, is your objection foundation or is

22   it relevance?

23              MR. HASSING:  It's foundation.  It's foundation.  He

24   doesn't know what was copyrighted.

25              THE COURT:  And you are offering this for what

166

1   purpose?

2          MR. BRAZE:  These are the documents he gave to the

3   attorney to be copyrighted.

4          THE COURT:  I think that the problem here is there is

5   a -- an absence of linking the documents that he has got here

6   that he may well have given to his attorney versus what the

7   attorney did to them, which is why the real objection is

8   relevance.

9          MR. BRAZE:  We will bring the attorney in tomorrow to

10  do that, but I just wanted to use one in particular, the

11  documents in his group, if I could.  But if the Court would

12  rather defer.

13         THE COURT:  Well, it depends on why you want to use

14  it.  If you are wanting to use that document for the purposes

15  of somehow assuming at the time you use the document that it

16  was a document that the attorney copyrighted, then you could

17  try to do that, and we will see if there is an objection.

18         Otherwise, if there is an objection, it will be

19  sustained until that foundation for relevancy has been

20  established.

21         MR. BRAZE:  Yes, sir.  What we would really like to

22  use is document number 489 out of P 108.

23         THE COURT:  Is that a Bates number?

24         MR. BRAZE:  Yes.

25         THE COURT:  Okay.

1          MR. BRAZE:  Excuse me, 436.

2          MR. ALEXANDER:  What's the number?

3          THE COURT:  436.

4          MR. BRAZE:  436 of P 108.

5          MR. ALEXANDER:  Thank you.

6          THE WITNESS:  I'm sorry.  They start at 464 and go

7    to -- well, they are all mixed up.

8          MR. HASSING:  They are out of order.

9          THE WITNESS:  I will have to find it.  Excuse me.

10   What are you looking for?

11         MR. BRAZE:  Grading plan.

12         THE WITNESS:  They are not all numbered, so I will

13   have to find it.

14         (Pause for the witness to locate the exhibit.)

15   BY MR. BRAZE:

16   Q.  Let me let someone else look for that and we will move on

17   with your testimony.

18         Let me direct your attention to what has been

19   introduced into evidence as J 2.  And could you identify that

20   for the jury, please.

21   A.  That is a Staff Report prepared for Tentative Tract 5472

22   and put together by the City of Wasco.

23   Q.  On page 3 of that report, at paragraph 15, did the City of

24   Wasco select the street names to be used in the Tract 5472?

25   A.  Number 15 says, "Full street improvements shall be made to

MCINTOSH

168

1    Augusta Way, Pebble Beach Way, Sawgrass Court, St. Andrews

2    Lane and St. Augustine Way."

3        Those were the streets that were shown on the

4    Tentative Tract 5472.

5    Q.   Did you select where those street names went?

6    A.   Yes.

7    Q.   So in addition to this tentative map, you prepared what we

8    saw as Exhibit 108, what would you describe those as, the

9    improvement plans?

10   A.   Yes.  Page 2 of the Staff Report states that "Final

11   Subdivision Map must be in accordance with City ordinances and

12   the Subdivision Map Act."

13       And number 6 on page 2, "All required construction

14   shall be detailed on plans prepared by a Licensed Civil

15   Engineer and shall conform to City of Wasco's standards and

16   shall be subject to review and approval by the City Engineer."

17   Q.   I think we finally found it in Exhibit P 108.  It bears

18   the Bates number of 436.  What is that document, sir?

19   A.   That document is the grading plan for Tentative Tract

20   5472.  It is -- has my logo on it, Martin-McIntosh.

21   Q.   And did you prepare that document in order to prepare a

22   Tentative Tract 5472?

23   A.   This grading plan was prepared after the tentative tract

24   was approved by the City, by the Staff Report.  After the

25   tentative map is prepared, we go into the improvement plans,

1    grading plans, street plans, water, sewer, et cetera, that the

2    improvements actually get built on.

3    Q.   And if we look at tentative map, J 25, do you have those

4    in front of you?

5    A.   I believe so, yes.

6    Q.   That tentative tract map contains some mistakes, doesn't

7    it?

8    A.   I'm sorry.  Could you repeat that?

9    Q.   That tentative tract map contains some mistakes?

10            MR. HASSING:  Objection, leading, your Honor.

11            THE COURT:  To the form of the question, sustained.

12   BY MR. BRAZE:

13   Q.   Were there any mistakes on the tract map in naming the

14   streets?

15   A.   Excuse me.  J 25 is a tentative tract map done by a prior

16   engineer which doesn't reflect either my map -- it doesn't

17   reflect my tentative tract.

18   Q.   But there were still mistakes on the street names, weren't

19   they?

20            MR. HASSING:  Objection, leading, your Honor.

21            THE COURT:  Sustained as to the form.

22            THE WITNESS:  The tracts --

23            THE COURT:  Wait.  Sustained.  No question pending.

24   BY MR. BRAZE:

25   Q.   In the Staff Report that you just reviewed, J 2, it said

1   the name of the street was supposed to be Olympic Court,

2   wasn't it?

3   A.   I believe so.

4   Q.   And what was put on this revised tract map is Olympic

5   Close, isn't it, C-l-o-s-e?

6   A.   That's correct.

7   Q.   That's a mistake, isn't it?

8   A.   Yes.

9   Q.   And this street at the north of the tract map is named St.

10  Andrews Crescent, even though it is a street/road, and that

11  was supposed to be St. Andrews Lane, wasn't it?

12  A.   That's correct.

13  Q.   Now, if I could get you to take a look at your scope of

14  work changes with respect to the work you did on the Valley

15  Rose Subdivision, can you -- I will represent to you those are

16  contained at various exhibits, but summarized at Exhibit J 4.

17          Just for the record, the scope of work changes were

18  contained at J 1, J 32, J 41, J 44, J 46 through 50, J 53

19  through 60.

20          And as shown on Exhibit J 4, what was the amount of

21  work that you put in on Tract 4571 [sic] in preparing the

22  tract map and improvement plans?

23  A.   Could you repeat the number tract?

24  Q.   5471.

25  A.   5472?

MCINTOSH

1   Q.  Yeah.

2   A.  Well, there are a number of -- you want the total?

3   Q.  Yeah.

4   A.  There are a number of tasks that we prepared.

5   Q.  Sure.  The total?

6   A.  $1,149,910.28.

7   Q.  Is that the amount of work you expended getting the tract

8   map and associated improvement plans together before

9   everything stopped for construction of the subdivision?

10  A.  That's the amount that we had expended on the entire

11  project.  There were some other tracts, one other tract that

12  we never processed as a tentative, but the rest of it was for

13  the development to get to the first Tentative Tract 5472.

14  Q.  Do you have P 110 in front of you?

15          MR. HASSING:  I'm sorry?

16          MR. BRAZE:  P 110.

17          THE WITNESS:  Yes.

18  BY MR. BRAZE:

19  Q.  So in 1999, did you and Mr. Martin decide to part ways, if

20  you will?

21  A.  That's correct.

22  Q.  And what was the nature of your -- in general, the nature

23  of your agreement?

24  A.  We agreed to disagree.

25  Q.  Okay.  And did you agree to keep one part of the business

MCINTOSH

172

1    and he agreed to keep the other?

2    A.   Yes.

3    Q.   And what did you agree to keep?

4    A.   I agreed to keep all the property and assets and business

5    in California and Arizona, and he took the assets and business

6    in Nevada.

7    Q.   And do you have before you as Exhibit P 110 the agreement

8    whereby you were assigned all the assets in California?

9    A.   Yes.

10   Q.   Okay.

11          I would move to admit Exhibit P 110, your Honor.

12          THE COURT:  P 10?

13          MR. BRAZE:  P 110.

14          THE COURT:  Any objection?

15          MR. HASSING:  No objection, your Honor.

16          THE COURT:  It's received.

17          (Plaintiff's Exhibit P 110 was received.)

18   BY MR. BRAZE:

19   Q.   Now, prior to 1999, did Martin-McIntosh put a © on all of

20   its drawings?

21   A.   Yes, we had a practice of putting the copyright symbol on

22   all plans that we prepared.

23   Q.   And did Mr. Martin take any interest whatsoever in

24   anything in California with him?

25   A.   No.

1   Q.  Did he take any clients or drawings of any plans or

2   projects that were going with him to Nevada?

3   A.  No.

4   Q.  And is it your understanding that that assignment

5   document, P 110, gave you the right, title and ownership in

6   all of the drawings and ongoing projects that were impending

7   in California?

8   A.  Yes.

9           MR. ALEXANDER:  Objection.  Relevance, your Honor.

10          MR. BRAZE:  I'm sorry.  I thought they raised this as

11  an issue.

12          THE COURT:  Just a second.  Go ahead.

13          MR. ALEXANDER:  It just seems -- I'm not going to

14  make a speaking objection.  I'm sorry, your Honor.

15          THE COURT:  Let me reread the question.

16          On relevance, it is overruled.

17  BY MR. BRAZE:

18  Q.  Have you reviewed the document to make sure that any

19  interest in a copyright in Tract Map 5472 was transferred to

20  you?

21  A.  Yes.

22  Q.  Have you found portions of the contract that refer to

23  that?

24  A.  Yes.

25  Q.  Could you direct our attention there?

MCINTOSH

174

1   A.   Page 2, paragraph 2a, where it talks about partnership

2   assets.   Do you want me to read it?

3           "Martin-McIntosh shall receive all of Martin's right,

4             title and interest to any of the assets of

5             Martin-McIntosh, which includes, but is not limited

6             to, all assets located in the State of California

7             and/or used in the business of Martin-McIntosh,

8             including accounts receivable, wherever located.  The

9             assets of Martin-McIntosh, except for the accounts

10            receivable, are more fully identified in the attached

11            Exhibit 1, and include the goodwill of

12            Martin-McIntosh, any client lists, as well as the

13            sole and exclusive right to continue using the names

14            'Martin-McIntosh' and 'Western Photogrammetrics.'"

