234

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

HON. LAWRENCE J. O'NEILL


ROGER McINTOSH,                    )
                                   )   1:07-cv-1080 LJO
          Plaintiff,               )
                                   )   JURY TRIAL, DAY 2
     vs.                           )
                                   )
NORTHERN CALIFORNIA                )
UNIVERSAL ENTERPRISES              )
COMPANY, a California              )
corporation, et al.,               )
                                   )
          Defendants.              )
_____)

Fresno, California                    Tuesday, March 2, 2010


REPORTER'S TRANSCRIPT OF PROCEEDINGS



Vol. 2, pgs. 234 to 465, inclusive






REPORTED BY:  PEGGY J. CRAWFORD, RDR, CRR, Official Reporter

235

APPEARANCES OF COUNSEL:

For the Plaintiff:                  LAW OFFICES OF BORTON PETRINI, LLP
                                    5060 California Avenue
                                    Suite 700
                                    Bakersfield, CA  93309
                                    BY:  **JAMES J. BRAZE**
                                         **JEFFREY A. TRAVIS**


For the Defendants:

(Northern/Lotus)                    LAW OFFICES OF STEVEN J. HASSING
                                    425 Calabria Court
                                    Roseville, CA  95747
                                    BY:  **STEVEN J. HASSING**

(DeWalt)                            ALEXANDER & ASSOCIATES, PLC
                                    1925 G Street
                                    Bakersfield, CA  93301
                                    BY:  **WILLIAM L. ALEXANDER**

(City of Wasco)                     GCR, LLP
                                    520 South Grand Avenue
                                    Suite 695
                                    Los Angeles, CA  90071
                                    BY:  **CHAKA C. OKADIGBO**
                                         **SUSAN GRAHAM BARNES**

236

# INDEX

**PLAINTIFF'S WITNESSES**:

**ROGER MCINTOSH**                                          259
FURTHER CROSS-EXAMINATION BY MR. HASSING     259
CROSS-EXAMINATION BY MR. ALEXANDER           339
CROSS-EXAMINATION BY MS. BARNES              347
REDIRECT EXAMINATION BY MR. BRAZE            358
RECROSS-EXAMINATION BY MR. HASSING           365
RECROSS-EXAMINATION BY MR. ALEXANDER         368

**KEVIN LAM**                                               369
DIRECT EXAMINATION BY MR. TRAVIS             369
CROSS-EXAMINATION BY MR. HASSING             372
CROSS-EXAMINATION BY MR. OKADIGBO            376
CROSS-EXAMINATION BY MR. ALEXANDER           377

**SARAH BURGI**                                             377
DIRECT EXAMINATION BY MR. BRAZE              377

**JOSHUA WOODARD**                                          382
DIRECT EXAMINATION BY MR. BRAZE              382

**GREGORY BLACK**                                           386
DIRECT EXAMINATION BY MR. BRAZE              386
CROSS-EXAMINATION BY MR. ALEXANDER           402
CROSS-EXAMINATION BY MR. OKADIGBO            407
REDIRECT EXAMINATION BY MR. BRAZE            408
RECROSS-EXAMINATION BY MR. ALEXANDER         414

**JEFFREY GUTIERREZ**                                       415
DIRECT EXAMINATION BY MR. BRAZE              416

**JAMES DELMARTER**                                         436
DIRECT EXAMINATION BY MR. BRAZE              436
CROSS-EXAMINATION BY MR. HASSING             447
CROSS-EXAMINATION BY MR. ALEXANDER           460
CROSS-EXAMINATION BY MR. OKADIGBO            463

* * * * *

237

## EXHIBITS

**PLAINTIFF'S**                                          **Received**

P 103, Page 142                                          272
P 104, Page A01473                                       272
P 103-A and P 104-A                                      272
P 104-B                                                  277
P 101 through 105                                        364
P 108                                                    372

**DEFENDANT'S**

D 250-A                                                  317
D 224                                                    331

1    Tuesday, March 2, 2010                Fresno, California

2    8:30 a.m.

3            (The following proceedings were had outside the

4            presence of the jury, to wit:)

5            THE COURT:  Back on the record.  Counsel are present.

6    Are we ready for the jury?

7            MR. BRAZE:  We had a couple of issues, your Honor.

8    Yesterday, you had ruled that, as I recall, that the evidence

9    of payments received by Mr. McIntosh were not relevant.  And

10   we have been attempting to redact that information from J 4,

11   and counsel has objected to that.

12           MR. HASSING:  Your Honor, yesterday, plaintiff

13   introduced Exhibit J 4, had it admitted into evidence, and

14   that was almost immediately after this Court ruled that we

15   weren't going to talk about payments that had been received by

16   Mr. McIntosh unless the plaintiff opened the door.

17           They immediately had J 4 introduced, admitted, and

18   now they want to redact the part that they don't want and

19   leave the part that they do want, and we object to that.

20           THE COURT:  The objection is sustained.  Once

21   something is in evidence, you can't redact anything.  It's in.

22           MR. BRAZE:  Well, your Honor, but you had previously

23   ruled that it wouldn't come in.

24           THE COURT:  Doesn't make any difference.  It was

25   offered, it was admitted without objection.  Once it is in, it

239

1    is in.

2              MR. BRAZE:  May we ask to have that redacted?

3              MR. HASSING:  No, your Honor.  Again, we made a

4    strong argument yesterday as to why it's relevant even that

5    these payments that were received be known to the jury.

6    Mr. McIntosh is here trying to get paid twice, is our opinion.

7    The Court ruled that you were going to leave it out unless

8    they opened the door.

9              THE COURT:  I remember the ruling.

10             MR. HASSING:  He stood right up and opened the door.

11   There is no reason now to take this out of evidence.  It's

12   already been admitted to evidence.  They are the ones who

13   admitted it.  They haven't demonstrated any prejudice.  They

14   haven't demonstrated any grounds, any good grounds for having

15   it taken back out of evidence now that it's been admitted into

16   evidence.

17             THE COURT:  Well, is it your position that you didn't

18   open the door?

19             MR. BRAZE:  Well, your Honor, first of all, we have

20   been trying to redact it.  There wasn't time yesterday.  In

21   fact, we asked how we should go about it.  We didn't show it

22   to the jury for that reason.

23             It was -- I didn't think that would be the

24   consequences, having it admitted, once you had already ruled

25   it wasn't relevant.

1          And so we would, based on mistake or inadvertence, I

2    would request to withdraw the exhibit or redact the exhibit as

3    it exists.

4          THE COURT:  My question is, is it your position that

5    you did not open the door in any manner?

6          MR. BRAZE:  We didn't question the witness on any of

7    the payments he received.  We only questioned the witness as

8    to that exhibit as to the total amount he charged for the

9    work.

10          MR. HASSING:  Your Honor, they have made it even

11    worse now.  They have asked the Court to allow them to

12    withdraw it based on mistake, and now they admit it wasn't a

13    mistake.  They knew this was in here and they intentionally

14    had it admitted.

15          THE COURT:  Let me ask you the question that is more

16    important and that is, how did they open the door?  Be more

17    specific.  I'm talking about how did they open the door in

18    front of the jury.

19          MR. HASSING:  I don't think that the jury saw the

20    exhibit.

21          THE COURT:  I think they didn't too.

22          MR. HASSING:  Okay.

23          THE COURT:  So my question isn't that.  My question

24    is how did they open the door in front of the jury?  In other

25    words, what is different now versus before yesterday when the

1  | ruling was made that it was not relevant?

2  | MR. HASSING:  First of all, are we sure they didn't

3  | show it on the Elmo?

4  | MR. BRAZE:  Positive.

5  | MR. HASSING:  I don't remember them doing it, but I

6  | can't be positive.

7  | THE COURT:  If they had shown it, I would have

8  | remembered it.

9  | MR. HASSING:  All right, fine.  If the jury didn't

10 | see it, the jury didn't see it.  But, you know, we prepare our

11 | case at night and in the morning based on the evidence that

12 | comes in the day before.  I spent a lot of time going over

13 | these things this morning, which, if this is now taken back

14 | out of evidence, was a total waste of time.

15 | I think that counsel, in having it admitted, knowing

16 | that it was there and then hoping to get it out later, wasn't

17 | acting in good faith, didn't make a mistake, and there is no

18 | grounds to take it out of evidence at this time.

19 | THE COURT:  How did they benefit in any way by doing

20 | it that way?

21 | MR. HASSING:  I don't know how they did benefit, your

22 | Honor.  I can't see that they did benefit by doing it that

23 | way.

24 | MR. ALEXANDER:  Your Honor, I see a concern that you

25 | have Mr. McIntosh testifying, trying to tie together all of

1  his expenses relating to the 480, even though we limited it to

2  the 33, so that the jury has heard all of that testimony.

3         I think they also should be entitled to hear that the

4  lion's share of the expenses that he is claiming now were

5  expenses related to the 480 and not to the 5472 tract matter.

6  So there is that relationship there.

7         THE COURT:  Well, are you suggesting that the jury

8  not hear testimony on cross-examination or on the defense side

9  that the -- that any expenses having anything to do with the

10  larger tract or the larger development just be totally ignored

11  and not be in at all?

12         MR. BRAZE:  That's not the issue.  The column that we

13  want to redact on J 4 is as to the amount paid.  If they want

14  to question him as to the amount he charged for the larger

15  tract, that's fair game.  We are talking about what payments

16  he received.

17         There is four columns charged, and then three columns

18  relating to payments, as to how much paid, due and total.

19  Those are the columns we want to redact.  It is just how much

20  he received.  How much he charged, if they want to question

21  him on that, they can, as far as how it relates to the other

22  tracts.

23         THE COURT:  You want the jury to know how much he

24  charged, but not how much he was paid?

25         MR. BRAZE:  That was the ruling yesterday.  He is

1   entitled to recover the value of his work, it doesn't matter

2   whether he was paid a dollar or a million dollars.

3           THE COURT:  Doesn't make a difference whether he

4   charged a dollar or a million dollars; that doesn't establish

5   the amount of worth, does it?

6           MR. BRAZE:  That's our contention, it does, that an

7   engineer's efforts, which he measures by what he charged, is

8   the value of his work.

9           THE COURT:  If there is evidence to indicate that he

10  charged a certain amount but was paid and accepted a certain

11  other amount, you think that's not evidence of worth any more

12  than it is the amount charged?

13          MR. BRAZE:  Well, there is no evidence of that.  It

14  is not a situation where he was paid what he asked for.  The

15  evidence has been is that he never was fully paid, and that's

16  when Mr. Wu called, because you recall, he said he wanted what

17  he was owed.  He never accepted a lesser amount for what his

18  charges were.

19          MR. HASSING:  Your Honor, and that really brings us

20  to another issue here that's very related.  He told Mr. Wu

21  that he wanted paid what was left owing.  Now, we need to

22  establish, we are entitled to establish --

23          THE COURT:  No, there hasn't been testimony to that

24  yet.

25          MR. HASSING:  But there will be.

1          THE COURT:  All right.

2          MR. HASSING:  And when he says to the jury, "I told

3    Mr. Wu that I wanted to be paid what was left owing" --

4          THE COURT:  Assuming that testimony comes in.

5          MR. HASSING:  And it will.

6          THE COURT:  All right.

7          MR. HASSING:  -- I'm entitled to ask him what that

8    amount was and how it was calculated.

9          THE COURT:  Well, I think you are.  And here's why I

10   think he is, is because if that testimony, first of all, comes

11   in, that Mr. McIntosh indicated to Mr. Wu that he wanted that

12   amount that was owed to him to be paid before he was going to

13   do any more work or allow any of his product to be used by

14   Mr. Wu, then the fact that Mr. Wu didn't use him, that is a

15   reason that the jury could believe.

16         Whether they do or not is not my issue, but they

17   could believe that that's the reason that Mr. Wu did not use

18   Mr. McIntosh rather than Mr. Wu's attempting to basically

19   steal the work product, not pay for it.

20         MR. BRAZE:  Well, we would -- if that was the

21   situation, we would view Mr. McIntosh's comments as a

22   protected settlement effort, that out of the blue, he is

23   negotiating with a guy in a way to resolve it.

24         THE COURT:  Well, there is no evidence that I have

25   heard from Mr. McIntosh that this was any type of a

1   settlement.  He had no beef with Mr. Wu.  He had no -- there

2   was no claim for Mr. Wu.  What's there to settle?

3          MR. BRAZE:  Well, if you recall, he said he talked

4   about it and he said, "I will give you a proposal as to the

5   work you want me to do."

6          THE COURT:  Right.  And I understand that's what

7   Mr. McIntosh testified to.  But the representation is that

8   Mr. Wu is going to say that Mr. McIntosh told him, "This is

9   how much I'm owed still."  $300,000 in interest brought it up

10  to $800,000.

11         And if Mr. Wu testifies Mr. McIntosh said, "I expect

12  to be paid for that before I do any work or you use my

13  product," that is incentive for Mr. Wu to go someplace else,

14  to wit, to Mr. DeWalt, rather than a motivation, as you are

15  suggesting or at least inferences can be drawn so far, that

16  Mr. Wu did that because he wanted to go on the cheap and steal

17  Mr. McIntosh's product.

18         MR. BRAZE:  Well, it was my understanding of the law

19  when we came in here that a person who is suing for copyright

20  infringement can recover the value of their work, irrespective

21  of how much had been paid.

22         THE COURT:  That may be true, but you have already

23  brought up the inferences that can certainly be easily drawn

24  by the jury that Mr. Wu had a motivation that shows what he

25  did and why he did it.

1       And the defense is entitled to say, "No, that's not

2  what happened.  It's something else.  There was a different

3  motivation, to wit, we are not paying $800,000 just out of the

4  box."

5       MR. BRAZE:  Well, I'm not sure exactly how that

6  relates to J 4, though.  I understand you can do it by

7  testimony, but the admissibility of J 4 is something

8  different, I believe.

9       THE COURT:  Well --

10       MR. BRAZE:  And you have to realize, the reason it

11  has a "J" in front of it is these are exhibits we had worked

12  with a long time ago prior to the Court's ruling.  It is not

13  like we prepared them after the Court had ruled.

14       THE COURT:  No, I understand that.  But the fact that

15  they have a J means that it is a Joint Exhibit and when it

16  came in, it's at least presumed by me that it's a Joint

17  Exhibit.  It came in because everybody agrees.

18       MR. BRAZE:  Understand.  We did have that -- like I

19  say, we did have that issue floating around that never got

20  resolved which we finally had the Court address yesterday.

21       THE COURT:  Well, I think Mr. Alexander's position is

22  that it is different from what's being -- what was originally

23  being argued by Mr. Hassing, and that is, Mr. Hassing is

24  arguing that there is prejudice to him now to have J 4 come in

25  and then out, redacted, and then back in, because he has put

1    work on it.

2            Mr. Alexander's position is that it comes in, it

3    shouldn't be redacted because it's still relevant for other

4    issues that we have just been talking about.

5            MR. BRAZE:  And the issues I believe he stated were

6    that it relates to work beyond the 5472 tract.  And that has

7    nothing to do with how much he was paid.  That has to do with

8    how much he charged.

9            MS. BARNES:  May I be heard, your Honor, for the

10   City?

11           THE COURT:  Yes.

12           MS. BARNES:  Just for the record, Susan Barnes.  We

13   agree with the other defense position.

14           THE COURT:  Which one?

15           MS. BARNES:  Both of them.  I mean I think -- but I

16   wanted to add our position, which is simply that we had a

17   lengthy conference, the lawyers, pursuant to the Court's

18   orders, and we agreed on joint exhibits.  And the issue of

19   redacting did not come up at that time, sir.  And our position

20   would be we are entitled to rely on that, because the parties

21   agreed.  There was no discussion, "Well, we are going to want

22   to redact and we need to hold this one aside."  It was just

23   one of the ones that was agreed upon.

24           THE COURT:  You are arguing Mr. Hassing's position,

25   prejudice.

1        MS. BARNES:  Well, it was agreed upon.  It is

2   prejudicial at this point.  We prepared our cases -- not just

3   last night -- based on what we thought were the joint

4   exhibits.  It has been admitted, and, yes, I agree with

5   Mr. Hassing.  I also agree with Mr. Alexander.

6        These numbers are, if you will, some of them relate

7   to the value that at one point, the plaintiff put on some of

8   these items.  And that, sir, we would submit, is an admission

9   against interest that we ought to be able to have in evidence

10  on the issue of the actual value of this property.

11       THE COURT:  Well, Mr. Alexander, do you agree or

12  disagree with Mr. Braze's statement that you're not talking

13  about the same thing that he is talking about with regard to

14  redaction?

15       MR. ALEXANDER:  I disagree, because I think what

16  Mr. McIntosh wants the jury to hear is that, "I charged a

17  million two or a million one on this entire project."

18       "I have broken it down for, for example, to Tract

19  Number 5618, Tract Number 5472, but I don't want the jury to

20  know that I was paid for any of that work."

21       And I think it also goes to the value for

22  Mr. McIntosh to try to carve out 480 acres versus the 33.

23       In other words, Mr. McIntosh would like the jury to

24  think that his value in relation to 5472 is 1.1 million.

25  That's his charges for the 480 acres.  That's why I don't

1  think you can separate them, your Honor.

2          THE COURT:  No.  What's the difference between the

3  charges, which nobody is suggesting is irrelevant, versus the

4  amount paid based on the charges, not compromised, not

5  accepted in full, but rather paid, partially paid; what's the

6  relevance of that?  What does that establish?

7          MR. ALEXANDER:  One example would be that if

8  Mr. McIntosh is going to suggest that his value is his unpaid

9  amount, then we must know the amount he charged and we must be

10  able to offset the amount he was paid to know the unpaid

11  amount.

12          THE COURT:  Why is he wrong?

13          MR. BRAZE:  Well, again, let's go back to when we had

14  this meeting that Ms. Barnes referred to.  We were together

15  doing exhibits.  We had not yet received your rulings on any

16  of the motions in limine when we went through the exhibit, and

17  it was our contention that you had addressed the issue about

18  not allowing the amount paid as evidence.  They disagreed with

19  that.

20          But you finally made that ruling yesterday at the

21  start of the trial that evidence of how much Mr. McIntosh was

22  paid is not relevant.

23          THE COURT:  What about addressing Mr. Alexander's

24  position, that if you want to bring in the amount that was

25  charged as some evidence of the accurate amount of damages,

250

1    how do you get to the actual amount of damages?

2            If the jury believes the figure on the amount

3    charged, why should the jury then exclude or not consider the

4    amount paid to subtract from the amount charged to get to the

5    amount of damages?

6            Because I understand you're wanting the amount

7    charged as some indication of worth, but the reason you want

8    the amount of worth is because you are trying to establish

9    damages.

10           But if some has been paid, how is that not relevant

11   to ultimately the amount of damages?

12           MR. BRAZE:  Because, as we stated yesterday, how much

13   he was paid, whether it was a dollar or a million, is

14   irrelevant.

15           THE COURT:  Well, it's not irrelevant if the jury

16   believes that the amount charged is -- establishes the

17   watermark for the damages.  Because the damages, the next step

18   is, well, was any of that paid to lower the amount of the

19   amount charged?

20           MR. BRAZE:  And we contend that second question is

21   irrelevant because the plaintiff is entitled to recover the

22   value of the work.  And the only value that an attorney or an

23   engineer has is his efforts, the time spent, the time billed.

24           THE COURT:  The value of the work, you are trying to

25   establish that value, that amount by the amount charged, in

1  part, at least, right?  Right?

2          MR. BRAZE:  Yes.

3          THE COURT:  Okay.  So if the jury buys that, how is

4  that not a double-dip?

5          MR. BRAZE:  Well, that's the point.  The copyright

6  holder is entitled to a double-dip because it is like having

7  your car stolen.  Because it was all paid off, you didn't

8  suffer anything, but you are still entitled to recover the

9  value of your car back.

10          THE COURT:  Well, wait a minute.  That's a false

11  analogy because nobody has paid you anything for a stolen car

12  before it is stolen; you paid them.

13          MR. BRAZE:  Well, I'm saying it is not a double-dip

14  if you had your car paid off and you get your money back.

15          What I'm saying is I understand copyright law -- and

16  maybe I'm wrong, but as I understand it, a copyright plaintiff

17  is entitled to recover the value of their work, nothing to do

18  with how much they were paid for it, depending on the type of

19  work, not even how much money they put into it.

20          THE COURT:  Do you have any law to establish that?

21  That a person who owns a copyright, if paid for work done, can

22  sue someone else for that same work that's already been paid

23  for?

24          MR. BRAZE:  Well, I believe we do.

25          MR. TRAVIS:  Your Honor, it is in our brief.  It is

252

1  actually in the Ninth Circuit jury instructions.

2        THE COURT:  Where?  Read it.  Read it and cite it.

3        MR. TRAVIS:  It is actually in the statute

4  themselves.

5        THE COURT:  Read it.

6        MR. TRAVIS:  "The amount a willing buyer would have

7  been reasonably required to pay a willing seller at the time

8  of the infringement for the actual use made by the defendant

9  of the plaintiff's work."

10        THE COURT:  That is not a misstatement of law.  That

11  part is true, but we are not talking about just that.  We are

12  talking about a situation in addition to that, where someone

13  has been paid.  We are talking about a credit.  We are talking

14  about a double-dip, a double payment.  I need law on that.

15  And I don't think you are going to find it.

16        MR. TRAVIS:  You know what, I think you are right,

17  your Honor, I don't think we will find it.  However, what I

18  will say is if the defendants are going to limit the value

19  based upon what Mr. McIntosh previously testified as to what

20  he was owed, then that's fine.

21        THE COURT:  What else could they do?

22        MR. TRAVIS:  I mean Mr. McIntosh, as I recall his

23  testimony, claimed that he was owed plus interest.  And he

24  didn't have an exact figure at that time.  So we would then

25  ask that Mr. McIntosh -- that we will establish what that

1   interest was from the date of time that Mr. Wu called

2   Mr. McIntosh until now, or, you know, calculate that interest

3   fully at the time of when he was called by Mr. Wu.

4           THE COURT:  What is the basis of any interest being

5   owed?  Was there a judgment?

6           MR. TRAVIS:  It was based upon the contract.

7           THE COURT:  So the contract provides for a certain

8   amount of interest of unpaid from a certain date forward; is

9   that what you are saying?

10          MR. TRAVIS:  That's true.  And that's how

11  Mr. McIntosh was calculating what he was owed.

12          THE COURT:  By whom?

13          MR. TRAVIS:  Well, Mr. McIntosh understood that

14  that's what he was owed as the value of the work and how he

15  established the value of the work based on what he was owed

16  by -- based on the breach of the original contract with The

17  Legacy Group.

18          THE COURT:  You are not suggesting that a person who

19  was not a party to that contract owed him based on a contract?

20          MR. TRAVIS:  That's what Mr. McIntosh testified was

21  the value, that he believed was the value of the work.

22          THE COURT:  He is entitled to say what he believes.

23          MR. TRAVIS:  Sure.

24          THE COURT:  But I'm asking you if you believe, if

25  it's your position that someone else, a nonparty to that

1    contract, owes interest.  And if so, on what basis, what legal

2    basis?

3           There is no judgment.  That person is -- nobody else

4    is a party to that contract.  Nobody assumed the obligations

5    of that contract.  The contract was not in any way assigned.

6    What's the legal basis?  No matter what Mr. McIntosh's belief

7    was, what is the basis for including the interest?

8           MR. TRAVIS:  If you are asking for a legal basis, it

9    is what a willing buyer would be -- whatever the language is,

10   what a reasonable buyer would -- a buyer would be willing to

11   pay for the work.

12          THE COURT:  Exactly.

13          MR. TRAVIS:  Right.

14          THE COURT:  And no reasonable buyer is going to say,

15   "I would be glad to pay the interest that somebody else that

16   entered into a contract with him was willing to pay."

17          So my question is:  No matter what Mr. McIntosh

18   thought and believed, I'm asking you, are you believing that

19   you should be able to tell the jury that part of the worth was

20   that interest, and, if so, on what basis?

21          MR. TRAVIS:  They want Mr. McIntosh to testify --

22   they are going to ask him what he believed the value was, and

23   that's what he testified in deposition.  And if they go up and

24   ask him that on the stand, that's exactly what he is going to

25   testify he believed that value was.

1          THE COURT:  What's the relevance of that, what he

2    believed it was worth?  We are talking about what he is

3    entitled to get as a matter of law.  What difference does it

4    make what he believes if his belief was false?

5          MR. BRAZE:  Well, our argument was that he is

6    entitled to recover the value of his work, period.

7          THE COURT:  Yes, I agree with that.

8          MR. BRAZE:  Mr. Wu asked him what he would take for

9    it, and he said, "I would take what I'm owed," and if that

10   amount owed happens to be $800,000 with interest, it is less

11   than the value of the work.  So Mr. Wu still had a bargain,

12   but Mr. Wu never pursued that.

13         THE COURT:  Well, I think that there is --

14   apparently, there is a factual difference between the two

15   sides on what that conversation encompassed.  It's up to the

16   jury to believe which it was.

17         But, again, Mr. Wu would have had to have his head

18   examined to somehow assume the interest debt of a contract

19   when he wasn't party to the contract and is not obligated in

20   any way, legally or otherwise, to pay that interest.

21         MR. BRAZE:  Well, his option was to redo all the maps

22   and plans.

23         THE COURT:  That's what he says he did.

24         MR. BRAZE:  No.  No, they used -- he testified they

25   simply used Mr. McIntosh's improvement plans and took them

1   over to the new tract without paying him, without even getting

2   his permission.

3        He went and did a record request to the City of Wasco

4   for a new tract map and got his own plans back.  They didn't

5   ask his permission or pay him for him.

6        THE COURT:  I think at this point, we are in a

7   factual dispute, and I understand.

8        MR. BRAZE:  I guess the basic issue is, legal issue

9   is, is Plaintiff McIntosh able to recover the value of his

10   worth measured by his time and effort in dollars per hour, or

11   is he -- they allowed to deduct from that the amount he was

12   paid.  And our position is they aren't.

13        THE COURT:  And you have given me no law to indicate

14   that they are not entitled to a credit and your client is

15   entitled to a double-dip.

16        MR. TRAVIS:  Your Honor, they have also presented no

17   law that we are not entitled to a credit, and they are the

18   ones that are raising the objection.

19        THE COURT:  Well, the standard law is that people

20   don't double-recover.

21        MR. TRAVIS:  I have never seen that with this

22   particular statute.

23        THE COURT:  I have never seen anybody get double

24   recovery.  So I can't just say, "Well, the burden is on you

25   because you objected," and just ignore the law.

1          Okay, anything else?

2          MR. BRAZE:  Yes.

3          THE COURT:  That request is denied.

4          What else?

5          MR. BRAZE:  Outside the jury yesterday -- the jury

6    heard a lot of argument before they were dismissed.  And

7    outside the jury yesterday, you made a ruling that as a matter

8    of law, Mr. McIntosh was assigned the interest of

9    Martin-McIntosh in the copyright.

10          THE COURT:  That's true.

11          MR. BRAZE:  We would request the jury be advised of

12   that.

13          THE COURT:  I think that's appropriate.

14          MR. ALEXANDER:  No objection, your Honor.

15          MR. HASSING:  No objection.

16          THE COURT:  Let's bring the jury in.

17          (The following proceedings were had in the presence

18          of the jury, to wit:)

19          THE COURT:  All right.  Let the record reflect the

20   jury has joined us.

21          Ladies and gentlemen, we are not starting late as far

22   as we are concerned.  We have been at it on legal issues.  If

23   I had realized that we had these legal issues when you left, I

24   would have had you come in just a little later, but we didn't,

25   and these took a little longer, but they are important.

1          I can't short-circuit legal objections and legal

2    discussion and argument because I have to -- it is my

3    obligation to have a record for the reasons that I make

4    certain decisions that affect the case.  And that's what we

5    were doing.  We were not out here eating doughnuts.

6          One of the things that, at the end of the day

7    yesterday, you were hearing some testimony, questioning and

8    answers, on the issue of the assignment of rights and whether

9    or not certain rights were or were not included.

10         You will remember that there was testimony that early

11   on, the plaintiff, Mr. McIntosh, had a relationship, a

12   business relationship with a man by the name of Martin.  And

13   Martin and McIntosh, you will remember, decided to go their

14   separate ways business wise, and there was a very lengthy

15   agreement, written agreement when they dissolved their

16   business.

17         I'm telling you that as a matter of law, that when

18   that dissolution took place between Martin and McIntosh, that

19   Mr. McIntosh was assigned all of the assets of that prior

20   business, and that included any rights that Mr. McIntosh --

21   any rights that the original business had concerning

22   copyright.

23         So Mr. McIntosh has a right as a result of that other

24   agreement with this nonparty, Martin, and Mr. McIntosh to

25   pursue the copyright.

1          Any questions about what that means?  Okay.

2          We are ready.

3          Mr. McIntosh, if you would retake the stand, and we

4     will go ahead and continue with Mr. Hassing and finish with

5     cross.

6                         **ROGER MCINTOSH**,

7     called as a witness on behalf of the Plaintiff, having been

8     previously sworn, testified as follows:

9                    FURTHER CROSS-EXAMINATION

10    BY MR. HASSING:

11    Q.  Mr. McIntosh, good morning, sir.

12    A.  Good morning.

13    Q.  Yesterday on direct examination, questioning by your

14    attorney, Mr. Braze, towards the end of the direct

15    examination, Mr. Braze asked you a series of questions about

16    your improvement plans.  He asked you about Exhibit P 102,

17    P 103.  P 103 is the Master Land Use Plan.  P 104 was the

18    Master Water Plan, P 105 was the Master Utility Plan.

19          And at the conclusion of that questioning, he asked

20    you if you had prepared those documents.  And I believe you

21    were testifying that, in your opinion, these were the

22    documents that were sent off to be copyrighted.

23          But when he asked you if you had prepared these

24    documents, you started to say something, and then you

25    hesitated, and then you said, "Yes."

1          I wondered about that, and I went back and reviewed

2   these documents and I have some questions for you about them.

3          102 is your Master Sewer Plan, correct?

4   A.   That's correct.

5   Q.   All right.  And the truth of the matter is that your

6   company didn't prepare all the documents that are included in

7   these exhibits that were sent off to the Copyright Office;

8   isn't that true?

9   A.   I don't believe that these documents were sent off to the

10  Copyright Office.  I don't think that was my testimony.

11  Q.   Oh, you have not testified that these documents were

12  copyrighted?

13  A.   Not to my recollection.

14  Q.   All right.  Let's take a look at P 103.  P 103 --

15  A.   If I could clarify?

16  Q.   P 103 is your Master --

17          THE COURT:  Just a second.  Do you need clarification

18  in your answer?

19          THE WITNESS:  Well, I think the question was did

20  Martin-McIntosh prepare these documents.  We weren't

21  discussing whether or not these were copyrighted.

22          These exhibits were prepared, on the front of them,

23  prepared for The Legacy Group by Martin-McIntosh.  And the

24  reason I hesitated was because there are some -- is some

25  language in here that was probably provided by others, but the

1    majority of the work was prepared and put together in a report

2    by Martin-McIntosh.

3    BY MR. HASSING:

4    Q.   All right.  In fact, if you would take a look, sir, at the

5    document contained in P 103 that's Bates-stamped 142.  Would

6    you take a look at that?

7    A.   I have it.

8    Q.   And in fact, this is a document that's contained in your

9    Master Water Plan, correct?

10   A.   That's correct.

11   Q.   And in fact, this document is a document that was prepared

12   by another engineering company, Porter-Robertson; isn't that

13   correct?

14   A.   That's correct.

15   Q.   And you understand Mr. Porter is on our witness list?

16   A.   I don't know who is on your witness list.

17   Q.   Well, up until a week ago --

18           See if I can use this, your Honor.

19           THE COURT:  Is that in evidence?  Can't show it to

20   the jury unless it is in evidence.

