466

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

HON. LAWRENCE J. O'NEILL


ROGER McINTOSH,                    )
                                   )   1:07-cv-1080 LJO
            Plaintiff,             )
                                   )   JURY TRIAL, DAY 3
      vs.                          )
                                   )
NORTHERN CALIFORNIA                )
UNIVERSAL ENTERPRISES              )
COMPANY, a California              )
corporation, et al.,               )
                                   )
            Defendants.            )
─────────────────────────────     )

Fresno, California              Wednesday, March 3, 2010



              REPORTER'S TRANSCRIPT OF PROCEEDINGS











Vol. 3, pgs. 466 to 623, inclusive


REPORTED BY:  PEGGY J. CRAWFORD, RDR, CRR, Official Reporter

467

APPEARANCES OF COUNSEL:

For the Plaintiff:           LAW OFFICES OF BORTON PETRINI, LLP
                             5060 California Avenue
                             Suite 700
                             Bakersfield, CA  93309
                             BY:  **JAMES J. BRAZE**
                                  **JEFFREY A. TRAVIS**


For the Defendants:

(Northern/Lotus)             LAW OFFICES OF STEVEN J. HASSING
                             425 Calabria Court
                             Roseville, CA  95747
                             BY:  **STEVEN J. HASSING**


(DeWalt)                     ALEXANDER & ASSOCIATES, PLC
                             1925 G Street
                             Bakersfield, CA  93301
                             BY:   **WILLIAM L. ALEXANDER**


(City of Wasco)              GCR, LLP
                             520 South Grand Avenue
                             Suite 695
                             Los Angeles, CA  90071
                             BY:   **CHAKA C. OKADIGBO**
                                   **SUSAN GRAHAM BARNES**

468

## INDEX

**PLAINTIFF'S WITNESSES**:

**KEITH WOODCOCK**                                          476
DIRECT EXAMINATION BY MR. TRAVIS                           476
CROSS-EXAMINATION BY MR. OKADIGBO                          494
REDIRECT EXAMINATION BY MR. TRAVIS                         499
CROSS-EXAMINATION BY MR. HASSING                           504
RECROSS-EXAMINATION BY MR. OKADIGBO                        505
FURTHER REDIRECT EXAMINATION BY MR. TRAVIS                 505

**ROBERT WREN**                                            506
DIRECT EXAMINATION BY MR. TRAVIS                           507
CROSS-EXAMINATION BY MR. OKADIGBO                          515
REDIRECT EXAMINATION BY MR. TRAVIS                         521

**DENNIS MCNAMARA**                                        526
DIRECT EXAMINATION BY MR. TRAVIS                           527
CROSS-EXAMINATION BY MR. OKADIGBO                          536

**GERALD HELT**                                            537
DIRECT EXAMINATION BY MR. TRAVIS                           538

**JAMES ZERVIS**                                           543
DIRECT EXAMINATION BY MR. TRAVIS                           543
CROSS-EXAMINATION BY MR. OKADIGBO                          550

**JOE WU**                                                 553
DIRECT EXAMINATION BY MR. BRAZE                            553
CROSS-EXAMINATION BY MR. HASSING                           595
REDIRECT EXAMINATION BY MR. BRAZE                          595

**ROGER MCINTOSH**                                         596
DIRECT EXAMINATION BY MR. BRAZE                            596
CROSS-EXAMINATION BY MR. HASSING                           601

**DEFENDANT NORTHERN/LOTUS' WITNESSES**:

**JOE WU**                                                 607
DIRECT EXAMINATION BY MR. HASSING                          607

* * * * *

469

## EXHIBITS

**DEFENDANT'S**                                                    **Received**

 D  411                                                           517

1   Wednesday, March 3, 2010              Fresno, California

2   8:10 a.m.

3              (The following proceedings were had outside the

4              presence of the jury, to wit:)

5              THE COURT:  Good morning, everyone.  Let's see,

6   nobody from the City?  Okay, well, it's time.  We will call

7   the McIntosh case, Action Number 07-1080.

8              All counsel are present except counsel for the City.

9              Why they are not here, we don't know, but it doesn't

10  make any difference.  We move on time.

11             We have the pending issue, and I believe it is yours

12  to address, Mr. Braze.

13             MR. BRAZE:  It is, your Honor.  You had identified --

14  or excuse me, the defendants had identified three areas of

15  objection to Mr. DelMarter's testimony, the first being lot

16  line sizes and second being shot points, and I believe the

17  third was a comparison of the grading plan to the final tract

18  map.  We are prepared to concede the shot points, so those --

19  that testimony concerning shot points can be excluded.

20             THE COURT:  All right.

21             MR. BRAZE:  However, with respect to lot sizes, we

22  believe there are numerous references in the deposition, which

23  we can read into the record if you would like.

24             THE COURT:  Why don't you just point us to the most

25  obvious and all you need is some.  You don't need it all.

1          MR. BRAZE:  First is the general comment

2    Mr. DelMarter made in his deposition regarding reserving the

3    right to review additional material that would be brought to

4    his attention or alter or supplement his testimony.

5          THE COURT:  But did he?  In other words, did he

6    notify the defendants that there was anything additional, any

7    changes?

8          MR. BRAZE:  No.  He just made that statement in his

9    deposition and on his -- I believe it is also in his Rule 26

10   disclosure.

11         THE COURT:  That?

12         MR. BRAZE:  That he reserved the right.

13         THE COURT:  He can reserve it, but he can't just keep

14   it secret.

15         MR. BRAZE:  And then of course Exhibit A to his

16   deposition were the two tentative tract maps and the final

17   tract map.  He also indicated in his deposition that he had

18   reviewed the improvement plan, which, of course, contained the

19   grading plan that he referred to.

20         THE COURT:  So far, I'm not convinced.  Is there

21   something else?

22         MR. BRAZE:  Yes.

23         THE COURT:  Oh, good.

24         MR. BRAZE:  At page 53, line 2 of his deposition

25   starts:

1           "All right.  You indicated in your first opinion" --

2           THE COURT:  Hang on one second, 53, line what?

3           MR. BRAZE:  2.

4           THE COURT:  Until what line, down to what?

5           MR. BRAZE:  7.

6           THE COURT:  Let's take a look.  There is reference to

7   lot configuration.

8           MR. BRAZE:  And on page 59, commencing at line 15

9   through line 23.

10          MR. ALEXANDER:  59:15 through 23?

11          MR. BRAZE:  Yes.

12          MR. ALEXANDER:  Thank you.

13          THE COURT:  Okay, go ahead.

14          MR. BRAZE:  And there, he points out, "The south line

15  of Lots 13 through 18 are the same."

16          And then also page 60, line 2 through 10.

17          THE COURT:  All right.

18          MR. BRAZE:  Page 65, line 23 to page 66, line 2.

19          THE COURT:  Okay.

20          MR. BRAZE:  Page 70, line 6 through 10.  I'm sorry,

21  page 71, lines 4 through 10.

22          THE COURT:  4 through 10?

23          MR. BRAZE:  70 --

24          THE COURT:  Page 71, if we look at 4 and 5, that's

25  question and answer, but 6 through 10 is a question.

1      MR. BRAZE:  This is where plaintiff's counsel taking

2  the deposition indicates that he has looked at all the lines.

3  And I think after that -- so page 74, line 6 through 10.

4      THE COURT:  Okay.  What about the issue of comparison

5  of grading, the grading plan to the final?

6      MR. BRAZE:  He did not compare the grading plan to

7  the final in his deposition.

8      THE COURT:  All right.

9      MR. BRAZE:  And I think I argued that yesterday that

10  it's just a matter of looking at one map and seeing if the

11  same dimensions are there compared to the other, which I'm not

12  sure is really expert testimony anyway.

13      THE COURT:  All right.  Anything else by anyone?

14      MR. HASSING:  I would only have further comment, your

15  Honor, if you think that any of these passages bear on the

16  dimension of the various lots that he colored.

17      THE COURT:  Well, I will give you my tentative, if

18  that's what you are asking for.

19      MR. HASSING:  Yes.

20      THE COURT:  On the comparison of the grading plan to

21  the final, the defense motion is granted.

22      On the shot points, it is granted because it is

23  conceded.

24      On the interior map lot dimensions, denied.

25      MR. HASSING:  I would have no further comment, your

1  Honor.

2          THE COURT:  Anybody?

3          MR. ALEXANDER:  Thank you, your Honor.

4          THE COURT:  That's the order.

5          So when the jury comes in, I'm going to indicate to

6  them that with regard to the testimony on the comparison of

7  the grading plan to the final and the testimony on the shot

8  points regarding the locations on the final, that those

9  answers are stricken, period.  Okay?

10         Any other issues that we need to take up?

11         We will be in recess for a few minutes and as soon as

12  the jury comes, we will be ready for them.

13         How many more witnesses do you have?

14         MR. ALEXANDER:  Your Honor, I'm sorry, there is one

15  clarification.  I think the shot points he testified to as to

16  all the maps, both the tentative and the final.

17         THE COURT:  You are right, and that's what will be

18  told.

19         MR. ALEXANDER:  Thank you, your Honor.

20         THE COURT:  How many more witnesses do you have?

21         MR. TRAVIS:  We have eight left, your Honor, but we

22  are going to get through some of these fairly quickly.

23         MR. BRAZE:  Should finish up tomorrow morning.

24         THE COURT:  That's fine.  I want to make sure so

25  everybody else is on track knowing when they are going to be

1    moving forward.

2         All right.  We will be in recess a few minutes.

3         (Recess)

4         THE COURT:  Back on the record.  Counsel are present.

5    Ready for the jury?

6         MR. ALEXANDER:  Yes, your Honor.

7         THE COURT:  Okay.  Ready for the jury.

8         (The following proceedings were had in the presence

9         of the jury, to wit:)

10        THE COURT:  We are still on the record, and the jury

11   has joined us.

12        Good morning, ladies and gentlemen.  Any issues,

13   concerns, problems?  Good.

14        At the end of the day yesterday, you will recall that

15   we had our last witness was Mr. DelMarter.  And there was a

16   legal issue as to whether or not some of the -- a couple of

17   the things, actually, had been covered in his -- the opinions

18   that he had given in deposition and his expert report.

19        And we have talked about it this morning and met

20   earlier than now, of course, and you are instructed that the

21   opinions that he gave with regard to the comparison of the

22   grading plan to the final one; and, two, the shot point

23   opinions, you are instructed that those opinions are excluded

24   and the answers are stricken.  So you can't consider those two

25   things.

1        Any questions on that?  Okay.  Everything else is not

2   stricken.  Everything else is in.

3        All right.  We are ready for the next witness.

4        THE COURT:  Sir, raise your right hand, please, and

5   be sworn.

6                           **KEITH WOODCOCK**,

7   called as a witness on behalf of the Plaintiff, having been

8   first duly sworn, testified as follows:

9        THE COURT:  Please take the witness stand right here,

10  and, once you do and you are comfortable, let us know who you

11  are.

12       THE WITNESS:  Okay.  My name is Keith Woodcock.

13       THE COURT:  All right.  Thank you.

14       Direct examination.

15                     DIRECT EXAMINATION

16  BY MR. TRAVIS:

17  Q.  Thank you for your patience, Mr. Woodcock.  I know you

18  have been out here for a few days.

19       Mr. Woodcock, can you tell us what your current --

20  scratch that.

21       Can you tell us, did you work for the City of Wasco?

22  A.  Yes, I did.

23  Q.  What was your position when you worked for the City of

24  Wasco?

25  A.  I was the Planning Director.

1  Q.  As I remember it, you were the Planning Director from

2  around 2005 to 2007; is that right?

3  A.  That's right.  July '05 to May '07.

4  Q.  And as I also remember it, you were also responsible for

5  overseeing the processing of Final Map 6451, right?

6  A.  That's correct.

7  Q.  And you understand that this litigation concerns copyright

8  infringement relating to the 6451 map, right?

9  A.  That's my understanding.

10  Q.  And I want to kind of go into a little bit of background

11  as far as what it was that you used to do when you were the

12  Planning Director as far as your oversight of the mapping

13  process.  Are you familiar with the Subdivision Map Act?

14  A.  Yes.

15  Q.  You are expected to know the provisions in the Subdivision

16  Map Act that pertain to your job?

17  A.  That's correct.

18  Q.  And the Subdivision Map Act is part of the Government

19  Code, right?

20  A.  That's correct.

21  Q.  And the Subdivision Map Act then has provisions in it from

22  the Government Code, and sometimes they are modified in some

23  ways in the Municipal Code of Wasco, right?

24  A.  That's correct.

25  Q.  And I know we have been throwing around a lot of terms

1   that can be confusing.  I have been living with this for two

2   years, I know you've lived it all your life.

3           So when a developer comes to you with a project and

4   they have raw land, what is it that -- they prepare something

5   called a "tentative map," and what is that supposed to do?

6   A.   The tentative map is the developer's concept for how the

7   land is to be subdivided.

8   Q.   Right.  So they have a proposed concept of the raw land,

9   correct?

10  A.   That's correct.

11  Q.   And then they submit it.  Does that go to your department?

12  A.   Yes, it does.

13  Q.   And then your department is the Planning Department,

14  right?

15  A.   Yes.

16  Q.   And then you go ahead and there is a committee, several of

17  you, right?

18  A.   Yes.

19  Q.   Okay.  And then you go ahead and you look at the tentative

20  map, right?

21  A.   Yes.

22  Q.   And then when you look at the tentative map, the City

23  then, it goes to City Council, right?

24  A.   No.  Subdivisions, tentative maps are approved by the

25  Planning Commission, and it would only go to the City Council

1    if it was -- a decision by the Planning Commission was

2    appealed.

3    Q.   Okay.  But after it comes to you guys -- and I say "you

4    guys"; I mean the Planning Commission -- you create what they

5    call a "staff report," right?

6    A.   That's right.

7    Q.   And that staff report says, colloquially, "We like it or

8    we don't like it and if we don't like it, here are the

9    conditions that we are going to put on that subdivision,"

10   correct?

11   A.   Yes.

12   Q.   And then it is expected that the developer is then

13   required to comply with that staff report, right?

14   A.   With the conditions that are imposed on it, yes.

15   Q.   Right.  But it is a little bit different when it occurs

16   with -- where the -- a tentative map had already been proposed

17   and then that tentative map expired, right?

18   A.   Yes.

19   Q.   Because, typically, when you have an initial project, the

20   land -- and I'm pointing to J 88, which is an aerial which

21   depicts land with improvements in it -- typically, there is

22   nothing here.

23          But in the case of the 6451 tract, there was

24   improvements already in the ground, right?

25   A.   That's correct.

WOODSIDE

480

1  Q.  And so it was a little bit different because the previous

2  tentative map that had already been approved by the City

3  Council had expired, right?

4  A.  That's correct.

5  Q.  In fact, it had been gone on -- in fact, that project

6  began in the early nineties and then finally expired in around

7  2002?

8  A.  That is my understanding, yes.

9  Q.  And once a project expires, then the City is not beholden

10 to the previous -- the conditions of the previous project, and

11 they can start the whole process over again, right?

12 A.  The process needs to start afresh, yes.

13 Q.  The City can impose a whole brand new set of conditions,

14 correct?

15 A.  Yes.

16 Q.  I'm going to go ahead, and you have a bunch of folders

17 there.  I'm going to have you look at J 89.  I will help you

18 find it.  I feel like we are playing bingo.

19        Your Honor, if you don't mind, if I can remove some

20 of these or put them aside.

21        THE COURT:  Sure, of course.  I thought you meant

22 remove from the binder.  Got it.

23 BY MR. TRAVIS:

24 Q.  If you could take a look at that?

25 A.  Yes.

481

1   Q.  You have seen that document before?

2   A.  Yes.

3   Q.  What is that document, Mr. Woodcock?

4   A.  This is the staff report on the tentative tract map.

5   Q.  If you could go in that staff report --

6           THE COURT:  Could you tell us, just so we are clear

7   on the time frame here, what's the date on that?

8           THE WITNESS:  It is dated January 2nd, 2005.

9           THE COURT:  Thank you.

10  BY MR. TRAVIS:

11  Q.  If you could turn in that staff report to -- there is a

12  section called "General" section, and then General section,

13  paragraph 12.  Can you read that to us?

14          MR. HASSING:  What Bates stamp?

15          MR. TRAVIS:  A 01901.

16          THE WITNESS:  Do you want me to read what 12 says?

17  BY MR. TRAVIS:

18  Q.  Yes, paragraph 12.

19  A.  Paragraph 12 reads, quote:

20          "If the developer's engineer utilizes

21          computer-assisted design drafting for the final map

22          and the subdivision improvement plans, then prior to

23          recordation of the map, the developer's engineer

24          shall ensure a disk with said information in a format

25          compatible with the City's computers to the City

482

1          Engineer."

2   Q.   So as a requirement of this staff report, was that if

3   there was a -- an electronic version of the final map, then

4   the improvement plans also had to be in electronic form and

5   submitted to the City, correct?

6   A.   As a standard condition, yes.

7   Q.   In this particular case with this particular subdivision,

8   were there improvement plans?

9   A.   No.

10  Q.   Were there any improvement plans related to this

11  subdivision?

12  A.   Not that were not submitted with this tentative map.

13  Q.   But wasn't it the case that the approved plans for the

14  6451 subdivision were McIntosh's plans?

15          MR. OKADIGBO:   Objection, your Honor.

16          THE COURT:   What's the legal ground?

17          MR. OKADIGBO:   There is no establishment --

18          THE COURT:   What is the legal ground?

19          MR. OKADIGBO:   Foundation.   He hasn't established --

20          THE COURT:   Sustained.

21  BY MR. TRAVIS:

22  Q.   Can you also turn to -- let me ask you another question.

23          Wasn't it also a requirement of the subdivision

24  agreement -- scratch that.

25          Was there also a subdivision agreement between the

483

1   developer who -- Northern, and also the City of Wasco?

2   A.   The subdivision agreement related to the final map.

3   Q.   Okay.  And as a condition of that subdivision agreement,

4   wasn't there a condition that any repairs or works be done in

5   accordance with the approved plans?

6   A.   That is a standard condition or statement in subdivision

7   agreements.

8   Q.   And what were the approved plans?

9   A.   In this case, that the subdivider was not required to

10  submit improvement plans.

11       MR. TRAVIS:  I object and move to strike as

12  nonresponsive.  I didn't ask whether or not the subdivider was

13  required.

14       THE COURT:  The question is:  And what were the

15  approved plans?

16       His answer is that the subdivider was not required to

17  submit improvement plans.  It's responsive.  Overruled.

18       MR. TRAVIS:  I am going to read from Mr. Woodcock's

19  deposition, paragraph 18 -- sorry.  Page 18, line 16 through

20  25.

21       Well, before I go there.

22  Q.   Mr. Woodcock, had you ever seen the tentative map for

23  6451?

24  A.   Yes.

25  Q.   And on the tentative map for 6451 there is a note section,

1  right?  I will have you read this.

2  A.  Notes --

3          THE COURT:  You mean you want him to read it out loud

4  or to himself.

5  BY MR. TRAVIS:

6  Q.  If you can refresh your recollection, but go ahead and

7  read it out loud.  First, Notes Section 1?

8  A.  It says, quote:

9          "This development contains existing improvements built

10          per Valley Rose Planned Community, expired Tentative

11          Map 5472, and associative improvement plans."

12  Q.  And associative approved improvement plans, right?

13  A.  Right.

14  Q.  What were the approved improvement plans, if that helps

15  you remember?

16  A.  Those were the plans that related to the expired map.

17  Q.  McIntosh's plans, right?

18  A.  That's correct.

19  Q.  In fact, isn't it Wasco's own municipal code that requires

20  improvement plans capable of being reproduced in order for a

21  project to be completed?

22  A.  Yes, to the best of my recollection.

23  Q.  To the best of your recollection, did DeWalt ever submit

24  electronic copies of improvement plans --

25  A.  No.

485

1   Q.  -- to the City of Wasco?

2   A.  No, it did not.

3   Q.  Even though it was a city requirement?

4        MR. ALEXANDER:  Assumes facts not in evidence and

5   misstates testimony.

6        THE COURT:  Sustained.  You will have to lay that

7   foundation.

8        MR. TRAVIS:  That's okay.

9   BY MR. TRAVIS:

10  Q.  Isn't it your understanding that improvement plans are the

11  property of the City Engineer?

12  A.  It is part of the public record when they are submitted.

13  Q.  I'm not asking when they are submitted.  I'm asking isn't

14  it your understanding that improvement plans are property of

15  the Engineer?

16        MR. HASSING:  Objection, your Honor.  "Property"

17  calls for legal conclusion.

18        THE COURT:  On that ground, it is overruled.

19        MR. TRAVIS:  Well, your Honor, I'm going to read from

20  his deposition.

21        THE COURT:  Do you want an answer to this question?

22        MR. TRAVIS:  I thought you said it was sustained.

23        THE COURT:  No, it's overruled.

24        MR. HASSING:  Objection, relevance, your Honor.

25        THE COURT:  Overruled.  Do you have the question in

WOODCOCK

486

1  mind?

2          MR. TRAVIS:  If you could read the question back.

3          THE WITNESS:  Yes, please.

4          (The question was read back as follows:

5       "I'm asking isn't it your understanding that

6        improvement plans are property of the Engineer?")

7          THE WITNESS:  As far as who retains them and

8  maintains them, yes, it is the City Engineer that would be the

9  record-holding body.

