624

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

HON. LAWRENCE J. O'NEILL


ROGER McINTOSH,                    )
                                   )   1:07-cv-1080 LJO
          Plaintiff,               )
                                   )   JURY TRIAL, DAY 4
     vs.                           )
                                   )
NORTHERN CALIFORNIA                )
UNIVERSAL ENTERPRISES              )
COMPANY, a California              )
corporation, et al.,               )
                                   )
          Defendants.              )
_____)

Fresno, California                 Thursday, March 4, 2010


           REPORTER'S TRANSCRIPT OF PROCEEDINGS










Vol. 4, pgs. 624 to 798, inclusive


REPORTED BY:  PEGGY J. CRAWFORD, RDR, CRR, Official Reporter

625

APPEARANCES OF COUNSEL:

For the Plaintiff:                LAW OFFICES OF BORTON PETRINI, LLP
                                  5060 California Avenue
                                  Suite 700
                                  Bakersfield, CA  93309
                                  BY:  **JAMES J. BRAZE**
                                       **JEFFREY A. TRAVIS**


For the Defendants:

(Northern/Lotus)                  LAW OFFICES OF STEVEN J. HASSING
                                  425 Calabria Court
                                  Roseville, CA  95747
                                  BY:  **STEVEN J. HASSING**

(DeWalt)                          ALEXANDER & ASSOCIATES, PLC
                                  1925 G Street
                                  Bakersfield, CA  93301
                                  BY:  **WILLIAM L. ALEXANDER**

(City of Wasco)                   GCR, LLP
                                  520 South Grand Avenue
                                  Suite 695
                                  Los Angeles, CA  90071
                                  BY:  **CHAKA C. OKADIGBO**
                                       **SUSAN GRAHAM BARNES**

626

## INDEX

**PLAINTIFF'S WITNESSES**:

| | |
|---|---|
| **JUBIN MERATI** | 630 |
| DIRECT EXAMINATION BY MR. BRAZE | 630 |
| VOIR DIRE EXAMINATION BY MR. HASSING | 653 |
| FURTHER DIRECT EXAMINATION BY MR. BRAZE | 655 |
| CROSS-EXAMINATION BY MR. HASSING | 661 |
| CROSS-EXAMINATION BY MR. ALEXANDER | 701 |
| REDIRECT EXAMINATION BY MR. BRAZE | 711 |
| RECROSS-EXAMINATION BY MR. ALEXANDER | 714 |

**DEFENDANTS' WITNESSES**:

| | |
|---|---|
| **LARRY PENNELL** | 718 |
| DIRECT EXAMINATION BY MR. OKADIGBO | 719 |
| **DENNIS MCNAMARA** | 727 |
| DIRECT EXAMINATION BY MR. OKADIGBO | 727 |
| CROSS-EXAMINATION BY MR. TRAVIS | 737 |
| CROSS-EXAMINATION BY MR. ALEXANDER | 743 |
| REDIRECT EXAMINATION BY MR. OKADIGBO | 744 |
| RECROSS-EXAMINATION BY MR. TRAVIS | 745 |
| **JAMES ZERVIS** | 746 |
| DIRECT EXAMINATION BY MR. OKADIGBO | 747 |
| **JAMES ZERVIS** | 759 |
| DIRECT EXAMINATION BY MR. ALEXANDER | 759 |
| **JEFFREY GUTIERREZ** | 759 |
| DIRECT EXAMINATION BY MR. ALEXANDER | 760 |
| CROSS-EXAMINATION BY MR. BRAZE | 784 |
| CROSS-EXAMINATION BY MR. OKADIGBO | 792 |

### EXHIBITS

| **PLAINTIFF'S** | Marked |
|---|---|
| J 134-A | 798 |

| **PLAINTIFF'S** | Received |
|---|---|
| P 111 | 638 |
| P 112 | 655 |
| P 113 through P 115 | 660 |

| **DEFENDANTS'** | |
|---|---|
| 226-A | 769 |

627

1   Thursday, March 4, 2010                    Fresno, California

2   9:45 a.m.

3           (The following proceedings were had outside the

4           presence of the jury, to wit:)

5           THE COURT:  Are we ready, Counsel?

6           MR. HASSING:  Yes, your Honor.

7           THE COURT:  Back on the record.  Counsel are present.

8   Are we ready for the jury?

9           MR. HASSING:  Not yet, your Honor.  One point.  Last

10  night, we took the deposition of Mr. Merati, their rebuttal

11  expert, and during that deposition, we learned that he intends

12  not only to give rebuttal testimony with regard to Mr. Wu's

13  expenses, but now, as of two weeks ago, he has been asked to

14  also give expert testimony in their case-in-chief with regard

15  to Mr. McIntosh's hourly worth for the work that he did in the

16  subdivision, something like -- I don't know.

17          Anyway, he was never disclosed as an expert in their

18  case-in-chief.  He was only disclosed as a rebuttal expert to

19  talk about Mr. Wu's expenses, and I don't want to get in the

20  same position we got in with Mr. DelMarter, where we start

21  into this thing, and we can't have a huge argument in front of

22  the jury, and he is allowed to go forward and we have to try

23  to unring a bell.

24          This is kind of like a motion in limine to exclude

25  that type of testimony.

628

1          MR. BRAZE:  No problem.

2          THE COURT:  Done.  We are ready for the jury.

3          (The following proceedings were had in the presence

4          of the jury, to wit:)

5          THE COURT:  The jury has joined us.  Good morning,

6     ladies and gentlemen.  I know what time it is.  I have the

7     same watch and clocks that you do.

8          Any time that you are required to wait, you are

9     entitled to an explanation, and that's just common courtesy

10    and respect.

11         I will tell you that we had a calendar that started

12    at 8:00 o'clock this morning.  As soon as it started, we did

13    not take a break.  It was a criminal calendar, and we had, it

14    turned out, approximately 15 matters on.  There were no breaks

15    between the time we started and the time we ended, and then we

16    came in about five minutes ago into this case.

17         I called the case.  We had a very brief issue with

18    regard to the testimony today.  I took it up.  Legal issue

19    decided.  And now you are out here.

20         And so I wanted to make sure that you knew that this

21    is not a situation where people just lounge around and take

22    breaks and don't care that you are sitting back there.  We do

23    very much.  Your time is valuable to you and it is valuable to

24    us.  So that is the explanation.

25         And I will tell you finally that in the Eastern

1   District of California, which is where, of course, all of you

2   live, that's why you are on jury duty here, this may come as

3   some surprise to you, but we have the largest number of cases

4   per judge in any district in the nation.

5          And you might ask, well -- as a matter of fact, I

6   will tell you that we have more than three times the number of

7   cases that the average district judge has in any other

8   district.

9          And you might ask, "Well, why don't you do something

10  about it?"

11         I can tell you that we have done everything we can,

12  including just a few months ago, I was summoned back to

13  Washington, D.C., to testify before the Senate Judiciary

14  Committee, which I did, on this issue.

15         So it is not a matter of not trying to get the job

16  done; it is a matter of trying to get the job done.  So we

17  just don't have the luxury, frankly, of just saying, "Well,

18  this is the only case I'm handling."  Not so.  Each one of us

19  has more than 1300 cases.

20         So that's what's going on, and you are entitled to

21  that explanation.

22         Any questions at all?

23         We are ready for the next witness.

24         MR. BRAZE:  I had one issue with Mr. Hassing, your

25  Honor.

1          THE COURT:  Okay.

2          (Counsel conferred off the record.)

3          MR. BRAZE:  What is plaintiff's next in order?

4          THE CLERK:  P 111, according to your list.

5          MR. BRAZE:  Your Honor, the plaintiff would call

6   Dr. Jubin Merati.

7                        **JUBIN MERATI**,

8   called as a witness on behalf of the Plaintiff, having been

9   first duly sworn, testified as follows:

10          THE COURT:  Please take the witness stand, tell us

11   who you are, and spell your first and last name for the

12   record.

13          THE WITNESS:  My name is Jubin, J-u-b-i-n, Merati,

14   M-e-r-a-t-i.

15                       DIRECT EXAMINATION

16   BY MR. BRAZE:

17   Q.  Good morning, sir.  Can you tell us what you do for a

18   living?

19   A.  I'm a forensic economist.  What that means is I do

20   economic research, consultation, in support of litigation

21   matters, business cases, intellectual property cases,

22   employment cases, as well as personal injury cases.

23   Q.  And can you tell us or give us a brief history of your

24   educational background after high school?

25   A.  Yes.  I have a Bachelor's degree in Business

631

1   Administration and a Master's degree in Economics, both of

2   them from Cal State Fullerton.

3           I also have a Doctorate degree in Economics from

4   Claremont Graduate University.  I also have some professional

5   designations.

6   Q.   When did you get your doctorate?

7   A.   I finished it in 1997.

8   Q.   Took a while to get it?

9   A.   I was working, teaching, getting married, all of it around

10  the same time frame.  So, yes.

11  Q.   And tell us about your teaching experience.

12  A.   Well, I, from 1989 to 1991, and then again in 1993, I

13  taught Micro Economics, Macro Economics, Business Economics,

14  and International Economics at Cal State Fullerton.

15  Q.   Can you tell us about your professional designations?

16  A.   Yes.  I'm a Certified Forensic Financial Analyst, CFFA, by

17  the National Association of Certified Valuation Analysts,

18  which basically means I'm certified to look at financial

19  statements, analyze them, criticize them, the whole thing.

20          And also I am a Accredited Business Appraiser by the

21  Institute of Business Appraisers, and a Business Evaluator,

22  accredited in Litigation by the Institute of Business

23  Appraisers.

24          The Institute of Business Appraisers and the National

25  Association of Certified Valuation Analysts are two of the

632

1    most respected organizations that give you the designations,

2    professional designations in, essentially, in business cases

3    in analyzing financial statements, especially for cases like

4    this.

5    Q.   And how long have you worked as an economist?

6    A.   Well, I started working as an economist in 1984, for a

7    consulting firm by the name of Natelson, N-a-t-e-l-s-o-n,

8    Levander, L-e-v-a-n-d-e-r, and Whitney.  And what we did was

9    real estate feasibility studies.

10          We worked for developers as well as government

11   entities hired us to tell them what the highest and best use

12   was for property.  And whether they had something planned,

13   like planned development for housing tracts, we would tell

14   them what they can expect to earn in profits, or if they

15   didn't know what to do with the land, we would tell them what

16   to do with the land.

17          And we also did similar projects for the U.S.

18   government as well as various government entities.  The very

19   last project I worked on was for the City of Simi Valley,

20   Southern California.  What we did was we told the City of Simi

21   Valley what kind of businesses they need so that their

22   residents wouldn't go to Thousand Oaks to do their shopping.

23          And that's the kind of work I did.

24          And then I started working for a consulting firm of

25   Brinton, B-r-i-n-t-o-n, Economics, and that was primarily

633

1    litigation work, with an economic analysis in support of

2    litigation, very much like what I do now, and I have been at

3    it since 1986.

4    Q.   Have you qualified as an expert witness in courts?

5    A.   Yes.  I have testified in federal and state cases 2, 300

6    times.  And I have been qualified in the states of California,

7    Nevada, Utah, Arizona, Oregon, Wisconsin, Florida.  I don't

8    know if I'm missing any.

9    Q.   I think someone said there were 58, but I think there is

10   fewer than that.

11        Have you ever testified in intellectual property

12   cases?

13   A.   Yes, I have.

14   Q.   Now, in this case, the plaintiff [sic], Mr. Wu, has

15   provided us with some economic information that -- commencing

16   with D 217, and he came up with an analysis indicating that he

17   will lose a little bit over a million dollars on the Valley

18   Rose Subdivision.

19        And at my request, did you analyze the -- his

20   methodology and the data that he used in arriving at that

21   opinion?

22   A.   Yes, sir.

23   Q.   And what is your opinion with respect to how much Mr. Wu

24   will either make or lose on the Valley Rose Subdivision?

25   A.   Oh, I believe Mr. Wu will profit from this project, and

634

1   the total profits is $3,984,215.

2   Q.   Now, the data that we were given, we were given five boxes

3   of backup data and then the general ledger, which I believe

4   you marked as an exhibit in this case.  And did you bother to

5   go back to see whether the entries in the general ledger were

6   accurate or did you just assume that what Mr. Wu put there was

7   accurate?

8   A.   You mean check the general ledger against the boxes of

9   documents?

10  Q.   Right.

11  A.   No, because the documents in the boxes, as was presented

12  to us, was supporting documents for the general ledger.

13          And what I did was I accepted the general ledger to

14  be accurate.  So there was no need to go through every page of

15  those boxes to make sure that the general item number -- I beg

16  your pardon -- the general ledger number is accurate.  It was

17  presented to me as an accurate estimate of the costs, and I

18  accepted it as such.  So I didn't need to verify any of it.

19  Q.   And then when you analyzed Mr. Wu's data and his

20  conclusions, if you came up with a result that was different,

21  did you give him the benefit of the doubt if it was in the

22  neighborhood or ball park?

23  A.   Well, what I did was, first of all, there were quite a few

24  items that I found the supporting documents, so they checked

25  out.  There were some that didn't match or didn't have any

635

1   supporting documents at all.  I accepted them to be accurate.

2           There were some that were different than what was

3   provided to support those estimates.  When I went through and

4   for every single one of them, of the items, I went through

5   each number to see what Mr. Wu or how Mr. Wu had calculated

6   that number.  I guess Mr. Wu or one of his assistants at the

7   office, as I understand, prepared the statements.

8           So I went through the statements, and the argument

9   that was made as to how those numbers were calculated.

10          If I saw something that was erroneous, I corrected

11  it.  So I disagreed with that number.

12          If I saw an assumption that was wrong or anything

13  like that, that I couldn't find supporting documents for it,

14  if the methodology was wrong, I disagreed with those and

15  corrected those estimates.

16          Other than that, I pretty much agreed with a lot of

17  the items listed, either because I found the supporting

18  documents or if there was nothing at all provided to support

19  it, I just accepted it.

20  Q.  Dr. Merati, in reaching your opinion that Mr. Wu will

21  profit to the extent of $3.9 million from the Valley Rose

22  Subdivision, do you have an opinion as to whether your

23  conclusions are conservative or moderate or extreme, one way

24  or another?

25  A.  Well, I believe they are very conservative, very

636

1   conservative for a couple of reasons.  One, I gave Mr. Wu

2   every benefit of the doubt that I could have.  Unless I saw a

3   mistake, I accepted the number, so I gave him the benefit of

4   the doubt.

5          Number two, the -- on the price of land, what we

6   have, what Mr. Wu bought was 98, approximately 98 acres of

7   land.  The 68 lots are on a portion of one of the parcels,

8   that's 33 and a half acres.  There is a, what's referred to in

9   the documents as a "designated remainder" that's still left.

10  There is also --

11  Q.  And let me direct your attention to Exhibit J 134.  And is

12  this area in the lower left-hand corner of the parcel the

13  designated remainder?

14  A.  Yes, sir.  Yes, sir.  There is also a 65 acre piece of

15  land adjacent to the property.  I believe it is parcel 3 that

16  was all included in the land.

17         So now the question is, out of the $1.6 million that

18  was paid for the land, how much of it will was for the 68 lots

19  and how much of it was for the 65 acres and how much of it is

20  for the designated remainder?

21         I understand that the 65-acre lot is up for sale for,

22  I believe it was, $2.8 million.  $2,830,000.  So this is a

23  property that was bought -- 98 acres was bought for 1.6.  65

24  acres is for sale for $2.8 million.  That's a substantial

25  profit.  That is not included in my estimate of the $3.9

1  million.

2         Also, the designated remainder -- which there are

3  different estimates as to how large that parcel is.  Let's say

4  ten acres, because I have heard anything from eight to 14.

5  And that's also land that's developed, zoned commercial.  Has

6  substantial value.  That also is not included in the $3.9

7  million that I have estimated.

8         So that, by itself, makes that $3.9 million number a

9  very conservative estimate of the profit that Mr. Wu will

10  make.

11  Q.  So in summary, in calculating your $3.9 million opinion,

12  you did not include the value of the 65-acre parcel, the value

13  of the designated remainder, and those are something else you

14  did not include?

15  A.  No.  As far as the land goes, those are the two.

16         Now, there are other areas as well.  For example, on

17  some of the areas that I just couldn't find the supporting

18  documents, I accepted Mr. Wu's estimate as accurate.

19         Now, I mean if we go through the documents, we can

20  talk about each one of them as to how it was done, but, for

21  example, for commissions --

22  Q.  Well, in fact, let's go through that.

23  A.  Okay, sure.

24  Q.  You see here on the screen, Defendant's 217, which is

25  Mr. Wu's calculation that he lost $1 point -- or was going to

638

1   lose $1.64 million.  And let me see what we have marked --

2           Your Honor, counsel has agreed I could move this in

3   evidence, so I would move to admit P 111 before I show it to

4   the jury.

5           THE COURT:  P 111 is received.

6           (Plaintiff's Exhibit P 111 was received.)

7   BY MR. BRAZE:

8   Q.  This is your analysis on the 30 homes where you show

9   Mr. Wu making $1.38 million on the 30 homes that are built?

10  A.  That is correct.

11  Q.  So let's go through it.  At the top, Mr. Wu says he will

12  sell those 30 homes for $6.6 million, and you have projected

13  that he will sell those 30 homes for $7.3 million?

14  A.  Yes, that's correct.

15  Q.  And can you tell us how you got that number?

16  A.  Yes.  What I did was I looked at the 19 homes that have

17  been sold already and I used that as my model, because that's

18  actual sales and, frankly, it can't get any better than that.

19  So I used that for my model.

20          MR. HASSING:  Your Honor, I hate to interrupt, but is

21  it possible for cocounsel here to also get a copy of the

22  exhibit that he is testifying from?  I think I'm the only one

23  that has a copy.

24          THE COURT:  How large is it?

25          MR. BRAZE:  8 and a half by 11.  How many pages, you

639

1    mean?

2         THE COURT:  No.  Do you have it right in front of you

3    there?

4         MR. BRAZE:  Yes.

5         THE COURT:  I see the size now.  How many pages is

6    it?

7         MR. BRAZE:  Two.

8         THE COURT:  How many counsel don't have it?

9         Yes.

10        Irma, could we borrow that from a second.  It will

11   take a couple of minutes.

12        MR. HASSING:  While we do that, can I confer with

13   counsel for a moment?

14        THE COURT:  Yes.

15   BY MR. BRAZE:

16   Q.  Tell us how you got to the $7.3 million in cost of sales

17   of 30 houses?

18   A.  Yes.  What I did, as I said earlier, was I used those 19

19   sales, actual sales, as my model.  And so what I did was

20   instead of averaging everything up and dividing it by 19 to

21   get an average price for all houses, what I did was I

22   calculated the average sales price for each model.

23        And then I looked at what's unsold of the 11 that

24   have been built, but not sold, and also the 38 lots.  I looked

25   at the building permits, the permits to see what model house

640

1   was going to be built on that lot.

2        So the 38 lots, the averages I got was for each model

3   type, I got a average price for that, which were based on

4   actual sales.

5        Now, on the largest model, I believe is 2408, which

6   basically means it has about 2400 square feet, there was only

7   one sale.  And so what I did was I assumed a 20 percent

8   reduction in price for any of those models to be sold in the

9   future.  And which was a little bit aggressive reduction, make

10  it a little bit too conservative.

11       Because when I looked at the average prices I got for

12  each model, the average price, for example, for the model

13  below it was only about 8 percent below the high price of that

14  model, the 2200 square feet.  The one before that was like 10,

15  12 percent.  But I just made a 20 percent reduction to be

16  conservative.  And also thinking, well, you know, these are

17  bigger houses, more expensive houses, maybe they need a bigger

18  reduction in price to sell them more reasonably.

19       So that's how I got the $7.3 million, by calculating

20  the average price for each model and projecting it based on

21  what's -- what was permitted to do.

22  Q.   Okay.  Then Mr. Wu had a category called "Cost of Sales."

23  Do you see that?

24  A.   Yes.

25  Q.   And his first category is Engineering.  And so what did

641

1  you find when you examined the ledger with respect to that?

2  A.  Well, what Mr. Wu has is, essentially, if you divide the

3  number by the number of lots, you got $560.29 per lot.

4       The supporting documents provided showed an average

5  cost of $497 per lot, but I used the high number.  I didn't go

6  based on what the documents showed.  I went based on what

7  Mr. Wu had shown.  It was a difference of about $63 a lot, and

8  I wasn't here to nickel and dime everything, so I figured 60

9  some dollars is okay.

10 Q.  You gave him the full credit on that?

11 A.  I gave him the benefit of the doubt on that one, yes.

12 Q.  Item 2 is Material.  What did you find when you analyzed

13 the general ledger with respect to material?

14 A.  Well, the $678,000 is comprised of materials which, per

15 general ledger, was 660,000.  Then Mr. Wu had assigned $576.40

16 per lot as general expenses assigned to this particular item.

17      I couldn't find any supporting documents for it.  And

18 that added up to $17,292 for the 30 houses that are built.

19 But what I did was, again, I ignored that $17,000 discrepancy,

20 and I gave Mr. Wu the benefit of the doubt on that one.  So I

21 used the high number myself.

22 Q.  Okay.  And the third item under Cost of Sales is City Fees

23 and Plans?

24 A.  Yes.

25 Q.  What did you do with that $6,576?

642

1  A.  I agreed with the number.

2  Q.  And then he has Building Permits, $432,729.  What did you

3  do with that number?

4  A.  Once again, I agreed with that number.

5  Q.  And item five, Subcontractor, he has $2,377,658.60, and

6  what did you do with that number?

7  A.  I accepted the number.

8  Q.  And then item 6 is Offsite Improvements.  Mr. Wu was

9  $39,690, and what did you do with that?

10  A.  Again, I agreed with the number.  Yeah.  I verified the

11  number.

12  Q.  So it looks like so far, the main difference is the

13  difference in what you project that the 30 homes would sell

14  for and so far, cost of sales are identical between D 217 and

15  P 111?

16  A.  Yes.  As I said, there were differences that I mentioned,

17  but I went with the numbers that Mr. Wu had allocated to those

18  items to the costs.

19  Q.  So let's move down to General Expenses.  And the first

20  item you have is Commission.  Mr. Wu has $208,735, and you

21  have 155,000.  How did you arrive at that number?

22  A.  Well, that was one of the bigger differences, and that was

23  one of the areas that I disagreed with Mr. Wu's methodology.

24          Now, the reason I did that is as follows:  Mr. Wu,

25  for each one of the lots that were sold, he shows $94,045.35

643

1   that was paid in commissions.

2          What I found in the general ledger was actually

3   $22,400.  So there was a difference of about $72,000 right

4   there.  But I looked some further into it.

5          The $208,735 that's listed in Mr. Wu's profit and

6   loss statement includes the $94,000.  It also includes a

7   $4,000 commission to be paid for the unsold homes and then

8   also another 3 percent referral fee.

9          Now, the $94,000 that's estimated, I see some of

10  these that are claimed commissions, $4,000, he includes those

11  in there.  Okay.  And that, of course, there is no supporting

12  documents for the $4,000, except for Lot Number 10 and 13,

13  there were $4,000 paid.  And then Lot 5 shows 7500, Lot 19

14  shows $6900.

15         So there is no record of flat $4,000 payment and a 3

16  percent referral fee on top of that.

17         But what I did, again, to be more than fair, I

18  ignored the actual amounts, the supported amounts of $22,000

19  and said, okay, he paid $94,000 for the 18 lots.  For the 19th

20  house that was sold recently, I believe that's Lot Number 4,

21  there was a $4,000 payment for that.  So I added the $4,000 to

22  the $94,000 that Mr. Wu has, which makes it $98,000.

23         I then divided the $98,000 by the 19 homes sold, and

24  that gave me average commission per house sold.

