799

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

HON. LAWRENCE J. O'NEILL


ROGER McINTOSH,                     )
                                    )   1:07-cv-1080 LJO
          Plaintiff,                )
                                    )   JURY TRIAL, DAY 5
     vs.                            )
                                    )
NORTHERN CALIFORNIA                 )
UNIVERSAL ENTERPRISES               )
COMPANY, a California               )
corporation, et al.,                )
                                    )
          Defendants.               )
_____ )

Fresno, California                  Monday, March 8, 2010



REPORTER'S TRANSCRIPT OF PROCEEDINGS















Vol. 5, pgs. 799 to 999, inclusive



REPORTED BY:  PEGGY J. CRAWFORD, RDR, CRR, Official Reporter

800

APPEARANCES OF COUNSEL:

For the Plaintiff:          LAW OFFICES OF BORTON PETRINI, LLP
                            5060 California Avenue
                            Suite 700
                            Bakersfield, CA  93309
                            BY:  **JAMES J. BRAZE**
                                 **JEFFREY A. TRAVIS**


For the Defendants:

(Northern/Lotus)            LAW OFFICES OF STEVEN J. HASSING
                            425 Calabria Court
                            Roseville, CA  95747
                            BY:  **STEVEN J. HASSING**

(DeWalt)                    ALEXANDER & ASSOCIATES, PLC
                            1925 G Street
                            Bakersfield, CA  93301
                            BY:  **WILLIAM L. ALEXANDER**

(City of Wasco)             GCR, LLP
                            520 South Grand Avenue
                            Suite 695
                            Los Angeles, CA  90071
                            BY:  **CHAKA C. OKADIGBO**
                                 **SUSAN GRAHAM BARNES**

801

### INDEX

**PLAINTIFF'S WITNESSES**:


**ROGER MCINTOSH (Rebuttal)**                               933
DIRECT EXAMINATION BY MR. BRAZE                            933
CROSS-EXAMINATION BY MR. ALEXANDER                        938

**DEFENDANTS' WITNESSES**:


**WARREN CRAIG**                                           818
DIRECT EXAMINATION BY MS. BARNES                          819
CROSS-EXAMINATION BY MR. HASSING                          825
CROSS-EXAMINATION BY MR. BRAZE                            826

**JOHN WOONER**                                            826
DIRECT EXAMINATION BY MR. OKADIGBO                        827
CROSS-EXAMINATION BY MR. BRAZE                            830

**STEPHEN WONG**                                           834
DIRECT EXAMINATION BY MR. OKADIGBO                        835
CROSS-EXAMINATION BY MR. BRAZE                            867
CROSS-EXAMINATION BY MR. ALEXANDER                        885
REDIRECT EXAMINATION BY MR. OKADIGBO                      885

**ROGER MCINTOSH**                                         887
DIRECT EXAMINATION BY MR. HASSING                         887
CROSS-EXAMINATION BY MR. BRAZE                            892
REDIRECT EXAMINATION BY MR. HASSING                       893

**JOE WU**                                                 894
DIRECT EXAMINATION BY MR. HASSING                         894
CROSS-EXAMINATION BY MR. BRAZE                            921
REDIRECT EXAMINATION BY MR. HASSING                       930
RECROSS-EXAMINATION BY MR. BRAZE                          931

* * * * *

802

## EXHIBITS

<u>DEFENDANT'S</u>                                                    MARKED

    D 502                                                         849
    D 503                                                         850
    D 504                                                         853

* * * * *

<u>DEFENDANT'S</u>                                                    RECEIVED

    D 504                                                         854
    D 221-A                                                       891
    D 221-B                                                       892
    D 500 through D 504                                           974

1    Monday, March 8, 2010                    Fresno, California

2    8:30 a.m.

3            (The following proceedings were had outside the

4            presence of the jury, to wit:)

5            THE COURT:  Back on the record.  It is 8:15.  Don't

6    see anybody from the City.  Counsel are here.

7            MR. HASSING:  Your Honor, Susan just had to go to the

8    restroom and Chaka is parking the car.  We don't have to wait

9    for them, though.

10           THE COURT:  We have issues?

11           MR. BRAZE:  Well, your Honor, I think on Friday, we

12   had suggested that Questions 1 and 2 be removed from the

13   verdict form because you had ruled that Mr. McIntosh was the

14   owner as a matter of law.

15           As I understand it, counsel has withdrawn their

16   objection to that.

17           MR. HASSING:  Yes, your Honor.  We are cognizant of

18   the fact that the Court has ruled on the effect of the

19   assignment, and so that would apply equally to the plans as

20   well as the map.

21           We contested that, but we will abide, obviously, by

22   the Court's ruling, and we are not going to further contest

23   that at this point.

24           THE COURT:  1 and 2 are out.  Questions 1 and 2 are

25   out, and we will change the verdict form.

804

1        What other issues?

2        MR. BRAZE:  In going through the verdict form and

3  jury instructions this weekend, one of the stipulated facts in

4  the jury instruction is that Northern California Universal

5  Enterprises is the general partner of Lotus, LLP.

6        Mr. Wu testified that he is the president of NCUE and

7  also a general partner in Lotus.

8        We may be mistaken about the last one, but it would

9  seem to me that the jury verdict has questions regarding

10  Northern and Lotus throughout, which, you know, basically

11  doubles the length of the verdict.  It would seem since there

12  was a unity of interest, we could avoid a double question as

13  to Northern, as to Lotus.

14        MR. HASSING:  Your Honor, with regard to the first

15  statement about Joe Wu's testimony, Joe did testify that he

16  was the general partner of Lotus.  That was a misstatement,

17  and I will clear that up when I get him on the stand.

18        Northern is the general partner of Lotus.  That's a

19  stipulated fact agreed to by everybody.

20        We still need to have separate reference to Northern

21  and Lotus on the jury verdict form.  There are two separate

22  legal entities.  And the fact that Northern is the general

23  partner of Lotus may, somewhere down the line, result in

24  Northern sharing Lotus' liability, but for purposes of the

25  verdict form, two separate entities.

1           And it was Northern that contracted with DeWalt, not

2    Lotus.  And the things that Northern does are not necessarily

3    attributable to Lotus, whereas liability of Lotus could carry

4    over to Northern.

5           Those liability issues are something for later

6    discussion and argument.  Right now, we need to have separate

7    entities addressed in the verdict forms.

8           MR. BRAZE:  They are not separate entities.  If

9    Northern California Universal is the general partner of Lotus,

10   it is a unity of identity.  Anything Northern does, Lotus is

11   vicariously liable for.

12          THE COURT:  Well, I understand what your argument is,

13   but we are talking about probably an extra ten minutes.

14          MR. BRAZE:  I just noticed that there was all these

15   questions about Northern and Lotus, Northern and Lotus.

16          THE COURT:  I understand.  It's just that we can't

17   get the jury back once we discharge them, and if there are

18   posttrial motions, if anyone believes they are necessary, it's

19   safer to do it.  Nobody wants to try this thing twice.

20          MR. BRAZE:  Definitely.

21          THE COURT:  While I understand what you are saying,

22   for the extra ten minutes of the investment of their time, and

23   that's all the down side is, I think the issue can be taken

24   care of fairly quickly by both sides in a matter of words in

25   closing if you deem it important to address.

1      MR. BRAZE:  I don't think we had a jury instruction

2    regarding liability of a general partner.  I guess we can add

3    something or stipulate.

4      THE COURT:  Or since it's a matter of law on

5    liability of a partnership, it would seem it could easily be

6    addressed in a posttrial motion if you can't agree.

7      MR. BRAZE:  Okay.

8      THE COURT:  Are we done on that issue?

9      MS. BARNES:  No, your Honor.  If the Court please,

10   Susan Barnes for the City of Wasco.  We would respectfully

11   request that with respect to the partnership issue which has

12   just been discussed, that the City of Wasco be removed from

13   that special verdict form because I would point out, your

14   Honor, that there has been no evidence in the record presented

15   by any party that Wasco did anything other than their duty

16   under the Municipal Code, and there is no evidence of any

17   participation in a partnership or even a practical

18   partnership.

19     MR. BRAZE:  I'm not sure what we are talking about.

20   There is undisputed evidence that Wasco violated the copyright

21   law by copying and distributing --

22     THE COURT:  Wait a minute.  Maybe I'm

23   misunderstanding what you are saying.  Do you want to discuss?

24     MR. HASSING:  Can I mention one thing to her?

25     THE COURT:  Sure.

1          (Counsel conferred off the record.)

2          MS. BARNES:  Your Honor, if the Court please, your

3     Honor, I did defer that until after the case closes by way of

4     motion.

5          THE COURT:  Fine.

6          What's your next issue?

7          MR. BRAZE:  Friday, we were advised that Defendant Wu

8     or Northern, however you want to call it, intends to introduce

9     evidence of subsequent sales that occurred after they provided

10    us with their sales data on the subdivision.

11         This is information they were well aware of before

12    they deposed our expert, Mr. Merati, and they did not reveal

13    that to him knowing Mr. Merati was a rebuttal expert.

14         Now, the day after he testifies, they want to bring

15    in additional evidence that he did not have the opportunity to

16    consider during his testimony, and we would make a motion in

17    limine to exclude that data that occurred in January or

18    February that they were well aware of before they deposed

19    Mr. Merati.

20         MR. HASSING:  Your Honor --

21         THE COURT:  Is what he says true or not?

22         MR. HASSING:  What he says is true.  We have had two

23    sales.  One in January, one in February.  The effect of those

24    sales is to increase our revenue.  It increases our revenue.

25         And we are not going to -- we are not going to try to

1 introduce any additional expenses related to those sales.  So

2 our expenses stay the same.  Our revenue increases by $15,000,

3 which is to their benefit.  There is no prejudice whatsoever.

4 I didn't know about the sales that occurred after Mr. Wu's

5 deposition.

6 　　　　　MR. BRAZE:  Then we will waive the benefit because

7 there has to be a reason the defendant wants to introduce that

8 evidence.  It's certainly not to help us.

9 　　　　　MR. HASSING:  The reason --

10 　　　　　MR. BRAZE:  It's to open the door.

11 　　　　　MR. HASSING:  The reason that we would introduce the

12 evidence of the two sales is to give the jury a clear picture

13 of what happened with the 30 houses.

14 　　　　　We have been telling the jury that we sold 19 houses.

15 I find out now that we have sold two additional houses.  I

16 don't want to be putting Joe on the witness stand and saying,

17 "What do you think these two houses are going to sell for?

18 What do you have them listed for," when they are already sold.

19 　　　　　And the net effect is we bump up our revenue $15,000.

20 We don't add any expenses.  It just gives a clear, complete

21 picture.  There is absolutely no prejudice.

22 　　　　　If they would prefer that I simply ask Mr. Wu, "Do

23 you have any idea or have you ever entered into a sales

24 contract on these houses for X number of dollars or do you

25 have any idea what these houses are worth," I can do that, but

1    I think I'm misleading the Court and jury in doing that.

2              THE COURT:  Anything else?

3              MR. BRAZE:  I don't understand why someone wants to

4    introduce evidence that's beneficial to the defendant [sic]

5    unless it's to open the door.

6              THE COURT:  You mean beneficial to the plaintiff?

7              MR. BRAZE:  I'm sorry.  "Plaintiff."  I don't

8    understand why they want to introduce evidence beneficial to

9    the plaintiff.  Like I said, we will waive the benefit.

10             So I don't -- I mean otherwise, this trial will never

11   end.  If he sells a house tomorrow --

12             THE COURT:  I understand.

13             MR. BRAZE:  And besides a sales contract is not

14   relevant unless the sale is closed.

15             THE COURT:  Anything else?

16             MR. HASSING:  The reason is we still have a million

17   dollar loss, so I don't care about the $15,000.  I just want a

18   complete picture without misleading anybody.

19             THE COURT:  Anything else?

20             MR. BRAZE:  Nothing.

21             THE COURT:  Motion is granted.  It is precluded.

22             Anything else?  Any other issues?

23             MR. HASSING:  Your Honor, at some point today -- and

24   I want to maybe get the Court's view on this -- but at some

25   point today, I plan on -- and I have distributed to counsel

1   and the fact that I advised them of the papers as of Friday --

2   I plan to make a motion asking the Court for an order allowing

3   us to reassert merger as an affirmative defense.

4          Now, this Court struck merger based on the summary

5   adjudication order.  I think with the evidence now before us

6   that's been admitted, I think merger should be an affirmative

7   defense.  You have struck it.

8          I'm not sure of the procedure.  I have filed a

9   motion.  Can I get any guidance at all from the Court?

10          THE COURT:  Do you have it in writing?

11          MR. HASSING:  I do.

12          THE COURT:  I need to see it.  What is your position?

13          MR. TRAVIS:  Our position is that there is no facts

14   that are anything different than what was already previously

15   presented.  I also have an opposition that I have prepared.

16          THE COURT:  Have you served it?

17          MR. TRAVIS:  He hasn't served it, so I didn't know if

18   it was going to be filed.

19          THE COURT:  Do you have his copy?

20          MR. TRAVIS:  I don't.

21          MR. HASSING:  I gave it to you this morning.

22          MR. TRAVIS:  This is our opposition.  I could give it

23   to the Court.

24          THE COURT:  All right.  Serge, could you make copies?

25          MR. BRAZE:  While he is doing that, we rested based

811

1   on the conditions of the pleadings and your rulings on motions

2   on summary judgment.  We didn't produce any evidence because

3   we thought that was gone.

4        THE COURT:  I understand that.  I have to read it

5   because I don't know what it says.  Anything else?

6        MR. OKADIGBO:  With respect to jury instruction

7   number 33, that reads, "A work is copied if a defendant copied

8   from a third work rather than from the plaintiff's work if

9   such third work was a copy of the plaintiff's work."

10        THE COURT:  It says, "A work is copied if a defendant

11   copied from a third work rather than from the plaintiff's work

12   if such third work was itself a copy of the plaintiff's work."

13        MR. OKADIGBO:  The City contends that that jury

14   instruction is not applicable to the facts of this case

15   because the only facts that have been put forth in front of

16   the Court concerns the copying of one work onto another.

17        We believe that the plaintiff is going to try and

18   attempt to say that the third work in this instance is the

19   improvements in the ground, and they made that argument in

20   their trial brief.

21        So we would like guidance on that, your Honor.  We

22   just don't believe that it is the law that copying physical

23   structures on the ground is copyright infringement.

24        THE COURT:  So your assumption is that the plaintiff

25   is going to say that the improvements that were in the ground

812

1   that your position is were surveyed, and then using the

2   results from the survey of that which was in the ground

3   already is a copyright violation; that's what you think

4   plaintiff is going to say?

5          MR. OKADIGBO:  Yes.  That's what they said in their

6   opening statement.  That's a position they stake out in their

7   trial brief, so we believe that that is what they want to use

8   this Instruction Number 33 for.

9          THE COURT:  Is that what your position is?

10         MR. TRAVIS:  Yes, your Honor.  And supported by the

11   law that even copying from a non-copyrightable element of a

12   copyrighted work is still copyright infringement.

13         And the classic example is music.  I mean if you hear

14   a song being played on the radio, just because -- it is not in

15   a tangible medium of expression that's copyrighted, but that's

16   still not independent creation, and that's really what it goes

17   to, is independent creation, that defense.

18         We are not trying to copyright.  We are not claiming

19   that we have a copyright interest in what's on the ground, and

20   I think there might be confusion on that.

21         THE COURT:  I'm now confused.  It sounds like you are

22   saying that's exactly what you think is the copyright

23   violation.  Now you are saying it is not.

24         MR. TRAVIS:  No, no.  And I think that's where the

25   confusion is.  We are trying to argue it is not independent

1    creation if you are basing your work on a non-copyrightable

2    expression of the plaintiff's copyrighted work.  In the same

3    sense as if I'm listening to music and I listen to the music,

4    I might not have ever seen the deposit or the lyric sheet that

5    was deposited with the Copyright Office, I'm still hearing the

6    music, right.  That is still not independent creation and

7    that's really to rebut their independent creation argument.

8            Another example would be if I have a metal grate with

9    ornate designs and I shine it onto the wall over there and a

10   person comes in and sees that design on the wall, to then come

11   in and claim somehow that because that copy was on the wall

12   and I never looked at the actual original ornate design is

13   somehow independent creation, that's the reason why we are

14   making that argument.

15           And we are not trying to claim that there was a

16   copyright interest in what was on the ground.

17           THE COURT:  So you are saying if a tract map is

18   prepared, for instance, as a result of someone going out to

19   the scene and looking to see where the sewers are, where the

20   improvements had been, that because there was an improvement

21   map by your client, that is or could be a violation of

22   copyright law?  Is that what you are saying?

23           MR. TRAVIS:  No.  I think it's a -- I think that it's

24   not independent creation.  I think it's a dependent creation.

25           THE COURT:  So, in other words, your answer to my

1    question is yes?

2              MR. BRAZE:  It goes to their affirmative defense.  In

3    other words --

4              THE COURT:  No matter what it goes to, that doesn't

5    change my question.

6              MR. TRAVIS:  Okay.  Okay.  Yes.

7              MR. ALEXANDER:  Your Honor, this is very important,

8    and I agree with Mr. Okadigbo, because what they are going to

9    try to argue is that the law says if you go out to the

10   subdivision with all the improvements built in the ground and

11   you survey it, you violated his copyright.

12             THE COURT:  That's what I'm understanding he is

13   saying.

14             MR. ALEXANDER:  That would turn the law upside down.

15             THE COURT:  That is what you are saying, isn't it?

16             MR. TRAVIS:  It is briefed out in our trial brief.

17             THE COURT:  So the answer to my question is yes?

18             MR. TRAVIS:  Yes.

19             MR. HASSING:  The examples he gives, your Honor, of

20   listening to music or looking at a shadow of a copyrighted

21   article, the difference is that in those examples, the person

22   is actually looking at or listening to the actual copyrighted

23   document.

24             Whereas in the subdivision, the subdivision was built

25   by somebody else on land not owned by McIntosh.  And,

1   therefore, McIntosh has no copyright interest to the actual

2   improvements.

3          MR. OKADIGBO:  If I might add, your Honor, their

4   point runs directly contrary to the established notion that

5   ideas are not copyrightable and that's one of the established

6   principles that we have in the jury instructions.

7          A copyright is not like intellectual property.  Ideas

8   are not protected.  And so for them to state that position is

9   basically saying that ideas are protected on the copyright

10  law.

11         MR. BRAZE:  Let me just say, their defense to the

12  copyright is that they independently created their map from

13  what was on the ground.

14         THE COURT:  Right.

15         MR. BRAZE:  All we are saying is that is not

16  independent creation, that's dependent creation.  You are

17  creating from something that is a result of the copyrighted

18  work.  It is not copyrightable.  It is just not independent

19  creation.  It's dependent creation.  It goes to the defense --

20         THE COURT:  I think you are not saying the same

21  thing, but I understand what you are saying.

22         MR. BRAZE:  Yes.  What we are saying is when DeWalt

23  went out and copied what was on the ground, that is not

24  independent creation.  That is their defense to the copyright

25  infringement, it is not a separate claim for copyright.

1       THE COURT:  What he has said has not been responded

2    to.  What Mr. Travis said has been responded to.

3       Does anybody wish to respond to what Mr. Braze says?

4       MR. HASSING:  Your Honor, I have got a case that's

5    been cited in our trial brief, it's the *Mason-Montgomery* case.

6    In *Mason-Montgomery*, the court specifically found that to go

7    out and copy improvements that have been built is not a

8    violation of a copyright of plans.

9       Maybe even a better case is --

10      THE COURT:  You are still responding to what

11   Mr. Travis said.  I don't think you are responding to what

12   Mr. Braze said.

13      MR. HASSING:  Maybe I'm not clear on what Mr. Braze

14   said.

15      THE COURT:  Mr. Braze is only addressing the

16   affirmative defense of independent creation.

17      MR. HASSING:  Oh, okay.  My case in my brief,

18   *Kunycia*, that talks about the independent creation by going

19   out and looking at stores, GAP stores, I think it was.  If you

20   copy the plans for the GAP store, you are infringing that

21   architect's copyright.  If you go to the GAP store and you

22   draw what is there, that is independent creation.

23      There is no principle in copyright law that I have

24   read called "dependent creation."  I think Mr. Braze just

25   created that.  I haven't seen it.  But *Kunycia* addressing

817

1  Mr. Braze's argument, and it's in my brief.

2          MR. ALEXANDER:  Thank you, your Honor.  The same

3  arguments are being made with a different set of clothes on by

4  Mr. Braze and Mr. Travis.  It's the same issue.

5          That is, is there any sort of copyright protection

6  whatsoever that exists in a set of improvements that have been

7  fully constructed from plans that may have been copyrighted.

8  It is the same issue.  It is being cleverly disguised as

9  something else.  It is not.

10         MR. OKADIGBO:  If I may add to that.  Independent

11  creation is one of the main affirmative defenses to copyright

12  infringement.

13         If Mr. Braze's position would be to prevail, it

14  would, essentially, give the plaintiff a copyright monopoly

15  just because he happened to have expressed his ideas in a set

16  of plans.  Anybody ad infinitum that goes out and draws what

17  they see would be liable for copyright infringement under

18  their position.  And they wouldn't be able to raise an

19  independent creation because their position would be,

20  essentially, that anybody else who wishes to develop that

21  property must rip out the improvements and do something

22  different altogether, and copyright law doesn't require that.

23         THE COURT:  All right.  What I'm going to do is I'm

24  going to reread, it was the *Kunycia* case?

25         MR. HASSING:  Yes.

1        THE COURT:  And I will read these briefs and we will

2   come back to it.

3        MR. HASSING:  *Mason-Montgomery* might be a good one

4   too.

5        THE COURT:  All right.  Anything else?

6        Are we ready for the next witness?

7        MR. TRAVIS:  Your Honor, I believe our position is

8   outlined in our trial brief.

9        THE COURT:  Okay.

10       (The following proceedings were had in the presence

11       of the jury, to wit:)

12       THE COURT:  The jury has joined us.  Good morning,

13   ladies and gentlemen.  I hope you had a nice, restful weekend.

14   We had a few matters we started at about 8:15 here.  We are

15   ready for the next witness.

16       Any issues, questions, concerns, problems?

17       Okay.  We are ready for the next witness.

18       MS. BARNES:  Your Honor, we would call Warren Craig.

19                    **WARREN CRAIG**,

20   called as a witness on behalf of the Defendant City of Wasco,

21   having been first duly sworn, testified as follows:

22       THE COURT:  Please take the witness stand right here,

23   and then tell us who you are.

24       THE WITNESS:  My name is Warren Craig.  Work for the

25   City of Wasco as a street supervisor.

CRAIG - D

819

1          THE COURT:  Thank you.
2                    DIRECT EXAMINATION
3    BY MS. BARNES:
4    Q.   Mr. Craig, when did you go to work for the City of Wasco?
5    A.   In March of 2001.
6    Q.   What was your job at the time you went to work for the
7    City?
8    A.   I was a maintenance worker.  As far as fixing signs and
9    the regular maintenance roads and whatnot, curb and gutters,
10   as duties of the maintenance crew.
11   Q.   And did there come a time during your employment by the
12   City when you became familiar with Valley Rose Estates?
13   A.   Yes.  We were out there.  They have green spaces out
14   there, and we were in control of keeping down the weeds and
15   mowing the lines and whatnot out there to keep control of
16   that.
17   Q.   Let me step back.  When did you start your employment as a
18   Maintenance II worker?
19   A.   I actually started at the Wastewater.  I was two weeks
20   there, and then they moved me up to the City -- well, up in
21   town for the Maintenance II workers, two weeks later.
22   Q.   And the start of your employment was what date, if you
23   would tell us that again?
24   A.   March 28, and two weeks after that, they moved me up to
25   the Street Division.

1    Q.  What year was that?

2    A.  2001.

3    Q.  Okay.  Now, you said there did come a time during your

4    employment when you became familiar with Valley Rose Estates?

5    A.  Uh-huh.

6          THE COURT:  "Yes"?  You have to answer "yes."

7          THE WITNESS:  Oh, yes.

8    BY MS. BARNES:

9    Q.  Okay.  And how did that -- that was while you were a

10   maintenance worker?

11   A.  Yes.

12   Q.  How did that happen?

13   A.  They told us to go out there.  We had green spaces in town

14   we took care of, and then we also took care of that Valley

15   Rose.  I don't know if the developer went broke or what all,

16   but we were just in control of keeping that trimmed down so it

17   wouldn't get all overgrown.

18   Q.  By "we," you mean whom?

19   A.  The Street Department.

20   Q.  To your knowledge, who owned that property, Valley Rose

21   Estates, at that time?

22   A.  I couldn't tell you who owned it.  All I know we were

23   told --

24          MR. BRAZE:  Objection.  I would like to have the

25   Court caution the witness.  His responses go way beyond the

1    questions.

2            THE COURT:  I know that you probably are

3    anticipating.  It is very normal for people to anticipate the

4    next question or maybe two or three questions, but here for

5    the purposes of objecting and the like, just limit your

6    answer, if you would, to the question that's asked, okay?

7            THE WITNESS:  Okay.  Question again?

8            (The question was read back as follows:

9            "To your knowledge, who owned that property, Valley

10           Rose Estates, at that time?")

11           THE WITNESS:  I do not know.

12   BY MS. BARNES:

13   Q.  But you did know it was part of your job to go out to

14   Valley Rose Estates?

15   A.  Yes.

16   Q.  How often?

17   A.  It was every Friday.

18   Q.  That was while you were a maintenance worker for the City?

19   A.  Yes.

20   Q.  Now, this jury has heard evidence that the public

21   improvements were already in the ground, streets, curbs,

22   gutters, walls around the property, lighting and so forth.  We

23   are not going to go back over that.

24           But I would like to ask you about what you observed

25   in the subdivision while you were working out there for the

1  City.

2        MR. BRAZE:  Objection.  Vague and ambiguous.  Overly

3  broad.

4        MS. BARNES:  Orienting him, your Honor.

5        THE COURT:  I understand.  There is no question

6  pending yet.

7        What is your question?

8  BY MS. BARNES:

9  Q.  I want to call your attention to the curbs that were in

10 place.  Will you tell us if you saw any markings on the curbs?

11 A.  Yes, there was markings on the curbs.

12 Q.  All right.  What markings did you see on the curbs during

13 the time you were maintaining the property for the City?

14 A.  There were sewer markings, water markings, gas company

15 markings.  There was lot numbers on the face of the curb

16 painted in a black stenciled deal all through the whole

17 subdivision.

18 Q.  Okay.  And there came a time then when you no longer had

19 an obligation to keep up the Valley Rose Estates for the City?

20 A.  Yes, there did come a time.

21 Q.  Now, I think you said there were stenciled lot numbers?

22 A.  Yes, they were painted on the face of the curb.

23 Q.  Have you, since the time you stopped maintaining the

24 property for the City, gone back to Valley Rose Estates?

25 A.  Yes.  I was out there from time to time.  I was called out

1  to look at certain things out there by the people that owned

2  it now, I guess.

3  Q.  Okay.  Now, have you recently returned to Valley Rose

4  Estates?

5  A.  Yes, I have been out there.

6  Q.  How recently?

7  A.  Saturday afternoon.

8  Q.  Okay.  Now, I want to call your attention, sir, to the

9  area that is east of the Valley Rose Parkway.  You got that in

10  your mind?

11  A.  Uh-huh.

12  Q.  To the east?

13  A.  Yes.

14  Q.  That's over towards the golf course?

15  A.  Yes.

16  Q.  Now, I want to also call your attention to a street called

17  "St. Andrews Crescent."

18  A.  Okay.

19  Q.  If you could answer "yes" or "no."

20  A.  Yes, I know where that's at.

21  Q.  Did you look at that street on Saturday?

22  A.  Yes, I did.

23  Q.  And when you looked at that street, did you look at the

24  north curb of the street?

