1000

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

HON. LAWRENCE J. O'NEILL


ROGER McINTOSH,                  )
                                 )  1:07-cv-1080 LJO
          Plaintiff,             )
                                 )  JURY TRIAL, DAY 6
     vs.                         )
                                 )
NORTHERN CALIFORNIA              )
UNIVERSAL ENTERPRISES            )
COMPANY, a California            )
corporation, et al.,             )
                                 )
          Defendants.            )
_____      )

Fresno, California                   Tuesday, March 9, 2010



          REPORTER'S TRANSCRIPT OF PROCEEDINGS








Vol. 6, pgs. 1000 to 1114, inclusive




REPORTED BY:  PEGGY J. CRAWFORD, RDR, CRR, Official Reporter

1001

APPEARANCES OF COUNSEL:

For the Plaintiff:          LAW OFFICES OF BORTON PETRINI, LLP
                            5060 California Avenue
                            Suite 700
                            Bakersfield, CA  93309
                            BY:  **JAMES J. BRAZE**
                                 **JEFFREY A. TRAVIS**


For the Defendants:

(Northern/Lotus)            LAW OFFICES OF STEVEN J. HASSING
                            425 Calabria Court
                            Roseville, CA  95747
                            BY:  **STEVEN J. HASSING**

(DeWalt)                    ALEXANDER & ASSOCIATES, PLC
                            1925 G Street
                            Bakersfield, CA  93301
                            BY:  **WILLIAM L. ALEXANDER**

(City of Wasco)             GCR, LLP
                            520 South Grand Avenue
                            Suite 695
                            Los Angeles, CA  90071
                            BY:  **CHAKA C. OKADIGBO**
                                 **SUSAN GRAHAM BARNES**

1002

<u>INDEX</u>

EXHIBITS

<u>COURT'S</u>                                              MARKED

A                                                1108
B                                                1108
B-1                                              1111

1 | Tuesday, March 9, 2010                 Fresno, California
2 | 8:15 a.m.
3 |           (The following proceedings were had outside the
4 |           presence of the jury, to wit:)
5 |           THE COURT:  Please be seated.  Back on the record.
6 | Counsel are present.  The jury is not.
7 |           There is an issue?
8 |           MR. OKADIGBO:  Yes, your Honor.  I was looking
9 | through the verdict form, and on page 3, it reads in such a
10 | way that it asks the jury if they answered yes to Questions 1
11 | to 8, they proceed to Question 9.
12 |           Question 9 is a contributory copyright infringement
13 | claim against Wasco.  The way this is laid out, it is possible
14 | for the jury to find that the other defendants didn't do
15 | anything and just Wasco is in Question 7 and 8, but yet they
16 | would still be required to answer contributory and vicarious
17 | infringement questions.
18 |           THE COURT:  So what are you suggesting?
19 |           MR. OKADIGBO:  It really should be, "If you answer
20 | yes to Questions 1 to 6, then proceed to Question 9."
21 |           THE COURT:  What about 7 and 8?
22 |           MR. OKADIGBO:  Well, 7 and 8 are claims against the
23 | City of Wasco.  The City of Wasco can't contribute to its own
24 | infringement.  The underlying infringement, for purposes of
25 | contributory infringement, is what the other defendants did.

1    MR. BRAZE:  I think counsel is looking at the wrong

2 verdict form because I don't see those numbers corresponding

3 to that.  Question 1 through 10 are direct copying.

4    THE COURT:  I think his concern seems to be on page

5 3, lines 20 and 21, the heading, where it is talking about

6 contributory copyright infringement by the City of Wasco.

7    Is that what you have got?  Is that the version

8 you've got?

9    MR. BRAZE:  Page 3?

10    THE COURT:  Page 3, lines 20 and 21, is the heading.

11    MR. BRAZE:  Yes.

12    THE COURT:  So --

13    MR. OKADIGBO:  And my point, just to summarize again,

14 is that a contributory infringement question against the City

15 of Wasco needs to be premised on a finding that the other

16 defendants have committed infringement.

17    The way these questions are laid out, it's as if the

18 City of Wasco engaged in infringement, which are Questions 7

19 and 8, that you could still proceed to ask questions about

20 contributory infringement, even if you have answered no to

21 infringement by the other defendants, which are Questions 1 to

22 6.

23    THE COURT:  Okay.  Just a minute.  Well, except that

24 9, if you look at the wording in Question 9, it says, "Did

25 City of Wasco know or have reason to know of the infringing

1 | activity by the other defendants, if any?"  If there is none,
2 | then there is nothing to answer.
3 |       MR. OKADIGBO:  I agree, but they could possibly still
4 | take yes, even if they have answered no to the other ones.
5 |       THE COURT:  It would be an inconsistent verdict, and
6 | that's one of the reasons I look at the verdict before I take
7 | it.  If there is a problem there, we will bring the jury back
8 | in.
9 |       Unless you have some specific unobjectionable
10 | suggestion, I mean it is easy enough to change the verdict; it
11 | is not a big deal now.
12 |       MR. OKADIGBO:  That's fine, your Honor.
13 |       THE COURT:  Leave it?
14 |       MR. OKADIGBO:  Yes.
15 |       THE COURT:  Everybody else ready to go?
16 |       MR. HASSING:  Yes, your Honor.
17 |       THE COURT:  Mr. Braze, do you want that podium turned
18 | around or not?
19 |       MR. BRAZE:  I think I will be okay with that like
20 | that.  I'm just trying to get the camera up.
21 |       THE COURT:  Okay, that's fine.  We will wait, the
22 | jury should be ready in ten minutes, and we will start.
23 |       (Recess)
24 |       THE COURT:  All right.  Back on the record.  Counsel
25 | are present, the jury is not.  Is there any reason we

1006

1    shouldn't call the jury out now?

2            MR. HASSING:  No, your Honor.

3            THE COURT:  We are ready.  Thanks.

4            (The following proceedings were had in the presence

5            of the jury, to wit:)

6            THE COURT:  And the jury has now joined us.  We are

7    still on the record.

8            Good morning, ladies and gentlemen.  Any issues,

9    concerns?  Good.

10           All right.  We are ready for the closing arguments.

11   Just keep in mind, as we go through these closing arguments

12   this morning, that this is no longer evidence.  You have heard

13   all the evidence.  And this is counsel's opportunity to tell

14   you what they believe the evidence is, and how you should

15   apply it to the law as I have given the law to you.  Remember

16   ultimately, it is your memory that counts as to the evidence.

17           You should understand and be mindful of the fact that

18   the lawyers aren't agreeing what the evidence is or how you

19   should apply it.  That's the purpose of closing arguments, is

20   so they can give you the different perspectives.

21           So just because one lawyer on one side of the case or

22   the other is not jumping up saying, "I don't agree with that,"

23   you will understand, when you hear all the closing arguments,

24   that they have different perspectives.  And it is up to you

25   ultimately to decide what the facts are and to put those facts

1  into action with the law as you find those facts to be.

2          Any questions at all?

3          All right, Mr. Braze, are we ready?

4          MR. BRAZE:  Thank you, your Honor.

5          Good morning, ladies and gentlemen.  You've come to

6  the end of a long journey and have one more step left.  That

7  would be your verdict.

8          And of course, trials like this don't just happen.

9  They take a lot of people, energy.  Certainly, Irma and Sergio

10  have done a wonderful job keeping us organized, and keeping

11  our exhibits together.

12          Peggy, of course, has been working her hands off.

13  She told me she has been hitting about 50,000 strokes a day

14  during the trial, so we thank you for her effort.

15          And of course, there is our Judge O'Neill.  32 years,

16  probably one of the best judges I have ever had the

17  opportunity to appear in front of, and you people of the

18  Eastern District should be proud to have a United States Judge

19  in your community that serves like this.

20          One thing that impressed me was that he was concerned

21  about you and your time and inconvenience.  And you might see

22  that from a federal judge or a state judge who has to run for

23  reelection because you people elect him, but Judge O'Neill is

24  appointed for life, so he doesn't have to impress you.  He

25  doesn't want to, but he is very concerned about your welfare.

1  And so for that, you should be very glad to have a judge like

2  him.

3          But the people we need to thank most, of course, are

4  you.  The eight of you have taken six days now of your lives

5  to help us resolve this case, and for that, we are deeply

6  grateful and thank you.

7          Years ago there was a little cartoon in the

8  newspaper, it was Ziggy, I don't know if you remember Ziggy.

9  It was a one-frame cartoon.  And Ziggy was a little guy.  He

10  was out to a candlelight dinner with this beautiful woman and

11  there is champagne, and underneath is written, "Well, sure,

12  there is plenty of money now, but what happens when jury duty

13  is over?"

14          So those of you that have been supporting any kind of

15  an extravagant lifestyle off what the United States pays you

16  to show up here, that's about to come to an end; that's about

17  over.

18          I want to thank you for driving so far.  I have never

19  had a jury that had to come so far.  Bakersfield, Mojave,

20  Los Banos.  That's truly impressive, that you come this far

21  and be on time every day.

22          You only have one leg left and you can go back to

23  your normal lives and return to your normal occupations.

24          I had a chance to speak to you first because we are

25  the plaintiff.  And after the defendants put their arguments

1009

1    on, I will address you again.

2          And my general outline is kind of give you an

3    overview of what we view the case is during our closing

4    argument.  And then after the defendants present their

5    arguments, I will try to address some of the issues they

6    raised in their arguments.

7          So this is the case of Roger McIntosh versus Northern

8    California Universal Enterprises Company.  We are here in the

9    United States District Court because, as I indicated, in the

10   beginning, this is a copyright case, which arises under

11   federal law, and this case has -- this court has original

12   jurisdiction in those cases.

13         I started my argument off to you talking about

14   damages.  I'm going to start my closing argument off to you

15   the same way.

16         You have been instructed yesterday that in this case,

17   the plaintiff is entitled to recover actual damages and

18   profits from the defendants as a result of the infringement.

19         And as we indicated to you in voir dire, this is the

20   law.  You don't really have a choice of following it or not.

21   You promised to follow the law, and this is what the judge has

22   instructed you.

23         Well, let's talk about actual damages.  As you

24   recall, this is Exhibit J 4, and it shows that Mr. McIntosh's

25   company expended $1.1 million in effort to develop the

1   studies, the plans and drawings.

2          And then, as you recall, when he was on the witness

3   stand, he testified that his time at -- his average time for

4   his people had risen from $72 an hour to $144 an hour, which

5   would take that to 2.2 million.  And subtracting the amount

6   that he was paid of 0.8 million, that was $1.4 million.

7          And as you recall, the Judge allowed Mr. McIntosh

8   that his hourly time had increased to a rate of $144 for the

9   year 2004.  And at first, remember I was puzzled as to what

10  was that about, but I realized the Judge had it right.  2004

11  was the year of the infringement and, therefore, that would be

12  the year that you would set the value of the work.

13         And so the value of the work, after subtracting out

14  the amount paid, comes out to 1.4 million.

15         Well, let's look at infringer's profits.  Now, we

16  have heard a lot of talk in this trial about Lotus, about

17  Northern California Universal Enterprises Company and about

18  Joe Wu.

19         I don't know how you can tell from what was said on

20  the witness stand when Joe Wu was acting on behalf of Northern

21  versus when Joe Wu was acting on behalf of Lotus, but you have

22  a basic fact that Northern California Universal Enterprises is

23  the General Partner of Lotus, and then for any act by Northern

24  California would be attributed to Lotus.

25         And they are all tied together.  You saw a contract

1   between Northern and DeWalt.  The bills were paid by Lotus.

2   And so, to me, I think there is a unity of identity.  And so I

3   think in the verdict where you are asked about a question for

4   Lotus or NCUE, that they are basically the same.  I don't

5   think that Mr. Wu has established any distinction between

6   those entities.

7           Now, what he has got, basically, is he has the land

8   held in the limited partnership, which is Lotus, but he has

9   got Northern California doing work.  And I think that's

10  obviously done for reasons which we won't discuss today, but I

11  don't think you can really make that distinction based on the

12  evidence that you have heard.

13          And as you recall, Plaintiff's Exhibit P 112, which

14  Mr. Merati testified to, show that Mr. Wu's total profit for

15  building homes on the 68 lots was $3.9 million.

16          Now, you heard some testimony yesterday that Mr. Wu

17  was going to lose a million dollars because he was not going

18  to sell 68 homes, but he was going to take 38 of those lots

19  and sell them at a loss, generating a million dollar loss.

20          And you have a financial adviser like Dr. Merati, who

21  basically said that would be really unwise from a financial

22  standpoint to sell off those lots, because Joe Wu front-end

23  loaded his construction costs and interest on the houses he

24  built, and the profits on the remaining homes would be very

25  high, around $70,000.

1    So why is Joe Wu choosing to do those things?  I

2  think Mr. Wu is a very knowledgeable and sharp businessman,

3  and I don't think he does anything to lose money.

4         Now, you know, of course, he bought the 34 acres with

5  the subdivision on it.  And he has 64 acres.  And, of course,

6  he owns the golf course.  What a deal.  $1.6 million, he paid.

7  He got improvements in the ground worth $1.9 million.

8  Basically, he got a hundred acres free.

9         So -- and as Dr. Merati testified, this parcel is on

10  sale on the Internet for $2.8 million.  So Dr. Merati gave a

11  very conservative economic evaluation.  And he came up with

12  $3.9 million.

13         I seriously doubt whether Mr. Wu's intent is to truly

14  potentially lose a million dollars.

15         And then, of course, we have Wasco.  One of their

16  items of damages or -- excuse me -- profits were that they

17  paid or received, I should say, $1.6 million for a property

18  they picked up at a tax sale for $100,000.

19         So this Exhibit J 21 shows that they collected impact

20  fees of $529,000 as a result of this transaction.  And what's

21  interesting to note, is that these fees are collected at the

22  time the builder takes out the building permit.

23         The testimony has been that all of the building

24  permits have been taken out for the 68 lots, which would also

25  be strange, that Joe Wu would want to intentionally sell off

1   lots if he already had building permits for all 68 of these

2   lots.

3            So I think there is probably something going on here

4   that we may never know the truth, but let me point to some

5   facts to you that I think would cause you to wonder what's

6   going on.

7            It wasn't until the trial of this matter that I

8   finally realized that escrow didn't close on the subdivision

9   that Joe Wu bought until December 28th, 2004.

10           As you recall, Joe Wu had hired DeWalt.  They had

11   already prepared the tentative map and submitted it in

12   November of 2004, at a time when Joe Wu didn't even own the

13   property.

14           So what's going on?  Is this a deal between the City

15   and Joe, where, "If you approve my tentative map, and I will

16   close the deal and take out my building permits right away, so

17   you get $529,000 in impact fees"?  Is that what we got going

18   on?  I don't know.  A question someone should answer to you

19   based on the evidence in this case.

20           And, of course, we know DeWalt made around 26,000.  I

21   think the exact number is 27-2.  If it is 26 or 27, it doesn't

22   really matter.  We know that was their profit.

23           Now, you have been instructed that a copyright is the

24   exclusive right to copy.  This includes exclusive rights to

25   authorize or make additional copies, recasts, transform, adapt

1   or make derivative works, distributive copies and display.

2   Those are Mr. McIntosh's exclusive rights, meaning he is the

3   only person that can do that based on the fact that he has a

4   copyright.

5        So copying.  Obviously, if we proved somebody copied

6   something, that's copyright infringement.  But because that's

7   so hard to do, the law does not require you to do that.  I

8   believe there is plenty evidence before you that someone

9   intentionally copied, thanks to plaintiff's expert, Mr. Wong.

10  You remember, he said, "Well, gee, if they were going to copy,

11  why didn't they just copy the exact same numbers?"  So we went

12  through about 30 or 40 numbers that were identical to the

13  hundredth of a foot.

14       And he thought, "Well, there could be copying."  So

15  there is enough evidence before you of actual copying.  But,

16  again, we don't need to prove that.  All we have to show is

17  access and substantial similarity.

18       So we have access.  That's no problem.  DeWalt's

19  Request For Admission Number 4, which we read to you:

20       "Responding party admits that it reviewed multiple

21       documents, which likely included" -- this was

22       DeWalt's admission of access.  "Responding party

23       admits that it reviewed multiple documents, which

24       likely included Tentative Map 5472, before preparing

25       Tentative Map 6451."

1    So I submit to you, access is over.  All you have to

2 find is that there is substantial similarity between Tentative

3 Tract Map 6451 and Tentative Tract Map 5472.  And you

4 remember, Mr. Wong went through with me through every

5 measurement and curve in those two maps that was identical.

6 Not just substantially similar, but identical.

7    You don't need to find that these maps are identical,

8 you only need to find that they are substantially similar.

9 That's the law.

10    DeWalt also admitted that:

11    "Documents used to prepare the parcel map" --

12    "Documents used to assist in preparing Tentative

13    Tract Map 6451 included the Parcel Map 9572, Parcel

14    Map 9629, Parcel Map 10488, Parcel Map 10542, Parcel

15    Map 10556," and a whole bunch of other parcel maps.

16    And of course, Tentative Tract Map 5472.

17    So again, access is not an issue.  The only issue, if

18 you don't believe that they actually copied, but they

19 physically copied the numbers, you can still find copying as

20 long as the documents are substantially similar.

