Northern California Universal Enterprise Company, ("Northern"), and Lotus Developments, L.P., ("Lotus"), (sometimes referred to collectively as "Defendants") now file their Memorandum of Points and Authorities in support of their Motion seeking to amend the judgment entered March 23, 2010 or for a new trial.  The motion was filed April 20, 2010, (Doc # 362) and the thirty day delay between the filing of the Motion and the filing of this brief was approved by this court on April 6, 2010. (Doc # 356).

**I**

**INTRODUCTION**

At trial, Plaintiff established that between 1992 and 1994 his company billed previous developer, Legacy, $1,149,910.28 for all of the planning, entitlement work, engineering and construction management related to a 480 acre parcel of land in Wasco, California.  (Exhibit J-4; RT 299; 19-300; 2).  Of that amount, Plaintiff admitted receiving $808,241.64, including the $10,000 billed for Tentative Map 5472, ("The Map").  (RT 311; 7-9) (RT 316; 18-318; 20) (RT 339; 7-10).

On March 10, 2010, the jury returned a verdict finding that Defendants had copied The Map.  However, instead of finding actual damages equal to The Map's 2004[1] fair market value, the jury awarded $1,400,000.  In addition, and in the absence of any reliable supporting evidence, it also awarded profit damages of $3,984,815.  On March 23, 2010, a $5,384,215 Judgment was entered against Defendants.  (Doc. # 333).

///

///

---

[1] 2004 is the relevant date because it is the date of the alleged infringement.

Memorandum of Points and Authorities in Support of Motion to Alter or Amend Judgment or for a New Trial

**A.      Relief Requested**

Defendants ask that the judgment be altered or modified to reflect a defense verdict with no amount due Plaintiff.  In the alternative, they ask that the judgment be reduced from $5,384,215 to $20,500, The Map's fair market value.  In the further alternative, they seek a new trial.

The Motion is brought under Rule 59 of the Federal Rules of Civil Procedure which the court should employ to avoid manifest injustice.  Rule 59(a) provides the authority allowing the court to set aside a verdict or judgment and order a new trial on all or some of the issues as to all or some of the parties.  Rule 59(e) allows the court to alter or amend a judgment.  A judgment of $5,384,215 based upon infringement of a $10,000 map, ($20,500 in 2004 dollars), is the very definition of manifest injustice.

**B.      Rule 59 allows the court to reweigh the evidence without viewing it in the light most favorable to the party who prevailed at trial**

Under Rule 59, the court has a duty to reweigh the evidence and to set aside a verdict even if it is supported by substantial evidence if the judge is of the conscientious opinion that the verdict is against the clear weight of the evidence or if it will result in a miscarriage of justice.  *Molski v. M.J. Cable, Inc.* 481 F.3d 724, 729 (9th Cir. 2007); *Silver Sage Partners, Ltd. v. City of Desert Hot Springs* 251 F3d 814, 819 (9th Cir. 2001).

The verdict should be set aside where, after giving full respect to the jury's findings, the judge is left with the definite and firm conviction that a mistake has been committed by the jury.  *Landes Construction Co., Inc. v. Royal Bank of Canada*, 833 F2d 1365, 1371-1372, (9th Cir. 1987).  Under Rule 59 the court does not begin with a presumption that the verdict is correct; nor need it view the evidence in the light most favorable to the party in whose favor the verdict was rendered.  *(Id* at 1371).

## C.     Brief summary of defendants' argument

The jury's mistakes, both in determining liability and in determining damages, require amendment of the judgment or a new trial.  As to liability, the jury determined that Lotus and Northern both infringed by direct copying despite Plaintiff's judicial admissions that neither company copied anything.  (RT 1027; 11- 22) (RT 1036; 11- 13) (RT 1097; 2-7).

The jury also made a mistake in finding vicarious infringement because Plaintiff failed to produce any evidence of direct profit or of any practical ability to control or supervise DeWalt.  Further, Plaintiff's Third Amended Complaint, (TAC) does not allow judgment against Defendants based on vicarious infringement.

Because of the judicial admissions regarding direct copying and insufficient evidence to prove vicarious infringement, no liability was established.  It follows that no damages could be awarded.  However, had infringement been proved as to Northern or Lotus, $20,500 is the most the jury could ever have awarded as actual damages.  As for profit damages, the jury failed to follow instruction 43 because its calculations were restricted to the $4,603,870 of <u>actual revenue</u> and it was required to disregard Plaintiffs' estimates of $11,845,281.67 of <u>future revenue</u>.

In this brief, Defendants explain, hopefully in a clear, concise and understandable manner, why the judgment and verdict are against the clear weight of the evidence and the law, why profit damages were based upon unreliable opinion and speculation, and why the court is duty-bound to intervene to prevent a terrible miscarriage of justice.

///

///

///

## II

**PLAINTIFF'S JUDICIAL ADMISSION THAT DEFENDANTS DID NOT COPY PRECLUDED THE JURY FROM FINDING DEFENDANTS LIABLE FOR DIRECT INFRINGEMENT.  THE JURY WAS ALSO PRECLUDED FROM FINDING VICARIOUS INFRINGEMENT DUE TO PLAINTIFF'S FAILURE TO OFFER EVIDENCE TO SUPPORT ANY OF THE REQUIRED ELEMENTS OF THAT TORT**.

**A.    Plaintiff admitted during closing argument that neither Northern nor Lotus copied anything and that any infringement liability as to them was vicarious. Plaintiff's attorney even told the jury to mark "no" at the appropriate part of the verdict form to signify finding that Defendants' did not copy.**

Absent egregious circumstances litigants are generally bound by the conduct of their attorneys.  *United States v. Guerra de Aguilera*, 600 F.2d 752, 753 (9th Cir. 1979).  *United States v. Adams*, 422 F.2d 515, 518 (10th Cir. 1970); *United States v. Bentson,* 947 F.2d 1353, 1356 (9th Cir. 1991) (counsel's statement, made during closing argument, is a judicial admission binding on the client).

