# EXHIBIT O

01/24/03  FRI 14:34 FAX 1 805 868 3409          KC TREASURER/TAX COLLECT          ⚐ 002

Recording requested by:

Phil Franey
Kern County Treasurer-Tax Collector

and mail to:

City of Wasco
P O Box 836
Wasco, CA 93280

Attention: Finance Director

Documentary transfer tax-
computed on full value of property conveyed $none

_signature of declarant_

---

James Maples, Assessor-Recorder     SOFIR
Kern County Official Records         Pages:  1

DOCUMENT #: 0202066933               4/26/2002
                                     14:00:00

*0202066933*

Fees....
Taxes...
Other...
TOTAL
  PAID..

NO FEE - FOR THE BENEFIT OF KERN COUNTY

Stat. Types:1

---

## TAX DEED TO PURCHASER OF TAX-DEFAULTED PROPERTY

On which the legally levied taxes were a lien for the Fiscal Year 1994-1995 and were duly declared to be tax-defaulted under Default Number 057944.

This deed, between the Treasurer-Tax Collector of Kern County ("Seller") and City of Wasco ("purchaser")
conveys to the Purchaser the real property described herein which the Seller sold to the Purchaser by Agreement April 4, 2002, pursuant to a statutory power of sale in accordance with the provisions of Division 1, Part 6, Chapter 8, Revenue and Taxation Code for the sum of $51,500.00.

No Taxing Agency objected to the sale.

In accordance with law, the Seller hereby grants to the Purchaser that real property situated in said County, State of California, which was last assessed to Valley Rose Development Corp. and is described as follows:

487-050-46-00-8
ATN (parcel number)

City of Wasco Parcel Map 9572 Lot 1 Exclusive of Mineral Rights (33.51 acres)

STATE OF CALIFORNIA}
COUNTY OF KERN}          executed on April 26, 2002

by _____
Treasurer-Tax Collector

On, April 26, 2002, before me, James A. Rhoades, personally appeared Phil Franey, known to me to be both the Treasurer-Tax Collector of said county and the person who subscribed to the within instrument and acknowledged to me that he executed the same in his authorized capacity as Treasurer-Tax Collector, and that by his signature on the instrument the person or entity upon behalf of which he acted executed the instrument.

WITNESS my hand and official seal

James A. Rhoades          by: _____
County Clerk                        deputy



# EXHIBIT P

01/24/03  FRI 14:35 FAX 1 805 868 3409       KC TREASURER/TAX COLLECT                    ☒003

W I I I

Recording requested by:

Phil Franey
Kern County Treasurer-Tax Collector

and mail to:

City of Wasco
P O Box 836
Wasco, CA 93280

Attention: Finance Director



James Maples, Assessor-Recorder       SOFIR
Kern County Official Records          Pages: 1
                                      4/26/2002
DOCUMENT #:0202066934                 14:00:00

                                      Fees....
                                      Taxes...
                                      Other...
                                      TOTAL
                                      PAID..

Stat. Types: 1

Documentary transfer tax-
computed on full value of property conveyed $none

signature of declarant

NO FEE - FOR THE BENEFIT OF KERN COUNTY

## TAX DEED TO PURCHASER OF TAX-DEFAULTED PROPERTY

On which the legally levied taxes were a lien for the Fiscal Year 1994-1995 and were duly declared to be tax-defaulted under Default Number 057946.

This deed, between the Treasurer-Tax Collector of Kern County ("Seller") and
City of Wasco ("purchaser")
conveys to the Purchaser the real property described herein which the Seller sold to the Purchaser by Agreement April 4, 2002, pursuant to a statutory power of sale in accordance with the provisions of Division 1, Part 6, Chapter 8, Revenue and Taxation Code for the sum of $76,700.00.

No Taxing Agency objected to the sale.

In accordance with law, the Seller hereby grants to the Purchaser that real property situated in said County, State of California, which was last assessed to Valley Rose Development Corp., and is described as follows:

487-050-48-00-4
ATN (parcel number)

City of Wasco Parcel Map 9572 Lot 3 Exclusive of Mineral Rights (64.06 acres)

STATE OF CALIFORNIA}
COUNTY OF KERN}          executed on April 26, 2002      by _____
                                                          Treasurer-Tax Collector

On, April 26, 2002, before me, James A. Rhoades, personally appeared Phil Franey, known to me to be both the Treasurer-Tax Collector of said county and the person who subscribed to the within instrument and acknowledged to me that he executed the same in his authorized capacity as Treasurer-Tax Collector, and that by his signature on the instrument the person or entity upon behalf of which he acted executed the instrument.

WITNESS my hand and official seal

James A. Rhoades          by: _____
County Clerk                    deputy



# EXHIBIT Q

## 13.04.120  Violation--Penalty.

It is unlawful for any person to violate any provision or to fail to comply with any of the requirements of this chapter. Any person violating any provision of this chapter or failing to comply with any of its requirements shall be deemed guilty of a misdemeanor and, upon conviction, shall be punished by a fine not exceeding five hundred dollars, or by imprisonment not exceeding six months, or by both such fine and imprisonment. Each such person shall be deemed guilty of a separate offense for each day during any portion of which any violation of any of the provisions of this chapter is committed, continued or permitted by such person, and shall be punishable therefor as provided for in this chapter.

(Ord. 141 § 12, 1968).

## Chapter 13.06  SANITATION IMPACT FEE

Sections:

13.06.010  Application and definitions.
13.06.020  Findings.
13.06.030  Imposition of sanitation impact fee.
13.06.040  Schedule of sanitation impact fee.
13.06.050  Payment of sanitation impact fee.
13.06.060  Disposition of sanitation impact fee.
13.06.070  Annual review.
13.06.080  Repeal of inconsistent prior actions.
13.06.090  Right of appeal to city council.

## 13.06.010  Application and definitions.

As the city of Wasco develops, there is an increased demand placed on the sanitation services that the city must supply. Revenues generated from monthly sanitation rates are only for operational and maintenance expenses, and do not cover the cost of capital improvements to keep pace with the added demand that new development puts on the overall sanitation system. The fees established by this chapter shall apply to any development project to be built in the city.

"Capital improvements" means either a refuse disposal truck or street sweeping vehicle required to service new developments and which are more fully described in the engineering study.

"Development project" means any project undertaken for the purpose of development. Development project includes a project involving the issuance of a permit for construction or reconstruction, but not a permit to operate.

"Engineering study" means that certain document entitled "Sanitation Impact Fee Engineering Study - City of Wasco" prepared for the city by Helt Engineering, Inc.

(Ord. 511 §1 (Exh. A (part)), 2006).

## 13.06.020  Findings.

The city council creates and establishes a development impact fee for the sanitation department ("Sanitation Impact Fee") for the city which shall be used by the city for capital improvements as described in the engineering study to serve the city of Wasco.

A.  The imposition of a sanitation impact fee is an essential method of ensuring that adequate sanitation capital improvements are provided and that the cost of capital improvements are apportioned based on a reasonable relationship between the fee and

the type of development and the capital improvements necessary to accommodate such development. This must be done in order to promote and protect the public health, safety and welfare.

B.  The fees established by this chapter are derived from, are based upon, and do not exceed the costs of providing capital improvements necessitated by the new development projects for which the fees are levied.

C.  The engineering study, as may be revised from time to time, sets forth a reasonable methodology and analysis for the determination of the unfunded portion of new capital improvements and the need for and costs for new capital improvements in the city and the need for new development projects to pay their appropriate share of same.

(Ord. 511 §1 (Exh. A (part)), 2006).

## 13.06.030  Imposition of sanitation impact fee.

A.  Any person who, after the effective date of the ordinance codified in this chapter, seeks approval of a development project to develop land within the city; an extension of a building permit issued prior to that date; a permit for mobilehome installation; or an extension of a permit for mobilehome installation issued prior to that date, to make an improvement to land which will generate additional requirements on the city's sanitation system, is required to pay a sanitation impact fee in the manner and amount prescribed by this chapter.

(Ord. 511 §1 (Exh. A (part)), 2006).

## 13.06.040  Schedule of sanitation impact fee.

A.  The city council shall establish by resolution, a schedule of sanitation impact fees calculated to provide sufficient revenue necessary to pay the estimated total cost for the capital improvements based on new development projects.

(Ord. 511 §1 (Exh. A (part)), 2006).

## 13.06.050  Payment of sanitation impact fee.

The sanitation impact fees created by this chapter for residential development projects shall be paid to the city pursuant to the time frames set forth in Government Code Section 66007, et seq. Sanitation impact fees for nonresidential development projects shall be paid at the time of issuance of the building permit for that particular project.

(Ord. 511 §1 (Exh. A (part)), 2006).

## 13.06.060  Disposition of sanitation impact fee.

A.  Pursuant to Government Code Section 66006, there is established a separate reserve account within the sanitation enterprise account. Any fee paid pursuant to the provisions of this chapter shall be placed into the reserve account established for such fees and used solely for the purpose of implementation of the applicable public purpose for which the reserve account was established. All moneys in the reserve account shall be credited to that account.

B.  All moneys and interest in the reserve account established by this chapter shall be expended on the implementation of the applicable public purpose for which the fee was established, in the following order of priority:



1.  The reimbursement to the city for all direct and indirect costs incurred by the city for the implementation of this chapter, including but not limited to, planning, legal costs, and engineering.

2.  The city shall use the balance of the funds so deposited into these special accounts (along with interest earnings thereon) for the costs of future public capital improvements as specified herein and only for the category of capital improvements for which the funds were deposited in that particular account.

C.  For the fifth fiscal year following the first deposit into the account or fund, and every five years thereafter, the city shall make all of the following findings with respect to that portion of the account or fund remaining unexpended, whether committed or uncommitted:

1.  Identify the purpose to which the fee is to be put;

2.  Demonstrate a reasonable relationship between the fee and the purpose for which it is charged;

3.  Identify all sources and amounts of funding anticipated to complete financing of capital improvements;

4.  Designate the approximate dates on which the funding is expected to be deposited into the appropriate account or fund.

When findings are required by this subsection, they shall be made in connection with the public information required by subdivision (b) of Section 66006. The findings required by this subsection need only be made for moneys in possession of the local agency, and need not be made with respect to letters of credit, bonds, or other instruments taken to secure payment of the fee at a future date. If the findings are not made as required by this subsection, the city shall refund the moneys in the account or fund as provided in Government Code Section 66001.

(Ord. 511 §1 (Exh. A (part)), 2006).

## 13.06.070  Annual review.

A.  Each year, pursuant to Government Code Section 66006, the city council will review the status of compliance with this chapter and the degree to which fees collected pursuant to this chapter are mitigating the impacts of new industrial, commercial and residential development projects on the city's sanitation system.

B.  For each of the accounts established by this chapter, the city shall, within one hundred eighty days after the close of each fiscal year, make available to the public all of the following information:

1.  A brief description of the type of fee in the account or fund;

2.  The beginning and ending balance for the fiscal year in that account;

3.  The fee, interest and other income to that account for the fiscal year;

4.  The amount of expenditure for public capital improvements by line item category from that account during the fiscal year identifying the capital improvements for which expenditures were made;

5.  An identification of an approximate date by which the capital improvements be purchased if the city determines that sufficient funds have been collected to complete financing on a capital improvement;

6.  A description of each interfund transfer or loan made from the account or fund,

connection the full service charge for each of the users shall be chargeable to one primary user who shall sign and be responsible for the full service, except as provided to the contrary in State of California Public Utilities Code Section 10009 and 10009.1.

B. All units of a multiple user connection shall be fully charged for services furnished until a disconnection or termination request has been made for said connection. There will be no prorations or refunds made for any claimed unused monthly services to any one or more of the multiple service users when the service has not been disconnected or terminated.

C. In those instances where a prior tenant has a non-payment account for payment of charges, the city may require that subsequent tenants be furnished on the account of the landlord or property owner as the user.

(Ord. 405 §§1--3, 1995).

## Chapter 13.10  WATER SYSTEM IMPACT FEE

Sections:

13.10.010  Application and definitions.
13.10.020  Findings.
13.10.030  Imposition of water system impact fee.
13.10.040  Schedule of water system impact fees.
13.10.050  Payment of water system impact fee.
13.10.060  Disposition of water system impact fee.
13.10.070  Annual review.
13.10.080  Repeal of inconsistent prior actions.
13.10.090  Right of appeal to city council.

### 13.10.010  Application and definitions.

As the city of Wasco develops, there is an increased demand placed on the amount of water that the city must supply and distribute. Revenues generated from monthly water rates are only for operational and maintenance expenses, and do not cover the cost of building new infrastructure to keep pace with the added demand that new development puts on the overall water system. The fees established by this chapter shall apply to any development project to be built in the city.

A. "Development project" means any project undertaken for the purpose of development. Development project includes a project involving the issuance of a permit for construction or reconstruction, but not a permit to operate.

