# EXHIBIT   26



LAND SURVEYING • CIVIL ENGINEERING

## VALLEY ROSE SUBDIVISION
## WEEKLY STATUS REPORT
## MARTIN-MCINTOSH PROJECT # 92-22
## APRIL 9, 1993

1.      The owner discussed the conversion of the Ag well with John Hendrickson. He apparently has no problem with Valley Rose using the well for one of their water sources.

2.      Improvement Plans for Tract 5472 were approved by Quad on March 25, 1993. Signed plans were forwarded to Jack Turman for refining his preliminary bid.

3.      A meeting was held on Tuesday, April 6, 1993, with Jack Turman to discuss various contract issues. Payment method and inspections by the City need to be resolved before Jack Turman will give a final bid.

4.      Right-of-way for offsite water and sewer is still not completely resolved. John Hendrickson has spoken to Wedel's. They appear to be ready to sign. No word on any other land owners. Easement forms were sent to Gordon Dreschler, City Attorney for his review. No comment as of this date.

5.      Gene has been working with Wally at the City in regard to the R-2 zoning issue. Wally plans to use (CL) Cluster Combing District to accomplish the setback variations we desire. Diane prepared an application, signed by the Owner on March 30, 1993 and submitted to the City.

6.      Diane prepared a proposal to write a set of Design Guidelines on March 2, 1993. These are very important since they will establish criteria for many features of Valley Rose. They need to be tied to the CC&R's. We are waiting word from the Owner to proceed.

7.      The Project Study Report (PSR) is currently being reviewed by CalTrans. Chris Conway is keeping in touch with CalTRans on status. Work on the Highway 46 plans cannot be completed until the PSR is approved.

8.      The Assessment work is on hold pending an agreement with Quad. Gene has had some discussions with Terry Schroepfer, but no agreement yet. We would like to know the value of Quad's contract so a percentage split can be worked out.

9.      The Final Map for Tract 5472 was returned from Quad on April 5, 1993. Minor corrections were made and the map returned to Quad on April 7, 1993 for second review.

2001 WHEELAN COURT • BAKERSFIELD, CA 93309 • 805/834-4814



EXHIBIT
J-55

# EXHIBIT  27

| | ENGINEERING COSTS | DATE: | 12-Apr-93 | | |
| | VALLEY ROSE ESTATES | | | | |
| | | Costs to: | 20-Mar-93 | | |
| | | BY: | JLH | | |
| PROJECT | | TOTAL | BILLED | | |
| NUMBER | DESCRIPTION | T&M | TO DATE | TOTAL | BUDGET |
| 9222-00 | Guidance Pkg & Conceptual | 4949.34 | 18499.27 | 18499.27 | 15200.00 |
| | | | | | |
| 9222-01-01 | Boundary & Topo  Survey | 1111.87 | 22946.35 | 45912.46 | 42080.00 |
| 9222-01-02 | Rte 46 Survey | 4547.17 | 4539.74 | | |
| 9222-01-03 | Offsite Sewer Survey | 6564.92 | 6564.92 | | |
| 9222-01-04 | Offsite Water Survey | 11861.45 | 11861.45 | | |
| | | | | | |
| 9222-02-01 | Land Use Plan | 39768.21 | 31750.52 | 125109.15 | 119620.00 |
| 9222-02-02 | Design Guidelines | 3961.79 | 2280.54 | | |
| 9222-02-03 | Development Agreement | 21099.97 | 21099.97 | | |
| 9222-02-04 | Water Master Plan | 17217.04 | 16302.29 | | |
| 9222-02-05 | Sewer Master Plan | 25176.39 | 23740.14 | | |
| 9222-02-06 | Drainage Master Plan | 13325.86 | 13125.86 | | |
| 9222-02-07 | Traffic Master Plan | 16787.90 | 16327.02 | | |
| 9222-02-08 | | 541.28 | 482.81 | | |
| | | | | | |
| 9222-03 | Williamson Act Cancellation | 4281.99 | 4190.45 | 4190.45 | 4280.00 |
| | | | | | |
| 9222-04-01 | Tract #5472-Base Map | 10643.80 | 8962.06 | 172049.43 | 72000.00 |
| 9222-04-02 | Tract #5472-Streets & Walls | 63962.35 | 63274.18 | | |
| 9222-04-03 | Tract #5472-Drainage Plans | 4016.93 | 3976.93 | | |
| 9222-04-04 | Tract #5472-Grading Plan | 14617.69 | 14467.76 | | |
| 9222-04-05 | Tract #5472-Sewer Plan | 16810.78 | 16545.20 | | |
| 9222-04-06 | Tract #5472-Water Plan | 8935.67 | 8325.54 | | |
| 9222-04-07 | Tract #5472-Final  Map | 21716.25 | 21266.89 | | |
| 9222-04-08 | Tract #5472-Landscape Plans | 26069.27 | 25122.42 | | |
| 9222-04-09 | Tract #5472-Plant. Design | 10385.35 | 10108.45 | | |
| 9222-04-10 | Tract#5472-Construct.Staking | 3057.70 | 0.00 | T&M | |
| 9222-04-11 | Bid Docs & Estimates | 6693.24 | 2309.90 | T&M | |
| | | | | | |
| 9222-05-01 | Tract #5618-Tentative Map | 13349.64 | 10626.12 | 169081.47 | 245660.00 |
| 9222-05-02 | Tract #5618-Street Plans | 82549.66 | 76993.93 | | |
| 9222-05-03 | Tract #5618-Drainage Plans | 6938.60 | 5961.28 | | |
| 9222-05-04 | Tract #5618-Grading Plan | 21268.51 | 16644.01 | | |
| 9222-05-05 | Tract #5618-Sewer Plans | 15859.69 | 14157.73 | | |
| 9222-05-06 | Tract #5618-Water Plans | 8819.32 | 5876.78 | | |
| 9222-05-07 | Tract #5618-Final  Map | 8875.06 | 8486.48 | | |
| 9222-05-08 | Tract #5618-Zone Change | 2977.43 | 1303.09 | | |
| 9222-05-09 | Tract #5618-Landscape Plans | 9581.27 | 9280.48 | | |
| 9222-05-10 | Tract #5618-Revise Tent Map | 4439.83 | 4259.83 | | |
| 9222-05-11 | Tract #5618-Revise Grading | 1001.06 | 960.64 | | |
| 9222-05-12 | Tract #5618-Revise Final Map | 111.30 | 72.00 | | |
| 9222-05-13 | Tract #5618-Revise Plot Plan | 3643.00 | 3491.00 | | |
| 9222-05-14 | Tract#5618-Revised Street R1 | 3770.90 | 3767.60 | | |
| 9222-05-15 | Tract#5618-Wall Plans | 8638.00 | 5173.20 | | |

EXHIBIT
J-56

| | ENGINEERING COSTS | DATE: | 12-Apr-93 | | |
|---|---|---|---|---|---|
| | VALLEY ROSE ESTATES | | | | |
| | | Costs to: | 20-Mar-93 | | |
| | | BY: | JLH | | |
| 9222-05-17 | Tract#5618 | | 2027.30 | | |
| | | | | | |
| 9222-06-01 | PM #9572-Tentative Map | 7724.92 | 7731.32 | 26072.47 | 26040.00 |
| 9222-06-01 | PM #9572-Final Map | 18338.63 | 18341.15 | | |
| | | | | | |
| 9222-07-00 | Business Cards | | | | |
| | | | | | |
| 9222-09-00 | Offsite Sewer Plans | 36401.06 | 32445.36 | 58303.35 | 59000.00 |
| 9222-09-01 | Pump St & Force Main | 24143.43 | 21980.59 | | |
| 9222-09-02 | Oversizing Pump Station | 4688.94 | 2583.80 | | |
| | Master Sewer | | 1293.60 | | |
| | | | | | |
| 9222-10 | Offsite Water Study & Plans | 51593.19 | 46375.69 | 46375.69 | 50000.00 |
| | | | | | |
| 9222-11-01 | Offsite Highway -Offsites | 1801.41 | 36063.69 | 36063.69 | 45000.00 |
| 9222-11-02 | Offsite Highway-Study | 6067.09 | | | |
| | | | | | |
| 9222-12 | Marketing Tasks | 4339.04 | 946.16 | 946.16 | |
| | TOTALS | 705025.19 | 704913.49 | 702603.59 | 678880.00 |
| | PERCENT BILLED OF T&M | | 100.0% | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |

BP001897

# EXHIBIT  28



**Martin-McIntosh**

LAND SURVEYING • CIVIL ENGINEERING

### VALLEY ROSE SUBDIVISION
### WEEKLY STATUS REPORT
### MARTIN-MCINTOSH PROJECT # 92-22
### APRIL 23, 1993

1.      The Grading Plan for Tract 5618 was received back from Quad after first plan check.

2.      Bill Black at Quad called Jeff Martin on 4-21-93 and informed him that the second check for Final Map for 5472 is complete.  There are a number of issues that need to be resolved with the owner prior to recording.

3.      The Monthly Team Meeting was held on Wednesday, April 21, 1993.  All items were summarized and sent to attendees by Sandy Bergam.

4.      Street Plans for Tract 5618 were sent to Quad for second review on 4-21-93.

5.      Lot Book Reports for each of the parcels for which easements are needed were received from the owner.  Easements can now be prepared for owner's signatures.

6.      A meeting was held with Terry Schroepfer at Quad to discuss further breakdown of the discrete systems for the acquisition agreement.  Terry will review the proposal with Tom Keene.

7.      Final bids are due from Denio, Guinn and Turman on Monday, April 26, 1993 for Tract 5472 improvements.

8.      Cost to Date:                        **$794,070.11**

Respectfully Submitted,

Ronald J. Staub, P.E.

RJS:yr
cc:     Chris Christensen
        Roger McIntosh
        Gene Martin



EXHIBIT
J-57

# EXHIBIT  29



**Martin-McIntosh**
LAND SURVEYING • CIVIL ENGINEERING

### VALLEY ROSE SUBDIVISION
### WEEKLY STATUS REPORT
### MARTIN-MCINTOSH PROJECT # 92-22
### APRIL 30, 1993

1.     The Grading Plan for Tract 5618 was returned to Quad for second check Thursday, April 29, 1993.

2.     The Water/Sewer Plans for Tract 5618 were submitted to Quad for first check on Wednesday, April 28, 1993.

3.     The Sewage Pump Station Plans were returned from Quad on Thursday, April 29, 1993. A meeting was held with Bill Black to review comments.

4.     Final Bids were tabulated for Tract 5472 Improvements. Turman Construction is the apparent low bidder at $899,729.00, about 4% under the Engineer's Estimate. Submitted explanation and analysis of bids versus Assessment District Acquisition costs to owners.

5.     Submitted Landscape Assessment District drawing to Quad for review on Thursday, April 29, 1993.

6.     Terry Schroepfer has not reached Tom Keene to get resolution on the Phased Acquisition Schedule revisions.

7.     **Cost to Date:**                              **$809,575.91**

Respectfully Submitted,

Ronald J. Staub, P.E.

RJS:yr
cc:     Chris Christensen
         Roger McIntosh
         Gene Martin

2001 WHEELAN COURT • BAKERSFIELD, CA 93309 • 805/834-4814



EXHIBIT
J-58

# EXHIBIT  30



**Martin-McIntosh**

LAND SURVEYING • CIVIL ENGINEERING

### VALLEY ROSE SUBDIVISION
### WEEKLY STATUS REPORT
### MARTIN-MCINTOSH PROJECT # 92-22
### MAY 7, 1993

1.      Terry Schroepfer has discussed the breakdown of the discrete systems with Tom Keene and has received verbal concurrence on the proposed modifications.

2.      The offsite Water Main Plans were returned from Quad on Wednesday, May 5, 1993. Comments on plans were discussed with Bill Black.

3.      A meeting was held with Terry Schroepfer and Bill Black to discuss the Sewage Pump Station. Quad has made numerous requests that we are reviewing. However, a number of issues are their personal opinions which result in compromising our design. We plan to resolve these next week.

4.      Tract #5618 Street Plans should be back from Quad's second check next week.

5.      Michael Brown called and is ready to start construction on Tract #5472. However, Jack Turman will not start until he receivers a firm payout schedule from the City. I attempted to reach John Hendrickson regarding the City's approval method and schedule. He has not returned my call.

6.      **Cost to Date:**                                    **$822,996.90**

Respectfully Submitted,

Ronald J. Staub, P.E.

RJS:yr
cc:     Chris Christensen
        Roger McIntosh
        Gene Martin



EXHIBIT
J-59

# EXHIBIT  31



# CITY OF WASCO

746 8th Street    P. O. Box 159    Wasco, California 93280   805-758-3003

May 21, 1993

Mr. Jack Turman
Turman Construction, Inc.
4301 Park Circle
Bakersfield, CA 93309

RE: Pay Schedule, Approved
Discrete Systems, and
City Inspectors

Dear Mr. Turman:

Per our discussion on Wednesday, May 19, 1993, this letter is to confirm that the City of Wasco has the funds to complete the project and will approve the attached pay schedule.

The City will pay for all discrete items approved by the City inspection authority. The inspectors will be: Bennie Wilkinson – grading, streets, electrical, gas, curbs and gutters, and storm drainage; Eddie Johnson – water and sewer lines. Payment will be for each approved discrete item completed, or substantially completed, except for a retention of ten (10%) percent.

The discrete items are listed in Exhibit A as attached. Please ignore the amount in the right column as a revised edition will take its place.

If you have any questions, please call me at (805) 758-3003.

Sincerely,

John F. Hendrickson
City Manager

*The City with a rosy future*


EXHIBIT
J-60

PAYSKED.XLS

## VALLEY ROSE CONTRACTOR PAY SCHEDULE

| # | CITY INSP DATE (FRI) | M-Mc SUBMTL DATE (MON) | CITY SUBMTL DATE (WED) | CITY COUNCIL MTG DATE (TUE) | CHECK ISSUE DATE (FRI) |
|---|---|---|---|---|---|
| 1 | 21-May-93 | 24-May-93 | 26-May-93 | 1-Jun-93 | 4-Jun-93 |
| 2 | 4-Jun-93 | 7-Jun-93 | 9-Jun-93 | 15-Jun-93 | 18-Jun-93 |
| 3 | 25-Jun-93 | 28-Jun-93 | 30-Jun-93 | 6-Jul-93 | 9-Jul-93 |
| 4 | 9-Jul-93 | 12-Jul-93 | 14-Jul-93 | 20-Jul-93 | 23-Jul-93 |
| 5 | 23-Jul-93 | 26-Jul-93 | 28-Jul-93 | 3-Aug-93 | 6-Aug-93 |
| 6 | 6-Aug-93 | 9-Aug-93 | 11-Aug-93 | 17-Aug-93 | 20-Aug-93 |
| 7 | 27-Aug-93 | 30-Aug-93 | 1-Sep-93 | 7-Sep-93 | 10-Sep-93 |
| 8 | 10-Sep-93 | 13-Sep-93 | 15-Sep-93 | 21-Sep-93 | 24-Sep-93 |
| 9 | 24-Sep-93 | 27-Sep-93 | 29-Sep-93 | 5-Oct-93 | 8-Oct-93 |
| 10 | 8-Oct-93 | 11-Oct-93 | 13-Oct-93 | 19-Oct-93 | 22-Oct-93 |
| 11 | 22-Oct-93 | 25-Oct-93 | 27-Oct-93 | 2-Nov-93 | 5-Nov-93 |
| 12 | 5-Nov-93 | 8-Nov-93 | 10-Nov-93 | 16-Nov-93 | 19-Nov-93 |
| 13 | 26-Nov-93 | 29-Nov-93 | 1-Dec-93 | 7-Dec-93 | 10-Dec-93 |
| 14 | 10-Dec-93 | 13-Dec-93 | 15-Dec-93 | 21-Dec-93 | 24-Dec-93 |
| 15 | 24-Dec-93 | 27-Dec-93 | 29-Dec-93 | 4-Jan-94 | 7-Jan-94 |
| 16 | 7-Jan-94 | 10-Jan-94 | 12-Jan-94 | 18-Jan-94 | 21-Jan-94 |
| 17 | 21-Jan-94 | 24-Jan-94 | 26-Jan-94 | 1-Feb-94 | 4-Feb-94 |
| 18 | 4-Feb-94 | 7-Feb-94 | 9-Feb-94 | 15-Feb-94 | 18-Feb-94 |
| 19 | 18-Feb-94 | 21-Feb-94 | 23-Feb-94 | 1-Mar-94 | 4-Mar-94 |
| 20 | 4-Mar-94 | 7-Mar-94 | 9-Mar-94 | 15-Mar-94 | 18-Mar-94 |
| 21 | 25-Mar-94 | 28-Mar-94 | 30-Mar-94 | 5-Apr-94 | 8-Apr-94 |
| 22 | 8-Apr-94 | 11-Apr-94 | 13-Apr-94 | 19-Apr-94 | 22-Apr-94 |
| 23 | 22-Apr-94 | 25-Apr-94 | 27-Apr-94 | 3-May-94 | 6-May-94 |
| 24 | 6-May-94 | 9-May-94 | 11-May-94 | 17-May-94 | 20-May-94 |
| 25 | 27-May-94 | 30-May-94 | 1-Jun-94 | 7-Jun-94 | 10-Jun-94 |
| 26 | 10-Jun-94 | 13-Jun-94 | 15-Jun-94 | 21-Jun-94 | 24-Jun-94 |
| 27 | 24-Jun-94 | 27-Jun-94 | 29-Jun-94 | 5-Jul-94 | 8-Jul-94 |
| 28 | 8-Jul-94 | 11-Jul-94 | 13-Jul-94 | 19-Jul-94 | 22-Jul-94 |
| 29 | 22-Jul-94 | 25-Jul-94 | 27-Jul-94 | 2-Aug-94 | 5-Aug-94 |
| 30 | 5-Aug-94 | 8-Aug-94 | 10-Aug-94 | 16-Aug-94 | 19-Aug-94 |
| 31 | 26-Aug-94 | 29-Aug-94 | 31-Aug-94 | 6-Sep-94 | 9-Sep-94 |
| 32 | 9-Sep-94 | 12-Sep-94 | 14-Sep-94 | 20-Sep-94 | 23-Sep-94 |
| 33 | 23-Sep-94 | 26-Sep-94 | 28-Sep-94 | 4-Oct-94 | 7-Oct-94 |
| 34 | 7-Oct-94 | 10-Oct-94 | 12-Oct-94 | 18-Oct-94 | 21-Oct-94 |
| 35 | 21-Oct-94 | 24-Oct-94 | 25-Oct-94 | 1-Nov-94 | 4-Nov-94 |
| 36 | 4-Nov-94 | 7-Nov-94 | 9-Nov-94 | 15-Nov-94 | 18-Nov-94 |
| 37 | 25-Nov-94 | 28-Nov-94 | 30-Nov-94 | 6-Dec-94 | 9-Dec-94 |
| 38 | 9-Dec-94 | 12-Dec-94 | 14-Dec-94 | 20-Dec-94 | 23-Dec-94 |

REV DATE: 10-May-93

A 00769

BP000251

DAT̲̅   18-May-93

### EXHIBIT A
### DESCRIPTION OF IMPROVEMENTS

**A.  ACQUISITION OF MASTER PLANS**

| | | |
|---|---|---|
| 1 | Drainage | Pd. |
| 2 | Sewer | Pd. |
| 3 | Water | Pd. |
| 4 | Traffic | Pd. |
| 5 | Utilities | Pd. |
| | SUBTOTAL: | $496,857.00 |

*retention*
*pd.*
*6/15/94*
*on*
*invoices*

**B.  TRACT NO. 5472**

| | | | |
|---|---|---|---|
| 1 | Storm Drainage | | $61,120.00 |
| 2 | Sewer | | $96,310.00 |
| 3 | Water | | $106,207.00 |
| 4 | Street Improvements | $147,803.00 | |
| | a. Curb & Gutter | | $39,098.00 |
| | b. Sidewalks & Special Concrete | | $22,350.00 |
| | c. Paving, Street Lights & Street Signs | | $86,355.00 |
| 5 | Utilities | | $83,989.00 |
| 6 | Walls | | $51,649.00 |
| 7 | Landscaping | | $14,625.00 |
| | SUBTOTAL: | | $561,703.00 |

*3217;*
*3229*

**C.  TRACT NO. 5618**

| | | | |
|---|---|---|---|
| 1 | Storm Drainage | | $191,530.00 |
| 2 | Sewer | | $361,550.00 |
| 3 | Water | | $453,300.00 |
| 4 | Street Improvements | $1,216,195.00 | |
| | a. Curb & Gutter | | $234,859.00 |
| | b. Sidewalks & Special Concrete | | $260,805.00 |
| | c. Paving, Street Lights & Street Signs | | $720,531.00 |
| 5 | Utilities | | $353,257.00 |
| 6 | Walls | | $318,764.00 |
| 7 | Landscaping | | $95,513.00 |
| | SUBTOTAL: | | $2,990,109.00 |

**D.  OFFSITE IMPROVEMENTS**

| | | | |
|---|---|---|---|
| 1 | Storm Drainage | | $71,488.00 |
| 2 | Sewer | $328,175.00 | |
| | a. Force Main & Pump Station | | $251,175.00 |
| | b. Emergency Generator | | $27,000.00 |
| | c. Gravity Main (in Valley Rose Pkwy) | | $50,000.00 |
| 3 | Water | $473,800.00 | |
| | a. Water Main (in Rte. 46) | | $221,800.00 |
| | b. Storage Tank & Booster Pump Station | | $200,000.00 |
| | c. Upgrade Well | | $25,000.00 |
| 4 | Streets | | $255,758.00 |
| 5 | Utilities | | $14,066.00 |
| 6 | Walls | | $20,419.00 |
| 7 | Landscaping | | $14,625.00 |
| | SUBTOTAL: | | $1,151,331.00 |

FILE: PHSDACO.XLS

TOTAL: $5,200,000.00

Page 1

A 00770

BP000252

# EXHIBIT   32

Based on Misc. Bids
Received in the past
Twelve Months
04-49

October 31, 2005

## BONDING ESTIMATE
## TRACT 6451
## CITY OF WASCO
## ( 68 SINGLE-FAMILY LOTS)

### CONSTRUCTION COSTS:

| ITEM | QUANTITY | | UNIT PRICE | | TOTAL | |
|------|----------|---|-----------|---|-------|---|
| **GRADING** | | | | | | |
| EXCAVATION | 68 | lots | $ 1,800.00 | /lots | $ | 122,400 |
| | | | SUB-TOTAL | | $ | 122,400 |
| | | | | | | |
| **STREETS** | | | | | | |
| INTERIOR PAVEMENT: | | | | | | |
| 0.20'AC/0.33' AB/0.50' SG PAVEMENT | 180,615 | sf | $ 1.74 | /sf | $ | 314,270 |
| RECLAMITE | 180,615 | sf | 0.03 | /sf | | 5,418 |
| TYPE "A" CURB & GUTTER | 7,103 | lf | 8.75 | /lf | | 62,151 |
| 4' SIDEWALK | 28,412 | sf | 2.50 | /sf | | 71,030 |
| BACKFILL BEHIND SIDEWALK | 7,103 | lf | 0.25 | /lf | | 1,776 |
| HANDICAP RAMPS | 18 | ea | 1,250.00 | /ea | | 22,500 |
| 6-FT WIDE CROSS-GUTTER | 8 | ea | 4,150.00 | /ea | | 33,200 |
| SURVEY MONUMENTS | 15 | ea | 350.00 | /ea | | 5,250 |
| SURVEY MONUMENTS @ PHASE BNDRY- | | | | | | |
| AT PHASE BOUNDRY - w/ ENCASEMENTS | 3 | ea | 350.00 | /ea | | 1,050 |
| STREET NAME SIGNS | 8 | ea | 185.00 | /ea | | 1,480 |
| TRAFFIC CONTROL SIGNS | 12 | ea | 195.00 | /ea | | 2,340 |
| STREET LIGHT - MAST | 6 | ea | 1,875.00 | /ea | | 11,250 |
| STREET LIGHT - POST | 14 | ea | 1,875.00 | /ea | | 26,250 |
| PARKWAY LANDSCAPE | 7,360 | sf | 5.00 | /sf | | 36,800 |
| 6-FT HIGH MASONRY WALL | 3,500 | lf | 97.75 | /lf | | 342,125 |
| | | | SUB-TOTAL | | $ | 936,891 |



JJW W\DWC2004\04-49\Docs\6451 Bonding  Estimate.xls

1 of 2

A 01884



EXHIBIT
J-73

October 31, 2005                                                                              04-49

## BONDING ESTIMATE
## TRACT 6451

| ITEM | QUANTITY | UNIT PRICE | TOTAL |
|------|----------|------------|-------|
| **UTILITIES** | | | |
| JOINT TRENCH | 3,700 lf | $ 22.00 /lf | $ 81,400 |
| | | SUB-TOTAL | $ 81,400 |
| **SEWER** | | | |
| 8" P.V.C. MAIN | 3,700 lf | 28.00 /lf | 103,600 |
| 4" P.V.C. LATERAL | 3,000 lf | 17.00 /lf | 51,000 |
| TIE INTO EXISTING | 1 ea | 750.00 /ea | 750 |
| MANHOLES | 13 ea | 3,350.00 /ea. | 43,550 |
| | | SUB-TOTAL | $ 198,900 |
| **DRAINAGE** | | | |
| 18" RCP STORM DRAIN PIPE | 1,000 lf | $ 35.00 /lf | $ 35,000 |
| STORM DRAIN MANHOLE | 4 ea | 3,500.00 /ea | 14,000 |
| STORM DRAIN CATCH BASIN | | | 0 |
| 4.5' WIDE | 5 ea | 3,750.00 /ea | 18,750 |
| | | SUB-TOTAL | $ 67,750 |
| **WATER** | | | |
| 8" C-900 P.V.C. MAIN | 3,700 lf | 20.00 /lf | $ 74,000 |
| 8" GATE VALVE | 22 ea | 1,050.00 /ea | 23,100 |
| VALVE BOX | 68 ea | 150.00 /ea | 10,200 |
| 6" FIRE HYDRANT ASSEMBLY | 12 ea | 2,750.00 /ea | 33,000 |
| 1" LONG SERVICE SINGLE | 12 ea | 600.00 /ea. | 7,200 |
| 1" SHORT SERVICE SINGLE | 56 ea | 450.00 /ea | 25,200 |
| 2" LANDSCAPE SERVICE w/ BOX | 2 ea | 700.00 /ea. | 1,400 |
| PURCHASE/DELIVER WATER METER | 68 ea | 190.00 /ea. | 12,920 |
| SET METER BOXES | 68 ea | 100.00 /ea | 6,800 |
| TEMPORARY BLOWOFFS | 4 ea | 500.00 /ea | 2,000 |
| TIE-IN TO EXISTING | 1 ea | 700.00 /ea | 700 |
| | | SUB-TOTAL | $ 196,520 |
| | | **TOTAL CONSTRUCTION COST** | $ 1,603,861 |
| | | **CONTINGENCY (20%)** | $ 320,772 |
| | | **TOTAL BONDING COST** | $ 1,924,633 |

J:JWWADWC2004\04-49\Dac\6451 Bonding Estimate.xls                                2 of 2

A 01885

# EXHIBIT  33

RECORDING REQUESTED BY:

The City of Wasco

WHEN RECORDED, RETURN TO:

City Manager
City of Wasco
Post Office Box 159
Wasco, CA  93280

## DEVELOPMENT AGREEMENT - THE LEGACY GROUP

THIS AGREEMENT is made and entered into this __3rd__ day of ___November___, 1992, by and between the City of Wasco (hereinafter referred to as the "City") and the Legacy Group, a California limited partnership (hereinafter referred to as the "Developer").  The City and the Developer agree as follows:

1.     **RECITALS**

1.1  **CODE AUTHORIZATIONS:**  The City of Wasco, a General Law city, is authorized pursuant to Article 2.5 of Chapter 4 of Title 7 of the Government Code, Sections 65864 through 65869.5, to enter into development agreements with persons having legal or equitable interest in real property for the development of such property in order to establish certainty in the development process.  City has adopted Resolution No. 91-1343 which establishes procedures and requirements for the approval of development agreements.

