1

2

3

4

5

6                    **IN THE UNITED STATES DISTRICT COURT**

7                    **FOR THE EASTERN DISTRICT OF CALIFORNIA**

8

9   ROGER McINTOSH,                          CASE NO. CV F 07-1080 LJO GSA

10                    Plaintiff,             **ORDER ON DEFENDANTS' F.R.Civ.P. 59**
                                            **ALTERNATIVE MOTIONS TO ALTER OR**
11          vs.                             **AMEND JUDGMENT OR FOR NEW TRIAL**
                                            (Docs. 362-364.)
12  NORTHERN CALIFORNIA
    UNIVERSAL ENTERPRISES,
13  INC., et al,

14                    Defendants.
                                          /
15  _____

16                           **INTRODUCTION**

17          Defendants Northern California Universal Enterprises, Inc. ("NCUE"), Lotus Developments, L.P.

18  ("Lotus") and Dennis W. DeWalt, Inc. ("DeWalt")[1] seek to alter or amend the combined $5,384,215

19  judgment against them on jury verdict in favor of plaintiff Roger McIntosh's ("Mr. McIntosh's")

20  copyright infringement claims arising from preparation of a subdivision tentative map and improvement

21  plans.  Defendants alternatively seek a new trial given what they characterize as the jury's excessive

22  award of actual damages and infringing profits.  This Court considered defendants' alternative

23  F.R.Civ.P. 59(a), (e) motions on the record without a hearing, pursuant to Local Rule 230(g).  For the

24  reasons discussed below, this Court GRANTS a new trial on actual damages and infringing profits

25  unless Mr. McIntosh accepts an amended judgment of $161,500 for Mr. McIntosh's actual damages and

26  $0 for infringing profits.

27  _____

28          [1]          NCUE, Lotus and DeWalt will be referred to collectively as "defendants."

                                          1

1

## BACKGROUND

### Summary

This action arises from alleged infringing use of a tentative map and improvement plans to develop 33.51 acres of a 480-acre parcel as a subdivision in the City of Wasco ("Wasco").[2]  Mr. McIntosh, a Bakersfield civil engineer, claims that defendants "created a residential subdivision by copying and using McIntosh's copyrighted works and employing a tangible embodiment of the landscape design McIntosh conceived and created."  This Court conducted a jury trial on March 1-4 and 8-9, 2010. The jury returned a March 10, 2010 verdict to award Mr. McIntosh $6,884,215, comprising what the jury found as Mr. McIntosh's actual damages and NCUE, Lotus and Wasco's profits[3] from infringing use of Mr. McIntosh's copyrighted works.  Given Wasco's settlement, the jury's findings of $1.4 million actual damages and NCUE and Lotus' $3,984,215 infringing profits remain at issue.

### Mr. McIntosh's Preparation Of Revised Tentative Map 5412

In January 1992, Legacy Group, L.P. ("Legacy"), a former land development firm, purchased the 480-acre Valley Rose Estates subdivision ("subdivision") in Wasco to develop the subdivision with Wasco financing.

In May 1992, Mr. McIntosh agreed to prepare for the subdivision Parcel Map No. 9572 for $5,000 and improvement plans and final map for 33.51-acre Tract 5472, at issue in this action, for $57,900.

In June 1992, Mr. McIntosh agreed to prepare a tentative map for Tract 5472 ("Map 5472")for $12,100.

In July 1992, Mr. McIntosh recorded Map 9572, which divided the subdivision's 480 acres into six parcels, including the 33.51-acre Tract 5472.[4]

According to Mr. McIntosh, he designed the overall subdivision layout and division of individual plots and common spaces and created the subdivision's landscape designs.  Mr. McIntosh's subdivision

---

[2]       Wasco is a former a defendant and settled with Mr. McIntosh during the pendency of post-trial motions.

[3]       The jury found that Wasco had profited $1.5 million from its infringing activity and awarded Mr. McIntosh such profits.  Wasco's profits are no longer at issue with its settlement.

[4]       Tract 5472 was Parcel 1.

and landscape designs are depicted in technical drawings ("McIntosh improvement plans") that are subject of his February 22, 2007 copyright registration certificate.

In 1992, the Wasco council approved Map 5472 for development of 33.51 acres into 68 residential lots and one 96-unit multi-family lot.

### Original Subdivision Improvements

In 1993, Mr. McIntosh prepared the McIntosh improvement plans (streets, sidewalks, curbs, gutters, storm drains, sewer, water and utilities) for the subdivision. Also in 1993, Mr. McIntosh submitted the McIntosh improvement plans to Wasco for Legacy to obtain a building permit to construct Tract 5472 improvements. Wasco approved Map 5472 and the McIntosh improvement plans, and improvements were constructed in 1993 and 1994.

In 1994, the real estate market declined, Legacy declared bankruptcy, and subdivision construction ceased. Although improvements were constructed for Tract 5472, legal lots within Tract 5472 were not created. Mr. McIntosh ceased work, with Legacy's default, before the final map was approved. Map 5472 expired on May 11, 2001, and a final map was not recorded to require new tentative and final maps for new home construction.

### Lotus' Subdivision Purchase

The subdivision was dormant for 10 years after Wasco decided to stop funding improvements. At an April 26, 2002 tax sale, Wasco purchased for $128,000 the 33.51-acre Tract 5472 (Parcel 1)and a partly contiguous 65.32-acre parcel (Parcel 3) of undeveloped agricultural land, which was included in the 480-acre subdivision. In November 2003, Wasco marketed Tract 5472 and circulated a developer information package which included Map 5472 and a sewer and water map and noted that there were several plan documents developed in the early 1990s and which Wasco would make available.