15            There is also on page 7, paragraph 6:

16          "Continuation of Business by McIntosh.  From and after

17            January 1st, 1999, Martin shall cease to be a partner

18            in the partnership and shall have no interest in the

19            profits and losses of the partnership accruing after

20            December 31st, 1998, or in the capital, surplus,

21            assets, or management of the partnership.

22          "Although the partnership will be dissolved and wound

23            up, McIntosh shall be entitled to continue operating

24            the business of Martin-McIntosh.  It is presently

25            contemplated that such business shall be continued as

1        a sole proprietorship, to wit, Roger McIntosh, doing

2        business as Martin-McIntosh, and Roger McIntosh doing

3        business as Western Photogrammetrics."

4        Also on page 12, paragraph 12:

5      "Covenant Not to Compete and Non-Solicitation.  Martin

6        agrees that he shall not at any time within the

7        four-year period commencing on January 1st, 1999,

8        directly or indirectly engage in or have any interest

9        in any person, firm, corporation or business, whether

10       as an employee, officer, director, agent, security

11       holder, creditor, consultant, or otherwise, that

12       engages in any activity which is the same as, similar

13       to, or competitive in any activity that the

14       partnership, including its affiliated companies, has

15       engaged within the State of California and/or

16       Arizona."

17       And also on page 13 -- I hope I'm not going too fast.

18      "Paragraph 13.  Trade Secrets and Intellectual

19       Property.  Martin agrees not to divulge, communicate,

20       use to the detriment of the partnership, its

21       affiliated companies or any of the their successor

22       entities, including, but not limited to, Roger

23       McIntosh, doing business as Martin-McIntosh, and

24       Roger McIntosh, doing business as Western

25       Photogrammetrics, or for the benefit of any other

176

1          person or persons, or misuse in any way any

2          confidential information, trade secret, copyright,

3          trademark, patent, or other intellectual property

4          right of the partnership, its affiliated companies or

5          of successors."  Et cetera et cetera.

6  Q.  And based on what you just read to us, is it your

7  understanding that you acquired all the right, title and

8  interest to any copyright in the plans, maps and drawings

9  associated with Tract 5472?

10 A.  That's correct.

11         MR. BRAZE:  If we have not already done so, your

12 Honor, I would like to move P 110 into evidence.

13         THE COURT:  It's already been received.

14         MR. BRAZE:  Thank you, your Honor.

15 BY MR. BRAZE:

16 Q.  Now, this tract apparently laid dormant for several years;

17 is that true?

18 A.  That's correct.

19 Q.  And Mr. Wu has testified that he called you in 2004; do

20 you recall that conversation?

21 A.  Yes, I do.

22 Q.  Do you recall what was said by Mr. Wu?

23 A.  He called, said he was buying the Valley Rose Subdivision

24 Tract 5472, and he wanted to know if I could redo the

25 tentative map because the original tentative tract had

1   expired.

2          And I told him that I would be willing to work with

3   him, but I was owed quite a bit of money on all the

4   improvement plans and the improvements that we had worked on

5   for The Legacy Group, and I told him it was around $300,000.

6   There had been interest accrued; that was it was then up to

7   $800,000.

8          And if he wanted me to work with him, I could give

9   him a proposal and we could go from there.

10  Q.  And what did Mr. Wu say in response?

11  A.  He said he would call me back.

12  Q.  Did he ever get back with you?

13  A.  No, he has never called me back.

14  Q.  Then at sometime, did you notice that there was activity

15  related to the 5472 tract?

16  A.  I'm sorry, could you repeat the question?

17  Q.  Sure.  At some point in time, did you notice that there

18  was activity associated with the 5472 tract?

19  A.  Yes.  I suspected that the City of Wasco was selling the

20  tract, probably to Mr. Wu, as he indicated, so I started

21  watching the agendas, the City Council agendas, to try to

22  determine if someone else was working on it.

23  Q.  Did you determine that somebody was?

24  A.  Yes.  It came through one of the agendas.  I believe it

25  was when the Final Map 6451 was being presented to the City

1   Council, sometime in late 2006.

2   Q.  And at some point in time, did you do a public records

3   request to get the information that was being utilized with

4   respect to this tract?

5   A.  Yes.  I had to, because they wouldn't give me information

6   when I went to the City of Wasco.

7   Q.  If you could look at P 101.  Is that the request you sent

8   to the City of Wasco for production of the documents

9   associated with that tract?

10  A.  Yes, it is.  I went to the City of Wasco in late 2006 and

11  asked for the plans that were being used for Tract 6451, and I

12  was not given that, so I filled out a records request after I

13  copyrighted the plans.

14  Q.  What did you receive?

15  A.  I received a disk from the City of Wasco with the new

16  Tract 6451 and all of my improvement plans that I had prepared

17  for Tract 5472.

18  Q.  So you received the new Map 6471 [sic]?

19  A.  6451.

20  Q.  And your improvement plans from 5472?

21  A.  Yes.  I received more than that, but that told me that

22  they were using my improvement plans to get Tract 6451

23  recorded.

24  Q.  Thereafter, did you consult with an attorney and have your

25  plans formally registered with the Copyright Office?

MCINTOSH

179

1    A.  I believe I consulted with an attorney prior to this

2    records request and the copyright was established.  It was

3    filed in -- well, you have the certificate.

4    Q.  Let me show you what's in evidence as J 5.  Is that the

5    Certificate of Copyright that you received?

6    A.  Yes, it is.

7    Q.  That copyright is dated February 22nd, 2007?

8    A.  That's correct.

9            MR. BRAZE:  Your Honor, on Exhibit P 108, I would

10   like to move into evidence, Bates stamp 436, the grading plan

11   that Mr. McIntosh prepared.

12           THE COURT:  Any objection?

13           MR. HASSING:  No objection, your Honor, to the

14   grading plan alone.

15           THE COURT:  It's received.

16           (Plaintiff's Exhibit P 108, Page 436 was received.)

17   BY MR. BRAZE:

18   Q.  When you did your contract with Michael Brown, which is

19   Exhibit J 24, did you agree to maintain all rights in the

20   copyrights and any such documents?

21   A.  Yes, the contract calls out for --

22   Q.  What paragraph are you at?

23   A.  Paragraph number 8.

24           "All original papers, documents, drawings and other

25             work product of consultant and copies thereof

1          produced by consultant pursuant to this agreement

2          shall remain the property of consultant and may be

3          used by consultant without the consent of client.

4          Upon request and payment of the costs involved,

5          client is entitled to a copy of all papers, documents

6          and drawings provided client's account is paid

7          current."

8    Q.  At some point in time, did you compare your Tentative

9    Tract Map 5472 with Tentative Tract Map 6451?

10   A.  Yes, I did.

11   Q.  And were you ever advised at any time that there were any

12   street signs out there on the tract map?

13   A.  No.  I was not aware that the street signs existed at the

14   time that the tentative map was prepared.

15   Q.  Let me show you Tentative Tract Map 6451 that was prepared

16   by DeWalt.  And that map has the same mistake in the street

17   sign, doesn't it?

18          MR. HASSING:  Objection, leading, your Honor.

19          THE COURT:  Sustained.

20   BY MR. BRAZE:

21   Q.  What is the name of the street that I'm pointing to?

22   A.  I believe that's Olympic Close.

23   Q.  Olympic Close, identical to the Olympic Close you had on

24   Tract 5472?

25          MR. HASSING:  Objection, leading.

1           THE COURT:  Sustained.

2   BY MR. BRAZE:

3   Q.  Is that identical to the Olympic Close and the location

4   you had on 5472?

5   A.  Yes, it is.

6   Q.  And the top street on Map 6451 or the top road on 6451 is

7   named what?

8   A.  I believe that's St. Andrews Crescent.

9   Q.  Is that in the same location and identical to where it was

10  in Map 5472?

11  A.  Yes, it is.

12  Q.  And then we previously determined that most likely that

13  was a mistake because a street is not supposed to be called a

14  "Crescent," is it?

15          MR. HASSING:  Objection.  Leading, your Honor.

16          THE COURT:  Sustained.

17  BY MR. BRAZE:

18  Q.  In engineering, do you name streets Crescents?

19  A.  Not typically.

20  Q.  Is there anything about Tentative Map 5472 that makes you

21  believe that this was copied from your Tentative Map 5472?

22  A.  There is a note on the tentative map -- I believe it is

23  Note Number 1 -- that refers to Tentative Tract 5472.

24  Q.  Now, can we compare two tract maps, the tentatives?

25  A.  Sure.

1    Q.   Could I ask Mr. McIntosh to come down to point to the --

2         THE COURT:  Sure.  I just ask that you not situate

3    yourself in a situation the jury can't see, okay?

4         THE WITNESS:  Sure.

5         THE COURT:  You can stand up, if you want.

6    BY MR. BRAZE:

7    Q.   Now, let's talk about surveying, if you will.  Is it

8    possible for two surveyors to go out and survey the same line

9    and get the same identical bearing to the second?

10   A.   It's unlikely.  There are a number of factors that come

11   into play when you survey a line or a subdivision, such as

12   temperature, light waves.  You have environmental corrections

13   that are always different that I have never seen two surveyors

14   get the same exact information.

15   Q.   And can you point out some bearings on these two maps that

16   are identical?

17   A.   I believe this bearing of this line is identical to that

18   bearing.

19        There are slight differences between that tentative

20   map and this tentative.

21        There are, let's see here.  This bearing is the same.

22   Q.   To the second?

23   A.   Yes, to the second.

24   Q.   For the jury's convenience, "bearing," if you have a

25   circle, it is 360 degrees, right?