21           MR. BRAZE:  I believe we moved P 101 through P 105

22   into evidence yesterday.

23           THE COURT:  I don't think they were accepted.  There

24   was an objection and they were not admitted.

25   ///

MCINTOSH - X

262

1   BY MR. HASSING:

2   Q.  You never got Mr. Porter's permission to include this

3   document within your submittal, did you?

4   A.  I don't know who provided this to be included in this

5   package.

6   Q.  That's not my question, sir.  You never got Mr. Porter's

7   permission to have it included in your package, did you?

8   A.  I don't know.  I didn't talk to Mr. Porter or directly

9   oversee the preparation of these reports.

10  Q.  Take a look, sir, at the document Bates-stamped A00144 of

11  your Exhibit P 103.

12  A.  Okay.

13  Q.  P 103 -- or excuse me.  This Exhibit 144, that's also a

14  Porter-Robertson document, isn't it?

15  A.  That's correct.

16  Q.  And it is --

17      MR. BRAZE:  Objection, your Honor.  You can't

18  question a witness about a document that's not in evidence.

19      THE COURT:  No, that's overruled.  He can't show the

20  jury, but he can question him about it.

21      MR. BRAZE:  I meant about the contents.

22      THE COURT:  No, because that's how you lay a

23  foundation to get the document into evidence, if that's the

24  goal.  Overruled.

25  ///

MCINTOSH - X

263

1  BY MR. HASSING:

2  Q.  Porter-Robertson was actually an engineering company that

3  created the Master Sewer Plan for this 480 acres; isn't that

4  correct?

5  A.  Originally, yes.

6  Q.  Yes.  And you included within your P 103 a copy of

7  Porter-Robertson's Master Sewer Plan; isn't that correct?

8  A.  That's correct.

9  Q.  Take a look, if you would, sir, at the document

10  Bates-stamped 146 within your exhibit.

11         THE COURT:  We are still on the P 103, correct?

12         MR. HASSING:  Yes, your Honor.

13         THE COURT:  Thank you.

14  BY MR. HASSING:

15  Q.  Are you there?

16  A.  I have it.

17  Q.  Now, that is a copy of Porter-Robertson's Master Storm

18  Drain Plan for this entire 480-acre subdivision; isn't it?

19  A.  That's correct.

20  Q.  And your company included that within your documents that

21  are submitted as your Master Water Plan, correct?

22  A.  I believe so.  I don't think that's copyrighted either.

23  Q.  Take a look at P 102, if you would, please.  What is

24  P 102?

25  A.  This is the Master Sewer Plan for Valley Rose Master

1  Planned Community, prepared by Martin-McIntosh.

2  Q.  All right.  And take a look, would you, please, at the

3  document in that exhibit that's Bates-stamped 1439.

4  A.  I'm there.

5  Q.  All right.  You see a paragraph 2?

6  A.  Yes, I do.

7  Q.  Did you know at the time that 103 was put together that

8  the --

9          THE COURT:  102 or 103?

10         MR. HASSING:  We are at 10 --

11         MR. ALEXANDER:  -- 2.

12         MR. HASSING:  -- 2 now, your Honor.  Did I say 103?

13         THE COURT:  Yes, it's all right.  Go ahead.

14 BY MR. HASSING:

15 Q.  At the time 102 was put together, did you understand that

16 the Master Sewer Plan that had been prepared by the

17 Porter-Robertson engineering company had been made a part of

18 Exhibit 102?

19 A.  Well, as it states:

20         "The Master Sewer Plan for the project area prepared

21          by Porter-Robertson Engineering was approved by the

22          City Engineer on May 24th, 1991.  The following study

23          is a revision to that plan and analyzes the sewering

24          of the project into mainlines along proposed streets

25          through the south end of the project area."

MCINTOSH

265

1  Q.  That's right.  And what your company did is it prepared a

2  revised sewer plan, right?

3  A.  That's correct.  That's what this P 102 is.

4  Q.  And it used the Robertson Engineering plan in order to

5  prepare that, correct?

6  A.  We had to have a sewer study to be --

7  Q.  That's a "yes" or "no."

8  A.  I'm trying to answer the question.

9          THE COURT:  Just a second.  Hang on.

10          THE WITNESS:  We had to have a sewer study.

11          THE COURT:  Just a minute.  Here's the question.

12          (The question was read back.)

13  BY MR. HASSING:

14  Q.  "Yes" or "no"?

15  A.  Yes.

16  Q.  All of your plans that you prepared for construction

17  within the subdivision were prepared based on your analysis

18  and revision of plans that Porter-Robertson had done earlier;

19  isn't that correct?

20  A.  We revised the original plans and studies done by

21  Porter-Robertson when we took over the project.

22  Q.  Now, J 5 that has been admitted into evidence is the

23  Certificate of Copyright in this case, do you recall that?

24  A.  Yes, I do.

25  Q.  When you copyrighted your work, you indicated that it was

1  original work, not a derivative work; isn't that correct?

2  A.   That's correct.

3  Q.   There is a place on this form to register derivative work;

4  are you aware of that, on the back page?

5  A.   Could you point it up to me?

6  Q.   It's line 6, on the second page.

7  A.   I see it.

8  Q.   And there is nothing filled in on that line, is there,

9  sir?

10  A.   No, it's blank.

11  Q.   Take a look, if you would, at -- within P 102, at the

12  document Bates-stamped 1447.  Are you at that page?

13  A.   Yes, I am.

14  Q.   If you take a look at the subsequent pages up through

15  1457, do you see that?

16  A.   Yes.  I have them.

17  Q.   These ten pages were all prepared originally by the City

18  of Wasco for Standards For Sanitary Sewers; isn't that

19  correct?

20  A.   These are copies of the City of Wasco's standards for

21  sanitary sewer, design standards, yes.

22  Q.   Take a look, if you would, at P 103 again.  And look at

23  the document Bates-stamped 109 through 114.  Do you recognize

24  that document, sir?

25  A.   I see it as a description of the project.  It's titled,

1    "Environmental Setting," and it goes through a description of

2    what the project is all about.

3    Q.   Right.  And it also says -- it also is, is it not, sir,

4    language copied from a previous Environmental Impact Report

5    and the City of Wasco General Plan; do you see reference to

6    that on page 1 of that document?

7    A.   It refers to the City of Wasco General Plan and describes

8    what that plan shows.

9    Q.   And it also talks about the following language having been

10   stated in the Environmental Impact Report, does it not?

11   A.   Where are you looking?

12   Q.   Just right before the City of Wasco General Plan at 2.2.

13   A.   Yes.  It says, "The following is a brief description of

14   the existing conditions of the Valley Rose Community, as

15   stated in the EIR" --

16   Q.   Nothing -- I thought you were finished.

17   A.   -- "the City of Wasco General Plan and general

18   observation."

19   Q.   All right.  Everything that's included in these ten pages

20   after that line, sir, was taken from other documents and was

21   not the original -- was not originally authored by anybody at

22   Martin-McIntosh; isn't that correct?

23   A.   Well, under General Observation, we would have had to

24   refer to a number of documents to have prepared this

25   Environmental Setting Summary.

1   Q.   And in referring to those documents, somebody at

2   Martin-McIntosh took pieces of those documents and inserted

3   them into this document; isn't that correct?

4   A.   Yes.

5   Q.   Take a look, if you would, at P 104, and tell us what

6   P 104 is again.

7   A.   P 104 is Master Water Plan for Valley Rose Master Planned

8   Community, prepared by Martin-McIntosh.

9   Q.   And take a look, if you would, at the document

10  Bates-stamped 1466 in that exhibit.

11  A.   I have it.

12  Q.   Take a look, if you would, at paragraph 2 of that page,

13  sir.

14  A.   I have it.

15  Q.   Does referring to that page refresh your recollection that

16  your work was an addendum to the Porter-Robertson Engineering,

17  which had been approved by the City with regard to the water

18  plan?

19  A.   It reads:

20       "Master Water Plan for the project area prepared by

21       Porter-Robertson Engineering was approved by the City

22       Engineer on May 24, 1991.  The following study is an

23       addendum to the approved plan and analyses water

24       system with mainlines aligned with the proposed

25       roadways and wells cited in the parks and community

MCINTOSH

269

1       areas."

2   Q.   And again, you understand, do you not, that

3   Porter-Robertson, prior to you getting involved in this

4   project, had done an entire comprehensive Water Master Plan

5   for this 480 acres, correct?

6   A.   That we addended, yes.

7   Q.   You took that plan, used that plan, and modified that plan

8   to come up with your particular plan; isn't that correct?

9   A.   That's correct.

10  Q.   Did you ever get Porter-Robertson's permission to do that

11  with their water plan?

12  A.   I don't believe theirs was copyrighted.

13  Q.   Sir, that's not what I asked you.  I asked you if you ever

14  got their permission to do that with their water plan?

15  A.   Not that I recall, but I wasn't the engineer that was

16  working on the project, so I wasn't directly involved.

17  Q.   Take a look, if you would, at 1473.

18  A.   I have it.

19  Q.   Now, 1473, you tell me what it is.  It has your letterhead

20  on it.  And it is included within your Exhibit 104, is it not?

21  A.   Yes, it is.  It is titled, "System Schematic."

22  Q.   What is it a system schematic of?

23  A.   It is very small.  I can't read that.  You have a better

24  copy?

25  Q.   I don't know if I have a better copy or not.  I'm happy to

MCINTOSH

270

1    show you mine, though, sir.

2    A.   That's fine.  I have had a detached retina, so it is a

3    little hard to see.  I'm sorry.  I can't read that.

4    Q.   Okay.

5    A.   It is something about a water plan.

6    Q.   You caught the word "water" in there, right?

7    A.   I see "Water Plan."

8    Q.   So this is something that your company prepared?

9    A.   Yes.

10   Q.   And you know that because you have got your logo at the

11   bottom, right?

12   A.   That's correct.

13   Q.   You see these notes over at the right-hand side of this

14   document, 1473?

15   A.   I see there are some notes at the right-hand side which

16   are even smaller than what I just tried to read.

17   Q.   Let's go back to Exhibit P 103 and look at page 142 again.

18   A.   I have it.

19   Q.   Page 142, as you indicated earlier, was the original

20   Master Water Plan prepared by Porter-Robertson, correct?

21   A.   That's what it says, yes.

22   Q.   You see the notes at the top right-hand side of the page

23   that Porter-Robertson prepared?

24   A.   I see some notes there.

25   Q.   All right.  And you see the notes on the top right-hand

1   side of the page that your company prepared for its revised

2   water plan?

3   A.   I'm sorry, which Bates stamp?

4   Q.   1473.

5   A.   1473?  Yes.

6   Q.   Those are the same notes, aren't they?

7   A.   I really can't read those.  I don't know.

8   Q.   Do you have any larger plans of yours that you brought to

9   trial that we could read?

10  A.   Of these?

11  Q.   Yes, sir.

12  A.   I don't recall if we do have those or not.

13        MR. HASSING:  Your Honor, at this point, I would move

14  that the Porter-Robertson Master Water Plan that's

15  Bates-stamped 142 that has been identified as such be admitted

16  into evidence.

17        THE COURT:  So you are moving P 103 as part of that

18  Bates number 142, only that one page?

19        MR. HASSING:  One page, your Honor.

20        THE COURT:  Any objection?

21        MR. BRAZE:  Well, first of all, yes.  We made no

22  claim that P 101 through 105 were copyrighted.  It is P 108

23  that we were claiming is copyrighted.

24        MR. HASSING:  That has nothing to do with my offer.

25        THE COURT:  If you have a legal objection, pose it.

MCINTOSH

272

1          MR. BRAZE:  Relevance.

2          THE COURT:  It's received.

3          (Plaintiff's Exhibit P 103, Page 142 was received.)

4          MR. HASSING:  Also, your Honor, I would like to have

5   admitted into evidence a document Bates-stamped A01473 from

6   P 104, which, for the record, is the Martin-McIntosh Revised

7   Water Plan.

8          THE COURT:  Any legal objection?

9          MR. BRAZE:  No.

10          THE COURT:  It's received.

11          (Plaintiff's Exhibit P 104, Page A01473 was

12   received.)

13   BY MR. HASSING:

14   Q.  Let's take a look, if we can, at those notes and see if we

15   can make them large enough to look at.  I'm going to first --

16   I guess we ought to put exhibit numbers on these documents,

17   your Honor.  My last exhibit was D 257.

18          THE COURT:  Well, don't we -- I see what you are

19   saying.  How about this, since they are already marked P 103,

20   how about P 103-A and P 104-A for the two documents you have

21   just moved and have been received.

22          MR. HASSING:  That's fine.

23          (Plaintiff's Exhibits P 103-A and P 104-A were

24   received.)

25   ///

1    BY MR. HASSING:

2    Q.  Starting first --

3            THE COURT:  Make sure the clerk ultimately gets

4    those.  All right, done.

5    BY MR. HASSING:

6    Q.  Starting first with P 103-A, which, for the record, is the

7    Porter-Robertson Master Water Plan.

8            Is there a way to make this focus in or not?

9            Can you see that now, Mr. McIntosh?

10   A.  It's better, yes, thank you.

11           MR. HASSING:  And does everybody have that?

12           THE COURT:  It's on your screens, isn't it?  Good.

13   BY MR. HASSING:

14   Q.  See Note Number 1?

15           "Well Site Number 1 will be constructed at the first

16           phase of development within the golf course.  Well

17           modified and connected to the system as a backup

18           source of supply."

19           Do you see that?

20   A.  Yes.

21   Q.  Let's see if we can take a look at P 104-A, which is the

22   Martin-McIntosh Water Plan, and see if that's the same.  It

23   reads, "Well Site Number 1 will be constructed with the first

24   phase of development."

25           Oh, boy.  It's awful hard to read.

1  A.  So it is not me.

2  Q.  It is not just you, sir.  Let's take a look at it this

3  way, on P 103-A, which is a Porter-Robertson map.

4  Porter-Robertson, in their notes, had 12 notes followed by

5  some additional notes with regard to pipe sizes.  In looking

6  at P 104-A, it looks like your Revised Water Plan had 12

7  notes, plus some additional notes.

8        Do you know if -- do you know if the language on

9  P 104-A is separate and independent from the language on

10  P 103-A?  Do you know that, sir?

11  A.  They appear to be independent.  The notes that were on the

12  original study looked to be standard engineering notes or

13  requirements for the project.  The revised study that we

14  prepared expanded on those notes and added a few notes, but

15  they are general engineering notes.  The plans are not the

16  same.

17  Q.  So what you are saying is that your company expanded on

18  the notes that Porter-Robertson put on their paper.  You used

19  some of them, you expanded on them, you maybe exchanged some

20  of them and you might have added some of them; is that your

21  testimony?

22  A.  Our study was a revision to the original master study.

23  And the notes that were added on probably were a requirement

24  of the City of Wasco in order to get the plan approved.

25  Q.  Okay.  So what you are saying, if I understand you

1  correctly, is that the majority of the notes on your plan were

2  the same as were on Porter-Robertson's plan, but you had to

3  make some revisions and you had to make some additions because

4  of the City of Wasco's requirements; is that correct?

5  A.  In order to revise the study, because, again, the two

6  plans are not the same.  We had to get with the City of Wasco

7  and the developer and prepare a revised study that addressed

8  the revised project.

9  Q.  All right.  They are not exactly the same, are they?

10 A.  They don't appear to be.

11 Q.  You took the Porter-Robertson Master Plan and used of it

12 what you could and then to make it fit the changes you were

13 making in the subdivision, you did some revisions; is that

14 correct?

15 A.  Yes, and to meet the requirements of the City of Wasco.

16 Q.  Let's take a look at P 104 again, and let's look at the

17 document Bates-stamped 1476.

18 A.  I have it.

19 Q.  1476 through 1479, can you tell me what that is?

20 A.  It looks like calculations from a flow network analysis

21 for the Valley Rose Planned Community.

22 Q.  Now, this work was taken from some source other than an

23 original authorship of Martin-McIntosh, correct?

24 A.  I don't know where it came from.  It doesn't have a

25 "prepared by" on it or a signature on it.

MCINTOSH

276

1  Q.  Well, does this look like the kind of a document that

2  somebody from Martin-McIntosh, back in 1992, would sit down

3  and prepare, just on their own?  Or does it look like it came

4  from a different source?

5  A.  It looks like something we may have prepared, but I can't

6  say for sure.

7  Q.  You don't know if you did or not?

8  A.  I don't know.  If I could take a minute, I may be able to

9  answer that question.

10  Q.  All right.

11  A.  The calculations are immediately following Bates stamp

12  1475, which is a map prepared by Martin-McIntosh, which shows

13  the water system, revised water system, master -- maximum hour

14  demand, and the nodes that are referred to on these

15  calculations appear to be related to the map that we prepared.

16  So I would guess that we prepared those calculations.

17  Q.  But you don't know if you did or not?

18  A.  I don't know for sure, but it is reasonable to make that

19  guess.

20  Q.  Take a look, if you would, at A 1480.

21  A.  I have it.

22  Q.  What is A 1480?

23  A.  It is the maximum day plus 1,000 gallons per minute plus

24  node 10.

25  Q.  All right.  And this is something that was prepared by

1    your company?

2    A.   Yes.

3    Q.   And the notes at the top right-hand side were prepared by

4    your company?

5    A.   Yes.

6              MR. HASSING:  Your Honor, I would move this document

7    into evidence.

8              THE COURT:  Any objection?

9              MR. BRAZE:  This document being?

10             THE COURT:  P 104, Bates 1480.

11             MR. BRAZE:  No objection.

12             THE COURT:  Received.

13             (Plaintiff's Exhibit P 104-B was received.)

14             THE COURT:  We will put that as P 104-B.

15   BY MR. HASSING:

16   Q.   Let's take a look at the notes on this Martin-McIntosh

17   document and let's compare them to the notes on the

18   Porter-Robertson document, which is P 103-A.  This being your

19   document, sir.  104-B.  And you've got 11 notes there,

20   correct?

21   A.   11 on the screen.

22   Q.   11 on the screen.  And then we have some notes underneath

23   that.  Again, are these notes that were taken originally from

24   the Porter-Robertson Water Plan and then modified and revised

25   by you, as required by the City of Wasco?

1  A.  They appear to be in order to match the revised overall

2  master plan.

3  Q.  I would like to have you take a look, if you would, at

4  1484 through 1518 of P 104, consisting of about 34 pages.

5  A.  I'm sorry, what was the last page number?

6  Q.  1518.

7  A.  I have it.

8  Q.  These documents all have something to do with the

9  Martin-McIntosh revised water system, correct?

10 A.  They appear to be -- yes, they appear to be prepared by

11 us.

12 Q.  The first page of that is a plan with notes on it,

13 correct?

14 A.  That's correct.

15 Q.  At the top?  All right.  And that's followed by additional

16 flow network analysis, correct?

17 A.  That's correct.

18 Q.  And at page 1418, there is another Martin-McIntosh parcel

19 map with, again, notes on it regarding the Revised Water Plan,

20 correct?

21 A.  I don't see 1418 in this group.  This starts at 1484 and

22 goes through 1518.

23 Q.  1488, I'm sorry.

24 A.  Could you repeat the question?

25 Q.  Yeah.  You see that as another Martin-McIntosh Revised

1    Water Plan?

2    A.   Yes.

3    Q.   All right.  And it also has notes up at the top right-hand

4    side?

5    A.   That's correct.

6    Q.   And it's followed by numerous pages of flow network

7    analysis?

8    A.   That's correct.

9    Q.   Page 1492, same thing; it's a drawing of a 480-acre parcel

10   with water lines running through it?

11   A.   That's correct, I see that.

12   Q.   And it's also got the same notes up at the top?

13   A.   It has a number of notes at the top.

14   Q.   All right.  And it's followed by a flow chart?

15   A.   That's correct.

16   Q.   All right.  And then we have a couple more, as you go

17   through here, of Martin-McIntosh plans, right, with notes at

18   the top?

19   A.   That's correct.

20   Q.   Is it your testimony, sir, that you believe that all of

21   these plans and all of these notes are in some way based on

22   the Porter-Robertson original water plan?

23   A.   No.  These plans are not the same as Porter-Robertson's.

24   Q.   No, I didn't ask you if they were the same, sir.  I said

25   all of these plans drawn by Martin-McIntosh are based somewhat

280

1   on the original Porter-Robertson Master Water Plan; isn't that

2   correct?

3   A.   No.   When the original Master Water Plan was prepared and

4   approved by the City of Wasco, then that becomes the document

5   that you have to follow for subsequent subdivisions.

6        We revised the plan in order to change the land plan

7   and prepare the Tentative Tract 5472.   That had to be done

8   first before we could even do a Tentative Map 5472, so we took

9   the originally-approved master plan by Porter-Robertson,

10  revised it, and had it reapproved in the new format.

11  Q.   And in revising the Porter-Robertson plan, you used that

12  plan and you used portions of it with revisions; isn't that

13  correct?

14  A.   The plan is a completely different plan.   The notes are

15  similar because they are engineering notes that are required

16  to be on these type of studies by the municipality, City of

17  Wasco.

18  Q.   Are you telling me then that the documents I'm holding in

19  my hand that we just reviewed are somehow, as they relate to

20  the Porter-Robertson original plan, somehow different from the

21  ones we talked about?

22  A.   I don't understand your question.

23  Q.   As I understood your testimony earlier when we talked

24  about the McIntosh revised plan, your testimony was you took

25  the Porter-Robertson Master Plan, you made revisions to it,

281

1  you took their notes, you made revisions and additions,

2  correct?

3  A.  Yes.

4  Q.  Is there any difference, then, with respect to the

5  documents I'm holding in my hand now?  Did you use a different

6  formula or format in coming up with your own plan, your

7  revised plan, as it relates to the Porter-Robertson original

8  plan, than you did with these earlier documents?

9  A.  Well, if the Porter-Robertson Master Plan was the plan

10 that we could use, we wouldn't have had to revise it.

11       MR. HASSING:  Your Honor, I object as nonresponsive

12 and move to strike.  Ask the witness to answer the question.

13       THE COURT:  Objection is sustained.  Here's the

14 question.

15       (The question was read back.)

16       THE WITNESS:  Yes.  Our plan is a different plan than

17 the Porter-Robertson plan.

18       MR. HASSING:  Objection.  Nonresponsive.  Move to

19 strike.

20       THE COURT:  The answer "yes" is responsive.  That's

21 in.  The rest is out as it is nonresponsive.

22       MR. HASSING:  Thank you, your Honor.

23 BY MR. HASSING:

24 Q.  Take a look, if you would, at 1525.

25 A.  I have it.

1              THE COURT:  We are still on P 104?

2              MR. HASSING:  Yes, your Honor.

3              THE COURT:  Thank you.

4    BY MR. HASSING:

5    Q.  Take a look at 1525 through 1539.

6    A.  I see that.

7    Q.  These documents are all included within your Exhibit P

8    104, correct?

9    A.  That's correct.

10   Q.  And these documents are all prepared by the City of Wasco,

11   right?

12   A.  These are copies of the City of Wasco's Standards For

13   Water Systems.

14   Q.  Take a look, if you would, sir, at 1551 of your Exhibit

15   104.

16   A.  I have it.

17   Q.  And that document goes through 1558.  Do you see that?

18   A.  1558 or 15 -- I see 15 --

19   Q.  1558, sir, I want you to go to.

20   A.  Okay.  Not 1559?

21   Q.  1558?

22   A.  Okay.

23   Q.  This document was prepared by John Carollo Engineers?

24   A.  That's what it says on it.

25   Q.  Who is John Carollo Engineers?

283

1  A.  They are an engineering firm located, I believe they have

2  an office located in Bakersfield and other cities.

3  Q.  Did you get their permission to include this within your

4  water plan?

5  A.  I believe this was a document that was given to the City

6  of Wasco and they gave that to us as part of the requirements

7  for --

8          MR. HASSING:  Objection, move to strike.

9          THE COURT:  It's stricken.  The question is:  Did you

10 get their permission to include this within your water plan?

11         THE WITNESS:  Not that I recall.

12 BY MR. HASSING:

13 Q.  Take a look, if you would, at 1551 through 1568.

14 A.  I have that.

15 Q.  Do you recognize that document, sir?

16 A.  Yes.  It's a document prepared by the City of Wasco

17 titled, "Future Well Capacity."

18 Q.  This document was prepared by John Carollo Engineers,

19 correct?

20 A.  I don't know.  It says "City of Wasco."

21 Q.  Are you looking at page 1561, sir?

22 A.  I'm looking at 1562.

23 Q.  Let's look at 1561.

24 A.  It just says Appendix A.

25 Q.  What does it say?

1    A.   "John Carollo Engineers, Future Well Capacity Study."

2    Q.   Right.  This was a document that was proposed by John

3    Carollo Engineers, right?

4    A.   I don't know.  It says "City of Wasco" on the next page.

5    Q.   Well, for sure, it wasn't prepared by your company, right?

6    A.   No, we didn't prepare this.

7    Q.   You never got Mr. Carollo's permission to include this

8    within your water plan, did you?

9    A.   Not that I know of.

10   Q.   Take a look, sir, if you would, please, at document

11   Bates-stamped 1694.

12   A.   I have it.

13   Q.   Now, I asked you earlier about the flow network analysis

14   documents that we were looking at, didn't I?

15   A.   Yes, you did.

16   Q.   And you thought that, well, maybe your company had

17   prepared those, right?

18   A.   They appeared to be.

19   Q.   All right.  Does looking at this software system, Kelex

20   Software System Flow Network Analysis, refresh your

21   recollection as to who prepared those flow charts?

22   A.   No, it doesn't.

23   Q.   All right.  Now, P 105 is a different exhibit of yours,

24   correct?

25            THE COURT:  Different from what?

MCINTOSH

285

1       MR. HASSING:  Different from 104.

2  BY MR. HASSING:

3  Q.  P 105 is another exhibit, sir, correct?

4  A.  P 105 is another exhibit, yes.

5  Q.  That's another one of the exhibits that you testified

6  yesterday that your company had prepared, right?

7  A.  This is a Master Utility Plan for the Valley Rose Master

8  Planned Community, prepared by Martin-McIntosh.

9  Q.  In preparing that document or that plan, you also used the

10  Porter-Robertson original plan, did you not?

11  A.  Could you refer me to what you are talking about?

12  Q.  Well, do you know if you did or not?

13  A.  I would have to look through a hundred pages to find it.

14  Q.  Okay.

15  A.  If I could -- I think I found it.

16  Q.  What number are you on, sir?

17  A.  The Bates stamp 1596, paragraph 2.

18          "Approved study.  Master Sewer Plan for the project

19           area prepared by Porter-Robertson Engineering was

20           approved by the City Engineer on May 24th, 1991, and

21           adopted with Annexation Number 23.  The following

22           study is a revision to that plan and analyzes the

23           sewering of the project into mainlines along proposed

24           streets through the south end of the project area."

25  Q.  So if I understand you correctly, then -- you correct me

1  if I'm wrong -- the McIntosh Utility Plan is a revision of the

2  Porter-Robertson plan; is that correct?

3  A.  Actually, this P 105 is a Master Utility Plan, and I'm not

4  sure.  This paragraph that I just read to you says "Master

5  Sewer Plan."

6  Q.  Master Sewer Plan?

7  A.  Okay.  But this is the Master Utility Plan.

8  Q.  That's the way you put your exhibit together?

9  A.  Apparently, that's a mistake.

10  Q.  We are talking about the Master Sewer Plan here right now?

11  A.  I think we are talking about the Master Utility Plan.

12  Q.  That makes reference to the Porter-Robertson Master

13  Utility Plan?

14  A.  No.  It makes reference to the Master -- Porter-Robertson

15  Master Sewer Plan.

16  Q.  Could I see that exhibit?  You looking at 1589, sir?  1589

17  of P 105 is the Master Utility Plan.

18  A.  It says "Master Utility Plan."

19  Q.  All right.  And within that, we have also got P 1592,

20  which is the Master Sewer Plan, right?

21  A.  Oh, yes, you are right.  Yes, this is the Master Sewer

22  Plan.

23  Q.  Right.  And your sewer plan, the Martin-McIntosh sewer

24  plan, is a revision of the Porter-Robertson sewer plan; isn't

25  that correct?

MCINTOSH

287

1  A.  Yes, it is.

2  Q.  Take a look, if you would, at J 30.

3  A.  I have it.

4  Q.  J 30 is in evidence as a Joint Exhibit.  And it is a

5  letter that was written by Ronald Staub on your letterhead.

6  Who is Ronald Staub?

7  A.  He was the Project Engineer on the Valley Rose Estates

8  Master Planned Community.

9  Q.  And he is writing letter to Mr. Cairns at the City of

10  Wasco, correct?

11  A.  That's correct.

12  Q.  Bullet point 1 of the letter states:

13          "Topographic contours have not been replotted since

14           they appear on the originally-approved map submitted

15           by Porter-Robertson."

16          Do you know what map Mr. Staub was referring to in

17  this letter?

18  A.  It was the original Tentative Tract Number 5472.

19  Q.  And it says that at the top of the letter, doesn't it?

20  A.  Yes, it does.

21  Q.  That this letter is referring to Revised Tentative Tract

22  Map 5472, and the revised one is the one you prepared?

23  A.  That's correct.

24  Q.  Mr. Staub, in this letter, is indicating to the City that

25  Martin-McIntosh hasn't replotted the topographic contours

1    because they already appear on Porter-Robertson's map and you

2    are just going to use those, correct?

3    A.   It says that:

4         "Per section 16.16.030.11, referring to the City of

5         Wasco Municipal Code, topographical contours have not

6         been replotted since they have been submitted on the

7         originally approved maps by Porter-Robertson."

8    Q.   What that means is Martin-McIntosh didn't replot the

9    topographic contours when it drafted its Revised 5472,

10   correct?

11   A.   That's correct.

12   Q.   Because those contours are already shown on the

13   Porter-Robertson map, correct?

14   A.   That's what it says.

15        MR. HASSING:  I would like, if I could, to hand the

16   witness his deposition testimony.

17        THE COURT:  Sure.

18   BY MR. HASSING:

19   Q.   You and I have talked about the Revised Tentative 5472

20   before, haven't we, sir?

21   A.   Many times.

22   Q.   I'm going to read aloud, with the Court's permission, a

23   short portion of testimony from Mr. McIntosh's January 28th,

24   2009, deposition, starting at page 268, line 10, and going to

25   269, line 2.

1          THE COURT:  Counsel, if you would look, see if there

2     is an objection, let me know.

3          MR. TRAVIS:  I missed the first.

4          THE COURT:  268:10 to 269:2.

5          MR. TRAVIS:  No objections.

6          THE COURT:  Go ahead.

7          Before he does that, ladies and gentlemen, counsel is

8     going to read from a deposition.  You need to understand that

9     a deposition is provided for by law and it allows counsel to

10    ask a witness, whether it's a party witness or any other

11    witness, but an attorney to ask a witness questions.

12         There is a court reporter there and the witness at

13    the time giving the answers is under oath, the same oath that

14    a person takes here in the courtroom.

15         So the testimony is to be viewed in the same light as

16    far as its import and impact.

17         Any questions?

18         Okay.  Go ahead.

19         MR. HASSING:  (Reading)

20         "Question:  Is the tentative map that Martin-McIntosh

21          prepared for Tract Number 5472 the only tentative map

22          that was prepared for the Tract Number 5472, to your

23          knowledge?

24         "Answer:  No.

25         "Question:  It's not?

1          "Answer:  No.

2          "Question:  Okay.  Do you know who prepared the other

3           tentative map?

4          "Answer:  Martin-McIntosh.

5          "Question:  Okay.  I think I'm missing something.  Let

6           me ask --

7          "Answer:  What you have is a revised tentative map.

8           There was an original tentative map that was prepared

9           and it was revised.  We did both of them.

10         "Question:  Okay.  So no one else, other than

11          Martin-McIntosh, had prepared a tentative map for

12          Tract Number 5472; is that correct?

13         "Answer:  Not to my knowledge."