10  BY MR. TRAVIS:

11  Q.  I'm sorry.  I might not have been clear.  I'm asking

12  whether the improvement plans would be the property of the

13  engineer who created the plans?

14  A.  Oh, that, I don't know.

15          MR. TRAVIS:  I'm going to go ahead and ask to read

16  from Mr. Woodcock's deposition transcript, page 23, lines 18

17  through 24.

18          THE COURT:  Any objection?

19          MR. ALEXANDER:  Just one second, your Honor.  No

20  objections, your Honor.

21          THE COURT:  Go ahead.

22          MR. TRAVIS:  (Reading)

23       "Question:  Okay.  Had your department ever looked

24        into whether or not there is any copyright interest

25        in the improvement plans for that particular

1          subdivision?

2          "Answer:  A copyright interest?  I -- I do know that

3              plans, when stamped, are the property of the

4              engineer.  The same thing with house plans that --

5              that if they are done by an architect."

6     BY MR. TRAVIS:

7     Q.  Going back to our earlier discussion about the processing

8     of maps, when a developer comes in and doesn't have -- and

9     there are no improvements in the ground, the City will

10    oftentimes want to ensure that those improvements get put in

11    place, correct?

12    A.  That's correct.

13    Q.  And they do that through what is called a bonding

14    estimate, right?

15    A.  That is one of the mechanisms, yes.

16    Q.  One of the mechanisms.  And can you describe what a

17    bonding estimate is?

18    A.  After the tentative map is approved, and looking at the

19    various conditions, the necessary improvements that are within

20    the public's right-of-way, such as streets, curbs, gutters,

21    fire hydrants, sewers, et cetera, need to be completed, and to

22    make sure that we don't wind up with a paper map, that those

23    improvements are typically having a financial instrument, the

24    most typical way is through a bond to make sure that the

25    improvements are put in.

488

1   Q.  Right.  Because you don't want a developer to come in and

2   say they are going to put something in, commit the City's

3   time, energy and resources, and then not put them in, right?

4   A.  And then have paper lots.

5   Q.  And then you have paper lots, that's right.  With the 6451

6   tract, was a bonding estimate required?

7   A.  No.

8   Q.  Why not?

9   A.  Because the improvements were in and had been inspected by

10  the City.

11  Q.  Going back a bit, to calculate a bonding estimate, how do

12  you calculate that estimate?

13  A.  The City Engineer develops his estimate of the overall

14  cost for those improvements, and then a financial security

15  instrument, typically a bond, needs to be secured to ensure

16  that if the developer defaults in completing those

17  improvements, that the City has an instrument to, therefore,

18  get the improvements put until.

19  Q.  Well, I guess I'm asking how the calculation is done for

20  that estimate.

21  A.  That is by the City Engineer.

22  Q.  Okay.  And does the City Engineer oftentimes interact with

23  the engineer for the developer to calculate that bonding

24  estimate?

25  A.  Yes.  In case that the City Engineer comes up with figure

1  X and the developer says, no, it is figure Y.

2  Q.  That happens quite frequently?

3  A.  Yes, it does.

4  Q.  Okay.  I guess the developer would want to say that it

5  usually comes in a little bit lower and the City comes in and

6  says it is going to be a little bit higher?

7  A.  In general, yes.

8  Q.  And what is taken into account in calculating that bonding

9  estimate?

10  A.  Well, again, the City Engineer has a cost formula saying

11  it costs so many dollars per square foot for the streets and

12  so many dollars per linear foot for water lines, et cetera.

13  Q.  Right.  So what is being calculated is all the

14  improvements that are there or what is expected in the

15  situation where you don't have anything in the ground?

16  A.  That's correct.

17  Q.  What is expected to be built, and then you calculate all

18  the different nuances and features of that proposed

19  development, right?

20  A.  That's correct.

21  Q.  Was a bonding estimate done?  Was any bonding estimate

22  done for the 6451 tract?

23  A.  No.

24  Q.  If you could, in that big thick volume, go to J 73.

25  A.  Yes.

1   Q.   Okay.  Is that a bonding estimate for Tract 6451?

2   A.   Yes, it appears so.

3   Q.   Was that bonding estimate done while you were employed by

4   the City of Wasco?

5   A.   I would have to look at the date.  No.  This was prepared

6   October 31st, 2005.

7   Q.   And so you just don't have a recollection of this

8   particular bonding estimate being done, correct?

9   A.   That's correct.  Because that would be prepared by the

10  City Engineer.

11  Q.   But it is instructive -- is this a typical bonding

12  estimate and how they look when they are finally finished?

13  A.   Yes.  This contains construction estimates related to

14  grading, streets, and has the features that I was mentioning

15  of water, utility, sewer.  Yes, this is, I would say, typical.

16  Q.   In this bonding estimate, if you look at it, it has all

17  the different features that we were talking about earlier of

18  the 6451 tract, right, and it calculates the improvements,

19  right?

20  A.   That's correct.

21  Q.   But in this particular case, as you testified earlier,

22  that there was no bonding estimate required, right?

23  A.   That the bonding estimate was prepared, it appears, but in

24  the subdivision agreement where this would get translated

25  into, there was no estimate in that subdivision agreement.

1  Q.  Right.  So in this particular case, the developer,

2  although typically, they would have to provide one, in this

3  case did not have to provide a bonding estimate, right?

4  A.  That's correct.

5  Q.  Okay.  And in this particular bonding -- in this, the

6  total bonding cost here, it looks like on the second page,

7  1.924 -- $1,924,633, correct?

8       MR. OKADIGBO:  Objection, your Honor, relevance.

9       THE COURT:  I can't make that determination.  Let me

10  ask this.  As an officer of the Court, are you representing

11  that you are going to somehow be attempting to tie that

12  estimate with anything having to do with worth?

13       MR. TRAVIS:  Yes.  The value of the plans and

14  avoidance of costs.

15       MR. OKADIGBO:  Your Honor, the bonding estimate for

16  the improvements that were done before the current developer

17  got into this mess is irrelevant.  Their whole point

18  ultimately is that they should have --

19       THE COURT:  That's your argument and that, you may

20  cross-examine and bring witnesses in that regard, but as far

21  as the relevance is concerned, it is overruled.

22  BY MR. TRAVIS:

23  Q.  In fact, what originally happened when the -- when Wasco

24  decided that they were going to engage a new developer to

25  complete the development of the subdivision, in fact, Wasco

492

1    originally wanted a design that was much more upscale, right?

2              MR. HASSING:  Objection, leading, your Honor.

3              MR. TRAVIS:  He is a former Wasco employee.

4              THE COURT:  I understand.  Are you representing --

5    are you requesting, I should say, the ability to request --

6    start over.

7              Are you requesting the Court to find adversity here?

8              MR. TRAVIS:  Yes, we are, your Honor.

9              MR. HASSING:  Your Honor, this is not an adverse

10   witness, he hasn't been employed by the City of Wasco since

11   2005, five years ago.  He has no ties to the City of Wasco

12   whatsoever.

13             THE COURT:  He did at the time.  The objection is

14   overruled.

15             Ladies and gentlemen, don't get too confused here

16   with the words here and the legal issues here.  Adversity does

17   not mean the same thing necessarily in a common phrase as it

18   does in the law.  This is just a legal issue.  So you are

19   entitled to ask leading questions if you wish.  The objection

20   is overruled.

21             MR. TRAVIS:  Thank you.

22   BY MR. TRAVIS:

23   Q.  I will go ahead and restate the question, if I can

24   remember it.

25             Isn't it true that when Wasco originally began

493

1    thinking about development, redevelopment, completing the
2    development of this subdivision, they wanted something more
3    upscale, right?
4    A.  Yes.
5    Q.  But the fact is, is that the improvements, as they were
6    in, wouldn't support a more upscale design, would they?
7    A.  Not for this initial phase, that's correct.
8    Q.  So if a developer wanted to put in something more upscale,
9    kind of what Wasco wanted, they would have had to tear out
10   this existing subdivision, right?
11   A.  That's correct.
12   Q.  As part of your job, you testified earlier that you are
13   required to follow the Municipal Code and the Government Code,
14   the Subdivision Map Act, right?
15   A.  Yes.
16   Q.  And is it your understanding that without a final map --
17   sorry.  Without a final map, you can't sell homes?
18   A.  That's correct.
19   Q.  In fact, you can't even allow occupancy in the home unless
20   a final map is approved, correct?
21   A.  That's correct.
22          MR. TRAVIS:  Thank you, your Honor.  I'm done with
23   this witness.
24          THE COURT:  Cross-examination, Mr. Hassing?  Oh, all
25   right.

WOODCOCK - X

494

1                          CROSS-EXAMINATION

2    BY MR. OKADIGBO:

3    Q.  Mr. Woodcock, you have given testimony about bonding

4    estimates in relation to your Tract 6451?

5    A.  Yes.

6    Q.  Can you explain to the jury why no bonding estimate was

7    required for the 6451 tract?

8    A.  The bonding, the requirement for bonding is to ensure that

9    improvements are in place so that if there is a default by the

10   developer, that the City has a mechanism to ensure that those

11   improvements are installed.

12              In this case, since that the improvements were

13   already in and had been inspected by the City, that no bond

14   was required because they did not need to install any of the

15   improvements.

16   Q.  Okay.  In connection with that, I'm going to show you

17   what's Exhibit J 8, which is the Wasco Municipal Code, and I'm

18   going to point your attention to 1620.010.  Do you have J 8 in

19   front of you?

20   A.  I see it up on the screen.

21   Q.  It might be more legible.

22   A.  I don't know which binder it is in.

23   Q.  If you look at section 16.20.010 --

24   A.  Yes.

25   Q.  -- is it your understanding that these are the documents

1    that are required to be filed with the City in connection with

2    the final map?

3    A.   That's correct.

4    Q.   I draw your attention to D of that section.

5    A.   Yes.

6    Q.   Can you read what that section says?

7    A.   D says, quote, "Five complete sets of improvement plans

8    (if necessary), including utility composites."

9    Q.   Can you explain to the jury what the "if necessary"

10   portion of that language means?

11   A.   If, at the determination of the City Engineer that

12   improvement plans do not need to be submitted, they don't need

13   to be submitted.

14   Q.   So is it fair to say that improvement plans are not

15   necessarily required in all instances?

16   A.   That's correct.

17   Q.   Now, you have given testimony earlier about maps being the

18   property of the engineer.  Correct?

19   A.   Yes.

20   Q.   You don't know that to be true in all cases, do you?

21   A.   That's correct.

22   Q.   In fact, it's a matter of law, correct?

23   A.   That's my understanding.

24   Q.   The engineer could have entered into a contract with some

25   other person or entity and have given away those rights,

1  correct?

2  A.  There are cases that I understand that that has happened.

3  Q.  Okay.  Now, you've given testimony that the City of Wasco

4  required -- I'm sorry -- not required, but they preferred that

5  the current developer of the 6451 tract develop it with more

6  upscale homes; is that correct?

7  A.  That's correct.

8  Q.  Based on that understanding, was the City of Wasco

9  insisting that the current developer develop the property in

10  any particular manner?

11  A.  No.

12  Q.  Was the City of Wasco insisting the developer develop the

13  property at all?

14  A.  It was our hope that something would happen with the land

15  out there.

16  Q.  That was the hope, but was the City requiring the

17  developer to do anything with the land after the sale of

18  the -- the sale of the 6451 tract to Mr. Wu?

19  A.  That occurred prior to my coming in employment, but it is

20  my understanding, you are correct, that the City, it was the

21  developer's choice.

22  Q.  You have given testimony earlier about conditions of

23  approval.  Can you explain to the jury what type of conditions

24  so that they understand what you mean by "conditions"?

25  A.  When a project comes into the City, it is routed to the

WOODSOCK

1    various departments, such as Public Works, Engineering, Fire,

2    Police, et cetera.  We have -- at that time we called it the

3    Development Review Committee, and we would take a look at the,

4    not only this tract, but any other tract to develop conditions

5    of approval as far as how we wanted to see the project

6    proceed.

7             Those are then translated into the staff report that

8    the Planning Department would write and then present that to

9    the Planning Commission with the overall recommendations.

10   Q.  Well, when you use the term "conditions," that doesn't

11   mean that the City tells the developer to develop, does it?

12   A.  No.  It's his choice as to whether he wishes to proceed or

13   not.

14   Q.  You have given testimony earlier about the stages of the

15   mapping process.  I believe you had said that the maps go to

16   the Planning Commission?

17   A.  Yes.

18   Q.  Doesn't the map go to the Planning Department before it

19   goes to the Planning Commission?

20   A.  Well, that's how the staff report gets written, is it

21   comes first to the Planning Department.  We do then the

22   routing to get the comments back and then the staff report is

23   prepared, and that's when it is presented to the Planning

24   Commission, along with the staff's recommendation.

25   Q.  Now, there had been discussion earlier about either the

498

1    staff report or the subdivision agreement referencing

2    improvement plans being required.  Can you explain why the --

3    there would be language of improvement plans in these reports?

4    A.   Looking at, say, like the subdivision agreement, that is a

5    boilerplate type of form that we have used, and that is a

6    standard phrase or paragraph within that agreement that would

7    say improvement plans need to be submitted.

8    Q.   So the reference to improvement plans in the reports does

9    not -- it does not mean that the City actually required

10   improvement plans; is that correct?

11   A.   That's correct.

12   Q.   And it's boilerplate language?

13   A.   Yes.

14   Q.   And that's because the City is used to processing many of

15   these things?

16   A.   That's correct.

17   Q.   And doesn't want to particularly -- doesn't want to

18   particularly parse out for each application specific things

19   that only apply to that developer, correct?

20   A.   It is standardly applied to each of the subdivisions that

21   we get, yes.

22   Q.   Now, you have given testimony, I believe, about a legend

23   on the Tentative Tract Map Number 6451, I think it is Note 1?

24   A.   Yes.

25   Q.   What is your understanding of what Note 1 means?

1   A.   May I see that again, please.  Well, it says that it

2   contains -- that this development, the improvements are

3   already built.  It says "existing improvement plans built per

4   the expired tentative map, and associative approved" --

5   "approved improvement plans," that those associative approved

6   improvement plans were related to the expired map.

7   Q.   Now, does that note mean that the current developer used

8   the improvement plans?

9   A.   Well, the improvements were already in.  I don't know what

10  you mean by "used."

11  Q.   The note is acknowledging that the improvements were in

12  the ground, correct?

13  A.   Yes.

14  Q.   It is not necessarily acknowledging that improvement plans

15  for 5472 were used, correct?

16  A.   I don't believe, yeah, that's correct.

17          MR. OKADIGBO:  No further questions.

18          THE COURT:  Any other questions?

19          Redirect?

20          MR. TRAVIS:  Yes.

21                  REDIRECT EXAMINATION

22  BY MR. TRAVIS:

23  Q.   Continuing on Mr. Okadigbo's last question of whether or

24  not they were used, there was a subdivision agreement when we

25  took your deposition, Mr. Woodcock, and we referred to it.  Do

500

1   you remember that?

2   A.  Yes.

3   Q.  It was attached to your deposition.  And in that

4   subdivision agreement, and that was Exhibit 2 to your

5   deposition --

6           MR. ALEXANDER:  Is this a trial exhibit?

7           MR. HASSING:  Is this in evidence?

8           MR. TRAVIS:  It is the deposition testimony.  We have

9   the subdivision agreement.

10          MR. ALEXANDER:  That's all we are looking for.

11          THE COURT:  Counsel, I know this may be a surprise,

12  but I'm on the bench.  And counsel do not address one another

13  when the Court is on the bench.  You know that.  If you have

14  something you want to confer, confer privately, but not like

15  you are doing it.

16          MR. TRAVIS:  If you can give me a moment to get the

17  subdivision agreement, your Honor?

18          THE COURT:  That's fine.

19          MR. TRAVIS:  Thank you, your Honor.

20          J 80.

21          MR. ALEXANDER:  Thank you.

22          MR. TRAVIS:  Thank you, your Honor.

23          THE WITNESS:  J 80.  Here we are.  Yes.

24  BY MR. TRAVIS:

25  Q.  And on the second page, and I believe if -- is that

WOODCOCK - RD

501

1    Bates-stamped on the bottom right hand; it says "A"?

2    A.   No.

3    Q.   Okay.

4    A.   It has a "CW."

5    Q.   Okay.  Well, at the top of the second page, do you see

6    where it says, "in accordance with"?

7    A.   Yes.

8    Q.   Okay.  It says -- and can you read the first sentence of

9    that subdivision agreement?

10   A.   Starting with, "In accordance"?

11   Q.   That's correct.

12   A.   Okay.

13            "In accordance with the requirements of the City

14            Council, the subdivider shall construct at its sole

15            cost and expense those improvements shown on the

16            plans, profiles and specification, all as approved by

17            the City Engineer and all of which are incorporated

18            in the agreement by reference as a part hereof, and

19            which are generally designated as follows."

20   Q.   And I will stop you there because there is a laundry list

21   of all the improvements I don't want to have to bore the Court

22   with.

23            Is it your understanding that when the developer

24   proceeded with developing this property, that they had to --

25   in fact had a whole punch list of items that they had to

1  repair, correct?

2  A.  Repair?  That, I don't know.

3  Q.  Okay.  Is it your understanding that the developer had to

4  go in and perform some work in order to make the Valley Rose

5  Subdivision suitable for living and for being accepted by the

6  City?

7       MR. HASSING:  Objection, compound, your Honor, and

8  vague.

9       THE COURT:  Rephrase.  It is.

10 BY MR. TRAVIS:

11 Q.  Is it your understanding that the developer had to go into

12 this subdivision and make it suitable for acceptance by the

13 City?

14 A.  When you say "acceptable," I don't know exactly what you

15 mean.

16 Q.  Well, did the developer have to go in and make any repairs

17 on the subdivision?

18       MR. HASSING:  Objection.  Asked and answered, your

19 Honor.

20       THE COURT:  It sounds foundational to clear up

21 something, so the objection is overruled.  It will be given

22 latitude.

23       Go ahead and answer it.

24       THE WITNESS:  Okay.  There were, because of the

25 length of time between when the improvements were in place and

1    when the project was now coming back to life, that the --

2    there were conditions related, as I recall, to curb, gutter,

3    sidewalks, that had cracked, that needed to be repaired.

4    BY MR. TRAVIS:

5    Q.  Did you have an understanding that something such as the

6    pump station needed to be repaired as well?

7    A.  There is a sewer lift station that the electrical

8    generator, backup generator needed to be worked on, yes.

9    Q.  And that needed to be repaired in accordance with the

10   approved plans, correct?

11   A.  It was in place.  I don't know if the -- the relationship

12   to the approved plans.  I know that the pump was in and that

13   the backup generator was of concern and that work had to be

14   done on that.

15   Q.  Is it your understanding that the approved plans, the

16   previously approved plans for this particular subdivision

17   included pump station plans prepared by Mr. McIntosh?

18   A.  I believe so.

19   Q.  Mr. Okadigbo asked you whether or not -- scratch that.

20          Let me ask it pointblank:  Did the developer proceed

21   with the conditions of the 6451 staff report?

22   A.  He needed to comply in order to bring it to the final map.

23   Q.  And you told us on direct that there can be no occupancy

24   of the residential units until the final map is approved, but

25   isn't it also true that the improvements have to be accepted

504

1   by the City before there can be occupancy?

2   A.   Typically, yes.

3   Q.   Has the City accepted the improvements installed on Tract

4   6451?

5   A.   I don't know that.

6   Q.   Who would know that?

7   A.   City engineer.

8   Q.   Jerry Helt?

9   A.   He was the City Engineer at the time, yes.

10   Q.   If there was a waiver of whether or not those -- the

11   improvement plans were required, would it be the City Engineer

12   who would waive that requirement?

13   A.   That's correct.

14          MR. TRAVIS:   No more questions, your Honor.

15          THE COURT:   Anything further?

16                       CROSS-EXAMINATION

17   BY MR. HASSING:

18   Q.   Good morning, Mr. Woodcock.  You have just given testimony

19   about replacement of a generator at the pump station, correct?

20   A.   Not the replacement of the generator, but working on the

21   backup generator, to make sure that the pump worked.

22   Q.   Okay.  Can you explain to the jury what the backup

23   generator was?

24   A.   Normally, that the pump would be supplied off the electric

25   grid to make sure that the effluent from the subdivision could

505

1   be pumped over to the wastewater treatment plan.  In the case

2   of electrical failure, that there needed to be a backup

3   generator to make sure that that pump operated.

4   Q.  Are you aware that Mr. Wu purchased a backup generator and

5   brought it to that site?

6   A.  That, I don't know.

7          MR. HASSING:  Thank you.

8          THE COURT:  Any other counsel?

9          MR. OKADIGBO:  Yes, your Honor.

10                 RECROSS-EXAMINATION

11  BY MR. OKADIGBO:

12  Q.  Not to beat a dead horse, but the improvements were in the

13  ground, correct, in 6451?

14  A.  That's correct.

15         THE COURT:  That horse is no longer even on a

16  resuscitator.

17         MR. OKADIGBO:  I apologize to the entire Court.

18  BY MR. OKADIGBO:

19  Q.  Therefore, no improvement plans were required by the City,

20  correct?

21  A.  That's correct.

22              FURTHER REDIRECT EXAMINATION

23  BY MR. TRAVIS:

24  Q.  And I guess that's my question.  Part of the conditions of

25  the staff report, if you could turn back to it, at Condition

506

1    10.