25         And that's what I used throughout my analysis for the

644

1   other houses.  And that's based on numbers that, well, they
2   are not supported, but they are claimed by Mr. Wu, but there
3   is no additional charges on top of it.
4           So that's how I came up with the $155,000.
5   Q.  Were you subtracting commissions because he was paying it
6   to himself?
7   A.  Well, there are -- those -- the money was taken out of
8   the -- in escrow that was paid to Mr. Wu.  And so what I did
9   was I dealt with it in the escrow fees as opposed to
10  commissions.
11          But it appears, based on the general ledger, if we
12  accept general ledger, some of these houses didn't have a
13  commission.
14          So, you know, we only have -- so far, $22,000, not
15  $94,000.  But I accepted the $94,000 number.
16  Q.  Next item is item number 8 under General Expenses.  Mr. Wu
17  has 392,000 and you have 312,000.  How did you get there?
18  A.  Well, we went through the documents, the closing
19  statements, and I noticed that on many of the sales, there
20  were payments paid to Mr. Wu that I believe is being claimed
21  as a business expense under escrow fees.  And I just don't see
22  how that could be an expense if the money is paid to Mr. Wu
23  himself.  That's an income.  It is not an expense.  So I
24  adjusted it for those.
25          And for escrow fees, what I did was I actually -- I

645

1    took the total cost, the amounts, and I, you know, took the

2    commission, I took the pay-offs to the bank because out of

3    every sale, some money was taken out and paid to East West

4    Bank.  And I took unpaid county taxes out, and funds.  I

5    believe it was called "Funds Paid Outside of Escrow to

6    Mr. Wu."  So I took those out too, and that's why we have a

7    difference.

8           Now, on some of these items, for example, Lot Number

9    5, Mr. Wu claimed $15,448.  I found support for $16,020, so I

10   used the $16,000 number, I used the higher number.

11          For Lot Number 9, he has $7,513.  I used 13,365.

12          So when the numbers were higher, I used the higher

13   number.  When the numbers were lower, I used the lower number.

14   So based on the ledgers, the actual supported -- the amounts

15   that we can support was substantially less, and that's what I

16   used in my analysis.

17   Q.   Okay.  Next item under General Expenses, Construction

18   Insurance.  You both have the same number.  What did you find

19   there?

20   A.   I just agreed with the number provided.

21   Q.   And how did he arrive at that number for construction

22   insurance?

23   A.   Well, for this particular item, there is absolutely no

24   supporting documentation.  It's just a one-page summary of

25   what he has.  And as I said, when there was no supporting

646

1    documents at all, I just accepted the number.

2    Q.  And did you base it on a certain number of homes?

3    A.  It was based on the 30 lots.

4    Q.  30 lots?

5    A.  Yes.

6    Q.  Next item is Interest, number 10 on General Expenses.

7    Land and Construction Interest, you have a difference there of

8    about $45,000?

9    A.  Yes.

10   Q.  How did you arrive at that?

11   A.  That has to do with Mr. Wu's valuation of the land price.

12   Mr. Wu assigned a value of $765,000 to the 68 lots.

13   Q.  For land?

14   A.  For land.  Now, the other 65 acres, Mr. Wu assigns a value

15   of $135,000 to it.  That 65 acres that's for sale for $2.8

16   million, for interest purposes, he assigns a value of

17   $135,000, with which I strongly disagree.  And so I didn't use

18   that number.

19       What I did was I said Mr. Wu says that he has paid

20   $590,000 total in interest, and I accepted that number.  And

21   but I distributed the $590,000 based on actual value of the

22   lands.

23       So that of the $2.7 million total loan, construction

24   loan was $1.8 million, we know that.  And so construction loan

25   was 67 percent of the total loan.

647

1          Then the other 33 percent loan was for land.  And

2     that 33 percent loan for land was divided into two properties,

3     the 33 and a half acres and the 65 acres.  So that assigns 34

4     percent of the interest for land to the subject property, to

5     the 68 lots, and the remainder goes to the 65 acres.

6          And that's how I come up with a different number for

7     the interest for construction.  Essentially, what that means

8     is it's the difference is because we have a different

9     valuation of land prices, Mr. Wu and I.  I just don't think

10    that 65 acres is valued at $135,000.

11    Q.  So then with respect to items 11, 12, and 13, Property

12    Tax, Utilities, Inspection, you both have exactly the same

13    number; is that correct?

14    A.  Yes.  Even though we had no supporting documents for

15    utilities, and for inspection fees, I just accepted whatever

16    numbers were given to us by Mr. Wu.

17    Q.  Then we go down to this big item of Operating Expenses,

18    item 14.  And Mr. Wu has a entry of $1.3 million, and you

19    reviewed the operating expenses and came up with a number of

20    $1.15 million; is that correct?

21    A.  Yes.

22    Q.  And with respect to operating expenses, are there some

23    areas that deserve -- need to be addressed on those, where the

24    difference comes from?

25    A.  Yes.  I, under operating expenses, we have a number of

1   items, and I'll just go through them briefly.  For

2   advertising, I accepted the number presented.

3          For auto, I accepted the numbers, even though the

4   numbers were not supported in the general ledger.  We had

5   different numbers, but I accepted what was presented.

6          For equipment lease and repair, I accepted what was

7   presented.

8          On the insurance, general liability insurance, I

9   accepted the number.

10          For health insurance and Worker's Comp, I disagreed

11   because this is for office staff and office staff is overhead.

12   So there was no additional costs incurred because of this

13   Wasco project.  Whether this project existed or not, Mr. Wu

14   would have had to pay for health insurance for everyone and

15   also for Worker's Comp for everyone.

16   Q.  Where did you get the information that that insurance was

17   for office workers?

18   A.  Mr. Wu's deposition.  So I took those two numbers out.

19          For business license, I agreed with the number.

20          Employee meal expenses, I accepted it.  It was

21   questionable, but I accepted it.

22          For office supplies, again, I accepted it.  That, you

23   know, it was all for this project.

24          For payroll and payroll taxes, again, I accepted it

25   as all being attributable to this project.

1          Under housing expenses, I strongly disagreed with

2     that expense.  What happens is the $35,000 that's being

3     claimed in the financial statements provided by Mr. Wu, of

4     that $35,000, $33,000 is payment for a house that Mr. Wu

5     bought.  He bought the house.  He still owns it.  It is not a

6     cost.  You can't assign that as a cost to this project.  That

7     house is still there.  He still owns it.  So I took that

8     amount out.

9          There was an item for $2,014 for employee housing.  I

10    accepted it.  I assumed he had to help out some employees for

11    a while, so I accepted whatever that number was.  So instead

12    of $35,000, I have $2,000.

13         The next item was utilities.  I agreed with that

14    number.

15         Appraisals, I agreed with.

16         The next item was legal and professional services.

17    Again, I disagreed with that number because the legal fees

18    included the litigation costs for this lawsuit, and that's not

19    a cost of building the project.  It is not related to this

20    project at all, this litigation cost.  So going through the

21    legal expenses, I subtracted anything that was paid for legal

22    expenses in this case.  And instead of $143,000, we are down

23    to $5900.  So that was another major area of difference.

24         And for taxes, I accepted the number as they were.

25         And that's all the operating expenses.

650

1   Q.  So then the next item appears to be Land Cost.  And Mr. Wu
2   used land cost of $600,000 and you used land cost of $243,000.
3   Can you explain to us why it was such a big difference in that
4   number?
5   A.   Yes.  What I did was I looked at -- well, here.  What
6   Mr. Wu did was to assign a value of $600,000 to the 30 homes,
7   and $760,000 to the 38 lots, okay.  Or I should say the land
8   for the 30 homes, not the houses themselves.  And he assigns
9   here, he assigns a value of $245,000 to the 65 acres.  Now,
10  remember, for interest, it was 135,000.  Here, it is 245,000,
11  which shows inconsistencies within that financial statement.

12          And, you know, once again, I disagreed with the
13  valuation of 245,000.  What I did was I said the total acreage
14  of this transaction was 98.8 acres.  The land cost was
15  approximately $1.6 million.  The Parcel 1, the 33 and a half
16  acres, was actually valued at $551,000 by the County.  The
17  property tax assessments, the value, assessed value of this
18  land in 2005, was $551,000.

19          So I said if this 33 and a half acres is valued at
20  551,000, that means for 68 lots, it means $8,105, almost 6
21  dollars, per lot.  Just divided the 551,000 by the number of
22  lots, the 68 lots, and got an average value of $8100 per lot.
23  And when I -- you know, approximately $8100, six dollars more.

24          So that's how I arrived at the number.  And then I
25  said, okay, for 30 lots, it's 30 times $8100, and that's how I

1    got the 243,000.

2    Q.   Okay.

3    A.   The remainder of the 551,000, by the way, is assigned to

4    the other 38 lots.

5    Q.   And then under item 15 is also Land Closing Costs.  Mr. Wu

6    has 40,000 and you have about 16,000.  What's the difference

7    there?

8    A.   That's correct.  That was another area of disagreement.

9    Once again, Mr. Wu assigns 85 percent of the value to the 68

10   lots, and I disagreed with that.

11           And based on the actual numbers, now, if you look at

12   the 98 acres, and this parcel being 33 and a half acres, it is

13   approximately a third, 34 percent of the total property.

14           And if you take the cost, I accepted the $108,000

15   that Mr. Wu indicated to be the closing fees.  But I said, I

16   disagreed with the allocation of the $108,000 between the 33

17   acres and the 65 acres.

18           So I basically said, okay, if we take the $108,000 as

19   closing costs and split it between these properties based on

20   value or size, ironically, they turn out to be about the same

21   percentage.  If you take the 551,000 out of 1.6, or if you

22   take the 33 acres out of 98, they turn out to be about the

23   same percentage.

24           So based on that, I assigned a value for the 30 homes

25   of $16,274.

652

1   Q.   Then the last item is Land Loan Renewal Fees and you used

2   the same number that Mr. Wu did?

3   A.   I did.  I just accepted it.

4   Q.   So the big difference in that area under land costs,

5   Mr. Wu had $672,000 and you had $290,000, correct?

6   A.   That's right.

7   Q.   So what is the net profit you show for the 30 homes that

8   Mr. Wu has built?

9   A.   It is $1,358,498.83.

10  Q.   Did you do the same projection for the sale of the total

11  68 lots?

12  A.   Yes.

13  Q.   Is that included on our Exhibit P 112?

14  A.   Yes.

15       MR. BRAZE:  I will move to admit Exhibit P 112.

16       MR. HASSING:  No objection, your Honor.

17       THE COURT:  Received.

18       MS. BARNES:  No objection, sir.

19       MR. HASSING:  If can we hang on just a minute, your

20  Honor.  I haven't got my exhibits marked like Mr. Braze.

21       THE COURT:  Why don't you approach him and see.  Make

22  sure you do.

23       MR. HASSING:  Your Honor, I do object to P 112 coming

24  into evidence.  I would like to voir dire the witness.

25       THE COURT:  All right.

MERATI - MD

653

1          MR. HASSING:  All right?

2          THE COURT:  Sure.

3                    VOIR DIRE EXAMINATION

4   BY MR. HASSING:

5   Q.  Good morning, Dr.  Merati.

6   A.  Good morning.

7   Q.  I want to ask you a few questions about what's been marked

8   as P 112.  You prepared this document, correct?

9   A.  Yes.

10  Q.  In preparing this document, you made certain assumptions,

11  didn't you?

12  A.  Yes.

13  Q.  This document pertains to the 38 lots that have not had

14  any homes built on them yet, correct?

15  A.  Correct.

16  Q.  And in creating P 112, you have projected the cost of

17  building 38 homes on those 38 lots, correct?

18  A.  Yes.

19  Q.  And you have projected the cost of doing that, correct?

20  A.  Yes.

21  Q.  You have projected the sales price of those 38 homes that

22  have not yet been built, correct?

23  A.  Yes.

24  Q.  And to do that, you used some assumptions, correct?

25  A.  Yes.

654

1  Q.  Now, first of all, you assumed that Mr. Wu or one of his

2  companies, intended or intends to build more homes on those 38

3  lots, right?

4  A.  Yes.

5  Q.  What is the basis of that assumption?

6  A.  The permits to build on those houses.  I mean we have the

7  permits and the specific model type for each lot.

8        MR. BRAZE:  Your Honor, is this voir dire or is this

9  cross-examination?

10        THE COURT:  I'm hoping it's going to be voir dire,

11  but it is not there yet.

12        MR. HASSING:  Your Honor, I'm intending to show that

13  this entire --

14        THE COURT:  You can, but the question is -- I know

15  what you are trying to do, but the question is whether or not

16  you are doing it on what is a true voir dire or are you just

17  moving forward with premature cross-examination.

18        MR. HASSING:  I'm trying to do a voir dire, and I'm

19  trying to establish the speculative nature of these --

20        THE COURT:  Well, here's the real procedural problem,

21  practical problem, I should say.  Mr. Braze is attempting to

22  use Exhibit P 112 during the direct examination, and the

23  reason you are wanting to voir dire now, of course, is because

24  for him to show the jury 112, it would have to be in evidence.

25        Am I stating that correctly so far, Mr. Braze?

1          MR. BRAZE:  I thought we moved it into evidence

2     because there was no opposition.

3          MR. HASSING:  I did object once I found out what it

4     was.

5          THE COURT:  I think the objection has backed that

6     out.  The real question is can he use P 112 if it's not in

7     evidence without objection.

8          MR. HASSING:  Can we do this?  Can we allow it into

9     evidence provisionally, without prejudice to me to move to

10    strike after cross-examination --

11         THE COURT:  Yes.

12         MR. HASSING:  -- if it's based on speculation?

13         THE COURT:  Yes.

14         MR. HASSING:  I will withdraw my objection.

15         THE COURT:  It's still in and the ruling to receive

16    it is without prejudice for revisitation, depending on whether

17    or not there is good legal ground to do that.

18         (Plaintiff's Exhibit P 112 was received.)

19         THE COURT:  We will continue with direct.

20                   FURTHER DIRECT EXAMINATION

21    BY MR. BRAZE:

22    Q.  In P 112, you indicated the profit to be derived building

23    and selling homes on the remaining 38 lots?

24    A.  Yes, sir.

25    Q.  Did you use the same assumptions you did in P 111 in

1  arriving at the costs of construction?

2  A.   Oh, absolutely.   Revenues and costs.

3  Q.   Okay.   So I assume costs of sales and all that is just a

4  multiplication per unit times 38?

5  A.   Yes.   The calculations were made based on what are the

6  revenues per model type, what are the expenses per lot, and

7  then whether it was 30 or 38, I continued that.

8       And so that's -- it really is simple as that.   So you

9  are calculating the cost per lot and the projected for the 38

10 lots with the -- I don't believe there are any exceptions, not

11 that I recall.

12 Q.   And then on page 2 of Exhibit P 112, do you arrive at the

13 net profits for the 38 lots of 2.6 million and the net profits

14 for all 68 lots of 3.9 million; is that correct?

15 A.   That's correct.   I believe there is one difference in the

16 38 lots in that the -- there won't be any more interest on

17 land.

18 Q.   Why is that?

19 A.   Well, the loan is almost paid off, so there is no

20 additional interest to be paid for the 38 lots.   So that

21 lowers the cost of the 38 homes that we built and which

22 generates higher profit.

23 Q.   So for lack of a better term, are you saying, Dr. Merati,

24 the interest expenses on the loan were front-end loaded so

25 that it was all paid during the first 30 homes?

1   A.  Well, yeah, because the $2.7 million loan that we have, we

2   found -- well, for each lot that was sold, some money was

3   taken out and paid to the bank.  And up to November of 2008,

4   we showed payments of just about $3.8 million.  This is on a

5   $2.7 million loan.

6   Q.  Is that a lot of interest?

7   A.  It is substantial.  It is substantial.  But again, I

8   didn't disagree with it.

9   Q.  So even though you found the interest paid to be

10  exorbitant, you used the same number anyway?

11  A.  Yes.  I did.  And I don't know to what extent this

12  includes the fees for every time the loan was revised.  Keep

13  in mind, I took Mr. Wu's numbers regarding that.

14  Q.  But even then, the loan is paid off, basically?

15  A.  Yes, because in November of 2008, the loan documents

16  showed there was a balance of $1.1 million approximately.

17  Since November of '08, if you add up the monies that was taken

18  out of close of escrows, and paid to the bank, that only

19  leaves about approximately $100,000 left on the balance.

20  That's how much is left of payments out of the $2.7 million,

21  if we accept that every single payment that was paid to the

22  bank was only for this project and not any other projects.

23  Q.  Which is the way it should be?

24  A.  Correct.  Correct.  So there was very little interest left

25  for the 38 lots, which means profit per lot goes up.

658

1    Q.  And counsel was asking you about assumptions that you made

2    during voir dire.  What assumptions did you make regarding

3    sales of these lots in the future?

4    A.  I assumed that they would be sold at the same average

5    price per model of the 19.

6    Q.  And you say that's a conservative approach?

7    A.  I believe so, because 2007, '08, and '09, as far as real

8    estate values are concerned, are bad, worse and worst.  2007

9    was the beginning of the bad market.  2008, it got worse.

10   2009 was really bad; it got even worse than that.

11          So I have taken, I have assumed depressed prices and

12   I have assumed that this will continue in the future.  And on

13   that, the 2400 or 2408 model, the biggest one, I even took a

14   20 percent reduction of the actual sales price, so it's even

15   lower than that.

16          So, yeah, I think the numbers are conservative,

17   keeping in mind the slightest change in the market will shoot

18   up the market prices again.

19   Q.  And what assumptions did you make with respect to building

20   costs in the future?

21   A.  I have assumed that the same costs will continue at the

22   same rate.  So, you know, on let's call it a per lot basis.

23   So whatever I calculated for the 19 lots, I assumed that that

24   would continue for the 11 lots and also the 38 lots.

25          Now -- so it is basically the same, basically the

659

1   same costs.

2   Q.  So why didn't you assume that building costs would

3   increase?

4   A.  Because they may decrease in a market that's not so good,

5   if you ever -- if you need a contractor, this is a good time

6   because they are not that busy and they will make you a deal

7   like you wouldn't believe just to get a job.  I know that from

8   personal experience.

9        So actually, material costs are down, labor costs are

10  down.  So this is -- this may not be a bad time at all to

11  build.

12  Q.  What if home prices were to increase 3 to 5 percent; how

13  would that affect your analysis?

14  A.  It would increase the numbers by 3 to 5 percent.

15  Q.  It would increase the profits by 3 to 5 percent?

16  A.  Yes.  Well, actually, probably more than that.  Because

17  revenues go up by 5 percent.  Costs stay the same.  See, if

18  you say profits go up by 5 percent, that means revenues go up

19  5 percent.  Costs may not.  But costs will go up 5 percent

20  too.  That differential would stay the same.  But if your

21  revenues go up 5 percent and costs don't, then your actual

22  profit goes up even higher.

23  Q.  And we have marked as Exhibits P 113, 114, and 115 as your

24  detailed sheets showing your calculations.  Could you tell the

25  jury what those three sheets are?

1    A.  Those are --

2    Q.  And I will put P 113 up.

3         MR. BRAZE:  I would like to move to admit P 113

4    through 115.  These are profit and loss calculations.  P 113

5    is for 19 homes sold.  P 114 is for 11 -- profit and loss

6    calculation for 11 unsold homes.  And P 115 is for the profit

7    and loss statements for 38 homes sold.

8         MR. ALEXANDER:  Thank you.

9         MR. BRAZE:  Move P 113 through 115 into evidence.

10        THE COURT:  Received.

11        (Plaintiff's Exhibits P 113 through P 115 were

12   received.)

13   BY MR. BRAZE:

14   Q.  So these are the examples of -- putting P 113 up on the

15   screen -- these are the examples of the calculations you did

16   for each of your -- for sale of the 19 homes, the sale of 11

17   homes, and then sale of the remaining 38 homes?

18   A.  Exactly.  And for example, for this document, this is for

19   the 19 homes that were sold.  So we show the prices, when they

20   were sold, the prices, and also the cost of sales.

21        It is just a detailed breakdown of the profit and

22   loss statements that we just went through.  And that's

23   basically all it is.  This is on a per lot calculation.

24        And then the exhibits that we went through now -- I

25   mean a few minutes ago is just a summary of these numbers.

661

1   Q.  So the, again, the summary of your opinion is shown on

2   Exhibit P 112, and that's Mr. Wu's total profits from selling

3   68 lots is $3.984 million?

4   A.  That's correct.

5           MR. BRAZE:  Thank you, Dr. Merati.

6           THE WITNESS:  Thank you.

7           THE COURT:  Cross?

8                       CROSS-EXAMINATION

9   BY MR. HASSING:

10  Q.  Good morning again, Mr. Merati.

11  A.  Good morning.

12  Q.  Now, Mr. Merati, during your testimony so far this

13  morning, I heard you say a few times something to the effect

14  that Mr. Wu's methodology was wrong here, his calculations

15  were wrong there, he made a mistake over here.

16          But in fact, what you did is you went through

17  Mr. Wu's summary, which is Exhibit D 217, and you, being an

18  economic forensic analyst, you used different methodologies in

19  some places than Mr. Wu did, correct?

20  A.  In some cases, yes.

21  Q.  All right.  And you used your education and training as an

22  economic forensic analysis --

23  A.  Analyst.

24  Q.  -- "analyst," I'm sorry -- to perform those functions, did

25  you not?

662

1   A.   Yes.

2   Q.   You made some assumptions in performing those calculations

3   in that analysis, did you not?

4   A.   Yes.

5   Q.   And Mr. Wu used different methods in arriving at his

6   summary in some cases, didn't he?

7   A.   Different assumptions, yes.

8   Q.   Yes.  Now, how much time did you spend analyzing Mr. Wu's

9   summary, which is D 217?

10   A.   Well, the -- I don't know D 17 [sic], what it includes.

11   But there were 14 exhibits to Mr. Wu's deposition which

12   included the general ledgers.

13          And you asked me that question last night and I

14   didn't have a good estimate for you.  I honestly don't know

15   the exact number of hours.  And I believe I told you last

16   night around 70 hours.

17   Q.   And, again, just so that we are talking apples for apples

18   here, when I refer to D 217, that's an exhibit in this trial,

19   you understand that?

20   A.   Yes, I do.

21   Q.   What you reviewed of Mr. Wu's was something that you call

22   Exhibit 14 to his deposition, correct?

23   A.   Exhibit 1 to 14.

24   Q.   Yes.  But you also reviewed Exhibit 14 to his deposition,

25   correct?

1    A.   Yes.

2    Q.   You are very familiar with Exhibit 14 to his deposition?

3    A.   Yes.

4    Q.   And I will represent to you, sir, that our Exhibit D 217

5    is an identical copy of his Deposition Exhibit 14.

6    A.   I see.

7    Q.   So when I say D 217, it's the same as Deposition 14.

8    A.   Okay.  In that case, to answer your question, the answer

9    is no, that's not the only document I reviewed.  I have also

10   reviewed Exhibits 1 through 13 to Mr. Wu's deposition, in

11   addition to his deposition.

12   Q.   Right.  Yes.  I believe when you speak about Exhibits 1

13   through 13 of his deposition, you are referring to this, are

14   you not?

15   A.   Yes, that's correct.

16   Q.   All right.  And if you take a quick look through that, you

17   will see that a lot of these exhibits are just copies of what

18   was in D 217, correct?

19   A.   Some are, some aren't.

20   Q.   Some are additional, right?

21   A.   Yes, correct.

22   Q.   And so you spent approximately 70 hours reviewing our

23   Trial Exhibit D 217 along with his Deposition Exhibits 1

24   through 13, correct?

25   A.   Keep in mind, that includes telephone conversations,

1   meeting, travel time --

2   Q.  I understand.

3   A.  -- to the meeting and all that, yes.

4   Q.  Right.  What you did not do, though --

5           Your Honor, may I move this over?

6           THE COURT:  Sure.

7           MR. HASSING:  I'm not going to drop this, I hope

8   (Referring to cart full of exhibit binders.)

9           THE WITNESS:  I can stand up and look at it if it

10  makes things easier.

11          MR. HASSING:  I would like somebody else to see it,

12  sir.

13  BY MR. HASSING:

14  Q.  Now, what you didn't do is you didn't look at any of these

15  33 exhibits that are facing the jury at this time; isn't that

16  correct?

17  A.  If they are different than what's included in the exhibits

18  that I talked about, then the answer is, that's correct.

19  Q.  All right.  And when you were involved or engaged in

20  performing your analysis of Mr. Wu's financial data, you were

21  told by the attorneys representing Mr. McIntosh that there

22  were approximately 14,000 pages of backup documentation to

23  support what was in those two volumes that you were reviewing,

24  correct?

25  A.  Well, I don't recall if I was told as to the number of

1   pages, but I was told that there are a few boxes that are

2   supposed to be supporting documents.

3   Q.   You were told there were six large boxes of supporting

4   documents, right?