25  A.  Yes, I did.

1    Q.   Were you able to observe whether or not there were still

2    the lot markings on the face of the curb?

3    A.   Yes, there is.

4    Q.   All right.  Would you tell the jury what these look like

5    in terms of how they compared to when you were out there

6    before, years ago, for the City?

7    A.   They are still the same as they was before, but they are

8    not as legible as before.

9    Q.   Okay.

10   A.   They have been weathered, but they are still there.

11   Q.   And this, again, just so we are clear, is to the east of

12   Valley Rose Parkway?

13   A.   Yes.

14   Q.   And the northmost curb?

15   A.   Yes.

16   Q.   Of St. Andrews Crescent?

17   A.   Yes.

18   Q.   All right.  Now, looking at the east side of the

19   subdivision, St. Andrews Crescent, the north side of the

20   street --

21   A.   Uh-huh.

22   Q.   -- can you now visualize the first lot that is immediately

23   adjacent to the Parkway on the north side of St. Andrews

24   Crescent?

25   A.   On the east side of the Parkway?

1    Q.  Yes.

2    A.  And north side of St. Andrews?

3    Q.  Yes, sir.

4    A.  That first lot, I believe, is lot number 30.

5    Q.  Okay.  And were you able then to look at other lot numbers

6    on that same north side of St. Andrews Crescent?

7    A.  Yes, I was.

8    Q.  What did you observe?

9    A.  I could make out the 30, 31, 32, up to 34, I believe, and

10   then they were kind of wore off.

11   Q.  All right.

12   A.  And you go on around to the other streets.

13          MS. BARNES:  That's all I have of the witness, your

14   Honor.

15          THE COURT:  Cross?

16          MR. BRAZE:  I don't believe we have anything, your

17   Honor.

18          MR. ALEXANDER:  No, thank you, your Honor.

19          MR. HASSING:  Just two, your Honor.

20                        CROSS-EXAMINATION

21   BY MR. HASSING:

22   Q.  Mr. Craig, back when you were maintaining the streets for

23   the City when the City owned the property, do you remember

24   whether or not you saw street signs out there?

25   A.  Yes, there was street signs out there.

1          MR. HASSING:  Thank you, sir.

2          THE COURT:  Anything else from anyone?

3          MR. BRAZE:  Yes, sir.

4                          CROSS-EXAMINATION

5   BY MR. BRAZE:

6   Q.  When do you recall there being street signs, sir?

7   A.  There were street signs when I first started working

8   there.  There were street signs out there before I started

9   working at the City of Wasco.

10  Q.  Were all the street signs there?

11  A.  Yes, sir.

12  Q.  It's your testimony in 2001, all the street signs were in?

13  A.  Yes, sir.

14  Q.  That's your testimony?

15  A.  Yes.

16         MR. BRAZE:  Thank you.

17         THE COURT:  Anything else?

18         MS. BARNES:  May the witness be excused, your Honor?

19         THE COURT:  Yes.  You are done.  Thanks.

20         Next witness?

21         MR. OKADIGBO:  City calls John Wooner.

22                        **JOHN WOONER**,

23  called as a witness on behalf of the Defendant City of Wasco,

24  having been first duly sworn, testified as follows:

25         THE COURT:  Please take the witness stand right here,

WOONER - D

827

1   and, once you are comfortable, tell us who you are, if you
2   would.
3               THE WITNESS:  Okay.  My name is John Wooner.
4               THE COURT:  How do you spell your last name?
5               THE WITNESS:  W-o-o-n-e-r.
6               THE COURT:  Thank you.  Direct?
7                     DIRECT EXAMINATION
8   BY MR. OKADIGBO:
9   Q.   Mr. Wooner, where are you currently employed?
10  A.   Semi-Tropic Water Storage District in Wasco.
11  Q.   How long have you been employed in that position?
12  A.   About three years and a few months now.
13  Q.   Have you been previously employed by the City of Wasco?
14  A.   Yes.
15  Q.   And what was your position when you were employed by the
16  City of Wasco?
17  A.   It was Finance Director.
18  Q.   During what period were you Finance Director of the City
19  of Wasco?
20  A.   I started in April of '99, and I left the City in I think
21  September of 2006.
22  Q.   Are you familiar with the Valley Rose Estates Subdivision?
23  A.   Yes.
24  Q.   Was it part of your duties to negotiate the sale of that
25  property in your position?

828

1  A.  I was asked by the City Council to spearhead the efforts

2  to sell the Valley Rose Estates and the golf course.

3  Q.  During what period of time were you carrying out this

4  responsibility?

5  A.  On I think it was 2003-2004 years.

6  Q.  Do you recall a set of materials that were entitled

7  "Developer Information Package"?

8  A.  Yes.

9  Q.  Now, it's a package of materials that the City put

10 together for potential purchases of the Valley Rose Estates

11 Subdivision; is that right?

12 A.  Yes, that's correct.

13 Q.  I'm going to direct your attention to Exhibit J 10.  Do

14 you recognize that exhibit?

15 A.  Yes.

16 Q.  Now, you notice that towards the end, under Appendix C,

17 there are several materials included in that package.  Can you

18 see that?

19 A.  Yes, yes.

20 Q.  Can you explain why the package contains that information

21 under Appendix C?

22 A.  Well, this document was put together.  First it was a

23 feasibility study, the second half of it, and then the first

24 half of it was a package put together by a number of people

25 within the City and on the staff.

1        But, essentially, this package was put together to

2   give information out to developers and potential purchasers of

3   the Valley Rose Estates and the golf course.

4        As far as the maps, these were included in the

5   original study, and was essentially included because it gave

6   pertinent information to developers and to purchasers of the

7   infrastructure and -- that was already out there, and give

8   them more information about the development as a whole.

9        The reason the whole package was put together was to,

10  from my understanding, was that the information that is in

11  here needed to be provided by law to make sure that the

12  developers and the purchasers were informed about everything

13  about the facility, everything that's out there and available

14  to them.

15  Q.  Okay.  Now, were you involved in the City's negotiations

16  with Mr. Wu or agents of Mr. Wu for the sale of that Valley

17  Rose Estates Subdivision?

18  A.  Yes.

19  Q.  Do you recall anybody from the City communicating to

20  either Mr. Wu or his agents anything about how Mr. Wu ought to

21  develop the property?

22  A.  It was always the hopes of the City that the property

23  would be developed in more of a benefit to the City and

24  benefit to the developer, that golf course holes and so forth

25  would be moved out into vacant land and so forth to give them

WOONER - X

830

1   more valuable and -- more valuable land, but ability to build

2   a more golf course related neighborhood.

3          But these items were discussed with representatives

4   of Mr. Wu and, essentially -- but the City never said, "You

5   had to do this."

6          We just said, "This is what we would like to see and

7   this is what would probably benefit you and the City in the

8   most -- in the best way."

9          But, essentially, we did not enforce it or did not

10  put covenants into the document that made them do it.

11          MR. OKADIGBO:  No further questions.

12          THE COURT:  Cross-examination?

13                      CROSS-EXAMINATION

14  BY MR. BRAZE:

15  Q.  Mr. Wooner, when you were negotiating the sale of the golf

16  course and the tract, who were you dealing with?

17  A.  Well, you mean the final sale?

18  Q.  Well, let's start at the beginning.  Who were you dealing

19  with?

20  A.  Well, there was a number of people that were interested in

21  it.  I can't remember all their names.

22  Q.  I'm more concerned about Mr. Wu and his organization.

23  A.  Oh, okay.  Mr. Wu's organization, Mr. Wu spoke very broken

24  English, and so we, essentially, dealt with Mr. Souza, Darrell

25  Souza.

1   Q.   Who is he?

2   A.   He is a realtor and he represented Mr. Wu.

3   Q.   And do you know whether you were negotiating with Lotus,

4   Limited Partnership or Northern California Universal

5   Enterprises Company, Incorporated?

6   A.   Do I remember those names?  No.  I just remember the

7   person I was dealing with.

8   Q.   So you don't know who the prospective buyer was at that

9   time?

10  A.   We met Mr. Wu later on.  At first, we didn't, but we met

11  Mr. Wu later on.  Now, the name of his companies, I don't

12  remember.

13  Q.   Now, you have suggested that you included the tentative

14  tract map from 5472 because you were required to do so; is

15  that correct?

16  A.   Well, there is two things that we --

17  Q.   Is that "yes" or "no"?

18  A.   Yes.

19  Q.   You included it because you believed you were required to

20  do so?

21  A.   Yes.

22  Q.   And why do you believe you had to include an expired tract

23  map in your Developer Information Package?

24  A.   Well, it may have been expired, but the facilities, the

25  roads, the walls for the first part of it and the

832

1   infrastructure was in.

2   Q.  So you put it in there not to show an expired tract map

3   but to show the roads and facilities that were in, correct?

4   A.  Correct.

5   Q.  So it is a fact that the tract map had really no

6   importance on your Developer Information Package?

7   A.  It did have effect.  If the tract was built based off of

8   that tract map, that tract map was pertinent.

9   Q.  How was it pertinent?

10  A.  Well, it's the start of the overall development in order

11  to find out how the lots and so forth were arranged; it had to

12  be represented that way.

13  Q.  And you knew there were associated improvement plans that

14  had gone along with that tract map, correct?

15  A.  Associated improvement plans?

16  Q.  Improvement plans.

17  A.  No, I did not know.

18  Q.  You don't know how the improvements got there?

19  A.  That was before my time, but I would assume they were done

20  by assessment bonds or something like that.

21  Q.  So were you part of preparing this package for the

22  developers, which is Exhibit J 10?

23  A.  No.  The way it happened is MGF put together the

24  feasibility study that was presented to the council.

25  Q.  And MGF is?

1  A.  I don't know their -- if that's the initials they have on

2  here.  I don't know exactly what MGF stands for.

3  Q.  Are they a marketing company?

4  A.  They are the company that the Council retained to do the

5  feasibility study.

6  Q.  So who made the decision to include the tentative map in

7  the developer information --

8  A.  It was included --

9  Q.  Let me finish my question.  Otherwise, I may change it and

10 you would answer the wrong question.

11        Who made the decision to include the map in the

12 Developer Information Package?

13 A.  It was included in the feasibility study.

14 Q.  That doesn't answer my question.

15        THE COURT:  Who made the decision to include it, is

16 the question.

17        THE WITNESS:  I would say it was included by MGF and

18 presented to the Council.

19 BY MR. BRAZE:

20 Q.  So did the Council approve the inclusion of the tentative

21 map in the developer information?

22 A.  They approved the report.

23 Q.  Did the Council approve the decision to include the

24 tentative map in the Developer Information Package?

25 A.  I don't believe that they specifically approved it, no.

WONG - X

834

1    But they approved the document as it was presented.

2    Q.  So you would have no idea who approved putting the

3    tentative tract map in the Developer Information Package?

4    A.  That's correct.

5    Q.  Were you assigned the golf course and the tract as a

6    package?

7    A.  Yes.

8    Q.  Did you sell it as a package?

9    A.  Yes.  They were done -- as much as we could, we tried to

10   tie them together, but they were sold separately.

11   Q.  Did you sell them to the same buyer?

12   A.  Yes.

13           MR. BRAZE:  Thank you.

14           THE COURT:  Anything further?

15           MR. HASSING:  Not from Northern.

16           MR. ALEXANDER:  Not from DeWalt.  Thank you, your

17   Honor.

18           THE COURT:  City have any other questions?

19           MR. OKADIGBO:  No, your Honor.

20           THE COURT:  You may step down.

21           Next witness.

22                         **STEPHEN WONG**,

23   called as a witness on behalf of the Defendant City of Wasco,

24   having been first duly sworn, testified as follows:

25           THE COURT:  Please take the witness stand right here,

WONG - D

835

1   and then if you would, tell us who you are.

2           THE WITNESS:  My name is my name is Stephen Wong,

3   W-o-n-g.

4                       DIRECT EXAMINATION

5   BY MR. OKADIGBO:

6   Q.  Mr. Wong, could you give us your educational background?

7   A.  I presume you want me to start after high school.  I went

8   to college at the University of Southern California, in Los

9   Angeles, obtaining a Bachelor's degree in Civil Engineering in

10  1966, I believe it is.  A long time ago now.

11          Since that time, I have obtained a Master's degree in

12  Business Administration from the University of Hawaii.  I

13  believe that was in about 1979 or so.

14  Q.  Can you describe, what is your profession?

15  A.  I'm a civil engineer.

16  Q.  And can you tell us about any licenses that you have?

17  A.  I am licensed as a Professional Engineer in five different

18  states, the state of Hawaii, California, Oregon, Arizona, and

19  Nevada.

20  Q.  Do you belong to any civil engineering organizations?

21  A.  I have been a member of two civil engineering type

22  organizations.  One is the Association of Civil Engineers.

23  They call it "ASCE."  I have been a member of that for over 30

24  years.

25          And the other is SAME, which is the Society of

WONG, P.

836

1   American Military Engineers.  I joined that when I was in the

2   military in, I believe, the late 60's.

3   Q.  Okay.  I'm going to go through your professional

4   experience.  Can you tell us about your experience, first

5   working as an engineer?

6   A.  Right out of college, I went into the American -- the U.S.

7   Navy as a Civil Engineer Corps Officer.  I served initially at

8   the Naval Construction Battalion Center in Davisville, Rhode

9   Island.  Then spent a year in Viet Nam at Da Nang base there.

10  And after that --

11          You want my entire history?

12  Q.  No.  Just a short history for your U.S. Navy experience

13  would be sufficient.

14  A.  After Viet Nam, I got out of the Navy, in 1970.

15  Q.  Okay.  And after you were -- after you got out of the

16  Navy, what next did you do?

17  A.  Initially, I went to work for a structural engineer doing

18  structural design work, who was A.J. Blaylock & Associates, in

19  the state of Hawaii, which was my home at that time.

20  Q.  After A.J. Blaylock & Associates, what did you do next?

21  A.  I went to work for the City and County of Honolulu.  And

22  in my capacity there at the City and County of Honolulu, I was

23  responsible for preparing standard drawings, standard

24  specifications for the City, which would be used by various

25  engineers to design improvements that we would improve within

WONG - D

837

1    the City and County.

2    Q.   Okay.   After your time with the City of Honolulu, what did

3    you do next?

4    A.   I went into private practice.   I joined a civil

5    engineering firm in Hawaii.   Worked for about four years doing

6    project management.   And in that capacity, I was responsible

7    for the design and following through to construction of

8    various types of projects, including subdivisions.   We

9    prepared maps, tentative maps, submitted them to the City.   It

10   was my responsibility to follow through with the City on the

11   applications, attend the public hearings, speak for the

12   developer at those public hearings.

13          Get the standard plans, the improvement plans for the

14   development eventually approved in accordance with the

15   conditions of approval.   Follow through with the construction

16   to ensure compliance with those plans, accuracy of what was

17   actually constructed, and then finally, "as building" it.

18          And the last step, I guess, with the development was

19   we were required to file the final map, which was a recorded

20   map of the final subdivision which complies with all of the

21   state laws.

22   Q.   Okay.   Now, you are at Burkett & Wong?

23   A.   I am currently a principal of Burkett & Wong.

24   Q.   How long have you been at Burkett & Wong?

25   A.   Since 1976.

WONG   B.

838

1    Q.   What do you do at Burkett & Wong?

2    A.   Well, as one of the owners, I'm responsible for

3    practically everything that is necessary to maintain and run a

4    business.

5          My primary responsibility, since we are both a civil

6    and structural firm, as well as surveyors and planners, I am

7    responsible for the civil side of the office.  My partner was

8    responsible for the structural side of the office.

9          And as that responsibility has grown over the years,

10   I was initially required to do the design work, get the work

11   from the clients, decide what we were responsible for, write

12   the contracts, do the actual design of the maps, the

13   improvement plans, the grading plans, get all of that reviewed

14   and approved by the City, much like I did in Hawaii.

15         And since that time, however, we have hired other

16   engineers to do the work.  I have become more of a supervisory

17   type position where I oversee the actual design of these work

18   and do quality control checks to ensure that the quality of

19   the work that's being put out by our firm meets our standards.

20   Q.   Now, in your experience with improvement plans, if

21   improvements are actually in place, in your experience, have

22   plans, nevertheless, still been required by a city?

23   A.   The cities will typically, in the tentative map stage,

24   provide you with conditions of approval.  And many of these

25   conditions are what we call "boilerplate."  Typical.

WONG - B

839

1           One of these typical requirements is that improvement

2    plans be prepared and approved by the City for the

3    construction of the streets and the utility systems that need

4    to be done.  That's normal.

5    Q.  Where the improvements have been constructed, has it been

6    your experience that plans are, nevertheless, required?

7    A.  The condition of approval says that you will improve the

8    streets, which includes the utilities and so forth for the

9    buildings for the construction of the homes.  If that

10   condition is satisfied, the City will sign off on it.

11          If the improvements are in fact installed, there is

12   no need then for further improvement plans because those

13   improvements have satisfied the requirement that's typical for

14   the conditions in the tentative map stage.

15   Q.  Now, have you, before this case, given testimony at trials

16   before?

17   A.  Yes, I have.

18   Q.  And how many times have you testified in court?

19   A.  I don't know the exact number, but I believe it is around

20   20 or so over the years.

21   Q.  And have you given testimony in depositions?

22   A.  Yes, I have.

23   Q.  And how many times have you done that?

24   A.  Again, I have never counted them all.  Several hundred

25   times.

WONG - B

840

1   Q.   Can you describe what types of cases you have been

2   retained for at the times that you did give testimony at

3   trial?

4   A.   Well, it varied.  Mainly having to do with civil

5   engineering, obviously, because that's my experience and

6   background.

7          A lot of it was construction defect litigation where,

8   in fact, we evaluated what was actually constructed.  And

9   representing either the plaintiffs or the defense in various

10  cases, we expressed an opinion based upon what was actually

11  done and whether or not that met the standards.

12         I can recall also testifying in a bankruptcy court,

13  where improvements were a part of the bankruptcy.

14  Q.   And what is your hourly fee for testifying at trial?

15  A.   I believe it's $420 an hour.

16  Q.   And what fee is it for providing deposition testimony?

17  A.   The same.

18  Q.   Now, you've been retained by the City of Wasco in this

19  case, correct?

20  A.   Yes.

21  Q.   Have you ever worked for the City of Wasco prior to your

22  retention in this case?

23  A.   No.

24  Q.   Have you ever been retained by my law firm before this

25  case, and that is the law firm of -- well, it was once known

WONG - D

841

1   as Garcia, Calderon, Ruiz -- it is now known as GCR, LLP?

2   A.   I have not.

3   Q.   Can you describe what your assignment is, in other words,

4   why the City of Wasco has retained you for this case?

5   A.   I was asked to evaluate the Tentative Map 5472 and the

6   associated engineering plans, the improvement plans that were

7   created with that map, and to compare that against the

8   Tentative Map 6451, which was created by another engineer, to

9   determine whether or not there were similarities and/or

10  differences between the two maps.

11  Q.   Okay.  And before coming to your conclusions about those

12  things, you reviewed some materials, correct?

13  A.   Yes.

14  Q.   Did you review the Revised Tentative Tract Map Number

15  5472?

16  A.   Yes.

17  Q.   Did you review Parcel Map Number 9572?

18  A.   Yes.

19  Q.   Did you review street construction plans for Tract Number

20  5472?

21  A.   Yes.

22  Q.   And you reviewed at that time the first amended complaint

23  for copyright infringement?

24  A.   Yes.

25  Q.   And you reviewed the deposition testimony of Roger

1  McIntosh?

2  A.   Yes.

3  Q.   And also the testimony of James DelMarter?

4  A.   Yes.

5  Q.   Did you review City of Wasco Municipal Code provisions 12

6  and 16?

7  A.   Yes.

8  Q.   And the Subdivision Agreement for Tract 6451?

9  A.   Yes.

10 Q.   So you have gotten a chance to compare the revised

11 tentative map -- sorry, the revised tentative map for Tract

12 5472 with the tentative map for 6451; is that right?

13 A.   Yes, I have.

14 Q.   And from comparing the two maps, have you come to any

15 conclusions as to whether the maps are the same or different?

16 A.   Yes.

17 Q.   And what are your conclusions?

18 A.   That there are some superficial similarities between the

19 two maps, and also some very significant differences.

20 Q.   Now, let's discuss what you call "superficial

21 similarities."  Could you explain what you mean by that?

22 A.   Yes.

23       May I, your Honor?

24       THE COURT:  Yes.  What are you asking him to do?

25       MR. OKADIGBO:  He is going to illustrate.

WONG - D

843

```
1              THE COURT:  Do you want him to come down?
2              MR. OKADIGBO:  Yes.
3              THE COURT:  I do ask you to keep your voice up so
4    everybody can hear.
5              MR. BRAZE:  Your Honor, are these exhibits we have
6    seen before?
7              MR. OKADIGBO:  Your Honor, these are --
8              THE COURT:  "Yes" or "no"?
9              MR. OKADIGBO:  Yes.
10             THE COURT:  Why don't you show him to make sure he
11   knows.
12             MR. OKADIGBO:  They are all J 131 and J 129.
13             MR. BRAZE:  With markings on them.  I think the Court
14   previously said you can't represent the same exhibit with
15   markings on them.
16             THE COURT:  Let's do a quick sidebar.
17             Peggy, please.
18             (The following proceedings were had at the sidebar,
19             to wit:)
20             THE COURT:  We are at sidebar with counsel.  You have
21   now seen them?
22             MR. BRAZE:  I have seen one.
23             THE COURT:  Okay.
24             MR. BRAZE:  So he is representing this as a previous
25   exhibit and there are some markings on this.
```

WONG - D

844

1          THE COURT:  What exhibit is this?  J what?

2          MR. OKADIGBO:  131.

3          THE COURT:  All right.  What are the markings?

4          MR. OKADIGBO:  This.

5          THE COURT:  I'm asking --

6          MR. BRAZE:  I just know, I have a feeling we are

7   going down the road, I want to make sure we have a ruling on

8   that before we get to the next ones.  It is a pink outline, I

9   assume he is going to show it for some reason.

10          THE COURT:  The pink outline seems pretty innocuous.

11          If you are going to have him write on this, you can

12   do that, but you can't do it on a J.  In other words, it is

13   not a J until it is in, and so if you are going to do this,

14   just indicate that you want a different exhibit number on it.

15          Sergio, what is the next defense exhibit number?

16          THE CLERK:  We will call it 500.

17          THE COURT:  We will call it D 500.

18          MR. OKADIGBO:  Just to be clear, all of these are the

19   same, minus the markings of D 131 and D 126.

20          THE REPORTER:  D or J?

21          MR. OKADIGBO:  J 126 and J 131.

22          THE COURT:  What you are planning on doing now is

23   calling one of these D 500.  How many are there?

24          MR. HASSING:  12 or 13, I think.

25          MR. OKADIGBO:  I think maybe 12 or so.

WONG - D

845

```
1              THE COURT:  So 500, et sequitur.  And doing that, do
2    you have any objection?
3              MR. BRAZE:  No.  I assume he is going to put a mark
4    on it.
5              THE COURT:  That's why they are D's instead of J's.
6              MR. BRAZE:  But they are all the same map?
7              MR. OKADIGBO:  All either 5472 tentative, revised
8    tentative, or they are 6451 tentative.
9              MR. BRAZE:  You are going to mark similarities in
10   different colors?
11             MR. OKADIGBO:  Right.  That's the purpose of each of
12   these, is to isolate one section of the map, but they are all
13   essentially the same.
14             THE COURT:  Thank you.
15             (The proceedings at the sidebar were concluded.)
16   BY MR. OKADIGBO:
17   Q.  Okay.  I'm going to show you what is D 500.  Now, you just
18   said that there were superficial similarities.  And you were
19   going to describe what you mean by that.  In relation to this
20   exhibit there, can you begin?
21   A.  Yes.  If you were just to look at the two maps -- this is
22   5472 -- you will see an arrangement of lots and streets.
23             THE COURT:  Remember to keep your voice up.  The
24   court reporter needs to hear it.
25             THE WITNESS:  And if you look at 6451, you will see
```

WONG - D

846

1    the same arrangement of streets.  And so on the surface, it

2    looks like, yes, they are similar in nature.

3            But you have to understand the underlying reason for

4    that.  5472 was created with a boundary.  It was also created

5    with an easement for a master planned street going right

6    through it.

7            But the rest of the areas that were to be developed

8    were basically a blank slate.  Nothing was there, so the

9    engineer had all the opportunities to decide how to create all

10   of these streets and then all of the lots adjacent to these

11   streets to conform with the zoning.

12           Let's contrast that with what the engineers had when

13   they were preparing 6451.  6451 was a map that was created --

14           MR. BRAZE:  Excuse me, Counsel?  Exhibit number?

15           THE COURT:  First one was D 500.  Are we moving on to

16   another one?  Are we marking that as D 501?

17           MR. OKADIGBO:  D 500.  This is D 501.

18           THE COURT:  Is that the one we are going to talk

19   about now?  That's the one he just talked about.

20           THE WITNESS:  That's the one we are going to talk

21   about.

22           MR. OKADIGBO:  We are going to talk about it now.

23           THE COURT:  We talked about D 500.  Now, we are going

24   to talk about D 51.

25           MR. BRAZE:  For the record D 500 had two pages, two

847

1   maps.

2          THE WITNESS:  Actually, there were three.

3          THE COURT:  Got to raise your voice.  We can't hear.

4          THE WITNESS:  I'm actually correcting that D 501 had

5   three pages rather than two.

6          THE COURT:  You mean D 500?

7          THE WITNESS:  Yes.  We showed this boundary.  The

8   street.

9          MR. BRAZE:  Page 2 showed the street.

10         THE WITNESS:  And page 3 showed the design.

11         THE REPORTER:  Excuse me, Counsel.  You have to keep

12  your voice up as well.

13         THE COURT:  The problem is this.  The court reporter

14  does not have the option under law to distinguish between an

15  aside conversation and testimony, so we can't put her in that

16  position.  So anything you say has got to be loud enough for

17  everyone to hear.

18         MR. OKADIGBO:  Understood, your Honor.

19         THE WITNESS:  Thank you.

20         THE REPORTER:  Thank you, your Honor.

21         THE WITNESS:  What we are back to now is Tract Map

22  6451.  The engineers started with the boundary for 6451, much

23  like the engineers for 5472 did.

24         MR. BRAZE:  That is exhibit number?

25         THE COURT:  We are talking about 501 now?

WONG - D

848

1          MR. OKADIGBO:  Yes.

2          THE WITNESS:  However, the engineers for 6451 also

3   were given not only the easement of the street for Valley Rose

4   Parkway, which went through the center, but they also were

5   given the street arrangements that were already constructed

6   and in place.

7          The location of these streets were given by a survey

8   of the property in this configuration.  So they did not have

9   the luxury of a blank canvas of how to arrange the streets on

10  either side of Valley Rose Parkway, much like the engineers

11  for 5472 did.

12         They also were given existing utilities, all of these

13  utilities that are shown here, which includes a sewer, the

14  storm drains, the water systems, streetlights, fire hydrants,

15  were all in place and existing and noted by their surveys

16  prior to the preparation of 6451.  So they were locked in.

17         And that's why these two maps look similar, simply

18  because -- well, and one other thing, I'm sorry.

19         There were also found that walls were actually

20  constructed along the perimeter of the side.  These walls

21  actually locked in, then, the areas to be developed by -- in

22  the residential portions because all these improvements, the

23  walls, the streets, the utilities were all in place and found

24  by their site surveys to have been constructed with the prior

25  map.

WONG   P.

849

1          (The witness resumed the stand.)

2    BY MR. OKADIGBO:

3    Q.  Now, before we go any further, the coloring on these maps

4    were done by you; is that correct?

5    A.  Yes.

6    Q.  Now, can you explain the differences that you observed

7    between Tentative Map 5472 and Tentative Map 6451?