21    You know, in every court, every trial, there is

22 always two witnesses that are present in the courtroom that

23 don't take the witness stand.  And those witnesses are logic

24 and common sense.  And so in viewing the evidence, always

25 listen to what logic and common sense have to tell you

1    because, ultimately, that's what the law is or should be,

2    isn't it?

3         Let's look at what logic and common sense have to

4    say.  This is a piece out of Joe Wu's deposition that I read

5    to you.  And Mr. Travis makes a comment, "It's a good market

6    for you today."

7         And Mr. Wu's answer was, "I clean up."

8         Well, he certainly has, hasn't he?  He has got a

9    hundred acres, basically, for free.  He has -- part of that,

10   he has up for sale for $2.8 million, and he is going to make

11   $3.9 million selling houses.

12        Now, Mr. Wu's counsel wants you to believe that that

13   means like "clean up on aisle five."

14        But I think if you look at it in the context,

15   Mr. Travis says, "It's a good market for you today," and

16   Mr. Wu says, "I clean up."  I think the logical and common

17   sense interpretation of that is, "I'm going to make a lot of

18   money."

19        And this isn't the first time he has done that, is

20   it?  I believe he testified he had six other similar projects,

21   where he takes failed housing developments --

22        MR. HASSING:  Objection, your Honor.  Misstates the

23   evidence.  Not in evidence.

24        THE COURT:  The objection is sustained.  I think he

25   did not testify in the trial that he -- with regard to that.

1    MR. BRAZE:  I believe he said there were three other

2    municipality ones that he had taken.

3    THE COURT:  That, I believe, is true.

4    MR. BRAZE:  Three other municipality ones that he had

5    taken.  So keep that in mind when you are reaching your

6    decision.

7    Now, you heard some stipulated facts, and most of

8    them are fairly straightforward.  Wasco purchased the land in

9    2002.  Wu contracted with McIntosh in 2004.  DeWalt prepared

10   the Tentative Tract Map 6451 in November of 2004.  And then in

11   December of 2004, Wasco sold the tract to Lotus.

12   So as I said, Mr. Wu is contracting with DeWalt,

13   DeWalt is performing the drawing of the tentative map, all at

14   a time when Mr. Wu didn't own this property.

15   Again, Joe Wu controls both Lotus and NCUE.  He is

16   the President of NCUE.  NCUE is the general partner of Lotus.

17   And so I think there is a unity of identity there.

18   Now, there is another concept in copyright called

19   "vicarious infringement."  This means if you don't do the

20   copying yourself, you still can be liable.  And as the Court

21   instructed you yesterday, defendant is liable for copyright

22   infringement of another if defendant profited from the

23   infringement and defendant had the right and ability to

24   supervise the infringing activity, whether or not the

25   defendant knew of the infringement.

PLAINTIFF'S CLOSING ARGUMENT

1018

1     And let me go back to direct copying again.  Wasco
2  committed direct copying.  I don't think there is any
3  question.  I don't even think they could stand up here with a
4  straight face and argue it.  They are the one that put the
5  tentative tract map in the Developer Information Package.
6  They are the one that sent the tentative map to DeWalt.
7  That's copying.  They are the ones that sent the improvement
8  plans to DeWalt.  That's direct copying.  So there is no
9  question that Wasco committed direct copying.  I just don't
10  think there is even an issue there.
11     So with respect to vicarious infringement, defendant
12  is liable for copyright infringement of another if defendant
13  profited from the infringement and defendant had the right and
14  ability to supervise the infringing activity, whether or not
15  the defendant knew of the infringement.  There is no knowledge
16  requirement.  The defendant who is vicariously liable for
17  infringement doesn't need to know that the other person is
18  doing something wrong, is violating the copyright law, to be
19  vicariously liable for copyright.
20     So we say, with respect to Wu and Wasco, yes, there
21  is vicarious infringement.  Not only did Wasco directly
22  infringe, but he vicariously infringed by providing the
23  material to DeWalt in the form of the tentative map and in the
24  form of the improvement plans.
25     And with respect to substantial similarity, of

1  course, we have been talking a lot about the two tentative

2  maps.  But we believe there is a substantial amount of

3  evidence that shows that there is also copying of the

4  improvement plans in preparing the Final Tract Map Number

5  6451.

6          Of interest, you will note that the bearing in the

7  middle of St. Andrews Crescent is identical to the bearing

8  contained on the construction -- or excuse me, the grading

9  plan over here.  It's North 39, 16 minutes, 5 seconds West.

10  And that bearing over there is also identical.

11         Now, when I say "identical," I mean to the hundredth

12  of a foot and to the second.  Remember, 360 degrees in a

13  circle, 60 minutes in a degree, 60 seconds in a minute -- 60

14  seconds in a minute.  So that's very precise.  And they are

15  exactly the same when I say they are the same.

16         You will also find the bearings of Olympic Court are

17  identical, both in the north-south direction and the east-west

18  direction.  You are going to find the bearings of Sawgrass

19  Court identical in the east-west direction.  You are going to

20  find the bearings of Valley Rose Parkway identical.

21         And you can say, well, that might all come from the

22  parcel map.  But, again, bearings of Pebble Beach Way,

23  identical.  Remember the cart path widths kept changing?  Ten

24  feet, 15 feet, 16 feet?  You will find that the cart path

25  widths, the three of them, identical.

1    This curve in the intersection of Rose Valley Parkway

2  [sic] and St. Andrews Crescent is a very interesting curve.

3  The straight -- the center of the road doesn't go right

4  through the intersection.  They are a little offset, and so

5  you have some inverse curves.  Highly unlikely someone could

6  figure that on their own.  They are identical between the

7  grading plan and the intersection of those two roads.

8    Landscape easements on either side of Rose Valley

9  Parkway are identical.  And I believe, unlike the tentative

10  map, the bearings on the east boundary are identical.

11    So compare them yourself, but I think you are going

12  to find they are identical.  And, again, it doesn't matter if

13  they were directly copied.  All you have to do is have access

14  and substantial similarity, and you have copying.

15    They had access.  They had received the improvement

16  plans from the City of Wasco, and they are substantially

17  similar.

18    So back to vicarious infringement.  Certainly, the

19  City of Wasco had the ability to control the activity of

20  DeWalt and did not need to send them the improvement plans or

21  the tentative map, but it did.  It certainly profited.  It had

22  the right and ability to supervise and control.  They could

23  have said no.  And it doesn't matter whether they knew or not

24  of the infringement, they would be guilty of vicarious

25  infringement.

1    Certainly, Mr. Wu -- and again, when I say "Wu," I

2  mean Northern and Lotus, because I don't think it really is

3  worth wasting the time to mention each one every time because

4  they are all the same, Mr. Wu certainly profited, we know, to

5  at least 3.9 million.

6    He had the right and ability to supervise the

7  infringing activity.  As DeWalt said, "If Mr. Wu had told us

8  to stop, we would have stopped."  And again, it doesn't matter

9  if he knew they were infringing.  That's the law.  And so I

10  believe it would be fairly straightforward to find that there

11  was vicarious infringement on the part of Mr. Wu and Wasco.

12    Wu had the right and ability to supervise.  He chose

13  to go to DeWalt and could have stopped it.  He is liable

14  whether he knew or not of the infringement, and certainly he

15  profited.

16    Which is another one of those kind of logic and

17  common sense questions.  When Mr. Wu called Mr. McIntosh, it

18  was clearly before he bought the property because it was

19  before he went to DeWalt.  And Mr. Wu was informed that

20  Mr. McIntosh was owed a lot of money for the plans and Mr. Wu

21  chose to go somewhere else rather than pay what Mr. McIntosh

22  was due.  So certainly that was intentional, there was no

23  matter of intent there at all.  He just did it.

24    And so he is liable, whether he knew of infringement

25  or not.  He chose DeWalt and could have stopped it.  And he

PLAINTIFF'S CLOSING ARGUMENT

1022

1    profited from the infringement.

2            Again, I think you can find Wasco both directly

3    liable, both direct copying and vicarious infringement.  With

4    direct copying, we had them copying and put it in the

5    Developer Information Package, copying and sending it to

6    DeWalt, so that's direct copying.

7            But, again, they had the right and ability to

8    supervise the infringing activity.  They could have told

9    DeWalt to stop, because, after all, who owned the property at

10   that time?  City of Wasco.  When DeWalt was working on the

11   project, the City of Wasco owned the property, not Mr. Wu.

12   They provided copies to DeWalt.

13           They admitted that the work was the property of the

14   engineer.  And you recall their employee, Mr. McNamara --

15   Mr. Woodcock acknowledged that the drawings were the property

16   of the engineer, and even Mr. Wong verified that.

17           And Mr. McIntosh puts the © on his drawings,

18   indicating that he considers them to be -- his work, his

19   copyright.

20           There is a second concept called "contributory

21   infringement," which the defendant is liable if he knew or

22   should have known of the infringing activity and induces,

23   causes or materially contributes to the activity.  And Mr. Wu,

24   in hiring DeWalt, contributorily contributed toward that.

25   Wasco, in furnishing the plants to DeWalt for both the

 1    tentative map and for the improvement plans, contributorily

 2    infringed.

 3         There again, if they knew or should have known of the

 4    infringing activity.  Had the improvements plans with the © on

 5    them.  They were on notice.  Wasco induced, caused or

 6    materially contributed to the activity by providing the

 7    documents to DeWalt.

 8         Now, at the conclusion of the verdict form, there is

 9    a question as to whether Northern California Universal

10    Enterprises Company and Lotus are partners or practically

11    partners.  I don't see how you can answer no to that question.

12    It's admitted that Northern California Universal Enterprises

13    Company is the general partner of Lotus.  And so they are

14    actual partners, they are not practically partners, they are

15    actually partners.

16         There is some unanswered questions in this case that,

17    hopefully, we will hear an answer to in the defendants'

18    argument.

19         Wonder, why haven't the improvement plans been

20    accepted all these years?  Until the improvement plans are

21    accepted, the City doesn't take responsibility for maintaining

22    them.  So why haven't they been accepted?

23         Why did Wasco put plaintiff's map in the Developer

24    Information Package when its primary intent was to sell the

25    golf course?  That was what the City Manager said.  Who made

1  that decision?  No one could tell you.

2          I got to tell you, in as many years as I practiced, I

3  have never seen a case where I have heard, "I don't know," "I

4  don't remember" --

5          MR. ALEXANDER:  Objection.  Injecting his personal

6  opinions.

7          THE COURT:  The objection is sustained, only because

8  it is not arguing that which is in evidence.

9          MR. BRAZE:  Okay.  I think you have heard a lot of

10  answers of "I don't know," "I don't remember," especially from

11  people who should have known, like the people who made the

12  map.

13          Sarah Burgi, her initials are on it.  She doesn't

14  remember how that map got made.  Doesn't remember how the lot

15  numbers got on there.  She said, what was it?  "Josh Woodard

16  did it."  And, of course, Josh Woodard comes in here and he

17  doesn't remember anything about it.

18          And then Mr. Gutierrez gets on the stand and tells

19  you a long litany of names of people who worked on this

20  project.  And not one of them took the witness stand.

21          Mr. Gutierrez testified about things he hadn't done.

22  He talked about what other people did, but never once did they

23  call an employee of DeWalt to answer any of those questions.

24          Now, you remember yesterday morning, we had the

25  gardener from Wasco come in here and tell you about the fact

1   that there might be some lot numbers on curbs.  No one from

2   DeWalt, though, told you that's where they got those lot

3   numbers, is it?

4        He also suggested to you that there was some street

5   signs up.  No one from DeWalt suggested to you they got those

6   street names from street signs.

7        And more importantly, you remember the pages and

8   pages of shot points that were taken by DeWalt.  And I asked

9   Mr. Gutierrez, "Where are the lot numbers shown on the shot

10   points?"

11        And he said, "Well, they are not there."

12        Well, it seems to me if you are doing a survey in the

13   field and there happens to be a street number on the curb, you

14   would write it down to show you how those shot points relate

15   to that lot number.

16        A lot of unanswered questions.

17        And again, my favorite, if DeWalt did a detailed

18   survey, why doesn't the tentative map correspond to the final

19   map?  If you went through all that trouble of spending 80

20   man-hours surveying, you would think you would have it dead

21   on, but you will see the difference between the tentative map

22   and the final map are different.  I don't know why.

23        Why did DeWalt need to look at the improvement plans

24   if they went out there and surveyed?  They testified under

25   oath they did look at the 5472 tentative map.  Why, if they

1   did a detailed survey?  Why didn't DeWalt simply call

2   Mr. McIntosh?  They both live in the same city.  They could

3   have cleared some of these things up as to what was going on.

4          And of course, who drew the map?  Who actually drew

5   the map?  Sarah Burgi and Josh Woodard are going like that

6   (Gesturing).  Yep, they heard about everybody who worked on

7   the project, but none of them were in the courtroom.

8          Lastly, why can't somebody tell us how the lot

9   numbers got on the map?  The gardener suggested to you they

10  were written on the curb, but no one who actually drew the map

11  suggested to you they took those numbers and put them on the

12  map.

13         So a lot of unanswered questions.

14         Well, this is your verdict and I would like to walk

15  you through it.  I'm going to try to see if it's clearer

16  laying over here on the Elmo versus from my computer.  I feel

17  like an optician, "Which is better, this one or that one?"

18         Two, this one?  Okay.

19         So this verdict you are going to be asked to fill out

20  is about nine pages long.  I, hopefully, have the right

21  verdict.  Do you have --

22         THE COURT:  Take a look at Number 32, that will tell

23  you.

24         MR. BRAZE:  Goes to 33?

25         THE COURT:  Yes.

1    MR. BRAZE:  Okay.  Can I mark on this?

2    THE COURT:  Yes, you can.

3    MR. BRAZE:  So the first question you are going to

4  answer, starts with copyright infringement and then in the

5  back, it goes to damages, and you sign your verdict on 9.

6    Question 1:  Did Dennis DeWalt copy Plaintiff Roger

7  McIntosh's tentative map for Tract 5472?

8    Again, we believe there is copying, but all we have

9  to do is prove access and substantial similarity, and we

10  believe the answer to that question is "yes."

11    Question number 2:  Did Dennis DeWalt copy Roger

12  McIntosh's improvement plans?

13    Again, as I just showed you, it appears that the

14  grading plan has been copied.  Again, don't need to prove

15  copying, just need to show access and substantial similarity.

16  And the answer to that is "yes."

17    Did Northern California Universal Enterprises

18  Company -- and I will call that Wu -- copy Roger McIntosh's

19  tentative map?

20    In all fairness, I don't believe so.  I don't think

21  he copied anything.  So I think that answer is probably "no."

22  Same with improvement plans, same thing on behalf of Lotus.

23    And Question Number 7:  Did Defendant City of Wasco

24  copy plaintiff Roger McIntosh's tentative map?

25    Obviously, yes.  Copied and distributed, without

1028

1  authorization.

2       Did Defendant City of Wasco copy Roger McIntosh's

3  improvement plans?

4       Again, obviously, yes.  Without authorization, they

5  distributed them to DeWalt.

6       Contributory copyright infringement by Defendant

7  Wasco, and for the reasons I gave to you, we believe they also

8  committed contributory copyright infringement, and that would

9  be also for Question Number 10.  They contributed to

10  infringement by distributing copyrighted works.

11       Then we have a set of questions addressed towards

12  vicarious copyright infringement.

13       Did the Defendant City of Wasco profit from any

14  copying?

15       Yes, of course.  That was part of the big deal.  They

16  were going to sell the golf course, they were going to unload

17  the tract and receive $1.9 million back, for which they paid

18  100.  Excuse me, 1.6 million.  They paid 100, so that's $1.5

19  million in profits plus the $529,000 in impact fees which they

20  received when Joe Wu took out all the building permits on 68

21  houses.

22       Did the City of Wasco have the right and ability to

23  supervise or control the other defendants' copying?

24       Yeah.  Simply by not turning them over, they could

25  have said, "If you want the plans, go ask Roger McIntosh.  He

1  owns the plans."

2  Did the City of Wasco fail to exercise the right and

3  ability to supervise or control the other defendants' copying?

4  And, of course, we believe that's "yes" because they

5  could have told DeWalt no and Mr. Wu no, but they didn't.

6  Could have told them to stop and they didn't.

7  Did Defendant Dennis DeWalt profit directly from any

8  copying?

9  Yes.  He made a lot -- excuse me, he didn't make a

10  lot.  He made 26, $27,000, but make no mistake of this.  This

11  is a common theft.  The guy who drives the getaway car gets

12  paid the least.  They are driving the getaway car.  They only

13  made 26 or $27,000.

14  Did DeWalt have the right and ability to supervise or

15  control the other defendant's copying?