During closing argument Plaintiff's counsel made a binding judicial admission in telling the jury that he didn't think Wu, Northern or Lotus copied anything.  In explaining to the jury how he would like them to fill out the verdict form, beginning with questions 1 and 2 pertaining to DeWalt, counsel explained that the jury should mark it "yes".  Next, obviously referring to the next four verdict questions, 3-6, counsel explained that "in fairness" he didn't think that Defendants copied anything and advised that the jury answer "no" on the verdict form.  Counsel then moved directly on to question number 7.  (RT 1027; 3- 23).  Questions 3-6 pertained to Northern and Lotus copying The Map and plans.  Clearly, counsel was telling the jury to find no copying by Defendants.

///

> **Did Northern California Universal Enterprises Company---and I
> will call that Wu---copy Roger McIntosh's tentative map?  In all
> fairness, I don't think so.  I don't think he copied anything.  So I
> think that answer is probably "no".  Same thing with improvement
> plans, same thing on behalf of Lotus.**

(RT 1027; 17- 22)

Lotus relied upon that judicial admission during closing, telling the jury;

> And now, today, finally, after five days of trial, he admits, 'No,
> Mr. Wu didn't copy anything'.

(RT 1036; 11- 13)

By his silence upon hearing counsel's comment, Mr. Braze signified agreement,

silently ratifying Lotus's statement.

When addressing the jury Lotus's counsel stated;

> Jury Instruction 38, vicarious infringement.  Mr. Braze talked
> to you about vicarious infringement.  He has admitted that my
> clients never copied anything.  But he hasn't let us go home yet
> because he says, well, DeWalt copied and since we hired DeWalt,
> that we are vicariously liable for what DeWalt did... But that's
> why my client is still here, vicarious infringement...

(RT 1042; 21- 1043; 6)

Again, there was no objection from Mr. Braze.

Later in his closing, Lotus's counsel stated;

> I'm going to go through the ones that apply to my client.
> Numbers 3, 4, 5, and 6 have already been admitted.  Mr.
> Braze says my client didn't copy, so those all get a 'no'.
> We already know that.

(RT 1051; 7-11)

Again, there was no objection by Mr. Braze.

During the City's closing argument, its attorney, discussing the vicarious infringement

claim against City of Wasco, stated;

since they claim that Northern didn't copy, I will take you
through their claim against DeWalt briefly.

(RT 1064; 2- 4).

Once again, no objection from Mr. Braze.

Finally, in the rebuttal portion of his closing argument, Mr. Braze again
acknowledged that Plaintiff was not claiming direct copying against Northern or Lotus and
was alleging only vicarious infringement against them;

> Now, Mr. Hassing suggested to you – and I'm sure he didn't
> mean to mislead you – but he said, at least what I heard, that
> Wu wasn't liable because it didn't copy the map.  That's not
> true.  As we have shown, **our allegations against Mr. Wu is
> <u>vicarious infringement</u>**.  We went through that with you.

(RT 1097; 2-7)

Despite being explicitly told by Plaintiff's attorney to mark "no" on questions 3, 4, 5
and 6, the jury mistakenly and inexplicably marked 3 and 5 "yes, finding that both Northern
and Lotus actually copied The Map.  (Verdict Form Qs 3, 5).  In addition to the judicial
admissions, there was absolutely no evidence of direct copying by either defendant.

**B.     Plaintiff failed to plead facts sufficient to obtain relief for vicarious
        infringement.**

With Plaintiff having admitted that neither defendant committed direct infringement
the only basis for Defendants' $5.384 million judgment is vicarious infringement.  However,
Plaintiff's TAC does not allow the court to enter judgment based upon vicarious
infringement.

In his TAC, Plaintiff alleged direct infringement by all defendants and contributory
infringement by City of Wasco.  There is neither a separate cause of action for vicarious
infringement nor facts plead under which such relief may be granted.

Memorandum of Points and Authorities in Support of Motion to Alter or Amend Judgment or for a New Trial

Rule 8 of the Federal Rules of Civil Procedure requires a short and plain statement of the claim showing that the pleader is entitled to relief and also requires a demand for the relief sought.  (Rule 8(a)(2), (3).  Even under the liberal requirements of notice pleading Plaintiff plead no facts to provide Defendants with notice that he sought recovery against them for infringement by any other party.  Nor did Plaintiff move to amend to conform to proof so as to allege vicarious infringement.

Factual allegations must be sufficient to raise a right to relief above the speculative level.  *Bell Atlantic Corp. v Twombly*, 550 U.S. 544, 555 (2007).  The complaint must at least establish the grounds upon which the Plaintiff's claim rests.  (Id at 555).  While courts may grant whatever relief is appropriate to a claim, they may not award relief as to claims not asserted.  *Melvin v. UA Local 13 Pension Plan*, 236 F.R.D. 139, 144 (W.D. N.Y. 2006).  Here, Plaintiff failed to assert any claim for vicarious infringement so any verdict based thereon cannot result in a judgment against Defendants.

**C.    Plaintiff failed to establish receipt of <u>direct</u> profit resulting from another defendant's infringement or that they had the <u>practical</u> <u>ability</u> to <u>supervise</u> or <u>control</u> infringing acts of any other defendant.**

A finding of vicarious infringement requires that Plaintiff prove Defendant received direct profits as a result of the infringing actions of some other party and that Defendant had the right and the ability to control or supervise the infringing party's infringing actions.  (JI 38).  In *Metro-Goldwyn-Mayer Studios Inc. v. Grokster*, 545 U.S. 913 (2005) the Supreme Court noted that one infringes vicariously by profiting from direct infringement while declining to exercise a right to stop or limit it.  (@ 930).  The Ninth Circuit, in *Perfect 10, Inc. v. Amazon.com*, 487 F.3d 701 (9th Cir. 2007) stated that the "ability" to stop or limit the directly infringing conduct is a "practical" ability.  (@ 730).

**Ability to control or supervise.**

During the trial and during closing argument, Plaintiff made it clear that the infringing activity upon which Defendants' vicarious liability was based was DeWalt's alleged copying of The Map.  Plaintiff offered no evidence or argument related to any right or ability to control or supervise City of Wasco.  And as to DeWalt, the only evidence of "ability to control" was Greg Black's testimony that DeWalt would have stopped work if Mr. Wu told them to.  (RT 399; 7- 19).