B. "Engineering study" means that certain document entitled "Water System Impact Fee Engineering Study--City of Wasco" prepared for the city by Helt Engineering, Inc.

C. "Water infrastructure projects" means the public improvements which include water wells, trunk lines, rights-of-way acquisition, and other related improvements required to service new development and which are more fully described in the engineering study.

(Ord. 509 §1 (Exh. A (part)), 2006).

### 13.10.020  Findings. 

The city council hereby creates and establishes a development impact fee for the water system ("Water System Impact Fee") for the city which shall be used by the city for water infrastructure improvements to the city's water system as described in the engineering study to serve the city of Wasco.

A. The imposition of a water system impact fee is an essential method of ensuring that

adequate water facilities are provided and that the cost of capital facilities are apportioned based on a reasonable relationship between the fee and the type of development and the water infrastructure projects necessary to accommodate such development. This must be done in order to promote and protect the public health, safety and welfare.

B. The fees established by this chapter are derived from, are based upon, and do not exceed the costs of providing water infrastructure projects necessitated by the new development projects for which the fees are levied.

C. The engineering study, as may be revised from time to time, sets forth a reasonable methodology and analysis for the determination of the unfunded portion of new infrastructure projects and the need for and costs for new water infrastructure projects in the city and the need for new development projects to pay their appropriate share of same.

(Ord. 509 §1 (Exh. A (part)), 2006).

## 13.10.030 Imposition of water system impact fee.

A. Any person who, after the effective date of the ordinance codified in this chapter, seeks approval of a development project to develop land within the city; or by an extension of a building permit issued prior to that date; a permit for mobilehome installation; or an extension of a permit for mobilehome installation issued prior to that date, to make an improvement to land which will generate additional requirements on the city's water system, is required to pay a water system impact fee in the manner and amount prescribed by this chapter.

(Ord. 509 §1 (Exh. A (part)), 2006).

## 13.10.040 Schedule of water system impact fees.

A. The city council shall establish by resolution, a schedule of water system impact fees calculated to provide sufficient revenue necessary to pay the estimated total cost for the water infrastructure projects based on new development projects.

(Ord. 509 §1 (Exh. A (part)), 2006).

## 13.10.050 Payment of water system impact fee.

The water system impact fees created by this chapter for residential development projects shall be paid to the city pursuant to the time frames set forth in Government Code Section 66007, et seq. Water system impact fees for nonresidential development projects shall be paid at the time of issuance of the building permit for that particular project.

(Ord. 509 §1 (Exh. A (part)), 2006).

## 13.10.060 Disposition of water system impact fee.

A. Pursuant to Government Code Section 66006, there is established a separate reserve account within the water enterprise account. Any fee paid pursuant to the provisions of this chapter shall be placed into the reserve account established for such fees and used solely for the purpose of implementation of the applicable public purpose for which the reserve account was established. All moneys in the reserve account shall be credited to that account.

B. All moneys and interest in the reserve account established by this chapter shall be expended on the implementation of the applicable public purpose for which the fee was established, in the following order of priority:

    1. The reimbursement to the city for all direct and indirect costs incurred by the city for the implementation of this chapter, including but not limited to, planning, legal costs and engineering.

    2. The city shall use the balance of the funds so deposited into these special accounts (along with interest earnings thereon) for the costs of future public water infrastructure projects as specified herein and only for the category of improvements for which the funds were deposited in that particular account.

C. For the fifth fiscal year following the first deposit into the account or fund, and every five years thereafter, the city shall make all of the following findings with respect to that portion of the account or fund remaining unexpended, whether committed or uncommitted:

    1. Identify the purpose to which the fee is to be put;

    2. Demonstrate a reasonable relationship between the fee and the purpose for which it is charged;

    3. Identify all sources and amounts of funding anticipated to complete financing of incomplete improvements;

    4. Designate the approximate dates on which the funding is expected to be deposited into the appropriate account or fund.

        When findings are required by this subsection, they shall be made in connection with the public information required by subdivision (b) of Section 66006. The findings required by this subsection need only be made for moneys in possession of the local agency, and need not be made with respect to letters of credit, bonds, or other instruments taken to secure payment of the fee at a future date. If the findings are not made as required by this subsection, the city shall refund the moneys in the account or fund as provided in Government Code Section 66001.

(Ord. 509 §1 (Exh. A (part)), 2006).


## 13.10.070 Annual review.

A. Each year, pursuant to Government Code Section 66006, the city council will review the status of compliance with this chapter and the degree to which fees collected pursuant to this chapter are mitigating the impacts of new industrial, commercial and residential development projects on the city's water system.

B. For each of the accounts established by this chapter, the city shall, within one hundred eighty days after the close of each fiscal year, make available to the public all of the following information:

    1. A brief description of the type of fee in the account or fund;

    2. The beginning and ending balance for the fiscal year in that account;

    3. The fee, interest and other income to that account for the fiscal year;

    4. The amount of expenditure for public improvements by line item category from that account during the fiscal year identifying the public improvements for which expenditures were made;

    5. An identification of an approximate date by which the construction of the public

improvement will commence if the city determines that sufficient funds have been collected to complete financing on an incomplete public improvement, as identified in paragraph (2) of subdivision (1) of Section 66001, and the public improvement remains incomplete;

6. A description of each interfund transfer or loan made from the account or fund, including the public improvement on which the transferred or loaned fees will be expended, and, in the case of an interfund loan, the date on which the loan will be repaid, and the rate of interest that the account or fund will receive on the loan.

7. The amount of refunds made pursuant to Section 66001(e) of the Government Code out of that account during the fiscal year and any allocation pursuant to Section 66001(f) of the Government Code.

C. The city council shall review the information described in subsection B of this section, at the next regularly scheduled public meeting of the council, not less than fifteen days after the information required by that subsection is made available to the public.

(Ord. 509 §1 (Exh. A (part)), 2006).

## 13.10.080  Repeal of inconsistent prior actions.

Any provision of previously adopted ordinances or resolutions of the city inconsistent with the provisions of this chapter, to the extent of such inconsistency and no further, is repealed or modified to the extent necessary to effect the provisions of this chapter.

(Ord. 509 §1 (Exh. A (part)), 2006).

## 13.10.090  Right of appeal to city council.

Any person subject to a fee required by this chapter may apply to the city council for a reduction, adjustment or waiver of that fee based upon the absence of a reasonable relationship between the impact of that person's development project and the amount of the fee charged or the type of facilities to be provided.

(Ord. 509 §1 (Exh. A (part)), 2006).

## Chapter 13.12 SEWERS

Sections:

13.12.010  Definitions.
13.12.020  Permit--Required--Application--Issuance--Exceptions.
13.12.030  Fees--Amount.
13.12.040  Fees--Accounting--Disposition.
13.12.050  Permit--Expiration.
13.12.060  Inspection--Requirements.
13.12.070  Inspection--Certificate--Issuance--Contents.
13.12.080  Construction--Compliance with standards required.
13.12.090  Connection--Required when.
13.12.100  Connections--Permit--Standards and procedures.
13.12.110  Taps--Standards and procedures.
13.12.120  Certain wastes and solids--Deposit prohibited.
13.12.130  Acids and corrosive liquids--Dilution and neutralization.
13.12.140  Stormwater prohibited in sewers.
13.12.150  Swimming pool--Connection prohibited.
13.12.160  Sand trap--Required when--Standards.
13.12.170  Grease traps--Required when--Standards.
13.12.180  Safe waste piping--Direct connection prohibited.

protecting the city from damages and liability of every kind.

H.  It is the duty of the city clerk to issue a certificate of registration, and every such certificate shall state the name and business address of the applicant and the date upon which the certificate expires, and shall certify that the person, firm or corporation named in the certificate has complied with the provisions of this chapter, and that such person, firm or corporation is deemed to be registered, and is entitled to conduct and engage in the business of laying of sewer pipe for the period specified in the certificate.

I.  Every certificate issued as provided in this section shall become null and void immediately upon the first conviction of the person, firm or corporation named in such certificate for violating any of the provisions of this chapter, and thereafter it shall be unlawful for any such person, firm or corporation to engage in or carry on the business of pipe laying or to represent himself, if a person, as being registered, or if a firm or corporation, to represent itself as a firm or corporation as being registered.

(Ord. 199 § 21, 1975).

## 13.12.230  Violation--Penalty.

A.  Any person, firm or corporation violating any of the provisions of this chapter shall be deemed guilty of a misdemeanor and, upon conviction, shall be punished by a fine of not less than ten dollars or more than three hundred dollars, or by imprisonment in the county jail for not less than five days nor more than ninety days, or by both such fine and imprisonment.

B.  Every person, firm or corporation shall be deemed guilty of a separate offense for each and every day during which any public sewer or house-connection sewer, which has been installed, constructed, moved or altered by such person, firm or corporation in violation of any of the provisions of this chapter, continued in such condition, and for every day during which any other violation of this chapter by such person, firm or corporation continues, and shall be punishable therefor as provided in this section.

(Ord. 199 § 23, 1975).

## Chapter 13.14  SEWER SERVICE CHARGES

Sections:
13.14.010  Sewer service charges.
13.14.020  Rate charges.
13.14.030  Billings.

## 13.14.010  Sewer service charges.

There is levied and imposed upon the owner or occupant of any and all parcels within the city of Wasco having any sewer connection with the sewage system of the city, or otherwise discharging sewage which ultimately passes through the sewage system of the city, a sewer service charge as hereinafter provided.

(Ord. 399 Art. I(1), 1994).

## 13.14.020  Rate charges.

A.  The charge imposed upon each residential parcel of property, dependent upon the category within which it is found in the list below, for each month, commencing the first day of the month

The city clerk shall bill each of the users monthly for the charge herein established and the charge shall be imposed upon the firm or person who subscribes for the water services for the premises and the said sewer services charge shall be coupled with the monthly water service billing. For nonpayment of either services, the water service and/or sewer service, same is subject to disconnection or turnoff.

(Ord. 399 Art. III, 1994).

## Chapter 13.16 SEWER CONNECTION CHARGES*

Sections:

13.16.010  Purpose.
13.16.030  Sewer trunk line charges.
13.16.040  Treatment plant charges.

* Prior ordinance history: Ords. 420, 426 and 509.

### 13.16.010  Purpose.

Residential, commercial, and industrial sewer connection charges for household, commercial and industrial facilities are adopted as set out in this chapter.

(Ord. 530 § 1 (Exh. A (part)), 2007: Ord. 510 § 1 (Exh. A (part)), 2006).

### 13.16.030  Sewer trunk line charges.

A.  Charges.

1.  The trunk line charges shall be determined and based upon the water service line size:

TABLE INSET:

| a.  With 3/4-inch water line | $ 480.00 PDU |
|---|---|
| b. With 1-inch water line for two or less units | 480.00 PDU |
| c. 1- 1/2 inch water service line for four units or less | $ 1,395.00 |
| d. 2-inch water service line for five units or less | 1,740.00 |
| e. 3 or 4-inch water service lines for 15 units or less for each unit in excess of 15, an additional $290.00 per unit | 5,220.00 |
| f. Motels | 175.00 PB |

B.  Implementation. Charges enumerated hereinabove for water availability and for sewer trunk lines shall be charged and collected at the time the building plans and specifications have been approved by the proper governmental agency and building permit is requested. If charges have prior hereto been collected under prior ordinances on an acreage basis, the amount of the prior charges collected shall be credited against the charges determined herein.

(Ord. 530 § 1 (Exh. A (part)), 2007: Ord. 510 § 1 (Exh. A (part)), 2006).



## 13.16.040 Treatment plant charges.

The city finds that demands for sewer service generated by new development and redevelopment will require expansion of the wastewater treatment plant, and the facilities appurtenant thereto, and the costs for the improvements are to be borne by the developments as follows:

> A. Applicability. Immediately upon adoption, charges would apply at the building permit stage on any vacant land where no prior sewer connection existed. However, where prior sewer connection existed but the land use will be changed to more units or increased sewage discharge, the treatment plant charges would apply on a pro-rata basis. Therefore, there are no exempt units.

> B. Charges.

TABLE INSET:

| 1. Single-family residential and multiple-family units | $3,400.00 per unit |
|---|---|
| 2. Mobilehomes in mobilehome parks and apartments | 3,400.00 per unit |
| 3. Motels | 1,224.00 per unit |
| 4. Commercial and industrial | 13.60 per GPD of effluent |

> C. Implementation. Charges for the expansion of the treatment plant shall be collected upon issuance of building permits for new construction lots. If the sewage flow per day is used as a basis for calculating charges, the owner shall install an accurate flow-measuring device with totalizer and recorder to monitor the flow to the sewer.

An agreement between the city and owner shall provide for additional payment at the then-current rates wherever the total daily flow exceeds the previously acquired capacity.