1.2  **DEVELOPER/PROPERTY:**  Developer has a legal or equitable ownership interest in certain real property located in the City of Wasco, County of Kern, California, more particularly described in **Exhibit A**, attached hereto and incorporated herein, which real property is the subject matter of this Agreement.  This real property is also known as "VALLEY ROSE MASTER PLANNED COMMUNITY."  Said property consists of approximately four hundred eighty (480) acres of property located within the Valley Rose Master Plan of the City of Wasco ("Real Property").

1.3  **INTEREST OF DEVELOPER:**  Developer represents that it has an equitable or a legal interest in the Real Property.  Developer has provided documentation of its legal or equitable interest to City and Developer will provide a current preliminary title report upon request by City to establish the legal interests.

1.4  **BENEFITS/BURDENS - INTENT OF PARTIES:**  City and Developer desire to enter into this Agreement in order to facilitate the development of the Real Property.  Developer and City have determined that the development of the Real Property is a development project (the "Project") for which this Agreement is



| | |
|---|---|
| B | Schedule of Performance for the development of the infrastructure associated with Area A, Phase 1 and Phase 2. |
| C | Schedule of City's fees for development currently in effect. |
| D | City of Wasco General Plan existing on the Effective Date of this Agreement. |
| E | The Master Plan, (as defined in Section 2.15 of this Agreement. |
| F | City of Wasco Tentative Subdivision Map 5472 for Area A, Phase 1. |
| G | City of Wasco Tentative Subdivision Map 5618 for Area A, Phase 2. |

4.   GENERAL PROVISIONS:

4.1   PROPERTY SUBJECT TO THE AGREEMENT:   This Agreement applies to and governs the development of the Real Property.

4.2   DURATION OF AGREEMENT:   The term of this Agreement shall commence upon the effective date hereof and shall expire on the same day and same month as the effective date in the year 2007, unless extended by written mutual agreement of the parties in writing.   Provided, however, that failure to complete development of all lots for Area A, meaning that such lots are completed with all infrastructure necessary therefor (including the commercial portion of Area A), except construction of on-site residential or otherwise approved structures, and grant of approval of the Tentative Map or Maps for either Area B or Area C or Area D or Area E, by City must have been finalized by the same day and same month as the date of execution in the year 2002, or this Agreement will expire on that date in the year 2002.

4.2.1   Expiration of the Agreement shall not affect any rights of Developer arising from entitlements for the Project approved of granted by City prior to, concurrently with, or subsequent to the approval of this Agreement, except that those entitlements which would have expired due to the passage of time, but for this Agreement, shall expire with the termination of this Agreement.

4.2.2   If this Agreement should expire after the completion of the residential portion of Area A but the additional nine holes of golf shall not yet have been built by Developer then the parties agree that damages shall be measured as is set forth in Section 7.3.3 of this Agreement.

10/16/92                                          7

A 01054

# EXHIBIT  34



"REVISED"

TENTATIVE TRACT MAP No. 5472

# EXHIBIT   35



# TRACT MAP NO. 6451

A 01394



TENTATIVE TRACT NO. 6451
CITY OF WASCO, CALIFORNIA

# EXHIBIT   36

# TRACT NO. 6451

CONSISTING OF 3 SHEETS

BEING A DIVISION OF A PORTION OF PARCEL 1 OF PARCEL MAP NO. 9572, FILED
IN THE KERN COUNTY RECORDER, AND BY CERTIFICATE OF CORRECTION IN THE OFFICE OF
THE KERN COUNTY RECORDER, AND BY CERTIFICATE OF CORRECTION RECORDED
DECEMBER 19, 1993 IN BOOK 6782, PAGE 34 OF OFFICIAL RECORDS, AND
CERTIFICATE OF CORRECTION RECORDED JUNE 10, 1993 IN BOOK 6662, PAGE
1323 OF OFFICIAL RECORDS BEING A PORTION OF THE SE 1/4 OF THE
SW 1/4 OF SECTION 4, TOWNSHIP 29 SOUTH, RANGE 24 EAST, M.D.B.M., IN
THE CITY OF WASCO, COUNTY OF KERN, STATE OF CALIFORNIA,

69 HUNDRED LOTS — 1 DESIGNATED REMAINDER   35.64 GROSS ACRES

## OWNER'S STATEMENT

## CITY CLERK'S CERTIFICATE

## CITY PLANNING DIRECTOR'S STATEMENT

## CITY ENGINEER'S STATEMENT

## SURVEYOR'S STATEMENT

## RECORDER'S CERTIFICATE

SHEET 1 of 3

A 01775

J-135



A 01776



A 01777

# EXHIBIT  37

# FILED

MAR 1 0 2010

CLERK, U.S. DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA
BY _____
DEPUTY CLERK

## IN THE UNITED STATES DISTRICT COURT

## FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ROGER McINTOSH, | CASE NO. CV F 07-1080 LJO GSA |
| Plaintiff, | **JURY INSTRUCTIONS** |
| vs. | |
| NORTHERN CALIFORNIA UNIVERSAL ENTERPRISES, INC., LOTUS DEVELOPMENTS, LP, THE CITY OF WASCO, AND DENNIS W. DeWALT, INC., | |
| Defendants. | |

The attached jury instructions were read to the jury in open court.

Dated: March __, 2010

VICTORIA MINOR, CLERK OF THE COURT

By: _____I. Lira_____
Deputy Clerk

1

# INSTRUCTION NO. 17

## STIPULATIONS OF FACT

The parties have agreed on certain facts which have been stated to you. You should therefore treat these facts as having been proved. In addition, the parties stipulate to the following facts:

1.     The plaintiff is Roger McIntosh. I will refer to him sometimes as "plaintiff" or "Mr. McIntosh."

2.     Mr. McIntosh is a civil engineer who does business as McIntosh & Associates.

3.     Prior to 1999, Mr. McIntosh was a partner with Eugene Martin in the firm Martin-McIntosh.

4.     The Martin-McIntosh firm dissolved in 1999.

5.     Defendant Northern California Universal Enterprises Co. is a California corporation engaged in real estate acquisition and development. I will sometimes refer to this defendant as "Northern."

6.     Defendant Lotus Development, LP is a California limited partnership engaged in real estate development and sales. I will sometimes refer to this defendant as "Lotus."

7.     Northern is the general partner of Lotus.

8.     Defendant the City of Wasco is a city located in Kern County, California. I will sometimes refer to this defendant as the "City."

19

9.     Defendant Dennis W. DeWalt, Inc. is a California corporation that performs civil engineering work in Kern County, California. I will sometimes refer to this defendant as "DeWalt."

10.    In 1992, a company called the Legacy Group, which is not a party to this case, hired the Martin-McIntosh firm to perform civil engineering services for a 480-acre parcel of land located in Wasco, California. The Legacy Group planned to develop the land and build a residential community.

11.    The 480-acre parcel of land was named the "Valley Rose Estates."

12.    The 480-acre parcel was then subdivided into six separate parcels in preparation for development and construction.

13.    In 1992, the Martin-McIntosh firm prepared a Tentative Tract Map for a part of Parcel Number One in the Valley Rose Estates. The tract in Parcel One was named "5472." I will sometimes refer to that tract as "Tract 5472."

14.    Martin-McIntosh also prepared improvement plans for Tract 5472.

15.    The City approved the tentative tract map and improvement plans for Tract 5472.

16.    The Legacy Group constructed streets, sidewalks, curbs, gutters, storm drains, sewers, water utility, block walls, and driveway approaches within Tract 5472.

17.    The Legacy Group ran out of funding and declared bankruptcy before it could begin building homes on Tract 5472.

18.    In 2001, the tentative tract map for Tract 5472 expired.

19.    In 2002, the Legacy Group's development agreement with the City expired.

20.    In 2002, the City purchased Tract 5472 at a tax sale.

21.    In December of 2004, the City sold Tract 5472 to Lotus.

22.    The City required Lotus/Northern to prepare a new tentative tract map for Tract 5472.

23.    The City did not require Lotus/Northern to prepare or submit new improvement plans for Tract 5472 because the improvements had already been constructed in Tract 5472 by the Legacy Group.

24.    The City required Louts/Northern to repair and/or replace damaged subdivision improvements.

25.    Northern hired DeWalt to prepare a new tentative tract map for Tract 5472.

26.    In 2004, DeWalt prepared a new tentative map which DeWalt numbered as Tract 6451.

27.    DeWalt submitted its Tentative Tract Map 6451 to the City in November of 2004.

28.    On February 22, 2007, Mr. McIntosh received copyright registration certificate No. VAU 721-180.

29.    Between 2006 and the present day, Lotus has sold 19 total homes at Tract 6451.

21

**INSTRUCTION NO. 32**

**COPYING—ACCESS AND SUBSTANTIAL SIMILARITY**

The plaintiff has the burden of proving that the defendant copied original elements from the plaintiff's copyrighted work. The plaintiff may show the defendant copied from the work by showing by a preponderance of the evidence that the defendant had access to the plaintiff's copyrighted work and that there are substantial similarities between the defendant's work and original elements of the plaintiff's work.

**INSTRUCTION NO. 34**

**COPYRIGHT INFRINGEMENT—COPYING—ACCESS DEFINED**

The plaintiff must show by a preponderance of the evidence that an infringing party had access to the plaintiff's work. You may find that an infringing party had access to the plaintiff's work if the infringing party had a reasonable opportunity to view, read, hear, or copy the plaintiff's work before the defendant's work was created.

# EXHIBIT  38

lj

1  James J. Braze, Esq.; SBN 75911
   Jeffrey A. Travis, Esq.; SBN 235507
2  BORTON PETRINI, LLP
   5060 California Avenue, Suite 700
3  Post Office Box 2026
   Bakersfield, CA 93303
4  Telephone (661) 322-3051
   jbraze@bortonpetrini.com
5  jtravis@bortonpetrini.com

6  Attorneys for Plaintiff, Roger McIntosh
   dba McIntosh & Associates
7

8              UNITED STATES DISTRICT COURT

9       EASTERN DISTRICT OF CALIFORNIA, FRESNO DIVISION

10

11  ROGER McINTOSH,                          Case No.  1:07-CV-01080-LJO-GSA

12              Plaintiff,
                                             THIRD AMENDED COMPLAINT FOR
13  v.                                       COPYRIGHT INFRINGEMENT; DEMAND
                                             FOR JURY TRIAL
14  NORTHERN CALIFORNIA UNIVERSAL
    ENTERPRISES COMPANY, a California
15  corporation; LOTUS DEVELOPMENTS,
    LLP; THE CITY OF WASCO, a municipal
16  corporation; DEWALT CM, INC., a
    California corporation also doing business as
17  DEWALT CORPORATION; DENNIS W.
    DE WALT, INC., a California corporation
18  also doing business as DEWALT
    CORPORATION; and DOES 1 through 10,
19  inclusive,

20              Defendants.

21

22          For his complaint against Northern California Universal Enterprises Company

23  ("Universal") Lotus Developments, LLP ("Lotus"), the City of Wasco ("Wasco"), DeWalt CM, Inc.,

24  also doing business as DeWalt Corporation, and Dennis W. De Walt, Inc., also doing business as

25  DeWalt Corporation (collectively "DeWalt") (all defendants referred to collectively as,

26  "Defendants"), Roger McIntosh dba McIntosh & Associates ("McIntosh") alleges:

27

28

## NATURE OF THE ACTION

1.      This is an action to redress the infringement of McIntosh's registered copyrights. Universal, Lotus and Wasco have created a residential subdivision by copying and using McIntosh's copyrighted works and employing a tangible embodiment of the landscape and subdivision design McIntosh conceived and created and that is the subject of Copyright Registration Certificate No. VAU-721-180.

## PARTIES AND OTHER IMPORTANT PERSONS

2.      Plaintiff Roger McIntosh is a civil engineer doing business as McIntosh & Associates and Associates, a sole proprietorship with its principal place of business at 2001 Wheelan Court, Bakersfield, CA  93309.

3.      Defendant Northern California Universal Enterprises Company, a California corporation with an address at 2099 Fortune Drive, San Jose, California 95131, started as a land development company in 1980 and is now a builder in California's Central Valley.  On information and belief, Joseph Wu is the founder and head of Northern California Universal Enterprises Company.

4.      Defendant Lotus Developments is a California Limited Partnership with an address at 300 B Street, Turlock, CA 95380.  On information and belief, Joseph Wu is also the founder and head of Lotus Developments.

5.      Defendant City of Wasco is a municipal corporation formed and organized under the laws of the State of California with an address at 746 Eighth Street, Wasco, CA 93280.

6.      The true names and capacities of defendants Does 1 through 10 inclusive are unknown to plaintiff, who therefore sues said defendants by such fictitious names.  Plaintiff is informed and believes and thereon alleges that each of the defendants herein designated as a Doe is responsible in some manner for the events and happenings herein referred to and caused injuries proximately thereby as hereinafter alleged.  Plaintiff is informed and believes and thereon alleges that at all times herein mentioned, each of the defendants was the agent, servant and employee of each of the remaining defendants, and at all times herein mentioned, each was acting within the purpose and scope of said agency and employment.  Plaintiff is further informed and believes and

1    thereon alleges that at all times herein mentioned, each of the defendants' employees was the agent,

2    servant and employee of each employee's respective employer, that at all times herein mentioned,

3    each employee was acting within the purpose and scope of said agency and employment, and that

4    each defendant has ratified and approved the acts of its agents and employees.

5         7.    The Legacy Group, referred to throughout, is not a defendant in this action

6    and no longer exists.  The Legacy Group was a land development company originally involved in

7    the development of the property that is the subject of this action.

8                           **JURISDICTION AND VENUE**

9         8.    This court has subject matter jurisdiction over the claims in this action

10   pursuant to 28 U.S.C. section 1331, 28 U.S.C. section 1338(a) through (b) and 28 U.S.C.

11   section 1367.

12        9.    Venue in this judicial district is proper under 28 U.S.C. section 1391(b).

13                           **FACTUAL BACKGROUND**

14                           **McINTOSH & ASSOCIATES**

15        10.   For more than 34 years, Roger McIntosh has been engaged in urban planning,

16   specifically the design of residential subdivisions in community spaces throughout California.  In

17   1980, Mr. McIntosh and Eugene Martin founded Martin-McIntosh Land Surveying.

18        11.   Over the last 27 years, the firm has expanded to offer an array of land-

19   planning services from civil engineering and landscape architecture to construction management

20   throughout Central and Southern California, Arizona and Nevada.

21        12.   On May 3, 1999, Roger McIntosh bought out his partner, Mr. Martin, and

22   Martin-McIntosh became McIntosh & Associates.  Pursuant to the buy-out agreement, the rights and

23   all works created up to that point by Martin-McIntosh were assigned to Roger McIntosh.

24        13.   McIntosh & Associates provides all types of civil engineering services,

25   specializing in site planning for private developments, residential developments and public works

26   projects, including infrastructure, subdivision design and oil field facilities.

27        14.   McIntosh & Associates also offers land surveying services, from boundary

28   surveys to geodetic control surveys.

## CONTRACT WITH THE LEGACY GROUP

15.     In or about 1992, McIntosh contracted with the Legacy Group to design and supervise the private development and construction of a subdivision called the Valley Rose Estates Project (the "Subdivision") on a parcel of land owned by the Legacy Group.

16.     Specifically, McIntosh contracted to (1) develop the subdivision's master plans for water, sewer and drainage systems; (2) develop a phase traffic and circulation plan; (3) develop a tentative tract map for the Subdivision; and (5) develop landscape design unique to the Subdivision.

17.     According to the contract between McIntosh and the Legacy Group, all work product McIntosh created for the Subdivision remained his property and McIntosh retained the right to use the plans without the Legacy Group's consent, including but not limited to McIntosh's designs and technical drawings.

18.     In addition, the Legacy Group agreed that McIntosh's designs and technical drawings were being created exclusively for the Legacy Group and could only be used by the Legacy Group on the Valley Rose Estates project.

19.     The contract between McIntosh and the Legacy Group also established that the agreement between the parties could not be assigned without the written consent of the other party.

20.     The Legacy Group had an agreement with the City of Wasco wherein the City would pay for the Subdivision project with bond anticipation notes. The Legacy Group was to pay McIntosh and the contractor from the money it received from the City of Wasco.

21.     According to the agreement between Wasco and the Legacy Group, the development agreement expired in 2002 because the improvements were not completed.

22.     The tentative map for the Valley Rose Estates subdivision, Tract No. 5472, expired in 2001.

## THE SUBDIVISION PLANS

23.     In accordance with his obligations under the Legacy Group contract, McIntosh designed the overall layout of the Subdivision, as well as the division of the individual

1    plots and common spaces. McIntosh also created landscape designs for the Subdivision. McIntosh's

2    subdivision and landscape designs are depicted in technical drawings ("The Plans") that are the

3    subject of Copyright Registration Certificate No. VAU-721-180, a true and correct copy of which

4    is attached as Exhibit "A."

5         24.    McIntosh is the sole author of the subdivision and landscape designs

6    embodied in the technical drawings.

7         25.    McIntosh is the sole owner of the copyright and the technical drawings. (See

8    Exhibit "A," Copyright Registration Certificate No. VAU-721-180.)

9                    **INITIAL CONSTRUCTION OF THE SUBDIVISION**

10        26.    In 1993, McIntosh submitted the Plans to the City of Wasco in order to obtain

11   a building permit to commence construction on the Subdivision. The City of Wasco subsequently

12   approved the Plans.

13        27.    Construction of the Subdivision commenced after the City of Wasco approved

14   the Plans. Several different contractors worked on the construction of the Subdivision, according

15   to McIntosh's Plans. McIntosh supervised construction of the Subdivision to ensure that the Plans

16   were properly implemented.

17        28.    In 1994, the bottom dropped out of the real estate market and the City of

18   Wasco's bond anticipation notes lost their value. The City was no longer able to pay the Legacy

19   Group for the construction on the Subdivision. Consequently, construction on the Subdivision

20   ceased. The Legacy Group subsequently declared bankruptcy and the City of Wasco purchased the

21   Subdivision at a tax sale.

22                 **DEFENDANTS' INFRINGEMENT OF MCINTOSH' PLANS**

23        29.    On information and belief, in or about December 2004, of defendants Lotus

24   and Universal  purchased the Subdivision, with all the improvements, from the City of Wasco.

25        30.    In or about late 2005 or early 2006, Mr. Wu of Northern California Universal

26   Enterprises Company and Lotus Developments contacted McIntosh and asked if he could use

27   McIntosh's Plans to finish the Subdivision. McIntosh told Mr. Wu that he could use the plans if he

28   paid for them. Mr. Wu refused to pay the price proposed by McIntosh for use of the Plans.

H:\PUBLIC\054493\060971
McIntosh v
Northern\THIRD AMD CP
12-29-08.wpd

1    31.    On information and belief, in or about October 2006, without paying McIntosh

2  for his Plans, defendants commenced construction on the Subdivision.

3    32.    In or about November 2006, a Wasco city employee told McIntosh that

4  Mr. Wu was using McIntosh's plans to complete the Subdivision.

5    33.    On information and belief, Defendants' construction of the Subdivision is

6  based on landscape and subdivision designs substantially similar to the subdivision and landscape

7  design conceived and created by McIntosh that is represented in the plans and that is the subject of

8  Copyright Registration Certificate No. VAU-721-180.

9    34.    A point-by-point, feature-by-feature comparison between the subdivision

10 constructed by Defendants and the Plans authored by McIntosh shows that the prominent features

11 of the subdivision are substantially similar to the Plans, such that the overall look and feel of the

12 design representative of the plans is embodied in the subdivision.

13    35.    Specifically, a feature-by-feature comparison between the subdivision and the

14 Plans reveals substantial similarity in, among other things, the streets, curbs and gutters, utilities,

15 walls, fences, entry monuments, street lights, landscaping, and reference lines, annotations, and

16 reference numbering.

17    36.    On information and belief, Defendants, without permission or license,

18 obtained and copied the Plans and are using them or have used them to complete the subdivision.

19 Defendants have not paid McIntosh for use of the Plans.

20                            **FIRST CAUSE OF ACTION**

21              **COPYRIGHT INFRINGEMENT OF TECHNICAL DRAWINGS**

22    37.    McIntosh incorporates by reference and re-alleges paragraphs 1 through 36

23 above.

24    38.    Plaintiff has in all respects complied with the requirements of the copyright

25 laws of the United States with respect to the Plans.

26    39.    The copying of the Plans by defendants constitutes infringement of

27 McIntosh's registered copyright and the technical drawings depicted in the Plans, in violation of the

28 Copyright Act, resulting in harm and injury to McIntosh.

1        40.    As a result of the above-described wrongful acts of defendants in creating

2  infringing copies of the Plans, McIntosh's copyright of the Plans has been infringed and he is entitled

3  to recover actual damages and that portion of the profits realized by Defendants from the use and

4  commercial exploitation of the infringing copies attributable to the unlawful use by Defendants of

5  the copyrighted material contained in the plans that is the subject of Copyright Registration

6  Certificate No. VAU-721-180.

7                     **SECOND CAUSE OF ACTION**

8            **C O N T R I B U T O R Y   C O P Y R I G H T**
                 **INFRINGEMENT OF TECHNICAL DRAWINGS**

9

10       41.    McIntosh incorporates by reference and re-alleges paragraphs 1 through 40

11  above.

12       42.    At all times during the construction of the Valley Rose Estates subdivision,

13  the City of Wasco controlled the development of the Valley Rose Estates subdivision project.

14       43.    As a result of the construction of the Valley Rose Estates subdivision and the

15  unlawful use of McIntosh's copyrighted plans, Wasco obtained a direct financial benefit.

16       44.    As a result of its actions, the City of Wasco knowingly and materially

17  contributed to and induced the infringing conduct of Lotus and Universal.

18       45.    Defendants also induced infringement through their copying, distribution, and

19  continued recording of the Plans.

20       46.    As a result of the above-described wrongful acts of defendants in contributing

21  to the infringement and infringing use of the Plans, McIntosh's copyright in the Plans has been

22  infringed and he is entitled to recover actual damages and that portion of the profits realized by

23  Defendants from the use of and commercial exploitation of the infringing copies attributable to the

24  unlawful use by Defendants of the copyrighted material contained in the Plans that is the subject of

25  Copyright Registration Certificate No. VAU-721-180.

26                   **DEMAND/PRAYER FOR RELIEF**

27       WHEREFORE, McIntosh requests that this Court enter a judgment against the

28  defendants that provides for:

1         (a)     A declaration that the defendants have willfully infringed McIntosh's

2 exclusive rights in the copyrighted material contained in the Plans that is the subject of Copyright

3 Registration Certificate No. VAU-721-180;

4         (b)     A preliminary and thereafter permanent injunction against defendants and all

5 persons acting in concert or participation with them or persons acting or purporting to act on their

6 behalf, including but not limited to their officers, directors, stockholders, partners, owners, agents,

7 representatives, employees, attorneys, successors and assigns and any and all other persons acting

8 in concert or privity with them, directing defendants to:

9                 (i) ·    Cease and desist from infringing plaintiff's copyright in the Plans;

10                 (ii)    Destroy all copies of the plans, including any and all drawings, models,

11 advertisements, catalogues and other materials based on or derived from the Plans; and

12                 (iii)    Take all steps necessary to remove any structures or design elements

13 that have been copied from the Plans or built based on the Plans;

14         (c)     The impounding of all copies of the Plans and any other materials derived

15 from the Plans in whole or in part, incorporating any element of the Plans, and all means by which

16 such copies may be reproduced and in order providing for the destruction or other reasonable

17 disposition of materials containing copies of the Plans of the designs embodied in the Plans that have

18 been used in violation of McIntosh's exclusive rights and all means by which such copies may be

19 produced; and in the event that certain such copies are no longer under the control of defendants,

20 provide the name, address and relevant contact information of those believed to be in possession and

21 control of such materials;

22         (d)     The filing with this Court and the service on McIntosh within thirty (30) days

23 following service of the injunction order, a report under oath and in writing, setting forth in detail

24 the manner and form in which defendants have complied with the injunction;

25         (e)     The awarding to plaintiff McIntosh of damages in an amount equal to the

26 actual damages suffered by McIntosh as a result of the infringement and that portion of the profits

27 earned by Defendants from the creation and commercial exploitation of the copied Plans and the

28 infringing building that is attributable to the infringement, and not taken into account in computing

1  McIntosh's actual damages, including an award of the reasonable attorney fees, costs and

2  disbursements incurred by McIntosh in connection with this action;

3          (f)     Alternatively, the awarding to plaintiff McIntosh the maximum statutory

4  damages permitted under the Copyright Act with respect to each infringement, or for such other

5  amount as may be proper pursuant to 17 U.S.C. section 504(c), including an award of reasonable

6  attorney fees, costs, and disbursements incurred by McIntosh in connection with this action; and

7          (g)     The granting to McIntosh of such other and further relief as this Court may

8  deem just and proper.

9                              **JURY TRIAL DEMAND**

10          McIntosh demands a trial by jury on all issues triable of right by a jury.

11  DATED:   April 23, 2009          BORTON PETRINI, LLP

12

13

                         By:    /s/ Jeffrey A. Travis

14                             Jeffrey A. Travis, Attorneys for Plaintiff, Roger
                           McIntosh dba McIntosh & Associates

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**PROOF OF SERVICE**
**(FRCP No. 5(b)(2)(E))**

**STATE OF CALIFORNIA, COUNTY OF KERN**

I, Vanessa J. Claridge, declare:

I am a citizen of the United States. I am employed in the County of Kern, State of California. I am over the age of 18 and not a party to the within action; my business address is 5060 California Avenue, Suite 700, Bakersfield, California 93309.

On **April 23, 2009**, I served the foregoing document described as **THIRD AMENDED COMPLAINT FOR COPYRIGHT INFRINGEMENT; DEMAND FOR JURY TRIAL** on the other party(ies) in this action as follows:

| | |
|---|---|
| Steven John Hassing, Esq.<br>**Law Offices of Steven J. Hassing**<br>425 Calabria Court<br>Roseville, CA 95747<br>email address: **stevehassing@yahoo.com** | Attorneys for Attorneys for Defendants,<br>Northern California Universal Enterprises<br>Company and Lotus Developments<br>Tel:    916/677-1776<br>**Fax:   916/677-1770** |
| Chaka Okadigbo<br>**Garcia Calderon Ruiz, LLP**<br>500 South Grand Ave Suite 1100<br>Los Angeles, CA 90071<br>email address: **cokadigbo@gcrlegal.com** | Attorneys for Defendant, City of Wasco<br><br>Tel: 213/347-0210<br>**Fax: 213-347-0216** |
| William L. Alexander, Esq.<br>**Alexander & Associates**<br>1925 "G" Street<br>Bakersfield, CA 93301<br>email address: **walexander@alexander-law.com** | Attorneys for Defendant, DeWalt CM, Inc.<br><br>Tel: 661/316-7888<br>**Fax: 661/316-7890** |

☒      **BY ELECTRONIC SERVICE:** Pursuant to Fed. R. Civ. P. 5(b)(2)(E) and Local Court Rule(s), the foregoing document will be served by the court via CM/ECF. Pursuant to the CM/ECF docket for this case proceeding the following person(s) are on the Electronic Mail Notice List to receive ECF transmission at the email address(es) indicated below:

☐      **BY MAIL:**  As follows: I am "readily familiar" with the firm's practice of collection and processing correspondence for mailing. Under that practice it would be deposited with U.S. postal service on that same day with postage thereon fully prepaid at , California in the ordinary course of business.  I am aware that on motion of the party served, service is presumed invalid if postal cancellation date or postage meter date is more than one day after date of deposit for mailing in affidavit.