Wasco and NCUE, a general contractor, entered into a May 18, 2004 agreement for NCUE's purchase of Parcels 1(Tract 5472) and Parcel 3 (65.32-acre tract). Prior to the close of escrow, NCUE assigned its purchase rights to Lotus which purchased Parcels 1 and 3 for $1.6 million from Wasco.[5] NCUE contemplated to take advantage of existing subdivision improvements to develop Tract 5472.

---

[5] Lotus is a limited partnership, and NCUE, a California corporation, is Lotus' general partner.

1   With the May 11, 2001 expiration of Map 5472, Wasco required Lotus to submit a new tentative

2   map.[6]

3   **New Tentative Map 6451**

4   Rather than redesign Tract 5472, NCUE with Wasco's permission chose to process new

5   Tentative Map 6451 to replace expired Map 5472.   On July 21, 2004, NCUE hired DeWalt, a

6   Bakersfield engineering firm, for $26,000 to survey existing improvements and prepare and process a

7   new Tentative Map 6451 and a final map.   DeWalt surveyed the improvements which had been

8   constructed in Tract 5472, renamed Tract 6451.[7]   Wasco provided DeWalt a copy of the McIntosh

9   improvement plans.  DeWalt processed the survey information and created Tentative Map 6451 to depict

10   observed site improvements and conditions.   DeWalt submitted Tentative Map 6451 to Wasco on

11   November 10, 2004.  Wasco approved Tentative Map 6451 on March 14, 2005 and Final Map 6451 on

12   February 20, 2007.[8]

13   No engineering work was required, and Wasco did not require NCUE to submit improvement

14   plans due to Legacy's prior improvement construction.   As such, NCUE and Lotus did not prepare or

15   submit subdivision improvement plans.

16   NCUE obtained Wasco permission to build houses on Tract 6451, and began building houses.

17   **Mr. McIntosh's Claims**

18   Mr. McIntosh registered his copyright on Map 5472 and the McIntosh improvement plans on

19   February 22, 2007.   Mr. McIntosh proceeded on this third-amended complaint ("TAC") against

20   defendants and Wasco to allege "Defendants' construction of the Subdivision is based on landscape and

21   subdivision designs substantially similar to the subdivision and landscape design conceived and created

22   by McIntosh that is represented in the plans and that is the subject of Copyright Registration Certificate

23   No. VAU-721-180."

24   ───────────────

25   [6]   As discussed below, Tract 5472 ultimately became Tract 6451 which was divided into 68 single-family

26   lots.

27   [7]   The improvements included paved streets, sewer lines, water lines, valves and hydrants, electrical lines and boxes, curbs, gutters, sidewalks, driveway approaches, street signs, walls and fences.

28   [8]   DeWalt was paid $27,200 for its work but lost money given its $35,000 actual costs.

The TAC's first claim alleges that the "copying of the Plans by defendants constitutes infringement of McIntosh's registered copyright and the technical drawings depicted in the Plans, in violation of the Copyright Act."  Mr. McIntosh claims Tentative Map 6451 is "substantially similar" to Map 5472 in that the street names, lot configuration, numbering system and tract boundaries appear identical. The TAC's second claim alleges that Wasco "knowingly and materially contributed to and induced the infringing conduct" of NCUE and Lotus.  Mr. McIntosh claims that Wasco controlled the subdivision's development, induced infringing activities by copying, distributing and recording Mr. McIntosh's plans, and financially benefitted from alleged infringing activities.

**Jury Verdict**

With its verdict, the jury found that:

1.   Defendants and Wasco copied Map 5472 and that only Wasco had copied the McIntosh improvement plans;

2.   NCUE, Lotus and Wasco profited directly from copying of either Map 5472 or the McIntosh improvement plans done by any of the other defendants;

3.   NCUE, Lotus and Wasco failed to exercise their right and ability to supervise or control the other defendants' copying of Map 5472 or McIntosh improvement plans;

4.   Mr. McIntosh is entitled to $1.4 million in actual damages;

5.   NCUE and Lotus each profited $1,992,107.50 from their respective infringing activity;

6.   Wasco profited $1.5 million from its infringing activity; and

7.   DeWalt did not profit from its infringing activity; and

8.   NCUE and Lotus acted as partners or practically partners in committing infringing activity.

Defendants contend that the awards of $1.4 million actual damages and $3,984,215 for NCUE and Lotus' profits [9] "shocks the conscience" and is unsupported by evidence.  On numerous grounds addressed below, defendants seek F.R.Civ.P. 59(a) or (e) relief to amend or alter the judgment on the

---

[9]     "When a copyright is infringed, all infringers are jointly and severally liable for plaintiffs' actual damages, but each defendant is severally liable for his or its own illegal profit; one defendant is not liable for the profit made by another." *Frank Music Corp. v. Metro-Goldwyn-Mayer, Inc.*, 772 F.2d 505, 519 (9th Cir. 1985) (citing *MCA, Inc. v. Wilson*, 677 F.2d 180, 186 (2d Cir.1981)).

1  jury's verdict or for a complete new trial or a new trial as to damages and profits only.

2  ## DISCUSSION

3  Defendants chiefly focus on the monetary awards for actual damages and profits. Defendants

4  make passing arguments that the evidence does not support infringement and in turn liability.

5  Defendants' points regarding the absence of infringement are unconvincing given the evidence of

6  defendants and Wasco's access to Map 5472 and the McIntosh improvement plans and the substantial

7  similarity of Maps 5472 and 6451. As such, this Court will focus chiefly on the jury's monetary awards.