1    A.   Yes.

2    Q.   And so if it's a right angle, it's 90 degrees.  And so in

3    that 90, we would divide each degree, and then each degree is

4    divided into 60 minutes?

5    A.   Correct.

6    Q.   And each minute is divided into 60 seconds?

7    A.   Correct.

8    Q.   So a single degree would be divided into 120 -- excuse me,

9    360 -- 3600 seconds, correct?

10   A.   Correct.

11   Q.   So to get identical bearings within one second of each

12   other over a period of several hundred feet, is highly

13   unlikely?

14          MR. HASSING:  Objection, leading.

15          THE COURT:  Sustained.

16   BY MR. BRAZE:

17   Q.   Is it likely that two independent surveyors could go out

18   and get bearings identical to the second on distances of

19   several hundred feet?

20   A.   It's unlikely.  You asked me about other similarities.

21   Q.   Yes.

22   A.   I pointed out at Note Number 1, "This development contains

23   existing improvements built" --

24          THE REPORTER:  I'm sorry, "built"?

25          THE COURT:  Raise your voice, please.

1          THE WITNESS:  -- "built per Valley Rose Planned

2    Community Expired Tentative Tract 5472 and Associative

3    Approved Improvement Plans."

4    BY MR. BRAZE:

5    Q.  So per DeWalt's tentative tract map, they said they

6    incorporated the improvement plan; is that correct?

7          MR. HASSING:  Objection, leading.

8          THE COURT:  Sustained.

9    BY MR. BRAZE:

10   Q.  I guess what did you mean by that statement you just read?

11   A.  Well, the reference to Tract 5472 meant that the

12   improvements were in the ground.  They weren't a hundred

13   percent complete.  It had sat for several years, probably 15

14   years, and some of the street lights were shot out.

15         MR. HASSING:  Objection.  Nonresponsive, your Honor.

16         THE COURT:  Sustained.

17   BY MR. BRAZE:

18   Q.  Let's talk about lot numbering.  How does a engineer go

19   about numbering the lots in a subdivision?

20   A.  Typically, when we start the numbering system, we pick a

21   starting point and we number the lots consecutively through

22   the whole tract and come back to the end.

23         And so in this case, we started at Lot 1 here at the

24   intersection of Valley Rose Parkway and St. Andrews Crescent,

25   and went around the tract and through the tract and ended up

1   at Lot 68 here.

2           DeWalt started their numbering system same location,

3   went around the tract, through the numbers, and ended it up

4   with Lot 68 here.

5   Q.  In other words, their lot numbers are exactly the same lot

6   numbers that are contained on your plan?

7           MR. HASSING:  Objection, leading.

8           THE COURT:  Sustained.

9   BY MR. BRAZE:

10  Q.  Are the lot numbers exactly the same on Tract 6451 as they

11  are on Tract 5472?

12  A.  They had to be the same in order to use the improvement

13  plans for 5472, so yes.

14  Q.  Are the boundaries the same on the two maps?

15  A.  The boundaries are the same boundaries.  We set property

16  corners for the recordation of 5472 final map and we set

17  monuments.  They are called "street monuments."  There is a

18  street monument in the center of the cul-de-sacs and all the

19  street intersections, so there would be one at each of these

20  locations throughout the tract.  And I believe Mr. DeWalt used

21  those monuments for the survey of his Tentative Tract Map

22  6451.

23  Q.  Now, I would like to show you Tract Map -- Final Tract Map

24  6451, which was Exhibit --

25          MR. TRAVIS:  We are using J 127.

MCINTOSH

186

1          MR. BRAZE:  So J 127?

2          MR. TRAVIS:  Yes.

3    BY MR. BRAZE:

4    Q.  I would also like to show you page 436 of J 108, which is

5    your grading plan.  Have you compared your grading plan to

6    Tract Map Number 6451 drawn by DeWalt?

7    A.  Yes, I did.

8    Q.  Are there indications on there that they were identical

9    measurements, bearings?

10   A.  Yes, there is.  And what's odd about this is that this

11   grading plan bearings and dimensions, are exactly the same as

12   these bearings and dimensions on the final map.  But the

13   tentative map, as Mr. DeWalt prepared, is not even the same as

14   his final map.

15   Q.  Have you concluded that the final map is copied from your

16   grading plan?

17   A.  There is -- in my opinion, there is no way that any other

18   surveyor could have come up with the exact same bearings,

19   dimensions as my grading plan without having copied it.

20         MR. BRAZE:  Thank you.  You may return to your seat.

21         THE COURT:  Let us know when you have a natural break

22   in your questioning, please.

23         MR. BRAZE:  Now.

24         THE COURT:  Okay.  Ladies and gentlemen, let's take

25   15 minutes, midafternoon break.  And we will come back, we

1   will continue with this witness.  Please remember, don't

2   discuss the case while you are on break.

3            (The jury left the courtroom.)

4            THE COURT:  Back on the record.  Counsel are present.

5   Are we ready for the jury?

6            MR. BRAZE:  Yes, your Honor.

7            THE COURT:  Okay.

8            (The following proceedings were had in the presence

9            of the jury, to wit:)

10           THE COURT:  The jury is back.  The witness is on the

11  stand.

12           Mr. Braze?

13           MR. BRAZE:  Thank you, your Honor.

14  BY MR. BRAZE:

15  Q.  Just as a matter of housekeeping, P 108 that we previously

16  discussed, does that reflect the work that you did on this

17  Tract 5472?

18  A.  Yes.

19           MR. BRAZE:  And we would offer P 108 for that

20  purpose, your Honor, exhibiting the work that he did on that

21  contract to get to the value shown.

22           THE COURT:  Any objection?

23           MS. BARNES:  I couldn't hear him, I'm sorry.

24           THE COURT:  He is moving Exhibit 108 in its entirety

25  into evidence.

MCINTOSH

188

1          MS. BARNES:  Objection, no foundation, your Honor.

2          MR. BRAZE:  I thought we just laid that.

3          MS. BARNES:  For certain pages, and we have no

4   objection, for example, to the grading plan.

5          THE COURT:  That's already in.

6          MS. BARNES:  My point is to admit the whole exhibit,

7   a large number of pages, without appropriate foundation.

8          THE COURT:  I think you are going to have to lay a

9   more specific foundation to get all of it.

10         MR. BRAZE:  Maybe she didn't hear the foundation, but

11  Mr. McIntosh was asked as to whether Exhibit P 108 was all of

12  the plans and drawings that he prepared in preparation for

13  Tract 5472.

14         MR. HASSING:  Well --

15         THE COURT:  Go ahead.

16         MR. HASSING:  Yes, your Honor.  I see within P 108 a

17  document Bates stamped 466, which is a tentative tract map for

18  5618 that obviously has nothing to do with 5472.

19         THE COURT:  Well, do you wish to voir dire the

20  witness with regard to this exhibit?

21         MR. HASSING:  Yes, your Honor.

22         THE COURT:  Go ahead.

23         MR. HASSING:  Can we take down his posters?

24         THE COURT:  Sure.  So the jury can see the

25  questioner.

1          MR. BRAZE:  Oh.

2                    VOIR DIRE EXAMINATION

3    BY MR. HASSING:

4    Q.  Mr. McIntosh, please take a look, if you would, at the

5    document contained within P 108 that bears Bates stamp number

6    BP 000466.  Are you there?

7    A.  Yes, I am.

8    Q.  Now, is it your testimony that this tentative tract map

9    just identified has something to do with 5472?

10   A.  As I testified earlier, these are the plans and documents

11   that we prepared for the larger property for Valley Rose

12   Estates, and many of these master plans and general plan

13   amendments, zoning maps, topography studies had to be prepared

14   to get to the first Tentative Tract 5472 except for that Tract

15   5618.

16   Q.  So your answer, then, would be no?

17   A.  My answer is the same as I testified earlier.  I guess the

18   answer is no.

19          MR. HASSING:  If I may just have a few moments, your

20   Honor, to see what else is in this exhibit.

21   BY MR. HASSING:

22   Q.  Mr. McIntosh, you just testified about a larger piece of

23   land that you had to do studies and development work on in

24   order to get to 5472, correct?

25   A.  That's correct.

1    Q.  And I'm showing you now the -- a copy of a parcel map that
2    I believe you prepared, 9572.  Did you prepare this parcel
3    map?
4    A.  Our firm, Martin-McIntosh, prepared the parcel map.
5    Q.  This parcel map depicts, does it not, the entire 480
6    acres, correct?
7    A.  It depicts the entire Valley Rose Estates project.
8    Q.  Which consists of about 480 acres, right?
9    A.  Approximately.
10   Q.  Because you have got a section of land here which is 640
11   acres?
12   A.  That's right.
13   Q.  And you have taken out about a quarter of a section for
14   the golf course, right?
15   A.  That's correct.
16   Q.  So that leaves three-quarters of a section, which is about
17   480, 485 acres?
18   A.  Most sections are about 480 acres, yes.
19   Q.  So what you are testifying to, then, with regard to P 108
20   is that you had to do certain studies for this entire 480 acre
21   parcel in order to eventually get down here into this 33-acre
22   parcel that we are talking about in this trial, right?
23   A.  That's correct.
24   Q.  Now, tell me why it is, sir, that you would have to do
25   studies for this entire area up here, including a major

1   subdivision over here, in order to develop a tract that's down

2   here close to the Paso Robles Highway?

3   A.  Well, the reason is that when you do a master planned

4   community, you don't want to under design any of your

5   infrastructure.  You don't want to undersize the sewers, you

6   don't want to undersize the water or any of the utilities, so

7   you have to study the entire project.  That way, you make sure

8   you don't bring in the first sewer line, for example, that may

9   run south to Highway 46, Paso Robles Highway, and it is too

10  small.

11          So the studies have to be done to take into account

12  the entire property, the entire project.  And then when you

13  start with the first tract, you know that you have all your

14  utilities and improvements correctly sized.  Otherwise, you

15  are putting in undersized utilities.