14    BY MR. HASSING:

15    Q.  Did I read that correctly, sir?

16    A.  Yes, you did.

17    Q.  Now, in fact, we all know now that there was another

18    company, an engineering company, that did prepare a Map 5472

19    before your company did, correct?

20    A.  That's what it appears.

21    Q.  And that was Porter-Robertson, right?

22    A.  That's what it appears.

23    Q.  Let's take a look at J 25.  Do you see J 25?

24    A.  Yes, I do.

25    Q.  Can you tell me what that is?

MCINTOSH

291

1    A.   That is a Tentative Tract 5472, prepared by

2    Porter-Robertson.

3    Q.   All right.

4              MR. HASSING:   I believe that's in evidence, is it

5    not, your Honor?  All the Joints are in, aren't they?

6              MR. TRAVIS:   No objections.

7              THE COURT:   Yes, they are.

8    BY MR. HASSING:

9    Q.   This is a blowup of J 25, is it not, sir?

10   A.   I don't know that it's a blowup.  It appears to be the

11   original size.

12   Q.   All right.  It is a copy of J 25?

13   A.   It appears to be a copy.

14   Q.   All right.  And this is the one that Porter-Robertson

15   prepared before you did, correct?

16   A.   That's correct.

17   Q.   Everybody see that okay?

18             Now, actually, when Martin-McIntosh prepared its

19   Revised 5472, your company borrowed some things from this

20   Porter-Robertson map, didn't it?

21             MR. TRAVIS:   Objection, vague and ambiguous.

22             THE COURT:   The objection is overruled.  It appears

23   to be a foundational question.

24             THE WITNESS:   I can't answer the question only

25   because I wasn't involved in preparing the revised tentative

MCINTOSH

292

1   map.

2   BY MR. HASSING:

3   Q.  Okay.  But you have reviewed both maps during the course

4   of this litigation, correct?

5   A.  Which "both maps"?

6   Q.  You reviewed the Revised 5472 that you prepared and you

7   have compared it from time to time with the original Tentative

8   Map 5472 that Porter-Robertson prepared, correct?

9   A.  I have seen the original Tentative Tract 5472 that

10  Porter-Robertson prepared and somewhat compared them, but not

11  in great detail.

12  Q.  Let's have you take a quick look at your own Map 5472.  Do

13  we have an exhibit number on 5472?

14          MR. TRAVIS:  Several.

15          THE WITNESS:  J 26.

16  BY MR. HASSING:

17  Q.  J 26, do you have that in front of you?

18  A.  Yes.

19  Q.  I would like you to compare J 26 with J 25 as I go through

20  a couple things here.  Now, there is a street on Robertson's

21  Tentative 5472 that is in front of the houses that back up to

22  the golf course; do you see that?

23  A.  Yes, I do.

24  Q.  All right.  And Porter-Robertson named their street Pebble

25  Beach Way, correct?

1   A.   That's what it appears.

2   Q.   On your map, you also have a street that's in front of the

3   houses that back onto the golf course, correct?

4   A.   Yes.

5   Q.   What did you name your street?

6   A.   Pebble Beach Way.

7   Q.   You took that name right off the Porter-Robertson map,

8   didn't you?

9   A.   We probably named that street in accordance with some of

10  the street names on 5472.

11  Q.   What do you mean by that, sir?

12  A.   Well, the theme was a golf course theme, so when you

13  prepare a tentative map, you can name the streets.  And the

14  developer wanted to continue that theme in the community.

15  Q.   Okay.  And did that developer at the time, to your

16  knowledge, have a copy of Tentative Tract 5472 that

17  Porter-Robertson had prepared?

18  A.   Probably.

19  Q.   But you don't know that?

20  A.   I don't know that.

21  Q.   All right.  You had one though, didn't you?

22  A.   Yes.

23  Q.   And are you telling us then that because it was a golf

24  course community, that you just came up with the name Pebble

25  Beach Way, or did you look at the Porter-Robertson map and

1  take that name from their map?

2  A.  I can't answer that because I wasn't involved in the

3  preparation of the revised tentative tract.

4  Q.  There is a street that intersects Pebble Beach Way and it

5  fronts on the houses that are on the northerly most portion of

6  the Porter-Robertson map; do you see that?

7  A.  Yes, I do.

8  Q.  And Porter-Robertson named that street St. Andrews Lane,

9  didn't they?

10  A.  That's what it appears.

11  Q.  And on your tentative map, you've also got a street that

12  fronts houses which are located at the most northerly portion

13  of the map, right?

14  A.  Yes.

15  Q.  And what did you name your street?

16  A.  St. Andrews Crescent.

17  Q.  Okay.  So one is St. Andrews Lane and one is St. Andrews

18  Crescent, right?

19  A.  Yes.

20  Q.  Where did your company come up with the name St. Andrews?

21  A.  I don't know where it came from.  I wasn't involved in the

22  preparation of the revised tentative map.

23  Q.  So you don't know if one of your draftsman took it from

24  the Porter-Robertson map then or not, do you?

25  A.  No, I do not.

MCINTOSH

295

1    Q.  Your map that your company prepared has a street that's

2    called Sawgrass Court, right?

3    A.  I believe so.

4    Q.  And do you see a Sawgrass Court on the map prepared by

5    Porter-Robertson before yours was prepared?

6    A.  It's hard to read, but looks like the southerly cul-de-sac

7    there.

8    Q.  That would be this one right here?

9    A.  Yes.

10   Q.  That says "Sawgrass Court," doesn't it?

11   A.  Does it?

12   Q.  You tell me.  Here's a bigger one for you.

13   A.  Yes.

14   Q.  All right.  And do you know whether or not your company

15   took that name from the Porter-Robertson map?

16   A.  No, I don't.  It could have been from the developer.

17   Q.  It could have been from the developer, it could have been

18   from one of your draftsman that took it from the other map

19   though, couldn't it?

20        MR. TRAVIS:  Objection, calls for speculation.

21        THE COURT:  Sustained.

22   BY MR. HASSING:

23   Q.  Take a look at J 2.

24   A.  I have it.

25   Q.  All right.  We talked about J 2 -- or we didn't.  You and

MCINTOSH

296

1    Mr. Braze talked about J 2 yesterday, right?

2    A.   I believe so.

3    Q.   And for the record, J 2 is a staff report apparently from

4    the City of Wasco.  It is a four-page document.  And I

5    realized something in looking at this this morning.  This is a

6    staff report concerning the Porter-Robertson 5472 submittal,

7    isn't it?

8    A.   That's what it says.

9    Q.   This has nothing to do with your submittal of the revised

10   5472, correct?

11   A.   This would have come first.

12   Q.   Yes.  And this would have nothing to do with your

13   submittal, correct?

14   A.   No.  Ours was not submitted until after this was.

15   Q.   Do you see any place in this staff report where the City

16   is requiring Porter-Robertson to use any particular names for

17   their subdivision, 5472?

18   A.   No.

19           THE COURT:  Let me know when you have a natural break

20   in your questioning.

21           MR. HASSING:  Right here, your Honor.

22           THE COURT:  Okay.  Ladies and gentlemen, let's take

23   the morning recess.  15 minutes.  Come back, and we will

24   finish with this witness.  Please remember, don't discuss the

25   case among yourselves.

```
 1              (The jury left the courtroom.)

 2              (Recess)

 3              THE COURT:  Back on the record.  Counsel are present.

 4    Are we ready for the jury?

 5              MR. HASSING:  Yes.

 6              THE COURT:  Mr. McIntosh, if you would retake the

 7    stand, please.

 8              (The following proceedings were had in the presence

 9              of the jury, to wit:)

10              THE COURT:  All right.  The jury has joined us and

11    the witness is on the stand.

12              We will go ahead and complete cross-examination,

13    Mr. Hassing.

14              MR. HASSING:  Okay, your Honor.

15    BY MR. HASSING:

16    Q.  Mr. McIntosh, we were talking earlier about these two

17    tentative maps, one prepared by Porter-Robertson, which is the

18    top one here, and the bottom one, the revised tentative map

19    prepared by your company.  Do you recall that?

20    A.  Yes.

21    Q.  And when we were discussing those maps, I kind of had them

22    turned one sideways and one backwards, and I have now oriented

23    them so that they both face the same direction.

24              And I want to -- you to verify that for me, if you

25    would, sir.
```

1          MR. BRAZE:  I'm not sure the witness can see them.

2          MR. HASSING:  Can you see them, Mr. McIntosh?

3          THE COURT:  Step down, if you like.  Just keep your

4    voice up if you testify.

5    BY MR. HASSING:

6    Q.  What I have done is I have oriented these maps so that

7    your revised tentative tract map is facing with the golf

8    course on the far right-hand side; is that correct?

9    A.  Yes, the north arrow and the north arrow.

10   Q.  So we have both north arrows pointing up.  We have the

11   golf course on the far right-hand side of both maps, correct?

12   A.  Correct.

13   Q.  And we were talking about Pebble Beach Way right here, and

14   Pebble Beach Way right there, correct?

15   A.  Correct.

16   Q.  And we were talking about Sawgrass Court being right here,

17   and Sawgrass Court being also on your map, correct?

18   A.  Correct.

19   Q.  And we were talking about St. Andrews Lane on the

20   Porter-Robertson map right in this location, and in the same

21   location on your map, we were talking about St. Andrews

22   Crescent, correct?

23   A.  Correct.

24   Q.  All right.  It's a little difficult to read.  We have also

25   got, do we not, an Olympic Court on the Porter-Robertson map

1  right here?

2  A.  Correct.

3  Q.  And we have an Olympic Close on your map, right?

4  A.  Correct.

5  Q.  Do you know where the "Olympic" name came from on your

6  map?

7  A.  The Olympic Close?

8  Q.  The "Olympic" part of the name, where did Olympic come

9  from?

10  A.  I don't know.

11  Q.  Thank you, sir.  I'm going to take these maps down now if

12  there is no objection.

13         Now, Mr. McIntosh, yesterday we looked at an exhibit

14  or we had an exhibit discussed between you and counsel that

15  was called "J 4."  Do you understand, do you remember that?

16  A.  J 4?

17  Q.  J 4, sir.

18  A.  Yes.

19  Q.  And in J 4, you were describing the amount of money that

20  you billed for the work that you did in the entire $480 acres,

21  correct?

22  A.  That's correct.

23  Q.  I believe you indicated that you had billed $1,149,910.28

24  for all the work you did in that subdivision, correct?

25  A.  Which subdivision?

MCINTOSH

300

1  Q.  I'm talking about the 480 acres.

2  A.  In the 480 acres, correct.

3  Q.  And that included all of the things, all of the specific

4  items that are listed under the heading "Description,"

5  correct?

6  A.  That's correct.

7  Q.  I notice that the left-hand side of the document, it says,

8  "Job Numbers," do you see that?

9  A.  Yes.

10  Q.  Can you tell me what that is?

11  A.  Those are Martin-McIntosh job numbers that are set up when

12  we commence the job.

13  Q.  And so the entire 480-acre job would be referred to as

14  "92-22"?

15  A.  Yes, that's correct.

16  Q.  And you break that down into 16 different categories?

17  A.  Or phases, yes.

18  Q.  Phases.  Do you have a phase here for what you did

19  specifically with regard to Tract 5472?

20  A.  It appears to be Phase 4, where it says "Tract 5472."

21  Q.  Okay.  And so I see that off to the right-hand side of the

22  5472, it shows a dollar amount that was total invoiced for

23  that portion of the project; do you see that?

24  A.  Yes, I do.

25  Q.  So can you tell the jury how much money you charged for

1    the work that you did at 5472?

2    A.   Looks like $308,419.37 for that Phase 4.

3    Q.   Did you receive any payment for that work?

4    A.   It appears that we received $240,776.18.

5    Q.   All right.  So that would leave around $66,000 unpaid for

6    that phase of the work, something like that?

7    A.   Did you say 66?

8    Q.   Yes, I did.

9    A.   I think it is around 67 or 68.

10   Q.   All right, 67, $68,000?

11   A.   Whatever the math is.

12   Q.   Something like that.  You have not yet been paid for the

13   work you did for Legacy back in 1992-93, right?

14   A.   Correct.

15   Q.   Now, out of the total you billed, which was a little over

16   a million-149, you've received how much, in total?

17   A.   $808,443.31.

18   Q.   Okay.  So there is approximately 340,000, 341,000,

19   something like that, that you had billed Legacy back in 92-93

20   that they hadn't paid you, correct?

21   A.   Correct.

22   Q.   And in fact, you prepared an analysis of that, didn't you,

23   that we have in the joint exhibits?  Take a look at J 100.

24   A.   I have it.

25   Q.   All right.  Your company prepared this document, right?

1   A.   I believe we did, yes.

2   Q.   And why was it prepared, sir?

3   A.   This is a -- it was prepared in June of 1995 outlining the

4   outstanding balance that was due.

5   Q.   Okay.  And if you go down to the bottom of the outstanding

6   balance line, it says, "$341,487.23 still due from Legacy,"

7   correct?

8   A.   That's correct.

9   Q.   And I believe you indicated that the code number for the

10  5472 project was 92-22-04, correct?

11  A.   Yes, for the tract map.

12  Q.   So how much was owed for the work you did in 5472?

13  A.   Leading up to it or just the tract map?

14  Q.   Not talking about the tract map.  I'm talking about the

15  work involved that you have here under the code 04; doesn't 04

16  relate to the 5472 subdivision?

17  A.   That phase, as well as other phases, right.

18  Q.   Let me start all over again.  Let me start all over again.

19       Let's go back to J 4.

20  A.   Okay.

21  Q.   Now, you've got certain categories under the heading

22  "Description," right?

23  A.   Correct.

24  Q.   For instance, under 01, you did a survey, topographic

25  survey and a boundary survey, right?

MCINTOSH

303

1    A.   Correct.

2    Q.   And this tells you what you charged for that, right,

3    $47,000, right?

4    A.   Correct.

5    Q.   And then you have master planning, you charged 142,000,

6    right?

7    A.   The master planning for the entire 480 acres.

8    Q.   Right.  And was the survey for the entire 480 acres?

9    A.   I believe it was.

10   Q.   And then you have got "Williamson Act cancellation,"

11   correct?

12   A.   Correct.

13   Q.   Tell the jury, please, what the Williamson Act is and how

14   you canceled it.

15   A.   The Williamson Act is a contract that is entered into

16   between a property owner, usually a farmer, and the State of

17   California to keep the land under agricultural production.

18   And because of that contract that he enters into, he gets a

19   tax break on his property taxes.

20          In order to develop the land, you have to cancel that

21   contract, you have to go through a process to cancel the

22   contract so you can subdivide and develop the property.

23   Q.   Okay.  And you charged them $4,000 and change for doing

24   that work?

25   A.   Correct.

304

1  Q.  And that related to the full 480 acres, right?

2  A.  Yes.  That had to be done before any subdivisions could be

3  prepared.

4  Q.  All right.  And then you take a look at the next item,

5  which is 04, and it says "Tract 5472," and it says you charged

6  $308,000 for that, correct?

7  A.  That's correct.

8  Q.  All right.  What did you do for that $308,000?

9  A.  Prepared all the improvement drawings and plans --

10 Q.  Okay.

11 A.  -- to support the tract.

12 Q.  What do you mean by "support the tract"?

13 A.  Well, to develop the tract and to get the tract recorded

14 so that the developer could sell lots.

15 Q.  I'm going to show you the 480-acre blowup, again, that we

16 looked at yesterday.  This area here that I'm pointing to

17 right now is the 480 acres.  This down in the lower right-hand

18 side is the golf course, correct?

19 A.  Yes.

20 Q.  All right.  You recognize this yellow square here as the

21 Tract 5472, correct?

22 A.  Yes.

23 Q.  Now, the $308,000 that we were just talking about, that

24 was -- was that for work that you did within this yellow

25 tract?

1    A.   That's correct.

2    Q.   All right.  It doesn't include work that you did out here

3    in these other areas, correct?

4    A.   No.  Those are included in the later phases of our job.

5    Q.   All right.  And then the next item is Tract 5618.  And can

6    you show me on this parcel map where Tract 5618 would be?

7    A.   I believe it is that area outlined in pink to the

8    northwest of 5472, the yellow area.

9    Q.   Right where I'm pointing?

10   A.   I believe so, yes.

11   Q.   Okay.  And so this would be the area, then, where the 5618

12   tentative tract map would fit into?

13   A.   Correct.

14   Q.   That has nothing to do with 5472, does it?

15   A.   Only that it is copyrighted as well.

16   Q.   Other than the fact that you have also copyrighted 5618,

17   is there any relationship between the two tracts?

18   A.   They both have to work together.  The streets that run

19   between the two tracts have to line up.  And it has to be

20   planned properly for sewer, water, utilities, drainage.  So

21   they are related.  Yes, they are related.  They are part of

22   the master planned community.

23   Q.   There are no streets out here in 5618, are there?

24   A.   Not now, but the street, I believe it was St. Andrews

25   Crescent that goes east and west through 5472, has to connect

1   into the future pink area.

2   Q.   Okay.  This street right here that I'm pointing to --

3   A.   Correct.

4   Q.   -- will eventually, if everything goes correct, extend off

5   into this new subdivision, right?

6   A.   That's correct.

7   Q.   At the present time, there is no subdivision there,

8   correct?

9   A.   I don't know.

10  Q.   You haven't been out there and seen it?

11  A.   Oh, I don't think there is.  I have been out there and I

12  don't recall seeing any subdivision.

13  Q.   All right.  Well, you have never seen any houses out

14  there?

15  A.   No.

16  Q.   You have never seen any streets?

17  A.   No, I haven't.

18  Q.   All right.

19  A.   I might add, if I could, Valley Rose Parkway also extends

20  to the north and has to line up with that pink boundary on the

21  east side as well.

22  Q.   And this is Valley Rose Parkway right here I'm pointing

23  to?

24  A.   Correct.

25  Q.   It extends at the present time up to where I'm pointing to

1    now?

2    A.   That's correct.

3    Q.   Eventually, it is supposed to travel up through here?

4    A.   Correct, that's the master plan.

5    Q.   But nothing has been built past this line here?

6    A.   No.

7    Q.   I was referring to the north boundary line of 5472.

8             You did a lot more work out there, I can see that.

9    We have got Assessment District Engineering, $36,000.  What

10   was that all about?

11   A.   That work was to support the developer in his processing

12   of an assessment district.

13   Q.   I see 09 is Offsite Sewer, $111,000.  What is the offsite

14   sewer?

15   A.   The offsite sewer had to be extended from existing sewer

16   facilities to get to the property to be able to support the

17   entire master planned area.

18   Q.   Could you come down here and show the jury, please --

19             With the Court's permission?

20             THE COURT:  Sure.

21   BY MR. HASSING:

22   Q.   -- what you are talking about?

23   A.   Well, the offsite sewer, if it is not located at this

24   point of connection --

25   Q.   Which is the south boundary line of 5472?

1  A.  Right.

2       -- and the intersection of Paso Robles Highway 46 and

3  Valley Rose Parkway, then we would have to extend it from

4  wherever the end of the sewer line is to get it to this point

5  and bring it into the subdivision.

6  Q.  Where did you have to bring it from?

7  A.  I don't recall.  I would have to look at the sewer plans.

8  It came from either the east or the west.

9  Q.  So you are saying that the $111,000 that we just talked

10  about for offsite sewer was the cost for you preparing sewer

11  plans to bring the sewer either from over here past the golf

12  course to the subdivision or over here on the west side to the

13  subdivision, one or the other?

14  A.  Yes.  And I believe it also included the design of a lift

15  station.  A lift station is where sewage can't flow by

16  gravity, so you have to lift it up to get the elevation so it

17  can continue to flow, and we designed a sewer lift station for

18  that as well.

19  Q.  As far as the offsite sewer line, the $111,000 for the

20  offsite sewer line, that doesn't include the sewer line that

21  you designed for this 5472, does it?

22  A.  No, it does not.

23  Q.  All right, thank you.

24       I see you have a category for offsite water for

25  $101,000.  Does that track with your testimony with regard to

1   offsite sewer?

2   A.   The offsite water also had to be extended to the property,

3   and there was also a requirement to build a storage tank as

4   part of the municipal system because there wasn't enough

5   capacity to provide the water capacity as well as fire flows,

6   so the City of Wasco required a water tank to be constructed

7   as part of the Tract 5472 as well.

8   Q.   Was it ever constructed?

9   A.   I believe it was.  Yes, it was.

10  Q.   So we were talking then earlier about Exhibit J 100.  And

11  I think my question to you was if you look at 92-22-04, and

12  you see $67,663, that is the amount that was left unpaid for

13  you for work you did in this yellow area over here, which is

14  5472; is that correct?

15  A.   That's correct.

16  Q.   All right.  And you understood when Mr. Wu called you that

17  he was buying this yellow area, 5472, right?

18  A.   That area, as well as other areas, yes.

19  Q.   Well, you understood that he wanted you to prepare a

20  tentative map for 5472, which is the yellow area here?

21  A.   Yes.

22  Q.   All right.  He didn't ask you to prepare a tentative map

23  for any other part of this property, did he?

24  A.   No.

25  Q.   Now, when you designed Revised 5472 -- and I'm talking

MCINTOSH

310

1    about this map right here that fits into this yellow area here

2    on the parcel map -- when you designed that for this parcel,

3    did you ever intend to use that tentative map on any other

4    parcel of land anywhere else?

5    A.  The County of Kern issues those numbers.  Tract 5472 was

6    issued for that piece of property.  So, no, I can't use it on

7    any other parcel.

8    Q.  All right.  And I'm not talking about the number 5472.  I

9    want you to understand, what I'm talking about is I'm talking

10   about the map.  I'm talking about the configuration of the map

11   that entails 68 lots with these streets running through it.  I

12   don't care about the number.

13          My question to you is:  When you designed this map

14   for Legacy Group, did you ever intend to use this map on any

15   other parcel of land anywhere at any time?

16   A.  No.

17   Q.  When you designed the improvement plans that went

18   underneath the streets in 5472, the sewer, the water, all that

19   stuff, did you ever intend to use those sewer plans on any

20   other tract of land anyplace else?

21   A.  No.

22   Q.  So when you contracted with Legacy to do this work, you

23   were anticipating getting paid one time for this work; isn't

24   that correct?

25   A.  Yes.

MCINTOSH

311

1  Q.  Are you now asking Mr. Wu and the rest of these defendants

2  to pay you an additional $800,000 over and above the 800,000

3  you have already received from Legacy?

4          MR. BRAZE:  Objection, argumentative.

5          THE COURT:  Rephrase your question, please.

6  BY MR. HASSING:

7  Q.  You have received from Legacy and/or the City $808,000 for

8  work that you have done on the 480 acres, correct?

9  A.  Yes.

10 Q.  You have left owing to you by Legacy, pursuant to their

11 contract, $341,000, right?

12         MR. BRAZE:  Misstates the facts.

13         THE WITNESS:  Plus interest.

14         THE COURT:  Your objection deals with the exact

15 amount; is that what you are talking about?

16         MR. BRAZE:  The date.

17         MR. HASSING:  I didn't give a date.

18         MR. BRAZE:  Well, that's my point.

19         THE COURT:  The question is you have left owing to

20 you by Legacy, pursuant to their contract, $341,000, right?

21         And the objection is?

22         MR. BRAZE:  As of 1994.

23         THE COURT:  Your objection is vagueness?

24         MR. BRAZE:  Not as of today.  That misstates the

25 facts.  Not as of today.

312

1       THE COURT:  Overruled.  That's a matter of redirect.

2       THE WITNESS:  As of 6/15/1995, according to Exhibit J

3  100, I was owed $341,487,23.

4  BY MR. HASSING:

5  Q.  Who owed you that money?

6  A.  The Legacy Group.

7  Q.  Have they paid any money?

8  A.  No.

9  Q.  My question then is, are you asking these defendants to

10  pay you the $341,000 that Legacy owed, or are you asking them

11  to pay you another -- excuse me, the 341 plus another 808,000?

12  A.  I'm asking to be paid for the value of my work.

13  Q.  And what is the value of your work, in your opinion?

14  A.  That's to be determined through these proceedings.

15  Q.  Well, you don't have any estimate as to the value of your

16  work?

17  A.  I told Mr. Wu when he called that I was owed over

18  $300,000, and with interest at the time I had the conversation

19  with him, it was up to around 800,000.

20  Q.  Okay.  So am I correct, then, that in this lawsuit, you

21  are now asking these defendants to pay you the 341,000 plus

22  some accumulated interest that might get it up to 800,000; is

23  that what you are asking for?

24  A.  I'm asking to be paid for the value of my work.

25  Q.  And you won't tell us what that is?

1   A.  I think we have told you through settlement what that is.

2   Q.  Sir, I can't talk about settlement.  I would like you to

3   tell the jury what the value of your work is.  What do you

4   want?

5   A.  The value of the work is $1,149,910.28.

6   Q.  That's the value of the work and that's what you want,

7   right?

8   A.  If that's the value of the work.

9   Q.  You have already been paid $808,000 of that, right?

10  A.  Correct.

11  Q.  So you want that to get paid again, correct?

12  A.  I want to be paid for the value of my work.

13  Q.  All right.  All right.  All right.  You weren't going to

14  sell this map again to anybody else, right?  We have gone

15  through that.

16          MR. BRAZE:  Is that a question?

17          THE WITNESS:  Do you want to buy it?

18          THE COURT:  Wait a minute.  There is no question

19  pending.

20          What is your question?

21          MR. HASSING:  Withdrawn.

22  BY MR. HASSING:

23  Q.  Now, when you do a subdivision map, like Revised 5472, do

24  you ever license your copyright interest to other developers

25  or other engineers and receive licensing fees or royalties,

MCINTOSH

314

1   anything like that?

2   A.   Yes.

3   Q.   And when have you done that?

4   A.   On previous subdivisions where I had prepared a survey and

5   another developer wanted to use it and I sold him a license to

6   use it.

7   Q.   Okay.  Have you ever talked to anybody about selling them

8   a license to use this Tentative Tract Map 5472?  Have you ever

9   had any discussions like that with anybody?

10  A.   Just when Mr. Wu called and asked me to reprocess the

11  tentative tract on the property, but other than that, no.

12  Q.   You and Mr. Wu talked about licensing agreements?

13  A.   No.  We discussed what I was owed and I gave him the

14  number.  I was owed over 300,000, plus interest was about

15  800,000 at that time.

16  Q.   You gave him the number 800,000, didn't you?

17  A.   I told him with interest, it was over 800,000.  It was 18

18  percent interest for the contract.

19  Q.   That's what you told him that he would have to pay in

20  order to get you to draw a new tentative map for him, correct?

21  A.   I told him that I was owed over $300,000 and with

22  interest, it was over 800,000.  If he wanted me to reprocess a

23  tentative tract, I would expect to be paid for the value of my

24  work, and I could put a proposal together for him.  He said he

25  would call me back and he never called me back.

315

1    Q.  So if I understand you correctly, what you were telling

2    Mr. Wu is you were owed at that time with interest a little

3    over $800,000, and if he wanted a proposal from you to prepare

4    a new tentative map, that he needed to pay that $800,000 and

5    then you would do a tentative map for him and charge him for

6    the tentative map on top of that; is that correct?

7    A.  I told him I would expect to be paid for the work that I

8    had done and I would prepare the tentative map as an

9    additional charge, yes.

10   Q.  You never did give Mr. Wu a price that you would charge

11   him to prepare a new tentative map, did you?

12   A.  He never called me back.

13   Q.  Sir, that's not what I asked you.  You were talking to him

14   on the telephone, right?

15   A.  That's correct.

16   Q.  And he called you because he wanted to find out what it

17   would take to have you prepare a new tentative map for him,

18   right?

19   A.  That's correct.

20   Q.  And you gave him part of the story.  You told him he would

21   have to pay $800,000; that's step number one, right?

22   A.  I told him I was owed over 300,000, and add interest to

23   that, it was up to 800,000.

24   Q.  That's step one, right?

25   A.  Yes.

1   Q.  And the next step would be to give him a price for a new

2   tentative, right?

3   A.  Yes.

4   Q.  That's what he called about, right?

5   A.  Yes.

6   Q.  And you didn't give him a price for a tentative, did you?

7   A.  No, I did not.

8   Q.  And he never called you back?

9   A.  No.

10  Q.  Well, certainly, that didn't surprise you, did it?

11          MR. TRAVIS:  Argumentative.

12  BY MR. HASSING:

13  Q.  Did that surprise you, sir?

14          THE COURT:  Withdrawn.

15          Go ahead and answer, please.

16          THE WITNESS:  Yes.

17  BY MR. HASSING:

18  Q.  Now, you only charged Legacy $10,000 to do their tentative

19  map; isn't that correct?

20  A.  I don't recall.  I don't have those numbers or the

21  breakdown.

22  Q.  Take a look, if you would, sir, at D 250.

23  A.  D 250?  I don't have D 250.

24          MR. HASSING:  Does the Judge need one?

25          THE COURT:  I don't need one unless there is an

317

1   objection.

2         MR. HASSING:  Okay.

3   BY MR. HASSING:

4   Q.  All right, for the record, D 250 is a two-page document

5   bearing Bates stamp number BP 001854 and 1855.

6         Mr. McIntosh, take a look at both of these pages and

7   tell me if you recognize them.

8   A.  Yes.

9   Q.  In fact, the second page contains your letterhead, right?

10  A.  Correct.

11  Q.  And this is a document that your office prepared, correct?

12  A.  Correct.

13  Q.  And this document was prepared to establish what

14  Martin-McIntosh charged for various discrete items to Legacy,

15  correct?

16  A.  Correct.

17        MR. HASSING:  Your Honor, move to admit.

18        THE COURT:  D 250, are you wanting both pages or one?

19        MR. HASSING:  Both pages as one document.  One

20  document, D 250.

21        THE COURT:  Any objection?

22        MR. BRAZE:  I guess I don't understand the relevance.

23        THE COURT:  It's received.  We will mark that as

24  D 250-A, a two-page document.

25        (Defendant's Exhibit D 250-A was received.)

MCINTOSH

318

BY MR. HASSING:

Q.  Now, if you would take a look at this first page, sir.
You see where, at the top it says, "Tract 5472, 69 lots"?

A.  I see it.

Q.  All right.  And then below that, it says, "Tentative Map,"
right?

A.  Yes.

Q.  And if you go off to the right, there is a $10,000 figure
there, correct?

A.  Correct.

Q.  And up above that number, it says, "Total Engineering
Costs," correct?

A.  Yes.

Q.  And to the right-hand side of the $10,000 number, it says,
"100 Percent Complete," correct?

A.  Correct.

Q.  And so does that refresh your recollection that you
charged Legacy $10,000 for this -- preparing this tentative
map?

A.  It appears that it was $10,000 for the tentative map.

Q.  And you were going to charge Legacy or you did charge
Legacy $23,000 for preparing a final map, correct?

A.  Correct.

Q.  You charged Legacy $18,000 for preparing storm drain plans
for 5472, correct?

319

1    A.   Correct.

2    Q.   You charged them $17,000 for preparing a sewer plan,

3    correct?

4    A.   Correct.

5    Q.   You charged them $9,000 for a water plan, correct?

6    A.   Correct.

7    Q.   And for street improvements, including sidewalks, special

8    concrete, paving, streetlights and street signs, you charged

9    them 71,000?

10   A.   Correct.

11   Q.   Now, does that also refresh your recollection with regard

12   to the street signs?

13   A.   Is there a question?

14   Q.   I lost you, yes.  Yesterday you were testifying in

15   response to Mr. Braze's questioning, and he asked you if you

16   recalled any street signs being involved in the 5472

17   construction process; do you recall that?

18   A.   Yes.

19   Q.   And you couldn't recall whether there was or not, right?

20   A.   I didn't find anything in my file that it would indicate

21   that the street signs had been constructed.

22   Q.   Okay.

23   A.   They were designed to be installed on our plans, but I

24   don't know if they were ever installed.