2    A.  Which exhibit?

3    Q.  I'm sorry.  J 89.  And it is under the Planning Department

4    section?

5    A.  Yes.

6    Q.  Do you see that?

7    A.  Yes.

8    Q.  Okay.  Was that -- it says:

9           "All public improvements shall conform to the City of

10          Wasco Improvement Standards and plans shall be

11          submitted to the City Engineer for approval prior to

12          the final map approval."

13   A.  That is a standard conditions that we have in our staff

14   reports.

15   Q.  Was this condition complied with?

16   A.  Well, no development plans or improvement plans were

17   required, so that, based on the City Engineer, we did not

18   require them to be submitted.

19          MR. TRAVIS:  Thank you.

20          THE COURT:  Anything else?

21          MR. ALEXANDER:  No, your Honor.

22          MR. OKADIGBO:  No, thank you.

23          THE COURT:  You may step down.

24          Next witness, please.

25                          **ROBERT WREN,**

1  called as a witness on behalf of the Plaintiff, having been

2  first duly sworn, testified as follows:

3          THE COURT:  Please take the witness stand right here,

4  and then when you are comfortable, tell us who you are.

5          THE WITNESS:  My name is Robert Edward Wren.

6          THE COURT:  Spell your last name for us.

7          THE WITNESS:  W-r-e-n.

8          THE COURT:  Thank you.

9                  DIRECT EXAMINATION

10  BY MR. TRAVIS:

11  Q.  Mr. Wren, could you please tell us what your occupation

12  is?

13  A.  I'm the Deputy Director of Public Works for the City of

14  Wasco.

15  Q.  How long have you held that position?

16  A.  Approximately two and a half years.

17  Q.  And before that, you were also employed with the City of

18  Wasco?

19  A.  Yes.

20  Q.  When did you first start working for the City?

21  A.  January 3rd, 2005.

22  Q.  And what is your position there at the City of Wasco?  I

23  mean what is it that are your duties?

24  A.  My main position, I'm in charge of the City projects, the

25  capital works projects, road improvement, water meter,

1   projects like that.

2   Q.   And as part of your job duties, wasn't it also at the time

3   to oversee the Valley Rose Estates construction project?

4   A.   No.   The Valley Rose Estates?   Could you ask the question

5   again?   I'm not -- it was already done.

6   Q.   You nervous?

7   A.   A little bit.

8   Q.   Okay.   The question is, is was it part of your job to

9   oversee the Valley Rose construction project?

10  A.   The inspection of it, of the improvements, correct.

11  Q.   In fact, wasn't it also to oversee -- well, the City

12  construction projects, including the construction of roads,

13  improvements, and reconstruction projects?

14  A.   That is correct.

15  Q.   As part of your job, you are to follow Wasco's Municipal

16  Code, correct?

17  A.   Correct.

18  Q.   And Wasco's Municipal Code incorporates the Subdivision

19  Map Act of California, correct?

20  A.   Correct.

21  Q.   It is also your job to follow the Subdivision Map Act,

22  right?

23  A.   Correct.

24  Q.   Isn't it your understanding that the improvements have not

25  been accepted, correct, by the City of Wasco?

509

1    A.   The improvements for?

2    Q.   The improvements for the Valley Rose Estates?

3    A.   Have not been accepted by the City, yes.

4    Q.   Isn't it part of the Municipal Code that one of the

5    requirements of acceptance of improvements is that you have to

6    have improvement plans?

7    A.   I don't believe that's true, that you have to have.  I

8    believe it says optional or not.  There is -- it isn't

9    required.

10   Q.   I'm going to have you look at J 8, if you could look in

11   your binders there.

12            Your Honor, can I help the witness?

13            THE COURT:  Sure.

14   BY MR. TRAVIS:

15   Q.   I'm going to have you turn to City of Wasco Municipal Code

16   16.32.360.

17   A.   Could you repeat the last three, please.

18   Q.   Sure.  .360?

19   A.   Okay.

20   Q.   Does that refresh your memory as to whether or not the

21   City of Wasco requires plans?

22            MR. ALEXANDER:  Sorry, your Honor.  Could I have

23   either a page number or the --

24            MR. TRAVIS:  J 8, and the page at the bottom is

25   224-51.

1        THE WITNESS:  I must not have understood the

2   question.  I thought you were talking about construction

3   plans, and this is for as-built plans.

4   BY MR. TRAVIS:

5   Q.  What is an as-built plan, Mr. Wren?

6   A.  It was a plan of what was constructed.

7   Q.  Does that include improvement plans that are then marked

8   up to show that those -- that what's on the ground is in

9   conformity with what's on the plans?

10  A.  Could you ask it again?

11  Q.  Well, aren't as-built plans simply a way for the City

12  inspector, such as yourself, to take the plans and mark them

13  to show that what's on the ground is in conformity with the

14  approved plans?

15  A.  It's to show what was built, if there would actually --

16  what was put down on the ground, if it differed from what the

17  construction plans were.

18  Q.  Were there as-built plans here?

19  A.  We have not received as-built plans.

20  Q.  Where would you receive those as-built plans from?

21  A.  From the developer.

22  Q.  If you can go -- turn back to 16.28.020.  And that's page

23  224-30 on the bottom.  Are you there, Mr. Wren?

24  A.  Yes.

25  Q.  In 16.28.020, it says, "Conformance to plans"; do you see

511

1  that?

2  A.  I do.

3  Q.  It says, "All subdivision maps shall conform to any

4  specific plans of streets, public areas, or other projects or

5  plans adopted or approved by the Council."  Do you see that?

6  A.  I do.

7  Q.  What are the approved plans in this case?

8       MR. HASSING:  Objection, your Honor.  Vague as to

9  which subdivision.

10 BY MR. TRAVIS:

11 Q.  For the subdivision for Tract 6451.

12 A.  On this, I would interpret that to mean that it is the

13 boundary conditions.  They need to conform to the conditions

14 that they are building in.  You can't have your roads be

15 mismatched or grades be different, and so other approved plans

16 in the area would conform to those.

17      MR. TRAVIS:  Objection, move to strike, your Honor,

18 as nonresponsive.  I asked him what were the approved plans.

19      THE COURT:  The question was -- hang on just a

20 second.  Let's go back.

21      "It says, 'All subdivision maps shall conform to any

22 specific plans of streets, public areas, or other projects or

23 plans adopted or approved by the Council.'  Do you see that?

24      "Answer:  I do."

25      And the question is:  "What are the approved plans in

WREN - B

512

1          this case for the subdivision for Tract 6451?"

2          The objection is sustained.  It is -- the answer is

3    stricken.  He does not answer the question that's pending.

4          Do you understand the question that he has asked?

5          THE WITNESS:  No.

6          THE COURT:  He is not asking you for an

7    interpretation of that which was before you.

8          THE WITNESS:  Okay.  I don't understand the question.

9          THE COURT:  Just rephrase, please.

10   BY MR. TRAVIS:

11   Q.  Are there approved plans for Tract 6451?

12   A.  Approved construction plans?

13   Q.  Yes.

14   A.  No.

15   Q.  Are there approved improvement plans for 6451?

16   A.  No.

17   Q.  Why have the improvements not been accepted, Mr. Wren?

18   A.  There was some maintenance issues that needed to be

19   brought up to current city standard.

20   Q.  Are those maintenance issues still there?

21   A.  They are.

22   Q.  Who's paying the maintenance and repairing the

23   improvements as a result?

24   A.  The developer.

25   Q.  Mr. Wu?

WREN - P

513

1   A.   I -- Northern California Enterprise.

2   Q.   Okay.  The defendant, Northern California Universal?

3   A.   Yes.

4   Q.   How were the residential units allowed to be occupied

5   without accepting the improvements?

6            MR. OKADIGBO:  Objection, your Honor.  Relevance to

7   copyright infringement.

8            THE COURT:  Where are you going with this?

9            MR. TRAVIS:  I will withdraw it, your Honor.

10           THE COURT:  Okay.

11  BY MR. TRAVIS:

12  Q.   I'm going to move on to a different topic, Mr. Wren.  When

13  I previously deposed you, you were designated as the person

14  most knowledgeable regarding procedures for accessing

15  subdivision maps and plans; do you remember that?

16  A.   I do.

17  Q.   And in fact you previously testified that you placed no

18  restrictions on anyone copying maps and plans from the City of

19  Wasco; isn't that right?

20  A.   We did place some restrictions.  If they are approved

21  maps, I wouldn't let them out of our office.  They would have

22  to have a blueprint service or someone come and make copies

23  because we couldn't make copies.

24  Q.   Well, how would Blueprint get the approved plans?

25  A.   They would come to us and we would give them -- they are a

514

1    bonded reproduction company and they would make them and bring

2    them back.

3    Q.   You would provide those copies to Blueprint, correct?

4    A.   Correct.

5    Q.   And the only reason you sent them to Blueprint is because

6    you don't have the facilities to make copies of them at your

7    office, right?

8    A.   We wouldn't send them.  We would have whoever wanted them

9    have Blueprint come up.  We wouldn't incur the cost.

10   Q.   My question was, though, that the only reason you send

11   them to Blueprint is because you do not have the facilities to

12   make copies yourself?

13   A.   The only reason they go to Blueprint is because we don't

14   have the facilities to make copies.

15   Q.   There is no written record that the City of Wasco keeps

16   that says who makes copies or who has copies made, correct?

17   A.   Correct.

18   Q.   And that's true for maps and plans, right?

19   A.   That come through my office, yes.

20   Q.   So if someone came into your office sometime in 2004 to

21   make a copy, you wouldn't have a record of it, would you?

22   A.   I would not.

23   Q.   But you do know that your office does have a copy of

24   electronic copies of Mr. McIntosh's plans, right?

25   A.   Could you give the tract number?  We have a lot of

WREN - X

515

1  Mr. McIntosh's plans in our office.

2  Q.  Okay.  For 6451, pardon me, for the 5472 expired tract.

3  A.  Yes, we do have electronic scanned copies in my office.

4  Q.  And also Mr. Woodcock testified that without a final map,

5  you can't sell lots, can't sell homes; is that true?

6  A.  I do not know.

7       MR. TRAVIS:  I'm finished, your Honor.

8       THE COURT:  Cross?

9       THE WITNESS:  I need to change my answer on the last

10  one.  I misunderstood the question on the last one.

11       I do know you can't sell lots without having a final

12  map.

13       MR. TRAVIS:  Thank you.

14       THE COURT:  All right.

15                      CROSS-EXAMINATION

16  BY MR. OKADIGBO:

17  Q.  Mr. Wren, you have been the person at the City of Wasco

18  responsible for interacting with Mr. Wu in relation to punch

19  list items, correct?

20  A.  Yes.

21  Q.  Can you explain what these punch list items are?

22  A.  Yes.  I started with there was some water meter boxes that

23  the lids were missing on.  There was cracked sidewalk.  There

24  was damage to the pavement where somebody had built a bon fire

25  or some type of fire in the road and melted the pavement.

WREN - X

516

1          There was damage and graffiti on the block wall.

2   There was landscape irrigation trees.  There were streetlight

3   issues, that type of thing.

4   Q.   Okay.  I'm going to show you what's been marked as

5   Defendant's Exhibit D 411.

6          THE COURT:  You can't show it unless it is in and

7   that's a D instead of a J.

8   BY MR. OKADIGBO:

9   Q.   Mr. Wren, you have prepared a letter advising Mr. Wu of

10  the punch list items that he needed to complete in order to

11  finalize the development of the subdivision, correct?

12  A.   Correct.

13         MR. OKADIGBO:  May I approach the witness?

14         THE COURT:  Sure.

15  BY MR. OKADIGBO:

16  Q.   Do you recognize that letter, Mr. Wren?

17  A.   Yes.

18  Q.   Did you author that letter?

19  A.   I did.

20  Q.   Now, it says "Dan Allen" at the bottom, but did you write

21  that?

22  A.   I did write the letter.

23         MR. OKADIGBO:  Your Honor, can I move D 11?

24         THE COURT:  D 411?

25         MR. OKADIGBO:  Yes.

517

1          THE COURT:  Any objections?

2          MR. HASSING:  No objections, your Honor.

3          MR. ALEXANDER:  No objections, your Honor.

4          THE COURT:  It is received.

5          (Defendant's Exhibit D 411 was received.)

6   BY MR. OKADIGBO:

7   Q.  Now, this is the first page of two, for one of the letters

8   you sent to Mr. Wu, correct?

9   A.  Correct.

10  Q.  And are these items identified in the letter the things

11  that the City of Wasco was requiring from Mr. Wu in order to

12  finalize development?

13  A.  Yes.

14  Q.  So the first item is remove -- read the first item for us.

15  A.  "Remove all dead and dying trees and replace with trees

16  from the tree list approved by the City."

17  Q.  Okay.  The fifth item?

18  A.  Fifth?

19  Q.  Yes.

20  A.  "Trim all trees that overhang Valley Rose Parkway.

21  Trimming must be done to City standards."

22  Q.  Can you read the sixth item?

23  A.  Okay.

24          "Replace all broken irrigation located in the planter

25          areas along Valley Rose Parkway.  Staff was unable to

1          test irrigation system due to the numerous

2          deficiencies in the existing irrigation.  Remove all

3          weeds from existing landscape.  If this is not

4          possible, remove existing landscaping and install new

5          landscaping.  Reinspection will be required for all

6          irrigation and landscape area."

7   Q.  Now, there is more items on the letter, but I will spare

8   everyone each item, since it is into evidence, but is this the

9   type of work in relation to the improvements that the City is

10  requiring Mr. Wu to or Northern to complete in order to

11  finalize the development of the subdivision?

12  A.  Yes.

13  Q.  Has that work been completed?

14  A.  No.

15  Q.  Is that why -- I withdraw that.

16          Now, you've given testimony earlier about the City of

17  Wasco's policies of providing maps and plans to members of the

18  public, correct?

19  A.  Correct.

20  Q.  Can you explain why the Public Works Department gives out

21  plans to the public?

22  A.  Yes.  If a developer was coming in and they wanted to

23  develop a portion of land in the City of Wasco, we would --

24  they would need to know where to tie in the water, sewer.  All

25  their gravity lines would have to match the boundary

WREN - X

519

1   properties.  Their curb, gutter, sidewalk, all has to line up,

2   and so they typically look for the surrounding area so they

3   know where to tie into it, how to design to meet those needs.

4   Q.  But you give the plans out to members of the public, not

5   just developers, correct?

6   A.  If a member of the public came to ask.  I haven't had

7   anybody just come to ask for them, but yes.  Only if they are

8   approved plans, though, because if they haven't been approved

9   for construction by the City, then we don't want it out there

10  for the same reason.  Somebody may design to something,

11  thinking that it's a natural location or elevation that isn't

12  actually approved, and that would change and then we would

13  have a problem.

14  Q.  Does the City of Wasco consider plans and maps to be

15  public records?

16          MR. TRAVIS:  Objection.  Calls for legal conclusion.

17          THE COURT:  Sustained as phrased.

18  BY MR. OKADIGBO:

19  Q.  Again, the City of Wasco provides the plans, not just to

20  developers, but to members of the public, correct?

21  A.  Correct.

22  Q.  Is it the Public Works Department's position that members

23  of the public are entitled to have plans and maps?

24          MR. TRAVIS:  Same objection.

25          THE COURT:  Rephrase.  It is vague.  I can't make the

1    determination of whether or not it is a legal conclusion you

2    are asking for when you say the word "entitled."

3           MR. OKADIGBO:  Okay.

4    BY MR. OKADIGBO:

5    Q.  Why does the Public Works Department provide plans and

6    maps to members of the public generally?

7    A.  It is a public record.  It is an approved map or drawing.

8    Q.  Mr. Travis had asked you earlier about whether the City of

9    Wasco retains copies of Mr. McIntosh's maps and plans; do you

10   recall that?

11   A.  Yes.

12   Q.  Can you explain to the jury why the City of Wasco has

13   Mr. McIntosh's plans generally?

14   A.  We keep all improvement plans for the reason I stated

15   earlier about future development.  We need to know what is

16   existing built in the ground, so we can tie into it and make

17   sure it has the right size for water, sewer lines, and to

18   assist in development of the city.

19   Q.  Is it fair to say that Mr. McIntosh had submitted these

20   plans to the City --

21   A.  Yes.

22   Q.  -- during some sort of process for developing property?

23          MR. TRAVIS:  Objection, your Honor.  Relevance.  This

24   also goes to the order relating to publication.

25          THE COURT:  Rephrase your question a little more

1  directly.  Where are we going with this?  What's the purpose?

2          MR. OKADIGBO:  Well, the purpose is to --

3          THE COURT:  No, just ask the question so the purpose

4  is clear.

5          MR. OKADIGBO:  Okay.

6  BY MR. OKADIGBO:

7  Q.  When a developer is proposing to develop a subdivision,

8  they submit plans to the Public Works Department; is that

9  right?

10 A.  Correct.

11 Q.  And the City retains the plans that it has received from

12 the developers, correct?

13 A.  And they have been approved, yes.  There may be

14 renditions, red lines, checks, until they get to that stage

15 that we keep the final plans, the approved plans.

16 Q.  Is that why the City has Mr. McIntosh's plans?

17 A.  Yes.

18          MR. OKADIGBO:  No further questions, your Honor.

19          THE COURT:  Any redirect?

20                    REDIRECT EXAMINATION

21 BY MR. TRAVIS:

22 Q.  Mr. Wren, I'm going to refer you back to the D 411-A,

23 which has been admitted into evidence.  Are you there?  It has

24 several --

25          THE COURT:  Do you have it?

522

1        THE WITNESS:  No.  It wasn't left with me.  It was

2   put on the screen.

3        MR. TRAVIS:  Okay.

4        THE WITNESS:  I was reading it off the screen.

5   BY MR. TRAVIS:

6   Q.  That's okay.  I can let you take a look at mine.  Can you

7   see those bullet lists there or those numbered items?

8   A.  Yes.

9   Q.  Numbers 2, 4, and 6?

10  A.  Yes.

11  Q.  Don't you need plans to make those repairs?

12       MR. HASSING:  Objection, lacks foundation.

13       THE COURT:  Lay the foundation, please.  Sustained.

14  BY MR. TRAVIS:

15  Q.  Could you please detail or read what the repair items are

16  from 2, 4, and 6?

17  A.  Yes.

18       "Number 2.  Entry monuments on both sides of the

19        Valley Rose Parkway damaged.  Replace any damaged

20        concrete associated with the entry monuments.

21       "Number 4.  Repair or replace footing on the second

22        streetlight north of Highway 46 on the east side of

23        the Valley Rose Parkway.

24       "Number 6.  Replace all broken irrigation located in

25        the planter areas along Valley Rose Parkway.  Staff

1          was unable to test irrigation system due to the

2          numerous deficiencies in the existing irrigation.

3          Remove all weeds from existing landscaping.  If this

4          is not possible, remove existing landscaping and

5          install new landscaping.  Reinspection will be

6          required for all irrigation and landscaped area."

7   Q.  All right.  And isn't it true that the improvement plans

8   prepared by Mr. McIntosh for this particular tract have

9   landscaping designs in them?

10  A.  I believe so.

11  Q.  And they also have plans for the other items that you

12  mentioned as well, correct?

13  A.  Yes.

14  Q.  So in order for the developer to make those changes,

15  wouldn't they have to consult the improvement plans?

16          MR. HASSING:  Objection, foundation, your Honor.

17          THE COURT:  Sustained.  You are calling for

18  speculation.

19  BY MR. TRAVIS:

20  Q.  I will move away from that for a minute.

21          You testified that you give out certain plans to the

22  community, correct?

23  A.  Yes.

24  Q.  Mr. Okadigbo asked you whether or not you gave out plans

25  and you said, yes, you did?

524

1  A.  Yes.

2  Q.  All right.  Isn't it true, but only for as-built plans?

3  A.  No.

4  Q.  Oh, I see.  So even -- I'm sorry.

5      So you will give out plans that aren't even approved

6  by the City?

7  A.  No.

8  Q.  Is it your understanding this particular development

9  project -- or do you have knowledge of the prior development

10  agreement that was in place before Northern California bought

11  the project?

12  A.  I do not.

13      MR. TRAVIS:  No questions, your Honor.

14      THE COURT:  Anything further?

15      MR. HASSING:  No, your Honor.

16      MR. ALEXANDER:  No, your Honor.

17      MR. OKADIGBO:  No, your Honor.

18      THE COURT:  You may step down.  You are done.

19      It's almost 10:00.  Please take the midmorning break,

20  ladies and gentlemen.  15 minutes.  Please don't discuss the

21  case and then we will come back for the next witness.

22      (Recess)

23      THE COURT:  Back on the record.  Counsel is present,

24  the jury is not.  There was a stipulation?

25      MR. HASSING:  Yes, your Honor.  If the Court would

525

1    allow it, all counsel have agreed to this stipulation for

2    convenience of witnesses and to expedite the trial.  And what

3    would happen is Northern and DeWalt's Exhibits D 201 through

4    D 217 will be deemed admitted into evidence.

5         Mr. Wu will take the stand today in the plaintiff's

6    case and provide evidence of gross receipts.  Mr. Wu will not

7    be questioned today regarding his expenses during plaintiff's

8    case-in-chief.