5   A.   Again, I can't remember the exact number of boxes, but I

6   was told that there are some boxes of documents.

7   Q.   Did you ever make any attempt to review any of these

8   documents that are contained in these 30 volumes that I'm

9   looking at right now?

10  A.   No.  As I said during my direct examination, I assumed

11  that the general ledger numbers were accurate.

12  Q.   Right.

13  A.   And the only reason for reviewing those documents is if I

14  wanted to verify whether the general ledger numbers were

15  accurate.  And they were produced by your clients.  I accepted

16  it to be accurate, and so I didn't need to go through those

17  binders.

18  Q.   There were many instances during your direct examination

19  where you indicated to Mr. Braze, "I couldn't find any

20  supporting documents for this.  I couldn't find any support

21  for that.  There was nothing other than the general ledger,

22  and I couldn't find a document."

23          Did you ever consider that if you had looked at any

24  of these 30 binders, that you might have found that supporting

25  documentation that was not in the summary?

666

1    A.  Oh, I absolutely did.  What happens here is, as I said,

2    the general ledger numbers are supposed to be reflective of

3    every single page in there.  All those invoices and whatever

4    documents that are in there, they are added up and are

5    included in the general ledger number.

6         So if I accept the general ledger number as accurate,

7    which I did consistently throughout my entire analysis, then I

8    didn't need to go through these boxes of documents.

9         If you accept the summary that -- as presented by

10   Mr. Wu to be accurate, why should I spend any time going

11   through those documents?  So I didn't need to because I

12   accepted Mr. Wu's word as accurate.

13        The disagreements come from the fact that what's

14   claimed under the profit and loss statement that was prepared

15   either by Mr. Wu or one of his assistants at the office, when

16   those amounts did not match the general ledger.  When they

17   didn't match, I accepted a lot of them, but when there were

18   few of them that clearly we had disagreements, I took those

19   out.

20        For example, Mr. Wu bought a house.  He claimed it on

21   the financial statements that he prepared on the P and L.

22   There was no support document for it.  I didn't need to see

23   any supporting document, because he has the house.

24        Your fees are included in there.  I didn't need to

25   see any supporting documents.  I just went through the general

1    ledger and I took your fees out because it doesn't belong

2    there.

3          For commission, for example, we have the closing

4    statements, so I didn't need to see anything else.  Escrow

5    fees, I didn't need to see anything else because we had the

6    final document.

7          So I wasn't going to run up my bill and waste time

8    going through those documents when I have Mr. Wu's

9    presentation in the general ledger which is supposed to be a

10   summary of all those documents.

11   Q.  Sir, if that's true, why, then, did you state on so many

12   occasions this morning, why did you offer, "I couldn't find

13   any documentation to support this, there was no documentation

14   to support that"?

15         Were you trying to make Mr. Wu look bad in front of

16   the jury?

17   A.  Not at all.  Not at all.  What I'm saying is if those

18   documents, the binders, the boxes of documents, if they are

19   there to support any of the costs, then those costs should be

20   included in the general ledger.

21         And so when I said I couldn't find any supporting

22   documents, it is because it is not in the general ledger.  I

23   mean, clearly, the statements were not prepared by a financial

24   expert.

25   Q.  That's what I wanted to get to next, sir.  You told me

668

1  last night in your deposition that it's clear that this

2  summary and, in fact, the entire summary of 217 was not

3  prepared by a CPA, right?

4  A.  I referred to the P and L statements, the profit and loss

5  statements only, not the general ledgers.

6  Q.  When you were referring to that, you told me this clearly

7  was not prepared by a CPA, right?

8  A.  That's correct.

9  Q.  You understood it was prepared by Mr. Wu's office, which

10  is a construction office, correct?

11  A.  Yes.

12  Q.  Did you see anything in your review that would cause you

13  to believe that Mr. Wu is trying to put information into his

14  summaries that is false in order to -- in order to make

15  anybody believe something that's not true?

16  A.  Well, I honestly can't say what the intent was.  I'm an

17  economist, I'm a financial expert.  I can only look at

18  documents and see what the documents say.

19         So I don't know what the intent was in preparing

20  these documents.  I can only point out the areas that I

21  disagreed with as I have mentioned.

22  Q.  Mr. Braze asked you a question about payments to East West

23  Bank that were reflected on certain closing statements; do you

24  remember that?

25  A.  Yes, I do.

669

1   Q.  Now, you understand, do you not, that when a developer

2   takes out a construction loan and owes money to the bank, that

3   as he sells homes, he doesn't get all of the money that the

4   buyer pays.  Some of that money goes to the bank, you

5   understand that?

6   A.  Based on the agreement, yes.

7   Q.  All right.  And that's common, isn't it?

8   A.  Well, I don't know if it's done every single time, but

9   it's not an uncommon practice.

10  Q.  And did you see instances those closing statements where

11  principal reduction payments were paid to East West Bank out

12  of sales proceeds?

13  A.  On every single one of them.

14  Q.  All right.  Now, did Mr. Wu include principal reduction

15  payments as an expense on his summary?

16  A.  No.

17  Q.  He did include interest payments as an expense, didn't he?

18  A.  Yes.

19  Q.  So there is nothing wrong with Mr. Wu allowing payments to

20  go to the bank for principal reduction out of his closings of

21  homes, is there?

22  A.  Not at all.  That wasn't what I was talking about at all.

23  I was referring to interest.

24  Q.  Well, there is nothing wrong with him paying interest to

25  the bank out of his closings, is there?

670

1    A.   No, no, no.  No.  I was talking about the allocation of

2    interest payments to land versus construction.  That was one

3    of the areas of disagreement.  So it wasn't that -- there is

4    nothing wrong with him paying interest to the bank, especially

5    not to the banks.

6         But what I was talking about was of the amount

7    allocated, of the amount of interest allocated to the land

8    versus the construction, I disagreed with that because Mr. Wu

9    and I have a serious disagreement on the valuation of the

10   land.

11   Q.   Right.  You do.  And we are going to get into that.

12        But for right now, I want to ask about something I

13   heard you testify to this morning to the effect that Mr. Wu

14   was paying himself out of some of these closings.

15   A.   There were payments to Mr. Wu, yes.

16   Q.   Can you show me any of those, sir?

17   A.   Sure.  Let me find them.  Exhibit 9 to the deposition of

18   Mr. Wu, which is, basically, the closing statements.

19   Q.   I'm going to grab my binder here.  I'm with you.

20   A.   Okay.  For example, Lot Number 1.

21   Q.   Yes.

22   A.   It shows funds paid to seller outside of escrow, $500.

23   Lot number 5 --

24   Q.   Hang on a second.  I'm not following that on Lot Number 1,

25   sir.

671

1  A.  Okay.  If you go --

2  Q.  I see it now.

3  A.  Okay.

4  Q.  And that says funds paid to seller outside of escrow,

5  $500, right?

6  A.  Yes.  Lot Number 5, there is a $1,000 payment.  Lot Number

7  7 --

8  Q.  Hang on just a second, would you, please.  How much was

9  the Lot Number 2?

10        THE COURT:  It was Lot Number 5.

11        MR. HASSING:  Lot Number 5.

12        THE WITNESS:  Lot Number 5 was $1,000.  Then there is

13  Lot Number 2 is 2,000.  Lot Number 7 is 2,000.  Lot Number 8

14  is 2,000.  Lot Number 9 is 2,000.  Lot Number 13, 500.  Lot

15  Number 16, 1,000.  Lot Number 18, 2,000.  Lot Number 22,

16  2,000.  Lot Number 23, 2,000.  Lot Number 24, 2,000.  Lot

17  Number 26, 2,000.  Lot Number 27, 2,000.  Lot Number 50,

18  5,000.  And that's what I could find.

19  BY MR. HASSING:

20  Q.  All right.  And you understand that the total proceeds

21  from the sale of those 19 homes is about $4.4 million, $4.6

22  million, something like that?

23  A.  Yes.

24  Q.  And you have indicated that Mr. Wu was paid around

25  $26,000?

672

1   A.   Is that what it added up to?

2   Q.   Yes.

3   A.   Okay.

4   Q.   What do you make of that, sir?  What is your conclusion

5   when you see that on those closing statements?

6   A.   All I said was it is not a closing costs, so when I

7   calculated the closing costs, I did not include those payments

8   as a closing cost.  That was my testimony.

9   Q.   Did you see anything wrong with Mr. Wu receiving $26,000

10  out of those proceeds?

11  A.   No.  You build the houses, you make a profit on it.  There

12  is nothing wrong with that.

13  Q.   Let's talk about your method of land cost allocation.  You

14  testified at some length about that, didn't you?

15  A.   Yes.

16  Q.   If I understand your theory, Mr. Wu's company bought 98

17  acres, right?

18  A.   Yes.

19  Q.   And he paid a million-six for the 98 acres, right?

20  A.   Yes.

21  Q.   And for that, he received Parcel 1, correct?

22  A.   Yes.

23  Q.   Which is identified in yellow on this parcel map, right?

24  A.   Yes.

25  Q.   And he also received Parcel 3, which is identified in

673

1   pink, correct?

2   A.   Yes.

3   Q.   And the Parcel 1 is about 33 acres?

4   A.   Yes.

5   Q.   And the Parcel 6 is about 64 acres?

6   A.   Okay.

7   Q.   All right.  And what you did is you said, well, there is a

8   tax assessment for Parcel 1 of $550,000 for the year 2005,

9   2006, right?

10  A.   Yes.

11  Q.   And so what you did is you took the amount of that tax

12  assessment, 550,000, and you subtracted that from the total

13  purchase price of a million-six, correct?

14  A.   Yes.

15  Q.   And you applied the balance, the difference, over to

16  Parcel 3, right?

17  A.   Yes.

18  Q.   All right.  So in doing that --

19  A.   Well, actually, effectively, for our purposes, it turns

20  out to be the 64, 65 acres and the designated remainder, but

21  that's fine.

22  Q.   There is a little designated remainder down here in the

23  bottom of this yellow portion, right?

24  A.   A little, about ten acres, yes.

25  Q.   And so you allocated the balance of that, which was a

674

1    little over a million dollars, to Parcel 3 and the designated

2    remainder?

3    A.  Yes.

4    Q.  Now, take a look, if you would, at that tax assessment

5    that you were relying upon.

6    A.  I'm sorry.  Is it possible to take probably a five-minute

7    break.

8            THE COURT:  If you need it.

9            THE WITNESS:  Please.

10           THE COURT:  You obviously do or you wouldn't ask.

11           THE WITNESS:  Exactly.

12           THE COURT:  Ladies and gentlemen, let's take five

13   minutes.  Please don't discuss the case.  We will come right

14   back as soon as five minutes is up and we will finish with

15   this witness.

16           (The jury left the courtroom.)

17           THE COURT:  Go ahead.

18           (Recess)

19           THE COURT:  Back on the record.  Counsel is present,

20   witness is back on the stand.  The jury is present?

21           Any issues?  Okay.  Good.

22           All right.

23   BY MR. HASSING:

24   Q.  Before we go to the continuation of land valuation, let's

25   go back to those escrow closing statements again, number 9 to

1    Mr. Wu's deposition.

2    A.   Yes, sir.

3    Q.   Take a look at the first closing statement, Lot Number 1.

4    A.   Yes, sir.

5    Q.   Where you see the $500, funds paid to seller outside of

6    escrow, don't you understand, sir, that that is a deposit that

7    was paid by the buyer to Mr. Wu when they entered into the

8    contract?

9    A.   Yes.

10   Q.   And Mr. Wu has to give the buyer a credit for that at

11   close of escrow?

12   A.   Yes.

13   Q.   That's the same with all of these $26,000 worth of

14   figures, correct?

15   A.   Yes, but it's not a cost.  That was my point.

16   Q.   Thank you, sir.

17   A.   To calculate escrow fees, I went through each item, each

18   closing statement and took out the payments and the money that

19   was paid to the bank and I assumed the rest of it is just

20   escrow costs.

21   Q.   Let's go back to land cost allocation.  I believe where we

22   left off is you were going to look at the tax assessment for

23   me.  Have you found that?

24   A.   Yes.

25   Q.   Can you tell me where I can find it in my binder?

1  A.  14-11.  Tab 11 of Exhibit 14.

2  Q.  Tab 11, okay.  What is it, sir, on this tax statement that

3  makes you believe that this does not also apply to the

4  remainder?

5  A.  The designated remainder?

6  Q.  Yes, sir.

7  A.  No, no, no.  I said this is for the 33 and a half acres.

8  Q.  I thought you said that in allocating $550,000 to the

9  Parcel 1, that that only took into consideration everything

10  but the designated remainder?

11  A.  No, sir.  No, no, no.  The reason I brought up the

12  designated remainder is to show that that designated remainder

13  remains an extra potential profit, which is not included in my

14  $3.9 million estimate.

15  Q.  But that --

16  A.  So that was the purpose of it, to say that, well, there is

17  profit to be made from the 65 acres as well as the designated

18  remainder.

19  Q.  Just to be clear then, the $550,000 allocation you made

20  was to all of Parcel 1, which included the lots and the

21  designated remainder?

22  A.  That's correct.

23  Q.  And the 1,055,000, or whatever is left over, you have

24  applied all of that to Parcel 3, which is the pink, correct?

25  A.  The 65 acres, yes.

677

1  Q.  I know you used this tax statement to help you come to

2  your conclusion on land cost valuation, right?

3  A.  Yeah.  It was, as I said during my direct examination,

4  even if you look at the properties and the 35 acres out of 98,

5  you get about the same ratio as what, you know, the County

6  assessed value is.

7  Q.  You didn't look, sir, at the County assessment for Parcel

8  3, though?

9  A.  No.

10  Q.  So you don't know what the County assessed Parcel 3 for,

11  do you?

12  A.  No.

13  Q.  But you used the County assessment to come up with an

14  allocation figure for Parcel 1, right?

15  A.  Yes, because that we have the total sales for 1.6, that,

16  we know.

17  Q.  Yes.

18  A.  And 550,000 was allocated to the 35 acres -- I beg your

19  pardon.  33 and a half acres.

20  Q.  Yes.

21  A.  If -- I didn't calculate any potential profits from the 65

22  acres, and so I didn't need any land values for that.  I

23  wanted to calculate the portion of the interest that goes to

24  the 33 and a half acres for the land.  So I used the assessed

25  value, which turns out to be, as I said earlier,

678

1   proportionately for the relative land, the total land, about

2   the same.

3   Q.  But it is not the same because you don't know, you have no

4   idea, what the tax assessment was for Parcel 3?

5   A.  No, no, no, no.  When I said proportionately, I'm talking

6   about the size of the land.  I'm not talking about proportion

7   as to the assessed value.

8   Q.  Proportionately, we can see how Parcel 1 relates to Parcel

9   3, can't we?

10  A.  Yes.

11  Q.  And we have a tax statement of $550,000 for Parcel 1?

12  A.  Yes.

13  Q.  We don't have a tax statement for Parcel 3?

14  A.  Correct.

15  Q.  So although we can see the relationship between the land

16  sizes of those parcels, you have no idea what the county had

17  assessed each of those parcels, so you have no idea what the

18  value of Parcel 3 is as compared to Parcel 1, when using the

19  Parcel 1 evaluation?

20  A.  No, that's not -- okay.  You did not provide any county

21  tax records for the 65 acres, I grant that.  I haven't seen

22  it.  You haven't provided it.

23  Q.  You didn't go look for any, did you?

24  A.  No.  But, but when you buy a property, the assessed value

25  turns out to be what you pay for the land.  That's how, you

1    know, property taxes are determined.

2            In 2005, which was, you know, very close to when this

3    property was purchased, the year following, the value of this

4    35 -- 33 and a half acres was determined at $551,000.

5            Now, 551,000 out of 1.6 is about a third.  Okay.  And

6    that's what I used.  And unless you show me the tax for the 65

7    acres being $135,000, as Mr. Wu has assumed, I stand by my

8    estimate.

9    Q.  All right.  I understand that you do.  I just want to ask

10   a couple of final questions about this issue.

11   A.  Sure.

12   Q.  You understand, do you not, that even though Mr. Wu's

13   company entered into a contract to buy this land in May of

14   2004, it didn't close escrow until towards the end of December

15   of that year, correct?

16   A.  That's correct.

17   Q.  So you don't really know whether or not that 2005

18   assessment captured that sale, do you?

19   A.  No, of course, it did.  It was a 2005-2006 bill.

20   Q.  All right.  And you are sure that the County Assessor

21   based that 2005-2006 bill on the late December 2004 close of

22   escrow, right?

23   A.  That's my assumption.

24   Q.  That's your assumption, but you don't know that, do you?

25   A.  Well, Counsel, it doesn't take the government a year to

1   catch up with the sale.  You know, the transaction was done in

2   2004.  It gets recorded right away.

3   Q.  Sir, have you ever heard of a supplemental tax bill?

4   A.  Yes, of course.

5   Q.  And you understand then that every time you buy a piece of

6   property towards the end of a tax year, that eventually, you

7   get a supplemental tax bill, correct?

8   A.  Yes.

9   Q.  That's because the government doesn't catch this stuff

10  immediately; isn't that correct?

11  A.  That's assuming if you buy the property and if the tax is

12  due immediately or within a short period of time after.  This

13  is a 2005-2006 property tax bill.  And the property, this deal

14  was closed in end of 2004.

15         So it is not -- this is not the property tax that's

16  due February of 2005.

17  Q.  I understand what you said and I want to ask a different

18  question.  Other than the tax statement and the closing

19  statement that showed that Joe Wu's company paid 1.6 million

20  for the entire property, did you rely on any other documents

21  in coming up with your land value allocation formula?

22  A.  No.  Again, there were two things.  One was the property

23  tax and the other one was the ratio of the land, the size of

24  the land.

25  Q.  All right.  And so --

681

1    A.   They both turned out to be about the same.

2    Q.   And so you did not rely on any other documents, you have

3    just stated, right?

4    A.   Yes.

5    Q.   And did you rely on any other information from any source

6    in coming up with your land value allocation formula?

7    A.   What do you mean?

8    Q.   I mean did anybody tell you anything that figured into

9    your coming up with this ratio that you were using?

10   A.   As far as the proportion of the interest on the loan

11   that's allocatable to these two properties, no.

12   Q.   That's not what I'm asking about.  When you start talking

13   about the allocation of interest, you are talking about using

14   your allocation formula, right?

15   A.   Yes, of course.

16   Q.   Yes.  And I'm not asking about that.

17        What I'm asking is you have come up with a land

18   allocation formula, and you have relied on a tax statement and

19   a closing statement.

20   A.   Yes.

21   Q.   And you haven't relied on any other documents.  Have you

22   relied on any other information to formulate that formula that

23   you have come up with?

24   A.   No.

25   Q.   Nothing else?

682

1   A.   Not that I recall off the top of my head.

2   Q.   Nothing that the lawyers have told you?

3   A.   No.

4   Q.   And nothing that Mr. McIntosh has told you?

5   A.   No.

6   Q.   Well, did you know, sir, that all of the development

7   infrastructure was already created and built in Parcel 1 when

8   Mr. Wu's company bought the property, and none of it had been

9   built in Parcel 3?

10  A.   Yes, I did.

11  Q.   You did know that?

12  A.   Yes.

13  Q.   And did you also know that there has been testimony in

14  this court yesterday that the value of that infrastructure

15  that was in Parcel 1 when Mr. Wu bought it was a million-nine?

16  A.   Yes.

17  Q.   And even knowing those facts, you have used a formula that

18  allocates $550,000 to the developed property and a million

19  dollars to the undeveloped property, correct?

20  A.   That's what the County says, yes.

21  Q.   Okay.  Now, sir, when were you hired to give expert

22  testimony in this case?

23  A.   About the middle of 2009.

24  Q.   And how much are you being paid to do that?

25  A.   My hourly rate is 320.

683

1  Q.  And you put in about 70 hours?

2  A.  Approximately, yes.

3  Q.  And so you are getting about 22,000, 23,000 to come here

4  and testify on behalf of Mr. McIntosh, right?

5  A.  Yes.

6  Q.  And you were told that Mr. McIntosh is seeking all of

7  Mr. Wu's profits from this development, right?

8  A.  Well, I was asked to calculate how much profit Mr. Wu will

9  make, so I don't know about the legal aspects of it.

10  Q.  Well, are you telling us that nobody told you that

11  Mr. McIntosh is asking the jury to award him all of Mr. Wu's

12  profits?

13  A.  All I know is in trademark cases, the plaintiff, if

14  prevails, is entitled to disgorgement of profit.  I don't know

15  what has been argued by counsel.

16  Q.  Do you know that this is not a trademark case?

17  A.  Well, infringement.  Again, all I know is infringement.

18  I'm not a lawyer, I'm an economist.

19  Q.  All right.  So you understand that an infringement case,

20  the plaintiff is entitled under some circumstances to ask for

21  the defendant's property, correct, you know that?

22  A.  Again, I have some familiarity with the law, but I am not

23  an expert in the area.  So, yes, I have some ideas.

24  Q.  And you knew then that Mr. McIntosh was seeking profit

25  from this developer, correct?

684

1    A.   Yes.

2    Q.   And you knew that you were being paid over $20,000 to

3    calculate what that profit was, correct?

4    A.   I was asked to calculate how much that profit was.

5    Q.   Now, you have been a professional expert witness for about

6    18 or 19 years, right?

7    A.   I am a forensic economist, and I have been doing it for 24

8    years now.

9    Q.   But what you have been doing for 20 some years is

10   supporting litigation in court, like testifying as you are

11   today, correct?

12   A.   Yes.

13   Q.   That's how you make your living, as a professional

14   witness?

15   A.   Well, I disagree with the professional witness part.  I'm

16   a forensic economist.

17   Q.   You have testified in 2 or 300 trials?

18   A.   Yes, most of them for defense.

19   Q.   And you have testified on behalf of Mr. Braze's clients

20   before, right?

21   A.   I have been retained by his law firm.  I have also been on

22   the opposite of his firm.

23   Q.   Why did you tell me that, sir?  I didn't ask that.

24   A.   I just want you to know.

25   Q.   You are not a real estate appraiser?

685

1   A.   I am not.

2   Q.   You have never had any training as a real estate

3   appraiser?

4   A.   Not formal.

5   Q.   You have never held yourself out to be a real estate

6   appraiser?

7   A.   No, sir.

8   Q.   You don't charge for appraising real estate?

9   A.   No.

10  Q.   You have never even been to the Wasco development, have

11  you?

12  A.   No.

13  Q.   You have never seen those homes?

14  A.   No.

15  Q.   Never seen pictures of those homes?

16  A.   No.

17  Q.   Don't know what kind of amenities Mr. Wu puts in those

18  homes?

19  A.   That's correct.

20  Q.   You have never taken the time to investigate what other

21  homes in the Wasco area outside of this development have sold

22  for, have you?

23  A.   Didn't have to.

24  Q.   Now, let's take a look at Exhibit P 112, I believe it is.

25  A.   I'm sorry, Counsel.  Would you identify which one P 112

686

1  is?

2  Q.  Yes.  P 112 is the profit and loss projected for the homes

3  on 38 lots.

4  A.  Yes, sir.

5  Q.  Now, Mr. McIntosh's lawyers asked you to perform some

6  calculations to determine what Joe's profit is going to be at

7  some point out in the future, right?

8  A.  Yes.

9  Q.  And that's based on various assumptions you have made with

10  regard to those 38 lots that are -- that have no houses built

11  on them, correct?

12  A.  Yes.

13  Q.  And you have decided that there is going to be gross sales

14  proceeds on those 38 homes that aren't there yet for over $9

15  million, right?

16  A.  Yes.

17  Q.  And you have also concluded that Mr. Wu is going to make a

18  profit on that endeavor of $2.6 million, correct?

19  A.  Yes.

20  Q.  Now, first of all, you assumed that Mr. Wu wants to build

21  homes on those 38 lots at this point in time, correct?

22  A.  At some point, yes.

23  Q.  And what did you base that assumption on?

24  A.  Well, he did everything, as far as preparation goes, to

25  build homes.

687

1   Q.  What did he do to prepare 38 lots to build homes that

2   already had the infrastructure built?

3   A.  He had the permits for what kind of homes to be built on.

4   Q.  So when did he buy those permits?

5   A.  I can't recall.  It was after the purchase of the

6   property.