8    A.  Yes.

9          May I again?

10          THE COURT:  Yes, sir.

11          MR. OKADIGBO:  We need another exhibit number.

12          THE CLERK:  502.

13          MR. OKADIGBO:  And also 503.  Thanks.  We are going

14    to mark this as Exhibit D 502.

15          (Defendant's Exhibit 502 was marked for

16    identification.)

17          THE WITNESS:  There were several major differences

18    between the two maps.  As I indicated earlier, one of the

19    first things they start with is the boundary.  Highlighted on

20    this for 5472 is the boundary that was shown on their

21    tentative map.

22          Highlighted on 6451 is the boundary that was shown on

23    the 6451 tentative map.

24          The difference is very significant.  The area

25    encompassed below and to the west of Valley Rose Parkway was

1 not shown on 5472 as part of their map, but it is included as

2 part of the legal description for 6451.  So the boundary is

3 significantly different, encompassing a difference in area of

4 about seven acres.

5          MR. OKADIGBO:  We will mark this as Exhibit D 503.

6          (Defendant's Exhibit D 503 was marked for

7 identification.)

8          THE WITNESS:  I want to leave this in front of you,

9 which is the 5472 tentative map, so you can look at some of

10 the differences that I'm trying to point out between these two

11 maps.

12          What I have done is highlighted portions of 6451 and

13 some of the improvements that were shown on 6451 that are not

14 in fact shown on 5472.

15          This happens to be the curbs and gutters.  All of the

16 existing curbs and gutters for Valley Rose Parkway and for all

17 the interior streets were constructed prior to 6451 and are

18 shown on the map as being constructed.

19          As you can see, only the right of way is shown on

20 5472.  No existing improvements, no curbs and gutters.

21          The sidewalks adjacent to these streets were also

22 constructed, not shown on 5472.

23          The paving, asphalt paving of the streets were all

24 completed shown as existing on 6451, not on 5472.

25          The underground utilities, which includes the sewer,

WONG - D

851

1    storm drain systems, and was not colored, is the water system.

2    The water system was apparently not shown, but the water

3    valves and hydrants were shown, so we know the water system

4    was in fact installed.

5            The topography.  These lines represent contours which

6    is an elevation, equal elevation all along these lines.  And

7    to an engineer, by looking at these various lines, we could

8    see what the lay of the land looks like, whether it is

9    rolling, it is flat or sloped.  As the lines get closer

10   together, as you can see here, it becomes steep.  As the lines

11   are more spaced, it's flatter.

12           So these "contours," as we call them, are topographic

13   lines, are shown on 6451, and again, not shown on 5472.

14           That is one of the specific requirements of the

15   Chapter 16.

16   BY MR. OKADIGBO:

17   Q.  Chapter 16?

18   A.  Municipal Code.

19           The lot areas, each lot on 6451 has a calculated area

20   that I have highlighted.  Each lot on the 5472 does not.

21           The bearings.  Each property line between the lots

22   are shown on 6451 and, again, not on 5472.

23           This is, again, the streetlights and the fire

24   hydrants are shown as existing on this map and not at all on

25   the other.

WONG - D

852

1              What, again, I'm trying to show you is there is a

2       number of significant differences between the two maps.  A lot

3       more information that is on 6451 that was not initially shown

4       on 5472.

5              These are lot distances.  Although some of the lot

6       distances are in fact shown on 5472, there are many more lot

7       distances that is the length of the property lines that are

8       shown on 6451.

9              And, really, this is a catch all.  It basically says

10      if you compare the two maps, you will see things like curb

11      data table that's not shown.  References to adjacent maps,

12      also a requirement of the Chapter 16 of the Municipal Code.

13      It is not shown on 5472.

14             A legend which describes existing improvements.  Not

15      on 5472.

16             So there are a large number of differences between

17      the two maps, and that's what all of this is trying to

18      illustrate for you.  Okay.

19             (The witness resumed the stand.)

20      Q.  Now, you've talked about -- you've talked somewhat about

21      differences between the lots.  But can you give some specific

22      examples of particular lots that you find to be differently

23      expressed between map 6451 and 5472?

24      A.  Well, to compare them would be a rather exhaustive

25      evaluation because there is 68 lots involved, but I think we

1  picked out four or five different lots that represent some of

2  these differences.

3          MR. OKADIGBO:  Your Honor, I want to show defense

4  [sic] counsel.

5          (The documents were shown to plaintiff's counsel.)

6          MR. OKADIGBO:  Could I get another exhibit tab?

7          (Defendant's Exhibit D 504 was marked for

8  identification.)

9  BY MR. OKADIGBO:

10 Q.  I'm now going to show you what's been marked as D 504.  It

11 is a series of lot comparisons between Map 5472 and Map 6451.

12         THE COURT:  That is not in evidence, is it?

13         MR. OKADIGBO:  No.

14         THE COURT:  Then it can't be shown.  Or is its

15 equivalent a J that is in evidence?

16         MR. OKADIGBO:  I would say it is not equivalent to a

17 J, but it is information from the J's.

18         THE COURT:  Okay.  Ruling stands.

19         MR. OKADIGBO:  Okay.

20 BY MR. OKADIGBO:

21 Q.  Mr. Wong, do you recognize these series of exhibits?

22 A.  Yes.

23 Q.  And what are they?

24 A.  They are comparisons between the two maps for specific

25 lots that we had addressed in my deposition, Lots 46, 13, 14,

854

1  and 16.

2  Q.  Did you put together these comparisons?

3  A.  Yes.

4  Q.  And how did you do that?

5  A.  I took portions of the both tentative maps.  5472, for

6  example, I took lot 46, and I blew it up and I pasted it onto

7  a sheet to create the exhibit.

8        MR. OKADIGBO:  Your Honor, can I move it into

9  evidence?

10        THE COURT:  You can move it.  Let's see what happens.

11        MR. OKADIGBO:  I would like to move this into

12  evidence.

13        THE COURT:  Any objection on D 504?

14        MR. BRAZE:  No, your Honor.

15        THE COURT:  It's received.

16        (Defendant's Exhibit D 504 was received.)

17  BY MR. OKADIGBO:

18  Q.  Okay.  Now, this is -- this represents Lot 46 of Tentative

19  Tract 5472 and Tentative Tract 6451, correct?

20  A.  Yes.

21  Q.  And could you describe the differences that you observed

22  between those lots?

23  A.  Well, you will see we have put side by side these two --

24  this exact same lot on these two different maps.  On the left

25  is 5472 and the information shown for each of these lots.  In

855

1   5472, for example, we see the lot number and three different

2   lot dimensions only.

3           On 6451, we see the lot number.  We have dimensions

4   for each of the five different property lines.  We have

5   bearings along three of the five property lines.  We also have

6   the square footage of the lot shown on 6451.

7   Q.  And the square footage would be?

8   A.  The 8,202 SF.

9   Q.  Here, correct?

10  A.  Yes.

11  Q.  And the bearings is here?

12  A.  Yes.

13  Q.  And here, correct?

14  A.  Yes.

15  Q.  And what is this?

16  A.  That's a distance along the curve or arc of the

17  cul-de-sac.

18  Q.  And the measurements over here are different, correct?

19  A.  Slightly, yes.  The distance is a few hundredths

20  different.

21  Q.  Okay.  Same exhibit, different lot.  Can you describe the

22  differences in Lot 13?

23  A.  Well, again, the Lot 5472 is on the left.  6451 is on the

24  right, and you can see the different configuration of the lot.

25  Look at the significant difference in the lot length, for

1    example, on the most southerly line of Lot 13.  On 5472, it's

2    45.34 feet.  On 6451, it is 79.15 feet.  A difference of about

3    34 feet.

4    Q.  Okay.  And again, there is bearings information, correct,

5    here?

6    A.  On 6451, we have bearings along the lot lines.  On 5472,

7    we do not.  And we also have the area on Lot 13 for 6451, but

8    again, on 5472, we do not.

9    Q.  Okay.  Same exhibit, I'm going to show you Lots 14 between

10   the two maps.  Could you describe the differences between the

11   two?

12   A.  Again, they are -- basically, the amount of information is

13   different.  The lengths of some of these property lines is

14   different.  The -- what can't be seen, I guess it is -- and

15   I'm sorry I didn't show it.

16          On 5472, there is a dotted line there which indicates

17   an easement, with the arrows pointing towards it.  On the map

18   itself, if you look very closely at it, it says that easement

19   is 10 feet in width.  On 6451, that easement straddles the

20   property line and it indicates on the map that that easement

21   width is 16 feet.

22   Q.  Again, bearings information on 6451 and not on 5472?

23   A.  Yes.

24   Q.  Now, the 6451 also notes an existing block wall; is that

25   correct?

857

A.   Yes.

Q.   And that's not present on 5472?

A.   That's correct.

Q.   And the last of these in Exhibit D 504, could you explain
the difference between 5472's representation of Lot 16 and
6451's representation of Lot 16?

A.   Much the same.  Differences between the amount of
information on 5472 that is in comparison with the information
that's shown on 6451.  The bearings for the side lot lines,
the square footage of the area, the distances, I guess, on the
easterly side of Lot 16 is about a foot in length difference
and it looks like the width of the lot is about seven feet
difference.

         So just a slightly different configuration for the
two lots, with different information shown.

Q.   Can you describe what this electric box means?

A.   It represents an existing improvement, probably some kind
of transformer.

Q.   Now, did you notice generally a difference in bearings
between the 5472 and 6451 maps?

A.   There were differences, yes.

Q.   Can you describe what those are?

A.   We would have to compare the two maps to do that, and,
yes, I could look through there and make those determinations,
if you wish.

858

1  Q.  Please do.

2          THE WITNESS:  Your Honor?

3          THE COURT:  Sure.

4          THE WITNESS:  Now, what we do is we look at each of

5  these two maps.  In this case, it is 5472.  And along the

6  northerly boundary, it has a bearing of North 89 degrees, 16

7  minutes, 5 seconds west.

8          The northern boundary of 6451 is South 89 degrees, 16

9  minutes, 9 minutes East.  There is some slight differences

10 between the two, based upon the actual surveys and what was

11 found by the surveyor as establishing that boundary.

12         Do you want to go through all of them?

13 Q.  Go through some more.

14 A.  Okay.  Along the easterly boundary on 5472, it's North 1

15 degree, 5 minutes and 50 seconds East.  It seems to coincide.

16         On the easterly boundary of 6451, it is also North 1

17 degree, 5 minutes, 50 seconds East.

18         So at least on this boundary, they seem to coincide

19 with the same bearing.

20         Let's look at the westerly side.  On 5472, it's South

21 1 degree, 5 minutes, 49 seconds West.  And on 6451, it is

22 North 1 degree, 4 minutes, 20 seconds East.

23         So there are some slight differences in the overall

24 boundary and bearings on these boundaries based upon the

25 actual surveys and the surveyor that was doing the work.

WONG - P

859

1   Q.   Okay.  Now, you did get a chance to read Mr. DelMarter's

2   deposition testimony, correct?

3   A.   Yes.

4   Q.   Mr. DelMarter stated that there was a similarity in tract

5   boundaries.  What is your evaluation of that opinion?

6   A.   There are some similarities, but the boundaries are

7   significantly different.  If you compare the two maps, the

8   boundary for 5472 is about seven acres less than the boundary

9   for 6451.  So 6451 encompasses more land area and, therefore,

10  the boundary is different.

11  Q.   He also testified to a similarity in street layouts.  What

12  is your evaluation of that?

13  A.   It's true, there are some similarities in the street

14  layouts.  We pointed that out when we were showing how these

15  lots were created.  The street layout was existing when 6451

16  was created and, therefore, would have to match what was

17  intended for 5472.

18  Q.   So in your conclusion that the two maps are different,

19  what weight do you place on the street layout similarities?

20  A.   Because those improvements were actually constructed

21  previous or prior to the creation of 6451, they would have to

22  be similar, because you don't want to tear out improvements

23  that were already paid for and in the ground.  It doesn't seem

24  to make a lot of sense to do that.

25           So I don't put a lot of weight because they look

1    similar.  I was looking at what are the differences between

2    the two maps and were there significant differences, what they

3    were -- I think we pointed those out -- and how could 6451

4    have been a copy of 5472 when it had a lot more information on

5    it than 5472 did.

6    Q.  Mr. DelMarter also expressed an opinion about the lot

7    numbers being the same.  Have you noticed that in the two

8    maps?

9    A.  Yes.

10   Q.  And what weight do you place on the lot numbering being

11   the same in your analysis of those differences between the two

12   maps?

13   A.  They are the same.  I mean when you number lots, the

14   Municipal Code requires that you number them consecutively,

15   that you start at one point and you work your way around the

16   project, with adjacent lots having a higher number.

17        They are what they are.  I don't -- I did not put a

18   lot of weight to that either.

19   Q.  And why did you not put a lot of weight to it?

20   A.  Because they are just numbers.  I mean we have -- you

21   start with 1 and you end up with whatever number of lots at

22   the end based upon the configuration.  And you have to make it

23   adjacent to each other.  I guess they could have started at a

24   different location, but they, coincidentally, started at the

25   same.

WONG   B.

861

1    Q.  I want to show you, ask you a question about Lot 40 in

2    6451 as well as Lot 40 in 5472.  Could you please come down?

3         THE WITNESS:  May I?

4         THE COURT:  Sure.  No problem.

5    BY MR. OKADIGBO:

6    Q.  Now, can you describe whether there is a difference in a

7    reference relating to golf cart access?

8    A.  Lot number 40 is located to the west -- or east side of

9    the subdivision.  There is a ten-foot path.  It doesn't say

10   "golf," but we know, of course, this is a golf course next to

11   it or a planned golf course.  It was indicated that there

12   would be a ten-foot path through these lots to get access to

13   the adjacent streets for the golf carts.

14        Frankly, there were actually three of those adjacent

15   to Lots 52 and 53, also another ten-foot wide path, and

16   another adjacent to Lot 14, again, a ten-foot path shown.

17        On 6451, those three paths are shown as existing.

18   There were block walls created adjacent to them, but they were

19   now shown 16-feet wide rather than ten-feet wide.  I think it

20   also calls it out as a 16-foot wide golf cart path.  Yeah.

21   Golf cart access roadway.

22   Q.  Okay. Now, was it your understanding that Tentative Tract

23   6451 was originally prepared as a vesting tentative tract map?

24   A.  Yes.

25   Q.  Can you describe what a vesting tentative tract map is?

1  A.   The City of Wasco Codes allow for different types of maps
2  to be filed.  A regular tentative map provides that you have
3  certain conditions of approval and these conditions are --
4  once the conditions are met, then your final map is approved.
5        A vesting tentative map, when it's approved, requires
6  more information to be provided, but also it gives the
7  developer of the lot more rights, and his rights are, quote,
8  "vested" or given to him upon the approval of that tentative
9  map.
10       So it is a different process and I think, as I
11  understand the process for this 6451, it was requested, but
12  denied by the City.  And so a vesting tentative map was never
13  specifically approved for the 6451.
14  Q.   Have you had a chance to compare the vesting tentative map
15  for 6451 or a vesting tentative map for 6451 with the
16  tentative map for 6451?
17  A.   Yes.
18  Q.   And did you find the two to be the same?
19  A.   They were exactly the same, except for one short
20  difference in the title of the vesting tentative map.  It
21  states that it was a "vesting tentative map."
22       In the revised map, they took off the word "vesting"
23  because the City didn't want them to get that.  And so that's
24  the only difference.  Everything else is basically the same.
25  Q.   So from that testimony, would you conclude that DeWalt was

1   setting out to provide more details for its 6451 map than

2   ordinarily would be required for tentative maps, regular

3   tentative maps?

4           MR. BRAZE:  Calls for speculation.

5           THE COURT:  Rephrase, please.

6   BY MR. OKADIGBO:

7   Q.  What is your opinion as to whether the tentative map for

8   Tract Number 6451 conveys information that is required for the

9   vesting tentative map?

10  A.  In my review of both maps and the Municipal Code for the

11  City of Wasco, it appears that a lot of the information that

12  is shown on the tentative map is in fact required for a

13  tentative map and not just for a vesting tentative map.

14          Let me give you some examples.  The topography, we

15  noted, was different between the topographic contours.  We

16  noted it was different between the 5472 map and the 6451 map.

17  That is required for a regular tentative map according to the

18  Municipal Code.

19          The description of adjacent parcels was also part of

20  the Municipal Code and required by -- on the regular map for

21  6451.  That was not shown on 5472.

22          So things like that, they may seem to be more than

23  necessary, but in fact, if you go to the details of what is

24  required by the Code itself, you will see that they were in

25  fact required, and not just because they made a mistake or

1    reversed themselves on the vesting map.

2    Q.   Okay.  And, once again, your conclusion, after comparing

3    Tentative Tract Map Number 6451 with the revised tentative map

4    for 5472, in exploring the similarities and differences, your

5    conclusion is?

6    A.   While there are similarities, as I pointed out to you with

7    the street arrangements and explained to you why they were

8    given for 6451, there were many significant differences

9    between the two maps.  Where 6451 had a lot more information

10   on it, topographic contours, lot areas, bearings, many

11   distances of the lots and so forth, that were not shown on

12   Tentative Map 5472, and, therefore, could not have been

13   created, that is, 6451 was not in fact created by copying

14   5472.

15              MR. TRAVIS:  Objection.  Calls for speculation.

16              THE COURT:  You are talking about the -- the

17   question?

18              MR. BRAZE:  Last statement.

19              THE COURT:  What is your objection?  You are

20   objecting not to the question?

21              MR. BRAZE:  Calls for speculation.

22              THE COURT:  The question does not.  It is overruled.

23              MR. TRAVIS:  Objection --

24              MR. BRAZE:  Nonresponsive to that extent.

25              THE COURT:  Just one second to the nonresponsive

1   objection.  The objection is overruled.  It's a matter of

2   cross-examination.

3          MR. OKADIGBO:  No further questions, your Honor.

4          THE COURT:  Let's see, it is time for the midmorning

5   break.  Ladies and gentlemen, let's take 15 minutes.  We will

6   come back and finish with this witness.  Please remember not

7   to discuss the case.

8          (The jury left the courtroom.)

9          THE COURT:  Let the record reflect that the jury has

10  left the courtroom.  I'm in a position now to answer and rule.

11  With regard to the plaintiff's request to strike the

12  Instruction Number 33 --

13         MR. ALEXANDER:  Excuse me.  Defendant's request, your

14  Honor.

15         THE COURT:  I thought that the defendants' request

16  was the issue of merger.

17         MR. ALEXANDER:  No.  The defense had requested.  City

18  of Wasco had moved to strike 33 and we had that argument and

19  discussion.  The plaintiffs didn't move to strike that.

20         THE COURT:  I'm sorry, it was the City.  We will come

21  back one second.

22         With regard to merger, the Court has had an

23  opportunity to review each of the cases that -- each one of

24  the cases that was cited.  And, frankly, in also looking at

25  the ruling on summary judgment as well, the cases cited make

866

1  the ruling of the summary judgment stronger.  And so that

2  request is denied.

3        On the request of the City to remove Instruction

4  Number 33 that reads, "A work is copied if the defendant

5  copied from a third work rather than from the plaintiff's work

6  if such third work was itself a copy of the plaintiff's work,"

7  I'm not ready to rule on that yet.  So I didn't want you to

8  think I forgot about it, but I will rule on it soon.  I just

9  need a little more time to read a couple things.

10        We will be in recess.

11        (Recess)

12        THE COURT:  Back on the record.  Counsel are present.

13  I have had a chance to review the dependent versus independent

14  creation instruction a little bit more specifically, number

15  was it, 33?

16        MR. ALEXANDER:  Yes, your Honor.

17        THE COURT:  And what I'm going to do is this.  I'm

18  going to wait until the end of the evidence and then I'm going

19  to ask plaintiff's counsel to give me an example of what fact

20  issue the jury is going to be presented with that would in any

21  way substantiate Number 33.  So we will leave it at that and

22  then we will take it up as soon as the evidence is done.

23  Okay?

24        MR. ALEXANDER:  Thank you, your Honor.

25        THE COURT:  Witness is on the stand.  We are ready

WONG - X

867

1    for the jury.

2            MR. TRAVIS:  Your Honor, there was one more issue.  I

3    don't know when we would want to bring it up and ask for your

4    guidance.  In our trial brief, we also asked to amend

5    according to proof for contributory negligence against

6    Northern and Lotus.

7            THE COURT:  I think that's appropriate to take up as

8    soon as the evidence is done.

9            MR. TRAVIS:  Thank you.

10           (The following proceedings were had in the presence

11           of the jury, to wit:)

12           THE COURT:  Okay.  The jury has joined us.  We will

13   go ahead and finish with this witness.

14           Cross-examination?

15           MR. BRAZE:  Thank you, your Honor.

16           THE COURT:  By Mr. Braze.

17                        CROSS-EXAMINATION

18   BY MR. BRAZE:

19   Q.  Mr. Wong, I believe you testified that you went to

20   engineering school at the University of Southern California;

21   is that correct?

22   A.  Yes.

23   Q.  And graduated from there, what, 1966?

24   A.  Yes.

25   Q.  And so I was also at the University of Southern California

WONG - X

868

1   Engineering School, but I graduated in 1968.

2   A.  Oh.

3   Q.  And I don't remember you, and you probably don't remember

4   me, hopefully.

5   A.  I remember OJ.

6   Q.  I have the OJ model ring.  He went to my class.

7       We had a course called "Engineering Ethics."  Did you

8   take that course also?

9   A.  I don't recall.

10  Q.  Don't recall that?  Do you recall the Dean's course on

11  Engineering, the first introductory course?

12  A.  No.  It's been so long.

13  Q.  Dean Ingersoll was the dean, wasn't he?

14  A.  Yes, he was.

15  Q.  It would be unethical for DeWalt to copy Mr. McIntosh's

16  plans, wouldn't it?

17  A.  In my opinion, yes.

18  Q.  Yes.  And you have no idea how DeWalt came up with the

19  tentative map that they came up with, correct?

20  A.  I have some ideas based upon information that was provided

21  to me.

22  Q.  And I will represent to you the people who drew the map

23  came here and testified, and they don't remember what they

24  looked at or how they necessarily came up with it.  Were you

25  told that?

1    A.   No.

2    Q.   One of them testified that they looked at the improvement

3    plans and the other one said they did not.  So you don't know

4    if they looked at the improvement plans in preparing the

5    tentative tract map, correct?

6    A.   Well, I did find some differences between what the

7    improvement plans shows and what the tentative map shows, so

8    if they did look at it, they didn't look at it very well.

9    Q.   Didn't do a good job, huh?

10        Now, one of the things you pointed out was that there

11   was more detail on the tentative map drawn by DeWalt as

12   opposed to the tentative map drawn by Mr. McIntosh, correct?

13   A.   Yes.

14   Q.   And that was in part due to the fact that when

15   Mr. McIntosh drew his map, there was nothing there but bare

16   ground, correct?

17   A.   That's correct.

18   Q.   And when DeWalt drew their map, there was all the streets,

19   gutters and improvements in, correct?

20   A.   That's correct.

21   Q.   And now, the improvement plans have to be in before the

22   improvements are put in, correct?

23   A.   Yes.

24   Q.   And the improvement plans -- or I should say on the final

25   tract map has to conform to the improvement plans, doesn't it?

1  A.  The final tract map has to satisfy all of the conditions

2  of approval of the tentative map.  It has to be in substantial

3  compliance or conformance with the tentative map, and the

4  improvements have to either be bonded for or completed before

5  the final map will be able to record.

6  Q.  And my point is, though, the final map has to conform to

7  the improvement plans, don't they?

8  A.  I'm not sure what you exactly mean by "conform to."  The

9  configuration of the streets, the layout of the lots are all

10  basically shown on the tentative map, the improvement plans

11  and the final map.

12  Q.  Now, I guess I was -- I didn't quite understand.  Taking a

13  look at Exhibit D 502, you had drew a pink line around that

14  area of 5472.  Why didn't you draw it around the entire

15  parcel?

16  A.  Because those other portions of what you call the "parcel"

17  are indicated as not a part.  That is, not a part of this map.

18  Q.  What do you call this entire area?  Is that a tract or a

19  parcel?

20  A.  I'm sorry?

21  Q.  What do you call that entire area?  Is that a tract or a

22  parcel?

23  A.  Circumscribed by the pink line?

24  Q.  No, by the outer boundary.

25  A.  That would be based upon the legal description of the lot

1   that was to be subdivided.

2   Q.  Well, you didn't see any change in the legal description

3   between the tentative map that Mr. McIntosh drew and the

4   tentative map that DeWalt drew, did you?

5   A.  Yes.

6   Q.  Where did you find that?

7   A.  If you read the legal description on 5472, it reads, "A

8   portion of a quarter section of a quarter section," and so

9   forth.  If you read the legal description on 6451, it says, "A

10  subdivision of Parcel 1 of Parcel Map 9472."

11  Q.  But you drew the pink line on the smaller area than the

12  larger parcel, correct?

13  A.  Yes.

14  Q.  And is it your understanding that improvement plans are

15  the property of the engineer who drew them?

16  A.  They are initially created by the engineer, but they

17  become public record once they are approved and filed with the

18  City.

19  Q.  Don't they become public record when the final map is

20  recorded?

21  A.  No.  Not to my understanding.

22  Q.  So when do they become public record?

23  A.  Once the plans are approved by the City.

24  Q.  How about the improvements being accepted?

25  A.  I'm sorry?

WONG - X

872

1    Q.   How about the improvements being accepted?

2           MR. HASSING:   Objection, vague, your Honor.

3           THE COURT:   What do you mean?

4    BY MR. BRAZE:

5    Q.   Don't the maps become public records when the improvements

6    are accepted?

7    A.   No.   It is my understanding that the plans become a part

8    of the public record when the plans themselves are signed by

9    the City Engineer.

10   Q.   Are you talking about the "as built" plans or the

11   improvement plans?

12   A.   The improvement plans.

13   Q.   And you reviewed the improvement plans in this situation?

14   A.   Yes.

15   Q.   And did you notice they had a © on them, indicating that

16   the person who had developed them contended they were

17   copyrighted?

18   A.   I did not note that, but that's not unusual.

19   Q.   Why would engineers do that?

20   A.   For their own protection, I presume.

21   Q.   Now, you testified that Mr. McIntosh was confronted with

22   Valley Rose Parkway and -- what was the other condition that

23   he was encountered when he started to design this?

24   A.   The boundary.

25   Q.   The boundary.   And it was your testimony that other than

1    the boundary and Valley Rose Parkway, the rest was
2    Mr. McIntosh's creation as to how he designed that
3    subdivision, correct?
4    A.   Yes.
5    Q.   Now, one of the differences that you pointed out between
6    Tentative Tract 6451 drawn by DeWalt and Tentative Map 5472
7    drawn by McIntosh is there were some contours on there, right?
8    A.   Yes.
9    Q.   And, of course, the reason there are contours is that many
10   years had passed between the two maps and the code had
11   changed, basically, correct?  In other words, in 1992, when
12   Mr. McIntosh did his tentative tract map, he wasn't required
13   to put contours on --
14          MR. OKADIGBO:  Objection.  Calls for speculation.
15          THE COURT:  I need a full question.
16   BY MR. BRAZE:
17   Q.   -- but in 2004 --
18          THE COURT:  Wait.  Go ahead and ask a full question
19   now, if you would.
20   BY MR. BRAZE:
21   Q.   In 1992, when Mr. McIntosh drew his tentative map, he was
22   not required to put contours on the tentative map.  However,
23   in 2004, when DeWalt drew their tentative map, they were
24   required to put contours on it; is that correct?
25          MR. OKADIGBO:  Objection.  Calls for speculation.

874

1          THE COURT:  It may or may not.

2          What are you asking him to base his answer on?

3          MR. BRAZE:  Sure.

4    BY MR. BRAZE:

5    Q.  Is it your understanding that code requirements have

6    changed, requiring the showing of contour lines on the map

7    drawn in 2004?