16  They could have called a halt to it.  They are

17  engineers.  As their only expert said, Mr. Wong, told you, it

18  would have been unethical for them to copy.  Mr. Woodcock told

19  you that engineers own the plans.  Engineers know that.  They

20  had the ability to stop.

21  Did Dennis DeWalt fail to exercise the right and

22  ability to supervise or control the other defendants?  "Yes."

23  Did Northern California Universal profit directly

24  from any copying of plaintiff Roger McIntosh's work?

25  I guess I should change "yes" to, "and how."

1    Question number 18:  Did Northern California

2    Universal Enterprises have the right and ability to control or

3    supervise the other defendant's copying?

4    Again, they could have said no to DeWalt or tried to

5    work this thing out.  They had plenty of time, as you recall.

6    They were talking to Mr. McIntosh earlier in the year.  The

7    escrow didn't close until December 28th.  They had plenty of

8    time to figure out what was going on with Mr. McIntosh, why he

9    claimed he was owed money, if a deal could have been worked

10   out, but nobody wanted to go there, did they?  They all just

11   went their own way in conscious disregard of Mr. McIntosh's

12   rights.

13   Did Northern California fail to exercise right and

14   ability to supervise or control?  "Yes."

15   And then you get the same questions as to Lotus,

16   which, of course, I don't see any difference between Lotus and

17   Northern California Universal, so I would mark the same with

18   regard to Lotus.

19   Then we get down to damages.

20   Question number 23:  What is the total amount of

21   actual damages Roger McIntosh is entitled to?

22   And I showed you, that's $1.4 million is the actual

23   damages.  I wrote it out like that.  If you like the zeroes,

24   you can put zeroes.  There are six zeroes in a million.

25   Did Defendant DeWalt obtain a profit?  "Yes."

1       What is the amount of defendant DeWalt's profit?

2       I believe we heard testimony about $26,000.  I

3  thought it was 27,200, but close enough.  Doesn't really

4  matter.  We will give them the benefit of the doubt.

5       Did Northern California Universal Enterprises -- not

6  used to this high technology.  So here on damages, I showed

7  1.4 million for actual damages to Mr. McIntosh, which is the

8  value of the work.

9       Did DeWalt obtain a profit?  "Yes."

10      And what was the amount of the DeWalt profit?

11      26 to $27,000.  Gave them the benefit of the doubt,

12  whichever one you feel.

13      Did Northern California Universal Enterprises Company

14  obtain a profit from its infringing activity?

15      Answer, "Yes."

16      What is the amount?

17      I would suggest to you $3.9 million because that's a

18  conservative number that Dr. Merati came up with.  Doesn't

19  take into account the golf course.  Doesn't take into account

20  the $2.8 million parcel over here, Parcel Number 3.

21      But more importantly, if you recall Dr. Merati's

22  testimony, it doesn't take into account the benefit from this

23  commercial piece of property right here, which is fronting on

24  Valley Rose Parkway.  If you got 68 residences in there, it

25  would be an ideal spot for obviously grocery stores or

1    gasoline stations.  They would have a captive market.  Very

2    valuable piece of property, that designated remaining.  So 3.9

3    million is a very, very conservative estimate for Mr. Wu's

4    profits.

5            So again, Defendant Lotus, they are the same, and the

6    amount Lotus made, again, 3.9 million.

7            Did the Defendant City of Wasco obtain a profit?

8            Yes, they did.

9            And Question 31, what is the amount of the Defendant

10   City of Wasco's profit?

11           As you recall, they sold the tract for $1.6 million;

12   they had acquired it for 100,000.  So they had a profit there

13   of 1.5 million.  And since somehow they got Joe Wu to take out

14   his building permits when he closed escrow, they also

15   immediately received $529,000 in impact fees, and that total

16   amount is 2 million -- 2.029 million.

17           Question 32 is actually a no-brainer.  Just asks you

18   whether you think Northern California and Lotus are partners

19   or practically partners.  I don't see any way you can argue

20   the opposite.  So I think that answer should be "yes."

21           And, of course, this would be "yes" also because it's

22   Lotus.

23           And you are free to go home as soon as you sign and

24   return the verdict.

25           Now, I have tried to hit the highlights for you.

1   After the other defendants give the closing arguments, I will

2   try to respond to some of their allegations.  I don't want to

3   put you to sleep, so I will turn it over to these defendants.

4   Remember, ask what logic and common sense would say when they

5   are talking.  Thank you.

6           THE COURT:  Mr. Hassing.

7           MR. HASSING:  Good morning, ladies and gentlemen.  On

8   behalf of Mr. Wu, I sincerely want to thank you for your time.

9   Like Mr. Braze commented, we understand that you have other

10  things that you could be doing this last five or six days, and

11  we really appreciate the attentiveness that you have given to

12  the evidence as it's gone on.

13          You know, the attorneys, as the witnesses are

14  testifying, the attorneys are listening to the witnesses and

15  they are also watching the jury.  And this jury has been a

16  very attentive the entire time.  You have taken a lot of

17  notes.  You have listened to all the evidence.  Nobody went to

18  sleep.

19          And we really appreciate that because the defendants

20  come here and, you know, they are not here by choice.  They

21  are brought by Mr. McIntosh, and all they seek is a fair deal.

22  In order for them to get a fair deal and to get justice, the

23  jury has to listen to the evidence and make a decision based

24  on the evidence.  And we thank you for that.

25          Now, my closing is not going to take a lot of time.

1034

1    In fact, it is even going to be shorter than it was going to

2    be since Mr. Braze, on behalf of Mr. McIntosh, has now

3    admitted finally that Mr. Wu -- neither Mr. Wu nor any of his

4    companies copied anything.

5         This is a copyright case, and copyright is about

6    copying somebody else's copyrighted work.  And we now find

7    that they agree, Mr. Wu, Northern, Lotus, didn't copy

8    anything.  Good news for Mr. Wu.

9         I am going to talk a little bit about the jury

10   instructions.  I'm going to talk a little bit about the

11   verdict form.

12        I'm not going to talk a lot about the witnesses and

13   the evidence, because you were all here, you heard the

14   evidence.  You listened to the witnesses, you know which

15   witnesses you want to believe and can believe.  You know which

16   ones had credibility.  I don't need to tell you.

17        But I do want to make a comment about Mr. Braze's

18   analysis of the evidence.  Now, Mr. Braze got up and he

19   explained to you what he thinks the evidence is.  He asked you

20   to trust him.  He asks you to adopt his analysis of the

21   evidence, and you have to decide whether or not you can trust

22   Mr. Braze at this time.

23        And I would like to take you back to the opening

24   statement.  And, of course, the plaintiff gets the first

25   opportunity to talk to the jury during the opening statement,

1   and it's crucial because they get to tell you what they think

2   the evidence is going to be, what the evidence is going to

3   show.  And it's your first impression.

4           And you all know about first impressions.  They are

5   important.  What was one of the first things Mr. Braze did

6   during opening statement?  I wrote it down.  It was very

7   interesting.  He said that "The evidence will show that when

8   Mr. Wu called Mr. McIntosh, Mr. Wu asked Mr. McIntosh if he

9   could use Mr. McIntosh's plans."  Do you remember that?

10          The first thing that I said when I got up to make my

11  opening was that, "Look, that's not what the evidence is going

12  to show.  And it won't be Mr. Wu telling you that, it will be

13  Mr. McIntosh admitting that that's not what happened."

14          And when Mr. McIntosh got up on the witness stand, I

15  asked him, "Did Mr. Wu ever ask if he could use your plans?"

16  And he said.  "No."  That's not what Mr. Braze told you the

17  evidence would show.

18          The other thing is, Mr. Braze said that during that

19  conversation, Mr. McIntosh told Mr. Wu, "My map was

20  copyrighted and my plans were copyrighted."

21          And I told you that's not what the evidence is going

22  to show, that's not what happened.

23          And, again, Mr. McIntosh got on the witness stand and

24  he said, "I never mentioned the word 'copyright.'  Never said

25  anything about copyright.  And not only that, I never said

1 anything about my plans."

2       Mr. Wu called to talk about a tentative map. That's

3 all they discussed, is a tentative map. They didn't discuss

4 any plans. They didn't discuss any copyright. How is Mr. Wu

5 supposed to know about a copyright? Mr. Wu is a builder. He

6 is a developer. He builds houses.

7       But Mr. Braze said, "That's what the evidence is

8 going to show." And he was asking you to trust him to believe

9 that is what the evidence was going to show.

10       And then to top it off, he said that Mr. Wu used the

11 map and the plans. And now, today, finally, after five days

12 of trial, he admits, "No, Mr. Wu, Mr. Wu didn't copy

13 anything."

14       So when Mr. Braze asks you to trust him to tell you

15 what the evidence was, which you heard, I suggest that you use

16 your own judgment. And when he tells you how to analyze the

17 evidence, how to make these calculations about profit, why you

18 should believe in Mr. Merati's speculation, think about that.

19       And he asked you to use logic and common sense. Go

20 ahead. Use logic and common sense. Does your logic and

21 common sense tell you that Mr. Merati had any idea what

22 Mr. Wu's profit would be, if any? All based on speculation.

23       Let's take a look at some of these jury instructions.

24 Instruction Number 24 -- and you will have these in the jury

25 room with you -- instruction 24 tells you that ideas cannot be

1037

1  copyrighted.  Ideas themselves cannot be copyrighted.

2         Now, we have taken a look many times at the

3  subdivision, obviously, that's the subject of this lawsuit.

4  And you heard ad nauseam about this 68-lot subdivision that

5  was Revised 5472.  And the layout of the subdivision is an

6  idea, an idea of how to lay out lots to be built on on a piece

7  of land.

8         This was Mr. McIntosh's idea.  And ideas can't be

9  copyrighted.  You will see that in your jury instruction.

10  Ideas are free for anybody to use.  And that's an important

11  element of copyright law, because there is not only one jury

12  instruction on it, there is two or three.

13         Jury Instruction 26 will also tell you, "Copyright

14  protection of an original work of authorship does not extend

15  to any idea."

16         What it extends to is the expression of the idea.

17  What is the expression of the idea?  It's the actual drawing

18  on a piece of paper of the idea.  That's how this idea is

19  expressed.

20         DeWalt, Mr. Wu, they can't actually copy what was

21  drawn, but the idea is fair game.

22         And so if DeWalt goes out there and surveys what's in

23  the ground, they are not copying the expression.  They are not

24  copying what's on the paper.  They are using the same idea.

25  And you know why they used the same idea?  Is because all the

1   streets and everything were in.

2          Jury Instruction 27.  Here's the third time the law,

3   which the Judge read to you, talks about ideas.  "A copyright

4   is not violated when someone uses the idea from a copyrighted

5   work as long as the particular expression of that idea in the

6   work is not copied."

7          So nobody here is saying that DeWalt could have sat

8   down at their drafting table and copied this paper map.  If

9   they had done that, yeah, there would have been copyright

10  infringement.  There is no evidence that they did that.  The

11  evidence that you have before you is that they went out and

12  surveyed everything.

13         Now, there are other things that can't be

14  copyrighted.  Ideas can't be copyrighted and facts can't be

15  copyrighted.

16         Jury Instruction 24.  Facts cannot themselves be

17  copyrighted.  What facts do we have in this case?

18         Well, when DeWalt was hired, there were asphalt

19  streets out there in Wasco; that's a fact.  There were

20  concrete curbs; that's a fact.  There were block walls; those

21  were all facts.  There were monuments placed in the ground.

22  Some of those monuments were placed in the ground by McIntosh.

23  But those are facts.  So if DeWalt goes out and makes note of

24  those facts, that's not copyright infringement.  Jury

25  Instruction 24.

1    Jury Instruction 30 is an interesting instruction.
2  It says, "An original work may include or incorporate elements
3  taken from prior works, works from the public domain, and
4  works owned by others with the owner's permission."  "Works
5  taken by" -- "works by others with the owner's permission."
6    Well, in conjunction with that instruction, I want
7  you to consider some testimony from yesterday, where Mr. Braze
8  asked Mr. Wong if it was ethical to copy somebody else's work.
9  And Mr. Wong said it wasn't.  And again this morning,
10 Mr. Braze pointed out that it is unethical to copy somebody
11 else's work.
12    And the greatest irony of this whole trial is
13 Mr. McIntosh coming in here, screaming, "Copycat, copycat,"
14 when it turns out, he is the copycat.  He is the one that did
15 the copying in this case.
16    Remember Porter-Robertson's maps?  Let's take a look
17 at some of this stuff.  This is all in evidence.
18    May 11th, 1992, a letter from Martin-McIntosh's man,
19 Mr. Staub, to the City Engineer of Wasco.  This is in evidence
20 as J 33.  Mr. Staub writes:
21    "Since master plans for water, sewer and drainage
22        prepared by Porter-Robertson have been signed and
23        approved by you, our requirement to satisfy Condition
24        11 will be limited."
25    Exhibit J 30, a letter dated April 21st, 1992 from

1   Mr. Staub to the City of Wasco, and it's with reference to

2   Revised Tentative Tract Number 5472.

3          "Topographic contours have not been replotted since

4           they appear on the originally-approved map submitted

5           by Porter-Robertson."

6          So Mr. McIntosh comes in here and he tells you that

7   his work, in creating revised Map 5472, his original work and

8   was copyrighted by him as the original work.  He tells you

9   that his plans were original work.  But we find -- and he even

10  admitted it, once he was forced to, that "Well, you know, we

11  did use Porter-Robertson's work.  We adapted to it, we revised

12  it, we added to it, we changed some of it."

13         But in their exhibits P 102 through P 105, you will

14  find exact copies.  You will have this in the jury room.  You

15  have exact copies of the Porter-Robertson storm drain plan.

16  You have exact copies of the Porter-Robertson sewer plan.  And

17  you have an exact copy of the Porter-Robertson water plan.

18         Now, what's the significance of that, other than the

19  fact that Mr. McIntosh copied this stuff and put it in his own

20  work, his own master plan work that was submitted?

21         He testified that P 108 encompassed the plans that

22  were sent off to the Copyright Office.  He also indicated that

23  P 108 was based on his master plan work, P 102 through P 105.

24         P 102 through P 105 contains a lot of copies.  In

25  fact, I got them all here for you right now.  I took these all

1  out of P 102 through P 105.  These are all copies of work that

2  were not done by Mr. McIntosh or his firm, but were done by

3  others.  All of this stuff here was -- is somebody else's work

4  that Mr. McIntosh has claimed as his own.

5       Because do you remember when he was on the witness

6  stand and at the end of -- I believe it was Tuesday's, maybe

7  Monday -- end of Monday's testimony, Mr. Braze was asking

8  Mr. McIntosh about P 102, P 103, P 104, and P 105, and at the

9  end of the testimony, he lumped them all together and he says,

10 "Now, did you prepare all that work?"

11      And Mr. McIntosh stumbled.  He started to say

12 something, and then he said, "Yes."  And we noticed that over

13 at the table.  We wrote that down and we went back and started

14 looking through those exhibits, and we found all of this

15 stuff.

16      And we found things that not only the verbatim actual

17 copies of Porter-Robertson's work, but we found various

18 references to studies that Porter-Robertson had done that

19 McIntosh prepared addendums to.  For instance, the Master

20 Water Plan.  We found all of this stuff in the water plan.

21      Again, you might take a look at these notes when you

22 go into the jury deliberation room and you might compare them

23 to the notes that are on Mr. Robertson's work.  They look to

24 me to be identical.  They are hard to read, I will grant you

25 that, they are very small.

1    Earlier in the trial, I saw -- maybe you saw it --

2    four big tubes of plans on the table.  Did you see those big

3    tubes of plans?  They didn't come into evidence.  You can read

4    those.  Those are big plans.  What we have is we have little

5    tiny things that you can't read.  Can't read all of the

6    writing, but take a look at it.  This stuff is all copies.

7         Again, the Master Storm Drain Plan prepared by

8    Porter-Robertson.  This was in the -- the Master Storm Drain

9    Plan that Mr. McIntosh passes off as his own.  Master Sewer

10   Plan, same thing.

11        Here is some work by John Carollo Engineers.  All

12   this stuff here.  John Carollo Engineers, all stuffed into

13   Mr. McIntosh's exhibits, all according to him, "Yes, prepared

14   by me."  It wasn't.

15        Copies from the Environmental Impact Report

16   referenced right here.  Copies from the Wasco General Plan.

17        And these, ladies and gentlemen, are all copies of

18   documents prepared by the City.  Mr. McIntosh is copying the

19   City documents, putting them in his files, claiming them as

20   his own, and then suing the City for copying his stuff.

21        Jury Instruction 38, vicarious infringement.

22   Mr. Braze talked to you about vicarious infringement.  He has

23   admitted that my clients never copied anything.  But he hasn't

24   let us go home yet because he says, well, DeWalt copied and

25   since we hired DeWalt, that we are vicariously liable for what

1  DeWalt did.

2       Well, you are going to find out when Mr. Alexander

3  gets up here, he will remind you of the evidence that supports

4  your conclusion that DeWalt didn't copy anything.

5       But that's why my client is still here, vicarious

6  infringement.  So let's talk about vicarious infringement.