During closing argument, Plaintiff's counsel stated;

> He (Mr. Wu) had the right and ability to supervise the infringing
> activity.  DeWalt said, 'if Mr. Wu had told us to stop, we would
> have stopped'.

(RT 1021; 6-8)

He went on to argue;

> Wu had the right and ability to supervise.  He chose to go to
> DeWalt and could have stopped it.  He is liable whether he knew
> or not of the infringement, and certainly he profited.

(RT 1021; 12- 15)

He concluded that subject stating;

> He chose DeWalt and could have stopped it.

(RT 1021; 25)

The foregoing being the total sum and substance of evidence, (and argument), the record does not reflect the evidence necessary for a finding of vicarious infringement.  There was no probative evidence of ability to control or supervise nor was there any evidence of Defendants receiving direct profit from any infringement by DeWalt.

Plaintiff failed, as a matter of law, to establish the kind of "practical ability to supervise or control" that the courts have determined is required for such secondary liability. The Copyright Act does not even provide for vicarious liability. (*MGM v. Grokster* @ 930). Vicarious infringement derives from the similar concept in the law of employer-employee relations. *Adobe Systems Inc. v. Canus Productions*, 173 F.Supp.2d 1044 (C.D. Cal. 2001).

Vicarious infringement is not a strict liability tort. (*Adobe* @ 1050). Certain facts must first be established. (JI 38). Certainly, the simple fact that DeWalt would have stopped work upon Mr. Wu's request cannot satisfy the requirement of "right and ability to control or supervise the infringing actions". If it could, then vicarious infringement would be a strict liability tort because, without discussing breach of contract ramifications, anyone hired to perform a task would obviously stop work if told to do so by the other contracting party. If right to require the other party to cease work satisfied the "ability to control or supervise" element, all infringing independent contractors would subject the non-infringing other party to vicarious liability. No reported case espouses that principle. Accordingly, the evidence offered by Plaintiff does not establish the control or supervisory element necessary for vicarious liability.

DeWalt was a professional engineering company. As such, it's hard to imagine how Defendants could "supervise" or "control" its efforts to create a map. Defendants would have had to place an employee with specialized knowledge in DeWalt's offices to watch them draft the map from their survey and make sure that they didn't copy anything from Plaintiff's Map. That is not practical and that is not what the law requires.

The amount of control necessary to support a finding of vicarious infringement is fact-specific. (*Adobe* @ 1053). In *Adobe*, there was a significant amount of supervision and

control which the court found inadequate to support summary judgment.  There, defendant controlled customer access, reserved the right to terminate vendors at any time and to eject any objectionable person.  It employed a team of 20 security guards to monitor entrances, exits and outside areas.  It employed an additional two to five undercover agents to walk the floors and monitor issues and who were instructed to take action regarding any infringing products.  (Id @ 1053, 1054).  The court was not convinced that these facts satisfied the "control and supervision" requirement, even going so far as to state that,

> there is a question of fact regarding the ability of the security guards to recognize infringing products.  There can be no practical ability to control the infringing behavior if Defendant does not know what constitutes an unauthorized Adobe product.

(Id @ 1055).

Similarly, holding Northern and Lotus vicariously liable when they could not have learned of, or controlled, any DeWalt copying is against the law.  It was not a matter of Defendants "declining" to exercise a right to stop infringement, a requirement noted by the Supreme Court in *MGM v. Grokster,* it was a matter of not having <u>any</u> supervisory control over DeWalt's performance of its professional responsibilities.

**Direct Profits**

Plaintiff also failed to offer any evidence of the other necessary element, direct profit received by Defendants resulting from DeWalt's infringement.  Direct profit can be earned from the sale of the infringing product, (*Polar Bear Productions v. Timex*, 384 F.3d 700, 710 (9th Cir. 2004) or from revenue attributable from the "draw" created by vendors marketing unauthorized products at swap meets, (*Fonovisa v. Cherry Auction, Inc*, 76 F.3d 259, 263 (9th Cir. 1996) and department stores, (Shapiro v. Green, 316 F.2d 304, 308 (2nd Cir. 1963).

The jury was never even told what "direct profit" is.  In fact, that term was never used in relationship to evidence as it was admitted.  The only reference in the record to "direct profit" comes from the jury instructions and DeWalt's closing argument.

Examples of profit not considered "direct" for purposes of vicarious infringement include fixed rents paid to landlords by individuals using the premises to market or reproduce infringing goods.  (*Deutsch v. Arnold*, 98 F.2d 686 (2d Cir. 1938).  Even the court in *Adobe* indicated that despite the promoter's receipt of fees from vendors and customers, a "draw" of requisite significance had not been shown to meet the requirement of "direct" profits. (*Adobe* @ 1050- 1053).

If DeWalt lessened its burden by copying part or all of The Map, Defendants received no direct benefit because they paid the full market value for an engineer's work in creating a tentative map.  As for any profit from the sale of the 19 homes, no part of it was shown to have been "directly" attributed to infringement and would have been "indirect profit" of the kind described in *Mackie v. Rieser*, 286 F.3d 909, 914 (9th Cir. 2002) as having a "more attenuated" nexus to the infringement.

## III

## ALL DAMAGES ASSESSED AGAINST NORTHERN AND LOTUS ARE AGAINST THE CLEAR WEIGHT OF EVIDENCE, FIND NO SUPPORT IN LAW, AND ARE THE RESULT OF THE JURY'S OUTRAGEOUS DISREGARD OF THE JURY INSTRUCTIONS

**A.      Actual damages of $1,400,000 is against the clear weight of evidence and law, awards plaintiff an inequitable windfall and if not reduced to -0- must be reduced to $20,500.**

Because the jury had no basis for finding liability against Defendants, either direct or vicarious, it could not have found that Plaintiff was entitled to any damages.  However, for

purpose of argument, the remainder of this brief ignores that there could not have been a finding of liability and explains why, if there had been a legitimate finding of infringement, the judgment against Defendants could not have exceeded $20,500.