(Ord. 530 § 1 (Exh. A (part)), 2007: Ord. 510 § 1 (Exh. A (part)), 2006).

## Chapter 13.18 SOUTHSIDE INFRASTRUCTURE SEWER FACILITY FEE

Sections:

13.18.010 Application and definitions.
13.18.020 Findings.
13.18.030 Payment of fee required when.
13.18.040 Amount of fees.
13.18.050 Disposition of development fees.
13.18.060 Annual review.
13.18.070 Repeal of inconsistent prior actions.
13.18.080 Right of appeal to city council.

## 13.18.010 Application and definitions.

The fee established by this chapter shall apply to an applicant for approval of any "development project" which is to be constructed on the "benefited properties", as those terms are defined in this section. The city council has determined that certain properties which are within the city limits as well as certain other properties which are not yet within the city limits but which are within the city's sphere of influence, are benefited by the improvements described in this chapter. The fees established by this chapter shall apply to any approval of any development project to be built on any of the benefited properties, so defined, whether or not the owners at the time of the application for approval of the development project are the current owners of the benefited property upon which the development project is to be built.

The fees established by this chapter shall apply to an applicant for any "development project" which is to be constructed on the "benefited properties," as those terms are defined in this section. The city council has determined that certain properties which are within the city limits as well as certain other properties which are not yet within the city limits but which are within the city's sphere of influence, are benefited by the improvements described in this chapter. The fees established by this chapter shall apply to any approval of any development project to be built on any of the benefited properties, so defined, whether or not the owners at the time of the application for approval of the development project are the current owners of the benefited property upon which the development project is to be built.

"Benefited properties" means each of the parcels which, on the effective date of the ordinance codified in this chapter, bears one or more of the following assessor's parcel numbers:

487-050-46-0;
487-050-47-8;
487-050-48-6;
487-050-40-3.

"Development project" means approval of a parcel map, site plan or tentative subdivision map or issuance of a building permit for land which includes any part or parcel of the benefited properties or any of them, as determined by the resolution of the council which sets the rate for the fees established by this chapter.

"Engineering study" means that certain document entitled "Impact Fee Engineering Study - City of Wasco Valley Rose Estates Zone of Benefit Valley Rose Estates Infrastructure Improvements" prepared for the city by Helt Engineering, Inc. and lodged with the city clerk on or before December 7, 2004.

"Valley Rose Estates infrastructure project" means the public improvements which included sewer mains and other related improvements and water pipelines and other related improvements, which benefit the Valley Rose Estates infrastructure project area and which are more fully described in the engineering study.

"Valley Rose Estates infrastructure project area" means all of the benefited properties listed in this chapter.

(Ord. 493 § 1 (Exh. A(part)), 2004).

## 13.21.020 Findings.

The city council creates and establishes a separate development impact fee for the Valley Rose Estates infrastructure project area which shall be used to reimburse the costs incurred by the city for sanitary sewer improvements and water system improvements as described in the engineering study to serve the Valley Rose Estates infrastructure project area.

> A.  The city council has already established and affirms its development facility fees for sewage treatment facilities and sewage collection facilities and for water system facilities which are more fully set forth in Chapter 13.12 of this title. The development fees for the Valley Rose Estates infrastructure project area established pursuant to this chapter are in addition to and not instead of the development facility fees already so established. For convenience, the Valley Rose Estates infrastructure project development fees established by this chapter shall, for the balance of this chapter, be referred to by the singular term, "the fee."
>
> B.  The purpose of the fee set forth in this chapter is to reimburse the city's enterprise funds' capital accounts for the costs incurred by the city in constructing the public Valley Rose Estates infrastructure project and shall be used by the city in conformity with the



limitations placed upon those accounts. A fair and just cost distribution between the benefited properties for each of these improvements would be to base the distribution on the following criteria:

> 1. The fees attributable to any property will be based on the number of "equivalent dwelling units" (EDU) each development will generate. Based upon the land use designated for the property in the city's general plan, and assuming build out to maximum capacity, the projected number of residential units per acre for residential property, assuming (a) 5.5 residential units (EDU)/acre for low density residential property, nonresidential properties are to be charged at (a) 7.5 EDU/acre for neighborhood commercial properties and (b)11.96 for commercial retail properties.

C. There is a reasonable relationship between the purpose of these fees and the benefited properties because the benefited properties will benefit from the public improvements and the development of the benefited properties would necessitate the construction of the public improvements at that time.

(Ord. 493 § 1 (Exh. A(part)), 2004).

### 13.21.030 When payment of fee is required.

Each of the benefited properties shall be charged for a proportional share of the costs to the city of the construction of the public improvements. The fee shall be payable at the time of the application for approval of a development project on a benefited property.

(Ord. 493 § 1 (Exh. A(part)), 2004).

### 13.21.040 Amount of fees.

A. The fees set forth in this chapter shall be adjusted from time to time, but at least once every five years (or more frequently if required by changes in state law subsequent to the effective date of the ordinance codified in this chapter), after a public hearing, subject to city council review and approval, to reflect changes in the uses of the benefited properties. The city council finds that there is a reasonable relationship between the amount of the fee set in this chapter and the public facilities or portions thereof attributable to the development project on which the fee is imposed. The basis for such determination is set out in that report titled "IMPACT FEE ENGINEERING STUDY - City of Wasco VALLEY ROSE ESTATES Zone of Benefit - VALLEY ROSE ESTATES Infrastructure Improvements," dated December 2004, on file with the city clerk of the city of Wasco. Based on the report, the fees to be set forth are as follows:

> 1. Sewer Fees. Nine hundred fifty-two dollars and thirty-nine cents per EDU;

> 2. Water Fees. One thousand six hundred nineteen dollars and fourteen cents per EDU.

(Ord. 493 § 1 (Exh. A(part)), 2004).

### 13.21.050 Disposition of development fees.

A. Pursuant to Government Code Section 66006, there is established separate reserve accounts within the sewer and water enterprise accounts. Any fee paid pursuant to the provisions of this chapter shall be placed into the reserve account established for such fees and used solely for the purpose of implementation of the applicable public purpose for which the reserve account was established. All monies in the reserve account shall be credited to that

account.

B.  All monies and interest in the reserve account established by this chapter shall be expended on the implementation of the applicable public purpose for which the fee was established, in the following order of priority:

> 1.  The reimbursement to the city of Wasco for all direct and indirect costs incurred by the city for such implementation pursuant to this chapter, including but not limited to, the costs of right-of-way acquisition, planning, legal advice, engineering, design, construction and equipment, as well as the actual cost of construction of the subject improvements.

> 2.  The city shall use the balance of the funds so deposited into these special accounts (along with interest earnings thereon) for the costs of additional, future public facilities as specified in this chapter and only for the category of improvements for which the funds were deposited in that particular account.

C.  If a fee paid by an owner or developer for a particular development has been retained by the city for five or more years, and city has not committed that fee to costs for public facilities, then the city council shall make findings describing the continuing need to retain the fee each fiscal year thereafter. If the city council does not make such findings, then the city shall refund the collected fees as appropriate, along with the interest, if any, which those funds have generated since they were collected.

(Ord. 493 § 1 (Exh. A(part)), 2004).


## 13.21.060  Annual review.

A.  Each year, during the budget review process, the city council will review the status of compliance with this chapter and the degree to which fees collected pursuant to this chapter are mitigating the impacts of new industrial, commercial and residential development projects and new development entitlements.

B.  For each of the accounts established by this chapter, the city shall, within sixty days after the close of each fiscal year, make available to the public all of the following information:

> 1.  The beginning and ending balance for the fiscal year in that account;

> 2.  The fee, interest and other income to that account for the fiscal year;

> 3.  The amount of expenditure by line item category from that account during the fiscal year;

> 4.  The amount of refunds made pursuant to Section 66001(e) of the Government Code out of that account during the fiscal year.

C.  The city council shall review the information described in subsection B of this section, at the next regularly scheduled public meeting of the council, not less than fifteen days after the information required by that subsection is made available to the public.

D.  Five years after the effective date of the ordinance which adopted this chapter, the city council will consider a report by the city manager reviewing the fee formulae established to implement the provisions of this chapter to determine whether any adjustments in the formulae are warranted.

E.  Once all of the benefited properties have developed and the fees associated with them have been paid, the city council will determine whether there is any further need for this chapter. If there is none, the council may rescind the ordinance codified in this chapter and provide a final accounting of the reserve accounts created pursuant to the ordinance codified in this chapter.

(Ord. 474 (part), 2002).

## 16.44.020  Fees--Required.

Pursuant to Section 66483 of the Map Act, the subdivider shall pay fees prior to issuance of grading permits for the purpose of defraying the estimated cost of constructing planned drainage facilities for the removal, transportation, and disposal of storm water from the city.

(Ord. 474 (part), 2002).

## 16.44.030  Fees--Calculation and payment.

Drainage fees shall be calculated on a per acre basis for the project area and be paid prior to issuance of grading permits. The project area shall be defined as the entire project site being developed or proposed to be developed including all property to the centerline of all adjacent streets.

(Ord. 474 (part), 2002).

## 16.44.040  Fees--Amount.

Fees shall be in the amount prescribed by resolution of the city council. All such fees shall be determined and administered in accordance with the Map Act.

(Ord. 474 (part), 2002).

## Chapter 16.46  PARK LAND DEDICATION

Sections:
16.46.010  Definitions.
16.46.020  General.
16.46.030  Requirements.
16.46.040  Standards and formula for dedication of land.
16.46.050  Fees in lieu of land dedication.
16.46.060  Criteria for requiring both dedication and fee.
16.46.070  Credit for private recreation or open space.
16.46.080  Credit for public facilities and/or open space.
16.46.090  Procedure.
16.46.100  Conveyance of land and payment of in lieu fee to the district.
16.46.101  Commencement of development.
16.46.102  Exemptions.

## 16.46.010  Definitions.

The definitions contained in this section apply to this chapter.

"District" means the Wasco Recreation and Parks District, a local public agency separate and distinct from the city of Wasco.

All other words and phrases shall have the meanings set forth in the Subdivision Map Act (Government Code Section 66410 et seq.) and this chapter.

(Ord. 474 (part), 2002).

## 16.46.020 General.

This section is enacted pursuant to the authority granted by Section 66477 of the Government Code of the state of California. The park and recreational facilities for which dedication of land and/or payment of a fee is required by this chapter are in accordance with the city of Wasco general plan, the recreational element of the general plan, and the master park and recreation plan of the district.

(Ord. 474 (part), 2002).

## 16.46.030 Requirements.

As a condition of approval of a tentative subdivision map or residential parcel map within the jurisdiction of the district, the subdivider shall dedicate land, pay a fee in lieu thereof, or both, as set forth in this chapter, for park or recreational purposes at the time and according to the standards and formula contained in this chapter.

(Ord. 474 (part), 2002).

## 16.46.040 Standards and formula for dedication of land.

A.  If the dedication of land is required, the amount of land to be provided shall be determined pursuant to the following standards and formula:

TABLE INSET:

| AVERAGE PERSONS PER DWELLING UNIT | X | NUMBER OF DWELLING UNITS | X | 2.5 ACRES 1,000 PERSONS = # ACRES |
| --- | --- | --- | --- | --- |

B.  Unless there is evidence to the contrary, federal census tract averages for the district will be used for determining the average number of persons per dwelling unit. Separate standards for single-family and multiple-family zoned land divisions may be used.

C.  Prior to recordation of a single-family zoned subdivision map or residential parcel map or prior to obtaining a building permit for multiple-family zoned residential subdivisions or parcel maps, land dedication shall be calculated based on the existing zoning. When the number of dwelling units/lots are shown, land dedication will be based on the actual density proposed.

(Ord. 474 (part), 2002).