Executed on **April 23, 2009**, at Bakersfield, California.

I declare that I am employed in the office of a member of the bar of this court at whose direction the service was made.

| | |
|---|---|
| _____<br>Vanessa J. Claridge | _____<br>/s/ Vanessa J. Claridge |

# EXHIBIT A

# EXHIBIT  39

1

2

3

4

5

6

7          **IN THE UNITED STATES DISTRICT COURT**

8          **FOR THE EASTERN DISTRICT OF CALIFORNIA**

9

10   ROGER McINTOSH,                          CASE NO. CV F 07-1080 LJO GSA

11              Plaintiff,                     **SUMMARY JUDGMENT/ADJUDICATION**
                                               **DECISION**
12          vs.                                (Docs. 97, 125, 128.)

13   NORTHERN CALIFORNIA
     UNIVERSAL ENTERPRISES
14   COMPANY, et al,

15              Defendants.
                                    /
16
     AND RELATED CROSS-ACTION.
17
                                    /
18

19                          **INTRODUCTION**

20          Defendants   Northern   California   Universal   Enterprises   Company   ("NCUE"),   Lotus

21   Developments, L.P. ("Lotus") and City of Wasco ("Wasco") seek summary judgment that plaintiff Roger

22   McIntosh's ("Mr. McIntosh's") copyright infringement claims arising from preparation of a subdivision

23   tentative map and improvement plans cannot be established and are barred by defenses. Mr. McIntosh

24   seeks summary adjudication that NCUE, Lotus, Wasco and defendant Dennis W. DeWalt, Inc.

25   ("DeWalt")[1] cannot establish affirmative defenses to his copyright infringement claims.  This Court

26   _____

27          [1]      NCUE, Lotus, Wasco and DeWalt will be referred to collectively as "defendants."  Although DeWalt did
     not file a summary judgment motion to defeat Mr. McIntosh's claims, DeWalt opposes Mr. McIntosh's summary adjudication
28   motion on affirmative defenses.

                                    1

1   5472.

2        The idea at issue here is a means to subdivide and arrange Parcel 5472. Tentative Map 5472

3   expressed a 68-residential lot subdivision. Defendants fail to demonstrate that there was only one way

4   to express a Parcel 5472 map or a subdivision of Parcel 5472, especially considering that more or less

5   lots was an option to Martin-McIntosh's 68-lot design with an additional lot for a multi-family unit.

6   NCUE and Lotus' election to use the existing improvements does not transform Tentative Map 5472 into

7   a merger of idea and expression. Tentative Map 5472 is an expression of Martin-McIntosh's idea.

8   However, the idea of a Parcel 5472 map or Parcel 5472 subdivision could be expressed in numerous

9   ways. Defendants chose to utilize Martin-McIntosh's expression of Martin-McIntosh's idea and fail to

10  establish application of merger, whereas Mr. McIntosh has defeated its application and is entitled to

11  summary judgment on the issue of merger.

12                                    **Publication**

13        Mr. McIntosh argues that required submission of Tentative Map 5472 and the MM improvement

14  plans for Wasco's approval did not constitute publication to deprive copyright protection.

15        Wasco contends that Mr. McIntosh "no longer retains any copyright interests" in Tentative Map

16  5472 and the MM improvement plans based on their submission to Wasco "for approval and comment

17  pursuant to a review and approval process that requires making the map and plans available to the

18  general public."

19        NCUE, Lotus and DeWalt argue that a factual dispute arises whether Martin-McIntosh sold or

20  transferred copyrighted works to Wasco and rely on DeWalt's survey to produce a different map.

21        "A general publication occurs when a work is made available to members of the public regardless

22  of who they are or what they will do with it." *Academy of Motion Picture Arts and Sciences v. Creative*

23  *House Promotions, Inc.*, 944 F.2d 1446, 1451-52 (9th Cir.1991) (*citing Burke v. National Broadcasting*

24  *Co., Inc.*, 598 F.2d 688 (1st Cir.), cert. denied, 444 U.S. 869, 100 S.Ct. 144, 62 L.Ed.2d 93 (1979)). 17

25  U.S.C. § 101 defines "publication" as "distribution of copies . . . of a work to the public by sale or other

26  transfer of ownership, or by rental, lease, or lending. The offering to distribute copies . . . to a group of

27  persons for purposes of further distribution, public performance, or public display, constitutes

28  publication. A public performance or display of a work does not of itself constitute publication."

1    Final Maps 6451. Wasco argues that it should not be placed in a position to "police" copyright interests.

2        Wasco again makes a conclusory claim without legal or factual support. Wasco attempts to

3    distract the issue by focusing on its "municipal" functions, not its dissemination of Tentative Map 5472

4    and the MM improvement plans. At a minimum, Wasco's approval of Tentative and Final Maps 6541

5    under the circumstances of reviving the dormant subdivision raises factual issues as to Wasco's ability

6    to supervise and control infringing activity, especially given Wasco's desire to complete the subdivision.

7    Despite Wasco's claims that its actions were limited to municipal functions, Wasco actively sought to

8    revive the subdivision to raise a factual question over its supervision and control of alleged infringing

9    activity.

10       As to financial benefit, Mr. McIntosh points to proceeds to Wasco from the subdivision sale and

11   collection of fees with home construction. Wasco faced the task to complete the subdivision which had

12   remained dormant for 10 years. The evidence suggests that Wasco enticed potential buyers and

13   developers with Tentative Map 5472 and the allure of completed improvements. There is no dispute that

14   Wasco financially benefitted from subdivision completion compared to leaving the subdivision

15   incomplete. Again, Mr. McIntosh may not prevail on his vicarious infringement claim but raises factual

16   issues to avoid summary judgment.

17                              **CONCLUSION AND ORDER**

18       For the reasons discussed above, this Court:

19       1.    DENIES NCUE, Lotus and Wasco summary judgment on all of Mr. McIntosh's

20             copyright infringement claims;

21       2.    GRANTS Mr. McIntosh summary adjudication on issues of implied nonexclusive

22             license, merger, publication, first sale doctrine, abandonment, limitations period and

23             laches;

24       3.    DENIES Mr. McIntosh summary adjudication on the independent creation issue; and

25       4.    CONFIRMS the March 17, 2010 pretrial conference and March 1, 2010 trial.

26       IT IS SO ORDERED.

27   Dated:    **October 30, 2009**              **/s/ Lawrence J. O'Neill**
                                                  UNITED STATES DISTRICT JUDGE
28

                                         40

# EXHIBIT  40

**William L. Alexander** (State Bar Number 126607)
**Tenielle E. Cooper** (State Bar Number 226717)
Alexander & Associates, PLC
1925 G Street
Bakersfield, CA 93301
Phone: (661) 316-7888
Fax: (661) 316-7890

**Attorneys for Defendant, Dennis W. DeWalt, Inc.**

### UNITED STATES DISTRICT COURT

### EASTERN DISTRICT OF CALIFORNIA, FRESNO DIVISION

| | |
|---|---|
| ROGER McINTOSH, | ) Case No. 1:07-CV-01080 LJO-GSA |
| Plaintiff, | ) **JOINT JURY INSTRUCTIONS** |
| vs. | ) |
| | ) Date:       February 12, 2010 |
| NORTHERN CALIFORNIA UNIVERSAL | ) Time:       1:30 p.m. |
| ENTERPRISES COMPANY, a California | ) Courtroom: 4 |
| Corporation, et al, | ) Judge:      Hon. Lawrence J. O'Neill |
| Defendants. | ) |

The parties, and each of them, have stipulated to and herein submit the attached Jury Instructions.  The proposed jury instructions is attached hereto as Exhibit "A".

DATED:  February 16, 2010

ALEXANDER & ASSOCIATES, PLC
By:      /s/ Tenielle E. Cooper
TENIELLE E. COOPER,
Attorneys for Defendant, Dennis W.
DeWalt, Inc.

Alexander & Associates
Attorneys at Law
1925 G Street
Bakersfield, CA 93301
(661) 316-7888

1          Case No. 1:07-CV-01080 LJO-GSA

STIPULATED JOINT JURY INSTRUCTIONS

## 17.0 PRELIMINARY INSTRUCTION—COPYRIGHT

This case is about copyrights. Plaintiff, ROGER McINTOSH, claims to own a copyright in a Tentative Tract Map and Improvement Plans for Tract 5472. Plaintiff claims his copyright has been infringed. Each of the defendants denies plaintiff's claims and assert that a new map was independently created.

## DEFINITION OF COPYRIGHT

The owner of a copyright has the right to exclude any other person from reproducing, preparing derivative works, distributing, performing, displaying, or using the work covered by copyright for a specific period of time.

Copyrighted work can be a pictorial work, graphic work, or architectural work.

Facts, ideas, procedures, processes, systems, methods of operation, concepts, principles or discoveries cannot themselves be copyrighted.

The copyrighted work must be original. An original work that closely resembles other works can be copyrighted so long as the similarity between the two works is not the result of copying.

## COPYRIGHT INTERESTS

The copyright owner may transfer, sell or convey to another person all or part of the owner's property interest in the copyright, that is, the right to exclude others from reproducing, preparing a derivative work from, distributing, performing, or displaying, the copyrighted work. To be valid, the transfer, sale or conveyance must be in writing. The person to whom a right is transferred is called an assignee.

## HOW COPYRIGHT IS OBTAINED

Copyright automatically exists in a work the moment it is fixed in any tangible medium of expression. The owner of the copyright may register the copyright by delivering to the Copyright Office of the Library of Congress a copy of the copyrighted work. After examination and a determination that the material deposited constitutes copyrightable subject matter and that legal and formal requirements are satisfied, the Register of Copyrights registers the work and issues a certificate of registration to the copyright owner.

## PLAINTIFF'S BURDEN OF PROOF

The plaintiff has the burden of proving by a preponderance of the evidence that the plaintiff is the owner of the copyright and that the defendant copied original elements of the copyrighted work. Preponderance of the evidence means that you must be persuaded by the evidence that it is more probably true than not true that the copyrighted work was infringed.

## PROOF OF COPYING

To prove that the defendant copied the plaintiff's work, the plaintiff may show that the defendant had access to the plaintiff's copyrighted work and that there are substantial similarities between the defendant's work and the plaintiff's copyrighted work.

## LIABILITY FOR INFRINGEMENT

One who reproduces, prepares derivative works from, or distributes a copyrighted work without authority from the copyright owner during the term of the copyright, infringes the copyright.

Copyright may also be infringed by vicariously infringing and contributorily infringing.

## VICARIOUS INFRINGEMENT

A person is liable for copyright infringement by another if the person has profited directly from the infringing activity and the right and ability to supervise the infringing activity, whether or not the person knew of the infringement.

## CONTRIBUTORY INFRINGEMENT

A person is liable for copyright infringement by another if the person knows or should have known of the infringing activity and induces, causes, or materially contributes to the activity.

## DEFENSES TO INFRINGEMENT

The defendants contend that there is no copyright infringement. There is no copyright infringement where the defendant independently created the challenged work, the defendants made fair use of a copyrighted work by reproducing copies for criticism, comment, news reporting, teaching, scholarship, or research.


Given_____ .
Given as Modified _____
Withdrawn _____
Refused _____

## 17.20 DERIVATIVE LIABILITY—VICARIOUS INFRINGEMENT—ELEMENTS AND BURDEN OF PROOF

If you find that a defendant infringed the plaintiff's copyright in the work, you may consider the plaintiff's claim that a different defendant vicariously infringed that copyright. The plaintiff has the burden of proving each of the following by a preponderance of the evidence:

1.      the defendant profited directly from the infringing activity of the infringing defendant;

2.      the defendant had the right and ability to supervise or control the infringing activity of the infringing defendant;  and

3.      the defendant failed to exercise that right and ability to supervise or control the infringing activity of the infringing defendant.

If you find that the plaintiff proved each of these elements, your verdict should be for the plaintiff if you also find that a defendant infringed plaintiff's copyright.

If, on the other hand, the plaintiff has failed to prove any of these elements, your verdict should be for the defendant.

Given_____
Given as Modified _____
Withdrawn _____
Refused _____

1

## PROOF OF SERVICE

2

    I am employed in the County of Kern, State of California.  I am over the age of 18 and not a

3

party to the within action; my business address is 1925 G Street, Bakersfield, California.

4

On February 16, 2010, I served the foregoing document entitled **JOINT JURY INSTRUCTIONS** on

5

interested parties in this action:

6

James J. Braze, Esq.
Jeffrey A. Travis, Esq.

7

Borton Petrini & Conron
5060 California Avenue, Suite 700

8

Bakersfield, CA 93303-2026

9

Email address: jbraze@bortonpetrini.com
Email address: jtravis@bortonpetrini.com

10

11

Chaka Chuba Okadigbo, Esq.
Garcia Caledron Ruiz

12

50 S. Grand Avenue, Suite 1100
Los Angeles, CA 90071

13

Email address: cokadigbo@gerlegal.com

Steven John Hassing, Esq.
Law Offices of Steven J. Hassing
425 Calabria Court
Roseville, CA 95747
Email address: stevehassing@yahoo.com

14

15

\_\_\_\_    BY MAIL.  I am "readily familiar" with the firm's practice of collection and processing
correspondence for mailing.  Under that practice it would be deposited with the U.S. postal service on

16

that same day with postage thereon fully prepaid at Bakersfield, California in the ordinary course of
business.  The above sealed envelopes were placed for collection and mailing on the above date

17

following ordinary business practice.

18

XX    BY ELECTRONIC SERVICE.  Pursuant to Fed. R. Civ.P. 5(b)(2)(E) and Local Court

19

Rule(s), the foregoing document will be served by the court via CM/ECF.  Pursuant to the CM/ECF
docket for this case proceeding the following person(s) are on the Electronic Mail Notice List to

20

receive ECF transmission at the email address(es) indicated above.

21

Executed on February 16, 2010, at Bakersfield, California.

22

 X   (Federal)  I declare that I am employed in the office of a member of the bar of this court at whose

23

direction the service was made.

24

   /s/    Diane Ruff       
   DIANE RUFF

25

26

27

28

Alexander & Associates
Attorneys at Law
1925 G Street
Bakersfield, CA 93301
(661) 316-7888

2        Case No. 1:07-CV-01080 LJO-GSA

STIPULATED JOINT JURY INSTRUCTIONS

# EXHIBIT 41

**William L. Alexander** (State Bar Number 126607)
**Tenielle E. Cooper** (State Bar Number 226717)
Alexander & Associates, PLC
1925 G Street
Bakersfield, CA  93301
Phone:  (661) 316-7888
Fax:  (661) 316-7890

**Attorneys for Defendant, Dennis W. DeWalt, Inc.**

## UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA, FRESNO DIVISION

| | |
|---|---|
| ROGER McINTOSH,<br><br>              Plaintiff,<br><br>vs.<br><br>NORTHERN CALIFORNIA UNIVERSAL<br>ENTERPRISES COMPANY, a California<br>Corporation, et al,<br><br>              Defendants. | ) Case No.  1:07-CV-01080 LJO-GSA<br>)<br>) ***AMENDED***<br>) **STIPULATED VERDICT FORMS**<br>)<br>)<br>) Date:        March 1, 2010<br>) Time:        8:30 a.m.<br>) Courtroom: 4<br>) Judge:       Hon. Lawrence J. O'Neill<br>)<br>)<br>) |

The parties, and each of them, submit the attached as their stipulated verdict forms for the above-referenced trial.  Attached as Exhibit "A" is the verdict form for the liability phase of the trial, and attached as Exhibit "B" is the proposed verdict form for the damages phase of the trial.

However, the parties are currently working toward a stipulation to no longer bifurcate this matter.

DATED:  February 16, 2010

ALEXANDER & ASSOCIATES, PLC
By:  ____/s/ Tenielle E. Cooper____
TENIELLE E. COOPER,
Attorneys for Defendant, Dennis W.
DeWalt, Inc.

Alexander & Associates
Attorneys at Law
1925 G Street
Bakersfield, CA 93301
(661) 316-7888

1

Case No. 1:07-CV-01080 LJO-GSA
*AMENDED* STIPULATED VERDICT FORMS

# EXHIBIT "A"

# VERDICT FORM

## OWNERSHIP OF THE COPYRIGHT

1.     Has plaintiff, ROGER McINTOSH, proven by a preponderance of the evidence that he owned the copyright to the Tentative Map for Tract 5472?

YES_____          NO_____

2.     Has plaintiff, ROGER McINTOSH, proven by a preponderance of the evidence that he owned the copyright to the Improvement Plans for Tract 5472?

YES_____          NO_____

If your response to Question Nos. 1 and 2 is NO, please sign, date and return this verdict form to the marshal or bailiff.  Thank you for your service.

If your response to Question No. 1 or 2i s YES, please continue to Question No. 3.

## COPYRIGHT INFRINGEMENT

3.     Has plaintiff, ROGER McINTOSH, proven by a preponderance of the evidence that defendant DENNIS W. DeWALT, INC. copied plaintiff's Tentative Map 5472 for Tract 5472?

YES_____          NO_____

4.     Has plaintiff, ROGER McINTOSH, proven by a preponderance of the evidence that defendant DENNIS W. DeWALT, INC. copied plaintiff's Improvement Plans for Tract 5472?

YES_____          NO_____

1

5.     Has plaintiff, ROGER McINTOSH, proven by a preponderance of the evidence that defendant NORTHERN CALIFORNIA UNIVERSAL ENTERPRISES, INC. copied plaintiff's Tentative Map 5472 for Tract 5472?

      YES_____          NO_____

6.     Has plaintiff, ROGER McINTOSH, proven by a preponderance of the evidence that defendant NORTHERN CALIFORNIA UNIVERSAL ENTERPRISES, INC. copied plaintiff's Improvement Plans for Tract 5472?

      YES_____          NO_____

7.     Has plaintiff, ROGER McINTOSH, proven by a preponderance of the evidence that defendant LOTUS DEVELOPMENTS, LP copied plaintiff's Tentative Map 5472 for Tract 5472?

      YES_____          NO_____

8.     Has plaintiff, ROGER McINTOSH, proven by a preponderance of the evidence that defendant LOTUS  DEVELOPMENTS, LP copied plaintiff's Improvement Plans for Tract 5472?

      YES_____          NO_____

9.     Has plaintiff, ROGER McINTOSH, proven by a preponderance of the evidence that defendant THE CITY OF WASCO copied plaintiff's Tentative Map 5472 for Tract 5472?

      YES_____          NO_____

2

10.     Has plaintiff, ROGER McINTOSH, proven by a preponderance of the evidence that defendant THE CITY OF WASCO copied plaintiff's Improvement Plans for Tract 5472?


         YES_____          NO_____


         If your responses to Questions 3, 4, 5, 6, 7, 8, 9, and 10 were NO, please sign, date and return this verdict form to the marshal or bailiff.  Thank you for your service.

         If your response to any of Questions  3, 4, 5, 6, 7, 8, 9 or 10 were YES, please continue to Question No. 10, below.


## CONTRIBUTORY COPYRIGHT INFRINGEMENT BY THE CITY OF WASCO


11.     If you found that any or all of the defendants copied plaintiff's work, has plaintiff proven by a preponderance of the evidence that defendant, THE CITY OF WASCO, knew or had reason to know of the infringing activity by the other defendants, if any?


         YES_____           NO_____


12.     If you found that any or all of the defendants copied plaintiff's work, has plaintiff proven by a preponderance of the evidence that defendant, The CITY OF WASCO, intentionally and materially contributed to any infringement by any of the other defendants?


         YES_____           NO_____


3

## VICARIOUS COPYRIGHT INFRINGEMENT

13.    Has plaintiff, ROGER McINTOSH, proven by a preponderance of the evidence that THE CITY OF WASCO profited directly from any copying of the plaintiff's work (either/or Tentative Map 5472 or Improvement Plans for Tract 5472) done by any of the defendants?

YES_____          NO_____

14.    Has plaintiff, ROGER McINTOSH, proven by a preponderance of the evidence, that THE CITY OF WASCO had the right and ability to supervise or control the other defendants from copying plaintiff's work?

YES_____          NO_____

15.    Has plaintiff, ROGER McINTOSH, proven by a preponderance of the evidence, that THE CITY OF WASCO failed to exercise that right and ability to supervise or control the other defendants from copying plaintiff's work?

YES_____          NO_____

16.    Has plaintiff, ROGER McINTOSH, proven by a preponderance of the evidence that the DENNIS W. DeWALT, INC. profited directly from any copying of the plaintiff's work done by any of the defendants?

YES_____          NO_____

4

17.    Has plaintiff, ROGER McINTOSH, proven by a preponderance of the evidence, that DENNIS W. DeWALT, INC. had the right and ability to supervise or control the other defendants from copying plaintiff's work?

YES_____          NO_____

18.    Has plaintiff, ROGER McINTOSH, proven by a preponderance of the evidence, that DENIS W. DeWALT, INC. failed to exercise that right and ability to supervise or control the other defendants from copying plaintiff's work?

YES_____          NO_____

19.    Has plaintiff, ROGER McINTOSH, proven by a preponderance of the evidence that NORTHERN CALIFORNIA UNIVERSAL ENTERPRISES, INC. profited directly from any copying of the plaintiff's work done by any of the defendants?

YES_____          NO_____

20.    Has plaintiff, ROGER McINTOSH, proven by a preponderance of the evidence, that NORTHERN CALIFORNIA UNIVERSAL ENTERPRISES, INC. had the right and ability to supervise or control the other defendants from copying plaintiff's work?

YES_____          NO_____

5

21.     Has plaintiff, ROGER McINTOSH, proven by a preponderance of the evidence, that
NORTHERN CALIFORNIA UNIVERSAL ENTERPRISES, INC. failed to exercise that right
and ability to supervise or control the other defendants from copying plaintiff's work?

YES_____                              NO_____


22.     Has plaintiff, ROGER McINTOSH, proven by a preponderance of the evidence that
LOTUS DEVELOPMENTS, LLP profited directly from any copying of the plaintiff's work
done by any of the defendants?

YES_____                              NO_____


23.     Has plaintiff, ROGER McINTOSH, proven by a preponderance of the evidence, that
LOTUS DEVELOPMENTS, LLP had the right and ability to supervise or control the other
defendants from copying plaintiff's work?

YES_____                              NO_____


24.     Has plaintiff, ROGER McINTOSH, proven by a preponderance of the evidence, that
LOTUS DEVELOPMENTS, LLP failed to exercise that right and ability to supervise or control
the other defendants from copying plaintiff's work?

YES_____                              NO_____

Please sign, date and return this verdict form to the marshal or bailiff.  Thank you for your service.

# EXHIBIT "B"

## DAMAGES VERDICT FORM

A copyright owner is entitled to recover the actual damages suffered as a result of the copyright infringement.   Actual damages is the amount a willing buyer would have been reasonably required to pay a willing seller at the time of the infringement for the actual use made by the defendant(s) of the plaintiff's work.

1.      What are the actual damages plaintiff is entitled to?  (This is the amount of money you will be awarding to plaintiff, ROGER McINTOSH.)


        $_____


2.      Did any of the defendants obtain a profit attributable to their infringing activity?


        YES_____               NO_____


        If you answered NO to Question No. 2, please sign, date, and return this verdict form to the marshal or bailiff.  Thank you for your service.

        If you answered YES to Question No. 2, please continue.


3.      Did defendant DENNIS W. DeWALT, INC. obtain a profit from its infringing activity?


        YES_____               NO_____


1

4.    If you answered YES to Question No. 3, what was the amount of DENNIS W. DeWALT, INC.'s profit?

$\underline{\hspace{5cm}}

5.    Did defendant NORTHERN CALIFORNIA UNIVERSAL ENTERPRISES, INC. obtain a profit from its infringing activity?

YES\underline{\hspace{3cm}}          NO\underline{\hspace{3cm}}

6.    If you answered YES to Question No. 5, what was the amount of NORTHERN CALIFORNIA UNIVERSAL ENTERPRISES, INC.'s profit?

$\underline{\hspace{5cm}}

7.    Did defendant LOTUS DEVELOPMENTS, LP. obtain a profit from its infringing activity?

YES\underline{\hspace{3cm}}          NO\underline{\hspace{3cm}}

8.    If you answered YES to Question No. 7, what was the amount of LOTUS DEVELOPMENTS, LP's profit?

$\underline{\hspace{5cm}}

9.    Did defendant THE CITY OF WASCO obtain a profit from its infringing activity?

YES_____            NO_____

10.     If you answered YES to Question No. 9, what was the amount of THE CITY OF
WASCO's profit?

$_____

1

### PROOF OF SERVICE

2

3    I am employed in the County of Kern, State of California.  I am over the age of 18 and not a party to the within action; my business address is 1925 G Street, Bakersfield, California.

4

5    On February 17, 2010, I served the foregoing document entitled *AMENDED* **STIPULATED VERDICT FORMS** on interested parties in this action:

6    James J. Braze, Esq.                    Steven John Hassing, Esq.
     Jeffrey A. Travis, Esq.                 Law Offices of Steven J. Hassing
7    Borton Petrini & Conron                 425 Calabria Court
     5060 California Avenue, Suite 700        Roseville, CA 95747
8    Bakersfield, CA 93303-2026              Email address: stevehassing@yahoo.com
     Email address: jbraze@bortonpetrini.com
9    Email address: jtravis@bortonpetrini.com

10

11   Chaka Chuba Okadigbo, Esq.
     Garcia Caledron Ruiz
12   50 S. Grand Avenue, Suite 1100
     Los Angeles, CA 90071
13   Email address: cokadigbo@gerlegal.com

14

15   ____   BY MAIL.  I am "readily familiar" with the firm's practice of collection and processing correspondence for mailing.  Under that practice it would be deposited with the U.S. postal service on that same day with postage thereon fully prepaid at Bakersfield, California in the ordinary course of business.  The above sealed envelopes were placed for collection and mailing on the above date following ordinary business practice.

16

17

18   XX   BY ELECTRONIC SERVICE.  Pursuant to Fed. R. Civ.P. 5(b)(2)(E) and Local Court Rule(s), the foregoing document will be served by the court via CM/ECF.  Pursuant to the CM/ECF docket for this case proceeding the following person(s) are on the Electronic Mail Notice List to receive ECF transmission at the email address(es) indicated above.

19

20

21   Executed on February 17, 2010, at Bakersfield, California.

22

23    X   (Federal)  I declare that I am employed in the office of a member of the bar of this court at whose direction the service was made.

24                            /s/     Diane Ruff
                              DIANE RUFF
25

26

27

28

Alexander & Associates
Attorneys at Law
1925 G Street
Bakersfield, CA 93301
(661) 316-7898

2                    Case No. 1:07-CV-01080 LJO-GSA
*AMENDED* STIPULATED VERDICT FORMS

# EXHIBIT  42

# FILED

MAR 1 0 2010

CLERK, U.S. DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA
BY _____
DEPUTY CLERK

# IN THE UNITED STATES DISTRICT COURT

# FOR THE EASTERN DISTRICT OF CALIFORNIA

ROGER McINTOSH,

               Plaintiff,

vs.