8  ### Alter Or Amend Judgment Standards

9  F.R.Civ.P. 59(e) authorizes a "motion to alter or amend judgment." A district court "enjoys

10  considerable discretion in granting or denying" a motion to alter or amend judgment. *McDowell v.*

11  *Calderon*, 197 F.3d 1253, 1255, n. 1 (9th Cir. 1999) (quoting 11 Charles Alan Wright, et al., Federal

12  Practice and Procedure, § 2810.1 (2nd ed. 1995)). A F.R.Civ.P. 59(e) motion may be granted to:

13      1.    Correct "manifest errors of law or fact upon which the judgment is based";

14      2.    Permit presentation of newly discovered or previously unavailable evidence;

15      3.    Prevent "manifest injustice"; and

16      4.    Address an intervening change in controlling law.

17  *McDowell*, 197 F.3d at 1255, n. 1 (9th Cir. 1999) (quoting 11 Charles Alan Wright, et al., Federal

18  Practice and Procedure, § 2810.1 (2nd ed. 1995)).

19  "The judge's duty is essentially to see that there is no miscarriage of justice. If convinced that

20  there has been then it is [the judge's] duty to set the verdict aside . . . ." *Smith v. Lightning Bolt Prods.,*

21  *Inc.*, 861 F.2d 363, 370 (2d Cir.1988).

22  ### New Trial Standards

23  F.R.Civ.P. 59(a)(1)(A) authorizes granting a "new trial on all or some of the issues – and to any

24  party . . . after a jury trial, for any reason for which a new trial has heretofore been granted in an action

25  at law in federal court." Grounds for F.R.Civ.P. 59(a) relief include:

26      1.    The "verdict is against the weight of the evidence";

27      2.    "[D]amages are excessive";

28      3.    "[F]or other reasons, the trial was not fair to the party moving"; and

4.      There are "questions of law arising out of alleged substantial errors in admission or rejection of evidence or instructions to the jury."

*Montgomery Ward & Co. v. Duncan*, 311 U.S. 243, 251, 61 S.Ct. 189 (1940).

A district court need not uphold an award of damages which "is grossly excessive or monstrous, clearly not supported by the evidence, or based solely on speculation or guesswork." *Del Monte Dunes at Monterey v. City of Monterey*, 95 F.3d 1422, 1435 (9th Cir. 1996).

The Ninth Circuit Court of Appeals has commented: "[W]hen an appellate court ponders the probable effect of an error on a civil trial, it need only find that the jury's verdict is more probably than not untainted by the error." *Abromson v. American Pacific Corp.*, 114 F.3d 898, 903 (9th Cir. 1997), *cert. denied*, 522 U.S. 1110, 118 S.Ct. 1040 (1998) (quoting *Haddad v. Lockheed Calif. Corp.*, 720 F.2d 1454, 1459 (9th Cir. 1983)).

The grant of a new trial is "confided almost entirely to the exercise of discretion on the part of the trial court." *Allied Chem. Corp. v. Daiflon, Inc.*, 449 U.S. 33, 36, 101 S.Ct. 188, 191, 66 L.Ed.2d 193 (1980). "The trial court's decision, therefore, will not be reversed absent a showing of abuse of discretion." *Murphy v. City of Long Beach*, 914 F.2d 183, 186 (9th Cir. 1990); *see Hard v. Burlington N.R.R.*, 812 F.2d 482, 483 (9th Cir. 1987). An appellate court will uphold a district court's granting a new trial if any of the district court's grounds are "reasonable." *Silver Sage Partners v. City of Desert Hot Springs*, 251 F.3d 814, 819 (9th Cir. 2001).

On a new trial motion, a district court has the right and duty "to weigh the evidence as he saw it . . ." *Murphy*, 914 F.2d at 187 (quoting *Moist Cold Refrigerator Co. v. Lou Johnson Co.*, 249 F.2d 246, 256 (9th Cir. 1957), *cert. denied*, 356 U.S. 968, 78 S.Ct. 1008 (1958)). "The judge can weigh the evidence and assess the credibility of witnesses, and need not view the evidence from the perspective most favorable to the prevailing party." *Landes Const. Co., Inc. v. Royal Bank of Canada*, 833 F.2d 1365, 1371 (9th Cir. 1987). Even if substantial evidence supports the jury's verdict, a district court may grant a new trial if "the verdict is contrary to the clear weight of the evidence, or is based upon evidence which is false, or to prevent, in the sound discretion of the trial court, a miscarriage of justice." *United States v. 4.0 Acres of Land*, 175 F.3d 1133, 1139 (9th Cir.), *cert. denied*, 528 U.S. 1047, 120 S.Ct. 582 (1999). "If, having given full respect to the jury's findings, the judge on the entire evidence is left with

7

1   the definite and firm conviction that a mistake has been committed, it is to be expected that he will grant

2   a new trial." *Landes Const. Co., Inc. v. Royal Bank of Canada*, 833 F.2d 1365. 1371-1372 (9th Cir.

3   1987).

4       A district court may afford a successful plaintiff "the option of a new trial when it entered

5   judgment for the reduced damages." *Hetzel v. Prince William County, Va.*, 523 U.S. 208, 211, 118 S.Ct.

6   1210 (1998).

7       With these standards in mind, this Court focuses on defendants' challenges to the jury's award

8   of actual damages and profits.

9                                    **Actual Damages**

10      The jury appeared to accept the calculation of actual damages which Mr. McIntosh's counsel

11  James Braze ("Mr. Braze") endorsed.  Mr. Braze pointed to Mr. McIntosh's $1.1 million billings for his

12  work on the entire 480-acre subdivision and suggested to double that figure to $2.2 million based on the

13  doubled increase in Mr. McIntosh's rates from the time of his subdivision work in 1992-1993 to the time

14  of defendants' 2004 alleged infringement of the Map 5472 and the McIntosh improvement plans.  Mr.

15  Braze suggested to subtract the $800,000 payments Mr. McIntosh received for his work on the entire

16  subdivision to leave a $1.4 million balance for Mr. McIntosh's alleged actual damages.