16  Q.  In P 108, what you have done is you have plans for an

17  intersection down here at Paso Robles Highway, right?

18  A.  I believe they are in there, yes.

19  Q.  And you have also got a master sewer plan that goes all

20  the way up and takes care of the whole 480 acres?

21  A.  I believe that's in there as well.

22  Q.  And a master drainage plan for the whole 480 acres?

23  A.  I believe that was done as well.

24          MR. HASSING:  Your Honor, I would restate my

25  objection, in that P 108 is in violation of a motion in

1    limine.  We need to be focusing here on the infrastructure and

2    the planning for 5472, which is a 33-acre site, not a 480-acre

3    master planned development that my client didn't purchase.

4    And he has just testified -- well, that's enough for the

5    speaking objection.

6            MR. TRAVIS:  Well, your Honor, I mean Mr. McIntosh

7    just testified that you can't do the one tract without doing

8    all the other stuff.  These master studies, they all relate.

9    You can't develop one particular tract and have it there.  You

10   have to include everything else.  Furthermore --

11           THE COURT:  I think that --

12           MR. TRAVIS:  Sorry.

13           MR. HASSING:  I would object we have two attorneys

14   here on the same subject.  Is that permissible in this

15   courtroom?  We didn't get the ground rules on that.

16           THE COURT:  I don't think it makes that big of a

17   difference, as long as we don't have both arguing on the same

18   issue.

19           MR. HASSING:  All right.

20           THE COURT:  Hang on one minute.  I'm looking for my

21   order on motions.  Did you say Motion in Limine Number 2?

22           MR. HASSING:  Yes, I believe it is Number 2.  It was

23   the City's motion.

24           THE COURT:  Ladies and gentlemen, could I ask you to

25   go back to the jury room for just one minute.  It won't take

1   very long, but I have to take up a legal issue.  We will be

2   working on this, and it won't take but just a few minutes.

3   Please don't discuss the case.

4           (The jury left the courtroom.)

5           THE COURT:  The jury has left.  The Court indicates

6   in Number 2:

7           "Wasco's Motion in Limine Number 2.  Court grants the

8               motion in limine insofar as to limit evidence as to

9               Mr. McIntosh's work for Tract 5472 only."

10          The problem here, and I would -- that I would like

11  you to address is now we have testimony that he can't do it

12  piecemeal, that the whole has to do with the 5472, and he

13  can't get to 5472 without doing the whole.  Did you hear it

14  differently?

15          MR. HASSING:  I heard him testify to that, your

16  Honor.  The problem that we have is my client bought one

17  parcel of land.  And he is building houses in one parcel of

18  land.  And he is accused of copying a tentative map, which

19  consists of 68 lots; that's one issue.

20          Then we come to the improvement plans.  Motion in

21  Limine Number 2 was designed to limit the testimony to the

22  improvement plans for the 5472 because Mr. McIntosh's lawsuit,

23  his complaint, third amended complaint states that we copied

24  his plans, we copied his map and plans.  And it relates to

25  that tentative subdivision map.

1        Now, my client is not accused, and neither is DeWalt,

2   of copying all of the 480 acres' worth of plans, of master

3   planning, all of the meetings they went to, all of the designs

4   for these other areas.

5        It just seems to me that the fact that Mr. McIntosh

6   was developing or drawing plans for a 480-acre master planned

7   community, that's one thing, but then to try to tag these

8   defendants with copyright infringement damages for all of

9   that, when they are only charged with copying 5472, seems to

10  be overbroad and really irrelevant.

11       THE COURT:  Well, unless I'm missing it, the argument

12  is this.  And the statement that it is relevant is that if the

13  plaintiff cannot get to the smaller tract, the 5472, without

14  going through the gymnastics of the entirety of the plan,

15  then, therefore, if he can't do it, neither should the

16  defendant have been able to do it.

17       And if the defendant had been doing it correctly and

18  not copying, then they would have had to have done the same

19  thing the plaintiff did, and that is the whole to get to the

20  part.

21       Now, I don't know whether that's true or not.

22       MR. HASSING:  Yeah.

23       THE COURT:  I don't know what the experts are going

24  to say, but that's the argument here and that's the position I

25  believe of the plaintiff as to why this is relevant.

1          MR. HASSING:  Okay.  There is another way to form an

2     objection, your Honor, and that would be lack of foundation.

3     I mean we have got an engineer sitting here saying that he had

4     to do it one way, but we don't have any foundation for that

5     testimony.

6          I mean he was hired by somebody who owned this 480

7     acres that wanted an entire subdivision.  We don't know what

8     would have happened if he had gone to the City and said, "I

9     want to do this particular piece here," and it just so happens

10    that's the first piece.  I mean this is the first piece of

11    this whole puzzle.  When he took the job on, he anticipated

12    doing the whole thing.  He only got to the first piece.  And

13    how do we know that he couldn't have just done that one piece

14    without doing the whole?

15         THE COURT:  Well, isn't that a matter -- first of

16    all, he has testified to that already.

17         MR. HASSING:  Well, he hasn't laid any foundation for

18    that.  He just said, "I just had to do this."

19         THE COURT:  Yes, he did, but he said that over no

20    objection that I heard.  He testified to that.

21         MR. HASSING:  But I thought at that time, he was

22    testifying as to this P 108, which we did object to it coming

23    into evidence.  Then I got to voir dire.

24         THE COURT:  You are objecting -- yes.  P 108 has been

25    moved into evidence and the objection was a lack of foundation

1  on some of the documents in P 108.  It was not -- there was no

2  objection to the question when it was asked him, whether or

3  not he had to do the whole versus just the small tract first.

4       He has just testified without objection that he did

5  have to do the whole before he could get to the part.  He just

6  said it.

7       MR. HASSING:  Okay.  But wasn't that testimony in

8  violation of your original order, and now we are talking about

9  modifying that order?

10      THE COURT:  No, that's what I'm saying.  I just read

11 the order, and it is limiting it to what he had to do with

12 5472.  And we now have testimony that he had to do the whole

13 to get to 5472.  He could not do it.

14      It is the domino effect.  That's what he is

15 testifying to.  If you knock down one domino and the next and

16 the next, by not allowing him to do the whole, he can't -- the

17 domino is removed; he can't get to 5472.

18      MR. HASSING:  Okay.  But where is the relevance to

19 copying?  I mean there is no allegation that anybody copied

20 that other work.  The only allegation is we copied 5472 and

21 the plans for 5472.

22      THE COURT:  But and that's back to what I was saying

23 before.  I think what's being argued here is that if the

24 defendants had done it correctly, they couldn't have skipped

25 the domino either.  They would have had to have done the work

1    on the whole before they got to 5472, but they didn't do that

2    because they copied 5472.

3            MR. HASSING:  Well --

4            THE COURT:  I'm not saying I'm buying the argument or

5    not buying it, I'm just saying that's what the argument is,

6    and that's why getting around the relevance issue has been

7    done.  I don't know what the jury is going to believe.  I

8    don't know.

9            MR. HASSING:  But don't we still have to focus on

10   copying?  This is a copyright case.  Don't we have to focus on

11   the allegations of what was copied?

12           THE COURT:  Copied versus should have been copied if

13   they had done it the right way?  In other words, do you

14   understand what I'm saying?

15           MR. HASSING:  I do understand what you are saying.

16   And I'm thinking that perhaps we are going to need a witness

17   from the City to contradict this testimony and explain it.

18   But I'm having a tough time wrapping my head around the idea

19   of getting tagged with this entire subdivision when we are

20   only alleged to have copied this one little piece.  That's

21   what I'm saying.

22           And I was focusing on your motion in limine that I

23   thought was going to rule out all this other stuff.

24           THE COURT:  I thought it was too except this

25   testimony where he is saying, "This does have to do with 5472,

1    because I cannot get to 5472 without doing this work first."

2        MR. HASSING:  Yeah.

3        THE COURT:  It's not possible.  Now, whether that's

4    true or not, I don't know.

5        MR. HASSING:  I hear you.

6        MR. OKADIGBO:  Your Honor, can the City be heard on

7    this matter?

8        THE COURT:  Yes.

9        MR. OKADIGBO:  We don't think that there is any basis

10   for this line of testimony by Mr. McIntosh, and the reason is

11   that if you look at the damages section of the copyright

12   statute, it speaks in terms of the value that a willing buyer

13   would pay for the infringed material.

14       If we focus on what is the infringed material, the

15   only infringed material that we have been talking about is the

16   maps and plans for 5472.  They have never alleged that there

17   was infringement with respect to any other tract.

18       If it is his position that he has conferred value or

19   he eventually got to 5472 by doing all this other work, that's

20   a benefit that was conferred that has nothing to do with the

21   specific infringement that he is alleging occurred here.

22       Unless he is prepared to say as a matter of law that

23   the defendants were required to redo all that work that he

24   did, and that they simply couldn't have focused on 5472 stuff.

25   If -- unless he is prepared to say that.

1          THE COURT:  Well, he wouldn't be saying that as a
2    matter of law.
3          MR. OKADIGBO:  I'm sorry.  Unless he is prepared to
4    say that the defendants necessarily, to have done things
5    properly, would have been required to redo the entire work
6    that he has done, even though the improvements for those other
7    tracts and the master plan work had been done, unless he is
8    willing to go that far --
9          THE COURT:  Ask him.
10          MR. OKADIGBO:  -- we are really limited to 5472
11   stuff.
12          THE COURT:  Ask him.  Go ahead.  Ask him right now.
13                    VOIR DIRE EXAMINATION
14   BY MR. OKADIGBO:
15   Q.  Mr. McIntosh, are you claiming in this lawsuit that if a
16   surveyor went out to just do 5472 work, in other words,
17   prepare a tentative map --
18          THE COURT:  At what point in time?
19          MR. OKADIGBO:  Now.
20   BY MR. OKADIGBO:
21   Q.  -- if they are going to prepare a tentative map of what
22   was Tract 5472 and they prepare improvement plans for what is
23   Tract 5472, are you stating that the person that prepares that
24   work must necessarily do all that other work that you did
25   previously for the entire 480 acres?