25   Q.   Okay, we will come back to the street signs.

1          Have you given any thought to what you would have

2    told Mr. Wu about the cost for preparing a new tentative map

3    for him?  Let me withdraw that question.

4          Mr. Wu called you about the prospect of you preparing

5    a tentative map, right?

6    A.  Correct.

7    Q.  And you and he never got that far, to where you gave him a

8    figure, correct?

9    A.  Correct.

10   Q.  You did Legacy's for 10,000, right?

11   A.  Correct.

12   Q.  Have you ever given any thought to what you would have

13   charged Mr. Wu?

14          MR. BRAZE:  Calls for speculation.

15          THE COURT:  Overruled.  He either has given it

16   thought or has not.

17          THE WITNESS:  No.

18   BY MR. HASSING:

19   Q.  When Mr. Wu called you, he told you that he was buying the

20   Parcel 1 --

21          And maybe we should go through this first.  Let me

22   withdraw that question.

23          You did a -- you prepared a parcel map for the 480

24   acres, right?

25   A.  Yes.

MCINTOSH

321

1   Q.  And this is kind of a picture of that parcel map, isn't

2   it?

3   A.  Yes, it is.

4           MR. BRAZE:  Exhibit number?

5           THE COURT:  What exhibit number is that?

6           MR. HASSING:  9572.

7           MR. OKADIGBO:  42.

8           MR. ALEXANDER:  J 42.

9           MR. HASSING:  J 42.

10           THE COURT:  Thank you.

11  BY MR. HASSING:

12  Q.  Now, the parcel map you prepared for the 480 acres divided

13  this 480 acres into six sections, correct?

14  A.  Six parcels, yes.

15  Q.  All right.  And Parcel 1, Parcel 1 was the yellow area

16  that we have been identifying as 5472, right?

17  A.  I can't see it.  Did you point to it?  I'm sorry.  It's

18  that parcel there.

19  Q.  Parcel 1, the yellow one.  And Parcel 2 is the one just to

20  the west of it, correct?

21  A.  I can't read the numbers.

22  Q.  All right.

23  A.  But it is the parcel you are pointing to.

24  Q.  Parcel 3 is the one right above Parcel 2?

25  A.  You are pointing to a parcel above the other parcel.

MCINTOSH X

322

1  Q.  All right.  Parcel 4 is the one all the way to the

2  northwest.  You remember that?

3  A.  I can't see your exhibit.  I'm sorry.  Yes, that's parcel

4  4.

5  Q.  And Parcel 5 is all the way to the northeast, right?

6  A.  Yes.

7  Q.  And Parcel 6 is right down here between the golf course

8  and Parcel 5, right?

9  A.  That's correct.

10        (The exhibit was published to the jury.)

11 BY MR. HASSING:

12 Q.  Now that we got that established, I forgot where I was.

13 When Mr. Wu called you, he told you he was buying a parcel or

14 parcels from the City, correct?

15 A.  Correct.

16 Q.  And you knew that he was calling specifically about Parcel

17 1, correct?

18 A.  Our discussion was about Tract 5472.

19 Q.  Yeah.  And at the time he was talking to you, you knew who

20 owned that parcel, right?

21 A.  The City of Wasco.

22 Q.  Right.  And did you also know that the City of Wasco owned

23 all of the improvements on that parcel?

24 A.  Well, if they owned the parcel, they owned all the

25 improvements on the parcel.

MCINTOSH - X

323

1    Q.   That's the way I would figure it.

2              THE COURT:  Wait.  Unless you are going to raise your

3    right hand, we don't care.

4              MR. HASSING:  All right.

5    BY MR. HASSING:

6    Q.   They owned the streets, right?

7    A.   They owned all the improvements.

8    Q.   They owned all the improvements, okay.

9              And you understood that if Mr. Wu or one of his

10   companies bought that parcel, that Mr. Wu or one of his

11   companies would own all those improvements, right?

12   A.   If he bought the parcel, he would own the improvements on

13   the parcel.

14   Q.   While the City owned that parcel, did you have an

15   understanding that the City couldn't use those improvements

16   unless they paid you some money?

17   A.   The City acquired the property through a tax sale.  And my

18   firm had a lien on the property prior to that.

19   Q.   What kind of lien?

20   A.   A mechanics lien.

21   Q.   At the time the City purchased the property, had the

22   mechanics lien expired?

23   A.   No.  We had a judgment to foreclose.

24   Q.   Okay.

25             MR. TRAVIS:  Objection, your Honor.  This testimony

1   is going to that which is excluded.

2           THE COURT:  The objection is sustained.

3           Next question.

4   BY MR. HASSING:

5   Q.  Let me go back to the beginning here.  Knowing that the

6   City owned the property, knowing that the improvements were in

7   the property, did you have an understanding before Mr. Wu

8   bought the property that the City couldn't use those

9   improvements without paying you some money?

10  A.  The City owned the improvements, but had not accepted the

11  improvements into their city street system.

12          MR. HASSING:  Your Honor, I object as nonresponsive.

13  Move to strike.

14          THE COURT:  The objection is sustained.

15          The question is:  Knowing that the City owned the

16  property, knowing that the improvements were in the property,

17  did you have an understanding before Mr. Wu bought the

18  property that the City couldn't use those improvements without

19  paying you some money?

20          "Yes" or "no"?

21          THE WITNESS:  The improvements were on the property.

22          MR. HASSING:  Nonresponsive.  Objection.

23          THE WITNESS:  They could use the improvements without

24  paying me.

25  ///

1   BY MR. HASSING:

2   Q.  They could use the improvements without paying you?

3   A.  Obviously, they did.

4   Q.  Okay.  Once Mr. Wu bought the property, then he owned the

5   improvements, correct?

6   A.  Unless he takes them out, yes.

7   Q.  Did you ever have any understanding that Mr. Wu couldn't

8   use his improvements without paying you money?

9   A.  I told Mr. Wu I would expect to be paid for the value of

10  my work that helped create those improvements.

11  Q.  So is your answer yes?

12  A.  What was the question again, please.

13  Q.  The question was:  When Mr. Wu bought the property with

14  the improvements on it, did you have any understanding that he

15  couldn't use those improvements without paying you money?

16  A.  Yes.

17  Q.  Okay.  He couldn't drive on the street without paying you

18  money?

19  A.  He can drive on his property.

20  Q.  And if he was driving on his property on one of these

21  streets that was built pursuant to your plans, would he have

22  to pay you money to do that, in your opinion?

23  A.  Mr. Wu?

24  Q.  Yes, sir.

25  A.  He is the property owner.

1  Q.  So he could do that without paying you money?

2  A.  He and anyone who he gives permission to could drive on

3  his property.

4  Q.  All right.  Did you have any understanding about whether

5  or not Mr. Wu could go out to the property and make a drawing

6  of what was on his property without owing you money?

7           MR. TRAVIS:  Objection.  Calls for legal conclusion.

8           THE COURT:  Overruled.  Your objection is premature.

9  The question is foundational as to whether or not he had an

10  understanding.

11          "Yes" or "no"?  He is not asking you for what your

12  understanding was, if you had one.  He is simply asking if you

13  had an understanding.

14          THE WITNESS:  Could you restate the question?

15  BY MR. HASSING:

16  Q.  Yes.  Did you have any understanding at the time Mr. Wu

17  purchased the property --

18          I'm sorry.  Could the court reporter read that

19  question back to me.

20          (The question was read back.)

21          THE WITNESS:  Mr. Wu could go prepare a drawing on

22  any part of his property.

23  BY MR. HASSING:

24  Q.  Without owing you money?

25          MR. TRAVIS:  Objection.  Calls for legal conclusion

1    as to the type of drawing.

2              THE COURT:  Just rephrase your question so we have a

3    full question.

4              MR. HASSING:  I'm going to withdraw the question,

5    your Honor.

6              THE COURT:  All right.

7    BY MR. HASSING:

8    Q.  Now, when you told Mr. Wu, "Look, I'm owed over $300,000

9    in principal; with interest, I'm owed $800,000, and I want to

10   be paid before I do any more work out there," you didn't

11   really think that he was going to open up his checkbook and

12   write you a check for 800,000, did you?

13             MR. BRAZE:  Objection, argumentative.

14             THE COURT:  What's the legal ground?

15             MR. BRAZE:  Argumentative.

16             THE COURT:  On that ground, it is overruled.

17             MR. TRAVIS:  Objection.  Calls for speculation as to

18   what Mr. Wu thought.

19             MR. HASSING:  I didn't ask what Mr. Wu thought.

20             THE COURT:  The question is, "You didn't really think

21   that he was going to open up."  It's what he thinks.  That

22   objection is overruled.

23             THE WITNESS:  I told Mr. Wu I was owed over $300,000

24   in principal and I would be -- I would expect to be paid for

25   my work if he was to have me reprocess a tentative map so that

328

1    he could develop the project and sell lots.

2    BY MR. HASSING:

3    Q.  I'm trying to get into your mind right now, what you were

4    thinking when those discussions were going on.  This was kind

5    of an opening negotiation with Mr. Wu, wasn't it?

6    A.  I wouldn't even characterize it as negotiation.  It was a

7    statement of fact.

8    Q.  The statement was that you were owed $340,000, something

9    like that, in principal, and with interest, it had climbed to

10   $800,000.  That was a fact you gave him, right?

11   A.  That's what I told him.

12   Q.  You also told him that before you did any more work out

13   there, you wanted to receive that money, right?

14   A.  I wanted to be paid for my work.

15   Q.  Yes.  But if Mr. Wu -- strike that.

16          When you told Mr. Wu that, were you absolutely set in

17   your belief that you wouldn't do any further work unless you

18   got the full $800,000, or were you open to negotiation?

19   A.  I was absolutely open to negotiation.

20   Q.  Okay.

21   A.  Always am.

22   Q.  All right.  What you really wanted Mr. Wu to do is pay you

23   the unpaid amount owed for the improvements you had done,

24   correct?

25   A.  I wanted to be paid for the value of my work, yes.

1  Q.  That's not what I asked you, sir.  I asked you

2  specifically about the improvements, the improvements.  And I

3  didn't state that very clearly.

4  A.  Could you repeat?

5  Q.  You wanted to be paid for the improvement plans that you

6  hadn't been paid for?

7  A.  Correct.

8  Q.  When you said that to Mr. Wu, were you referring to the

9  amount that remained unpaid for the improvement plans that had

10  been drawn specifically for Parcel 1, which is 5472, or were

11  you talking about payment from him for improvement plans that

12  had not been paid in full for the entire 480 acres?

13  A.  I was referring to all the amounts that was owed to me for

14  all the master planning and all the studies, all the work that

15  we had prepared that had not been paid.

16  Q.  All right.  And so that then included, if we look at

17  J 100, that included $125,797.45 for work that you did in

18  drafting a tentative map and improvement plans for 5618, the

19  parcel that we have talked about as not having yet been built,

20  correct?

21  A.  Yes.  And I understand Mr. Wu also purchased that land.

22  Q.  Well, has Mr. -- to your knowledge, has Mr. Wu done

23  anything with that land?

24  A.  I don't know.

25  Q.  Do you know if Mr. Wu even still owns that land?

1   A.   I don't know.

2   Q.   My question, sir, was -- and I think you have answered it,

3   so I'm not going to ask it again.

4        I will ask this, though.  Knowing that Mr. Wu was

5   trying to get a tentative map for 5472, why is it that you

6   expected him to pay $125,000 for the work you did in drawing a

7   Tentative Map 5618 that Mr. Wu wasn't even talking to you

8   about?

9   A.   Well, it goes back to all the master planning for the

10  entire community.  And the two tracts have to work together.

11  The utilities have to be sized correctly.  So 5618 was part of

12  that master planned community, which he was purchasing parcels

13  in.

14  Q.   This $67,000 that was left owing to you for work that you

15  did specifically on 5472, did you ever do any calculations to

16  figure out what work was actually done that hadn't been paid

17  for that totaled the 67,000?

18  A.   No.

19  Q.   Take a look, if you would, at D 224.

20  A.   I have it.

21  Q.   All right.  For the record, D 224 is a three-page

22  document.  It's Bates-stamped -- we don't need the Bates

23  stamp.

24       Mr. McIntosh, do you know what this document is?

25  A.   It is a ledger printout of accounts receivable that was

1  dated 10/12 of 1994.

2  Q.  And was this prepared by your company?

3  A.  Yes, it was.

4  Q.  And it was prepared at your direction, wasn't it?

5  A.  This is a standard report that is prepared for my use or

6  my partner's, at that time, use.

7  Q.  Didn't you specifically ask Judy Higgins of your office to

8  prepare this particular report for your use?

9  A.  I don't recall if I did or my partner did.

10 Q.  Now, tell the jury, if you will --

11         Your Honor, I would move that D 224 be admitted into

12 evidence.

13         THE COURT:  Any objection?

14         MR. TRAVIS:  No.

15         MR. BRAZE:  No.

16         THE COURT:  Received.

17         (Defendant's Exhibit D 224 was received.)

18 BY MR. HASSING:

19 Q.  Mr. McIntosh, please explain to the jury what it is that

20 this three-page document reveals.

21 A.  This is a document, it's accounts receivable, which tracks

22 the invoices that have been sent out to the client and what is

23 outstanding to be paid on those invoices.  So if there is a

24 hundred invoices, it is a summary of all the invoices that

25 have been paid.

MCINTOSH

332

1   Q.   And can you tell when this report was prepared?

2   A.   As I stated earlier, 10/12/1994.

3   Q.   At that time, all your work on the subdivision had come to

4   an end, correct?

5   A.   I believe it had, yes.

6   Q.   Can you tell from looking at page 1 of this document

7   whether or not you have a list of invoices that explain the

8   indebtedness left owing on 5472?

9   A.   For Phase 4, it has a number of $67,601.57.

10  Q.   All right.  And Phase 4 refers to your tracking number for

11  5472 billings, correct?

12  A.   Correct.

13  Q.   And so we come down to the bottom, that's the same number

14  we have been talking about over here on the other side, right,

15  what's left owing on 5472?

16  A.   Close.

17  Q.   Yeah, within a few dollars, right?

18  A.   Yes.

19  Q.   And so these invoices, maybe 15, 16 invoices, if we look

20  at those invoices, we would know exactly what you had billed

21  for on 5472 that had not yet been paid, correct?

22  A.   For that phase.  Our job phase, yes.

23  Q.   Well, your job phase was 5472, right?

24  A.   Correct.

25  Q.   That's all I'm asking about.  Did you understand the

1   question?

2   A.  Yes.

3   Q.  All right.  I mean there are other categories here.  For

4   instance, you have a category for 5618 on this sheet, don't

5   you?

6   A.  Yes.

7   Q.  And for 5618, you are still owed $125,797, right?

8   A.  Correct.

9   Q.  And the total, the grand total at the end is 328,000,

10  360,000, somewhere in that area?

11  A.  Correct.

12  Q.  And the difference between the 364 on D 224 and the

13  $341,000 on J 100 is probably interest calculation, right?

14  A.  As of 1994, yes.

15  Q.  All right.  All right.  Now, when Mr. Wu didn't call you

16  back, you suspected he was probably going to hire a different

17  engineer to do this map, correct?

18  A.  I didn't know.

19  Q.  Well, as soon as you talked to Mr. Wu, you started

20  ordering city agenda reports so you could see if there was any

21  progress being made on that subdivision, right?

22  A.  That's correct.

23  Q.  Because Mr. Wu told you he was going to buy it and develop

24  it, right?

25  A.  Yes.

334

1    Q.  And he hadn't called you back, right?

2    A.  No, he never called me back.

3    Q.  And you knew in order for him to develop it, he would need

4    to hire an engineer to do a map, right?

5    A.  He would have to hire someone to do a map.

6    Q.  You suspected he was going to hire somebody else besides

7    you, right?

8    A.  Yes.

9    Q.  And you thought that if he hired another engineer to draw

10   a new tentative map that showed the improvements that are

11   already out there, that he would be infringing on your

12   copyright, correct?

13   A.  I didn't -- I didn't know what he was going to do or how

14   he was going to use the plans that I had prepared.

15   Q.  All right.

16           I object.  Move to strike, nonresponsive.

17           THE COURT:  It's nonresponsive.  It's stricken.

18           The question is:  And you thought that if he hired

19   another engineer to draw a new tentative map that showed the

20   improvements that are already out there, that he would be

21   infringing on your copyright; is that correct?

22           MR. TRAVIS:  Objection, calls for legal conclusion.

23           THE COURT:  No.  The objection is overruled because

24   of the words in the question, what he thought, in other words,

25   the two words, "you thought."

MCINTOSH

335

1          THE WITNESS:  I thought that he would be using my

2    plans to finish out his tract which I had ownership of.

3    BY MR. HASSING:

4    Q.  If he did that, you thought that he would be infringing on

5    your copyright, correct?

6    A.  That's correct.

7    Q.  And if he did that, you thought you would have a right to

8    sue him, correct?

9    A.  At the time?  Yes.

10   Q.  And so you thought you had a valuable copyright interest,

11   correct?

12   A.  I thought I had a copyright.

13   Q.  And you thought that Mr. Wu was going to hire an engineer

14   and infringe on your copyright, correct?

15   A.  I didn't know.

16   Q.  And so did you call Mr. Wu and say, "Hey, look, I think

17   you are going to be making a mistake here," anything like

18   that?

19   A.  No.

20   Q.  You kind of watched his progress, didn't you?

21   A.  I -- yes.  I watched the progress of the subdivision.

22   Q.  Yeah.  You got the City agendas, so you could see when he

23   had hearings on his map approvals, right?

24   A.  Right.

25   Q.  You found out DeWalt was drafting the plans, correct?

MCINTOSH - X

336

1  A.  Correct.

2  Q.  Did you call DeWalt and say, "Hey, you know what?  You are

3  going to be infringing on my copyright.  We are going to have

4  a lawsuit.  You better watch out"?

5  A.  It is not my responsibility to call another engineer and

6  tell him what his -- what the legalities of using someone

7  else's work are.

8  Q.  So is your answer to my question "no"?

9  A.  I did not call Mr. DeWalt or Mr. Gutierrez.

10  Q.  You thought the City was participating in this

11  infringement, correct?

12  A.  Correct.

13  Q.  Did you call anyone at the City --

14       MS. BARNES:  Excuse me, your Honor.  May we approach

15  or address something outside the jury?  I think he is getting

16  into an area that's been addressed in a motion in limine.

17       MR. HASSING:  I will withdraw the question.

18       THE COURT:  That's fine.

19  BY MR. HASSING:

20  Q.  You have driven from Bakersfield to Wasco many times,

21  right?

22  A.  Through Wasco, to Wasco, yes.

23  Q.  How far is it from Bakersfield to Wasco, roughly?

24  A.  About 30 minutes.

25  Q.  You started making that 30-minute drive on occasion just

337

1   to see if Mr. Wu was building any houses yet, right?

2   A.  No.

3   Q.  Let's take a look at your deposition transcript, sir.

4   Page 197.

5          MR. TRAVIS:  Which deposition?

6          MR. HASSING:  Actually, I'm going to have the witness

7   look at it to refresh his recollection.

8          THE COURT:  Page 97, line what?

9          MR. HASSING:  Line 17 through 198, line 1.

10          THE WITNESS:  I'm sorry?  197?

11          MR. HASSING:  197:17.

12          THE WITNESS:  Okay.  I see that.

13   BY MR. HASSING:

14   Q.  Does that refresh your recollection --

15          MR. TRAVIS:  We would object to the reading of that

16   testimony.

17          THE COURT:  He is not asking him to.  He asked him to

18   read it privately for a refreshing issue.

19   BY MR. HASSING:

20   Q.  Does this refresh your recollection that you used to drive

21   by the site to see if Mr. Wu was building houses?

22   A.  Your question earlier was did I start driving to the site

23   to see if Mr. Wu was building houses.  I did not specifically

24   drive to the site for that purpose.  I drove by the site on my

25   way to other places and I noticed that the houses were being

MCINTOSH - X

338

1    constructed.

2    Q.  And you also drove by the site while you were in Wasco for

3    other purposes prior to that when there were no houses being

4    built, right?

5    A.  I've driven by the site many times before or after Mr. Wu

6    started houses.

7    Q.  Right.  After Mr. Wu purchased the property, there were a

8    number of occasions that you drove past the site to see if

9    there was any activity going on on that property, right?

10   A.  Actually, you can Google it and find out if there is

11   activity on the property.  So I started looking on Google to

12   see what was going on on the property.

13   Q.  All right.  You also started driving by the property when

14   you were out there to see for yourself, didn't you?

15   A.  I have driven by the site, yes.

16   Q.  And did you ever consider during all of this time that was

17   going by between the time Mr. Wu talked to you and the time

18   that you saw houses going up, did you ever consider calling

19   him and discussing the fact that you thought he was violating

20   your copyright?

21   A.  Well, I took him at his word, that if he wanted me to do

22   work on the project and use my plans, that he would call me

23   back.  And since he didn't, I felt no reason to follow up and

24   call him.

25            MR. TRAVIS:  And, your Honor, we would object to this

MCINTOSH

339

1    line of testimony.  It continues to go into testimony that has

2    been excluded pursuant to your order.

3           THE COURT:  I think we are moving onto a different

4    topic.

5           MR. HASSING:  Yep.

6    BY MR. HASSING:

7    Q.  This $10,000 that you charged Legacy for the work you did

8    in drafting this tentative map, they paid that money, didn't

9    they?

10   A.  I believe so.

11          MR. HASSING:  I have no further questions, your

12   Honor.

13          THE COURT:  All right.  Mr. Alexander.

14          MR. ALEXANDER:  Thank you, your Honor.

15                       CROSS-EXAMINATION

16   BY MR. ALEXANDER:

17   Q.  Mr. McIntosh, you don't have any reason to doubt that

18   DeWalt in fact did all of the surveying work that it did with

19   regard to the Map 6451, do you?

20   A.  Could you restate the question?

21   Q.  Sure.  Do you have any reason to doubt that DeWalt did the

22   surveying for the work it performed in relation to 6451?

23   A.  The surveying?

24   Q.  Yes, sir.

25   A.  I have no reason to doubt that.  Are you talking about the

MCINTOSH - X

340

1   tentative map or the final map?

2   Q.   With regard to the tentative map.

3   A.   The tentative map?

4   Q.   Yes, sir.

5   A.   No.

6   Q.   Okay.  And also, is it your testimony here today that you,

7   as an engineer, have a right to utilize plans that are filed

8   with the City and which have been approved?

9   A.   If the plans are approved by the City, then they are

10  public record.

11  Q.   And then those plans could be used without the engineer's

12  permission or consent, correct?

13  A.   If the improvements have been completed and accepted by

14  the City, correct.

15          MR. ALEXANDER:  Your Honor, I would like to read from

16  the deposition testimony of Mr. McIntosh, second volume, taken

17  January 28, 2009.  And if it's convenient, your Honor, I'm

18  going to step over here for a moment.

19          THE COURT:  All we need is page and line from

20  beginning to end.

21          MR. ALEXANDER:  Thank you.  Deposition, beginning at

22  page 267, lines 7 through 22.

23          MR. TRAVIS:  7 through?

24          THE COURT:  22.

25          MR. TRAVIS:  Your Honor, we would object to the

341

1  reading of this deposition testimony on two grounds.

2  Relevance, and it also goes to the heart of the order on

3  publication.

4          THE COURT:  The order of what?

5          MR. TRAVIS:  The order on the plaintiff's motion --

6  I'm sorry, plaintiff's summary adjudication on publication.

7          THE COURT:  Let me see what this is about.  Hang on

8  just a minute.

9          The objection is sustained on relevance grounds.

10  BY MR. ALEXANDER:

11  Q.  Okay, Mr. McIntosh, I think yesterday, the jury may have

12  been left with the impression that you somehow selected street

13  names for 5472.  You didn't, did you, sir?

14  A.  I personally did not.

15  Q.  And no one at Martin-McIntosh did, as far as you know;

16  isn't that correct?

17  A.  It appears that some of the names came from the prior 5472

18  map with some variations to it.

19  Q.  And then you also, I think, left the impression yesterday

20  that the selection of Crescent was some sort of a mistake, I

21  believe your attorney referenced; is that right?

22  A.  I said that?

23  Q.  I think your attorney asked you the question whether use

24  of Crescent was somehow a mistake?

25  A.  I don't recall that question, no.

342

1    Q.  And the reason St. Andrews Crescent makes sense is when

2    you take the street to its logical extension into track number

3    5618, it creates a big half moon, like a crescent; isn't that

4    right?

5    A.  I believe it does, yes.

6    Q.  Okay.  Again, and maybe it is clear -- it isn't to me --

7    but there was never any copyright symbol located anywhere on

8    Tract Number 5472; isn't that correct?

9    A.  That's correct.

10   Q.  And you did Parcel Map Number 9572 as well, correct?

11   A.  Correct.

12   Q.  And parcel number -- parcel map number 9572 can be

13   compared to the grading plan to look at the boundaries, isn't

14   that correct, and the bearings?

15   A.  The grading plan of what?

16   Q.  5472.

17   A.  I haven't compared those two maps.

18   Q.  Okay.  Now, part of your objection in this case is that

19   what my client did, DeWalt, was copy the improvements that

20   were in the ground; isn't that right?

21   A.  That, among others.

22   Q.  Okay.  And the City of Wasco actually approved the

23   improvement plans that you prepared and submitted for 5472;

24   isn't that correct?

25   A.  Correct.

MCINTOSH X

343

1   Q.   And those improvement plans that you submitted to the

2   City, which were approved by the City, contained information

3   and documentation from Porter-Robertson, correct?

4   A.   No.

5   Q.   They were derived, at least in part, from the

6   Porter-Robertson studies; isn't that correct?

7   A.   They were -- whatever master studies were revisions of a

8   study that was prepared by Porter-Robertson.

9   Q.   Correct.  And those studies included a master sewer,

10  correct?

11  A.   Correct.

12  Q.   Master water, correct?

13  A.   Yes.

14  Q.   And a master storm drainage, correct?

15  A.   That's correct.

16  Q.   And that information in those studies was all reflected in

17  some way in the improvement plans that you submitted to tell

18  the builders how to build out this tract, correct?

19  A.   The improvement plans were based on those master studies

20  that were approved as revised.  The improvement plans use

21  standards and methodologies that were approved by the master

22  study.

23  Q.   And you know Fred Porter, correct?

24  A.   Yes.

25  Q.   Never called him to ask permission to utilize any of his

344

1  studies, correct?

2  A.  No.

3        THE COURT:  Wait a minute.  "No," it's not correct,

4  or "no," you didn't call?

5        THE WITNESS:  No, I did not call.

6        MR. ALEXANDER:  I apologize, your Honor.

7  BY MR. ALEXANDER:

8  Q.  You never offered to pay him any money for the studies,

9  correct?

10  A.  Correct.

11  Q.  Never offered to buy a license for the studies, correct?

12  A.  They weren't copyrighted.

13  Q.  And as far as you know, as we sit here today, Mr. Porter

14  was unaware that you ever used his studies when you prepared

15  the improvement plans, correct?

16  A.  His studies weren't copyrighted.

17  Q.  Is that a correct statement?

18  A.  Right.

19  Q.  Thank you.  And Mr. McIntosh, I need to -- for you to

20  explain whether or not, without moving the improvements that

21  were in place at the time that DeWalt began to perform their

22  services, could the development had been redesigned so that it

23  could be utilized as a residential development without moving

24  the improvements?

25  A.  Yes.

345

1   Q.   Okay.  I would like to read from the deposition of

2   Mr. McIntosh, taken on June 24, 2009, page 20, lines 8 --

3   let's make it 1 through 14.

4   A.   What was the page number?

5        THE COURT:  20, lines 1 through 14.

6        MR. BRAZE:  Which volume?

7        MR. ALEXANDER:  The June 24th, 2009, deposition.

8        THE COURT:  Are you sure that's this witness?

9        MR. ALEXANDER:  It is, your Honor.

10       THE COURT:  Okay.  I don't have that one.

11       THE WITNESS:  I don't think I was deposed on June 20.

12       MR. ALEXANDER:  You were, because I took it, and I

13   don't know why the Court doesn't have that one.

14       THE COURT:  Are you asking him to read it to refresh

15   or are you asking to read it?

16       MR. ALEXANDER:  I was going to read it into the

17   record.

18       THE COURT:  Do you have the transcript?  Maybe share

19   it.  Let's make sure we are on the same page here.

20       MR. ALEXANDER:  Your Honor, I don't think anybody has

21   it.  I have it on the computer, but I thought it was lodged

22   with the Court, according to what I reviewed.

23       If it hasn't been lodged, I will try to refresh in a

24   different way.

25   ///

BY MR. ALEXANDER:

Q.   Mr. McIntosh, do you recall that I took your deposition in this case, not a long one, but a short deposition, perhaps in the summer of 2009?

A.   I recall a short deposition.

Q.   You came to my office and I took your deposition?

A.   Yes.

Q.   It was under oath?

A.   Yes.

Q.   Do you remember at that deposition me asking you whether or not you could have moved or redesigned the development to utilize it as a residential subdivision without moving the improvements?

A.   I don't recall the question, but you could have redesigned the subdivision.

Q.   Do you remember testifying in an answer that, "No, it would have to be exactly the way it was designed originally"?

A.   Okay.  If you didn't move the improvements, yes.

Q.   That's the point.  Thank you.  It's your testimony today that the value of your work that you are asking to get money for is essentially what you believe you were owed by the developer who did not pay you; isn't that correct?

A.   I don't know what the value of my work is.

        MR. ALEXANDER:  Thank you.  I have no further questions at this time, your Honor.

1          THE COURT:  Counsel?

2          MS. BARNES:  May I have a moment, your Honor?

3          THE COURT:  Yes.

4          MS. BARNES:  Thank you.

5                         CROSS-EXAMINATION

6   BY MS. BARNES:

7   Q.  Good morning, Mr. McIntosh.

8   A.  Good morning.

9   Q.  I think we have all agreed, have we not, that the

10  improvements were in the ground when Mr. Wu bought the

11  property?

12  A.  I would say that 95 percent of the improvements were

13  complete.

14  Q.  Okay.  And at the time he bought the property then, what

15  he got from the City and what the City got in the tax sale,

16  were a series of facilities, such as sewer, and water, right?

17  Now, they are in the ground with the sewer, right?

18  A.  As far as I know.

19  Q.  Water system was in the ground?

20  A.  Actually, the sewer system was not working.  The pump

21  station was not working.  There was a part that was missing.

22  Q.  Yeah.  And you knew that there was a part that was missing

23  because someone from a construction company called up your

24  office and asked about a part that was needed for repair of

25  the pump station, which was part of the sewer facility?

1    A.   Is that a question?

2    Q.   Let me rephrase for you.  You knew that there was a part

3    that was missing from the pump station, did you not, because

4    someone called your company and asked about a part needed for

5    repair of the pump station?

6    A.   Someone called my firm and asked for a set of the plans

7    for the pump station because a part was missing, and they

8    needed to repair it to be able to make the pump station work.

9    Q.   All right.  Now, didn't they also ask after they got the

10   plans, if it would be appropriate or if another part was --

11   would work to replace the part that was designated on your

12   plans?

13   A.   I don't know that I gave them plans because I hadn't been

14   paid for that work.

15   Q.   And in fact, you did not receive the call, but somebody in

16   the company, you understood, received the call?

17   A.   That's correct.

18   Q.   And your engineer asked you whether he could give out the

19   information for repair of the pump station, that is, what part

20   might work, because the people who called to ask could not

21   find the part designated in the plans; do you recall that?

22        MR. BRAZE:  Objection, hearsay.  Compound, vague and

23   ambiguous.

24        THE COURT:  It is compound.  Rephrase.

25   ///

349

1  BY MS. BARNES:

2  Q.  All right.  Now, you did receive a call from someone at a

3  construction company asking about a part needed for repair of

4  the pump station, right?