9         Tomorrow, Mr. Merati, who is plaintiff's rebuttal

10   witness, will testify out of order with our consent as a

11   rebuttal witness regarding the summaries provided in D 217,

12   which is a big thick binder of summaries, expense and cost

13   summaries.

14        After plaintiff closes, Northern may put Mr. Wu back

15   on the stand at some point to testify further as to his

16   expenses and costs, his profit and loss.

17        At that time, after Mr. Wu testifies in our case,

18   plaintiff may cross-examine Mr. Wu at length regarding the

19   expenses and costs depicted in our Exhibit 217, which is

20   Northern's expense and cost summary.

21        We would like also for the Court to instruct the jury

22   that regarding taking Mr. Merati as a rebuttal witness out of

23   order for the convenience of the witnesses and to expedite the

24   trial, let them know that he is a rebuttal witness out of

25   order.

1          THE COURT:  Do you want me to do that when he comes

2     in?

3          MR. HASSING:  I think you can do it -- well, let's

4     see.  Yes, when he comes in, because we don't need to go

5     through this with the jury, obviously, so when he comes in,

6     that would be the time to do it.

7          THE COURT:  That's fine.

8          MR. BRAZE:  That is the agreement and, most likely,

9     after Mr. Merati, we will rest.

10         THE COURT:  That's fine.  We are ready for the jury.

11         (The following proceedings were had in the presence

12         of the jury, to wit:)

13         THE COURT:  All right.  The jury has joined us.  We

14    are still on the record.

15         Next witness, please.

16         Sir, could you raise your right hand, please, and be

17    sworn.

18                      **DENNIS MCNAMARA**,

19    called as a witness on behalf of the Plaintiff, having been

20    first duly sworn, testified as follows:

21         THE COURT:  Please take the witness stand right here,

22    and then tell us who you are.

23         THE WITNESS:  My name is Dennis McNamara,

24    M-c-N-a-m-a-r-a.

25    ///

527

                        DIRECT EXAMINATION

1

2   BY MR. TRAVIS:

3   Q.  Mr. McNamara, can you please tell us who is your employer.

4   A.  The City of Wasco.

5   Q.  How long have you been employed by the City of Wasco?

6   A.  Approximately ten years.

7   Q.  And your current position, as I understand it, is Senior

8   Planner, correct?

9   A.  Yes, sir.

10  Q.  Before that, it was Assistant Planner, correct?

11  A.  Associate and then Assistant, yes.

12  Q.  And last time I saw you, you had more hair than you do

13  now, so I appreciate that.

14          The Assistant Planner, you were responsible for

15  overseeing the 6451 tentative map, correct?

16  A.  Correct.

17  Q.  And as part of that process, you are expected to follow

18  the Subdivision Map Act, correct?

19  A.  Correct.

20  Q.  And the -- also Wasco's Municipal Code, correct?

21  A.  Correct.

22  Q.  And were you aware or -- pardon me.

23          It is your understanding that there was a prior

24  expired Tract 5472 for this project, correct?

25  A.  Correct.

MCNAMARA

528

1    Q.   And then there were prior improvement plans that were
2    prepared for this project?
3    A.   Correct.
4    Q.   And there was a prior development agreement that was in
5    place for this project, right?
6    A.   I'm unsure about the development agreement.
7    Q.   But you are familiar with development agreements, right?
8    A.   Correct.
9    Q.   That's something that you will ordinarily have a developer
10   assign or enter into with the City prior to performing any
11   work on any subdivision, right?
12   A.   Correct.
13   Q.   Not all the time, but sometimes, right?
14   A.   A subdivision agreement, yes.
15   Q.   And as I understand it -- pardon me.
16        As you understand it, isn't it typical that a
17   development agreement between the City and the developer
18   usually designates its developer undertake a private
19   undertaking until everything is dedicated to the public,
20   correct?
21   A.   Restate that, please.
22   Q.   Well, the property, when a development agreement is
23   entered into, for example, in Tract 6451, the developer owns
24   the property, right?
25   A.   Correct.

529

1    Q.   In fact, in this case, the City had previously owned the
2    property, right?
3    A.   To the best of my knowledge, yes.
4    Q.   And then Northern purchased it from the City, right?
5    A.   I'm not sure if it was Northern, but it was purchased from
6    the City.
7    Q.   All right.  And then after they purchased it, then they
8    enter into an agreement whereby the developers will typically
9    go ahead and agree that they are going to abide by this
10   development agreement, right?
11   A.   After the map is approved, I deal with the subdivision
12   agreement, which comes after the map's approved, the tentative
13   map is approved.
14   Q.   I'm sorry, that's correct, and that's what I was referring
15   to, the subdivision agreement.
16   A.   All right.
17   Q.   And is there typically standard language, boilerplate
18   language that are in these agreements?
19   A.   Yes.
20   Q.   All right.  And at some point in time, after the developer
21   goes ahead and creates the improvements in the ground, at some
22   point, they then will take their private, parts of their
23   private property and dedicate it to the public, right?
24   A.   To the best of my knowledge, but that's more of a public
25   works question.

1    Q.  But the ultimate impact, as I understand it -- I'm sorry.

2          But for all developments, they are required to have

3    improvement plans; isn't that right?

4    A.  Our subdivision ordinance says they may be required.

5    Q.  And the reason they are required to have improvement plans

6    is because if you don't have them --

7          MR. OKADIGBO:  Objection, your Honor.

8          THE COURT:  Well, I need a full question first.

9          Ask your question, please.

10   BY MR. TRAVIS:

11   Q.  And the reason why it will oftentimes require you have the

12   improvement plans is so that you can have -- so that you can

13   get taxes; isn't that correct?

14   A.  That's -- I'm not sure.  That's not in my realm as a

15   planner.

16          MR. TRAVIS:  Your Honor, I would like to read

17   Mr. McNamara's deposition transcript, page 14, lines 21

18   through 25, and 15, lines 1 through 10.

19          MR. HASSING:  Your Honor, may I inquire if this is to

20   impeach or for substantive evidence?

21          MR. TRAVIS:  It's to impeach, your Honor.  The

22   question that was asked previously --

23          THE COURT:  You have answered the question.  Let's

24   take a look and see if there is an objection.

25          MR. OKADIGBO:  Can you repeat the passages?

1          THE COURT:  Page 14, line 21 through 15, line 10.

2          MR. OKADIGBO:  I don't see the impeachment.

3          THE COURT:  Any legal objection why he should not

4    read it?

5          MR. HASSING:  Your Honor, I would object based on the

6    fact that the question and the answer are irrelevant, so there

7    should be no impeachment on that, and move to strike the

8    question and the answer.

9          THE COURT:  The objection is overruled.

10         Go ahead and read.

11         MR. TRAVIS:  Thank you.

12         "Question:  What conditions were applied for 6451?

13         "Answer:  I would have to look.  We have a boilerplate

14            for Public Works, and then we route it out to public

15            agencies for their comment.  I would have to look at

16            the file.  I don't know those conditions.

17         "Question:  Do you know in general what conditions may

18            or may not apply?

19         "Answer:  Yeah.  Now there is a new requirement to

20            enter into a police tax, a fire tax.  You have to

21            have improvement plans, you have to comply with the

22            City of Wasco's ordinance and any other section of

23            the Municipal Code.

24         "Question:  Are you finished?

25         "Answer:  Yes."

532

1    BY MR. TRAVIS:

2    Q.   Mr. McNamara, did you ever provide improvement plans to

3    DeWalt?

4    A.   Yes.

5    Q.   And were those improvement plans that you provided to

6    DeWalt Mr. McIntosh's improvement plans?

7    A.   They were prepared by McIntosh & Associates, yes.

8    Q.   And those improvement plans are the same improvement plans

9    on which Tract 6451 is based; isn't that correct?

10   A.   I'm unsure of that.

11   Q.   In your dealings with the City, in your dealings with the

12   City regarding the development of the subdivision, isn't it

13   true that Joe Wu, the president of Northern California and

14   Lotus Developments, has used these two companies

15   interchangeably?

16           MR. HASSING:  Objection, lacks foundation.  Calls for

17   legal conclusion.

18           THE COURT:  Just a minute.

19           MR. OKADIGBO:  Objection, relevance, also.

20           THE COURT:  I understand the other objections.  What

21   is the relevance of this?

22           MR. TRAVIS:  Well, the relevance, your Honor, is the

23   fact that, ultimately, on some of the jury instructions, which

24   have not been read, that there is going to be an issue of

25   partnership and, therefore, I'm going to refresh

1    Mr. McNamara's memory from his declaration that he stated in

2    support of his motion -- Wasco's motion for summary judgment.

3            THE COURT:  Is there an issue in that regard, "yes"

4    or "no"?

5            MR. HASSING:  Yes.

6            THE COURT:  Okay.  On the issue of asking for legal

7    conclusion, the objection is overruled.  It is a factual

8    question.  Hold on one second.

9            Lacking foundation is sustained.  You are going to

10   have to lay a foundation that there was ever any such

11   discussion or involvement in any discussion of that which is

12   the subject of your question.

13           MR. TRAVIS:  Okay.

14   BY MR. TRAVIS:

15   Q.  Mr. McNamara, you previously testified, as I recall, that

16   you were the Assistant Planner for the processing of Tentative

17   Tract 6451, correct?

18   A.  Correct.

19   Q.  And in that processing, you had to deal with DeWalt,

20   correct?

21   A.  Correct.

22   Q.  And you had to deal with Joe Wu from Northern California,

23   correct?

24   A.  If I remember, they were the applicant.

25   Q.  Okay.  And so you had conditions that the staff report

1   required them to meet, correct?

2   A.  Correct.

3   Q.  And it was your job to interact with them to make sure

4   that they met those conditions, correct?

5   A.  Yes and no.  For planning issues, yes, but for public

6   works instances, no.

7   Q.  Some instances, yes, and some instances no, correct?

8   A.  Correct.

9   Q.  And in your dealings with Northern California regarding

10  the processing of the map and the development of the

11  subdivision, did Joe Wu ever identify which companies he

12  worked for?

13  A.  Not Mr. Wu directly, but I remember Northern California,

14  and also I did see a reference to Lotus Developments.

15  Q.  And they used these companies interchangeably, correct?

16  A.  I'm unsure.

17          MR. HASSING:  Objection, lacks foundation.

18          THE COURT:  You are going to have to be more specific

19  with your question rather than the broad question that is

20  pending.  Sustained.

21  BY MR. TRAVIS:

22  Q.  What were your dealings with Lotus Development,

23  Mr. McNamara?

24  A.  Just through the approval of the tentative map.  And I --

25  it was either Lotus or Northern California, I'm not sure what

1    entity.

2    Q.  All right.  So in the processing of the 6451 tentative

3    map, you would interact with either Lotus Developments or

4    Northern California, correct?

5    A.  I primarily interacted with DeWalt.

6    Q.  I'm asking not who you primarily contacted with, but I'm

7    also asking you whether or not you interacted for the

8    processing of the 6451 map with Lotus and Northern.

9    A.  To the best of my knowledge.

10   Q.  And in your processing -- in the processing of the 6451

11   map and in your interactions, you -- Northern and Lotus were

12   used interchangeably, correct?

13          MR. HASSING:  Objection, foundation still.

14          THE COURT:  No.  He has limited his question to --

15   let me use his words -- "and in your interactions."  So the

16   objection is overruled because of the limited question.

17          MR. HASSING:  Okay.  I would lodge a further

18   objection as vague and ambiguous.  Possibly beyond this

19   witness' knowledge.

20          THE COURT:  No, overruled.  That's subject to

21   cross-examination, if you wish.

22          Go ahead and answer, if you can.

23          THE WITNESS:  Can you please repeat the question.

24          THE COURT:  The question is this:  And in your

25   processing, in the processing of the 6451 map and in your

536

1   interactions, Northern and Lotus were used interchangeably; is

2   that correct?

3         THE WITNESS:  Yeah, I saw references to both names,

4   but I don't know if they were interchangeable.

5         MR. TRAVIS:  Okay.  I have no more questions, your

6   Honor.

7         THE COURT:  All right, cross?

8         MR. HASSING:  Nothing from me, your Honor.

9         MR. ALEXANDER:  No, thank you, your Honor.

10                      CROSS-EXAMINATION

11  BY MR. OKADIGBO:

12  Q.  Just one question.  Mr. Travis had read a passage from

13  your deposition where you stated that it was a new requirement

14  to enter into a police tax or fire tax, and then you said you

15  have to have improvement plans.  You weren't speaking of Tract

16  6451 when you made that comment, correct?

17  A.  No.  I was speaking of all tentative tracts.

18        MR. OKADIGBO:  No further questions.

19        THE COURT:  Anything further?

20        MR. TRAVIS:  Nothing further, your Honor.

21        THE COURT:  Thank you, sir.  You may step down.

22        Next witness?

23        MR. TRAVIS:  Your Honor, we have an issue that we

24  would like to bring up with you, but we don't want to do that

25  in front of the jury.

537

1          THE COURT:  Is it a sidebar issue or --

2          MR. TRAVIS:  It is a sidebar.  We can approach, your

3     Honor.

4          THE COURT:  Peggy, please.  Just a minute.

5          Counsel approach sidebar, please, on the record.

6          (The following proceedings were had at the sidebar,

7          to wit:)

8          THE COURT:  We are on the record.  All counsel are

9     present, outside the earshot of the jury.

10         What is the issue?

11         MR. TRAVIS:  The issue is there are numerous

12    witnesses out there that are conferring with each other,

13    witnesses who are Non-City and City witnesses, and others who

14    are conferring.  And we want to make sure that the witnesses

15    aren't conferring about previous testimony that's already in.

16    They are sequestered for a reason.

17         MR. BRAZE:  It's been reported they have been leaving

18    the witness stand and going outside and talking to the

19    witnesses coming on the stand.

20         THE COURT:  Let's have one or two of you, one from

21    each side, go out and say, "Stop it.  Don't do that.  Judge

22    says no."

23         (The proceedings at the sidebar were concluded.)

24         THE COURT:  Sir, would you come forward, please.

25                        **GERALD HELT**,

1 | called as a witness on behalf of the Plaintiff, having been

2 | first duly sworn, testified as follows:

3 |      THE COURT:  Please take the stand right here, and

4 | then tell us who you are.

5 |      THE WITNESS:  My name is Gerald Frank Helt, and I go

6 | by the nickname of "Jerry," and I'm the contract City Engineer

7 | for the City of Wasco.

8 |      THE COURT:  Spell your last name for us.

9 |      THE WITNESS:  H-e-l-t.

10 |      THE COURT:  Thank you.

11 |               DIRECT EXAMINATION

12 | BY MR. TRAVIS:

13 | Q.  As the City Engineer, were you the City Engineer

14 | responsible for overseeing the development of the 6451

15 | tentative and final map, sir?

16 | A.  As the contract City Engineer, I was involved for the

17 | tentative map process and the approval of the final map.

18 | Q.  And you interfaced with DeWalt Corporation; is that right?

19 | A.  That's right.

20 | Q.  And you were the in house interface between DeWalt and the

21 | City of Wasco, right?

22 | A.  I interfaced with the City of Wasco also.

23 | Q.  As I understand it, you were contracted by the City of

24 | Wasco, right?

25 | A.  I'm under contract agreement to serve as the contract City

539

1    Engineer.

2    Q.  Is it your understanding, and I have been trying to figure

3    out, for the improvements for Tract 6451, is it your

4    understanding those improvements have not been accepted?

5    A.  That's my understanding.

6    Q.  Why not?

7    A.  I was under the belief that during the time that the tract

8    recorded, they would be accepted.  I was unaware until

9    recently that they had not been accepted.

10   Q.  Okay.  Do you have any understanding of why they have not

11   been accepted?

12   A.  Currently, I do not.

13   Q.  When you say "currently," did you previously have a reason

14   why you thought they might not have been accepted?

15        MR. OKADIGBO:  Objection, your Honor, this line of

16   questioning generally.  City feels it is irrelevant as far as

17   the copyright infringement.

18        THE COURT:  It sounds foundational.  Whether it is or

19   not, we will see, but the objection is overruled without

20   prejudice.

21        Go ahead and answer, if you can.

22        THE WITNESS:  During the time the final map was being

23   processed for recordation, there was activity with the Public

24   Works Department to determine the status of the existing

25   improvement.  And I was told there was minor curb and gutter

540

1    that needed to be replaced, and that was the extent of the

2    work that I was aware of.

3    BY MR. TRAVIS:

4    Q.   But isn't it the law that you can't occupy residential

5    units without accepting the improvements?

6    A.   There is a condition, the condition of approval, that

7    states that the Certificate of Occupancy won't be issued.

8    Q.   So how is it that the residential units are allowed to be

9    occupied when the improvements haven't been accepted?

10   A.   I do not know how that happened.

11   Q.   I know.  That seems to be the answer I have been getting.

12          THE COURT:  No comment.  No comment on his answers,

13   please.

14          MR. TRAVIS:  Sorry, your Honor.

15   BY MR. TRAVIS:

16   Q.   In your dealings with DeWalt Corporation, did that also

17   encompass trying to create a bonding estimate for the 6451

18   tract?

19   A.   That's correct.

20   Q.   Now, as I understand it, the bonding estimate wasn't

21   required, right?

22   A.   I requested an estimate for calculating an amount to be

23   used for the maintenance bond.

24   Q.   And the amount of the bonding estimate that you, you being

25   you and DeWalt, came up with for the improvements was $1.9

541

1   million, correct?

2   A.  I don't recall the amount.

3   Q.  But it would be --

4        MR. OKADIGBO:  Objection, relevance, your Honor.

5        THE COURT:  Overruled.

6   BY MR. TRAVIS:

7   Q.  But it would be on the bonding estimate, correct?

8   A.  It would be in the estimate that we were provided.

9   Q.  Have you ever looked at the --

10  A.  Excuse me.  Could I add to that?

11  Q.  If you need to.

12  A.  I do.  Because I think the question leaves one thinking

13  that the bonding amount was for the full amount.  And, again,

14  we were looking for an estimate for the maintenance portion,

15  which is less than the full amount.

16  Q.  No, I understand that.  What you are saying is that you

17  had originally come up with a bonding estimate for the value

18  of the improvements, but that changed, right?

19  A.  It doesn't change.  It is a number that is used in the

20  calculation for the maintenance amount.

21  Q.  And in fact, for the defendants, Northern and Lotus, that

22  that amount was very small, wasn't it?

23  A.  I'm not sure what "very small" is relative to.  In

24  comparison to what it would have been for the full bonding

25  amount, it's less.  It is much less.  The maintenance bond is

542

1    10 percent of the full bond.

2    Q.   Thank you.

3    A.   You are welcome.

4    Q.   Have you reviewed the Tentative Map Number 6451 and the

5    previous Tract Map 5472?

6    A.   Yes.

7    Q.   And in fact, you testified at your deposition earlier that

8    the lot numbering is similar, isn't it?

9    A.   That's correct.

10   Q.   And the road layout is similar, isn't it?

11   A.   That's correct.

12   Q.   And the streets are similar, isn't it?

13   A.   That's correct.

14   Q.   And the acreage is similar; isn't it?

15   A.   That's correct.

16            MR. TRAVIS:  I'm all through, your Honor.

17            THE COURT:  Cross, anyone?

18            MR. HASSING:  May I have just a moment to look at an

19   exhibit first, your Honor?

20            THE COURT:  Sure.

21            MR. HASSING:  I have no questions, your Honor.

22            THE COURT:  Anyone?

23            MS. BARNES:  No questions, your Honor.

24            THE COURT:  You are done.  You may step down.

25            THE WITNESS:  Thank you.

1          THE COURT:  Next witness?

2          MR. TRAVIS:  Jim Zervis.

3                      **JAMES ZERVIS**,

4    called as a witness on behalf of the Plaintiff, having been

5    first duly sworn, testified as follows:

6          THE COURT:  Please have a seat there, if you would,

7    and tell us who you are.

8          THE WITNESS:  My name is James Zervis, Z-e-r-v-i-s.

9                      DIRECT EXAMINATION

10   BY MR. TRAVIS:

11   Q.  Mr. Zervis, can you please tell us what your position is

12   at the City of Wasco?

13   A.  I'm the City Manager for the City of Wasco.

14   Q.  As the City Manager, were you the one responsible --

15   strike that.

16          We had previously submitted, the plaintiffs had

17   submitted a number of discovery requests to the City.  And

18   were you the one that was responsible for answering those

19   responses.

20   A.  I answered some.  They went through the City Attorney.

21   Q.  Thank you.  Did the City of Wasco ever call Mr. McIntosh

22   to ask whether or not his plans could be used for the 6451

23   tract?

24   A.  Not to my knowledge.

25   Q.  Did the City of Wasco ever instruct anyone to contact

544

1   Mr. McIntosh for permission to use his 5472 plans?

2   A.   Not to my knowledge, but I wasn't the City Manager or even

3   employed with the City at the time that 6451 was approved.

4   Q.   But you are the one designated to answer the responses to

5   our questions, correct?

6   A.   That's correct.

7   Q.   How much did the -- it's previously been testified here --

8   and maybe you can answer the question -- that the City of

9   Wasco purchased -- I'm sorry -- sold the subdivision to

10  Northern; is that your understanding?

11  A.   Yes, that's my understanding.

12  Q.   And it's going to be one of the stipulated facts, I

13  believe, that the City of Wasco purchased the Valley Rose

14  Subdivision at a tax sale, correct?

15  A.   That's correct.

16  Q.   Okay.  And how much did the City of Wasco purchase that

17  subdivision for?