7   Q.  And he purchased the property in late 2004, right?

8   A.  Yes.

9   Q.  And you don't know when he purchased the permits, right?

10  A.  Well, I can go through them and tell you.

11  Q.  Please do.

12  A.  The permits are in 2005.

13  Q.  You know in 2005, Mr. Wu intended to build houses on those

14  38 lots?

15  A.  That's right.

16  Q.  How do you know that five years later, he still intends to

17  build houses on those 38 lots?

18  A.  Well, that's his decision.  I can't deny that.  All I know

19  is at the time, that appears to be his intention.

20  Q.  Yeah.

21  A.  What he is going to do now is up to him.

22  Q.  You have no idea what he wants to do now with those 38

23  lots, do you?

24  A.  Again, I'm not in Mr. Wu's head, so I don't know what he

25  is going to do, but the project has a potential of $2.6

688

1   million of profit.

2   Q.  It also has a potential to lose a lot of money, doesn't

3   it?

4   A.  How do you figure?

5   Q.  Well --

6          THE COURT:  Wait a minute.  We don't switch roles

7   here.

8          THE WITNESS:  Sorry.

9   BY MR. HASSING:

10  Q.  Sir, is it your testimony that all developers always make

11  profit on all subdivisions that they build?

12  A.  No.

13  Q.  Do you have any idea -- strike that.

14         What do you base your contention on that a developer

15  of these 38 homes will make a profit in the future?

16  A.  If he sells these houses at the same price as he has been

17  selling the other 19, then he will make a $2.6 million profit.

18         And as I said earlier, I have used the average prices

19  for basically 2007, 2008, and 2009.  So I expect him to

20  actually make more than that because the economy is going to

21  pick up, and sell at high prices.

22  Q.  All right.  Let's talk about the economy for just a

23  moment.  The economy -- you being an economist probably know

24  this better than I -- is not in very good shape right now,

25  correct?

689

1    A.   Yes.

2    Q.   All right.  And I guess you believe that it's going to get

3    better in the near future?

4    A.   Yes, it will.

5    Q.   Uh-huh.  And you are basing your assumptions on the profit

6    that will be made on his 38 homes, if they are ever built, on

7    the fact that the economy is going to get better, correct?

8    A.   Oh, no.  No.  No.  No.  If I make the assumption that the

9    economy is going to get better, then the profits would be even

10   higher than they are.

11         I have assumed that housing prices will average about

12   what they did in 2007, 2008, and 2009.

13   Q.   All right.  Is it possible, sir, that the economy will get

14   worse as 2010 progresses towards December?

15   A.   I know of no economic projections that say that.  I know

16   of no economist that predicts that.  And according to the

17   Anderson projections from UCLA, the real estate market will

18   pick up.

19   Q.   Now, do you know if all of these forecasts and projections

20   that you have just talked about are going to bear fruit that

21   they are accurate; do you know that, sir?

22   A.   Do I know whether they are going to be?

23   Q.   Yes, sir.

24   A.   As a Ph.D. in Economics, I agree.

25   Q.   I understand you agree, but do you know that is going to

1  happen?

2  A.   No, I don't have a crystal ball.  I wish I did.

3  Q.   It could get worse; isn't that correct?

4  A.   That would be pure speculation if we say, oh, it's going

5  to get worse.   In my opinion, it would be pure speculation,

6  not based on anything that any trained professional would

7  agree with.

8  Q.   And you don't want to give this jury any speculation, do

9  you?

10  A.   I have used my assumptions based on actual data.

11  Q.   All right.

12  A.   Not guesses.

13  Q.   When is Mr. Wu going to start building these 38 homes?

14  A.   That's up to him.

15  Q.   When -- where is he going to get the financing for these

16  38 homes?

17  A.   Same way he got the financing for the other 30 homes.

18  Q.   How do you know?

19  A.   That's the way people do.   That's the way developers

20  function.   They get a loan, they build.

21  Q.   You are assuming Mr. Wu still has a great relationship

22  with East West Bank, right?

23  A.   I have no reason to assume he doesn't.   And whether it is

24  East West Bank or another bank -- actually, I think East West

25  Bank should really like Mr. Wu because he paid them a lot of

1   money.

2          THE COURT:  Let me know when you have a natural break

3   in your questions.

4          MR. HASSING:  I'm going to make one motion and then

5   I'm going to have a break.  I move, your Honor, that Exhibit

6   P 115 and P 112, their provisional admittance, be taken out of

7   evidence based on speculation.

8          THE COURT:  That request is denied.  It will be a

9   matter of credibility.  It will be a matter of jury

10  determination on facts, and, of course, it's free to argue

11  during the closing argument.

12         MR. HASSING:  Thank you, your Honor.  This is a great

13  time to break.

14         THE COURT:  All right.  Ladies and gentlemen, it is

15  now noon.  I have a judge's meeting at -- during the noon

16  hour, and I'm quite sure I can be done and back by 1:15, so I

17  would ask you to be back at 1:15 in the jury room so we can

18  finish with this witness.  Please remember the admonitions.

19  Don't have anything to do with the case during the lunch hour.

20         We will see you at 1:15.

21         (The jury left the courtroom.)

22         (The lunch recess was taken.)

23

24

25

1                          AFTERNOON SESSION

2      1:15 p.m.

3            THE COURT:  Back on the record.  Counsel are present.

4      Are we ready for the jury?

5            MR. HASSING:  Yes, your Honor.

6            THE COURT:  Okay.

7            (The following proceedings were had in the presence

8            of the jury, to wit:)

9            THE COURT:  All right.  And the jury is back.

10     Witness is on the stand.  We will go ahead and finish with

11     cross-examination.

12           Mr. Hassing.

13     BY MR. HASSING:

14     Q.  Good afternoon, Mr. Merati.  I would like you to direct

15     your attention, if you would, to P 114, which is your analysis

16     of the 11 homes that remain unsold, correct?

17     A.  Yes.

18     Q.  And in performing that analysis, you have determined, have

19     you not, that Mr. Wu or his company will make a profit, when

20     he eventually sells those homes, of about $500,000, correct?

21     A.  Yes.

22     Q.  Now, do you know when these 11 homes are going to sell?

23     A.  Not specifically.

24     Q.  Do you know how much they will sell for, if they ever to

25     sell?

1  A.  The assumption is based on the average price of the other

2  19 that have been sold.

3  Q.  All right.  And some of those were sold in 2007?

4  A.  Some, 2007, 2008, and 2009.

5  Q.  All right.  Do you know how many houses Mr. Wu has sold in

6  2009?

7  A.  Yes.

8  Q.  Do you know how many houses he sold in 2010?

9  A.  This year?

10  Q.  Yes, sir.

11  A.  No.

12  Q.  Do you know what kind of traffic he is having now through

13  his subdivision, people looking at houses?

14  A.  No.

15  Q.  Do you know if that traffic -- strike that.

16       Have you -- do you think that it would be helpful to

17  know what the traffic pattern is for the last two months as

18  opposed to earlier dates in trying to project when these 11

19  houses might sell?

20  A.  Counsel, it is not a question of --

21       THE COURT:  Just answer his question, please.

22       THE WITNESS:  I'm sorry.  What's the -- would you

23  repeat the question?

24  BY MR. HASSING:

25  Q.  Do you think it would be worthwhile information for you

694

1  to, have as you try to determine when these houses are going

2  to sell in the future, to know what kind of traffic is going

3  through those subdivisions now as opposed to, say, six or

4  eight months ago?

5  A.   No.

6  Q.   Would it be helpful to know whether anybody has looked at

7  those houses right now?

8  A.   Again, as of this time, as of this moment, if they are

9  looking at it, no.

10  Q.   How about within the last 30 or 45 days, would that be of

11  any help to you in determining when these houses might sell?

12  A.   No.

13  Q.   What if nobody was looking at the houses in the last 45

14  days; would that have any impact on your conclusion?

15  A.   Again, no, because these houses are going to be sold in

16  the future.

17  Q.   When?

18  A.   Well, my analysis is made such that it really doesn't

19  matter when these houses are going to be sold or when the 38

20  are going to be built and sold, because what I have done is I

21  have assumed prices based on 2007 to 2009.

22       You see, houses don't go out of style.  If Mr. Wu was

23  selling a perishable product, I could understand that this

24  will have no value in the future.  If he were in the fashion

25  industry, one could argue that, well, this style is not going

695

1   to be in anymore, so next year, it doesn't have a value.

2          These are houses.  If anything, they would appreciate

3   in the future.  So it doesn't matter if anyone has looked at

4   them for the past 30, 40 or whatever days.  It is more a

5   function of accepting the fact that these houses will be sold.

6   When, in the future, frankly, the longer we wait, the higher

7   the prices are going to be.  So time is on his side.

8   Q.   While time is on his side, who is paying the property

9   taxes on all these houses?

10  A.   Property taxes are paid by Mr. Wu.

11  Q.   Who is paying the utility fees that are being assessed to

12  these houses that are sitting there?

13  A.   Well, again, if there is no one living in them, I don't

14  know what kind of utility bills there will be, but whatever is

15  assigned, since they are not sold, expenses are paid by

16  Mr. Wu.

17  Q.   Who is going to be taking care of the landscaping?

18  A.   The landscaping for the 11 homes is no different than the

19  other 19 that have been done already, but again, these

20  expenses, until they are sold, these are expenses paid by

21  Mr. Wu.

22  Q.   Well, when you say that the landscaping costs or

23  maintenance for these 11 houses is no different than the 19,

24  don't you understand that the owners of the 19 houses that

25  have been sold are taking care of their own landscaping and

696

1   maintaining it?

2   A.  Well, that depends on what you mean by the landscaping.

3   If it is the grass in the front yard, then the owners will pay

4   for it, but if it is the entire project, then it would be

5   different.

6   Q.  I'm talking about the landscaping within each lot --

7   A.  Okay.

8   Q.  -- of those 11 lots that are sitting there?

9   A.  Right.

10  Q.  You understand that while time is on Mr. Wu's side, he

11  will be paying to take care of that landscaping?

12  A.  Yes.

13  Q.  Who is going to be taking care of any security issues and

14  vandalism issues that take place with those 11 houses?

15  A.  Again, these will be things that Mr. Wu will deal with.

16  Q.  In order to determine what kind of profit Mr. Wu is going

17  to end up with when he sells those 11 houses, you need to know

18  how long he is going to have those houses and incur these

19  costs, don't you?

20  A.  Again, Counsel, the expenses you mentioned are not

21  significant expenses relative to even a -- you know, an

22  increase in price of a couple of percentage points will more

23  than make up of any of these costs to be paid.

24  Q.  Has the value of homes in the Central Valley of California

25  decreased between 2007 and 2008?

697

1   A.   Yes.

2   Q.   Have they decreased between 2008 and 2009?

3   A.   Yes.

4   Q.   Have they decreased between 2009 and 2010?

5   A.   Not that I'm aware of.

6   Q.   You have done research to make that determination?

7   A.   Yeah.  And we are only two months into 2010, and the data,

8   I couldn't find any data to show that.

9   Q.   So you don't know one way or the other?

10   A.   Well, as I said, I haven't seen any data.

11   Q.   All right.  And do you know, sir, whether or not the value

12   or the price of homes is going to continue to decline in 2010?

13   A.   I believe they are going to go up.

14   Q.   That's what you believe?

15   A.   Yes.  As well as the UCLA business school, as well as a

16   number of other entities, who make a living making these

17   projections.

18   Q.   You have indicated that the housing expense for Mr. Wu's

19   employees that work in the subdivision of $35,000 should be

20   disallowed, correct?

21   A.   Well, not all of it.

22   Q.   You've allowed $2,000?

23   A.   That's right.  The other 33,000 is for a house that Mr. Wu

24   purchased.

25   Q.   Well, let me ask this.  If Mr. Wu purchased a house in

1   Wasco, and he has employees that work in his subdivision in

2   the Wasco -- in Wasco, residing in that house, do you know

3   whether or not he is receiving credit from them for rent?

4   A.  I'm sorry.

5   Q.  You don't understand that question?  You know, I don't

6   even understand it.  Let me withdraw it and ask a different

7   one.

8           Mr. Wu is providing living quarters for a number of

9   his workers in Wasco, correct?

10  A.  I don't know.  I saw employees, part of those housing

11  expenses, at about $2,000, which is what I calculated.

12  Q.  You also have testified that Mr. Wu has employees living

13  in a house that he bought, correct?

14  A.  No.

15  Q.  Oh, okay.

16  A.  That wasn't my testimony.

17  Q.  All right.  Let me back up then.  If you understood that

18  Mr. Wu bought a home in Wasco to house some of his employees

19  that worked in the subdivision, you would allow him some sort

20  of an expense for the cost of -- a portion of the cost of that

21  house, wouldn't you?

22  A.  No.

23  Q.  You wouldn't?

24  A.  No.

25  Q.  If you did that, that would decrease the profit, wouldn't

1    it?

2    A.   If that's an allowable expense, yes, it would.

3    Q.   Yes.

4    A.   But that assumes that this house will not increase in

5    value in the future.  And the house is not a perishable item,

6    and you can't write it off in one year.  So the house was

7    there and still here, and it will be here in the future.

8    Q.   Do you know how long he has had employees living in that

9    house?

10   A.   Well, the project is finished, so I don't see any

11   employees living there.

12   Q.   Well, how could the project be finished if he still has 38

13   lots there to take care of and maintenance on 11 houses?

14   A.   Well, so you are agreeing with me that the 38 lots will be

15   completed then and houses built on it, is that the --

16   Q.   You cannot ask me questions, sir.

17   A.   No.  I'm just stating that -- well, your questions are

18   contradicting each other.

19   Q.   Let me ask it this way.  There are 38 lots out there with

20   no homes on them, right?

21   A.   Yes.

22   Q.   Somebody has to maintain the weeds and whatnot on those

23   lots, right?

24   A.   Yes.

25   Q.   There are 11 homes that haven't been sold?

1  A.  Yes.

2  Q.  Somebody has to maintain the landscaping and everything

3  else that goes with those houses, correct?

4  A.  Yes.

5  Q.  Mr. Wu needs employees to do that, right?

6  A.  Not necessarily.  They could be contracted out.

7  Q.  But they are not?

8  A.  I'm sorry.

9  Q.  They are not contracted out, are they?

10 A.  I don't know.  That's Mr. Wu's decision.  But what I'm

11 saying is those are expenses assigned to the project.  It is

12 not the cost of the house that should be subtracted.  And if

13 Mr. Wu chooses to provide housing for his employees, as

14 opposed to contract out the landscaping to some gardeners,

15 that's his option, and I'm not questioning that.

16         What I'm saying is he bought the house, okay, and I

17 don't know who lives in the house, but he bought the house.

18 That house has -- had a value when he bought it, still has a

19 value, and will have a value in the future when he sells it.

20         He stands to actually gain a profit from that

21 transaction.  So it is not -- you know, to write it off as a

22 business expense for this project is not something I would

23 agree with.

24 Q.  What about this line I, Housing Expense-Employee, causes

25 you to believe he is trying to write off the house?

1   A.   The portion of the expenses for the house that he is

2   writing off as a business expense.

3          MR. HASSING:  That's my last question, your Honor.

4          THE COURT:  Mr. Alexander?

5          MR. ALEXANDER:  Thank you, your Honor.

6                      CROSS-EXAMINATION

7   BY MR. ALEXANDER:

8   Q.   Good afternoon.

9   A.   Good afternoon.

10  Q.   I won't be as long with you, I promise.  You are aware of

11  the forecasts that have been predicting a new release of

12  foreclosure homes into the market in 2010 by banks that have

13  acquired ownership of homes through foreclosure?

14  A.   These are houses that have been in fore --

15  Q.   Are you aware of that?

16  A.   Yes, I am.

17  Q.   Thank you.  And you are aware of the forecasts that

18  predict that there will be another decline in housing prices

19  as a result of the flood of these foreclosure homes onto the

20  market in 2010; is that right?

21  A.   I'm not aware of that.

22  Q.   Okay.  And are you aware, based upon any studies you have

23  done, that the cost of building a home is greater than the

24  sales price that can be obtained for that same home in today's

25  market?

1   A.   I haven't seen anything to indicate that.

2   Q.   And your assumption based upon the numbers you provided --

3   and forgive me if my math is wrong, but I don't think it is --

4   you're predicting that Mr. Wu is going to be making $70,000

5   per home for the remainder of the homes in the 38 lots,

6   correct?  $70,000 per home profit?

7   A.   I don't know.  Let me see.

8   Q.   Okay.

9   A.   That's not what my numbers show.

10  Q.   Looking at a net profit for 38 homes of $2.6 million.

11  A.   Yes.

12  Q.   Correct?

13  A.   Yes.

14  Q.   Divided by 38.  How much is that?

15  A.   Oh, that's for the 38 homes, yes, not for 68.

16  Q.   No, sir, I said for the 38.

17  A.   For the 38, yes.

18  Q.   $70,000 profit per home on those 38 homes, is your

19  testimony?

20  A.   Yes, yes.

21  Q.   And likewise, your testimony is those same 38 homes are

22  going to sell for an average of $240,000 per home, correct?

23  A.   Again, I calculated --

24  Q.   Is that your testimony?

25  A.   Well, Counsel, I can't tell you yes or no because --

703

1   Q.  Look at 112.

2   A.  Those are per model, Counsel.  Did you add them all up and

3   take an average?

4           THE COURT:  Wait a minute.  You can't ask him

5   questions.

6   BY MR. ALEXANDER:

7   Q.  Thank you.  I took your projected home sale revenue of $9

8   million and I divided it by --

9   A.  By the total.

10  Q.  Correct.

11  A.  All right.

12  Q.  And that comes out to 240, unless my math is crazy.

13  A.  Okay.

14  Q.  So what I'm trying to get is you expect Mr. Wu to be able

15  to earn a 30 percent profit per home on those remaining 38

16  lots, correct?

17  A.  Yes.

18  Q.  And you are aware currently that the national builders are

19  earning between 4 --

20          MR. BRAZE:  Objection, your Honor.  That form of

21  question is improper.

22          THE COURT:  Which one?

23          MR. BRAZE:  When you start a question out as, "as you

24  know" or "do you know," that lacks foundation because he is

25  trying to introduce facts in his questions.

704

1          THE COURT:  Just a minute.  It's the only way he can

2   get to it, by saying, "Do you know this," and he is entitled

3   to ask leading questions which would include the suggested

4   answer.

5          MR. BRAZE:  But I think you can't ask -- "isn't it

6   true" type questions.  They lack foundation.  "Isn't it true

7   that," when you are attempting to introduce evidence through

8   the question.

9          THE COURT:  Please, if you are going to continue

10  along these questions, just say, "Do you know."  He either

11  does or doesn't.

12         And ladies and gentlemen, just keep in mind, as I

13  told you at the beginning of the case, questions, no matter

14  who is asking them, are not evidence themselves.  The only

15  reason that they are important is because they can give

16  context to the answer.

17         Any questions?

18         Go ahead.

19  BY MR. ALEXANDER:

20  Q.  Do you have any awareness as to the average profit margins

21  being generated right now by home builders who are publicly

22  traded companies?

23  A.  No.

24  Q.  In connection with your projections, did you take into

25  account the existence of the golf course?

1   A.   No.

2   Q.   Have you ever been to Wasco?

3   A.   I have answered that question already, no.

4        THE COURT:  Sir.  You haven't answered it by this

5   counsel.

6        THE WITNESS:  Oh.

7        THE COURT:  The rules are any counsel can ask the

8   same question.  It's just the same counsel can't ask the same

9   question.

10       THE WITNESS:  I understand.

11       No, sir.

12  BY MR. ALEXANDER:

13  Q.   Have you ever conducted any studies about the City of

14  Wasco's real estate market involving the sale of new homes?

15  A.   Yes.

16  Q.   Okay.  What studies have you conducted yourself?

17  A.   I looked at the markets in Wasco over the past couple of

18  years, and as I indicated earlier, the market was not -- the

19  data was not really available for 2010.

20  Q.   And was the peak of the residential pricing market in

21  about October or November of 2006?

22  A.   Mmmmm, sounds about right, 2006, but I can't remember what

23  time.

24  Q.   And in 2007, there was certainly decline in the market

25  value, correct?

1    A.   Yes.

2    Q.   That's both of resale homes and of new home purchases?

3    A.   Yes.

4    Q.   And then the decline accelerated in 2008?

5    A.   Yes.

6    Q.   Accelerated in 2009?

7    A.   Yes.

8    Q.   And has now somewhat flattened for the time being?

9    A.   It has become "stabilized," is what we call it.

10   Q.   Okay.  And did you take into account on your future

11   projections the availability of capital to Mr. Wu to build

12   additional homes?

13   A.   Yes.

14   Q.   Okay.  And you assumed that Mr. Wu would be able to obtain

15   as much financing as he needs to build the 38 homes; isn't

16   that correct?

17   A.   Yes.

18   Q.   And did you take into account the fact that in the fall of

19   2008, we had a collapse of the financial markets that led to

20   an inability of people to borrow money?

21            MR. BRAZE:  Objection, lack of foundation.

22            THE COURT:  No, the objection is overruled.  The

23   question itself is foundational.

24            THE WITNESS:  Am I aware of the banking crisis?  Yes.

25   ///

1   BY MR. ALEXANDER:

2   Q.  Yes, sir.

3   A.  Yes.

4   Q.  Earlier in the -- the rate you are being paid is $320 an

5   hour?

6   A.  Yes.

7   Q.  That's for all work you are doing?

8   A.  Yes.

9   Q.  And through today's date, you have roughly 70 or 80 hours

10  work on this matter?

11  A.  I don't know the exact number of hours.

12  Q.  And I'm not looking for exact.  I'm looking for roughly.

13  A.  It's in excess of 70 hours.

14  Q.  In excess of a hundred?

15  A.  No, no, no.

16  Q.  Okay.  And are you being paid by the attorneys or by

17  Mr. McIntosh?

18        MR. BRAZE:  Objection.  Calls for attorney-client

19  privilege.

20        THE COURT:  Sustained.

21  BY MR. ALEXANDER:

22  Q.  What sort of discount rate did you apply to take these

23  future dollars that Mr. Wu is sometime going to receive and

24  bring them back to today's present value?

25  A.  Oh, I actually used a net discount rate of zero, which is

708

1   a conservative assumption.  That's not to say zero interest

2   rate.  You do know what net discount rate -- I'm sorry.

3   Q.  A discount rate is a rate that takes into account the

4   risk, for example, that the market won't be as economists like

5   you predict, correct?  Doesn't a discount rate have risk in

6   it?

7   A.  Yes, of course.

8   Q.  So if an economist like you, or those like you, who

9   believe this economy is going to turn around, are incorrect,

10  then a discount rate should reflect that uncertainty as to

11  what the economy is really going to do, right?

12  A.  If you believe that, yes.

13  Q.  In conjunction with the opinions you have been giving

14  indirectly about the value of the property, at least the land,

15  you didn't conduct any appraisals, correct?

16  A.  That's correct.

17  Q.  And nor are you qualified to do an appraisal, correct?

18  A.  That's correct.

19  Q.  And you didn't review any comparable sales data, correct?

20  A.  For what?

21  Q.  For the sales of homes.

22  A.  Of course, I did.

23  Q.  Operable sales data for the sales of land?

24  A.  Not for land.  The only one I looked at is the 65 acres

25  that's available for sale now for $2.8 million.

709

1  Q.  And the types of homes that you believe Mr. Wu will be

2  building on the 38 lots are what we call "spec homes"; isn't

3  that correct?

4  A.  Yes.

5  Q.  And "spec" means speculative, correct?

6  A.  Okay.

7  Q.  Is that correct?

8  A.  Yes.

9  Q.  You understand the term "spec homes"?

10  A.  Yes.

11  Q.  Okay.  And what it means by speculative is that when you

12  are building the homes, you don't know if you are going to

13  sell them or when you are going to sell them or for how much;

14  isn't that correct?

15  A.  Counsel, I don't know.

16  Q.  And that's fair.  If you don't know, you don't know.

17  A.  I'm an economist, so let's talk about the numbers.  I'm

18  not into semantics, so let's stick with the numbers.  That's

19  all I'm qualified to testify on.

20        THE COURT:  Just a minute.  You are not entitled to

21  lecture.  You are not entitled to comment.  You are entitled

22  to answer questions that are asked.

23        THE WITNESS:  Yes, sir.

24        THE COURT:  Those are the rules and you are going to

25  follow them, clear?