8          MR. OKADIGBO:  Objection.  Also foundation, your

9    Honor.

10          THE COURT:  You are going to have to lay the

11   foundation on code requirements before and then later.

12   BY MR. BRAZE:

13   Q.  Do you believe the contour lines were put on that map just

14   for looks?

15          MR. HASSING:  Objection, argumentative, your Honor.

16          THE COURT:  Sustained.

17   BY MR. BRAZE:

18   Q.  Do you know why contour lines are put on that map?

19   A.  Yes.

20   Q.  Why?

21   A.  It depicts the lay of the land.  It shows areas that may

22   not be readily developable, such as steep canyons.

23   Q.  There is no canyons, are there?

24   A.  No.  You asked a general question, so I'm responding to it

25   in general form, why contours are shown on maps.

WONG - X

875

1    Q.  But were they required to put the contours on there or

2    were they not?

3    A.  For 6451 --

4             MR. HASSING:  Objection, lacks foundation.

5             THE COURT:  You have to lay the foundation.

6    BY MR. BRAZE:

7    Q.  Do you know whether they were required to put contours on

8    the 6451 tentative map?

9    A.  Yes.

10   Q.  And what is your understanding?

11   A.  They were required to do so.

12   Q.  Thank you.  Now, how many subdivisions have you processed

13   in the State of California?

14   A.  Me personally or my company?

15   Q.  You, personally.

16   A.  I don't know specifically.  It's been 30 plus years that I

17   have been practicing in the State of California.

18   Q.  Don't give away our age now.

19   A.  I'm two years older than you are.

20   Q.  Now, even though Mr. McIntosh was locked in by Valley Rose

21   Parkway and the boundaries of the parcel map, tract map,

22   whatever you want to call it, he could have designed it in a

23   different way if he wanted to, correct?

24   A.  He could have laid out the interior streets different from

25   what he did; is that your question, sir?

WONG - X

876

1  Q.  Yes.

2  A.  The answer is yes.

3  Q.  And with respect to DeWalt, could they have laid it out in

4  a different manner?

5  A.  Not with the existing improvements in place.

6  Q.  Why not?

7  A.  Because they were existing.  The streets were completed.

8  The utilities were installed.  The street lights and the fire

9  hydrants were in place, all helping to define the limits of

10  where these streets needed to be.

11  Q.  So are you saying they had no latitude as to how they drew

12  the tentative map, they had to make it conform to

13  Mr. McIntosh's tentative map?

14  A.  Without having to tear out existing improvements, yes.

15  Q.  Now, you had -- where are the little ones?  The lots.

16        Now, you were shown lot 46.  And we have been through

17  this exercise before, but the dimensions on these maps are

18  expressed in hundredths of a foot, correct?

19  A.  Yes.

20  Q.  And a hundredth of a foot is slightly less than one-eighth

21  of an inch, correct?

22  A.  Yes.

23  Q.  Now, Map [sic] 46 has dimensions on the DeWalt map of

24  113.33 and on the McIntosh map of 113.28.  That's five

25  hundredths of an inch, correct --

877

1    A.  Yes.

2    Q.  -- difference.  So that's about a half an inch?

3    A.  Yes.

4    Q.  In 113 feet?

5    A.  Yes.

6    Q.  And the eastern boundary has dimensions on the McIntosh

7    map of 100.83 inches, and on the DeWalt map, 100.82 inches, a

8    difference of one hundredth of a foot?

9    A.  One correction.  That's in feet, not inches.  And that's

10   correct.  One hundredth of a foot.

11   Q.  Correct.  Sorry.  Is that difference significant to you?

12   A.  It's just different.  That means it's not copied.

13   Q.  So for you to think it was copied, the dimensions would

14   have to be exact to the hundredth of a foot?

15   A.  I can't quite understand copying a different number.  If

16   you were to copy it, why not copy the same number?

17   Q.  So if we had maps that had the same number, you would

18   believe that was evidence of copying, wouldn't you?

19   A.  At least potentially, it could have been.

20   Q.  Now, you told us about some of the differences in the two

21   tract maps, but did you note all the similarities?

22   A.  I did note some similarities, yes.

23   Q.  Did you note that Lots 31 through 36 on both maps are

24   exactly 66 feet wide?

25   A.  I probably did, yes.

WONG  X

878

1  Q.  Did you note that Lots 39 through 43 are exactly 65 feet

2  wide to the hundredth of an inch [sic]?

3  A.  Of a foot, sir.

4  Q.  Excuse me.  Hundredth of a foot, thank you.

5  A.  Makes a little difference between friends.

6  Q.  Makes a lot of difference.

7  A.  I imagine you are correct.

8  Q.  I was a mechanical engineer.  That's why I deal in inches.

9  A.  That's forgiven, then.

10  Q.  Okay.  And did you note that the dimension on Lot 44 -- on

11  both lots was exactly 61 feet to the hundredth of a foot?

12  A.  Yes.

13  Q.  I'm working on it.

14  A.  We are from USC.

15  Q.  And did you note that Lot 47 had the exact southern

16  dimension of 107.77 feet to the hundredth of a foot?

17  A.  I mean without actually going up there and doing the same

18  thing you are, I would imagine you are reading it correctly.

19  Q.  Do you want to come on down?

20  A.  I believe that you are exactly correct.

21  Q.  Thank you.  Did you note that Lot 49 had a long dimension

22  of 102.06 feet and had exactly the same dimension on the

23  DeWalt map of 102.06 feet?

24  A.  I believe you.

25  Q.  And to quote you, if you are going to copy, you would copy

1   the exact dimension, right?
2           MR. OKADIGBO:  Objection.  Mischaracterizes his
3   testimony.
4           THE COURT:  Overruled on that ground.
5   BY MR. BRAZE:
6   Q.  And Lot 50 has the identical westerly boundary of a
7   hundred feet, doesn't it?  I guess it is actually the easterly
8   boundary of Lot 51.  Both have identical 100 feet to the
9   hundredth of an inch, right?
10  A.  Hundredth of a foot.
11  Q.  Thank you.
12  A.  It's going to be one of those things.
13  Q.  I hope not.
14  A.  Again, I can only do the same thing you are and presume
15  that that's accurate.
16  Q.  So what you have done -- and I can go on but I will risk
17  boring the jury, what the heck.
18          Lots 62 through 67 all have the identical dimension
19  of 66.00 feet.
20  A.  Yes.
21  Q.  And Lots 58 through 60 all have the identical northerly
22  boundary of 61.49 feet to the hundredth of an inch [sic],
23  would you agree with that?
24          THE COURT:  Hundredth of a foot.  And I didn't go to
25  USC.

880

1      MR. BRAZE:  I'm sorry.

2      THE WITNESS:  I am too.

3      MR. OKADIGBO:  Which lots were you referring to,

4  Counsel?

5      MR. BRAZE:  58 through 60 have the identical

6  northerly border of 61.49 feet.

7      MR. OKADIGBO:  Objection, your Honor.  58 and 59 do

8  not have a measurement.

9      MR. BRAZE:  I will withdraw that.

10      THE COURT:  Withdrawn.

11  BY MR. BRAZE:

12  Q.  The note on Tentative Map 5472 says it was based on the

13  improvement plans; is that correct?

14  A.  Actually, if you look on 6451, it says that.

15  Q.  You are right.  Thank you for pointing that out.

16      So the DeWalt map says that it is based on the

17  improvement plans from 5472?

18      MR. HASSING:  Objection.  Misstates testimony.

19      THE COURT:  Just a minute.  The objection is

20  sustained.  Rephrase.

21  BY MR. BRAZE:

22  Q.  Doesn't the note on Tentative Map 6451 say, "This

23  development contains existing improvements built per Valley

24  Rose Planned Community Expired Tentative Tract 5472 and

25  associative approved improvement plans"?

WONG   X

881

1    A.  To my recollection, that is accurate, yes.

2    Q.  Of course, we have all agreed the lot numbering is

3    identical, correct?

4    A.  Yes.

5    Q.  And did you compare the curves on the street?

6    A.  The curves on the street, sir?

7    Q.  In other words, on Map 6451, the radius of curvature of

8    the cul-de-sac were indicated on a table, but on this drawing,

9    the radius of curvature is shown on the map itself, is it?

10          MR. OKADIGBO:  Your Honor, can the witness approach

11   for these series of questions?  They are requiring him --

12          THE COURT:  If he needs to.

13          Do you need it?

14          THE WITNESS:  I think so.

15          THE COURT:  Go ahead.

16   BY MR. BRAZE:

17   Q.  Here we have -- withdraw that.

18          On Exhibit 502, which is the tentative tract map for

19   Parcel 5472, constructed by Mr. McIntosh, we have radius of

20   curvature shown in circles on the cul-de-sac, correct?

21   A.  Yes.

22   Q.  And over on Map 6451, those radius of curvatures are shown

23   in a table?

24   A.  They are different.

25   Q.  First of all; is that correct, that one shows the radius

1   of curvature on the map, the other is showing on the table?

2   A.   They are showing different curves, and that's what I'm

3   trying to explain to you.   5472 shows the curvature of the

4   cul-de-sac right-of-way, whereas the curve data table shows

5   the curvature of the street improvements, that is, the curb

6   and gutter.   And you could see just by the radius.   There is a

7   20 foot radius.   This is 50 foot radius.

8   Q.   Well, where is that curve at?   Which curve is that?

9   A.   We are talking about various curves --

10  Q.   No.   What I'm saying is the table refers to a curve, C-1

11  through 10?

12  A.   Yes.

13  Q.   And I don't see C-1 through 10 on that map.

14  A.   Here's C-5, for example, which is on the cul-de-sac of

15  Olympic Close.

16  Q.   What is the radius of curvature of C-5?

17  A.   C-5 is 50.

18  Q.   And over here on Mr. McIntosh's rap, what is the radius?

19  A.   It's 50, that's correct.

20  Q.   Let's go to this cul-de-sac right here.

21  A.   It also says C-5.

22  Q.   That's also 50, right?

23  A.   Yes.

24  Q.   And on Mr. McIntosh's map, the radius of curvature is 50;

25  is that correct?

883

1    A.   Yes.

2    Q.   What's the radius of curvature at the end of Sawgrass

3    Court?

4    A.   All of these are 50.

5    Q.   So that's identical, to answer the question?

6    A.   Yes.

7              MR. BRAZE:  Thank you.  I think that's all there.

8    BY MR. BRAZE:

9    Q.   Now, you had discussed that Mr. Wu, Northern or Lotus,

10   whichever one, had requested a tentative map, a tentative

11   vesting map; do you recall that testimony?

12   A.   To my understanding, initially, Northern California

13   submitted a vesting tentative map to the City for their review

14   and approval.

15   Q.   And a vesting map normally has improvement plans with it,

16   doesn't it?

17   A.   No.  The conditions of approval for a map would require

18   that plans or improvements be provided.

19   Q.   Don't you have to have a map to show what plans and

20   improvements are being provided?  Drawings to show what plans

21   or improvements are being provided?

22   A.   Not if in fact they conform with what was actually

23   existing.  And in this case, the streets were in existence in

24   the same configuration that was proposed by the tentative map.

25   Q.   So would you need the improvement plans to file with the

WONG - X

884

1   City to get your vesting tentative map?

2   A.   Not if those improvements were in fact complete.

3   Q.   Were these improvements complete?

4   A.   Yes.

5   Q.   Do you know why the tentative map, vesting tentative map

6   was not approved by the City?

7   A.   No.

8   Q.   It is my understanding you have been retained by the City

9   of Wasco; is that correct?

10  A.   Yes.

11  Q.   To talk about differences in the maps prepared by DeWalt;

12  is that correct?

13  A.   Both similarities and differences.

14  Q.   Oh, I heard mostly differences this morning.

15          THE COURT:  Oh, we don't comment on answers.  That's

16  closing argument.

17  BY MR. BRAZE:

18  Q.   You testified on direct about differences, correct?

19  A.   Yes.

20  Q.   And on cross-examination by me, you testified about

21  similarities, correct?

22  A.   I also discussed similarities on direct as well.

23          MR. BRAZE:  Thank you, your Honor.  That's all I have

24  of this witness.

25          THE COURT:  Mr. Hassing?

885

1          MR. HASSING:  Nothing from me, your Honor.

2          THE COURT:  Mr. Alexander?

3          MR. ALEXANDER:  Just a couple.

4                          CROSS-EXAMINATION

5  BY MR. ALEXANDER:

6  Q.  Mr. Wong, in relation to this particular subdivision, was

7  there a minimum lot size that was required?

8  A.  Yes.

9  Q.  What was that?

10  A.  6,000 square foot.

11          MR. ALEXANDER:  Thank you.  No further questions,

12  your Honor.

13          THE COURT:  Any redirect?

14          MR. OKADIGBO:  Yes.

15                       REDIRECT EXAMINATION

16  BY MR. OKADIGBO:

17  Q.  Could you explain to the jury what it was that you

18  intended to say about the curve table information on the two

19  maps?

20  A.  Thank you.

21          MR. BRAZE:  Well --

22          THE COURT:  Wait a second.  Is there an objection?

23          MR. BRAZE:  I don't understand the question.

24          THE COURT:  Could you rephrase your question, please.

25  BY MR. OKADIGBO:

1  Q.  What is the difference in the curve table information

2  between the two maps?

3  A.  We discussed in a question about the curvature of the

4  right-of-way that's shown on 5472 as being 50 feet.  First of

5  all, that's set by the City.  The size of the cul-de-sac is

6  standard, so all cul-de-sacs for residential lots of this type

7  are required to be 50 foot in radius.  So the fact that they

8  are the same is meaningless since it is a standard

9  requirement.

10         Just like the width of the streets.  The width of the

11  streets are exactly the same simply because the City mandates

12  those requirements.

13         MR. OKADIGBO:  No further questions.

14         THE COURT:  Any recross?

15         MR. BRAZE:  Not at this time, your Honor.

16         THE COURT:  Anything further?

17         MR. ALEXANDER:  Nothing further, thank you, your

18  Honor.

19         MR. OKADIGBO:  Nothing further.

20         THE COURT:  You may step down.  Thank you, sir.

21         Next witness, please.

22         MR. HASSING:  Your Honor, Northern would now present

23  its case.  I would call Mr. McIntosh.

24         THE COURT:  All right.  Mr. McIntosh, if you would

25  please retake the stand.  You are still under oath.  You need

1    not be resworn.

2                        **ROGER MCINTOSH,**

3    called as a witness on behalf of the Defendant Northern/Lotus,

4    having been previously sworn, testified as follows:

5                        DIRECT EXAMINATION

6    BY MR. HASSING:

7    Q.   Good morning, Mr. McIntosh.

8    A.   Good morning.

9    Q.   Mr. McIntosh, back when Legacy Group was constructing

10   improvements or having improvements constructed to Parcel 1,

11   do you recall the name of the contractor that it hired?

12   A.   For which improvements?  On site?

13   Q.   The general contractor for the streets, curbs, sidewalks,

14   gutters, utilities.

15   A.   I believe it was Turman Construction, but there may have

16   been other subcontractors that worked on the project.

17   Q.   Who is -- you might have testified to this already, but

18   who is Ronald Staub?

19   A.   Ron Staub was the project manager that worked for me and

20   Martin-McIntosh on the project.

21   Q.   It's true, isn't it, that when Turman Construction wanted

22   to be paid for the work it completed --

23            MR. BRAZE:  Objection, irrelevant.

24            THE COURT:  I don't know.  I need a full question.

25   BY MR. HASSING:

MCINTOSH

888

1    Q.  It's true when Turman Construction wanted paid for a

2    portion of the work that it completed, it would submit a

3    payment request and invoice to Martin-McIntosh through Ronald

4    Staub?

5    A.  Yes.

6    Q.  Take a look, if you would, sir, at Exhibit D 221.

7    A.  I don't have it.

8    Q.  Okay.

9    A.  I have it now.

10   Q.  All right.  And you understand that Turman was paid as

11   retention after Martin-McIntosh determined that the job or the

12   item being billed for had been completed, correct?

13           MR. BRAZE:  Objection.  Relevance.  I don't

14   understand the relevance of this line of questioning.

15           THE COURT:  What is the relevance?

16           MR. HASSING:  It is foundational, your Honor, to my

17   next exhibit.

18           THE COURT:  I will give you latitude subject to a

19   motion to strike appropriate.

20           THE WITNESS:  Could you repeat the question, please.

21   BY MR. HASSING:

22   Q.  You understand the term "retention" in the context of a

23   construction project, right?

24   A.  Yes, I do.

25   Q.  And tell the jury, if you would, what the purpose of

1   billing for retention was?

2            MR. BRAZE:  Objection.  Relevance, your Honor.

3            THE COURT:  It's foundation to what I'm not sure, but

4   we will give him a little latitude and see where it goes.

5   Bring your objection, renew it, if appropriate, along with a

6   motion to strike, if it is appropriate.

7            THE WITNESS:  The purpose for billing retention is to

8   get paid for the full amount of the contract.

9   BY MR. HASSING:

10  Q.  And is retention billed after a particular item has been

11  completed?

12  A.  It's usually billed at the close of the job, when the

13  improvements and the work is complete, the billing for

14  retention is sent in.

15  Q.  Take a look, if you would, at that document within D 221,

16  which is invoice number Retention B4C.

17           MR. BRAZE:  I'm sorry, where are we?

18           THE COURT:  D 221.

19           MR. HASSING:  B, like "boy," 4 C, like "cat."

20           THE WITNESS:  I'm sorry.  I don't see the B4C.  Where

21  is that?

22  BY MR. HASSING:

23  Q.  Look in a few pages until you find this invoice.  This

24  is --

25           MR. BRAZE:  Is there a page number?

1          MR. HASSING:  No, there is not a page number.

2          MR. BRAZE:  How do we find it?

3          MR. HASSING:  You look through until you find B4C.

4          THE COURT:  We are still on D 221.

5          THE WITNESS:  I see it.  Yes, Retention B4C.

6          THE COURT:  Are you there?

7          MR. BRAZE:  Haven't found it yet.  I found it.

8          THE COURT:  Okay.

9   BY MR. HASSING:

10  Q.  Mr. McIntosh, tell me, if you would, please, what is this

11  document?

12  A.  This is a retention billing for on site discrete items

13  B4C, street improvements, streetlights, and street signs,

14  retention.

15  Q.  And was this signed by Mr. McIntosh of your firm?

16  A.  No.

17  Q.  Excuse me, Mr. Staub of your firm?

18  A.  It appears that it was signed by --

19  Q.  By Mr. Staub?

20  A.  It appears that, yes.

21          MR. HASSING:  Your Honor, move to admit.

22          THE COURT:  Any objection?

23          MR. BRAZE:  No.

24          THE COURT:  D 221 -- let me just for clarification,

25  are you asking for D 221 to be admitted, are you asking for

891

1    D 221, specific page of the invoice B4C?

2              MR. HASSING:  Specific page, your Honor.

3              THE COURT:  We will mark B4C as D 221-A.

4              (Defendant's Exhibit D 221-A was received.)

5    BY MR. HASSING:

6    Q.  Now, having seen this, Mr. McIntosh, does this now refresh

7    your recollection as to whether or not street signs were

8    erected during the construction of the 5472 improvements?

9    A.   I know that Mr. Turman did not get paid for his work, and

10   I -- if Mr. Staub approved this retention, then street signs

11   probably were put up, but I wasn't out there to specifically

12   observe that at the time.

13   Q.  Take a look, if you would, at another document within

14   D 221, and it is designated E, like "elephant," 4C, like

15   "Charlie."

16   A.   I have it.

17             (Counsel conferred off the record.)

18   BY MR. HASSING:

19   Q.  Sir, directing your attention now to the document in front

20   of you, tell me what that is?

21   A.   I'm sorry, I have two documents in front of me now.

22   Q.  Well, the one I just directed your attention to was --

23             THE COURT:  What's it say at the top?

24             MR. HASSING:  "E4C."

25             THE WITNESS:  E4C is an invoice for retention for

1    off-site discrete items.  E4C, street improvements,

2    streetlights and street signs.

3    BY MR. HASSING:

4    Q.  This again is also signed by Mr. Staub?

5    A.  Yes.

6         MR. HASSING:  Move to admit this as D 221-B.

7         THE COURT:  It's received.

8         (Defendant's Exhibit D 221-B was received.)

9         MR. HASSING:  Thank you, Mr. McIntosh.  I have

10   nothing further.

11        MR. ALEXANDER:  No questions, your Honor.  Thank you.

12        MR. OKADIGBO:  No questions, your Honor.

13        THE COURT:  Anything from the plaintiffs?

14                    CROSS-EXAMINATION

15   BY MR. BRAZE:

16   Q.  Mr. McIntosh, do you have any reason to believe one way or

17   another that the street signs were actually put in?

18   A.  Well, when I was researching the street signs, I went back

19   and looked at my files to see, and I couldn't tell if the

20   street signs had actually been placed.

21        So I went on Google maps and they have what's called

22   a "street view," where you can actually go to the street

23   scene.  Google drove a lot of the United States in the last

24   few years and took pictures of a lot of the streets in the

25   United States.

893

1          This subdivision was one of the street scenes that I

2     observed.  And when I went to that site, I did not see many of

3     the street signs that were in the subdivision.  I couldn't

4     print it out because it is probably copyrighted, but they

5     don't allow you to print those out, but I could not see those

6     signs at that time.

7          They may have been put in in 1994, but as to whether

8     or not they were there when the infringement took place, I

9     don't know.

10    Q.  So you don't know whether they were there or not in 1994

11    and you don't know whether they were there in 2004 either; is

12    that correct?

13    A.  I would speculate that they were --

14         MR. HASSING:  Objection, your Honor.  The answer is

15    going to be based on speculation.

16         THE COURT:  Lack of foundation.  Sustained.

17         MR. BRAZE:  Thank you.  No further questions.

18         THE COURT:  Anything further?

19         MR. HASSING:  Yes, your Honor.

20                   REDIRECT EXAMINATION

21    BY MR. HASSING:

22    Q.  I believe you just testified, Mr. McIntosh, that when you

23    looked at Google, many of the signs could not be seen; isn't

24    that correct?

25    A.  That's correct.

894

1   Q.  And so some of the signs could be seen, right?

2   A.  I believe there was at least one that I found.

3   Q.  And you didn't have a date on that Google photograph, did

4   you, sir?

5   A.  No, I did not.

6   Q.  And so you don't know when that photograph was taken, do

7   you?

8   A.  Not exactly.

9   Q.  And you don't know if the signs were up at the time of the

10  DeWalt survey and later removed, do you?

11  A.  No, I don't.

12          MR. HASSING:  Thank you.

13          THE COURT:  Anything further?

14          MR. ALEXANDER:  No, your Honor.

15          THE COURT:  Thank you.  You may step down.

16          MR. HASSING:  Call Joe Wu, your Honor.

17                          **JOE WU**,

18  called as a witness on behalf of the Defendant Northern/Lotus,

19  having been previously sworn, testified as follows:

20          THE COURT:  All right.  He is back on the stand.

21          Please be seated.  Thanks.  You are still under oath.

22          MR. HASSING:  Thank you, your Honor.

23                       DIRECT EXAMINATION

24  BY MR. HASSING:

25  Q.  Good morning, Mr. Wu.

895

1    A.   Good morning, Steve.

2    Q.   Sir, can you tell me what the form of business is for

3    Lotus Developments?

4    A.   Lotus Development was the one that, when we purchased the

5    subdivision, we used the Lotus Development.

6    Q.   Can you tell me, sir, is Lotus Development a corporation

7    or limited partnership?

8    A.   It is a limited partnership.

9    Q.   When you first got on the stand, I believe last Wednesday,

10   I believe it was, I believe I heard you say that you, Joe Wu,

11   were the general partner of Lotus Limited Partnership.  Do you

12   recall that testimony?

13   A.   Yes, I did.

14   Q.   Was that correct, sir?

15   A.   No, I made a mistake.

16   Q.   Who or what is the general partner of Lotus?

17   A.   The general partner is Northern California Universal

18   Enterprises Company.

19   Q.   Do you have any position within Northern California

20   Universal?

21   A.   Yeah.  I'm the President of Northern California Universal

22   Enterprises Company.

23   Q.   Now, let's move back in time to 2004, when one of your

24   companies made an offer to the City to purchase Parcel 1.  All

25   right?

1   A.   Yes.

2   Q.   Do you remember the name of the entity that that offer was

3   made through?

4   A.   I believe it was Lotus Development.

5   Q.   Take a look, if you would, at J 7 in this book.

6   A.   J 7.

7   Q.   Looking for J 7, Mr. Wu.

8   A.   Okay.  Yes, right here.

9   Q.   Are you looking at J 7?

10  A.   Yes.

11  Q.   Now, when one of your companies entered into an agreement

12  with the City, did that company take an assignment from a

13  previous potential purchaser of that property?

14  A.   Yes.

15  Q.   And do you recognize Exhibit J 7 as the assignment

16  agreement?

17  A.   Yes.

18  Q.   Take a look, if you would, at the name of your company

19  that's listed as the new purchaser of the City's property.  In

20  the first paragraph, do you see that?

21  A.   Yes.

22  Q.   Does that refresh your recollection as to which one of

23  your companies originally entered into an agreement to buy

24  property from the City?

25  A.   I believe it is using the Lotus Development.

897

1   Q.  Sir, take a look, please, if you would, at the first

2   paragraph of that assignment.  Do you see that, where it says,

3   "This assignment of purchase and sale agreement"; do you see

4   that?

5   A.  Yes.

6   Q.  Which one of your companies is listed there as the

7   purchaser, Lotus or Northern?

8   A.  Well, it is kind of difficult to read it.

9           THE COURT:  Look on the screen.

10          THE WITNESS:  Sorry.

11  BY MR. HASSING:

12  Q.  Do you see one of your companies there, underlined in

13  orange?

14  A.  Yes.

15  Q.  Does that refresh your recollection as to which one of

16  your companies first entered into an agreement to purchase the

17  property?

18  A.  Yes.

19  Q.  Which company was it, sir?

20  A.  Northern California Universal Enterprises Company.

21  Q.  Thank you.  Now, a few months later, you entered into an

22  agreement with DeWalt; is that correct?

23  A.  Yes.

24  Q.  And do you remember which one of your companies entered

25  into the agreement with DeWalt?  That's J 18, sir, if you want

898

1  to refresh your recollection.

2  A.  Yes.  It's Northern California.

3  Q.  It was Northern California that entered into the agreement

4  with DeWalt?

5  A.  Yes.

6  Q.  Now, as of July 21st of 2004, had any of your companies

7  actually purchased the property yet?

8  A.  No.

9  Q.  Do you recall when one of your companies actually

10  purchased the property?

11  A.  Are you asking the purchase, the 68 finished lots?

12  Q.  Yes.

13  A.  I believe it is the December of 2004.

14  Q.  All right.  Let me show you what is in evidence as D 217,

15  and that's a long exhibit.  This is tab 15, page 2 of Exhibit

16  D 217.

17          For the record, it is a closing statement --

18          THE COURT:  Is that in?

19          MR. HASSING:  It is.

20          THE COURT:  Thanks.

21          MR. BRAZE:  What's the page?

22          MR. HASSING:  Tab 15, and it's page 2 of tab 15 in

23  D 217.

24          MR. BRAZE:  I don't see it.

25  BY MR. HASSING:

899

1   Q.  Sir, does this particular exhibit refresh your

2   recollection as to the closing date when one of your companies

3   actually purchased the City property?

4   A.  Yes, December 28, 2004.

5   Q.  And can you tell the jury which of your companies was the

6   actual purchaser?

7   A.  Based on this statement, the purchase was Lotus

8   Developments.

9   Q.  Now, we've looked at the contract between Northern and

10  DeWalt, right?

11  A.  Yes.

12  Q.  Did Lotus ever have a contract with DeWalt?

13  A.  No.

14  Q.  Let's talk about your conversation with Mr. McIntosh.

15  Actually, let me strike, and let's move on to your profit and

16  loss statement.  And regarding the 38 lots, you have got 38

17  finished lots out there?