7            "If you find that a defendant infringed, you may

8            consider plaintiff's claim that a different defendant

9            vicariously infringed."

10       That's my clients, the different defendant.

11       Now, the plaintiff has the burden of proving each of

12  the following by a preponderance of the evidence.  They have

13  got to prove that my client profited directly from the

14  infringing activity.  So if you find -- and I'm sure you

15  won't -- but if for some reason you found that DeWalt

16  infringed, in order to find my clients guilty of infringement,

17  you would have to find that my clients profited directly from

18  the infringing activity.

19       Well, I can't imagine that there is anybody here on

20  this jury that believes my clients have profited at all yet.

21  My clients have lost money so far.

22       My client might make money in the future.  My client

23  might make money if it sells the 65 acres for some huge amount

24  of money or if it's able to develop the commercial property

25  and obtains money from that.  Or if somebody comes along and

1   decides to pay a lot of money for those 38 lots, not the

2   20,000 he is asking, but some exorbitant amount, he may make a

3   profit.

4           But at this point in time, you have been shown a

5   million dollar loss.  Any profit is speculation.  So right

6   there, that kills vicarious infringement, because you have to

7   find that my client profited.  Can you find that my client has

8   profited through today?  Not on the evidence before you, you

9   can't.

10          You also have to find another element.  You have to

11  find that my client Wu, Northern, Lotus, I don't care how

12  you -- what you call it, but you have to find that my client

13  had the right and ability to supervise or control the

14  infringing activity.

15          Now, if there was infringing activity, what was it?

16  It was copying a map.  Now, my client could fire DeWalt at any

17  time.  But when it says that my client had to have the right

18  and ability to supervise or control the infringing activity,

19  that doesn't talk about firing them.  It talks about

20  supervising the copying, supervising their preparation of the

21  map, controlling their preparation of the map.

22          DeWalt is an engineering company.  It's a

23  professional company.  It performs a professional service

24  that's beyond the ability of my client to perform or he would

25  have done it himself.

1    Jeff Gutierrez testified that Mr. Wu did not tell him

2 how to draw the map.  Mr. Wu testified that he didn't tell

3 anybody to copy anything.  So you can't find that my clients

4 vicariously infringed anything.

5    Let's take a look at 43.  That's my favorite one.  It

6 is about profits, all right?  Plaintiffs have missed the boat

7 entirely on profit.

8         "In addition to actual damages, if there are any, the

9          copyright owner is entitled to any profits of the

10         defendant attributable to the infringement."

11    You first have to show or they have to show that

12 there was a causal relationship between the infringement and

13 the profits from it, and then to determine the profit, you

14 have to subtract all of the expenses.

15    But here's my favorite part:  You have to subtract

16 all expenses from the defendant's gross revenue.  All right.

17 You see what I'm saying?  The gross revenue.  You don't look

18 at what Northern might make in the future if this happens, if

19 it builds houses, if it obtains bank loans, if the cost of

20 construction stays low, if somebody decides to buy the houses.

21 That's not receipts.

22    43, Number 43.  And you know, if you wouldn't mind,

23 Geez, I would like you to write this down so you don't forget

24 to look at it when you go back in the jury room.  About

25 halfway down the page, it says:

1      "The defendant's gross revenue is all of the

2        defendant's receipts from the use or sale of a

3        copyrighted work associated with the infringement."

4      Receipts.  Everybody understands receipts, I think.

5 That's why it is my favorite.  There is no profit.  In fact,

6 when Mr. Wu did his calculation showing $6.6 million worth of

7 gross anticipated revenue, that only included 4.4 or 4.6

8 million worth of receipts.

9      Then he showed you expenses of 7 point some million

10 dollars.  So instead of having a one million dollar loss for

11 purposes of this trial, he has a three million dollar loss

12 right now.

13     Mr. Merati.  I need to talk about Mr. Merati for just

14 a moment.  Jury Instruction 21 says that you can accept or

15 reject expert testimony.  It's up to you.  You give it the

16 weight that you think it deserves.

17     Now, Mr. Merati, professional witness, paid 22,

18 $23,000 to come in here and find a big profit.  And how did he

19 do that?  He kicked out a few expenses.  He lowered a few

20 expenses.

21     But that was not the big deal.  We could use his

22 calculation of expenses and still have a two or three million

23 dollar loss.  But what he did is he tried to convince you that

24 the way to allocate land costs is to take the total purchase

25 price, divide it by the number of acres purchased, and he

Case 1:07-cv-01080-LJO-GSA   Document 339   Filed 03/25/10   Page 48 of 115

1   totally ignored the fact that one piece of property had $1.9

2   million worth of improvements in it, and the other piece of

3   property is being farmed and Mr. Wu was receiving $2,000 a

4   year for that.  That's not fair.  That's not fair at all.

5          And when Mr. Merati tries to convince you of that by

6   using the original assessment that came from the County and

7   ignoring the $20,000 per lot assessment that was in the page

8   right behind that, that's misleading.  That's misleading.  And

9   he was paid to mislead you.  And you should reject his

10  testimony.

11         Number 41, my second favorite.  It talks about the

12  actual damages suffered by Mr. McIntosh.  Mr. McIntosh, if

13  there was copyright infringement, is entitled to actual

14  damages suffered.  He must prove what those damages were.

15         Now, I remember when Mr. McIntosh was on the witness

16  stand and I asked him, "Sir, you charged $1.1 million for this

17  work back in '92?"

18         "Yeah."

19         "And you've received $800,000?"

20         "Yeah."

21         "And so Legacy, the company you contracted with,

22  still owed you 300,000?"

23         "Yes."

24         "So how much do you want this jury to give you?  What

25  are your damages?"

1    Would he tell you what his damages were?  Do you

2  remember that testimony?  He says, "I want what I'm worth."

3    Well, I told him, "This is your opportunity to tell

4  the jury what you are worth.  You are going to ask them to

5  give you money at the end of the trial.  What do you want?

6  Tell the jury what you are worth."

7    Wouldn't do it, would he?

8    You don't have any evidence as to what his damages

9  would be.  But one thing was clear, I asked him, "Are you

10  expecting to get paid twice for the same job," because he

11  charged a million-one.  "You got 800,000.  It appears from the

12  opening that you are asking for actual damages of another 1.1

13  million.  You expecting to get paid twice?"

14    He said, "Yes."  That baffled me.  Teachers don't get

15  paid twice for doing their job.  County employees, they don't

16  get paid twice for doing their job.  Nurses don't get paid

17  twice for doing their job.  Who does get paid twice?  Nobody.

18    And Mr. McIntosh isn't going to get paid twice by you

19  people.  I know that.

20    Now, this map right here is the map that

21  Porter-Robertson did a year before, and this is J 25.  This is

22  the map Porter-Robertson did a year before Mr. McIntosh got

23  the client.

24    And Mr. McIntosh didn't know anything about this

25  until I brought it out, all right.  Except when his lawyer

1049

1   started asking him questions, then he remembered all about it

2   and why it was revised and why his client didn't want to use

3   this and on and on and on.  But it was a secret for a long

4   time.

5          And I read some deposition testimony into the record,

6   and I have shown it to counsel this morning, and I want to

7   read it for the jury again.

8          "Question:  Have you ever used someone else's

9           tentative map without their permission to prepare a

10          final map?

11      "Answer:  No.

12      "Question:  Is a tentative map that Martin-McIntosh

13          prepared for Tract Number 5472 the only tentative map

14          that was prepared for the Tract Number 5472, to your

15          knowledge?

16      "No.

17      "Question:  It's not?

18      "Answer:  No.

19      "Question:  Okay.  Do you know who prepared the other

20          tentative map?

21      "Answer:  Martin-McIntosh.

22      "Question:  Okay.  I think I'm missing something.  Let

23          me ask.

24      "Answer:  What you have is a revised tentative map.

25          There was an original tentative map that was prepared

1    and it was revised.  We did both of them.  We did

2    both of them."

3         He didn't do both of them.  Porter-Robertson did this

4    one.  And Martin-McIntosh used this map, and it's obvious that

5    they used it, because look where the golf course is and look

6    at this row of houses backing to the golf course, and look at

7    the name of the street that Porter-Robertson put on there.  It

8    is Pebble Beach.

9         And Mr. McIntosh prepared Revised 5472.  He puts

10   houses along the golf course and he calls his street "Pebble

11   Beach."

12        Now, do you think that's a coincidence, or did he

13   copy?

14        And then you have got a street coming from the -- a

15   north side of the development coming into Pebble Beach called

16   "St. Andrews."  And then you've got a cul-de-sac over here

17   called "Sawgrass Court."  I think it is pretty clear what

18   happened here and who the copier is, and it is not DeWalt.

19        Now, I'm going to finish up here.  I want to take you

20   to the verdict form.  And again, Mr. Braze gets up to talk

21   again.  I don't get to come back and talk to you people

22   anymore, and after I get through speaking, the City is going

23   to come up and then DeWalt's attorney is going to come up.

24        And so it is very important to my client that you

25   remember what I'm going to tell you about the verdict form.

1051

1    And I hope you trust me to lead you on how this should be

2    filled out.  I'm going to tell you what I think the evidence

3    supports as far as a verdict.

4         And if you would be so kind, I would ask you to take

5    out your pad again and write down some of these numbers and

6    what I think the evidence shows.

7         Now, I'm not going to go through all of them.  I'm

8    going to go through the ones that apply to my client.  Number

9    3, 4, 5, and 6 have already been admitted.  Mr. Braze says my

10   client didn't copy, so those all get a "no."  We already know

11   that.

12        Then we go over to Number 17.  And Number 17 asks:

13   Did Northern California profit directly from any copying?

14        I would like you to mark that as "no" because that's

15   what the evidence shows.  Neither Northern nor Lotus made any

16   profit from anything.

17        Number 18:  Did Northern have the right and ability

18   to supervise or control other defendants' copying?

19        18 should be "no."  We didn't have the right to

20   control it.  We didn't supervise the drawing of the map.

21        Number 20:  Did Lotus profit directly from any

22   copying?

23        Number 20 should be "no" based on the evidence.

24        Did Lotus -- Number 21:  Did Lotus have the right and

25   ability to supervise or control?

1052

1     "No."  Of course not.

2          Damages.  Number 23, damages.  What is the total

3     amount of actual damages Plaintiff Roger McIntosh is entitled

4     to?

5          I think you all know the answer to that.  Zero.

6     Nothing.  He is not entitled to any damages in this case.

7     There was no copying in this case.  He is not entitled to get

8     paid twice.   Since there was no copying, he is not entitled

9     to receive any money for any reason.

10         Number 26:  Did Northern obtain a profit from its

11    infringing activity?

12         Of course not.  We now know that Northern didn't

13    infringe, so like 3, 4, 5 and 6, Number 26 is an automatic

14    "no," because it's from its infringing activity.

15         Number 28:  Did Lotus obtain a profit from its

16    infringing activity?

17         Of course not.  Lotus didn't infringe, Lotus didn't

18    copy anything.  Lotus didn't make a profit either.

19         Number 29:  What is the amount of Lotus' profits?

20    Zero.

21         No dispute over the fact that Northern and Lotus are

22    partners.  There is no dispute over that.  Of course they are

23    partners.

24         Now, one final thing before I sit down.  Mr. McIntosh

25    received a telephone call from Mr. Wu before Mr. Wu ever even

1053

1    bought the property.  And Mr. Wu was trying to find an

2    engineer to do a map, a $10,000 map, or DeWalt, I think,

3    charged 7500 for that map or 5500.  But it was, say, a $10,000

4    map.  He didn't ask about any plans.  Didn't need any plans.

5         The City said to him, "You need a new map."  They

6    didn't say to him, "You need new plans," and that's obviously

7    because you don't need new plans if the improvements are in

8    the ground.  We have talked about that ad nauseam.

9         What did Mr. McIntosh say?  "I'm owed $800,000.  And

10   I want you to pay me that money before we talk about me doing

11   anything else."

12        Mr. Wu was not interested.  But the interesting thing

13   is -- and Mr. McIntosh told you this from the witness stand.

14   He had read some article somewhere, remember that?  He had

15   read an article about an engineer who had sued somebody and

16   received money because, years later, his plans were

17   copyrighted, was violated or something.

18        So he understood nobody was going to pay him $800,000

19   to do a $10,000 map, so he stayed quiet, didn't say a word.

20   But he did call the City and he said, "I want to start

21   receiving agendas."  Wanted to see what Mr. Wu would do.

22        So he started receiving these agendas and he found

23   out DeWalt was the engineer.  Didn't warn Wu, he didn't warn

24   DeWalt.  He didn't warn the City.  He just waited and watched.

25        And Mr. Wu spent 900 and some thousand on building

1054

1  permits and he started building houses.  Mr. McIntosh was

2  still waiting and watching.  He was looking at Google to see

3  when Mr. Wu would start building because he figured that, all

4  right, that's when I can get him.  And then when he was in

5  Wasco, he would drive by the site to see if there were any

6  houses going up yet.

7          And ladies and gentlemen, that's not fair.  It's not

8  fair that Mr. McIntosh he had a copyright and suspected that

9  Mr. Wu was going to stumble into some kind of an infringement

10  and stood back and waited and watched.  That's not fair.  It

11  is not right.

12          And I would ask you not to reward this man for that

13  kind of conduct.  Thank you very much for your time.

14          THE COURT:  Ladies and gentlemen, it is just a few

15  minutes after 10:00.  We are going to take the midmorning

16  recess.  Let's do that for 15 minutes.  Then we will come back

17  and finish with the closing arguments.

18          Now something different has happened.  We are

19  starting to talk about the case, but you can't yet.  It is

20  very close, but not quite.  So please don't succumb to the

21  temptation.  Don't discuss the case during the break, and we

22  will see you in 15 minutes.

23          (The jury left the courtroom.)

24          THE COURT:  Let the record reflect that the jury has

25  left the courtroom.  Any issues, Counsel?

1    MR. ALEXANDER:  No, your Honor.

2    MS. BARNES:  No, your Honor.

3    THE COURT:  15 minutes.

4    (Recess)

5    THE COURT:  Back on the record.  Counsel is present.

6 Are we ready for the jury?

7    MR. TRAVIS:  Just a couple quick issues from the

8 plaintiffs, your Honor.  I guess when Mr. Hassing was arguing,

9 it was bordering on a laches type of argument or defense.  We

10 didn't object -- it is closing argument, not evidence -- but

11 we are now concerned that similar types of arguments might be

12 made by the City regarding publication.

13    I know there is a fair use defense that says if they

14 drew their stuff out of the public, you know, what they had in

15 the public files.  And we are concerned that given the Court's

16 previous ruling on adjudication on the publication issue, that

17 that's going to be argued as some sort of a defense to

18 infringement by the City.

19    THE COURT:  Well, laches isn't an affirmative defense

20 in this case, one.  And, two, I -- the inference that I was

21 drawing from the argument was that if the jury believes that

22 Mr. McIntosh was doing exactly what Mr. Hassing was arguing,

23 the issue is that that's an indication that even Mr. McIntosh

24 didn't believe that what was going on was a copyright; he was

25 just trying to set somebody up and then claim it.

1    So am I missing something here, Counsel, on the

2  defense?

3    MR. HASSING:  You are right on, your Honor.  You are

4  not missing anything.

5    THE COURT:  So everybody understands, just from the

6  request from the issue, that laches is not an affirmative

7  defense here.  Anything else?

8    MR. TRAVIS:  As to the publication issue, that's just

9  our concern.  We don't want to have to object, and that's part

10  of the reason, because we knew there were different

11  interpretations of Mr. Hassing's argument, but we don't want

12  to have to object.  And, I guess, putting the City on notice.

13    THE COURT:  I suppose the good news is that you have

14  got the last ace in the deck.

15    MR. TRAVIS:  Okay.  Thank you, your Honor.

16    THE COURT:  We are ready for the jury.

17    (The following proceedings were had in the presence

18    of the jury, to wit:)

19    THE COURT:  The jury has joined us.  Ladies and

20  gentlemen, any issues, problems or concerns?  Good.  All

21  right.  Then we are ready.

22    Who is next?

23    MR. OKADIGBO:  I am.

24    THE COURT:  Okay.

25    MR. OKADIGBO:  Like other counsel before me, I also

1  thank you for your service, and I know that it is a lot for

2  you guys to sit there and take in all this testimony and

3  listen to complicated issues of fact and law.  So I want to

4  express my appreciation for your service in that regard.

5           THE COURT:  And I would ask you either to raise your

6  voice or use the microphone because it is very difficult,

7  especially for people behind you, to hear.  Thanks.

8           MR. OKADIGBO:  Sure.  Now, in my opening statement, I

9  noted the plaintiff's insistence on talking about damages as

10  the point of first concern for them.

11          And they certainly started off their closing

12  statement the same way.  I think that the clearest thing about

13  their case is how much money their counsel is asking you to

14  award the plaintiff.

15          But as Mr. Hassing pointed out, even the plaintiff

16  didn't know the value of his work, when asked on the stand

17  several times to communicate to you, what this value was.