The jury awarded actual damages of $1,400,000. However, jury instruction 42 made clear that actual damage was limited to the amount of money adequate to compensate the copyright owner for the "reduction of the fair market value" of the copyrighted work caused by the infringement. (JI 42). "Fair market value" was specifically defined as the amount a willing buyer would have been "reasonably" required to pay a willing seller at the time of the infringement for the <u>actual use</u> made by the defendant of Plaintiff's work. (JI 42). Accordingly, one must employ an objective test in determining fair market value. *Mackie v. Rieser*, 296 F.3d 909, 917 (9th Cir. 2002).

If Defendants had infringed, actual damages should have been limited to the reduction of fair market value of The Map since that's what the jury determined that Defendants copied. (JI 42). Uncontroverted evidence established the fair market value to be $20,500. The record includes two documents evidencing fair market value. The first is the letter proposal from DeWalt to Northern. (Ex J-18).[2] The second is one of Plaintiff's internal accounting records showing that Martin-McIntosh charged Legacy $10,000 for The Map. (Ex D-250). Additionally, Plaintiff admitted that Legacy was charged $10,000 for the map and testified that his rates doubled between 1992 and 2004. (RT 318; 17- 20; 320; 1-11;

---

[2] The proposal noted that the tentative map itself would only cost $5,500 but that the related topographic survey and boundary surveys would cost an additional $7,500 each. The total is $20,500.

596; 18- 23; 601; 2- 11). The record reflects no contrary evidence of The Map's fair market value.

An award of $1,400,000 based on undisputed evidence establishing a maximum fair market value of $20,500, is, by definition, grossly excessive, shocking, against the weight of the evidence, manifestly unjust and provides Plaintiff with an inequitable windfall; an inappropriate "double dip".[3] That's because Plaintiff charged $1,149,910.28 for all of the work related to the 480 acres and was paid $808,241.64. (Exhibit J-4). There is no conceivable justification for now awarding him an additional $1,400,000 based on the copying of a $20,500 map which represents only a tiny fraction of the total work. Rule 59 is meant for just such a manifest injustice.

On these facts, and based on the law embodied in the jury instructions, the court has an absolute duty to alter or amend the judgment by reducing the actual damages assessed against Defendants to no more than $20,500—or grant them a new trial. *Molski v. M.J. Cable, Inc.* 481 F.3d 724, 729 (9th Cir. 2007); *Silver Sage Partners, Ltd. v. City of Desert Hot Springs* 251 F3d 814, 819 (9th Cir. 2001).

///

///

///

---

[3] On the morning of the second day of trial, the parties engaged in argument outside the presence of the jury regarding damages. Plaintiffs were arguing that the amount which Plaintiff had been paid was irrelevant. In essence, they were arguing that Plaintiff should be allowed a double recovery. When the court finally convinced Plaintiff's counsel that double recovery was not going to be allowed, Mr. Travis conceded the point stating, "...if defendants are going to limit the value based upon what Mr. McIntosh previously testified as to what he was owed, then that's fine". The Court then noted, "What else could they do"? (RT 252; 16-21).

**B.    In Determining Profit Damages of $3,984,815 the Jury Failed to Follow Instruction 43.  In Addition, the Award Was Against the Great Weight of Evidence and Law and Was Based on Speculation.  The Part of the Judgment Reflecting the Jury's Determination of Profit Must be Reduced to Zero or a New Trial Must be Ordered.**

**1.    <u>In determining profit, instruction 43 allowed the jury to use only revenue actually received.  The jury's use of $11,845,281.67 in estimated future revenue violated the mandate of instruction 43 and requires a new trial</u>.**

This section pertaining to profits relies only upon the testimony and exhibits of Plaintiff's expert, Dr. Merati.  Merati's own numbers, applied in accordance with the mandates of instruction 43, establish a <u>loss of $1,221,547.61</u> rather than the profit of $839,389.39 to which he testified.

That is because profit must be determined by subtracting <u>all expenses</u> from gross <u>revenue</u>.  (JI 43).  Gross revenue is defined by instruction 43 as all <u>receipts</u> from the use or sale of a copyrighted work associated with the infringement.  Instruction 43 is unambiguous in limiting the jury's calculations of profit to money <u>actually received</u>.  The limitations of instruction 43 prevented the jury from considering either party's opinion of estimated revenue from <u>future</u> sales.

There was no dispute as to <u>actual receipts</u>.  The 19 closing statements established receipts from sales of $4,603,870 (Exhibit J-3).  Based on actual receipts, Merati's opinion was that there was an $839,389.39 profit from the sale of the 19 homes.  However, Merati's calculations violated instruction 43 because he failed to deduct all paid expenses.  This is addressed in further detail below.

Merati went on to opine that there would be an additional profit of $519,109.44 from the "future" sale of 11 existing homes[4] and a further additional profit of $2,625,715.99 from "future" sales of 38 homes, construction of which had not even begun. [5] Merati arrived at total profit of $3,984,814.82 by adding these estimates of future profits to $839,389.39, his mistaken opinion of actual profit from the 19 homes.

Except as to seventeen cents due to "rounding", the jury adopted Merati's opinion verbatim, finding total profit to be $3,984,815. In order to come to their decision, the jury had to entirely ignore, or not understand, instruction 43. The jury's consideration of $11,845,281.67 in estimated future revenue resulted in a judgment which was unfair, unjust, excessive and which did not comport with copyright law.

Moreover, the court can't simply reduce profit to $839,389.39. Merati employed a transparent accounting trick to show profit. His calculation ignored the mandate of instruction 43 to deduct <u>all expenses</u>. Merati deducted only those expenses that he "assigned" to the 19 sold homes. The rest of the paid expenses he "assigned" to the 11 existing unsold homes. Instruction 43 does not allow such accrual allocations. If one uses the figures from Merati's reports, Exhibits P-113 and P-114, but allocates them as required by instruction 43, it is plain to see that Lotus had a net loss of $1,221,547.61. This is not an "interpretation" of the evidence. This is what the evidence actually shows and how the jury was obligated to apply the law in arriving at its verdict.