## 16.46.050 Fees in lieu of land dedication.

A.  When a fee is to be paid in lieu of land dedication, the amount of such fee shall be calculated using the following formula:

TABLE INSET:

| AVERAGE PERSONS PER DWELLING UNIT* | X | NUMBER OF DWELLING UNITS | X | .0025 | X | FAIR MARKET VALUE PER ACRE = FEE |
| --- | --- | --- | --- | --- | --- | --- |

# EXHIBIT R

Tuesday, December 28, 2004, 19:42

Escrow: 50341-LO

ATTACHMENT TO RESPA

|  | BUYER | SELLER |
|---|---|---|
| DEPOSITS TO ESCROW<br>Crossland Developments LLC | 160,500.00 | |
| DEPOSITS TO ESCROW<br>Lotus Developments | 660,000.00 | |
| DEPOSITS TO ESCROW<br>Lotus Developments | 40,000.00 | |


EXHIBIT J-72

| A. U.S. DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT SETTLEMENT STATEMENT | B. TYPE OF LOAN | | OMB No. 2502-0265 |
|---|---|---|---|
| **Fidelity National Title Company** | 1. [ ] FHA   .   2. [ ] FmHA   3. [ ] Conv. Unins | | |
| | 4. [ ] VA   5. [ ] Conv. Ins | | |
| | 6. ESCROW NUMBER:   50341-LO | 7. LOAN NUMBER:   10018498 | |
| | 8. MORTGAGE INSURANCE NUMBER: | | |

NOTE: THIS FORM IS FURNISHED TO GIVE YOU A STATEMENT OF THE ACTUAL SETTLEMENT COSTS. AMOUNTS PAID TO AND BY THE SETTLEMENT AGENT ARE SHOWN. ITEMS MARKED "(P.O.C.)" WERE PAID OUTSIDE OF THE CLOSING; THEY ARE SHOWN HERE FOR INFORMATIONAL PURPOSES AND ARE NOT INCLUDED IN THE TOTALS.

| D. NAME OF BORROWER: Lotus Developments 2278 Trade Zone Blvd. San Jose, CA 95131 | E. NAME OF SELLER: City of Wasco P.O. Box 190 Wasco, CA 93280 | F. NAME OF LENDER: United National Bank 10991 N. De Anza Blvd. Cupertino, CA 95014-0439 |
|---|---|---|
| G. PROPERTY LOCATION: Parcels 1 and 3 of Parcel Map 9572 Wasco, CA 93280 | H. SETTLEMENT AGENT: Fidelity National Title Company<br><br>PLACE OF SETTLEMENT: 110 New Stine Rd. Bakersfield, CA 93309 | I. SETTLEMENT DATE:<br><br>12/28/2004 |

| J. SUMMARY OF BORROWER'S TRANSACTIONS | | K. SUMMARY OF SELLER'S TRANSACTIONS | |
|---|---|---|---|
| **100. GROSS AMOUNT DUE FROM BORROWER** | | **400. GROSS AMOUNT DUE TO SELLER** | |
| 101. Contract Sales Price | | 401. Total Consideration | 1,605,000.00 |
| 102. Personal Property | | 402. Personal Property | |
| 103. | | 403. | |
| 104. | | 404. | |
| 105. | | 405. | |
| Adjustments: Items Paid by Seller in Advance | | Adjustments: Items Paid by Seller in Advance | |
| 106. City/Town Taxes | | 406. City/Town Taxes | |
| 107. County Taxes | | 407. County Taxes | |
| 108. Assessments | | 408. Assessments | |
| 109. | | 409. | |
| 110. | | 410. | |
| 111. | | 411. | |
| 112. | | 412. | |
| 113. | | 413. | |
| 114. | | 414. | |
| 115. | | 415. | |
| 116. | | 416. | |
| 117. | | 417. | |
| 118. | | 418. | |
| 120. GROSS AMOUNT DUE FROM BORROWER | | 420. GROSS AMOUNT DUE TO SELLER | 1,605,000.00 |
| **200. AMOUNTS PAID BY OR IN BEHALF OF BORROWER** | | **500. REDUCTIONS IN AMOUNT DUE TO SELLER** | |
| 201. Deposit or earnest money | | 501. Excess deposit (see inst.) | |
| 202. Principal amount of new loan(s) | | 502. Settlement charges to seller (line 1400) | 1,365,393.34 |
| 203. Existing loan(s) taken subject to | | 503. Existing loan(s) taken subject to | |
| 204. | | 504. | |
| 205. | | 505. | |
| 206. | | 506. | |
| 207. | | 507. | |
| 208. | | 508. | |
| 209. | | 509. | |
| | | | |
| | | | |
| | | | |
| | | | |
| Adjustments: Items Unpaid by Seller | | Adjustments: Items Unpaid by Seller | |
| 210. City/Town taxes | | 510. City/Town Taxes | |
| 211. County Taxes | | | |

A 01195

**L. SETTLEMENT STATEMENT**

*Escrow: 50341-LO*

| | PAID FROM BORROWER'S FUNDS AT SETTLEMENT | PAID FROM SELLER'S FUNDS AT SETTLEMENT |
|---|---|---|
| **700. TOTAL SALES/BROKER'S COMMISSION based on price $1,605,000.00 @ 10.00% = 160,500.00** | | |
| Division of Commission (line 700) as follows: | | |
| 701. 100,000.00 - Sperry Van Ness/Souza & Associates Commercial | | |
| 702. | | |
| 703. | | |
| 704. | | |
| **800. ITEMS PAYABLE IN CONNECTION WITH LOAN** | | |
| 801. Loan Origination Fee | | |
| 802. Loan Discount | | |
| 803. Appraisal Fee | | |
| 804. Credit report | | |
| 805. Lender's inspection fee | | |
| 806. Mortgage Insurance Application Fee | | |
| 807. | | |
| 808. | | |
| 809. | | |
| 810. | | |
| 811. | | |
| 812. | | |
| 813. | | |
| 814. | | |
| **900. ITEMS REQUIRED BY LENDER TO BE PAID IN ADVANCE** | | |
| 901. Int @      Day    from         to | | |
| 902. Mortgage Insurance Premium | | |
| 903. | | |
| 904. | | |
| 905. | | |
| **1000. RESERVES DEPOSITED WITH LENDER** | | |
| 1001. Hazard Insurance        months @ $         per month | | |
| 1002. Mortgage Insurance     months @ $         per month | | |
| 1003. City property taxes      months @ $         per month | | |
| 1004. County property taxes   months @ $         per month | | |
| 1005. Annual assessments      months @ $         per month | | |
| 1006. | | |
| 1007. | | |
| 1008. | | |
| **1100. ESCROW AND TITLE CHARGES** | | |
| 1101. Settlement or closing fee to       Fidelity National Title Company | | |
| 1102. Abstract or Title Search | | 1,150.00 |
| 1103. Title Examination | | |
| 1104. Title Insurance Binder | | |
| 1105. Document preparation | | |
| 1106. Notary fees | | |
| 1107. | | |
| 1108. Title Insurance        Fidelity National Title Company | | |
| | | 4,030.00 |
| 1109. Lender's coverage - ALTA Constr.Ln Policy w/Form 1 (10-17-92) $ 2,700,000.00 | | |
| 1110. Owner's coverage CLTA Standard Policy - 1990 Form $1,605,000.00 | | |
| 1111. | | |
| 1112. | | |
| 1113. | | |
| 1114. | | |
| 115. | | |
| 116. | | |
| **1200. GOVERNMENT RECORDING AND TRANSFER CHARGES** | | |
| 1201. Recording Fees: Deed $ 0.00   Mortgage $0.00   Releases $0.00 | | |
| 1202. City/Count tax/stamps 0.00   Mortgage $ | | |

A 01196

BP000174



**FIDELITY NATIONAL TITLE COMPANY**
ESCROW TRUST - BAKERSFIELD BRANCH 915-01
110 NEW STINE ROAD
BAKERSFIELD, CA 93309
(661) 833-5900

BANK OF AMERICA
GLOBAL CLIENT SERVICES
333 SOUTH BEAUDRY AVENUE.
LOS ANGELES, CA 90017-1466
16-56/1220

**219737**

ESCROW NO.     50341-LO

December 28, 2004

.PAY     TWO HUNDRED THIRTY-NINE THOUSAND SIX HUNDRED SIX AND 66/100*************     $     *239,606.66*

TO
THE
ORDER
OF

City of Wasco
P.O. Box 190
Wasco, CA  93280

ESCROW TRUST ACCOUNT - VOID AFTER 90 DAYS

AP

AP

TWO SIGNATURES REQUIRED

⑈219737⑈ ⑆122000661⑆ 12353⑈20654⑈

219737

JM

**FIDELITY NATIONAL TITLE COMPANY**
ESCROW TRUST - BAKERSFIELD BRANCH 915-01

DETACH AND RETAIN THIS STATEMENT
THE ATTACHED CHECK IS IN PAYMENT OF THE ITEMS DESCRIBED BELOW.
IF NOT CORRECT PLEASE NOTIFY US PROMPTLY.  NO RECEIPT DESIRED.

**219737**

County # Branch #: 0915 0091
Escrow Number:     50341-LO
Buyer    : Lotus Developments
Seller   : City of Wasco
Property: Parcels 1 and 3 of Parcel Map 9572, Wasco, CA  93280
Seller(s) Proceeds

· Date: 12/28/04

Check No: 219737
Amount: $239,606.66

JM

A 01197

BP000175

# EXHIBIT S

EXHIBIT "3"

## PURCHASE AND SALE AGREEMENT

## AND JOINT ESCROW INSTRUCTIONS

This Purchase and Sale Agreement and Joint Escrow Instructions ("Agreement"), dated as of April 6th, 2004 is entered into by and between WASCO [illegible] LLC ("Buyer"), and CITY OF WASCO ("Seller").

WHEREAS, Seller is the sole owner in fee of two parcels of real property which contain approximately +/- 91.57 acres which are located in the City of Wasco, and are more particularly described in Exhibit "A" attached hereto and incorporated herein by this reference (the "Property"); and

WHEREAS, the Property is subject to over Four Million Dollars in Assessment Liens; and

WHEREAS, the Property has been partially developed and is currently in a blighted condition; and

WHEREAS, the best use of the Property is for private development; and

WHEREAS, it is for the public benefit that said Property be sold; and

WHEREAS, Buyer desires to purchase from Seller and Seller desires to sell to Buyer the Property on the terms and conditions set forth herein.

Buyer and Seller hereby agree as follows:

1. <u>Purchase and Sale</u>. Upon, and subject to the terms and conditions set forth in this Agreement, Seller hereby agrees to sell to Buyer and Buyer hereby agrees to buy from Seller the following property (collectively, the "Property"): that certain real property located in the County of Kern, State of California, more particularly described in <u>Exhibit "A"</u> attached hereto, together with all easements, hereditaments and appurtenances thereto, and all improvements situated thereon and all other rights and interests in connection with the foregoing.

2. <u>Purchase Price</u>. The purchase price for the Property (the "Purchase Price") shall be $ 1,950,000.00

3. <u>Method of Payment of Purchase Price</u>. The Purchase Price shall be paid by Buyer to Seller upon the Closing (as that term is defined in Paragraph 4.3, below). Buyer shall make the following deposits into the Escrow (as defined in Paragraph 4.1, below):

EXHIBIT J-7

3.1   Deposit. Buyer shall deposit into the Escrow, at the Opening, the sum of $ _____ (10% of the Purchase Price) (the "Deposit"). Escrow Holder (as defined in Paragraph 4.1, below) shall invest the Deposit in an interest-bearing account and the interest earned on such account shall be applied as provided in this Agreement.

3.2   Cash At Closing. Buyer shall deposit into the Escrow in the form of cash, a certified or bank cashier's check or a confirmed wire transfer of funds, on or before the Closing Deadline, the balance of the Purchase Price remaining after deduction of the Deposit (and interest earned thereon in Escrow). The amount payable by Buyer pursuant to this Paragraph 3.2 shall be adjusted as necessary to reflect the costs and prorations payable pursuant to Paragraph 4.8, below.

4.   Escrow.

4.1   Opening; Joint Instructions. Within five (5) days after the execution of this Agreement, Buyer and Seller shall open an escrow (the "Escrow") with Fidelity National Title Company, whose address is 110 New Stine Road, Bakersfield, California ("Escrow Holder"), by delivering to Escrow Holder a fully-executed copy of this Agreement (the "Opening"). The purchase and sale of the Property shall be completed through the Escrow. This Agreement, together with the provisions of Exhibit "E" attached hereto and incorporated herein by this reference, shall constitute joint escrow instructions to the Escrow Holder in connection with the Escrow. In the event of any inconsistency between the typed provisions of this Agreement and the provisions of Exhibit "E", the typed provisions of this Agreement shall prevail.

4.2   Additional Instructions. Buyer and Seller hereby agree to execute such additional instructions not inconsistent with this Agreement as may be reasonably required by the Escrow Holder.

4.3   Closing Deadline. The Grant Deed (as defined in Paragraph 4.4, below) shall be recorded and the Escrow shall close (the "Closing") as soon as possible after the satisfaction of all of the conditions precedent in this Agreement, including but not limited to Section 7.1, but in no event later than June 1st, 2004 (the "Closing Deadline"). Time is specifically of the essence as to the Closing Deadline, and the Closing Deadline shall not be extended, except by the mutual written agreement of Buyer and Seller.

4.4   Seller's Closing Documents. Seller shall deliver to the Escrow Holder, on or before the date two (2) business days prior to the Closing Deadline, the following documents:

(a)   a Grant Deed to the Property duly executed and acknowledged by the Seller in favor of Buyer and in recordable form (the "Grant Deed"); and

(b)   other instruments and documents that may be required by the Escrow Holder to transfer the Property to Buyer.