NORTHERN CALIFORNIA
UNIVERSAL ENTERPRISES,
INC., LOTUS DEVELOPMENTS,
LP, THE CITY OF WASCO,
AND DENNIS W. DeWALT,
INC.,

               Defendants.

CASE NO. CV F 07-1080 LJO GSA

**VERDICT**

We, the jury, unanimously find the following, by a **preponderance of the evidence**:

## COPYRIGHT INFRINGEMENT

**Question No. 1:**

    Did defendant Dennis W. DeWalt, Inc. copy plaintiff Roger McIntosh's Tentative Map for Tract 5472?

YES _____✓_____

NO _____

Proceed to Question No. 2.

1

1    **Question No. 2:**

2        Did defendant Dennis W. DeWalt, Inc. copy plaintiff Roger McIntosh's Improvement Plans for

3    Tract 5472?

4    YES_____

5    NO_____✓_____

6    Proceed to Question No. 3.

7    **Question No. 3:**

8        Did defendant Northern California Universal Enterprises, Inc. copy plaintiff Roger McIntosh's

9    Tentative Map for Tract 5472?

10   YES_____✓_____

11   NO_____

12   Proceed to Question No. 4.

13   **Question No. 4:**

14       Did defendant Northern California Universal Enterprises, Inc. copy plaintiff Roger McIntosh's

15   Improvement Plans for Tract 5472?

16   YES_____

17   NO_____✓_____

18   Proceed to Question No. 5.

19   **Question No. 5:**

20       Did defendant Lotus Developments, LP copy plaintiff Roger McIntosh's Tentative Map for Tract

21   5472?

22   YES_____✓_____

23   NO_____

24   Proceed to Question No. 6.

25   / / /

26   / / /

27   / / /

28   / / /

2

**Question No. 6:**

Did defendant Lotus Developments, LP copy plaintiff Roger McIntosh's Improvement Plans for Tract 5472?

YES_____

NO_____✓_____

Proceed to Question No. 7.

**Question No. 7:**

Did defendant City of Wasco copy plaintiff Roger McIntosh's Tentative Map for Tract 5472?

YES_____✓_____

NO_____

Proceed to Question No. 8.

**Question No. 8:**

Did defendant City of Wasco copy plaintiff Roger McIntosh's Improvement Plans for Tract 5472?

YES_____✓_____

NO_____

If you answered "yes" to any of Question Nos. 1-8, proceed to Question No. 9.

If you answered "no" to all of Question Nos. 1-8, stop here, answer no further questions, and have your presiding juror date and sign this form.

**CONTRIBUTORY COPYRIGHT INFRINGEMENT**

**BY DEFENDANT CITY OF WASCO**

**Question No. 9:**

Did defendant City of Wasco know or have reason to know of the infringing activity by the other defendants, if any?

YES_____✓_____

NO_____

If you answered "yes" to Question No. 9, proceed to Question No. 10.

If you answered "no" to Question No. 9, proceed to Question No. 11.

3

**Question No. 10:**

Did defendant City of Wasco intentionally and materially contribute to any infringement by any of the other defendants?

YES_____✓_____

NO_____

Proceed to Question No. 11.

## VICARIOUS COPYRIGHT INFRINGEMENT

**Question No. 11:**

Did defendant City of Wasco profit directly from any copying of plaintiff Roger McIntosh's work (either the Tentative Map for Tract 5472 or Improvement Plans for Tract 5472) done by any of the other defendants?

YES_____✓_____

NO_____

If you answered "yes" to Question No. 11, proceed to Question No. 12.

If you answered "no" to Question No. 11, proceed to Question No. 14.

**Question No. 12:**

Did defendant City of Wasco have the right and ability to supervise or control the other defendants' copying of plaintiff Roger McIntosh's work?

YES_____✓_____

NO_____

If you answered "yes" to Question No. 12, proceed to Question No. 13.

If you answered "no" to Question No. 12, proceed to Question No. 14.

**Question No. 13:**

Did defendant City of Waco fail to exercise that right and ability to supervise or control the other defendants' copying of plaintiff Roger McIntosh's work?

YES_____✓_____

NO_____

Proceed to Question No. 14.

**Question No. 14:**

Did defendant Dennis W. DeWalt, Inc. profit directly from any copying of plaintiff Roger McIntosh's work done by any of the other defendants?

YES_____

NO_____✓_____

If you answered "yes" to Question No. 14, proceed to Question No. 15.

If you answered "no" to Question No. 14, proceed to Question No. 17.

**Question No. 15:**

Did defendant Dennis W. DeWalt, Inc. have the right and ability to supervise or control the other defendants' copying of plaintiff Roger McIntosh's work?

YES_____

NO_____

If you answered "yes" to Question No. 15, proceed to Question No. 16.

If you answered "no" to Question No. 15, proceed to Question No. 17.

**Question No. 16:**

Did defendant Dennis W. DeWalt, Inc. fail to exercise that right and ability to supervise or control the other defendants' copying of plaintiff's work?

YES_____

NO_____

Proceed to Question No. 17.

**Question No. 17:**

Did defendant Northern California Universal Enterprises, Inc. profit directly from any copying of plaintiff Roger McIntosh's work done by any of the other defendants?

YES_____✓_____

NO_____

If you answered "yes" to Question No. 17, proceed to Question No. 18.

If you answered "no" to Question No. 17, proceed to Question No. 20.

///

5

**Question No. 18:**

Did defendant Northern California Universal Enterprises, Inc. have the right and ability to supervise or control the other defendants' copying of plaintiff Roger McIntosh's work?

YES_____✔_____

NO_____

If you answered "yes" to Question No. 18, proceed to Question No. 19.

If you answered "no" to Question No. 18, proceed to Question No. 20.

**Question No. 19:**

Did defendant Northern California Universal Enterprises, Inc. fail to exercise that right and ability to supervise or control the other defendants' copying of plaintiff Roger McIntosh's work?

YES_____✔_____

NO_____

Proceed to Question No. 20.

**Question No. 20:**

Did defendant Lotus Developments, LP profit directly from any copying of plaintiff Roger McIntosh's work done by any of the other defendants?

YES_____✔_____

NO_____

If you answered "yes" to Question No. 20, proceed to Question No. 21.

If you answered "no" to Question No. 20, proceed to Question No. 23.

**Question No. 21:**

Did defendant Lotus Developments, LP have the right and ability to supervise or control the other defendants' copying of plaintiff Roger McIntosh's work?

YES_____✔_____

NO_____

If you answered "yes" to Question No. 21, proceed to Question No. 22.

If you answered "no" to Question No. 21, proceed to Question No. 23.

///

6

**Question No. 22:**

Did defendant Lotus Development, LP fail to exercise that right and ability to supervise or control the other defendants' copying of plaintiff Roger McIntosh's work?

YES_____✔_____

NO_____

Proceed to Question No. 23.

## DAMAGES

**Question No. 23:**

What is the total amount of actual damages plaintiff Roger McIntosh is entitled to? (This is the amount of money you will be awarding plaintiff Roger McIntosh.)

$___1.4 million___

Proceed to Question No. 24.

**Question No. 24:**

Did defendant Dennis W. DeWalt, Inc. obtain a profit from its infringing activity?

YES_____

NO_____✔_____

If you answered "yes" to Question No. 24, proceed to Question No. 25.

If you answered "no" to Question No. 24, proceed to Question No. 26.

**Question No. 25:**

What was the amount of defendant Dennis W. DeWalt, Inc.'s profit?

$_____

Proceed to Question No. 26.

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

1  **Question No. 26:**

2      Did defendant Northern California Universal Enterprises, Inc. obtain a profit from its infringing

3  activity?

4  YES_____✓_____

5  NO_____

6  If you answered "yes" to Question No. 26, proceed to Question No. 27.

7  If you answered "no" to Question No. 26, proceed to Question No. 28.

8  **Question No. 27:**

9      What was the amount of defendant Northern California Universal Enterprises, Inc.'s profit?

10  $ *1,992,107.50*_____

11  Proceed to Question No. 28.

12  **Question No. 28:**

13      Did defendant Lotus Developments, LP obtain a profit from its infringing activity?

14  YES____✓_____

15  NO_____

16  If you answered "yes" to Question No. 28, proceed to Question No. 29.

17  If you answered "no" to Question No. 28, proceed to Question No. 29.

18  **Question No. 29:**

19      What   was   the   amount   of   defendant   Lotus   Developments,   LP's   profit?

20  $ *1,992,107.50*_____

21  Proceed to Question No. 30.

22  **Question No. 30:**

23      Did defendant City of Wasco obtain a profit from its infringing activity?

24  Yes____✓_____

25  No_____

26  If you answered "yes" to Question No. 30, proceed to Question No. 31.

27  If you answered "no" to Question No. 30, proceed to Question No. 32.

28  ///

8

1  **Question No. 31:**

2        What was the amount of defendant City of Wasco's profit?

3  $ _____ 1.5 million _____

4  **Question No. 32:**

5  If you entered an amount more than $0 in response to Question No. 27, answer Question No. 32.

6  If you did not enter an amount in response to Question No. 27, proceed to Question No. 33.

7        In committing infringing activity, did defendant Northern California Universal Enterprises, Inc.

8  act as a partner or practically partner with defendant Lotus Developments, LP?

9                      Yes __✓__

10                      No _____

11  Proceed to Question No. 33.

12  **Question No. 33:**

13  If you entered an amount more than $0 in response to Question No. 29, answer Question No. 33.

14  If you did not enter an amount in response to Question No. 29, stop here, answer no further questions,

15  and have your presiding juror date and sign this form.

16        In committing infringing activity, did defendant Lotus Developments, LP act as a partner or

17  practically partner with defendant Northern California Universal Enterprises, Inc.?

18                      Yes __✓__

19                      No _____

20  Please have the presiding juror date and sign this form.

21

22

23  DATED:      March 10 , 2010          _[signature]_

24                                       PRESIDING JUROR

25

26        After this form has been dated and signed, please use a "Note From The Jury" to inform the

27  Court that you have reached a unanimous verdict.

28

# EXHIBIT   43

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

HON. LAWRENCE J. O'NEILL

ROGER McINTOSH,                     )
                                    )   1:07-cv-1080 LJO
            Plaintiff,              )
                                    )   JURY TRIAL, DAY 1
      vs.                           )
                                    )
NORTHERN CALIFORNIA                 )
UNIVERSAL ENTERPRISES               )
COMPANY, a California               )
corporation, et al.,                )
                                    )
            Defendants.             )
_____    )

Fresno, California              Monday, March 1, 2010


REPORTER'S TRANSCRIPT OF PROCEEDINGS




Vol. 1, pgs. 1 to 233, inclusive


REPORTED BY:  PEGGY J. CRAWFORD, RDR, CRR, Official Reporter

APPEARANCES OF COUNSEL:

For the Plaintiff:                    LAW OFFICES OF BORTON PETRINI, LLP
                                      5060 California Avenue
                                      Suite 700
                                      Bakersfield, CA 93309
                                      BY:  JAMES J. BRAZE
                                           JEFFREY A. TRAVIS


For the Defendants:

(Northern/Lotus)                      LAW OFFICES OF STEVEN J. HASSING
                                      425 Calabria Court
                                      Roseville, CA 95747
                                      BY:  STEVEN J. HASSING


(DeWalt)                              ALEXANDER & ASSOCIATES, PLC
                                      1925 G Street
                                      Bakersfield, CA 93301
                                      BY:  WILLIAM L. ALEXANDER


(City of Wasco)                       GCR, LLP
                                      520 South Grand Avenue
                                      Suite 695
                                      Los Angeles, CA 90071
                                      BY:  CHAKA C. OKADIGBO
                                           SUSAN GRAHAM BARNES

3

## INDEX

**PLAINTIFF'S WITNESSES:**

ROGER MCINTOSH                                                161
DIRECT EXAMINATION BY MR. BRAZE                              161
VOIR DIRE EXAMINATION BY MR. HASSING                         189
VOIR DIRE EXAMINATION BY MR. OKADIGBO                        199
FURTHER DIRECT EXAMINATION BY MR. BRAZE                      205
CROSS-EXAMINATION BY MR. HASSING                             213

\* \* \* \* \*

## EXHIBITS

**PLAINTIFF'S**                                            Received

P 110                                                         172
P 108, Page 436                                               179

1        THE COURT:   Okay.

2    BY THE COURT:

3    Q.   Juror 004?

4    A.   Yes.  Juror 004, (spelling redacted.)  I live in Clovis,

5    California.  I have a college degree in intercultural child

6    development.  I do not work outside the home.  I home-school

7    two of our three boys.  My husband is a consultant for a

8    medical computer company based out of Chicago.

9        THE COURT:   Thank you.

10   BY THE COURT:

11   Q.   Juror 022, and could you speak out?  You have a very low

12   voice, light voice, and could you speak out a little bit

13   louder so we can make sure everybody hears you?

14   A.   My name is Juror 022.  I live in Valley Springs,

15   California.  I went to college, but didn't graduate.  My

16   wife -- I am a general contractor.  My wife works as assistant

17   to the Dean of Rudolf Steiner College in Sacramento.

18   Q.   Anything else?

19   A.   That's it.

20   Q.   Adult children?

21   A.   No.

22       THE COURT:   Thanks.

23   BY THE COURT:

24   Q.   Juror 006?

25   A.   Juror 006, (spelling redacted.)  I live in Fresno.

1      JUROR:  I raised my hand that we have had two homes

2  built.

3      MR. HASSING:  On either of those occasions, did you

4  have any kind of problem with the builder?

5      JUROR:  We didn't.

6      MR. HASSING:  You did not?

7      JUROR:  Our second home was by the same builder and

8  it was just fine.

9      MR. HASSING:  I would like to ask you, Juror 001,

10 your husband worked for KB Homes for sometime.

11     JUROR:  Yes.

12     MR. HASSING:  Did he work for any builders prior to

13 that?

14     JUROR:  Anderson Homes, in Los Banos.

15     MR. HASSING:  How long did he work for Anderson?

16     JUROR:  Two years.

17     MR. HASSING:  Did you learn of any facts from your

18 husband because of his employment that would cause you to be

19 biased against a home builder?

20     JUROR:  No.

21     MR. HASSING:  Juror 012, just a couple of questions.

22 I understand that you know Mr. Braze's wife?

23     JUROR:  Yes.

24     MR. HASSING:  You see her at the courthouse from time

25 to time?

1  have agreed.

2          If lawyers agree in this case, I will make it very

3  clear that they have agreed.  You won't have to guess whether

4  or not there was an agreement.  In reaching your verdict, you

5  may not consider things that are not evidence.  You may

6  consider only the testimony and exhibits received into

7  evidence.

8          The things that are not evidence and that you may not

9  consider in deciding what the facts are include arguments and

10  statements by lawyers.  The lawyers themselves, remember, are

11  not witnesses.  What they will say in their opening statements

12  or in their closing arguments and at any other time is

13  intended to help you interpret the evidence, but it is not

14  itself evidence.

15          If the facts as you remember them differ from the way

16  the lawyers have stated them, your memory controls.  Questions

17  and objections by lawyers are not evidence.  Attorneys have a

18  duty to their clients to object when they believe a question

19  is improper under the rules of evidence.

20          You should not be influenced by the objection or by

21  the Court's ruling on that objection.

22          Testimony that's been excluded or stricken or that

23  you have been instructed to disregard is not evidence and must

24  not be considered by you.

25          Sometimes testimony and exhibits are received only

1    bring back a verdict in favor of DeWalt and to conclude that

2    even if -- that -- excuse me, that 6451 is not substantially

3    similar, but even if it is, because it was independently

4    created, McIntosh is entitled to nothing.

5         Thank you very much.

6         THE COURT:  All right.  We are ready for the first

7    witness, please.

8         MR. BRAZE:  Yes, your Honor.  We would call Roger

9    McIntosh.

10        THE COURT:  All right.

11                      **ROGER MCINTOSH,**

12   called as a witness on behalf of the Plaintiff, having been

13   first duly sworn, testified as follows:

14        THE COURT:  Please take the witness stand right here,

15   and, once you do, please tell us who you are.

16        THE WITNESS:  My name is Roger McIntosh.

17                     DIRECT EXAMINATION

18   BY MR. BRAZE:

19   Q.  Good afternoon, Mr. McIntosh.  You are the plaintiff in

20   this case, are you not?

21   A.  Yes, I am.

22   Q.  And can you give us a brief summary of your educational

23   background after high school?

24   A.  I have an Associate's degree in Construction Technology

25   from Iowa State University.

1          MR. TRAVIS:  That's it.  The enlargement is 131.

2          MR. BRAZE:  J 128.

3          MR. ALEXANDER:  Thank you.

4          MR. BRAZE:  Do we have an easel around?

5          THE CLERK:  It's in the back.

6          THE COURT:  I think we do.  We will get it.

7          MR. BRAZE:  Maybe I can borrow this chair for a

8    moment.

9          THE COURT:  Sure.

10   BY MR. BRAZE:

11   Q.  I want to talk to you for a moment about the work that

12   goes into coming up with one of these tentative maps.  And

13   counsel was correct in that when you started out, this was

14   just bare land, right?

15   A.  That's correct.  It was a vacant piece of property.

16   Q.  And so what do you have to do to get to this tentative

17   map?

18   A.  To get to that tentative map, we were under contract with

19   The Legacy Group to perform general plan amendments, zone

20   changes, master studies, to develop a much larger piece of

21   property, but all of that work had to go into the larger piece

22   of property before we could get to the first tentative tract.

23   Q.  And are these papers here, which I believe we have

24   identified as P 108, and all the drawings and maps that are

25   contained in P 108, are those documents that you had to

1    prepare in order to get to the tentative map?

2    A.  I haven't seen what's in those tubes.

3    Q.  Let me put the exhibits in front of you.

4         Well, let's come back.  We will look for P 108 and

5    see if we can find it.

6         Let me show you what's been marked as J 24, and

7    again, "J" indicates it is a Joint Exhibit.

8         MR. ALEXANDER:  24 or 124?

9         MR. BRAZE:  24.

10        MR. ALEXANDER:  Thank you.

11   BY MR. BRAZE:

12   Q.  Is that your contract with Legacy Group to develop the

13   Valley Rose Subdivision?

14   A.  This is -- this is our contract with Michael Brown, who

15   was acting as The Legacy Group, yes.

16   Q.  And when did you enter into that contract?

17   A.  That was entered into on March 26, 1992.

18   Q.  Let me show you what's been marked as P 108.  It's

19   Plaintiff's Exhibit 108.  Are all those the drawings and

20   improvement plans that you prepared in order to prepare the

21   tract map, the tentative map?

22   A.  These are documents that we prepared leading up to the

23   preparation of that tentative map, yes.

24   Q.  And are those the documents, along with the tentative map

25   that you -- tentative tract map, that you also copyrighted?

1          MR. BRAZE:  Excuse me, 436.

2          MR. ALEXANDER:  What's the number?

3          THE COURT:  436.

4          MR. BRAZE:  436 of P 108.

5          MR. ALEXANDER:  Thank you.

6          THE WITNESS:  I'm sorry.  They start at 464 and go

7   to -- well, they are all mixed up.

8          MR. HASSING:  They are out of order.

9          THE WITNESS:  I will have to find it.  Excuse me.

10  What are you looking for?

11         MR. BRAZE:  Grading plan.

12         THE WITNESS:  They are not all numbered, so I will

13  have to find it.

14         (Pause for the witness to locate the exhibit.)

15  BY MR. BRAZE:

16  Q.  Let me let someone else look for that and we will move on

17  with your testimony.

18         Let me direct your attention to what has been

19  introduced into evidence as J 2.  And could you identify that

20  for the jury, please.

21  A.  That is a Staff Report prepared for Tentative Tract 5472

22  and put together by the City of Wasco.

23  Q.  On page 3 of that report, at paragraph 15, did the City of

24  Wasco select the street names to be used in the Tract 5472?

25  A.  Number 15 says, "Full street improvements shall be made to

1  Augusta Way, Pebble Beach Way, Sawgrass Court, St. Andrews

2  Lane and St. Augustine Way."

3           Those were the streets that were shown on the

4  Tentative Tract 5472.

5  Q.  Did you select where those street names went?

6  A.  Yes.

7  Q.  So in addition to this tentative map, you prepared what we

8  saw as Exhibit 108, what would you describe those as, the

9  improvement plans?

10  A.  Yes.  Page 2 of the Staff Report states that "Final

11  Subdivision Map must be in accordance with City ordinances and

12  the Subdivision Map Act."

13          And number 6 on page 2, "All required construction

14  shall be detailed on plans prepared by a Licensed Civil

15  Engineer and shall conform to City of Wasco's standards and

16  shall be subject to review and approval by the City Engineer."

17  Q.  I think we finally found it in Exhibit P 108.  It bears

18  the Bates number of 436.  What is that document, sir?

19  A.  That document is the grading plan for Tentative Tract

20  5472.  It is -- has my logo on it, Martin-McIntosh.

21  Q.  And did you prepare that document in order to prepare a

22  Tentative Tract 5472?

23  A.  This grading plan was prepared after the tentative tract

24  was approved by the City, by the Staff Report.  After the

25  tentative map is prepared, we go into the improvement plans,

169

1    grading plans, street plans, water, sewer, et cetera, that the

2    improvements actually get built on.

3    Q.   And if we look at tentative map, J 25, do you have those

4    in front of you?

5    A.   I believe so, yes.

6    Q.   That tentative tract map contains some mistakes, doesn't

7    it?

8    A.   I'm sorry.  Could you repeat that?

9    Q.   That tentative tract map contains some mistakes?

10             MR. HASSING:  Objection, leading, your Honor.

11             THE COURT:  To the form of the question, sustained.

12   BY MR. BRAZE:

13   Q.   Were there any mistakes on the tract map in naming the

14   streets?

15   A.   Excuse me.  J 25 is a tentative tract map done by a prior

16   engineer which doesn't reflect either my map -- it doesn't

17   reflect my tentative tract.

18   Q.   But there were still mistakes on the street names, weren't

19   they?

20             MR. HASSING:  Objection, leading, your Honor.

21             THE COURT:  Sustained as to the form.

22             THE WITNESS:  The tracts --

23             THE COURT:  Wait.  Sustained.  No question pending.

24   BY MR. BRAZE:

25   Q.   In the Staff Report that you just reviewed, J 2, it said

1   the name of the street was supposed to be Olympic Court,

2   wasn't it?

3   A.   I believe so.

4   Q.   And what was put on this revised tract map is Olympic

5   Close, isn't it, C-l-o-s-e?

6   A.   That's correct.

7   Q.   That's a mistake, isn't it?

8   A.   Yes.

9   Q.   And this street at the north of the tract map is named St.

10   Andrews Crescent, even though it is a street/road, and that

11   was supposed to be St. Andrews Lane, wasn't it?

12   A.   That's correct.

13   Q.   Now, if I could get you to take a look at your scope of

14   work changes with respect to the work you did on the Valley

15   Rose Subdivision, can you -- I will represent to you those are

16   contained at various exhibits, but summarized at Exhibit J 4.

17         Just for the record, the scope of work changes were

18   contained at J 1, J 32, J 41, J 44, J 46 through 50, J 53

19   through 60.

20         And as shown on Exhibit J 4, what was the amount of

21   work that you put in on Tract 4571 [sic] in preparing the

22   tract map and improvement plans?

23   A.   Could you repeat the number tract?

24   Q.   5471.

25   A.   5472?

1   Q.  Yeah.

2   A.  Well, there are a number of -- you want the total?

3   Q.  Yeah.

4   A.  There are a number of tasks that we prepared.

5   Q.  Sure.  The total?

6   A.  $1,149,910.28.

7   Q.  Is that the amount of work you expended getting the tract

8   map and associated improvement plans together before

9   everything stopped for construction of the subdivision?

10  A.  That's the amount that we had expended on the entire

11  project.  There were some other tracts, one other tract that

12  we never processed as a tentative, but the rest of it was for

13  the development to get to the first Tentative Tract 5472.

14  Q.  Do you have P 110 in front of you?

15        MR. HASSING:  I'm sorry?

16        MR. BRAZE:  P 110.

17        THE WITNESS:  Yes.

18  BY MR. BRAZE:

19  Q.  So in 1999, did you and Mr. Martin decide to part ways, if

20  you will?

21  A.  That's correct.

22  Q.  And what was the nature of your -- in general, the nature

23  of your agreement?

24  A.  We agreed to disagree.

25  Q.  Okay.  And did you agree to keep one part of the business

1   and he agreed to keep the other?

2   A.   Yes.

3   Q.   And what did you agree to keep?

4   A.   I agreed to keep all the property and assets and business

5   in California and Arizona, and he took the assets and business

6   in Nevada.

7   Q.   And do you have before you as Exhibit P 110 the agreement

8   whereby you were assigned all the assets in California?

9   A.   Yes.

10  Q.   Okay.

11           I would move to admit Exhibit P 110, your Honor.

12           THE COURT:   P 10?

13           MR. BRAZE:   P 110.

14           THE COURT:   Any objection?

15           MR. HASSING:   No objection, your Honor.

16           THE COURT:   It's received.

17           (Plaintiff's Exhibit P 110 was received.)

18  BY MR. BRAZE:

19  Q.   Now, prior to 1999, did Martin-McIntosh put a © on all of

20  its drawings?

21  A.   Yes, we had a practice of putting the copyright symbol on

22  all plans that we prepared.

23  Q.   And did Mr. Martin take any interest whatsoever in

24  anything in California with him?

25  A.   No.

1          person or persons, or misuse in any way any

2          confidential information, trade secret, copyright,

3          trademark, patent, or other intellectual property

4          right of the partnership, its affiliated companies or

5          of successors."  Et cetera et cetera.

6    Q.  And based on what you just read to us, is it your

7    understanding that you acquired all the right, title and

8    interest to any copyright in the plans, maps and drawings

9    associated with Tract 5472?

10   A.  That's correct.

11         MR. BRAZE:  If we have not already done so, your

12   Honor, I would like to move P 110 into evidence.

13         THE COURT:  It's already been received.

14         MR. BRAZE:  Thank you, your Honor.

15   BY MR. BRAZE:

16   Q.  Now, this tract apparently laid dormant for several years;

17   is that true?

18   A.  That's correct.

19   Q.  And Mr. Wu has testified that he called you in 2004; do

20   you recall that conversation?

21   A.  Yes, I do.

22   Q.  Do you recall what was said by Mr. Wu?

23   A.  He called, said he was buying the Valley Rose Subdivision

24   Tract 5472, and he wanted to know if I could redo the

25   tentative map because the original tentative tract had

1  expired.
2          And I told him that I would be willing to work with
3  him, but I was owed quite a bit of money on all the
4  improvement plans and the improvements that we had worked on
5  for The Legacy Group, and I told him it was around $300,000.
6  There had been interest accrued; that was it was then up to
7  $800,000.
8          And if he wanted me to work with him, I could give
9  him a proposal and we could go from there.
10 Q.   And what did Mr. Wu say in response?
11 A.   He said he would call me back.
12 Q.   Did he ever get back with you?
13 A.   No, he has never called me back.
14 Q.   Then at sometime, did you notice that there was activity
15 related to the 5472 tract?
16 A.   I'm sorry, could you repeat the question?
17 Q.   Sure.  At some point in time, did you notice that there
18 was activity associated with the 5472 tract?
19 A.   Yes.  I suspected that the City of Wasco was selling the
20 tract, probably to Mr. Wu, as he indicated, so I started
21 watching the agendas, the City Council agendas, to try to
22 determine if someone else was working on it.
23 Q.   Did you determine that somebody was?
24 A.   Yes.  It came through one of the agendas.  I believe it
25 was when the Final Map 6451 was being presented to the City

1  Council, sometime in late 2006.

2  Q.  And at some point in time, did you do a public records

3  request to get the information that was being utilized with

4  respect to this tract?