17      Jury Instruction No. 42 informed the jury of the measure of damages under 17 U.S.C. § 504(b)

18  and provided:

19          The copyright owner is entitled to recover the actual damages suffered as a result
            of the infringement. Actual damages means the amount of money adequate to
20          compensate the copyright owner for **the reduction of the fair market value of the
            copyrighted work** caused by the infringement.

21
            The reduction of the fair market value of the copyrighted work is the **amount a
22          willing buyer would have been reasonably required to pay a willing seller at the
            time of the infringement** for the actual use made by the defendant of the plaintiff's
23          work. That amount also could be represented by the lost license fees the plaintiff would
            have received for the defendant's unauthorized use of the plaintiff's work. (Bold added.)
24

25      In *Polar Bear Productions, Inc. v. Timex Corp.*, 384 F.3d 700, 707 (9th Cir. 2004), the Ninth

26  Circuit Court of Appeals explained recoverable copyright damages:

27          Congress explicitly provides for two distinct monetary remedies – actual damages
            and recovery of wrongful profits.  These remedies are two sides of the damages coin –
28          the copyright holder's losses and the infringer's gains.  "Actual damages are usually

determined by the loss in the fair market value of the copyright, measured by the profits lost due to the infringement or by the value of the use of the copyrighted work to the infringer." *McRoberts Software, Inc. v. Media 100, Inc.*, 329 F.3d 557, 566 (7th Cir. 2003) . . .

. . .

Under § 504(b), actual damages must be suffered "as a result of the infringement," and recoverable profits must be "attributable to the infringement." From the statutory language, it is apparent that a causal link between the infringement and the monetary remedy sought is a predicate to recovery of both actual damages and profits. We take this opportunity to reaffirm the principle that a plaintiff in a § 504(b) action must establish this causal connection, and that this requirement is akin to tort principles of causation and damages.

For copyright actual damages, "the test of market value" is "what a willing buyer would have been reasonably required to pay to a willing seller for plaintiffs' work." *Frank Music Corp. v. Metro-Goldwyn-Mayer, Inc.*, 772 F.2d 505, 512 (9th Cir. 1985) (citation omitted).

Mr. McIntosh contends that Map 5472's value "was inherently tied up in the value of the efforts expended in creating it" to include supporting work of the McIntosh improvement plans, master studies, planning and engineering work, and the "entire work performed on the entire 480 acres." Mr. McIntosh argues that Map 5472's value included developer ability to get Wasco's final map approval. Mr. McIntosh concludes that "[d]rawing the map was easy but making it acceptable for approval by the City was costly and difficult" to allow a "fast-track through Wasco's planning department." Mr. McIntosh claims there is no "double recovery" in the $1.4 million actual damages award given the "offset by amounts previously paid for that work."

Defendants dispute that a willing buyer would pay Mr. McIntosh $1.4 million for Map 5472 and the McIntosh improvement plans. DeWalt notes the "complete lack of a causal relationship between the infringing activity (use of the copyrighted material) and the amount of damages awarded." DeWalt points to the absence of evidence of:

1.    The fair market value of the copyrighted Map 5472 and McIntosh improvement plans;

2.    Reduction in fair market value of Map 5472 and McIntosh improvement plans caused by infringement;

3.    Lost license fees from unauthorized use of Map 5472 and McIntosh improvement plans;

4.    Marketability of Map 5472 to developers or engineers whether by sale or license;

9

1    5.    Land parcels approproximate in size, location and entitlements to use Map 5472;

2    6.    History of selling or licensing Map 5472;

3    7.    Industry practice or customs, including amounts paid, for sale or licensing of tentative

4          maps or work similar to Map 5472; and

5    8.    A willing buyer other than NCUE president Joseph Wu ("Mr. Wu").

6    DeWalt argues that the "obvious measurement" of the value of Map 5472 and McIntosh

7    improvement plans is the $27,200 NCUE paid DeWalt.  NCUE and Lotus argue that $20,500 is the

8    maximum that Mr. McIntosh could be entitled to Map 5472 based on DeWalt's charges to perform a

9    topographical survey ($7,500), to prepare a tentative map ($5,000), and to provide addition survey

10   services ($7,500).

11   Defendants are correct that no evidence supports a $1.4 million actual damages award given that

12   such figure is based on the value of Mr. McIntosh's work for the entire 480-acre subdivision, not Tract

13   5472, which was solely at issue here.   Master studies, planning and engineering work, and other work

14   on the entire 480-acre subdivision held values independent from Map 5472 and the McIntosh

15   improvement plans and for which Mr. McIntosh billed and received payment.  Mr. Braze improperly

16   extrapolated Mr. McIntosh's unrelated work to that performed for Tract 5472.  Given the jury's findings

17   of infringement, Map 5472 and the McIntosh improvement plans held a value for defendants.  This

18   Court is tasked to determine that value based on the evidence.

19   As noted above, the best evidence is what a willing seller would have paid a willing buyer for

20   Map 5472 and the McIntosh improvement plans.  Such evidence is reflected in Mr. McIntosh's billings

21   to Legacy (Exhibit D 250; Reporter's Transcript ("RT") 318:21-319:10).  Mr. McIntosh billed Legacy

22   $161,500 for (tentative) Map 5472 and the work reflected in the McIntosh improvement plans.  Map

23   5472 and the McIntosh improvement plans held a value of $161,500 for their use to Legacy or a

24   subsequent developer, such as NCUE.  Such value did not increase with Mr. McIntosh's increased

25   billings as Mr. McIntosh's work was completed no later than 1994.  DeWalt's charges reflect that

26   necessary to update Map 5472 to result in Tentative and Final Maps 6541.  The value of Map 5472 and

27   the McIntosh improvement plans remained constant.  Map 5472 and the McIntosh improvement plans

28   held a $161,500 value to defendants to pursue development of Tract 6451.  As such, Mr. McIntosh's

1   actual damages from infringement is $161,500, and this Court next turns to the jury's findings on

2   defendants' NCUE and Lotus' profits.