1   A.  I'm saying at the time --

2            THE COURT:  That answer can be "yes" or "no."

3            THE WITNESS:  You talking about today?

4            MR. OKADIGBO:  Yes.

5            THE WITNESS:  Or five years ago?

6            MR. OKADIGBO:  I'm talking about at the time DeWalt

7   did their survey.

8            THE WITNESS:  Well, at the time that DeWalt did their

9   survey, all of the master planning, general plan amendment and

10  zoning had already been prepared and put into place.  So

11  DeWalt didn't have to do all that work.

12           MR. HASSING:  Objection, nonresponsive.

13           THE COURT:  Oh, I think it is responsive.  I think he

14  is getting what he is looking for actually.

15           MR. HASSING:  Okay, okay, okay.

16  BY MR. OKADIGBO:

17  Q.  So your testimony is that DeWalt did not need to do all

18  that master planned work because you had already done it to do

19  just specifically 5472 map and plan work, correct?

20  A.  It was already required to be done by the City of Wasco

21  under the development agreement with the original developer.

22           THE COURT:  And in fact, had been done?

23           THE WITNESS:  And had been done.

24           THE COURT:  Okay.  That's a problem.  That's a

25  problem, then, in moving in P 108 in its entirety.

1          MR. BRAZE:  Well, and I believe the evidence is going

2     to be is that is what was filed with the Copyright Office.

3          THE COURT:  That, what?

4          MR. BRAZE:  P 108.

5          THE COURT:  That may be.  Let's assume it's true.

6     But does that mean -- is there any evidence that anybody

7     copied the entirety of it versus just that involved with 5472?

8          MR. TRAVIS:  Your Honor, I think there is confusion

9     about the association and the distinction in trying to

10    segregate 5472 from the improvement plans.  There is this

11    assumption, it seems to be he is arguing, that somehow the

12    improvement plans only relate to Tract 5472, and that's simply

13    not the case.

14         For example, the Valley Rose Parkway, we have the

15    water plans.  We have all these other plans that are all

16    interrelated to what's in that particular -- not just for the

17    5472 tract.

18         THE COURT:  Well, that might be true, but is there

19    any evidence at all that anybody, just because it happened to

20    be there, in any way used it, that it had anything to do with

21    what they were doing?

22         MR. TRAVIS:  I'm not understanding your question,

23    sir.

24         THE COURT:  You are saying that in the improvement

25    plans -- are you claiming that the improvement plans were

1  copyrighted and they were infringed?

2          MR. TRAVIS:  That's correct.

3          THE COURT:  Okay.  Then your position, I think,

4  factually, is that the defendants copied that for their work

5  on 5472 that turned out to be 6451.

6          MR. TRAVIS:  That's correct.

7          THE COURT:  Okay.  So what difference does it make on

8  those improvement plans if it was broader than 6451, if you

9  are saying -- and I think you are -- that the defendant's

10  interest was only 6451?  Why then do we expand all the damages

11  and all the issues and all the facts and all the evidence to

12  incorporate and encompass the entirety of this development?

13          MR. TRAVIS:  Because you need those improvement plans

14  for the final map.  You got to have them.  And so what we are

15  getting to is the value of what those improvement plans cost

16  to take.

17          THE COURT:  The improvement plans for 6451?

18          MR. TRAVIS:  Or Mr. McIntosh's improvement plans.

19          THE COURT:  For 5472?

20          MR. TRAVIS:  I'm sorry, the 5472 improvement plans

21  are the improvement plans that they are basing their 6451 map

22  on.

23          THE COURT:  I know that's the allegation.  They are

24  denying that, but I understand that part.  But where is it

25  that makes, all of a sudden, the 5472 McIntosh plans that you

1   believe were stolen, infringed upon, and used for the 6451,

2   how does that in any way segue into the broader entirety of

3   the development, which was exactly what the City's Motion in

4   Limine Number 2 was intended to address?

5          MR. TRAVIS:  Specifically, for the improvement plans,

6   I'm not sure specifically what exactly they are talking about,

7   maybe we are confused, because the argumentation about what is

8   it exactly that is broader than what's related to 5472.

9          THE COURT:  What is broader is you want to segue into

10  the entirety of the development.

11         MR. TRAVIS:  Your Honor, I think what happened is

12  Mr. Hassing pointed out that there was a Tract Map 56118

13  [sic].  I think I understand where we are.  When Mr. McIntosh

14  submitted his copyright deposit, it included the 5472

15  improvement plans and also the parcel map 9572 and the 56118

16  tract, because you have the plans and you have the tract and

17  you have the map.

18         To the extent that the improvement plans only relate

19  to 5472, understood.

20         But I thought that we were going to deal with the

21  deposit issue tomorrow, but as far as the entirety of the

22  improvement plans, as far as value and whether they are

23  relevant and admissible, I thought that's what we were talking

24  about.

25         If that means we need then to exclude the 56118 and

1  9572 parcel map, that's fine.  Because right now, we are

2  trying to establish what the value of, you know, I think the

3  1.2 million, or whatever it is, of the 5472 improvement plans.

4  However, that's not all that was sent in for the copyright

5  deposit.

6          Now, whether or not the value of the -- what he did

7  for 9472 and the 5618, we are not arguing that he is claiming

8  a value for that.

9          I think the confusion is he was pointing out that

10 there was additional stuff in the deposit, that there is this

11 assumption we are laying claim to as far as value, and that's

12 not what we are doing.

13          We are dealing with the -- what was deposited as far

14 as what was related to the 5472 tract and the value of that.

15          MR. OKADIGBO:  Your Honor, it is a long-winded

16 argument.  The main issue that we are focused on here is they

17 are claiming $1.2 million in actual damages.  And when you

18 look at their figures, a large -- the majority of it is stuff

19 that doesn't -- that isn't 5472 maps and plans specifically.

20 Mr. McIntosh --

21          THE COURT:  We don't need to expand this argument to

22 go there.

23          Anything further?

24          MR. TRAVIS:  Nothing further.  Only that if you are

25 going to exclude it now --

MCINTOSH

 1          THE COURT:  I'm not going to exclude it.  I'm simply
 2   not going to admit it.
 3          MR. TRAVIS:  But we would reserve that tomorrow until
 4   we get the attorney in.
 5          THE COURT:  Things change.
 6          MR. TRAVIS:  Thanks.
 7          THE COURT:  We are ready for the jury.
 8          (The following proceedings were had in the presence
 9          of the jury, to wit:)
10          THE COURT:  Okay.  The jury is back.  We have taken
11   care of the legal issue and we will continue and finish with
12   this witness on direct.
13                    FURTHER DIRECT EXAMINATION
14   BY MR. BRAZE:
15   Q.  Sir, do you have in front of you P 102 through P 105?
16   A.  Yes.
17   Q.  What is P 102?
18   A.  P 102 is the Valley Rose Master Planned Community Master
19   Sewer Plan.
20   Q.  Was that necessary for Tract 5472?
21   A.  Yes.
22   Q.  And what is P 103?
23   A.  P 103 is the Master Land Use Plan for Valley Rose Master
24   Planned Community.
25   Q.  Was that necessary to obtain tract map for 5472?

1   A.   Yes.

2   Q.   What is P 104?

3   A.   P 104 is the Master Water Plan for Valley Rose Master

4   Planned Community.

5   Q.   Was that necessary for Tract 5472?

6   A.   Yes, it was.

7   Q.   And what's P 105?

8   A.   P 105 is the Master Utility Plans for Valley Rose Master

9   Planned Community.

10  Q.   Was that necessary for Tract 5472?

11  A.   Yes.

12  Q.   Did you prepare all those documents, you being your firm?

13  A.   Many of the documents.  Yes, we did.

14       MR. BRAZE:  I would move P 102 through P 105 into

15  evidence.

16       THE COURT:  Any objection?

17       MR. HASSING:  Objection, your Honor, relevance,

18  overbroad.

19       THE COURT:  Let me ask this question so I can rule on

20  that objection.

21       As to P 102 through and including P 105, although you

22  have indicated what is included, what you have indicated is

23  included having to do with 5472, is there anything in any of

24  those documents, 102 through and including 105, that has to do

25  with something other than Tract 5472?

207

1   A.  Yes.  These documents applied to the entire 480-acre

2   master planned community.

3          THE COURT:  The objection on breadth is sustained.

4   BY MR. BRAZE:

5   Q.  Well, let's return.  Before our break, we were looking at

6   similarities between your grading plan and the final tract

7   map.  Maybe you can again come down here.

8   A.  Sure.  Do you want me to continue with the similarities?

9   Q.  Yes, let's go with the similarities between the two maps.

10  For instance --

11         MR. HASSING:  Your Honor, I want to object to this

12  line of questioning because at his deposition, when we tried

13  to find out these facts, Mr. McIntosh could only point to like

14  the street names and the lot numbers, I believe it was.

15         THE COURT:  Well, I think what I'm going to have to

16  do is I'm going to have to listen to the question and if there

17  is an objection and you have a part of the deposition you want

18  to point to as a discovery violation, I would be glad to look.

19         MR. HASSING:  Okay.

20         MR. BRAZE:  And Steve, these are similarities between

21  the grading plan and the final tract map.  I don't think --

22  anyway.

23  BY MR. BRAZE:

24  Q.  So if we continue.  For instance, can you look at the

25  intersection of St. Andrews Crescent and Valley Rose Parkway.

1  What is it at that intersection that leads you to believe the

2  map is similar?