5          MR. BRAZE:  Lack of foundation.  Hearsay.

6          MS. BARNES:  I think he raised it, your Honor.

7          THE COURT:  Wait a second.  No, the objection is

8  overruled.

9          Did you or didn't you?

10          THE WITNESS:  Someone called my firm and asked for

11  the plans for the pump station.

12  BY MS. BARNES:

13  Q.  All right.  And I thought you testified a moment ago that

14  you gave them the plans and then there was a discussion about

15  a part.

16  A.  I don't recall saying I gave them the plans.

17  Q.  I'm sorry, I misunderstood.  Let me withdraw that.

18  A.  I don't recall giving anyone plans, because I was owed a

19  lot of money.

20  Q.  Now, we are talking about the pump station that would be

21  part of the public facility that was part of the improvements

22  that would serve the entire parcel, are we not, when the

23  parcel was built out?

24  A.  Those improvements hadn't been accepted by the City and I

25  don't know that they have been.

350

1   Q.  I wonder if I could get a "yes" or "no" answer to your
2   question, sir.
3           MR. BRAZE:  Her question assumed the fact that it was
4   a public facility.
5           THE COURT:  The legal objection?
6   BY MS. BARNES:
7   Q.  "Yes" or "no," sir?  Was it your understanding that the
8   pump station was part of the public facility, that is, the
9   public facility that was part of the improvements which was to
10  serve this parcel when it was built out?  Just "yes" or "no,"
11  if you know?
12  A.  When it was built out?
13  Q.  I'm saying was it -- can you answer the question and then
14  I will rephrase if you can't.
15  A.  No.
16          THE COURT:  "No," you can't answer or is that your
17  answer?
18          THE WITNESS:  I'm sorry.  No, it was not a public
19  facility.
20  BY MS. BARNES:
21  Q.  It was not part of the public improvements that the --
22  were built out as part of the subdivision?
23  A.  As I stated earlier, the subdivision was 95 percent
24  complete.  It wasn't complete, a hundred percent complete and
25  hadn't been accepted by the City.  So they don't become public

1    improvements until they are accepted by the City.

2    Q.   All right.  But we have a dispute as to whether the City

3    really accepted the improvements.

4         But let me ask you the question this way.  This was

5    part of a sewer system, was it not, that was going to serve

6    this subdivision, "yes" or "no"?

7    A.   Yes.

8    Q.   Okay.  And the sewer system could not be used until the

9    pump was repaired; isn't that the case?

10   A.   That's correct.

11   Q.   And you instructed your employee not to give out the

12   information because you were owed, still owed money that

13   Legacy had not paid; is that correct?

14   A.   That's correct.

15   Q.   So now getting back to the improvements that were in the

16   ground, sir, those included, in addition to the sewer and

17   water system that we have talked about, it included the

18   streets, right?

19   A.   Yes.

20   Q.   It included driveways, right?

21   A.   Yes.

22   Q.   And that included the approaches onto the individual lots,

23   right?

24   A.   Yes.

25   Q.   It included utility boxes that were placed for the

1   structures that were to be built on the individual lots; is

2   that right?

3   A.  That's correct.

4   Q.  And I think it included some walls that went around the

5   parcel or at least around the tract; those were in place,

6   right?

7   A.  That's correct.

8   Q.  And it included the necessary foundation for electricity

9   that would serve the tract and eventually the parcel when it

10  was built out?

11  A.  Yes.

12  Q.  And all of those things had been made possible and were in

13  the ground with funds generated by the City; is that right?

14  A.  No.

15  Q.  Are you saying that these funds were paid by someone else?

16  A.  I paid about $341,467.23 to make that happen.

17  Q.  I'm asking if all of these improvements, which were

18  constructed and in place on the site were paid with funds that

19  were generated by the City?  Without getting into the details,

20  just were they paid with funds that were generated by the

21  City?

22  A.  It is my understanding that the City paid for some of

23  those improvements.  I don't know how much or if anyone else

24  was involved.

25  Q.  But it was quite a substantial sum, was it not, to build

MCINTOSH

353

1    out all of this for the tract that had been known as -- I have

2    lost the number, but the tract that was the subject of the

3    Porter-Robertson tentative map, your revised tentative map,

4    and then eventually same tract that DeWalt did their survey

5    and prepared a map based upon.

6          And I am told, even though I have heard it 25 times

7    this morning at least, that what I'm talking about is Tract

8    Number 5472?

9    A.  Could you define "substantial amount"?

10   Q.  I'm going to have the number for you, sir, in a moment,

11   and we will go from there.

12         All right.  Now, what we had were, you say, 95

13   percent.  Did you also at one point tell us previously in your

14   deposition that you believed, at the time you gave at

15   deposition, that the improvements or these facilities I have

16   just discussed with you were a hundred percent improved?

17   A.  I don't recall that.

18   Q.  You don't remember?

19   A.  I don't remember having a deposition with you.

20         THE REPORTER:  I'm sorry?

21         THE WITNESS:  She has never taken my deposition.

22   BY MS. BARNES:

23   Q.  I'm sorry, sir.  I represent the City of Wasco and

24   participated in the depositions you gave, is that right?

25   A.  Yes.

1   Q.   I apologize.  I didn't mean I personally took it.

2            But in any event, you don't remember ever saying that

3   the City -- excuse me, that the improvements were a hundred

4   percent in, and what was left was repairs and so forth, right?

5   A.   Not that I recall.

6   Q.   Okay.  But you do agree that the improvements were at

7   least 95 percent in?

8   A.   That's been my testimony at deposition.

9   Q.   And what was left to be done were what, besides repairs?

10  A.   Well, the tract needed improvements to be added.  As far

11  as repairs, the parts in the sewer lift station, the

12  streetlights, some of them were shot out.  Vandalism had

13  occurred.

14           There was a lot of the landscaping was in disrepair.

15  A lot of it had been sitting for many, many years, so a lot of

16  the work that needed to be done to make it into a saleable

17  subdivision had to be done in order to record the tract of

18  6451 final map.

19  Q.   Now, all of those things that you have mentioned are

20  repairs, are they not?  Things that were broken because the

21  land had been sitting there in this state for approximately 15

22  years; isn't that correct?

23  A.   I don't know if the tract was originally 100 percent

24  complete and it sat through disrepair, because we stopped

25  working on it before the tract was recorded.  So I don't know

1 that it was ever finished out to begin with.  I estimate it
2 was probably 95 percent complete.
3 Q.  And what I asked you was, if I may ask one more time to
4 make sure we are on the same page, in addition to needed
5 repairs -- understandable, since it has been there all that
6 time -- what were the improvements or public facilities that
7 were not completed at the time that Legacy abandoned the
8 project?
9 A.  Well, the biggest thing is a final tract map had never
10 been recorded.
11 Q.  Excuse me, sir.  I'm asking about the improvements to the
12 public facility.
13 A.  Well, in order to become public facilities, they have to
14 be dedicated to the City through the process of a final map.
15 Q.  I think we all understand that.
16 A.  Okay.
17 Q.  What I'm asking you is what public improvements that were
18 needed were not in the ground when the City, when Legacy gave
19 up the property?  We will start there.
20 A.  The lift station, sewer lift station was not complete.
21 The streetlights were not constructed.  They were -- weren't
22 working.  I don't know that the electricity was even turned
23 on.  The sewer system didn't work.  The electrical probably
24 didn't work.  The telephone hadn't been hooked up.
25        Those are all things that needed to be completed in

356

1   order to make it a liveable community.

2   Q.  But, sir, aren't those all in the nature of repairs?

3   A.  Not necessarily.

4   Q.  But you do not know exactly what portions of the facility

5   that were not repairs had not been accomplished?  You knew it

6   needed a lot of repairs, right?  We, being the --

7   A.  I knew it had been sitting there --

8           MR. BRAZE:  Objection.

9           THE COURT:  Just a second.

10          MS. BARNES:  Let me withdraw that.

11          THE COURT:  Let me know when you have a natural break

12   in your questioning, please.

13          MS. BARNES:  I think here will be fine, your Honor.

14          THE COURT:  Let's come back at 1:15, ready to finish

15   with this witness.  Please don't discuss the case or allow

16   anyone to discuss it with you.  Please, no independent

17   investigation.

18          Any questions?  See you at 1:15.

19          (The jury left the courtroom.)

20          THE COURT:  The jury has left.  See you at 1:15.

21          (The lunch recess was taken.)

22

23

24

25

357

1                    AFTERNOON SESSION

2    1:15 p.m.

3              (The following proceedings were had outside the

4              presence of the jury, to wit:)

5              THE COURT:  Back on the record.  Counsel are present.

6    Are we ready for the jury?

7              MR. HASSING:  Yes, your Honor.

8              MR. ALEXANDER:  Yes, your Honor.

9              MS. BARNES:  Yes, your Honor.

10             THE COURT:  What's your time estimate?

11             MS. BARNES:  Mine?

12             THE COURT:  Yes.

13             MS. BARNES:  Zero.

14             THE COURT:  What's your time on redirect?

15             MR. BRAZE:  Not very long.  I assumed she was doing

16   more.

17             THE COURT:  All right.

18             (The following proceedings were had in the presence

19             of the jury, to wit:)

20             THE COURT:  The jury has joined us again.  Any

21   further questions?

22             MS. BARNES:  No, thank you, your Honor.

23             THE COURT:  Okay.  Redirect.

24   ///

25   ///

MCINTOSH - RD

358

1                          REDIRECT EXAMINATION

2    BY MR. BRAZE:

3    Q.  Good afternoon, Mr. McIntosh.

4    A.  Good afternoon.

5    Q.  You were questioned by, I believe, Mr. Hassing, regarding

6    your Tentative Tract Map Number 5472, which is Exhibit P

7    108 -- no, J 131.  Too many numbers here.  J 131 -- and the

8    Tentative Tract Map 5472, which was J 25.

9              Now, first of all, when you were retained by Legacy

10   Group, what was the status of Tract 5472?

11   A.  It had been approved prior to us getting involved in the

12   project.

13   Q.  Okay.  And --

14   A.  It was an active tentative map.

15   Q.  What were you asked to do by The Legacy Group?

16   A.  When we were hired by The Legacy Group, we were asked to

17   redesign Tentative Tract 5472.

18   Q.  Why did you use the same number?  Why didn't you just go

19   get another number for your tract map?

20   A.  Because when there is an active tentative map, once the

21   tentative tract map is approved, it is good for a period of

22   years.  And if you revise that tentative map, then you use the

23   same number.  Once the map expires, then you have to get a new

24   tract number.

25   Q.  And can you basically point out what you did with

1    Tentative Tract Map 5472 that existed when you were retained,

2    as shown in just Exhibit J 25 to develop Tentative Tract Map

3    5472 revised, which is Exhibit J 131?

4    A.  Well, you put the two tracts together, you see the

5    original map had streets that went through the subdivision

6    east-west, and one, two, three -- and then three cul-de-sacs

7    coming down to the south.

8          On the revised one, there is only one street east and

9    west.  The cul-de-sacs are different, the design is different,

10   the layout is different.  That revised map is for 68 lots.

11   This original map was for, I believe, it was 80 -- 80 some

12   lots.

13         So when we took over the tract, we redesigned

14   everything.  We couldn't use this tract because it was

15   completely different than the revised tentative tract and the

16   developer wanted it laid out differently from the original

17   tentative map.

18   Q.  And did you change the lot numbering?

19   A.  Yes.  We had to change the lot numbering because the

20   layout was completely different.  This one has 84, 85, 86,

21   looks like -- oh, there is over a hundred lots, 102 lots, it

22   looks like.

23         And this one only has 68 lots.  So they are

24   completely different maps.

25   Q.  Okay.  Now, you were previously asked on cross-examination

1   about putting little ©'s on drawings.  And what's your

2   understanding of the significance of putting a © on a drawing?

3   A.  It's our practice to put the ©, which indicates a

4   copyright of that drawing.

5   Q.  And I think you were also asked about why you didn't put a

6   © on a tract map.  And what's your understanding of why you

7   don't do that?

8   A.  Because the jurisdiction doesn't allow for that symbol to

9   go onto tentative maps or final maps.

10  Q.  Why is that?

11  A.  They have certain criteria in their codes that require

12  certain information to go on that tentative map, and it is

13  specific.  It does not include copyright.

14  Q.  When these maps become recorded, and ultimately become

15  final, are they in the public domain?

16  A.  Yes.

17  Q.  Now, we had some discussion -- I think in -- you can

18  probably drop the maps.

19          Do you have Exhibit J 89 in front of you?

20  A.  J 89?

21  Q.  Yes.

22  A.  Yes, I do.

23  Q.  What is Exhibit J 89?

24  A.  It is a City of Wasco Planning Department Staff Report for

25  Tentative Tract 6451.

MCINTOSH - RD

361

1   Q.  Does that staff report say anything about acceptance of

2   public improvements?

3   A.  Yes, it does.  On the second page, Bates-stamped 1899,

4   it's titled, the first paragraph is titled, "Analysis," and

5   this is referring to Tract 6451.

6           "Tentative Tract 6451 is a 68-lot detached single

7           family subdivision.  The project was previously

8           mapped as Tentative Tract 5472, which was never

9           recorded, and, therefore, expired.  However, upon

10          approval of Tract 5472, the previous developer

11          commenced to put in improvements that were never

12          formally accepted by the City of Wasco."

13  Q.  Does that -- go ahead.

14  A.  (Reading)

15          "These improvements include streets, sidewalks, curb,

16          gutter, storm drain, sewer, water, and dry

17          utilities."

18  Q.  So you were questioned as to public utilities as to when

19  Mr. Wu purchased the property, and does that staff report

20  basically say that those utilities had never been accepted?

21  A.  That's what it says.

22  Q.  What's the import of a utility accepting the improvements?

23          MR. ALEXANDER:  Lacks foundation.  Calls for legal

24  opinion.

25          THE COURT:  Sustained.  Lay the foundation.

362

1    BY MR. BRAZE:

2    Q.  How long have you been doing this work, Mr. McIntosh, that

3    is, development of tract land and having them approved by

4    public entities?

5    A.  About 30 years.

6    Q.  And how many tracts have you done over that 30-year

7    period?

8    A.  Hundreds.

9    Q.  And are you involved with the process of developing

10   improvement plans and having cities accept those improvement

11   plans?

12   A.  Yes.

13   Q.  And having the cities accept the improvements built

14   pursuant to those improvement plans?

15   A.  Yes.

16   Q.  And prior to the public utility -- or excuse me, prior to

17   the public entity accepting those improvements, what is their

18   status?

19          MR. HASSING:  Objection, vague and ambiguous, your

20   Honor.

21          THE COURT:  Sustained.

22          Be more specific with what you are asking.

23   BY MR. BRAZE:

24   Q.  Who is responsible for maintaining those public

25   improvements prior to the acceptance by the municipality?

363

1   A.   The developer is responsible to maintain those

2   improvements until and even after a period of time after the

3   map records, usually up to a year, and then the municipality

4   usually takes over the improvements and accepts the

5   improvements into their public facilities after that

6   maintenance period.

7   Q.   Do you have any knowledge as to whether the City of Wasco

8   has accepted the improvements built pursuant to your

9   improvement plans in the case of this Tract 6451, is it?

10  A.   I'm not aware that the City of Wasco has accepted those

11  improvements, and I'm not sure how they could since they

12  referred to the improvement plans for 5472.

13          MR. HASSING:  Objection to the last half of that as

14  nonresponsive.  Move to strike.

15          MS. BARNES:  City joins in the objection of the

16  motion.

17          THE COURT:  The last half is nonresponsive and has

18  been stricken.

19          MR. BRAZE:  Your Honor, during cross-examination,

20  several pieces were taken out of Exhibits P 101 through 105,

21  and we had admitted into evidence, and we believe they have

22  been taken out of context since they represent Mr. McIntosh's

23  studies.

24          THE COURT:  What is your request?

25          MR. BRAZE:  That P 101 through 105 be admitted into

MCINTOSH   RD

364

1   evidence.

2           THE COURT:  No objection?

3           MR. HASSING:  No objection, your Honor.

4           THE COURT:  All right.  They are all received.

5           (Plaintiff's Exhibits P 101 through 105 were

6   received.)

7   BY MR. BRAZE:

8   Q.  Now, referring to P 101 through 105, you were questioned

9   at length regarding the fact that apparently a prior

10  engineering company, Porter-Robertson, had done some studies.

11  Do you recall that line of questioning?

12  A.  Yes, I do.

13  Q.  And what is it you had to do with respect to those studies

14  performed by Porter-Robertson for the old Tract 5472?

15  A.  What did I have to do?

16  Q.  Yes.

17  A.  For the old tract; I didn't do anything for the old tract.

18  Q.  I'm saying "old tract."  You came up with the revised

19  tentative map for 5472?

20  A.  Correct.

21  Q.  As a result of that, did you have to revise the studies

22  done by Porter-Robertson for Tract 5472?

23  A.  Yes.  Because the tract was redesigned.  In the revised

24  tract, we had to revise the master studies that were done for

25  the previous tract.

MCINTOSH   RX

365

1   Q.  Why so?

2   A.  So that the new layouts would work and we had

3   infrastructure for the overall master planned community that

4   worked.

5   Q.  And was that a requirement of the City of Wasco, that all

6   of these studies be done for the greater master planned

7   community?

8   A.  Yes.

9        MR. BRAZE:  Nothing further, your Honor.

10        THE COURT:  Any further questions?

11                    RECROSS-EXAMINATION

12   BY MR. HASSING:

13   Q.  Mr. McIntosh, you, on redirect, just gave some testimony

14   about Porter-Robertson's prior tentative map, indicating to

15   the jury that you were aware of the fact that he had drawn one

16   and your client wanted you to make some changes to it and that

17   it had expired.

18        But I read your deposition testimony, wherein you

19   denied knowing anything about any other company having done a

20   tentative map and in fact, you testified in that deposition

21   that the only company that ever did a tentative map for 5472

22   was Martin-McIntosh.

23        My question to you, sir, is:  Why didn't you tell me

24   that in your deposition?  Why didn't you tell me in your

25   deposition what you just told this jury this afternoon?

366

1  A.  I think my answer in my deposition was to my knowledge at

2  the time of the deposition.  I thought we had prepared the

3  original tentative tract.  I now find out there was another

4  tentative tract done by someone else.

5  Q.  You found that out this morning?

6  A.  Yes.

7  Q.  And based on that, you were able to tell the jury that

8  your client wanted you to make changes to Porter-Robertson's

9  tentative map and that Porter-Robertson tentative map had

10  expired; is that your testimony?

11  A.  No.  That's not my testimony.  Porter-Robertson's

12  tentative map did not expire or had not expired.  And when a

13  map is not expired, you use the same number because it hasn't

14  expired.  It's still an active tentative map.  When you revise

15  it, you call it a "revised tentative map" and use the same

16  number.

17  Q.  My point is how is it that you now remember that your

18  client wanted changes to this particular map when, before this

19  morning, you didn't even know this map existed?

20  A.  Well, when we first started this project -- and, again, as

21  I testified earlier, I wasn't involved in the preparation of

22  the original tentative map or the revised tentative map.

23         But early on in our discussions with The Legacy

24  Group, we were asked to prepare a number of different layouts,

25  and to do a layout that was different in Tract 56818 as well

367

1   as Tract 5472.

2   Q.  So are you saying that early on in your dealings with your

3   client that you actually saw this Porter-Robertson map?

4   A.  I didn't specifically see that Porter-Robertson map.  It

5   is in much of the master studies that were prepared by an

6   engineer in my office.

7   Q.  All right.  You just testified that you didn't know about

8   this map until this morning; isn't that your testimony?

9   A.  I didn't realize that that's the trail of what happened.

10  Q.  And my last question, sir, is you gave some testimony on

11  redirect about the fact that these Porter-Robertson master

12  plans for sewer, water, storm drain, they were pretty much

13  revised by you or amended by you; is that correct?

14  A.  That's correct.

15  Q.  But you still found the need, did you not, to include

16  those actual plans of Porter-Robertson within your master

17  plan; isn't that correct?

18  A.  I didn't find the need.  Typically, the City of Wasco

19  would require some discussion about what was originally

20  approved and why it's being revised.  So this discussion

21  referred to the Porter-Robertson studies, and then the

22  revision was made.

23  Q.  Nevertheless, you felt the need, or somebody in your

24  office felt the need, to include the verbatim actual copies of

25  the Porter-Robertson master plans, correct?

1  A.  Well, typically --

2  Q.  Is that correct, sir?  "Yes" or "no"?

3  A.  No.

4        MR. HASSING:  Thank you.

5        THE COURT:  Mr. Alexander, anything?

6        MR. ALEXANDER:  Just one or two, your Honor.  If I

7  can do it from here.

8                      RECROSS-EXAMINATION

9  BY MR. ALEXANDER:

10  Q.  Mr. McIntosh, when you responded to Mr. Braze in stating

11  that the maps are in the public domain, are you telling the

12  people here in court that those maps are now accessible to

13  anyone for review and use?

14  A.  I believe the question was, once the maps are recorded,

15  are they in the public domain.  And they are public record.

16  They are filed at the Recorder's Office.

17  Q.  And then the public can access them without any consent or

18  permission, correct?

19  A.  That's what "public record" means.

20  Q.  That's the same with regard to Parcel Map Number 9572 that

21  you did, correct?

22  A.  Once it is recorded in the Recorder's Office, anyone has

23  access to it.

24        MR. ALEXANDER:  No further questions, your Honor.

25        THE COURT:  Ms. Barnes, anything?

369

1          MS. BARNES:  No questions.

2          THE COURT:  Anything further?

3          MR. BRAZE:  Nothing.

4          THE COURT:  Thank you, sir.  You may step down.  Next

5    witness?

6          MR. TRAVIS:  Kevin Lam.

7          THE COURT:  Come forward, please.  Would you raise

8    your right hand and be sworn.

9                          **KEVIN LAM**,

10   called as a witness on behalf of the Plaintiff, having been

11   first duly sworn, testified as follows:

12         THE COURT:  Please take the witness stand right here,

13   and once you do, tell us who you are.

14         THE WITNESS:  My name is Kevin Lam.

15         THE COURT:  L-a-m?

16         THE WITNESS:  L-a-m.

17         THE COURT:  Thank you very much.

18                     DIRECT EXAMINATION

19   BY MR. TRAVIS:

20   Q.  Thank you for your patience, Mr. Lam.  You realize you are

21   here because you were served with a subpoena from Roger

22   McIntosh?

23   A.  Yes, I do.

24   Q.  I'm going to ask you quickly, have you ever done any work

25   for Mr. McIntosh?

1   A.  Yes, I have.

2   Q.  And where is it that you work?

3   A.  I work for the law firm Goodwin & Proctor.

4   Q.  Can you tell us what type of work you did for

5   Mr. McIntosh?

6   A.  Yes.  I registered his copyright in the Valley Rose plans.

7           THE COURT:  Are you an attorney?

8           THE WITNESS:  I am, yes, your Honor.

9           THE COURT:  Thank you.

10  BY MR. TRAVIS:

11  Q.  Can you explain the process for registering Mr. McIntosh's

12  copyright?

13  A.  Sure.  To register the copyright, you send a copyright

14  application, along with a copy of the material to be

15  copyrighted, in this case, the plans.

16  Q.  Okay.  Did you bring those with you here today?

17  A.  I did.  I brought my copy of the plans that were

18  registered.

19  Q.  I guess that's my question.  You know, when you filed his

20  copyright, did you also keep a copy for your records of what

21  it is that you sent to the Copyright Office?

22  A.  Yes, I did.

23  Q.  And we had previously -- there is an Exhibit P 108, and

24  have you had a chance to review what you sent to the Copyright

25  Office with the P 108 exhibits, the improvement plans?

371

1   A.  Yes, I did.  Last night I had a chance to look through the

2   P 108 exhibit, and I spent probably about an hour making sure

3   each page matched up and each page matched up exactly with my

4   copy of the claims that were sent to the Copyright Office.

5   Q.  After you sent the copyright off to the -- I'm sorry, the

6   application to the Copyright Office, did you receive anything

7   in return?

8   A.  I did.  I received the Certificate of Registration.

9   Q.  Okay.  And I'm going to point you to J 5.  I think there

10  is -- it is a joint --

11          Permission to help him sort through those?

12          Is that the certificate you received, Mr. Lam?

13  A.  Yes, it is.

14  Q.  And is that your name on there?

15  A.  Yes, it is.

16  Q.  On the certificate, it says, correct me if I'm wrong,

17  "Valley Rose" -- I'm sorry.  "Land Planning Drawings and

18  Landscape Design"?

19  A.  Yes.

20  Q.  And how did you come up with that name?

21  A.  You know, to me, that just seemed like the most

22  appropriate way to describe it in a way that, you know, would

23  reflect the authorship that was in it.

24          MR. TRAVIS:  Your Honor, if there is no objections,

25  we would like to move the entirety of P 108 into evidence.

372

1          THE COURT:  Any objection?

2          MR. HASSING:  No, your Honor.

3          THE COURT:  Received.

4          (Plaintiff's Exhibit P 108 was received.)

5          MR. TRAVIS:  No further questions for this witness,

6   your Honor.

7          THE COURT:  Any cross-examination by anyone?

8                      CROSS-EXAMINATION

9   BY MR. HASSING:

10  Q.  Good afternoon, Mr. Lam.

11  A.  Good afternoon.

12  Q.  Mr. Lam, tell me, if you would, sir, generally what it was

13  that you sent to the Copyright Office or that was sent there

14  from your office?

15  A.  Well, it was a bunch of drawings, and I'm actually not a

16  land use attorney or a real estate attorney or anything like

17  that.  So to me, they were just a bunch of drawings.

18  Q.  Were they big, long wrapped-up, round --

19  A.  They were, yes.

20  Q.  -- tubular drawings?

21  A.  Yeah, they were on big paper.

22  Q.  And you say you have kept copies of all of those?

23  A.  I have, yes.

24  Q.  Which one of your secretaries -- is the secretary that

25  mailed that stuff, is she still with you?

373

1    A.   No.  Well, the secretary that mailed it is still with my

2    law firm, yes.

3    Q.   All right, all right.  What's her name?

4    A.   I believe it is Judy Curry.

5            But let me explain how it was sent to the Copyright

6    Office.

7    Q.   Please.

8    A.   So what we did is we sent the materials and the

9    application to our Washington, D.C. office, because it was on

10   big paper.  So what we needed to do was have somebody

11   hand-deliver the copyright application and the materials to

12   the Copyright Office.

13   Q.   So you didn't actually mail anything to the Copyright

14   Office in Washington, D.C. from your San Francisco office?

15   A.   I had it sent from the San Francisco office to the D.C.

16   office, yes.

17   Q.   Yes.  I don't think that my question was clear.

18   A.   Okay.

19   Q.   The Copyright Office is in Washington, D.C.?

20   A.   That's right.

21   Q.   And your law firm has an office in Washington, D.C.?

22   A.   That's correct.

23   Q.   And you asked your secretary to mail some drawings to your

24   Washington, D.C. office, correct?

25   A.   Correct.

374

1    Q.  But you didn't have your secretary to mail anything to the

2    actual Copyright Office in Washington, D.C., did you?

3    A.  That's right.  We had the application and the materials

4    hand-delivered from our D.C. office to the Copyright Office.

5    Q.  What's the name of the person that hand-delivered that

6    from your office to the Copyright Office?

7    A.  I'm not aware of the name.

8    Q.  Also, sir, have you done any investigation with the

9    Copyright Office to find out if they actually -- to find out

10   what they actually received?

11   A.  So we -- I haven't.  I did instruct a junior associate to

12   order a conformed copy, but for whatever reason, it didn't

13   happen, and I didn't follow up on it because I had a record of

14   what was being registered.

15   Q.  Now, this associate that was asked by you to obtain a

16   certified copy of the lodging of the documents that were

17   lodged, didn't he tell you that he had talked to Rosemarie

18   Kelly at the Records and Research, and she couldn't find

19   anything?

20   A.  She didn't follow up, so she didn't talk with anybody.

21   Q.  All right.  So the associate that you talked to?

22   A.  Uh-huh.

23   Q.  -- didn't really find out whether or not the Copyright

24   Office ever received those documents, did she?

25   A.  Not to my knowledge.

1  Q.  And you don't know for sure whether the Copyright Office

2  received those documents?

3  A.  No.  I spoke with Paige Miller of the Copyright Office in

4  March of 2007, before we received the certificate and she told

5  me that they received the materials.

6  Q.  And who is Paige Miller?

7  A.  As far as I know, she is an employee of the Copyright

8  Office.

9  Q.  Did you call her?

10 A.  I did.  Well, I called the Copyright Office, and she is

11 the person that I got on the line.

12 Q.  And but you have no idea why the Copyright Office can't

13 produce to you a certified copy or any kind of a copy of the

14 documents that were sent to them, right?

15 A.  I don't know why.  My understanding is that they were

16 lost.

17 Q.  The documents were lost?

18 A.  Right.

19 Q.  Yeah.  And where did you come by that understanding at?

20 A.  I was told that by Mr. Travis.

21 Q.  All right.  All right.  When did Mr. Travis tell you that?

22 A.  I believe it was in April of 2009, when he asked for our

23 copy of what was sent to the Copyright Office.

24 Q.  Did you provide him with a copy of that?

25 A.  I did.

376

1   Q.  And at that time, he told you that he had tried to get a

2   copy from the Copyright Office and they didn't have it?

3   A.  That's right.

4           MR. HASSING:  Thank you, sir.

5           THE COURT:  Any further cross-examination?

6           MR. ALEXANDER:  No, thank you, your Honor.

7                         CROSS-EXAMINATION

8   BY MR. OKADIGBO:

9   Q.  Just a followup on Mr. Hassing's questions.  You don't

10  have any personal knowledge of grading plans being submitted?

11  A.  I believe if they are in here, then they were submitted.

12  But like I said, I don't really know the difference between

13  the types of plans.

14  Q.  You didn't submit it, though, yourself, personally?

15  A.  What do you mean by "personally"?

16  Q.  You didn't send it to the Copyright Office yourself; you

17  directed others to do that?

18  A.  That's right.  We had it hand-delivered to the Copyright

19  Office.

20          MR. OKADIGBO:  No further questions.

21          THE COURT:  Redirect?

22          MR. TRAVIS:  No, your Honor.

23          THE COURT:  Okay.

24          MR. ALEXANDER:  Your Honor, I had one.

25  ///

```
 1                       CROSS-EXAMINATION
 2   BY MR. ALEXANDER:
 3   Q.  Sir, when you were referencing Mr. Travis, are you talking
 4   about Jeff Travis, who is seated here in the courtroom?
 5   A.  I am.
 6            MR. ALEXANDER:  Thank you.
 7            THE COURT:  Thank you.  You may step down, your
 8   Honor.
 9            Next witness?
10                       SARAH BURGI,
11   called as a witness on behalf of the Plaintiff, having been
12   first duly sworn, testified as follows:
13            THE COURT:  Please take the witness stand right here,
14   and then if you would, tell us who you are.
15            THE WITNESS:  My name is Sarah Burgi.
16            THE COURT:  Could you move right up to the
17   microphone, please.  Spell your last name.
18            THE WITNESS:  B-u-r-g-i.
19            THE COURT:  Is Sarah with an "H" or not?
20            THE WITNESS:  With an H.
21                       DIRECT EXAMINATION
22   BY MR. BRAZE:
23   Q.  Good afternoon, Ms. Burgi.  We haven't met.  My name is
24   Jim Braze.  I represent Mr. McIntosh.
25            In 2004, by whom were you employed?
```

BURSI - D

378

1   A.   By DeWalt Corporation.

2   Q.   What was your position with DeWalt Corporation?

3   A.   It went from survey technician.  I was first a civil

4   drafter and I went to survey technician.

5   Q.   Can you tell us briefly what that means?

6   A.   I research for projects, mapping, getting maps ready to

7   submit to whatever agency it is being submitted to.