18  A.   I believe it was purchased for roughly $129,000.

19  Q.   129,000?

20  A.   I believe so.

21  Q.   That's your best estimate?

22  A.   Yes.

23  Q.   And how much did the City of Wasco sell the subdivision to

24  Northern for?

25  A.   The sale was for 1.2 million.  Can I add something to my

ZERVIS - D

545

1    previous answer?

2         THE COURT:  Do you need to clarify your answer?

3         THE WITNESS:  I believe so.

4         THE COURT:  Go ahead.

5         THE WITNESS:  The 1.2 million, none of that money

6    went to the City.  It went to other obligations.

7         MR. TRAVIS:  Your Honor, I would like to object that

8    that's nonresponsive.  It is not a clarification.

9         THE COURT:  It's not, so it is stricken.

10   BY MR. TRAVIS:

11   Q.  As part of the mechanism -- scratch that.

12        As part of the marketing, the way in which Wasco

13   marketed the Valley Rose Subdivision to developers, they did

14   this through a Developer Information Package; isn't that

15   right?

16   A.  I don't know how it was marketed.

17   Q.  Have you ever seen a Developer Information Package?

18   A.  Yes, I have.

19   Q.  Recently?

20   A.  In preparation for trial.

21   Q.  And in fact, that Developer Information Package, which is

22   marked as Joint Exhibit 10, and I will -- if you could go to

23   Joint Exhibit 10, Mr. Zervis?

24   A.  Sure.  I'm there.

25   Q.  Thank you.  If you could go to page 5 on the bottom,

546

1   and -- I'm sorry, page 5 on the bottom, and then there is the

2   paragraph there.  And can you please read -- I'm sorry.

3          Can you read the first sentence, please.

4   A.  Yes.

5          "The City and the Wasco Community Development

6          Corporation recently purchased through a property tax

7          sale 97 acres of residential and commercial land

8          adjacent to the golf course, of which 34 acres has

9          infrastructure.

10  Q.  Can you continue reading, please.

11  A.  (Reading)

12         "This property is part of the approximately 468-acre

13         unfinished Master Planned Community named Valley Rose

14         Estates that lies to the west and north of the golf

15         course property.  Infrastructure, including roadways

16         and water lines, were developed on a 34-acre parcel

17         within the City-owned land.  A Location Map,

18         Assessor's Parcel Map, Final Parcel Map 9572,

19         Tentative Tract Maps 5472 and Number 5618, Zoning

20         Map, Sewer and Water Map, are included as Appendix C

21         herein."

22  Q.  In fact, if you go to Appendix C, there is Tentative Tract

23  Map 5472; do you see that?

24  A.  Which page is that?

25  Q.  Let me find it.  On the bottom, BP 02422.

547

1    A.   This is Revised Tentative Tract Map Number 5472.

2    Q.   You have that there?

3    A.   Yes.

4    Q.   And that Revised Tentative Tract Map Number 5472 is

5    Mr. McIntosh's map, isn't it?

6    A.   I believe it was done by McIntosh.

7    Q.   So the City was marketing this development, and part of

8    the benefit of that development was that it had existing

9    infrastructure and a previously approved tract map, didn't it?

10   A.   I'm not aware of what marketing efforts were undertaken

11   during this time period.  I was not an employee with the City.

12   Q.   I understand that, but aren't you the person that can

13   answer questions on behalf of the City?

14   A.   Yes, sir.

15   Q.   Regarding the marketing and answers about what it is that

16   the City did to obtain a financial benefit for selling the

17   subdivision?

18   A.   Yes.  I have been designated to answer questions.

19   Q.   So isn't it true that after review of this document, that

20   the City of Wasco marketed in its marketing program, expected

21   that the developer is going to retain the benefit of

22   Mr. McIntosh's current infrastructure and previously approved

23   map?

24            MR. HASSING:  Objection, compound, your Honor.

25            THE COURT:  Sustained.  Break it down, if you wish.

TRAVIS - D

548

1   BY MR. TRAVIS:

2   Q.  Did the City of Wasco expect to obtain a benefit from a --

3   from the previously approved Tract Map 5472?

4   A.  I can't answer what the City expected.

5   Q.  Well, I will ask it.  Why, then, would the City of Wasco

6   put in the Developer Information Package that there is already

7   a Location Map, Assessor's Parcel Map, Final Parcel Map

8   9572 --

9           THE REPORTER:  I'm sorry.

10          THE COURT:  Slow it down a little bit.

11  BY MR. TRAVIS:

12  Q.  -- Tentative Tract Map 5472 and 5618, Zoning Map, Sewer

13  and Water Map are included as Appendix C herein?

14          MR. HASSING:  Objection, foundation, your Honor.  It

15  calls for speculation.

16          THE COURT:  That's the same issue, foundation or

17  speculation.  No, the objection is overruled.

18          If you can answer, answer.  If you don't know, tell

19  him you don't know.

20          THE WITNESS:  I don't know.

21  BY MR. TRAVIS:

22  Q.  The City of Wasco has received fees because of the sale of

23  lots on the subdivision, haven't they?

24  A.  Yes.

25  Q.  And those are called "impact fees," correct?

1    A.   Yes, that's correct.

2    Q.   At your deposition, I believe that you said that currently

3    that amount is roughly in the amount of $529,000, correct?

4    A.   That's correct.

5    Q.   And the City expects to receive more fees from the sale

6    of -- expects to receive more fees from the existing lots, the

7    homes that have been sold, correct?

8    A.   What type of fees?

9    Q.   Impact fees.

10   A.   Impact fees are only collected one time, at the time of

11   development.

12   Q.   Does the City expect to receive any more fees, any kind of

13   fees because from the sale of homes on the Valley Rose

14   Subdivision?

15   A.   As more units, more houses are developed, there will be

16   more fees, yes.

17   Q.   You don't know what that is right now, right?

18   A.   No.  Because we don't know what, ultimately, is going to

19   be built out.

20   Q.   But is it your understanding or you know that currently,

21   there are 30 homes that have been sold, right?

22   A.   I don't know how many homes have been sold.

23   Q.   But you do know that there is a whole bunch of homes or a

24   number of homes that need to be built, correct?

25   A.   That need to be built?

1    Q.   Correct.

2              MR. OKADIGBO:  Objection.

3              THE COURT:  Rephrase.  What are you asking him.  Need

4    to be built to do what?

5    BY MR. TRAVIS:

6    Q.   You do understand that there are lots out there where

7    homes have not been built, correct?

8    A.   Yes.

9    Q.   And so once homes are built on those lots, then you can

10   start receiving fees, correct?

11   A.   We will receive fees, so it is a one-time fee.

12             MR. TRAVIS:  Okay.  I'm finished, your Honor.

13             THE COURT:  Cross, any cross?

14                       CROSS-EXAMINATION

15   BY MR. OKADIGBO:

16   Q.   Now, Mr. Travis had asked you earlier about the Developer

17   Information Package.  Just to clarify, were you employed by

18   the City at the time that package was distributed?

19   A.   No.

20   Q.   So you don't have any knowledge about any -- any personal

21   knowledge about the City's intentions back when that package

22   was distributed, correct?

23   A.   No.  And I don't know where it was distributed.

24   Q.   Can you describe to the jury what the purpose for the

25   collection of the impact fees is?

ZERYAS - X

551

1    A.   Sure.   Impact fees are of various types.   They would be

2    particular to a community facility, such as water or sewer.

3    In the City of Wasco's case, we have a water well impact fee,

4    which looks at the impact of a single family home or a

5    development on the City's water system, and the -- based on an

6    engineer's report, calculates the cost associated with that

7    capacity that's being taken to service that residence or that

8    development.

9         That fee is collected in accordance with Government

10   Code section 6600.   It is kept in a separate account, and it

11   is used for capital improvements to expand the City's system

12   with respect to water or sewer or whatever the impact fee is

13   for.

14        The purpose of these fees are so that existing

15   residences don't have to pay for new development coming in,

16   the idea that new development coming in should pay for its own

17   impact on municipal services, and not other residents within

18   the community.

19        They are very common fees.   All communities that I'm

20   aware of personally have similar fee structures in place.

21   Q.   So is it fair to say that the purpose of the fee is to

22   reimburse the City for actual or projected costs that it has

23   or will expend?

24   A.   Yes.

25        MR. TRAVIS:   Objection, leading.

552

1        THE COURT:  It's cross-examination.

2        MR. TRAVIS:  It's his own witness, your Honor.

3        THE COURT:  He wasn't designated as an adverse.  Did

4   you want the -- were you expecting the Court to assume that?

5        MR. TRAVIS:  I would not expect the Court to assume

6   anything, your Honor.

7        THE COURT:  It would appears as though now he brought

8   the issue up, he is correct.  So the objection is sustained.

9        MR. OKADIGBO:  Is the purpose --

10        THE COURT:  Ask him what is the purpose and not be

11   leading.

12   BY MR. OKADIGBO:

13   Q.   What is the purpose for the collection of impact fees?

14   A.   The collection of impact fees, there is two purposes with

15   respect to the various fees in Valley Rose Estates.  One is to

16   recover the cost of the impact which will be spent in the

17   future to, for example, put in a new well or new water line to

18   add capacity to assist them.  So to collect future costs that

19   are resulting from the new development.

20        In the second scenario, there are two impact fees

21   that are assessed to Valley Rose Estates, the Valley Rose

22   Estates project, to reimburse the City for the cost of

23   providing the water and sewer line out to that property.

24        So in that instance, the City's recovering costs that

25   were already spent.

553

1  Q.  Now, you were asked earlier by Mr. Travis about the 5472

2  plans.  Do you have any knowledge of whether 5472 improvement

3  plans were used to finalize the development of Tract 6451?

4  A.  No.

5          MR. OKADIGBO:  No further questions.

6          THE COURT:  Any redirect?

7          MR. TRAVIS:  No more questions, your Honor.

8          THE COURT:  Thank you, sir.  You may step down.

9          Next witness, please.

10         MR. BRAZE:  We would call Mr. Wu, your Honor.

11                        **JOE WU**,

12  called as a witness on behalf of the Plaintiff, having been

13  first duly sworn, testified as follows:

14         THE COURT:  Please take the witness stand, sir, and

15  then tell us who you are.

16         THE WITNESS:  My name is Joe, J-o-e, last name is Wu,

17  W-u.

18         THE COURT:  Okay.

19                  DIRECT EXAMINATION

20  BY MR. BRAZE:

21  Q.  Good afternoon, Mr. Wu.

22  A.  Yes.

23  Q.  What business are you in?

24  A.  I'm in construction, a builder and developer.

25  Q.  And what is your relationship to Northern California

1    Universal Enterprises Company, the defendant in this case?

2    A.   I'm the President of that Northern California Universal

3    Enterprise Company.

4    Q.   And what is your relationship to the defendant Lotus

5    Development?

6    A.   Lotus Development is a part of an entity we are using for

7    this subdivision.

8    Q.   And what's your relationship to that entity?

9    A.   I believe that it was Lotus Development, LP.  Limited

10   partnership.

11   Q.   What is your relationship with respect to Lotus

12   Development, LP?

13   A.   I'm a general partner.

14   Q.   General partner?

15   A.   Yes.

16   Q.   And are there limited partners or are there other general

17   partners?

18   A.   No, only me and my wife together.

19   Q.   So you have the corporation, Northern California Universal

20   Enterprises, as a corporation, and Lotus Development as a

21   limited partnership?

22   A.   Yes.

23   Q.   Okay.  Were there any other entities that you were

24   affiliated with that worked on the Valley Rose Subdivision?

25   A.   Yes.

555

1    Q.   What other companies?

2    A.   Recently, I believe we changed Northern Development to

3    Valley Rose Estates, LP.

4    Q.   A new partnership?

5    A.   Just changed the entity.

6    Q.   Changed the name?

7    A.   Changed the name, yes.

8    Q.   So you are still the General Partner of Valley Rose, LP?

9    A.   Valley Rose Estates, yes.

10   Q.   Valley Rose Estates, LP.  Were the employees that worked

11   on the Valley Rose Subdivision employed by any other company?

12   A.   I'm sorry.  I don't understand.

13   Q.   Sure.   You had employees that worked on the Valley Rose

14   Subdivision, didn't you?

15   A.   Yes.

16   Q.   And who was their employer?  Who did they work for?

17   A.   Employee or employer?

18   Q.   Who wrote their checks?

19   A.   Oh.

20   Q.   What company gave them their checks?

21   A.   I wrote the check.

22   Q.   I know you did, but what company?

23   A.   The company check is under Northern California Universal

24   Enterprises Company.

25   Q.   Thank you.

556

1          MR. BRAZE:  I would like to read from Mr. Wu's

2    deposition.

3          THE COURT:  Page and line, please.

4          MR. BRAZE:  Page 17, it would be volume 1, page 17,

5    commencing at line 24 through line 8 on page 18.

6          THE WITNESS:  Can you show me which binder?

7          MR. BRAZE:  That's okay.  You don't have to worry

8    about it.

9          THE COURT:  It is not up there.

10          MR. HASSING:  Shouldn't Mr. Wu have a copy?

11          MR. BRAZE:  It is not for impeachment.

12          THE COURT:  Depends on what he is doing it for.

13          MR. HASSING:  We don't know.

14          MR. BRAZE:  I'm just going to read it.

15          THE WITNESS:  Go ahead.

16          MR. BRAZE:  (Reading)

17        "And correct me if I'm wrong, it sounds like the

18         nature of your business is to take over subdivisions

19         that are partially completed where the developer has

20         failed to finish them and you complete them; is that

21         correct?

22        "Answer:  Yes.

23        "Question:  Is that the nature of your business?

24        "Answer:  Yes.

25         Mr. Travis adds:  "It's a good market for you today?

557

1          "Answer:  I clean up."

2     BY MR. BRAZE:

3     Q.   How many failed subdivisions have you taken over, Mr. Wu,

4     in the last five years to build homes on and sell them?

5     A.   Are you saying last five years, since 2005?

6     Q.   Yes.

7     A.   We haven't take any subdivision, no.

8     Q.   Well, in your deposition, you told me you had taken over

9     about six subdivisions, haven't you?

10    A.   That's before 2005.

11    Q.   Before 2005.  And three of those subdivisions, you took

12    over from municipalities, such as Wasco, correct?

13    A.   Yes.

14    Q.   You took one over from the City of Chowchilla; is that

15    correct?

16    A.   Yes.

17    Q.   And what was the other city that you took one over from?

18    A.   I believe it was City of Oroville.

19    Q.   Oroville.  And so in all of those instances, you go in

20    where there are existing maps and plans, and they may or may

21    not have improvements already installed, correct?

22    A.   Yes.

23    Q.   Now, when you purchased the Rose Valley Estates [sic]

24    property, how much money did you anticipate making?

25    A.   I don't --

558

1            MR. HASSING:  Objection, your Honor.  Relevance.

2            THE COURT:  Sustained.  His anticipation is not

3    relevant.

4            MR. BRAZE:  It goes to damages, doesn't it, your

5    Honor?

6            THE COURT:  Not the anticipation doesn't.

7            MR. BRAZE:  Okay.  All right.

8    BY MR. BRAZE:

9    Q.   Well, you did anticipate to make a profit, didn't you?

10   A.   No.  I want to make a profit.

11   Q.   That's what I just said.  You did anticipate that you

12   would make a profit, right?

13   A.   Yes.

14   Q.   Did you have a business plan that showed how much profit?

15   A.   No.

16   Q.   You borrowed some money from the bank to make this

17   purchase?

18   A.   Yes.

19   Q.   And did you tell them what you believed your profits would

20   be?

21           MR. HASSING:  Objection, relevance.

22           THE COURT:  It's not relevant.  Sustained.

23   BY MR. BRAZE:

24   Q.   Let's take a look at Exhibit J 10, which is the City of

25   Wasco Developer Information Package.  Do you recall seeing

559

1   that?

2   A.   Yes.

3   Q.   It is dated November of 2003, and did you first see it in

4   or about November of 2003?

5   A.   Yes.

6   Q.   And it was brought to you by a broker; is that correct?

7   A.   Yes.

8   Q.   And of course, there is a lot of information in there

9   about what a great place Wasco is to live and work?

10  A.   (Witness nods head.)

11  Q.   And in there is a map of the subdivision.  And was it your

12  understanding that you were going to be acquiring this area

13  down here in the lower left-hand corner?

14  A.   I don't follow you.

15  Q.   Sure.  What area did you understand you would be

16  acquiring, as shown on that map?

17  A.   The left-hand corner of the property is not -- I do not

18  own that left-hand corner property.

19         THE COURT:  If you will take your finger and touch

20  the screen where you do own, that's what he is asking, I

21  think.

22         THE WITNESS:  Okay.  The one I point out is 33.51

23  acre.

24  BY MR. BRAZE:

25  Q.   Well, you bought a hundred acres, didn't you?  Didn't you

560

1    buy close to a hundred acres?

2    A.   The one, when I bought it, is 33.51 acres, is 68 finished

3    lots.  And also I have the adjacent, 46.06.  That's the one

4    currently that is agriculture, 46.06 acre.

5    Q.   Okay.  But your initial intent was to buy that for the

6    purpose of building homes and selling them, right?

7    A.   Yes.

8    Q.   Contained in that Developer Information Package was the

9    tentative tract map for Tract 5472, wasn't it?

10   A.   Yes.

11   Q.   And at the lower right-hand corner, it indicates that that

12   was prepared by Martin-McIntosh?

13   A.   I cannot read it.

14        MR. BRAZE:  Does this focus, your Honor?

15        THE COURT:  I think they can do it from her --

16        MR. HASSING:  May I give him a hand?

17        THE COURT:  Sure.

18   BY MR. BRAZE:

19   Q.   Is that better?

20   A.   Still a little blurred.

21   Q.   Did you ever inquire of anyone what the status of that

22   tract map was?

23   A.   No.

24   Q.   When you received the development package, did you call

25   Mr. McIntosh, who had prepared that tract map?

561

1    A.   I don't recall I called McIntosh about this map.

2    Q.   I'm sorry?

3    A.   I do not recall I called McIntosh to talk about this map.

4    Q.   Let me show you the sale agreement, which is Exhibit J 7.

5    Now, the copy I have says that on April 6, 2004, you entered

6    into this purchase and sale agreement with the City of Wasco.

7    Looks like Lotus Development and City of Wasco.  This is for

8    1.95 million.  Was that the final contract?

9    A.   I'm not sure.

10   Q.   Do you remember how much you paid?

11   A.   Yeah.  I remember it was around 1.9, but I do not remember

12   exact figure.

13   Q.   There is an amendment to that agreement, it is not

14   identified by a page number, but it says it's between Northern

15   California Universal and City of Wasco for $1.6 million.  Do

16   you recall the number being changed?

17   A.   I believe it was 1.6.

18   Q.   And do you recall that the purchase was for 97.57 acres?

19   A.   Exactly acre, I don't know.  It's plus, minus.

20   Q.   Plus or minus a hundred acres?

21   A.   No.

22   Q.   Plus or minus?

23   A.   Because normally, they call it "gross," so sometimes it's

24   a little bit different from the map called for.

25   Q.   Well, isn't it true that you purchased about 98 acres?

562

1    A.  Yes, possible.

2    Q.  And so if the Valley Rose Estates was 35 acres, you owned

3    63 acres outside of the subdivision, correct?

4    A.  Yes.

5    Q.  If you paid $1.6 million, that would indicate you

6    purchased all of this land, including the subdivision, for

7    about $16,000 an acre, correct?

8    A.  No, you don't calculate it that way.

9    Q.  How do you calculate it?

10   A.  I believe that the tax assessor, they value the finished

11   lot.  I believe it is $20,000 per finished lot.

12          Then the remaining is farming because it is

13   agricultural land, so the value is less than the finished lot

14   value.

15   Q.  Sure.  All I'm saying is you got a hundred acres of land

16   for about $1.6 million, including a subdivision, right?

17   A.  Yes.

18   Q.  So what investigation did you do before you bought this

19   subdivision?

20   A.  I think it was a broker that bring me, you know, the

21   opportunity to consider this piece of project.

22   Q.  But I mean what did you do to determine whether you wanted

23   to spend $1.6 million on buying this?

24   A.  Well, at the time I was thinking about the things that I'm

25   purchasing, the 68 finished lots, so I figure out if timing is

563

1    okay, you know, for me to developing this project.

2    Q.  I would like to read to you from a declaration that you

3    filed in this case.

4             THE COURT:  Could you give us the date, please.

5             MR. BRAZE:  Certainly.  It's declaration of Joe Wu.

6    It was filed with the Court on September 29, 2009.

7             THE COURT:  Is this a Rule 56?

8             MR. BRAZE:  Yes.

9             THE COURT:  Page and line?

10            MR. BRAZE:  Page -- line 12, page 3.

11            THE COURT:  Go ahead.

12            MR. BRAZE:   (Reading)

13            "Prior to Lotus' purchase, I spoke by telephone to

14            Mr. McIntosh about my intended purchase of Parcel 1

15            from the City.  I asked Mr. McIntosh if he would be

16            interested in preparing the new tentative map that

17            the City was requiring.  Mr. McIntosh stated that he

18            would, but that he would have to be paid an

19            exorbitant amount of money, which he said was left

20            owing by the previous developer and the City."

21   BY MR. BRAZE:

22   Q.  Does that refresh your recollection about what

23   investigation you did prior to buying the tract?