1    THE WITNESS:  Yes, sir.

2    THE COURT:  Next question.

3  BY MR. ALEXANDER:

4  Q.  And there is another type of home that we call

5  "pre-solds," are you film with?

6  A.  Yes.

7  Q.  And a pre-sold home has less risk because you have the

8  home sold before you begin construction, correct?

9  A.  That's correct.

10  Q.  In this case, you took the highest risk scenario, which is

11  speculative homes, instead of a pre-sold assumption, correct?

12  A.  I don't know if I can answer that.  I have used the actual

13  sales of these homes, the 19 homes.

14  Q.  And you are aware that out of the 11 homes that have not

15  yet been sold, that -- you can correct me if I'm wrong -- some

16  of them were completed as long ago as 2006?

17  A.  Whether completed or not, I did not take into account.  I

18  looked at when they were sold.

19  Q.  I'm talking about the 11 that have not been sold.

20  A.  Right.  The date of completion is not a factor I

21  considered.

22  Q.  Well, it's in your spreadsheet, P 114.

23  A.  Yes.

24  Q.  And I see an "NOC" date?

25  A.  Yes.

711

1   Q.   And I assume that's "Notice of Completion"?

2   A.   Right.

3   Q.   So let's say, for example, on Lot Number 3, that home

4   shows a Notice of Completion date of December 7 of 2006.

5   A.   Yes, it does.

6   Q.   So this is now March of 2010, and the home hasn't been

7   sold, correct?

8   A.   Yes.

9   Q.   And likewise, there are other homes that were completed in

10  2007, three years later; they are still not sold, correct?

11  A.   Right.

12  Q.   But it's your testimony they will sell, correct?

13  A.   Yes.

14          MR. TRAVIS:   No further questions.   Thank you, your

15  Honor.

16          MS. BARNES:   The City has no questions, your Honor.

17          THE COURT:   Thank you.

18          Redirect?

19          MR. BRAZE:   Thank you, your Honor.

20                      REDIRECT EXAMINATION

21  BY MR. BRAZE:

22  Q.   Mr. Hassing asked you whether you had been out there to

23  look at the amenities in the house that Mr. Wu was building or

24  what the houses looked like.   Was that necessary?

25  A.   No, it wasn't necessary at all.   For the purposes of

1   comps, I used that the 19 homes that are sold.  You can't get

2   better comps for the unsold houses than the 19 that were

3   actually sold, because these are identical plans with

4   identical amenities.  So I had no need to do any market

5   studies of what the comps are out there because I had 19

6   comparables.

7   Q.  Now, you were questioned about how much time you spent, 70

8   hours.  Why did it take you so long?

9   A.  Well, if we had the supporting documents that matched the

10  general ledger numbers, then I wouldn't have had to spend that

11  much, but because of the contradictions, I had to find out --

12  go through everything and find out how Mr. Wu has done it and

13  why the number I'm arriving at was different than his.

14  Q.  You were questioned as to whether the property tax bill

15  for the year 2005 to 2006 could be a supplemental tax bill.

16  Do you know what supplemental tax bill is?

17  A.  Yeah.  A supplemental tax bill is -- property taxes go

18  from February to November and then November to February.  You

19  pay them in, I believe, November and April.

20       If you buy a house that's after the cutoff date for

21  the property taxes, then you will get a supplemental bill for

22  it at a later time.

23       But in this case, it would be a supplemental bill in

24  February of 2005.  Not 2005-2006.

25       So I accepted the $551,000 as the accurate assessed

713

1  value.

2  Q.  And when a house is sold today, in today's situation, what

3  is the assessed value?

4  A.  The assessed value becomes the sales price.

5  Q.  So in this case, the City of Wasco, after the sale of land

6  to Mr. Wu, based on that sale, assessed the property at

7  550,000?

8  A.  That's right.  Based on what was -- the property was

9  bought for.

10 Q.  Counsel questioned you and criticized your study because

11 he had assumed that Mr. Wu would sell the 38 lots as opposed

12 to build homes on them.  Why didn't you make that assumption?

13 A.  Because it makes no economic or business sense to do so.

14 All the ground work is done.  The plans are there and the land

15 loan is paid off.  The loan is paid off, actually, which makes

16 the 38 homes more profitable than the other 30.  There is no

17 loan payments to make on the land anymore, which is why it

18 leads to a higher profit per house for the 38 homes.

19       So it would make -- I mean it's a prudent business

20 and economic decision to go ahead and finish the project,

21 actually, get it done as soon as possible, because it will

22 cost you less money and sell it in the future at a much higher

23 profit.

24 Q.  You, during your analysis, said that the -- for interest

25 purposes, the value of the 65 acres was placed at $135,000?

714

1   A.   That's what Mr. Wu assumed, that the -- that the 65 acres

2   would be worth $135,000.

3   Q.   This is the property that's now on the market for 2.8

4   million?

5   A.   This is the same property that's listed for sale for 2.8,

6   yes.

7   Q.   Now, counsel criticized you for claiming that Mr. Wu would

8   make $70,000 per home on the next 38 houses sold after the 30.

9   Is part of the reason that number is so high is because the

10  loan has all been paid off in the first 30 houses?

11  A.   Exactly.  It's the expenses have been incurred for the 30

12  homes, and there is no interest to make on the land.  It makes

13  the other 38 homes more profitable.  And the $68,000 of profit

14  is not unreasonable at all.

15  Q.   So basically, a lower amount of profit was made on the

16  first 30 to make a larger amount of profit on the last 38?

17  A.   That's correct.

18        MR. BRAZE:  That's all I have.

19        THE COURT:  Redirect?  -- excuse me.  Recross.

20        MR. ALEXANDER:  I have a couple, your Honor.

21        THE COURT:  Mr. Alexander.

22                     RECROSS-EXAMINATION

23  BY MR. ALEXANDER:

24  Q.   Dr. Merati, the property tax here in California is from

25  July 1 to June 30th, correct?

1  A.  I believe so.  They are payable in two payments.

2  Q.  Okay.  I think you may have misspoke.  You said that it

3  was from February to November, or were you talking about the

4  pay dates?

5  A.  No, no.  I'm talking about when they are due.  You pay

6  them in November, half of it in November and half of it in

7  February.

8  Q.  But the tax year begins on July 1 and ends on June 30th?

9  A.  Right, fiscal.

10  Q.  And then each county in the State of California has its

11  own timeline as far as when it sends out its assessment of

12  value, correct?

13  A.  Yes.

14  Q.  So did you analyze when the County of Kern sends out its

15  assessment of value?

16  A.  No, sir.  This is a 2005-2006 bill.

17  Q.  I understand.  And that means it went from July 1 of 2005

18  to June 30, 2006 and was assessed at some point in time before

19  July 1 of 2005, correct?

20  A.  Yes.

21  Q.  You understand that --

22  A.  That's my assumption.

23  Q.  You understand for whatever reason, we pay our taxes in

24  advance for property?

25  A.  Right.

1    Q.  So we get a bill before the tax year comes due?

2    A.  Yes.

3    Q.  Okay.  So in relation to your assumption about the

4    2005-2006 property tax bill, your assumption is that that sale

5    of land occurred with sufficient time to give the county time

6    to update its assessment records when it sent its assessment

7    out in 2005?

8    A.  Yes.

9    Q.  So that's an assumption that you made?

10   A.  Yes.  This bill doesn't say "supplemental."  That's what

11   I'm trying to say.

12   Q.  I understand.

13   A.  It's not supplemental.  It is the actual tax bill for the

14   property.

15   Q.  I understand.  And sometimes tax bills come out that are

16   actual tax bills.  And then later, you get a supplemental bill

17   that says oh, by the way, we didn't pick your transaction up

18   fast enough, correct?

19   A.  Well --

20   Q.  Correct?

21   A.  That assumes that the property was not recorded for like

22   seven months, so that's a big assumption to make.

23   Q.  Well, let's talk about that just briefly.

24   A.  Okay.

25   Q.  If a property sells in December and the county's policy is

717

1   to send out its assessment on February 1, that's a pretty

2   tight time period, correct?

3   A.  I'm not aware of the county sending bills out in February

4   1.

5   Q.  Okay.  You didn't research the issue, did you?

6   A.  I did not.

7   Q.  And, likewise, you didn't research the issue of whether or

8   not this property could have had a reduction in its property

9   taxes on account of its assessed value being too high,

10  correct?

11  A.  I'm sorry.  I didn't follow that question.

12          MR. ALEXANDER:  Withdrawn.  Thank you, your Honor.

13          THE COURT:  Any further questions?

14          MR. HASSING:  No.

15          THE COURT:  Anyone?

16          MR. BRAZE:  No.

17          THE COURT:  Okay.  Thank you, sir.  You may step

18  down.

19          THE WITNESS:  Thank you, your Honor.

20          THE COURT:  Next witness.

21          MR. BRAZE:  Subject to a couple requests for judicial

22  notice, we would be resting.

23          THE COURT:  All right.

24          Defense?

25          MR. BRAZE:  The plaintiff requests that the Court

718

1  take judicial notice of Government Code section 66499.3.

2         THE COURT:  Any objection?

3         MR. ALEXANDER:  I'm sorry, your Honor.  I didn't hear

4  him.

5         THE COURT:  He is asking that the Court take judicial

6  notice of Government Code section 6499.3.

7         MR. ALEXANDER:  I have no objections.

8         THE COURT:  Done.

9         MR. BRAZE:  Should I read it into the record, your

10  Honor?

11         THE COURT:  Generally, that -- since it is law, it

12  generally would be included in the jury instructions rather

13  than now.

14         MR. BRAZE:  Okay.  We would also request the Court to

15  take judicial notice of Wasco Municipal Code section

16  16.28.020.

17         MR. ALEXANDER:  Your Honor, I believe we already have

18  the Wasco Municipal Code in evidence as an exhibit.

19         THE COURT:  I believe that that's true, so it is

20  already in evidence.

21         MR. BRAZE:  Thank you.  That comes from Exhibit J 8.

22         THE COURT:  That's in.

23         MR. BRAZE:  Plaintiffs rests.

24         MR. OKADIGBO:  The City calls Larry Pennell.

25                         **LARRY PENNELL,**

1    called as a witness on behalf of the Defendant City of Wasco,

2    having been first duly sworn, testified as follows:

3              THE COURT:  Please take the witness stand and tell us

4    who you are.

5              THE WITNESS:  My name is Larry Pennell.  I'm the

6    retired City Manager from the City of Wasco.

7              THE COURT:  Could you spell your last name for us?

8              THE WITNESS:  P-e-n-n-e-l-l.

9              THE COURT:  Thank you.

10             Direct?

11                      DIRECT EXAMINATION

12   BY MR. OKADIGBO:

13   Q.  Mr. Pennell, when -- during what period were you City

14   Manager for the City of Wasco?

15   A.  From 1994 to 2007, August of 1994 to August 2007.

16   Q.  Can you describe for the jury the City's structure of

17   government in terms of the role of the City Manager, City

18   Council, and that sort of thing?

19   A.  Absolutely.  In California, in general, all cities in

20   California, cities have an option of creating the council

21   manager form of government.  It is authorized by state

22   legislature and it is implemented by Municipal Code, an

23   ordinance adopted by the City Council.

24             Pretty typical format.  The City Manager is appointed

25   by and serves at the pleasure of the elected City Council.  In

1    Wasco's case, and in most cases in California, the City

2    Council is composed of five members, one being the mayor,

3    sometimes directly elected by the people, other times, being

4    elected by his or her colleagues on the Council.

5            The Manager then is responsible for, and brings to

6    the position, a certain level of competence in running a

7    municipal corporation.

8            And in my case, I was what would be considered a

9    strong manager.  I had full authority to prepare the proposed

10   municipal budget for the City Council's consideration,

11   unlimited discretion in the appointment and termination of

12   public employees, including department heads.

13           And in fact, as the administrative head of the City,

14   and for my own professional obligations, I tried to give the

15   City a face.  Rather than it being an institution of faceless

16   people, I tried to complement the City Council's public effort

17   to personalize local government.

18           And I think that's a legitimate role of the City

19   Manager, although you seldom find that in the job description.

20   Q.  During the time you were City Manager, the City sold

21   property that's known as "Tract 6451" to Mr. Wu's company,

22   either Northern or Lotus, correct?

23   A.  That's correct.

24   Q.  And did you participate in the negotiations for the sale

25   of that property?

1  A.  I was a part of that negotiation process, yes.

2  Q.  Can you describe what the City's intentions were during

3  that time?

4  A.  It was twofold.  One, to sell the Wasco Valley Rose Golf

5  Course to a private entity; and, two, to hopefully provide a

6  opportunity for residential development in and around the

7  facility.

8  Q.  Did the City have any hopes in terms of what a potential

9  developer would do with the property once the developer bought

10 the property?

11             MR. BRAZE:  Objection, vague.

12             THE COURT:  Just a second.  Sustained.  It is vague.

13 Rephrase.

14 BY MR. OKADIGBO:

15 Q.  When the City sold the property to Mr. Wu's companies, did

16 the city insist that Mr. Wu's companies develop the property

17 at all?

18 A.  No.  The sale was "as is" sale.  Our number one priority

19 was to sell the development.  We thought it had development

20 potential.  But we wanted to sell the golf course.  That was

21 the ultimate objective.

22 Q.  Did the City have any desire that the purchaser of the

23 property would develop the property differently than what was

24 proposed by Mr. McIntosh?

25 A.  I had -- though I don't know that I could characterize it

1    as the City had -- I had, and shared my hopes with a gentleman

2    by the name of Darrell Souza, who was involved in negotiating,

3    we negotiated principally with Mr. Souza as an agent of Mr. Wu

4    in the sales of the golf course.

5             I had hoped and expressed a hopefulness that we would

6    enjoy some upscale residential development.  I had seen enough

7    golf courses with rambling homes on the greens and on the

8    fairways that I thought this would be an ideal opportunity for

9    the developer to provide the community with some upscale

10   development and, at the same time, profit more handsomely from

11   the more expensive homes that conceivably could be built.

12   Q.   And you communicated this to Mr. Souza, correct?

13   A.   That's correct.

14   Q.   But you did not insist that Mr. Souza take up your

15   suggestion, did you?

16   A.   There were no restrictions on discretion that could be

17   exercised by the purchaser.  The last thing we wanted to do

18   was put any type of constraints or restraints on the

19   conditions surrounding the sale that might otherwise preclude

20   the transfer of title to Mr. Wu.

21   Q.   I'm going to show you what's marked as Exhibit J 7.  This

22   is the purchase and sale agreement between Mr. Wu's companies

23   and the City with respect to this property.  This is the first

24   page of agreement, just for reference sake, but I want to draw

25   your attention to paragraph 6.3 and 6.4.

723

1         Can you read it clearly enough there or would you

2    need help locating it and in any one of those binders?

3    A.  I think I will need to see a better copy, if I might,

4    please.  I hope I'm not the only one having problems reading

5    it.  Oh, that's better.  Thank you.  Did you want me to read

6    this?

7    Q.  You had just testified that the City was not going to

8    place any requirements on the present developer on whether to

9    develop or not or how to develop, correct?

10   A.  That's correct.

11   Q.  In terms of the City's representations to Mr. Wu's

12   companies, could you read paragraph 6.3?

13   A.  Certainly.

14            "Transaction.  Buyer hereby acknowledges and agrees

15             that seller has made no representations or

16             warranties, express or implied, as to the property or

17             improvements or contract rights or entitlements

18             relating thereto, or as to the condition, state of

19             repair or fitness for use of the property or such

20             improvements or appurtenances and" -- can't make out

21             the next symbol, but -- "buyer shall, following

22             satisfaction of the conditions contained in this

23             paragraph, accept title to the property and any

24             improvements thereon, or appurtenances thereto as is,

25             and without warranty, express or implied.  Buyer

724

1              acknowledges that the seller has not induced buyer to

2              execute and deliver this agreement based upon any

3              representation or warranties of seller and that buyer

4              is relying upon buyer's own independent investigation

5              of the property in entering into this agreement and

6              purchasing the property."

7    Q.  And that paragraph represents the nature of your

8    communications with Mr. Wu's companies, correct?

9    A.  That's correct.

10   Q.  Do you recall as part of those negotiations, the City

11   advising Mr. Wu's companies that infrastructure improvements

12   were in the ground?

13   A.  Yes.  It was obvious that there was some infrastructure

14   improvements in the ground.

15   Q.  And do you recall advising Joe Wu's companies that new

16   subdivision maps would have to be obtained for the property?

17   A.  I don't recall saying that, nor would I typically be the

18   one, if that was a requirement, be the one who would deliver

19   that information to the buyer.  That would come from one of

20   the operating departments, whether it be Planning or Public

21   Works.

22   Q.  Could you read paragraph 6.4?

23   A.  Okay.

24              "Seller and buyer acknowledge that the property is in

25              a blighted condition and is an old subdivision site

1           that has not been completed, which contains

2           infrastructure improvements that have been

3           constructed, and buyer accepts the responsibility for

4           taking any and all action necessary regarding

5           security and maintenance of the improvements.  Buyer

6           further acknowledges that the subdivision map has not

7           been finalized and that the time for finalizing said

8           map has expired.  And it is buyer's responsibility to

9           obtain a new subdivision map or maps for the

10          property."

11  Q.  And you were one of the representatives of the City that

12  signed this agreement, correct?

13  A.  That's correct.

14  Q.  Just to verify, in the -- one of the approved and

15  recommended -- I'm sorry, the only approved and recommended;

16  that's your signature, correct?

17  A.  That's correct.

18  Q.  Between the period 2004 to 2007, had Mr. McIntosh brought

19  to your attention any claims of copyright infringement by

20  other persons with respect to Tract 6451?

21  A.  No.

22  Q.  Had anyone from the City informed you that there were any

23  claims of infringement, copyright infringement with respect to

24  Tract 6451 between the period 2004 to 2007?

25  A.  No.

726

1  Q.  Now, earlier in this case, we heard testimony from Dennis

2  McNamara and also Keith Woodcock, both of whom work in the

3  Planning Department.  Mr. Woodcock is no longer there.  They

4  described the Planning Department's role in processing

5  tentative maps.

6          Could you tell us what the City Manager's

7  involvement, if any, is in the tentative map review and

8  approval process?

9  A.  The City Manager plays no role in that process.

10  Q.  Did you ever direct anybody from the Planning Department

11  to approve the 6451 map?

12  A.  No.

13  Q.  I'm sorry.  Let me rephrase it.

14          Did you direct anyone from the Planning Department to

15  recommend approval to the Planning Commission of the 6451 map?

16  A.  Absolutely not.

17  Q.  Did you ever direct the Planning Commission to approve the

18  6451 map?

19  A.  No.  The Planning Commission is an independent body

20  appointed by the City Council and has no reporting

21  responsibilities whatsoever to the City Manager.  It would be

22  highly inappropriate to make such a demand on the Planning

23  Commission.

24          MR. OKADIGBO:  No further questions.

25          THE COURT:  Cross-examination?

MCNAMARA D

727

1        MR. TRAVIS:  No questions, your Honor.

2        THE COURT:  Okay.  Any examination?

3        MR. ALEXANDER:  No thank you, your Honor.

4        MR. HASSING:  No, your Honor.

5        THE COURT:  Thank you, sir.  You may step down.

6        THE WITNESS:  Thank you, your Honor.

7        THE COURT:  Okay.  Next witness?

8                        **DENNIS MCNAMARA,**

9    called as a witness on behalf of the Defendant City of Wasco,

10   having been previously duly sworn, testified as follows:

11       THE COURT:  Please take the witness stand right here,

12   and tell us who you are, if you would.

13       THE WITNESS:  My name is Dennis McNamara.

14                      DIRECT EXAMINATION

15   BY MR. OKADIGBO:

16   Q.  Mr. McNamara, I'm going to show you what is Exhibit J 138;

17   it also has been marked as D 410.  First of all, could you

18   describe -- I know you have already given testimony, but just

19   to remind the jury, what is your position at the City of

20   Wasco?

21   A.  I am the senior planner.

22   Q.  And you've had involvement with processing the 6451

23   tentative map, correct?

24   A.  Yes, sir.

25   Q.  And also the final map?

1   A.  Yes, sir.

2   Q.  Could you describe to us the process for reviewing and

3   approving maps?

4   A.  Yes, sir.  When a project is first submitted, we meet with

5   the applicant and give them the opportunity to submit a

6   preliminary copy or five copies of a tentative tract map.

7          We, the City, then review them in-house for

8   consistency with General Plan Zoning, and then we will have a

9   meeting with the applicant and their engineer to discuss any

10  discrepancies with zoning or any changes that we might need to

11  be seen on the map as it relates to zoning and general

12  planning density issues.

13         After that meeting, they will -- the applicant then

14  will submit a revised map and, if necessary, we add another 14

15  days to member agencies, the utility districts, the school

16  districts, CalTrans, if necessary, for 14-day comment period.

17         Any comments we receive, we will share with the

18  applicant and incorporate that into the initial study and then

19  use that to determine if the application is complete or

20  incomplete.

21         And if it is determined that it is complete, we send

22  a letter saying, "Your application is complete."  If it is

23  incomplete, we will ask for more information.

24         After that, the applicant will then submit the

25  application package, which includes 30 clean copies of the

1    map, any fees and any documents that we might require.

2            We will then do a determination by the California --

3    California Environmental Quality Act to determine if the

4    project is categorically exempt, if it requires a negative

5    declaration, a mitigative declaration, or a full blown

6    Environmental Impact Report based on the comments we receive

7    from the agencies and our own review.

8            Once we determine what is required, if it requires a

9    negative declaration or mitigative declaration, we will

10   prepare the initial study, and we will route that out along

11   with a notice of intent to adopt a negative declaration or

12   mitigative declaration to member agencies for a 30-day comment

13   period.  And, also, we post this notice of intent at the

14   County Clerk's, and we make available to the public as

15   required by the California Environmental Quality Act.

16           We, and the notice of -- the notice of intent was to

17   include project description, project location, the extent, the

18   time frames for the comment period and where the information

19   is available for the public to review.

20           Once we go through the 30-day process with the

21   California Environmental Quality Act, we will then prepare a

22   Staff Report and notice it for a public hearing before the

23   Planning Commission.

24           We are required to do a ten-day notice.  That notice

25   has to go in the newspaper, in the local newspaper of

1  circulation at least ten days before the date of the hearing.

2          In addition, we have to mail out a copy of the legal

3  notice of public hearing to all people within 300 feet of the

4  affected parcel.

5  Q.  Let me stop you for a second.  When you say "we," are you

6  talking about the Planning Department?

7  A.  The City.  The City, through the Planning Commission, will

8  route the notice of public hearing to the newspaper, as well

9  as to all property owners within 300 feet of the affected

10  parcel.

11  Q.  But when you say "we" in terms of preparing the reports,

12  you are talking about the Planning Commission?

13  A.  Yes, the Planning Commission.

14  Q.  Okay.  Go ahead.  I'm sorry.

15  A.  Sorry about that.  Once the notices are sent, we will

16  conduct a public hearing before the Planning Commission.

17  Staff will present their report, which includes a

18  recommendation for approval or denial.

19          The Planning Commission will then open a public

20  hearing and they will take any testimony from the public as

21  well as the Staff Report.

22          They will then close the public hearing and consider

23  the item.  They will ask staff questions, if necessary, ask

24  the applicant questions, if necessary, and then they will make

25  a decision through a resolution.

731

1  Q.  At that public hearing, the tentative map is made

2  available to members of the public, correct?

3  A.  Correct.

4  Q.  Yesterday, there was testimony on what the term

5  "conditions of approval" or "conditions" mean.  Could you

6  describe for the jury what that means?

7  A.  Whenever a project is approved, there are certain

8  conditions that shall be required to make sure that it

9  satisfies and complies with the City ordinances, any comments

10  from member agencies.

11        So those are submitted to the applicant and they have

12  to satisfy those conditions prior to the project being

13  approved or, in the case of a business, prior to a business

14  being opened, these all have to be satisfied.

15  Q.  So conditions relate to things like complying with City

16  ordinances, zoning regulations and the like?

17  A.  Correct.

18  Q.  The City doesn't initiate the application process for

19  tentative maps, does it?

20  A.  No, sir.

21  Q.  And if the Planning Department decides that a tentative

22  map meets most of the conditions, or maybe all of them, does

23  it usually recommend approval?

24  A.  Yes.

25  Q.  You are familiar with the Tentative Tract Map 6451,

732

1   correct, sir?