18  A.  Yes.

19  Q.  Are you now planning on building on those lots?

20  A.  No.

21  Q.  Why is that?

22  A.  Well, the market is so depressed that the real estate

23  sales market is continuing to slide.  Especially that we are

24  facing a really, really tremendous financial crisis, and the

25  banking is completely break down, that we have a hard time to

900

1    obtain a construction loan since 2007.

2          Besides that, the construction costs is more than the

3    home sales price, so I just cannot build anymore.

4    Q.   This particular subdivision, 6451, is that the only

5    subdivision that you have now in the State of California?

6    A.   No.

7    Q.   You have other subdivisions?

8    A.   Yes.

9    Q.   Are you trying to build -- are you trying to obtain loans

10   to build in these other subdivisions?

11   A.   Yes, I do, but I never get a construction loan since 2007.

12   Q.   What do you plan to do with those 38 lots, Mr. Wu?

13   A.   I am trying to put it for sale since a year ago.

14   Q.   How much are you trying to sell them for, each lot?

15   A.   I tried to put around $20,000 per finished lot based on

16   the value of the assessed.

17   Q.   Now, you heard about -- you heard Dr. Merati testify about

18   his assumptions with regard to allocating your land costs,

19   right?

20   A.   Yes.

21   Q.   Did you agree with those assumptions he made?

22   A.   No.

23   Q.   What did you pay for the entire land you bought from the

24   City?

25   A.   I paid for 1.605 million.

1   Q.   And then was there a reason why you tried to figure out an

2   allocation between the finished lots and the 65 acres that you

3   purchased?

4   A.   Yes.   What I did is that the -- I used the common assessed

5   $20,000 per finished lot times 68 lot come out 1.36 million.

6   Then subtract from the money we paid for, the 1.605.

7           THE REPORTER:   I lost you there.   $20,000 per finished

8   lot times 68 lot come out 1.36 million.

9           THE WITNESS:   Yes.   Then we using the purchase price

10  of 1.605 million, to subtract the 1.36.   That's the low end of

11  the 65 acre value come from, 245,000.

12  Q.   Well, sir, if you bought 97 acres for 1.6 million, why

13  didn't you just do a cost allocation based on a price per

14  acre?

15  A.   No, you cannot do that.   The 68 finished lot is more value

16  than the 64.7 acre of the low land, which is farmland.

17  Q.   Okay.   And why is it -- why was the 68 lots, in your

18  opinion, worth more than the 65 acres of farmland?

19  A.   Well, because the 68 lots, already have to spend

20  tremendous money to put into the infrastructure, like street,

21  street signs, streetlights and underground facility, water,

22  sewer, storm drain, those kind of structure stuff.

23  Q.   All right.   Please take a look, if you would, sir, at the

24  very first page of Exhibit D 217.   I think it is in a

25  different binder, Mr. Wu.   Actually, it is the second page of

902

1   D 217, which is a one-page summary of profit and loss.  Do you

2   see that, Mr. Wu?

3   A.  Yes.

4   Q.  Now, you and your staff prepared this document, didn't

5   you?

6   A.  Yes.

7   Q.  And take a look, if you would, at the top of the document

8   where it refers to sales, 30 homes, do you see that?

9   A.  Yes.

10  Q.  Now, on this document, you have indicated that there were

11  18 homes sold, right?

12  A.  Yes.

13  Q.  By the way, when was this document prepared?

14  A.  Well, this is prepared back to I believe it is September

15  and October last year.

16  Q.  Take a look at the date at the top of it, sir.

17  A.  October 31st, '09.

18  Q.  Is that when it was prepared?

19  A.  Yes.

20  Q.  Now, as of October 31st, 2009, had you sold homes having a

21  total sales price of $4.43 million?

22  A.  Yes.

23  Q.  And if you had sold 14 homes -- excuse me, 18 homes, how

24  many homes did you have left to sell at that time?

25  A.  12 homes.

1  Q.  All right.  And did you come up with this figure of

2  2,178,000 for the anticipated sales price of the remaining 12

3  homes?

4  A.  Yes.

5  Q.  Now, who, at your company, is the person who has been in

6  charge of setting sales prices for those homes since they were

7  built?

8  A.  Usually, I working with the sales agent and we search

9  around the City of Wasco area at all the homes sold and

10  compare the ones to our subdivision, the home sales, so we

11  finally determine what is the value on a home price for sale.

12  Q.  You work with your sales agent?

13  A.  Yes.

14  Q.  Who makes the final decision on what these homes are going

15  to be listed for?

16  A.  Me.

17  Q.  All right.  And when you estimated that you were going to

18  sell the remaining 12 homes for $2.178 million, did you take

19  into consideration the various market factors at play back in

20  October?

21  A.  Yes.

22  Q.  And have those conditions, based on your observation,

23  gotten better or less, as far as selling new homes in Central

24  California?

25  A.  Well, we noticed that the home sales market in Wasco area

904

1   is continue deteriorate since '07, '08, '09, and even right

2   now, it still continues to slide down.

3   Q.  This number that's shown on the screen right now, the $6.6

4   million?

5   A.  Yes.

6   Q.  What does that number represent?

7   A.  It represents the 18 homes sold -- actually sell plus 12

8   homes.  And at that time I sold at a weak projection, the home

9   sale price, to get it.

10  Q.  Thank you, sir.  Now, I also notice on this summary that

11  you have made a calculation of projected sales revenue for

12  your 38 lots, is that correct, towards the middle of the page?

13  A.  Yes.

14  Q.  And what is that number, sir?

15  A.  $851,274.48.

16  Q.  Sir, please look at the screen.  And do you see where I'm

17  pointing right now?

18  A.  Yes.

19  Q.  What is that, sir?  Why did you put that there?

20  A.  That's called a "projected land sale."

21  Q.  And did you make a projection as to what you might be able

22  to sell those 38 lots for?

23  A.  Yes.

24  Q.  What number did you come up with?

25  A.  760,000.

905

1  Q.  You say you have been trying to sell the lots?

2  A.  Yes.

3  Q.  How long have you been trying to sell them for that amount

4  of money?

5  A.  Year and a half.

6  Q.  Have you had any offers for 20,000 per lot?

7  A.  No.

8         MR. BRAZE:  Objection, it's irrelevant.

9         THE COURT:  Overruled.

10         THE WITNESS:  No.

11  BY MR. HASSING:

12  Q.  If you receive an offer for 20,000 a lot, will you accept

13  it and sell those lots?

14  A.  No.

15  Q.  You won't?

16  A.  No, I will sell it, but I have no offer.

17  Q.  I understand you haven't had an offer, but if you get an

18  offer for 760,000, will you accept it?

19  A.  Yes.

20  Q.  All right.  Let's take a look at a few items that

21  Dr. Merati had a problem with.  Do you remember Dr. Merati

22  questioning the amount of commission that you indicate on this

23  summary that you have paid in order to get those 18 houses

24  sold?  Item number 7 here.

25  A.  Yes.

906

1    Q.  And do you recall him saying that he was only willing to

2    use a portion of that number in his summary?

3    A.  Yes.

4    Q.  Now, Exhibit D 217 that you have in front of you, sir,

5    when you prepared that, did you intend that to represent all

6    of the financial documents that have been created and are

7    involved in the construction of your subdivision, or was that

8    just a summary?

9    A.  No.  That's for entire financial, that's for all of this

10   68 lots.

11   Q.  D 217 that's in front of you, sir --

12   A.  Yes.

13   Q.  -- is that a summary or does that include all of the

14   exhibits, all of the documents?

15   A.  Well, it includes all the exhibits and all the documents.

16   Q.  Did you prepare these 14,000 pages I'm looking at right

17   here, sir?

18   A.  Yes.

19   Q.  What are they?

20   A.  Well, this is evidence to supporting document all of this

21   summary that relate to all expenses.

22   Q.  So you just mentioned the word "summary."  What summary

23   are you talking about?

24   A.  Summary for profit and loss.

25   Q.  Is that the book in front of you?

907

1    A.  Yes.

2    Q.  Are these other 30 books here, they the backup information

3    that goes with that summary?

4    A.  Yes.

5    Q.  Explain to the jury, if you would, how it was that you

6    paid $208,000 in commissions.

7    A.  Well, the commission usually that the -- is paid for

8    the -- we the in-house agent.  We pay $4,000 per house and

9    besides that, because other homes sold, other homes go through

10   the outside sales agent, so we had paid up to 3 percent on

11   sales price of the -- each home.

12   Q.  Sir, take a look, if you would, in your summary at tab 7.

13   Tab 7.

14   A.  Yes.

15   Q.  Open it to tab 7.

16   A.  (Witness Complies.)

17   Q.  What is tab 7?

18   A.  This is the spreadsheet for the total commission we paid

19   for.

20   Q.  And is that just a one-page document?

21   A.  Yes.

22   Q.  Do you recall if that was the document that Dr. Merati was

23   looking at?

24   A.  Yes.

25   Q.  And do you recall Mr. Merati saying that he allowed you

908

1    $94,000?

2    A.   Yes.

3    Q.   But disallowed the rest?  You remember that?

4    A.   Yes.

5    Q.   Where would I find the rest?  If I wanted to find out all

6    these commissions you paid, where would I look to find that?

7    Do you know?

8    A.   Well, it is in one of the binders here showing that the --

9    supporting how much we pay per house related commission.

10   Q.   I'm going to hand you, sir, what has been marked as

11   Exhibit and entered as Exhibit D 207, and ask you to take a

12   look at that.  Is there more than one page in that section,

13   Mr. Wu?

14   A.   Yes.

15   Q.   How many pages are in there, roughly?  Just give me an

16   estimate.

17   A.   Well, at least about, I would say maybe 15 to 20 pages.

18   Q.   All right.  If you look in that page D 207, does that

19   provide the backup information to support the rest of the

20   $208,000 that you've paid in commissions?

21   A.   Yes.

22   Q.   Now, you performed your own land cost allocation analysis,

23   correct?

24   A.   Yes.

25   Q.   And take a look, if you would, at -- again, at tab 217,

909

1  tab 15.  Excuse me.  Exhibit D 217, tab 15, page 1.
2  A.  Okay.
3  Q.  What is that, Joe?
4  A.  This is a spreadsheet showing how to allocation the land
5  cost.
6  Q.  Is this the allocation, is this the way you allocated the
7  cost of the land?
8  A.  Yes.
9  Q.  You've got a total purchase price of 1.605 million at the
10 top, correct?
11 A.  Yes.
12 Q.  And then you have allocated 1.36 million of that to the 68
13 lots; do you see that?
14 A.  Yes.
15 Q.  Now, explain to the jury how you came up with that number
16 of 1.38 million?
17 A.  Well, 1.36 million come from, like I explained, using the
18 tax assessor value for finished lot of $20,000, so 68 lots
19 come to 1.36 million.
20 Q.  All right.  Take a look, if you will, at the third page of
21 tab 15.  Are you there?
22 A.  Yes.
23 Q.  What is that third page, sir?
24 A.  This is for the property tax bill.
25 Q.  And it's a property tax bill for what?

910

1   A.   For the 68 finished lots.

2   Q.   Well, is it a property tax bill for all of the lots, sir,

3   or for one lot?

4   A.   This is showing one lot.

5   Q.   What lot is it?

6   A.   I believe right here, it is Lot 30.

7   Q.   All right.   And what is the amount that the County

8   assessed Lot 30 at?

9   A.   Assess value here, 20,000.

10  Q.   Did you get a similar assessment for each of the 68 lots?

11  A.   Yes.

12  Q.   How much did the County assess each of your 68 lots for?

13  A.   $20,000 each.

14  Q.   Is that how you came up with the $1.36 million for the

15  land cost allocation?

16  A.   Yes.

17  Q.   So after you determined that the finished lots were worth

18  1.36 million, and you had paid 1.6 million, how did you then

19  calculate the cost allocation for the 65 acres?

20  A.   I was using the purchase price of 1.605, subtract to 1.36

21  million on the finished value, and remaining come out is

22  245,000 for the low land, 65 acre, approximate.

23  Q.   You came up for a figure of 245,000 for the 65 unimproved

24  acres?

25  A.   That's correct.

1   Q.   You own that land right now?

2   A.   Yes.

3   Q.   What's going on on that piece of land?

4   A.   I have done nothing.

5   Q.   Is anybody using it for anything?

6   A.   Yes, they are farming.

7   Q.   You have leased it to somebody for farmland?

8   A.   Yes.

9   Q.   How much income are you making from that farmland that you

10  have leased?

11  A.   Well, not that much, you know.  Maybe couple thousand

12  dollars a year income.

13  Q.   2,000 a year?

14  A.   Yes.

15  Q.   Now, you remember Dr. Merati -- by the way, do you

16  remember Dr. Merati looking at item 8 on your profit and loss

17  statement, which is Escrow Fees?  Do you remember that, sir?

18  A.   Yes.

19  Q.   Do you remember Dr. Merati -- well, first of all, you have

20  got here, 392,000 for escrow fees or escrow deductions; do you

21  see that?

22  A.   Yes.

23  Q.   Do you recall Mr. Merati only allowed you 196,000?

24  A.   Yes.

25  Q.   All right.  And, again, take a look at tab 8, if you

912

1   would, in Exhibit D 217.

2   A.   Yes.

3   Q.   What does tab 8 illustrate in that exhibit, sir?

4   A.   The tab 8 is showing that the 18 home escrow fee for Lot 1

5   and continued to the Lot 15, that the fee that we paid for the

6   seller and also for buyer and also for both -- paid for buyer

7   and seller together, that we paid for each lot cost.

8   Q.   These are the amounts that were deducted from your closing

9   statements for costs; is that correct?

10   A.   Yes.

11   Q.   And how many sheets of paper in the summary, which is

12   D 217, are included in tab 8?  How many pages in D 17 [sic]

13   that you are looking at closest to you, tab 8, how many pieces

14   of paper in that section?

15   A.   Only one.

16   Q.   All right.  Did you supply Mr. McIntosh's lawyers with

17   additional documentation so that they could ascertain what

18   your escrow fees and deductions were?

19   A.   Yes, I did.

20   Q.   Where are they found?  Do you know where they are found,

21   sir?

22   A.   Yes, I found it.

23   Q.   Where are they?

24   A.   Tab, Exhibit 8.

25   Q.   How many sheets of paper are there in that document,

913

1    roughly?

2    A.  Well, I would estimate it is about 40, 40 pages.

3    Q.  All right.  And take a look at the back of the binder and

4    then see what exhibit that is you are looking at?

5    A.  Okay.  Yes.  Exhibit D 207, D 208, D 209, and D 210 and

6    final, D 211.

7    Q.  You are in the D 208 section, are you?

8    A.  Yes.

9    Q.  All right.  Are all of the documents that substantiate

10   your $392,000 in escrow deductions included in that D 208?

11   A.  Yeah, I believe so.

12   Q.  Take a look at page 2 of your profit and loss summary,

13   which is called Operating Expenses, part of D 217.  Are you

14   there?

15   A.  Yes.

16   Q.  Do you recall that Dr. Merati said that you shouldn't be

17   entitled to write off for expense any medical insurance or

18   Workers' Compensation; do you remember that?

19   A.  Yes.

20   Q.  Tell the jury why you are charging $15,000 in medical

21   insurance to the Lotus job site?

22   A.  Let me see.

23   Q.  That's number D, Mr. Wu.

24   A.  D?

25   Q.  D, under Operating Expenses.

914

1    A.   Okay.  Yeah.

2    Q.   I'm talking about medical insurance?

3    A.   Oh, medical insurance is $15,209.60.

4    Q.   Why are you charging $15,000 in medical insurance premiums

5    to this project?

6    A.   Well, medical insurance is that the one that we had

7    provided to employee that for working to -- especially like a

8    superintendent or any full-time employee that intend to

9    working on the 30 homes, so we gave them a medical insurance

10   benefit.

11   Q.   All right.  The next item down is Workers' Compensation

12   benefit?

13   A.   Yes.

14   Q.   Do you recall Dr. Merati saying that it was improper for

15   you to expense Workers' Compensation insurance premiums to

16   this project?

17   A.   Yes.

18   Q.   Tell the jury why you did that.

19   A.   Well, under the California law, that any worker, we need

20   to provide Workers' Compensation insurance.  So we calculated

21   based on the worker or full-time employee that build home in

22   the Wasco area, that we need to provide a Workers'

23   Compensation expense to those employees.

24   Q.   Now, drop down, if you would, to "I," Housing Expense,

25   Employee.  Do you see that?

915

1    A.   Yes.

2    Q.   And you expensed $35,000 over a four-and-a-half or

3    five-year period to the project, correct?

4    A.   Yes.

5    Q.   Tell the jury why you did that.

6    A.   Well, because the Wasco area was, my employee was -- some

7    is living a little bit far away.  Some come from Modesto, some

8    come from the Sacramento area, so we had provided housing for

9    the employees to stay over there during the time we need the

10   employee to do some service and also related to the

11   construction activities.

12   Q.   Have you had employees living in that house since the time

13   that Lotus purchased the house?

14   A.   Yes.

15   Q.   Are you still have employees living in that house?

16   A.   Yes.

17   Q.   While your employees live in that house, can you do

18   anything else with that house?  Can you rent it out to anybody

19   else?

20   A.   No.

21   Q.   And take a look at number L, Legal and Professional.  And

22   you included an amount that you had paid me for defending you

23   in this lawsuit, correct?

24   A.   Yes.

25   Q.   Now, when you pay me for the work I do for you in this

916

1   lawsuit, what project does that money come from?

2   A.   Usually, that come from the, you know, if we make money on

3   the project, it come from the sale proceeds and profit, I will

4   allocate some money to pay for your fee.

5   Q.   If you don't have enough money in the project to pay those

6   fees, what do you do then?

7   A.   Well, in this case, because we do not make money, so we

8   had to borrow money from a different resource to pay legal

9   fee.

10   Q.   And if those fees are applicable to defending you with

11   regard to this project, which project do you allocate those

12   fees to?

13   A.   Well, the project, we have a few project to support each

14   other, so it is different project other than, you know, the

15   Wasco project.

16   Q.   But the fees that are incurred based on work done related

17   to this project in Wasco are charged to which project?

18   A.   I mentioned that because insufficient money to cover legal

19   fee, we had to borrow that, some money from the private money.

20   Or come from the other projects, if we make money, we are

21   using that money to cover these expense.

22   Q.   But do you do an internal accounting adjustment to show

23   what project those fees are actually charged to?

24   A.   Yes, we do.

25   Q.   What project is that?

917

1  A.  Oh, this is, you know, the Valley Rose Estates.

2  Q.  Okay.  Thank you.

3       Now, Mr. Merati talked about the interest that you

4  paid in building the homes and in financing the land.  Do you

5  remember that?

6  A.  Yes.

7  Q.  And you have indicated on your summary that you have paid

8  $468,000 in interest allocated to the 30 homes, correct?

9  A.  Yes.

10  Q.  And you've also paid interest of $92,000 allocated to the

11  38 lots, correct?

12  A.  Yes.

13  Q.  All right.  Now, does that interest charge, Mr. Wu, does

14  that interest charge have anything to do with the way you

15  allocated the land cost?

16  A.  Yes, related.

17  Q.  And the interest figures that you have used reflect the

18  way you allocated land costs, correct?

19  A.  That's correct.

20  Q.  If you allocated land costs the way Dr. Merati did, you

21  would have different interest figures as expenses on the

22  summary, wouldn't you?

23  A.  Yes.

24       THE COURT:  Let me know when you have a natural break

25  in your questioning, please.

918

1          MR. HASSING:  Right here, your Honor.

2          THE COURT:  Ladies and gentlemen, we are going to

3    take the noon recess.  It is now noon.  Let's come back at

4    1:15, ready to resume this witness.  Please remember the

5    admonitions not to discuss the case, or, frankly, do anything

6    about the case during the time we leave now until we come back

7    at 1:15.  Any questions, issues, problems?  See you at 1:15.

8          You may step down, thank you.

9          (The jury left the courtroom.)

10         THE COURT:  The jury has left.  Any issues?  All

11   right.  How many more witnesses -- off the record.

12         (Discussion off the record.)

13         (The lunch recess was taken.)

14

15

16

17

18

19

20

21

22

23

24

25

919

1                          AFTERNOON SESSION

2    1:15 p.m.

3           (The following proceedings were had outside the

4           presence of the jury, to wit:)

5           THE COURT:  Back on the record.  Counsel and parties

6    are present.  Are we ready for the jury?

7           MR. HASSING:  Yes.

8           THE COURT:  Okay.  We are ready for the jury.

9           Sir, if you would retake the stand.

10          THE WITNESS:  Yes.

11          (The following proceedings were had in the presence

12          of the jury, to wit:)

13          THE COURT:  All right.  The jury has joined us.  Any

14   issues, ladies and gentlemen?

15          Okay.  We are ready, then, to complete the direct

16   examination, Mr. Hassing.

17   BY MR. HASSING:

18   Q.  Mr. Wu, you were here during opening statements, right?

19   A.  Yes.

20   Q.  And you understand, do you not, that Mr. McIntosh contends

21   that if Lotus or Northern made any profit, that he would be

22   entitled to all of that profit, right?

23   A.  Yes.

24   Q.  You understand that he -- that his contention is based on

25   the belief that you somehow used his plans and map to create

1   this subdivision, right?

2   A.   Yes.

3   Q.   Now, you have been a builder for how many years, sir?

4   A.   Almost 30 years.

5   Q.   All right.  Could you have sold any of these houses if you

6   had not installed windows?

7   A.   No.

8   Q.   Could you have sold any of these windows if you had not

9   installed plumbing?

10   A.   No.

11   Q.   Could you have built any of these houses if you didn't

12   have a bank loan?

13   A.   No.

14   Q.   Have you copied any map in relation to the Wasco

15   subdivision?

16   A.   No.

17   Q.   Have you copied any plans?

18   A.   No.

19   Q.   Have you made any profit?

20   A.   No.

21           MR. HASSING:  No further questions.

22           THE COURT:  Cross?

23           MR. BRAZE:  Thank you, your Honor.

24   ///

25   ///

1                           CROSS-EXAMINATION

2    BY MR. BRAZE:

3    Q.   Good afternoon, Mr. Wu.

4    A.   Good afternoon.

5    Q.   Now, on direct by your -- examination by your attorney, he

6    said that you, as President for Northern California Universal

7    Enterprises Company, entered into a contract with DeWalt; is

8    that correct?

9    A.   Yes.

10   Q.   And yet isn't it a fact that Lotus paid the bill for

11   DeWalt?

12   A.   I don't recall.

13   Q.   Okay.  Let me show you some invoices.  This is Exhibit

14   J 19.  There is an invoice from DeWalt for Invoice Number

15   105305 from DeWalt to Northern California, and there is a

16   check for Lotus Development for the same invoice, 105305.

17          Here is an invoice from DeWalt, Invoice 1052190, a

18   progress billing, for $1500.  And there is a check from Lotus

19   Development to DeWalt for Invoice 1052190 for $1500.

20          Here is another check from Lotus to DeWalt for

21   $6,061.

22          Does that refresh your recollection that while

23   Northern entered into the contract with DeWalt, Lotus was

24   paying the bill?

25   A.   Well, can be a mistake.

922

1   Q.   All these checks are mistakes; that's your testimony?

2   A.   No.   I'm just saying that Lotus at the time covered the

3   field subdivision, field subdivision, so it can be, you know,

4   internal transaction.

5   Q.   Mr. Wu, isn't it fair to say that Northern California

6   Universal Enterprises Company and Lotus are just legal

7   entities that you use interchangeably for your business; isn't

8   that true?

9   A.   No.

10  Q.   I mean you probably have been advised to try to keep it

11  straight so that Lotus owns the land and that Northern

12  California does the work, but sometimes things get confused,

13  right?

14  A.   Yes.   Sometime it's the secretary that can make a mistake,

15  you know, by using a different entity of a check.

16  Q.   So it is your testimony that your secretary made a mistake

17  and wrote all of these checks to DeWalt on Lotus checks; is

18  that correct?

19          MR. HASSING:   Objection, misstates his testimony.

20          THE COURT:   Rephrase your question, please.

21  BY MR. BRAZE:

22  Q.   I guess I misunderstood.   How is it you said that Lotus

23  paid DeWalt?

24  A.   Like I explained to you, Lotus, this entity was using

25  field subdivision at the time that I see, 2007.   So sometime

923

1   that the secretary can be using a different entity to pay if,

2   at that time, the account does not have the money or whatever

3   reason.  So that's my explanation.

4   Q.  Are you suggesting there was a commingling of funds?

5   A.  I'm sorry, I cannot hear you.

6   Q.  Are you suggesting there was a commingling of funds?

7   A.  No.

8   Q.  Are you suggesting one entity paid bills of the other

9   entity whenever there was checks available?

10  A.  No.

11  Q.  So what is your explanation then as to how Lotus paid the

12  bills of Northern?

13          MR. HASSING:  Objection, asked and answered, your

14  Honor.

15          MR. BRAZE:  I'm sorry, your Honor.  I didn't

16  understand.

17          THE COURT:  It's all right.  The objection is

18  overruled.

19          THE WITNESS:  Well, like I explained to you, can be a

20  mistake by a secretary.

21  BY MR. BRAZE:

22  Q.  Secretary mistake, okay.  Let me show you what's been

23  marked in evidence as J -- I'm sorry.  That's out of your D

24  exhibit that you produced, D 14, I believe.

25          Now, this is the closing statement for purchase of

924

1    the subdivision by Lotus Development; do you see that?

2    A.   Yes.

3    Q.   And there is a deposit by Lotus Development, and there is

4    also a deposit by Crossland Developments, LLC.  Do you see

5    that?

6    A.   Yes.

7    Q.   That's another business entity of yours, isn't it?

8    A.   Yes.

9    Q.   What was Crossland Development's role in the subdivision?

10   A.   Like I explain to you, we do have several different entity

11   during the time of this transaction back to December of 2004.

12   Q.   What is your position with Crossland Development, LLC?

13   A.   I do believe I'm the President.

14   Q.   You are the President of that too also, okay.

15           Now, you had told us before lunch that the insurance,

16   the medical insurance that you wrote off was for the workers

17   at the subdivision; do you recall that?

18   A.   Yes.

19   Q.   Do you recall telling me in your deposition that the --

20   excuse me.

21           Do you recall telling Mr. Travis in your deposition

22   that the medical insurance was for your office workers?

23   A.   Yes.

24   Q.   So are you changing your testimony today?

25   A.   No.  What I'm saying is that the medical insurance, that's

925

1   provided to the full-time employee that doing the Wasco
2   project.
3   Q.  Let me read to you from page 102, line 9 through line
4   15 -- excuse me, line 18.
5           "Question:  Isn't this a summary of the health
6               insurance for all of your employees?
7           "Answer:  I believe this one here, health insurance is
8               for people I believe when they are working in the
9               office, usually in the office area, because the
10              office, they do for all project, so they share a
11              percentage of health insurance.
12          "Question:  I see.  And so as I understand it, the
13              total amount of insurance you paid for all those
14              workers was $304,000?
15          "Answer:  Right."
16          Now, Mr. Wu, see if I can get this straight.  What
17  Lotus purchased in December of 2004 from the City of Wasco was
18  about a hundred acres, correct, 97 acres?
19  A.  Yes.
20  Q.  And was that Parcel 1, 2, and 3?
21  A.  Can you tell me which one is Parcel 2?
22          No.  We only purchased Parcel 1 and Parcel 3.
23  Q.  Parcel 3.  So that's about a hundred acres.  And most
24  recently, you had Parcel 3 on sale for $2.8 million?
25  A.  No.