18          The City's position, and I think you will find, is

19  that his work is worth zero and the City didn't make any

20  profits, but we will get into that later.

21          Let me take you through the deficiencies of

22  plaintiff's case.

23          With respect to the plaintiff's claim of contributory

24  infringement against the City of Wasco, they gloss over the

25  elements, because it is easy to do that, so that you can

1    arrive at big numbers like $2 million without even reviewing

2    the elements of the case.

3           In order to prove contributory infringement, the

4    plaintiff has to show that the defendant knew or had reason to

5    know of infringing activity of another defendant, and that the

6    defendant intentionally induced or materially contributed to

7    the infringing activity.  That's two elements.

8           Let's take the issue of knowledge of infringing

9    activity.  The plaintiff has absolutely no evidence that the

10   City knew one way or other how DeWalt would set about

11   preparing their tentative map.

12          You heard evidence from Keith Woodcock and Dennis

13   McNamara that the developer initiates the process of

14   subdividing the land.  The City's role after that is to look

15   at their application and to communicate deficiencies with

16   respect to whether the map complies with the City's zoning

17   ordinance, municipal codes, general plans, and things of that

18   nature.  There has been absolutely no evidence put to you that

19   the City knew one way or another how DeWalt was going to set

20   about actually drawing these plans.  That was not the City's

21   business.  The City was merely looking at their plans and

22   deciding whether it complied with their regulations.

23          Again, there is no evidence to show that the City

24   knew or should have known what DeWalt would do.

25          And the plaintiff, sitting back all this time, and

1 watching the development, as Mr. Hassing just described,

2 certainly didn't think that he should have informed the City

3 of any claims of infringement.  He hasn't told you that he

4 told the City about any copying on the part of DeWalt's of

5 their maps and plans.

6       It is our position that DeWalt didn't copy maps and

7 plans, and we will get into that later.

8       But because they have failed to provide to you any

9 evidence that the City knew or should have known of infringing

10 activity, you cannot find that the City committed contributory

11 copyright infringement.

12       With respect to the improvement plans, the testimony

13 has established that the City did not require DeWalt or

14 Northern or Lotus to submit improvement plans.  The

15 improvements were in the ground.  There was no copying of

16 improvement plans because DeWalt didn't submit any improvement

17 plans.

18       The City of Wasco's Municipal Code section

19 16.16.20.010, which is in your Joint Exhibit J 8, makes clear

20 that improvement plans are not required in all instances.

21 That section concerns the documents you have to submit when

22 you apply for a final map.  And it makes clear that you do

23 not, in all instances, have to submit improvement plans.

24       Again, there is no evidence that improvement plans

25 were infringed upon and there is no evidence in the record

1    that the City was informed, one way or other, about any

2    copying with respect to the improvement plans.  For these

3    reasons, you cannot find the City of Wasco engaged in

4    contributory copyright infringement.

5            Now, let's talk about vicarious copyright

6    infringement.  That's another claim that the plaintiffs have

7    against the City of Wasco.  Vicarious copyright infringement

8    has three elements.

9            First, the plaintiff must show that in this case, the

10   City profited directly from infringing activity.  That's point

11   one.

12           Point two is that the defendant had the right and

13   ability to supervise or control the infringing activity.

14           And point three is the defendant failed to exercise

15   that right.  That's Instruction Number 38.

16           Let's take the first issue of profits.  One of the

17   things they claim constitutes profits on behalf of the -- on

18   the part of the City is impact fees, the revenue that the City

19   collected from the developer of the subdivision.

20           Mr. Zervis testified that impact fees are not

21   profits.  Impact fees are designed to reimburse the City for

22   the actual or projected cost of providing services to the

23   subdivision.  If the subdivision was not going to have any

24   impact on existing city resources, there would be no

25   collection of those fees.  Those fees, by nature, are not

1   profits.

2          So their claim that $529,000 of fees is profits is

3   completely false.  It's wrong.  They are not profits.

4          As a matter of law, if the City collects in excess of

5   its estimate of the cost of providing these services, the City

6   is actually required to turn it over to the developer.  It

7   can't keep excess costs.  So impact fees aren't profits.

8          So when you face the question of what profits did the

9   City make, if any, if you are considering vicarious copyrights

10  infringement or if you are considering the issue of infringer

11  profits, the answer is zero with respect to impact fees.

12         The other claim that they have made is that the City

13  sold the two subdivision tracts for 1.6 million.  And although

14  they claim the 120 was what the City bought it for, the record

15  actually shows that it's in fact 128,000.

16         But, regardless, Mr. Zervis, when he was on the

17  stand, when I asked him this question, clearly showed you that

18  the only monies the City actually took home from that sale was

19  $240,000, and we produced a check to that effect made out to

20  the City.

21         So they want to have you compare the gap between 1.6

22  and 128.  The gap is actually between 240 and 128.  And even

23  that isn't profit, and here's why.  They need to prove that

24  the reason those two tracts of land sold was because of that

25  map, that one-page map, one-page expired map from 1992.  In

1    that entire stack, that that's the reason that the City made

2    that difference between 240 and 128.  They haven't shown that.

3            And the testimony -- in fact, if you recall Mr. Larry

4    Pennell's testimony, I showed Mr. Larry Pennell the contract

5    documents between the City and Northern.  And the contract

6    documents state that Northern was buying the property as is

7    and without any representation, without any reliance or

8    representations from the City.

9            In short, that means that Northern was buying that

10   property without relying on the marketing brochure or any

11   discussions with the City.  They would do their own due

12   diligence and decide whether or not to buy that property.  So

13   the one-page map in the marketing brochure is not the City's

14   reason for the collection of the $240,000.

15           So that's the first element, no profits in relation

16   to the vicarious infringement.

17           The second element of vicarious infringement requires

18   you to look at whether the City had the right and ability to

19   supervise or control the infringing activity.

20           Well, the evidence has established that the City's

21   role in this process, after selling the property to Northern,

22   was simply to process their maps and tell them whether it

23   complies with the City's regulations.

24           The City is not in charge of designing the map.  The

25   City isn't DeWalt's baby-sitter.  The City processes tons of

1    these maps.  To say that every time the City receives a map

2    that the City is in charge of making sure that the preparer of

3    the map isn't copying another map, that would be ludicrous.

4          It was not brought to the City's attention any claims

5    of copying, and because of that, the City was not in a

6    position to control or supervise any allegedly infringing

7    activities that DeWalt may have engaged in.

8          And I will say, our argument is that DeWalt did not

9    infringe, but whatever it is they did in terms of how to go

10   about preparing their map, that was not the City's

11   responsibility.  The City didn't have a right and ability to

12   supervise or control them.

13         For this reason, you can't find that the City

14   committed vicarious copyright infringement.

15         Now, I'm going to take you through the plaintiff's

16   underlying claims of infringement against DeWalt's -- well,

17   since they have admitted that they don't have anything against

18   Northern, I'm going to take you through their underlying claim

19   of infringement against DeWalt.

20         MR. BRAZE:  That misstates.  I didn't say we didn't

21   have anything against Northern --

22         THE COURT:  Sorry?

23         MR. BRAZE:  We didn't say we didn't have anything

24   against Northern.  That misstates it.

25         THE COURT:  Please proceed.  You heard the objection.

1  I think he is correct.

2       MR. OKADIGBO:  Since they claim that Northern didn't

3  copy, I will take you through their claims against DeWalt

4  briefly.  Mr. Alexander will address probably the bulk of it.

5       The reason I will get into that is if you find, as I

6  think you will, that DeWalt did not copy maps and plans, you

7  cannot find that the City committed contributory or vicarious

8  infringement.

9       That's why it's important for the City to get into

10  the issue of whether there was underlying infringement, and

11  that's why the City hired Dr. Wong as an expert, even though

12  the City was not in charge of preparing these maps.

13       Now, Mr. Wong reviewed and compared the 5472

14  tentative map with the 6451 tentative map.  And it's very

15  important to note his conclusion.

16       His conclusion was that there was superficial

17  similarities and significant differences.  And that's the key

18  words or phrase to keep in mind as you decide whether there

19  was any copying.  The two maps are not substantially similar

20  as a matter of law based on their substantial differences.

21       Mr. Wong touched on those differences.  He pointed

22  out to you the difference in the tract boundaries between 6451

23  and 5472 tentative map.  There was testimony about how the

24  5472 map contained a "not a part" area and how that made the

25  boundary different from the 6451 map.

1   Mr. Wong also talked about bearings and distance
2   information in the 6451 map.  That was shown on all the lots
3   for 6451, but they were not shown in the 5472 map.
4   He also mentioned the fact that the 6451 map has
5   topographical contour information, whereas the 5472 map has
6   none of that.
7   He talked about how the 6451 map has lot dimensions
8   for all lots, whereas that wasn't true of the 5472 map.
9   He mentioned that the 6451 map has pavements,
10  sidewalks, streets, storm drainage information, curbs and
11  gutters, fire hydrant locations.  It shows the existence of
12  water lines.  None of that is in the 5472 map.
13  Mr. Wong also compared specific lots.  In this case,
14  it was Lots 13, 14, 15 -- I'm sorry, 13, 14, 16 and 40, and
15  explained the differences in the lots.
16  Mr. Wong explained that the similarities between Maps
17  6451 and 5472 were due to the fact that the improvements had
18  been put in.  For example, if the claim is that the street
19  layouts are the same.  Well, of course they are the same,
20  because the streets were built in accordance with the 5472
21  improvement plans.  So anybody that's going to draw those
22  streets, if they go out there, they are going to draw the same
23  shape, so that's a superficial similarity.
24  You heard Mr. Warren Craig, whom they describe as
25  "the gardener," but in fact is a street supervisor.  You heard

1   him testify that lot numbers were on the curbs.  So that

2   explains the similarity in numbering.

3        Now, I believe the plaintiff claimed through

4   Mr. DelMarter, his expert, that the tract boundaries are the

5   same, or plaintiff claims that they are, anyway.

6        But even if the outer tract boundaries are the same,

7   the legal description of the property controls what space you

8   have.  So if your property is shaped in a triangle, for

9   example, that's the land you bought.  If I go and draw a

10  triangle because I'm hovering over your property in a

11  helicopter, it is what it is.  It's a superficial similarity

12  to say that, well, because I drew the triangle, I'm infringing

13  on copyright interests because you happen to have put it in a

14  map.  That's ridiculous.

15       You will hear testimony from -- I'm sorry.  You heard

16  testimony from Jeff Gutierrez about the extent of the

17  surveying work done, the shooting of 400 points.  I will let

18  Mr. Alexander get into that in more detail, but that shows the

19  extensive efforts that DeWalt devoted towards preparing their

20  6451 tentative map.

21       Now, I am not stating that there are not any

22  similarities between 6451 and 5472, but the construction of

23  the improvements explains those facts.

24       Mr. Braze asked you to use logic and common sense.

25  Well, let me put to you what I think is logic and common sense

1  in this matter.  This is the same thing as an "A" student

2  studying hard for a test, and the "A" student is answering 95

3  percent of the questions.  And then he says, you know what?  I

4  don't feel like doing the other 5 percent.  Let me look over

5  this other guy's shoulder and do that 5 percent.

6        Their map had to be more detailed.  They set about

7  trying to create a vesting tentative map which, by nature,

8  gives the property owner more rights.

9        Why would they go out into the field and do all this

10 work, shooting all these survey points, measuring, measuring

11 all these distances between the lots, and then say, "Oh, you

12 know what?  I feel like being lazy on one lot here and another

13 lot there."  That doesn't make sense.

14       Now, in this regard, I want to bring to your

15 attention the fact that Mr. Braze asked Mr. Wong on the stand

16 about certain similarities he observed.  Mr. Wong was sitting

17 right there and Mr. Braze was asking him here about supposed

18 similarities in a bunch of lots.  Mr. Wong was taking his

19 representation as accurate, as far as the information that

20 was -- the information that was portrayed.

21       Mr. Braze was basically saying, "These are the same,

22 correct," "These are the same, correct," and Mr. Wong was

23 trusting that those representations were true.

24       Well, at 9:00 p.m. last night, I said, "Hang on a

25 minute.  Let me see what he is talking about."

1    So one of the sequences of lots that Mr. Braze asked

2    Mr. Wong about was 31 to 36.  31 to 36.  And he asked Mr. Wong

3    to admit that 31 to 36 has a 66-foot measurement across this

4    line.

5    Well, you can see that between 31 and 36, only 31 and

6    36 has measurements.  32, 33, 34, 35, they don't have

7    measurements.  DeWalt clearly didn't copy their measurements

8    of 32, 33, 34, and 35, because it is not stated here.

9    And let me show you Tentative Map 6451 in that

10   regard.  31, 66, 32, 66, 33, 66, 66, 66, and 66.

11   So I have just shown you that there is missing

12   information that he was trying to represent that was put in

13   that map that actually wasn't and was in this 6451 map, which

14   further confirms that they did measure and do the work rather

15   than the opposite.

16   Now, he also mentioned 39 to 43.  And if you look at

17   39 to 43, over here, same problem.  Only 39 and 43 mention a

18   hundred square foot.  The others are absent.  40, 41 and 42,

19   there is no measurements.

20   And on 6451, 39, 40, 41, and 42, and 43, they are all

21   65-foot measurements.  Again, missing information there that

22   they were trying to represent was being copied but wasn't even

23   in that map.

24   Same problem with 62 to 67.  Yeah.  62 to 67, only

25   two measurements of 66 foot.  Mr. Braze was asking Mr. Wong to

1  admit that it was 66 foot all along here and that that was

2  being copied.  Again, you see the 63, 4, 5, and 6 have no

3  measurements.

4         And here, they have measurements.  All of them.  66

5  foot.  And last example, 58 to 60.  58 to 60, only one

6  measurement for 60, 58 and 59, no information.  On the other

7  hand, on the other hand, here there are measurements for all

8  of these.

9         Anyway, my point is this is the only thing that they

10  asked Mr. Wong about in terms of comparing these two maps and

11  trying to assail Mr. Wong's testimony that the maps are

12  substantially different.  That's the only thing they asked him

13  about.  And I have just shown to you that their portrayal of

14  that information is completely inaccurate, because there is

15  more information in the 6451 map.

16         Now, plaintiff has direct infringement claims against

17  the City of Wasco.  And the claim is based on the inclusion of

18  the 5472 map in a Developer Information Package.

19         If you look at your Jury Instruction Number 37, that

20  instruction deals with an affirmative defense of fair use.

21  And the instruction says:

22         "Defendant City of Wasco contends that it made fair

23              use of the copyrighted work for the purposes -- for

24              the purpose of criticism or comment or scholarship or

25              research by providing information about the property

1  existing in its public records to prospective

2  purchasers of a tract within the Valley Rose

3  Estates."

4       Well, that's exactly what the City of Wasco did do in

5  this case.  You heard testimony from John Wooner that the

6  City's position was that it would make information available

7  in its public records to prospective buyers of the property.

8  And that it was his understanding that you have to tell

9  property owners, you have to provide them all information that

10 relates to their decision to buy the property.

11      It was a fair use for the City to provide that

12 information.  And for that reason, the City is asking you,

13 when you are determining whether copying occurred, to say no

14 based on the fair use defense.

15      There is no space on that instruction for affirmative

16 defense.  It just simply asks you whether there is copying.

17 And if you say yes, then it proceeds to finding damages.  So

18 the answer really is "no" on that, based on the fair use

19 defense.

20      Now, their other claim against the City is that the

21 City provided copies of the improvement plans to Greg Black of

22 DeWalt via e-mail.  And they are saying that's direct

23 infringement.

24      When plaintiff got on the stand, you heard him say

25 that if plans are approved, then it is fair game for anybody

1   to use the plans.  His only dispute is that he wants to draw a

2   distinction between when the improvements are accepted and

3   when they are not accepted.

4       That makes no sense.  He ultimately agrees that if

5   plans are approved, it's fair game to use them.  And Mr. Wong

6   gave testimony that the plans, if they are approved, are fair

7   game to use.

8       So we would ask that when you consider the question

9   did the City copy plans or did the City copy maps, that the

10  answer be "no" in both of those instances.

11      Now, I'm going to talk to you a bit about infringer

12  profits.  We don't think you will get that far in the

13  instructions because the City of Wasco, we are comfortable,

14  will be found not liable for any type of infringement.  But if

15  you do get that far, I have to discuss infringer profits.

16      That's Instruction Number 43.  Number 43 says that

17  profits are determined by subtracting all expenses from gross

18  revenue.  It then says the gross revenue is all receipts from

19  sale or use of copyrighted material -- copyrighted work.

20      Impact fees are not profits.  Impact fees are not

21  receipts from the sale or use of a copyrighted work.

22      Again, we have explained that the impact fees are

23  collected to mitigate or to reimburse the City for the costs

24  of providing services.  They are not receipts from the sale or

25  use of a copyrighted work.

1  So they are not gross revenue and they are definitely

2  not profit under the statute.  And that's why, when you are

3  determining whether these fees are profits, you have to say --

4  we would ask you to say, "no," they are not.