---

[4] This was based on his estimate of $2,751,579.17 of "future" revenue. (See top right hand side of page 2, P-114)

[5] This estimate was based upon Merati's opinion that 38 homes would, at some unknown point in the future, be constructed and sold to generate revenue of $9,093,702.50.

The following five paragraphs focus on Exhibits P-113 and P-114.  Exhibit P-115 is not addressed because—except for $308,026.32 in land costs(founded at the 6th to last line of page 3 of P-115)—all revenue and all expenses in Exhibit P-115 are future estimates and cannot be considered under instruction 43.[6]

Merati's P-113 was the schedule attempting to show profit from the sale of 19 homes. P-114 was the schedule showing estimated profit from the future sale of the remaining 11 homes.  The problem with both exhibits is that neither provides an accurate picture conforming to the requirements of instruction 43 which requires that all expenses be deducted from all revenue.  To meet the requirement of instruction 43 one must eliminate the estimated future revenue of P-114 and move the actual paid expenses from P-114 to P-113.

Merati correctly showed gross revenue of $4,603,870 at the top right hand side of page 2 of Ex P-113.  Exhibit P-113 deducts $3,764,480.61, only part of the paid expenses. Exhibit P-114 deducts the remaining paid expenses but deducts them from anticipated future revenue to be received when and if the remaining 11 homes sell.

In order to comply with instruction 43, the jury had to ignore estimated revenue from possible future sales and deduct all the actual paid expenses shown on P-113 and P-114 from the $4,603,870 of actual revenue.

The only expenses shown on P-114 which were not already paid by Lotus were estimated future commissions ($57,052.57 from line 15, pg 2, P-114) and future escrow fees ($114,480.16 line 16, pg 2, P-114).  Since they were not actually paid, those future expenses are not now included in this calculation of the actual loss suffered by Lotus.

---

[6]  This land cost is found at the 6th to the last line of page 3 of P-115.  If used in this analysis it would increase the net loss by $308,026.32.

When these estimated future expenses, (the commissions and escrow fees), are deducted from the actual expenses that Merati shows on Exhibit P-114, the result is an additional $2,060,937 of paid expenses which should have been deducted from gross revenue on Ex P-113 to comply with instruction 43.  In effect, by eliminating estimated revenue from P-114 and moving paid expenses from P-114 to P-113, P-114 is eliminated.

Set forth below is a chart of Merati's numbers illustrating the calculations necessary to comply with instruction 43.

Exhibit P-113, Page 2

| | | |
|---|---|---|
| Line 05, Total Sales Revenue | $4,603,870.00 | |
| Line 48, Cost  Allocated to 19 homes | <u><3,764,480.61></u> | |
| | | |
| Merati Calculation of Profit from Sale of 19 homes | $ 839,389.39 | 839,389.39 |

Exhibit P-114, Page 2

| | | |
|---|---|---|
| Line 48, Total Cost (Actual and projected) | $2,232,469.73 | |
| Line 15, Projected Commission Expense | <57,052.57> | |
| Line 15, Projected Escrow Expense | <u><114,480.16></u> | |
| | | |
| Merati Calculation of Total Additional Paid Expenses | $2,060,937.00 | <u><$2,060,937.00></u> |

| | |
|---|---|
| Subtracting the actual paid expenses shown on P-114 from the "profit" Shown on P-113 results in a true net loss based on actual revenue and actual expenses paid | <u><$1,221,547.61></u> |

   **2.**   **Before the jury could award profit damages to Plaintiff it had to find a casual relationship between the infringement and the profit.  However, there is no evidence to support this required relationship**

Jury Instruction 43 provided that the copyright owner is entitled to any profits of the defendant *attributable* to the infringement.  It instructed that the jury could only make an award of Defendants' profits if it found that the Plaintiff showed a **causal relationship**

between the infringement and the profits generated from the infringement.  However,

Plaintiff provided no evidence of this required causal relationship.

Before Plaintiff may recover profit damages he must proffer sufficient non-speculative evidence to support a casual relationship between the infringement and the profit. *Mackie v. Reiser* 296 F.3d 909, 916 (9th Cir. 2002).  The infringement has to at least partially cause the profits. (at 911).

> "There must first be a demonstration that the infringing acts had an effect on profits before the parties can wrangle about apportionment.  To do otherwise would be inconsistent with both rudimentary principles of tort law, to which copyright law is often analogized, and our earlier holding in Frank I".

(*Mackie* at 915).  (referring to *Frank Music Corp. v. Metro-Goldwyn-Mayer*, 772 F.2d 505, 517 (9th Cir. 1985)

Plaintiff offered no evidence of any relationship between infringement of The Map and profits earned by Defendants.  There was no evidence that having DeWalt create The Map for $20,500 instead of having Plaintiff create it for the fair market value of $20,500 had any effect on profit. Accordingly, the jury had no evidence on which it could determine that infringement by DeWalt affected profit.  Defendants' profit or loss would have been exactly the same no matter who provided the new map.

Certainly there is no evidence that the home buyers cared which engineer prepared The Map.  There is no evidence that DeWalt performed its work faster than Plaintiff would have and thereby somehow contributed to increased profit.  If Lotus had copied someone's actual house plans a causal relationship might be conceivable.  But if, as Plaintiff contends, the DeWalt Tentative Map <u>was the same</u> as Martin-McIntosh's, Plaintiff failed to offer evidence to explain how Lotus's use of DeWalt's map affected or increased profits.

It really comes down to the fact that Plaintiff did not earn the $20,500 in fees which he might have been paid if Northern had hired him at fair market value.  But that goes to <u>actual</u> damages, not profit.  The court should preclude recovery of a defendant's profits if they are only remotely or speculatively attributable to the infringement.  *Frank Music Corp. v. Metro-Goldwyn-Mayer*, 772 F.2d 505, 517 (9th Cir. 1985).  Without any evidence of causation to support the jury's finding, any part of the judgment based on profits must be vacated.

> **3.**   **The court's failure to strike Merati's written summaries on Lotus's motion mandates a new trial.  He had no training as an appraiser or contractor, rendering his opinions on future sales prices and future construction costs unreliable and speculative.**

After Merati admitted that he was not a real estate appraiser — and because his reports were based on his estimates of future sales prices — Lotus moved to strike the reports.  The motion was denied.