PAGE   11                                                    UPSTATE

09/06/2004   11:35   1591

Case 1:07-cv-01080-LJO-GSA   Document 381   Filed 05/20/10   Page 29 of 51
Case 1:07-cv-01080-LJO-GSA   Document 131   Filed 09/30/2009   Page 26 of 48

Case 1:07-cv-01080-LJO-GSA   Document 82   Filed 05/21/2009   Page 10 of 44

4.5    Actions at Closing.   At the Closing, the Escrow Holder shall do the following:

(a).    Prorate all matters in accordance with Paragraph 4.7, below, based on the latest available information.

(b)    Cause the Grant Deed to be recorded in the Official Records of the county in which the Property is located.

(c).    Deduct from funds deposited with the Escrow Holder by Buyer in payment of the Purchase Price for the Property for the amount of items chargeable to the account of Seller pursuant to this Agreement;

(d)    The remaining balance of the funds deposited by Buyer into the Escrow in payment of the Purchase Price shall be disbursed for the benefit of the Seller promptly upon the Closing in accordance with separate escrow instructions to be provided to the Escrow.

(e).    Deliver or cause to be delivered to Buyer an original of the owner's policy of title insurance, or commitment therefor, to be issued pursuant to Paragraph 1.2, below, and deliver to Buyer a conformed copy of the Grant Deed.

4.6    Cancellation of Escrow.

(a)    In the event that the Closing does not occur at the time and in the manner provided in this Agreement due to the material failure of Buyer to comply with any of its obligations under this Agreement ("Buyer Default"), Seller shall have the right to cancel the Escrow by written notice to Buyer and the Escrow Holder, and upon such cancellation all costs of cancellation of the Escrow, including without limitation the cost of the preliminary title report furnished to Buyer pursuant to Paragraph 1, below (collectively, the "Cancellation Costs"), shall be paid by Buyer.

(b)    In the event that the Closing does not occur at the time and in the manner provided in this Agreement due to the material failure of Seller to comply with any of its obligations under this Agreement ("Seller Default"), Buyer shall have the right to cancel the Escrow by written notice to Seller and the Escrow Holder, and upon such cancellation the Cancellation Costs shall be paid by Seller, and the Escrow Holder shall refund to Buyer the Deposit and all interest earned thereon in Escrow.

(c)    In the event that the Closing does not occur at the time and in the manner provided in this Agreement for any reason other than a Buyer Default or a Seller Default, either Buyer or Seller may, at any time after the Closing Deadline, cancel the Escrow by written notice to the Escrow Holder and to the other, and upon such cancellation, the Cancellation Costs shall be divided equally between Buyer and Seller, and Escrow Holder shall refund to Buyer the Deposit and all interest earned thereon in Escrow.

(d)   Upon any cancellation of the Escrow, all instruments and documents deposited into the Escrow shall be returned to the parties who deposited the same, and any amounts deposited into the Escrow by Buyer pursuant to Paragraph 2 above, shall be returned to Buyer.

4.7   **Closing Costs and Prorations.** The costs incidental to the Closing shall be paid as follows:

(a)   Seller shall pay: (i) the cost of the preliminary title report furnished to Buyer pursuant to Paragraph 5.1, below (ii) the premium for the CLTA standard coverage owner's policy of title insurance obtained pursuant to Paragraph 5.2, below (provided that if Buyer elects to obtain an ALTA extended coverage policy of title insurance or any endorsements to the policy of title insurance pursuant to Paragraph 5.2, below, Buyer shall pay the additional premium for such policy over the premium for a CLTA policy and the additional premium for any endorsements to, the policy of title insurance); (iii) the documentary transfer tax on the Grant Deed; and (iv) the Escrow Holder's fees in connection with the Escrow.

(b)   Buyer shall pay: (i) the cost of recording the Grant Deed; (ii) one-half (1/2) of the Escrow Holder's fees in connection with the Escrow; and (iii) the additional premium for an ALTA extended coverage policy of title insurance over the premium for a CLTA policy, in the event that Buyer elects to obtain an ALTA policy pursuant to Paragraph 5.2, below, and the additional premium for any endorsements to the policy of title insurance.

(c)   Buyer and Seller shall each pay their own legal fees and other incidental expenses incurred in connection with the transaction contemplated by this Agreement.

(d)   Any other costs or expenses in connection with the transactions contemplated by this Agreement shall be apportioned in the manner customary in the County in which the Property is located.

(e)   As between Buyer and Seller only, Buyer shall be responsible for all real and personal property taxes and assessments for the Property relating to the period commencing on or after the Closing, and the Seller shall be responsible for all real and personal property taxes and assessments for the Property relating to the period prior to the Closing, if any.

5.   **Title.**

5.1   **Preliminary Title Report.** Seller shall furnish Buyer, as soon as available, a preliminary title report for the Property prepared by Fidelity National Title Company (the "Title Company"), together with copies of the documents described in such report (collectively, the "Title Documents"). Buyer shall have ten (10) business days after receipt of the Title Documents (the "Title Approval Period") to approve the same. If Buyer fails to deliver a written notice disapproving the Title Documents to the Escrow

[W02-LA1:YLM0641379.]

-4-

Company on or before the last day of the Title Approval Period, Buyer shall be conclusively deemed to have approved the Title Documents and the exceptions contained therein. If Buyer timely disapproves the Title Documents, Buyer at its option may (i) cancel the Escrow and this Agreement by written notice to Seller and the Escrow Holder, in which case the Cancellation Costs shall be paid by Seller, or (ii) permit Seller to remove the objectionable items from title. If Seller does not remove such items before the Closing Deadline, Buyer at its option may (x) waive its objection and close the transaction or (y) cancel the Escrow and this Agreement by written notice to Seller and the Escrow Holder, in which case the Cancellation Costs shall be paid by Seller.

5.3    Title Insurance.  At the time of the Closing and as a condition thereto, the Escrow Holder shall deliver to Buyer an original of either a CLTA standard coverage owner's policy of title insurance issued by the Title Company or an unconditional and unqualified commitment by the Title Company to issue such a policy, naming Buyer as insured, in a policy amount equal to the Purchase Price, showing title to the Property to be vested in Buyer, subject only to (a) non-delinquent taxes and assessments (provided that any lien by of all current and future assessments for the Wasco Assessment District 1992-2 (Valley-Rose Estates) ("Assessment Liens") shall be released concurrently with the Closing), and (b) the exceptions contained in the Title Documents approved or deemed approved by Buyer pursuant to Paragraph 5.1 above.  Buyer shall have the right to elect to receive an ALTA owner's extended coverage policy of title insurance with the same liability amount and subject only to the exceptions described in (a) and (b), above in this Paragraph 5.3, in lieu of such CLTA policy, provided that Buyer pays the difference in premium and any costs of receiving such owners attributable to such policy and provided further that the procurement of such policy shall not result in an extension of the Closing Deadline.  Notwithstanding the foregoing, the Seller shall have no obligation to remove or eliminate any lien or encumbrance affecting title to the Property, including but not limited to the assessment liens.

6.    Buyer's Conditions.  The following shall constitute conditions to the obligations of Buyer under this Agreement:

6.1    Title Insurance.  Receipt by Buyer of a title insurance policy in the manner provided in Paragraph 5.3, above.

6.2    Inspections.  Approval by Buyer, on or before the date ten (10) business days after the Opening (the "Inspection Period"), of all conditions of, and other matters related to, the Property, specifically including the following matters, which shall be deemed approved unless Seller receives written notice of disapproval on or before the last day of the Inspection Period:

(a)    The physical condition of the Property, including without limitation soil conditions, the absence from the Property of asbestos and other hazardous and toxic materials, compliance of the Property with all applicable laws, including any laws relating to hazardous and toxic materials.  Seller shall cause the Owners to allow Buyer and/or its agents access to the Property to perform any and all investigations and inspections desired by Buyer, provided that

WO2-LA:LYL\70651279.1

-5-

Case 1:07-cv-01080-LJO-GSA   Document 381   Filed 05/20/10   Page 32 of 51
Case 1:07-cv-01080-LJO-GSA   Document 131   Filed 09/30/2009   Page 29 of 48
Case 1:07-cv-01080-LJO-GSA   Document 82   Filed 05/21/2009   Page 13 of 44

Buyer shall indemnify and hold Seller and the Owners harmless from and against any and all claims, demands, losses, obligations, costs and expenses (including attorneys' fees and costs) resulting from such entry; and

(b)     All applicable government ordinances, rules and regulations and evidence of Seller's compliance therewith, including without limitation zoning and building regulations, and all licenses, permits and other governmental approvals and/or authorizations relating to the Property, including the suitability of the Property for Buyer's intended use and/or development; and

(ii)     All costs and economic feasibility of Buyer's use and/or intended development of the Property.

The foregoing indemnity in Section 6.2(a) by Buyer shall survive the Close of Escrow and the recordation of the Grant Deed, or the earlier termination of this Agreement.

6.3     AS-IS Transaction. Buyer hereby acknowledges and agrees that Seller has made no representations or warranties, express or implied, as to the Property or improvements or contract rights or entitlements relating thereto, or as to the condition, state of repair, or fitness for use, of the Property or such improvements or appurtenances, and (ii) Buyer shall, following satisfaction of the conditions contained in this Paragraph 6, accept title to the Property and any improvements thereon or appurtenances thereto "AS IS" and without warranty, express or implied. Buyer acknowledges that Seller has not induced Buyer to execute and deliver this Agreement based upon any representations or warranties of Seller and that Buyer is relying upon Buyer's own independent investigation of the Property in entering into this Agreement and purchasing the Property.

6.4     Subdivision Size. Seller and Buyer acknowledge that the Property is in a blighted condition and is in a subdivision size that has not been completed which contains infrastructure improvements that have been constructed and Buyer accepts the responsibility for taking any and all actions necessary regarding security and maintenance of the improvements. Buyer further acknowledges that the Subdivision Map has not been finalized and that the time for finalizing said Map has expired and it is Buyer's responsibility to obtain a new subdivision map or maps for the Property.

7.     Seller's Condition. The obligations of the Seller under this Agreement shall be conditioned upon the Seller obtaining all appropriate releases of the Assessment Liens from all interested parties thereto, including, without limitation, obtaining any court orders or other instructions with respect to such Assessment Liens or any related public financing that it may determine necessary, in its sole discretion. Failure of Seller to obtain releases of the Assessment Liens or court orders will not be considered an event of default by Seller.

7.1     CONDITIONS PRECEDENT TO CITY CONVEYANCE. Prior to, and as conditions to the City Conveyance, the following conditions shall be completed:

(a)     Prior to April 15th, 2004, the Buyer shall submit to the Seller evidence that the Buyer has obtained sufficient equity capital and firm and binding

-6-

Case 1:07-cv-01080-LJO-GSA   Document 381   Filed 05/20/10   Page 33 of 51
Case 1:07-cv-01080-LJO-GSA   Document 131   Filed 09/30/2009   Page 30 of 48
Case 1:07-cv-01080-LJO-GSA   Document 82   Filed 05/21/2009   Page 14 of 44

commitments for interim and/or permanent financing necessary for the purchase of the Property in accordance with this Agreement. Such evidence of financing shall include copies of all conditional and firm financing commitments and any permanent financing commitments or other documents that indicate Buyer's ability to finance the purchase of the Property. Conditional commitments shall be firm and binding commitments subject only to standard conditions required by the lender. Proof of funding, acceptance of each loan commitment by Buyer and proof of payment of all loan commitment fees required to fund the financing commitments and proof of funding of equity capital contributions shall also be required.

(b) **Material Default.** Buyer shall not be in material default of any provision of this Agreement.

(c) **Settlement Agreement and Mutual Release.** The Seller shall enter into a Settlement Agreement and Mutual Release with Michael Richardson and Badger Technology, Inc, and all the terms and conditions of said Agreement shall be satisfied by May 24th, 2004.

(d) **Workout Agreement.** The Seller shall enter into a satisfactory agreement with U.S. Bank National Association in its capacity as the Trustee for the Water Public Financing Authority 1989 Local Agency Revenue Bonds, Series A and the Assessment District No. 1989-2 Assessment District Bonds, Michael Richardson and Badger Technology, Inc, and all the terms and conditions of said agreement shall be satisfied by May 24th, 2004.

8. **Buyer's Indemnity/Release.** Buyer hereby agrees, following the Closing, to indemnify and hold Seller harmless from and against any and all claims, demands, losses, obligations, costs and expenses (including without limitation attorneys' fees and court costs) which arise out of (a) the ownership or operation of the Property after the Closing, or (b) any alleged presence upon the Property of, or any required remediation of, any hazardous or toxic materials. In addition, Buyer hereby waives, releases and forever discharges Seller of and from any and all claims of any kind whatsoever, at law or in equity, known or unknown, which Buyer has ever had, now has, or hereafter can have arising out of any condition of or matter related to the Property, specifically including the alleged presence upon the Property of, or any required remediation of, any hazardous or toxic materials. Buyer hereby agrees to waive the benefits of Section 1542 of the Civil Code of the State of California, which provides as follows:

"A general release does not extend to claims which the creditor does not know or suspect to exist in his favor at the time of executing the release, which if known by him, must have materially affected his settlement with the debtor."