5  A.  Yes.  I had to, because they wouldn't give me information

6  when I went to the City of Wasco.

7  Q.  If you could look at P 101.  Is that the request you sent

8  to the City of Wasco for production of the documents

9  associated with that tract?

10  A.  Yes, it is.  I went to the City of Wasco in late 2006 and

11  asked for the plans that were being used for Tract 6451, and I

12  was not given that, so I filled out a records request after I

13  copyrighted the plans.

14  Q.  What did you receive?

15  A.  I received a disk from the City of Wasco with the new

16  Tract 6451 and all of my improvement plans that I had prepared

17  for Tract 5472.

18  Q.  So you received the new Map 6471 [sic]?

19  A.  6451.

20  Q.  And your improvement plans from 5472?

21  A.  Yes.  I received more than that, but that told me that

22  they were using my improvement plans to get Tract 6451

23  recorded.

24  Q.  Thereafter, did you consult with an attorney and have your

25  plans formally registered with the Copyright Office?

180

1          produced by consultant pursuant to this agreement

2          shall remain the property of consultant and may be

3          used by consultant without the consent of client.

4          Upon request and payment of the costs involved,

5          client is entitled to a copy of all papers, documents

6          and drawings provided client's account is paid

7          current."

8  Q.  At some point in time, did you compare your Tentative

9  Tract Map 5472 with Tentative Tract Map 6451?

10 A.  Yes, I did.

11 Q.  And were you ever advised at any time that there were any

12 street signs out there on the tract map?

13 A.  No.  I was not aware that the street signs existed at the

14 time that the tentative map was prepared.

15 Q.  Let me show you Tentative Tract Map 6451 that was prepared

16 by DeWalt.  And that map has the same mistake in the street

17 sign, doesn't it?

18          MR. HASSING:  Objection, leading, your Honor.

19          THE COURT:  Sustained.

20 BY MR. BRAZE:

21 Q.  What is the name of the street that I'm pointing to?

22 A.  I believe that's Olympic Close.

23 Q.  Olympic Close, identical to the Olympic Close you had on

24 Tract 5472?

25          MR. HASSING:  Objection, leading,

1          THE COURT:  Sustained.

2    BY MR. BRAZE:

3    Q.   Is that identical to the Olympic Close and the location

4    you had on 5472?

5    A.   Yes, it is.

6    Q.   And the top street on Map 6451 or the top road on 6451 is

7    named what?

8    A.   I believe that's St. Andrews Crescent.

9    Q.   Is that in the same location and identical to where it was

10   in Map 5472?

11   A.   Yes, it is.

12   Q.   And then we previously determined that most likely that

13   was a mistake because a street is not supposed to be called a

14   "Crescent," is it?

15          MR. HASSING:  Objection.  Leading, your Honor.

16          THE COURT:  Sustained.

17   BY MR. BRAZE:

18   Q.   In engineering, do you name streets Crescents?

19   A.   Not typically.

20   Q.   Is there anything about Tentative Map 5472 that makes you

21   believe that this was copied from your Tentative Map 5472?

22   A.   There is a note on the tentative map -- I believe it is

23   Note Number 1 -- that refers to Tentative Tract 5472.

24   Q.   Now, can we compare two tract maps, the tentatives?

25   A.   Sure.

1    Q.   Could I ask Mr. McIntosh to come down to point to the --

2         THE COURT:  Sure.  I just ask that you not situate

3    yourself in a situation the jury can't see, okay?

4         THE WITNESS:  Sure.

5         THE COURT:  You can stand up, if you want.

6    BY MR. BRAZE:

7    Q.   Now, let's talk about surveying, if you will.  Is it

8    possible for two surveyors to go out and survey the same line

9    and get the same identical bearing to the second?

10   A.   It's unlikely.  There are a number of factors that come

11   into play when you survey a line or a subdivision, such as

12   temperature, light waves.  You have environmental corrections

13   that are always different that I have never seen two surveyors

14   get the same exact information.

15   Q.   And can you point out some bearings on these two maps that

16   are identical?

17   A.   I believe this bearing of this line is identical to that

18   bearing.

19        There are slight differences between that tentative

20   map and this tentative.

21        There are, let's see here.  This bearing is the same.

22   Q.   To the second?

23   A.   Yes, to the second.

24   Q.   For the jury's convenience, "bearing," if you have a

25   circle, it is 360 degrees, right?

1  A.  Yes.

2  Q.  And so if it's a right angle, it's 90 degrees.  And so in

3  that 90, we would divide each degree, and then each degree is

4  divided into 60 minutes?

5  A.  Correct.

6  Q.  And each minute is divided into 60 seconds?

7  A.  Correct.

8  Q.  So a single degree would be divided into 120 -- excuse me,

9  360 -- 3600 seconds, correct?

10  A.  Correct.

11  Q.  So to get identical bearings within one second of each

12  other over a period of several hundred feet, is highly

13  unlikely?

14          MR. HASSING:  Objection, leading.

15          THE COURT:  Sustained.

16  BY MR. BRAZE:

17  Q.  Is it likely that two independent surveyors could go out

18  and get bearings identical to the second on distances of

19  several hundred feet?

20  A.  It's unlikely.  You asked me about other similarities.

21  Q.  Yes.

22  A.  I pointed out at Note Number 1, "This development contains

23  existing improvements built" --

24          THE REPORTER:  I'm sorry, "built"?

25          THE COURT:  Raise your voice, please.

1          THE WITNESS:  -- "built per Valley Rose Planned

2     Community Expired Tentative Tract 5472 and Associative

3     Approved Improvement Plans."

4     BY MR. BRAZE:

5     Q.   So per DeWalt's tentative tract map, they said they

6     incorporated the improvement plan; is that correct?

7          MR. HASSING:  Objection, leading.

8          THE COURT:  Sustained.

9     BY MR. BRAZE:

10    Q.   I guess what did you mean by that statement you just read?

11    A.   Well, the reference to Tract 5472 meant that the

12    improvements were in the ground.  They weren't a hundred

13    percent complete.  It had sat for several years, probably 15

14    years, and some of the street lights were shot out.

15         MR. HASSING:  Objection.  Nonresponsive, your Honor.

16         THE COURT:  Sustained.

17    BY MR. BRAZE:

18    Q.   Let's talk about lot numbering.  How does a engineer go

19    about numbering the lots in a subdivision?

20    A.   Typically, when we start the numbering system, we pick a

21    starting point and we number the lots consecutively through

22    the whole tract and come back to the end.

23         And so in this case, we started at Lot 1 here at the

24    intersection of Valley Rose Parkway and St. Andrews Crescent,

25    and went around the tract and through the tract and ended up

1   at Lot 68 here.

2          DeWalt started their numbering system same location,

3   went around the tract, through the numbers, and ended it up

4   with Lot 68 here.

5   Q.  In other words, their lot numbers are exactly the same lot

6   numbers that are contained on your plan?

7          MR. HASSING:  Objection, leading.

8          THE COURT:  Sustained.

9   BY MR. BRAZE:

10  Q.  Are the lot numbers exactly the same on Tract 6451 as they

11  are on Tract 5472?

12  A.  They had to be the same in order to use the improvement

13  plans for 5472, so yes.

14  Q.  Are the boundaries the same on the two maps?

15  A.  The boundaries are the same boundaries.  We set property

16  corners for the recordation of 5472 final map and we set

17  monuments.  They are called "street monuments."  There is a

18  street monument in the center of the cul-de-sacs and all the

19  street intersections, so there would be one at each of these

20  locations throughout the tract.  And I believe Mr. DeWalt used

21  those monuments for the survey of his Tentative Tract Map

22  6451.

23  Q.  Now, I would like to show you Tract Map -- Final Tract Map

24  6451, which was Exhibit --

25          MR. TRAVIS:  We are using J 127.

186

1              MR. BRAZE:  So J 127?

2              MR. TRAVIS:  Yes.

3    BY MR. BRAZE:

4    Q.  I would also like to show you page 436 of J 108, which is

5    your grading plan.  Have you compared your grading plan to

6    Tract Map Number 6451 drawn by DeWalt?

7    A.  Yes, I did.

8    Q.  Are there indications on there that they were identical

9    measurements, bearings?

10   A.  Yes, there is.  And what's odd about this is that this

11   grading plan bearings and dimensions, are exactly the same as

12   these bearings and dimensions on the final map.  But the

13   tentative map, as Mr. DeWalt prepared, is not even the same as

14   his final map.

15   Q.  Have you concluded that the final map is copied from your

16   grading plan?

17   A.  There is -- in my opinion, there is no way that any other

18   surveyor could have come up with the exact same bearings,

19   dimensions as my grading plan without having copied it.

20             MR. BRAZE:  Thank you.  You may return to your seat.

21             THE COURT:  Let us know when you have a natural break

22   in your questioning, please.

23             MR. BRAZE:  Now.

24             THE COURT:  Okay.  Ladies and gentlemen, let's take

25   15 minutes, midafternoon break.  And we will come back, we

1          MR. BRAZE:  Oh.

2                    VOIR DIRE EXAMINATION

3   BY MR. HASSING:

4   Q.  Mr. McIntosh, please take a look, if you would, at the

5   document contained within P 108 that bears Bates stamp number

6   BP 000466.  Are you there?

7   A.  Yes, I am.

8   Q.  Now, is it your testimony that this tentative tract map

9   just identified has something to do with 5472?

10  A.  As I testified earlier, these are the plans and documents

11  that we prepared for the larger property for Valley Rose

12  Estates, and many of these master plans and general plan

13  amendments, zoning maps, topography studies had to be prepared

14  to get to the first Tentative Tract 5472 except for that Tract

15  5618.

16  Q.  So your answer, then, would be no?

17  A.  My answer is the same as I testified earlier.  I guess the

18  answer is no.

19          MR. HASSING:  If I may just have a few moments, your

20  Honor, to see what else is in this exhibit.

21  BY MR. HASSING:

22  Q.  Mr. McIntosh, you just testified about a larger piece of

23  land that you had to do studies and development work on in

24  order to get to 5472, correct?

25  A.  That's correct.

1   Q.   And I'm showing you now the -- a copy of a parcel map that

2   I believe you prepared, 9572.  Did you prepare this parcel

3   map?

4   A.   Our firm, Martin-McIntosh, prepared the parcel map.

5   Q.   This parcel map depicts, does it not, the entire 480

6   acres, correct?

7   A.   It depicts the entire Valley Rose Estates project.

8   Q.   Which consists of about 480 acres, right?

9   A.   Approximately.

10  Q.   Because you have got a section of land here which is 640

11  acres?

12  A.   That's right.

13  Q.   And you have taken out about a quarter of a section for

14  the golf course, right?

15  A.   That's correct.

16  Q.   So that leaves three-quarters of a section, which is about

17  480, 485 acres?

18  A.   Most sections are about 480 acres, yes.

19  Q.   So what you are testifying to, then, with regard to P 108

20  is that you had to do certain studies for this entire 480 acre

21  parcel in order to eventually get down here into this 33-acre

22  parcel that we are talking about in this trial, right?

23  A.   That's correct.

24  Q.   Now, tell me why it is, sir, that you would have to do

25  studies for this entire area up here, including a major

1   subdivision over here, in order to develop a tract that's down

2   here close to the Paso Robles Highway?

3   A.  Well, the reason is that when you do a master planned

4   community, you don't want to under design any of your

5   infrastructure.  You don't want to undersize the sewers, you

6   don't want to undersize the water or any of the utilities, so

7   you have to study the entire project.  That way, you make sure

8   you don't bring in the first sewer line, for example, that may

9   run south to Highway 46, Paso Robles Highway, and it is too

10  small.

11          So the studies have to be done to take into account

12  the entire property, the entire project.  And then when you

13  start with the first tract, you know that you have all your

14  utilities and improvements correctly sized.  Otherwise, you

15  are putting in undersized utilities.

16  Q.  In P 108, what you have done is you have plans for an

17  intersection down here at Paso Robles Highway, right?

18  A.  I believe they are in there, yes.

19  Q.  And you have also got a master sewer plan that goes all

20  the way up and takes care of the whole 480 acres?

21  A.  I believe that's in there as well.

22  Q.  And a master drainage plan for the whole 480 acres?

23  A.  I believe that was done as well.

24          MR. HASSING:  Your Honor, I would restate my

25  objection, in that P 108 is in violation of a motion in

MCINTOSH - D

207

1    A.   Yes.  These documents applied to the entire 480-acre

2    master planned community.

3            THE COURT:  The objection on breadth is sustained.

4    BY MR. BRAZE:

5    Q.  Well, let's return.  Before our break, we were looking at

6    similarities between your grading plan and the final tract

7    map.  Maybe you can again come down here.

8    A.   Sure.  Do you want me to continue with the similarities?

9    Q.  Yes, let's go with the similarities between the two maps.

10   For instance --

11           MR. HASSING:  Your Honor, I want to object to this

12   line of questioning because at his deposition, when we tried

13   to find out these facts, Mr. McIntosh could only point to like

14   the street names and the lot numbers, I believe it was.

15           THE COURT:  Well, I think what I'm going to have to

16   do is I'm going to have to listen to the question and if there

17   is an objection and you have a part of the deposition you want

18   to point to as a discovery violation, I would be glad to look.

19           MR. HASSING:  Okay.

20           MR. BRAZE:  And Steve, these are similarities between

21   the grading plan and the final tract map.  I don't think --

22   anyway.

23   BY MR. BRAZE:

24   Q.  So if we continue.  For instance, can you look at the

25   intersection of St. Andrews Crescent and Valley Rose Parkway.

208

1  What is it at that intersection that leads you to believe the

2  map is similar?

3          THE COURT:  You are looking at J 127; is that

4  correct?

5          MR. BRAZE:  That's correct, your Honor.

6          THE WITNESS:  Well, at that intersection of

7  St. Andrews Crescent and Valley Rose Parkway, the bearing of

8  St. Andrews Crescent is North 89, 16'05" West.  And the

9  grading plan bearing is North 89 -- I'm sorry, South 89,

10  16'05" East, which is the opposite of northwest.  The bearings

11  to the degree, minute and seconds are exactly the same.

12          There is a curb --

13          MR. HASSING:  Your Honor, I want to object at this

14  point.  I found the deposition transcript pages where he

15  testifies to the similarities.

16          THE COURT:  Page and line that you are referring to

17  that is an indication that -- not an indication that there was

18  a different answer to this question, but the answer being that

19  he did not know.

20          MR. TRAVIS:  If I could get the deposition date?

21          THE COURT:  December 18, '08.  Is it that one or is

22  it the January 28 of '09?

23          MR. HASSING:  It is the December 18th.

24          THE COURT:  Okay.  Page and line?

25          (Counsel conferred off the record.)

1   Q.   Mr. McIntosh, if I could address your attention to the

2   intersection of St. Andrews Court and Valley Rose Parkway, is

3   there anything on that drawing that shows they are the same

4   between the final tract map and your grading plan?

5   A.   There is a curve that starts just south of St. Andrews

6   Crescent and goes to the north tract line, and that curve

7   information is shown on both plans.  The length of the curve

8   is virtually the same, the radius is the same.  There are

9   other distances throughout the tract that are exactly the same

10  to the hundredth of a foot, which is very difficult to

11  measure.

12  Q.   So a foot is 12 inches, correct?

13  A.   12 inches.  A foot is 12 inches.  A hundredth of a foot is

14  about an eighth of an inch.

15       So there are bearings, as I mentioned.  The bearing

16  along the north boundary line is the same.  The bearing on the

17  street Pebble Beach Way is the same.  The bearing on Sawgrass

18  Court is the same.  And --

19  Q.   How about the bearing Olympic Close?

20  A.   Olympic Close is 89 16'05", 89 16'05".  The distance

21  242.70, 242.70.  And when you measure these kind of distances,

22  it is almost impossible to get the same measurement from two

23  surveyors.

24       MR. HASSING:  Objection.  Nonresponsive.  Move to

25  strike that last couple of sentences, your Honor.

244

1              THE COURT:  All right.

2              MR. HASSING:  And when he says to the jury, "I told

3      Mr. Wu that I wanted to be paid what was left owing" --

4              THE COURT:  Assuming that testimony comes in.

5              MR. HASSING:  And it will.

6              THE COURT:  All right.

7              MR. HASSING:  -- I'm entitled to ask him what that

8      amount was and how it was calculated.

9              THE COURT:  Well, I think you are.  And here's why I

10     think he is, is because if that testimony, first of all, comes

11     in, that Mr. McIntosh indicated to Mr. Wu that he wanted that

12     amount that was owed to him to be paid before he was going to

13     do any more work or allow any of his product to be used by

14     Mr. Wu, then the fact that Mr. Wu didn't use him, that is a

15     reason that the jury could believe.

16             Whether they do or not is not my issue, but they

17     could believe that that's the reason that Mr. Wu did not use

18     Mr. McIntosh rather than Mr. Wu's attempting to basically

19     steal the work product, not pay for it.

20             MR. BRAZE:  Well, we would -- if that was the

21     situation, we would view Mr. McIntosh's comments as a

22     protected settlement effort, that out of the blue, he is

23     negotiating with a guy in a way to resolve it.

24             THE COURT:  Well, there is no evidence that I have

25     heard from Mr. McIntosh that this was any type of a

303

1   A.   Correct.

2   Q.   And this tells you what you charged for that, right,

3   $47,000, right?

4   A.   Correct.

5   Q.   And then you have master planning, you charged 142,000,

6   right?

7   A.   The master planning for the entire 480 acres.

8   Q.   Right.  And was the survey for the entire 480 acres?

9   A.   I believe it was.

10  Q.   And then you have got "Williamson Act cancellation,"

11  correct?

12  A.   Correct.

13  Q.   Tell the jury, please, what the Williamson Act is and how

14  you canceled it.

15  A.   The Williamson Act is a contract that is entered into

16  between a property owner, usually a farmer, and the State of

17  California to keep the land under agricultural production.

18  And because of that contract that he enters into, he gets a

19  tax break on his property taxes.

20       In order to develop the land, you have to cancel that

21  contract, you have to go through a process to cancel the

22  contract so you can subdivide and develop the property.

23  Q.   Okay.  And you charged them $4,000 and change for doing

24  that work?

25  A.   Correct.

304

1    Q.   And that related to the full 480 acres, right?

2    A.   Yes.  That had to be done before any subdivisions could be

3    prepared.

4    Q.   All right.  And then you take a look at the next item,

5    which is 04, and it says "Tract 5472," and it says you charged

6    $308,000 for that, correct?

7    A.   That's correct.

8    Q.   All right.  What did you do for that $308,000?

9    A.   Prepared all the improvement drawings and plans --

10   Q.   Okay.

11   A.   -- to support the tract.

12   Q.   What do you mean by "support the tract"?

13   A.   Well, to develop the tract and to get the tract recorded

14   so that the developer could sell lots.

15   Q.   I'm going to show you the 480-acre blowup, again, that we

16   looked at yesterday.  This area here that I'm pointing to

17   right now is the 480 acres.  This down in the lower right-hand

18   side is the golf course, correct?

19   A.   Yes.

20   Q.   All right.  You recognize this yellow square here as the

21   Tract 5472, correct?

22   A.   Yes.

23   Q.   Now, the $308,000 that we were just talking about, that

24   was -- was that for work that you did within this yellow

25   tract?

1  anything like that?

2  A.  Yes.

3  Q.  And when have you done that?

4  A.  On previous subdivisions where I had prepared a survey and

5  another developer wanted to use it and I sold him a license to

6  use it.

7  Q.  Okay.  Have you ever talked to anybody about selling them

8  a license to use this Tentative Tract Map 5472?  Have you ever

9  had any discussions like that with anybody?

10  A.  Just when Mr. Wu called and asked me to reprocess the

11  tentative tract on the property, but other than that, no.

12  Q.  You and Mr. Wu talked about licensing agreements?

13  A.  No.  We discussed what I was owed and I gave him the

14  number.  I was owed over 300,000, plus interest was about

15  800,000 at that time.

16  Q.  You gave him the number 800,000, didn't you?

17  A.  I told him with interest, it was over 800,000.  It was 18

18  percent interest for the contract.

19  Q.  That's what you told him that he would have to pay in

20  order to get you to draw a new tentative map for him, correct?

21  A.  I told him that I was owed over $300,000 and with

22  interest, it was over 800,000.  If he wanted me to reprocess a

23  tentative tract, I would expect to be paid for the value of my

24  work, and I could put a proposal together for him.  He said he

25  would call me back and he never called me back.

1    Q.   As I understand it, it was your understanding that

2    Northern had overall control of this project?

3    A.   What do you mean by "overall control"?

4    Q.   I was just reading from a portion of your deposition.

5    A.   My understanding, that Northern was the owner of this

6    property.

7    Q.   Did you interact with the owners of Northern?

8    A.   Yes, sir.

9    Q.   Sorry?

10   A.   Yes, sir.

11   Q.   And who did you interact with?

12   A.   Mr. Joe Wu.

13   Q.   How did he participate with you in these maps?

14   A.   Being the owner, he would have directed DeWalt Corporation

15   to prepare a tentative map per the proposal that DeWalt

16   Corporation would have sent to Mr. Wu.

17   Q.   Mr. Wu could have told you to stop work and you would have

18   stopped work on these plans?

19   A.   Yes, sir.

20   Q.   Did he tell you it had to be filed by a certain date?

21   A.   Not to my recollection.

22   Q.   Do you recall how long it took you to prepare this

23   tentative map?

24   A.   Off the top of my head, I don't recall.  I mean I could

25   speculate, you know, two, three months, four months, something

425

1   to use the improvement plans from the 5472 map?

2   A.  I did not.

3   Q.  You never heard that?

4   A.  No.

5   Q.  Now, you heard me ask where the lot numbers came from, I

6   asked Mr. Black where the lot numbers came from?

7   A.  Yes.

8   Q.  Do you have any idea where the lot numbers came from?

9   A.  I don't.

10  Q.  Have you compared the 5472 tentative map with the 6451

11  tentative map?

12  A.  Yes.

13  Q.  And the lot numbers are identical?

14  A.  They are.

15  Q.  Any idea where those came from?

16  A.  I don't know.

17  Q.  Let me show you Exhibit J 88, which is an aerial view of

18  the subdivision.  Is there anything on that aerial view that

19  would suggest to you what the lot numbers are?

20  A.  No.  No, there is not.

21  Q.  Now, this is a Joint Exhibit.  I believe we can represent

22  to the jury this was taken in 2000.  Now, during the progress

23  of this litigation, you had verified discovery responses under

24  oath as the -- being the person most knowledgeable of DeWalt

25  Engineering, correct?

1   A.   Yes.

2          MR. BRAZE:   Your Honor, I would like to read Request

3   For Admission Number 4 and the Response.

4          THE COURT:   Any objection?

5          MR. ALEXANDER:   No.   No objection.

6          THE COURT:   Go ahead.

7          MR. BRAZE:   Request For Admission Number 4 --

8          THE COURT:   Just one second.

9          Ladies and gentlemen, the request for admission is a

10  process that is allowed under the Federal Rules of Civil

11  Procedure where one party sends to another a request for them

12  to either admit a fact or to deny a fact.  And he is going to

13  read from that.

14         Go ahead.

15         The Response, by the way, is under oath.

16         MR. BRAZE:   Thank you.

17         "Admit that you reviewed Tentative Map Number 5472

18         before you prepared Tentative Map Number 6451.

19         (Reviewed means that you looked at and used Tentative

20         Map Number 5472 to assist you in the preparation of

21         Tentative Map Number 6451."

22         Response to Request For Admission Number 4:

23         "Responding party admits that it reviewed multiple

24         documents which likely included Tentative Map 5472

25         before preparing Tentative Map 6451."

427

1  BY MR. BRAZE:

2  Q.  Do you recall making that admission?

3  A.  Not exactly like that.

4  Q.  Do you recall signing that response to Request For

5  Admission under penalty of perjury?

6  A.  I do, but my recollection is that I named multiple maps

7  and not just 5472, because there were multiple maps that we

8  looked at when we were preparing the tentative map.  And when

9  you read it, you only mentioned 5472.

10  Q.  I read it as it was.

11  A.  Is that how it's written?

12  Q.  Would you like to look at it?

13  A.  No.  My recollection was that we mentioned multiple ones.

14  Q.  You are probably thinking of Special Interrogatory Number

15  2.  I will let you read that one.

16  A.  Maybe that's the case.

17  Q.  I will read Special Interrogatory Number 2, and you can

18  read the response.

19          "Special interrogatory number 2.  Please identify all

20          documents you used to assist you in preparing

21          Tentative Map Number 6451."

22          And you can read the response.

23  A.  It says, there are objections.  "Overbroad and unduly

24  burdensome."

25          THE COURT:  You don't have to do those.

428

1        THE WITNESS:  Start it "without"?

2    BY MR. BRAZE:

3    Q.  Yes.

4    A.  Okay.

5            "Without waiting, and subject to such objection,

6            documents used include Parcel Map 9572, Parcel Map

7            9629, Parcel Map 10488, Parcel Map 10542, Parcel Map

8            10556, Parcel Map 10608, Parcel Map 10669, Record of

9            Survey 19-054, Record of Survey 20-191, Record of

10           Survey 21-012, Tentative Tract Map 5472, Filed Map or

11           7-1, Book 7, page 48, Preliminary Title Report by

12           Fidelity National Title Company, City of Wasco Zoning

13           Ordinance, results of survey by DeWalt Corporation."

14           And you are correct, that is what I recollected.

15   Q.  And so that also mentions the Tentative Map 5472?

16   A.  Yes.

17   Q.  Now, you had an opportunity yesterday to compare the

18   grading plan to the final tract map on 6451, correct?

19   A.  Yes.

20   Q.  And you compared the final tract map for 6451 to the

21   grading plan, which was an improvement plan, from Tract 5472,

22   correct?

23   A.  Yes.

24   Q.  Did you notice they were very close to each other?

25   A.  Yes.

434

1  A.  Not necessarily, because we don't have to do lot closures

2  on the tentative map.

3  Q.  I didn't ask about lot closures.  I asked you about what

4  you could see, what you could see on J 88.

5  A.  So you are talking about the position of the improvements?

6  Q.  Right.

7  A.  Yeah, they were probably pretty accurate on the tentative

8  map.

9  Q.  Should have been almost dead on?

10  A.  We surveyed them.

11  Q.  I believe you have already given some testimony in this

12  case that you actually compared 5472 to Map 6451, correct?

13  A.  At what point in time?

14  Q.  Let me hand you a declaration you filed in this case and

15  see if that refreshes your recollection that you stated under

16  oath that you compared Map 5472 to Map 6451.

17  A.  Yes, I do recall this.

18  Q.  You did compare those two maps?

19  A.  We compared the exterior boundaries, yes.

20  Q.  Excuse me?

21  A.  We compared the exterior boundaries.

22  Q.  You got the improvement plans, didn't you?  Your counsel

23  just introduced some evidence that you requested and received

24  the improvement plans in the spring of 2008, I believe it

25  was -- excuse me -- spring of 2005?

438

1   A.   Yes, it is.

2   Q.   Because that's the one I got.  And Chi Epsilon is the

3   civil engineering?

4   A.   Yes.

5   Q.   You have been retained as an expert witness in this case

6   on behalf of the plaintiff, Roger McIntosh; is that correct?

7   A.   Yes.

8   Q.   And, of course, as an expert witness, you are charging for

9   your services, are you not?