3                    **$3,984,215 Profits Award Against NCUE And Lotus**

4          The jury appears to have agreed with Mr. Braze's assessment of NCUE and Lotus' profits for

5   "building homes" based on the opinion of forensic economist Jubin Merati ("Mr. Merati"), who testified

6   that "Mr. Wu will profit from this project, and the total profits is $3,984,215."[10]  The jury further appears

7   to have assessed half of that figure, $1,992,107.50, to NCUE and Lotus each.  Mr. Merati testified that

8   he reviewed Mr. Wu's "general ledger" and "[i]f I saw something that was erroneous, I corrected it. So

9   I disagreed with that number.  If I saw an assumption that was wrong or anything like that, that I couldn't

10  find supporting documents for it, if the methodology was wrong, I disagreed with those and corrected

11  those estimates."  Mr. Merati calculated that NCUE/Lotus' net profit for 30 built homes on Tract 6451

12  is $1,358,498.83 and that NCUE/Lotus' net profit for 38 remaining homes on Tract 6451 will be

13  $2,625,715.99 to roughly total $3,984,214.  Mr. Merati arrived at his figures by using 19 actual sales to

14  date "as my model" and "calculated the average sales price for each model."

15         Jury Instruction No. 43 informed the jury on an award and calculation of profits:

16                 . . . the copyright owner is entitled to any profits of the defendant attributable to
                   the infringement. You may not include in an award of profits any amount that you took
17                 into account in determining actual damages.

18                 You may make an award of the defendant's profits only if you find that the
                   plaintiff showed a causal relationship between the infringement and the profits generated
19                 indirectly from the infringement.

20                 The defendant's profit is determined by subtracting all expenses from the
                   defendant's gross revenue.
21

22                 The defendant's gross revenue is all of the defendant's receipts from the use or
                   sale of a copyrighted work associated with the infringement. The plaintiff has the burden
23                 of proving the defendant's gross revenue by a preponderance of the evidence.

24                 Expenses are all operating costs, overhead costs, and production costs incurred
                   in producing the defendant's gross revenue. The defendant has the burden of proving the
25                 defendant's expenses by a preponderance of the evidence.

26                 Unless you find that a portion of the profit from the use or sale of a copyrighted

27  ─────────────────────

28          [10]       Mr. McIntosh notes that Mr. Merati was called "as a rebuttal expert to Mr. Wu's own calculations" and
        "anticipated future profits from sales."

1      work is attributable to factors other than use of the copyrighted work, all of the profit is
       to be attributed to the infringement. The defendant has the burden of proving the portion
2      of the profit, if any, attributable to factors other than infringing the copyrighted work.

3          "The copyright owner is entitled to recover . . . any profits of the infringer that are attributable

4   to the infringement . . ." 17 U.S.C. § 504(b).  "Direct profits" are "generated by selling an infringing

5   product." *Polar Bear Productions*, 384 F.3d at 710.  17 U.S.C. § 504(b) is "expansive enough to afford

6   parties an indirect profits remedy under certain conditions." *Mackie v. Rieser*, 296 F.3d 909, 914 (9th Cir.

7   2002).  "Indirect profits" constitute "revenue that has a more attenuated nexus to the infringement."

8   *Mackie*, 296 F.3d at 914.

9          A "copyright holder must establish the existence of a causal link before indirect profits damages

10  can be recovered." *Mackie*, 296 F.3d at 914.  17 U.S.C. § 504(b) "creates a two-step framework for

11  recovery of indirect profits: 1) the copyright claimant must first show a causal nexus between the

12  infringement and the gross revenue; and 2) once the causal nexus is shown, the infringer bears the

13  burden of apportioning the profits that were not the result of infringement." *Polar Bear Productions*,

14  384 F.3d at 711.  A "copyright owner is required to do more initially than toss up an undifferentiated

15  gross revenue number; the revenue stream must bear a legally significant relationship to the

16  infringement." *Polar Bear Productions*, 384 F.3d at 711.  "Such an approach dovetails with common

17  sense – there must first be a demonstration that the infringing acts had an effect on profits before the

18  parties can wrangle about apportionment.  To do otherwise would be inconsistent with both rudimentary

19  principles of tort law, to which copyright is often analogized." *Mackie*, 296 F.3d at 915.  "When an

20  infringer's profits are only remotely and speculatively attributable to infringement, courts will deny

21  recovery to the copyright owner." *Polar Bear Productions*, 384 F.3d at 711 (quoting 4 Nimmer on

22  Copyright, § 14.03, 14-34).

23         NCUE and Lotus take issue with Mr. Merati's calculations in that "he failed to deduct all paid

24  expenses" and accuse the jury of ignoring or not understanding Jury Instruction No. 43 with its failure

25  "to deduct all expenses."  NCUE and Lotus challenge Mr. McIntosh's evidence of "direct profit received

26  by Defendants resulting from DeWalt's infringement."  NCUE and Lotus argue that Mr. McIntosh

27  provided no evidence of a causal relationship between infringement and NCUE and Lotus' profits.

28  NCUE and Lotus point to the absence of evidence that DeWalt's creation of Tentative and Final Maps

6541 contributed to NCUE and Lotus' profits.  NCUE and Lotus question Mr. Merati's qualifications to opine on "future sales and future construction costs [which] were unrelated to his qualifications as a forensic economist."  NCUE also claims an absence of evidence that it received "any revenue, any receipts, or any profit."