3            THE COURT:  You are looking at J 127; is that

4  correct?

5            MR. BRAZE:  That's correct, your Honor.

6            THE WITNESS:  Well, at that intersection of

7  St. Andrews Crescent and Valley Rose Parkway, the bearing of

8  St. Andrews Crescent is North 89, 16'05" West.  And the

9  grading plan bearing is North 89 -- I'm sorry, South 89,

10  16'05" East, which is the opposite of northwest.  The bearings

11  to the degree, minute and seconds are exactly the same.

12            There is a curb --

13            MR. HASSING:  Your Honor, I want to object at this

14  point.  I found the deposition transcript pages where he

15  testifies to the similarities.

16            THE COURT:  Page and line that you are referring to

17  that is an indication that -- not an indication that there was

18  a different answer to this question, but the answer being that

19  he did not know.

20            MR. TRAVIS:  If I could get the deposition date?

21            THE COURT:  December 18, '08.  Is it that one or is

22  it the January 28 of '09?

23            MR. HASSING:  It is the December 18th.

24            THE COURT:  Okay.  Page and line?

25            (Counsel conferred off the record.)

209

1          MR. HASSING:  Page 202, line -- all right.  Page 202,

2     line 20, through page 207, line 2.

3          THE COURT:  Okay.

4          MR. HASSING:  I have another one for your Honor, if

5     the Court please.

6          THE COURT:  Go ahead.

7          MR. HASSING:  January 28th deposition, and it begins

8     page 265, line 14.

9          MR. TRAVIS:  Wait.  We were at the December 18th one,

10    if you could give us some time to look at that deposition

11    transcript.

12         MR. HASSING:  I'm giving the Judge the citation, all

13    the way over to 267, line 6.

14         (Counsel conferred off the record.)

15         THE COURT:  All right.  I read it.  Is it your

16    position that the plaintiff is a designated expert?

17         MR. HASSING:  He is not a designated expert.

18         THE COURT:  Okay.  Then the objection is overruled.

19    If this were an expert deposition and the objection were as

20    stated, it would be sustained, but since he is a party and he

21    is a -- rather, a witness, this is a matter of

22    cross-examination and impeachment rather than preclusion.

23         So it is overruled.

24         All right.  Go ahead.

25    BY MR. BRAZE:

MCINTOSH

210

1   Q.  Mr. McIntosh, if I could address your attention to the

2   intersection of St. Andrews Court and Valley Rose Parkway, is

3   there anything on that drawing that shows they are the same

4   between the final tract map and your grading plan?

5   A.  There is a curve that starts just south of St. Andrews

6   Crescent and goes to the north tract line, and that curve

7   information is shown on both plans.  The length of the curve

8   is virtually the same, the radius is the same.  There are

9   other distances throughout the tract that are exactly the same

10  to the hundredth of a foot, which is very difficult to

11  measure.

12  Q.  So a foot is 12 inches, correct?

13  A.  12 inches.  A foot is 12 inches.  A hundredth of a foot is

14  about an eighth of an inch.

15          So there are bearings, as I mentioned.  The bearing

16  along the north boundary line is the same.  The bearing on the

17  street Pebble Beach Way is the same.  The bearing on Sawgrass

18  Court is the same.  And --

19  Q.  How about the bearing Olympic Close?

20  A.  Olympic Close is 89 16'05", 89 16'05".  The distance

21  242.70, 242.70.  And when you measure these kind of distances,

22  it is almost impossible to get the same measurement from two

23  surveyors.

24          MR. HASSING:  Objection.  Nonresponsive.  Move to

25  strike that last couple of sentences, your Honor.

1          THE COURT:  Hang on just one minute.  The objection

2    is sustained.  Nonresponsive to the question pending.

3    BY MR. BRAZE:

4    Q.  Based on your experience as a land surveyor, is it

5    possible for two surveyors to get exactly the same bearing to

6    the minute and exactly the same distances to the hundredth of

7    a foot in measuring these kind of distances?

8          MR. HASSING:  Objection.  That calls for expert

9    testimony, your Honor.

10          THE COURT:  Sustained, unless he has been designated.

11   BY MR. BRAZE:

12   Q.  Have you personally been able to do that, sir?  Have you

13   been able to measure bearings within a second and distances

14   within a hundredth of a foot in measuring these kinds of

15   distances?

16          MR. HASSING:  Objection, your Honor.  Again, he is

17   calling for expert testimony here in a roundabout way.

18          THE COURT:  Sustained.

19   BY MR. BRAZE:

20   Q.  Is it your belief, sir, that this final tract map is a

21   copy of your grading plan?

22   A.  Yes.  And it's odd that this final map --

23          THE COURT:  "Yes" is the answer to the question

24   pending.

25          Next question.

1  BY MR. BRAZE:

2  Q.  Does -- now, you heard Mr. Alexander's opening statement,

3  saying that the way DeWalt did this was independent.  They

4  went out there and measured what was on the ground and that's

5  how they came up with the tentative map.  Did you hear that

6  testimony or argument?

7  A.  Yes, I did.  Yes, I did.

8  Q.  And do the dimensions on the DeWalt tentative map for

9  6451, are they the same as the dimensions on the final map for

10 Tract 6451?

11        MR. HASSING:  Objection, vague, your Honor.  What

12 dimensions?

13        THE COURT:  Sustained.  Just be more specific with

14 what you are asking.

15        THE WITNESS:  No, they are not.

16        THE COURT:  There is no question pending.

17 BY MR. BRAZE:

18 Q.  Do you see differences between the DeWalt Tentative Tract

19 6451 map, which is Exhibit J 134, and the DeWalt final tract

20 map for 6451, which is J 127?

21 A.  Yes.

22 Q.  If the tentative map was derived from the survey,

23 shouldn't those measurements be the same?

24        MR. HASSING:  Objection.  Lacks foundation.

25        THE COURT:  Sustained.

1          MR. BRAZE:  That's all I have, your Honor.

2          THE COURT:  Who is going to cross first?

3          MR. HASSING:  I will, your Honor.

4          THE COURT:  Okay, Mr. Hassing.

5                    CROSS-EXAMINATION

6    BY MR. HASSING:

7    Q.  Mr. McIntosh, you were asked on direct examination if you

8    heard Mr. Alexander's opening statement, right?  You were

9    asked that, correct?

10   A.  I heard Mr. Alexander's opening statement.

11   Q.  And you also heard your own counsel's opening statement,

12   didn't you?

13   A.  Yes.

14   Q.  Mr. Wu never asked you if he could use your plans, did he?

15   A.  No.

16   Q.  Mr. Wu was not told by you that your map was copyrighted,

17   was he?

18   A.  No.

19   Q.  You didn't tell Mr. Wu that your plans were copyrighted,

20   did you?

21   A.  There was a copyright symbol on the plans.

22   Q.  You didn't tell Mr. Wu that your plans were copyrighted,

23   did you?

24   A.  No, I did not.

25   Q.  You have no information that would cause you to believe

1   that Mr. Wu ever saw your plans at the time he talked to you;

2   isn't that correct?

3   A.  No.

4           THE COURT:  "No," it's not correct, or "no," he

5   didn't?

6           THE WITNESS:  No, it's not correct.

7   BY MR. HASSING:

8   Q.  Mr. Wu called you in 2004, and you had a five-minute

9   telephone conversation with him, correct?

10  A.  That's correct.

11  Q.  What was it in that telephone conversation that made you

12  believe that he had seen your improvement plans?

13  A.  Nothing in that conversation that would lead me to believe

14  that he saw my improvement plans.

15  Q.  Now, the work that you claim to have a copyright interest

16  in was created by a partnership called "Martin-McIntosh,"

17  correct?

18  A.  That's correct.

19  Q.  And the engineers that actually drafted the 5472 map were

20  employees of Martin-McIntosh, correct?

21  A.  That's correct.

22  Q.  You didn't draft the map yourself, did you?

23  A.  No, I did not.

24  Q.  Your revised tentative map was created in 1992?

25  A.  Was that a question?

1    Q.   Yes, sir.

2    A.   I believe it was.

3    Q.   And when you decided to sue these defendants for copyright

4    infringement, you learned that you couldn't do that until you

5    registered a copyright with the U.S. Copyright Office in

6    Washington D.C., correct?

7    A.   Because we had always put a copyright symbol on our

8    improvement plans, I assumed that they were copyrighted.  When

9    I decided to pursue that, I consulted with an attorney who

10   recommended that they be filed with the Copyright Office.

11   Q.   Well, your attorney not only recommended that they be

12   filed, but you learned from that conversation that they had to

13   be filed before you filed a lawsuit, right?

14   A.   Well, I'm not an attorney, so I -- it was my understanding

15   that by putting the copyright symbol on the plans, that they

16   were copyrighted.

17   Q.   Okay.  Sir, why did you then, all of a sudden, register

18   this particular copyright with the Copyright Office in

19   Washington D.C.?

20   A.   Because the attorney I consulted with recommended that

21   they be filed in the Copyright Office.

22   Q.   And you filed these -- you filed this document with the

23   Copyright Office in anticipation of filing this lawsuit,

24   right?

25   A.   Yes.

MCINTOSH X

216

1   Q.   Take a look, if you would, sir, please, at J 5, which is
2   the two-page Certificate of Registration.
3   A.   I have it.
4   Q.   Now, on this document, you're listed as the claimant,
5   correct?
6   A.   That's correct.
7   Q.   And that means that you are representing yourself as the
8   owner of the copyright, correct?
9   A.   That's correct.
10  Q.   Roger McIntosh, dba McIntosh & Associates, a sole
11  proprietorship, correct?
12  A.   That's correct.
13  Q.   And you indicate in this registration form that the work
14  being copyrighted was assigned from Martin-McIntosh to
15  McIntosh & Associates, which is you, on May 3rd, 1999, right?
16  A.   That's what the document says, yes.
17  Q.   Now, do you have any other written documentation, other
18  than P 110, that would substantiate the fact that
19  Martin-McIntosh transferred this copyright of these 5472 plans
20  to you?
21  A.   No.
22  Q.   You are relying totally, as far as your ownership of this
23  copyright, on P 110, which is the dissolution agreement
24  between you and Mr. Martin, correct?
25  A.   That's correct.