8   Q.   And are you still employed by DeWalt?

9   A.   No.

10   Q.   When did you leave them?

11   A.   In May of 2008.

12   Q.   And how are you employed now?

13   A.   I'm employed by Canon Corporation.

14   Q.   Doing the same thing?

15   A.   Yes, basically.

16   Q.   One of the issues in this case relates to a Tentative

17   Tract Map Number 6451, which is Exhibit J 134, and I would

18   like to address your attention to the -- I guess that's the

19   lower right corner, and I will bring it up to you here without

20   hurting a juror.

21        And are your initials on that corner?

22   A.   Yes.

23   Q.   And what are the blanks there?  One says, "Drawn By"?

24   A.   Yes.

25   Q.   And what does it say after that?

379

1    A.   "Checked By."   Under "Drawn By," it says, "SAB."   Those

2    are my initials.

3    Q.   Okay.   And then "Checked By"?

4    A.   "GOB."

5    Q.   Who is that?

6    A.   Gregory Black.

7    Q.   What's after that?

8    A.   "Approved By."

9    Q.   What's it say "By"?

10   A.   "JAG," Jeff Gutierrez.

11   Q.   Jeff Gutierrez.   Okay.   So according to the legend on this

12   map, this map was drawn by you?

13   A.   I have made probably the last change to the map, yes.

14   Q.   Well, were you responsible for drawing this map?

15   A.   I aided in the drawing of the map.

16   Q.   Who actually drew the map?

17   A.   I believe it was Josh Woodard.

18   Q.   What was Josh Woodard --

19   A.   By drawing the map, you mean the entire thing?   The

20   topography was drawn in by somebody else.

21   Q.   What part did you draw?

22   A.   I would have helped with the presentation of the way the

23   map looks now, making sure everything was on it that needed to

24   be on it for submittal.

25   Q.   Do you know what Josh Woodard did?

1   A.  He would have drawn the map.

2   Q.  He would have drawn the map?

3   A.  Yes, the lines of the map.

4   Q.  Do you know what Josh Woodard used to draw the map?

5   A.  Existing conditions.

6   Q.  Mr. Woodard ask you for improvement plans that were drawn

7   by Mr. McIntosh to aid in drawing the map?

8   A.  I believe he had asked if there were improvement plans,

9   but I didn't know of any.

10  Q.  Do you know if you had received improvement plans before

11  this map was submitted?

12  A.  Not to my knowledge at all.

13  Q.  Had you seen a copy of the prior tract map?

14  A.  No.

15  Q.  And so how did you go about drawing this map?

16  A.  Well, you draw -- you research the record boundaries,

17  whatever had been recorded, and you draw those in to find the

18  external boundary of the map.

19  Q.  And do you know how Mr. Woodard drew the map?

20  A.  I'm sure he would have drawn it off of the improvements

21  that were already put in place.

22  Q.  When you say you are sure of that, how do you know?

23  A.  There is nothing else he could have drawn it off of.

24  Q.  Did you ever see the developer information package

25  prepared by the City of Wasco for the developers?

381

1   A.  Prior to the map, no.

2   Q.  Do you know who gave you the street names to put on the

3   map?

4   A.  No.

5   Q.  Do you know where those came from?

6   A.  I can only assume.

7   Q.  Well, we don't want you to assume.  So somehow those

8   street names got there --

9   A.  Uh-huh.

10          THE COURT:  Wait.  "Yes"?

11          THE WITNESS:  Yes.

12  BY MR. BRAZE:

13  Q.  You don't know where they came from?

14  A.  No.

15  Q.  And you don't know how Mr. Woodard got them?

16  A.  No.

17  Q.  And you have no personal knowledge as to where any of the

18  dimensions or measurements on this map came from?

19  A.  No.

20          MR. BRAZE:  Thank you.

21          THE COURT:  Any cross?

22          MR. ALEXANDER:  Your Honor, at this time we will

23  reserve and call her in our case if we need to.

24          MR. HASSING:  No, your Honor.

25          THE COURT:  You may step down.

WOODARD

382

 1          Next witness?

 2                        **JOSHUA WOODARD**,

 3   called as a witness on behalf of the Plaintiff, having been

 4   first duly sworn, testified as follows:

 5          THE COURT:  Please take the witness stand right here,

 6   and, once you do, tell us who you are.

 7          THE WITNESS:  My name is Joshua Woodard.

 8          THE COURT:  Spell your last name for the record.

 9          THE WITNESS:  W-o-o-d-a-r-d.

10                    DIRECT EXAMINATION

11   BY MR. BRAZE:

12   Q.  In 2004, Mr. Woodard, did you work for DeWalt Engineering?

13   A.  Yes, sir.

14   Q.  And what was your position?

15   A.  Junior engineer/drafter.

16   Q.  And did you graduate from college?

17   A.  Yes.

18   Q.  Where did you go to school?

19   A.  Pensacola Christian college.

20   Q.  What did you graduate in?

21   A.  Degree in Mechanical Engineering.

22   Q.  And that was in 2004?

23   A.  2003.

24   Q.  Okay.  And was this the first job you held after college?

25   A.  No.

1   Q.  What job did you hold before?

2   A.  I worked for T.J. Cross Engineering.

3   Q.  Where was that located?

4   A.  In Bakersfield.

5   Q.  When did you come to work for DeWalt Engineering?

6   A.  I worked at T.J. Cross for about a year and I worked at

7   another company for about nine months, so just under --

8   probably 2005.  I don't remember the exact dates.

9   Q.  Well, this map was drawn in 2004 and bears a date of

10  November 8, 2004.  Does that refresh your recollection as to

11  when you worked at DeWalt Engineering?

12  A.  No.

13  Q.  Sarah Burgi just testified that you were the person that

14  drew this map, which is Exhibit J 131.  Is that your

15  recollection?

16          MR. HASSING:  I think it misstates the testimony.  I

17  think she testified he was involved in the process.

18          THE COURT:  Sustained.

19  BY MR. BRAZE:

20  Q.  What was your involvement with drawing Map 6451, which is

21  Exhibit J 131?

22  A.  I do not remember working on that map at all.

23  Q.  Now, you are a mechanical engineer, correct?

24  A.  Yes, sir.

25  Q.  And maps such as J 134 is not the kind of thing a

WOODARD

384

1    mechanical engineer works on, is it?

2    A.   No.

3    Q.   In fact, if you did work on this map, this would probably

4    be the very first tract map that you ever worked on, correct?

5    A.   Yes.

6    Q.   And you still have no recollection whatsoever as to what

7    you did with respect to this map?

8    A.   No.

9    Q.   How many tract maps like this have you drawn since

10   November of 2004?

11   A.   Probably eight or 12, but that's a pretty involved

12   process.  They take a long time to do.

13   Q.   How long?

14   A.   Can range from weeks to months.

15   Q.   Do you have any recollection of this map being drawn in

16   three weeks?

17   A.   No.

18   Q.   Did you use any survey data in preparing this map?

19   A.   I don't remember working on that map, so I couldn't say

20   one way or the other.

21   Q.   Do you know where the street names came from?

22   A.   I can't read them, so no.

23   Q.   If I brought them closer, would it help?

24   A.   Sure.

25   Q.   Moving in closer, does that refresh your recollection as

1  to where those street names came from?

2  A.  No, sir.  None of them seem familiar to me.

3  Q.  Do you remember requesting some improvement plans to

4  assist you in the drawing of this map?

5  A.  No.

6  Q.  Do you know what improvement plans are?

7  A.  Yes.

8  Q.  What's your understanding of an improvement plan?

9  A.  It's a plan that shows curb, gutter, sidewalk, storm

10  drain, and utilities, that sort of thing.

11  Q.  Do you have any recollection of seeing a prior tract map,

12  a prior expired tract map for the same tract?

13  A.  No.

14  Q.  What, if anything, did you review in preparation of this

15  map?

16       THE COURT:  I'm sorry?  What did you what?

17  BY MR. BRAZE:

18  Q.  What, if anything, did you review in preparation of this

19  map?

20  A.  I don't remember working on that map, so I couldn't say

21  one way or the other.

22       MR. BRAZE:  Thank you.

23       THE COURT:  Any cross?

24       MR. ALEXANDER:  No, thank you, your Honor.

25       MR. HASSING:  No, your Honor.

1          MS. BARNES:  No, thank you, your Honor.

2          THE COURT:  Sir, you may step down.

3          Next witness?

4          MR. ALEXANDER:  Mr. Braze, who is next?

5          MR. BRAZE:  Black.

6                     **GREGORY BLACK**,

7    called as a witness on behalf of the Plaintiff, having been

8    first duly sworn, testified as follows:

9          THE COURT:  Please take the witness stand right here,

10   and, once you do, tell us who you are.

11         THE WITNESS:  My name is Gregory Black.

12                    DIRECT EXAMINATION

13   BY MR. BRAZE:

14   Q.  Good afternoon, Mr. Black.  By whom are you presently

15   employed?

16   A.  By Palmetto Engineering and Land Surveying.

17   Q.  How long have you been employed by them?

18   A.  Approximately two years.

19   Q.  And prior to that, were you employed with DeWalt

20   Engineering?

21   A.  Yes, sir.

22   Q.  What was your position with DeWalt Engineering?

23   A.  I was the Director of Engineering.

24   Q.  Director of Engineering, what does that mean?

25   A.  All of the engineering activities that were performed in

BLACK - D

387

1   the office were performed under my direction.  I supervised

2   staff and project level engineers and also drafting and design

3   staff.

4   Q.  Did you supervise Josh Woodard?

5   A.  Yes, sir, I did.

6   Q.  Did you supervise Sarah Burgi?

7   A.  Yes, sir.

8   Q.  Okay.  As you may know, the subject of this trial is Tract

9   Map Number 6451.  Have you seen this map before?

10  A.  Yes, sir.

11  Q.  And that's Exhibit J 134.  And the testimony we have had

12  is that your initials are on the corner of this map?

13  A.  Yes, sir.

14  Q.  And having those initials there, does that mean you

15  actually reviewed the map?

16  A.  Yes, sir.

17  Q.  And so "Reviewed By," or excuse me, "Checked By," is that

18  what it says?

19  A.  I believe so.

20  Q.  "Checked By Gregory Black."  What is it you checked it

21  for?

22  A.  For completeness of information that would typically be

23  required for a tentative map.

24  Q.  And what is the last time you saw this map?

25  A.  I believe I looked at it briefly middle part of last week

1   as I was reviewing some information for my appearance here.

2   Q.  And you were working with the attorneys for DeWalt to do

3   that?

4   A.  Yes, sir, we had a meeting with them.

5   Q.  Are they representing you here at this trial?

6   A.  No, sir.

7   Q.  What was said at that meeting by the attorneys for DeWalt

8   to you about your review of this map?

9   A.  There was nothing in particular said about my review of

10  that map.  It was more based on -- the meeting was more based

11  on the particulars of trial and when I may get called to

12  appear, things predominantly related to the trial.

13  Q.  Like how to answer questions?

14  A.  No, sir.  Like when to show up, how to dress, items such

15  as that.

16  Q.  Okay.  Now, what's your understanding of how this map was

17  drawn?

18  A.  The map was drawn based on a field survey conducted of the

19  site, that field survey gathering data of the existing

20  topography and other improvements on the site.

21  Q.  Was that something that was discussed last week with you?

22  A.  I guess in an indirect manner, yes, sir.

23  Q.  Do you have Exhibit J 137 in front of you -- 134?

24          THE COURT:  You mean that which you have right there?

25          MR. BRAZE:  Well, there is a smaller version in the

BLACK - D

389

1   binder.

2          THE WITNESS:  There is all kinds of stuff here in

3   front of me.  I don't know if it's here or not.

4   BY MR. BRAZE:

5   Q.  Well, let me show you what's been marked J 129.  Our

6   blowup for some reason is marked J 134, so we may have to

7   correct the record on that.  The blowup has been referred to

8   as J 134, but apparently it is a blowup of J 129.

9          THE COURT:  Well, that's all right.  134 we will know

10  is the blowup of 129.  I don't think we should change it

11  because there is too much record already made.

12         MR. ALEXANDER:  That's fine, your Honor.

13         THE WITNESS:  I'm not sure this is the same map as

14  the large blowup.

15  BY MR. BRAZE:

16  Q.  Does it say "Tentative Tract Map Number 6451"?

17  A.  Indeed it does.  However, I see a couple of other little

18  pieces of information on here that are not on the large blowup

19  map.

20  Q.  What do you see that's not on there?

21  A.  Specifically, these little points.

22         THE COURT:  Could you raise your voice just a little

23  bit so everybody can here?

24         THE WITNESS:  Specifically, these little points.  We

25  call them "spot elevations."  And they may be on there, but I

BLACK - D

390

1   can't see them from here.

2   BY MR. BRAZE:

3   Q.  I can't see them from here.  Don't worry about it.

4           So do you see any information on that map that was

5   acquired by a survey?

6   A.  On J 129?

7   Q.  Yes.

8   A.  Yes, sir, I do.

9   Q.  What do you see?

10  A.  All of those little spot elevations.

11  Q.  Those little dots down here?

12  A.  They appear to cover the entire area.

13  Q.  Do you see any monuments on the map?

14          MR. HASSING:  Your Honor, if I might, I have a

15  concern in that the witness has testified that the map he is

16  looking at is different than the map that Mr. Braze has in

17  front of the jury and is pointing to as he testifies.  If they

18  are not the same, I think we have got a problem with that.

19          THE COURT:  Well, I don't know.  That depends on the

20  questions and depends on the answers.

21          MR. HASSING:  They were talking about dots on the map

22  that he was looking at, and I don't know if they are on this

23  one or not.  I can't see the map.

24          THE COURT:  I bet you will address that on cross.

25          MR. HASSING:  Okay.

BLACK - P

391

1   BY MR. BRAZE:

2   Q.  So fair to say you were the lead project engineer on this

3   map?

4   A.  Yes, sir.

5          THE COURT:  "This map" being?

6          MR. BRAZE:  This map being J 129/134.

7          THE COURT:  Well, that is the problem.  Now I do have

8   to address it.  When you say 129/134, it has not been

9   established that these are the same, so we can't refer to them

10  in that manner.

11         MR. BRAZE:  You are right.  Can we take a break to

12  try to resolve that?

13         THE COURT:  Yes.  Let's take five minutes, ladies and

14  gentlemen.  It's worth the clarity of the record to make sure

15  that we do this.  So let's take five minutes.  Please don't

16  discuss the case and we will be back with you very shortly.

17         (The jury left the courtroom.)

18         THE COURT:  Back on the record.  Counsel are present.

19  Witness is still on the stand.  Are we ready for the jury?

20         MR. BRAZE:  We are.  We have found J 69, which is

21  identical, counsel have agreed it is identical to J 134, so we

22  will continue to call the blowup J 134.

23         THE COURT:  Fine.

24         MR. BRAZE:  And there is an Exhibit J 69.

25         (The following proceedings were had in the presence

392

1              of the jury, to wit:)

2              THE COURT:  The jury has joined us.  Ladies and

3    gentlemen, what we have done, or counsel have done, they have

4    found that J 69 is a smaller version of J 134.  J 134 is the

5    big map there.

6              So we are going to proceed.  Go ahead.

7              MR. BRAZE:  Thank you, your Honor.

8    BY MR. BRAZE:

9    Q.  Now, at some point --

10             THE REPORTER:  Your Honor, we are missing a juror.

11             THE COURT:  Hang on just one second.  Thank you.  We

12   didn't do that on purpose.

13             MR. BRAZE:  We were one juror short.

14             THE COURT:  Juror 023, what I just had indicated to

15   the rest of the jurors was that counsel have found a smaller

16   version of the blown up map, J 134, and it is J 69.  And we

17   have not asked any questions of this witness that you missed.

18             Go ahead.

19             MR. BRAZE:  Thank you.

20   BY MR. BRAZE:

21   Q.  Addressing your attention to what's in front of you as

22   J 69 and what's in front of the jury as J 134, do you recall

23   working on that map?

24   A.  Yes, sir, I do.

25   Q.  Where did the street names come from?

1  A.  I do not specifically recall where they came from.

2  Q.  Where did the lot numbers come from?

3  A.  I believe the lot numbers would have been generated by the

4  drafter or designer who took the raw data and then prepared

5  the tentative map with it.

6  Q.  Would have been Sarah Burgi?

7  A.  It may have been.  It may have been one of other several

8  designers.

9  Q.  Have you ever seen the tentative tract map for Map 5472?

10 A.  I believe I have.

11 Q.  Which is Exhibit J 131.  And would you agree with me that

12 the street names are identically the same?

13 A.  Yes, sir, appears to be.

14 Q.  Would you agree with me that the lot numbers for the 68

15 lots are identically the same?

16 A.  I believe they are.

17 Q.  Do you know how that happened?

18 A.  No, sir, I don't.

19 Q.  At sometime you did see the map and improvement plans for

20 Tract 5472, didn't you?

21 A.  Yes, sir.

22 Q.  Did you note at that time, when you were checking your

23 drawings, that the street names were the same and the lot

24 numbers were the same?

25 A.  At the time I was checking this drawing, I was checking it

1    independently and not side by side with the previously expired

2    tentative map.

3    Q.  So if someone had taken the lot numbers from Map 5472 and

4    put them on Tract 6451, that happened before you checked it?

5    A.  If that happened, yes, sir.

6    Q.  Well, can you think of any other way that the lot numbers

7    got exactly the same on 68 lots?

8    A.  It could have happened just from following typical lot

9    numbering convention.

10   Q.  You mean like starting at 1 and going to 68?

11   A.  Yes, sir.  Well --

12   Q.  Wouldn't it depend where you pick lot number 1?

13   A.  It would.  And many times, as drafters or designers are

14   preparing multiple tentative maps, they kind of get into a

15   system or routine of where they will -- they will pick their

16   first lot and then number through consecutively, typically to

17   try to do that so that the resulting highest lot number is

18   close to number 1 so that you can easily tell from looking at

19   the map that, oh, there is 68 lots or whatever the lot number

20   will be.

21   Q.  So who numbered these lots?

22   A.  I assume it was a designer or drafter.

23   Q.  Who was that?

24   A.  Again, one of several possible people.

25   Q.  Well, the legend says it was drawn by SAB.

A.  Yes, sir, and that would imply -- I believe those are
Sarah Burgi's initials, and that would imply that she was the
one that had prepared the drawing and the lot numbers, but I
don't specifically recall.  It could have been someone else.

In ideal practice, as a drafter begins a new drawing,
he would insert his or her initials and the date in there, and
when a subsequent drafter or designer would go in to make some
modifications of that map, they are supposed to update the
initials and the date, and sometimes that happens; sometimes
it doesn't happen.

Q.  Well, Sarah Burgi said Josh Woodard worked on this map?

A.  And that's possible.

Q.  Do you know if he picked the lot numbers?

A.  Again, I don't know.

Q.  So you checked the map, but you don't know who drew it,
you don't know who picked the lot numbers and you don't know
how the street names got on there; is that correct?

A.  That's correct.  I don't remember five, six years ago, who
drew this map.

Q.  Well, like I say, what were you checking for then?  Were
you checking to see that the work was accurate?

A.  I was checking to see if lot sizes and arrangements
complied with requirements of the City of Wasco, I was
checking to see if all of the other pertinent information on
the map related to property zoning, school district

1  information, other bits of information like that that's

2  required by the City to be on the tentative map.  I was

3  checking that that information was on there and was correct.

4  Q.  Could you read Note Number 1 for us from Exhibit J 69,

5  J 131?

6  A.  Sure.

7       "This development contains existing improvements built

8          per Valley Rose Planned Community, expired Tentative

9          Tract Map 5472 and associative approved improvement

10         plans."

11 Q.  Is it your testimony that you did not review the expired

12 Map 5472?

13 A.  Could you explain what you mean by "review"?

14 Q.  Sure.  Note Number 1 says:

15      "This development contains existing improvement plans

16         built per Valley Rose Planned Community, expired

17         Tentative Tract 5472 and associated approved

18         improvement plans."

19 A.  The note says, "Development contains existing improvements

20 built per those plans."

21      The purpose of that note being to specify that

22 streets, sidewalks, curb and gutters, street signs, light

23 poles, block walls, all of the improvements were constructed

24 and existing on the site at the time this map Tract 6451,

25 tentative map, was prepared.

1  Q.  Wouldn't it have been helpful for you to look at the Tract
2  5472 map?
3  A.  Was that the expired tentative map?
4  Q.  Right.
5  A.  Not sure it would have been helpful because it, you know,
6  we still had surveyed the physical improvements that had been
7  constructed on the site.
8  Q.  Well, the survey didn't give you the street name, did it?
9  A.  I don't know.  Possibly.
10 Q.  You think a survey would give you a street name?
11 A.  If there was a street sign there and a shot or survey
12 point was taken on the street sign, and the surveyor in the
13 description perhaps could have typed in the name shown on the
14 street sign.
15 Q.  But that would be the only way, right, to get street signs
16 off a survey?
17 A.  The only way I can think of right now.
18 Q.  Yeah.  So if there was a mistake in the street sign, which
19 mistake was the same as it was on the 5472 map, that probably
20 didn't come from a street sign, did it?
21       MR. HASSING:  Your Honor, I would object as improper
22 hypothetical.  There actually is no evidence in this case
23 about a mistake.
24       THE COURT:  Well, it's not a hypothetical.
25       Any other ground?

398

1        MR. HASSING:  Lacks foundation, your Honor.

2        THE COURT:  It is calling for speculation.

3        Next question, please.

4   BY MR. BRAZE:

5   Q.  When you checked Map 6451 in front of you, did you notice

6   that this street was named Olympic Close?

7   A.  I don't specifically recall when I checked this map, you

8   know, five, six years ago, whether or not I noticed that or

9   not.

10  Q.  Doesn't look right, does it?  Have you ever seen a street

11  named "Close" instead of "Street" or "Avenue" or "Lane"?

12  A.  Or "Crescent"?

13  Q.  Is that a "no"?

14  A.  I have seen some interesting street names before, and if I

15  saw this, I wouldn't necessarily say it is an improbable name.

16  Q.  So where do you believe the people that work for you got

17  these names?

18  A.  Again, I don't remember.

19  Q.  So eventually, though, you did get the 5472 improvement

20  plans, correct?

21  A.  Yes, sir.

22  Q.  And you got those in about April 2005?

23  A.  Not sure.  I know in the exhibits that were attached to my

24  original deposition, the e-mails are in there that would have

25  the date on that.  I don't remember the date on that.

BLACK

399

1   Q.  As I understand it, it was your understanding that

2   Northern had overall control of this project?

3   A.  What do you mean by "overall control"?

4   Q.  I was just reading from a portion of your deposition.

5   A.  My understanding, that Northern was the owner of this

6   property.

7   Q.  Did you interact with the owners of Northern?

8   A.  Yes, sir.

9   Q.  Sorry?

10  A.  Yes, sir.

11  Q.  And who did you interact with?

12  A.  Mr. Joe Wu.

13  Q.  How did he participate with you in these maps?

14  A.  Being the owner, he would have directed DeWalt Corporation

15  to prepare a tentative map per the proposal that DeWalt

16  Corporation would have sent to Mr. Wu.

17  Q.  Mr. Wu could have told you to stop work and you would have

18  stopped work on these plans?

19  A.  Yes, sir.

20  Q.  Did he tell you it had to be filed by a certain date?

21  A.  Not to my recollection.

22  Q.  Do you recall how long it took you to prepare this

23  tentative map?

24  A.  Off the top of my head, I don't recall.  I mean I could

25  speculate, you know, two, three months, four months, something

1    like that, but I don't specifically recall.

2    Q.   Two, three, or four months?

3    A.   Again, that's speculation.  We would have to look back at

4    billing records and such information as that to --

5    Q.   How about two or three weeks?

6    A.   It's possible.

7    Q.   So there is no period of time it takes to draw one of

8    these maps?

9    A.   If you are working on that map solely and no other

10   projects, then, yeah, it could easily be prepared within a

11   matter of a few weeks.

12   Q.   In your deposition, you were asked to compare the two

13   tentative tract maps; do you recall that?

14   A.   Yes, sir.

15   Q.   That being Map 5472 and 6451?

16   A.   Yes, sir.

17   Q.   And you recall testifying that the lots were similar?

18   A.   Yes, sir.

19   Q.   Of course, the street names were identical, correct?

20   A.   Yes, sir.

21   Q.   And the general overall layout was the same, correct?

22   A.   Yes, sir.

23   Q.   And what did you base the 5472 improvements on?  Excuse

24   me.

25            What did you use the 5472 improvement plans for?

1        MR. ALEXANDER:  Assumes facts not in evidence, your

2  Honor.

3        THE COURT:  I'm not sure I understand your question.

4  What are you asking?

5        MR. BRAZE:  I'm sorry, your Honor.  I will withdraw

6  it.

7  BY MR. BRAZE:

8  Q.  When you received the improvement plans from the City of

9  Wasco, what did you use them for?

10        MR. ALEXANDER:  Assumes facts not in evidence.

11        THE COURT:  It's not been established.  You have to

12  ask him.

13        MR. BRAZE:  He already testified they received the

14  improvement plans, I believe he said, in April of 2007, your

15  Honor.

16        THE WITNESS:  I did not say.

17  BY MR. BRAZE:

18  Q.  Did you receive improvement plans from the City of Wasco?

19  A.  Yes, sir.  At some point.

20  Q.  What did you use them for?

21  A.  If I recall correctly, it was towards the beginning of the

22  project and in an effort just to try to obtain all the

23  information about this particular piece of property that I

24  could find.

25  Q.  Beginning of the project, being when?  When you were doing

1   the tentative map?

2   A.   Yes, sir, yes, sir.

3   Q.   Okay.

4   A.   And at that time, just gathering all the information that

5   we could about the project, typical engineering fashion.

6   Q.   Okay.  So you recall receiving improvement plans about the

7   time you were doing the tentative map?

8   A.   Again, I don't remember exactly the timing or the dates of

9   when that information came in.

10  Q.   But you believe at the beginning of the project?

11  A.   I think so, but again, you know, that long ago, I don't

12  recall specifically.

13  Q.   It would make sense to get all the information you could

14  about the project before you launched into it, correct?

15  A.   Typically, yes, sir.

16          MR. BRAZE:  Sure.  Thank you.

17          THE COURT:  Cross?

18                      CROSS-EXAMINATION

19  BY MR. ALEXANDER:

20  Q.   Good afternoon, Mr. Black.

21  A.   Hi there.

22  Q.   In terms of the improvement plans, did you actually ever

23  print out a set of improvement plans that you can recall?

24  A.   Not to my knowledge, no, sir.

25  Q.   How did you receive them?

1   A.  Via e-mail, and they were attached to the e-mail in, I

2   believe, a TIF format.

3   Q.  Describe what a TIF is?

4   A.  A TIF is basically an image file that I guess it could be

5   modified, but not by any fashion that I know of.  Essentially,

6   it is the result of like a scan of an existing drawing or page

7   or document.

8   Q.  Kind of like a picture?

9   A.  Yes.

10  Q.  In a sense?

11  A.  Yes.

12  Q.  In a computer file format?

13  A.  Yes.

14  Q.  Do you ever remember looking at any of the improvement

15  plans in conjunction with the work you did?

16  A.  I remember when I received the e-mail just, you know,

17  glancing through the plans.  Don't really remember any of the

18  particulars.  I don't remember pouring over them in detail.

19  Again, it's been a while, so I can't tell you if it was a

20  one-minute review or a one-hour review of those plans.  I just

21  don't recall.

22  Q.  That's fair.  Do you remember taking anything off of the

23  improvement plans and using them in the tentative map that

24  DeWalt developed?

25  A.  No, sir.

404

1   Q.   Now, in relation to the street names, I'm going to show

2   you what's been marked, and you have a little monitor in front

3   of you, as J 66.  This is the first page of Exhibit J 66.

4          For the record, this is a letter on the City of Wasco

5   letterhead, dated May 2, 1994.

6          And if you can recall, do you ever remember seeing

7   any sort of list -- in fact, let me show you the entire

8   exhibit first.  That's the first page of that document.

9   A.   Okay.

10  Q.   The second page is numbered RMO 029 at the bottom.

11         THE CLERK:  Let me get this real quick.

12  BY MR. ALEXANDER:

13  Q.   Just take a moment and look at that, and I will put the

14  third page on, and that's all there will be.  Had a chance?

15  A.   Yes.

16  Q.   Thank you.  The final page, which is numbered RMO 030.

17         Ladies and gentlemen, can you see that as well?

18         Quick glance at that?

19  A.   Yes.

20  Q.   Now, have you ever seen that letter or the attachments to

21  it before that you can recall?

22  A.   Not that I can recall.

23  Q.   And do you see on this attachment that it actually has the

24  lot numbers, a street address and street names, such as

25  St. Andrews Crescent and Olympic Close; do you see that?

405

1   A.  Yes, sir.

2   Q.  Mr. Braze had asked you a question previously whether or

3   not the street names or lot numbers could have come from some

4   other source, and you will notice that this one is dated May

5   2, 1994.  Do you see that?

6   A.  Yes, sir, I do.

7   Q.  When was it that you were involved in this project?

8   A.  I believe it was beginning about in July or August of

9   2004.

10  Q.  Ten years later?

11  A.  Yes, sir.

12  Q.  Thank you.  So this is another source from which the

13  street numbers and street names could have come from; is that

14  correct?

15  A.  It appears to be, yes.

16  Q.  Okay.  And then with regard to the improvement plans that

17  you received by e-mail but don't recall printing, do you

18  remember whether or not you received those before or after the

19  Planning Commission had approved Tentative Tract 6451?

20  A.  I really don't recall the timing of the receipt of that.

21  Q.  And the e-mails you received would be an indication of

22  when you received those; is that right?

23  A.  Yes, sir, I believe so.

24  Q.  All right.  In any way, did you utilize any of the

25  information off of Tract 5472 or off of the improvement plans

BLACK - X

406

1    to somehow lessen your work load or your burden in connection

2    with Tract 6451?

3           MR. BRAZE:  Objection, lack of foundation.  He didn't

4    do the work.

5           THE COURT:  The objection is sustained.  Lacks

6    foundation.  He is not -- it has not been established that he

7    did the work or that he recalls specifics as to that.

8    BY MR. ALEXANDER:

9    Q.  Do you recall doing any work in relation to Tract Number

10   6451?

11   A.  I recall reviewing the maps.

12   Q.  And in connection with your review, was there anything

13   that you did to take information off of 5472 or the

14   improvement plans in conjunction with your review?

15   A.  No, sir.

16   Q.  Are you aware of whether anybody else utilized any

17   information off of Tract Number 5472 or the improvement plans?

18           MR. BRAZE:  Objection.  Lack of foundation.

19           THE COURT:  Did you say 5472?

20           MR. ALEXANDER:  Yes, your Honor.

21           THE COURT:  Okay.  Thanks.  What's the objection?

22           MR. BRAZE:  Lack of foundation.

23           THE COURT:  No, the objection is overruled because

24   the question seeks foundation.  It asks him are you aware of

25   whether anybody else utilized any information off of Tract

1    5472 or the improvement plans.  So the question itself is

2    foundational.

3              Are you aware?

4              THE WITNESS:  No, sir, not to my knowledge.

5    BY MR. ALEXANDER:

6    Q.  Do you have any recollection of having transmitted the

7    improvement plans to anybody in conjunction with your work on

8    Tract Number 6451?

9    A.  Not that I recall.

10             MR. ALEXANDER:  Thank you very much.

11                         CROSS-EXAMINATION

12   BY MR. OKADIGBO:

13   Q.  Mr. Black, I just want to clear up one point that

14   Mr. Alexander went into.  Now, this is the first page of

15   Exhibit J 15.  Do you recognize that exhibit?

16   A.  It appears to be an e-mail from Dennis McNamara, a planner

17   with the City of Wasco, to me, with several attachments, which

18   I assume were the attachments of the previous tentative map

19   and improvement plans.