24   A.  Yes.  I do recall McIntosh one time.  The call was to try

25   to find out if he was interested in doing some tentative map

564

1 for my company.

2 Q.  So this was no secret to you that when you bought this

3 property, you knew Mr. McIntosh was claiming that he hadn't

4 been paid for developing the final tract map and the

5 improvement plans?

6          MR. HASSING:  Objection.  That's compound, your

7 Honor.

8          THE WITNESS:  I don't --

9          THE COURT:  Hang on just one second.  It's compound.

10 Break down your question, please.

11          MR. BRAZE:  Certainly.

12 BY MR. BRAZE:

13 Q.  Before you purchased the property on May 18th, 2004 -- I

14 will rephrase that.  That was a sloppy introduce.

15          Before you purchased the property on May 18, 2004,

16 you knew that Mr. McIntosh claimed that he was owed money such

17 that he would not do any work for you until it was paid,

18 right?

19 A.  I did not have a conversation with him about that he owed

20 money and all the maps stuff.  All I know is that when I call

21 him, I asked him about, you know, whether he is interested to

22 give me a proposal to prepare a map.

23          And at that time, I remember he just saying that the

24 previous developer owed him a lot of money.  That's all.  I

25 heard what he said.

565

1  Q.  What investigation did you do to determine what that was

2  all about?

3  A.  I actually not interested to know how much the people owe

4  him the money.  I simply just wanted to, you know, ask him to

5  give me a proposal.

6  Q.  Well, were you concerned that he might have a claim

7  against the property or some of the drawings?

8  A.  I have no concern at that time.

9  Q.  You weren't concerned at all?

10  A.  No.

11  Q.  Did you ask the City about it?

12  A.  No.

13  Q.  Did you say, you know, "Gee, in your Developer Information

14  Package, you showed me this tract map for 5472, and I called

15  the guy up and he claimed to be owed a lot of money."  Jess

16  didn't explain that to you?

17  A.  No.

18  Q.  So then you went to talk to DeWalt, correct?

19  A.  Yeah.  I might -- my field engineer searched in the

20  Bakersfield area because the project was near by Bakersfield.

21  It is a big city.  So finally, I, you know, searched a civil

22  engineer to prepare a map.

23  Q.  And Exhibit J 18, which we saw during the testimony of

24  Mr. Gutierrez, is DeWalt's proposal to you, what they are

25  going to do for you; is that correct?

1    A.   Yes.

2    Q.   And what did you understand that they would be doing for

3    Northern California Universal?

4    A.   What I understanding, that DeWalt engineer is going to be

5    doing all the surveying and producing the topo data and to

6    create another tentative map for me.

7    Q.   Did you ask Mr. Gutierrez about your conversation with

8    Mr. McIntosh?

9    A.   No.

10   Q.   Did you say, "You know there is a tract map associated

11   with this Developer Information Package, and I called

12   Mr. McIntosh and he claimed he was owed a lot of money," did

13   you talk to Mr. Gutierrez about that?

14        MR. HASSING:  Objection, asked and answered.

15        THE COURT:  Sustained.  He said no.

16   BY MR. BRAZE:

17   Q.   So what was your understanding of what DeWalt Engineering

18   was going to do for you?

19        MR. ALEXANDER:  Asked and answered.

20        THE COURT:  Overruled.

21        THE WITNESS:  That they were going to prepare a new

22   tentative map for me.

23   BY MR. BRAZE:

24   Q.   A new tentative map and a final map, right?

25   A.   And include a final map.

1    Q.  And did you and Mr. Gutierrez discuss the issue about a

2    final map requiring improvement plans?

3    A.  No.

4    Q.  Was there a discussion as to whether the final map on your

5    tract would use the improvement plans from the prior tract?

6    A.  No.

7    Q.  Was there any discussion of how that situation was going

8    to be rectified so if someone walked to the Planning

9    Department and asked for improvement plans on your map, they

10   would get the right one?

11           MR. ALEXANDER:  Assumes facts not in evidence.

12           THE COURT:  Sustained.

13   BY MR. BRAZE:

14   Q.  Well, at sometime you realized you needed improvement

15   plans, right?

16           MR. ALEXANDER:  Assumes facts not in evidence.

17           THE COURT:  Overruled.  Doesn't assume anything.

18           Did you or didn't you know?

19           THE WITNESS:  In this case, we don't need improvement

20   plans, okay, because the -- all the infrastructure is already

21   completed in the subdivision.

22   BY MR. BRAZE:

23   Q.  Well, then why hasn't a Certificate of Occupancy been

24   issued so that the improvements can be assumed by the City or

25   adopted by the City if they are all in?

568

1          MR. HASSING:  Objection, lacks foundation.  Calls for
2  speculation.
3          THE COURT:  Sustained.  You have to lay the
4  foundation, whether or not he knows it.
5  BY MR. BRAZE:
6  Q.  Mr. Wu, do you know that the improvements associated with
7  your tract have not been accepted by the City?
8  A.  Well, I understand the infrastructure has been there over
9  15 something years, so --
10  Q.  Is that a "yes" or "no," please.
11  A.  Can you say again?
12  Q.  "Yes" or "no"?
13          THE COURT:  Do you know that the improvements
14  associated with your tract have not been accepted by the City?
15  Do you know that or not?
16          THE WITNESS:  Improvement plans?  I'm sorry.
17  BY MR. BRAZE:
18  Q.  No, the improvements.
19  A.  Oh, the improvements.  The improvements was one time
20  accepted by the City, during the time was different City
21  Manager.  Then after the City Manager changed, I think the --
22  they want me to go back to fix some minor concrete cracks.
23  That's why the way it is, the situation is now.
24  Q.  So the situation, according to testimony by the employees
25  of the City of Wasco, is that the improvements have not been

569

1   accepted by the City, correct?

2   A.   Yes.

3   Q.   And so as a result, you are still responsible for

4   maintaining all the public streets and the utilities, correct?

5   A.   Yes.

6   Q.   And have any of your -- the people you've sold homes to

7   complained about that, that the City is not maintaining the

8   roads or utilities?

9           MR. HASSING:   Objection, relevance.

10          THE COURT:   Sustained.

11  BY MR. BRAZE:

12  Q.   Have you had to post a bond to maintain those public

13  utilities?

14  A.   No.

15  Q.   So what do you have to have do out there in order to get

16  those improvements accepted?

17  A.   As far as the 30 homes I build, we don't have any outside

18  improvement issue, okay.   The concrete has been completed and

19  accepted by the City.   Other than that, we are finishing up

20  the 38 lot that the City want me to finalize with any minor

21  concrete cracks.   That situation still stays.

22  Q.   How long have you been doing that?   This is 2010, right?

23  A.   Yes.

24  Q.   When did you start selling homes?

25  A.   2007, I think.

1    Q.  How about 2005?

2    A.  No.

3    Q.  Well, we heard some testimony that the final map was --

4    when was your final map was recorded?

5    A.  Final map was recorded in, I believe, 2007.

6    Q.  You can't sell homes until you get a final map, right?

7    A.  Yes.

8    Q.  So since 2007, you still had these issues that you have

9    not yet fixed?

10   A.  Well, we continued the progress to finish the -- any punch

11   out list items.

12   Q.  Let me show you Exhibit J 21.  That shows that Lotus

13   Development has paid the City of Wasco $529,000 and some

14   change for impact fees; is that correct?

15   A.  Yes.

16   Q.  And has that been on a per house basis, or how does that

17   work?

18   A.  I believe the basis is include total house we pay.  I

19   believe it is 68 home permit.

20   Q.  That's for 68 homes?

21   A.  Yes.

22   Q.  And at the present time, you have built 30 homes?

23   A.  Yes.

24   Q.  And you've sold about 19?

25   A.  Yes.

1   Q.   So you've already paid all of the impact fees that were

2   required for this development, correct?

3   A.   Yes.

4   Q.   For the full 68 homes?

5   A.   Yes.

6   Q.   And that has been paid out of the proceeds of the sales

7   from the first 19 homes?

8   A.   Yes.

9   Q.   And you heard the testimony of the Wasco City Manager

10  testifying that Wasco had acquired that property for a hundred

11  thousand dollars and then sold it to you for 1.6 million?

12  A.   1.2 million, is what I hear.

13  Q.   So it is not 1.6 million?  Didn't you pay 1.6 million for

14  the property?

15  A.   Yeah.  I pay 1.6, but I was hearing that the City Manager

16  was saying that -- they sold to me for 1.2 because only 33

17  something acre was finished out.

18  Q.   But you paid 1.6, correct?

19  A.   Yes.

20  Q.   Did you see bonding estimates for the improvements?

21  A.   I hear that, you know, the previous City Manager, you

22  know, testified.

23  Q.   Let me show you Exhibit J 73.  And this is a bonding

24  estimate for Tract 6451, City of Wasco, 68 single family lots,

25  dated October 31, 2005.  That was after you purchased the

1  property, right?

2  A.  I believe so.

3  Q.  And that total bonding estimate is $1.9 million?

4  A.  Yes.

5  Q.  And do you know why that bonding estimate was prepared?

6  A.  I do believe normally that it is a standard process, you

7  know, that when you do the offsite improvement, they always

8  require you to prepare the estimate by engineer.

9  Q.  And did they ask you to bond 1.9 million?

10  A.  No.

11  Q.  Did you have to post a bond of any kind?

12  A.  No.

13  Q.  Did you have to post a maintenance bond for the

14  improvements?

15  A.  I don't recall.

16  Q.  You don't recall?

17  A.  I don't.

18  Q.  We heard some testimony that a maintenance bond would be

19  about 10 percent of the total bond.  So did you have to post a

20  bond of $196,000 for maintenance of the improvements?

21  A.  Like I say, I don't remember if I post the maintenance

22  bond.

23  Q.  Excuse me?

24  A.  I don't remember I post the 10 percent maintenance bond.

25  Q.  I'm sorry.  I thought I heard two answers there.

573

1          THE COURT:  He doesn't remember that he posted the

2    maintenance bond.

3    BY MR. BRAZE:

4    Q.  You do remember?

5    A.  I do not remember.

6    Q.  You don't remember if you posted a 10 percent maintenance

7    bond?

8    A.  No.

9    Q.  Did you ever ask to see the improvement plans for Tract

10   5472?

11   A.  No.

12   Q.  Did you call Mr. McIntosh and ask for plans relating to

13   landscaping?

14   A.  I don't, no.

15   Q.  Did you call and ask Mr. McIntosh for plans relating to a

16   sewer lift station?

17   A.  No.

18   Q.  Or a pump station?

19   A.  No.

20   Q.  So the only one conversation you had with Mr. McIntosh was

21   before you bought the property; is that correct?

22   A.  I don't remember I called, you know, that Dennis

23   McNamara -- Dennis, okay, to talk about this particular map,

24   no.

25   Q.  You have had some problem with landscaping out there,

574

1  haven't you?

2  A.  Yes.

3  Q.  Some of the plants have died?

4  A.  Yes.

5  Q.  And if you go to the landscaping plan, it will tell you

6  what type of plans are supposed to be there, correct?

7  A.  Yes.

8  Q.  And it's your testimony that even though the plants have

9  died, you have never looked at the landscaping plan to find

10  out what kind of plants you are supposed to replace them with?

11  A.  Yes.

12  Q.  I would like to read you from your deposition, page 34,

13  starting at line 2, going to page 35, line 9.

14         MR. HASSING:  No objection, your Honor.

15         MR. ALEXANDER:  No objection.

16         THE COURT:  Go ahead.

17         MR. BRAZE:  Thank you.

18         "Okay.  The answer is yes.

19         "Question:  You had had conversations?

20         "Answer:  Only one time.

21         "Question:  You have had conversations with

22          Mr. McIntosh?

23         "Answer:  Yes.

24         "Question:  Did the conversation deal with the Valley

25          Rose Subdivision

1      "Answer:  No.

2      "Question:  What did it deal with?

3      "Answer:  That's what I said, the pump station

4      "Question:  Where was the pump station?

5      "Answer:  Right at the intersection of the -- in front

6       of Highway 46, next to -- I will say it is next to

7       the Valley Rose Parkway

8      "Question:  And in your mind, did that not deal with

9       the Valley Rose Subdivision?

10      "Answer:  Yes.

11      "Yes, it did, or yes, it did not?"

12      "Answer:  No, you're asking me if it's related to the

13       Valley Rose Estate, and I said no.

14      "Why do you say it's not related to it?"

15       That's a question.

16      "Answer:  Because pump station was never mentioned

17       to -- part of the subdivision.

18      "Question:  Were you ever doing any other work near

19       that pump station other than the Valley Rose

20       Subdivision?

21      "Answer  Yes.  The City asked me to test the pump, see

22       how this pump is going to work.  So I don't have a

23       plan.  That's why I traced it to find out who

24       designed this.  We are right in the middle of

25       nowhere.  When I took over the project, I didn't have

1              anything.
2              "Question:  Did you get plans from the City of Wasco
3               for the subdivision?
4              "Answer:  Yes, we did, but it's incomplete."
5    BY MR. BRAZE:
6    Q.  So you did get plans for the subdivision from the City of
7    Wasco?
8              MR. HASSING:  Your Honor, that's an incomplete
9    reading.  I would like to read a little further, if I might.
10             THE COURT:  What is your request, specifically, and
11   see if there is an objection.
12             MR. HASSING:  My request is to read from line 10
13   through lines 20.
14             THE COURT:  Do you have any objection?
15             MR. BRAZE:  No.  I will read it.
16             THE COURT:  Do you want him to read it?
17             MR. HASSING:  He can read it, if he wants.
18             MR. BRAZE:  Repeating line 9:
19             "Answer:  Yes, we did, but it is incomplete.
20             "Question:  The question is did you get plans from the
21              City of Wasco for the subdivision?
22             "Answer:  No.  For a pump station.
23             "Question:  So you never got any plans from the City
24              of Wasco for the Valley Rose Subdivision?
25             "Answer:  Yes, never

577

1          "Question:  Never?

2          "Answer:  Never

3          "Question:  Did you look at any plans for the Valley

4           Rose Subdivision that were on file with the City?

5          "Answer:  No."

6     BY MR. BRAZE:

7     Q.  I guess I'm kind of confused, Mr. Wu.  If you are having

8     problems with pump stations, why don't you simply get plans

9     from the City of Wasco?

10    A.  Well, at that time, I didn't know that where to get the

11    plan regarding the pump station.

12    Q.  Who was your contact with the City of Wasco?

13    A.  I believe we called, you know, City or building

14    department.

15    Q.  Did you have someone there that you worked with?

16    A.  Yeah.  At that time, I had my superintendent, you know,

17    went to City to ask if there is any plan relating to this pump

18    station.

19    Q.  And did they give him one?

20    A.  I believe at that time, they may -- they do get it, the

21    plan.

22    Q.  Did you ever call Mr. McIntosh to ask him for drawings?

23    A.  No.

24          MR. BRAZE:  Read from page 54 of your deposition,

25    starting at line 7 through 11.

578

1          THE COURT:  Go ahead.

2          MR. BRAZE:  (Reading)

3      "Question:  You mentioned that you got the landscaping

4       plans from your broker?

5      "Answer:  I believe from the City.

6      "Question:  You got the landscaping plans from the

7       City?

8      "Answer:  Yes."

9  BY MR. BRAZE:

10  Q.  Do you recall that testimony you gave in October 2008,

11  that you actually got landscaping plans from the City?

12  A.  I know we have it, but I don't know who give to us.

13  Q.  Now, your business designs its own homes, right?

14  A.  Yes.

15  Q.  And do you do some of the designing?

16  A.  Yes.

17  Q.  Yes?  And you believe that those designs are your

18  property, correct?

19  A.  Yes.

20  Q.  And the reason you believe those are your property is

21  because you designed it, right?

22  A.  Yes.

23  Q.  And so it is not a surprise to you that Mr. McIntosh feels

24  the same way; because he designed it, he believes it's his

25  property, correct?

579

1    A.   I thought he is working for the City, you know.

2          THE COURT:   I thought he was working for the City,

3    you know.

4    BY MR. BRAZE:

5    Q.   You thought Mr. McIntosh was working for the City?

6    A.   No, I'm sorry.  McIntosh, sorry.  I was with Dennis.

7    Sorry.

8    Q.   Well, you testified that you do your home plan design and

9    you believe you own those designs because you designed it,

10   correct?

11   A.   Yes.

12   Q.   And so you understand, then, why Mr. McIntosh believed he

13   owns his plans because he designed it?

14   A.   Well, at that time, I do nothing about the plan, who owns

15   it.  All I want is just asking the general information because

16   these pump station actually was missing some parts.  That's

17   why we was asking about it.

18   Q.   So when did you start selling houses at Valley Rose

19   Subdivision?

20   A.   I believe it was around 2007.

21   Q.   Now, you purchased this property in May of 2004; do you

22   recall that?

23   A.   Yes.

24   Q.   Do you recall ever seeing Exhibit J 96, the appraisal of

25   68 proposed single family lots and homes located at the

1  northern terminus of Valley Rose Parkway?

2  A.  Can you speak again?

3  Q.  Have you seen that before?

4  A.  Yes.

5  Q.  And when did you see it?

6  A.  When do I see it?

7  Q.  Yes.

8  A.  I believe it was about when we start to have a deposition,

9  2008.

10  Q.  So, well, who loaned you the money for your construction

11  loan at that time?

12      MR. HASSING:  Objection, relevance.

13      THE COURT:  Sustained.

14  BY MR. BRAZE:

15  Q.  Well, this appraisal was prepared for United National

16  Bank.  Is that the bank that was doing the construction loan?

17      MR. HASSING:  Objection, relevance, your Honor.

18      THE COURT:  Sustained.

19  BY MR. BRAZE:

20  Q.  Do you know how this appraisal was prepared or who asked

21  for it to be prepared?

22  A.  I believe it was bank.

23  Q.  Your bank?

24  A.  United is not my bank.

25  Q.  Not your bank.  So when you acquired the property, did you

581

1   see this appraisal that said the market value of the lots, as

2   is, is 2.28 million?

3   A.  Where do you read it?  Okay.  Yes.  I saw it.

4   Q.  Did you see that in or about the time you purchased the

5   property?

6   A.  I don't recall I read it.

7   Q.  It also states that the prospective market value of lots

8   in a finished condition is 2.788 million?

9   A.  Yes, the paper say that.

10  Q.  And it states that the aggregate retail value for 68 homes

11  was $8.75 million?

12          MR. HASSING:  Your Honor, I object on the basis of

13  relevance.

14          THE COURT:  Sustained.

15          MR. BRAZE:  This is an exhibit that's been admitted

16  into evidence.

17          THE COURT:  I understand, but there is a question

18  pending, there was an objection pending, and I ruled.

19  BY MR. BRAZE:

20  Q.  Have you seen a later appraisal in 200 -- since then,

21  since 2004?

22  A.  I believe we have another appraisal that was in 2008.

23  Q.  And do you know how that appraisal came around?

24  A.  Can you say again, please.

25  Q.  Sure.  How did that appraisal come about?

1   A.  I don't recall the value.

2   Q.  No, no.  I didn't ask you the value --

3         THE COURT:  Did you order that new appraisal or did

4   somebody else?

5         THE WITNESS:  I do not order it.  I believe it was a

6   bank.

7         THE COURT:  Is this a natural break?

8         MR. BRAZE:  It is.

9         THE COURT:  Ladies and gentlemen, let's take the noon

10  recess.  It is noon.  Come back at 1:15.  We will finish with

11  this witness.

12        Please remember the admonition, don't discuss the

13  case, do any investigation.  Nothing.  See you at 1:15.

14        (The jury left the courtroom.)

15        THE COURT:  The jury has left.  Any issues, Counsel?

16        MR. HASSING:  No, your Honor.

17        MR. BRAZE:  No, your Honor.  It's just that we were

18  offering the appraisals as evidence on the gross income, gross

19  value.  That's what the appraisals show, the gross value of

20  the land with homes on them.

21        MR. HASSING:  The actual better evidence would be the

22  closing statements to show the actual gross revenues.

23        THE COURT:  That's the problem.  That was also the

24  problems with the questions with regard to the -- what were

25  your expectations.  You know, his expectations could have been

583

1    very low, they could have been very high, but his expectations

2    didn't help any more with the value of damages than appraisals

3    that don't pan out.

4            MR. BRAZE:  Well, we have a later appraisal, which I

5    will also show him.

6            THE WITNESS:  You have what?

7            MR. BRAZE:  We have a later appraisal, a 2008

8    appraisal, which I will also show him.

9            MR. HASSING:  It's the same problem though.  We have

10   to look at the sales to know what the revenue was.  Not what

11   was anticipated by an appraiser.

12           THE COURT:  What does he do when there haven't been

13   sales?  In other words, there are some lots that are still for

14   sale.  Are they worth nothing?

15           MR. HASSING:  Some houses?

16           THE COURT:  Yes.

17           MR. HASSING:  What we do there is we take a look at

18   the listing price to establish the maximum value if those

19   houses haven't sold at that listing price.  We can also take a

20   look at the price per square foot of recent houses in that

21   subdivision built by Mr. Wu that have sold to extrapolate into

22   a value per square foot on the remaining houses.

23           We can do that two different ways and average those

24   costs or values or what.  But to look at an '08 appraisal, and

25   now it is March of '10, would be irrelevant.