2   A.   Yes, sir.

3   Q.   You processed that map?

4   A.   Yes, sir.

5   Q.   Now, earlier today, Larry Pennell testified that the City

6   Manager stays out of the review and approval process for

7   tentative maps.

8          The question I'm asking you is:  Was that true as of

9   the processing of this tentative map?

10  A.   Correct.

11  Q.   The City Manager didn't tell you or the Planning

12  Department what to do or what to not do?

13  A.   No, sir.

14  Q.   Are you familiar with an expired map, revised tentative

15  map for Tract 5472?

16  A.   Yes.

17  Q.   Can you explain whether the City's review and approval

18  process for the Tract 6451 map -- I'm sorry.  Let me rephrase

19  that.

20         Can you explain whether that expired Map 5472 had any

21  bearing on the City -- I'm sorry, on the Planning Department's

22  decision whether to recommend approval for the 6451 tentative

23  map?

24  A.   No, sir.

25  Q.   It had no role?

733

1    A.   No, sir.

2    Q.   And why is that?

3    A.   When a map is expired, for any new project to come in on

4    that same land, a new map has to be submitted per the

5    Subdivision Map Act.  Once a map is expired, it is no longer a

6    valid document, so we review the new map for consistency with

7    the General Plan and zoning.

8    Q.   Is it fair to say that the 6451 map represents the current

9    developer's intentions on how to divide that tract of land?

10   A.   Can you restate the question?

11   Q.   Okay.  The 6451 map in this case, it's Mr. Wu's map or his

12   company's map, correct?

13   A.   Correct.

14   Q.   And the map represents what Mr. Wu wants to do with Tract

15   6451, correct?

16   A.   Yes.

17   Q.   Is it fair to say that the Planning Department doesn't

18   look at 5472 in terms of the review process, because 5472 was

19   not Mr. Wu's intentions; he --

20   A.   Correct.

21   Q.   Now, you discussed earlier the fact that the 6451 map

22   would have been made available to the public at some stage

23   during the tentative map review process, correct?

24   A.   Correct.

25   Q.   What would have been the purpose for making that map

1    available to the public?

2    A.   To inform the public of the project that was coming and

3    what it would entail and what it would look like.

4              MR. TRAVIS:   Objection, your Honor, this line of

5    questioning.   Relevance.

6              THE COURT:   Sustained as to the last question.

7    BY MR. OKADIGBO:

8    Q.   Can you explain what role does improvement plans have in

9    this review and approval process for the 6451 map?

10   A.   For the tentative map, improvement plans are not required

11   to process the tentative map.

12   Q.   So is it fair to say that when the Planning Department is

13   deciding whether to recommend approval of the tentative map,

14   it does not look at improvement plans?

15   A.   Correct.

16   Q.   Can you explain -- how long have you worked for the City

17   of Wasco?

18   A.   Approximately ten years.

19   Q.   And how long of that ten years, how long have you been

20   Senior Planner?

21   A.   Probably the last five.   Four or five, actually.   I'm not

22   sure.

23   Q.   Between the period 2004 to 2007, had Mr. McIntosh ever

24   informed you that anyone else was copying or allegedly copying

25   the Tract 5472 map?

1   A.  No.

2   Q.  Had Mr. McIntosh informed you that anybody was copying any

3   of his improvement plans for the 5472 tract between the period

4   2004 to 2007?

5           MR. TRAVIS:  Objection, relevance.

6           THE COURT:  Overruled.

7           THE WITNESS:  No.

8   BY MR. OKADIGBO:

9   Q.  To your knowledge, has anyone from the Planning Department

10  been informed that -- let me rephrase.

11          To your knowledge, has anyone else at the Planning

12  Department been told anything about copying or infringement

13  with respect to 6451 map during the period 2004 to 2007.

14          MR. TRAVIS:  Objection, calls for hearsay.

15          THE COURT:  The objection is overruled as being one

16  question premature.  The answer is either "yes," or it is

17  "no."

18          THE WITNESS:  No.

19  BY MR. OKADIGBO:

20  Q.  Do you attend the Planning Commission meetings?

21  A.  Yes.

22  Q.  Did you attend all Planning Commission meetings regarding

23  the review of Map 6451?

24  A.  Yes.

25  Q.  During those meetings, did anyone ever state anything

736

1    about copyright infringement with respect to Tentative Tract

2    Map 6451?

3    A.   Not that I can recall.

4    Q.   Same question, but in relation to 5472 improvement plans?

5    A.   Not that I can recall.

6    Q.   Does the Planning Department play any role in -- I'm

7    sorry.

8              Did the Planning Department play any role in the

9    City's decision to sell property to Mr. Wu's companies?

10   A.   No.

11   Q.   How about the Planning Commission?

12   A.   No.

13   Q.   Now, you've been interacting about DeWalt Corporation in

14   regards to processing the tentative map for 6451, correct?

15   A.   Correct.

16   Q.   And you've had conversations with persons from DeWalt on

17   the requirements, city requirements for processing these maps,

18   correct?

19   A.   Correct.

20   Q.   Were you the point person from the City in regards to

21   dealing with DeWalt on what the -- what they had to do to

22   process this 6451 map?

23   A.   Yes.

24   Q.   In your dealings with DeWalt, have you ever told them, one

25   way or other, how to design the subdivision on Tract 6451?

1    A.   No.

2    Q.   Can you describe the nature of your conversations with

3    DeWalt with respect to Tract 6451?

4    A.   Just the application process, what was needed at the time

5    to submit the map, when it was routed.  We forwarded any

6    comments to DeWalt.  Made the Staff Report.  The initial

7    study, mitigating and neg dec available to them.  And then to

8    the public hearing process to the Planning Commission and

9    through the final map process as well.

10   Q.   You advised them of things like what it takes to satisfy

11   the City's ordinances, correct?

12   A.   Correct.

13   Q.   And the zoning requirements, correct?

14   A.   Correct.

15   Q.   And the Subdivision Map Act as well?

16   A.   Correct.

17        MR. OKADIGBO:  No further questions.

18        THE COURT:  Cross?

19                    CROSS-EXAMINATION

20   BY MR. TRAVIS:

21   Q.   Hello again, Mr. McNamara.

22   A.   Hello.

23   Q.   You had sent Mr. Greg Black -- do you know who Mr. Greg

24   Black is?

25   A.   Yes.

738

1    Q.   He works for DeWalt Corporation, right?

2    A.   He did.

3    Q.   You had sent him some e-mails with improvement plans to

4    Mr. Black, correct?

5    A.   Correct.

6    Q.   Had you ever looked at Mr. McIntosh's improvement plans?

7    A.   No.

8    Q.   You have never --

9    A.   I have glanced at them, but not in detail.

10   Q.   Have you ever seen improvement plans before?

11   A.   Yes.

12   Q.   And you've seen improvement plans not just by

13   Mr. McIntosh, but by other engineers?

14   A.   Yes.

15   Q.   Have you ever seen anything on there with a notice of

16   copyright notice?

17   A.   No.

18   Q.   Have you ever seen any engineering stamps on the plans?

19   A.   Yes, yes.

20   Q.   Is it your understanding that Mr. McIntosh had his

21   engineering stamps on his plans?

22   A.   Yes.

23   Q.   Did you ever call Mr. McIntosh and ask him for permission

24   if you could, in any way, send or use his plans?

25   A.   No.

MCNAMARA X

739

1  Q.  When you go through the mapping process, which you are
2  familiar with, right?
3  A.  Correct.
4  Q.  Sometimes you can start out with a parcel map, right, and
5  that's usually much larger than a tentative map, correct?
6  A.  Correct.
7  Q.  Because a tentative map is usually part of a parcel,
8  right?
9  A.  In some cases.
10 Q.  In some cases, right.  So do improvements always go into
11 the ground for parcels?
12 A.  They may, some.  I'm not sure.  Sometimes they are
13 conditioned to go in, but not all the time.
14 Q.  So sometimes does a parcel map go for final approval?
15 A.  A parcel map does, yes.
16 Q.  Right.  But parcel maps don't always get improvements,
17 right?
18 A.  Correct.
19 Q.  So in that case, you wouldn't need improvement plans,
20 right?
21 A.  In the cases that don't require the improvements, yes.
22 Q.  Right.  So in the case of going through the mapping
23 process, improvement plans in the case we are talking about
24 would not be necessary, right?
25 A.  For a parcel map?

MCNAMARA

740

1   Q.  For a parcel map.

2   A.  That would be conditioned by the City Engineer.

3   Q.  But there are instances, in your experience as a city

4   planner, or a -- or in your office, that you would not need

5   improvement plans to final parcel maps, correct?

6   A.  Correct.

7   Q.  Have you ever had a final map -- I'm sorry, a tract as

8   part of a parcel that didn't require improvements?

9   A.  A tentative tract?

10  Q.  Yeah.

11  A.  Their condition that all improvements -- improvement plans

12  may be required.

13  Q.  In some cases, you could have a tentative map, a tentative

14  tract where improvements might be required and in other cases,

15  where they might not be required, right?

16  A.  Correct.

17  Q.  In the cases where tentative maps do not have

18  improvements, you don't need improvement plans, right?

19  A.  That's up to the City Engineer.  The Public Works

20  Department, they make the conditions about the improvement

21  plans, what is needed and why.

22          MR. TRAVIS:  Objection, your Honor, as nonresponsive.

23          THE COURT:  The question was, "In the cases where

24  tentative maps do not have improvements, you don't need

25  improvement plans, right?"

MCNAMARA - X

741

1          His answer was, "That's up to the City Engineer."

2          The rest of it is stricken as nonresponsive.  But he

3    has responded.

4          MR. TRAVIS:  Thank you, your Honor.

5    BY MR. TRAVIS:

6    Q.  In the case where there is a tentative tract where you

7    have improvements in the ground, isn't it always the case that

8    you need improvement plans?

9    A.  Our -- the City of Wasco subdivision ordinance says that

10   improvement plans may be required.

11   Q.  But doesn't -- but aren't they only -- isn't there the "if

12   necessary" clause in that ordinance because there are some

13   times where you don't have improvements in the ground?

14   A.  Yes.

15   Q.  In fact, if there are improvements that are in the ground,

16   you need improvement plans, don't you?

17   A.  That's not my area of expertise.  That would be the Public

18   Works Department making that comment.

19   Q.  I'm looking at J 8, page 224-30.  Can you see that,

20   Mr. McNamara?

21   A.  Yes, sir.

22   Q.  And I'm looking specifically at what looks like a

23   highlighted area, 16.28.020?

24   A.  Correct.

25   Q.  And it says "Conformance to Plans," do you see that?

MCNAMARA

742

1   A.  I see it.

2   Q.  And where it talks about, "All subdivision maps conforming

3   to any specific plans of streets, public areas, or other

4   projects or plans adopted or approved by the Council," that's

5   referring to improvement plans, isn't it?

6           MR. HASSING:  Calls for speculation.  Lacks

7   foundation.

8           THE COURT:  Lacks foundation.  I don't know if it's

9   calling for speculation.  Lay the foundation, if you can.

10  BY MR. TRAVIS:

11  Q.  Mr. McNamara, you previously testified that you are

12  familiar with the mapping process, right?

13  A.  Correct.

14  Q.  In fact, you have given us a -- your counsel has provided

15  us with a pretty detailed flow chart for the Planning Division

16  review process?

17  A.  Correct.

18  Q.  This is something that you have done for how many years?

19  A.  Approximately ten.

20  Q.  And you are required to follow the mapping process as is

21  outlined in the Subdivision Map Act, right?

22  A.  And the City of Wasco Subdivision Ordinance.

23  Q.  And also the City of Wasco Municipal Code?

24  A.  Correct.

25  Q.  And I'm reading from the City of Wasco Municipal Code, and

MCNAMARA - X

743

1    isn't the plans that it's talking to here and I'm pointing to,

2    "Conforms to any specific plans of streets, public areas or

3    other projects or plans adopted or approved by the Council,"

4    isn't that referring to improvement plans?

5    A.  Well, for the tentative map, no, because -- okay.

6    Q.  I think you have already testified that you don't need

7    improvement plans for a tentative map.  I don't think that's

8    in dispute here.

9           I think what we are talking about with 16.28.20 is

10   design standards, what we are talking about here is design

11   standards for the mapping process, and isn't this 16.28.020,

12   the first sentence, referring to improvement plans?

13   A.  I don't know.

14          MR. TRAVIS:  I'm all through, your Honor.

15          THE COURT:  Any cross?

16          MR. OKADIGBO:  Yes, your Honor.

17          MR. ALEXANDER:  Thank you, your Honor, just briefly.

18                       CROSS-EXAMINATION

19   BY MR. ALEXANDER:

20   Q.  Mr. McNamara, improvement plans are essentially designed

21   to tell the City how the construction of improvements is going

22   to occur, correct?

23   A.  To the best of my knowledge.  I don't review improvement

24   plans, so I don't know.

25          MR. ALEXANDER:  Okay.  No further questions, your

744

1  Honor.

2                              REDIRECT EXAMINATION

3  BY MR. OKADIGBO:

4  Q.  Now, you testified earlier that you work in the Planning

5  Department, correct?

6  A.  Correct.

7  Q.  Who at the City deals with the issue of improvement plans

8  and whether the City is going to require improvement plans or

9  not?

10  A.  The Public Works Department.

11  Q.  That's not what you do, correct?

12  A.  No, sir.

13          THE COURT:  Wait a minute.  "No," it's not what you

14  do, or "no," it's not correct?

15          THE WITNESS:  I don't work in the Public Works

16  Department.

17          Can you restate the question?

18          THE COURT:  I think you answered it.  Thanks.

19  BY MR. OKADIGBO:

20  Q.  Who at the City handles the issue of whether the City will

21  require improvement plans or not?

22  A.  The Public Works Department.

23  Q.  To your knowledge, would improvement plans be required if

24  improvements have already been built?

25  A.  I do not know that.  That's --.

MCNAMARA   RX

745

1          MR. OKADIGBO:  No further questions, your Honor.

2          THE COURT:  Anything from anyone?

3                         RECROSS-EXAMINATION

4    BY MR. TRAVIS:

5    Q.  Mr. McNamara, doesn't a final map have to conform to

6    approved improvement plans?

7          MR. HASSING:  Objection, lacks foundation.

8          MR. OKADIGBO:  Beyond the scope also.

9          THE COURT:  Overruled on the second ground.

10   Sustained on the first, foundation.

11   BY MR. TRAVIS:

12   Q.  Let me clear it up.  As part of the -- is it the Planning

13   Commission that you work for?

14   A.  I work for the City of Wasco.

15   Q.  The City of Wasco, the department is the Planning

16   Commission?

17   A.  That's not a department.  That's an advisory agency.

18   Q.  What is your department again?

19   A.  The Community Development Department.

20   Q.  The Community Development Department.  Do you have any

21   role in assisting, in fixing repairs in subdivisions?

22   A.  No.

23          MR. HASSING:  Your Honor, objection.  Beyond the

24   scope of cross.

25          MR. TRAVIS:  I'm done, your Honor.

1          THE COURT:  Anything further?

2          MR. OKADIGBO:  No, your Honor.

3          THE COURT:  Thank you, sir.  You may step down.

4          Next witness.

5          MS. BARNES:  If we may have a moment, your Honor,

6    regarding the next witness?

7          THE COURT:  Are you talking about five minutes?  What

8    are you talking about?

9          MR. OKADIGBO:  Five minutes.

10         THE COURT:  Let's take 15 minutes earlier than we

11   ordinarily do so we can get some scheduling done here.  Please

12   don't discuss the case, and in 15 minutes, we will come back

13   with the next witness.

14         (The jury left the courtroom.)

15         (Recess)

16         THE COURT:  Back on the record.  Counsel are present.

17   Are we ready for the jury?

18         MR. HASSING:  Yes, your Honor.

19         THE COURT:  All right.

20         (The following proceedings were had in the presence

21         of the jury, to wit:)

22         THE COURT:  The jury has joined us and we are still

23   on the record.  Next witness, please.

24         MR. OKADIGBO:  City calls Jim Zervis.

25                        **JAMES ZERVIS,**

1  called as a witness on behalf of the Defendant City of Wasco,

2  having been previously sworn, testified as follows:

3        THE COURT:  All right.  He is back on the witness

4  stand.  You are still under oath.  You need not be resworn.

5        Direct exam.

6                DIRECT EXAMINATION

7  BY MR. OKADIGBO:

8  Q.  Mr. Zervis, just to refresh everybody's recollection, you

9  used to be the Finance Director for the City of Wasco,

10 correct?

11 A.  That's correct.

12 Q.  Can you explain what period?

13 A.  I started as Finance Director with the City of Wasco

14 December 10th of 2006, and retained that position until

15 January, sometime in January of 2009.

16 Q.  And in that capacity, you came to be knowledgeable about

17 the City's collection of fees from the 6451 tract, correct?

18 A.  That's correct.

19 Q.  Now, earlier you had been shown Exhibit J 21, and this

20 exhibit regards the City's collection of fees from the 6451

21 tract, correct?

22       If I may?

23       THE COURT:  Sure.

24       THE WITNESS:  Yes, this is a summary of the fees

25 collected on Tract 6451.

1    BY MR. OKADIGBO:

2    Q.   Okay.  I'm going to go through each of those categories so

3    that you can explain, hopefully, for the jury what these fees

4    represent.  Could you describe what storm drain impact fees

5    are?

6    A.   Yes.  The storm drain impact fees are a fee assessed and

7    collected against all new development within the City of

8    Wasco.  It's a fee based on the size of the development, and

9    the money is used to maintain and expand the City's storm

10   water system to handle rain runoff and items alike, so that

11   the impact that that new development would have on the storm

12   system, storm chamber system within the City is accounted for

13   and we are able to expand that system as necessary.

14           Now, in the event where a development has completely

15   on site storm water retention, and they have made allowances

16   for that provision within their development, then that fee

17   would not be collected, but in all other developments that do

18   impact the storm drain system, then that fee is assessed.

19   Q.   So is the idea to collect monies for costs that the City

20   will expend?

21   A.   That's correct.  Those fees are set aside in an account

22   and used on a regular basis for maintenance and upkeep and

23   expansion of the storm water system.

24   Q.   What happens if the City collects more monies than the

25   costs it projects?

1   A.   As with any impact fee that's collected, the law is very

2   clear in that regards, and those fees, if they aren't used

3   within a certain period of time, must be returned to the

4   developers that paid them in.  They can't be used for any

5   other purpose.

6   Q.   I'm going to direct your attention to Exhibit J 21.  And

7   while we are still on the subject of storm drainage fees,

8   direct your attention to page 224-56, which is under Chapter

9   16.44 of the Wasco Municipal Code.

10          Does this section relate to the City's authority to

11  collect storm drainage fees?

12  A.   Yes.  This chapter of the Municipal Code governs the

13  City's -- requires the City to collect those fees.

14  Q.   It also goes on to the next page.  I want to show that for

15  convenience purposes.

16          Now, the next category is -- next category on J 21 is

17  Zone of Benefit Fees.  Can you explain to the jury what zone

18  of benefit fees are?

19  A.   Zone of benefit fees in this case, the City of Wasco has

20  established a zone of benefit around the Valley Rose Estates

21  Subdivision to collect, to reimburse the City for costs that

22  were expended to run a water line out to that subdivision and

23  a sewer line.

24          The Valley Rose Estates Subdivision is fairly far

25  outside the condensed city limits of the City of Wasco, and

1    when that development was established, the City had to run

2    both water and sewer lines all the way out to where that

3    development would occur.

4           Because that -- those water and sewer lines benefit

5    those properties, because they are now able to develop, an

6    assessment district was created around Valley Rose Estates to

7    reimburse the City for the costs incurred --

8           MR. TRAVIS:  We would object that this question and

9    the answer violates your order on Motion in Limine Number 5,

10   Plaintiff's Motion in Limine Number 5, and ask to strike it.

11          THE COURT:  Let's have a quick sidebar, please, with

12   the court reporter.

13          (The following proceedings were had at the sidebar,

14          to wit:)

15          THE COURT:  Okay.  We are on the record at sidebar.

16   Counsel are all present outside the hearing of the jury.

17   Where are we going with this?

18          MR. OKADIGBO:  Your Honor, the City's position is

19   that impact fees are not profits.  I'm going into the reasons

20   for collection of the fees that would establish that,

21   therefore, the costs the City incurred.

22          Motion in Limine Number 5 relates to bond debts.  I'm

23   not talking about bond debts.

24          MR. TRAVIS:  I want to cut it off at the pass because

25   I think the fees that they expended came from those bond

751

1  debts, so if counsel is going to represent that he is not
2  going there, that's fine, but that's the logical conclusion.
3       MR. OKADIGBO:  I'm not going to represent any
4  connection to bond debts with the impact fees.
5       THE COURT:  You are representing you are not going
6  there?
7       MR. OKADIGBO:  Yes.
8       THE COURT:  Okay.  Where are we going with this?  How
9  much longer are we going to go?
10      MR. OKADIGBO:  I was going to go through each of the
11 different fees on that statute.  My ultimate point is that
12 they are not profits, they are costs.  The City can't collect
13 any more than what's been authorized.
14      THE COURT:  Why don't you just ask him that straight
15 out?
16      MR. OKADIGBO:  All right.
17      THE COURT:  I can tell you, looking over at the jury,
18 this is painful.
19      MR. OKADIGBO:  All right.
20      (The proceedings at the sidebar were concluded.)
21 BY MR. OKADIGBO:
22 Q.  I wasn't sure where we left off in terms of whether you
23 had finished describing the purposes of the collecting zone of
24 benefit fees.  I guess could you just describe what zone of
25 benefit fees are?

1   A.   Sure.   In this case, the purpose of collecting the zone of

2   benefit fees are to recover the costs of running water lines

3   and sewer lines out to the developed area.

4   Q.   Can you describe what trunk line fees are?

5   A.   Water or waste water or both?

6   Q.   I have on the sheet "trunk line fees."

7   A.   Trunk lines are large lines that either -- that run for

8   sewer or water services.   They run throughout the City and

9   then to individual service connections.

10         As new development occurs, it takes capacity out of

11   those trunk lines and the City eventually has to maintain or

12   increase capacity on those trunk lines.

13         So this fee has been established to recover the

14   impact that a development would have on those trunk lines so

15   that the City can continue to expand that system and that

16   existing customers don't have to burden that cost.

17   Q.   Could you explain what hookup fees are?

18   A.   Typically, those are referred to as, I believe, plant

19   fees.   In the municipal code here, they are described as

20   hookup fees.

21         Again, this relates to the impact that new

22   development has on the waste water treatment plant for the

23   City.   They take a certain amount of capacity away from the

24   plant, and the plant has to expand in order to accommodate new

25   development.

753

1          So to the extent that that impact or that development

2     occurs, they have to pay for that impact so that the waste

3     water treatment plant can be expanded, and that helps to cover

4     the cost of that expansion.

5     Q.  Is it fair to say that for each of these fees that they

6     relate to actual or projected costs?

7     A.  Yes.  They either relate directly to costs that have

8     already been incurred or costs for specific capital

9     improvements based on the impact that that development has.

10    Q.  And if the development was not going to have an impact,

11    the City wouldn't collect the fee, correct?

12    A.  Correct.  It wouldn't need to.  The user, monthly user

13    rate would pay for the normal maintenance and delivery of

14    those services.

15    Q.  Each of the fees identified on Exhibit J 21 is authorized

16    by Wasco Municipal Code sections 13 and 16, correct?

17    A.  Yes.

18    Q.  And 13 is Exhibit J 84, and 16 is Exhibit J 21.  Could you

19    describe -- there is two descriptions, WWT zone of benefits,

20    and WAT zone of benefits.

21    A.  WWT stand for "Waste Water Treatment."  That's the sewer

22    plant.  And WAT is "Water," for the water services.

23    Q.  Okay.  How about water trunk line fees?

24    A.  Water trunk line fees, similar to sewer trunk line fees,

25    are large water lines that run throughout the City to provide

1    services to the development.  As development occurs, they take

2    capacity out of those lines and the system has to be expanded.

3    So this fee covers the cost of that expansion and maintenance

4    on that system.

5    Q.   How about water well impact fees?

6    A.   Water well impact fees cover the future cost from the

7    impact that a development has on the water supply.  The City

8    of Wasco runs off a series of municipal wells that are all

9    looped into a water system.  The wells only provide so much

10   water before they have to be up-sized or a new well has to be

11   punched.  In that case, this fee is designed to recover that

12   future cost from the development that's creating the need for

13   the cost.