926

1          MR. HASSING:  Your Honor, I object to the question.
2     That's beyond the scope.  Move to strike the question and the
3     answer.
4          THE COURT:  It appears as though it is beyond the
5     scope.
6          Why isn't it?
7          MR. BRAZE:  Because he was talking about how much
8     money he was losing at this point.
9          MR. HASSING:  Your Honor, even if he was talking
10    about how much money he was losing, a listing, if he had one,
11    does nothing to change or address how much money he is losing.
12         THE COURT:  Well, this isn't listing.  This is
13    talking about -- well, isn't that true?  I mean it is not as
14    though he had to use only the monies that had to do with this
15    project to purchase anything.
16         MR. BRAZE:  Well, this has to do with Mr. Merati's
17    testimony, as you recall, that the plan was beyond --
18         THE COURT:  The objection is sustained.
19    BY MR. BRAZE:
20    Q.  So you bought the 35 acres?
21    A.  33 acres.
22    Q.  33 acres.  And then you bought the 64 acres, correct?
23    A.  Yes.
24    Q.  That amount, you paid 1.6 million for those two?
25    A.  1.605.

927

1   Q.   605.   And this morning, we understand you bought the golf

2   course too?

3   A.   Yes.

4   Q.   How much did you pay for the golf course?

5           MR. HASSING:   Objection, relevance, your Honor.

6           THE COURT:   Sustained.

7   BY MR. BRAZE:

8   Q.   Now, you were present during the deposition of Dr. Merati,

9   were you not?

10  A.   When?

11  Q.   In this trial.

12  A.   Yes.

13  Q.   And did you listen to his testimony?

14  A.   Yes, I do.

15  Q.   And did you hear his testimony when he said that you had

16  front-end loaded the 30 homes with so much of your interest

17  expense that it would be foolish for you to sell the lots for

18  a loss; did you hear that?

19  A.   Yes.

20  Q.   And you are a fairly substantial businessman, aren't you,

21  Mr. Wu?

22          MR. HASSING:   Objection, relevance.  Foundation.

23          THE COURT:   On those two grounds, it's overruled.

24  BY MR. BRAZE:

25  Q.   I mean you own the golf course at Wasco, you own a hundred

928

1   acres right next to it.  Are you suggesting that --

2          MR. HASSING:  Objection.  Wealth information is --

3          THE COURT:  That's what it appears to be bordering

4   on.

5          MR. BRAZE:  It's not.

6          THE COURT:  I will make that decision.  I think it

7   is.  Let's move on or get more specific.

8   BY MR. BRAZE:

9   Q.  Are you suggesting that you are intentionally selling the

10  38 unimproved lots for a loss of $1 million?

11  A.  38 finished lots.  It is not unimproved lot, it is the

12  finished lot.

13  Q.  But the summary you presented to the jury shows you are

14  going to sell those lots and lose a million dollars; isn't

15  that what it says?

16  A.  The reason I decided to sell --

17         THE COURT:  No.  Answer his question.

18         THE WITNESS:  Yes, I want to sell.

19  BY MR. BRAZE:

20  Q.  You are telling us you are intentionally selling those 38

21  lots so you can lose a million dollars?

22  A.  Yes.

23         MR. BRAZE:  I would like to read Responses to Request

24  For Admissions.

25         THE COURT:  Was more than one set sent out?

1          MR. BRAZE:  Yes, they are to two different

2    defendants.

3          THE COURT:  Could you give us the date?

4          MR. BRAZE:  Sure.  First is a set of Request For

5    Admissions from plaintiff to defendant, Northern California

6    Universal Enterprises Company, Set Number 1.

7          MR. HASSING:  Your Honor, I believe this might be

8    beyond the scope.  I don't have my set.  Could I see what he

9    is going to read before he reads it?

10         THE COURT:  That's fine.  Go ahead and tell us, what

11   is the date of it and what number, so if anybody else can

12   look, they can.

13         MR. BRAZE:  Request number 19, dated -- served on

14   February 2nd, 2009.

15         THE COURT:  Okay.

16         MR. HASSING:  No objection, your Honor.

17         THE COURT:  Go ahead and read.

18         MR. BRAZE:  This was propounded to Northern

19   California Universal Enterprises Company.

20         "Request For Admission Number 19.  Admit that your

21          purpose in developing Tract Number 6451 was to make a

22          profit on the sale of homes built on the lots on that

23          tract.

24         "Response:  Admit.

25         "Request For Admission From Plaintiff to Lotus

930

1              Developments, LP.  Request number 19.  Admit that

2              your purpose in developing Tract Number 6451 was to

3              make a profit on the sale of homes built on the lots

4              on that tract.

5         "Response:  Admit."

6         That's all I have, your Honor.  Thank you.

7         THE COURT:  Mr. Alexander?

8         MR. ALEXANDER:  No, thank you, your Honor.

9         THE COURT:  City, either one?

10        MS. BARNES:  No, thank you, your Honor.

11        THE COURT:  Mr. Hassing?

12                   REDIRECT EXAMINATION

13   BY MR. HASSING:

14   Q.   Mr. Wu, you were just asked a question about selling your

15   38 lots and losing a million dollars; do you recall that?

16   A.   Yes.

17   Q.   Now, you bought 68 lots, right?

18   A.   Yes.

19   Q.   And you allocated $20,000 per lot of the cost to each lot,

20   right?

21   A.   Yes.

22   Q.   And that came out to $1,360,000; is that correct?

23   A.   Yes.

24   Q.   Now, how many lots have you built on?

25   A.   30.

931

1   Q.  And those lots were each worth $20,000?

2   A.  Yes.

3   Q.  And so you've used up $600,000 worth of lots, right?

4   A.  Yes.

5   Q.  How many lots do you have left?

6   A.  38.

7   Q.  And what are those lots -- what did you allocate as far as

8   cost to those lots?

9   A.  Times 20.

10  Q.  $20,000 per lot?

11  A.  Yes.

12  Q.  So you paid 760,000 for those lots, right?

13  A.  Yes.

14  Q.  And if you sell those lots for 760,000, are you going to

15  lose a million dollars?

16  A.  No.

17  Q.  Are you going to lose anything?

18  A.  No.

19          MR. HASSING:  Thank you.

20          THE COURT:  Any recross?

21          MR. BRAZE:  Yes, your Honor.

22                    RECROSS-EXAMINATION

23  BY MR. BRAZE:

24  Q.  Let me show you your exhibit, Mr. Wu, number D 217.  This

25  exhibit was prepared by you, was it not?

932

1   A.  Yes.

2   Q.  Doesn't that exhibit show that you planned, according to

3   this, to lose $978,000 on the sale of these lots?

4   A.  Yes.

5   Q.  And that projects a total loss of a million dollars, does

6   it not?  See the parentheses around the number means it is a

7   negative loss?

8   A.  Yes.

9   Q.  So is it your testimony that you are going to lose a

10  million dollars selling these lots?

11  A.  Yes.

12          MR. BRAZE:  Thank you.

13          THE COURT:  Anything else?

14          MR. HASSING:  Nothing further, your Honor.

15          THE COURT:  Thank you, sir.  You may step down.

16          MR. HASSING:  I have no further questions, your

17  Honor.  We rest.

18          MR. ALEXANDER:  No further questions, your Honor.

19          MR. OKADIGBO:  No further questions, your Honor.

20          THE COURT:  Rebuttal then?

21          MR. BRAZE:  We would recall Roger McIntosh.

22          Is this a time to consider that motion or do you want

23  us to do our rebuttal first?

24          THE COURT:  Does it affect your rebuttal?

25          MR. BRAZE:  No.

1           THE COURT:  Then rebuttal.

2                      **ROGER MCINTOSH**,

3     called as a rebuttal witness on behalf of the Plaintiff,

4     having been previously sworn, testified as follows:

5                      DIRECT EXAMINATION

6     BY MR. BRAZE:

7     Q.   Mr. McIntosh, when you were working on Tract Number 5472,

8     were the improvements plans required before the improvements

9     could be put in?

10    A.   Yes.

11    Q.   And earlier today, you were present, were you not, during

12    the testimony of Mr. Wong?

13    A.   Yes, I was.

14    Q.   Mr. Wong, on Exhibit D 500, drew a pink line, what he

15    claimed to be a boundary line.  Is that the correct boundary

16    for your map?

17    A.   No.

18    Q.   And why not?

19    A.   Because the -- when you do a tract map, you designate

20    certain parcels or parts of the original parcel as not a part

21    or designated remainder.

22           So on my tract map, the correct boundary of the

23    original parcel would be Parcel 1 of Parcel Map 9572, which

24    goes down to Highway 46 and includes the two "not a part"

25    properties.

934

1   Q.  It would follow this bearing and then across and up?

2   A.  Yes, that's correct, which is the same as Tentative Tract

3   6451.

4   Q.  Have you had an opportunity to compare the grading plans

5   to your tract map or the -- excuse me.  Let me withdraw that

6   question.

7          Have you had an opportunity to compare the grading

8   plans that you prepared for Tentative Map 5472 to the final

9   tract map prepared by DeWalt for 6451?

10  A.  I have compared the grading plan for 5472 to the final map

11  of Tract 6451, which that's the tentative map there.

12  Q.  Thank you.  They all start to look alike after a while.

13         Maybe you can tell me what the results of your

14  comparison was between the grading plan from your improvement

15  plans on Tract 5472 with the final map prepared by DeWalt for

16  6451.

17  A.  Well, I found it interesting that the final map for 6451

18  does not match the Tentative Tract 6451, in that a tentative

19  map is a concept of how you are proposing to subdivide the

20  property, and things can change between the tentative map and

21  the final map.

22         When we prepared Tentative Tract 5472, we had a

23  concept, and, for example, some of these easements that were

24  mentioned earlier, the cart path easements and the paseos were

25  shown as 10-foot wide on our Tentative Tract 5472.  We changed

1    that on our grading plan to, I believe they are 15-feet wide.

2           That, interestingly enough, also shows up on the

3    final map that DeWalt prepared, as they are now 15-feet wide.

4    Q.  So that cart path there, that cart path there, and this

5    cart path right here are all 15-feet wide?

6    A.  That's correct.

7    Q.  And --

8    A.  So those are identical to our grading plan.

9    Q.  On the tentative tract map DeWalt drew, they are 16-feet

10   wide, correct?

11   A.  I believe so, yes.  They are 16 feet on his tentative map,

12   but they turned out to be 15 feet on the final map, which is

13   the same as our grading plan.

14          In addition -- I'm sorry.

15   Q.  If they were measured when they were surveyed, they should

16   be the same on both maps, correct?

17   A.  That's correct.

18   Q.  Are there any other similarities between your grading plan

19   and DeWalt's final tract map?

20   A.  Yes, there is several.  The Valley Rose Parkway, we had

21   shown on our grading plan a 15-foot landscape easement.

22          MR. ALEXANDER:  Excuse me.  This doesn't appear to be

23   rebuttal, but rather a case-in-chief that's being put on.

24          MR. BRAZE:  I thought it's all we have been talking

25   about the last week.

1              THE COURT:  It has been, but has it been -- no, the

2       objection is overruled.  I understand what your objection is,

3       I understand.  He did talk about it on direct and he can't

4       just say the same thing, but other witnesses on the defense

5       side have talked about this issue.

6              MR. HASSING:  Your Honor, I don't recall anybody

7       talking about the grading plan on the defense side.  Now all

8       he is doing is he is comparing.

9              THE COURT:  Hang on.  Who did?

10             MR. BRAZE:  Well, it was introduced through a defense

11      witness, as I recall.  In fact, Mr. DelMarter had it.

12             MR. OKADIGBO:  Your Honor, if I may --

13             MR. ALEXANDER:  Wait.

14             MR. BRAZE:  It was introduced in evidence by itself

15      before P 108 was introduced.

16             MR. HASSING:  DelMarter was his witness.  DelMarter

17      put it --

18             THE COURT:  I understand that part.

19             MR. HASSING:  No defense witness talked about the

20      grading plan at all that I can recall, and now that's all

21      Mr. McIntosh is talking about.

22             THE COURT:  I understand.

23             MR. OKADIGBO:  And just to add to it, the only thing

24      that was discussed about the grading plan before was

25      similarities in bearings.  Now they are proceeding to add

1   several more things, it seems like.

2            THE COURT:  Are you disagreeing with Mr. Hassing?

3   Are you suggesting that a defense witness testified in that

4   regard?

5            MR. OKADIGBO:  I'm not disagreeing with Mr. Hassing.

6            MR. HASSING:  I think he is referring to

7   Mr. DelMarter.

8            THE COURT:  I understand.  Anything else?

9            MR. BRAZE:  About?

10           THE COURT:  About this issue, about the objection.

11           MR. BRAZE:  I'm sorry, I assumed it was rebuttal to

12   show that the grading plan was identical to the final tract

13   map.

14           THE COURT:  The objection is sustained.  The

15   testimony in this -- on this issue, unless you are asking --

16   let me ask.  I should back up.

17           Are you suggesting that Mr. McIntosh is disagreeing

18   or is going to disagree with one of the witnesses that you

19   brought into the courtroom on this issue of grading map?

20           MR. BRAZE:  No.  I thought we had Mr. Gutierrez up

21   here talking about it.  Maybe I'm missing the point.  But I

22   thought these issues have been coming and going all day long

23   about the similarities between all the maps.

24           THE COURT:  It is your position that you believe

25   Mr. Gutierrez talked about the grading map?

MCINTOSH X

938

1        MR. BRAZE:  I believe so.

2        THE COURT:  Anything else?

3        MR. BRAZE:  That's all.

4        THE COURT:  Objection is sustained.

5        MR. BRAZE:  Okay.  That's all I have, your Honor.

6        THE COURT:  Any cross-examination?

7        MR. ALEXANDER:  Yes, your Honor.

8                        CROSS-EXAMINATION

9   BY MR. ALEXANDER:

10  Q.  Mr. McIntosh, in conjunction with a tentative map, if you

11  designate something as "not a part" or as a "designated

12  remainder," then the planning staff cannot comment on it or

13  condition it; isn't that correct?

14       MR. BRAZE:  Objection, beyond the scope of direct.

15       MR. ALEXANDER:  The testimony --

16       THE COURT:  The objection is overruled, because it is

17  within the subject matter of that which was on direct.

18       Do you understand the question?

19       THE WITNESS:  Yes, sir, I do.

20       THE COURT:  Go ahead and answer, if you can.

21       THE WITNESS:  It's a somewhat complex answer.

22  BY MR. ALEXANDER:

23  Q.  If you listen to my question, perhaps you can answer it.

24  If something is designated on a tentative map as "not a part,"

25  that is intended to mean not a part of the tentative map,

939

1   correct?

2   A.   No.

3   Q.   It means something different, right?

4   A.   That's correct.

5   Q.   All right.  And if something is designated as a designated

6   remainder, that is not a part of the tentative map, correct?

7   A.   No, not necessarily.

8   Q.   And if something is designated as not a part of the map,

9   or is identified as a "designated remainder," then the City

10  cannot impose conditions upon those parcels that are not a

11  part of it, right?

12  A.   No, not necessarily.

13       THE COURT:  "No," they can't, or "no," it's not true.

14       THE WITNESS:  No, it's not the way it's practiced.

15  BY MR. ALEXANDER:

16  Q.   And with regard to the cart path size, Mr. McIntosh, do

17  you know whether or not the cart path size, meaning the path

18  itself, is ten feet?

19  A.   I don't believe they are ten feet.

20  Q.   The path.  Not the easement, the path?

21  A.   I don't know.

22  Q.   Have you ever been out there to look at it?

23  A.   I would have to look at the improvement plans.

24  Q.   Do you know whether or not the easement runs from wall to

25  wall or is it open?

940

1   A.  I don't know if the walls were correctly constructed per

2   the final map or per the improvement plans.  I don't know.

3   Q.  Never gone out to do any of that work?

4   A.  I have never gone out and measured them.

5        MR. ALEXANDER:  Thank you.  No further questions,

6   your Honor.

7        MR. OKADIGBO:  No further questions, your Honor.

8        THE COURT:  Anything further?

9        MR. BRAZE:  No, your Honor.

10        THE COURT:  Thank you, sir.  You may step down.

11        Any further rebuttal?

12        MR. BRAZE:  No, your Honor.

13        THE COURT:  Any surrebuttal?

14        MR. ALEXANDER:  No, your Honor.

15        MR. HASSING:  No, your Honor.

16        MR. OKADIGBO:  No, your Honor.

17        THE COURT:  Ladies and gentlemen, you have now heard

18   all the evidence in the case.  There are some legal matters

19   that I must take care of now.  I have tried to do my best to,

20   and counsel have too, in handling the legal issues before you

21   come or after you leave.  But when all of the evidence is in

22   and both sides rest as far as the evidence is concerned, which

23   is just what has happened here, I have to, by law, take care

24   of the legal issues now.

25        And one of the legal issues that I'm going to be

1  taking care of are any other issues that are left and

2  remaining concerning the verdict form and/or the jury

3  instructions.

4        And we have been working on those all along, but as I

5  said, there are certain things, the details of which we cannot

6  work on until everybody has rested.

7        So what I'm trying to do is I'm trying to explain to

8  you why I'm going to have you go back into the jury room for

9  just a little while, and we will handle those.

10       We won't be taking a break out here.  We will be

11  handling those.  And then when you come back, I will be giving

12  you the rest of the instructions, in other words, the rest of

13  the law in this case, and then we will move forward into the

14  area of closing arguments.

15       But remember, even though you have now heard all the

16  evidence, you haven't heard all the law and you haven't heard

17  the arguments.  And closing arguments are part, by law, of the

18  case.  Please don't start any deliberations, don't talk about

19  the case.

20       Any questions?  If you could return to the jury room,

21  as soon as we are done here, we will bring you right back out.

22  There won't be any delay.

23       (The jury left the courtroom.)

24       THE COURT:  All right.  Let the record reflect that

25  the jury has left the courtroom.

1          First issue -- I believe there are two pending, and

2    we will see if there are any others.  One is Instruction

3    Number 33.  Defendant City has made the motion to exclude the

4    Instruction Number 33.

5          And is plaintiff still objecting?

6          MR. TRAVIS:  Yes, we are, your Honor.

7          THE COURT:  Okay.  Then I need you to tell me or give

8    me an example of evidence where this instruction would apply.

9          MR. TRAVIS:  Yes, your Honor.  Actually, you have

10   asked us to provide you with some facts that would support

11   that instruction, and we have about six so far.

12          The first is that both Woodcock and McNamara, both

13   the former and current Planning Directors for the City of

14   Wasco, said the tentative map comes first and then

15   improvements are based on the improvement plans that come

16   shortly thereafter.

17          Secondly, even today, John Wooner said that the Tract

18   Map 5472 was relevant because the tract was built based upon

19   that map, meaning the 5472 map.

20          DeWalt has admitted that they have gone out and they

21   found many of McIntosh's monuments and markers.  There were

22   some missing that they had to replace, but many of the surveys

23   were based upon what was already put out there by

24   Mr. McIntosh's firm.

25          Even today, Mr. Wong stated, and I'm quoting, "You

943

1    had to make the 6451 map conform to McIntosh's map because if

2    they didn't, you would have to tear out the improvements."

3           Also, the notes on the 6451 map state that the

4    improvements were built per the 5472 improvement plans.

5           There has been testimony that the associative

6    improvements plans by Mr. Woodcock and others, that they were

7    Mr. McIntosh's plans.

8           And, lastly, Mr. McIntosh had testified that the

9    improvement plans were created before the improvements were

10   put in, along the same lines as Mr. McNamara and Woodcock, and

11   that was because those improvements were based upon his plans.

12   To that extent, it is a copy of a copy.

13          Now, we are not claiming that we can go out and

14   copyright the -- what's on the ground anymore than you can say

15   that you can copyright the music in the air that happens to be

16   carrying the musical notes of the original work that's on

17   deposit in the Copyright Office.  In the same way the courts

18   have held that certain photographs of ballet performances

19   could violate the copyright of the dance.  Now, it's not the

20   copyright that they are actually displaying; that's usually in

21   the script that's deposited.

22          What we think is that the position of the defendants,

23   then, is that anyone can go out, as long as the copyright is

24   expressed in a non-copyrightable medium, and they can go out

25   and they can go ahead and copy that, disclaim any knowledge of

944

1  the original work, and, therefore, it's independent.

2         It is not a independent creation.  That is a

3  dependent creation on something that was purely based on

4  Mr. McIntosh's original works.

5         THE COURT:  Is it your position that, although you

6  have given me some examples of what you believe would allow

7  that, are you suggesting that the independent creation is out

8  of this case, or is that not what you are arguing?

9         MR. TRAVIS:  We believe there is no evidence to

10 suggest that there was independent creation.

11        THE COURT:  And if there were, would you believe that

12 Instruction 33 were still appropriate?  Yes or no.

13        MR. TRAVIS:  It would still be appropriate because

14 there is --

15        THE COURT:  I understand.  You have answered it.

16        MR. TRAVIS:  Okay.

17        THE COURT:  Okay.

18        MR. OKADIGBO:  Your Honor, the City contends that

19 plaintiff's position that you can't copyright what's on the

20 ground is precisely what we agree with; in other words,

21 persons and entities can go out to the subdivision and draw

22 what they observe.  That is an independent creation.

23        The fact that the improvements --

24        THE COURT:  That's why I asked the last question I

25 asked him.  I think you are both in agreement with that.  And

1   I think what you are in disagreement with is his position --

2   plaintiff's position is that there is no evidence of

3   independent creation from which the jury could make that

4   determination and arrive at your affirmative defense.  Your

5   position is there is.

6          But -- and that's a different issue from what I think

7   we are talking about now.  What we are talking about right now

8   is whether or not there is anything, any evidence from which

9   the jury could determine and decide, that would in any way

10  bring Instruction 33 into play.

11         MR. OKADIGBO:  The City's position is that there

12  isn't.  The physical improvements in the ground are not third

13  copies within the meaning of Instruction Number 33.

14         THE COURT:  That's not what Mr. Travis was arguing.

15  He wasn't arguing that because the improvements were in the

16  ground that, as a result of that, that Instruction 33 should

17  be included.  That's not what his argument is.

18         MR. OKADIGBO:  My understanding from reading

19  Mr. Travis' trial brief is that he is planning to state that

20  the improvements in the ground are derivative of

21  Mr. McIntosh's original plans and, therefore, copying the

22  improvements -- copying or drawing the improvements is the

23  same thing as copying the original.  That seems to me what

24  they were arguing.

25         THE COURT:  Maybe I missed it.

1        Is that what you said, Mr. Travis?

2        MR. TRAVIS:  No.

3        THE COURT:  I don't think that's what he is arguing.

4        Mr. Hassing?

5        MR. HASSING:  If I understand Mr. Travis correctly

6   then, in closing argument, they are not going to tell the jury

7   that if DeWalt went out and drew what was on the ground, that

8   that is infringement, just as if DeWalt copied the paper map.

9        THE COURT:  Let's, just so we make sure we all

10  understand, let's assume that the jury believes, and it was

11  un -- just not refuted.  It is without contradiction that

12  DeWalt went out there and never saw the improvement map, never

13  thought about the improvement map, never thought about the

14  need for one, never realized one existed, didn't look for one.

15  Just never had anything to do with it.  They went out there

16  and they looked at the improvements, did their surveys on the

17  improvements, and came up with a tract map.

18        Would it be your argument under those circumstances,

19  under those very limited circumstances, that that would be

20  enough for a copyright violation?

21        MR. TRAVIS:  It would be enough to defeat independent

22  creation, yes.  That's one part of our argument.

23        THE COURT:  That would be enough for -- well, before

24  we get there, I'm asking you if you think that that would be

25  enough for a copyright violation.

1          MR. TRAVIS:  If we could show -- well, the problem

2     with that hypothetical is that you still have to get through

3     the access of substantial similarity.  So assuming we had gone

4     through that --

5          THE COURT:  No, no.  I'm asking my question for -- I

6     don't want you to argue about all the reasons that there is

7     other evidence here for other purposes, other reasons.

8          I want you to just state, wholly limited in the

9     strapping that I'm giving you here, in other words,

10     confinement to this question, what is your answer?

11          MR. TRAVIS:  Well, your Honor, that's difficult to

12     say because its independent creation is a defense --

13          THE COURT:  I'm not talking about independent

14     creation.  I'm talking about before we even get to the

15     affirmative defense of independent creation, I'm talking about

16     whether or not you believe that that would still be argument

17     for a violation of copyright?

18          MR. TRAVIS:  Yes.

19          THE COURT:  Okay.  What else?

20          MR. OKADIGBO:  That's the precise point I have been

21     making.

22          THE COURT:  I'm saying as a matter of law, that would

23     be wrong.  But on the other hand, I am just talking about it

24     would be wrong, his answer would be wrong, I believe, legally,

25     based on the question I gave him.

948

1          Now we are bringing the issue into a little bit more

2     of the reality of the evidence, the expanse of the evidence

3     here.  And that is that it would appear to me that Instruction

4     33 should be given because I believe that there is evidence

5     from which they can argue that, not based on the fact that

6     just because somebody went and looked at the improvements in

7     the ground and came up with a survey, that that would be

8     enough for copyright violation, because I believe under those

9     circumstances, if that's what the jury believes, the plaintiff

10    is done.

11         Having said that, they are not necessarily done based

12    on the evidence here.  There are factual determinations for

13    the jury to make, not for me to make in law and motion issue.

14         MR. OKADIGBO:  May I ask what the third work in this

15    instance would be then if it's not the --

16         THE COURT:  I think Mr. Travis adequately answered

17    that question when he was arguing his position.  He is arguing

18    things you don't agree with; in other words, you don't believe

19    that those things exist, but that's up to the jury to

20    determine, not up to me.

21         MR. OKADIGBO:  Well, your Honor, there was no

22    presentation of a third work.  He said in his trial brief and

23    throughout that the third work essentially is the improvements

24    in the ground.  There has been no evidence of a third work.

25         THE COURT:  Maybe I misunderstood him, but I didn't

949

1    hear that in his argument.  And that's why I specifically,

2    because of what your concern was, that's why I specifically

3    asked him that question and limited the question to what I

4    asked, to see if that was his position.

5          He said yes, but there was more.  If it were yes and

6    that was the end of the argument, I would agree with you.  But

7    I don't know what the jury is going to determine based on the

8    evidence in this case.

9          MR. OKADIGBO:  Okay.  Can the City then ask this?

10   That if the jury instruction is going to stand as it is, that

11   he not be permitted to argue to the jury that drawing the

12   improvements out in the field is infringement?

13         THE COURT:  By itself?

14         MR. OKADIGBO:  By itself.

15         THE COURT:  Alone, nothing more?

16         MR. OKADIGBO:  Correct.

17         THE COURT:  If he does, I would expect an objection

18   that would be sustained.

19         MR. OKADIGBO:  Okay, your Honor.

20         THE COURT:  And I'm not inviting a lot of objections

21   during closing because, frankly, I don't think it's fair to

22   one side or the other.  I try to explain to the jury that

23   lawyers don't agree on the evidence generally, and they don't

24   agree on how the evidence fits into the law, which is why we

25   are giving arguments.  Most of the time lawyers don't just get

1   up and say, "Well, I agree with what he said," and sit down.

2          So I understand that part.  So what I'm trying to do

3   is say, unless there is a -- an absolute statement of --

4   misstatement of law like I think that would be, I'm not

5   inviting a lot of arguments that -- a lot of objections that

6   throw counsel off on either side.

7          Mr. Alexander?

8          MR. ALEXANDER:  My only comment is, your Honor, it

9   seems as though the only purpose of 33 is to allow the

10  plaintiff to argue that there was a copying of the work in the

11  field into a map form, thereby, violating.

12         THE COURT:  Let's find out.  Who is going to argue?

13         Mr. Braze, how, if at all, are you planning on using,

14  from a factual standpoint, Instruction 33?

15         MR. BRAZE:  I'm using it as a defense to independent

16  creation.  I'm not going to argue that he violated the

17  copyright by going out there and surveying it.

18         THE COURT:  Well, what are you going to argue with

19  regard to Instruction 33 if -- you are telling me what you are

20  not going to argue, but you are not telling me what you are

21  going to argue.