5  And going back again to the $112,000 that the City

6  made from the sale of the two tracts to Northern, in order for

7  plaintiff to collect them as profits, he has to show that the

8  sale of the property was caused by the insertion of that 5472

9  map into the marketing brochure.  He can't establish this.

10  The evidence establishes that Mr. Wu bought the property as is

11  and without any reliance on any representations by the City,

12  and he signed the contract to that effect.

13  For this reason, there is no causal link between that

14  112,000 and any infringing activity.

15  So in short, were there any profits that the City

16  made?  No, no profits.

17  Now, let me talk to you, lastly, about actual

18  damages.  Actual damages is the amount a willing buyer would

19  reasonably be required to pay a willing seller at the time of

20  infringement for the actual use made by the defendant of the

21  plaintiff's work.

22  Now, it is the plaintiff's burden of proof to

23  establish actual damages.  What is the plaintiff's actual

24  damages?

25  Answer:  "Nothing."  And the reason it's nothing is

1   you heard Mr. McIntosh refuse to tell you on the stand what

2   the value of his work was.  It is his burden of proof.  If he

3   doesn't want to tell you, it is not up to you to fashion what

4   you think he should be given.  The answer is nothing based on

5   that.

6        And even if you overlook that problem, the value is

7   still zero.  And that's because the actual use made by the

8   City was just to distribute it.  The City didn't charge for

9   it.  There is no evidence to that effect. And his works

10  weren't used by the other defendants.  So the value is still

11  zero.

12       If you even get past those two barriers, plaintiff's

13  internal records show that they valued that map back in 1994

14  or 1992, somewhere in that time period, as $10,000.  10,000.

15       Now, they want to collect 1.1 or 1.4 million.  That

16  doesn't make any sense.  How can a one-page map that's expired

17  from 1992 cost 1.4 million?  That's logic and common sense

18  that they are asking you to use.  I agree with them.  You

19  should use logic and common sense.  But it doesn't add up.

20       You will also see in Exhibit J 39 evidence that the

21  plaintiff estimated collectively the value of his improvement

22  plans for 5472 and the tentative map for 5472 at $70,000.

23  Again, we don't think you will arrive there -- I have already

24  given you two reasons to find zero -- but if you even go

25  there, $70,000.  You cannot climb from $70,000 to the 1.4

1    million they are asking for now.

2           Lastly, I will just say that listening to the

3    plaintiff's closing statement, again, they just gloss over the

4    elements of what you must show to get any kind of money in

5    this case.  They say that giving the maps and plans out means

6    the City had the ability to control or supervise or the City

7    had an ability to stop the infringing activity.  It doesn't

8    make sense to say that because the City provided these maps,

9    that it should have known necessarily, one way or other, what

10   DeWalt would do with these maps.

11          These are public documents.  The City provides them,

12   and --

13          MR. TRAVIS:  Objection, your Honor.

14          THE COURT:  The legal ground?

15          MR. TRAVIS:  Summary adjudication, the publication.

16   Arguing the fair use defense -- pardon me, the affirmative

17   defense of publication.

18          THE COURT:  If that is what you are arguing, please

19   move on.  Sustained.

20          MR. OKADIGBO:  Your Honor, I'm not arguing that.

21          THE COURT:  Then be more clear.

22          MR. OKADIGBO:  Okay.  The point of saying that these

23   are public documents is to state that just because the City

24   provides these documents does not mean that the City should

25   necessarily know one way or other whether DeWalt or anybody

1  else would engage in copying.  There is no evidence of

2  copying.  There is no evidence of the City being informed of

3  this.

4         And so think hard about that element when they are

5  asking you to just simply toss that to the side and find that,

6  well, the City provided these maps and plans, therefore, open

7  up the flood gates to the 1.4 million.

8         Thank you for your time.  We appreciate it.

9         THE COURT:  Mr. Alexander?

10         MR. ALEXANDER:  Your Honor, if I could have two

11  minutes to set up and then be ready to go.

12         THE COURT:  Are you asking for the jury to be

13  excused?

14         MR. ALEXANDER:  I would.  I would rather have them

15  step out for a couple.  I wouldn't mind using the restroom as

16  well.

17         THE COURT:  Ladies and gentlemen, let's take five

18  minutes, and then we will come back with Mr. Alexander and we

19  will finish with the rebuttal.  Please don't discuss the case

20  yet.

21         (The jury left the courtroom.)

22         THE COURT:  Let's take five minutes.

23         (Recess)

24         THE COURT:  Back on the record.  Counsel is present,

25  the jury is not.  Any further issues?

1    We are ready for the jury.  Thanks.

2    (The following proceedings were had in the presence

3    of the jury, to wit:)

4    THE COURT:  Still on the record.  The jury has joined

5    us.

6    Mr. Alexander, please.

7    MR. ALEXANDER:  Thank you.  Good morning, ladies and

8    gentlemen.  This is my opportunity to speak on behalf of my

9    client, DeWalt Corporation.  And as the other attorneys have

10   done, I too thank you very much on behalf of my client, and

11   the Court, for your time and effort.  We know it is a great

12   imposition, but it is very important for you to be here and we

13   appreciate it.

14   And you are almost done, but at this time, I have an

15   opportunity to explain to you what has happened in the trial

16   and explain to you the facts that have been brought up and how

17   they tie together with the law.

18   Now, you are going to hear one more time from the

19   plaintiff in rebuttal, but that's going to be limited to any

20   comments that may have been made by the defense attorneys when

21   they have talked up here.

22   Now, perhaps, first, just to give you the lay of the

23   land, when DeWalt was hired, if you will take a look at

24   Exhibit J 88, which is on your screen, which is an aerial,

25   this shows you exactly what was facing DeWalt when they were

1  hired.  As you can see, this entire improvement was in place

2  and ready to go.

3          The importance of that is to address the legal

4  questions in the case.  Now, please listen carefully, and I'm

5  going to say it a couple different ways.  Is the similarity

6  that you see -- and it's a visual similarity between Tract Map

7  5472 and 6451 -- is that similarity a result of copying or is

8  it a result of the fact that the improvements are already in

9  the ground?  That is your legal standard.

10         Mr. Braze incorrectly told you that if you find

11  access and you find substantial similarity, that the case

12  ends.  That's not the law.

13         The law is, was the substantial similarity caused by

14  copying.  If it was not caused by copying, then the case is

15  over and you must decide in favor of the defendant, my client.

16         Now, in relation to this particular matter, the

17  evidence has shown that all of the improvements were in.  All

18  of them.  The sewers, the gutters, the concrete curbs, the

19  streets, the power, the utilities, the water, even

20  telecommunications.  All of the improvements were in.

21         If in fact DeWalt went out to the site and did not

22  generate a map that was similar on its face, then DeWalt would

23  not have been doing its job.  The only way that DeWalt could

24  have created a map that was not similar on the surface would

25  have been, as Mr. McIntosh would like, for all of the

1 improvements to be ripped out and to start again.

2          And that's an important point.  Because when

3 Mr. McIntosh was faced with the same task when he was hired,

4 he had a blank whiteboard in front of him, a blank chalkboard

5 in front of him.  The Porter-Robertson map that you have seen

6 gave a design and, in fact, had a general concept or idea when

7 Mr. McIntosh adopted, and that is commercial on the frontage

8 of the property, commercial on the side, some multi-tenant,

9 and then the residential in the back.  Likewise, it shows the

10 houses along the north side and the houses along the golf

11 course.

12          However, Mr. McIntosh was not faced with designing a

13 subdivision with existing improvements on the ground.  He had

14 a blank slate.  He had raw land with which to work.  DeWalt

15 did not have that.

16          There was no infringement by DeWalt.  There was no

17 copying of the map by DeWalt.  Possession is not copying,

18 ladies and gentlemen, nor is even reviewing or looking at the

19 map.

20          Copying is stealing, as Mr. McIntosh has alleged, and

21 what did DeWalt do to steal?  They did nothing, and the

22 evidence hasn't supported that contention all along.

23          Now, one other thing in terms of your ability to make

24 a decision in the case is that you can believe both that there

25 is -- excuse me, both that DeWalt had access to the

1079

1    plaintiff's work, and you can believe that there is

2    substantial similarity, but you can also conclude that the

3    defendant, DeWalt, independently created its work.

4           And I don't think the evidence in the case is

5    disputed in any way.  In fact, I believe all the parties have

6    conceded that DeWalt did its work and did its job.  And we are

7    going to go into that in a moment.

8           The only thing that proof of access and substantial

9    similarity does is to allow you to find infringement and allow

10   you to find copying if it was not independently created.

11          So when you heard argument earlier about the jury

12   verdict form, one of the things I would like to do is tell you

13   how to fill it out if, in fact, you find, as I believe the

14   evidence has showed, that the map was independently created.

15          And let's take a look at that verdict form.

16          Question 1:  Did Defendant Dennis W DeWalt, Inc.,

17   copy plaintiff Roger McIntosh's tentative map for 5472?

18          And the answer here is "no."  So if you determine

19   that DeWalt did its job and performed its work and developed

20   Tract Number 5472, the map, as a result of the work, you must

21   check "no."

22          Now, DeWalt -- excuse me.  Mr. McIntosh also alleges

23   that its improvement plans were infringed upon.  Now,

24   unfortunately, during trial, you were really never shown any

25   of those improvement plans so you don't know what they are,

DEWALT'S CLOSING ARGUMENT

1080

1   but we do know that they are in evidence as Exhibit Number

2   108.  And Exhibit 108 consists of about 72 pages of

3   improvement plans.

4          Now, what's in here?  And I'm going to go through it

5   with you so that you can understand what's in here, and you

6   can look at it yourself in the jury room.  What's in here?

7   The State Highway 46 and Valley Rose Parkway Proposed

8   Intersection Design.  There has been no evidence of any

9   copying of that whatsoever.  In fact, no involvement.

10         There is a Proposed Transition Paving Design.  Again,

11  there is no evidence of copying of that.

12         There is a Proposed Transition Striping Design.  No

13  evidence.

14         Proposed Ultimate Intersection Design, no evidence.

15         Then there is a Revised Master Sewer Plan.  And there

16  is 11 different sheets on the Master Sewer Plan.  Again, we

17  know that Mr. McIntosh took those ideas or took the master

18  studies from Porter-Robertson and developed those.  But

19  insofar as this case is concerned, there is no evidence that

20  DeWalt used any Master Sewer Plans at all.

21         There is a Sewage Pump Station set of plans, 12

22  sheets.  There is no evidence again that DeWalt used the

23  sewage pump station plans in any way.

24         There is an Offsite Water Construction Plan, 12

25  sheets of plans.  Again, no evidence that DeWalt used those

1    Offsite Water Construction Plans in any way.

2         There is a Storm Drain Plan.  A system schematic.

3    There is also a landscape construction drawing set of plans,

4    seven pages.  There is also a wall construction plans, 11

5    pages.

6         None of those improvement plans which have never been

7    shown by the plaintiff, none of them is there any evidence to

8    show that DeWalt copied them or used them or reviewed them in

9    any way, shape or form.

10        The only reference to any documents in the

11   improvement plans is to the grading plan, and there are two

12   sheets of the grading plan.  But the difficult part is to

13   really believe that DeWalt spent the time and effort to go

14   hunt down, out of 70 or 90 pages of improvement plans, a sheet

15   of paper called the grading plan to assist it in performing

16   its work.  It makes no sense.

17        More importantly, you heard evidence earlier that the

18   grading plan, which I'm going to show you now, was somehow

19   copied because the bearings that are on the grading plan North

20   89, 16'05" West -- and those are all around the boundaries --

21   that those bearings were somehow copied because they were

22   found on DeWalt's Tentative Map 5472.

23        Now, what Mr. Braze didn't tell you is that there is

24   a publicly recorded document that Mr. McIntosh is not claiming

25   any copyright to called "Parcel Map Number 9572."  It's

1   Exhibit Number J 42 in your package.

2          If you look at Parcel Map 9572, you will find that

3   the very bearings on which Mr. Braze and Mr. McIntosh are

4   relying, are identical in the grading plan and in the

5   tentative map to publicly available and unprotected 9572.

6          And I gave you the one example a moment ago, North

7   89, 16'05" West.  And you are welcome to look at the others as

8   well.

9          The only other use of the grading plan is to state

10  that, oh, the cart paths -- and really, it is the cart path

11  easement -- were 15 feet.

12         Well, you may recall, and you are welcome to look at

13  it, that the original 5472 prepared by Mr. McIntosh had cart

14  paths of ten feet, not 15.  Of ten feet.

15         The ultimate final map of DeWalt has cart path

16  easements of 15 feet.  And there is no evidence to suggest

17  that DeWalt somehow failed to go out and measure that easement

18  from block wall to block wall to determine that it was 15

19  feet, okay?  And that's the entire extent of the use of the

20  improvement plans.

21         So when you are looking at the special verdict form,

22  and you are -- and then you go to item number 2, Question

23  Number 2:  Did DeWalt copy the improvement plans for 5472?

24         The answer is clearly "no."

25         Now, there was a great deal of effort by Mr. McIntosh

1    during the trial to find some witness who would say, oh, gosh,

2    improvement plans are required.  Not a single witness, whether

3    current or former employees of the City, DeWalt or otherwise,

4    would ever state that improvement plans were required.

5           And let's talk about why not.  Because the

6    improvements were already in the ground.  You don't need to

7    design a wall.  You don't need to design landscape

8    construction.  You don't need to design offsite water or sewer

9    or master water plans, or highway interchanges, because it's

10   all there.  That's why no improvement plans were required.

11          Now, let's focus a moment on what started out in the

12   trial to be a pretty big issue for Mr. McIntosh.  And that's

13   the street names and locations.

14          Well, we now know that Mr. McIntosh not only could

15   claim no right to the street names at all because they weren't

16   his, they came from Porter-Robertson.  At worst, they came

17   from Porter-Robertson and the City based on Tract Number 5472.

18          And I will show you just one moment that map, and you

19   have seen this before.  Again, this is Exhibit Number 25, and

20   it shows the very street names that Mr. McIntosh was

21   complaining about.

22          And let's talk for a moment why that claim is

23   absolutely without any support.  First, J 25 has "St. Andrews"

24   on it.  It has "Pebble Beach," et cetera.

25          Second -- and I'm going to jump down a little bit as

1    we -- I try to move this along.  The City, as of 1994 -- and

2    this is Exhibit J 66 -- as of May of 1994, had been using all

3    of these street names.

4         And, again, I showed you this letter during trial,

5    and here it is again on your screen, showing St. Andrews

6    Crescent -- oh, I'm sorry.  I apologize.  This is the J 66

7    letter.  St. Andrews Crescent, Olympic Close, Pebble Beach,

8    Sawgrass.  This document illustrates that the City was using

9    those very street names that early.

10        More evidence.  March 15th, 2005, the map is

11   approved.  So as of March of 2005, the map had been approved.

12   Okay.

13        If you look at Exhibit J 20 -- and this one, I'm

14   going to only show you a couple pages -- Mr. McIntosh seemed

15   to make a big deal out of the use of the worth "Close" instead

16   of "Court," as you recall, during trial.

17        Now, one of the things that happened was when the

18   tract map was approved, the City imposed a certain condition.

19   And if you look in the middle of your screen at number 18, the

20   applicant is required to rename Olympic Close to Olympic

21   Court.  So the renaming of Olympic Close to Court had nothing

22   whatsoever to do with Mr. McIntosh.  The City required that to

23   be done.

24        J 236 is another example.  J 23 is a Quad Knopf

25   report that you also saw during trial briefly.  And if we look

1085

1    at that briefly, you will note -- you will forgive me just one

2    second to find it -- at the bottom of the page, item D,

3    "Replace all street signs."  So as of 2000, the street were

4    in.

5            And perhaps the most persuasive bit of evidence, of

6    course, comes from Mr. Craig, who said he went to work out

7    there in 2001.  And from the time he worked out there onward,

8    the street signs were in place.

9            Now, you've heard some instruction from the Judge

10   about direct and circumstantial evidence.  You are to treat

11   them the same.  Well, this is certainly circumstantial

12   evidence of the street names and some direct evidence of the

13   street names.

14           Likewise, it goes to the issue of the lot numbers,

15   because you heard a big complaint about the lot numbers being

16   copied.  Well, again, lot numbers in the Jury Instruction

17   Number 31 will tell you that numbers are not copyrightable.

18   But more important than that, is that now we have testimony

19   that the lot numbers were actually stenciled in black upon the

20   face much each curb of each of the 68 lots, and it is

21   unrefuted testimony.

22           Now, you have heard some criticism of the DeWalt

23   witnesses.  "Gosh, I don't know," "I don't remember," and

24   Mr. Braze made a real big deal out of that.  But ladies and

25   gentlemen, let me ask you this.  Would you rather have someone

1  who was genuinely honest and doesn't remember something, or

2  would you rather have someone who has an answer for

3  everything, like Mr. McIntosh?  When faced with this evidence,

4  he tried to put on evidence that he went on Google and tried

5  to look at the street signs and couldn't find anything.