Rule 702 of the Federal Rules of Evidence grants expert witnesses testimonial latitude unavailable to other witnesses on the assumption that the expert's opinion will have a reliable basis in the knowledge and experience of his discipline.  *Kumho Tire Co., Ltd. v. Carmichael* 526 US 137,148 (1999).  It allows opinion testimony from a witness qualified as an expert by knowledge, skill, experience, training, or education if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

Merati provided opinion testimony regarding future real estate values and construction costs.  He testified that the profit to be earned from <u>future</u> sales of existing homes was $519,109.44.  (Exhibit P-114, pg 2, last line).  Even more astounding was his testimony that profit to be earned from construction and sale of 38 homes to be built at some

unknown point in the <u>future</u> would be $2,625,715.99.  (Exhibit P-115, pg. 3, last line).  In order to determine future profit, Merati not only had to estimate the sales prices of the 11 unsold homes but estimate the <u>cost and sale prices</u> of the 38 yet-to-be-built homes.  In order to provide such testimony competently, Merati would have had to be a real estate appraiser and have specialized knowledge or experience in construction costs in Wasco, CA.

When Merati admitted that he was not a real estate appraiser— in fact, had no training as such— it was clear that his opinions and summaries lacked the required reliability.  (RT 684; 25- 685; 4).  Merati's opinions on future sales and future construction costs were unrelated to his qualifications as a forensic economist. (RT 630; 19 & RT 709; 11-19).  Following Merati's admissions, Lotus moved to strike Exhibits P-112 and P-115 as speculative.[7]

Lotus's motion to strike was denied with the court stating that it was a matter of credibility.  But the jury should not have been left to make its decision based on what amounted to pure speculation.  *Business Trends Analysts, Inc. v. Freedonia Group, Inc.* 887 F2d 399, 404 (2d Cir. 1989).  An expert's opinion should be excluded when it is based on assumptions which are speculative and are not supported by the record.  *Tyger Construction Co., Inc. v. Pensacola Construction Co.*, 29 F.3d 137, 142 (4th Cir. 1994).

Merati assumed that Lotus presently "intended" to continue building in the subdivision, (RT 686; 20- 687; 19), while at the same time admitting that he had no idea what Lotus intended to do.  (RT 687; 22- 688; 1).  He based his revenue assumptions on

---

[7]  Exhibits P-112 and P-115 were provisionally admitted subject to a motion to strike based upon speculation following cross-examination. (RT 655; 5- 13).

2007-2009 housing prices (RT 694; 15-21), despite the fact that he had no idea when the homes would be built, (RT 690; 13- 14).

The trial judge, as "gatekeeper", has the obligation to ensure that expert testimony is reliable. *Kumho Tire Co., Ltd. v. Carmichael* (1999) 526 US 137, 147.  In fact, Merati demonstrated his complete lack of reliability in providing opinions as to what or when future revenue will be realized in the following exchange with Mr. Alexander;

**Q.  Okay. And what it means by speculative is that when you are building the homes, you don't know if you are going to sell them or when you are going to sell them or for how much; isn't that correct?**

**A.  Counsel, I don't know**.

**(RT 709; 11- 15).**

The record reflects none of the knowledge, skill, experience, training, or education in appraisal or construction that Section 702 requires.  Yet, Merati testified, and the jury accepted, that Lotus would generate future sales of $11,845,281.67 and suffer future costs of $6,467,986.51 (Exhibit P-115 next to last line of page 3).

**4.    <u>There was no evidence that Northern received any revenue whatsoever.</u>**

Profit is based on <u>revenue</u> and there is no evidence of Northern receiving any revenue.  Yet, the jury determined that Northern and Lotus "each" profited in the amount of $1,992,107.50.  However, during deliberations, the jury sent out the following question, "If we award money to the Plaintiff regarding Mr. Wu's companies do we split the award between Lotus and Northern"?  The court sent back the following reply, "If you decide that the Plaintiff is due any damages from one or both of Mr. Wu's companies, then you must treat each company separately, both on the decision to award <u>and</u> the amount of the award".  (Ct Ex "E", Doc 326 filed 3/10/2010).

Lotus is a limited partnership.  Northern is a corporation and is Lotus's general partner.  (Stip. Facts 5, 6 & 7; JI 17).  As a matter of law, Northern is liable for Lotus's obligations.  (California Corporations Code § 15643(b)).  However, the fact that Northern is Lotus's general partner does not also mean that <u>income</u> received by Lotus is received by or attributable to Northern.  Northern's share of Lotus's income is determined by the partnership agreement.  (California Corporations Code § 15653).  The partnership agreement is not in evidence so it is not known how much, <u>if any</u>, of Lotus's profit is shared with Northern. Accordingly, there is no evidence to support a contention that Northern received any revenue, any receipts, or any profit.  The finding that Northern received profit of $1,992,107.50 must be vacated and because of the court's clear instruction to the jury regarding separate findings for each entity, cannot simply be moved to Lotus.   (Ct Ex "E", Doc 326 filed 3/10/2010).

## IV

## PREJUDICIAL MISSTATEMENT OF LAW BY PLAINTIFF'S COUNSEL, THE COURT'S FAILURE TO ISSUE AN ADEQUATETLY STRICT ADMONITION, AND THE GIVING OF INSTRUCTION 33 OVER ALL DEFENDANTS' OBJECTIONS MANDATE A NEW TRIAL

**A.**     **Deliberate Misstatements of Law by Plaintiff's Counsel During Closing Argument Constitutes Prejudicial Misconduct Requiring a New Trial**

Near the end of the <u>rebuttal</u> portion of Plaintiff's closing argument, while talking about the independent creation defense, Mr. Braze stated;

> and our position is, no, you didn't independently create it.
> **You went out and created it by copying what was on the ground.**  And, therefore, your creation was dependent, it was not independent.

(RT 1102; 17- 20).

Mr. Alexander objected to Mr. Braze's misstatement of law.  (RT 1102; 21- 22).