9. **Possession.** Upon the Closing, Seller shall cause possession of the Property to be delivered to Buyer.

-7-

Case 1:07-cv-01080-LJO-GSA   Document 381   Filed 05/20/10   Page 34 of 51
Case 1:07-cv-01080-LJO-GSA   Document 131   Filed 09/30/2009   Page 31 of 48

Case 1:07-cv-01080-LJO-GSA   Document 82   Filed 05/21/2009   Page 15 of 44

10. **Representations and Warranties of Buyer**.  Buyer hereby represents and warrants to Seller as follows:

(a)  Buyer has full authority to enter into this Agreement and all documents executed by Buyer which are to be delivered to Seller at the Closing are or at the time of Closing will be duly authorized, executed and delivered by Buyer and do not and at the time of Closing will not violate any provisions of any agreement or judicial order to which Buyer is a party or to which Buyer or the Property is subject.

(b)  The Buyer does not have any material contingent obligations or any material contractual agreements which could materially adversely affect the ability of the Buyer to carry out its obligations in this Agreement.

(c)  There are no material pending or, so far as is known to the Buyer, threatened legal proceedings to which the Buyer is or may be made a party or to which any of its property is or may become subject, which has not been fully disclosed in the material submitted to the Seller which could materially and adversely affect the ability of the Buyer to carry out its obligations in this Agreement.

(d)  Buyer has the full financial where with all to secure financial commitments to be able to purchase the Property on the terms and conditions set forth in this Agreement.

(e)  The Buyer shall maintain the improvements on the Property and shall keep the Property free from any accumulation of debris, weeds, or waste materials.

(f)  The Buyer covenants and agrees for itself, its successors, its assigns and every successor-in-interest to the Property or any part thereof, there shall be no discrimination against or segregation of any person, or group of persons, on account of sex, marital status, race, color, religion, creed, national origin, ancestry or handicap in the sale, lease, sublease, transfer, use, occupancy, tenure or enjoyment of the Property, nor shall the Buyer, itself or any person claiming under or through it, establish or permit any such practice or practices of discrimination or segregation with reference to the selection, location, number, use or occupancy of tenants, lessees, subtenants, sublessees or employees.

11. **Liquidated Damages on Buyer Default**.  AS USED IN THIS AGREEMENT, "BUYER DEFAULT" SHALL MEAN THE FAILURE OF BUYER TO COMPLY WITH ANY PROVISION HEREOF AND SHALL INCLUDE ANY FAILURE OF THE CLOSING TO OCCUR (AFTER SATISFACTION OF THE CONDITIONS SET FORTH IN PARAGRAPH 6 ABOVE) AT THE TIME AND IN THE MANNER PROVIDED IN THIS AGREEMENT FOR ANY REASON OTHER THAN THE MATERIAL FAILURE OF SELLER TO COMPLY WITH ANY OF ITS OBLIGATIONS UNDER THIS AGREEMENT. BUYER AND SELLER HEREBY ACKNOWLEDGE AND AGREE THAT, IN THE EVENT OF A BUYER

Case 1:07-cv-01080-LJO-GSA   Document 381   Filed 05/20/10   Page 35 of 51
Case 1:07-cv-01080-LJO-GSA   Document 131   Filed 09/30/2009   Page 32 of 48
Case 1:07-cv-01080-LJO-GSA   Document 82   Filed 05/21/2009   Page 16 of 44

DEFAULT, SELLER WILL SUFFER DAMAGES IN AN AMOUNT WHICH WILL, DUE TO THE SPECIAL NATURE OF THE TRANSACTION CONTEMPLATED BY THIS AGREEMENT AND THE SPECIAL NATURE OF THE NEGOTIATIONS WHICH PRECEDED THIS AGREEMENT, BE IMPRACTICAL OR EXTREMELY DIFFICULT TO ASCERTAIN. IN ADDITION, BUYER WISHES TO HAVE A LIMITATION PLACED UPON THE POTENTIAL LIABILITY OF BUYER TO SELLER IN THE EVENT OF A BUYER DEFAULT, AND WISHES TO INDUCE SELLER TO WAIVE OTHER REMEDIES WHICH SELLER MAY HAVE IN THE EVENT OF A BUYER DEFAULT. BUYER AND SELLER, AFTER DUE NEGOTIATION, HEREBY ACKNOWLEDGE AND AGREE THAT THE AMOUNT OF THE DEPOSIT, TOGETHER WITH INTEREST EARNED THEREON IN ESCROW, REPRESENTS A REASONABLE ESTIMATE OF THE DAMAGES WHICH SELLER WILL SUSTAIN IN THE EVENT OF SUCH BUYER DEFAULT. BUYER AND SELLER HEREBY AGREE THAT SELLER MAY, IN THE EVENT OF A BUYER DEFAULT, TERMINATE THIS AGREEMENT AND THE ESCROW BY WRITTEN NOTICE TO BUYER AND RETAIN THE DEPOSIT, TOGETHER WITH INTEREST EARNED THEREON IN ESCROW, AS LIQUIDATED DAMAGES. SUCH RETENTION OF THE DEPOSIT AND INTEREST EARNED THEREON IN ESCROW BY SELLER IS INTENDED TO CONSTITUTE LIQUIDATED DAMAGES TO SELLER PURSUANT TO SECTIONS 1671, 1676 AND 1677 OF THE CALIFORNIA CIVIL CODE, AND SHALL NOT BE DEEMED TO CONSTITUTE A FORFEITURE OR PENALTY WITHIN THE MEANING OF SECTION 3275 OR SECTION 3369 OF THE CALIFORNIA CIVIL CODE, OR ANY SIMILAR PROVISIONS, FOLLOWING THE TERMINATION OF THIS AGREEMENT, INTEREST EARNED THEREON IN ESCROW AS LIQUIDATED DAMAGES PURSUANT TO THIS SECTION 10, ALL OF THE RIGHTS AND OBLIGATIONS OF BUYER AND SELLER UNDER THIS AGREEMENT SHALL BE TERMINATED. RETENTION OF THE DEPOSIT AND INTEREST EARNED THEREON IN ESCROW AND TERMINATION OF THIS AGREEMENT AND THE ESCROW AS PROVIDED HEREIN SHALL BE SELLER'S SOLE AND EXCLUSIVE REMEDY IN THE EVENT OF BUYER DEFAULT, AND SELLER EXPRESSLY WAIVES ITS RIGHT TO SPECIFIC ENFORCEMENT OF THIS AGREEMENT IN SUCH EVENT.

BUYER AND SELLER ACKNOWLEDGE THAT THEY HAVE READ AND UNDERSTAND THE PROVISIONS OF THIS SECTION 9 AND, BY THEIR INITIALS IMMEDIATELY BELOW AGREE TO BE BOUND BY ITS TERMS.

"Seller":

City of Wasco

12. _Seller Default_. If there is a material default by Seller under this Agreement (which remains uncured ten (10) days after notice from Buyer to Seller), then Buyer may, at its sole remedy hereunder, terminate this Agreement upon written notice to Seller and Escrow Holder, in which case the Deposit shall be paid to Buyer and each party shall be released from all obligations hereunder, provided, however, Buyer shall be entitled to receive reimbursement from Seller for its actual "out-of-pocket" costs and expenses incurred in connection with its investigation of the Property, in no event to exceed $10,000.00. The foregoing remedies are the

W02-LA:LYL/70063379.1

-9-

Case 1:07-cv-01080-LJO-GSA   Document 381   Filed 05/20/10   Page 36 of 51
Case 1:07-cv-01080-LJO-GSA   Document 131   Filed 09/30/2009   Page 33 of 48
Case 1:07-cv-01080-LJO-GSA   Document 82   Filed 05/21/2009   Page 17 of 44

only remedies of Buyer hereunder in the event of Seller's default under this Agreement, and Buyer shall not be entitled to, and hereby waives all right to seek any other damages, specific performance, or any other remedies that otherwise may be available at law or in equity to it. Under no circumstances shall Buyer have the right to file a lis pendens against the Property.

13.    Notices. All notices, approvals, disapprovals or elections required or permitted to be given under this Agreement shall be in writing and shall be delivered personally, or mailed, certified or registered mail, return receipt requested, or sent by Federal Express or other professional carrier, to the parties at the following addresses:

If to Buyer:   WASTE PROVIDER LLC
               P.O. Box 11828
               ...
Attention:     ...
Telephone:     ...
Fax:           ...
Email:         ...

If to Seller:  City of Wasco
               P.O. Box 190
               Wasco, CA 93280
Attention:     ... City Clerk
Telephone:     (661) 758-7200
Fax:           (661) 758-7411
Email:         ...

And a copy to:

               Weil, Weil & Peake
               ... "F" Street
               P.O. Box 2207
               Bakersfield, CA 93303
Attention:     Alan J. Peake, Esq.
Telephone:     (661) 327-8461
Fax:           (661) 327-8363
Email:         ...

Personally delivered and courier-delivered notices shall be deemed given upon actual personal delivery or tender of delivery to the intended recipient. Mailed notices shall be deemed given upon the date of actual delivery or tender of delivery as evidenced by the return receipt.

14.    Attorneys' Fees. In the event of any action between Buyer and Seller for enforcement or interpretation of any of the terms or conditions of this Agreement, the prevailing party in such action shall be entitled to recover its reasonable costs and expenses, including without limitation court costs and attorneys' fees actually incurred, as awarded by a court of competent jurisdiction.

-10-

15.    Brokers. Except for [illegible] ("Broker"), who shall be paid [illegible] by Buyer when the Property is transferred, each party represents and warrants to the other that no broker or real estate agent has been engaged by it in connection with this Agreement or the subject transaction. Buyer shall be solely responsible for any commission due to Broker. Buyer and Seller each hereby indemnify and hold the other harmless from and against all costs, expenses or liabilities (including without limitation attorneys' fees and court costs, whether or not taxable and whether or not any action is prosecuted to judgment) incurred by the indemnified party in connection with any claim or demand by any person or entity for any broker's, finder's or other commission or fee in connection with the indemnifying party's entry into this Agreement and the transactions contemplated hereby.

16.    Effect and Duration/Covenants, Conditions and Obligations which are for Seller's Benefit. The covenants established in this Agreement and the Grant Deed shall, without regard to technical classification and designation, be binding to the fullest extent permitted by law, of the Seller, its successors, and assigns, as to those covenants which are for its benefit. The covenants contain in this Agreement and the Grant Deed (Attachment No. 3) shall remain in perpetuity.

The Seller is deemed the beneficiary of the terms and provisions of this Agreement and of the covenants running with the land, for and in its own rights and for the purposes of protecting the interests of the community and other parties, public or private, in whose favor the covenants running with the land have been provided. The Agreement and the covenants shall run in favor of the Seller without regard to whether the Seller has been, remains or is an owner of any land or interest therein in the Property. The Seller shall have the right, if the Agreement or covenants are breached, to exercise its rights and remedies, and to maintain any action or suits at law or in equity or other proper proceedings to enforce the curing of such breaches to which it or any other beneficiaries of this Agreement and covenants may be entitled.

17.    Continuation and Survival of Representations, Warranties and Covenants. All representations and covenants by the respective parties contained herein or made in writing pursuant to this Agreement are intended to and shall remain true and correct as of the Close of Escrow, shall be deemed to be material, and shall survive the execution and delivery of this Agreement, the delivery of the Grant Deed and transfer of title.

18.    Conflict of Interest. No member, official or employee of the Seller shall have any personal interest, direct or indirect, in this Agreement nor shall any such member, official or employee participate in any decision relating to the Agreement which affects his or her personal interests or the interests of any corporation, partnership, or association in which he or she is directly or indirectly interested.

19.    Non-Liability of Seller Officials and Employees. No member, official, employee, consultant, Attorney, or independent contractor of the Seller shall be personally liable to the Buyer, or any successors-in-interest, in the event of any default or breach by the Seller or for any amount which may become due to the Buyer, or to its successor, or on any obligations under the terms of this Agreement.

PAGE 28

Case 1:07-cv-01080-LJO-GSA   Document 381   Filed 05/20/10   Page 38 of 51
Case 1:07-cv-01080-LJO-GSA   Document 131   Filed 09/30/2009   Page 35 of 48
Case 1:07-cv-01080-LJO-GSA   Document 82   Filed 05/21/2009   Page 19 of 44

20. **INVALIDITY OF TERMS.** It is hereby declared to be the intention of the parties that the sections, paragraphs, subdivisions, clauses and phrases of this Agreement are severable, and if any phrase, clause, sentence, paragraph or section of this Agreement shall be declared unconstitutional, invalid or unenforceable by a judgment or decree of a court of competent jurisdiction, such unconstitutionality, invalidity or unenforceability shall not affect any of the remaining clauses, sentences, paragraphs, subdivisions of this Agreement.