10  A.   Yes, I am.

11  Q.   How much are you charging us here today for your time?

12  A.   $250 an hour.

13  Q.   Did we ask you to compare tentative Tract Number 6451 with

14  Tentative Tract Number 5472?

15  A.   Yes.

16  Q.   Did you find those two tracts, tract maps to be similar?

17  A.   Yes.

18  Q.   And could you tell the jury what similarities you found

19  between Tentative Tract Number 5472 and Tentative Tract Number

20  5471 [sic]?

21  A.   All the street names is the same.  The lot numbering is

22  the same.

23          THE REPORTER:  Let me read the question back to you.

24          THE COURT:  I think you misstated it.  You'd better

25  ask it again.

442

1           THE COURT:  There is nothing more to address.

2    BY MR. BRAZE:

3    Q.  So you have highlighted dimensions, lot dimensions on the

4    exhibit previously identified as J 134.  Anything else other

5    than lot dimensions you found similar?

6    A.  Well, street names are all the same and the lot numbers

7    are the same, but I didn't mark all of those.

8    Q.  So the lots are actually numbered and the streets are the

9    same?

10   A.  Yes.

11   Q.  Even Olympic Close?

12   A.  Yes.

13   Q.  Thank you.

14           (The witness resumed the stand.)

15           MR. BRAZE:  My client advises me that we can produce

16   another blowup of Tentative Tract Map 6451 without markings on

17   it.

18           THE COURT:  That's fine.  Well, are you suggesting

19   a -- an exhibit exactly like that that you are going to

20   substitute for a J and you want to remark this?  Is that what

21   you are saying?

22           MR. BRAZE:  At that time, we will bring in an

23   identical map without yellow on it, call it P -- excuse me, a

24   J exhibit.

25           THE COURT:  That's fine.  All you need to do is

1  consult with defense counsel so there is an agreement, and

2  then just let the clerk know so we keep track of the exhibit.

3         MR. BRAZE:  Thank you, your Honor.

4  BY MR. BRAZE:

5  Q.  Based on your examination, have you reached a conclusion

6  as to whether Tract Map 5472 -- excuse me.

7         Have you reached a conclusion -- it is getting late

8  in the day.  I will start slower.

9         And based on your review, have you reached an opinion

10 as to whether Tentative Tract Map 5472 is similar to Tentative

11 Tract Map 6451?

12 A.  Yes.

13 Q.  What is your opinion?

14 A.  My opinion is that they represent the same piece of

15 property and subdivided in the same manner, the same number of

16 lots and the same shape and size.

17 Q.  And we also showed the jury Final Tract Map 6451 and

18 grading plans from 5472.  Did you compare those two drawings?

19 A.  Yes.

20 Q.  And what did you find with respect to those two drawings?

21 A.  I found that the bearings and distances on the final map

22 of 6451 were very similar, if not identical, to those on the

23 grading plan for 5472.

24 Q.  Now, what is a bearing?

25 A.  A bearing is a direction.  It is an arbitrary line that is

DELMARTER - D

444

1    based on two known points or more known points in the field.

2         Bearings are relative, but when you have bearings on

3    a map, they describe angles between the lines.  And so,

4    therefore, when you show a bearing and distance on one line,

5    and a bearing and distance on another line, by comparing the

6    bearings, you can determine the angle and the position of the

7    points on the ends of those lines with each other.

8    Q.   Do you have a screen there in front of you?

9    A.   Yes.

10   Q.   Now, if I draw a circle, that's 360 degrees, correct?

11   A.   Yes.

12   Q.   And a right angle is 90 degrees, correct?

13   A.   Yes.

14   Q.   And so if I cut that angle in half, that would be a

15   45-degree angle, right?

16   A.   Yes.

17   Q.   And how are degrees divided?

18   A.   How are they divided?  Well, a degree is a proportion of a

19   circle.  There is 360 degrees in a circle.  And then a degree

20   is further divided into 60 increments, which are called

21   "minutes."  And a minute is divided into 60 increments called

22   "seconds."  It is like hours, minutes and seconds; degrees,

23   minutes and seconds is pretty similar.

24   Q.   Have you, as a surveyor, ever been able to survey a line

25   twice and get it to be exact to the second?

DELMARTER - D

445

1   A.   Very rarely.

2   Q.   How about measurements?  You measure things in feet, and

3   in these maps in tenths of feet and hundreds of feet, so a

4   foot is 12 inches, correct?

5   A.   That's correct.

6   Q.   So a tenth of a foot would be 1.2 inches?

7   A.   Yes.

8   Q.   And a hundredth of a foot would be .12 inches?

9   A.   Yes.

10   Q.   Which would be about a eighth of an inch?

11   A.   That's correct.

12   Q.   In measuring distances several hundred feet, how often

13   have you been able to measure the same line within a hundredth

14   of an inch?

15   A.   You mean a hundredth of a foot?

16   Q.   Yes, excuse me.  A hundredth of a foot?

17   A.   Again, very rarely.  Occasionally, you can get the same

18   answer, but a lot of times, you are off a hundredth or two.

19   Q.   So with respect to bearings, back to my picture, if this

20   is north and this is south, this bearing would be North 45

21   degrees East?

22   A.   Or South 45 degrees West.  They are interchangeable.

23   Q.   Uh-huh.  And so those are the bearings that we see on

24   these drawings?

25   A.   That's right.

1  developer who -- Northern, and also the City of Wasco?

2  A.  The subdivision agreement related to the final map.

3  Q.  Okay.  And as a condition of that subdivision agreement,

4  wasn't there a condition that any repairs or works be done in

5  accordance with the approved plans?

6  A.  That is a standard condition or statement in subdivision

7  agreements.

8  Q.  And what were the approved plans?

9  A.  In this case, that the subdivider was not required to

10  submit improvement plans.

11       MR. TRAVIS:  I object and move to strike as

12  nonresponsive.  I didn't ask whether or not the subdivider was

13  required.

14       THE COURT:  The question is:  And what were the

15  approved plans?

16       His answer is that the subdivider was not required to

17  submit improvement plans.  It's responsive.  Overruled.

18       MR. TRAVIS:  I am going to read from Mr. Woodcock's

19  deposition, paragraph 18 -- sorry.  Page 18, line 16 through

20  25.

21       Well, before I go there.

22  Q.  Mr. Woodcock, had you ever seen the tentative map for

23  6451?

24  A.  Yes.

25  Q.  And on the tentative map for 6451 there is a note section,

1  right?  I will have you read this.

2  A.  Notes --

3        THE COURT:  You mean you want him to read it out loud

4  or to himself.

5  BY MR. TRAVIS:

6  Q.  If you can refresh your recollection, but go ahead and

7  read it out loud.  First, Notes Section 1?

8  A.  It says, quote:

9        "This development contains existing improvements built

10       per Valley Rose Planned Community, expired Tentative

11       Map 5472, and associative improvement plans."

12  Q.  And associative approved improvement plans, right?

13  A.  Right.

14  Q.  What were the approved improvement plans, if that helps

15  you remember?

16  A.  Those were the plans that related to the expired map.

17  Q.  McIntosh's plans, right?

18  A.  That's correct.

19  Q.  In fact, isn't it Wasco's own municipal code that requires

20  improvement plans capable of being reproduced in order for a

21  project to be completed?

22  A.  Yes, to the best of my recollection.

23  Q.  To the best of your recollection, did DeWalt ever submit

24  electronic copies of improvement plans --

25  A.  No.

488

1   Q.   Right.   Because you don't want a developer to come in and

2   say they are going to put something in, commit the City's

3   time, energy and resources, and then not put them in, right?

4   A.   And then have paper lots.

5   Q.   And then you have paper lots, that's right.   With the 6451

6   tract, was a bonding estimate required?

7   A.   No.

8   Q.   Why not?

9   A.   Because the improvements were in and had been inspected by

10  the City.

11  Q.   Going back a bit, to calculate a bonding estimate, how do

12  you calculate that estimate?

13  A.   The City Engineer develops his estimate of the overall

14  cost for those improvements, and then a financial security

15  instrument, typically a bond, needs to be secured to ensure

16  that if the developer defaults in completing those

17  improvements, that the City has an instrument to, therefore,

18  get the improvements put until.

19  Q.   Well, I guess I'm asking how the calculation is done for

20  that estimate.

21  A.   That is by the City Engineer.

22  Q.   Okay.   And does the City Engineer oftentimes interact with

23  the engineer for the developer to calculate that bonding

24  estimate?

25  A.   Yes.   In case that the City Engineer comes up with figure

1   X and the developer says, no, it is figure Y.

2   Q.   That happens quite frequently?

3   A.   Yes, it does.

4   Q.   Okay.  I guess the developer would want to say that it

5   usually comes in a little bit lower and the City comes in and

6   says it is going to be a little bit higher?

7   A.   In general, yes.

8   Q.   And what is taken into account in calculating that bonding

9   estimate?

10   A.   Well, again, the City Engineer has a cost formula saying

11   it costs so many dollars per square foot for the streets and

12   so many dollars per linear foot for water lines, et cetera.

13   Q.   Right.  So what is being calculated is all the

14   improvements that are there or what is expected in the

15   situation where you don't have anything in the ground?

16   A.   That's correct.

17   Q.   What is expected to be built, and then you calculate all

18   the different nuances and features of that proposed

19   development, right?

20   A.   That's correct.

21   Q.   Was a bonding estimate done?  Was any bonding estimate

22   done for the 6451 tract?

23   A.   No.

24   Q.   If you could, in that big thick volume, go to J 73.

25   A.   Yes.

1  Q.   Okay.  Is that a bonding estimate for Tract 6451?

2  A.  Yes, it appears so.

3  Q.  Was that bonding estimate done while you were employed by

4  the City of Wasco?

5  A.  I would have to look at the date.  No.  This was prepared

6  October 31st, 2005.

7  Q.  And so you just don't have a recollection of this

8  particular bonding estimate being done, correct?

9  A.  That's correct.  Because that would be prepared by the

10  City Engineer.

11  Q.  But it is instructive -- is this a typical bonding

12  estimate and how they look when they are finally finished?

13  A.  Yes.  This contains construction estimates related to

14  grading, streets, and has the features that I was mentioning

15  of water, utility, sewer.  Yes, this is, I would say, typical.

16  Q.  In this bonding estimate, if you look at it, it has all

17  the different features that we were talking about earlier of

18  the 6451 tract, right, and it calculates the improvements,

19  right?

20  A.  That's correct.

21  Q.  But in this particular case, as you testified earlier,

22  that there was no bonding estimate required, right?

23  A.  That the bonding estimate was prepared, it appears, but in

24  the subdivision agreement where this would get translated

25  into, there was no estimate in that subdivision agreement.

1  Q.  Right.  So in this particular case, the developer,

2  although typically, they would have to provide one, in this

3  case did not have to provide a bonding estimate, right?

4  A.  That's correct.

5  Q.  Okay.  And in this particular bonding -- in this, the

6  total bonding cost here, it looks like on the second page,

7  1.924 -- $1,924,633, correct?

8          MR. OKADIGBO:  Objection, your Honor, relevance.

9          THE COURT:  I can't make that determination.  Let me

10 ask this.  As an officer of the Court, are you representing

11 that you are going to somehow be attempting to tie that

12 estimate with anything having to do with worth?

13         MR. TRAVIS:  Yes.  The value of the plans and

14 avoidance of costs.

15         MR. OKADIGBO:  Your Honor, the bonding estimate for

16 the improvements that were done before the current developer

17 got into this mess is irrelevant.  Their whole point

18 ultimately is that they should have --

19         THE COURT:  That's your argument and that, you may

20 cross-examine and bring witnesses in that regard, but as far

21 as the relevance is concerned, it is overruled.

22 BY MR. TRAVIS:

23 Q.  In fact, what originally happened when the -- when Wasco

24 decided that they were going to engage a new developer to

25 complete the development of the subdivision, in fact, Wasco

493

1    thinking about development, redevelopment, completing the

2    development of this subdivision, they wanted something more

3    upscale, right?

4    A.   Yes.

5    Q.   But the fact is, is that the improvements, as they were

6    in, wouldn't support a more upscale design, would they?

7    A.   Not for this initial phase, that's correct.

8    Q.   So if a developer wanted to put in something more upscale,

9    kind of what Wasco wanted, they would have had to tear out

10   this existing subdivision, right?

11   A.   That's correct.

12   Q.   As part of your job, you testified earlier that you are

13   required to follow the Municipal Code and the Government Code,

14   the Subdivision Map Act, right?

15   A.   Yes.

16   Q.   And is it your understanding that without a final map --

17   sorry.  Without a final map, you can't sell homes?

18   A.   That's correct.

19   Q.   In fact, you can't even allow occupancy in the home unless

20   a final map is approved, correct?

21   A.   That's correct.

22        MR. TRAVIS:   Thank you, your Honor.  I'm done with

23   this witness.

24        THE COURT:   Cross-examination, Mr. Hassing?  Oh, all

25   right.

1          THE COURT:  Page 14, line 21 through 15, line 10.

2          MR. OKADIGBO:  I don't see the impeachment.

3          THE COURT:  Any legal objection why he should not

4     read it?

5          MR. HASSING:  Your Honor, I would object based on the

6     fact that the question and the answer are irrelevant, so there

7     should be no impeachment on that, and move to strike the

8     question and the answer.

9          THE COURT:  The objection is overruled.

10          Go ahead and read.

11          MR. TRAVIS:  Thank you.

12          "Question:  What conditions were applied for 6451?

13          "Answer:  I would have to look.  We have a boilerplate

14          for Public Works, and then we route it out to public

15          agencies for their comment.  I would have to look at

16          the file.  I don't know those conditions.

17          "Question:  Do you know in general what conditions may

18          or may not apply?

19          "Answer:  Yeah.  Now there is a new requirement to

20          enter into a police tax, a fire tax.  You have to

21          have improvement plans, you have to comply with the

22          City of Wasco's ordinance and any other section of

23          the Municipal Code.

24          "Question:  Are you finished?

25          "Answer:  Yes."

1    BY MR. TRAVIS:

2    Q.  Mr. McNamara, did you ever provide improvement plans to

3    DeWalt?

4    A.  Yes.

5    Q.  And were those improvement plans that you provided to

6    DeWalt Mr. McIntosh's improvement plans?

7    A.  They were prepared by McIntosh & Associates, yes.

8    Q.  And those improvement plans are the same improvement plans

9    on which Tract 6451 is based; isn't that correct?

10   A.  I'm unsure of that.

11   Q.  In your dealings with the City, in your dealings with the

12   City regarding the development of the subdivision, isn't it

13   true that Joe Wu, the president of Northern California and

14   Lotus Developments, has used these two companies

15   interchangeably?

16          MR. HASSING:  Objection, lacks foundation.  Calls for

17   legal conclusion.

18          THE COURT:  Just a minute.

19          MR. OKADIGBO:  Objection, relevance, also.

20          THE COURT:  I understand the other objections.  What

21   is the relevance of this?

22          MR. TRAVIS:  Well, the relevance, your Honor, is the

23   fact that, ultimately, on some of the jury instructions, which

24   have not been read, that there is going to be an issue of

25   partnership and, therefore, I'm going to refresh

1  entity.

2  Q.  All right.  So in the processing of the 6451 tentative

3  map, you would interact with either Lotus Developments or

4  Northern California, correct?

5  A.  I primarily interacted with DeWalt.

6  Q.  I'm asking not who you primarily contacted with, but I'm

7  also asking you whether or not you interacted for the

8  processing of the 6451 map with Lotus and Northern.

9  A.  To the best of my knowledge.

10  Q.  And in your processing -- in the processing of the 6451

11  map and in your interactions, you -- Northern and Lotus were

12  used interchangeably, correct?

13          MR. HASSING:  Objection, foundation still.

14          THE COURT:  No.  He has limited his question to --

15  let me use his words -- "and in your interactions."  So the

16  objection is overruled because of the limited question.

17          MR. HASSING:  Okay.  I would lodge a further

18  objection as vague and ambiguous.  Possibly beyond this

19  witness' knowledge.

20          THE COURT:  No, overruled.  That's subject to

21  cross-examination, if you wish.

22          Go ahead and answer, if you can.

23          THE WITNESS:  Can you please repeat the question.

24          THE COURT:  The question is this:  And in your

25  processing, in the processing of the 6451 map and in your

1   interactions, Northern and Lotus were used interchangeably; is

2   that correct?

3        THE WITNESS:  Yeah, I saw references to both names,

4   but I don't know if they were interchangeable.

5        MR. TRAVIS:  Okay.  I have no more questions, your

6   Honor.

7        THE COURT:  All right, cross?

8        MR. HASSING:  Nothing from me, your Honor.

9        MR. ALEXANDER:  No, thank you, your Honor.

10                      CROSS-EXAMINATION

11  BY MR. OKADIGBO:

12  Q.  Just one question.  Mr. Travis had read a passage from

13  your deposition where you stated that it was a new requirement

14  to enter into a police tax or fire tax, and then you said you

15  have to have improvement plans.  You weren't speaking of Tract

16  6451 when you made that comment, correct?

17  A.  No.  I was speaking of all tentative tracts.

18        MR. OKADIGBO:  No further questions.

19        THE COURT:  Anything further?

20        MR. TRAVIS:  Nothing further, your Honor.

21        THE COURT:  Thank you, sir.  You may step down.

22        Next witness?

23        MR. TRAVIS:  Your Honor, we have an issue that we

24  would like to bring up with you, but we don't want to do that

25  in front of the jury.

1    BY MR. TRAVIS:

2    Q.  Did the City of Wasco expect to obtain a benefit from a --

3    from the previously approved Tract Map 5472?

4    A.  I can't answer what the City expected.

5    Q.  Well, I will ask it.  Why, then, would the City of Wasco

6    put in the Developer Information Package that there is already

7    a Location Map, Assessor's Parcel Map, Final Parcel Map

8    9572 --

9           THE REPORTER:  I'm sorry.

10          THE COURT:  Slow it down a little bit.

11   BY MR. TRAVIS:

12   Q.  -- Tentative Tract Map 5472 and 5618, Zoning Map, Sewer

13   and Water Map are included as Appendix C herein?

14          MR. HASSING:  Objection, foundation, your Honor.  It

15   calls for speculation.

16          THE COURT:  That's the same issue, foundation or

17   speculation.  No, the objection is overruled.

18          If you can answer, answer.  If you don't know, tell

19   him you don't know.

20          THE WITNESS:  I don't know.

21   BY MR. TRAVIS:

22   Q.  The City of Wasco has received fees because of the sale of

23   lots on the subdivision, haven't they?

24   A.  Yes.

25   Q.  And those are called "impact fees," correct?

1  A.  Yes, that's correct.

2  Q.  At your deposition, I believe that you said that currently

3  that amount is roughly in the amount of $529,000, correct?

4  A.  That's correct.

5  Q.  And the City expects to receive more fees from the sale

6  of -- expects to receive more fees from the existing lots, the

7  homes that have been sold, correct?

8  A.  What type of fees?

9  Q.  Impact fees.

10  A.  Impact fees are only collected one time, at the time of

11  development.

12  Q.  Does the City expect to receive any more fees, any kind of

13  fees because from the sale of homes on the Valley Rose

14  Subdivision?

15  A.  As more units, more houses are developed, there will be

16  more fees, yes.

17  Q.  You don't know what that is right now, right?

18  A.  No.  Because we don't know what, ultimately, is going to

19  be built out.

20  Q.  But is it your understanding or you know that currently,

21  there are 30 homes that have been sold, right?

22  A.  I don't know how many homes have been sold.

23  Q.  But you do know that there is a whole bunch of homes or a

24  number of homes that need to be built, correct?

25  A.  That need to be built?

556

1        MR. BRAZE:  I would like to read from Mr. Wu's

2   deposition.

3        THE COURT:  Page and line, please.

4        MR. BRAZE:  Page 17, it would be volume 1, page 17,

5   commencing at line 24 through line 8 on page 18.

6        THE WITNESS:  Can you show me which binder?

7        MR. BRAZE:  That's okay.  You don't have to worry

8   about it.

9        THE COURT:  It is not up there.

10       MR. HASSING:  Shouldn't Mr. Wu have a copy?

11       MR. BRAZE:  It is not for impeachment.

12       THE COURT:  Depends on what he is doing it for.

13       MR. HASSING:  We don't know.

14       MR. BRAZE:  I'm just going to read it.

15       THE WITNESS:  Go ahead.

16       MR. BRAZE:  (Reading)

17       "And correct me if I'm wrong, it sounds like the

18       nature of your business is to take over subdivisions

19       that are partially completed where the developer has

20       failed to finish them and you complete them; is that

21       correct?

22       "Answer:  Yes.

23       "Question:  Is that the nature of your business?

24       "Answer:  Yes.

25       Mr. Travis adds:  "It's a good market for you today?

1        "Answer:  I clean up."

2   BY MR. BRAZE:

3   Q.  How many failed subdivisions have you taken over, Mr. Wu,

4   in the last five years to build homes on and sell them?

5   A.  Are you saying last five years, since 2005?

6   Q.  Yes.

7   A.  We haven't take any subdivision, no.

8   Q.  Well, in your deposition, you told me you had taken over

9   about six subdivisions, haven't you?

10  A.  That's before 2005.

11  Q.  Before 2005.  And three of those subdivisions, you took

12  over from municipalities, such as Wasco, correct?

13  A.  Yes.

14  Q.  You took one over from the City of Chowchilla; is that

15  correct?

16  A.  Yes.

17  Q.  And what was the other city that you took one over from?

18  A.  I believe it was City of Oroville.

19  Q.  Oroville.  And so in all of those instances, you go in

20  where there are existing maps and plans, and they may or may

21  not have improvements already installed, correct?

22  A.  Yes.

23  Q.  Now, when you purchased the Rose Valley Estates [sic]

24  property, how much money did you anticipate making?

25  A.  I don't --

1          MR. HASSING:  Objection, your Honor.  Relevance.

2          THE COURT:  Sustained.  His anticipation is not

3    relevant.

4          MR. BRAZE:  It goes to damages, doesn't it, your

5    Honor?

6          THE COURT:  Not the anticipation doesn't.

7          MR. BRAZE:  Okay.  All right.

8    BY MR. BRAZE:

9    Q.  Well, you did anticipate to make a profit, didn't you?

10   A.  No.  I want to make a profit.

11   Q.  That's what I just said.  You did anticipate that you

12   would make a profit, right?

13   A.  Yes.

14   Q.  Did you have a business plan that showed how much profit?

15   A.  No.

16   Q.  You borrowed some money from the bank to make this

17   purchase?

18   A.  Yes.

19   Q.  And did you tell them what you believed your profits would

20   be?

21          MR. HASSING:  Objection, relevance.

22          THE COURT:  It's not relevant.  Sustained.

23   BY MR. BRAZE:

24   Q.  Let's take a look at Exhibit J 10, which is the City of

25   Wasco Developer Information Package.  Do you recall seeing

1   that?

2   A.   Yes.

3   Q.   It is dated November of 2003, and did you first see it in

4   or about November of 2003?

5   A.   Yes.

6   Q.   And it was brought to you by a broker; is that correct?

7   A.   Yes.

8   Q.   And of course, there is a lot of information in there

9   about what a great place Wasco is to live and work?

10  A.   (Witness nods head.)

11  Q.   And in there is a map of the subdivision.  And was it your

12  understanding that you were going to be acquiring this area

13  down here in the lower left-hand corner?

14  A.   I don't follow you.

15  Q.   Sure.  What area did you understand you would be

16  acquiring, as shown on that map?

17  A.   The left-hand corner of the property is not -- I do not

18  own that left-hand corner property.

19          THE COURT:  If you will take your finger and touch

20  the screen where you do own, that's what he is asking, I

21  think.

22          THE WITNESS:  Okay.  The one I point out is 33.51

23  acre.

24  BY MR. BRAZE:

25  Q.   Well, you bought a hundred acres, didn't you?  Didn't you

1   buy close to a hundred acres?

2   A.   The one, when I bought it, is 33.51 acres, is 68 finished

3   lots.  And also I have the adjacent, 46.06.  That's the one

4   currently that is agriculture, 46.06 acre.

5   Q.   Okay.  But your initial intent was to buy that for the

6   purpose of building homes and selling them, right?

7   A.   Yes.

8   Q.   Contained in that Developer Information Package was the

9   tentative tract map for Tract 5472, wasn't it?

10  A.   Yes.

11  Q.   And at the lower right-hand corner, it indicates that that

12  was prepared by Martin-McIntosh?

13  A.   I cannot read it.

14          MR. BRAZE:  Does this focus, your Honor?

15          THE COURT:  I think they can do it from her --

16          MR. HASSING:  May I give him a hand?

17          THE COURT:  Sure.

18  BY MR. BRAZE:

19  Q.   Is that better?

20  A.   Still a little blurred.

21  Q.   Did you ever inquire of anyone what the status of that

22  tract map was?

23  A.   No.

24  Q.   When you received the development package, did you call

25  Mr. McIntosh, who had prepared that tract map?

1    A.   Yes, possible.

2    Q.   And so if the Valley Rose Estates was 35 acres, you owned

3    63 acres outside of the subdivision, correct?

4    A.   Yes.

5    Q.   If you paid $1.6 million, that would indicate you

6    purchased all of this land, including the subdivision, for

7    about $16,000 an acre, correct?

8    A.   No, you don't calculate it that way.

9    Q.   How do you calculate it?

10   A.   I believe that the tax assessor, they value the finished

11   lot.  I believe it is $20,000 per finished lot.

12            Then the remaining is farming because it is

13   agricultural land, so the value is less than the finished lot

14   value.

15   Q.   Sure.  All I'm saying is you got a hundred acres of land

16   for about $1.6 million, including a subdivision, right?

17   A.   Yes.

18   Q.   So what investigation did you do before you bought this

19   subdivision?

20   A.   I think it was a broker that bring me, you know, the

21   opportunity to consider this piece of project.

22   Q.   But I mean what did you do to determine whether you wanted

23   to spend $1.6 million on buying this?

24   A.   Well, at the time I was thinking about the things that I'm

25   purchasing, the 68 finished lots, so I figure out if timing is

1  okay, you know, for me to developing this project.

2  Q.  I would like to read to you from a declaration that you

3  filed in this case.

4          THE COURT:  Could you give us the date, please.

5          MR. BRAZE:  Certainly.  It's declaration of Joe Wu.

6  It was filed with the Court on September 29, 2009.

7          THE COURT:  Is this a Rule 56?

8          MR. BRAZE:  Yes.

9          THE COURT:  Page and line?

10         MR. BRAZE:  Page -- line 12, page 3.

11         THE COURT:  Go ahead.

12         MR. BRAZE:  (Reading)

13         "Prior to Lotus' purchase, I spoke by telephone to

14         Mr. McIntosh about my intended purchase of Parcel 1

15         from the City.  I asked Mr. McIntosh if he would be

16         interested in preparing the new tentative map that

17         the City was requiring.  Mr. McIntosh stated that he

18         would, but that he would have to be paid an

19         exorbitant amount of money, which he said was left

20         owing by the previous developer and the City."

21  BY MR. BRAZE:

22  Q.  Does that refresh your recollection about what

23  investigation you did prior to buying the tract?

24  A.  Yes.  I do recall McIntosh one time.  The call was to try

25  to find out if he was interested in doing some tentative map

 1    for my company.

 2    Q.  So this was no secret to you that when you bought this

 3    property, you knew Mr. McIntosh was claiming that he hadn't

 4    been paid for developing the final tract map and the

 5    improvement plans?

 6              MR. HASSING:  Objection.  That's compound, your

 7    Honor.

 8              THE WITNESS:  I don't --

 9              THE COURT:  Hang on just one second.  It's compound.

10    Break down your question, please.

11              MR. BRAZE:  Certainly.

12    BY MR. BRAZE:

13    Q.  Before you purchased the property on May 18th, 2004 -- I

14    will rephrase that.  That was a sloppy introduce.