Mr. McIntosh reponds that Mr. Merati's "opinion was based on his review of past sales and future economic outlook which his in his bailiwick."  Mr. McIntosh claims an absence of indication "why Merati's testimony was unreliable, speculative, or unsupported."  Mr. McIntosh, without supporting authority, urges this Court to "find that the award of profits is akin to goodwill" in that the "existing homes had intrinsic value to the infringer" and "[s]imilar to goodwill, this can be considered profit.

The key problem for Mr. McIntosh is the absence of a causal connection to NCUE and Lotus' infringement and their purported $3,984,214 infringing profits.  Putting aside Mr. Merati's calculations, the focus is on causal link to indirect profits arising from use of Map 5472 and the McIntosh improvement plans.  NCUE and Lotus' revenues were generated from selling homes in Tract 6451.  Inclusive in the sales where the physical homes themselves and byproducts, such as driveways, streets, sidewalks, gutters, utilities, and landscaping.  Map 5472 and the McIntosh improvement plans contributed to an overall layout which ultimately resulted in Wasco's approval of Tract 6451.  NCUE and Lotus' revenue stream is tied, at best, in minimal part to the overall layout.  However, there is no evidence that the limited 19 home sales is tied to the layout of Tract 6451, the genesis of which is arguably Map 5472 and the McIntosh improvement plans.

Mr. McIntosh provided services which Legacy used up to the point of its financial difficulties.  NCUE and Lotus benefitted from Mr. McIntosh's services but not to the tune of $3,984,214.  There is no evidence that NCUE and Lotus' revenue stream bore a legally significant relationship to infringement of Map 5472 and the McIntosh improvement plans which held a total value of $161,500 and no more.  Mr. Merati's opinions constitute no more than an "undifferentiated gross revenue number" and reveal no more than that $3,984,214 of purported profits is remotely and speculatively attributable to NCUE and Lotus' infringement.  No evidence supports an award of profits against NCUE and Lotus, and Mr. McIntosh presents no meaningful arguments to support the profits award against NCUE and Lotus.

### Mr. Braze's Misconduct

Defendants attribute to Mr. Braze prejudicial misconduct arising from portions of his opening statement and closing argument.

Defendants point to Mr. Braze's opening statement comment that "they copied what was on the ground. They -- what was put on the ground came from our tract map and improvement plans. So by copying it, they were basically committing the act of infringement in order to make the new tentative tract map."

Defendants further complain of Mr. Braze's closing arguments that DeWalt infringed by "copying what was on the ground."  The following transpired during Mr. Braze's rebuttal closing argument:

> Let's talk about independent creation.[11] So if we prove that the work is substantially similar, DeWalt's defense would say, "No, I independently created it," and that's their defense.  And our position to that is, no, you didn't independently create it. You went out and created it by copying what was on the ground. And, therefore, your creation was dependent, it was not independent.

> MR. ALEXANDER: Objection, your Honor. That is misstating the law too.

> THE COURT: Hang on just one moment. Let me just look. The wording of what his oral argument is not a misstatement of law. It doesn't go to the level of what we were talking about from a legal standpoint. It's still within the parameter of argument, what he has just stated. But let's not spend too much time on it so we don't cross the line.

> MR. BRAZE: Okay, your Honor. Based on that, there was no independent creation, therefore, there was no defense to the fact that the drawings were substantially similar or had substantial similarities.

> MR. HASSING: Your Honor, I object. Move to strike. That does go past the line --

> THE COURT: Just a minute.

---

[11]    Independent creation attempts to disprove a copyright plaintiff's claim of copying.  The issue of independent creation arises in that copyright infringement plaintiffs generally rely on indirect evidence of copying:

> Because, however, the act of copying is rarely witnessed, copying is ordinarily established indirectly. The plaintiff demonstrates that the defendant had access to the copyrighted items, and that the defendant's product is substantially similar to plaintiffs' work. Once this is done, the burden shifts to the defendant to prove his work was not copied, but independently created.

*Kamar Intern., Inc. v. Russ Berrie and Co.*, 657 F.2d 1059, 1062 (9th Cir. 1981).

1    MR. HASSING: -- when you tie it all together.

2        THE COURT: Ladies and gentlemen, some of this is so close, it is very difficult,
     depending on what inferences one can draw, such as you, the triers of the fact, that the
3    legal issues are very, very difficult. And so I urge you that -- we will send in, even
     without your asking, we will send in a copy of the instructions with the verdict form. So
4    remember, the law is as it is in the jury instructions. Nobody can change that part.

5        So let's go ahead and finish.

6    NCUE and Lotus fault Mr. Braze for suggesting an unrecognized concept of "dependent

7    creation" to mislead and confuse the jury. NCUE and Lotus argue that "[t]elling the jury that 'copying'

8    what was on the ground negated independent creation because it amounted to 'dependent creation' was

9    an extremely prejudicial misstatement of law" given that independent creation was defendants' "chief

10   defense." NCUE and Lotus surmise that Mr. Braze's misstatement likely resulted "in the jury's finding

11   of copying" as to defendants.

12   Defendants question the effectiveness of this Court's admonitions to Mr. Braze. NCUE and

13   Lotus note that Mr. Braze made his comments during rebuttal argument "immediately before

14   deliberations, with defense counsel having no opportunity to respond." NCUE and Lotus characterize

15   the Court's admonitions as lacking "force necessary to let the jury know that counsel had actually

16   misstated the law as to a crucial element of Defendants' defense." NCUE and Lotus suggest that the

17   absence of a strong admonition "points to a strong likelihood of serious prejudice."