1   Q.  All right.  Now, we are going to talk about that agreement

2   a little bit, but first, I would like you to tell the jury

3   where you first got the idea that you could copyright an

4   expired tentative map and then sue somebody for developing a

5   map that looks similar to yours?

6           MR. TRAVIS:  Objection.  Calls for attorney-client

7   privilege.

8           THE COURT:  Sustained.  I'm not sure whether it does

9   or doesn't.  If you wish to add to your question an exclusion,

10  that would take care of it, but sustained.

11          MR. HASSING:  All right.  I will rephrase the

12  question.

13  BY MR. HASSING:

14  Q.  You learned that there was a possibility of filing a

15  copyright infringement action based on your Tentative Map 5472

16  from an article you read someplace; isn't that correct?

17  A.  That's correct.

18  Q.  And you read that article after this dissolution agreement

19  was entered into with your partner, right?

20  A.  That's correct.

21  Q.  Now, let's take a look at P 110.  I guess you have it in

22  front of you?

23  A.  Yes, I do.

24  Q.  This was drafted by a law firm in Bakersfield, right?

25  A.  Yes.

1   Q.  They put an awful lot of work into it, didn't they?

2   A.  Yes, they did.

3   Q.  What is it, about 150 pages, something like that?

4   A.  It's quite extensive.

5   Q.  All right.  Now, you would agree with me, would you not,

6   that this dissolution and redemption agreement, P 110, between

7   you and Martin, does not specifically mention an assignment to

8   you of any intellectual property or copyrights, does it?

9   A.  I believe I read that section earlier.  The sections I

10  referred to earlier I believe covers that.

11  Q.  Well, which -- okay.  Let me ask it this way.  I read

12  along with you when you recited from the agreement, and my

13  question is, there is nothing that you recited that

14  specifically refers to an assignment to you of any

15  intellectual property; isn't that correct?

16          THE COURT:  He is asking if those words were used.

17          THE WITNESS:  Oh, those specific words?  I don't

18  recall.  I believe it was "including, but not limited to, all

19  assets."

20  BY MR. HASSING:

21  Q.  All right.  We will get into that a little bit more in

22  more detail, but let me ask you this first.  When you and

23  Mr. Martin were negotiating this buy-out agreement -- and I

24  presume that you did negotiate it, correct?

25  A.  Yes.

1   Q.  It is fairly detailed, and Mr. Martin is going to get

2   about a million dollars, right?

3   A.  Over a million dollars, yes.

4   Q.  While you were negotiating this buy-out agreement, you and

5   Mr. Martin never did specifically address intellectual

6   property rights; isn't that correct?

7   A.  I believe it's covered in one of the sections that I

8   referred to.

9   Q.  Well, and I'm not talking about what's in writing right

10  now.  We are going to get to that.  I'm talking about your

11  discussions with Mr. Martin.  You and Mr. Martin had extensive

12  discussions about this agreement, correct?

13  A.  Yes.

14  Q.  There is a list of assets that's page after page after

15  page.  And you guys had to discuss all those, who was going to

16  get all those assets, what they were worth and that type of

17  thing, right?

18  A.  That's correct.

19  Q.  And in those discussions, the words "intellectual

20  property" never came up, did it?

21          MR. BRAZE:  Objection, your Honor.  Doesn't the parol

22  evidence rule apply?  Isn't this the final document -- I don't

23  believe you can go outside the agreement or beyond it under

24  the parol evidence rule.

25          MR. HASSING:  This does not have an integration

1    clause that I can see in it.

2         MR. BRAZE:  It's still a final expression between the

3    parties.

4         THE COURT:  Well, the issue is, without an

5    integration clause, the issue is whether or not the contract

6    intended to include, and in fact did include, the issue that's

7    being addressed.

8         So at this point, it is a factual issue, not a legal

9    issue.  And, of course, we are not talking about a breach of

10   contract issue here at all.  So the objection is overruled.

11   BY MR. HASSING:

12   Q.  If you can answer the question, sir.

13   A.  Well, it was our intention to split up the partnership.

14   Q.  I understand that.  And you did do that by this agreement,

15   right?

16   A.  Yes.  And I was to continue business in California and

17   Arizona, and Mr. Martin was to continue the business in

18   Nevada.

19   Q.  But in your negotiations with Mr. Martin, you guys did not

20   discuss intellectual property; isn't that true?

21        THE COURT:  You are talking about those words, is

22   that what you are asking?

23        MR. HASSING:  Yes.

24        THE WITNESS:  I don't recall.  We left it up to the

25   attorney to cover all those bases.

1   BY MR. HASSING:

2   Q.  In your conversations with Mr. Martin, not only did you

3   not discuss the term intellectual property, but you didn't

4   discuss copyright interests?

5          MR. TRAVIS:  Objection, relevance, to the extent that

6   Mr. McIntosh wasn't involved in creating the document.

7          THE COURT:  I'm not sure he has gone to that extent

8   in his testimony, so the objection is overruled.  I understand

9   what you are focusing in on a couple of answers ago, but that

10  is not -- his answer does -- was not conclusive in that

11  fashion.

12  BY MR. HASSING:

13  Q.  You can answer the question, sir.

14  A.  We discussed not interfering or releasing any intellectual

15  information or copyrights or interfere with each other's

16  business.

17  Q.  That's right.  But you didn't discuss who was going to

18  receive actual copyright interest, did you?  You didn't use

19  those terms in your negotiations?

20  A.  I believe it is mentioned in one of the paragraphs --

21  Q.  All right.  Let's take a look at that paragraph.

22  A.  -- that I read from.

23  Q.  Paragraph 13, on page 13.

24  A.  Correct.

25  Q.  In that paragraph, it says -- it's got a heading that

MCINTOSH X

222

1    says, "Trade Secrets and Intellectual Property"?

2    A.   Correct.

3    Q.   So you have got the term "intellectual property" in this

4    document, although you and Mr. Martin never discussed that

5    term, right?

6    A.   We agreed to that term.

7    Q.   And this paragraph says:

8              "Martin agrees not to divulge, communicate, use to the

9              detriment of the partnership, its affiliated

10             companies or any of their successor entities,

11             including, but not limited to, Roger McIntosh, dba

12             Martin-McIntosh, and Roger McIntosh, dba, Western

13             Photogrammetrics, for the benefit of any other person

14             or persons, or misuse in any way any confidential

15             information, trade secret, copyright, trademark,

16             patent," et cetera.

17             But nowhere in this paragraph does it say anything

18   about retention of copyright interest as an asset; isn't that

19   true?

20   A.   Not specifically.

21   Q.   All right.

22   A.   And you left out "intellectual property" in that statement

23   you were reading from.

24   Q.   All right.  And you are correct.  I did.  Let me continue

25   there.

223

1          "Misuse in any way any confidential information, trade

2              secret, copyright, trademark, patent, or other

3              intellectual property right of the partnership."

4          But there is nowhere in this particular paragraph

5    where anybody is talking about disposing of intellectual

6    property or a copyright interest, correct?

7    A.  I don't see it in there.  I felt that I paid for that

8    right, along with all the assets.

9          THE COURT:  Let me know when you have a natural break

10   in your question.  We have a couple of legal issues that we

11   need to take up, and we don't have to have the jury waiting

12   around for us to do that.

13         MR. HASSING:  How about like three minutes, something

14   like that?

15         THE COURT:  Okay.

16   BY MR. HASSING:

17   Q.  Mr. McIntosh, there was a catch-all phrase in this

18   agreement to cover assets that had been omitted; isn't that

19   correct?

20   A.  Could you refer me to it?

21   Q.  Yes, I will.  Take a look, if you would, at page 4 of 19,

22   and look at number small "d" at the bottom.  Do you see that?

23   A.  Small "d"?

24   Q.  Small "e"?

25   A.  E, yes, I see it.

224

1   Q.  And that heading is "Omitted Assets," right?

2   A.  Yes.

3   Q.  And there is a checkmark by that word, isn't there?

4   A.  I don't see that.

5        MR. HASSING:  Those are the original exhibits up

6   there, your Honor?

7        THE COURT:  As far as I know they are.

8        MR. HASSING:  Could I take a look at that, please.

9        THE COURT:  Sure.

10        MR. HASSING:  Not on that one.  Must be my checkmark.

11   BY MR. HASSING:

12   Q.  In any event, Mr. McIntosh, you and Mr. Martin anticipated

13   that there might be some assets that might not be included in

14   this dissolution agreement, right?

15   A.  We didn't anticipate there would be.  It looks like a

16   standard omitted asset statement.  It is a one-sentence, says

17   that "Any assets that have been omitted from the

18   above-referenced entities shall be divulged to the other

19   parties as such omitted assets are discovered."

20   Q.  Sir, have you ever notified Mr. Martin about your

21   discovery of the fact that you have what you think is a

22   valuable asset in this copyright?

23   A.  No.

24        MR. BRAZE:  Objection, calls for a legal conclusion.

25   It's irrelevant.

1          THE COURT:  On the first ground, it is overruled.

2          I will hold your second objection in abeyance because

3   it is one of the legal issues we are going to take up as soon

4   as the jury is done.

5          MR. HASSING:  Good breaking point then here, your

6   Honor.

7          THE COURT:  Ladies and gentlemen, we are going to

8   break as far as you are concerned.  We are going to keep going

9   for a while here.