20   Q.  For the 5472 tract, correct?

21   A.  Yes, sir.

22   Q.  And the e-mail is dated April 13th, 2005, correct?

23   A.  Yes, sir, that's.

24   Q.  I'm going to show you Exhibit J 69.  Bear with me a

25   second.

1          THE COURT:  What are you trying to accomplish here?

2          MR. OKADIGBO:  I'm trying to focus on the date

3     portion of this map.

4          MR. BRAZE:  Your Honor --

5          THE COURT:  Do you have a blowup of this, is that

6     what's going on?

7          MR. OKADIGBO:  Oh, right.  Okay.

8     BY MR. OKADIGBO:

9     Q.  Now, this is the tentative map you had looked at earlier,

10    I think it was Exhibit J 69?

11    A.  Yes, sir.

12    Q.  And the date of that tentative map is November 8th, 2004,

13    correct?

14    A.  Yes, sir, that's the date that's on the map.

15    Q.  So it would appear that this Tentative Tract Map Number

16    6451 was created or prepared before that e-mail that we just

17    looked at, J 15, correct?

18    A.  The date of it, of Exhibit J 69 indeed is before the date

19    of that e-mail.

20         MR. OKADIGBO:  No further questions, your Honor.

21         THE COURT:  Any further questions of this witness?

22         MR. BRAZE:  Yes.

23                    REDIRECT EXAMINATION

24    BY MR. BRAZE:

25    Q.  Mr. Black, you were the highest ranking engineer at DeWalt

1  in 2004; is that correct?

2  A.   The latter part of 2004, yes.

3  Q.   Because the fellow you worked for, Mr. Gutierrez, is not

4  an engineer, is he?  He is a land surveyor?

5  A.   He is a licensed land surveyor.

6  Q.   And you were the only registered engineer, is that

7  correct, in your capacity?

8  A.   There was one other licensed civil engineer employed by

9  DeWalt Corporation.

10  Q.   But Tract Map 6451 was your project?

11  A.   I was the project manager on the project, yes, sir.

12  Q.   You saw that project through from the tentative map to the

13  final map; is that correct?

14  A.   Yes, sir.

15  Q.   Do you know, as you sit here today, whether the

16  improvement plans that you received were used to construct the

17  final map?

18  A.   I don't believe they were.

19  Q.   How do you know?  Did you do the work?

20  A.   I know in my review of the tentative map and subsequently

21  the final map, I did not use the improvement plans for any of

22  that review or checking.

23  Q.   Who drew the final tract map for 6451?

24  A.   Again, one of a handful of designers and drafters within

25  our company and I don't specifically recall who did that work.

410

1  Q.  Now, the difference, of course, is that on the final tract

2  map, the person who drew the drawing, name does not appear on

3  that, does it?

4  A.  On the final?

5  Q.  Correct.

6  A.  That's correct.  No initials or other identifying

7  information is allowed on those maps.

8  Q.  Did you and DeWalt know who prepared the final map?

9  A.  No, sir, I don't recall.

10  Q.  Is that documents you had at DeWalt that would tell you

11  who drew that final map?

12  A.  I would assume.

13  Q.  That's a "yes" or "no."  Do you have documents that would

14  tell you who drew that final map?

15  A.  I believe there is information there that may show who had

16  worked on that.

17  Q.  And prior to coming here today, did you ever look to see

18  who drew the final map?

19  A.  No, sir.

20  Q.  So you don't know if the person who drew the final map

21  actually used the improvement plans to draw it, do you?

22  A.  Not for sure, no, sir.

23  Q.  Have you ever compared the final map to the grading plan

24  from 5472?

25  A.  No, sir.

BLACK - RD

411

1  Q.  So what kind of supervision did you have over these people

2  that were drawing these maps?  Did they bring them to you when

3  they were finished and say, "Here it is," or what did you do?

4  A.  In effect, yes.  They would be assigned a drawing to

5  prepare and after they would prepare it, they would bring it

6  to me for check and review.

7  Q.  What would you check and review?

8  A.  For completeness of information and to make sure that the

9  information provided on there was sufficient for the purpose

10  of the map.  For tentative map, it would have been for City of

11  Wasco approval of the tentative map.  And then for the final

12  map, it would have been for approval and recordation of the

13  final map.

14  Q.  Did you ever compare the final map for 6451 to the

15  tentative map for 6451?

16  A.  I did not compare -- excuse me, compare the final map for

17  6451 with the previously expired tract.

18  Q.  No, that's not my question.  Maybe I misled you.

19       The question is:  Did you ever compare the final map

20  for 6451 to the tentative map that you drew for 6451?

21  A.  I don't believe I did.  That's typically not part of the

22  process.

23  Q.  Because if the points on the tentative map were truly

24  developed as a result of a survey, then the tentative map

25  should be exactly like the final map, shouldn't it?

BLACK - RD

412

1   A.   Not necessarily.

2   Q.   Why not?

3   A.   Because the purpose of the two maps are different.   The

4   purpose of the tentative map is to provide the City or

5   whatever jurisdiction is going to review it, but in this case,

6   the City of Wasco, provide that planner with an overview of

7   what the developer's proposing to do with the property, such

8   that that planner could then evaluate the impacts of that

9   development.

10        The purpose of the final map is to actually take the

11   large piece of property and split it into all of these little

12   smaller lots.

13        So for that reason, on the final map, the checks and

14   processes for laying out those final maps is much more

15   detailed and much more tedious, such that sometimes you may

16   see some lines that shift a little bit between the tentative

17   map and the final map to accommodate things such as minimum

18   square footage on lot size.

19        On the tentative map, the -- let me step back.

20        On the final map, for each individual lot, you go in

21   and check the length and bearing or angle of each side of the

22   lot and make sure that you start at one corner and follow

23   those lengths and angles around the lot that you wind up

24   exactly back on your starting point.

25        On the tentative map, that thorough of a check does

1    not happen.

2    Q.   Well, assuming that the tentative map was made from a

3    survey, which is what your testimony is, correct --

4    A.   Yes, sir.

5    Q.   -- shouldn't there be some basic things that are identical

6    between the tentative and the final, such as the boundaries?

7    A.   Should be pretty close.

8    Q.   Streets?

9    A.   What about the streets?

10   Q.   Streets should be the same, shouldn't they?

11   A.   Typically.

12   Q.   Gutters?

13   A.   Typically.

14   Q.   Sidewalks?

15   A.   None of that information shows up on the final map.

16   Q.   On the final map?

17   A.   The gutters, sidewalks, none of that information shows on

18   the final map.

19   Q.   Of course, these were all in place, weren't they?

20   A.   Yes, sir.

21   Q.   So there is some basic things that should be the same

22   between the tentative map and the final map if the tentative

23   is based on a survey of what was actually there?

24   A.   Again, because of the checking --

25   Q.   "Yes" or "no"?

414

1   A.   No, not necessarily.

2   Q.   So based on the survey, they could be different?

3   A.   They can be slightly different, yes.

4           MR. BRAZE:  Thank you.

5           THE COURT:  Anything further?

6           MR. ALEXANDER:  Yes, briefly, your Honor.

7                     RECROSS-EXAMINATION

8   BY MR. ALEXANDER:

9   Q.   Mr. Black, just briefly, Exhibit J 20, March 15, 2005

10  letter, on the City of Wasco's letterhead.  Just so that is

11  clear, let me show you the number at the bottom.  J 20, do you

12  see that?

13  A.   Yes, sir.

14  Q.   And describe what this letter is?

15  A.   Give me just a second to read it.

16  Q.   No problem.

17  A.   It is a letter advising Lotus Development, which I believe

18  was a subsidiary or -- I'm not sure of the legal arrangement,

19  but my understanding was it was a subsidiary of Northern

20  California Universal, advising them that the Planning

21  Commission at the City of Wasco had reviewed and approved

22  their request for a tentative map, and advising them that

23  there was a 14-day appeal period which, if any party wanted to

24  appeal approval of a tentative map, it would then be required

25  to go before City Council for approval.

415

1  Q.  And using common parlance, this is essentially the City

2  Planning Department approving the Tentative Tract Map 6451

3  prepared by DeWalt?

4  A.  Yes, sir.

5         MR. ALEXANDER:  Thank you, no further questions.

6         THE COURT:  Anything further?

7         MR. BRAZE:  Nothing further.

8         THE COURT:  Thank you, sir.  You may step down.

9         Ladies and gentlemen, let's take the midafternoon

10 break.  15 minutes.  Come back at ten after 3:00 for the next

11 witness.  Please remember, don't discuss the case.

12         (The jury left the courtroom.)

13         THE COURT:  Back on the record.  Counsel are present.

14 Are we ready for the next witness?

15         MR. BRAZE:  Yes.

16         THE COURT:  All right.  We are ready for the jury.

17         (The following proceedings were had in the presence

18         of the jury, to wit:)

19         THE COURT:  The jury has joined us.  We are ready for

20 the next witness.

21         MR. BRAZE:  Yes, we would call Jeff Gutierrez.

22         THE COURT:  Sir, if you would raise your right hand

23 and be sworn.

24                    **JEFFREY GUTIERREZ,**

25 called as a witness on behalf of the Plaintiff, having been

1    first duly sworn, testified as follows:

2              THE COURT:  Please take the witness stand, tell us

3    who you are, and spell your last name for the record.

4              THE WITNESS:  My name is Jeffrey Gutierrez,

5    G-u-t-i-e-r-r-e-z.

6                        DIRECT EXAMINATION

7    BY MR. BRAZE:

8    Q.  Good afternoon, Mr. Gutierrez.  Can you tell us who you

9    work for?

10   A.  I work for DeWalt Corporation.

11   Q.  And what is your position with DeWalt Corporation?

12   A.  I'm the President of DeWalt Corporation.

13   Q.  So you are the highest ranking officer in the corporation?

14   A.  Yes.

15   Q.  I would like to direct your attention to Exhibit J 18.

16   A.  Okay, I have got it.

17   Q.  And could you identify this document for us.

18   A.  This is a proposal letter that was prepared for Northern

19   California Universal Enterprises by DeWalt Corporation.

20   Q.  And did you deal with anyone from that organization in

21   particular?

22   A.  This letter was written to Jess Marimla.

23   Q.  Who was your main contact with Northern California

24   Universal Enterprises?

25   A.  Probably Joe Wu was the main contact.

1    Q.   And does Exhibit J 18 set forth the scope of the work you

2    proposed to do for Mr. Wu and Northern California?

3    A.   Yes.

4    Q.   And the first category is Topographic Survey.  And maybe

5    you can read the first bullet point for us.

6    A.   "Research existing horizontal and vertical monumentation

7    with the Kern County survey."

8    Q.   What did you do for that?

9    A.   A representative of DeWalt Corporation would either go

10   down to the County's office and into their -- the area where

11   they keep records, and find existing record of other surveys,

12   other maps, other information that is in close proximity to

13   the project that is proposed.

14   Q.   And would Tentative Tract 5472 be one of those maps you

15   would research?

16   A.   You wouldn't find a tentative map at the County building.

17   Q.   Would you find that with the City of Wasco?

18   A.   A tentative map, you would find with probably the Planning

19   Department of the agency with which it was submitted.

20   Q.   Did Joe Wu bring you the developer information packet that

21   he was given by the City of Wasco?

22   A.   I haven't seen it.

23   Q.   You have never seen it?

24   A.   I have never seen it.

25   Q.   And what was your second bullet point?

1  A.  "Research existing infrastructure improvement plans with

2  the Kern County Resource Management Agency, City of Wasco, and

3  any other related utility companies and service districts."

4  Q.  And what does that mean, in 25 words or less?

5  A.  When you submit a tentative map, one of the charges that

6  the agency has is to determine all of its impacts, and so we

7  have to provide them with information, you know, as to who is

8  going to be impacted, and some of those impacts are sewer,

9  water, phone, fire, police agencies.

10         So typical of doing a job like this, we have to go

11  out and do some research so that we can provide that

12  information to the agency.

13  Q.  Well, when Joe Wu came to you, did he tell you that this

14  tract had an expired tract map and all of the improvements

15  were already in?

16  A.  You know, I don't know that I talked to Joe Wu

17  specifically about, you know, what was in there.  But I did

18  know of the project.  It's a little infamous in our county.

19  Q.  Infamous?

20  A.  Yeah.

21  Q.  Well, what I'm saying is did you know from whatever source

22  that the improvements were already in, the streets were in,

23  gutters, curbs and gutters, water, sewer, was already in?

24  A.  Yes.

25  Q.  And how did you know that?

GUTIERREZ Q.

419

1   A.   I drive down Highway 46 from time to time, and I have
2   played golf at Wasco Valley Rose Golf Course.
3   Q.   Hopefully not the same day Juror 006 was there?
4   A.   I don't think so.
5   Q.   How did you find out about those improvements that are
6   already in?  What did you do to research those improvements?
7   A.   I didn't do the actual research.  There were people at
8   DeWalt Corporation that did the actual research.  My knowledge
9   was just like I said from passing by the site.
10  Q.   Well, who did you charge with doing this work?
11  A.   Greg Black was the project manager for the project.
12  Q.   And what did you tell him to do?
13  A.   I probably gave Greg this proposal letter and said, "You
14  know, here are the things that we are going to do for Northern
15  California on this project," and, you know, he took it from
16  there.
17  Q.   Are these standard language in your contract or is this
18  something you especially wrote for this contract?
19  A.   A lot of it is standard language, yes.
20  Q.   Because some of it you probably didn't have to do if you
21  had existing improvements in the ground?
22  A.   Correct.
23  Q.   Then your third bullet point is what?
24  A.   "Perform a boundary survey of the site, corroborating the
25  existence of property corners and defining the site boundary.

1    During the course of the boundary portion of the survey, we

2    will also devote time to identifying any encroachment of the

3    property lines."

4    Q.   Okay.  Were you supposed to set any monuments or corners?

5    A.   Not with the topographic survey.

6    Q.   That's the next item, isn't it?

7    A.   Yes.  The next item is the topographic survey, but the

8    general heading of this section is "Topographic Survey."

9    Q.   Oh, I'm sorry.  You are absolutely right.

10          So we will move on to the next part of the agreement.

11   A.   "Perform a topographic survey of the existing pads, street

12   and infrastructure improvements.  Pad certification will be

13   desired for proof of flood and grading plan conformance with

14   County of Kern."

15   Q.   Now, you didn't prepare a grading plan, did you?

16   A.   No.

17   Q.   You didn't prepare any improvement plans?

18   A.   No.

19   Q.   And I believe you saw yesterday that Roger McIntosh had

20   prepared a grading plan for 5472 tract map, right?

21   A.   Yes.

22   Q.   And did you obtain a copy of that grading plan?

23   A.   I have never seen a copy of the grading plan.

24   Q.   Until yesterday?

25   A.   Well, yeah, yesterday I did see it.  But up until then, I

421

1    hadn't seen one.

2    Q.  So what did you do with respect to the grading plan, as

3    indicated in your contract if you didn't prepare a grading

4    plan and you never saw Mr. McIntosh's grading plan?

5    A.  I'm not sure what the question is.

6    Q.  Sure.   Under your bullet point you just read, it said,

7    "Pad certification will be desired for proof of flood and

8    grading plan for County of Kern"?

9    A.  Right.

10   Q.  So if you didn't prepare a grading plan and you didn't see

11   Mr. McIntosh's grading plan, what did you do with respect to a

12   grading plan?

13   A.  We weren't required to do one.  What this statement is

14   talking about is we did a survey of the ground so we could

15   draw a map of it, including the elevations, and so I think,

16   you know, at this point in time, when we were doing the

17   proposal letter, we were stating, hey, we are going to shoot

18   the existing ground so you have some idea of what elevations

19   it's at in case it is in a flood zone, then we can say it is

20   either above or below the flood zone, or if there was a

21   grading plan that it had to be in conformance with, we could

22   show what the elevations of the pads were, the building pads,

23   the existing ground, any of the other infrastructure.

24   Q.  Going to page 2, it talks about the tentative map.  Again,

25   this is Exhibit J 18.  Under tentative map, your first bullet

422

1   is, "Meetings with owners to discuss development plans, layout

2   and phasing"?

3   A.   Yes.

4   Q.   And did you do that?

5   A.   I didn't do it.

6   Q.   Do you know who did?

7   A.   I don't.

8   Q.   Next bullet, could you read that?

9   A.   "Meetings with County staff to discuss development

10   options, scheduling and fees."

11   Q.   And did you do that?

12   A.   I didn't do it.

13   Q.   Do you know who did?

14   A.   I'm going to say that probably Greg Black, but I don't

15   know for sure.

16   Q.   And then your next item?

17   A.   "Preparation of boundary and easement map from record data

18   and available title information."

19   Q.   Now, is that different from a tentative map?

20   A.   That would be the creation of, you know, it is kind of a

21   base map that we put together.

22   Q.   Base map?

23   A.   Yes, in our AutoCAD file, electronic drafting.

24   Q.   And then the next item?

25   A.   "Prepare and process tentative subdivision map and

1  application package."

2  Q.  And were you aware that Ms. -- the young lady that came in

3  today that testified?

4  A.  Sarah.

5  Q.  Sarah Burgi prepared the map?

6  A.  I know she worked on it.

7  Q.  Do you know who prepared it?

8  A.  There were two drafts people that worked on that tentative

9  map.

10 Q.  Was one of them Josh Woodard?

11 A.  No, I don't believe it was.

12 Q.  So you don't believe Josh Woodard worked on the map at

13 all?

14 A.  I don't believe he worked on the tentative map, no.

15 Q.  He says he doesn't recall, and Sarah Burgi said he did.

16 So you still don't know who worked on it?

17        MR. ALEXANDER:  Argumentative, misstates testimony.

18        THE COURT:  Sustained.

19        What's your question?

20 BY MR. BRAZE:

21 Q.  So you don't know who worked on it.  Sarah Burgi?

22 A.  I know that Sarah worked on it and I know of another

23 draftsman who worked on the map.

24 Q.  Who was that?

25 A.  Brandon Thompson.

GUTIERREZ, D.

424

1    Q.   And then, lastly, you are to prepare the final map; is

2    that correct?

3    A.   Yes.

4    Q.   Now, it's true, is it not, that all final subdivision maps

5    have to have improvement plans; is that correct?

6    A.   No.  It's not correct.

7    Q.   So you don't need any improvement plans to get a final

8    subdivision map approved?

9    A.   You only need improvement plans if the agency that's doing

10   the map has required them as a condition of approval for the

11   final map.

12   Q.   And did you investigate that?

13   A.   In this case, we were not required to provide any

14   improvement plans.

15   Q.   Who told you that?

16   A.   It wasn't told to me directly.

17   Q.   Who told you that you didn't need to prepare improvement

18   plans?

19   A.   I think Greg Black was probably the person who got the

20   information from the City of Wasco that we didn't need

21   improvement plans.

22   Q.   And was there any discussion of where the improvement

23   plans would come from?

24   A.   Not to my knowledge.  I don't know.

25   Q.   Did you ever hear that the new final tract map was going

425

1    to use the improvement plans from the 5472 map?

2    A.  I did not.

3    Q.  You never heard that?

4    A.  No.

5    Q.  Now, you heard me ask where the lot numbers came from, I

6    asked Mr. Black where the lot numbers came from?

7    A.  Yes.

8    Q.  Do you have any idea where the lot numbers came from?

9    A.  I don't.

10   Q.  Have you compared the 5472 tentative map with the 6451

11   tentative map?

12   A.  Yes.

13   Q.  And the lot numbers are identical?

14   A.  They are.

15   Q.  Any idea where those came from?

16   A.  I don't know.

17   Q.  Let me show you Exhibit J 88, which is an aerial view of

18   the subdivision.  Is there anything on that aerial view that

19   would suggest to you what the lot numbers are?

20   A.  No.  No, there is not.

21   Q.  Now, this is a Joint Exhibit.  I believe we can represent

22   to the jury this was taken in 2000.  Now, during the progress

23   of this litigation, you had verified discovery responses under

24   oath as the -- being the person most knowledgeable of DeWalt

25   Engineering, correct?

426

1  A.  Yes.

2        MR. BRAZE:  Your Honor, I would like to read Request

3  For Admission Number 4 and the Response.

4        THE COURT:  Any objection?

5        MR. ALEXANDER:  No.  No objection.

6        THE COURT:  Go ahead.

7        MR. BRAZE:  Request For Admission Number 4 --

8        THE COURT:  Just one second.

9        Ladies and gentlemen, the request for admission is a

10 process that is allowed under the Federal Rules of Civil

11 Procedure where one party sends to another a request for them

12 to either admit a fact or to deny a fact.  And he is going to

13 read from that.

14       Go ahead.

15       The Response, by the way, is under oath.

16       MR. BRAZE:  Thank you.

17       "Admit that you reviewed Tentative Map Number 5472

18        before you prepared Tentative Map Number 6451.

19        (Reviewed means that you looked at and used Tentative

20        Map Number 5472 to assist you in the preparation of

21        Tentative Map Number 6451."

22        Response to Request For Admission Number 4:

23       "Responding party admits that it reviewed multiple

24        documents which likely included Tentative Map 5472

25        before preparing Tentative Map 6451."

1   BY MR. BRAZE:

2   Q.  Do you recall making that admission?

3   A.  Not exactly like that.

4   Q.  Do you recall signing that response to Request For

5   Admission under penalty of perjury?

6   A.  I do, but my recollection is that I named multiple maps

7   and not just 5472, because there were multiple maps that we

8   looked at when we were preparing the tentative map.  And when

9   you read it, you only mentioned 5472.

10  Q.  I read it as it was.

11  A.  Is that how it's written?

12  Q.  Would you like to look at it?

13  A.  No.  My recollection was that we mentioned multiple ones.

14  Q.  You are probably thinking of Special Interrogatory Number

15  2.  I will let you read that one.

16  A.  Maybe that's the case.

17  Q.  I will read Special Interrogatory Number 2, and you can

18  read the response.

19          "Special interrogatory number 2.  Please identify all

20          documents you used to assist you in preparing

21          Tentative Map Number 6451."

22          And you can read the response.

23  A.  It says, there are objections.  "Overbroad and unduly

24  burdensome."

25          THE COURT:  You don't have to do those.

428

1          THE WITNESS:  Start it "without"?

2    BY MR. BRAZE:

3    Q.  Yes.

4    A.  Okay.

5          "Without waiting, and subject to such objection,

6           documents used include Parcel Map 9572, Parcel Map

7           9629, Parcel Map 10488, Parcel Map 10542, Parcel Map

8           10556, Parcel Map 10608, Parcel Map 10669, Record of

9           Survey 19-054, Record of Survey 20-191, Record of

10          Survey 21-012, Tentative Tract Map 5472, Filed Map or

11          7-1, Book 7, page 48, Preliminary Title Report by

12          Fidelity National Title Company, City of Wasco Zoning

13          Ordinance, results of survey by DeWalt Corporation."

14          And you are correct, that is what I recollected.

15   Q.  And so that also mentions the Tentative Map 5472?

16   A.  Yes.

17   Q.  Now, you had an opportunity yesterday to compare the

18   grading plan to the final tract map on 6451, correct?

19   A.  Yes.

20   Q.  And you compared the final tract map for 6451 to the

21   grading plan, which was an improvement plan, from Tract 5472,

22   correct?

23   A.  Yes.

24   Q.  Did you notice they were very close to each other?

25   A.  Yes.

1    Q.   Do you have any idea how that happened?

2    A.   The only thing that I can comment on is how the final map

3    was prepared.  So I can comment on that.

4    Q.   And how is that?

5    A.   Well, the legal description for the parcel that Joe Wu

6    bought is "Parcel 1 of Parcel Map 9572."

7            So when we drew the boundary for our tentative map

8    and for our final map, we referred to 9572 pretty heavily;

9    that was the legal description for the property.

10           When we went out to do our survey, there were

11   monuments that had been set at the exterior boundary of Parcel

12   1 for 9572 that we weren't able to locate.  We made searches

13   for them, but I think that construction of the walls and

14   fences might have disturbed those monuments.  We weren't able

15   to find them.

16           We were able to find monuments on the south section

17   line that were also part of Parcel Map 9572 and we referenced

18   those as our basis of bearing and the basis for our survey.

19           Because we didn't find any of the boundary monuments

20   around Parcel 1 of 9572, we drew it in our AutoCAD file

21   exactly as it was shown on Parcel Map 9572.  It just so

22   happens that the grading plan for Tract Map or Tentative Tract

23   Map 5472 and the exterior boundary of Parcel 1 of Parcel Map

24   9572, they are identical, which makes sense because Roger did

25   Parcel Map 9572.

GUTIERREZ, D.

430

1  Q.  How about the bearings of the streets and the angles that
2  are to the minute and the measurements that are within a
3  hundredth of a foot; those didn't come off a parcel map, did
4  they?
5  A.  Well, just one of the streets is in the parcel map, so
6  that particular street probably was -- did come off of Parcel
7  Map 9572.
8  Q.  So is it your testimony that the tract map -- let me
9  strike that.
10       You heard some testimony that the tentative tract map
11  off 6451 came off a survey?
12  A.  Yes.
13  Q.  Is that your understanding?
14  A.  Yes.
15  Q.  So if the tentative tract map came off a survey, what was
16  actually on the ground, why would it be different on the final
17  map?
18  A.  It is -- it is fairly common for a final map to be
19  different than a tentative map.
20  Q.  Oh, I understand that.  But normally, you don't survey for
21  a tentative map, do you?
22  A.  Oh, yes, absolutely you survey before you do a tentative.
23  Q.  No, I mean survey points.  Streets and roads and things
24  like that?
25  A.  That is unusual.  Typically, when we do a survey for a

1    tentative map, the ground is --

2    Q.   Normally it would look something like that field on J 88.

3    A.   Yes.

4    Q.   So you wouldn't have to do any surveys, really, to do your

5    tentative map, and so it is understandable why the final map

6    would not correspond to the tentative map.

7             In this case, however, the testimony has been you

8    surveyed to do the tentative map?

9    A.   Yes.

10   Q.   And so those survey points should at least be on the final

11   map, shouldn't they?

12   A.   They are for two different purposes, doing the tentative

13   map and doing the final map.  The tentative map, it's a

14   concept of what your client is going to propose and what the

15   existing conditions are so that the agency can determine what

16   impacts it is going to have.

17            So I could have turned in a tentative map that had

18   dimensions to the nearest foot, and it still would have been

19   okay.

20   Q.   Sure.

21   A.   Because, basically, they are going to count how many lots

22   are going to be here.  And there is going to be 68 houses

23   flushing their toilet; can our sewer lines handle 68 houses?

24   You know, that's the concept that they are looking for.

25            When we do the final map, somebody is going to take

1  title to those lots that are created, and so it becomes much

2  more important at the final map stage to really dial in the

3  exterior boundary and each individual lot and the dimensions

4  around it.

5       Because the second that that map is recorded, there

6  are 68 brand new pieces of property that somebody is going to

7  pay money for that they will have title to.

8  Q.  So I believe your attorney represented in opening

9  statement that you spent 80 and a half hours surveying before

10  you prepared the tentative map?

11  A.  That's correct.

12  Q.  Why did you spend so much time surveying if it just had to

13  be within a foot?

14  A.  Just like if we were doing a survey for raw ground, our

15  job is to create the most efficient best use of the property

16  for our client.

17       In this case, if I had not done a survey and laid out

18  a lotting concept for my client and there was some physical

19  condition on the property that didn't allow him to enjoy the

20  best use of the property, then I would have failed as a

21  surveyor and for my client.

22       So we did a thorough survey so we could make sure

23  that Mr. Wu would get the best satisfaction out of the

24  property that he purchased.

25  Q.  Why didn't you simply copy the Tentative Map 5472?

1   A.   Because tentative maps can change from the time they are

2   tentative maps to they are final maps, it really had no value

3   to me, because there could have been a condition of approval

4   that would have changed from the tentative map to, if Roger

5   had done a final map, and that would have really blown my

6   whole project for Joe.

7         If there was a lot line on there that I copied, and

8   out in the field, on the ground, it went right through the

9   middle of a driveway, I have done a bad job for Joe.  I would

10  have to, you know, make that right for him.

11  Q.   Well, why wouldn't you take 5472 tentative map and go out

12  there with a surveyor and verify a few things so you wouldn't

13  have to spend 80 hours?

14  A.   Well, we just thought it was the right thing for us to do

15  to survey it like we would if it were raw property.  We did a

16  thorough survey of all of the curbs, all of the driveway

17  approaches and where all the utilities were, wherever they

18  were visible above the ground.  We didn't excavate anything to

19  try to find anything.

20  Q.   So they should have been accurate on the tentative map,

21  correct?

22  A.   Well -- the position of the lot lines --

23  Q.   No.  Those things you could see, streets, gutters, curbs,

24  whatever monuments you could see, those should have been

25  accurate on the tentative map, right?

1   A.  Not necessarily, because we don't have to do lot closures

2   on the tentative map.

3   Q.  I didn't ask about lot closures.  I asked you about what

4   you could see, what you could see on J 88.

5   A.  So you are talking about the position of the improvements?

6   Q.  Right.

7   A.  Yeah, they were probably pretty accurate on the tentative

8   map.

9   Q.  Should have been almost dead on?

10  A.  We surveyed them.

11  Q.  I believe you have already given some testimony in this

12  case that you actually compared 5472 to Map 6451, correct?

13  A.  At what point in time?

14  Q.  Let me hand you a declaration you filed in this case and

15  see if that refreshes your recollection that you stated under

16  oath that you compared Map 5472 to Map 6451.

17  A.  Yes, I do recall this.

18  Q.  You did compare those two maps?

19  A.  We compared the exterior boundaries, yes.

20  Q.  Excuse me?

21  A.  We compared the exterior boundaries.

22  Q.  You got the improvement plans, didn't you?  Your counsel

23  just introduced some evidence that you requested and received

24  the improvement plans in the spring of 2008, I believe it

25  was -- excuse me -- spring of 2005?

GUTIERREZ - D

435

1   A.  This doesn't mention the improvement plans.

2   Q.  But I'm saying you did have the improvement plans?

3   A.  We did have the improvement plans, yes.  We had an

4   e-mailed TIF file of them.

5   Q.  You didn't actually do the comparison on the two maps

6   yourself, did you?

7   A.  No.

8   Q.  Did you notice that the lot numbers were the same on each

9   map when you compared them?

10  A.  I think you just said I didn't really do the comparison.

11  Q.  So you don't know?

12  A.  I don't know, yeah.

13         MR. BRAZE:  Thank you.

14         THE COURT:  Any examination at this time?

15         MR. ALEXANDER:  Not at this time, thank you.

16         MR. HASSING:  No, your Honor.

17         THE COURT:  Thank you.  You may step down.

18         Next witness.

19         MS. BARNES:  Your Honor, before you start with the

20  next witness, I have a brief matter for the Court.

21  Mr. Zervis, our client, who is the City Manager of Wasco, has

22  to leave now or before 4:00 in order to attend a City Council

23  meeting down in Wasco, and he is concerned that, you know,

24  people think he is not interested.  And, of course, he is very

25  interested and he will be back tomorrow.  We just wanted to

436

1    advise the Court and the jury.

2         THE COURT:  You are not planning on calling him as a

3    witness this afternoon, are you?

4         MR. BRAZE:  Would that help?

5         MS. BARNES:  No.  I think he wants to go to the

6    Council Meeting.  He has to.

7         MR. BRAZE:  Okay.  We will wait.

8         THE COURT:  That's fine.

9         Next witness.

10                        **JAMES DELMARTER**,

11   called as a witness on behalf of the Plaintiff, having been

12   first duly sworn, testified as follows:

13        THE COURT:  Take the witness stand, if you would, and

14   then tell us who you are.