584

1          THE COURT:  Well, I'm not sure that that is

2     completely irrelevant.  I believe that the expectations at the

3     time that the purchase was made is of no relevance.  And I

4     believe that a very old appraisal, based on the general

5     conditions of the economy in the last couple of years, appear

6     to be irrelevant, but a more recent appraisal is not

7     irrelevant.

8          It may not be what you think, but it is not

9     irrelevant to the point of where it should be legally

10    excluded.

11         MR. HASSING:  It could be considered along with the

12    listing price and along with the per square foot price.

13         THE COURT:  Exactly.  So that's why I'm not saying

14    anything about your 2008 appraisal.

15         MR. BRAZE:  We are going to offer the 2008 appraisal

16    as evidence of a person's opinion in 2008, when, of course,

17    the market was not good, as to what the value of the 68 lots

18    with homes on them are.

19         THE COURT:  And --

20         MR. BRAZE:  And he can counter with whatever.

21         THE COURT:  Exactly.  See you at 1:15.

22         (The lunch recess was taken.)

23

24

25

585

1              AFTERNOON SESSION

2    1:15 p.m.

3              THE COURT:  All right.  Back on the record.  Counsel

4    are present.  Are we ready for the jury?

5              MR. BRAZE:  We will finish with Mr. Wu here within

6    the next 30 minutes probably.  Plan to recall Mr. McIntosh for

7    a short period, and then we would be through with any

8    plaintiff witnesses today until Mr. Merati first thing

9    tomorrow morning.

10             THE COURT:  So who is going to go?  Somebody ready

11   with witnesses?

12             MR. ALEXANDER:  Not really, your Honor.  We were

13   planning on starting tomorrow.

14             THE COURT:  Well, that's -- we would be giving away a

15   lot of time.

16             MR. ALEXANDER:  We don't want to give it away either.

17             MR. HASSING:  Your Honor, based on the time schedule

18   that was given to us, when we started this case, we

19   anticipated that they would be going through Thursday at

20   least, maybe even Friday.  And --

21             THE COURT:  Remember, there is no court Friday.

22             MR. HASSING:  I know.  We found that out that

23   morning.  We figured they would be going through Thursday

24   without a problem.  They have cut a lot of witnesses, and we

25   weren't advised of that until this morning.

1          And so a lot of us haven't spent the time that we are

2     going to need to prepare our witnesses.  We will be finished

3     by Tuesday night, Wednesday, no matter what happens tomorrow,

4     Thursday.

5          THE COURT:  That still doesn't give us good reason to

6     not move forward.  So who can go forward with a witness?

7          MR. HASSING:  You mean today?

8          THE COURT:  Today.  Sounds to me like you are going

9     to be done when?

10         MR. BRAZE:  I imagine maybe within an hour.

11         THE COURT:  So by 2:15 or 2:30.

12         MR. HASSING:  I only have one witness, and that would

13    be Mr. Wu, and I don't have any idea what I'm going to ask him

14    until I deposition Mr. Merati tonight, and he testifies

15    tomorrow.

16         THE COURT:  My question is who has a witness who can

17    go forward?  You are telling me why you can't.  I want to know

18    who can.

19         MR. ALEXANDER:  I think anybody can, your Honor.  The

20    question is are we going to do it in a way that is effective

21    for our clients.

22         THE COURT:  I'm not trying to push people so that

23    things are so out of order that it is unfair, and I understand

24    that part.  Isn't there someone we can put on this afternoon

25    and it wouldn't make any difference when they testify?

587

1          MR. ALEXANDER:  I can wing it with Mr. Gutierrez.  I
2    can do the best I can, your Honor.
3          THE COURT:  You think about it for the next 45
4    minutes or so and see if there is somebody you can't come up
5    with that we can put on and get done, okay?
6          Mr. Wu, retake the stand, please.
7          (The following proceedings were had in the presence
8          of the jury, to wit:)
9          THE COURT:  We are still on the record and the jury
10   has joined us.
11         Just so you know, ladies and gentlemen, we were
12   talking a few minutes ago about some scheduling issues, and
13   even though we are dealing with some scheduling issues, we are
14   doing fine on the time of trial.  The trial is not behind
15   based on the estimate we gave you.  So you should not be
16   concerned about that.
17         All right.  Go ahead.  Mr. Braze.
18         MR. BRAZE:  Thank you.
19   BY MR. BRAZE:
20   Q.  Now, Mr. Wu, I understand you have a Master of Science
21   degree in Mechanical Engineering?
22   A.  Yes.
23   Q.  And when did you receive that degree?
24   A.  I graduate Master in Mechanic Engineer in Tennessee Tech
25   University.

588

1    Q.   Yes, but what year was that?

2    A.   1978.

3    Q.   1978?

4    A.   '77.

5    Q.   '77?  And I take it you are a licensed contractor?

6    A.   Yes.

7    Q.   And in what areas are you licensed?

8    A.   General Contractor.

9    Q.   And do you have any other sub specialties that you are

10   licensed in?

11   A.   No.

12   Q.   Aren't you a plumbing contractor?

13   A.   Oh, yeah.  That's a subcontractor trade.

14   Q.   Sure.  What trades are you licensed in?

15   A.   Plumbing, electrical, HVAC and fire sprinkler.

16   Q.   And did you have to take a test for all of those?

17   A.   Yes.

18   Q.   And have you ever worked as a mechanical engineer?

19   A.   Say that again, please.

20   Q.   Have you worked as a mechanical engineer?

21   A.   Yes, I did.

22   Q.   For how long?

23   A.   I believe it was about three to four years.

24   Q.   What kind of work did you do?

25   A.   Design.  Designed the HVAC.

589

1   Q.   And the HVAC stands for "heating, ventilation and air

2   conditioning"?

3   A.   Yes.

4   Q.   Let me show you this appraisal from 2008.  It is Exhibit J

5   9.

6            MR. ALEXANDER:  9?

7            MR. BRAZE:  J 9.

8            MR. ALEXANDER:  Thank you.

9   BY MR. BRAZE:

10  Q.   This was requested by East West Bank, and that was a bank

11  that was doing some construction financing for you?

12  A.   Yes.

13  Q.   The date of that appraisal is June 25, 2008.  And it says

14  there the first, the market value of the 22 homes and 38

15  finished lots, as is, on June 3rd, 2008, is 3.85 million.  Do

16  you see that?

17  A.   Yes.

18  Q.   And that the aggregate value of the 22 homes, their

19  hypothetical assumption, was 4.485 million?

20  A.   Yes.

21  Q.   And the bulk market value of the 22 homes under the

22  assumption, again, is 3.1 million?

23  A.   Yes.

24  Q.   I notice this time they didn't estimate how much the value

25  of 68 homes would be; is that correct?

590

1   A.  Yes.

2   Q.  Okay.  Now, it's -- when you purchased the subdivision,

3   were you aware that the tract map had expired?

4   A.  Yes, I do.

5   Q.  When did you find that out?

6   A.  I believe my project engineer called City to find out.

7   Q.  So that's something you investigated before you bought the

8   property; is that correct?

9   A.  Yes.

10  Q.  In fact, Exhibit J 16 [sic] is a letter.  Is Sperry Van

11  Ness someone who worked for you?

12  A.  Yes.

13  Q.  It is a letter from the City of Wasco, looks like, from

14  Mr. McNamara to you, telling you that the Tract Map 5472 had

15  expired, correct?

16  A.  Yes.

17  Q.  Does it appear to you that you were attempting to use that

18  expired tract map and they said, no, you have to do a new

19  tract map?

20  A.  Yes --

21         MR. HASSING:  Objection.  Objection.  Misstates

22  testimony.

23         THE COURT:  On that ground, it is overruled.

24  BY MR. BRAZE:

25  Q.  So is that when you went -- is that when you called

591

1   Mr. McIntosh to ask if you could use his plans?

2   A.  No.

3   Q.  Do you have any recollection of whether it was before or

4   after you got this letter from the City of Wasco telling you

5   that the tract map was expired?

6   A.  I believe the broker, you know, informed us.  The real

7   estate broker, who bring this project to us to try to sell.

8   Q.  My only question was did you call Mr. McIntosh before you

9   received this July 7th, 2004 letter, or after?

10  A.  I don't recall the date of.

11  Q.  Thank you.

12          MR. ALEXANDER:  Exhibit number again one more time,

13  please?

14          THE COURT:  J 16.

15          MR. BRAZE:  116.

16          THE COURT:  Oh, 116, thank you.

17  BY MR. BRAZE:

18  Q.  Let me show you what has been marked as J 3.  Do you see

19  that, Mr. Wu?

20  A.  Yes.

21  Q.  And you can look at it, if you like, but these are the

22  closing statements for all of the homes that you have sold at

23  the Valley Rose Estates; is that correct?

24  A.  I believe this is only one house.

25  Q.  Sure.  Sure.  I mean there is one for each house, but

1    these are the closing statements.  Here's one for the house at

2    5614 St. Andrews Crescent, 1646 St. Andrews Crescent.

3             These are all the closing statements that shows what

4    the home sold for, how much you received, how much you paid to

5    the bank and that kind of thing?

6    A.   Yes.

7    Q.   And those are in evidence as Exhibit J 3.  Excuse the

8    delay.

9             Let me show you what has been introduced into

10   evidence as P 108.  And directing your attention to what looks

11   like page 3595, those are the --

12            MR. ALEXANDER:  Just one second, please.  Thank you.

13   BY MR. BRAZE:

14   Q.   -- plans for the sewage pump station.  And those go on for

15   a few pages.  Have you seen those before?

16   A.   I may see some, but not all of these pages.

17   Q.   And let me show you, again, in Exhibit P 108, starting

18   with page 3560, those are the landscaping plans for the Valley

19   Rose Subdivision.  And same question:  Have you seen those

20   before?

21   A.   I see some pages.

22   Q.   Okay.  Thank you.  Now, you asked DeWalt Engineering to

23   prepare a tentative tract map for you, which is Exhibit J 134,

24   and also a final tract map, which is Exhibit J 127.  Have you

25   seen those before?

1   A.  Yes, I do.

2   Q.  When did you see them, at or about the time that DeWalt

3   finished them?

4   A.  Yes.  Around that time.

5   Q.  And what did you do with the tract maps?

6   A.  We asked the DeWalt Engineer to prepare a tentative map

7   and grading for submitting to the City Planning Department for

8   approval.

9   Q.  And did they -- did someone tell you that you could start

10  building homes?

11  A.  No.

12  Q.  How did you know when to start building homes?

13  A.  In order for me to start building homes, I need to get a

14  final map to recording and accept the offsite improvement.

15  Q.  What do you mean, "accept the offsite improvements"?

16  A.  What I mean is that the City would be inspecting, you

17  know, infrastructure, sidewalk, curb and gutters, street, and

18  streetlights, driveway approach, those infrastructure got to

19  be completed and accepted by the City.

20  Q.  I thought you told us this morning that they had not yet

21  accepted the improvements?

22  A.  I said it was a partial was accepted.

23  Q.  What part was accepted?

24  A.  The home we already build, the 30 home.

25  Q.  The what?

594

1    A.   The 30 homes we built.

2         THE COURT:   The 30 homes we built.

3    BY MR. BRAZE:

4    Q.   What was accepted?

5    A.   Accepted, all the sidewalk, curb and gutter, driveway,

6    driveway approach.

7    Q.   So has the sewer and water system been accepted?

8    A.   Yes.

9    Q.   So what is it that hasn't been accepted?  Because the

10   people from the City of Wasco said it hasn't been accepted.

11   A.   The other that has not been accepted relates to

12   landscaping and stuff, and also on building 38 finished lots

13   that relate to the concrete, the minor repair.

14   Q.   The 38 finished lots?

15   A.   Yes.

16   Q.   So still more concrete repair to the 38 finished lots?

17   A.   Need to be, yes.

18   Q.   So when did you start building homes?

19   A.   Excuse me, when?

20   Q.   When did you start building homes?

21   A.   I believe it was 2007, after the final recording.

22        MR. BRAZE:  That's all I have of this witness, your

23   Honor.

24   ///

25   ///

1                    CROSS-EXAMINATION

2   BY MR. HASSING:

3   Q.  Mr. Wu, you recall early in your, I guess

4   cross-examination here by Mr. Braze, he asked you about a

5   passage in your deposition where you talked about buying one

6   or two or three incompleted subdivisions that had been

7   sitting; do you remember that?

8   A.  Yes.

9   Q.  And you indicated that, "I clean up."  Do you remember

10  that?

11  A.  Yes.

12  Q.  What did you mean by that statement?

13  A.  What I tried to explain to the counsel is that the

14  subdivision has been sit over there for so many years that we

15  need to do a lot of cleanup, especially, you know, in the

16  subdivision, weeds grow up and the concrete is real dirty and

17  those kind of stuff.

18          MR. HASSING:  Thank you, Mr. Wu.

19          THE COURT:  Any questions, Mr. Alexander?

20          MR. OKADIGBO:  No questions.

21          THE COURT:  Any further questions?

22                  REDIRECT EXAMINATION

23  BY MR. BRAZE:

24  Q.  So when you told me you were going to clean up, are you

25  still cleaning up?  Are you still fixing it?

MCINTOSH

596

1   A.   Yes.

2   Q.   So you are still cleaning up?

3   A.   So far, yes, for any unbuilt, finished out.

4   Q.   You bought it in 2004 to clean up, and it is 2010?

5   A.   Yes, as long as the weeds are growing up, we are obligated

6   to clean up.

7            THE COURT:  Anything else?

8            MS. BARNES:  No, thank you, your Honor.

9            THE COURT:  Mr. Braze?

10           MR. BRAZE:  Recall Mr. McIntosh for a few.

11                        **ROGER MCINTOSH,**

12   called as a witness on behalf of the Plaintiff, having been

13   previously sworn, testified as follows:

14           THE COURT:  You are still under oath.  You need not

15   be resworn.

16                     DIRECT EXAMINATION

17   BY MR. BRAZE:

18   Q.   Just a few items, cleanup items on that matter of some

19   economic issues.  The work that was done by your company, or

20   excuse me, by your firm in the 1992, '93, '94, what was your

21   average hourly rate that that work was performed at?

22   A.   The average hourly rate in 1992 was about $72 per hour,

23   per man-hour.

24   Q.   And what is your present average hourly rate?

25           MR. HASSING:  Your Honor, I would object.  This is

1    beyond the scope of cross.

2            MR. OKADIGBO:  Objection also on grounds of

3    relevance.

4            THE COURT:  I think he is recalling him, I'm taking

5    that as an implied motion to reopen.  Is there an objection

6    with regard to that?

7            MR. HASSING:  I have no objection to reopening if

8    that's what it is he is doing.

9            THE COURT:  Is that what you are doing?

10           MR. BRAZE:  Yes.

11           THE COURT:  All right.

12   BY MR. BRAZE:

13   Q.  What's your present average hourly late?

14           MR. OKADIGBO:  Objection, relevance.

15           THE COURT:  Sustained as it relates to today, which

16   is what the pending question is.

17           MR. BRAZE:  Goes to the issue of present worth, your

18   Honor.

19           THE COURT:  Present worth?  Well, I don't think we

20   are dealing with today, are we?

21           MR. BRAZE:  Well, I think we are.

22           THE COURT:  Objection is sustained.

23           MR. BRAZE:  I guess what day would you like?

24           THE COURT:  Well, it is not a matter of what I like.

25   It is a matter of what is relevant, and the issue is the times

1    that were involved with this case, and today is not one of

2    them.  He is not doing any work today.  Nobody is.

3              MR. BRAZE:  We can discuss that outside the presence

4    of the jury.

5              THE COURT:  That's right.

6              MR. BRAZE:  I thought that issues had to be expressed

7    in present value.

8              THE COURT:  The definition of presence is dealing

9    with the other evidence in the case as to what the definition

10   of presence is.  That's the problem.

11             MR. BRAZE:  Okay.  Can I elicit evidence from him as

12   to his hourly rate by year?

13             THE COURT:  Go right ahead and see if there is an

14   objection, and I will rule.

15   BY MR. BRAZE:

16   Q.  How about in 1994, what was your hourly rate?

17             THE COURT:  What year?

18             MR. BRAZE:  '94.

19             THE COURT:  $72 per man-hour.

20             MR. BRAZE:  I thought he said 1992, but I may have

21   been wrong.

22             THE WITNESS:  I stated in 1992, it was around $72 per

23   hour.

24             THE COURT:  My recollection is the question was:

25   Between 1992 and 1994, what was your rate?

MCINTOSH

599

1       And I thought you said $72 per man-hour.  Is that not

2   correct?  Did it change during that period of time?

3       THE WITNESS:  Our rates change every year.

4       THE COURT:  Okay.  Go ahead.

5   BY MR. BRAZE:

6   Q.  Okay.  And I think the last year you worked on this

7   project was 1994?

8   A.  About that time, yes.

9   Q.  Did you have an indication of how your rates changed from

10  1992 to 1994?

11  A.  They probably went up five to 10 percent per year.

12  Q.  And have you maintained that pattern of raising them five

13  to ten percent a year?

14  A.  I couldn't hear the question.

15  Q.  Have you maintained that pattern of raising them five to

16  ten percent a year?

17      MR. HASSING:  Objection, relevance.

18      THE COURT:  You are going to have to be more limiting

19  in your question to have it be relevant.  Sustained.

20  BY MR. BRAZE:

21  Q.  Since 1994, have you increased your hourly rates 5 to 10

22  percent per year?

23      MR. HASSING:  Objection, relevance.

24      THE COURT:  Sustained.  That's the same question.

25  That would bring it up today, and it is not relevant today.

1   BY MR. BRAZE:

2   Q.   Have you reviewed the Developer Information Package which

3   is, I believe it is J 10?

4   A.   I've briefly looked through it.  I haven't reviewed it in

5   detail.

6   Q.   And you heard the testimony that this is the package that

7   the City of Wasco sent out to all of the interested developers

8   in order to get them to bid on the purchase of the Valley Rose

9   Subdivision?

10           MR. HASSING:  Objection, misstates testimony.

11           THE COURT:  I don't think the testimony was that

12   specific, so sustained.

13   BY MR. BRAZE:

14   Q.   Well, let's take a look at the Developer Information

15   Package that Mr. Wu received before he bought the Valley Rose

16   Subdivision.  Is any of your drawings or maps contained within

17   that Developer Information Package, that which was put out by

18   the City of Wasco?

19   A.   Yes.

20   Q.   And what is contained in there that was your product?

21   A.   The Revised Tentative Parcel Map 9572, Revised Tentative

22   Tract Map 5472, and Tentative Tract Map Number 5618.  I

23   believe that's all.

24   Q.   Okay.  And did the City of Wasco ask your permission

25   before they circulated that information?

1   A.   No.

2   Q.   Let me take one more stab at this.  Do you have any

3   estimate as to what your hourly rate was in the year 2004?

4            MR. HASSING:  Objection, your Honor, relevance.

5            THE COURT:  Overruled.

6            THE WITNESS:  2004, our hourly rates probably

7   increased approximately 200 percent from 1992.

8   BY MR. BRAZE:

9   Q.   So that would be $150 or -- that's a hundred percent.

10  225?

11  A.   They doubled.  Probably around a $150 an hour.

12           MR. BRAZE:  Thank you.

13           THE COURT:  Cross-examination?

14                     CROSS-EXAMINATION

15  BY MR. HASSING:

16  Q.   Mr. McIntosh, you indicated that Map 9572, which is the

17  overall parcel map, was included in the City's Development

18  Information Package?

19  A.   It's in this one.

20  Q.   Yes.  And that map, by that time, had been recorded with

21  the Kern County, had it not?

22  A.   That's correct.

23  Q.   And that map then was public record, public information,

24  right?

25           MR. TRAVIS:  Objection.  Calls for legal conclusion.

MCINTOSH X

602

1          MR. HASSING:  Your Honor, I believe this witness had
2     testified --
3          THE COURT:  I understand.  The objection is overruled
4     because of his prior testimony.  It's fair cross-examination.
5          THE WITNESS:  The question Mr. Braze asked me --
6     BY MR. HASSING:
7     Q.  I'm asking you, sir, if in fact 9572, having been recorded
8     with the Kern County Recorder's Office, was not public
9     information at the time that that manual was put together?
10          MR. BRAZE:  I think you misstated yourself.
11          THE COURT:  I do too.  Just repeat your question.
12     BY MR. HASSING:
13     Q.  I'm asking you, sir, if Parcel Map 9572, having been
14     recorded with Kern County Recorder's Office, was not public
15     record -- let me rephrase that.
16          Isn't it a fact, sir, that after having recorded 9572
17     with the Kern County Public Recorder's Office, or Recorder's
18     Office that that map had become a public record?
19     A.  Absolutely.
20          MR. HASSING:  Thank you, sir.
21          THE COURT:  Mr. Alexander?
22          MR. ALEXANDER:  I don't think so.  Thank you, your
23     Honor.
24          MR. OKADIGBO:  No questions.
25          THE COURT:  Redirect?

603

1          MR. BRAZE:  None.

2          THE COURT:  Thank you, sir.  You may step down.

3          Mr. Braze, your position?

4          MR. BRAZE:  We are through with witnesses for the

5     today, your Honor.  We will have one witness tomorrow morning,

6     and we will rest.

7          THE COURT:  Ladies and gentlemen, could I have just a

8     few minutes with counsel and talk about this afternoon and

9     then I will bring you right back.  Please don't discuss the

10    case.  Won't be but just a few minutes.