14   Q.   Last, can you explain what Quimby fees are?

15   A.   Yes.  Quimby fees aren't an impact fee.  They are

16   administered under a separate section of the Government Code.

17   And Quimby fees are designed to make sure that adequate park

18   space is made available to residents.

19          And so developers have the option of dedicating land

20   within their development as a park space or an open space, or

21   if they choose not to do that, they can pay a fee.  That fee

22   is set aside into an account that can only be used for the

23   creation or expansion of a new park or an expansion of an

24   existing park.  So it is a fee that relates to the future

25   development of park space.

755

1   Q.  Again, in relation to all of these impact fees, without an

2   impact on existing City resources, there would be no costs for

3   the City, correct?

4   A.  That's correct.

5   Q.  And in those instances, the City would not be collecting

6   fees; is that correct?

7   A.  That's correct.

8   Q.  So the City only collects fees if it projects costs or

9   suffers actual costs, correct?

10  A.  Yes.

11  Q.  Are you familiar with the Mitigation Fee Act?

12  A.  Somewhat familiar, yes.

13  Q.  Are you familiar with whether or not it sets forth

14  conditions for collecting impact fees?

15  A.  Yes, it does.

16  Q.  And what is your familiarity with those conditions?

17  A.  It's my understanding and -- that there are several

18  conditions that have to be set.  There has to be a nexus drawn

19  between the cost, the fee that's going to be charged, and the

20  actual impact on the system, the fees being implemented for.

21        That's done through an engineer's report that

22  outlines the specific purpose for the fee and the calculations

23  for those fees that's stamped by an engineer to justify those

24  fees.  In addition, those fees have to be reported on annually

25  and kept in a separate account, and if those fees aren't used

756

1    in a certain period of time, they must be returned to the

2    developers that paid them in.

3    Q.  So is it fair to say that in no instance would the City,

4    at least under that law, retain funds in excess of costs?

5    A.  That's correct.  If there were excess funds, they would

6    have to be returned to the developer.

7    Q.  Now, yesterday there was testimony about the sale of Tract

8    6451 to Mr. Wu's companies, the City selling those properties

9    to Mr. Wu's companies.

10             MR. BRAZE:  Misstates the testimony.

11             THE COURT:  Sustained.  You put plural on

12   "companies."

13             MR. BRAZE:  I'm saying they didn't sell Tract 6451 to

14   Mr. Wu.  They sold the whole parcel to Mr. Wu.

15             THE COURT:  On that ground, it is overruled.  It's

16   subject to clarification, if you wish, on cross.

17   BY MR. OKADIGBO:

18   Q.  Yesterday there was testimony about selling Parcel 1 to

19   Northern California Universal --

20             THE COURT:  Could you raise your voice.

21   BY MR. OKADIGBO:

22   Q.  -- to Northern California Universal Enterprises, correct?

23   A.  Yes.

24   Q.  Or to Lotus Developments?

25   A.  To one of Mr. Wu's companies.

1   Q.   Now, do you recall how much the property was sold to

2   Mr. Wu's companies?

3   A.   I do.  It was $1,605,000.  And I misspoke yesterday when I

4   mentioned that I thought it had been $1.2 million.

5   Q.   There was also testimony about the City, before that,

6   buying the property at a tax sale.  And do you recall the

7   amount, roughly?

8   A.   It was roughly $128,000.

9   Q.   Now, the monies received for the sale of Parcel 1, did the

10   City retain those monies?

11          MR. TRAVIS:  Objection, relevance.

12          THE COURT:  The objection is overruled.

13          THE WITNESS:  The City retained roughly $239,000 from

14   the sale, and that's only the amount to recover the costs for

15   both buying the parcel and costs incurred in selling the

16   parcel.

17   BY MR. OKADIGBO:

18   Q.   I'm going to show you, I believe it is Exhibit J 72.  This

19   is one of the pages there.  And that is a check made out to

20   the City of Wasco.  Do you recognize that?

21   A.   Yes.

22   Q.   What is that?

23   A.   That's the check the City received as final distribution

24   from escrow for selling the two parcels to Lotus Developments.

25   Q.   Okay.  What happened to the other monies received from the

758

1    sale?

2          MR. TRAVIS:  Objection, relevance.

3          THE COURT:  Sustained.

4    BY MR. OKADIGBO:

5    Q.  Now, as City Manager, you are responsible for the

6    day-to-day operations of the City, correct?

7    A.  Yes, that's correct.

8    Q.  And you report to the City Council, correct?

9    A.  Yes.

10   Q.  And you attend City Council meetings?

11   A.  Yes, I do.

12   Q.  To your knowledge, have city councilmembers given any

13   direction to the Planning Department on the review of 6451

14   maps?

15   A.  No.  The City councilmembers are responsible for setting

16   city policy and city law through the Municipal Code.  They --

17   the City councilmembers do not direct staff on administration

18   duties.  That's my job and the jobs of other managers within

19   the City.

20         MR. OKADIGBO:  No further questions, your Honor.

21         THE COURT:  Cross-examination?

22         MR. TRAVIS:  No questions, your Honor.

23         THE COURT:  Mr. Alexander?

24         MR. ALEXANDER:  I have two.  I can do it in my case.

25         THE COURT:  Up to you.

759

1                              **JAMES ZERVIS**,

2   called as a witness on behalf of the Defendant DeWalt

3   Corporation, having been first duly sworn, testified as

4   follows:

5                          DIRECT EXAMINATION

6   BY MR. ALEXANDER:

7   Q.  Mr. Zervis, do you know if the City of Wasco has any

8   streets that end in "Close"?

9   A.  Yes.  The City of Wasco has two such streets.  Pine Tree

10  Close and Fern Tree Close.

11          MR. ALEXANDER:  That's all I have.  Thank you, your

12  Honor.

13          THE COURT:  Anything further?

14          MR. OKADIGBO:  No.

15          THE COURT:  Anything else?

16          MR. ALEXANDER:  At this point, I will take over.

17          THE COURT:  That doesn't mean the City has rested its

18  case.  It means we are accommodating schedules, and so they

19  will come back on Monday for a witness or two more.

20                         **JEFFREY GUTIERREZ**,

21  called as a witness on behalf of the Defendant DeWalt

22  Corporation, having been previously sworn, testified as

23  follows:

24          THE COURT:  State your name once more for us.

25          THE WITNESS:  My name is Jeffrey Gutierrez.

1                         DIRECT EXAMINATION

2    BY MR. ALEXANDER:

3    Q.   Mr. Gutierrez, what is a parcel map?

4    A.   A parcel map is a land division instrument.

5    Q.   Okay.  And describe the circumstances under which a parcel

6    map can be used?

7    A.   Parcel maps are used when dividing four or less parcels of

8    land, and they have a little bit less administration

9    associated with them, so if you are dividing four parcels or

10   less, it is preferable to use a parcel map as opposed to a

11   tract map.

12   Q.   Why is that?

13   A.   I believe that, well, the agency that is responsible,

14   whether it is the City or a county agency, they give more

15   review and input on a tract map than they do on a parcel map.

16   Q.   Okay.  And can you use a parcel map to develop -- or

17   excuse me, to subdivide a property into five or more parcels?

18   A.   No, you cannot.

19   Q.   What must you use?

20   A.   There is a limitation on a parcel map.

21   Q.   What has to be used to subdivide a parcel into more than

22   four parcels?

23   A.   A tract map.

24   Q.   Are there circumstances in which a subdivision of more

25   than four parcels can be done without having improvement

1    plans?

2    A.   Yes.  Yeah, you could do a tract map to do something

3    larger, yes.

4    Q.   Give me an example.

5    A.   An example that comes to mind, we have divided -- DeWalt

6    Corporation, we divided some land in Porterville, where a

7    farmer, he had orange orchards, and he had some children and

8    he wanted to divide up his land for his children.  And it was

9    more than four parcels, and so he did it with a tract map.

10   Q.   No improvement plans were required there?

11   A.   No.  The City, I think, decided that that wasn't

12   appropriate for that land at that point in time.

13   Q.   Thank you.  If you can, summarize for me, if you recall --

14   and I apologize if I'm covering old ground.  What do you

15   recall being your first contact with regard to what ultimately

16   became Tract Number 6451?

17   A.   My first contact would have been the request from Jess

18   Marimla for a proposal.

19   Q.   Who is he?

20   A.   He was a gentleman who worked for Joe Wu.

21   Q.   And do you remember when that first contact occurred?

22   A.   It was in 2004, I think the proposal letter was done in

23   July, so it had to have been right before that.

24   Q.   Okay.  I'm putting up on the monitor as Exhibit J 16, and

25   what is this document, if you could describe it?

1   A.   This is our contract between DeWalt Corporation and

2   Northern California Universal Enterprises.

3   Q.   Does it have a date on it?

4   A.   It has a date of September 2004.

5   Q.   Okay.  And then at the bottom of that same exhibit, there

6   is a reference to Exhibit A, signed Letter of Proposal?

7   A.   Yes.

8   Q.   Okay.  Just one second.  Make sure we are tracking this.

9   Exhibit J 18, I'm going to put the first page up right now.

10  Do you see that document, J 18?

11  A.   Yes.

12  Q.   And if you would, describe what this document is?

13  A.   This is our proposal letter to Northern California

14  Universal Enterprise.

15  Q.   And you discussed this in some detail with, I think,

16  Mr. Travis.  Did you have any familiarity with the tract in

17  question before you ever were called by somebody on behalf of

18  Mr. Wu's company?

19  A.   I knew of it.

20  Q.   How did you know of it?

21  A.   From passing by.  I have driven down Highway 46 before and

22  seen it and I played golf at Valley Rose before.

23  Q.   Okay.  I'm going to show you what's been marked as J 129,

24  J 129.  And if you would, would you tell me what this is

25  generally?

763

1   A.  It's a Tentative Tract Map 6451.

2   Q.  Okay.  Now, this map has a bunch of little dots all around

3   it.  Can you see that from there?

4   A.  I can't.

5   Q.  Let me walk up a little closer.  And I apologize, I don't

6   have a bigger version.

7   A.  Okay.

8   Q.  Okay?

9   A.  Yes, I see them.

10   Q.  What are those dots?  What do they represent?

11   A.  Those would be a point somewhere on the ground where our

12   surveyors located a position on the ground.

13   Q.  Now, there are a couple places on the map -- and I'm going

14   to walk back to you and back to the jury for a moment -- where

15   there appear to be lots and lots of black marks combined

16   together.  Do you see those?

17   A.  Yes.

18   Q.  What are those?

19   A.  They are points.  They are also points.

20   Q.  Okay.  Is that one point where there is one mark or are

21   there a whole bunch of points put together?

22   A.  There is a lot of points at the intersections.

23   Q.  Why?

24   A.  In order for them to translate what's on the ground to the

25   draftsman that's going to draw the map, they have to shoot

1    everything that might be pertinent to the draftsman.

2          At those intersections, there is curbs in the curb

3    and gutter, there is handicap ramps.  I believe in those there

4    are also walls and planters.  So especially at that

5    intersection, there was a lot of points that had to be shot.

6    Q.  Let's talk for a moment about the process of the survey

7    conducted by DeWalt.  How was the survey conducted?

8    A.  From the very beginning?

9    Q.  Yes, sir.

10         MR. BRAZE:  Lack of foundation.

11         THE COURT:  Sustained.

12   BY MR. ALEXANDER:

13   Q.  Mr. Gutierrez, did you have an opportunity to review all

14   of DeWalt's books and records in relation to this project?

15   A.  Yes.

16   Q.  And were you able to review any digital files in relation

17   to this project?

18   A.  Yes.

19   Q.  Were you also able to review any printed files in relation

20   to this project?

21   A.  Yes.

22   Q.  And did any of those files reveal to you the fact that

23   survey shots were taken?

24   A.  Yes.

25   Q.  And did any of those files reveal to you that survey shots

1   were printed out?

2   A.   Yes.

3   Q.   And did any of those files reveal to you that all of the

4   survey shots that were taken were then transmitted into a

5   computer file?

6   A.   Yes.

7   Q.   And did any of that investigation lead you to conclude

8   that all of those survey shots are now reflected on Exhibit

9   J 129?

10   A.   Yes.

11   Q.   Okay.

12             MR. BRAZE:  Move to strike as hearsay.

13             THE COURT:  What's the exception?

14             MR. ALEXANDER:  It would be obviously the business

15   records exception, but it is not hearsay, your Honor, because

16   we are not relying on any out of court statement.  This is the

17   personal review of the data of his company.

18             THE COURT:  But the review obtaining information from

19   that information, and then testifying as to what it is, is

20   hearsay.  The records themselves have an exception, but what

21   about his statement as to what the records say?

22             MR. ALEXANDER:  Once the records come in --

23             THE COURT:  Are they in?

24             MR. ALEXANDER:  I'm going to use them, but once they

25   are in, then it would enable him to explain what they are,

1  because they are evidence.

2             THE COURT:  I agree with that, but I don't think they

3  are in.

4             MR. ALEXANDER:  I will do it that way.

5             THE COURT:  Sustained.

6             MR. ALEXANDER:  Trying to do it a little faster.

7  BY MR. ALEXANDER:

8  Q.  Mr. Gutierrez, will you get in front of you Exhibit D 226?

9  A.  Will it be up here?

10  Q.  I'm going to find out in just one moment.  Okay.  If you

11  will take a moment in there, will you try to locate some

12  pages, a little thick packet of pages that look like this, and

13  at the top, it reads, "Point Listing."

14  A.  I found it.

15  Q.  Okay.  Now, at the top right, what does it say, page

16  number?

17  A.  Page 1 of 19.

18  Q.  All right.  And would you describe what this document is?

19  A.  This is a text file that contains the data that creates

20  all the points that our surveyors located in the field and

21  that get used to draw our base map.

22  Q.  Now, how does the data get from the field to your office?

23  A.  The survey instrument, it relays data into a data

24  collector.  And the data collector, it looks like a great big

25  calculator.  Has a screen on it and a key pad.  And as they

1    survey each point, information from the survey instrument goes

2    into the data collector, as well as information from the

3    surveyor can -- he can put in information in the data

4    collector too.

5    Q.   This is something in the field they are using?

6    A.   Yes, it is connected to a rod and they walk around with

7    it, and they are putting data into it as they shoot each one

8    of these points.

9    Q.   How does it reach the computers in the DeWalt offices?

10   A.   There is, you know, a cable that connects to the data

11   collector and we can plug it into the computer, and then you

12   tell the software in the computer and in the data collector,

13   you know, go ahead and transfer the data down into the

14   computer.

15   Q.   Okay.  And then this data, after it is in the computer,

16   what is done with it?

17   A.   Then you can take this data, and we have another piece of

18   software, which is for drafting maps --

19   Q.   What's it called?

20   A.   "AutoCAD."

21   Q.   Okay.

22   A.   And you can upload this data from the file that was

23   created by the data collector into the AutoCAD drawing, and it

24   creates the dots that you see on the map.

25   Q.   Okay.  Now, in the normal course of DeWalt's business, is

1  that the practice and custom that's employed to transfer data

2  from the field into the office's computers?

3  A.   Yes.

4  Q.   And is the data transferred through a digital file

5  initially?

6  A.   Yeah.  The file is digital coming out of the data

7  collector.

8  Q.   And would you describe the hand-held device as being

9  somewhat of a mini computer?

10  A.   Sure.

11  Q.   And then when the files are imported or uploaded, I think

12  you said, into the DeWalt computer systems, can you then print

13  the files out?

14  A.   Yes, that's what this is.

15  Q.   And have you taken steps to determine whether or not the

16  documents 1 through 19 in front of you were the points that

17  were shot for Tract Number 6451?

18  A.   Yes.  I looked at them.  Yes.

19  Q.   Describe the steps you took.

20  A.   Well, I took the point numbers and had the AutoCAD drawing

21  open in front of me.  And I would compare the point number

22  that was on the dot on the AutoCAD drawing with the

23  description that was on this file, and I was able to match

24  some of them up.

25  Q.   Okay.  And so the dots you are talking about are the ones

1  on J 129?

2  A.  Yes.

3  Q.  Okay.

4      Your Honor, I would move this portion, pages 1

5  through 19 of the point listings, into evidence.

6      THE COURT:  Any objection?

7      MR. BRAZE:  It's just the point listing?

8      MR. ALEXANDER:  Yeah.

9      THE COURT:  Since it is not all of 226, let's mark it

10 as 226-A.

11     MR. ALEXANDER:  Thank you, your Honor.

12     THE COURT:  Received.

13     (Defendant's Exhibit 226-A was received.)

14 BY MR. ALEXANDER:

15 Q.  I'm showing you page 1 of Exhibit 226-A.  Bear with me

16 while I get the size correct.  And at the top right, does that

17 say page 1 of 19?

18 A.  Yes.

19 Q.  And then it says, "Point Listing Made"; do you see that?

20 A.  Yes.

21 Q.  What date is that?

22 A.  October 4th, 2004.

23 Q.  Okay.  Now, please describe for the members of the jury

24 what the data is on this page.

25 A.  You mean the description of what they shot?

1   Q.  Yes.

2   A.  It looks like some of it has been blacked out, but I

3   suspect it was a highlighter that didn't copy very well, but I

4   believe those first few points are control points, points that

5   are used out in the field for establishing where we are at

6   with respect to other survey monumentation.  And then it looks

7   like right around point 3,000, they go straight into surveying

8   existing objects that are out there on the property.

9   Q.  We are not going to look at them all, but let's look at a

10  few of them.  What does, let's say, 3002, what does that mean?

11  A.  So 3002 is a point number, and the point number is

12  arbitrary.  It is just an identifier so that when this is in a

13  database, it won't repeat itself or have two 3002's.

14  Q.  The next number to the right?

15  A.  That's what's called a "northing."  And if you know a

16  little bit about Cartesian math --

17  Q.  I don't and the jury probably doesn't.  Just tell us

18  briefly.

19  A.  Cartesian math would have like two baselines like this.

20  And one baseline, in this case that first column is a

21  northing, right, going north.  And the other baseline is an

22  easting, so it is going east.

23          So if you had zero at the intersection of those two

24  lines, then the northing of 767,774 feet, it would be that

25  distance north of that point.  And the other distance, the

1  easting, would be east of that point.  So it would create a
2  point related up here from the 00.
3  Q.  Could you determine where that location is by those very
4  complex numbers?
5  A.  Yes.  And in this case, they are state plain coordinates,
6  so they are really big.  They don't have to be state plain
7  coordinates.  We have made our own coordinates.  In this case,
8  we used a known coordinate that's recognized by surveyors in
9  the state.
10  Q.  Which is what?
11  A.  Zone five of the California state plain coordinate system.
12  Q.  What type of survey was this?  Was it conducted manually
13  or through a computer system?
14  A.  I was able to determine from looking at the file that we
15  did this survey with GPS surveying equipment.
16  Q.  "GPS" means?
17  A.  "Global positioning system."
18  Q.  Okay.  Now, in the far right column, there are some
19  descriptions.  Let's take a look at this.  What does that
20  indicate to you, the one I'm pointing at, which is 3004?
21  A.  Water edge pump.
22  Q.  What does that mean?
23  A.  I think that description is -- there is three of them.  So
24  that would tell me that there was a water pump out there and
25  it probably had a base around it, so the surveyor shot three

772

1    points along the base so that they could draw a line and

2    depict it on a map.

3    Q.   Okay.  Let's go on down a little farther.  3020, it says,

4    "GE."  What does that mean?

5    A.   That means "ground existing."

6    Q.   What does that mean in terms of what the surveyor would

7    do?

8    A.   It's a point on the dirt.  It's just a dirt point that

9    they shot.  Those are probably shot more for the elevation as

10   position.

11   Q.   EP?

12   A.   "Edge of pavement."

13   Q.   How about "Toe," is that my toe?

14   A.   No.  Sometimes out on the ground there would be a slope of

15   some kind, and so rather than just being flat ground, and so

16   at the top of that slope, we would shoot a point called a

17   "top" and at the bottom of the slope we shoot a point called a

18   "toe" and it allows us to draw contours for that slope.

19   Q.   And how many of these survey shots were you able to

20   identify were done in regard to Tract Number 6451

21   approximately?

22   A.   I think we shot 420 points.

23   Q.   Were you able to determine when it was that you first

24   began, meaning you, DeWalt, first began doing the survey work

25   for Mr. Wu?

1    A.  Yes.

2    Q.  When was that?

3    A.  That was in September of 2004.

4    Q.  And how long did it take for your surveyors to go out to

5    the site and complete their survey shots?

6    A.  It took a little over a week.

7    Q.  And how many man-hours did it take?

8    A.  I think there was about 44 two-man survey crew hours.  It

9    was a two-man crew, so that's 80 some odd man-hours, I guess.

10   Q.  Would you describe whether your agreement with Mr. Wu was

11   for a fixed sum or was it on a time and materials basis?

12   A.  It was a fixed sum.

13   Q.  How much?

14   A.  $26,000.

15   Q.  Who did the bid?

16   A.  I did.

17   Q.  And, ultimately, were you able to review the records at

18   DeWalt to determine whether or not DeWalt made any money on

19   this project?

20   A.  I was.

21   Q.  And how much money was DeWalt paid?

22   A.  DeWalt was paid about $27,200.

23   Q.  So that was more than the contract amount?

24   A.  Yes.

25   Q.  Why was that?

1   A.  We did some extra things that Mr. Wu agreed were extra

2   outside the scope of the contract.

3   Q.  Okay.  And what were DeWalt's costs?

4   A.  Our costs were more like, I think, $35,000.

5   Q.  Okay.  Why was it that you believed DeWalt lost money on

6   this job?

7         THE COURT:  You mean other than doing the math?  Are

8   you asking --

9         MR. ALEXANDER:  I will rephrase, your Honor.  Thank

10  you.  Withdraw and rephrase.

11  BY MR. ALEXANDER:

12  Q.  You bid the job?

13  A.  Yes.

14  Q.  Were you expecting to be able to do the job for $26,000

15  and not lose money?

16  A.  Yes.

17  Q.  Okay.  And did the job require more work than you

18  anticipated?

19  A.  Yes.  And -- and I probably should have bid it better.  I

20  don't want to put any blame on my employees, because I think

21  they worked hard.

22  Q.  Exhibit J 6.  And would you describe what this is, please.

23  A.  This is a letter from Greg Black to Joe Wu.

24  Q.  And by the time this letter was sent, were you able to

25  determine from the records of DeWalt whether the survey had

1   been completed?

2   A.  It states right on it that we have completed the survey

3   portion of our work.

4   Q.  Okay.  Now, describe generally what it is that you agreed

5   to do for Mr. Wu at DeWalt?  What was your job?

6   A.  Topographic survey, boundary survey, tentative map, final

7   map, and to set his corners, set his lot corners.

8   Q.  And at any time, did you review Parcel Map Number 9572?

9   A.  Yes.

10  Q.  Now, you heard testimony earlier in trial about a

11  comparison between maps.  Were you able to have an opportunity

12  to review the grading map?

13  A.  Yes.

14  Q.  Were you able to compare the grading map to Tract Number

15  9572 in terms of its exterior boundaries?

16  A.  Yes.

17  Q.  What did you find?

18  A.  That the exterior boundary of the grading plan and Parcel

19  1 of Parcel Map 9572 were the same.

20  Q.  Were you able to determine from your review of Parcel Map

21  9572 whether or not Mr. McIntosh did an independent survey?

22  A.  Yes.  I believe it states on the map.

23  Q.  That it was an independent survey?

24  A.  Yes.

25  Q.  Prior to beginning a survey, does DeWalt have a custom and

1   practice in terms of doing investigation before beginning

2   survey work?

3   A.   Yes.

4   Q.   Let me back up.  Maybe I didn't ask it and maybe it was

5   obvious.  Do you hold any licenses?

6   A.   Yes.

7   Q.   What are you?

8   A.   I'm a Licensed Land Surveyor in the State of California.

9   Q.   And have been since when?

10   A.   Since 1996.

11   Q.   Okay.  So what type of research does DeWalt do before

12   beginning a survey?

13   A.   For the purposes of a boundary survey, we will go to

14   various agencies that might collect records of other surveys

15   that were done prior to ours just so that we can try to either

16   verify or match the work that they did before.  We want to see

17   if our results come out close or comparable to their results.