22         MR. BRAZE:  Well, I don't know what I'm going to

23  argue in rebuttal, but my intent is to argue that there is

24  plenty of evidence of direct copying, but I don't need to

25  prove that.

951

1          THE COURT:  If there is plenty of evidence of direct

2    copying by the defense, that's what not 33 is about.

3          MR. BRAZE:  I agree.

4          THE COURT:  So if you are not planning on using it

5    for any other reason, sounds like 33 should be gone.

6          MR. BRAZE:  Well, I'm saying in response, I could say

7    if they really wanted to say they went out there and copied

8    what was on the ground to make their maps, that is a

9    derivative work, and we believe that's a copyright violation.

10          THE COURT:  Well, that's exactly what I said.

11          MR. BRAZE:  But I don't think that's my strongest

12    argument.

13          THE COURT:  Well, the real question is, is it your

14    argument at all as a matter of law; are you able to make that

15    argument?

16          MR. BRAZE:  I was relying on Mr. Travis to make that

17    legal argument for me.

18          MR. ALEXANDER:  That's my point, is I don't think, as

19    a matter of law, you can even make the argument.

20          THE COURT:  That's why I said, if an objection were

21    made under those circumstances, I would sustain it.  I think

22    I'm giving the plaintiffs a sizable hint here that would not

23    be a good thing for them to argue.

24          But if that be the case, where does 33 come in?  It

25    sounds like it doesn't.

1          MR. TRAVIS:  Your Honor, it does.  And I want to move

2   us away from your hypothetical that's very limited and into

3   what it is that we have to prove, which is, apart from some of

4   the direct evidence of copyright infringement, we are also

5   moving into indirect, or what we believe are indirect,

6   evidence of copyright infringement, which is access, to

7   substantial similarity, to which they have to say, "Well, no,

8   no, no, no, we independently created this."

9          But in order for them to show that it's independently

10  created, they have to then demonstrate that somehow they did

11  this separate and apart from Mr. McIntosh's work.

12         Well, if all the evidence was in factually, or what

13  we believe is the evidence, shows that, no, the works that

14  were in the grounds were based -- in fact it is even right on

15  the map itself -- were based upon his work, that's not an

16  independent creation.

17         THE COURT:  Oh, no.  Okay.  That's your best argument

18  on 33?

19         MR. TRAVIS:  I don't know if it's my best.  It's what

20  comes to my mind as I'm arguing before you.  If you want to go

21  ahead and limit it to what we can't say, then we can work it

22  out.  If you believe it is in violation, then we simply won't

23  make it.

24         But I'm not going to tell you that's an exhaustive

25  list on all the ways I could interpret 33.

1          THE COURT:  All I'm looking for is one way that you

2     can use it.  Not based on what you are going to argue, but

3     just one way you can use Instruction 33, and I'm not hearing

4     it.

5          Frankly, I honestly don't think it is a huge thing in

6     this case, but, you know, that is not a basis upon which to

7     give or not give an instruction.

8          MR. TRAVIS:  Well, I mean we have the Court's -- we

9     have taken the Court's hint and we understand it, and we

10    certainly won't go there as far as anything that you say what

11    not to argue.

12         If we can think of anything other than what we have

13    said that we will argue on which you said don't argue, then we

14    will make it.

15         MR. ALEXANDER:  Your Honor, just for one moment, who

16    the heck really knows what's important to the jury --

17         THE COURT:  That's true.

18         MR. ALEXANDER:  -- but if the jury is led to believe

19    by the plaintiffs that the state of the law is not what it is,

20    that's what my concern is.

21         In other words, if the jury were led to conclude that

22    the law says if you go out and survey existing facilities and

23    put them into a map, you violated copyright, that's what I

24    don't want to have happen.

25         THE COURT:  I understand that, and I think I have

1  taken care of that.  But we are really back on 33, and I'm

2  just not hearing any argument, based on the evidence where you

3  think the evidence will fit in, to justify Instruction 33.

4          Anything else?

5          MR. BRAZE:  No, your Honor.

6          MR. TRAVIS:  No, your Honor.

7          THE COURT:  All right.  Instruction 33 is eliminated.

8          The other issue is a plaintiff's motion to amend to

9  proof on the issue of Northern/Lotus contributorily being

10 liable.  It's at page 7, commencing at line 21 of the

11 plaintiff's brief.

12         Are you making that motion?

13         MR. TRAVIS:  We are, your Honor.

14         MR. HASSING:  Your Honor, there has been no evidence

15 offered at all to support any of the elements of contributory

16 infringement, which I think, without looking at it right now,

17 are encouraging infringement, assisting in infringement.

18         There is none of that evidence with respect to

19 Northern.  All we did was hire an engineer and let him do his

20 job.

21         THE COURT:  The law under *Fonovisa* at 76 Fed.3d 259,

22 is as it is stated in their brief, and that is:

23         "The defendant may be liable for copyright

24             infringement engaged in by another if it knew or had

25             reason to know of the infringing activity and

1          intentionally adduced or materially contributed to

2          that infringing activity."

3      So your position is the evidence isn't there?

4      MR. HASSING:  It's not there because right out of

5  Mr. McIntosh's mouth, he admitted that he didn't tell Mr. Wu

6  anything about copyright, either the plans or maps.  And,

7  therefore, Mr. Wu had no reason to know that these plans and

8  maps were even copyrighted.  Had McIntosh told him that, then

9  they might have been able to satisfy element number one.

10     But it's an "and."  You have to satisfy both

11 elements.

12     THE COURT:  Let me ask this.  On the side of the

13 plaintiff, what is the evidence, if there is any evidence,

14 from which the jury can reasonably conclude that these

15 elements are present?  Then you are entitled to the amendment

16 to proof.

17     MR. TRAVIS:  Well, first of all, in response to

18 Mr. Hassing, Mr. McIntosh is not under an obligation to tell

19 Mr. Wu.

20     THE COURT:  I don't think that's the issue.  I think

21 the issue is notice, in other words, knowledge.  Where is the

22 evidence that he had any knowledge?

23     MR. TRAVIS:  Well, it is undisputed at trial that the

24 improvement plans had Mr. McIntosh's name, the copyright

25 notice.  In fact those are what gave Mr. Wu the knowledge to

1  even call Mr. McIntosh in the first place.

2         It was Lotus -- we just established through the

3  invoices that it was Lotus and Northern that were contributing

4  to DeWalt processing that map.

5         They knew from the City of Wasco that that map had to

6  be -- just we heard from Mr. Wooner and Wong today and from

7  McNamara and Woodcock that that map had to conform to what was

8  already preexisting.

9         Therefore, Greg Black had also stated that "If at any

10 time Mr. Wu told us to stop, we would have had to stop."  That

11 they controlled that project.

12        Even the City has said that "We set the conditions,

13 and if anything isn't met, then we have the ability to set

14 whatever conditions we believe are necessary."  They certainly

15 knew about the plans because they are the ones that were

16 sending copies out to the other defendants.

17        THE COURT:  But what I'm hearing you argue is why

18 individual defendants, not just one, but individual

19 defendants, are liable.  In other words, you are citing to the

20 evidence that would indicate that one or more than one of the

21 defendants is liable.

22        MR. TRAVIS:  I thought I was arguing that they knew

23 of the activity, which was the processing of the substantially

24 similar map, in our opinion; and, two, that they intentionally

25 adduced or materially contributed to that infringing activity

957

1    by paying for it, making it happen.

2              That is what meets the elements of *Fonovisa*.

3              THE COURT:  It would appear to me as though the

4    evidence in the best light of the plaintiff, as far as Mr. Wu

5    is concerned, is that he's basically told by the City, you

6    "Are going to have to get a tract map and a final map.  And

7    you are not going to be able to do it yourself.  You are going

8    to have to get an engineer."

9              And Mr. Wu, by some way, in some manner, learned that

10   Mr. McIntosh had done, had been involved in doing the original

11   improvements map.  And as a result, Mr. Wu felt that it was

12   the reasonable thing to do to go there since this guy knew

13   about it, was familiar with it, and so he made a phone call.

14             He didn't -- he wasn't told by anybody that I -- any

15   evidence I heard here, that he needed a new improvement map,

16   an updated improvement map.

17             Did you hear something different?

18             MR. BRAZE:  Let me add, your Honor, remember the

19   phone call with Mr. Wu, between him and Mr. McIntosh, where

20   Mr. McIntosh claimed he was owed money on that map.  Wu knew

21   that McIntosh was exerting a claim of right on that map.  And

22   he --

23             THE COURT:  Wait, wait, wait.  No.  He is told this.

24   He is told, "I am owed a bunch of money on work I have done on

25   this project that hasn't been paid."

1          And Mr. Wu inferred from that that Mr. McIntosh was

2     saying, "You are going to have to pay some or all of that

3     money and then I will come aboard and see what you need."

4          But how does that testimony then move on to the next

5     link of that there was some knowledge by Mr. Wu on behalf of

6     his entities that somebody -- that if Wu hired someone else,

7     some other engineering firm, that anything was going to be

8     used or stolen?

9          MR. BRAZE:  Well, keep in mind -- and I was kind of

10    shocked until today to figure out the time line here -- Mr. Wu

11    didn't buy this property until December 28th, 2004.

12         THE COURT:  Okay.

13         MR. BRAZE:  DeWalt was retained, I believe as early

14    as September, October, 2004, and did their survey in October.

15         THE COURT:  All right.

16         MR. BRAZE:  So they are working out there for Mr. Wu

17    before he is even an owner of the property.  He has had plenty

18    of time to figure out what is going on with these maps and

19    improvement plans.

20         And I believe this conversation with Mr. McIntosh put

21    him on notice that he should have inquired of the City of

22    Wasco what was going on.

23         I additionally had thought that he bought this

24    property and then started to develop it.  He didn't close this

25    deal until the end of December 2004.  So he had all this time

1   to figure out what was going on, what were the claims, and he

2   didn't do it.

3        There are some interesting questions -- and I don't

4   know if we will ever fully know the full truth in this case --

5   as to who called who and what did they do, but it would be

6   hard to believe that Mr. Wu did not know that there was a

7   problem with respect to these improvement plans and maps and

8   that Mr. McIntosh had made a claim.

9        THE COURT:  He did know.  But the only evidence

10  before us here is that what he knew was that the problem was

11  that Mr. McIntosh had not gotten paid for work he had done on

12  the project.

13       MR. TRAVIS:  Your Honor --

14       THE COURT:  That's what the evidence is.

15       MR. TRAVIS:  -- if you look at the contract, in that

16  contract --

17       THE COURT:  Between?

18       MR. TRAVIS:  -- between Northern and also between

19  Northern and DeWalt, it specifically says there "For Expired

20  Tract 5472."

21       I mean he -- they knew full well going into it that

22  they were going to have to create a similar map that met the

23  same conditions for the same improvements, conforming to the

24  same improvement plans that had already been put in there.

25       THE COURT:  That's a strong argument against DeWalt

1    perhaps, but how does that bring in Mr. Wu and any knowledge

2    he might have had as to what DeWalt would do?

3         MR. TRAVIS:  His signature is right on that contract.

4         THE COURT:  That doesn't answer my question.  My

5    question is, if Wu were as smart in engineering as you think

6    he is, he would have just done it himself.

7         MR. TRAVIS:  Well, the Developer Information Package,

8    which Mr. Wu testified that he is the one that received, he

9    knew that he had to have something similar.

10        THE COURT:  Something similar.  What do you mean by

11   that and where do you get that?  Something similar to what?

12        MR. TRAVIS:  Well, the Developer Information Package

13   stated that there was a 5472 map previously that had expired

14   that had existing improvements that were in the ground.

15        THE COURT:  Yes.

16        MR. TRAVIS:  That was what you needed to get it

17   through the Planning Commission, unless you wanted to, as

18   every expert of any witness has said, you have to tear out the

19   improvements.  So Mr. Wu knew quite well that if you want that

20   subdivision and you want to meet the conditions, if you don't

21   want to tear everything out, you make it conform to that map,

22   that map being the 5472 map.

23        MR. HASSING:  The Court has already expressed that if

24   DeWalt would have gone out and surveyed what was there,

25   period, created a map from that, there is no infringement.

961

1          THE COURT:  From that being what they saw.

2          MR. HASSING:  From what they saw.  That's what Mr. Wu

3    hired DeWalt to do.  And the contract says they are going to

4    do a survey and then they are going to prepare a map.

5          There is absolutely no evidence that Mr. Wu knew or

6    should have known that DeWalt was infringing.  And when I say

7    that, I don't think DeWalt was infringing.  But even if DeWalt

8    were infringing, how would Wu know?  Because he hired DeWalt

9    and they are professional engineers and they went out and did

10   their survey and created a map.  To be contributorily guilty

11   of infringement, Mr. Wu would have to known or should have

12   known of the infringing activity.  He didn't know about any

13   infringing activity.

14         THE COURT:  I understand.  Anything else?

15         MR. TRAVIS:  If I can respond to that, your Honor.  I

16   think there is an equivocation on the use of that word,

17   "infringing."  By defendant's interpretation, if you don't

18   know of infringement at all, somehow you don't fit within the

19   threshold for contributory infringement.  And it's the

20   infringing activity.  It is not meant -- that doesn't mean

21   that -- DeWalt could get up and say, "We didn't know we were

22   infringing, therefore, we wouldn't meet this requirement."

23         THE COURT:  I understand that argument.

24         MR. TRAVIS:  Okay.  That was it.

25         THE COURT:  Anything else?

962

1          The request for a motion to amend to proof is denied

2   because the Court finds there is no such evidence.  That is

3   not in any way taking away from the plaintiff's argument as to

4   each individual defendant.

5          But I, what I'm hearing the argument truly be, when

6   I'm hearing the argument on the one side and on the other

7   side, knowing what the evidence is in this case -- and I'm not

8   finding certain factual things to be true.  I'm talking about

9   all the evidence from which a trier of fact could make a

10  finding of truth -- is that you are telling me the strength of

11  your case against each individual defendant, and that's up to

12  the jury to determine.  I'm not -- that's not before me.

13         But I am not seeing a legal link between from one

14  defendant to the other to the other factually that answers and

15  addresses and fulfills the requirements of the necessity of

16  contributory liability.

17         Anything else?  Any other legal issues?

18         Verdict.  Any other matters on jury instructions?

19         If not, what I'm intending on doing is I'm intending

20  to bringing the jury out.  I will read them the rest of the

21  instructions.  I will take a five-minute recess right after so

22  you can have a chance to set up.

23         And just so you know, the podium does turn.  And so

24  if you wish to turn the podium so it faces the jury, that

25  might be a little bit more manageable for you.  If you prefer

963

1   not to, it doesn't make any difference.  Do whatever you want.

2            MR. OKADIGBO:  Your Honor, before we adjourn, I

3   wanted to make another request with regard to partnership or

4   practically partners.  There has not been enough -- there has

5   not been any evidence regarding a partnership between the

6   defendants, and the City requests that that be stricken.

7            THE COURT:  The defendants, which defendants?

8            MR. OKADIGBO:  The City of Wasco and --

9            THE COURT:  Period?

10           MR. OKADIGBO:  And any of the other remaining

11  defendants.

12           MR. ALEXANDER:  I would make the only comment, my

13  notes show me that as to the City and as to DeWalt, there has

14  been no evidence at all about the partnership concept.

15           Certainly, perhaps, the Lotus and Northern connection

16  might be a tad different.

17           MR. HASSING:  Northern and Lotus, separate issue.

18  But there is no partnership or practically partner evidence

19  that would link either Northern and Lotus to DeWalt or the

20  City.  There is no sharing of profits.  There is no

21  contingency fees.

22           THE COURT:  What jury instruction number are you

23  talking about?

24           MR. OKADIGBO:  We think it is in the verdict form for

25  sure.

1          THE COURT:  What number?

2          MR. ALEXANDER:  The new numbers, your Honor, are 32,

3   33, 34.

4          THE COURT:  Just a minute.  Let's look at 32.

5          MR. ALEXANDER:  Old number 34, new number 32.

6          THE COURT:  Let's talk about the new, the most recent

7   verdict.

8          MR. ALEXANDER:  Number 32, your Honor.

9          THE COURT:  I understand.  What is the plaintiff's

10  side?

11         MR. TRAVIS:  I'm not finding that instruction, your

12  Honor.

13         THE COURT:  It is not an instruction.  It is the

14  question on the verdict form.

15         MR. TRAVIS:  As to which?  There are a couple

16  defendants that were raising the objection.  I'm not sure

17  which one I'm responding to.

18         THE COURT:  Let's just take a look at the verdict

19  form.  On the new verdict form, the most recent version of it,

20  because we took out, remember, 1 and 2.

21         MR. BRAZE:  Has that been distributed?

22         THE COURT:  I believe it has.

23         MR. TRAVIS:  It's right here.

24         THE COURT:  We are talking about Question Number 33

25  in its entirety.  We are talking about Question Number 33 as

1   it deals with DeWalt and the City of Wasco -- I think it

2   should be Wasco, not Waco.  I see that that mistake has been

3   made a couple times here.  We will take care of that.

4           MR. ALEXANDER:  And 34 is the same, your Honor.

5           THE COURT:  34, yes.  34, as it deals with DeWalt and

6   the City of Wasco.

7           MR. ALEXANDER:  And 35, your Honor.

8           THE COURT:  Okay.  And 35 in its entirety.

9           MR. TRAVIS:  We don't think there is anything there

10  for DeWalt.

11          As to the other defendants as far as --

12          THE COURT:  So 32 should be out?

13          MR. TRAVIS:  Yeah.  We are not going to argue that,

14  your Honor, as far as DeWalt and partners or practically

15  partners, that 32 and 34.

16          THE COURT:  Okay.  So 32 and 34 --

17          MR. TRAVIS:  Hold on a minute.

18          THE COURT:  No, no.  We are actually looking at 32

19  and 35 in their entirety and 33 and 34 partially.

20          MR. TRAVIS:  Okay.  I'm sorry.  I'm not seeing the

21  way these were written.  With respect to DeWalt and the

22  partners or practically partners, we have no objection with

23  them being removed.

24          THE COURT:  What about 35, with the City of Wasco?

25          MR. BRAZE:  We object to that.

966

1        THE COURT:  You think that somebody -- there is

2   evidence that somebody is a partner with the City of Wasco?

3        MR. BRAZE:  This is a mutual benefit thing.  The City

4   of Wasco got almost $1.6 million from this deal, and Mr. Wu

5   got a hundred acres of land --

6        THE COURT:  Yes.

7        MR. BRAZE:  -- at very cheap.  And we believe they

8   were practically partners in sharing in this.

9        THE COURT:  They were -- certainly, one was a buyer

10   and one was a seller.

11        MR. BRAZE:  Certainly, there was an agreement, there

12   were roles, and each had a financial interest.

13        THE COURT:  Is there any evidence at all that, other

14   than being buyer and seller, that Wasco and Northern Cal/Lotus

15   had anything to do with DeWalt?  Together?

16        MR. BRAZE:  No, no.  Not together, no.

17        THE COURT:  So are you saying that the City of Wasco

18   was a partner with DeWalt, or are you saying they were a

19   partner with Wu and his enterprises?

20        MR. BRAZE:  Wu.

21        THE COURT:  Okay.  What is it that Wu and the City of

22   Wasco -- and when I say "Wu," I'm talking about all of his

23   enterprises, any of them -- where is the evidence that they

24   did anything other than be a buyer and a seller in the same

25   transaction?

1          MR. ALEXANDER:  Well, the buyer and the seller, Wu

2     obviously obtained a significant financial benefit from what

3     he bought.  He bought $1.9 million worth of improvements

4     installed on a tract and he paid 1.6 million for the

5     improvements and a hundred acres of land.

6          THE COURT:  He may have gotten a good deal in the

7     contract and Wasco may have thought they got a good deal in

8     the contract.

9          MR. BRAZE:  And in return, Wasco got 1.5 million plus

10    $525,000 in impact fees.

11         THE COURT:  That doesn't make them partners.

12         MR. BRAZE:  Well, they certainly had a mutual benefit

13    to make sure each survived or exceeded.

14         THE COURT:  Sure, they both wanted the contract to be

15    fulfilled.

16         MR. BRAZE:  And the closing was put off until the end

17    of December and while they are trying to draw up these

18    tentative maps.  In fact the tentative map was submitted on

19    November 7th, I believe the date was, and the closing wasn't

20    until December 28th.

21         I think there is circumstantial evidence there that

22    Mr. Wu was waiting for that tentative map to be approved

23    before he closed the deal.

24         THE COURT:  And that makes the City --

25         MR. BRAZE:  Practically partners, not partners, as we

968

1   call them, but practically partners.

2          MR. TRAVIS:  The City also will benefit in the future

3   from the continued development.  I mean they were the ones

4   that submitted the Developer Information Package with the

5   expectation -- maybe they weren't going to push it -- with the

6   expectation that there was existing infrastructure in the

7   ground.  They certainly didn't push it.  As the City Manager

8   testified, they didn't push it.  They allowed all the

9   conditions that were previously met, all the improvement

10  plans, all the improvements, all that stuff went hand in hand,

11  and they pushed through that mapping process.

12         THE COURT:  Your basic argument is that any time that

13  there is a buyer and a seller or, frankly, two people on

14  opposite sides of a contract, where they both believe that

15  they are getting mutual benefits, which is, of course, why

16  they entered into the contract in the first place, and they

17  both, in other words, mutually push to make sure that the

18  contract is fulfilled, that they are practically partners.

19         MR. BRAZE:  Well, there are a lot of interesting

20  things that happened in this case which I don't think we will

21  ever know why.  For instance, Mr. Wu is now selling off all of

22  his lots.  Why did he immediately go out and take out building

23  permits on 68 lots?  That was so Wasco would get $529,000 in

24  impact fees.

25         THE COURT:  Maybe it was because he thought the

1    market was so good at the time he was going to build on them

2    and get them done.

3              MR. BRAZE:  I think he is smarter than that.

4              MR. TRAVIS:  It is a factual issue.

5              THE COURT:  You think it's a factual issue as to

6    whether or not the City of Wasco, based on the evidence before

7    us, and the Wu Enterprises, are practically partners?

8              MR. TRAVIS:  Well, your Honor, I mean if we are

9    going -- and I think we had this discussion in our pretrial

10   meeting, that if we are going by a strict definition of

11   "partnership," we agree.  I mean if it is a mutual profit

12   interest, are you sharing your profits, which doesn't seem to

13   be the case here, then we agree.

14             But that's not how strict the Ninth Circuit has dealt

15   with this issue.  I mean they have given us examples of

16   different cases in citing to them and how it is not quite that

17   rigid.

18             THE COURT:  Okay.  Anything else?

19             MR. BRAZE:  No.

20             THE COURT:  Anything else?

21             Okay.  By agreement then, Number 32 and Number --

22   well, actually, it is only 32 by agreement that is out.

23             33 will be amended to read, "Did defendant Northern

24   California Universal Enterprises act as a partner or

25   practically partner with Defendant Lotus Developments, LP?"

1          And 34 will read, "Did defendant Lotus Developments,

2     LP, act as a partner or practically partner with" -- let's

3     see -- "Defendant Northern California Universal Enterprises?"

4          And number 35, is out.

5          Anything else from anyone?

6          MR. OKADIGBO:  No, your Honor.

7          THE COURT:  Okay.  Let me just quickly step back and

8     get this verdict form corrected and updated.  And then we will

9     proceed.

10          (Pause in the proceedings.)

11          THE COURT:  While we are doing that, let's talk for a

12     second about timing here.

13          What is your best estimate?  I know it is not an

14     absolute, but what is your best estimate of your opening

15     closing?

16          MR. BRAZE:  It is shorter than it was a few minutes

17     ago.

18          THE COURT:  Not that much shorter.  I didn't take

19     that much away.

20          MR. BRAZE:  It is going to be between about 40

21     minutes.

22          MR. HASSING:  Half hour, at the most, for me.

23          MR. OKADIGBO:  I'm estimating half an hour at the

24     most, maybe shorter.

25          MR. ALEXANDER:  45, plus or minus.

971

1          THE COURT:  What do you think on rebuttal?  You

2     basically know what they are going to say.

3          MR. BRAZE:  I do?  Well, then why do I even have

4     rebuttal?  20 minutes.

5          THE COURT:  Okay.  So here's what I'm debating.  You

6     can probably can figure this out.  I'm wondering if maybe what

7     I ought to do is instruct them and send them home, and we get

8     all the closing in the first thing in the morning and then

9     give it to them.

10          The reason is because if we start splitting you up,

11     I'm not sure who is -- who it punishes and who it doesn't

12     punish.  It gets disjointed.  The jury can't remember the next

13     day.

14          I will leave it up to you.  Whatever you want to do.

15     What do you want to do?

16          MR. HASSING:  I go along with your proposal.

17          MR. OKADIGBO:  City agrees, your Honor.

18          MR. ALEXANDER:  I'm going to be the odd ball out.  I

19     would like to get it going, get it argued, and get it to the

20     jury.

21          THE COURT:  If it were going to get it to the jury

22     today, I would agree with you a hundred percent.  I just think

23     that when you start cutting people up and disjointing the flow

24     of it all, I don't know.

25          What do you think, Mr. Braze?

972

1        MR. BRAZE:  Well, I would be glad to do mine and send

2    the jury home.

3        THE COURT:  Oh, I'm sure that's true.

4        MR. BRAZE:  I don't have a problem with that.

5        THE COURT:  If we started with you, we still wouldn't

6    have the day done.

7        MR. BRAZE:  I can try to talk until 4:30.

8        THE COURT:  Then the defense wouldn't have to argue.

9    They would say, "We submit it right now to the jury."

10       And then the question is, then they leave overnight,

11   hearing the defense.

12       I don't know, you know, I'm not sure who it punishes,

13   but I'm concerned about the flow of it.

14       MS. BARNES:  If the Court please, I have seen

15   situations -- and I'm not from California, maybe it happens

16   here too -- where the jury wants to get the case once the

17   lawyers start into argument and then if they have to stop

18   before they hear all the arguments, the person who comes back

19   the next morning is the bad guy and the client possibly gets

20   punished.  It doesn't happen all the time, but it seems to me

21   it makes a lot more sense to simply all of us try to shorten

22   it up a bit and present it to the jury tomorrow morning and

23   let them deliberate and --

24       THE COURT:  Based on these suggestions of time, even

25   if you did exactly what you said you were going to do, we

1   would have it to them before the end of the morning if we

2   start in the morning.

3          MS. BARNES:  Yeah.

4          THE COURT:  Unless there is some compelling reason, I

5   really think we probably ought to do that, just in the

6   fairness of everyone.

7          MR. ALEXANDER:  That's fine, your Honor.

8          THE COURT:  In addition, arguments are important,

9   especially in a case like this where the jury may not be

10  catching some of the legal subtleties of what we are doing and

11  why, and even though you understand why you are asking some of

12  the questions, they understand the answers to the question,

13  but they don't understand why you are asking.  I think they

14  are more alert than they are in the afternoon.

15         Everybody okay with that?

16         (All defense counsel agreed.)

17         THE COURT:  Are you okay, Mr. Braze?

18         MR. BRAZE:  Yes.

19         THE COURT:  Why don't we bring the jury up, and I

20  will explain to them that -- I will explain why.

21         MR. ALEXANDER:  Gary is going --

22         THE COURT:  Gary is not there, but Mia is doing it

23  right now, and she will have it done before I'm done with the

24  instructions.

25         MR. BRAZE:  You are going to instruct now?

974

1          THE COURT:  Yes, I will instruct now.  That way, your

2     arguments won't be interrupted tomorrow.  Before you leave

3     today, after I'm done with the jury instructions, just meet

4     for just a couple minutes with the clerk to make sure that

5     nobody has a disagreement on what's in or what's not in on the

6     exhibits.  Okay?