6       So take a choice -- excuse me.  Consider very

7  seriously, whether you would prefer to listen to a witness who

8  was genuinely honest or someone who has an answer for

9  everything.

10      Now, here Sarah Burgi, she doesn't have a

11 recollection.  It was six years ago, as we know.  And it's lot

12 numbers.  Lot numbers.  Josh doesn't have a recollection of

13 having worked on the project.  Mr. Gutierrez explained that he

14 wasn't involved in that aspect of the job at all.

15      Those are witnesses who have no fight.  They are not

16 involved in this fight, they don't work for DeWalt.  They

17 don't care about the outcome of the case.  Mr. McIntosh does.

18      Mr. Black also testified as to the convention of

19 surveyors and engineers to number lots in a subdivision

20 starting at some point where the last lot will end near that

21 point.  And that's consistent both with both of the tentative

22 maps.

23      Now, later in the case, you heard a newer theory, and

24 it's one that wasn't talked about earlier.  And it was the

25 cart path easements.  And, again, we have discussed it, but

1087

1   there is no evidence at all suggesting to you that those cart

2   path easements are not 15-feet wide.  That is not indicative

3   of copying.

4          Now, what else was out there that Mr. McIntosh is

5   suggesting was copied?  How about the lot sizes?  Well, we

6   know that the zoning was R-1, and that the minimum lot size

7   was 6,000 feet.  And it is no coincidence that many of the

8   lots are in fact 6,000 square feet.  J 134, J 69 is an example

9   showing the lot dimensions as being 60 feet, or thereabouts.

10         Now, there was some big argument being made that all

11  of these lots on the straightaway street on St. Andrews, for

12  example, must have been copied because they are all the same.

13         Well, let me explain that.  Whenever you have a flat

14  stretch of road separated by two streets, and you have X

15  amount of lots, and they must be at least 60 feet wide, it

16  only makes sense to take the two corners, meet the 6,000

17  square foot minimum, and divide the interior equally.  Okay.

18         What's also important here, remember, is that the

19  driver approach is already installed.  The driver approach is

20  the cut in the curb upon which a car drives to go into the

21  driveway of a house.  So when you have sister drive approaches

22  right next to each other, where is the lot line going to go

23  but in the middle?

24         There was also suggestion that lot locations were

25  important.  Well, again, going back to J 88, there is only one

1   place where the lot locations can be when everything is in the

2   ground, including the drive approaches.

3           Those are the main complaints that Mr. McIntosh has

4   with the work that DeWalt did.

5           Let's talk about damages for a moment.  And let's

6   talk about the event that you were to determine that there was

7   any infringement.

8           I'm doing my best.  I promise to get you out of here,

9   so if I'm a little hurried, I apologize.

10          First of all, damages.  J 41.  This is one of the

11  instructions you were given.  "The plaintiff has the burden of

12  proof on the amount of any damages suffered."

13          Mr. Braze suggested during opening that if it is

14  50/50, then the plaintiff wins.  That's not the law.  This

15  isn't like tie goes to the runner.  They have the burden of

16  proving their damages as well as the responsibility of any

17  defendant for those damages.

18          But this references actual damage.  Now, let's talk

19  about actual damages and look at the instruction on actual

20  damages.  Okay.  Now, the reason I want to spend a moment on

21  this -- and the other parties have as well, but I think I have

22  a different point to make -- is that the standard for actual

23  damages in the second paragraph is the amount a willing buyer

24  would have reasonably required -- been required to pay a

25  willing seller for the actual use made.  Okay.

1089

1    Now, in this particular case, a reasonable amount,

2    what would a reasonable amount have been?  I suggest to you

3    that a reasonable amount would have been no greater than the

4    amount that DeWalt bid for the job and no more because there

5    is no value in the tentative tract map or the plans, as we

6    have discussed, because they are not saleable.  They are not

7    marketable.  They can't be used elsewhere.  They have never

8    been licensed.  Those are all undisputed facts that you have

9    before you.

10   If you look down at the bottom, it says "the license

11   fees."  There is no evidence by Mr. McIntosh that he lost any

12   license fees on either the map or the improvement plans.

13   Now, in opening, if you recall, Mr. Braze drew up all

14   the profits on the board and told us what all the damages

15   were.  And right next to DeWalt, under "Profits," he had a

16   little mark, and there was nothing there.

17   Now, in closing, he is suggesting to you that DeWalt

18   profited to the tune of 27,000.  Nothing could be further from

19   the truth.  The only evidence admitted in trial, and it wasn't

20   contested, was that DeWalt was paid roughly 27,000, but

21   actually lost about eight to 10,000.  Mr. Gutierrez testified

22   that he spent $35,000 on this job, roughly.  So there is a

23   little backtracking, but nevertheless, the evidence is clear

24   on that.

25   Now, I also want to point out something that was not,

1   and that's if you look at vicarious infringement -- we are

2   just going to take a look at this real quick -- and under item

3   number 1, Mr. Braze put a blowup and told you that so long as

4   the defendant profited, then vicarious liability would stand.

5           That's not the truth.  Look at the instruction.  "So

6   long as the defendant profited directly."  And why is that

7   significant?  Let's look at Number 43, which is the Profits

8   instruction.  In item number 43, it says, in the second

9   paragraph, that "You may make an award of defendant's profits

10  only if you find a causal relationship between the

11  infringement and the profits generated indirectly."

12  "Indirectly."

13          So under the vicarious liability, you must prove

14  direct profiting from any alleged infringement.

15          There is no evidence on that at all.  The only

16  evidence is indirect profiting through the sale by Mr. Wu of

17  houses.

18          Now, the other thing on 43 I would like to point out

19  is that the plaintiff bears the burden of showing a causal

20  relationship between the infringement and the those profits

21  generated.  There has been no evidence of a causal

22  relationship between the infringement.  In fact the plaintiff

23  hasn't told us how it is that Mr. Wu profited, for example, by

24  the use of some infringement.  What was it?

25          Well, we know it wasn't the improvement plans because

1 the only improvement plans referenced were the grading plan,

2 and we have discussed that.  So how was it that he profited

3 from the tentative tract map?  And that's a question I will

4 leave rhetorically to you.

5       I'm going to give you a couple other alternatives

6 that I would suggest if you find that there was copying, in

7 other words, that there was not independent creation.

8       So one cost would be the cost paid to DeWalt to

9 complete the tentative map and the final map.  And I think the

10 highest amount you could ever reach would be the amount that

11 Mr. McIntosh was actually not paid.

12       And I believe that's Exhibit Number 100.  Here we go,

13 Exhibit Number 100.  And if you recall, under Job Number

14 92-22.04, 67,000, roughly, was the amount Mr. McIntosh was not

15 paid in relation to Tract 5472.  So if you are looking at the

16 top end, in the event you find copying, that is the top end.

17       Now, there is one other way you could calculate it,

18 which would result in a lower number, and that is you could

19 take the unpaid amount, $341,000, take Tract Number 5472,

20 which is 33.51 acres, divide it by the 480 acres as to which

21 Mr. McIntosh performed his work, and then you would come up

22 with a figure of 7 percent that would result in the damages of

23 23,870.  That's the only other way that you could calculate

24 his damages.

25       Now, I want to walk you through as quickly as I can

1092

1    DeWalt's efforts in relation to this project.  DeWalt was

2    hired in September of 2004.  We know that through exhibits

3    J 16 and J 18.  They went to work immediately.  They sent a

4    survey crew out.  They did all of their pre-survey work, such

5    as pulling down public information and data, getting

6    information on the tract, and they sent their crew out.

7         They sent their crew out and they prepared a

8    topographic survey, and they had roughly 420 shot points.  We

9    showed you the 19-page exhibit, D 226-A.  Those shot points

10   were then taken from a hand-held device in the field, moved to

11   the company computers, and a base map was prepared.

12        That's how the project started.  Once the base map

13   was prepared -- and excuse me.  I will go back just one moment

14   and say that the topographic survey was done by Paul Chavez

15   and Don Osborne.  They spent roughly 85 man-hours, which is

16   two men, at 42 hours each, so it is a two-man crew.

17        A base map was prepared using the data.  And then by

18   October -- excuse me.  By October of 2004, they had already

19   submitted a status report to Mr. Wu.  And by November 10th of

20   2004 -- this is Exhibits J 121 and J 13 -- they had submitted

21   the tentative tract for approval.

22        By November, they updated their submittal.  In

23   December, J 14, the City said, "Hey, we don't want the

24   vesting."

25        By December 20th, J 22, the vesting was dropped and

1    the map proceeded.

2         On March 15 of 2005 -- we have already seen it -- the

3    tentative map was approved.

4         And you have heard some suggestion that

5    Mr. Gutierrez's company copied the improvement plans.  And,

6    again, we know what we are dealing with, those weren't even

7    e-mailed until April 13, 2005, more than a month after the

8    tentative tract map was approved.  That's Exhibit Number J 15.

9         What do we know about the independent creation?

10   Here's what we know.  DeWalt agreed to perform certain

11   services on behalf of Mr. Wu's companies.  DeWalt committed

12   the time, materials, equipment and resources and did all that

13   work.  Even the witnesses provided by Mr. McIntosh, including

14   himself and Mr. DelMarter, no one is contesting the fact that

15   it was done.

16        So then the question becomes, if they did all of

17   their work, that they performed all of their services, and if

18   they based their work upon their surveys, the work in the

19   office, how can it not have been independently created?  How

20   can it not?

21        Let me ask you this, ladies and gentlemen, and this

22   is on the independent creation issue.  What if, what if

23   Mr. McIntosh had been faced with the very same development

24   with everything in place in the ground?  Would his map,

25   tentative map, have looked anything different unless they were

1094

1  going to rip out all the improvements?  And I think the answer
2  to that is no.

3       Now, let's talk briefly -- and I have a couple more
4  points to make and I apologize for taking so long.

5       Again, there was no copying because the substantial
6  similarity was not the result of copying, it was the result of
7  the fact that all the improvements were there and there were
8  no other choices.

9       Independent creation means independent effort and
10 independent work.  Could DeWalt have easily copied the map?
11 Sure.  Sure.  It would have been easy.  They didn't.  They did
12 their work.

13      Now, here's the point I would like you to pay
14 attention to right at the end.  How would this have been
15 copyright infringement?  The easy answer is had DeWalt been
16 faced with the same blank sheet that Mr. McIntosh faced, and
17 had Tract Number 5472 been prepared and looked just the way it
18 does today, that's copyright infringement.  That's copyright
19 infringement.  Had DeWalt taken the tentative map and applied
20 it on a sister parcel of the same size right next door and
21 built the parcel?  Copyright infringement.  No doubt.  Had
22 DeWalt not done its work?  Of course.

23      Lastly, what motives -- and again, Mr. Braze said it
24 best.  He is calling it "theft."  What motives did DeWalt have
25 to copy?  Was it for financial benefit or gain?  We know that

1    didn't occur.  Was it to lessen their burden?  We have heard

2    testimony that they did all the work and nothing reduced the

3    amount of their work.  There is no motive whatsoever for

4    DeWalt to have cheated.

5           At this point, what I'm going to ask is that you

6    carefully consider the question I asked you earlier, and I

7    believe the evidence will show, and you will conclude, that

8    the -- any similarities between the two maps -- I don't care

9    whether they are superficial or deep, I don't care how you

10   look at it -- but those similarities were created because of

11   one reason and one reason alone, and that is because DeWalt

12   faced a subdivision with all the improvements in place and for

13   the other reasons we have talked.

14          And for that reason, I believe that you must come

15   back and answer the question "no" to Questions 1 and 2 on the

16   special verdict form.  And once you do so, you will have

17   nothing else to do regarding DeWalt on the verdict form.  That

18   should end the case insofar as my client is concerned.

19          Again, thank you very much for your time.  I'm sorry,

20   I went a little longer than I wanted, but again, we appreciate

21   it.

22          THE COURT:  Rebuttal, Mr. Braze?

23          MR. BRAZE:  Those were the unanswered questions I

24   posed to you during the direct examination.  And I didn't

25   realize that most of the cross-examination or the cross of

1    closing arguments would be directed to me.  I'm not a party to

2    this lawsuit.  And, certainly, if anything I have done has

3    caused you to decide against my client or hold my client in

4    ill will, I apologize and certainly ask you not to hold

5    anything that I have done against my client.

6           But the bottom line is we still haven't gotten an

7    answer to these questions.  Why haven't the improvements been

8    accepted?  Why did Wasco put plaintiff's map in the Developer

9    Information Package?  If someone said, "Oh, it was required,"

10   but nobody could tell you who approved that.

11          Never answered the question if they conducted a

12   detailed survey, why didn't the tentative map conform to the

13   final map.

14          Didn't answer the question of why DeWalt needed to

15   look at the improvement plans if they weren't needed.  Didn't

16   answer the question of why DeWalt didn't call McIntosh to get

17   the improvement plans.  And despite the fact that a bunch of

18   names have been thrown around, no one has told you who drew

19   the tentative map.

20          And, still, we haven't heard how the numbers got on

21   the map.  We have heard, "Oh, they were painted on the curb."

22   Was there any evidence that anyone from DeWalt relied on the

23   numbers from the curb?  No.  Absolutely not.  There was a

24   suggestion they were there.  But you would think the people

25   who drew the map could tell you that's where they got the

1   numbers.  No evidence.

2           Now, Mr. Hassing suggested to you -- and I'm sure he

3   didn't mean to mislead you -- but he said, at least what I

4   heard, that Wu wasn't liable because it didn't copy the map.

5   That's not true.  As we have shown, our allegations against

6   Mr. Wu is vicarious infringement.  We went through that with

7   you.

8           Mr. Wu is well aware of the concept of ownership of

9   designs.  As you recall him saying, "I don't let people use my

10  designs of my houses because they belong to me."  So he is

11  well aware of the concept that the work belongs to him.

12          Mr. Hassing suggested to you that ideas could not be

13  copyrighted.  That's part of a sentence, in a way.  If you put

14  those ideas down on paper or express them in some form, then

15  they do become copyrightable.  He didn't bother to tell you

16  that.  Ideas can be copyrighted if you put them down as an

17  expression.

18          And everybody was making a lot of -- this is

19  Mr. McIntosh's work, P 101 -- or P 100 through P 110, the work

20  that took years to develop.

21          P 101 through 105 are not copyrightable -- are not

22  copyrighted.  And I think the defendants forgot that.  And

23  they say, "Well, he included the works of others in there."

24  Well, if you are reporting to the City about changes in how

25  your plans are going to change what they already have, you

1   almost, out of necessity, have to put the plan in there to

2   say, look, this is what you had in the past and this is why I

3   think it needs to be changed.  And we are not copyrightable,

4   we are not copyrighting it.

5         The only thing that's copyrighted in here is P 108,

6   which are the tubes and drawings.  And I can throw them out

7   here on all the floor to show you how much footwork it is, but

8   it is much more convenient for you to take it back in the jury

9   room like that.

10        Then there was this argument about receipts, which I

11   don't quite understand.  Mr. Wu gave us his own analysis,

12   showed us how much money he was making, how much money he said

13   he was going to lose.  And this was my favorite.  He is

14   renting 65 acres for farming for $2,000 a year.  If that's

15   right, I'm going to be in line for that thing because for

16   $2,000 a year for 65 acres?  I think someone made a mistake.

17   That's probably 2,000 a month, maybe -- but 2,000 a year to

18   lease 65 acres?  No way.  Mr. Wu would need some advice if he

19   is doing that.

20        Then he argued, "You don't need the improvement

21   plans."  Well, you do need the improvement plans because you

22   need to know where things are.  You need a final map.  You got

23   to have the improvement plans to get a final map because you

24   have to know where the improvements are.

25        And then, of course, he said that Mr. McIntosh stood

1    back and did nothing.  There is nothing in the law that

2    requires you to go up to someone and say, "By the way, did you

3    know you are doing something wrong?  And that if you don't

4    stop, I will do something about it."  You didn't see any jury

5    instruction like that.  That's not the law.

6         Let's talk about Wasco's argument.  Mr. Okadigbo

7    proved beyond a reasonable doubt that he does not know how to

8    read mechanical drawings.  He was showing you that the

9    distance here is 61'07", but there is nothing in between.

10        That's what you indicate when it is a ditto,

11   basically, that each lot is the same.  He just didn't

12   understand how to understand the ditto marks.

13        So each of those lots where he said -- where he

14   pointed those out that they weren't the same, Mr. Wong knew

15   what we were talking about.  He told you they were all

16   identical.

17        Now, there is this discussion about impact fees not

18   being profits.  If I owe $500 a month on my car payment and

19   you give me $500 per month, it doesn't matter the fact I used

20   it to pay my car payment.  It is still income.

21        So because Wasco took money and used them somewhere

22   still makes it income.  Where they used it has to do with

23   their own situation.  I use $500 to pay my car payment.  That

24   doesn't mean I didn't get $500 in income.

25        Well, he said, "Well, we didn't get 1 and a half

1   million because there is only a check for 250."  Did anybody

2   ever tell you where the other 1 million 250 went?  No evidence

3   at all where the other 1 million 250 went.