There is no legal concept known as "dependent creation" and Lotus's counsel had previously

warned that Braze was attempting to manufacture an imaginary legal doctrine called

"dependent creation". (RT; 816; 23-25).

The court did not sustain Mr. Alexander's objection, stating;

> the wording is <u>not a misstatement</u> of law.  It doesn't go to the
> level of what we were talking about from a legal standpoint.  It's
> still within the parameter of argument, what he has just stated.
> But let's not spend too much time on it so we don't cross the line.

(RT 1102; 23- 1103; 4).

But Mr. Braze then took up right where he left off, stating;

> **Based on that, there was no independent creation, therefore,
> there was no defense to the fact that the drawings were sub-
> stantially similar or had substantial similarities**.

(RT 1103; 5- 8).

At that point Mr. Hassing objected and moved to strike, arguing "that does go past the

line when you tie it all together".  (RT 1103; 9- 12).  Again, <u>the court did not sustain the</u>

<u>objection</u>.  Nor did it strike the misstatement of law or give a strong admonition. Instead, the

court stated;

> ladies and gentlemen, some of this is so close, it is very difficult, depending
> on what inferences one can draw, such as you, the triers
> of the fact, that the legal issues are very, very difficult.  And so I
> urge you that---we will send.. the instructions with the verdict form.
> So remember, the law is as it is in the jury instructions.  Nobody can
> change that part.  So let's go ahead and finish.

(RT 1103; 13- 21).

This misstatement of law during closing was even more devastating considering that

during opening statement, Mr. Braze had told the jury;

> ...they copied what was on the ground. ....what was put on the
> ground came from our tract map and improvement plans.  So by
> copying it, they were basically committing the act of infringement
> in order to make a new tentative tract map.

(RT 142; 14- 19).

Though no objections were at the time raised, Counsel's misstatement is relevant to, and compounded, his related misstatement of law during closing.

Defense counsel knew that Plaintiff's attorneys planned on doing something like that in closing.  During the trial, City of Wasco determined that Plaintiff had proposed jury instruction 33 based upon an intention to argue that copying what was on the ground was infringement and moved that the court not give that instruction.  Instruction 33 provided,

> A work is copied if a defendant copied from a third work rather
> than from the plaintiff's work if such third work was itself a copy
> of the plaintiff's work.

Argument on the motion is found at RT 942- 954.  Following argument, the court granted City of Wasco's motion stating, "**Instruction 33 is eliminated**". (RT 954; 7).

The intent and purposefulness of the misstatement of law is obvious in light of the extensive argument of counsel and comments by the court regarding instruction 33.  The court had effectively warned Plaintiff's attorneys that if they argued that basing a new map on the existing improvements constituted "infringement" they would be wrong.  (RT 946; 9- 947; 25).  Later, the court commented that such a statement would be, "**an absolute misstatement of law**" (RT 950; 2- 6).

Telling the jury that "copying" what was on the ground negated independent creation because it amounted to "dependent creation" was an extremely prejudicial misstatement of law.  With access to Plaintiff's Map not contested and with the maps expressing numerous obvious similarities, independent creation was Defendants' chief defense.  Insertion of this

non-existent concept, "dependent creation", and suggesting that "copying what was on the ground" eliminated Defendants' main defense, may not have been the verbatim "misstatement" that the court instructed Counsel not to make but it was so close as to have the same intended effect of misleading and confusing the jury.

Both Mr. Braze and Mr. Travis represented that they wouldn't make that argument. (RT 950; 16- 17; 952; 19- 23; 953; 8- 14).  The court noted that

> if an objection were made under those circumstances, I would
> Sustain it.  I think I'm giving the plaintiffs a sizable hint here that
> would not be a good thing for them to argue.

(RT 951; 20- 23).

A closing argument in direct violation of the district court's ruling is highly improper. *Brown v. Royalty*, 535 F.2d 1024, 1028 (8th Cir.1976).

During the opening portion of his closing argument, Mr. Braze stayed clear of misstating the law relative to DeWalt copying what was in the ground.  (RT 1007- 1032). Of course, with it being their chief defense, all three defense attorneys argued that DeWalt surveyed and drew <u>what was on the ground</u>.  (Northern at RT 1037; 22- 24; RT 1038; 23- 24; Wasco at RT 1065; 21- 23; RT 1066; 15- 20; RT 1067; 9- 11 and DeWalt at RT 1092; 7- 17). Mr. Braze intentionally waited until rebuttal to offer his extremely prejudicial misstatement. The misstatement was no accident.  It was planned during the entire time that Mr. Braze and Mr. Travis were representing to the Court that they would not make the misrepresentation. In fact, it was planned when Plaintiff's trial brief was drafted.  (PTB 10; 10- 11; 26)

In *Gruca v. Alpha Therapeutic Corp.*, 51 F3d 638 (7th Cir. 1995), the court determined that counsel's improper remarks during the rebuttal portion of closing argument and the court's erroneous instruction substantially prejudiced the plaintiffs and compelled a

new trial.  An important consideration was that the opposing party had no opportunity to reply.

The *Gruca* court found that this mistaken view of the law <u>could have</u> directly resulted in the jury's verdict in favor of the defendants, that the resulting prejudice was clear and substantial and that the district court abused its discretion in denying the plaintiffs' motion for a new trial.  (*Gruca* at 645, 646).  Similarly, Mr. Braze's misstatement <u>could have</u>, and likely did, result in the jury's finding of copying as to Northern, Lotus and DeWalt.  Under these circumstances, a new trial is the mandated remedy.

**B.      The court's admonitions were ineffective to cure counsel's egregious misstatement of law, and the resulting prejudice requires a new trial**

Plaintiff's counsel's misstatement of law was given to the jurors during the rebuttal portion of Plaintiff's closing argument immediately before deliberations, with defense counsel having no opportunity to respond.