21. **TIME FOR ACCEPTANCE OF AGREEMENT BY SELLER.** This Agreement, when executed by the Buyer and delivered to the Seller must be authorized, executed and delivered by the Seller within thirty (30) days after the date of signature by the Buyer or this Agreement may be terminated by the Buyer on written notice to the Seller. The date of this Agreement shall be the date upon the Agreement shall have been signed by the Seller.

Case 1:07-cv-01080-LJO-GSA   Document 381   Filed 05/20/10   Page 39 of 51
Case 1:07-cv-01080-LJO-GSA   Document 131   Filed 09/30/2009   Page 36 of 48
Case 1:07-cv-01080-LJO-GSA   Document 82   Filed 05/21/2009   Page 20 of 44

12. **Miscellaneous.** This Agreement, together with the documents described and referred to herein, constitutes all of the agreements of Buyer and Seller with regard to the transactions contemplated hereby, and supersedes all prior agreements, understandings and negotiations, whether written or oral. This Agreement shall not be modified or amended except by an instrument in writing duly executed by both Buyer and Seller. This Agreement may be executed in counterparts either by original signature or facsimile thereof, each of which shall be deemed to be an original, and all counterparts shall together constitute the Agreement. The provisions of this Agreement shall be binding upon and shall inure to the benefit of the successors in interest and assigns of Buyer and Seller provided, however, that Buyer shall have no right to assign its rights or obligations hereunder without the express prior written consent of Seller. This Agreement shall be governed by and construed in accordance with the laws of the State of California. The paragraph headings and captions in this Agreement are for convenience only and shall not limit or define the contents of this Agreement. This Agreement shall survive the Closing, and shall not merge into the Grant Deed upon recordation. Time is of the essence of this Agreement. As used in this Agreement, "business day" shall mean any day except Saturday, Sunday or a day on which banking institutions in California are required or allowed to close for business.

IN WITNESS WHEREOF, Seller and Buyer have caused this Agreement to be duly executed as of the date first above written.

"Buyer"

WASCO PERFECT LLC

By: _____

Its: _____

"Seller"

CITY OF WASCO

By: _____
    Randy Bigham
Its: Mayor

ATTEST:

_____
City Clerk

-13-

Case 1:07-cv-01080-LJO-GSA    Document 381    Filed 05/20/10    Page 41 of 51
Case 1:07-cv-01080-LJO-GSA    Document 131    Filed 09/30/2009    Page 38 of 48
Case 1:07-cv-01080-LJO-GSA    Document 82    Filed 05/21/2009    Page 23 of 44

### ASSIGNMENT OF PURCHASE AND SALE AGREEMENT

This Assignment of Purchase and Sale Agreement (the "Agreement") is entered into as of May 18th, 2004 by and between the City of Wasco, a municipal corporation ("City"), Wasco Project, LLC, ("Assignor") and Northern California Universal Enterprises, a California Limited Partnership ("Assignee") with reference to the following facts:

A.    The City and Assignor have entered into that certain Purchase and Sale Agreement dated April 6th, 2004 ("Purchase Agreement") with respect to property commonly known as Valley Rose Estates as more specifically described in the Purchase Agreement ("Property").

B.    Assignor is not able to obtain financing to complete the purchase of the Property as required under the Purchase Agreement and Assignor is currently in default under the Purchase Agreement.

C.    Assignor desires to assign all of its rights and obligations under the Purchase Agreement to avoid liability for being in default under the Purchase Agreement.

D.    Assignee desires to purchase the Property and is willing to accept assignment of Assignor's rights and obligations under the Purchase Agreement so long as certain amendments to the Purchase Agreement are made.

E.    Assignor has entered into other agreements in which the City is a party, which Assignor will not be able to meet the terms and conditions of and which will also need to be assigned to Assignee.

NOW THEREFORE, in consideration of the foregoing, of the mutual promises of the parties hereto and for other good and valuable consideration the receipt and sufficiency of which are hereby acknowledged, the parties mutually agree as follows:

1.    Assignment by Assignor. The Assignor hereby assigns and delegates to the Assignee, and the Assignee hereby accepts from the Assignor, all of the Assignor's rights, title and interest in and any and all obligations under the Purchase Agreement.

2.    Acceptance of Assignment. The Assignee hereby accepts the above assignment and hereby assumes, agrees and undertakes to perform all of the obligations, covenants and promises of the Assignors pursuant to the Purchase Agreement. Any reference to the Assignor in the Purchase Agreement shall be deemed a reference to the Assignee. The Assignee shall reimburse the Assignor for any amount paid by the Assignor under any of the agreements, contracts and proposals described above.

3.    Release of Assignor. The City hereby consents to the assignment by Assignor to Assignee and to the release of the Assignor from all obligations imposed under the Purchase Agreement.

Case 1:07-cv-01080-LJO-GSA    Document 381    Filed 05/20/10    Page 42 of 51
Case 1:07-cv-01080-LJO-GSA    Document 131    Filed 09/30/2009    Page 39 of 48
Case 1:07-cv-01080-LJO-GSA    Document 82    Filed 05/21/2009    Page 24 of 44

4.  Effective Date. The assignment set forth above shall be effective as of the date of this Agreement.

5.  Additional Assignments. As additional consideration of the execution of this Agreement, the parties will execute the Assignment of the Supplemental Golf Course Bonds Agreement attached hereto as Exhibit "1" and the assignment of the Workout Agreement attached hereto as Exhibit "2".

6.  Amendment to Purchase Agreement. The City and Assignee agree to amend the Purchase Agreement as set forth in Exhibit "3".

7.  Cooperation. The Parties acknowledge that it may be necessary to execute additional documents or take additional actions other than those specifically referred to herein in order to complete the assignment contemplated by this Agreement. Therefore, each party hereto agrees to cooperate with each other by executing such other documents or taking such other action as may be reasonably necessary to complete the transactions contemplated by this Agreement in accordance with the intent of the parties as evidenced in this Agreement.

8.  Amendment. This Agreement may be amended only by a written instrument executed by the parties hereto or their successors in interest.

9.  Integration. This Agreement constitutes the entire agreement between the parties hereto pertaining to the subject matter hereof and all prior and contemporaneous agreements, representations, negotiations and understandings of the parties hereto, oral or written are hereby superseded and merged herein.

10. Representations and Warranties. Each of the parties hereto represents and warrants to each other party hereto that the execution and delivery of this Agreement and the performance of their obligations hereunder have been duly authorized and that this Agreement is a valid and legal agreement binding on him, her or it and enforceable in accordance with its terms. Each of the parties hereto each also represents and warrants to each other party hereto that he, she or it has not assigned any rights or claims against any of the other parties hereto to any third party.

11. Interpretation: The provisions of this Agreement shall be construed and interpreted neutrally, as if drafted by all parties, and shall not be construed or interpreted as against any party hereto.

12. Counterparts: The Agreement may be executed in counterparts, each of which, when executed and delivered, shall be deemed to be an original, but such counterparts together constitute one and the same document.

13. Facsimile. Except for documents that must be recorded on real property title records, facsimile copies of signed documents shall be deemed originals for all purposes.

Case 1:07-cv-01080-LJO-GSA   Document 381   Filed 05/20/10   Page 43 of 51
Case 1:07-cv-01080-LJO-GSA   Document 137   Filed 09/30/2009   Page 10 of 48
Case 1:07-cv-01080-LJO-GSA   Document 82   Filed 05/21/2009   Page 25 of 44

14.    <u>Governing Law.</u>  California law shall apply for purposes of enforcement and interpretation of this Agreement.

15.    <u>Time is of the Essence.</u>  Time is of the essence with regard to each covenant, condition and provision of this Agreement.

16.    <u>Attorneys' Fees.</u>  In any proceeding brought by any party to this Agreement regarding the terms, conditions, obligations, and/or covenants of this Agreement, the prevailing party shall be entitled to recover its reasonable attorney's fees and costs of litigation in addition to any other relief awarded in such proceeding.

IN WITNESS WHEREOF, the parties have executed this Agreement as of the date first written above.

ASSIGNOR

Wasco Project, LLC

By:_____
Name:_____
Its:_____

By:_____
Name:_____
Its:_____

ASSIGNEE

Northern California Universal Enterprises

By:_____
Name:_____
Its:_____

CITY

City of Wasco

By:_____
Name: DANNY ESPITIA
Its:_____ Mayor

O:\files\wasco\agreements\reassignmentpurchase.agr

Case 1:07-cv-01080-LJO-GSA    Document 381    Filed 05/20/10    Page 44 of 51
Case 4:07-cv-01080-LJO-GSA    Document 131    Filed 09/30/2009    Page 41 of 48

Case 1:07-cv-01080-LJO-GSA    Document 82    Filed 05/21/2009    Page 26 of 44

04/04/1999  09:25    2895933818

SPERRY VAN NESS

PAGE  07

14.  **Governing Law.** California law shall apply for purposes of enforcement and interpretation of this Agreement.

15.  **Time is of the Essence.** Time is of the essence with regard to each covenant, condition and provision of this Agreement.

16.  **Attorneys' Fees.** In any proceeding brought by any party to this Agreement regarding the terms, conditions, obligations, and/or covenants of this Agreement, the prevailing party shall be entitled to recover its reasonable attorney's fees and costs of litigation in addition to any other relief awarded in such proceeding.

IN WITNESS WHEREOF, the parties have executed this Agreement as of the date first written above.

**ASSIGNOR**

Wasco Project, LLC

By:_____
Name:_____
Its:_____

By:_____
Name:_____
Its:_____

**ASSIGNEE**

Northern California Universal Enterprises

By:_____
Name:_____
Its:_____

**CITY**

City of Wasco

By:_____
Name:_____
Its:_____

C:\lien\wasco\agreements\wcassignmentpurchase.agr

## AMENDMENT TO PURCHASE AND SALE AGREEMENT

This Amendment Agreement ("Agreement") is entered into as of May 18th, 2004 by and between the City of Wasco, a municipal corporation ("City") and Northern California Universal Enterprises, a California limited partnership ("Northern") with reference to the following facts:

A.   The City and Wasco Project, LLC. entered into that certain Purchase and Sale Agreement ("Purchase Agreement") dated as of April 6th, 2004.

B.   The Purchase Agreement was assigned to Northern on the condition that certain amendments were made to the Purchase Agreement.

C.   Section 22 of the Purchase Agreement provides that it can be modified in writing.

NOW THEREFORE, based upon the foregoing, the parties agree that Sections 2, 3.1, 4.3, 7.1(a) (c) and (d), 13 and 15, shall be modified as follows:

2.   "Purchase Price. The purchase price for the Property (the "Purchase Price") shall be $1,605,000.00."

"3.1   Deposit. Buyer shall deposit into the Escrow, at the Opening, the sum of $180,500.00 (10% of the Purchase Price) (the "Deposit"). Escrow Holder (as defined in Paragraph 4.1 below) shall invest the Deposit in an interest-bearing account and the interest earned on such account shall be applied as provided in this Agreement." As part of the consideration for this Agreement, the Deposit shall be non-refundable and retained by Seller if Buyer does not purchase the Property by the Closing Deadline.

"4.3   Closing Deadline. The Grant Deed (as defined in Paragraph 4.4, below) shall be recorded and the Escrow shall close (the "Closing") as soon as possible after the satisfaction of all of the conditions contained in this Agreement, including but not limited to Section 7.1, but in no event later than  November 1st, 2004 (the "Closing Deadline"). Time is specifically of the essence as to the Closing Deadline, and the Closing Deadline shall not be extended except by the mutual written agreement of Buyer and Seller."

"7.1(a)   Financing. Prior to June 1st, 2004, the Buyer shall submit to the Seller evidence that the Buyer has obtained sufficient equity capital and firm and binding commitments for interim and/or permanent financing necessary for the purchase of the Property in accordance with this Agreement. Such evidence of financing shall include copies of all conditional and firm financing commitments and any permanent financing commitments or other documents that indicate Buyer's ability to finance the purchase of the Property. Conditional commitments shall be firm and binding commitments subject only to standard conditions required by the lender. Proof of funding acceptance of each loan commitment by Buyer and proof of payment of all loan commitment fees required to fund the financing commitments and proof of funding of equity capital contributions shall also be required."

"7.1(c)   Settlement Agreement and Mutual Release. The Seller shall enter into a Settlement Agreement and Mutual Release with Michael Richardson and Badger Technology, Inc. and all the terms and conditions of said Agreement shall be in full force and effect for the duration of this Agreement."