15              Before you purchased the property on May 18, 2004,

16    you knew that Mr. McIntosh claimed that he was owed money such

17    that he would not do any work for you until it was paid,

18    right?

19    A.  I did not have a conversation with him about that he owed

20    money and all the maps stuff.  All I know is that when I call

21    him, I asked him about, you know, whether he is interested to

22    give me a proposal to prepare a map.

23              And at that time, I remember he just saying that the

24    previous developer owed him a lot of money.  That's all.  I

25    heard what he said.

1   Q.   What investigation did you do to determine what that was

2   all about?

3   A.   I actually not interested to know how much the people owe

4   him the money.  I simply just wanted to, you know, ask him to

5   give me a proposal.

6   Q.   Well, were you concerned that he might have a claim

7   against the property or some of the drawings?

8   A.   I have no concern at that time.

9   Q.   You weren't concerned at all?

10   A.   No.

11   Q.   Did you ask the City about it?

12   A.   No.

13   Q.   Did you say, you know, "Gee, in your Developer Information

14   Package, you showed me this tract map for 5472, and I called

15   the guy up and he claimed to be owed a lot of money."  Jess

16   didn't explain that to you?

17   A.   No.

18   Q.   So then you went to talk to DeWalt, correct?

19   A.   Yeah.  I might -- my field engineer searched in the

20   Bakersfield area because the project was near by Bakersfield.

21   It is a big city.  So finally, I, you know, searched a civil

22   engineer to prepare a map.

23   Q.   And Exhibit J 18, which we saw during the testimony of

24   Mr. Gutierrez, is DeWalt's proposal to you, what they are

25   going to do for you; is that correct?

1   Q.   How about 2005?

2   A.   No.

3   Q.   Well, we heard some testimony that the final map was --

4   when was your final map was recorded?

5   A.   Final map was recorded in, I believe, 2007.

6   Q.   You can't sell homes until you get a final map, right?

7   A.   Yes.

8   Q.   So since 2007, you still had these issues that you have

9   not yet fixed?

10  A.   Well, we continued the progress to finish the -- any punch

11  out list items.

12  Q.   Let me show you Exhibit J 21.  That shows that Lotus

13  Development has paid the City of Wasco $529,000 and some

14  change for impact fees; is that correct?

15  A.   Yes.

16  Q.   And has that been on a per house basis, or how does that

17  work?

18  A.   I believe the basis is include total house we pay.  I

19  believe it is 68 home permit.

20  Q.   That's for 68 homes?

21  A.   Yes.

22  Q.   And at the present time, you have built 30 homes?

23  A.   Yes.

24  Q.   And you've sold about 19?

25  A.   Yes.

1    haven't you?

2    A.  Yes.

3    Q.  Some of the plants have died?

4    A.  Yes.

5    Q.  And if you go to the landscaping plan, it will tell you

6    what type of plans are supposed to be there, correct?

7    A.  Yes.

8    Q.  And it's your testimony that even though the plants have

9    died, you have never looked at the landscaping plan to find

10   out what kind of plants you are supposed to replace them with?

11   A.  Yes.

12   Q.  I would like to read you from your deposition, page 34,

13   starting at line 2, going to page 35, line 9.

14           MR. HASSING:  No objection, your Honor.

15           MR. ALEXANDER:  No objection.

16           THE COURT:  Go ahead.

17           MR. BRAZE:  Thank you.

18           "Okay.  The answer is yes.

19           "Question:  You had had conversations?

20           "Answer:  Only one time.

21           "Question:  You have had conversations with

22           Mr. McIntosh?

23           "Answer:  Yes.

24           "Question:  Did the conversation deal with the Valley

25           Rose Subdivision

1    "Answer:  No.

2    "Question:  What did it deal with?

3    "Answer:  That's what I said, the pump station

4    "Question:  Where was the pump station?

5    "Answer:  Right at the intersection of the -- in front

6    of Highway 46, next to -- I will say it is next to

7    the Valley Rose Parkway

8    "Question:  And in your mind, did that not deal with

9    the Valley Rose Subdivision?

10    "Answer:  Yes.

11    "Yes, it did, or yes, it did not?"

12    "Answer:  No, you're asking me if it's related to the

13    Valley Rose Estate, and I said no.

14    "Why do you say it's not related to it?"

15    That's a question.

16    "Answer:  Because pump station was never mentioned

17    to -- part of the subdivision.

18    "Question:  Were you ever doing any other work near

19    that pump station other than the Valley Rose

20    Subdivision?

21    "Answer  Yes.  The City asked me to test the pump, see

22    how this pump is going to work.  So I don't have a

23    plan.  That's why I traced it to find out who

24    designed this.  We are right in the middle of

25    nowhere.  When I took over the project, I didn't have

1        anything.

2        "Question:  Did you get plans from the City of Wasco

3        for the subdivision?

4        "Answer:  Yes, we did, but it's incomplete."

5    BY MR. BRAZE:

6    Q.  So you did get plans for the subdivision from the City of

7    Wasco?

8            MR. HASSING:  Your Honor, that's an incomplete

9    reading.  I would like to read a little further, if I might.

10           THE COURT:  What is your request, specifically, and

11   see if there is an objection.

12           MR. HASSING:  My request is to read from line 10

13   through lines 20.

14           THE COURT:  Do you have any objection?

15           MR. BRAZE:  No.  I will read it.

16           THE COURT:  Do you want him to read it?

17           MR. HASSING:  He can read it, if he wants.

18           MR. BRAZE:  Repeating line 9:

19        "Answer:  Yes, we did, but it is incomplete.

20        "Question:  The question is did you get plans from the

21        City of Wasco for the subdivision?

22        "Answer:  No.  For a pump station.

23        "Question:  So you never got any plans from the City

24        of Wasco for the Valley Rose Subdivision?

25        "Answer:  Yes, never

1        "Question:  Never?

2        "Answer:  Never

3        "Question:  Did you look at any plans for the Valley

4         Rose Subdivision that were on file with the City?

5        "Answer:  No."

6    BY MR. BRAZE:

7    Q.  I guess I'm kind of confused, Mr. Wu.  If you are having

8    problems with pump stations, why don't you simply get plans

9    from the City of Wasco?

10   A.  Well, at that time, I didn't know that where to get the

11   plan regarding the pump station.

12   Q.  Who was your contact with the City of Wasco?

13   A.  I believe we called, you know, City or building

14   department.

15   Q.  Did you have someone there that you worked with?

16   A.  Yeah.  At that time, I had my superintendent, you know,

17   went to City to ask if there is any plan relating to this pump

18   station.

19   Q.  And did they give him one?

20   A.  I believe at that time, they may -- they do get it, the

21   plan.

22   Q.  Did you ever call Mr. McIntosh to ask him for drawings?

23   A.  No.

24        MR. BRAZE:  Read from page 54 of your deposition,

25   starting at line 7 through 11.

1    THE COURT:  Go ahead.

2    MR. BRAZE:  (Reading)

3    "Question:  You mentioned that you got the landscaping

4    plans from your broker?

5    "Answer:  I believe from the City.

6    "Question:  You got the landscaping plans from the

7    City?

8    "Answer:  Yes."

9  BY MR. BRAZE:

10  Q.  Do you recall that testimony you gave in October 2008,

11  that you actually got landscaping plans from the City?

12  A.  I know we have it, but I don't know who give to us.

13  Q.  Now, your business designs its own homes, right?

14  A.  Yes.

15  Q.  And do you do some of the designing?

16  A.  Yes.

17  Q.  Yes?  And you believe that those designs are your

18  property, correct?

19  A.  Yes.

20  Q.  And the reason you believe those are your property is

21  because you designed it, right?

22  A.  Yes.

23  Q.  And so it is not a surprise to you that Mr. McIntosh feels

24  the same way; because he designed it, he believes it's his

25  property, correct?

1    A.  Yes.

2    Q.  Okay.  Now, it's -- when you purchased the subdivision,

3    were you aware that the tract map had expired?

4    A.  Yes, I do.

5    Q.  When did you find that out?

6    A.  I believe my project engineer called City to find out.

7    Q.  So that's something you investigated before you bought the

8    property; is that correct?

9    A.  Yes.

10   Q.  In fact, Exhibit J 16 [sic] is a letter.  Is Sperry Van

11   Ness someone who worked for you?

12   A.  Yes.

13   Q.  It is a letter from the City of Wasco, looks like, from

14   Mr. McNamara to you, telling you that the Tract Map 5472 had

15   expired, correct?

16   A.  Yes.

17   Q.  Does it appear to you that you were attempting to use that

18   expired tract map and they said, no, you have to do a new

19   tract map?

20   A.  Yes --

21        MR. HASSING:  Objection.  Objection.  Misstates

22   testimony.

23        THE COURT:  On that ground, it is overruled.

24   BY MR. BRAZE:

25   Q.  So is that when you went -- is that when you called

1    A.   Yes.

2    Q.   So you are still cleaning up?

3    A.   So far, yes, for any unbuilt, finished out.

4    Q.   You bought it in 2004 to clean up, and it is 2010?

5    A.   Yes, as long as the weeds are growing up, we are obligated

6    to clean up.

7              THE COURT:   Anything else?

8              MS. BARNES:   No, thank you, your Honor.

9              THE COURT:   Mr. Braze?

10             MR. BRAZE:   Recall Mr. McIntosh for a few.

11                        ROGER MCINTOSH,

12   called as a witness on behalf of the Plaintiff, having been

13   previously sworn, testified as follows:

14             THE COURT:   You are still under oath.   You need not

15   be resworn.

16                     DIRECT EXAMINATION

17   BY MR. BRAZE:

18   Q.   Just a few items, cleanup items on that matter of some

19   economic issues.   The work that was done by your company, or

20   excuse me, by your firm in the 1992, '93, '94, what was your

21   average hourly rate that that work was performed at?

22   A.   The average hourly rate in 1992 was about $72 per hour,

23   per man-hour.

24   Q.   And what is your present average hourly rate?

25             MR. HASSING:   Your Honor, I would object.   This is

601

1    A.   No.

2    Q.   Let me take one more stab at this.  Do you have any

3    estimate as to what your hourly rate was in the year 2004?

4              MR. HASSING:  Objection, your Honor, relevance.

5              THE COURT:  Overruled.

6              THE WITNESS:  2004, our hourly rates probably

7    increased approximately 200 percent from 1992.

8    BY MR. BRAZE:

9    Q.   So that would be $150 or -- that's a hundred percent.

10   225?

11   A.   They doubled.  Probably around a $150 an hour.

12             MR. BRAZE:  Thank you.

13             THE COURT:  Cross-examination?

14                       CROSS-EXAMINATION

15   BY MR. HASSING:

16   Q.   Mr. McIntosh, you indicated that Map 9572, which is the

17   overall parcel map, was included in the City's Development

18   Information Package?

19   A.   It's in this one.

20   Q.   Yes.  And that map, by that time, had been recorded with

21   the Kern County, had it not?

22   A.   That's correct.

23   Q.   And that map then was public record, public information,

24   right?

25             MR. TRAVIS:  Objection.  Calls for legal conclusion.

1   Q.   Then the last item is Land Loan Renewal Fees and you used

2   the same number that Mr. Wu did?

3   A.   I did.  I just accepted it.

4   Q.   So the big difference in that area under land costs,

5   Mr. Wu had $672,000 and you had $290,000, correct?

6   A.   That's right.

7   Q.   So what is the net profit you show for the 30 homes that

8   Mr. Wu has built?

9   A.   It is $1,358,498.83.

10  Q.   Did you do the same projection for the sale of the total

11  68 lots?

12  A.   Yes.

13  Q.   Is that included on our Exhibit P 112?

14  A.   Yes.

15          MR. BRAZE:  I will move to admit Exhibit P 112.

16          MR. HASSING:  No objection, your Honor.

17          THE COURT:  Received.

18          MS. BARNES:  No objection, sir.

19          MR. HASSING:  If can we hang on just a minute, your

20  Honor.  I haven't got my exhibits marked like Mr. Braze.

21          THE COURT:  Why don't you approach him and see.  Make

22  sure you do.

23          MR. HASSING:  Your Honor, I do object to P 112 coming

24  into evidence.  I would like to voir dire the witness.

25          THE COURT:  All right.

1  Q.  Now, first of all, you assumed that Mr. Wu or one of his

2  companies, intended or intends to build more homes on those 38

3  lots, right?

4  A.  Yes.

5  Q.  What is the basis of that assumption?

6  A.  The permits to build on those houses.  I mean we have the

7  permits and the specific model type for each lot.

8       MR. BRAZE:  Your Honor, is this voir dire or is this

9  cross-examination?

10      THE COURT:  I'm hoping it's going to be voir dire,

11  but it is not there yet.

12      MR. HASSING:  Your Honor, I'm intending to show that

13  this entire --

14      THE COURT:  You can, but the question is -- I know

15  what you are trying to do, but the question is whether or not

16  you are doing it on what is a true voir dire or are you just

17  moving forward with premature cross-examination.

18      MR. HASSING:  I'm trying to do a voir dire, and I'm

19  trying to establish the speculative nature of these --

20      THE COURT:  Well, here's the real procedural problem,

21  practical problem, I should say.  Mr. Braze is attempting to

22  use Exhibit P 112 during the direct examination, and the

23  reason you are wanting to voir dire now, of course, is because

24  for him to show the jury 112, it would have to be in evidence.

25      Am I stating that correctly so far, Mr. Braze?

1  A.  Those are --

2  Q.  And I will put P 113 up.

3        MR. BRAZE:  I would like to move to admit P 113

4  through 115.  These are profit and loss calculations.  P 113

5  is for 19 homes sold.  P 114 is for 11 -- profit and loss

6  calculation for 11 unsold homes.  And P 115 is for the profit

7  and loss statements for 38 homes sold.

8        MR. ALEXANDER:  Thank you.

9        MR. BRAZE:  Move P 113 through 115 into evidence.

10        THE COURT:  Received.

11        (Plaintiff's Exhibits P 113 through P 115 were

12  received.)

13  BY MR. BRAZE:

14  Q.  So these are the examples of -- putting P 113 up on the

15  screen -- these are the examples of the calculations you did

16  for each of your -- for sale of the 19 homes, the sale of 11

17  homes, and then sale of the remaining 38 homes?

18  A.  Exactly.  And for example, for this document, this is for

19  the 19 homes that were sold.  So we show the prices, when they

20  were sold, the prices, and also the cost of sales.

21        It is just a detailed breakdown of the profit and

22  loss statements that we just went through.  And that's

23  basically all it is.  This is on a per lot calculation.

24        And then the exhibits that we went through now -- I

25  mean a few minutes ago is just a summary of these numbers.

1   is?

2   Q.   Yes.  P 112 is the profit and loss projected for the homes

3   on 38 lots.

4   A.   Yes, sir.

5   Q.   Now, Mr. McIntosh's lawyers asked you to perform some

6   calculations to determine what Joe's profit is going to be at

7   some point out in the future, right?

8   A.   Yes.

9   Q.   And that's based on various assumptions you have made with

10   regard to those 38 lots that are -- that have no houses built

11   on them, correct?

12   A.   Yes.

13   Q.   And you have decided that there is going to be gross sales

14   proceeds on those 38 homes that aren't there yet for over $9

15   million, right?

16   A.   Yes.

17   Q.   And you have also concluded that Mr. Wu is going to make a

18   profit on that endeavor of $2.6 million, correct?

19   A.   Yes.

20   Q.   Now, first of all, you assumed that Mr. Wu wants to build

21   homes on those 38 lots at this point in time, correct?

22   A.   At some point, yes.

23   Q.   And what did you base that assumption on?

24   A.   Well, he did everything, as far as preparation goes, to

25   build homes.

1  million of profit.

2  Q.  It also has a potential to lose a lot of money, doesn't

3  it?

4  A.  How do you figure?

5  Q.  Well --

6          THE COURT:  Wait a minute.  We don't switch roles

7  here.

8          THE WITNESS:  Sorry.

9  BY MR. HASSING:

10  Q.  Sir, is it your testimony that all developers always make

11  profit on all subdivisions that they build?

12  A.  No.

13  Q.  Do you have any idea -- strike that.

14          What do you base your contention on that a developer

15  of these 38 homes will make a profit in the future?

16  A.  If he sells these houses at the same price as he has been

17  selling the other 19, then he will make a $2.6 million profit.

18          And as I said earlier, I have used the average prices

19  for basically 2007, 2008, and 2009.  So I expect him to

20  actually make more than that because the economy is going to

21  pick up, and sell at high prices.

22  Q.  All right.  Let's talk about the economy for just a

23  moment.  The economy -- you being an economist probably know

24  this better than I -- is not in very good shape right now,

25  correct?

Case 1:07-cv-01080-LJO-GSA   Document 397-4   Filed 07/02/10   Page 168 of 201

1    A.   Yes.

2    Q.   All right.  And I guess you believe that it's going to get

3    better in the near future?

4    A.   Yes, it will.

5    Q.   Uh-huh.  And you are basing your assumptions on the profit

6    that will be made on his 38 homes, if they are ever built, on

7    the fact that the economy is going to get better, correct?

8    A.   Oh, no.  No.  No.  No.  If I make the assumption that the

9    economy is going to get better, then the profits would be even

10   higher than they are.

11           I have assumed that housing prices will average about

12   what they did in 2007, 2008, and 2009.

13   Q.   All right.  Is it possible, sir, that the economy will get

14   worse as 2010 progresses towards December?

15   A.   I know of no economic projections that say that.  I know

16   of no economist that predicts that.  And according to the

17   Anderson projections from UCLA, the real estate market will

18   pick up.

19   Q.   Now, do you know if all of these forecasts and projections

20   that you have just talked about are going to bear fruit that

21   they are accurate; do you know that, sir?

22   A.   Do I know whether they are going to be?

23   Q.   Yes, sir.

24   A.   As a Ph.D. in Economics, I agree.

25   Q.   I understand you agree, but do you know that is going to

1   money.

2          THE COURT:   Let me know when you have a natural break

3   in your questions.

4          MR. HASSING:   I'm going to make one motion and then

5   I'm going to have a break.   I move, your Honor, that Exhibit

6   P 115 and P 112, their provisional admittance, be taken out of

7   evidence based on speculation.

8          THE COURT:   That request is denied.   It will be a

9   matter of credibility.   It will be a matter of jury

10  determination on facts, and, of course, it's free to argue

11  during the closing argument.

12         MR. HASSING:   Thank you, your Honor.   This is a great

13  time to break.

14         THE COURT:   All right.   Ladies and gentlemen, it is

15  now noon.   I have a judge's meeting at -- during the noon

16  hour, and I'm quite sure I can be done and back by 1:15, so I

17  would ask you to be back at 1:15 in the jury room so we can

18  finish with this witness.   Please remember the admonitions.

19  Don't have anything to do with the case during the lunch hour.

20         We will see you at 1:15.

21         (The jury left the courtroom.)

22         (The lunch recess was taken.)

23

24

25

1    to send out its assessment on February 1, that's a pretty

2    tight time period, correct?

3    A.  I'm not aware of the county sending bills out in February

4    1.

5    Q.  Okay.  You didn't research the issue, did you?

6    A.  I did not.

7    Q.  And, likewise, you didn't research the issue of whether or

8    not this property could have had a reduction in its property

9    taxes on account of its assessed value being too high,

10   correct?

11   A.  I'm sorry.  I didn't follow that question.

12          MR. ALEXANDER:  Withdrawn.  Thank you, your Honor.

13          THE COURT:  Any further questions?

14          MR. HASSING:  No.

15          THE COURT:  Anyone?

16          MR. BRAZE:  No.

17          THE COURT:  Okay.  Thank you, sir.  You may step

18   down.

19          THE WITNESS:  Thank you, your Honor.

20          THE COURT:  Next witness.

21          MR. BRAZE:  Subject to a couple requests for judicial

22   notice, we would be resting.

23          THE COURT:  All right.

24          Defense?

25          MR. BRAZE:  The plaintiff requests that the Court

1   take judicial notice of Government Code section 66499.3.

2        THE COURT:   Any objection?

3        MR. ALEXANDER:   I'm sorry, your Honor.   I didn't hear

4   him.

5        THE COURT:   He is asking that the Court take judicial

6   notice of Government Code section 6499.3.

7        MR. ALEXANDER:   I have no objections.

8        THE COURT:   Done.

9        MR. BRAZE:   Should I read it into the record, your

10  Honor?

11       THE COURT:   Generally, that -- since it is law, it

12  generally would be included in the jury instructions rather

13  than now.

14       MR. BRAZE:   Okay.   We would also request the Court to

15  take judicial notice of Wasco Municipal Code section

16  16.28.020.

17       MR. ALEXANDER:   Your Honor, I believe we already have

18  the Wasco Municipal Code in evidence as an exhibit.

19       THE COURT:   I believe that that's true, so it is

20  already in evidence.

21       MR. BRAZE:   Thank you.   That comes from Exhibit J 8.

22       THE COURT:   That's in.

23       MR. BRAZE:   Plaintiffs rests.

24       MR. OKADIGBO:   The City calls Larry Pennell.

25                         **LARRY PENNELL,**

1  correct, sir?

2  A.  Yes, sir.

3  Q.  You processed that map?

4  A.  Yes, sir.

5  Q.  Now, earlier today, Larry Pennell testified that the City

6  Manager stays out of the review and approval process for

7  tentative maps.

8       The question I'm asking you is:  Was that true as of

9  the processing of this tentative map?

10  A.  Correct.

11  Q.  The City Manager didn't tell you or the Planning

12  Department what to do or what to not do?

13  A.  No, sir.

14  Q.  Are you familiar with an expired map, revised tentative

15  map for Tract 5472?

16  A.  Yes.

17  Q.  Can you explain whether the City's review and approval

18  process for the Tract 6451 map -- I'm sorry.  Let me rephrase

19  that.

20       Can you explain whether that expired Map 5472 had any

21  bearing on the City -- I'm sorry, on the Planning Department's

22  decision whether to recommend approval for the 6451 tentative

23  map?

24  A.  No, sir.

25  Q.  It had no role?

Case 1:07-cv-01080-LJO-GSA Document 397-4 Filed 07/02/10 Page 173 of 201

1  A.  No, sir.

2  Q.  And why is that?

3  A.  When a map is expired, for any new project to come in on

4  that same land, a new map has to be submitted per the

5  Subdivision Map Act.  Once a map is expired, it is no longer a

6  valid document, so we review the new map for consistency with

7  the General Plan and zoning.

8  Q.  Is it fair to say that the 6451 map represents the current

9  developer's intentions on how to divide that tract of land?

10  A.  Can you restate the question?

11  Q.  Okay.  The 6451 map in this case, it's Mr. Wu's map or his

12  company's map, correct?

13  A.  Correct.

14  Q.  And the map represents what Mr. Wu wants to do with Tract

15  6451, correct?

16  A.  Yes.

17  Q.  Is it fair to say that the Planning Department doesn't

18  look at 5472 in terms of the review process, because 5472 was

19  not Mr. Wu's intentions; he --

20  A.  Correct.

21  Q.  Now, you discussed earlier the fact that the 6451 map

22  would have been made available to the public at some stage

23  during the tentative map review process, correct?

24  A.  Correct.

25  Q.  What would have been the purpose for making that map

1  Q.  Yes.

2  A.  The answer is yes.

3  Q.  And with respect to DeWalt, could they have laid it out in

4  a different manner?

5  A.  Not with the existing improvements in place.

6  Q.  Why not?

7  A.  Because they were existing.  The streets were completed.

8  The utilities were installed.  The street lights and the fire

9  hydrants were in place, all helping to define the limits of

10  where these streets needed to be.

11  Q.  So are you saying they had no latitude as to how they drew

12  the tentative map, they had to make it conform to

13  Mr. McIntosh's tentative map?

14  A.  Without having to tear out existing improvements, yes.

15  Q.  Now, you had -- where are the little ones?  The lots.

16       Now, you were shown lot 46.  And we have been through

17  this exercise before, but the dimensions on these maps are

18  expressed in hundredths of a foot, correct?

19  A.  Yes.

20  Q.  And a hundredth of a foot is slightly less than one-eighth

21  of an inch, correct?

22  A.  Yes.

23  Q.  Now, Map [sic] 46 has dimensions on the DeWalt map of

24  113.33 and on the McIntosh map of 113.28.  That's five

25  hundredths of an inch, correct --

877

1    A.   Yes.

2    Q.   -- difference.  So that's about a half an inch?

3    A.   Yes.

4    Q.   In 113 feet?

5    A.   Yes.

6    Q.   And the eastern boundary has dimensions on the McIntosh

7    map of 100.83 inches, and on the DeWalt map, 100.82 inches, a

8    difference of one hundredth of a foot?

9    A.   One correction.  That's in feet, not inches.  And that's

10   correct.  One hundredth of a foot.

11   Q.   Correct.  Sorry.  Is that difference significant to you?

12   A.   It's just different.  That means it's not copied.

13   Q.   So for you to think it was copied, the dimensions would

14   have to be exact to the hundredth of a foot?

15   A.   I can't quite understand copying a different number.  If

16   you were to copy it, why not copy the same number?

17   Q.   So if we had maps that had the same number, you would

18   believe that was evidence of copying, wouldn't you?

19   A.   At least potentially, it could have been.

20   Q.   Now, you told us about some of the differences in the two

21   tract maps, but did you note all the similarities?

22   A.   I did note some similarities, yes.

23   Q.   Did you note that Lots 31 through 36 on both maps are

24   exactly 66 feet wide?

25   A.   I probably did, yes.

1   D 217, which is a one-page summary of profit and loss.  Do you

2   see that, Mr. Wu?

3   A.   Yes.

4   Q.   Now, you and your staff prepared this document, didn't

5   you?

6   A.   Yes.

7   Q.   And take a look, if you would, at the top of the document

8   where it refers to sales, 30 homes, do you see that?

9   A.   Yes.

10  Q.   Now, on this document, you have indicated that there were

11  18 homes sold, right?

12  A.   Yes.

13  Q.   By the way, when was this document prepared?

14  A.   Well, this is prepared back to I believe it is September

15  and October last year.

16  Q.   Take a look at the date at the top of it, sir.

17  A.   October 31st, '09.

18  Q.   Is that when it was prepared?

19  A.   Yes.

20  Q.   Now, as of October 31st, 2009, had you sold homes having a

21  total sales price of $4.43 million?

22  A.   Yes.

23  Q.   And if you had sold 14 homes -- excuse me, 18 homes, how

24  many homes did you have left to sell at that time?

25  A.   12 homes.

1  Q.  All right.  And did you come up with this figure of

2  2,178,000 for the anticipated sales price of the remaining 12

3  homes?

4  A.  Yes.

5  Q.  Now, who, at your company, is the person who has been in

6  charge of setting sales prices for those homes since they were

7  built?

8  A.  Usually, I working with the sales agent and we search

9  around the City of Wasco area at all the homes sold and

10  compare the ones to our subdivision, the home sales, so we

11  finally determine what is the value on a home price for sale.

12  Q.  You work with your sales agent?

13  A.  Yes.

14  Q.  Who makes the final decision on what these homes are going

15  to be listed for?

16  A.  Me.

17  Q.  All right.  And when you estimated that you were going to

18  sell the remaining 12 homes for $2.178 million, did you take

19  into consideration the various market factors at play back in

20  October?

21  A.  Yes.

22  Q.  And have those conditions, based on your observation,

23  gotten better or less, as far as selling new homes in Central

24  California?

25  A.  Well, we noticed that the home sales market in Wasco area

1    is continue deteriorate since '07, '08, '09, and even right

2    now, it still continues to slide down.

3    Q.   This number that's shown on the screen right now, the $6.6

4    million?