18   In conjunction with Mr. Braze's comments, defendants point to disallowed Jury Instruction No.

19   33,[12] which was provided in the packet of written instructions given to the jury although this Court had

20   rejected it and did not read it. Defendants contend that the combination of Mr. Braze's comments and

21   disallowed Jury Instruction No. 33 compounded potential jury confusion and, in NCUE and Lotus'

22   words, "gave life to Mr. Braze's intentional misstatement of law." NCUE and Lotus conclude that the

23   effect of the instruction's inclusion in the packet given to the jury left the jury "free to conclude that the

24   Court had blessed Mr. Braze's misstatement of independent creation." NCUE and Lotus conclude that

25   Mr. Braze's "misstatement of law" with inclusion of Jury Instruction No. 33 suggested to the jury that

26   "under the law, DeWalt's surveying (copying) what was on the ground did not qualify as independent

27

28       [12]    Disallowed Jury Instruction No. 33 provided: "A work is copied if a defendant copied from a third work
     rather than from the plaintiff's work if such third work was itself a copy of the plaintiff's work."

15

1   creation and amounted to infringement."

2         Mr. McIntosh responds that the "direct evidence of infringement" overwhelmed the independent

3   creation defense to render it "inapplicable." Mr. McIntosh argues that "any misstatement in rebuttal was

4   not sufficient to alter or amend or declare a new trial" given this Court's instruction that "attorney

5   argument is not evidence" and defendants "equally presented argument contradicting statements" by Mr.

6   Braze. Mr. McIntosh points to the absence of evidence that Mr. Braze's "alleged misstatement was so

7   pervasive throughout trial to rise to the level of prejudicial misconduct by counsel." Mr. McIntosh

8   characterizes as "not believable" the notion that "the jury was swayed by one statement by counsel

9   during rebuttal."

10        A "party is entitled to a new trial when opposing counsel's conduct causes prejudice to that party

11  . . . thereby unfairly influencing its verdict." *Tesser v. Board of Educ. Of City School Dist. of the City*

12  *of New York*, 370 F.3d 314, 321 (2nd Cir. 204) (citing *Greenway v. Buffalo Hilton Hotel*, 143 F.3d 47 (2nd

13  Cir. 1998) ('[f]ederal courts have recognized unfair prejudice and ordered new trials")); *see California*

14  *Sansome Co. v. U.S. Gypsum*, 55 F.3d 1402, 1405 (9th Cir. 1995) (district court "did not abuse its

15  discretion in granting a new trial based on attorney misconduct"); *Alejo Jimenez v. Heyliger*, 792 F.Supp.

16  910, 919-920 (D.P.R. 1992) (improper injection of irrelevant allegations about opposing party); *Pappas*

17  *v. Middle Earth Condominium Ass'n*, 963 F.2d 534, 540-541 (2nd Cir. 1992) ("when the conduct of

18  counsel in argument causes prejudice to the opposing party and unfairly influences a jury's verdict, a new

19  trial should be granted.")

20        To evaluate prejudice from attorney misconduct, courts consider "the totality of circumstances,

21  including the nature of the comments, their frequency, their possible relevancy to the real issues before

22  the jury, the manner in which the parties and the court treated the comments, the strength of the case,

23  and verdict itself." *Hemmings v. Tidyman's Inc.*, 285 F.3d 1174, 1193 (9th Cir. 2002) (quoting *Puerto*

24  *Rico Aqueduct & Sewer Auth. v. Construction Lluch, Inc.*, 169 F.3d 68, 82 (1st Cir. 1999)). Often "a

25  combination of improper remarks" will demonstrate prejudicial impact. *Fineman v. Armstrong World*

26  *Indus., Inc.*, 980 F.2d 171, 207 (3rd Cir. 1992). "Repeated improprieties by one counsel severely

27  prejudice his adversary." *Koufakis v. Carvel*, 425 F.2d 892, 901 (2nd Cir. 1970).

28        At times, attorney misconduct may be too prejudicial to be cured with instructions. The

1   "cautionary instructions given to the jury proved to be insufficient to immunize the jury from the

2   improper and inflammatory remarks of plaintiffs' counsel." *Fineman*, 980 F.2d at 206.   Where

3   misconduct permeates the proceedings, the jury is "necessarily prejudiced." *Anheuser-Busch, Inc. v.*

4   *Natural Beverage Distributors*, 69 F.3d 337, 346 (9th Cir. 1995).   Constant objections are unnecessary

5   in that they "could antagonize the jury." *Anheuser-Busch*, 69 F.3d at 346.

6          Great deference is given to the trial judge to gauge prejudicial effect of attorney misconduct.

7   "We recognize that the trial judge has considerable discretion in determining whether conduct by counsel

8   is so prejudicial as to require a new trial." *Draper v. Airco, Inc.*, 580 F.2d 91, 94 (3rd Cir. 1978).

9   "Because the trial judge was present and able to judge the impact of counsel's remarks, we defer to his

10  assessment of the prejudicial impact." *Fineman*, 980 F.2d at 207.   "We recognize the trial court's

11  superior vantage point when evaluating the possible impact of the alleged prejudicial conduct.   A printed

12  record is unable to replicate in full all the circumstances – for example, tones of voices, demeanor of

13  witnesses and jurors and the like – that occur in the course of an unfolding trial." *Pappas*, 963 F.2d at

14  540.

15         Defendants extrapolate much from Mr. Braze and this Court's limited comments.   Defendants

16  fail to substantiate Mr. Braze's misstatements of law to warrant a new trial.   The jury found that DeWalt

17  copied Map 5472 and that, in effect, did not independently create Tentative and Final Maps 6541.   There

18  was sufficient evidence for the jury to make such findings, despite DeWalt's survey results, including

19  surveying "what was on the ground."   The jury clearly concluded that DeWalt had access to Map 5472

20  and that it was substantially similar to Tentative and Final Maps 6541.   Defendants failed in their burden

21  to convince the jury that DeWalt independently created Tentative and Final Maps, despite Mr. Braze's

22  comments.