10         But when you left your homes, you were on jury duty,

11  but you were not on a jury.  And I guarantee you, you have

12  become more interesting people to your family and friends now

13  because they are going to want to know the fact that you are

14  on a jury, what type of case.  "Don't tell me anything about

15  it.  Criminal or civil?  I'm not going to ask you anymore

16  about it," and then they do.

17         You need to be very careful, because once you start

18  answering a question, they impregnate, and then all of a

19  sudden, you are several questions down the road and you are

20  thinking, "I think we are talking about things what the judge

21  was talking about we shouldn't be doing."

22         And the way to take care of that is just not go down

23  the road at all.  If somebody asks you if you got on a jury,

24  you can say, "Yes, I did, but I can't tell you anything about

25  it, so please don't ask me," and stop and leave it there.

1        And if you are inclined, you can say, "But when I'm

2   off the jury, I will talk about it."  That's totally up to

3   you.  But you can't talk to them about it now.

4        Please, between the time you leave the courtroom now

5   and when you get back tomorrow morning, at 8:30 in the jury

6   room tomorrow morning, don't do anything having to do with the

7   case.  Don't talk about it, look anything up, do any

8   investigation of any nature.  Nothing.  Absolutely nothing.

9        Any questions?  Okay.  We will see you tomorrow

10  morning in the jury room, ready to go, at 8:30, and I think we

11  will be on time for you.

12        (The jury left the courtroom.)

13        THE COURT:  Let the record reflect that the jury has

14  left the courtroom.

15        I'm not sure where you are going.  We have a contract

16  between Mr. Martin and Mr. McIntosh that indicates and

17  includes language that makes it unmistakable that they view

18  copyright and intellectual, other intellectual issues present.

19  We know that because they refer to them.

20        Obviously, a copyright is not a debt or a deficit,

21  but rather, it is an asset to a company.

22        We then have another clause that says, "all assets

23  are assigned."

24        Where are we going here?

25        MR. HASSING:  Well, I can explain it this way, your

227

1   Honor.  The best way to do it, if I can, is take a look at

2   this agreement.  Here it is.  I think there is a lot of room

3   in there for debate on whether they intended to include and

4   whether to include the copyright and whether the copyright was

5   included.

6           THE COURT:  Where is the debate?  Do you have

7   information that I'm not seeing here that hasn't been

8   presented?

9           MR. HASSING:  I'm probably reading this a little bit

10  differently than you are, your Honor.  I have read it so many

11  times.  You are probably referring to paragraph 2(a) to begin

12  with.

13          THE COURT:  All I'm doing is referring to the

14  testimony so far and the references to the dissolution

15  contract.

16          MR. HASSING:  Yeah.  The reference in the agreement

17  on page 13, I think it is, to copyright and trademark, it is

18  an entirely different context than looking at copyright as an

19  asset.

20          Let me start this way.

21          THE COURT:  The fact that they mentioned it, the fact

22  that they mentioned it at all anywhere in it means that they

23  both recognized its existence.

24          MR. HASSING:  They recognized the existence of

25  copyright, yes, sir.  Yes, your Honor.

1          THE COURT:  All right.  And you'll admit, I think,

2     won't you, that there is only one way to view a copyright in

3     this context, and that is as an asset or at least a potential

4     asset?

5          MR. HASSING:  They didn't look at it that way in that

6     paragraph.  If you look the page 13 and read that paragraph,

7     they are only looking at copyright and trademark in the

8     context of damaging -- somehow Mr. Martin damaging

9     Mr. McIntosh by disclosing trade secrets.  And they throw in

10    the words "copyright" and "intellectual property," but they

11    don't in any way indicate that they are looking at it as an

12    asset.

13         THE COURT:  Wait a minute.  Just based on that

14    argument alone, if they are going down that road, talking

15    about the copyright, and basically Mr. McIntosh saying to

16    Mr. Martin, "There is nothing you can do as a result of our

17    agreement to in any way damage the copyright that is being

18    assigned to me."

19         MR. HASSING:  That's not what it's saying, your

20    Honor.  There is no talk about a copyright being assigned to

21    anybody.  That's the whole problem.

22         THE COURT:  Well, let's back up.  They are talking

23    about a copyright.

24         MR. HASSING:  Yes.

25         THE COURT:  They are talking about protecting the

1 copyright from one another.  That necessarily means that the

2 copyright is an asset.  Now, if it's an asset, and we then

3 move to the clause that says all assets are assigned, where is

4 your legitimate argument or where is any evidence to make this

5 a horse race rather than a done deal?

6     MR. HASSING:  Under your interpretation, as you just

7 laid it out, I would be cooked, your Honor.

8     THE COURT:  I'm trying to figure out how you can

9 interpret it any other way.

10     MR. HASSING:  Because under this heading here, under

11 "Trade Secrets and Intellectual Property," it says that:

12     "Martin will not divulge or use to the detriment of

13     the partnership or for the benefit of any other

14     person, or misuse in any way confidential

15     information, trade secrets, copyright, trademark,

16     patent, or other intellectual property right of the

17     partnership."

18     THE COURT:  Now, don't you agree that just based on

19 that statement alone, that they are viewing this as an asset?

20     MR. HASSING:  I don't, your Honor.  That's not the

21 way I'm reading it, and I'm being as honest and forthright as

22 I can.

23     THE COURT:  What do you think they are talking about,

24 something they don't want?  Something they don't think is an

25 asset?  Something that they think is the opposite of an asset?

1      MR. HASSING:  I'm thinking that this clause is

2  specifically put in there to protect Mr. McIntosh from

3  disclosure of confidential information.

4      THE COURT:  I agree with that statement.

5      MR. HASSING:  Okay.

6      THE COURT:  I agree with that statement.  I

7  understand what you are talking about there.  But the fact

8  that they are even talking about it in that context, the only

9  inference you can draw from that is that it was an asset.

10      MR. HASSING:  I'm not drawing that inference, your

11  Honor.  I'm not seeing it.  I'm just not seeing it.  I'm not.

12  And here's one of the reasons I'm not seeing it.  There is

13  attached to this dissolution agreement, there is an extensive

14  list of assets.  They have got every computer on there.  They

15  have got every truck, they have got all of their accounts

16  receivable.  It is probably 150 pages of assets, and they even

17  have pieces of real estate.

18      Nowhere in that list of assets is there any mention

19  made of a copyright, of a trade secret, of intellectual

20  property, nowhere.

21      Now, there is a catch-all phrase.

22      THE COURT:  That's right.

23      MR. HASSING:  There is a catch-all phrase -- I knew

24  you were going to come to that -- and it says -- it says --

25  and of course I am trying to interpret it in the best light

1    possible for my client, but I'm honestly interpreting it this

2    way.  It says, "Notwithstanding the omission of any asset from

3    Exhibit 1 or 2" --

4            THE COURT:  And what are Exhibits 1 and 2, the 150 --

5            MR. HASSING:  Yes.

6            THE COURT:  All right.

7            MR. HASSING:  Okay.

8        "Such omitted asset, if not already specifically

9            listed as an asset of another entity herein shall be

10           considered a partnership asset if the above

11           referenced criteria are satisfied."

12       You go back up to the above referenced criteria, and

13   the above referenced criteria is, "all assets located in the

14   State of California and/or used in the business."

15       My argument, your Honor -- and here's where I might

16   getting on a little bit of thin ice -- my argument is that

17   this intellectual property, this copyright, is not located in

18   California.  It is owned, at the time this document was

19   drafted, it is owned by Mr. Martin, who resides in Nevada, and

20   half of it by Mr. McIntosh, who resides in California.

21       And I, if I were Mr. Martin's attorney, would be

22   making an argument that that copyright asset is not included.

23       And my one last argument would be there is a million

24   dollars going to Mr. Martin because of all of the specific

25   assets that are listed here.

1          THE COURT:  Not exclusive, but go ahead.

2          MR. HASSING:  Okay.  Now, you just saw in opening

3     statement that they think that this copyright is worth five,

4     six, $7 million.  Five, six, $7 million.

5          And if I were Mr. Martin, I would be saying right

6     now, your Honor, "I did not anticipate or intend that my six

7     or $7 million asset would be going over to Mr. McIntosh for no

8     money at all because the million dollars that I got was

9     received by me because I gave away a million dollars worth of

10    other assets.  I did not give away that copyright."

11         THE COURT:  Well, that's a fine argument, but

12    Mr. Martin is not making it and we are stuck with the language

13    of the contract and the testimony of this witness at this

14    point.

15         MR. HASSING:  Yes, I know we are, your Honor.  And I

16    think -- I know Mr. McIntosh is going to disagree with my

17    analysis, but I have got the language of the contract that I'm

18    hanging my hat on, and I think that I should be entitled to

19    argue to the jury that, based on the language here, they can

20    determine, if they so choose, that the copyright was not

21    included as an asset.

22         THE COURT:  Okay.  Anything else?

23         MR. HASSING:  No, your Honor.

24         THE COURT:  Anybody else want to be heard?

25         MR. ALEXANDER:  No, your Honor, thank you.

1          MS. BARNES:  No, thank you.

2          THE COURT:  No, that contract is clear that it is

3    talking about a copyright, it is talking about intellectual

4    property.  It is talking about them because they are assets.

5    And there is an all encompassing clause of "all assets," and,

6    therefore, the Court makes a finding as a matter of law that

7    the asset of the copyright is included in the contract and it

8    was assigned.

9          Anything else?

10         MR. BRAZE:  No.

11         THE COURT:  Okay.  We will see you tomorrow morning

12   at 8:30, to finish up with this witness.

13         (The proceedings were adjourned at 4:44 p.m.)

14         I, PEGGY J. CRAWFORD, Official Reporter, do hereby

15         certify the foregoing transcript as true and correct.

16

17   Dated:   03/18/2010              /s/ Peggy J. Crawford
                                      PEGGY J. CRAWFORD, RDR-CRR
18

19

20

21

22

23

24

25