15        THE WITNESS:  My name is James DelMarter.

16        THE COURT:  Could you spell your last name for us.

17        THE WITNESS:  D-e-l-M-a-r-t-e-r.

18        THE COURT:  Okay.  Thanks.

19        Direct exam, Mr. Braze.

20                      DIRECT EXAMINATION

21   BY MR. BRAZE:

22   Q.  Mr. DelMarter, can you tell the jury what you do for a

23   living?

24   A.  I'm a civil engineer in private practice.

25   Q.  And could you give us a brief summary of your education

437

1    after high school?

2    A.   I went to junior college in Bakersfield for two years, and

3    then I graduated from the University of California, at

4    Berkeley in 1964, with honors.

5    Q.   And have you been employed as an engineer since that date?

6    A.   Yes, sir.

7    Q.   And are you registered as an engineer?

8    A.   Yes, I'm a registered civil engineer, registered in

9    December 1967.

10   Q.   And has part of your occupation been involved with the

11   development of tracts such as the one which is the subject of

12   this lawsuit?

13   A.   Yes.

14   Q.   And approximately how many tracts have you worked on in

15   your career?

16   A.   Oh, approximately 200.

17   Q.   Do you belong to any professional associations?

18   A.   Yes.

19   Q.   Which ones?

20   A.   I'm a life member of the American Society of Civil

21   Engineers.  I'm a past president, past director of the

22   American Council of Engineering Companies of California.  I

23   belong to the Honorary Societies of Chi Epsilon and Tau Beta

24   Pi, which are engineering fraternities.

25   Q.   Tau Beta Pi is the all engineering fraternity?

1   A.  Yes, it is.

2   Q.  Because that's the one I got.  And Chi Epsilon is the

3   civil engineering?

4   A.  Yes.

5   Q.  You have been retained as an expert witness in this case

6   on behalf of the plaintiff, Roger McIntosh; is that correct?

7   A.  Yes.

8   Q.  And, of course, as an expert witness, you are charging for

9   your services, are you not?

10  A.  Yes, I am.

11  Q.  How much are you charging us here today for your time?

12  A.  $250 an hour.

13  Q.  Did we ask you to compare tentative Tract Number 6451 with

14  Tentative Tract Number 5472?

15  A.  Yes.

16  Q.  Did you find those two tracts, tract maps to be similar?

17  A.  Yes.

18  Q.  And could you tell the jury what similarities you found

19  between Tentative Tract Number 5472 and Tentative Tract Number

20  5471 [sic]?

21  A.  All the street names is the same.  The lot numbering is

22  the same.

23          THE REPORTER:  Let me read the question back to you.

24          THE COURT:  I think you misstated it.  You'd better

25  ask it again.

439

1          MR. BRAZE:  The two maps are 5472.

2          THE COURT:  And 6451.

3          MR. BRAZE:  And 6451.

4          THE COURT:  Those are the maps that you compared?

5          THE WITNESS:  Yes, sir.

6    BY MR. BRAZE:

7    Q.  If you could, come down in front of the jury and point out

8    the similarities.

9          THE COURT:  As you get away from the microphone, I

10   ask you to keep your voice up so we can all hear.

11         THE WITNESS:  Yes.  Can I use the maps that I brought

12   to compare with those that are there?

13         MR. BRAZE:  Why don't you come down here.

14         THE WITNESS:  Can I use my maps?

15         MR. BRAZE:  Sure.

16         MR. ALEXANDER:  Are we using something that's not an

17   exhibit in trial?

18         THE COURT:  I don't know.  We are not there yet.  We

19   will find out.

20         MR. BRAZE:  He may be looking at a map, but the only

21   thing the jury is looking at are the two tentative tract maps.

22   BY MR. BRAZE:

23   Q.  In fact, here is a yellow highlighter.  Could you

24   highlight on Tract Number 5472 -- excuse me, Tract Number 6451

25   those items that are similar, in your opinion, to Tentative

1    Tract Number 5472?

2              THE COURT:  And could you give me the exhibit number

3    that he is going to be marking on, please.

4              MR. BRAZE:  That would be J 134, your Honor.

5              THE COURT:  Thank you.

6              THE WITNESS:  The items that I'm going to mark are

7    not only similar, but they are identical to the items that are

8    on the other map.

9              MR. HASSING:  I object, in that the witness is

10   marking beyond his deposition testimony, expert deposition

11   testimony.

12             THE COURT:  Well, since I can't make that -- come

13   that conclusion unless there is an agreement and stipulation

14   with counsel, you are going to have to handle that on

15   cross-examination and then subject to a motion to strike.

16             MR. HASSING:  All right.

17             THE WITNESS:  Those are the items that I found that

18   are identical on this map with the previous Map 5472.

19             MR. ALEXANDER:  Your Honor, just for one moment.  I

20   would like to make sure the record is clear that we are

21   actually marking a trial exhibit that we cannot unmark once it

22   is done.

23             THE COURT:  That's exactly right.

24   BY MR. BRAZE:

25   Q.  So this is Exhibit J 134, which is a blowup of Exhibit J

441

1   69?

2          THE COURT:  So if there is going to be marking, now

3   that the issue is brought up, if it were a P exhibit, it would

4   be one thing, but if it is a J exhibit, there has to be

5   agreement among counsel that it can be marked.

6          MR. HASSING:  We object to the marking, your Honor,

7   in that it is beyond the scope, for one thing.

8          THE COURT:  It doesn't make any difference what the

9   reason is.  Unless there is a stipulation to actually mark on

10  a J exhibit, it can't be utilized for that purpose.

11         MR. HASSING:  We object.

12         MR. OKADIGBO:  We object.

13         MR. BRAZE:  We will rename the blowup as a P.

14         THE COURT:  Do you have another one?

15         MR. BRAZE:  Another blowup?

16         THE COURT:  Yes.  If you have that --

17         MR. BRAZE:  Hopefully, we have it.  I don't know if

18  it's mounted.

19         THE COURT:  Whatever you want to use, you can call it

20  whatever you want as long as we don't mark on the J exhibit.

21  We have to preserve the J exhibit unless there is a

22  stipulation.  There is no stipulation here.  You can't mark on

23  J.

24         MR. BRAZE:  Well, I guess we can address this outside

25  of the presence.

442

1          THE COURT:  There is nothing more to address.

2     BY MR. BRAZE:

3     Q.  So you have highlighted dimensions, lot dimensions on the

4     exhibit previously identified as J 134.  Anything else other

5     than lot dimensions you found similar?

6     A.  Well, street names are all the same and the lot numbers

7     are the same, but I didn't mark all of those.

8     Q.  So the lots are actually numbered and the streets are the

9     same?

10    A.  Yes.

11    Q.  Even Olympic Close?

12    A.  Yes.

13    Q.  Thank you.

14          (The witness resumed the stand.)

15          MR. BRAZE:  My client advises me that we can produce

16    another blowup of Tentative Tract Map 6451 without markings on

17    it.

18          THE COURT:  That's fine.  Well, are you suggesting

19    a -- an exhibit exactly like that that you are going to

20    substitute for a J and you want to remark this?  Is that what

21    you are saying?

22          MR. BRAZE:  At that time, we will bring in an

23    identical map without yellow on it, call it P -- excuse me, a

24    J exhibit.

25          THE COURT:  That's fine.  All you need to do is

443

1  consult with defense counsel so there is an agreement, and

2  then just let the clerk know so we keep track of the exhibit.

3        MR. BRAZE:  Thank you, your Honor.

4  BY MR. BRAZE:

5  Q.  Based on your examination, have you reached a conclusion

6  as to whether Tract Map 5472 -- excuse me.

7        Have you reached a conclusion -- it is getting late

8  in the day.  I will start slower.

9        And based on your review, have you reached an opinion

10 as to whether Tentative Tract Map 5472 is similar to Tentative

11 Tract Map 6451?

12 A.  Yes.

13 Q.  What is your opinion?

14 A.  My opinion is that they represent the same piece of

15 property and subdivided in the same manner, the same number of

16 lots and the same shape and size.

17 Q.  And we also showed the jury Final Tract Map 6451 and

18 grading plans from 5472.  Did you compare those two drawings?

19 A.  Yes.

20 Q.  And what did you find with respect to those two drawings?

21 A.  I found that the bearings and distances on the final map

22 of 6451 were very similar, if not identical, to those on the

23 grading plan for 5472.

24 Q.  Now, what is a bearing?

25 A.  A bearing is a direction.  It is an arbitrary line that is

444

1    based on two known points or more known points in the field.

2            Bearings are relative, but when you have bearings on

3    a map, they describe angles between the lines.  And so,

4    therefore, when you show a bearing and distance on one line,

5    and a bearing and distance on another line, by comparing the

6    bearings, you can determine the angle and the position of the

7    points on the ends of those lines with each other.

8    Q.   Do you have a screen there in front of you?

9    A.   Yes.

10   Q.   Now, if I draw a circle, that's 360 degrees, correct?

11   A.   Yes.

12   Q.   And a right angle is 90 degrees, correct?

13   A.   Yes.

14   Q.   And so if I cut that angle in half, that would be a

15   45-degree angle, right?

16   A.   Yes.

17   Q.   And how are degrees divided?

18   A.   How are they divided?  Well, a degree is a proportion of a

19   circle.  There is 360 degrees in a circle.  And then a degree

20   is further divided into 60 increments, which are called

21   "minutes."  And a minute is divided into 60 increments called

22   "seconds."  It is like hours, minutes and seconds; degrees,

23   minutes and seconds is pretty similar.

24   Q.   Have you, as a surveyor, ever been able to survey a line

25   twice and get it to be exact to the second?

445

1    A.   Very rarely.

2    Q.   How about measurements?  You measure things in feet, and

3    in these maps in tenths of feet and hundreds of feet, so a

4    foot is 12 inches, correct?

5    A.   That's correct.

6    Q.   So a tenth of a foot would be 1.2 inches?

7    A.   Yes.

8    Q.   And a hundredth of a foot would be .12 inches?

9    A.   Yes.

10   Q.   Which would be about a eighth of an inch?

11   A.   That's correct.

12   Q.   In measuring distances several hundred feet, how often

13   have you been able to measure the same line within a hundredth

14   of an inch?

15   A.   You mean a hundredth of a foot?

16   Q.   Yes, excuse me.  A hundredth of a foot?

17   A.   Again, very rarely.  Occasionally, you can get the same

18   answer, but a lot of times, you are off a hundredth or two.

19   Q.   So with respect to bearings, back to my picture, if this

20   is north and this is south, this bearing would be North 45

21   degrees East?

22   A.   Or South 45 degrees West.  They are interchangeable.

23   Q.   Uh-huh.  And so those are the bearings that we see on

24   these drawings?

25   A.   That's right.

446

1  Q.  We had some testimony that the Tentative Tract Map 6451

2  was developed off a survey.  They actually went out there and

3  measured points and developed that tract map from that survey.

4  Did you receive a copy of the shot points that were taken on

5  that survey?

6  A.  Yes.

7  Q.  And in reviewing those shot points and the tentative map,

8  did you see any evidence that those shot points were used to

9  develop that tentative map?

10 A.  The information that the shot points would have revealed,

11 which are bearings and distances between found monuments, are

12 not depicted on that tentative map.

13 Q.  So did you see any survey information on there at all?

14 A.  No, no.

15 Q.  And I asked you to compare the final map and the grading

16 plan, and you just testified about that similarity, did you

17 not?

18 A.  Yes.

19 Q.  And how does the 6451 final map compare to the 5472

20 grading plan?

21 A.  They are very similar.

22 Q.  Similar to be to the point where they are too similar?

23 A.  Yes.

24      MR. HASSING:  Objection.  Vague.  Ambiguous, your

25 Honor.

447

1          THE COURT:  The objection is sustained.  Rephrase

2     your question, please.

3     BY MR. BRAZE:

4     Q.   Again, did you find measurements within a hundredth of a

5     foot over long distances?

6     A.   In some cases, yes.

7     Q.   And did you find bearings within a second on the two maps,

8     the grading plan and the final map?

9     A.   Yes.

10    Q.   And of course, lot numbers are the same?

11    A.   Yes.

12    Q.   And street names are similar?

13    A.   Except for one was changed.

14    Q.   That was the Olympic Close was finally changed to Olympic

15    Court?

16    A.   Yes.

17         MR. BRAZE:  Thank you, your Honor.

18         THE COURT:  Cross?

19                       CROSS-EXAMINATION

20    BY MR. HASSING:

21    Q.   Good afternoon, Mr. DelMarter.

22    A.   Good evening.  Good afternoon, sir.

23    Q.   Now, just a couple of things before we get started here.

24    You have been friends with Mr. McIntosh for 35 or 40 years,

25    haven't you?

1   A.   Approximately, yes.

2   Q.   And you understand that one of the defendants in this case

3   is Dennis W. DeWalt, Inc.?

4   A.   Yes.

5   Q.   And in fact, you had quite a problem with Dennis W.

6   DeWalt, Inc., some years ago, didn't you?

7   A.   Yes.

8   Q.   In fact, Mr. DeWalt got angry with you over something and

9   he tried to have you censored through the Board of

10  Registration, correct?

11  A.   It was one of his -- it wasn't him.  It was one of his

12  employees.

13  Q.   Right.  And you had to hire an attorney to defend

14  yourself?

15  A.   Well, we didn't go to that point.  I had an attorney write

16  a letter to him, yes.

17  Q.   You had to hire an attorney to do something, right?

18  A.   Yes.

19  Q.   And you haven't had any dealings with DeWalt since then,

20  have you?

21  A.   No.

22  Q.   Now --

23  A.   And if I might add, I never had any before that either.

24  Q.   Now, you have never had any prior experience with regard

25  to copyright issues, have you?

449

1   A.   No.

2   Q.   And you were contacted, I believe, sometime in December or

3   November of 2009, by Mr. Travis, who was one of Mr. McIntosh's

4   attorneys, with regard to this case?

5   A.   I was originally contacted by Roger McIntosh and then

6   followed up with Mr. Travis.

7   Q.   All right.   And Mr. Travis asked you to write a report,

8   did he not?

9   A.   Yes.

10  Q.   And you wrote the report, didn't you?

11  A.   Yes.

12  Q.   And you wrote a report based on a sample copy that

13  Mr. Travis had sent you, correct?

14  A.   Yes.

15  Q.   And Mr. Travis told you that in that report, he wanted you

16  to use the word, "similar," didn't he?

17  A.   Yes.

18  Q.   You did use the word "similar," didn't you?

19  A.   Yes.

20  Q.   Now, in your deposition that I took of you back in, I

21  think, it was January of -- I'm not sure it was, but I did

22  take your deposition, didn't I?

23  A.   Yes.

24  Q.   And during that deposition, I asked you a lot of questions

25  about what similarities you found between 5472 and 6451,

450

1   didn't I?

2   A.   Yes.

3   Q.   And at that time, you told me all of the similarities that

4   you had discovered; isn't that correct?

5   A.   No, I didn't tell you all of them.  I told you there were

6   quite a few.  I did not enumerate them.

7   Q.   Well, did I not ask you to tell me all the similarities?

8   A.   No.

9   Q.   I'm going to give you your deposition --

10  A.   I have a copy of it in front of me.

11  Q.   Okay.  Direct your attention then to page 37, line 17

12  through page 39, line -- actually, page 40, line 1.

13          Everybody with me?

14          MR. ALEXANDER:  One more time.

15          MR. HASSING:  It's page 37, line 17 through page 40,

16  line 1.

17  BY MR. HASSING:

18  Q.   My question, beginning at line 17 is:

19          "'With respect to the above referenced case, to the

20           extent that additional materials are brought to my

21           attention, I respectfully reserve the right to

22           supplement and/or amend the following opinions.'

23          "And then it goes down to give what I perceive to be

24           two separate opinions.

25          "The first paragraph of the opinion says that:

451

1      "'The revised tentative map for Tract Number 5472,

2      dated April 21st, 1992, and the tentative map for

3      Tract Number 6451, dated November 8th, 2004, are

4      substantially similar, in that the lot configuration

5      numbering, street names, and tract boundary appear to

6      be identical with minor differences due to the

7      separate surveys.  Tentative Tract Number 6451

8      reflects existing improvements constructed as a

9      result of the plans prepared for Tract Number 5472

10     herein above referenced.'

11     "I considered that to be one opinion.  What did you

12     mean by that?

13     Your answer:  "That's what I meant."

14     "Question:  One opinion?

15     "Answer:  Yes.

16     "I next read, 'It is my opinion that Tract Number 6451

17     could not have been recorded had the improvements

18     prepared from the plans for Tract Number 5472 not

19     been constructed.'

20     "I interpreted that as a second opinion.

21     "Answer:  Okay.

22     "Question:  How did you intend it?

23     "Answer:  As a second opinion.

24     "Question:  Okay.  Other than these two opinions, have

25     you formulated any other opinions that you expect to

452

1     testify to at trial?

2     "Answer:  Well, I could have gone into the second

3     opinion in a lot more detail in the fact that in

4     order to record a final map, improvements either have

5     to be constructed or bonded for.  Plans have to be

6     prepared and approved, signed by the City.  In this

7     particular case, in either a security and/or secured

8     for through a bond or the improvements to be

9     constructed.  I go into detail in that second

10    opinion, but that's what I intended.

11    "Question:  Okay.  So if I understand you correctly,

12    and correct me if I'm wrong, and I don't want to put

13    words in your mouth, but it seems to me what you have

14    just done is basically explained or given an

15    explanation, a partial explanation for your second

16    opinion.  Would that be fair to say?

17    "Answer:  Yes.

18    "Question:  All right.  All right.  I understand what

19    you said.  Now, other than what you have testified to

20    so far today, are there any other than these two

21    opinions" --

22    Let me back up.

23    "Question:  All right.  All right.  I understand what

24    you said.  Now, other than what you've testified to

25    so far today, and other than these two opinions, are

1        there any other opinions that you intend to give at

2        trial?

3        "Answer:  No.

4        "Question:  There are no other opinions that you have

5        been asked to render at trial, correct?

6        "Answer:  No.

7        "Question:  That's not correct?

8        "Answer:  Yes, that's correct.  No more opinions.

9        "Question:  Okay, all right.  Do you intend to review

10       any more documents between now and the time of trial?

11       "Answer:  No."

12            Now, I have got another passage here I want to get

13  into to close the loop here.  Let's start at page 73, line 2,

14  and let's go to page 75, line 2.

15       "Question:  Are you prepared to offer an opinion at

16       trial that DeWalt copied the McIntosh tentative?

17       "Answer:  Yes.

18       The witness goes on:

19       "Well, let me qualify that.  He copied the street and

20       lot alignments and the lot numbering and the street

21       names.  Obviously, the improvements were already in

22       when -- when DeWalt did it.  So obviously, he had to

23       have gone out and done some surveying to determine

24       the extent of the improvements that were in.  But as

25       far as the boundary of the map, it is my opinion that

1      these two maps are the same from a tentative and a

2      final.

3      "Question:  Okay.  So when I asked you if you had an

4      opinion whether or not DeWalt copied McIntosh's

5      tentative, you said yes.  And what you mean by that,

6      and correct me if I'm wrong when I get through, but

7      what you meant by that was the boundaries are within

8      minuscule differences, identical.  The streets are

9      all in the same place.  The streets are all named the

10     same, and the lots are all numbered the same, and,

11     therefore, the two maps are, as you say, nearly

12     identical.  Would that be an accurate statement?

13     "Answer:  That's accurate to the effect that one

14     street name was changed by the fact that the City, I

15     think, wanted to change the -- the -- this one street

16     was called Olympic Close and now they call it Olympic

17     Court.

18     "Question:  Right.

19     "Answer:  But that's the -- essentially from a -- I

20     haven't looked and -- and compared each and every lot

21     line, each and every bearing and distance and so

22     forth.  But from a standpoint of looking at the final

23     map and the two tentatives, I would say that they are

24     essentially the same.

25     "Question:  All right.  I know I asked you this

455

1          question.  I don't remember if I got an answer.  And

2          if I did, I don't remember what the answer was.  So

3          I'm going to ask you again.

4       "Your opinion number 1 has reference to separate

5          surveys, and how do you know there were separate

6          surveys?

7       "Answer:  Well, obviously McIntosh had to do a survey

8          in order to prepare their tentative map.  Their

9          tentative map was prepared in 1992.  The final map

10         for 6451 indicates his survey was done in 2004.

11         Therefore, there is two separate surveys.

12      "Question:  All right.  You did answer that question.

13         I apologize.  Separate and apart from what you have

14         testified to here today, do you have any other

15         opinions that you intend to express at trial?

16      "Answer:  No."

17         Your Honor, based on that, I would ask to strike any

18   testimony with regard to interior lot line dimensions.

19         MR. BRAZE:  Well, quite frankly, it is not expert

20   testimony to take a look at it and see that they are

21   identical.

22         THE COURT:  It doesn't make any difference.  If he

23   has opinions, he only has them because he was retained as an

24   expert and either it goes beyond his report and deposition

25   testimony or it does not.

456

1          So the question is, if you believe it does not,

2    because there is a motion based on the fact that it does, I

3    need you to tell me, direct me to page and line.

4          MR. BRAZE:  I guess I didn't follow your Honor.

5          THE COURT:  The motion that is pending before the

6    Court is that the opinion with regard to --

7          MR. BRAZE:  The lot dimensions.

8          THE COURT:  Yes, it goes beyond the scope of his

9    deposition answers and/or the expert report.  And so my

10   question for you, in response to the motion, is, first of all,

11   do you have an objection to the motion?  If you do, then you

12   need to point to me either in the report or the deposition

13   that indicates that he did not go beyond that which is in

14   either one.

15         MR. BRAZE:  I don't believe pointing out lot

16   dimensions that are obvious on their face is a violation of an

17   expert's opinion because it's merely pointing out that which

18   is obvious to the jury.

19         THE COURT:  Are you suggesting it is not an opinion?

20         MR. BRAZE:  It is not an opinion, because they are

21   identical.  It is not an opinion that they are close.  It is

22   an opinion they are identical.

23         THE COURT:  That is an opinion, is it not?

24         MR. BRAZE:  I mean I could point that out in closing

25   argument.  It wouldn't be expert testimony.

457

1          THE COURT:  Well, no.  He is not a percipient

2     witness.  He is an expert witness.  So anything he indicates

3     is an expert opinion, and so it's either inclusive or it's

4     exclusive of deposition testimony and/or expert report.

5          So I need a citation, if it is your position that it

6     was covered.

7          MR. BRAZE:  I would like to look at his deposition

8     for a minute, your Honor.  There were obviously many pages

9     read by Mr. Hassing into the record.

10          MR. ALEXANDER:  Your Honor, while he is doing that.

11     I would suggest this.  There were two other areas that were

12     obviously not covered in the deposition, and one was a

13     comparison of the grading plan to the final map and the other

14     was testimony to the effect that the shot points were not all

15     located on the Tentative Map 6451.  Neither of those was

16     addressed in the deposition either.

17          THE COURT:  All right.  So that just simply, it is a

18     joinder and an expansion of the motion, but it still doesn't

19     take away from your request, and that is that you take a

20     look -- have an opportunity to review and then give me a

21     citation.  We can do that either at the end of the day or

22     first thing tomorrow morning before the jury comes in.

23          MR. BRAZE:  Okay.

24          MR. HASSING:  Am I to continue then?

25          THE COURT:  You are, and I will hold the motions, in

458

1    plural, in abeyance.

2              MR. HASSING:  Thank you, your Honor.

3              MR. ALEXANDER:  Thank you, your Honor.

4    BY MR. HASSING:

5    Q.  There is no question in your mind but what DeWalt went out

6    and surveyed that property, is that right?

7    A.  No, there is no question.  He did.

8    Q.  Now, if we take as a fact that the improvements that are

9    out there on that Tract 6451, if they were built pursuant to

10   Mr. McIntosh's plans, and then DeWalt went out and surveyed

11   them, and then DeWalt drafted a new map based on his survey,

12   you would expect those two maps to look similar, wouldn't you?

13   A.  McIntosh's map was done without the benefit of the

14   improvements or the monuments in place on the ground.

15   McIntosh's map shows some center line dimensions.

16              DeWalt's map shows no center line information, and he

17   had the survey monuments, he had surveyed the monuments, but

18   he didn't put the information on the tentative map.

19   Q.  I think that misses my point.  My point is this, sir.  We

20   start out with a bare piece of ground, correct?

21   A.  Yes.

22   Q.  Mr. McIntosh draws a tentative map for that piece of

23   ground, correct?

24   A.  Okay.

25   Q.  He also drafts some improvement plans, correct?

459

1    A.   Yes.

2    Q.   The contractors go out and they build streets, curbs,

3    gutters, sidewalks on that land based on McIntosh's plans,

4    correct?

5    A.   Yes.

6    Q.   And in conformance with his tentative map, correct?

7    A.   No.

8    Q.   Why not?

9    A.   Because most of the plan -- the plans are normally done

10   based on a final map.  A tentative map is an approximation of

11   what the final dimensions are going to be.

12   Q.   Okay.

13   A.   McIntosh set the monuments based on what his final map was

14   probably going to be.  I never saw his final map.  But he set

15   monuments and DeWalt went out and tied those monuments in and

16   purportedly prepared the tentative map from those monuments.

17           Now, I can add that the final map that DeWalt

18   prepared does not reflect the exact information that he

19   surveyed.  And also the fact that the final map does not show

20   boundary monuments on the tract and the points that I reviewed

21   did not have any survey point, any survey information from the

22   monument boundary -- for the boundary point, excuse me.

23   Q.   Well, you already have testified that there is no doubt in

24   your mind that DeWalt went out and surveyed the property; is

25   that right?

460

1    A.   That's right.

2    Q.   Well, is the fact that there are no survey notations on

3    DeWalt's map, does that in any way detract from the fact that

4    they actually did a survey?

5    A.   No.

6    Q.   All right.  And getting back to my larger point, if the

7    streets were built in that subdivision based on plans drawn by

8    McIntosh, and a survey was done then to determine exactly

9    where those streets were, you would anticipate that those --

10   and then a map was drawn based on the survey, you would

11   anticipate that the information would be pretty close,

12   wouldn't you?

13   A.   Pretty close, yes.

14   Q.   All right.

15             I have no further questions, your Honor.

16             THE COURT:  Mr. Alexander?

17                         CROSS-EXAMINATION

18   BY MR. ALEXANDER:

19   Q.   Mr. DelMarter, I want to make sure, at no time during your

20   work before your deposition, did you ever compare Parcel Map

21   Number 9572 with Final Map 6451, did you?

22   A.   Yes, I did.  I had that parcel map, and it's listed as one

23   of the exhibits that I reviewed.

24   Q.   And the dimensions, in terms of the bearings, on Parcel

25   Map 9572 and Final Map 6451 are identical, correct?

461

1  A.  I can't say that right now, but they may be, yes.  Now --

2  Q.  And you also mentioned that the purpose of a tentative map

3  is to give the governmental agency an idea of what the final

4  map is going to be, correct?

5  A.  Yes.

6  Q.  And so there is less certainty required of things such as

7  lot boundaries in a tentative map, correct?

8  A.  Yes, that's correct.

9  Q.  Because at the tentative map stage, owners are not buying

10  individual lots where they have to have certainty as to the

11  lot dimensions, correct?

12  A.  That's correct.

13  Q.  However, at the final map stage, you have to have

14  certainty as to the lot boundaries because a person buying a

15  lot needs to know what they are buying, correct?

16  A.  That's correct.

17  Q.  Finally, you actually went out to the site at some point

18  in time, correct?

19  A.  I had my surveyors go out there, yes.

20  Q.  Did you go out there personally?

21  A.  No.

22  Q.  Did Mr. McIntosh or Mr. Travis ever identify for you what

23  they thought were the items that were similar and different in

24  any of these maps?

25  A.  No.

462

1   Q.  And did your surveyors go out and come back with a report
2   to you?
3   A.  Yes.
4   Q.  Did they tell you they had located all of the lot corner
5   markers that had been set by DeWalt?
6   A.  No.
7   Q.  Did they tell you that they located any lot corner markers
8   that had been set by DeWalt?
9   A.  They said they saw some, but they didn't tie those in.  We
10  were more concerned with the monument positions.
11  Q.  Do you recall testifying in your deposition that
12  Mr. McIntosh actually wanted you to compare the tentative
13  maps?
14  A.  He asked me to look at some of the conditions, yes.
15  Q.  And that he also told you about what he believed the
16  similarities to be?
17  A.  He didn't point them out specifically, no.
18  Q.  Okay.
19          MR. ALEXANDER:  Your Honor, I would like to read from
20  the deposition testimony of Mr. DelMarter at page 23, lines 9
21  through 15.
22          THE COURT:  Any objection?
23          MR. BRAZE:  No.
24          THE WITNESS:  What lines?
25          MR. ALEXANDER:  9 through 15, page 23.

DELMARTER - X

463

1           "Question:  Well, Mr. McIntosh told you about the

2            similarities, didn't he?

3           "Answer:  Yes.

4           "Question:  And he asked you to look at the two maps

5            and see if you concurred with the similarities that

6            he pointed out to you or that he mentioned to you?

7           "Answer:  Yes."

8           MR. ALEXANDER:  Subject to the Court's determination

9    on the pending motions, that's all I have right now.

10          THE COURT:  Any further cross.

11          MR. OKADIGBO:  Just one question, your Honor.

12                          CROSS-EXAMINATION

13   BY MR. OKADIGBO:

14   Q.   Mr. DelMarter, at the time of your deposition, you had not

15   read any documents from the City of Wasco regarding its

16   process for approving tentative maps, correct?

17   A.   No.  That's correct, yes.

18          MR. OKADIGBO:  No further questions.

19          THE COURT:  Any redirect?

20          MR. BRAZE:  No, your Honor.  We may want to read some

21   deposition testimony in the record in response to your

22   request.

23          THE COURT:  That's fine.  You may step down.

24          Ladies and gentlemen, we are going to stop now.

25   There are a couple things we need to handle, but there is no

464

1   reason to have you wait while we do that.

2          Please remember not to form or express an opinion,

3   discuss this case with anyone, allow anybody to discuss it

4   with you, do anything having to do with the case, especially

5   with regard to any investigation, looking anything up, trying

6   to get some help from someplace else.  It all has to come from

7   here.

8          Tomorrow morning, counsel and I are going to meet on

9   the record earlier, but again, I would ask you to be ready to

10  go at 8:30, and we are going to try to do a better job

11  tomorrow morning than we did this morning on being ready for

12  you at 8:30.

13         Any questions, issues?  See you tomorrow morning at

14  8:30.  Thanks.

15         (The jury left the courtroom.)

16         THE COURT:  Okay.  The jury has left.  It would seem

17  to me that the best way to handle this is to give Mr. Braze,

18  you, a chance to review the report and/or the deposition.  And

19  why don't we meet tomorrow morning at 8:10?

20         MR. BRAZE:  Okay.

21         THE COURT:  If there are issues, we will handle them

22  and be ready for the jury at 8:30.  Fair enough?

23         MR. HASSING:  Yes.

24         MR. ALEXANDER:  Yes.

25         MR. BRAZE:  Two issues for clarification.

465

1        THE COURT:  Actually, it is three.  Mr. -- there was

2   the -- Mr. Hassing raised one and then Mr. Alexander added an

3   extra two.  The two that Mr. Alexander suggested were the

4   comparison of the grading plan to the final plan was not

5   included.

6        MR. BRAZE:  As an opinion.

7        THE COURT:  As an opinion.  The shot points opinions

8   regarding the location on the final map, not included.

9        And Mr. Hassing's position was the interior lot

10  dimensions were not part of either the report or the

11  deposition, those three.  Okay?

12        MR. HASSING:  Thank you, your Honor.

13        (The proceedings were adjourned at 4:31 p.m.)

14

15        I, PEGGY J. CRAWFORD, Official Reporter, do hereby

16        certify the foregoing transcript as true and correct.

17

18  Dated:  03/20/2010              /s/ Peggy J. Crawford
                                    PEGGY J. CRAWFORD, RDR-CRR
19

20

21

22

23

24

25