11         (The jury left the courtroom.)

12         THE COURT:  The jury has left.  On the defense side,

13    what's your position?

14         MS. BARNES:  Your Honor, with respect to the City, we

15    have just had our entire witness list called, and the status

16    is in order to try to solicit someone for this afternoon, the

17    status is that we could not reach one witness.

18         The second witness was discussed at the beginning of

19    trial, and he is with his wife today at the hospital, where

20    she gets her weekly medical treatment.

21         The other witnesses are in Bakersfield, and we don't

22    think they can get here in time.  They didn't think they could

23    make their arrangements and get here in time for trial today.

24         So that's, essentially, our current status.

25         We understand the Court's position.

1          THE COURT:  Okay.

2          Mr. Alexander?

3          MR. ALEXANDER:  Again, your Honor, my concern is the

4   preparation because of the estimates provided by plaintiff's

5   counsel.  It's put me at a disadvantage.  I can wing it if the

6   Court orders me to do so and I will do my best.

7          THE COURT:  No, I'm not going to order you to do

8   that.

9          MR. ALEXANDER:  I have Mr. Gutierrez here, but I

10  don't have exhibits I'm going to use with him prepared, so it

11  would be a very loosy goose examination, and I don't know if

12  that's in his interest.

13         THE COURT:  Okay.

14         MR. HASSING:  Your Honor, if forced to, or if I had

15  to, or if the Court wished me to, I could put Mr. Wu on for

16  some testimony, but I couldn't do it all because I haven't

17  deposed Merati, which I'm going to do tonight.

18         And tomorrow, I will be able to, after Merati

19  testifies, I will be able to finish up with Joe.  But I could

20  start with Joe.  I can't do more than probably 30 or 40

21  minutes with him.

22         THE COURT:  Okay.  If that doesn't compromise your

23  case, let's do what you can do so that we don't waste the

24  time.

25         MR. HASSING:  All right.

1        THE COURT:  And when you are done, you are done.

2        MR. ALEXANDER:  Your Honor, looking forward, for

3   scheduling, tomorrow I can be ready to go with our case, and I

4   know we are starting a hair later.

5        THE COURT:  9:45.

6        MR. ALEXANDER:  But I can tell you that my case isn't

7   going to take a day.  It is going to take somewhere between

8   probably two to four hours.

9        THE COURT:  Okay.

10       MR. ALEXANDER:  That's it.

11       THE COURT:  All right.

12       MR. HASSING:  Your Honor, one last thing, to the

13   extent that I, in my rush here have forgotten to ask something

14   of Joe that does not relate to Merati's rebuttal, I would ask

15   to be allowed to go into that.

16       THE COURT:  That's not going to be a problem.

17       MR. HASSING:  Thank you.

18       THE COURT:  Anything else?

19       All right.  We are ready for the jury.

20       (The following proceedings were had in the presence

21       of the jury, to wit:)

22       THE COURT:  All right.  The jury has again joined us.

23       Ladies and gentlemen, what we are going to do is the

24   witness that we were talking about, the last witness for the

25   plaintiff, is tomorrow morning, he is scheduled.

1        And we are trying to accommodate people's -- their

2    schedules.  And that's why we are going to now call Mr. Wu out

3    of order, in other words, Mr. Hassing is going to call Mr. Wu

4    in his case-in-chief, and he is going to examine on certain

5    things, but we are not going to finish with Mr. Wu this

6    afternoon because there are a couple of other things that have

7    to happen before Mr. Wu will be in a position to continue and

8    finish his testimony.

9        That said, my estimate is that we have probably

10   another hour of testimony here with Mr. Wu.  Then counsel and

11   I can do a few things that don't require you, such as talk

12   about some jury instructions and the verdict form.  We won't

13   be wasting time.  That has to be done at some point in trial

14   in any event.

15       And tomorrow morning, just so you know, I have 12 or

16   14 matters on, starting at 8:00 a.m.  I'm confident I can be

17   done with them at 9:45, and that's the time I will ask you to

18   be in the jury room tomorrow morning.  You can sleep in a

19   little.

20       Any questions?

21       Okay.  Mr. Hassing, you are going to call Mr. Wu

22   back?

23       MR. HASSING:  Yes, I would, your Honor.

24       THE COURT:  Mr. Wu, you are still under oath, so you

25   can take the witness stand again.

607

1          THE WITNESS:  Yes.

2          THE COURT:  Thanks.

3                         **JOE WU**,

4    called as a witness on behalf of the Defendants, having been

5    previously sworn, testified as follows:

6                    DIRECT EXAMINATION

7    BY MR. HASSING:

8    Q.   Good afternoon again, Mr. Wu.  I heard you testify earlier

9    that at some point, you received at least part of the

10   landscaping plans that had been prepared by Mr. McIntosh; do

11   you recall that?

12   A.   Yes.

13   Q.   Did you use those landscaping plans for anything?

14   A.   No.

15   Q.   Did you make any copies of those landscaping plans?

16   A.   No.

17   Q.   Did you give whatever it was you received, what portion of

18   those landscaping plans you received, did you give them to

19   anybody else?

20   A.   No.

21   Q.   Let's talk about the pump station for just a moment.  At

22   some point in time, you received plans for the pump station;

23   is that correct?

24   A.   Yes.

25   Q.   Had you asked anybody for those plans?

1   A.   I may.

2   Q.   All right.  And do you recall why it was that you asked

3   for a copy of the plans?

4   A.   Well, the City asked me to test the pump station, and we

5   were facing the difficulty that pump station have a problem,

6   cannot function.  So we were looking for some print.

7   Q.   Okay.  Do you recall what was wrong with the pump station

8   that it would not function?

9   A.   Well, we find out it's the flow switch, the one that

10  control.

11  Q.   And can you explain to the jury and to me what a flow

12  switch is?

13  A.   Well, usually, a pump lift station, they usually have a

14  high level and low level switch to control the flow to avoid

15  overflow, so that's why the flow switch function for.

16  Q.   And did you have the plans at the time you figured out

17  that the flow switch was not working?

18  A.   No.  I don't have plans.

19  Q.   Did you obtain a copy of the plans in hopes of being able

20  to figure out how to fix the flow switch?

21  A.   Originally, I tried to find it from the map and see if

22  have anything wrong, but in the end, we don't need a plan

23  because the flow switch has nothing to do with the plan.

24  Q.   So let me back up a second.  Did you obtain the plan

25  before you found out that the problem was the flow switch or

609

1  after you found out the problem was the flow switch?

2  A.  Before.

3  Q.  So you had a set of plans.  Did you go to the pump station

4  or did you send somebody else?

5  A.  I sent somebody else.

6  Q.  One of your employees?

7  A.  Yes.

8  Q.  Did you learn then, at some point, that the problem was

9  the flow switch?

10  A.  Yes.

11  Q.  Did you look at those plans, then, to try to figure out if

12  you could use those plans to repair the flow switch?

13  A.  Yes.

14  Q.  And were you able to repair the flow switch by reference

15  to the plans?

16  A.  Well, we don't need the plan to fix the flow switch.

17  Q.  Well, tell me why.

18  A.  Because the flow switch is the one that actually is not

19  shown in the drawing.

20  Q.  Okay.  So you are saying that the flow switch itself was

21  not shown on Mr. McIntosh's drawing?

22  A.  Yes.

23  Q.  Would it be correct to assume, then, that you didn't use

24  Mr. McIntosh's drawing to fix the flow switch?

25  A.  Yes, that's correct.

610

1   Q.  Did you use the drawings for the pump station for any
2   purpose then?
3   A.  No.
4   Q.  Now, you testified that prior to purchasing the land, you
5   learned that Tentative Map 5472 had expired; is that correct?
6   A.  Yes, I believe so.
7   Q.  So when you bought the land from the City, did you then
8   already know that the map that Mr. McIntosh had prepared could
9   not be used by you?
10  A.  Yes, I do.
11  Q.  Did you ever try to use Revised 5472 for any purpose?
12  A.  No.
13  Q.  Did you ever tell DeWalt to copy it?
14  A.  No.
15  Q.  Did you ever tell DeWalt to copy anything?
16  A.  No.
17  Q.  Have you ever copied anybody else's work?
18  A.  Never.
19  Q.  Now, when you hired DeWalt, did you know that they were
20  licensed engineers?
21  A.  Yes.
22  Q.  As they did their work, did you tell them how to do their
23  work?
24  A.  No.
25  Q.  Did you give Mr. Gutierrez any pointers on how to do his

611

1   survey?

2   A.   No.

3   Q.   Did you give Mr. Black or any of his people any ideas on

4   the best way to draft a tentative map?

5   A.   No.

6   Q.   Did you tell them how to do anything with regard to their

7   work for you?

8   A.   No.

9   Q.   Now, your profession is land development and building

10  homes and selling homes, correct?

11  A.   Yes.

12  Q.   And you have been doing that for 20 or 30 years?

13  A.   Yes.

14  Q.   All right.  Back in 2004, there were certain market

15  conditions that existed in the Central Valley, in the Wasco

16  area, correct?

17  A.   Yes.

18  Q.   Did you consider that those market conditions were

19  favorable to developing, building and selling homes at that

20  time?

21  A.   Yes.

22  Q.   Is that why you bought that subdivision?

23  A.   Yes.

24  Q.   And was one of the main reasons you bought that

25  subdivision that the -- all of the infrastructure had already

1  been built?

2  A.  Yes.

3  Q.  Have you noticed any change in the market conditions

4  between the time you bought the land in 2004, and the time you

5  started building houses, in 2007?

6  A.  Yes.  The economy is upside down now.  And since the

7  economic depression, the market value of the home has been

8  completely, you know, slide down the hill, so the price is

9  almost 50 percent or 60 percent less than the 2004 market

10  value on the home.

11  Q.  So between 2004 and 2007, did the market decrease, the

12  market for new homes?

13  A.  No.  The market in 2004 to 2006 is the peak of the market

14  value.

15  Q.  So 2006 was the top, as far as your experience in selling

16  houses in the Central Valley?

17  A.  Yes.

18  Q.  And between 2006 and 2007, the market began to decline?

19  A.  Yes.

20  Q.  And you actually started building those houses sometime in

21  2007?

22  A.  Yes.

23  Q.  All right.  Did you have any houses completed that you can

24  recall in 2007?

25  A.  Yes.  Yeah, we sold -- we built and sold houses on 2007.

613

1   Q.  All right.  Let's talk for a moment about the kind of

2   houses you were building out there in Wasco.  How many

3   different models do you have out there?

4   A.  Six model.

5   Q.  You have got six models?

6   A.  Yes.

7   Q.  And how -- do they have numbers or names?

8   A.  Yes, we go by number, referred to as "square footage."

9   Q.  So what is the smallest house you are building out there?

10  A.  1440.

11  Q.  What's the next one?

12  A.  1580.

13          MR. HASSING:  Everybody see that?

14  BY MR. HASSING:

15  Q.  What's the next size?

16  A.  1670.

17  Q.  Now, these are all the numbers that you referred to, but

18  they are also the square footage of each house, right?

19  A.  Yes, that's correct.

20  Q.  What's the next one?

21  A.  Next one is a two-story house, 1897.

22  Q.  And that's a two-story?

23  A.  Yes.

24  Q.  All right.  I will put a little "two" there.  What's the

25  next one?

614

1    A.   2239.

2    Q.   Next?

3    A.   2408.

4    Q.   Are these two-stories?

5    A.   Yes, that's correct.

6    Q.   So I will put a little "two" there.  And one more?

7    A.   No, that's all.

8    Q.   Okay.  That's six, all right.  And you were able to sell

9    some of these houses in 2007?

10   A.   Yes.

11   Q.   And I believe J 3 is an exhibit that consists of all of

12   your 19 closing statements; do you recall that?

13   A.   Can I see it?

14   Q.   Do you have J 2 up there?

15        MR. ALEXANDER:  3.

16   BY MR. HASSING:

17   Q.   Do you have a book that says -- right here.

18        Are you looking at J 3?

19   A.   Yes, yes.

20   Q.   And the first house there that you sold -- well, maybe not

21   the first house you sold, but the first document on J 3 has a

22   date of October 30th, 2007, when you closed 5604 St. Andrews

23   Crescent; do you see that?

24   A.   Yes.

25   Q.   What was the total, the gross sales price of that home?

615

1   A.  I think it is $339,950.

2   Q.  What model was that?

3   A.  I don't recall.

4   Q.  Do you have any -- you don't recall what model that was?

5   A.  I believe I see the outlying corner say "Number 1."

6   Number 1, I believe, was a 2239 model.

7   Q.  This Number 1 in the top right-hand corner --

8           THE REPORTER:  Wait.

9           THE COURT:  Wait, wait.

10          THE WITNESS:  I see the right hand upper corner say

11  "Number 1."  I believe it means Lot 1.

12  BY MR. HASSING:

13  Q.  We are looking at that now on the Elmo, and you see the

14  number that's been written on that closing statement at the

15  right-hand top corner.  That Number 1, is that what you are

16  referring to?

17  A.  Yes.

18  Q.  And so you believe that relates to Lot Number 1?

19  A.  Yes.

20  Q.  All right.  The houses that you sold out there -- strike

21  that.

22          So Lot Number 1, do you know what model was built on

23  Lot Number 1?

24  A.  I believe it is 2239 model.

25  Q.  So we have $339,950 sold in October of '07; is that

616

1   correct?

2   A.   Yes.

3   Q.   The next page has a "2" at the top of it.  Do you think

4   that that's Lot 2?

5   A.   Yes.

6   Q.   And do you know what model that was?

7   A.   I don't recall.

8   Q.   Alrighty.  I guess that's one of the things that --.

9         You sold this in April 27th, 2007?

10  A.   Yes.

11  Q.   And the purchase price was $309,950?

12  A.   Yes.

13  Q.   Okay.  Do you have any documents here with you today that

14  would tell you what models were built on what lots?

15  A.   Yeah, I may be able to find the data.

16  Q.   You may be able to find it where?

17  A.   Later, in my documents.

18  Q.   Okay.  Not here in the courtroom, though?

19  A.   No.

20  Q.   You will look for that tonight?

21  A.   Yes.

22  Q.   All right.  Let's take a look at the next page, Mr. Wu,

23  the third page in that binder.  And it looks like it has a

24  closing date of December 9, 2009; do you see that?

25  A.   Yes.

617

1    Q.  And the price was 160,000?

2    A.  Yes.

3    Q.  Does that look like Lot 4?

4    A.  Yes.

5    Q.  Do you know what model that was?

6    A.  1440.

7    Q.  $160,000.  And that was December of '09.

8            Can everybody see that?

9            Now, have you sold other 1440 models in that

10   development?

11   A.  So far, still don't have any one closing.

12   Q.  This is the first 1440 you ever sold at any time in Wasco?

13   A.  Yes, we do have another sold.

14   Q.  How many 1440's have you sold in Wasco?

15   A.  Well, I don't recall how many, but a few.

16   Q.  All right.

17   A.  Yes.

18   Q.  Did the -- do you know when the others sold?

19   A.  I know I have some sold in the last couple, '07 and '08.

20   Q.  Do you know what they sold for?

21   A.  I don't recall now.

22   Q.  Why don't you look in your book there and see if you can

23   find the closing statements for any more 1440's?  Are you

24   having trouble recognizing a 1440 from the closing statement?

25   A.  I think I can provide tomorrow.

618

1   Q.  Let's move to something else.  Let's take a look at some

2   other sales in '09.  Take a look at Lot 9.

3   A.  Yes.

4   Q.  Lot 9 sold for $188,850, February 20th of '09, about a

5   year ago.  Do you recall what model that was?

6   A.  I believe this one is 1670 model.

7   Q.  What makes you think that?

8   A.  Because I knew it was a corner lot.

9   Q.  Okay.  Here's one.  Lot 10 is October 16th of 2009, that

10  you sold for 160,000.  Do you know what model that is?  You

11  sold that to Miguel Ruiz.

12  A.  I know it is one-story home, but I don't recall its square

13  footage.  More likely, maybe it is 1580.

14  Q.  Well --

15  A.  I need to double-check.

16  Q.  Here is a Lot 13, sold March 10th, 2009, for 220,000.  Do

17  you know what model that was?

18  A.  I don't recall.

19          THE COURT:  Mr. Hassing, am I putting you at a

20  disadvantage by making you go forward with this?

21          MR. HASSING:  Well, as I explained to the Court, I

22  hadn't prepared Mr. Wu for this, and so I probably look a

23  little unorganized up here.

24          But I will tell you this, your Honor, if he could

25  make a phone call to his office, I'm sure he could get all

1    those models and we could proceed with an analysis of what the

2    homes have been selling for in 2009 and 2008, if that would

3    move this thing along.

4              THE COURT:  Well, I'm wondering if maybe the time

5    would be better spent, if he wishes to do that, maybe prepare

6    a chart, and then adopt the chart in the morning.

7              MR. HASSING:  That would be excellent.

8              THE COURT:  I think, in all fairness, it's probably

9    better to do that.

10             MR. HASSING:  Yes.

11             THE COURT:  And it would be more efficient with the

12   time, even though --

13             MR. ALEXANDER:  My only comment was I think the jury

14   should be aware, too, because they should know a little bit

15   about what we are doing.

16             MR. HASSING:  I was going to suggest that.

17             THE COURT:  Ladies and gentlemen, what we are trying

18   to do is we are trying to make sure that the time is not

19   wasted, that's what we are really trying to do.  And there

20   have been decisions along the way here, and some of our

21   meetings outside your presence when we have been talking about

22   legal issues, that have actually sped the trial along and made

23   it not necessary to call certain witnesses.

24             And so that's why I was saying that time is -- our

25   time estimate is not off.  I don't want you to think that

1    there have been some delays here and there and this will

2    extend the trial.  Actually, what it was doing was it was

3    doing the opposite; it was speeding the trial along.

4          Having done that and said that, counsel on both sides

5    of the case do their best to make sure that we don't waste

6    time, that we do move things along.  But sometimes things move

7    along at a clip where certain witnesses are subpoenaed at

8    certain times and, because of that, they don't go through

9    their documents and the like.  And that's what we are doing.

10         It's not a matter of counsel not being prepared.  It

11   is a matter of moving things along so quickly that it threw

12   off the schedule.

13         So what I think I'm going to do now is this.  I'm

14   going to allow you to go and come back tomorrow morning at

15   9:45.  We will have a full day when you come tomorrow morning

16   and we will, as I say, we will be prepared for you.  And then

17   rather than just stretch this out and then have to revisit all

18   of this tomorrow morning, that's a waste of time, yours and

19   ours.  And so we are going to do something else with regard to

20   the case while you are gone that doesn't require your

21   appearance.

22         So I'm going to ask you again, I know that about now,

23   as I'm giving you these instructions about not -- certain

24   things you should not do, it is about now, you are lipping

25   them back to me.  You know what I'm going to say.  But I still

1  have to keep giving them to you because they are that

2  important and the law requires me to do that.

3          So even though they are becoming a little bit rote at

4  this point, it's still very, very important.  So please

5  remember the impact of the statement of not doing anything

6  between now and when you come back.  Nothing.  Talking,

7  Googling, researching, all of that is strictly prohibited and

8  I ask you, please, don't do that.

9          Any questions that you might have?

10         Okay.  Then we will see you tomorrow morning in the

11 jury room, ready to go, at quarter to 10:00.  We will be done

12 with our 12 or 13 cases in the morning before you got here,

13 and then we will move forward with this case.  See you in the

14 morning.

15         (The jury left the courtroom.)

16         THE COURT:  All right.  I'm not real sure that there

17 is anything to accomplish except getting prepared for tomorrow

18 and moving things along when we get here tomorrow.

19         Does everybody agree?

20         MS. BARNES:  Yes.

21         MR. HASSING:  Agreed.

22         MR. ALEXANDER:  Yes, your Honor.

23         MR. HASSING:  We are going to start with Merati in

24 the morning, right?

25         THE COURT:  That's what your intent is, right?

622

1          MR. BRAZE:  Yes.

2          THE COURT:  9:45.

3          MR. ALEXANDER:  And Pennell is off, so that's your

4  last?

5          MR. BRAZE:  We are going to rest.

6          MR. ALEXANDER:  I would be happy to pick it up from

7  there, your Honor.

8          THE COURT:  Totally up to your side.  Makes no

9  difference.

10         MR. ALEXANDER:  We will talk about it.

11         THE COURT:  That's fine.

12         I think this.  Tomorrow morning, we do have numerous

13  criminal cases, and I'm not going to make you clean up

14  everything so it looks like we are not in trial; we are in

15  trial.  So if I could just ask you, if you could just make a

16  little room for counsel for tomorrow.  They don't need to

17  spread out.  They are not in trial.

18         We are doing things like taking changes of plea,

19  doing some sentencings and those types of motions, but it is

20  not paper-intensive tomorrow morning.

21         Just, if you could, perhaps move some of your

22  documents up toward the top of the table, nobody is going to

23  be doing anything with your exhibits or anything else.  We can

24  leave them.

25         We will see you in the morning, 9:45.

623

1          (The proceedings were adjourned at 2:18 p.m.)

2

3          I, PEGGY J. CRAWFORD, Official Reporter, do hereby

4     certify the foregoing transcript as true and correct.

5

6   Dated:  03/24/2010                  /s/ Peggy J. Crawford
                                        PEGGY J. CRAWFORD, RDR-CRR
7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25