18   Q.   And in conjunction with Tract Number 6451, what initial

19   research was done to gather information?

20   A.   DeWalt Corporation staff contacted the County of Kern, the

21   City of Wasco.  They also did some independent research on the

22   Internet for getting state plain coordinates in the area.  I

23   can't think of what else.  That's probably the majority of it,

24   and a lot of this research you can do on line now.

25   Q.   And who were the survey staff members who were involved in

777

1    the gathering of the survey data from the site?

2    A.   Paul Chavez and Don Osborne were the ones that did the

3    initial research.

4    Q.   And what other members of DeWalt actually went to the

5    field and took survey shots?

6    A.   For the topographic survey, the party chief that did it

7    was named Jeff McDonald, and he had a second surveyor that

8    worked with him named Chris Bishop, and I believe one day

9    another survey named Daniel Hardin worked with him.

10   Q.   And that was all related to the topographic survey?

11   A.   Yeah.  That was topographic survey.

12   Q.   What's a topographic survey?

13   A.   That's the -- all the dots that our surveys go out there

14   and collect to show what the existing condition of the site

15   is.

16   Q.   Now, what is a base map?

17   A.   In our office, what we call a base map is the results of

18   the survey plus any other title information or easements or

19   encroachments on the property that we have discovered in our

20   research or from the title report.  We try to put it all

21   together into a base map that can be used for mapping purposes

22   or sometimes improvement plans.  But we create a base map

23   that's -- it's kind of our starting point, our foundation for

24   the rest of the work that we are going to do.

25   Q.   Who are the persons at DeWalt who participated in the

1   drafting Tentative Map Number 6451?

2   A.   Initially, it was probably Heath James, who is the guy who

3   would take the survey data and connect the dots.  He would

4   also probably spend some time in disseminating the title

5   report.  I think Heath probably did most of the work on the

6   base map.

7   Q.   Did anybody else, like Sarah Burgi, participate?

8   A.   Based on my review of the billing records, I don't think

9   Sarah got involved in the base map.  She was a little bit

10  further down the road, I think once they started drafting the

11  tentative map.

12  Q.   Who was the project manager, so to speak, on this project?

13  A.   It was Greg Black.

14  Q.   At one point in time, was the client, Mr. Wu, pursuing a

15  vesting tentative map?

16  A.   Yes.

17  Q.   What is a vesting tentative map as opposed to a regular

18  tentative map?

19  A.   A vesting tentative map, if you meet all the requirements

20  of the agency, you know, in their Municipal Code for a vesting

21  map, you retain the right to kind of lock in the fees that are

22  in place when your tentative map gets approved.  So if, beyond

23  that time, if two years later, the City wants to increase

24  their fees and you have a vesting map, you can refer back to

25  the fees at the time you were vested.  Otherwise, you just do

1  a standard tentative map and then you are subject to the fees

2  at the time you move forward.

3  Q.  And did, at some point in time, Mr. Wu elect to abandon

4  the vesting tentative and go with a regular tentative?

5  A.  Yes, he did.

6  Q.  Why was that, if you recall?

7  A.  In the City of Wasco, they had some requirements in order

8  to have a vesting map for showing architectural sketches of

9  the houses that you plan to build and some color schemes, I

10  think some landscape things also.  So I think at that point in

11  time, I didn't know if Mr. Wu had all that information

12  together, but he chose not to go with the vesting map.

13  Q.  Okay.  Now, after the tentative map was prepared, at some

14  point, was it approved by the City of Wasco?

15  A.  Yes.

16  Q.  All right.  Do you know when?

17  A.  That was approved in March of 2005.

18  Q.  After the tentative map was approved, was the next process

19  to prepare a final map?

20  A.  Yes.

21  Q.  Tell us what is involved in the preparation of a final

22  map?

23  A.  The final map is different than the tentative map in that

24  the tentative map is a tool for the agency, for the Planning

25  Department to try and figure out what the City will require of

1   that developer.  In order for him to get the right to divide

2   the property, he has to satisfy things, conditions of

3   approval.

4         The final map is the land division instrument and it

5   gets recorded, so its sole purpose is to depict how the big

6   piece of property is going to be broken into little pieces.

7   Q.  And at DeWalt, who worked on the final map?

8   A.  The final map was drafted by Robert Balow and Joe

9   Stormont.

10  Q.  Now, before the final -- at some point, the final map was

11  approved; is that right?

12  A.  Yes.

13  Q.  Now, before that, was there any lot boundary line work

14  done?  For example, where the lot corners are?

15  A.  You mean on the ground?

16  Q.  Yes.

17  A.  I don't believe the -- I don't think the corners were set

18  until after the final map was done.

19  Q.  Okay.  Describe for me what happened in relation to the

20  lot corners.  Were they ever set or established by DeWalt?

21  A.  The actual physical lot corners, yes.

22  Q.  How were they set in a development with existing

23  improvements?  How do you set them?

24  A.  Oh, it's kind of the opposite process of the topo survey

25  in that in the case of the lot corners, you go out with a set

1    of coordinates, a set of, you know, a data set that tells you

2    the northing and easting of a point, and instead of shooting

3    it to locate it for mapping, you stake it out.  You use the

4    data collector and the information for it to direct you to

5    where that point needs to go.  So we actually stake out each

6    one of the lot corners.

7    Q.  By "staking out," what does that mean?

8    A.  If you are familiar with a GPS device, you know, if you --

9    you can put an address into it in your car and it will tell

10   you how to get there.  It is kind of the same concept, only in

11   the survey world, it will tell you what angle to turn and what

12   distance to go in order to get right to the point you need to

13   be on.

14   Q.  Who were the members of DeWalt that actually did the lot

15   corner surveying?

16   A.  That was Mike Weller was the party chief, and Kenny Greer

17   was another party chief who worked on it, and they both worked

18   with Chris Bishop.

19   Q.  Did DeWalt set the lot corners?

20   A.  Yes.

21   Q.  What do you do to set a lot corner physically?

22   A.  Here at this site, for the front lot corner, we set a tag,

23   looks like a penny, and it has my license number on it.  We

24   set a penny tag on the top of the curb at the extension of the

25   property line.

1          And in the back of the property, we would set what's

2    called "rebar."  It is a piece of steel that's like a rod.  We

3    drive that into the ground.  And on top of it, we put a

4    plastic cap that has, again, my license number on it.

5          So those two points would create one of the lot lines

6    for our lot, so that would be done over and over.

7          Now, there was some instances at this tract because

8    there was walls -- we couldn't set the rebar in the back of

9    the lot -- and so we projected the property line onto the wall

10   and we set a penny tag in the wall.

11         And on the east property line between the golf

12   course, I think there is some pilasters and a fence there.  We

13   set some tags in those pilasters too.

14   Q.  What's a pilaster?

15   A.  It is like a little tiny block wall, so there would be a

16   pilaster, like a little block wall, and wrought iron fencing

17   and another pilaster and wrought iron fencing.  It holds up

18   the wrought iron fencing.

19   Q.  How do you set a lot corner when there is concrete in the

20   way?

21   A.  In this case, we drilled a hole.

22   Q.  Where?

23   A.  In the concrete.  We would drill a hole right where the

24   point needed to be and put some epoxy in there and put a nail

25   with our tag number.

783

1    Q.   Did DeWalt set all the lot corners in this subdivision as

2    far as you know?

3    A.   As far as I know, yes.

4    Q.   The little markers that are placed, does it have your

5    license surveyor number on them?

6    A.   Yes, it does.

7    Q.   Did you go out and locate any of those yourself recently?

8    A.   Yes, I did.

9    Q.   Did DeWalt perform all of the work that it agreed to

10   perform on behalf of Mr. Wu?

11   A.   Yes.

12   Q.   Did DeWalt in any way use Tract Number 5472 to somehow

13   lessen or reduce its work?

14   A.   No.

15   Q.   Did DeWalt in any way use the improvement plans?

16   A.   No.

17   Q.   In your review of all the records in relation to this

18   project, did you ever see the improvement plans printed out?

19   A.   I never saw them printed out.

20   Q.   Was DeWalt's work on Tract Number 6451 influenced by any

21   of the improvement plans in any way?

22   A.   Not to my knowledge.

23   Q.   Did DeWalt ever copy Tract Number 5472?

24   A.   No.

25   Q.   Did DeWalt ever copy the improvement plans?

1   A.   No.

2           MR. ALEXANDER:  Your Honor, I have nothing further at

3   this time.

4           THE COURT:  Cross-examination?

5           MR. BRAZE:  Yes, your Honor.

6                       CROSS-EXAMINATION

7   BY MR. BRAZE:

8   Q.   Yesterday, you admitted seeing the tentative map of 5472

9   before you drew the tentative map for 6451; do you recall

10  that?

11  A.   Yes.

12  Q.   And just now you said, "I never saw the improvement plans

13  printed out."  Did you see them in electronic format?

14  A.   Yes.

15  Q.   And I noticed on this exhibit, I don't remember the

16  number --

17          Number of the exhibit?

18          MR. ALEXANDER:  226-A.

19  BY MR. BRAZE:

20  Q.   -- 226-A, there is, in our field, we call that "redacted."

21  Do you know what that is?  What's been redacted, blacked out?

22  A.   I don't believe it was blacked out.  I think what happened

23  was that somebody highlighted those points at one point in

24  time and then a copy was made of that highlighted one and it

25  didn't come out very good.  I think those are the control

785

1    points.  They are just other points that were out there.  I

2    don't think they wanted to redact them.

3    Q.  Those are probably marked "LS 4713," right?

4    A.  Probably.

5    Q.  Which is Mr. McIntosh's land surveyor number?

6    A.  No, it is not.

7    Q.  It is not?

8    A.  It is not.  It's Mr. Martin's, it is not Mr. McIntosh's.

9    Q.  It's Martin-McIntosh's?

10   A.  Yeah, but it was Gene's number, I think.

11   Q.  The point is that Martin-McIntosh numbers are blacked out

12   on your exhibit?

13   A.  Some of those were those points, but there is other points

14   that aren't those.

15   Q.  And those points, of course, would be shown on your final

16   map, right?

17   A.  Which ones?

18   Q.  Those monument points?

19   A.  Yes, some of those were shown, but some of the other

20   control points wouldn't be shown because they are just for our

21   use.

22   Q.  So I mean, obviously, when you got out there and you saw

23   the monuments with LS 4713, you know those are the

24   Martin-McIntosh survey points, correct?

25   A.  Yes.

786

1  Q.  Now, isn't it a fact that final maps have to conform to
2  the improvement plans?  Yes or no?
3  A.  No.
4  Q.  They don't have to conform to the improvement plans?
5  A.  Do you want me to give you an example or just say no?
6  Q.  Well, is the general rule final maps have to conform with
7  improvement plans, don't they?
8  A.  If the improvement plans are a condition of approval, then
9  yes.
10  Q.  Okay.  So if the improvement plans are a condition of
11  approval, they have to be -- have to conform with the final
12  map?
13  A.  Yes.
14  Q.  And why is that?
15  A.  Because there are instances where final maps don't require
16  improvements, so there is no improvement plans.
17  Q.  Well, in this case, there were improvement plans for 5472,
18  right?
19  A.  For 5472, there were improvement plans.
20  Q.  And those improvement plans were going to be used for
21  6451, correct?
22  A.  I don't know that.  I can't say.  They weren't a condition
23  of approval for us to prepare, you know, to use them.
24  Q.  Have you ever had to go look for storm drain covers in a
25  street?

1   A.   In a street, sure.

2   Q.   And they get paved over?

3   A.   Yes.

4   Q.   Got to go to the improvement plan, right?

5   A.   That happens.

6   Q.   So if Final Map 6451 doesn't have improvement plans and

7   someone paved over the sewer cover, where would you go to find

8   the sewer covers?

9   A.   And I think we are talking about two different kinds of

10  plans here too.  Should I explain?

11  Q.   Sure.

12  A.   Improvement plans are made for construction.  The City

13  looks at them, they approve them so that somebody can go and

14  build that in the field per their standards.  So if, you know,

15  if you were a city agency and somebody came to you with a

16  project and you thought they needed to have streets or sewer

17  or water, and you would condition them to do improvement

18  plans.

19         If I were looking for a sewer manhole, I wouldn't

20  want to look at the improvement plans because that was a plan

21  of how it should have been constructed, not how it was

22  constructed.

23  Q.   You want to look at the as built?

24  A.   I would want to look at the as built.

25         MR. ALEXANDER:  I couldn't hear, your Honor.

1          THE COURT:  "There were as built plans for 5471,

2    weren't there?"

3          THE WITNESS:  I don't know if there were as built

4    plans for 5472.

5    BY MR. BRAZE:

6    Q.  I'm sorry.  I can't get the numbers straight.  The earlier

7    map.

8          So isn't it a fact that some of the dimensions on

9    your final map conformed to the improvement plans?

10   A.  No.

11   Q.  Such as the golf course cart path size?

12   A.  Our final map, the dimensions in the final map were

13   created more around Parcel 9572.  That was the basis, I think,

14   of our final map, from my review.

15   Q.  Well, if I represented to you that your tentative map had

16   a different golf cart path size than your final map, was that

17   to conform to the improvement plans?

18          MR. ALEXANDER:  Lacks foundation, assumes facts.

19          THE COURT:  Overruled.

20          Go ahead and answer, if you can.

21          THE WITNESS:  The tentative map, you know, it doesn't

22   have to have any particular accurate dimension.

23   BY MR. BRAZE:

24   Q.  But you spent 80 hours surveying it.

25          THE COURT:  What's your question?

1    BY MR. BRAZE:

2    Q.  I mean shouldn't it be accurate?

3    A.  If it's a conceptual plan of, you know, what we were going

4    to do there.  We, you know, we could be accurate or not

5    accurate.

6           But I know that at some point in time, the City is

7    going to say, "Did they follow through on their concept with

8    their final map?  If they didn't, then we are going to make

9    them do something again.  We are going to take another look at

10   it."

11          But if you do, then they will let you do the final

12   map.

13   Q.  Are you suggesting you drew the final map without

14   determining whether there were as built plans?

15   A.  We don't need the improvement plans or the as built plans

16   for the final map.

17   Q.  Well, at some point in time --

18   A.  It is just a land division instrument.

19   Q.  At sometime they have to come on the map, don't they?

20   A.  There are no improvements at all shown on the final map.

21   Q.  Okay.

22   A.  The final map is just the lots by themselves.  There is no

23   sewer or water or anything like that shown on them.

24   Q.  Now, you go down to municipalities and check out plans all

25   the time, don't you?

GUTIERREZ - X

790

1   A.   Sure.

2   Q.   Now, where would I go to get the improvement plans for

3   6451?

4   A.   There were never any improvement plans conditioned for

5   6451, so none were prepared for 6451.

6   Q.   So if you went down to City of Wasco and you asked for the

7   improvement plans for Tract 6451, they say, "There aren't

8   any"?

9   A.   I don't know.  I don't know.  But we didn't prepare any

10   improvement plans for 6451.

11   Q.   You didn't prepare any improvement plans?

12   A.   Or --

13   Q.   Or as built plans?

14   A.   Or as built plans.

15   Q.   And to your knowledge, no one has prepared any as built

16   plans that Mr. McIntosh hadn't been preparing?

17   A.   Yeah, I didn't do them.  I didn't do them.

18   Q.   So if you were going out there now to locate a sewer cover

19   because it was paved over, what would you do?

20        MR. HASSING:  Objection, relevance, your Honor.

21        THE COURT:  What is the relevance of this question?

22        MR. BRAZE:  Well the point is there have to be plans

23   to match up to a map, and we have been skirting around this

24   issue.

25        THE COURT:  Ask him straight out.

1          MR. BRAZE:  I thought I had.

2          THE COURT:  If you have and you have gotten an

3     answer, we need to move on.

4     BY MR. BRAZE:

5     Q.  Don't there have to be as built plans associated with a

6     map?

7     A.  Again, a final map is just a land division instrument.

8     It's not -- it has no representation of any of the utilities.

9     And my job was to prepare a final map.

10    Q.  Where do you go to get the representation of the utilities

11    if the tract map does not have any?

12    A.  If I were researching a project and I wanted to go get a

13    representation of the utilities, I would go to that agency or,

14    if there is a separate agency for the utility, I would go to

15    them and I would ask them if they have got some record of it.

16    And I have been in jurisdictions where they didn't have

17    records of things.

18          And so it is a little frustrating at that time, and

19    then you have to take extraneous measures to go forward with

20    your survey.  You might have to get metal detectors to try to

21    figure out where the manholes are, you might have to dig

22    potholes to find out where the sewer is.  It is always more

23    convenient when those improvement plans or as built plans are

24    available, but sometimes they are not.

25    Q.  Is Wasco one of those jurisdictions?

GUTIERREZ - X

792

1   A.  By and large, the projects that I have done in Wasco, they

2   have had fairly good mapping of their improvements.

3   Q.  So this is a one-time occurrence, right?

4        MR. HASSING:  Objection, argumentative, your Honor.

5        THE COURT:  Sustained.

6   BY MR. BRAZE:

7   Q.  On your survey data, 226-A, where are the lot numbers?

8   A.  I don't believe there are any lot numbers.

9        MR. BRAZE:  Thank you.

10       THE COURT:  Mr. Hassing?

11       MR. HASSING:  Nothing from me.

12       THE COURT:  Mr. Alexander.

13       MR. ALEXANDER:  No thank you, your Honor.

14       THE COURT:  Counsel?

15       MR. OKADIGBO:  Couple of questions.

16                    CROSS-EXAMINATION

17  BY MR. OKADIGBO:

18  Q.  Mr. Gutierrez, did you interact with the City of Wasco in

19  regards to the preparation of this 6451 tentative map?

20  A.  DeWalt Corporation did, yes.

21  Q.  But did you personally interact with the City?

22  A.  I might have minorly done it.  Most of it was done by

23  Greg.

24  Q.  Is that also true for the final map, the preparation of

25  the final map?

793

1   A.   Yes.

2   Q.   Do you recall what the nature of your interactions with

3   the City was?

4   A.   I think I had a conversation with Dennis McNamara one day.

5   Q.   Do you recall what about?

6   A.   I don't recall.

7        MR. OKADIGBO:  No further questions, your Honor.

8        THE COURT:  Anything further of this witness?

9        MR. ALEXANDER:  No thanks, your Honor.

10       MR. BRAZE:  No.

11       THE COURT:  Thank you.  You may step down.

12       What is your pleasure?

13       MR. ALEXANDER:  Nothing further today, your Honor.

14       THE COURT:  All right, ladies and gentlemen, we are

15  going to stop now for not only today, but for the weekend.  As

16  you remember, we don't have session tomorrow.  We, of

17  course -- the Court will have session here, but not in this

18  case.

19       This weekend is a mixture of sun and rain, and the --

20  that means it can either be guests coming over to your

21  barbeque or guests coming over to your living room to watch

22  television.

23       These are wonderful opportunities for them to find

24  out what you are doing in life.  And I guarantee you that as

25  soon as you tell them you are on jury duty, they will not want

1    to stop there.

2          So it is very important that you understand, it is

3    not their obligation to stop there; it is yours.

4          So, please, between now and on Monday morning, at

5    8:30, which is when I'm asking you to be in the jury room

6    ready to go for the next witness, please don't have anything

7    to do with this case.  Don't talk to anybody.  Don't let

8    anybody talk to you about it.  Don't let anyone talk to you --

9    in front of you about this case.  Don't look anything up.

10   Even if nobody else knows you are looking it up, you do, and

11   it's your obligation not to do that.

12         So please don't form or express an opinion or do

13   anything having to do with the case.

14         Any issues, questions, or problems?

15         Okay.  Then we will see you at 8:30, Monday morning.

16   Have a pleasant weekend.

17         (The jury left the courtroom.)

18         THE COURT:  Let the record reflect the jury has left

19   the courtroom.  Any issues?

20         MR. TRAVIS:  Your Honor, just a couple things.  I

21   don't know what DeWalt's case is, but if, you know, at this

22   point, I think we can all stipulate that there was a survey

23   out there.  I don't know if they are planning on calling any

24   surveyors, but it might take up more time than is necessary.

25         MR. ALEXANDER:  That would be fine, your Honor.

1          THE COURT:  You want a stipulation that there was a

2   survey?

3          MR. BRAZE:  We don't want it.  We are offering it.

4          MR. HASSING:  Not just that there was a survey, but

5   that DeWalt went out and surveyed all of the improvements that

6   were existing; is what you are saying?

7          MR. TRAVIS:  That's not what we are saying.

8          MR. HASSING:  Well, that doesn't --

9          MR. TRAVIS:  We are saying there is a stipulation.

10          THE COURT:  Stipulation offered.  Stipulation

11   refused.

12          MR. BRAZE:  One comment.  With respect to the special

13   verdict, Questions 1 and 2 were decided as a matter of law.

14   So if we are revising at this point, it can be taken off.

15          THE COURT:  Does anybody disagree with that

16   statement?

17          MR. HASSING:  Can we have a reading of it?

18          THE COURT:  Yes.

19          Question 1:  Did Plaintiff Roger McIntosh own the

20   copyright to the tentative map for Tract 5472?

21          Question 2:  Did Plaintiff Roger McIntosh own the

22   copyright to the improvement plans for Tract 5472?

23          MR. HASSING:  I think we still have an issue with

24   regard to whether or not all of the improvement plans can be

25   copyrighted because of their utilitarian nature.  I mean we

1   have resolved the issue of the assignment, but we still don't

2   believe that all of these improvement plans, the

3   three-dimensional sewer lines, water lines, are copyrightable

4   because of the utilitarian nature of the object being drawn.

5          THE COURT:  What about Question 1?

6          MR. HASSING:  I have no objection to that.

7          MR. ALEXANDER:  No objection, your Honor.

8          MS. BARNES:  No objection, your Honor.

9          THE COURT:  All right.  Then Question 1 will be

10  removed as having been determined by the Court as a matter of

11  law the other day in a ruling.

12         MR. TRAVIS:  Your Honor, we would ask -- I know that

13  Mr. Hassing has stated that he has issues with number 2, and

14  we would state that as a matter of law, the utilitarian

15  exception is completely unrelated to this case.

16         I don't know if that's a point that the Court wants

17  to address now or later.  I know there was some briefing done.

18         THE COURT:  What was the last statement?

19         MR. TRAVIS:  I know that there was some briefing done

20  on it in our trial brief and in some of our motions.

21         THE COURT:  All right.  Does defense want an

22  opportunity to respond to that legal briefing as to Question

23  2?  Mr. Hassing?

24         MR. HASSING:  I'm not prepared right now to --

25         THE COURT:  I don't mean now.  I mean do you want to

1 | do some briefing and submit it?

2 |     MR. HASSING:  Yes, your Honor.

3 |     THE COURT:  When can you do that?

4 |     MR. HASSING:  I can submit it Monday.

5 |     THE COURT:  Perfect.  All right.  As soon as they

6 | have submitted it, I will rule.

7 |     MR. TRAVIS:  Okay.

8 |     THE COURT:  But 1 is out.  1 is done.  Okay.

9 |     Anything else?

10 |     MR. ALEXANDER:  As far as timing, your Honor, I have

11 | talked to all counsel involved, I think we might be able to

12 | perhaps argue on Monday and maybe, worst case, Tuesday, the

13 | way it sounds.

14 |     THE COURT:  Good.  Then everybody be prepared, and we

15 | will move forward with great vigor.

16 |     MR. BRAZE:  Your Honor, we have brought that

17 | replacement exhibit.  Remember, one had some yellow marks on

18 | it.

19 |     THE COURT:  Yes.  And I don't remember what the

20 | exhibit number was that we assigned to the replacement.  Do

21 | you?

22 |     MR. BRAZE:  It is --

23 |     MR. ALEXANDER:  I don't remember either.

24 |     MR. BRAZE:  J 134 is the big one we had.

25 |     THE COURT:  Why don't we mark this as J 134-A.

1          MR. BRAZE:  Okay.

2          (Plaintiff's Exhibit J 134-A was marked for

3   identification.)

4          THE COURT:  Thanks.

5          (The proceedings were adjourned at 4:23 p.m.)

6

7          I, PEGGY J. CRAWFORD, Official Reporter, do hereby

8          certify the foregoing transcript as true and correct.

9

10  Dated:  03/22/2010                /s/ Peggy J. Crawford
                                      PEGGY J. CRAWFORD, RDR-CRR
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25