7          MR. OKADIGBO:  Your Honor, before you bring the jury

8     in --

9          THE COURT:  You want to go back on the record?

10         MR. OKADIGBO:  Yes.

11         THE COURT:  Back on the record.  Counsel is present,

12    jury is not.

13         MR. OKADIGBO:  I wanted to move D 500 to 504 into

14    evidence.

15         THE COURT:  Any objection?

16         MR. BRAZE:  I thought we had done that.

17         THE COURT:  I think he is right.  I don't think we

18    have.  No objection, then?

19         D 500 to D 504, received.

20         (Defendant's Exhibits D 500 through D 504 were

21    received.)

22         THE COURT:  Anything else?  We are ready for the

23    jury.

24         (The following proceedings were had in the presence

25         of the jury, to wit:)

975

1          THE COURT:  Let the record reflect that the jury has

2     joined us.  Ladies and gentlemen, there has been a little bit

3     of a change, and let me explain what the change is and let me

4     explain the reason for it.

5          I am going to give you the rest of the jury

6     instructions now.  We have talked about legal issues.  We have

7     ironed everything out.  Rulings have been made, and now we are

8     ready to proceed.

9          I am going to give you the rest of the jury

10    instructions now and then we are going to send you home, and

11    here's the reason we are going to do that.

12         I have gotten time estimates from the attorneys as to

13    their closing arguments, and it is unfair, frankly -- and I'm

14    making this decision, it is not anybody has made a motion --

15    to interrupt closing arguments once they start.

16         Once they start, we ought to be able to flow through

17    them.  And I'm still convinced by the end of tomorrow morning,

18    even if we start tomorrow morning at 8:30 with the closing

19    instructions, that you are going to have the case.

20         But I think it's going to be easier for them to

21    present, and I think it's going to be easier for you to

22    follow, if we don't stop and start.

23         And this is one of those cases where closing

24    arguments may be helpful to you.  It's up to you whether they

25    are or not.  It's totally up to you.

976

1          But I want there to be some smoothness to the

2    presentation of closing arguments for your sake as well as for

3    the presenter's sake.  And so, as I said, if we start at 8:30

4    tomorrow morning, you are going to have the case by the end of

5    the morning anyway to commence your deliberations.

6          And also, in a case of this nature, where there are

7    some specifics that the lawyers will argue with regard to the

8    facts and how those facts, as they view the evidence fits into

9    the law as I'm giving it to you, that sometimes takes an extra

10   amount of concentration on your part.

11         And I think that if we start in the morning, it is

12   more likely that you will be able to concentrate for the

13   entire morning rather than starting at midafternoon or a

14   little later afternoon.

15         And that's the reason for it.  There is no magic here

16   and it is not as though we have more things to talk about

17   after you leave.  We really don't.  Once I give you the

18   instructions, then we are done in the courtroom, except one

19   thing I have asked the attorneys to do is to meet with the

20   clerk after you leave and after I leave the bench to make sure

21   that all the exhibits that they believe are in evidence have

22   been accepted in fact have been.

23         That way, we do all the cleanup, we do -- we make

24   sure that the only thing left is the closing arguments, and we

25   start those fresh in the morning.  Any questions or any

1    problems with that?

2          Because I don't mind getting your input in this

3    regard, but I really do think that that's the best thing to do

4    as far as the presentation is concerned.  Any problems or

5    questions?

6          Okay.  Then let me do this.  Let me read you the rest

7    of the instructions.  And just a reminder, that if you ask for

8    them, if you want them, we will send a copy of these

9    instructions in for your deliberations, so just so you know

10   that it's not a situation where, if you miss it, right this

11   minute, that you will never be able to know what I said.  You

12   will.  All you have to do is ask for the instructions.  We

13   will send them in, okay?

14         Lastly, I want to tell you that we -- and this

15   instruction is toward the back -- but I want to tell you so

16   you know and you are not wondering about it or concerned about

17   it, we do give you a verdict form.

18         And the verdict form is set up so that it asks you

19   questions.  And depending on how you answer the first

20   question, depends on what you then next do.

21         And it will give you instructions on what to do.  For

22   instance, it will say, "If you have answered Question Number 1

23   yes, go to Question 2.  If you have answered Question Number 1

24   no, go to Number 3, or whatever, whatever it says.

25         And you can go through the form any way you want to.

978

1    I don't dictate that, that's up to you and all the jurors

2    during your deliberations, but I do believe that in a case of

3    this nature, where there are several questions for you to

4    answer, that it does help you go from point A to point Z in a

5    fashion so it helps with your deliberations.

6            But as I said, however you want to do it is the way

7    you want to do it.  We don't control your deliberations.

8            Any questions about that?

9            All right.  You have now heard all the evidence and

10   you will hear the arguments of the attorneys first thing in

11   the morning, and it is my duty to instruct you on the rest of

12   the law of the case.

13           As I said, a copy of the instructions will be sent

14   in.  When you deliberate, all you have to do is ask for them.

15   We will send them in.

16           You must not infer from the instructions or from

17   anything I have said or done as indicating that I have an

18   opinion regarding the evidence or what your verdict should be.

19   As a matter of fact, I don't.  I would never convey such a

20   thing to you.  That's totally within your purview.

21           It is your duty to find the facts from all the

22   evidence in the case.  To those facts, you must apply the law

23   as I give it to you and follow the law as I give it to you,

24   even if you don't agree with the law.  And you must not be

25   influenced by any personal likes or dislikes or opinions or

prejudices or sympathies.  That means you must decide the case solely on the evidence before you here.  You will recall that you took an oath to do that.

You must follow all the instructions and not single out some and ignore others.  They are all important.

You should decide the case as to each party separately.  Unless otherwise stated, the instructions apply to all of the parties.

The parties have agreed on certain facts which have been stated to you.  You should, therefore, treat those facts as having been proved.  The parties stipulate to the following facts:

Number one, that plaintiff is Roger McIntosh.  I will refer to him sometimes as the "plaintiff" or "Mr. McIntosh."

Number two, Mr. McIntosh is a civil engineer, who does business as McIntosh & Associates.

Number three, prior to 1999, Mr. McIntosh was a partner with Eugene Martin in the firm of Martin-McIntosh.

Number four, the Martin-McIntosh firm dissolved in 1999.

Number five, the Defendant Northern California Universal Enterprises Company is a California corporation engaged in real estate acquisition and development.  I will sometimes refer to this defendant as "Northern."

Number six, Defendant Lotus Development, LP, is a

1  California limited partnership, engaged in real estate

2  development and sales.  I will sometimes refer to this

3  defendant as "Lotus."

4         Number seven, Northern is the general partner of

5  Lotus.

6         Number eight, Defendant, the City of Wasco, is a city

7  located in Kern County.  I will sometimes refer to this

8  defendant as the "City."

9         Number nine, Defendant Dennis DeWalt, Incorporated,

10  is a California corporation that performs civil engineering

11  work in Kern County, California.  I will sometimes refer to

12  this defendant as "DeWalt."

13         Number ten, in 1992, the defendant called The Legacy

14  Group, which is not a party to the case, hired the

15  Martin-McIntosh firm to perform civil engineering services for

16  a 480-acre parcel of land located in Wasco, California.  The

17  Legacy Group planned to develop the land and build a

18  residential community.

19         Number 11, the 480-acre parcel of land was named the

20  "Valley Rose Estates."

21         Number 12, the 480-acre parcel was then subdivided

22  into six separate parcels in preparation for development and

23  construction.

24         Number 13, in 1992, the Martin-McIntosh firm prepared

25  a tentative tract map for a part of Parcel Number 1 in the

1  Valley Rose Estates.  The tract in Parcel 1 was named "5472."

2  I sometimes will refer to that as "Tract 5472."

3       Number 14, Martin-McIntosh also prepared improvement

4  plans for Tract 5472.

5       Number 15, the City approved the tentative tract map

6  and improvement plans for Tract 5472.

7       Number 16, The Legacy Group constructed streets,

8  sidewalks, curbs, gutters, storm drains, sewers, water

9  utility, block walls and driveway approaches within Tract

10 5472.

11      Number 17, The Legacy Group ran out of funding and

12 declared bankruptcy before it could begin building homes in

13 Tract 5472.

14      Number 18, in 2001, the tentative tract map for Tract

15 5472 expired.

16      Number 19, in 2002, The Legacy Group's development

17 agreement with the City expired.

18      Number 20, in 2002, the City purchased Tract 5472 at

19 a tax sale.

20      Number 21, in December of 2004, the City sold Tract

21 5472 to Lotus.

22      Number 22, the City required Lotus/Northern to

23 prepare a new tentative tract map for Tract 5472.

24      Number 23, the City did not require Lotus/Northern to

25 prepare or submit new improvement plans for Tract 5472 because

982

1    the improvements had already been constructed in Tract 5472 by

2    The Legacy Group.

3            Number 24, the City required Lotus/Northern to repair

4    and/or replace damaged subdivision improvements.

5            Number 25, Northern hired DeWalt to prepare a new

6    tentative tract map for Tract 5472.

7            Number 26, in 2004, DeWalt prepared a new tentative

8    map which DeWalt numbered as Tract 6451.

9            Number 27, DeWalt submitted its tentative tract map

10   6451 to the City in November of 2004.

11           Number 28, on February 22, 2007, Mr. McIntosh

12   received copyright registration certificates number VAU

13   721-180.

14           Number 29, between 2006 and the present day, Lotus

15   has sold 19 total homes at Tract 6451.

16           That's the end of the stipulations.

17           During trial, you heard testimony read from a

18   deposition.  A deposition is the testimony of a person taken

19   before trial.  At a deposition, the person is sworn to tell

20   the truth and is questioned by the attorneys.  You must

21   consider the deposition testimony that was read to you in the

22   same way as you consider testimony given here in court.

23           The evidence that a witness lied under oath on a

24   prior occasion may be considered, along with all other

25   evidence, if you make that determination, in deciding whether

983

1    or not to believe the witness and how much weight to give to

2    the testimony of the witness and for no other purpose.

3          Evidence was presented to you in the form of answers

4    of one of the parties to written interrogatories submitted by

5    the other side.  These answers were given in writing and under

6    oath before the actual trial began in response to questions

7    that were submitted in writing under established court

8    procedures.  You should consider the answers insofar as

9    possible in the same way as if they were made from the witness

10   stand.

11         Some witnesses, because of education or experience,

12   have been allowed to state opinions and the reasons for those

13   opinions.

14         Opinion testimony should be judged just like any

15   other testimony.  You may accept it or reject it and give it

16   as much weight as you think it deserves considering the

17   witness' education and experience, the reasons given for the

18   opinion, and all the other evidence in the case.

19         Certain charts and summaries not received in evidence

20   have been shown to you in order to help explain the contents

21   of books, records, documents, or other evidence in the case.

22   They are not themselves evidence or proof of any facts.  If

23   they do not correctly reflect the facts or figures shown by

24   the evidence in this case, you should disregard these charts

25   and summaries and determine the facts from the underlying

1    evidence.

2         Certain charts and summaries have been received into

3    evidence to illustrate information brought out in the trial.

4    Charts and summaries are only as good as the underlying

5    evidence that supports them.  You should, therefore, give them

6    only such weight as you think the underlying evidence

7    deserves.

8         This case is about copyrights.  Plaintiff Roger

9    McIntosh claims to own a copyright in a tentative tract map

10   and improvement plans for Tract 5472 of the Valley Rose

11   Estates Subdivision.

12        Plaintiff claims his copyright has been infringed.

13   Each defendant denies the claim and asserts that a new map was

14   independently created.

15        The owner of a copyright has the right to exclude any

16   other person from reproducing, preparing derivative works,

17   distributing, performing, displaying or using the work covered

18   by copyright for a specific period of time.

19        Copyright work can be a pictorial work, graphic work

20   or architectural work.  Facts, ideas, procedures, processes,

21   systems, methods of operation, concepts, principles, or

22   discoveries cannot themselves be copyrighted.

23        The copyright work must be original.  An original

24   work that closely resembles other works can be copyrighted so

25   long as the similarity between the two works is not the result

985

1   of copying.

2          The copyright owner may transfer, sell or convey to

3   another person all or part of the owner's property interest in

4   the copyright, that is, the right to exclude others from

5   reproducing, preparing a derivative work from, distributing,

6   performing, or displaying the copyrighted work.

7          To be valid, the transfer, sale or conveyance must be

8   in writing.  The person to whom a right is transferred is

9   called an assignee, a-s-s-i-g-n-e-e.

10          Copyright -- I will start that again.

11          Copyright automatically exists in a work the moment

12   it is fixed in any tangible medium of expression.  The owner

13   of a copyright may register the copyright by delivering to the

14   Copyright Office of the Library of Congress a copy of the

15   copyrighted work.

16          After examination and a determination that the

17   material deposited constitutes copyrightable subject matter

18   and that legal and formal requirements are satisfied, the

19   Register of Copyrights registers the work and issues a

20   Certificate of Registration to the copyright owner.

21          The plaintiff has the burden of proving by a

22   preponderance of the evidence that the plaintiff is the owner

23   of the copyright and that the defendant copied original

24   elements of the copyrighted work.

25          The term "preponderance of the evidence" means that

986

1   you must be persuaded by the evidence that it is more probably

2   true than not true that the copyrighted work was infringed.

3          To prove that the defendant copied the plaintiff's

4   work, the plaintiff must show that the defendant had access to

5   the plaintiff's copyrighted work and that there are

6   substantial similarities between the defendant's work and the

7   plaintiff's copyrighted work.

8          One who reproduces, prepares, derivative works from,

9   or distributes a copyrighted work without authority from the

10  copyright owner during the term of the copyright, infringes on

11  the copyright.

12         Copyright may also be infringed by vicariously

13  infringing and contributorily infringing.  A person is liable

14  for copyright infringement by another if the person has

15  profited directly from the infringing activity and has the

16  right and ability to supervise the infringing activity,

17  whether or not the person knew of the infringement.

18         The defendants contend that there is no copyright

19  infringement.  There is no copyright infringement where the

20  defendant independently created the challenged work, the

21  defendants made fair use of a copyrighted work by reproducing

22  copies for criticism, comment, news reporting, teaching,

23  scholarship or research.

24         Copyright is the exclusive right to copy.  The right

25  to copy includes the exclusive rights to:

1          Number one, authorize or make additional copies or

2     otherwise reproduce the copyrighted work in copies.

3          Number two, recast, transform, adapt the work and

4     prepare derivative works based upon the copyrighted work.

5          Number three, distribute copies of the copyrighted

6     work to the public by sale or other transfer of ownership or

7     by rental or lease or lending.

8          And number four, display publicly a copyrighted

9     pictorial work or graphic work.

10          It is the owner of a copyright who may exercise these

11     exclusive rights to copy.  The term "owner" includes the

12     author of the work and an assignee.

13          In general, copyright law protects against

14     production, adaptation, distribution, performance and display

15     of substantially similar copies of the owner's copyrighted

16     work without the owner's permission.

17          An owner may enforce these rights to exclude others

18     in an action for copyright infringement.  Even though one may

19     acquire a copy of the copyrighted work, the copyright owner

20     retains rights and control of that copy, including uses that

21     may result in additional copies or alterations of the work.

22          The works involved in this trial are known as

23     pictorial works or graphic works, such as two-dimensional and

24     three-dimensional works of fine, graphic and applied art,

25     photographs, prints and art reproduction, maps, globes,

988

1    charts, diagrams, models and technical drawings, including

2    architectural plans.

3         These works can be protected by the copyright law.

4    Only that part of the work comprised of original works of

5    authorship produced in any tangible form of expression from

6    which it can be perceived, reproduced or otherwise

7    communicated, either directly or with the aid of a machine or

8    device, is protected by the copyright act.

9         Copyright protection for an original work of

10   authorship does not extend to any idea, procedure, process,

11   system, method of operation, concept, principle or discovery,

12   regardless of the form in which it is described, explained,

13   illustrated or embodied.

14        Copyright law allows the author of an original work

15   to prevent others from copying the way or form -- just a

16   minute.  Yes.

17        Copyright law allows the author of an original work

18   to prevent others from copying the way or form the author used

19   to express the ideas in the author's work.  Only the

20   particular expression of an idea can be copyrighted.

21        Copyright law does not give the author the right to

22   prevent others from copying or using the underlying ideas

23   contained in the work, such as any procedures, processes,

24   systems, methods of operation, concepts, principles or

25   discoveries.

989

1         In order to protect any ideas in the work from being

2    copied, the author must secure some other form of legal

3    protection, because ideas cannot be copyrighted.

4         The right to exclude others from copying extends only

5    to how the author expressed the ideas in the copyrighted work.

6    The copyright is not violated when someone uses an idea from a

7    copyrighted work as long as the particular expression of that

8    idea in the work is not copied.

9         The plaintiff is the owner of a valid copyright if

10   the plaintiff proves by a preponderance of the evidence that:

11        Number one, the plaintiff worked -- the plaintiff's

12   work is original; and

13        Number two, the plaintiff is the author or creator of

14   the work and received a transfer of the copyright.

15        In this case, the plaintiff does not claim to be the

16   initial owner of the copyright at issue.  Instead, the

17   plaintiff claims that he received the copyright by virtue of

18   assignment from the work's initial owner so the plaintiff is

19   now the assignee of the copyright.

20        A copyright owner may transfer, sell or convey to

21   another person all or part of the owner's property interest in

22   the copyright, that is, the right to exclude others from

23   copying the work.

24        The person to whom the copyright is transferred,

25   sold, conveyed becomes the owner of the copyright in the work.

990

1      To be valid, the transfer, sale or conveyance must be

2   in writing.  The person to whom the right is transferred is

3   called an "assignee" and the assignee may force this right to

4   exclude others in an action for copyright infringement.

5      An original work may include or incorporate elements

6   taken from prior work, works from the public domain and works

7   owned by others with the owner's permission.  The original

8   part of the plaintiff's work are the parts created:

9      Number one, independently by the work's author, that

10  is, the author did not copy it from another work.

11     And Number two, by use of some minimal creativity.

12     In copyright law, the original element of a work need

13  not be new or novel.  Numbers by themselves are not original

14  works.

15     The plaintiff has the burden of proving the defendant

16  copied original elements from the plaintiff's copyrighted

17  work.  The plaintiff may show the defendant copied from the

18  work by showing by a preponderance of the evidence that the

19  defendant had access to the plaintiff's copyrighted work and

20  that there are substantial similarities between the

21  defendant's work and original elements of the plaintiff's

22  work.

23     The plaintiff must show by a preponderance of the

24  evidence that an infringing party had access to the

25  plaintiff's work.  You may find that an infringing party had

991

1   access to the plaintiff's work if the infringing party had a

2   reasonable opportunity to view, read, hear, or copy the

3   plaintiff's work before the defendants' work was created.

4        A lesser showing of substantial similarity is

5   required by plaintiff if there is a strong showing of access.

6   Elements unprotected by copyright law must be identified and

7   filtered out before the work can be considered as a whole.

8        One who is not the owner of the copyright may use the

9   copyrighted work in a reasonable way under the circumstances

10   without the consent of the copyright owner if it would advance

11   the public interest.  Such use of a copyrighted work is called

12   a fair use.  The owner of a copyright cannot prevent others

13   from making a fair use of the owner's copyrighted work.

14        Defendant City of Wasco contends that it made fair

15   use of the copyrighted work for the purpose of criticism or

16   comment or scholarship or research by providing information

17   about the property existing in its public records to

18   prospective purchasers of a tract within the Valley Rose

19   Estates.  The defendant has the burden of proving this defense

20   by a preponderance of the evidence.

21        In determining whether the use made of the work was

22   fair, you should consider the following factors:

23        Number one, the purpose and character of the use,

24   including whether such use is of a commercial nature or is for

25   nonprofit educational purposes.

1          Number two, the nature of the copyrighted work.

2          Number three, the amount and substantiality of the

3    portion used in relation to the copyrighted work as a whole.

4          And number four, the effect of the use upon the

5    potential market for or value of the copyrighted work.

6          If you find that the defendant proved by a

7    preponderance of the evidence that the defendants made a fair

8    use of the plaintiff's work, your verdict should be for the

9    defendant.

10          If you find that the -- that a defendant infringed

11    the plaintiff's copyright in the work, you may consider the

12    plaintiff's claim that a different defendant vicariously

13    infringed that copyright.

14          The plaintiff has the burden of proving each of the

15    following by a preponderance of the evidence:

16          Number one, the defendant profited directly from the

17    infringing activity of the infringing defendant.

18          Number two, the defendant had the right and ability

19    to supervise or control the infringing activity of the

20    infringing defendant.

21          And number three, the defendant failed to exercise

22    that right and ability to supervise or control infringing

23    activity of the infringing defendant.

24          If you find that the plaintiff proved each of these

25    elements, your verdict should be for the plaintiff if you also

1   find that a defendant infringed the plaintiff's copyright.

2         If, on the other hand, the plaintiff has failed to

3   prove any of these elements, your verdict should be for the

4   defendant.

5         A defendant may be liable for copyright infringement

6   engaged in by another if it knew or had reason to know of the

7   infringing activity and intentionally induced or materially

8   contributed -- let's see.  This instruction 39 should not be

9   given.  That's out.

10         Inadvertent mistakes on copyright registration

11   certificates do not invalidate a copyright and thus do not bar

12   an infringement action unless the copyright claimant intended

13   to defraud the Copyright Office by making the misstatement.

14         A copyright defendant may offer evidence to dispute

15   validation of the copyright registration.

16         If you find for the plaintiff on the plaintiff's

17   copyright infringement claim, you must determine the

18   plaintiff's damages.  The plaintiff is entitled to recover the

19   actual damages suffered as a result of the infringement.

20         In addition, the plaintiff is also entitled to

21   recover any profits of the defendant attributable to the

22   defendant.  The plaintiff must prove damages by a

23   preponderance of the evidence.

24         The copyright owner is entitled to recover the actual

25   damages suffered as a result of the infringement.  Actual

994

1   damages means the amount of money adequate to compensate the

2   copyright owner for the reduction of the fair market value of

3   the copyrighted work caused by the infringement.

4        The reduction of the fair market value of the

5   copyrighted work is the amount a willing buyer would have been

6   reasonably required to pay for a willing seller at the time of

7   the infringement for the actual use made by the defendant of

8   the plaintiff's work.

9        The amount also could be represented by the lost

10  license fees that plaintiff would have received for the

11  defendant's unauthorized use of the plaintiff's work.

12       In addition to actual damages, the copyright owner is

13  entitled to any profits of defendant attributable to that

14  infringement.

15       You may not include in an award of profits any amount

16  that you took into account in determining actual damages.

17       You may make an award of the defendant's profits only

18  if you find that the plaintiff showed a causal relationship

19  between the infringement and the profits generated indirectly

20  from the infringement.

21       The defendant's profit is determined by subtracting

22  all expenses from the defendant's gross revenue.  The

23  defendant's gross revenue is all of the defendant's receipts

24  from the use or sale of a copyrighted work associated with the

25  infringement.  The plaintiff has the burden of proving the

1    defendant's gross revenue by a preponderance of the evidence.

2           Expenses are all operating costs, overhead costs and

3    production costs incurred in producing the defendant's gross

4    revenue.

5           The defendant has the burden of proving the

6    defendant's expenses by a preponderance of the evidence.

7    Unless you find that the -- that a portion of the profit from

8    the use or sale of a copyrighted work is attributable to

9    factors other than the use of the copyrighted work, all the

10   profits -- all the profit is to be attributed to the

11   infringement.

12          The defendant has the burden of proving the portion

13   of the profit if any attributable to the factors other than

14   infringing the copyright work.

15          You will be asked to decide whether certain

16   defendants acted as partners or practically partners in

17   infringement of the plaintiff's copyright.  Factors to

18   consider to decide whether defendants acted as partners or

19   practically partners include an agreement to share profits and

20   losses, a written or oral agreement, an agreement implied by

21   the defendant's conduct, defendant's roles in the infringing

22   activity, the degree of direction of activity and each

23   defendant's financial interest in the activity.

24          When you begin your deliberations, you should elect

25   one member of your jury as the presiding juror.  That person

1    will preside over the deliberations and speak for you here in

2    court.  You will then discuss the case with your fellow jurors

3    to reach an agreement if you can.

4         Your verdict must be unanimous.  Each of you must

5    decide the case for yourself, but should do so only after you

6    considered all the evidence, discussed it fully with the other

7    jurors and listened to the views of your fellow jurors.

8         Do not hesitate to change your opinion if the

9    discussion persuades you that you should.  Do not come to a

10   decision simply because other jurors think it is right.  It is

11   important that you attempt to reach a unanimous verdict, but,

12   of course, only if you -- each of you can do so after having

13   made your own conscientious decision.  Do not change an honest

14   belief about the weight and effect of the evidence simply to

15   reach a verdict.

16        If it becomes necessary during your deliberations to

17   communicate with me, you may send out a note through the staff

18   attorney or court security officer, signed by the presiding

19   juror or by one or more members of the jury.

20        The member of -- no member of the jury should attempt

21   to communicate with me except in a signed writing.  I will

22   communicate with you on anything concerning this case only

23   either in writing or here in open court on the record.  If you

24   send out a question, I will consult with the parties before

25   answering it, which may take some times.  I'm required to do

997

1    that.  You may continue your deliberations while waiting for

2    the answer to any question you might send out.

3         Remember that you are not to tell anyone, including

4    me, how you stand numerically or otherwise, until after you

5    have reached a unanimous verdict and you have been discharged.

6    Do not disclose any vote count in any note to me.

7         As I indicated before, a verdict form has been

8    prepared for you, and after you reach unanimous agreement on

9    the verdict, your presiding juror will fill in the form that

10   has been given to you, sign it and date it, and advise me that

11   you are ready to return to the courtroom.

12        Now, ladies and gentlemen, that ends the

13   instructions.  And what we will do then is stop now.  It is

14   3:20.

15        And tomorrow morning, I would ask you to be in the

16   jury room, ready to go, at 8:30, and then we come out and you

17   will hear all of the closing arguments.

18        One additional thing has happened to you.  Now you

19   have heard all the evidence.  Now you have heard all the law,

20   so you might think, well, it is time to talk about it.  It

21   isn't, because the closing arguments of counsel by law are a

22   part of the trial, and counsel are entitled to talk to you in

23   their closing arguments, to argue their case to you before you

24   commence your deliberations.

25        So please don't talk about the case among yourselves

1   or, of course, anyone else until tomorrow morning when we give

2   you the case after the closing arguments.

3        It is a sensitive time.  Please remember don't do

4   anything about the case.  Don't even think about looking

5   anything up.  Just don't do anything about the case from now

6   until you get back tomorrow morning at 8:30.

7        Any questions, issues, problems, concerns?

8        Okay.  Have a restful evening, and we will see you

9   tomorrow morning in the jury room.  8:30.

10       (The jury left the courtroom.)

11       THE COURT:  Let the record reflect the jury has left.

12   Give me a minute.  I'm going to go back and see if the verdict

13   is ready for you, because we will give each one of you copies.

14   In the meantime --

15       THE CLERK:  You should have a copy there.

16       THE COURT:  Oh, she is faster and quieter than I

17   thought.

18       So why don't we do this.  Go ahead and take care of

19   the issues with regard to confirmation on the exhibits,

20   whether they are in or not, make sure everybody is on the same

21   track.  Take a look at the verdict form tonight.

22       And why don't we figure that we will all be here

23   right around 8:15, just in case there are any last minute

24   issues on the verdict.  And that way, we will be ready for the

25   jury at 8:30, when we promised them we will be.

999

1          MR. ALEXANDER:  Thank you, your Honor.

2          THE COURT:  We will see you in the morning.

3

4          (The proceedings were adjourned at 3:20 p.m.)

5

6          I, PEGGY J. CRAWFORD, Official Reporter, do hereby

7          certify the foregoing transcript as true and correct.

8

9  Dated:  03/24/2010                    /s/ Peggy J. Crawford
                                         PEGGY J. CRAWFORD, RDR-CRR
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25