4        MR. OKADIGBO:  Objection, your Honor.  You were going

5   to get into it but it was --

6        MR. BRAZE:  But you weren't because of a motion in

7   limine --

8        THE COURT:  Counsel, just a minute.  Just a minute.

9        MR. OKADIGBO:  But you used --

10       THE COURT:  Counsel, let's not move into areas where

11  we don't have evidence because of motions.  Let's proceed and

12  finish, please.

13       MR. BRAZE:  No evidence what they did with the impact

14  fees.  They said, "Oh, if we get them and we don't use them,

15  we have to give them back."  Did you hear any evidence they

16  gave them back?  None.

17       Let's talk about this fair use defense.  This is in

18  Jury Instruction Number 37 that you can read.  If you would

19  like a copy, just ask for one.

20       And this is, let me read this to you.

21       "Defendant City of Wasco contends that it made fair

22       use of the copyrighted work for the purpose of

23       criticism, comment, or scholarship or research by

24       providing information about the property existing in

25       its public records to prospective purchasers of a

1   tract within the Valley Rose Subdivision."

2   I didn't hear any evidence of comment, criticism,

3   scholarship or research in this trial.  Did you?  And so with

4   that, goes out the fair use defense.

5   Let's not forget, there was a question, "Well, why do

6   we need a final lot [sic]?  We don't need your plans."  Well,

7   Government Code section 66499.30(a), which we read to you

8   during trial, provides you can't sell lots without a final

9   map.  Tentative map and all that stuff is irrelevant when it

10  comes to selling houses; you have to have a final map before

11  you can sell houses.

12  Now, DeWalt relies on this -- their whole defense --

13  because I think Mr. Alexander misquoted the concept of

14  copying.  If you prove copying, of course, there is copyright

15  infringement.  If you prove access and substantial similarity,

16  you prove copying.

17  MR. HASSING:  Objection.  Misstates the law, your

18  Honor.

19  THE COURT:  Restate what you said, please.  I think

20  you misstated.  Just restate it.

21  MR. BRAZE:  I will read it from the jury instruction

22  to make sure I don't.  I believe I said, if you have access --

23  THE COURT:  Just stick with that, and that way --

24  MR. BRAZE:  -- and substantial similarity, you have

25  copying.

1    MR. HASSING:  That's -- objection.  Misstates the

2  law.

3    THE COURT:  Sustained.  You just misstated, so just

4  stick to the instruction, if you wish to refer to it.

5    MR. BRAZE:  Yeah.  I will read it to you.

6    "To prove that the defendant copied the plaintiff's

7    work, the plaintiff may show that the defendant had

8    access to the plaintiff's copyrighted work and that

9    there are substantial similarities between

10    defendant's work and the plaintiff's copyrighted

11    work."

12    I thought that's what I said.

13    Let's talk about independent creation.  So if we

14  prove that the work is substantially similar, DeWalt's defense

15  would say, "No, I independently created it," and that's their

16  defense.

17    And our position to that is, no, you didn't

18  independently create it.  You went out and created it by

19  copying what was on the ground.  And, therefore, your creation

20  was dependent, it was not independent.

21    MR. ALEXANDER:  Objection, your Honor.  That is

22  misstating the law too.

23    THE COURT:  Hang on just one moment.  Let me just

24  look.  The wording of what his oral argument is not a

25  misstatement of law.  It doesn't go to the level of what we

1    were talking about from a legal standpoint.  It's still within

2    the parameter of argument, what he has just stated.

3         But let's not spend too much time on it so we don't

4    cross the line.

5         MR. BRAZE:  Okay, your Honor.  Based on that, there

6    was no independent creation, therefore, there was no defense

7    to the fact that the drawings were substantially similar or

8    had substantial similarities.

9         MR. HASSING:  Your Honor, I object.  Move to strike.

10   That does go past the line --

11        THE COURT:  Just a minute.

12        MR. HASSING:  -- when you tie it all together.

13        THE COURT:  Ladies and gentlemen, some of this is so

14   close, it is very difficult, depending on what inferences one

15   can draw, such as you, the triers of the fact, that the legal

16   issues are very, very difficult.  And so I urge you that -- we

17   will send in, even without your asking, we will send in a copy

18   of the instructions with the verdict form.  So remember, the

19   law is as it is in the jury instructions.  Nobody can change

20   that part.

21        So let's go ahead and finish.

22        MR. BRAZE:  Mr. Alexander suggested to you that you

23   pay Mr. McIntosh in 1992 dollars.  In reality, the

24   infringement occurred in 2004 and he should be paid in 2004

25   dollars, and we gave you that information.

1104

 1      It cost DeWalt so little to prepare this map because

 2   it cost Mr. McIntosh so much.  He had done a lot of work for

 3   this.  He had done work, as you can see, in 108, and 105 to

 4   get this project to where it was when it had failed.  And,

 5   sure, it didn't take DeWalt much at all to go in there and do

 6   it.

 7      Still no evidence of how the map was made, still no

 8   evidence of where the street names came from or where the lot

 9   numbers came from.

10      Now, you can see we can all argue back and forth all

11   day about this.  When I was young and growing up, my parents

12   weren't very well educated.  They had a sixth grade education

13   and they were 40 years old when I was born.  And all I heard

14   my mother ever say was, "All I want you to do when you grow up

15   is learn the difference between right and wrong," which, to

16   me, of course, as a kid, you don't think much of that.  And as

17   you get older, you realize knowing the difference between

18   right and wrong is pretty important.  And what's more

19   important, to know that when you do something wrong, you need

20   to make it right.

21      The first decade of the 21st Century is probably

22   going to be known as one of the most corrupt in business

23   situations in the history.  Bank failures, insurance company

24   failures because people are so greedy.

25      MR. ALEXANDER:  I'm sorry, this is way beyond

1  rebuttal.

2         THE COURT:  No, the objection is overruled.  It is

3  argument.

4         MR. ALEXANDER:  Okay.

5         MR. BRAZE:  It is argument.

6         THE COURT:  I don't need help.  Go ahead.

7         MR. BRAZE:  Thank you.

8         THE COURT:  Go ahead.

9         MR. BRAZE:  It's time for jurors like you to make a

10 change.  And the way you make a change is to send a message

11 that business as usual needs to be changed.  Business like

12 this needs to be changed.  And so it is now time for you, for

13 someone who has done something wrong, to go make it right.

14 Thank you.

15        THE COURT:  All right, ladies and gentlemen, it is

16 now about ten after 12:00, and I'm going to ask you to go into

17 the jury room and select your foreperson and decide when you

18 want to come back after lunch.  In other words, now I don't

19 set your lunch times, I don't set what you do and when you do

20 it.  This is deliberation time and it is totally up to you as

21 a body, as a body of the jury.

22        And so I would ask you to send out a message when you

23 want to come back.  And it is important so we know when you

24 are deliberating so we can always be available, all of us can

25 be available, because that's required.

1     So if you would go back into the jury room, do that,

2  that would be good.

3     And in just a few minutes, actually, during the noon

4  hour, we will make sure the verdict is there, the jury

5  instructions, the evidence that has been received into

6  evidence.  And we will send in the note forms.  In case you

7  have any notes for me, you just use the note form and send it

8  out.

9     You need to understand that during your

10  deliberations, all communication devices, cell phones,

11  laptops, anything you have of communication outside the jury

12  room must be turned off and not left on for any reason.

13     And finally, I will ask the clerk to please do the

14  swearing in.

15     (The Court security officer and the law clerk were

16  sworn in.)

17     THE COURT:  Any questions?  Okay.  We will expect

18  your note, telling us what time you would like to be back so

19  we will know when you are back after lunch and you can start

20  your deliberations.

21     If, for instance, you were to say, "We want to take

22  an hour," and you leave at 12:15 and you agree all to come

23  back at 1:15, frankly, 1:15 is not the important number.  The

24  important number is "eight."  If you all come back few minutes

25  early, you can start a few minutes early as long as all eight

1    of you are present.  You can never do any deliberating until

2    all of the jurors are present.  You can never fill someone in

3    on something they have missed.  Okay?

4            Thanks.  If you would return to the jury room, and

5    send out your note when you have decided.

6            (The jury left the courtroom to begin their

7    deliberations at 12:11 p.m.)

8            THE COURT:  Let the record reflect the jury has left

9    the courtroom.

10           Any issues, counsel?

11           MR. HASSING:  No, your Honor.

12           MR. ALEXANDER:  I have one, your Honor, but it is not

13   a big one.  In terms of the deliberations, do you like us to

14   be in the courthouse or by cell phone nearby or?

15           THE COURT:  It depends.  If you are available by cell

16   phone, what is your time estimate to be gone?  In other words,

17   when can you get back?

18           MR. ALEXANDER:  Ten minutes.

19           THE COURT:  That's not a problem.  Just be sure to

20   give the clerk of the Court the cell phone numbers.

21           MR. ALEXANDER:  Will do.

22           THE COURT:  We will be in recess.  Thank you.

23           (Recess)

24   2:55 p.m.

25           THE COURT:  Back on the record.  Counsel are present.

1    The jury is not present.  They sent out the first note telling

2    us when they were going to be back, and that will be Court

3    Exhibit A.

4            (Court's Exhibit A was marked for identification.)

5            THE COURT:  Then they sent us another question, which

6    will be marked as Court Exhibit B.

7            (Court's Exhibit B was marked for identification.)

8            THE COURT:  We have given you each a copy of that.

9    It says, "Does the copyright have to be registered to be

10   valid?  Just because there is a C mark on the map, does that

11   make the copyright valid?  If so, where can we find that mark

12   on Tentative Map Tract Map 5472?  And how long would that C

13   with a circle around it be valid?"

14           I have given you a few minutes to talk about it.  Do

15   you have suggestions or are you looking for suggestions?

16           MR. TRAVIS:  I think we are pretty much agreed.

17   Counsel from Wasco, I think we have something we both think is

18   pretty succinct.

19           MS. BARNES:  If the Court please, I wanted to point

20   out that Mr. Alexander isn't here, and I don't know if there

21   has been some communication, and he is indicating he won't be,

22   but I thought the Court should know.

23           THE COURT:  He is indicating he won't be?

24           MS. BARNES:  I don't know where he is.

25           MR. HASSING:  Mr. Alexander is ten minutes away, and

1    DeWalt and Northern are taking the same position in most of

2    these issues.  And I would represent to the Court that it is

3    my belief that we don't need Mr. Alexander to answer this

4    question, that the lawyers that are here can handle it.

5              THE COURT:  Is he coming?

6              MR. HASSING:  I don't know if anybody has called him.

7    Did anybody call Alexander?

8              THE COURT:  We -- why don't we do this.  Let's get

9    him on the line.

10             (Pause while the clerk called Mr. Alexander.)

11             THE COURT:  Mr. Alexander?

12             MR. ALEXANDER:  Yes, sir.

13             THE COURT:  This is Judge O'Neill.

14             MR. ALEXANDER:  Hi, Judge.

15             THE COURT:  All counsel are in the courtroom, except

16   you.  And so rather than have you come over, we will just tell

17   you that they have a question, and we will tell you what it

18   is, and then any counsel who want to give you a -- their

19   suggestion on a proposed answer, which I have not yet heard,

20   by the way, that would be fine, and we will see you if you

21   agree.  Because we are not going to send anything into the

22   jury in the form of an answer until and unless we have some

23   type of an agreement or I have ruled.

24             The question is actually several in one.

25             "Does the copyright have to be registered to be valid?

1        Just because there is a C with a circle around it

2        mark on the map, does that make the copyright valid?

3        If so, where can we find that mark on Tentative Tract

4        Map 5472?  And how long would that C mark be valid?"

5        Those are the questions.  And Mr. Hassing, I believe,

6  has a suggested, after meeting and conferring in the courtroom

7  here, has a suggested response.  And we will hear from him

8  now.

9        MR. HASSING:  We have, all the attorneys here, have

10  conferred, and we agree on this language.  You tell us what we

11  think about it.

12        The answer is:

13        "A copyright exists the moment the work is created.  A

14        copyright holder must register the work to file a

15        lawsuit.  A copyright symbol is not required to be on

16        the work.  A copyright lasts seven years from the end

17        of the calendar year in which the author dies.  There

18        is no copyright symbol on the 5472 tentative map."

19        We all agree with that.  What do you think?

20        MR. ALEXANDER:  It sounds innocuous enough to me.

21        MR. HASSING:  All right.

22        THE COURT:  Whatever you have in your hand, is that

23  readable?

24        MR. HASSING:  Yes.

25        THE COURT:  Can I take a look?  Thanks.

1111

1         Mr. Alexander, are you in Fresno or Chicago?

2         MR. ALEXANDER:  It's a little breezy.  I'm ready to

3    walk into your courthouse.  Sounds loud, but it is a little

4    breeze.

5         THE COURT:  All right.  Then is there agreement here

6    that I can indicate just, in other words, send in this note.

7    We will call it Court Exhibit B-1, because it has the answer

8    on it, not just the question.  And I add at the bottom, "If

9    you have" -- "If you believe this does not answer your

10   question or questions, let us know."

11        (Court's Exhibit B-1 was marked for identification.)

12        MR. HASSING:  That would be fine, Judge.

13        THE COURT:  Everybody fine with that?

14        MR. OKADIGBO:  That's fine.

15        MR. ALEXANDER:  That's fine, your Honor.

16        MR. BRAZE:  Yes.

17        THE COURT:  Okay.  What I have added here is this

18   language:  "If you believe this does not answer your

19   questions, please send out another note," and I have signed

20   it.  Fair enough?

21        Okay.  Then we will mark this as an exhibit, and I'm

22   going to ask Barbara, when she takes it back in, to make sure

23   that they understand that they need to retain this note and

24   return it to me with the verdict whenever they have a verdict.

25   That way, we have the full record.  Okay.

1      All right.  If I hear anything more from them, of

2  course, I will let you know.

3           MR. ALEXANDER:  Thank you, your Honor.

4           THE COURT:  Be in recess.

5           (Recess)

6  4:30 p.m.

7           THE COURT:  Back on the record.  Counsel are present.

8  The jury is not.  The jury has buzzed and indicated that they

9  want to go home.  So we can either bring them out or I can go

10 in with the court reporter and give them their good night

11 admonitions, your choice.

12          MR. HASSING:  Go on in.

13          THE COURT:  Any objection?

14          (No objection was registered.)

15          THE COURT:  If you wait a minute, I will give them

16 their good night admonitions and will ask them what time they

17 want to come back, and I will come out and tell you.

18          (The proceedings were adjourned to the jury room.)

19          THE COURT:  Back on the record in the jury room, with

20 the stipulation of counsel.

21          Ladies and gentlemen, my understanding is you want to

22 go home and come back in the morning.  What time would you

23 like to come back in the morning?

24          THE JURY:  8:30.

25          THE COURT:  Everybody agree?

1    Then now things have changed.  Now you have started

2  talking about it, and sometimes that makes people a little

3  easier to talk with and makes it easier for you to talk about

4  it.  And please be very careful.  You can't talk about it with

5  anyone.

6    All eight of you have to be present for all parts of

7  the deliberation.  Please don't do anything tonight about it.

8  Sometimes when you start talking about a case, you get stuck

9  on a word or something like that, and somebody goes out and

10  does a little research on the word and figures that it is just

11  innocent and won't make any difference.  It makes a

12  difference.  So please don't do anything having to do with the

13  case.

14    As soon as all eight of you are present, you don't

15  have to come into the courtroom.  Come right in here, and as

16  soon as all eight of you are present for the deliberations to

17  start, 8:30, if it's 8:25, so be it, just start, as long as

18  all eight of you are present.

19    Any issues with regard to these admonitions?

20    Okay.  Have a pleasant evening.

21    JUROR:  Do we need to buzz someone before we start

22  talking to make sure?

23    THE COURT:  No, but it would be appreciated if you

24  buzz us to let us know all eight are present, and that way, we

25  know when you have started and everything is -- everybody is

1114

1  present and everything is fine, okay?

2          All right.  Okay, have a pleasant evening.  Rest.

3  Get some rest, and we will see you tomorrow.

4          (The proceedings were adjourned to the courtroom.)

5          THE COURT:  Back on the record in the courtroom.  All

6  counsel are present.  I have given the good night admonitions

7  to the jury.  They had no questions that they asked me

8  verbally, which, if they had, I would have stopped them and I

9  would have told them they would have to put it in writing, but

10  they didn't try.

11          They want to come back tomorrow morning at 8:30.

12  They will let us know when all eight of them are present,

13  around 8:30, when they get there, and I think you can count on

14  within a few minutes of 8:30 they will be there.

15          Any issues?  Get some rest, and we will see you

16  tomorrow.

17          (The proceedings were adjourned at 4:34 p.m.)

18          I, PEGGY J. CRAWFORD, Official Reporter, do hereby

19          certify the foregoing transcript as true and correct.

20

21  Dated:  03/25/2010            /s/ Peggy J. Crawford
                                  PEGGY J. CRAWFORD, RDR-CRR
22

23

24

25