The court's admonitions lacked the force necessary to let the jury know that counsel had actually misstated the law as to a crucial element of Defendants' defense.  The court didn't sustain DeWalt's or Lotus's objection.  It noted that the jury instructions would be sent in, but then sent in instruction 33 over Defendants' objection which likely compounded the problem because there was no reason to give instruction 33 unless it was to instruct that copying, what was on the ground was infringement.  There was no other evidence of any such copying of a copy.  The court's admonishment must be sufficient to remedy the prejudice.  *Official Airline Guides, Inc. v. Goss* 6 F3d 1385, 1396 (9th Cir. 1993).  On appeal, the court will weigh the forcefulness of the instruction and the conviction with which it was given against the degree of prejudice generated ..." *United States v. Johnson*, 618 F.2d 60, 62 (9th Cir. 1980).

The court's curative instruction must be as forceful and as comprehensive as warranted under the circumstances. *B.K.B. v. Maui Police Dept* 276 F3d 1091 (9th Cir. 2002)**.** A district court's decision to grant a new trial based on prejudicial conduct or pernicious behavior is less likely to constitute an abuse of discretion than a grant of a new trial based on some other ground. *McWhorter v. City of Birmingham,* 906 F2d 674, 676- 677 (11th Cir. 1990).

In evaluating the likelihood of prejudice from the comments, the court considers "the totality of circumstances, including the nature of the comments, their frequency, their possible relevancy to the real issues before the jury, the manner in which the parties and the court treated the comments, the strength of the case, and the verdict itself." *Puerto Rico Aqueduct & Sewer Auth. v. Constructora Lluch, Inc.*, 169 F.3d 68, 82 (1st Cir. 1999).

Here, the nature of the misstatement was extremely prejudicial. The jury heard similar misstatements in opening. The fact that they also heard it in rebuttal and that a strict admonition was not given, points to a strong likelihood of serious prejudice. Worse, counsel's misstatements regarding independent creation carved the heart out of Lotus's defense. Taken together, these statements made prejudice to the jury deliberations inescapable. What other explanation could there be for the jury's unsupportable findings? Failure to provide the required admonishment requires a new trial.

**C.    It was legal error to give instruction 33 over defendants' objection**

Instruction 33 was provided to the jury for its use during deliberations. (Ct Doc 357, page # 39 filed 4/8/2010). This instruction, together with Counsel's misstatement of law, doomed Defendants' chances with the jury. It requires that a new trial be ordered because it gave life to Mr. Braze's intentional misstatement of law. By giving the instruction over

Defendants' objection the jury was free to conclude that the Court had blessed Mr. Braze's misstatement of independent creation.

As noted above there was no reason to give instruction 33 unless it was to instruct that copying, what was on the ground was infringement.  There was no other evidence of any such copying of a copy.  Instruction 33, combined with Mr. Braze's misstatement of law and the Court's failure to adequately admonish requires a new trial because the jury was left with the impression that, under the law, DeWalt's surveying (copying) what was on the ground did not qualify as independent creation and amounted to infringement.

## V

## CONCLUSION

There is something fundamentally wrong with Plaintiff walking out of the U.S. Federal District Court in Fresno with a $6,780,000 judgment based largely on a complaint of being owed $341,000.  It's worse when the $341,000 is related to the development of a 480 acre parcel and the alleged infringement relates only to 33 of those acres.

There is also something obviously unfair about a judgment of $5.384 million against the only Defendants who Plaintiff admitted didn't copy anything and which was based upon another Defendant's copying of a $20,500 map.

All Defendants did was hire DeWalt, a professional engineering company, to prepare a tentative map.  They paid DeWalt market value for its work.  They had absolutely no practical ability to control or supervise DeWalt's efforts.  They didn't ask DeWalt to copy anything and would have had no way to know if DeWalt did.  Vicarious infringement is not a strict liability tort.  There is no case holding that the ability to cause the contractor to "stop work" equals the ability to control or supervise infringing acts.  On the evidence in the

record, the jury's finding Defendants liable for what DeWalt might have done is unjustified and legally unsupportable

Everyone associated with this case must clearly understand that the jury got it terribly wrong. It could not have understood the law embodied in jury instructions 38, 42 and 43. The fact that the jury found that Defendants "copied" after Plaintiff actually told them that Northern and Lotus didn't copy anything and <u>instructed</u> it not to find that they did, begs the question, "what, if anything, did the jury hear or understand"?

The fact that the jury ignored instruction 43 and adopted in full Merati's speculation about future profits, that it ignored instruction 42 and adopted in full Plaintiff's farcical calculations leading to $1.4 million in "actual" damages, and that it found Northern to have earned nearly $2 million of profit without a shred of evidence that Northern received <u>any</u> revenue whatsoever, shakes one's faith in the jury system. **The court must now step in to prevent a loss of faith in the entire legal system**.

When a jury, for whatever reason, gets it this wrong the court is duty-bound to make sure that the resulting injustice does not stand. Rule 59 is made for this situation. Northern and Lotus respectfully ask that actual damages against them be reduced to zero, or at worst, $20,500. They ask that all profit damages be stricken. In the alternative, they ask for a <u>new trial</u>.

Dated this 20th day of May, 2010

       /s/ Steven J. Hassing
Steven J Hassing, Attorney for Lotus
Developments, LP and Northern
California Universal Enterprise
Company

**CERTIFICATE OF SERVICE**

1.    On May 20, 2010, I served the following document:

- **MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION TO ALTER OR AMEND JUDGMENT OR FOR A NEW TRIAL**

2.    The above-named document was served by the following means to the persons as listed below:

  XX    United States Mail, first class postage fully prepaid and addressed to:

James Braze
Jeffrey Travis
Borton, Petrini, LLP
5060 California Ave, Suite 700
Bakersfield 93309

Chaka Okadigbo
Garcia Calderon Ruiz, LLP
520 South Grand Avenue, Ste. 695
Los Angeles, CA  90071

William L. Alexander
Alexander & Associates
1925 G Street
Bakersfield, CA  93301

By fax transmission. I faxed the document to the persons at the fax number listed below. No error was reported by the fax machine that I used. A copy of the record of the fax transmission is attached.

I declare under penalty of perjury that the foregoing is true and correct.

Dated this 20th day of May, 2010

/s/ Kimberley A. Hassing
Kimberley A. Hassing