"7.1(d)   Workout Agreement The Seller shall enter into a satisfactory agreement with U.S. Bank National Association in its capacity as the Trustee for the Wasco Public Financing Authority 1989 Local Agency Revenue Bonds Series A and the Assessment District No. 1992-2 Assessment District Bonds, Michael Richardson and Badger Technology, Inc. and all

Case 1:07-cv-01080-LJO-GSA   Document 381   Filed 05/20/10   Page 47 of 51
Case 1:07-cv-01080-LJO-GSA   Document 131   Filed 09/30/2009   Page 44 of 48
Case 1:07-cv-01080-LJO-GSA   Document 82   Filed 05/21/2009   Page 29 of 44

the terms and conditions of said agreement shall be in full force and effect for the duration of this Agreement."

13.        "....

If to Buyer:____Northern California Universal Enterprises

_____2276 Trade Zone Blvd.

_____San Jose, CA 95131

Attention:____Mr. Joe Wu

Telephone: (408) 946-7856  "

"15.       Brokers. Except for Darrell Sousa of Sperry Van Ness Commercial Real Estate, ("Broker"), who shall be paid One Hundred Thousand Dollars ($100,000) by Buyer when the Property is transferred, each party represents and warrants to the other that no broker or real estate agent has been engaged by it in connection with this Agreement or the subject transaction. Buyer shall be solely responsible for any commission due to Broker. Buyer and Seller each hereby indemnify and hold the other harmless from and against all costs, expenses or liabilities (including without limitation attorneys' fees and court costs, whether or not taxable and whether or not any action is prosecuted to judgment) incurred by the indemnified party in connection with any claim or demand by any person or entity for any broker's, finder's or other commission or fee in connection with the indemnifying party's entry into this Agreement and the transactions contemplated hereby."

All other terms and provisions of the Purchase Agreement, which are not expressly modified by this amendment shall remain in full force and effect.

NORTHERN CALIFORNIA
UNIVERSAL ENTERPRISES

By:_____

APPROVED AND RECOMMENDED

By:_____
    Larry Pennell, City Manager

APPROVED AS TO FORM

By:_____
    Alan J. Peake, City Attorney

c:\files\wasco\agreements\vrepurchase0521clean.wpd

CITY OF WASCO

By:_____
    Danny Espitia, Mayor

05/17/2004  16:19    9278568                    WA                              PAGE  02/03
04/04/1999  21:06    2095933010                 SPERRY  VAN  NESS               PAGE  02

04/04/1999  09:58    2095939818               SPERRY  VAN  NESS               PAGE  01

## AMENDMENT TO PURCHASE AND SALE AGREEMENT

This Amendment Agreement ("Agreement") is entered into as of May 15th, 2004 by and between the City of Wasco, a municipal corporation ("City") and Northern California Universal Enterprises, a California limited partnership ("Northern") with reference to the following facts:

    A.    The City and Wasco Project, L.L.C., entered into that certain Purchase and Sale Agreement ("Purchase Agreement") dated as of April 8th, 2004,

    B.    The Purchase Agreement was assigned to Northern on the condition that certain amendments were made to the Purchase Agreement.

    C.    Section 22 of the Purchase Agreement provides that it can be modified in writing.

NOW THEREFORE, based upon the foregoing, the parties agree that Sections 2, 3.1, 4.3, 7.1(a) (c) and (d), 13 and 15, shall be modified as follows:

2.    "Purchase Price. The purchase price for the Property (the "Purchase Price") shall be $1,608,000.00."

"3.1    Deposit. Buyer shall deposit into the Escrow, at the Opening, the sum of $160,800.00 (10% of the Purchase Price) (the "Deposit"). Escrow Holder (as defined in Paragraph 4.1 below) shall invest the Deposit in an interest-bearing account and the interest earned on such account shall be applied as provided in this Agreement."

"4.3    Closing Deadline. The Grant Deed (as defined in Paragraph 4.4, below) shall be recorded and the Escrow shall close (the "Closing") as soon as possible after the satisfaction of all of the conditions contained in this Agreement, including but not limited to Section 7.1, but in no event later than  November 1, 2004 (the "Closing Deadline"). Time is specifically of the essence as to the Closing Deadline, and the Closing Deadline shall not be extended except by the mutual written agreement of Buyer and Seller."

"7.1(a)    Financing. Prior to June 1st, 2004, the Buyer shall submit to the Seller evidence that the Buyer has obtained sufficient equity capital and firm and binding commitments for interim and/or permanent financing necessary for the purchase of the Property in accordance with this Agreement. Such evidence of financing shall include copies of all conditional and firm financing commitments and any permanent financing commitments or other documents that indicate Buyer's ability to finance the purchase of the Property. Conditional commitments shall be firm and binding commitments subject only to standard conditions required by the lender. Proof of funding acceptance of each loan commitment by Buyer and proof of payment of all loan commitment fees required to fund the financing commitments and proof of funding of equity capital contributions shall also be required."

"7.1(c)    Settlement Agreement and Mutual Release. The Seller shall enter into a Settlement Agreement and Mutual Release with Michael Richardson and Badger Technology, Inc. and all the terms and conditions of said Agreement shall be in full force and effect for the duration of this Agreement."

"7.1(d)    Workout Agreement. The Seller shall enter into a satisfactory agreement with U.S. Bank National Association in its capacity as the Trustee for the Wasco Public Financing Authority 1989 Local Agency Revenue Bonds Series A and the Assessment District No.

*3d*

I  :  9    NO. 446  P. 1             MAY. 13. 2004  4:30PM

Case 1:07-cv-01080-LJO-GSA   Document 137   Filed 05/30/2009   Page 49 of 51
Case 1:07-cv-01080-LJO-GSA   Document 137   Filed 09/30/2009   Page 46 of 48
Case 1:07-cv-01080-LJO-GSA   Document 82   Filed 05/21/2009   Page 31 of 44

05/17/2004 15:19   3270566                                    WA                        PAGE 03/03
04/04/1999 21:06   2096933818                                SPERRY VAN NESS            PAGE 04

04/04/1999 03:25   2095933818                          SPERRY VAN NESS                  PAGE 03

1992-2 Assessment District Bonds, Michael Richardson and Badger Technology, Inc. and all the terms and conditions of said agreement shall be in full force and effect for the duration of this Agreement."

18.    "....."

       If to Buyer    Northern California Universal Enterprises

                      3270 Trade Zone Blvd,

                      San Jose, CA, 95161

       Attention:    Mr. Joe Wu

       Telephone:   (408) 945-7888   "

"19.    Brokers. Except for Darrell Sousa of Sperry Van Ness Commercial Real Estate, ("Broker"), who shall be paid One Hundred Thousand Dollars ($100,000) by Buyer when the Property is transferred, each party represents and warrants to the other that no broker or real estate agent has been engaged by it in connection with this Agreement or the subject transaction. Buyer shall be solely responsible for any commission due to Broker. Buyer and Seller each hereby indemnify and hold the other harmless from and against all costs, expenses or liabilities (including without limitation attorneys' fees and court costs, whether or not taxable and whether or not any action is prosecuted to judgment) incurred by the indemnified party in connection with any claim or demand by any person or entity for any broker's, finder's or other commission or fee in connection with the indemnifying party's entry into this Agreement and the transactions contemplated hereby."

All other terms and provisions of the Purchase Agreement, which are not expressly modified by this amendment shall remain in full force and effect.

NORTHERN CALIFORNIA
UNIVERSAL ENTERPRISES

By:_____          5-24-04

APPROVED AND RECOMMENDED.

By:_____
    Larry Pennell, City Manager

APPROVED AS TO FORM                              CITY OF WASCO

By:_____          By:_____
    Alan J. Peake, City Attorney           Danny Espitia, Mayor

NO. 446   P. 5                                        MAY. 13. 2004  4:32PM

MAY. 24. 2004 4:16PM NOR CAL UFC NO. 901 P. 1



AMENDMENT TO PURCHASE AND SALE AGREEMENT

This Amendment Agreement ("Agreement") is entered into as of May 18th, 2004 by and between the City of Wasco, a municipal corporation ("City") and Northern California Universal Enterprises, a California ~~limited partnership~~ corporation ("Northern") with reference to the following facts:

A. The City and Wasco Project, LLC, entered into that certain Purchase and Sale Agreement ("Purchase Agreement") dated as of April 8th, 2004.

B. The Purchase Agreement was assigned to Northern on the condition that certain amendments were made to the Purchase Agreement.

C. Section 22 of the Purchase Agreement provides that it can be modified in writing.

NOW THEREFORE, based upon the foregoing, the parties agree that Sections 2, 3.1, 4.3, 7.1(a) (c) and (d), 13 and 15, shall be modified as follows:

2. "Purchase Price. The purchase price for the Property (the "Purchase Price") shall be $1,605,000.00."

"3.1 Deposit. Buyer shall deposit into the Escrow, at the Opening, the sum of $160,500.00 (10% of the Purchase Price) (the "Deposit). Escrow Holder (as defined in Paragraph 4.1 below) shall invest the Deposit in an interest-bearing account and the interest earned on such account shall be applied as provided in this Agreement." As part of the consideration for this Agreement, the Deposit shall be non-refundable and retained by Seller if Buyer does not purchase the Property by the closing deadline.

"4.3 Closing Deadline. The Grant Deed (as defined in Paragraph 4.4, below) shall be recorded and the Escrow shall close (the "Closing") as soon as possible after the satisfaction of all of the conditions contained in this Agreement, including but not limited to Section 7.1, but in no event later than November 1st, 2004 (the "Closing Deadline"). Time is specifically of the essence as to the Closing Deadline, and the Closing Deadline shall not be extended except by the mutual written agreement of Buyer and Seller."

"7.1(a) Financing. Prior to June 1st, 2004, the Buyer shall submit to the Seller evidence that the Buyer has obtained sufficient equity capital and firm and binding commitments for interim and/or permanent financing necessary for the purchase of the Property in accordance with this Agreement. Such evidence of financing shall include copies of all conditional and firm financing commitments and any permanent financing commitments or other documents that indicate Buyer's ability to finance the purchase of the Property. Conditional commitments shall be firm and binding commitments subject only to standard conditions required by the lender. Proof of funding acceptance of each loan commitment by Buyer and proof of payment of all loan commitment fees required to fund the financing commitments and proof of funding of equity capital contributions shall also be required."

"7.1(c) Settlement Agreement and Mutual Release. The Seller shall enter into a Settlement Agreement and Mutual Release with Michael Richardson and Badger Technology, Inc. and all the terms and conditions of said Agreement shall be in full force and effect for the duration of this Agreement"

"7.1(d) Workout Agreement. The Seller shall enter into a satisfactory agreement with U.S. Bank National Association in its capacity as the Trustee for the Wasco Public Financing Authority 1989 Local Agency Revenue Bonds Series A and the Assessment District No. 1992-2 Assessment District Bonds, Michael Richardson and Badger Technology, Inc. and all

Case 1:07-cv-01080-LJO-GSA   Document 381   Filed 05/20/10   Page 51 of 51
Case 1:07-cv-01080-LJO-GSA   Document 131   Filed 09/30/2009   Page 48 of 48
Case 1:07-cv-01080-LJO-GSA   Document 82   Filed 05/21/2009   Page 33 of 44

MAY. 24. 2004  4:17PM    NOR CAL UEC                              NO. 901    P. 2

the terms and conditions of said agreement shall be in full force and effect for the duration of this Agreement."

13.      "....

If to Buyer:   Northern California Universal Enterprises

           2278 Trade Zone Blvd.

           San Jose, CA  95131

Attention:   Mr. Joe Wu

Telephone: (408) 946-7856  "

"16.    Brokers. Except for Darrell Sousa of Sperry Van Ness Commercial Real Estate, ("Broker"), who shall be paid One Hundred Thousand Dollars ($100,000) by Buyer when the Property is transferred, each party represents and warrants to the other that no broker or real estate agent has been engaged by it in connection with this Agreement or the subject transaction. Buyer shall be solely responsible for any commission due to Broker. Buyer and Seller each hereby indemnify and hold the other harmless from and against all costs, expenses or liabilities (including without limitation attorneys' fees and court costs, whether or not taxable and whether or not any action is prosecuted to judgment) incurred by the indemnified party in connection with any claim or demand by any person or entity for any broker's, finder's or other commission or fee in connection with the indemnifying party's entry into this Agreement and the transactions contemplated hereby."

All other terms and provisions of the Purchase Agreement, which are not expressly modified by this amendment shall remain in full force and effect.

NORTHERN CALIFORNIA
UNIVERSAL ENTERPRISES

By: _____ 5/24/09

APPROVED AND RECOMMENDED

By: _____
     Larry Pennell, City Manager

APPROVED AS TO FORM

By: _____
     Alan J. Peake, City Attorney

c:\files\wasco\agreements\viepurchase0521clean.amd

CITY OF WASCO

By: _____
     Danny Espitia, Mayor