5    A.   Yes.

6    Q.   What does that number represent?

7    A.   It represents the 18 homes sold -- actually sell plus 12

8    homes.  And at that time I sold at a weak projection, the home

9    sale price, to get it.

10   Q.   Thank you, sir.  Now, I also notice on this summary that

11   you have made a calculation of projected sales revenue for

12   your 38 lots, is that correct, towards the middle of the page?

13   A.   Yes.

14   Q.   And what is that number, sir?

15   A.   $851,274.48.

16   Q.   Sir, please look at the screen.  And do you see where I'm

17   pointing right now?

18   A.   Yes.

19   Q.   What is that, sir?  Why did you put that there?

20   A.   That's called a "projected land sale."

21   Q.   And did you make a projection as to what you might be able

22   to sell those 38 lots for?

23   A.   Yes.

24   Q.   What number did you come up with?

25   A.   760,000.

1    Q.  You say you have been trying to sell the lots?

2    A.  Yes.

3    Q.  How long have you been trying to sell them for that amount

4    of money?

5    A.  Year and a half.

6    Q.  Have you had any offers for 20,000 per lot?

7    A.  No.

8           MR. BRAZE:  Objection, it's irrelevant.

9           THE COURT:  Overruled.

10          THE WITNESS:  No.

11   BY MR. HASSING:

12   Q.  If you receive an offer for 20,000 a lot, will you accept

13   it and sell those lots?

14   A.  No.

15   Q.  You won't?

16   A.  No, I will sell it, but I have no offer.

17   Q.  I understand you haven't had an offer, but if you get an

18   offer for 760,000, will you accept it?

19   A.  Yes.

20   Q.  All right.  Let's take a look at a few items that

21   Dr. Merati had a problem with.  Do you remember Dr. Merati

22   questioning the amount of commission that you indicate on this

23   summary that you have paid in order to get those 18 houses

24   sold?  Item number 7 here.

25   A.  Yes.

1   Q.   And do you recall him saying that he was only willing to

2   use a portion of that number in his summary?

3   A.   Yes.

4   Q.   Now, Exhibit D 217 that you have in front of you, sir,

5   when you prepared that, did you intend that to represent all

6   of the financial documents that have been created and are

7   involved in the construction of your subdivision, or was that

8   just a summary?

9   A.   No.   That's for entire financial, that's for all of this

10  68 lots.

11  Q.   D 217 that's in front of you, sir --

12  A.   Yes.

13  Q.   -- is that a summary or does that include all of the

14  exhibits, all of the documents?

15  A.   Well, it includes all the exhibits and all the documents.

16  Q.   Did you prepare these 14,000 pages I'm looking at right

17  here, sir?

18  A.   Yes.

19  Q.   What are they?

20  A.   Well, this is evidence to supporting document all of this

21  summary that relate to all expenses.

22  Q.   So you just mentioned the word "summary."   What summary

23  are you talking about?

24  A.   Summary for profit and loss.

25  Q.   Is that the book in front of you?

1   A.   Yes.

2   Q.   Are these other 30 books here, they the backup information

3   that goes with that summary?

4   A.   Yes.

5   Q.   Explain to the jury, if you would, how it was that you

6   paid $208,000 in commissions.

7   A.   Well, the commission usually that the -- is paid for

8   the -- we the in-house agent.  We pay $4,000 per house and

9   besides that, because other homes sold, other homes go through

10  the outside sales agent, so we had paid up to 3 percent on

11  sales price of the -- each home.

12  Q.   Sir, take a look, if you would, in your summary at tab 7.

13  Tab 7.

14  A.   Yes.

15  Q.   Open it to tab 7.

16  A.   (Witness Complies.)

17  Q.   What is tab 7?

18  A.   This is the spreadsheet for the total commission we paid

19  for.

20  Q.   And is that just a one-page document?

21  A.   Yes.

22  Q.   Do you recall if that was the document that Dr. Merati was

23  looking at?

24  A.   Yes.

25  Q.   And do you recall Mr. Merati saying that he allowed you

1       The request for a motion to amend to proof is denied

2  because the Court finds there is no such evidence.  That is

3  not in any way taking away from the plaintiff's argument as to

4  each individual defendant.

5       But I, what I'm hearing the argument truly be, when

6  I'm hearing the argument on the one side and on the other

7  side, knowing what the evidence is in this case -- and I'm not

8  finding certain factual things to be true.  I'm talking about

9  all the evidence from which a trier of fact could make a

10 finding of truth -- is that you are telling me the strength of

11 your case against each individual defendant, and that's up to

12 the jury to determine.  I'm not -- that's not before me.

13      But I am not seeing a legal link between from one

14 defendant to the other to the other factually that answers and

15 addresses and fulfills the requirements of the necessity of

16 contributory liability.

17      Anything else?  Any other legal issues?

18      Verdict.  Any other matters on jury instructions?

19      If not, what I'm intending on doing is I'm intending

20 to bringing the jury out.  I will read them the rest of the

21 instructions.  I will take a five-minute recess right after so

22 you can have a chance to set up.

23      And just so you know, the podium does turn.  And so

24 if you wish to turn the podium so it faces the jury, that

25 might be a little bit more manageable for you.  If you prefer

1    you must be persuaded by the evidence that it is more probably

2    true than not true that the copyrighted work was infringed.

3         To prove that the defendant copied the plaintiff's

4    work, the plaintiff must show that the defendant had access to

5    the plaintiff's copyrighted work and that there are

6    substantial similarities between the defendant's work and the

7    plaintiff's copyrighted work.

8         One who reproduces, prepares, derivative works from,

9    or distributes a copyrighted work without authority from the

10   copyright owner during the term of the copyright, infringes on

11   the copyright.

12        Copyright may also be infringed by vicariously

13   infringing and contributorily infringing.  A person is liable

14   for copyright infringement by another if the person has

15   profited directly from the infringing activity and has the

16   right and ability to supervise the infringing activity,

17   whether or not the person knew of the infringement.

18        The defendants contend that there is no copyright

19   infringement.  There is no copyright infringement where the

20   defendant independently created the challenged work, the

21   defendants made fair use of a copyrighted work by reproducing

22   copies for criticism, comment, news reporting, teaching,

23   scholarship or research.

24        Copyright is the exclusive right to copy.  The right

25   to copy includes the exclusive rights to:

1        Number two, the nature of the copyrighted work.

2        Number three, the amount and substantiality of the
3   portion used in relation to the copyrighted work as a whole.

4        And number four, the effect of the use upon the
5   potential market for or value of the copyrighted work.

6        If you find that the defendant proved by a
7   preponderance of the evidence that the defendants made a fair
8   use of the plaintiff's work, your verdict should be for the
9   defendant.

10        If you find that the -- that a defendant infringed
11   the plaintiff's copyright in the work, you may consider the
12   plaintiff's claim that a different defendant vicariously
13   infringed that copyright.

14        The plaintiff has the burden of proving each of the
15   following by a preponderance of the evidence:

16        Number one, the defendant profited directly from the
17   infringing activity of the infringing defendant.

18        Number two, the defendant had the right and ability
19   to supervise or control the infringing activity of the
20   infringing defendant.

21        And number three, the defendant failed to exercise
22   that right and ability to supervise or control infringing
23   activity of the infringing defendant.

24        If you find that the plaintiff proved each of these
25   elements, your verdict should be for the plaintiff if you also

1    find that a defendant infringed the plaintiff's copyright.

2         If, on the other hand, the plaintiff has failed to

3    prove any of these elements, your verdict should be for the

4    defendant.

5         A defendant may be liable for copyright infringement

6    engaged in by another if it knew or had reason to know of the

7    infringing activity and intentionally induced or materially

8    contributed -- let's see.  This instruction 39 should not be

9    given.  That's out.

10        Inadvertent mistakes on copyright registration

11   certificates do not invalidate a copyright and thus do not bar

12   an infringement action unless the copyright claimant intended

13   to defraud the Copyright Office by making the misstatement.

14        A copyright defendant may offer evidence to dispute

15   validation of the copyright registration.

16        If you find for the plaintiff on the plaintiff's

17   copyright infringement claim, you must determine the

18   plaintiff's damages.  The plaintiff is entitled to recover the

19   actual damages suffered as a result of the infringement.

20        In addition, the plaintiff is also entitled to

21   recover any profits of the defendant attributable to the

22   defendant.  The plaintiff must prove damages by a

23   preponderance of the evidence.

24        The copyright owner is entitled to recover the actual

25   damages suffered as a result of the infringement.  Actual

1  that.  You may continue your deliberations while waiting for

2  the answer to any question you might send out.

3         Remember that you are not to tell anyone, including

4  me, how you stand numerically or otherwise, until after you

5  have reached a unanimous verdict and you have been discharged.

6  Do not disclose any vote count in any note to me.

7         As I indicated before, a verdict form has been

8  prepared for you, and after you reach unanimous agreement on

9  the verdict, your presiding juror will fill in the form that

10  has been given to you, sign it and date it, and advise me that

11  you are ready to return to the courtroom.

12         Now, ladies and gentlemen, that ends the

13  instructions.  And what we will do then is stop now.  It is

14  3:20.

15         And tomorrow morning, I would ask you to be in the

16  jury room, ready to go, at 8:30, and then we come out and you

17  will hear all of the closing arguments.

18         One additional thing has happened to you.  Now you

19  have heard all the evidence.  Now you have heard all the law,

20  so you might think, well, it is time to talk about it.  It

21  isn't, because the closing arguments of counsel by law are a

22  part of the trial, and counsel are entitled to talk to you in

23  their closing arguments, to argue their case to you before you

24  commence your deliberations.

25         So please don't talk about the case among yourselves

1    or, of course, anyone else until tomorrow morning when we give

2    you the case after the closing arguments.

3            It is a sensitive time.  Please remember don't do

4    anything about the case.  Don't even think about looking

5    anything up.  Just don't do anything about the case from now

6    until you get back tomorrow morning at 8:30.

7            Any questions, issues, problems, concerns?

8            Okay.  Have a restful evening, and we will see you

9    tomorrow morning in the jury room.  8:30.

10           (The jury left the courtroom.)

11           THE COURT:  Let the record reflect the jury has left.

12   Give me a minute.  I'm going to go back and see if the verdict

13   is ready for you, because we will give each one of you copies.

14   In the meantime --

15           THE CLERK:  You should have a copy there.

16           THE COURT:  Oh, she is faster and quieter than I

17   thought.

18           So why don't we do this.  Go ahead and take care of

19   the issues with regard to confirmation on the exhibits,

20   whether they are in or not, make sure everybody is on the same

21   track.  Take a look at the verdict form tonight.

22           And why don't we figure that we will all be here

23   right around 8:15, just in case there are any last minute

24   issues on the verdict.  And that way, we will be ready for the

25   jury at 8:30, when we promised them we will be.

1   activity by the other defendants, if any?"  If there is none,

2   then there is nothing to answer.

3       MR. OKADIGBO:  I agree, but they could possibly still

4   take yes, even if they have answered no to the other ones.

5       THE COURT:  It would be an inconsistent verdict, and

6   that's one of the reasons I look at the verdict before I take

7   it.  If there is a problem there, we will bring the jury back

8   in.

9       Unless you have some specific unobjectionable

10  suggestion, I mean it is easy enough to change the verdict; it

11  is not a big deal now.

12      MR. OKADIGBO:  That's fine, your Honor.

13      THE COURT:  Leave it?

14      MR. OKADIGBO:  Yes.

15      THE COURT:  Everybody else ready to go?

16      MR. HASSING:  Yes, your Honor.

17      THE COURT:  Mr. Braze, do you want that podium turned

18  around or not?

19      MR. BRAZE:  I think I will be okay with that like

20  that.  I'm just trying to get the camera up.

21      THE COURT:  Okay, that's fine.  We will wait, the

22  jury should be ready in ten minutes, and we will start.

23      (Recess)

24      THE COURT:  All right.  Back on the record.  Counsel

25  are present, the jury is not.  Is there any reason we

1   shouldn't call the jury out now?

2          MR. HASSING:  No, your Honor.

3          THE COURT:  We are ready.  Thanks.

4          (The following proceedings were had in the presence

5          of the jury, to wit:)

6          THE COURT:  And the jury has now joined us.  We are

7   still on the record.

8          Good morning, ladies and gentlemen.  Any issues,

9   concerns?  Good.

10          All right.  We are ready for the closing arguments.

11   Just keep in mind, as we go through these closing arguments

12   this morning, that this is no longer evidence.  You have heard

13   all the evidence.  And this is counsel's opportunity to tell

14   you what they believe the evidence is, and how you should

15   apply it to the law as I have given the law to you.  Remember

16   ultimately, it is your memory that counts as to the evidence.

17          You should understand and be mindful of the fact that

18   the lawyers aren't agreeing what the evidence is or how you

19   should apply it.  That's the purpose of closing arguments, is

20   so they can give you the different perspectives.

21          So just because one lawyer on one side of the case or

22   the other is not jumping up saying, "I don't agree with that,"

23   you will understand, when you hear all the closing arguments,

24   that they have different perspectives.  And it is up to you

25   ultimately to decide what the facts are and to put those facts

1    into action with the law as you find those facts to be.

2              Any questions at all?

3              All right, Mr. Braze, are we ready?

4              MR. BRAZE:  Thank you, your Honor.

5              Good morning, ladies and gentlemen.  You've come to

6    the end of a long journey and have one more step left.  That

7    would be your verdict.

8              And of course, trials like this don't just happen.

9    They take a lot of people, energy.  Certainly, Irma and Sergio

10   have done a wonderful job keeping us organized, and keeping

11   our exhibits together.

12             Peggy, of course, has been working her hands off.

13   She told me she has been hitting about 50,000 strokes a day

14   during the trial, so we thank you for her effort.

15             And of course, there is our Judge O'Neill.  32 years,

16   probably one of the best judges I have ever had the

17   opportunity to appear in front of, and you people of the

18   Eastern District should be proud to have a United States Judge

19   in your community that serves like this.

20             One thing that impressed me was that he was concerned

21   about you and your time and inconvenience.  And you might see

22   that from a federal judge or a state judge who has to run for

23   reelection because you people elect him, but Judge O'Neill is

24   appointed for life, so he doesn't have to impress you.  He

25   doesn't want to, but he is very concerned about your welfare.

1    MR. BRAZE:  Okay.  Can I mark on this?

2    THE COURT:  Yes, you can.

3    MR. BRAZE:  So the first question you are going to

4  answer, starts with copyright infringement and then in the

5  back, it goes to damages, and you sign your verdict on 9.

6    Question 1:  Did Dennis DeWalt copy Plaintiff Roger

7  McIntosh's tentative map for Tract 5472?

8    Again, we believe there is copying, but all we have

9  to do is prove access and substantial similarity, and we

10  believe the answer to that question is "yes."

11    Question number 2:  Did Dennis DeWalt copy Roger

12  McIntosh's improvement plans?

13    Again, as I just showed you, it appears that the

14  grading plan has been copied.  Again, don't need to prove

15  copying, just need to show access and substantial similarity.

16  And the answer to that is "yes."

17    Did Northern California Universal Enterprises

18  Company -- and I will call that Wu -- copy Roger McIntosh's

19  tentative map?

20    In all fairness, I don't believe so.  I don't think

21  he copied anything.  So I think that answer is probably "no."

22  Same with improvement plans, same thing on behalf of Lotus.

23    And Question Number 7:  Did Defendant City of Wasco

24  copy plaintiff Roger McIntosh's tentative map?

25    Obviously, yes.  Copied and distributed, without

1037

1   copyrighted.  Ideas themselves cannot be copyrighted.

2           Now, we have taken a look many times at the

3   subdivision, obviously, that's the subject of this lawsuit.

4   And you heard ad nauseam about this 68-lot subdivision that

5   was Revised 5472.  And the layout of the subdivision is an

6   idea, an idea of how to lay out lots to be built on on a piece

7   of land.

8           This was Mr. McIntosh's idea.  And ideas can't be

9   copyrighted.  You will see that in your jury instruction.

10  Ideas are free for anybody to use.  And that's an important

11  element of copyright law, because there is not only one jury

12  instruction on it, there is two or three.

13          Jury Instruction 26 will also tell you, "Copyright

14  protection of an original work of authorship does not extend

15  to any idea."

16          What it extends to is the expression of the idea.

17  What is the expression of the idea?  It's the actual drawing

18  on a piece of paper of the idea.  That's how this idea is

19  expressed.

20          DeWalt, Mr. Wu, they can't actually copy what was

21  drawn, but the idea is fair game.

22          And so if DeWalt goes out there and surveys what's in

23  the ground, they are not copying the expression.  They are not

24  copying what's on the paper.  They are using the same idea.

25  And you know why they used the same idea?  Is because all the

1    streets and everything were in.

2        Jury Instruction 27.  Here's the third time the law,

3    which the Judge read to you, talks about ideas.  "A copyright

4    is not violated when someone uses the idea from a copyrighted

5    work as long as the particular expression of that idea in the

6    work is not copied."

7        So nobody here is saying that DeWalt could have sat

8    down at their drafting table and copied this paper map.  If

9    they had done that, yeah, there would have been copyright

10    infringement.  There is no evidence that they did that.  The

11    evidence that you have before you is that they went out and

12    surveyed everything.

13        Now, there are other things that can't be

14    copyrighted.  Ideas can't be copyrighted and facts can't be

15    copyrighted.

16        Jury Instruction 24.  Facts cannot themselves be

17    copyrighted.  What facts do we have in this case?

18        Well, when DeWalt was hired, there were asphalt

19    streets out there in Wasco; that's a fact.  There were

20    concrete curbs; that's a fact.  There were block walls; those

21    were all facts.  There were monuments placed in the ground.

22    Some of those monuments were placed in the ground by McIntosh.

23    But those are facts.  So if DeWalt goes out and makes note of

24    those facts, that's not copyright infringement.  Jury

25    Instruction 24.

Case 1:07-cv-01080-LJO-GSA   Document 397-4   Filed 07/02/10   Page 194 of 201

1    Mr. Wong also talked about bearings and distance

2    information in the 6451 map.  That was shown on all the lots

3    for 6451, but they were not shown in the 5472 map.

4    He also mentioned the fact that the 6451 map has

5    topographical contour information, whereas the 5472 map has

6    none of that.

7    He talked about how the 6451 map has lot dimensions

8    for all lots, whereas that wasn't true of the 5472 map.

9    He mentioned that the 6451 map has pavements,

10   sidewalks, streets, storm drainage information, curbs and

11   gutters, fire hydrant locations.  It shows the existence of

12   water lines.  None of that is in the 5472 map.

13   Mr. Wong also compared specific lots.  In this case,

14   it was Lots 13, 14, 15 -- I'm sorry, 13, 14, 16 and 40, and

15   explained the differences in the lots.

16   Mr. Wong explained that the similarities between Maps

17   6451 and 5472 were due to the fact that the improvements had

18   been put in.  For example, if the claim is that the street

19   layouts are the same.  Well, of course they are the same,

20   because the streets were built in accordance with the 5472

21   improvement plans.  So anybody that's going to draw those

22   streets, if they go out there, they are going to draw the same

23   shape, so that's a superficial similarity.

24   You heard Mr. Warren Craig, whom they describe as

25   "the gardener," but in fact is a street supervisor.  You heard

1066

1    him testify that lot numbers were on the curbs.  So that

2    explains the similarity in numbering.

3          Now, I believe the plaintiff claimed through

4    Mr. DelMarter, his expert, that the tract boundaries are the

5    same, or plaintiff claims that they are, anyway.

6          But even if the outer tract boundaries are the same,

7    the legal description of the property controls what space you

8    have.  So if your property is shaped in a triangle, for

9    example, that's the land you bought.  If I go and draw a

10   triangle because I'm hovering over your property in a

11   helicopter, it is what it is.  It's a superficial similarity

12   to say that, well, because I drew the triangle, I'm infringing

13   on copyright interests because you happen to have put it in a

14   map.  That's ridiculous.

15         You will hear testimony from -- I'm sorry.  You heard

16   testimony from Jeff Gutierrez about the extent of the

17   surveying work done, the shooting of 400 points.  I will let

18   Mr. Alexander get into that in more detail, but that shows the

19   extensive efforts that DeWalt devoted towards preparing their

20   6451 tentative map.

21         Now, I am not stating that there are not any

22   similarities between 6451 and 5472, but the construction of

23   the improvements explains those facts.

24         Mr. Braze asked you to use logic and common sense.

25   Well, let me put to you what I think is logic and common sense

1   in this matter.  This is the same thing as an "A" student

2   studying hard for a test, and the "A" student is answering 95

3   percent of the questions.  And then he says, you know what?  I

4   don't feel like doing the other 5 percent.  Let me look over

5   this other guy's shoulder and do that 5 percent.

6           Their map had to be more detailed.  They set about

7   trying to create a vesting tentative map which, by nature,

8   gives the property owner more rights.

9           Why would they go out into the field and do all this

10  work, shooting all these survey points, measuring, measuring

11  all these distances between the lots, and then say, "Oh, you

12  know what?  I feel like being lazy on one lot here and another

13  lot there."  That doesn't make sense.

14          Now, in this regard, I want to bring to your

15  attention the fact that Mr. Braze asked Mr. Wong on the stand

16  about certain similarities he observed.  Mr. Wong was sitting

17  right there and Mr. Braze was asking him here about supposed

18  similarities in a bunch of lots.  Mr. Wong was taking his

19  representation as accurate, as far as the information that

20  was -- the information that was portrayed.

21          Mr. Braze was basically saying, "These are the same,

22  correct," "These are the same, correct," and Mr. Wong was

23  trusting that those representations were true.

24          Well, at 9:00 p.m. last night, I said, "Hang on a

25  minute.  Let me see what he is talking about."

1  DeWalt's efforts in relation to this project.  DeWalt was

2  hired in September of 2004.  We know that through exhibits

3  J 16 and J 18.  They went to work immediately.  They sent a

4  survey crew out.  They did all of their pre-survey work, such

5  as pulling down public information and data, getting

6  information on the tract, and they sent their crew out.

7         They sent their crew out and they prepared a

8  topographic survey, and they had roughly 420 shot points.  We

9  showed you the 19-page exhibit, D 226-A.  Those shot points

10  were then taken from a hand-held device in the field, moved to

11  the company computers, and a base map was prepared.

12         That's how the project started.  Once the base map

13  was prepared -- and excuse me.  I will go back just one moment

14  and say that the topographic survey was done by Paul Chavez

15  and Don Osborne.  They spent roughly 85 man-hours, which is

16  two men, at 42 hours each, so it is a two-man crew.

17         A base map was prepared using the data.  And then by

18  October -- excuse me.  By October of 2004, they had already

19  submitted a status report to Mr. Wu.  And by November 10th of

20  2004 -- this is Exhibits J 121 and J 13 -- they had submitted

21  the tentative tract for approval.

22         By November, they updated their submittal.  In

23  December, J 14, the City said, "Hey, we don't want the

24  vesting."

25         By December 20th, J 22, the vesting was dropped and

1    the map proceeded.

2         On March 15 of 2005 -- we have already seen it -- the

3    tentative map was approved.

4         And you have heard some suggestion that

5    Mr. Gutierrez's company copied the improvement plans.  And,

6    again, we know what we are dealing with, those weren't even

7    e-mailed until April 13, 2005, more than a month after the

8    tentative tract map was approved.  That's Exhibit Number J 15.

9         What do we know about the independent creation?

10   Here's what we know.  DeWalt agreed to perform certain

11   services on behalf of Mr. Wu's companies.  DeWalt committed

12   the time, materials, equipment and resources and did all that

13   work.  Even the witnesses provided by Mr. McIntosh, including

14   himself and Mr. DelMarter, no one is contesting the fact that

15   it was done.

16        So then the question becomes, if they did all of

17   their work, that they performed all of their services, and if

18   they based their work upon their surveys, the work in the

19   office, how can it not have been independently created?  How

20   can it not?

21        Let me ask you this, ladies and gentlemen, and this

22   is on the independent creation issue.  What if, what if

23   Mr. McIntosh had been faced with the very same development

24   with everything in place in the ground?  Would his map,

25   tentative map, have looked anything different unless they were

DEWALT'S CLOSING ARGUMENT

1094

1  going to rip out all the improvements?  And I think the answer

2  to that is no.

3         Now, let's talk briefly -- and I have a couple more

4  points to make and I apologize for taking so long.

5         Again, there was no copying because the substantial

6  similarity was not the result of copying, it was the result of

7  the fact that all the improvements were there and there were

8  no other choices.

9         Independent creation means independent effort and

10  independent work.  Could DeWalt have easily copied the map?

11  Sure.  Sure.  It would have been easy.  They didn't.  They did

12  their work.

13         Now, here's the point I would like you to pay

14  attention to right at the end.  How would this have been

15  copyright infringement?  The easy answer is had DeWalt been

16  faced with the same blank sheet that Mr. McIntosh faced, and

17  had Tract Number 5472 been prepared and looked just the way it

18  does today, that's copyright infringement.  That's copyright

19  infringement.  Had DeWalt taken the tentative map and applied

20  it on a sister parcel of the same size right next door and

21  built the parcel?  Copyright infringement.  No doubt.  Had

22  DeWalt not done its work?  Of course.

23         Lastly, what motives -- and again, Mr. Braze said it

24  best.  He is calling it "theft."  What motives did DeWalt have

25  to copy?  Was it for financial benefit or gain?  We know that

1    were talking about from a legal standpoint.  It's still within

2    the parameter of argument, what he has just stated.

3           But let's not spend too much time on it so we don't

4    cross the line.

5           MR. BRAZE:  Okay, your Honor.  Based on that, there

6    was no independent creation, therefore, there was no defense

7    to the fact that the drawings were substantially similar or

8    had substantial similarities.

9           MR. HASSING:  Your Honor, I object.  Move to strike.

10   That does go past the line --

11          THE COURT:  Just a minute.

12          MR. HASSING:  -- when you tie it all together.

13          THE COURT:  Ladies and gentlemen, some of this is so

14   close, it is very difficult, depending on what inferences one

15   can draw, such as you, the triers of the fact, that the legal

16   issues are very, very difficult.  And so I urge you that -- we

17   will send in, even without your asking, we will send in a copy

18   of the instructions with the verdict form.  So remember, the

19   law is as it is in the jury instructions.  Nobody can change

20   that part.

21          So let's go ahead and finish.

22          MR. BRAZE:  Mr. Alexander suggested to you that you

23   pay Mr. McIntosh in 1992 dollars.  In reality, the

24   infringement occurred in 2004 and he should be paid in 2004

25   dollars, and we gave you that information.

1    present and everything is fine, okay?

2         All right.  Okay, have a pleasant evening.  Rest.

3    Get some rest, and we will see you tomorrow.

4         (The proceedings were adjourned to the courtroom.)

5         THE COURT:  Back on the record in the courtroom.  All

6    counsel are present.  I have given the good night admonitions

7    to the jury.  They had no questions that they asked me

8    verbally, which, if they had, I would have stopped them and I

9    would have told them they would have to put it in writing, but

10   they didn't try.

11        They want to come back tomorrow morning at 8:30.

12   They will let us know when all eight of them are present,

13   around 8:30, when they get there, and I think you can count on

14   within a few minutes of 8:30 they will be there.

15        Any issues?  Get some rest, and we will see you

16   tomorrow.

17        (The proceedings were adjourned at 4:34 p.m.)

18        I, PEGGY J. CRAWFORD, Official Reporter, do hereby

19        certify the foregoing transcript as true and correct.

20

21   Dated:  03/25/2010                    /s/ Peggy J. Crawford
                                           PEGGY J. CRAWFORD, RDR-CRR

22

23

24

25