23         Defendants' criticisms of inadequate admonitions to Mr. Braze are unsubstantiated.   As this

24  Court explained at the time, "this is so close, it is very difficult, depending on what inferences one can

25  draw."   In effect, defendants quibble with the inferences which the jury drew.   In the absence of anything

26  to admonish, no ill effect resulted from this Court's treatment of Mr. Braze's comments.

27         As to rejected Jury Instruction No. 33, defendants offer conjecture as to its effect.   The instruction

28  was not read to the jury.   Defendants point to no evidence or argument to put the instruction into context

17

1  for the jury to arrive at an unsupported liability finding.  At most, the instruction is irrelevant in the

2  absence of evidence or argument of copying from a third work.

3      Neither Mr. Braze comments nor rejected Jury Instruction No. 33 gives rise for a new trial.

4  **Other Grounds**

5      Defendants claim other grounds, chiefly addressing liability issues, to support altering or

6  amending the judgment or new trial.

7      DeWalt raises points that:

8      1.    DeWalt "independently performed all of its services" to create Tentative and Final Maps

9            6451;

10     2.    This Court wrongfully refused DeWalt proposed jury instructions which this Court found

11           duplicative of other instructions or argumentative; and

12     3.    The jury's finding that DeWalt copied Map 5472 is inconsistent with its findings that

13           DeWalt did not copy the McIntosh improvement plans and did not profit from infringing

14           activity.

15     DeWalt fails to justify altering or amending the judgment or granting a new trial on these points.

16 Several of these points were raised in passing reference to reflect that they were "thrown in."  DeWalt

17 fails to demonstrate ill effects from jury instruction refusal to which it takes exception.  DeWalt's papers

18 chiefly reflect only that they disagree with prior rulings.  Moreover, DeWalt's points are rendered moot

19 given this Court's above discussion on other issues.

20     NCUE and Lotus argue that Mr. McIntosh failed to assert a vicarious infringement claim against

21 them.  NCUE and Lotus point to Mr. Braze's comments to the jury that "[i]n all fairness" Mr. Wu copied

22 nothing.[13]  NCUE and Lotus extrapolate from Mr. Braze's comments "judicial admissions" that they are

23 not liable for copyright infringement.

24     Mr. McIntosh responds that his TAC properly alleged that NCUE and Lotus are "contributorily

25 liable" with its claim that defendants "induced infringement through their copying, distribution, and

26

27     [13]    In his closing argument, Mr. Braze stated: "Did Northern California Universal Enterprises Company – and I will call that Wu – copy Roger McIntosh's tentative map?  In all fairness, I don't believe so.  I don't think he copied

28 anything.  So I think that answer is probably "no."  Same with improvement plans, same thing on behalf of Lotus."

1  continued recording of the Plans."  Mr. McIntosh points to NCUE and Lotus' joint submission and

2  acquiescence in vicarious infringement jury instructions and verdict questions to waive post-trial

3  objections to vicarious infringement findings.  Mr. McIntosh points to NCUE's ability to supervise and

4  control infringement with NUCE hiring DeWalt to prepare tentative and final maps.  Mr. McIntosh

5  contends that Mr. Braze's ambiguous statements do not qualify as an admission.

6      NCUE and Lotus ignore the verdict findings that NCUE and Lotus copied Map 5472 and profited

7  directly from copying of either Map 5472 or the McIntosh improvement plans by DeWalt or Wasco.

8  NCUE and Lotus further ignore the vicarious copyright infringement verdict findings that NCUE and

9  Lotus had and failed to exercise the "right and ability to supervise or control the other defendants'

10  copying of plaintiff Roger McIntosh's work."

11      The Second Circuit Court of Appeals has explained that "even in the absence of an employer-

12  employee relationship one may be vicariously liable if he has the right and ability to supervise the

13  infringing activity and also has a direct financial interest in such activities."  *Gershwin Publishing Corp.*

14  *v. Columbia Artists Management, Inc.*, 443 F.2d 1159, 1162 (2nd Cir. 1971).  Despite NCUE and Lotus'

15  claims, there was sufficient evidence for the jury to conclude that NCUE and/or Lotus supervised or

16  controlled DeWalt.  Nonetheless, most of NCUE and Lotus' points regarding vicarious liability are

17  rendered meaningless in the absence of a causal link between infringement and profits, as discussed

18  above.

19                              **CONCLUSION AND ORDER**

20      Defendants offer no meaningful challenge to the jury's findings of defendants' infringing activity.

21  However, there is an absence of sufficient evidence to support awards of $1.4 million actual damages

22  and $1,992,107.50 profits against NCUE and Lotus each.  This Court finds that the evidence supports

23  an award of only $161,500 actual damages and $0 infringing profits.  As such, and for the reasons

24  discussed above, this Court GRANTS a new trial on the issues of actual damages and infringing profits

25  unless Mr. McIntosh, no later than July 15, 2010, files and serves his statement that he accepts an

26  amended judgment of $161,500 actual damages and $0 profits.  Based on this Court's finding of the

27  good faith of Mr. McIntosh and Wasco's settlement and its allocation between actual damages and

28  infringing profits, $150,000 of the settlement has been allocated to actual damages to leave remaining

1    actual damages of $11,500.   If Mr. McIntosh does not accept the amended judgment, this Court

2    ORDERS Mr. McIntosh, no later than July 15, 2010, to file and serve a statement that he does not accept

3    the amended judgment, and this Court will set a new trial on the limited issues of actual damages and

4    infringing profits.

5          IT IS SO ORDERED.

6    **Dated:      July 7, 2010**                        _____/s/ Lawrence J. O'Neill_____
                                                 UNITED STATES DISTRICT JUDGE